IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Robert Smith Jr., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 21-cv-1159 |
| | ) | |
| The City of Chicago, | ) | |
| Former CPD Superintendent Phillip Cline, | ) | |
| Detective Daniel McWeeny, | ) | |
| Detective Steven Brownfield, | ) | |
| Detective William Pedersen, | ) | JURY TRIAL DEMANDED |
| Detective John Solecki, | ) | |
| Detective Michael Rowan, | ) | |
| The Estate of John A. Yucaitis, | ) | |
| The Estate of William Higgins, | ) | |
| The Estate of Robert Rice, | ) | |
| Cook County Assistant State's Attorney | ) | |
| Raymond Brogan, | ) | |
| Unidentified Employees of the City of | ) | |
| Chicago, | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff Robert Smith ("Robert" or "Smith") complains against Defendants

(1) the City of Chicago (the "City"), (2) Former Chicago Police Department ("CPD")

Superintendent Phillip Cline (Star No. 265), (3) Former CPD Detectives Daniel

McWeeny (Star No. 14367), (4) Steven Brownfield (Star No. 15752), (5) William

Pedersen (Star No. 8553), (6) John Solecki (Star No. 5174), (7) Michael Rowan (Star

No. 3717), (8) deceased Detective John A. Yucaitis (Star No. 7498), named as a

defendant through his Estate (9) deceased Detective William Higgins (Star No. 16143),

named as a defendant through his Estate, and (10) deceased Detective Robert Rice (Star

No. 4004), named as a defendant through his Estate (collectively, the "Detective

Defendants"), (11) Cook County Assistant State's Attorney ("ASA") Raymond Brogan, and (12) Unidentified Employees of the City, as follows:

**INTRODUCTION**

1. Defendants framed Robert Smith for a brutal double murder he did not commit. Smith spent 33 years, one month, and seven days in Illinois prisons and jails.

2. The Detective Defendants – all protegees of disgraced Area 2 Violent Crimes Lieutenant Jon Burge – framed Robert for the murders by beating, threatening, and abusing him, over a 19-hour-long interrogation at Area 2 Violent Crimes, causing him to falsely confess to a story that the Detectives made up about the murders.

3. The Detective Defendants also framed Robert by fabricating and planting evidence that the State used at Robert's August 1990 trial to convict him, and by concealing and withholding material exculpatory evidence from Robert, his attorneys, the jury, as well as from the criminal trial and appellate courts.

4. The Defendants' malicious and unconstitutional misconduct resulting in Robert's wrongful conviction was not an isolated incident. Rather, it was part of a widespread pattern and practice, which the City and the County ratified, condoned, and facilitated, and under which police torture of suspects was an ordinary occurrence at Area 2, as were other forms of police corruption, including the fabrication of incriminating evidence, the withholding of exculpatory evidence, and perjured testimony to support the fabrication and concealment of evidence.

5. On October 23, 2020, after Robert served more than 33 years in prison, Cook County Special Prosecutors, who have been assigned especially to cover Burge-

era torture cases, moved to: (a) vacate Smith's murder convictions, (b) dismiss his indictment in its entirety and with prejudice, and (c) have the Court order Robert's immediate release.

6.     The Special Prosecutors informed Circuit Court of Cook County Judge Adriene Davis that after its careful review and investigation of "all materials related to the convictions of Robert Smith," they had significant questions about the integrity of the police investigation and had "formed an opinion that there are critical issues with the evidence [used to convict Smith]."  More specifically, the State told Judge Davis that its investigation revealed that key information relating to the police's supposed recovery of key pieces of evidence used to convict Smith was missing from police reports and that previous testimony at Robert's suppression hearing and criminal trial not only could not be validated by the police reports, but also "made no sense."  Judge Davis granted the State's motion and entered an Order for Smith's immediate release, a copy of which is attached to this Complaint as Exhibit 1.

7.     Robert immediately filed a Petition for a Certificate Innocence pursuant to the Illinois Innocence Act, 735 ILCS 5/2-702, which Chief Cook County Criminal Court Judge, LeRoy K. Martin Jr., granted on November 6, 2020, a copy of which is attached to this Complaint as Exhibit 2.

8.     Although Robert, who is now 72 years-old, has finally regained his freedom and has finally received judicial recognition of his innocence, the injuries he suffered as a result of Defendants' malicious misconduct, including his more than three-decades-long depravation of liberty and isolation from family and society, are profound and

immeasurable. Robert therefore brings this lawsuit, seeking compensation for those injuries and to hold Defendants accountable for their malicious and unconstitutional misconduct. Robert asserts his claims pursuant to 42 U.S.C. § 1983, the United States Constitution, the Illinois Constitution, and Illinois common law, and seeks $33,101,369.86 in compensatory damages and $33,101,369.86 in punitive damages.

## JURISDICTION AND VENUE

9. This Court has federal subject matter jurisdiction over Smith's federal claims pursuant to 28 U.S.C. § 1331.

10. This Court has federal subject matter jurisdiction over Smith's state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because all the events giving rise to Smith's claims occurred within this judicial district.

12. Venue is also proper in this district under 28 U.S.C. § 1391(c)(3) because the Court has personal jurisdiction over all the defendants.

## THE PARTIES

13. Plaintiff Robert Smith is 72 years-old and resides in Chicago, Illinois. On September 19,1987, the day of his arrest, Robert was 39 years-old and resided, together with his wife, Diane Yeager-Smith, in Chicago, Illinois. On the night of his arrest, Robert's wife, Diane, was pregnant with the couples' first child (and, as it turned out because of the unconstitutional conduct outlined here, only child).

14. The Defendant City is a municipal corporation under the laws of the State of Illinois. The City, at all relevant times, employed Lieutenant Cline, each of the Detective Defendants, and each of the Unidentified Employees of the City.

15. At all relevant times, former Chicago Police Department ("CPD") Phillip Cline was an employee of the Chicago Police Department holding the rank of Lieutenant, acting under color of law and within the scope of his employment during the investigation of the murders at issue. Robert sues Defendant Cline in his individual capacity.

16. At all relevant times, each of the Detective Defendants (individually named and defined above on Page 1) were CPD employees, acting under color of law and within the scope of their employment during the investigation of the murders at issue. Robert sues each of the Detective Defendants in their individual capacities.

17. The "Unidentified Employees of the City" is a placeholder for any additional defendants employed by the City who had a role in the unconstitutional and malicious conduct that led to Robert's wrongful conviction but who are not currently known to Robert or his counsel.

18. At all relevant times, Defendant Brogan was an employee of the Cook County State's Attorneys' Office ("CCSAO"), who had non-prosecutorial, investigatory responsibilities during the investigation of the murders at issue and who acted under color of law and within the scope of his employment. Robert sues Defendant Brogan in his individual capacity. (The Detective Defendants, Defendant Cline, and Defendant Brogan will be referred to collectively as the "Individual Defendants.")

## THE FACTS

### A. Police Improperly Arrest Robert Smith Without Probable Cause and Without Charging Him with Any Crime.

19.     At approximately 3:20 a.m. on September 19, 1987, the Chicago Police and Fire Departments were summoned to a burning one-story bungalow at 325 West 107th Street, on the south side of Chicago.

20.     At approximately 5:20 a.m., the victims' daughter and granddaughter, Diane Yeager Smith ("Diane"), and her husband, Robert Smith, arrived at the house.

21.     After Diane and Robert entered the house and stepped into the dining room, they were stopped by a plain-clothed officer who asked them who they were, and after they identified themselves as the daughter and son-in-law of the people who lived at the house, the officer told them "there had been a tragedy" and asked them to wait outside of the house.  Both Robert and Diane then left the house, as instructed, through the front door.  Outside, they tried to learn what happened to Diane's mother and grandmother.

22.     Approximately one-half hour later, Robert reentered the house through the rear door leading into the first-floor kitchen.  Robert approached a group of officers, demanding to know what happened to his in-laws.  Detective Daniel McWeeny did not take well to Robert's reentry into the house and demand for information.  McWeeny immediately grabbed Robert, and when Robert struggled to get loose from McWeeny, McWeeny, with the help of another officer, threw Robert to the floor and pinned him down.

23.     Diane witnessed Robert being pinned on the floor by the officers, including witnessing McWeeny with his knee on Robert's neck.

24.     Officer McWeeny then handcuffed Robert, whisked him out of the home, and arranged with other officers for Robert to be transported in a CPD vehicle to Area 2 Violent Crimes.

25.     McWeeny had no probable cause to detain, handcuff, or arrest Smith, nor did he charge Smith with any crime at that time, nor did he or any other officer during the next 19-plus hours. McWeeny never prepared an arrest report that stated any reason for McWeeny detaining, handcuffing, or arresting Smith at his in-laws' home. No other person involved in Smith's arrest prepared an arrest report that stated any reason Robert had been arrested.

26.     The sole reason McWeeny arrested Robert was because he was a black man who had the audacity to reenter the house after being told to wait outside and to demand that the police tell him what had happened to his in-laws.

**B. The Detective Defendants Beat, Threatened, and Abused Robert Until He Falsely Confessed to The Murders.**

27.     At Area 2, Robert was placed in a small windowless interrogation room and handcuffed to a ring on the wall. When one of the two officers directed Robert to sit down and Robert refused, that officer kicked Robert in the chest. That officer was approximately 6 ft. tall, 180-190 lbs., with blonde hair and glasses.

28.     Robert then asked the officer who had kicked him to take off the handcuffs, and the officer kicked Robert again.

29.     A short while after Robert was twice kicked, Detective McWeeny, the one who had arrested Robert at the house, and another Detective, believed to be Defendant Detective Steven Brownfield, burst into the interrogation room and directed the officer guarding Smith to leave the room. One of the detectives closed the door.

30.     The detective believed to be Brownfield immediately pounced on Robert and began beating him in the chest and calling him a "cold-blooded killer," a "MF," and "all kind of other names." Robert went into a rage, cursing back at the Detective.

31.     At that point, the detective who was beating Robert in the chest took Robert's wallet and handkerchief (which the detective had been holding) and stuffed them into Robert's mouth. Robert "couldn't breathe," started "choking," and his "eyes [were] bugging out" until the point that Robert almost lost consciousness.

32.     Eventually, Detective McWeeny, who had taken a seat in the room and watched the beating and choking, told the Detective choking and beating Robert to stop.

33.     After the Detective with the wallet and handkerchief stopped choking and beating Robert, Detective McWeeny began his "good cop routine," attempting to calm things over by bringing Robert a cup of coffee and giving him cigarettes.

34.      McWeeny then told Robert "we know you did this," "you almost committed the perfect crime," but you "didn't pour gasoline on the body to make it explode." McWeeny also told Robert that the police knew that the victims' throats had been cut and asked Robert to tell him how he had committed the murders.

8

35. Robert denied any involvement in the murders, told McWeeny that he needed medical attention, and begged McWeeny to let him see a doctor and his wife. McWeeny ignored Robert's pleas and eventually left the room.

36. A short while later, two or three other Detectives entered the room. One, a white detective, approximately 5'10, 220 lbs., with a full head of dark hair, asked Robert if he wanted to talk about committing the murders. Robert, who had already told the police repeatedly he was not involved in the murders, went into another "rage," cursing at the dark-haired Detective.

37. Doing so at Area 2 Violent Crimes did not go well for Robert. The dark-haired Detective slapped Robert on the side of his head with an open hand and told him he was the only one who could have committed the murders because "all the doors to the house were locked," which was false.

38. The same Detective also told Robert that he (Robert) had "cleaned up down in the basement" and "washed his clothes," and also that Robert had "left a thumbprint" at the crime scene, which was also false. (It would later be established that no physical evidence at all, including fingerprint evidence, ever tied Robert to the murders in any way).

39. When Robert requested to see a doctor (having recently been released from the hospital after suffering an unrelated skull fracture), the Detective who had slapped Robert in the face replied, "you'll get one when we get through with you" and left the room. Sometime later, the same detective who had slapped Robert in the face returned to the interrogation room and again questioned Robert about the murders.

When Robert kept denying involvement and refused to give that Detective the answers he wanted, the Detective repeatedly slapped him.

40.     This same Detective also questioned Robert about his whereabouts in the early morning hours of the murders.  Robert told the Detective that he had participated in a pool (billiards) tournament at a tavern located below the apartment of a friend named Sally Payne Atkins. Robert further told the Detective that throughout the night he had gone back and forth from the tavern to Ms. Atkins' apartment, and that on two or three occasions during the night he left Atkins' place to look for another friend of his, a man named Mike Santee, in order to score drugs.

41.     The Detective told Robert he would check out his story and left the room. CPD Detectives in fact interviewed Atkins and Santee twice that day, September 19, and both Atkins and Santee twice corroborated what Robert had told the Detectives. Both confirmed that Robert had in fact been with them in the early morning hours of September 19.  Police ignored this information and failed to further investigate it.

42.     Sometime after the Detective who had been slapping Robert had left the interrogation room, two more Detectives entered the room; one white, who Robert later testified was William Higgins and the other black, who Robert could not name. The black Detective began to verbally abuse Robert, telling him he was a "low down and nothing nigger," who had a "fine wife," but all she had was a "piece of shit and garbage."

43.     Detective Higgins told Robert what he had done and asked who he had done it with, asserting, "you couldn't have done this yourself."  Robert kept denying

10

involvement, explaining again where and with whom he had been on the night of the murders. Both Detectives eventually left the room.

44. Thereafter, two other detectives entered the room, one telling Robert "he didn't like niggers" and threatening "to splatter [Robert's] black butt all against this here doggone wall."

45. Sometime later, two other detectives came into the room. One told Robert that he was a "man of God" and that he had heard that Robert believed in God and would go to church. On information and belief, this was Detective William Pedersen. The other, who Robert later described as fat and wearing "a pretty polka-dotted tie," told Robert that he was on his way to a party and that he "didn't have time to be messing with no nigger all night long." The fat detective then repeatedly threatened Robert, telling him that if Robert did not cooperate "he would be all up against the wall." Robert continued to deny involvement and kept begging to see a doctor, telling the detectives again that he was under a doctor's care and had serious injuries, including a skull fracture, which he suffered during an assault two months earlier. Before these detectives could continue questioning (and beating) Robert, another detective interrupted them and summoned them to the hallway.

46. Detective Pedersen repeatedly played the role of "good cop," offering Robert cigarettes and telling Robert about his belief in God. Pedersen asked Robert, "why don't you make it easy for yourself?, . . . why don't you make a statement?" Robert repeatedly denied any involvement, telling Pedersen, "man, I believe in God, . . . I didn't do this here. Do you believe me?"

11

47.     At some point during Robert's conversation with Detective Pedersen, Detective Rice retuned to the room accompanied by Lieutenant Cline, who Rice introduced to Robert as "the big boss."  Cline told Robert he heard "they been giving you a rough time." Robert immediately began to beg and plead with Cline to let him see a doctor, telling him how bad he was hurting. Cline saw that Robert was hurt and that he was "trembling and shaking." Still, Cline refused to provide Robert with any medical attention, telling him "give these guys a statement and I'll get you to the hospital and see about getting you a doctor." At that point, Robert told Cline, "Okay. I'll give a statement."

48.     Robert agreed to give the statement because he believed that he could escape the Detectives' further beatings and that once he was transferred to the hospital, he would be able to show he was beaten into a confession.

49.     Robert was tired and hurting and was relying on Cline's statement that he would assist him to get to a hospital.

50.     By the time Robert told Cline he would give an oral statement he had not slept for at least 39 hours.

51.     At that time, Robert had severe chest pain and believed his rib was broken.  (Medical records would later establish that his rib was, in fact, broken.)  At the time he agreed to give a statement, Robert was "weak, "scared," and "tired," and he was in excruciating pain in his neck, head, and ribs.

52.     The Detective Robert believes to be Pedersen was next assigned to work with Robert on the questions and answers for his confession.  Pedersen asked Robert a

12

bunch of questions, such as, "how many times did you cut them?" and "how did you get in the house?" and Robert gave answers that Pedersen and other detectives had coached him to give and wanted him to say.

53.     After Pedersen prepared Robert with the questions he would be asked and the answers he was to give, Cline re-entered the room and told Robert words to the effect of, "Okay. . . We going to get you a doctor because I see you need one bad," but first," Cline stated, "I need you to see the State's Attorney."

54.     Robert was then removed from the small interrogation room (for the first time in over 18 hours, with the exception of two bathroom breaks) and placed in a larger room.  A short time later, ASA Brogan arrived and introduced himself to Robert as an Assistant State's Attorney. Robert immediately began to beg Brogan to allow him to see a doctor, told Brogan that the Detectives had beaten him, that he was under a doctor's care, and that if he (Brogan) would "put him back out there" the detectives would continue to beat him.  Robert also gave Brogan one of the detective's names. Brogan replied, "they ain't doing nothing like that to you" and left the room.

55.     Shortly thereafter, Brogan retuned to the room accompanied by Detective Higgins. Robert repeated what he had told Brogan earlier, that the detectives had been beating him and that he needed to see a doctor. Brogan responded "you told [Higgins] out there you were going to cooperate. Them guys out there say they ain't did nothing like that to you," and "if you ain't going to cooperate I'm not going to be bothered with you."  Brogan then began walking towards the door. Before he could leave, however, Robert told Brogan, "Okay, all right, I'll cooperate. Okay."

13

56. While waiting for a court reporter to arrive at Area 2, Brogan rehearsed with Robert, two or three times, the questions and answers that Robert had rehearsed with and had been fed by Detective Pedersen earlier. During this rehearsal, Brogan told Robert how to answer each question, saying things to Robert such as "I want you to answer just like that."

57. When the court reporter arrived, ASA Brogan read the rehearsed questions and Robert gave the rehearsed answers. Towards the very end of this process, Detective Higgins whispered something to Brogan, and Higgins then took out two McDonald's hamburgers and handed them to Robert. Brogan then asked Robert, if the police gave him food while he was at Area 2, to which Robert replied "yes." Higgins gave Robert the hamburgers after 12:05 a.m. on Sunday, September 20, 1987. With the exception of a cup of coffee (that McWeeny gave Robert at the beginning of McWeeny's attempted "good guy routine"), the two McDonald's hamburgers were the first and only food or drink that the police had given Robert to eat or drink since carting him from his mother-in-law's home eighteen hours earlier.

58. After the court reporter finished preparing the statement, Brogan asked Robert to initial and sign the transcribed statement. Robert initialed an error in the address of his in-laws' home, but he refused to sign the statement or initial any other part of it, telling Brogan, "I'm not signing nothing."

59. Although Robert refused to sign the transcribed confession and although the transcribed confession had been procured from Robert through beatings and other

physical and psychological abuse, the State was permitted to read the confession at Robert's trial, line by line, into evidence.

**C. Detective McWeeny and The Other Detectives Fabricated an Implausible and Demonstrably False Basis for Robert's Arrest.**

60.     Sometime while Robert was being held, beaten, and abused at Area 2, Detective McWeeny and the other Detectives realized they had no valid basis to arrest or detain Robert in the first instance. The Defendant Detectives knew that without probable cause to arrest or detain Robert, the confession they were beating out of him would likely be inadmissible.

61.     McWeeny solved this problem by concocting a false and fantastical story about Robert diving into a pool of blood and being arrested at the crime scene for obstructing justice and interfering with a police investigation. According to McWeeny, who testified about this on three separate occasions (Robert's 1989 suppression hearing, 1990 criminal trial, and at McWeeny's 2019 deposition), on September 19, 1987, at approximately 5:30 a.m., immediately after arriving at the house with his wife Diane, Robert rushed into the house screaming "Mama's dead, Granma's dead!" and then dove headfirst into a pool of the victims' blood that had formed in the hallway outside one of the bedrooms, "wiggled" and "rolled around" in the blood for approximately 15 seconds, at which point McWeeny twice commanded Robert to get out of the blood, which Robert refused to do. McWeeny then forcibly removed Robert from the blood by Robert's neck. McWeeny repeatedly emphasized that Robert "had a lot of blood on him" and that Robert's diving into the blood justified his immediate

arrest and detention. (This Complaint hereafter refers to McWeeny's false testimony concerning Robert's purported arrest as the "purported blood incident.")

62. The purported blood incident never happened. Robert never dove into or rolled around in a pool of blood, nor was he ever arrested for obstruction of justice or interference with the police investigation. The entire purported blood incident was just an after-the-fact, made-up story that McWeeny concocted in order to justify carting Robert off to Area 2 and holding him there for more than at least fifteen hours without probable cause.

63. The CPD took a contemporaneous photo of Robert at Area 2 attached to this Complaint as Exhibit 3. The photo shows that Robert was *not* covered in blood. Further, the clothing Robert wore during his arrest were subject to State forensic testing, and the results of that testing further establish that Robert was not covered in blood at the time of his false arrest.

64. Nor is the purported blood incident McWeeny concocted supported by any police report. Although McWeeny testified that he arrested Robert at the crime scene for obstruction of justice and interference with a police investigation, he did not write any General Progress Report ("GPR"), any arrest report, nor any Supplemental Report identifying the purported blood incident nor explaining any part of it. Similarly, he did not write any GPR, arrest report, or Supplemental Report stating that Robert had been arrested. Nor did any other police officer or detective write up an arrest report, GPR, or supplemental report describing or explaining either the purported blood

incident or Robert's arrest. Nor was anything at all written about the purported blood incident in the Defendant Detectives' Cleared and Closed Report.

65. Lt. Cline also falsely testified at Robert's criminal trial that Robert had told him that he "went into the house and threw himself into a pool of blood." Cline lied about this; Robert never said this to Cline or to any other person.

66. The State used McWeeny's lies about the purported blood incident to assert at trial that Robert must be guilty of the murders because he tried to contaminate the evidence. For example, during closing arguments the State told the jurors that Robert was taken "into custody for interfering with a police investigation and destroying evidence" and that "[the detectives] made a determination after Smith rolled around in the blood that something was wrong."

67. McWeeny's lies about the purported blood incident, Cline's lies about the purported blood incident, and the government's use of those lies at Smith's suppression hearing and trial were one of the causes of:

(a) the wrongful denial of Robert's motion to suppress the coerced confession;

(b) the wrongful denial of Robert's motion to quash his arrest;

(c) Robert's eventual conviction; and

(d) Robert's 33-year-plus wrongful incarceration.

**D. Detective Higgins and Other Detective Defendants Fabricated the Bloody Underwear, Planted It at the Crime Scene, and Used It Against Robert At His Criminal Trial.**

68. While Robert was being held, beaten, and abused at Area 2, the Defendant Detectives realized they had no evidence to corroborate the false confession

they were beating out of Robert and no physical evidence at all tying Robert to the murders. One step detectives took to gather physical evidence was directing Robert to remove his clothes so that the clothes could be tested for the victims' blood or for any other evidence that Robert was present at the murder scene.  Robert complied with the demand that he remove his clothes, at which time Detective Higgins observed that Robert was not wearing any underwear.

69.     Robert also informed Higgins at or about that time that Robert kept clothes at his in-laws' home.

70.     At that point, Higgins and two other Detectives, Solecki and Rowan, returned to the crime scene.  Higgins testified that they arrived at the home at approximately 7:00 p.m., and that either he or Solecki (Higgins couldn't remember which one) found a pair of "crumpled and bloody" blue men's size 34 to 36 underwear on the top stair of the stairway leading to and from the basement.  This testimony was fabricated.  While Higgins or Solecki may have found Robert's underwear in the home, they did not find it crumpled and bloody, nor did they find it on the stairway leading to and from the basement.

71.     Detective Higgins returned to the interrogation room and showed Robert the pair of bloody men's underwear, asserting to Robert that this bloody underwear had been found at the crime scene.  Robert acknowledged that the underwear appeared familiar to him and that he believed they were his, but Robert denied having had any involvement in the murders, and Higgins left the room.

18

72. Both the fabricated "bloody" underwear and the fabricated location in which it was purportedly found were admitted into evidence against Robert at both his suppression hearing and his criminal trial and were one of the causes of:

(a) the wrongful denial of Robert's motion to suppress the coerced confession;

(b) the wrongful denial of Robert's motion to quash his arrest;

(c) Robert's eventual conviction; and

(d) Robert's 33-plus-year wrongful incarceration.

**E. Detective Higgins and Other Defendant Detectives Fabricated the Bloody Blue Sheet, Planted It at the Crime Scene, and When They Determined It Contradicted Evidence Gathered By Other Officers, Made It Disappear.**

73. Detective Higgins also testified that at approximately the same time he or Solecki found the underwear, they found a blood-stained blue bed sheet on the basement floor. According to Solecki's GPR, when he and Higgins showed Robert the blue sheet (together with the underwear at approximately 8:30 p.m.), Robert immediately confessed that he "used the sheet to stand on, rather than stand *in the blood*."

74. Higgins' testimony that he and Solecki found the blue sheet in the basement and Solecki's written GPR that at the time they confronted Robert with the blue sheet, he confessed to using it to avoid standing in blood, are false.

75. Detectives Higgins, Solecki, and/or Rowan found a blue sheet at the Home but fabricated its bloody condition, and Robert never confessed to Higgins or Solecki in relation to it, neither at 8:30 p.m. (the time Higgins and Solecki assert that the confession occurred), nor at any other time. Any testimony that Robert so confessed to Higgins and/or Solecki is fabricated and false.

19

76.     Later, when Higgins or Solecki were told that crime scene investigators had already recovered a yellow bed sheet from in front of or nearby the washer and dryer in the basement, Higgins and/or Solecki caused the purported bloody blue sheet to disappear from the evidence.

**F. Higgins and Solecki Falsely Asserted in Their GPR and in Their Testimony That Robert Admitted to Them That He Had Poured Gasoline and Started A Fire in The House.**

77.     Solecki also falsely wrote in a GPR that Robert admitted to Higgins and him and that he had poured gasoline near the bodies and started a fire before exiting the home.  Higgins testified to this false fact at both the suppression hearing and Robert's criminal trial.  Robert, however, never made any such admission to Solecki, Higgins, or any other detective.

78.     The State did not produce any evidence that Robert or his clothes smelled of gasoline, smoke, or fire on the morning of his arrest, and no forensic evidence of any kind that was admitted in the criminal case supports that Robert Smith had poured gasoline near the victims or started a fire near the victims.  The State did not produce any evidence that Robert had gasoline on his skin or clothing, nor did it produce any trace evidence of burning or scarring on Robert's clothes or body from the purported "explosion" that occurred.

79.     None of the witnesses called by the State at the trial and the suppression hearing, several of whom testified that they interacted with Robert on several occasions on the day of his arrest, testified that Robert smelled of gasoline, smoke, or fire or that his clothes appeared scorched or soiled from burning.

80. Diane Smith testified at both the suppression hearing and trial that she did not notice anything unusual about Robert's clothes when she picked him up earlier the same morning and that Robert's clothes did not appear to be dirty or soiled in any way at that time, nor did she smell gasoline or burn smell on him or his clothing.

### G. Higgins Repeatedly Falsely Testified About Robert's Purported 8:30 p.m. Oral Confession.

81. Higgins testified repeatedly that he obtained Robert's oral confession September 19, 1987, at 8:30 p.m. For example, during Detective Higgins' February 8, 1989 suppression hearing testimony and his August 29, 1990 criminal trial testimony, Detective Higgins testified that on September 19, 1987, at 8:30 p.m., he took Robert 's oral confession about dropping bloody underwear on his way down to the basement, in order to wash blood off his clothes, and standing on a blue sheet to avoid standing in the blood that had pooled there. Higgins' testimony was false in its entirety. Robert never made any such oral confession to Higgins.

82. Cline testified repeatedly that he obtained Robert's oral confession September 19, 1987, at 9:15 p.m. According to Cline, having never seen or spoken to Robert ever before, he went into Robert's interrogation room between 9:00 and 9:15 p.m. and heard Detective Pedersen telling Robert that his "story doesn't hold together, tell the truth." Then, according to Lt. Cline, Robert blurted out, "OK. I'll tell the truth now" and went on to confess to the murders.

### H. Cline Repeatedly Testified Falsely About Robert's Purported 9:15 p.m. Oral Confession.

21

83. Cline similarly fabricated much of his testimony concerning Robert's purported 9:15 p.m. oral confession. For example, at the suppression hearing, Lieutenant Cline testified that when he entered the interrogation room, Detective Pedersen then left the room, and Detective Rice then told Robert that Robert would "feel a lot better by telling us the truth." Cline asserted that he then heard Robert respond to Rice, "I'll tell the truth now. I went over to my mother in laws' house. I don't know what went wrong, but I killed them both. I slit both their throats with a razor blade."

84. This never happened; Robert Smith never made any of these statements to Lieutenant Cline on September 19, 1987, or at any other time.

85. At the criminal trial, Cline provided essentially the same story about him entering the room at approximately 9:15 p.m. and Detective Pedersen leaving the room. Cline, however, embellished the story at the criminal trial by changing the assertion that Rice had prompted Robert to make a confession to the assertion that Cline *himself* had prompted Robert to make the confession. Specifically, Cline testified, "*I told* the defendant that his version of what had occurred that day was different from several other people that we had gone out and talked to . . . and *I told* him to tell the truth." See 8/29/90 Trial Tr. at C32 (emphasis added).

86. Cline's trial description of the purported confession is false. Cline was not present when Robert told Pedersen and Rice that he was ready to cooperate with them.

87. According to Cline's trial testimony, Robert told Cline that he murdered the victims with a razor blade and left that razor blade on the floor of the crime scene.

22

Indeed, Cline was more specific, testifying that Robert told Cline that he threw the razor blade to the ground when he was standing next to the hallway bathroom.

88.     Cline further testified that after Robert made his 9:15 p.m. confession, Cline specifically ordered Higgins and Solecki to go back to the House to search for the razor blade.

89.     Robert's actual reason for agreeing to confess was the Detectives' repeated beating of Robert, the excruciating pain that he was in, the fact that he had not slept in more than 39 hours, the fact that he had not eaten in more than eighteen hours, the fact that Cline had falsely promised Robert medical care if he agreed to confess to the murders, and for other reasons related to his physical and psychological condition.

### I. Pedersen, Rice, Cline, and Brogan Concocted That Robert Committed the Murders With A Razor Blade That Robert Kept In His Wallet.

90.     Rice falsely wrote in a GPR that Robert stated he slashed the victims' throat with a razor blade.

91.     Pedersen falsely wrote in the Cleared and Closed Report that Robert stated to Rice and Pedersen that he (Robert) slashed the victims' throat with a razor blade.

92.     Cline falsely testified at Robert's suppression hearing that Robert confessed in his presence to murdering the victims with a razor blade.

93.     Cline falsely testified at Robert's criminal trial that Robert confessed in his presence to murdering the victims with a razor blade that Robert left at the crime scene.

94.     Cline falsely testified at his 2019 deposition in Robert's post-conviction proceedings that Robert confessed in his presence to murdering the victims with a razor blade that Robert left at the crime scene.

95.     Cline also falsely testified at his deposition during Robert's post-conviction proceeding that he informed Higgins and Solecki that Robert had confessed to using a razor blade to kill the victims and further that Robert tossed the razor blade to the ground near the bathroom on the first floor, and further, that he, Cline, directed Higgins and Solecki to return to the crime scene and search for the razor blade.

96.     Higgins and Solecki never searched for a razor blade at the crime scene.

97.     Higgins and Solecki never found a razor blade at the crime scene.

98.     Higgins and Solecki never reported back to Cline that they conducted a search for a razor blade, nor that they were unable to locate a razor blade during their search.

99.     Neither Higgins, nor Solecki, nor the third detective who purportedly went with them, Rowan, ever prepared a GPR or supplemental report stating that Cline had ordered them to go to the house to search for the murder weapon, nor one stating that they had gone to the crime scene to search for the murder weapon, nor one that described any search that they had undertaken to try to locate a razor blade on the floor of the house, nor one that explained why they were unable to locate the purported razor blade, nor one asking the next watch to return to the house during daylight hours to continue the search for the razor blade.  No such GPR or supplemental report exists.

100.    There was no razor blade left at the crime scene, nor was there ever a search for the razor blade, nor did Robert ever confess to Cline or anyone else that he committed the murders with a razor blade that he left at the crime scene. All of that

was completely made up by Cline and the Detective Defendants. Had such a razor blade been used, it would have been easy for the detectives and/or evidence technicians to have found such a razor blade at the crime scene. The Detective Defendants never searched for the razor blade because they knew there was no razor blade to look for, as they themselves concocted the use of the razor blade and Robert's purported oral confession relating to it.

101. Lt. Cline, Detective Higgins, and the Detective Defendants fabricated Robert's oral confessions later in the night, after they beat and abused Robert into agreeing to give a transcribed confession.

### J. The Detective Defendants' Routine of Coercing False Confessions, Fabricating Evidence, and Withholding Exculpatory Evidence.

102. Deceased Detective John Yucaitis testified at Robert's suppression hearing that he had been a Chicago police officer for 25 years and a CPD detective for 21. Yucaitis testified that on September 19, 1987, he began his shift at 8:30 in the morning and that on that day he had "looked in on" Robert twice. The first time, according to Yucaitis, Robert was lying on the bench unhandcuffed and asleep, and they had no communication. The second time, according to Yucaitis, he entered the interview room by himself, *mirandized* Robert, who was unhandcuffed at that time, and he then had a 5-minute conversation with Robert alone. Yucaitis testified that neither he nor anyone in his presence had kicked, beat, or choked Robert. Yucaitis lied about all of this. When Yucaitis entered the room, Robert was not asleep and was handcuffed to the ring on the wall, and Yucaitis and other Detective Defendants repeatedly beat and abused Robert.

25

103.   Over many years, Yucaitis was deeply involved with the torture of purported suspects at Area 2, including but not limited to the following purported suspects: Andrew Wilson in February 1982, Lavert Jones, Thomas Craft, and  Alex Moore in January 1984; Phillip Adkins and Robert Billingsly in June 1984; Michael Tillman and Steven Bell in July 1986.

104.   Detective Daniel McWeeny falsely testified at Robert's suppression hearing that neither he nor anyone in his presence ever kicked, beat, or choked Robert.  McWeeny also falsely testified at the suppression hearing about the purported blood incident, as discussed in detail above.  McWeeny further falsely testified that he had been with Robert in the interrogation room on only two occasions, the first time bringing Robert two cups of coffee and a cigarette and telling him he was arrested for interfering with a police investigation and obstruction of justice, and the second time to just "check on [Robert] and see how he was doing."

105.   Over many years, McWeeny was deeply involved with the torture of purported suspects at Area 2, including but not limited to the following purported suspects:  Melvin Jones in February 1982; James Andrew and David Faultneroy in April 1983; Darrell Cannon in November 1983; Leroy Orange, Leonard Kidd, and Alex Moore in January 1984; Stanley Howard in November 1984; Aaron Patterson in April 1986; and Madison Hobley in January 1987.  McWeeny also took the Fifth Amendment on at least nine separate occasions when questioned about Area 2 torture.

106.   Detective William Pedersen testified at Robert's suppression hearing through a stipulation.  Pedersen was deeply involved in Robert's investigation and

26

interrogation, including authoring the Cleared and Closed Report, according to which he took one of Robert's purported oral confessions.

107. Pedersen is highly implicated in the torture of suspects at Area 2, including but not limited to the April 1986 torture of Aaron Patterson. At least twice Pedersen took the Fifth Amendment when questioned about torture at Area 2.

### K. Additional *Monell* Pattern and Practice Evidence.

108. The evidence that police tortured suspects at Area 2 Violent Crimes is overwhelming. The Chicago Police Department's Office of Professional Standards ("OPS") has concluded that torture occurred at Area 2; more than one Police Superintendent has concurred; the Chicago Police Board has concluded it did; the Cook County State's Attorney Office has admitted it occurred in specific cases, as has the Office of the Special Prosecutor; the U.S. Attorney for the Northern District has prosecuted perjury charges asserting that it occurred; a federal jury convicted Jon Burge of perjury for lying about torture that occurred under his command; the City Council and at least two Mayors have admitted it occurred, as has the Corporation Counsel in certain filings.

109. Mayor Rahm Emanuel described Area 2 torture as a "*stain [that] cannot be removed from the history of our City*" and apologized to the victims of torture. May 6, 2015 torture apology by Emanuel, https://chicago.suntimes.com/2015/5/6/18399418/city-council-approves-5-5-million-in-reparations-for-burge-torture-victims.

110. Current Mayor Lori Lightfoot, in her prior role as Chair of the Police Accountability Task Force, wrote in 2016 that "*from 1972 to 1991, CPD detective and commander Jon Burge and others he supervised tortured and abused at least 100 African-Americans on the South and West sides in attempts to coerce confessions.*" See Police Accountability Task Force April 2016 Report at 34-35, available at https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_Executive_Summary_4_13_16-1.pdf

111. The Chicago City Council has set up a reparations fund for torture victims.

112. The Illinois Legislature passed the Illinois Torture Investigation and Relief Commission Act, 775 ILCS 40/1 *et seq.*, to afford torture victims a chance to have their cases heard in circumstances where their claims were otherwise barred by the single post-conviction petition rule or by the statute of limitations.

113. Numerous state and federal courts have found that torture occurred at Area 2. For example, in *People v. Patterson*, 192 Ill. 2d 93, 145 (2000), the Illinois Supreme Court relied on the OPS's own 1990 finding that "torture was systemic and methodical at Area 2 under the command of Burge" in holding that Patterson was entitled to an evidentiary hearing on his torture claims.

114. In, 1999, United States District Court Judge Milton Shadur wrote:

It is now common knowledge that in the early to mid–1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis.

*U.S. ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999) (Shadur, J.).

*See also Andrews v. Burge*, 660 F. Supp. 2d 868, 873 (N.D. Ill. 2009) (same).

115.   In *Hinton v. Uchtman*, 395 F.3d 810 (7th Cir. 2005), federal Seventh

Circuit Judge Diane Wood held that "*a mountain of evidence* indicates that torture

was an ordinary occurrence at the Area Two station of the Chicago Police

Department." *Id*. at 822 (Wood, J., concurring) (emphasis added).

116.   With respect to Robert Smith himself, a four-Judge panel of the Illinois

Court of Claims held:

> Robert Smith represents yet another victim of the violent and abusive tactics of
> Chicago Police Lieutenant Jon Burge and his devout crew of similarly violent
> Chicago Police detectives.
>
> Following hours of torture, Smith orally confessed.  But tellingly, when it was
> demanded that he sign a written confession by the assigned felony review
> State's Attorney and detectives, Smith refused.  The oral confession along with
> other fabricated evidence formed the basis of his double murder conviction.  But
> for the trial judge who raised concerns about the lack of motivation by Smith,
> he might very well have been sentenced to death.

*Smith v. State of Illinois*, 21 CC 1102, Order at 1 (Ct. Claims Jan. 21, 2021).

117.   Nevertheless, during Robert Smith's post-conviction proceeding, Detectives

McWeeny, Pedersen, Brownfield, and Lieutenant Cline have each falsely denied under

oath ever participating in, witnessing, or even hearing from other detectives or officers

about the torture of Smith or of any person held in custody at Area 2 Violent Crimes.

**L. The City and The County Ratified, Condoned, Facilitated, and Covered Up the Detective Defendants' Pattern and Practice of Torturing Suspects, Fabricating Incriminating Evidence, and Withholding and Destroying Exculpatory Evidence.**

118.    Robert Smith's torture and abuse was not an isolated incident of individual police officer brutality and misconduct. Rather, it was part of a widespread pattern and practice of similar acts of racially motivated torture, including electric shock, baggings, mock executions, Russian roulette, suspensions, telephone book beatings, and other beatings committed against African American men by Area 2 Detectives.

119.    This pattern and practice of torture began at Area 2 violent crimes in the early 1970s and continued there throughout the 1980s. (The same pattern and practice also occurred at the Area 3 when Burge became the Commander of the Area 3 Detective Division in January 1988). The earliest known torture in this pattern and practice occurred on or about May 29, 1973, when Burge and other Area 2 detectives tortured African American suspect Anthony Holmes using an electric shock box, suffocation with a bag, beating, and racial epithets. The CPD took no action to punish or restrain Burge or other Area 2 detectives at that time.

120.    Over the next decade, Burge and other Area 2 detectives tortured many African American suspects, including, among others, Lawrence Poree, George Powell, Tony Thompson, Willie Porch, Ollie Hammonds, Derrick King, Michael Coleman, Sylvester Green, and Melvin Jones.

121.    In February 1982, then Superintendent of the CPD, Richard Brzeczek, and then Mayor of the City, Jane Byrne, placed Burge in charge of a manhunt for the killers of two white Chicago Police officers. In the course of that manhunt, Burge and

30

other Area 2 detectives tortured a number of African American citizens, including

Donald White, Roy Brown, Walter Johnson, Paul Mike, Alphonso Pinex, and Larry

Milan, and abused and terrorized a large number of other African American citizens.

122.    In the early morning hours of February 14, 1982, Burge and several

Area 2 detectives arrested Andrew Wilson for the police officer murders. Throughout

that day, Burge and other Area 2 detectives tortured Wilson, using the following

techniques, among others: electric-shocking on the genitals, ears, and other parts of

the body with a black box and a second, plug in, electrical device; suffocating with a

plastic bag; burning on a radiator; and repeated beatings.

123.    The City and Cook County's highest-ranking officials, including the then

State's Attorney Richard M. Daley, then Mayor of the City Jane Byrne, and then CPD

Superintendent Richard Brzeczek, all closely monitored developments in the

manhunt.  All three learned from numerous sources of the widespread abuse during

the manhunt, including the torture and abuse of Andrew Wilson. They nevertheless

did not prevent, stop, or attempt to stop that torture and abuse, nor did they

discipline, investigate, or otherwise bring to justice Burge and the other Area 2

detectives who perpetrated it.

124.    By no later than February 1982, Daley had direct personal knowledge

that Burge and Yucaitis, as well as other Area 2 Detectives, had committed acts of

torture against African American suspects at Area 2. In fact, during the February

1982 manhunt, Daley closely monitored events, receiving regular reports from

subordinates who, at various times, were at Area 2. Daley therefore knew or should

31

have known of the abuses of African American citizens that occurred in the course of the manhunt, including, in particular, the abuse of Donald White, who was placed in protective custody by the CCSAO following acts of torture that Burge and his men perpetrated against him.

125. Daley was informed of the arrest of Andrew Wilson on the morning of February 14, 1982. In fact, throughout that day, as Wilson was tortured (frequently screaming in the course of the abuse), several high-ranking ASAs were present at Area 2 and at least one ASA, assigned as a supervisor to the Felony Review Unit, Larry Hyman, participated directly in the interrogation of Wilson, interacting with him between sessions of torture at the hands of Burge and his men.

126. The high-ranking members of the CCSAO present at Area 2 on February 14, 1982, knew or should have known that Wilson was being tortured. Those high-ranking assistants were reporting directly to Daley and to the First Assistant State's Attorney at the time, Richard Devine. Neither Daley nor Devine nor any of the top CCSAO assistants did anything to halt or prevent the torture of Wilson.

127. On or about February 17, 1982, then CPD Superintendent Brzeczek received a letter from Dr. John Raba, the Director of Medical Services at Cook County Jail, informing him that medical examination of Andrew Wilson revealed unmistakable evidence that Wilson had been brutalized while in police custody, that Wilson reported being tortured with electric shock, and demanding an investigation. After conferring with high ranking police command personnel (and chastising those present at Area 2 for allowing Wilson's torture to happen), Brzeczek wrote a letter to

Daley, enclosing the Raba letter and advising Daley that, in light of the pending prosecution of Wilson, he would not investigate or otherwise pursue the matter without instructions from Daley.

128.    Daley received the Brzeczek letter (with its enclosure) and shared and discussed it with First Assistant Devine and other high-level subordinates. Daley, however, never responded to the letter.

129.    Daley and his subordinates were fully aware that Superintendent Brzeczek's letter set forth criminal conduct by Burge and other Area 2 detectives and officers, and they knew or should have known that ASA Hyman might be complicit in this criminal conduct. They also knew that there was physical, medical, and testimonial evidence which supported Wilson's claim of physical abuse.

130.    Not only did Daley fail to instruct Superintendent Brzeczek to conduct a criminal and/or administrative investigation, he also failed to conduct a criminal investigation of his own and did not refer the evidence to an independent agency for investigation. Instead, on information and belief, Daley communicated to Dr. Raba, through the then Cook County Board President George Dunne, that Raba "should not get involved" in the Wilson case, and subsequently, together with Brzeczek, Daley issued public commendations to Burge and his men.

131.    In the period of time between Wilson's torture, in February 1982, and Robert Smith's torture, on September 19, 1987, the Cook County State's Attorney's Office, under the direction of Daley, prosecuted at least thirty African American men who were tortured by Burge and other Area 2 detectives.

33

132.     In none of these cases did Daley or his subordinates disclose specific exculpatory information within the possession of the CCSAO regarding the torture of Wilson and the specific knowledge of Daley and his high-ranking subordinates as to the truth of Wilson's allegations. In none of these cases did Daley request or pursue an investigation into the allegations of torture. On the contrary, despite knowledge of Wilson's credible torture claim, Daley, in consultation with both his high command at the CCSAO and the line assistants handling prosecutions, continued to seek the death penalty against several Area 2 torture victims including Robert Smith, Andrew Wilson, Darrell Cannon, Leroy Orange, Leonard Kidd, Stanley Howard, Aaron Patterson, Michael Tillman, Reginald Mahaffey, and Jerry Mahaffey.

133.     In 1983 Leroy Martin was the Commander of Area 2 and Burge's direct supervisor.  As Area 2 Commander, Martin knew that Burge and other Area 2 detectives systematically tortured and abused at least the following African American suspects: Eric Smith, Alonzo Smith, James Andrews, Jerry Mahaffey, Reginald Mahaffey, Gregory Banks, David Bates, Darrell Cannon, James Cody and Leonard Hinton. Martin nevertheless failed to initiate appropriate investigations or to discipline Burge or other Area 2 detectives in connection with any of these cases.

134.     In 1987 Martin was named CPD Superintendent.  As Superintendent, possessing direct knowledge of Burge and other Area 2 Detectives' torture practices from his time as Area 2 commander, Martin continued to fail to intervene, to supervise, discipline, or otherwise act to prevent the ongoing misconduct of Burge and his men. As a result, Area 2 Detectives continued their torture practices with near impunity.

34

135. In 1990 Chicago Police OPS investigator Michael Goldston issued a report (hereinafter, the "Goldston Report") finding that there was *systemic* abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it.

136. In 1991, the Goldston Report was supplemented with a finding that Burge, Byrne, Dignan, and Yucaitis were the prime movers in this pattern of abuse and torture and that Burge, Yucaitis and another Area 2 detective had tortured Andrew Wilson.

137. In 1990, OPS Investigator Francine Sanders, in a companion report (the "Sanders Report"), recommended that Burge, Yucaitis and a third detective, Patrick O'Hara, be fired for their torture of Andrew Wilson. Burge, Yucaitis, and O'Hara were suspended from the force pending a termination hearing before the Chicago Police Board.

138. The Goldston and Sanders Reports, and the information contained in them, were highly exculpatory for Robert Smith and many other victims tortured after the time period analyzed by the Goldston Report.

139. Superintendent Martin and other police command personnel delayed, obstructed, and otherwise undermined the OPS investigation and the Goldston Report findings and conclusions by suppressing the findings that Wilson was tortured and by refusing to suspend, transfer, or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November 1990.

140.    Superintendent Martin and other command personnel further delayed, obstructed, and otherwise undermined the OPS investigation and Goldston Report findings and conclusions by suppressing the findings that there was systematic abuse at Area 2. Although the Goldston Report and its findings were initially issued on or about November 2, 1990, the Report was not publicly released until more than 15 months later, February 7, 1992, when Federal District Judge Milton I. Shadur ordered the Report's release.

141.    On or before February 7, 1992, Daley, who became Mayor of the City in 1989, was specifically informed or was otherwise aware of the Goldston Report findings of "systematic" Area 2 torture that was "condoned and participated in" by Area 2 command personnel.

142.    Daley knew or should have known that Martin had been the commanding officer at Area 2 and Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Martin therefore had a motive and the intent to suppress and discredit the Goldston Report and its findings.

143.    Despite this and all that he previously learned as the State's Attorney about torture by Burge and his men, and despite the findings of the Goldston Report itself, Daley did not seek an independent federal investigation; did not direct Defendant Martin to initiate a criminal investigation; nor did he open or direct others to open disciplinary proceedings against the Area 2 detectives, supervisors, and command officers identified in the Goldston Report; or seek the prosecution of Burge or his confederates.

36

144.    Instead, in a joint effort with Martin, Daley sought to publicly discredit and undermine the Goldston Report and to defend Martin's prior suppression of it, publicly saying "these are only allegations . . . rumors, stories, things like that." The intent and effect of these statements was to undermine the accuracy and validity of the Goldston Report's finding that the torture at Area 2 was "systematic" and participated in by Area 2 command personnel.

145.    Even after learning of the findings in the Goldston Report, Martin, OPS, and other command personnel, in violation of  CPD regulations, refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse previously made by electric shock victim Melvin Jones against Burge.

146.    From 1989 to 1992, Daley and Martin, and their command subordinates, were given additional actual notice that Burge was the leader of a group of Area 2 detectives that systematically tortured and abused African American suspects in order to obtain confessions in murder and other felony cases.  Among that additional evidence was an Amnesty International report identifying the torture and a series of public hearings held by the Chicago City Council and the Chicago Police Board in which witnesses testified about the torture they had suffered at the hands of the Area 2 Detectives.

147.    Finally, in January 1992, Martin admitted in a publicly-filed pleading that there was an "astounding pattern or plan" on the part of Burge and his confederates "to torture certain suspects, often with substantial criminal records, into confessing to crimes."

37

148.    In February 1993, the Chicago Police Board finally fired Burge for torturing Andrew Wilson. These findings became final in December 1995.

149.    In 1993 the OPS re-opened investigations into approximately ten Area 2 torture cases. After an exhaustive re-investigation, which uncovered substantial new evidence in support of the allegations, OPS sustained numerous allegations that Area 2 Detectives Byrne and Dignan racially abused and tortured Darrell Cannon with a cattle prod.  OPS Supervisor Carmen Christia reviewed the findings and approved them. The OPS also entered sustained findings of torture and abuse against Area 2 Detectives Byrne and Dignan in five other re-opened cases, including that of death row inmate Stanley Howard, as well as against Area 2 Detectives Boffo and Yucaitis.

150.    From 1993 until 1998, then OPS Director Gayle Shines (who had previously been appointed by Daley), suppressed these findings and the evidence which supported them by secreting the files in her personal office.

151.    In 1996, despite numerous allegations and sustained findings of torture and abuse against Area 2 Detective Dignan, Daley promoted Dignan to the police rank of lieutenant.

152.    In 1998, with full knowledge that Burge and other Area 2 (and Area 3) detectives participated in a pattern and practice of torture and abuse of suspects, CPD Superintendent Terry Hillard and his then legal counsel and administrative assistant, Thomas Needham, intentionally violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases set forth above; by refusing to investigate other torture victims' claims that they had been tortured;

by refusing to investigate Shines' suppression of evidence; and by suppressing these OPS files and findings from criminal defendants.

153. On April 24, 2002, Cook County's Chief Criminal Judge Paul Biebel appointed a Special Prosecutor to investigate the allegations of police torture and abuse committed by Burge and officers under his command at Areas 2 and 3.

154. Biebel's decision to appoint a Special Prosecutor was based in part on State's Attorney Richard Devine's conflict of interest. Biebel appointed Edward J. Egan, a former high-ranking prosecutor and Illinois Appellate Court judge, as the special prosecutor, and Robert Boyle, also a former high-ranking prosecutor, as Egan's assistant.

155. On July 19, 2006, the Special Prosecutor released a Report of the findings of his investigation, which has come to be known as either the "Egan-Boyle Report" or the "2006 Special Grand Jury Report."

156. Among other things, the Special Prosecutors Egan and Boyle found that there were "many cases" in which it was reasonable to believe that African-American men were abused by Burge and Area 2 Detectives. The Egan-Boyle Report also identified several cases in which there was "proof beyond a reasonable doubt" of Area 2 abuse by detectives under Burge's command and supervision, and further concluded that,

    a. Burge abused persons in custody "with impunity," and it therefore "necessarily follows that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they."

    b. Chicago Police Superintendent Richard J. Brzeczek was guilty of a "dereliction of duty" and "did not act in good faith in the investigation of Andrew Wilson," because Brzeczek "believed at the time that officers at Area 2 had tortured Andrew Wilson," and that Brzeczek "kept Burge in command at Area 2 and issued a letter of commendation to all of the detectives at Area 2."

c. Brzeczek "received and believed evidence that a prisoner [Andrew Wilson] had been brutalized by the Superintendent's subordinates, that the prisoner had confessed, that those subordinates had testified under oath on a motion to suppress and before a jury and he [Brzeczek] had to believe they [Burge and Yucaitis] testified perjuriously, *that the prisoner had been sentenced to death,* and that for 20 years the Superintendent still remained silent."

d. "[S]omething should have been done [by the Chicago Police Superintendent] about the disgrace and embarrassment [at Area 2] 24 years ago".

e. The CCSAO's Chief of Felony Review, Lawrence Hyman, gave false testimony when "he denied that Andrew Wilson told him he had been tortured by detectives under the command of Jon Burge."

f. No meaningful police investigation was conducted, nor any police witness questioned either in the *Wilson* case, or in the Michael Johnson electric shock case, which occurred a few months after Wilson, and had "similarities" to the Wilson allegations.

g. If action had been taken against Jon Burge at the time of the Andrew Wilson case, or even shortly thereafter, the appointment of the Special Prosecutor would not have been necessary.

h. This action should have included, "at the very least," the Superintendent's removal of Burge from any investigative command and a "complete shake-up at detective Area 2."

157. Because the City and County's highest-ranking officials, including Daley, Brzeczek, Martin, Hillard, Shines, and Needham had consistently failed to intervene, discipline, and investigate Burge and other Area 2 Detectives' for their torture practices, and because the same high-ranking officials concealed and covered up the pattern of torture and abuse, Area 2 Detectives, including the Detective Defendants in this case, continued to torture African American suspects throughout the 1980s.

158. The victims of such torture in the 1980s, in addition to Robert Smith, included, among others, the following African American men: Shadeed Mumin,

40

Michael Johnson, Lee Holmes, Rodney Benson, Stanley Wrice, Eric Smith, Alonzo Smith, James Andrews, Reginald Mahaffey, Jerry Mahaffey, Gregory Banks, David Bates, Darrell Cannon, Leonard Hinton, Eric Smith, Leroy Orange, Leonard Kidd, Philip Adkins, Robert Billingsley, Stanley Howard, Alphonso Pinex, Thomas Craft, Lavert Jones, Lonza Holmes, and Aaron Patterson.

## LEGAL CLAIMS

### Count I – 42 U.S.C.1983
### The Individual Defendants
### <u>Violation of the 5th & 14th Amendments – Coerced Confession Used At Trial</u>

159.    Smith incorporates each preceding paragraph as if fully restated here.

160.    The Individual Defendants, individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, forced Robert Smith to incriminate himself falsely and against his will, in violation of Smith's Fifth Amendment rights against self-incrimination.

161.    Through the State's use of the coerced and false confession to deprive Smith of liberty in some way, including but not limited to reading the coerced and false confession to the jury during Smith's criminal trial, these Individual Defendants violated Smith's constitutional rights under the Fifth and Fourteenth Amendments.

162.    The Individual Defendants unconstitutionally interrogated Smith, causing him to make involuntary statements that falsely implicated him in the victims' murders.  The Individual Defendants fabricated, unlawfully coerced, and wrote false statements that they knew to be false, as well as falsely testified about the same. These false statements were used against Robert Smith to his detriment in his

underlying criminal case and to deprive him of his liberty. Smith was prosecuted and convicted for the victims' murders based on these false statements.

163. The Individual Defendants' misconduct was objectively unreasonable, and the Defendants acted intentionally and with willful indifference to Smith's constitutional rights.

164. The Individual Defendants' misconduct proximately caused Smith to suffer injuries, including but not limited to loss of liberty, personal physical injury, and emotional distress.

**Count II – 42 U.S.C. § 1983**
**The Detective Defendants and Detective Cline**
**<u>Violation of Due Process – Fabrication of Evidence Used At Trial</u>**

165. Smith incorporates each preceding paragraph as if fully restated here.

166. The Individual Defendants, acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Robert Smith of his constitutional right to due process and a fair trial by fabricating evidence against Smith and using that fabricated evidence at Smith's trial.

167. The Individual Defendants, acting individually, as well as jointly, and/or in concert and in conspiracy with one another, fabricated Smith's confessions, false reports, and other false evidence, which caused the conviction of Smith.

168. Through the conduct identified in this Count, the Individual Defendants proximately caused Smith's unjust criminal conviction and his continued wrongful imprisonment. Without their misconduct of fabricating evidence against him, Smith would not have been prosecuted or convicted.

169. The Individual Defendants deprived Smith of his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

170. The Individual Defendants' misconduct was objectively unreasonable, and the Defendants acted intentionally and with willful indifference to Smith's constitutional rights.

171. The Individual Defendants' misconduct proximately caused Smith to suffer injuries, including but not limited to loss of liberty, personal physical injury, and emotional distress.

### Count III – 42 U.S.C. § 1983
### The Individual Defendants
### *Brady* Violation – Withholding Exculpatory Evidence

172. Smith incorporates each preceding paragraph as if fully restated here.

173. The Individual Defendants, acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Smith of his constitutional right to due process and a fair trial by withholding exculpatory evidence.

174. These Defendants, acting individually, jointly, and/or in concert and in conspiracy with one another, deliberately withheld exculpatory evidence from Smith before, during, and after his trial.

175. Such exculpatory evidence included, among other things, the following pieces of evidence: (a) the systematic torture of persons in police custody at Area 2, as

43

well as the instruments used in such torture and findings from official investigations of such torture, (b) the fabrication of, tampering with, and planting of the purportedly bloody underwear, and (c) the fabrication of, tampering with, and/or planting of, and later concealment of, the purportedly bloody blue bed sheet purportedly uncovered at the scene.

176. Through the conduct identified in this Count, the Individual Defendants proximately caused Smith's unjust criminal conviction and his continued wrongful imprisonment. Without their misconduct of withholding exculpatory evidence, Smith would not have been prosecuted or convicted.

177. By withholding this evidence from prosecutors, defendant, and his counsel, the Individual Defendants deprived Smith of his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

178. The Individual Defendants' misconduct was objectively unreasonable, and the Defendants acted intentionally and with willful indifference to Smith's constitutional rights.

179. The Individual Defendants' misconduct proximately caused Smith to suffer injuries, including but not limited to physical injury, loss of liberty, and emotional distress.

**Count IV – 42 U.S.C. §§ 1983, 1985**
**The Individual Defendants**
**Federal Conspiracy to Deprive Smith of His Constitutional Rights**

180. Smith incorporates each preceding paragraph as if fully restated here.

181. After the murders, the Detective Defendants, and later Defendants Cline and Brogan, acting within the scope of their employment and under color of law, agreed to frame Smith for the murders and deprive him of his constitutional rights, including but not limited to his rights to due process and a fair trial, the right to be free from unconstitutionally coercive interrogation, and the right to be free from evidence fabricated against him, and which conspiracy was subsequently used to convict him at trial and otherwise deprive him of liberty in some way.

182. The Individual Defendants further conspired to deprive Smith of exculpatory evidence and information to which he was lawfully entitled and which would have led to Smith's confession being recognized as false, which in turn would have led to Smith not being charged, not being convicted, and to Smith's more timely exoneration.

183. The Individual Defendants, in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

184. In furtherance of that conspiracy, each of the co-conspirators committed overt acts and was a willful participant in joint activity.

185. The Individual Defendants engaged in this conspiracy with the knowledge and purpose of depriving Robert Smith, who is African American, and numerous other African American Area 2 torture victims, the equal protection of the laws and/or equal privilege and immunities under the law.

186. The conspiracy was racially motivated.

187. The Individual Defendants willfully conspired with racial animus toward Smith and the many other African American Area 2 torture victims identified above.

188. The Individual Defendants willfully conspired with malice and/or reckless indifference to the rights of Smith.

189. Through their conspiracy, the Individual Defendants deprived Robert Smith of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

190. Through the Individual Defendants' misconduct identified in this Count, they violated Smith's rights, and he suffered loss of liberty, physical harm, and severe emotional distress and anguish as a direct and proximate result of the Individual Defendants' conspiracy.

**Count V – 42 U.S.C. §§ 1983, 1986**
**The Individual Defendants**
**Failure to Intervene**

191. Smith incorporates each preceding paragraph as if fully restated here.

192. The Detective Defendants and Defendants Cline and Brogan, by their conduct and color of law, stood by without intervening to prevent the violation of Smith's constitutional rights, even though they had the ability and opportunity to do so.

193. As a direct and proximate of the Individual Defendants' failure to intervene to prevent the violation of Smith's constitutional rights, Smith suffered injury, including but not limited to physical injury, loss of liberty, and emotional distress. The Defendants had a reasonable opportunity to prevent this harm but failed to do so.

46

194. The Individual Defendants' conduct was objectively unreasonable, and the Defendants acted intentionally and with willful indifference to Smith's constitutional rights.

195. The Individual Defendants, knowing of the conspiracy to torture and convict Smith, and having the power to prevent or aid in preventing the commission of the acts in furtherance of that conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C. § 1986.

196. Through the Individual Defendants' misconduct identified in this Count, they violated Smith's rights, and he suffered loss of liberty, physical harm, and severe emotional distress and anguish as a direct and proximate result of the Individual Defendants' failure to intervene.

**Count VI**
**The City of Chicago**
**Section 1983 _Monell_ Policy Claim**

197. Robert Smith incorporates each preceding paragraph as if fully restated here.

198. The Individual Defendants committed and caused the commission of the above-alleged constitutional violations pursuant to one or more interrelated _de facto_ policies, practices and/or customs of the City.

199. Specifically, at all times material to this Complaint, the City, through the CPD, its Superintendents, the Police Board, the City's Mayors, the City Council, and/or the Corporation Counsel's Office, established and implemented the following interrelated _de facto_ policies, practices and customs:

   a. conducting physically, psychologically or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees to obtain false

47

confessions and wrongful convictions, including most specifically the torture committed by Burge and his protegees at Area 2 and later Area 3;

b.  filing false reports and giving false statements and testimony about such coerced interrogations and confessions and other fabricated evidence;

c.  fabricating or constructing false and coerced confessions, as well as other evidence;

d.  suppressing evidence concerning coercive and false interrogations and confessions, and pursuing and obtaining wrongful prosecutions and false imprisonments on the basis of such confessions and interrogations and other fabricated evidence;

e.  denying suspects their right to full and fair access to the courts through the use of coercive and false interrogations and confessions and by withholding, suppressing, and destroying exculpatory evidence;

f.  covering up the true nature of coerced interrogations and confessions, particularly those of Burge and his protegees at Area 2 and later at Area 3;

g.  failing to video and/or audio tape the interrogation or questioning of suspects, arrestees, and witnesses;

h.  failing to properly train, supervise, discipline, monitor, or otherwise control police officers engaged in police brutality and misconduct, particularly officers such as the Detective Defendants here, who were repeatedly accused of torture and abuse of persons in police custody, making false arrests, destroying or withholding evidence, filing false reports, making false statements, providing false testimony, and otherwise engaging in malicious prosecutions and wrongful convictions;

i.  encouraging and facilitating the "police code of silence" under which CPD officers refused to report, covered up, suppressed and destroyed evidence of police torture and other unconstitutional and coercive interrogations at Area 2 and Area 3, despite their obligation under the law and police regulations to report such misconduct;

j.  encouraging CCSAO prosecutors and CPD officers to either remain silent or give false and misleading information in official investigations of Area 2 and 3 torture in order to protect the City and County from civil liability and officers and prosecutors from the same, as well as from internal discipline and criminal charges; and

48

k. otherwise covering up for and suppressing evidence and findings of Area 2 and 3 torture, and refusing to properly investigate, arrest and charge those participating in the torture.

200. As set forth in greater detail above, the pattern and practice of torture and abuse at Area 2 and later Area 3, and the cover-up of that abuse and torture, was well known both before and after Robert Smith was tortured and wrongfully convicted, including by:

a. the command officers at Area 2, including Burge, Martin, and Burge's successor, Defendant Cline;

b. former City of Chicago Mayors Jane Byrne and Richard Daley (both before and throughout his tenure as Mayor of Chicago),

c. several high ranking CCSAO prosecutors, including Daley himself during his tenure as the State's Attorney; Larry Hyman, who as the supervisor of the Felony Review Unit directly participated in the interrogation and torture of Andrew Wilson; and the First Assistant State's Attorney at that time, Richard Devine;

d. successive CPD Superintendents, including Richard Brzeczek, Fred Rice, Leroy Martin, Matt Rodriguez, Terry Hillard, and Phil Cline;

e. OPS Directors, including Gayle Shines;

f. various other CPD Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke and Townsend;

g. Chiefs of Detectives, including William Hanhardt and Terry Hillard;

h. the City Council and the Chicago Police Board, and other high ranking and policy making, command, and supervisory personnel, who collectively and individually participated in the cover-up and suppression of the torture scandal, as set forth in detail above.

201. The above-listed interrelated policies, practices and customs, both individually and together, were maintained and implemented with deliberate indifference; they encouraged, among other things, the coercing of statements from

49

suspects, witnesses and arrestees, by torture and related abusive tactics and techniques; the construction and fabrication of confessions, admissions, statements, and other false witness evidence; the suppression and destruction of evidence of torture and other exculpatory evidence; the intimidation and manipulation of witnesses; the making of false statements and reports; the giving of false testimony; the obstruction of justice and manipulation and obstruction of the State and Federal courts; and the pursuit and continuation of wrongful convictions and false arrests and imprisonments.

202.    Separately and together, the above-listed interrelated policies, practices and customs, directly and proximately caused the unconstitutional violations committed by the Individual Defendants, and the resulting injuries suffered by Robert Smith.

203.    Additionally, the City and County Defendants failure to properly train, discipline, monitor, control, supervise, and counsel the Individual Defendants was also done with deliberate indifference and likewise directly and proximately caused the unconstitutional violations committed by the Individual Defendants, and the resulting injuries suffered by Robert Smith.

204.    Additionally, the City and County's policymakers' involvement in, and ratification of, the unconstitutional policies, practices and customs directly and proximately caused the unconstitutional violations of the Individual Defendants and the resulting injuries suffered by Robert Smith.

## Count VII
## The Individual Defendants
## State Law Claim for Malicious Prosecution

205. Robert Smith incorporates each preceding paragraph as if fully restated here.

206. The Individual Defendants, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Robert Smith, and continued that prosecution without probable cause.

207. That prosecution was ultimately terminated in Smith's favor.

208. The Defendants' actions were done in a willful and wanton manner, and directly and proximately caused Smith's injuries, including but not limited to loss of liberty, physical harm, and severe emotional distress and anguish.

### Count VIII
### The Individual Defendants
### State Law Claim for Intentional Infliction of Emotional Distress

209. The Individual Defendants individually, jointly, and in conspiracy, by committing and causing the commission of the unconstitutional acts set forth in greater detail above, engaged in extreme and outrageous conduct.

210. These Defendants intended, by subjecting Smith to their torture and abuse, to inflict severe emotional distress on Smith and knew that their conduct would cause Smith and his family severe emotional distress.

211. As a direct and proximate cause of the Individual Defendants' outrageous conduct, Smith suffered and continues to suffer from severe emotional distress, including symptoms of post-traumatic stress disorder, anxiety, depression, inability to focus or concentrate, and a recurring fear of re-arrest, torture, and re-prosecution.

### Count IX
### The Individual Defendants
### State Claim for Conspiracy

51

212.    Robert Smith incorporates each preceding paragraph as if fully restated here.

213.    The Individual Defendants reached an understanding together to engage in the unconstitutional overt acts set forth in detail above and jointly acted and/or conspired among and between themselves to commit those acts.

214.    In furtherance of this conspiracy, the Individual Defendants jointly committed unlawful acts, including, among many other things, beating Smith into a false confession, fabricating incriminating evidence, destroying and withholding exculpatory evidence, as well as maliciously prosecuting Smith and intentionally inflicting continuing severe emotional distress on him, as set forth below.

215.    This conspiracy was the direct and proximate cause of Smith's injuries, including but not limited to loss of liberty, physical harm, and severe emotional distress and anguish.

### Count X
### The City of Chicago
### State Law *Respondeat Superior* Claim

216.    Robert Smith incorporates each preceding paragraph as if fully restated here.

217.    The Detective Defendants and Defendant Cline were at all times material to this Complaint employees of the City and acting within the scope of their employment. Their acts in violation of state law are therefore directly chargeable to the Defendant City pursuant to the doctrine of *respondeat superior*.

### Count XI
### The City of Chicago
### 745 ILCS 10/9-102 – Indemnification

218.    Robert Smith incorporates each preceding paragraph as if fully restated here.

219. Because the Detective Defendants and Defendant Cline were, at all times relevant to this Complaint, employees of the City acting under color of law and within the scope of their employment, the City, by statute, is responsible for paying for any tort judgment entered against them. 745 ILCS 10/9-102.

WHEREFORE, Plaintiff Robert Smith respectfully requests this Court to:

(a) enter judgment in his favor and against all Defendants jointly and severally;

(b) award him compensatory damages jointly and severally,

(c) award him attorneys' fees and costs against each Defendant jointly and severally;

(d) enter punitive damages against each of the Individual Defendants;

(e) award pre-judgment interest for all applicable damages;

(f) award post-judgment interest for all applicable judgments; and

(g) award such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff Robert Smith demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: May 11, 2021

Respectfully submitted,
**ROBERT SMITH JR.**

/s/ Stuart J. Chanen

Stuart J. Chanen
Ariel Olstein
CHANEN & OLSTEIN
7373 Lincoln Avenue, Suite 100
Lincolnwood, IL 60712
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com