**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Robert Smith Jr., | ) | |
| Plaintiff, | ) | No. 21-cv-1159 |
| v. | ) | |
| | ) | Honorable Ronald A. Guzman |
| The City of Chicago, et al. | ) | |
| | ) | |
| Defendants. | ) | |

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO BIFURCATE**</u>

Count VI of Plaintiff's Amended Complaint is a *Monell* claim charging Defendant

City of Chicago with having a municipal custom of condoning the violence, abuse, and torture that

disgraced Chicago Police Lieutenant Jon Burge and detectives he supervised inflicted on more than 100

African Americans at Area 2 Violent Crimes throughout the 1970s and 80s (as well as the officers'

fabrication and withholding of evidence) and the City's failures to supervise and/or discipline such

unconstitutional conduct.

Seventh Circuit Pattern Jury Instruction 7.24, attached as Exhibit 1, sets forth the elements of

*Monell* liability for a municipal custom of constitutional violations that are persistent and widespread.

Such liability does not require the City's formal approval of the custom so long as Plaintiff proves that

a policy-making official knew of the pattern and allowed it to continue (a "permitted-the-wrongful-

conduct" violation). Pattern Instruction 7.25, Exhibit 2, sets forth the elements of *Monell* liability for

failing to adequately supervise or discipline officers who are engaged in a pattern of constitutional

violations (a "failure-to-supervise-and-discipline" violation).

In the City's Answer to Plaintiff's Amended Complaint, Dkt.34, the City admitted, among

other things, that the City has repeatedly acknowledged and apologized for Area 2 torture, and even

more significantly that it made 57 reparation payments to victims under a standard that required the

applicant to present "a credible claim" of torture by Chicago Police Detectives in order to obtain

compensation.  Shockingly, despite these admissions and the extensive evidence Plaintiff Smith

outlines in his Amended Complaint proving the City's cover up of torture, the City expressly denies

that the torture amounted to a "pattern and practice." *Id*. at ¶¶119, 200.  At the same time, the City

and the Individual Defendants, in the purported interests of judicial economy and "relieving" Smith

of the burden of having to establish municipal liability, have moved the Court to bifurcate Plaintiff's

*Monell* claim from the remainder of Plaintiff's case. Dkt. 39 (City's Motion); Dkt.43 (Individual

Defendants' Motion to Join and Supplement, cited in this opposition as  "Supplement").

There is no dispute that the Court has the discretion to bifurcate the *Monell* claim; Federal

Rule of Civil Procedure ("Rule") 42(b) provides:

> (b) SEPARATE TRIALS. For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

Fed. R. Civ. P. 42(b).  Nevertheless, there are numerous procedural and substantive reasons this

Court should deny Defendants' bifurcation motion.

Defendants also purportedly move this Court under Rule 42(b) to stay all *Monell* discovery.

Rule 42(b) of course says nothing about a stay of discovery.  *See Abramson v. Gohealth LLC*, No. 19

C 6318, 2020 WL 5209817, at *1 (N.D. Ill. Sept. 1, 2020)( ". . . the Federal Rules of Civil Procedure

do not explicitly allow for bifurcated discovery – and that includes Fed. R. Civ. P. 42, upon which

Defendant relies.").  Rather, it is Rule 26(c)(4) and the Court's inherent authority that permits it to

stay discovery.[1]

---

[1]     *See* Fed. R. Civ. P. 26(c)(1)(d) (Court may "forbid[] inquiry into certain matters, or limit[] the scope of disclosure or discovery to certain matters").  *See also Lopez v. City of Chicago*, No. 01 C 1823, 2002 WL 335346, at *3 (N.D. Ill. Mar. 1, 2002) ("Federal Rule of Civil Procedure 26(c) allows the Court to control the sequence and scope of discovery."); *Ankcorn v. Kohl's Corp.*, 15-CV-1303, 2017 WL 395707, at *2 (N.D. Ill. Jan. 30, 2017) (the Court's power to stay discovery – either in whole or in part – derives more simply from the court's "inherent authority").

The distinction is actually important in this instance because the City spends much time attempting to bootstrap its Motion to Stay arguments onto its Motion to Bifurcate motion and vice-versa. For example, under the section heading, "*Bifurcation is appropriate because the City's liability is entirely dependent on the liability of Defendant Officers*," the very first sentence is: "Bifurcation will allow the parties to avoid burdensome, time-consuming, and likely unnecessary discovery while substantially reducing litigation costs," Motion at 3, a complete non-sequitur. In other words, because Defendants do not have a strong argument to bifurcate Smith's *Monell* claim from his other claims, especially this early in the case, the City uses the purported savings of burdensome discovery as the primary basis to eliminate Smith's *Monell* claim, and then later in the Motion, it flips that script, and attempts to use trial efficiency to eliminate Smith's *Monell* discovery. As the Court will see, both arguments bootstrap the other, and neither stands on its own weight.

## I.   THE COURT SHOULD DENY DEFENDANTS' MOTION AS PREMATURE.

Courts in this district have repeatedly held that the beginning of discovery is not the proper time to decide whether to bifurcate claims from the trial of the case. *Gibson v. City of Chicago et al*., No. 19 C 4152, 2021 WL 2127182, at *1–2 (N.D. Ill. Apr. 6, 2021) (Ellis, J.) ("the Court cannot determine at this time the evidence the parties intend to introduce at trial, making it difficult to assess the potential prejudice the City and the Defendant Officers [assert]" and denying the City's bifurcation motion without prejudice); *Estate of Loury by Hudson v. City of Chicago*, No. 16-CV-04452, 2017 WL 1425594, at *4 (N.D. Ill. Apr. 20, 2017) (St. Eve, J.) ("Discovery is still in its early stages and thus any analysis of undue prejudice is premature and speculative. Discovery proceeding simultaneously on all claims does not prejudice Defendants and if Defendants still have concerns of undue prejudice as trial approaches, the Court—at that later stage—can still order the bifurcation of the trial or can mitigate any potential prejudice through the use of limiting instructions, motions *in*

*limine,* and the Rules of Evidence") (internal citations and quote marks omitted). *See also Estate of McIntosh v. City of Chicago*, No. 15 C 1920, 2015 WL 5164080, at *9 (N.D. Ill. Sept. 2, 2015); *Giles v. Ludwig*, No. 12-cv-6746, 2013 WL 6512683, at *2 (N.D. Ill. Dec. 6, 2013); *Cadiz v. Kruger*, No. 06 C 5463, 2007 WL 4293976, at *6 (N.D. Ill. Nov. 29, 2007); and *Cadle v. City of Chicago*, No. 15 C 4725, 2015 WL 6742070, at *2 (N.D. Ill. Nov. 2, 2015). These holdings are perhaps best summarized in an opinion earlier this year from Magistrate Judge Lisa Jensen of the Northern District's Western Division, *Trexler v. City of Belvidere*, No. 20 CV 50113, 2021 WL 493039 (N.D. Ill. Feb. 10, 2021):

> [T]he City has brought the instant motion at a relatively early stage in the litigation. At this point in time, neither the parties nor the Court know what evidence would be offered at trial or how prejudicial the evidence may be. As such, it would be premature to speculate on the prejudice that one or both Defendants would face should all of Plaintiff's claims move forward in one trial. When faced with this sort of uncertainty at the discovery stage, courts routinely decline to grant motions to bifurcate. If the City still has concerns about prejudice at a later stage as trial approaches, the Court may reconsider granting bifurcation of the trial. The Court and the parties may also be able to mitigate potential prejudice through tools such as limiting instructions, motions *in limine*, and the Rules of Evidence.
> . . .
> The Court concludes that the City's motion to bifurcate Plaintiff's *Monell* claim and stay discovery are not in accordance with Rule 42(b)'s considerations of convenience, economy, expedition, and prejudice. The potential for bifurcation or a stay to serve the interests of judicial economy and avoid unfair prejudice is speculative at this point in the litigation, especially when weighed against the interests of and prejudice to Plaintiff as the non-moving party.

*Id*. at *5-6. Based solely on prematurity alone, this Court may and should deny the City's Motion.

## II.   THE COURT SHOULD DENY DEFENDANTS' MOTION ON ITS MERITS.

If the Court nevertheless decides to reach the merits of the City's Motion, it should still deny it. In the City's Introduction, it makes three basic arguments:

(1)   The trial against the individual defendants is already "potentially lengthy," and there is no good reason for it to be prolonged by a potentially "extended and complex trial on the City's *Monell* liability;"

(2)   "The potential for undue prejudice to the individual defendants will be avoided;" and

(3)   "Plaintiff will be relieved of the burden of having to establish municipal liability in order to obtain entry of judgment against the City on his §1983 claims."

4

Motion at 1.  Numerous judges in this district have rejected these arguments as a basis to bifurcate *Monell* and stay *Monell* discovery, and this Court should as well.

**A. The Court Should Reject Defendants' Efficiency Argument.**

Defendants assert that that this litigation will be more efficient if the Court *both* bifurcates Smith's *Monell* claim and stays all *Monell* discovery, arguing that allowing Smith's *Monell* claim to remain will lead to burdensome, time-consuming, expensive, and unnecessary discovery, Motion at 1, 3, and will turn a lengthy trial against Detectives into an even lengthier and more complex case that unfairly focuses on the City's municipal liability.  *Id*. at 11; *see also* Supplement at 3.

For many years, the judges in this district accepted these general propositions and ruled in favor of the City, but over the past several years, the judges have taken a completely different approach, repeatedly and convincingly rejecting this argument because they have come to realize that the suggested efficiencies are rarely, if ever, achieved, and that the efficiencies only have a chance of being achieved if the *Monell* claim is taken from the plaintiff altogether.  *See*, *e.g.*, *Gomez v. City of Chicago*, 2019 U.S. Dist. LEXIS 155120, *12-13 (bifurcation would constitute a *de facto* dismissal of Plaintiff's *Monell* claim).  *See also infra* at 7 n.2 (listing recent cases, especially Area 2 cases).  The judges who have rejected the City's motion on efficiency grounds rely on two primary holdings:  (1) bifurcation does not save work for the parties; (2) it does not save work for the judges.

First, judges in this district have come to realize that the work *required of the parties* to discover and try the *Monell* claim is not nearly as burdensome as the City suggests, and that is especially true in a Burge-era torture case.  All of the *Monell* discovery that the parties will need has already been extensively collected, copied, collated, classified, categorized, and catalogued. There is an easy-to-use website entitled "Chicago Police Torture Archive" ("CPTA"), https://invisible.institute/cpta, in which Plaintiff, Defendants, and this Court can obtain any of the

following extensive information about the City's role in the Burge torture scandal. After pressing

"Documents," the viewer receives the following message:

> After decades of litigation, independent journalism and organizing by survivors, their family members, activists, artists and educators, a wealth of evidence was developed proving a racist pattern and practice of torture.
>
> This digital archive contains much of this evidence, collected by the People's Law Office over a 30-year period when representing police torture survivors in their criminal cases and civil rights cases, and advocating [that victims] receive reparations from the City of Chicago.

https://chicagopolicetorturearchive.com/documents (last accessed June 19, 2021). The viewer than

has access to the following documents.

1. transcripts of testimony from more than one hundred Area 2 torture victims;

2. transcripts of several former detectives who admitted that torture was an "open secret" at Area 2;

3. transcripts of testimony from several Cermak physicians, including Dr. John Raba, who examined injuries torture victims suffered at Area 2 and reported those injuries to the CPD Superintendent Richard Brzeczek;

4. sworn statements and testimony from Mayor Daley, State's Attorney Dick Devine, CPD Superintendents Brzeczek and Martin, and other high-ranking City and Cook County officials, who acknowledged the torture as well as tacitly admitted the City's failures to investigate & stop it;

5. testimony from civilians who met Burge and heard him and other Area 2 detectives brag and joke about the torture;

6. testimony and reports from several police misconduct and torture experts, who found that the torture was widespread, and that the City knew about it and failed to stop and investigate it;

7. admissions by the City concerning the pattern of the torture in various signed pleadings;

8. analyses and reports authored by OPS investigators Goldston and Sanders who made sustained findings of the torture in numerous cases;

9. the 2006 Report of Special Prosecutors Egan and Boyle, finding systematic torture and faulting CPD Superintendent Brzeczek with allowing it to go on even after Wilson's torture in 1982;

10. 1992 transcripts from the Police Board cases against Burge, O'Hara and Yucaitis; and

11. thousands of pages of additional evidence and testimony from numerous sources proving the torture and the City's knowledge of it.

*Id.* Because of this massive amount of public information, Plaintiff has yet to issue a single *Monell* discovery request, interrogatory, request to admit, or deposition notice, and without waiving his right to do so, it is very unlikely that Mr. Smith will ever issue any such discovery. He already has more evidence that the City was fully aware of Area 2 Detectives' misconduct and did nothing to stop or discipline it than he could possibly use in a single trial.

Therefore, more than 39 years after Burge, Yucaitis, and O'Hara interrogated Andrew Wilson, more than 31 years after John Conroy published his seminal article, "House of Screams," in *The Chicago* Reader, almost twelve years after the Illinois General Assembly passed the Illinois Torture and Relief Commission Act, 775 ILCS 40/1, *et. seq.*, and more than six years after the City Council passed reparations for Area 2 and Area 3 torture victims, there is very little evidence related to the torture, framing, and cover up at Area 2 Violent Crimes that has not already been carefully collected and made publicly available. Even if Smith does in fact issue *Monell* discovery requests to the City, the City will easily be in a position to respond because it has already repeatedly responded to such discovery in other torture cases or will do so very imminently.[2]

---

[2]     The Area 2 torture cases in which bifurcation was *denied* and *Monell* discovery proceeded include at least the following four cases: *Smith v. Burge*, 16-cv-3404 at Dkt. 205 (N.D. Ill. August 9, 2018) (J. St. Eve) (different Smith); *Bailey v. City of Chicago*, No. 19-cv-00197, at Dkt. 87 (N.D. Ill. Jan. 10, 2019) (J. Tharp) (no written opinion; extensively discussed in *Batchelor* opinion); *Batchelor v. City of Chicago*, 18-CV-08513, 2021 WL 825607, at *4 (N.D. Ill. Mar. 4, 2021) (J. Kness) (granting Plaintiff's Motion for reconsideration); *Gibson v. City of Chicago*, No. 19 C 4152 at Dkt. 159 (N.D. Ill. Mar. 4, 2021) (J. Ellis). (*See also McIntosh v. City of Chicago*, No. 17 CV 6357, Dkt. 101, (N.D. Ill. Feb. 13, 2019) (J. Leinenweber), a police misconduct case that did not involve Area 2 torture also required the production of *Monell* evidence related to non-supervision of police misconduct).

        Even in the older Area 2 cases, where limits were placed on *Monell* discovery, the City still produced at least some *Monell* discovery because of the significant overlap between *Monell* and so-called "non-*Monell*" discovery. *See generally Patterson v. Burge*, No. 03-cv-4433 (N.D. Ill.); *Orange v. Burge*, No. 04-cv-168 (N.D. Ill.); *Hobley v. Burge*, No. 03-cv-3678 (N.D. Ill.); *Howard v. City of Chicago*, No. 03-cv-8481 (N.D. Ill.); *Cannon v. Burge*, No. 05-cv-2192 (N.D. Ill.); *Tillman v. Burge*, No. 10 -cv-4551 (N.D. Ill.); *Caine v. Burge*, No. 11-cv-8996 (N.D. Ill.); and *Wrice v. Byrne*, No. 14-cv-05934 (N.D. Ill.).                                                                 (*footnote cont.*,)

Therefore, far from being time-consuming, expensive, and burdensome, far from being extensive, extraordinary, and complicated, *Monell* discovery in this case will rather fall somewhere between completely non-existent and requiring some patient culling of documents off of the CPTA website.  Indeed, in its Motion, the sole discovery area on which the City focuses are depositions, complaining that plaintiff intends to take a whopping "20-25 depositions."  (106 were taken in *Patrick*).  What the City leaves out, however, is that those 20-25 depositions are *occurrence witnesses necessary to prove Smith's Section 1983 claims against the individual defendants*.  In light of Federal Rule of Evidence 804 (use of hearsay for unavailable witnesses) and Federal Rule of Civil Procedure 32 (use of depositions at trial), most prior statements by City officials are already admissible, and therefore very few, if any, *Monell* depositions will be taken.  Moreover, to the extent there remains any dispute about admissibility, the City can ensure through agreed-upon stipulations that any prior depositions of those officials are admissible.  In sum, the City's unsupported claims of "undue burden" are simply not borne out in a case such as this and should be rejected.

Second, the judges have also come to realize that the bifurcation does not necessarily reduce *judges' time*.  While getting rid of all *Monell* discovery and skipping *Monell* claims at the first trial may seem appealing on first blush, the appeal is in fact illusory; the time just gets eaten up in other ways.  Taking discovery first, as Judge Rowland held recently in *Maysonet v. Guevara*,

> [B]ifurcation could result in two rounds of depositions and document production. . . . "It could create double work in the sense of, for example, needing to depose witnesses or solicit testimony first regarding [plaintiff's] specific case and a second time regarding how the City's policies impacted that case work. . . .  Thus, because bifurcation would likely duplicate discovery efforts and expense, and because the burden of unitary discovery is lessened by the expanse of similar litigation, the interests of judicial economy weigh against bifurcation.

---

Finally, we hope that the irony of the Individual Defendants' citation to Judge Ellis's 2015 opinion in *Fuery*, Motion at 4, is not lost on the Court, as over the past six years, Judge Ellis has done a complete 180° on her views regarding *Monell* bifurcation, as evidenced by her 2021 opinion two months ago in *Gibson*.

8

No. 18-CV-2342, 2020 WL 3100840, at *1 (N.D. Ill. June 11, 2020); *Id*. at *3 n.3 ("Also, the Court [would be required] to referee the inevitable disputes about the scope of Monell versus non-*Monell* discovery, [which only adds to the Court's work if it grants bifurcation]").

As to trying the case, the Courts have recognized that in the police misconduct cases, "much of the evidence required to litigate the individual claims will be relevant to the *Monell* claim and *vice a versa*." *Maysonet*, 2020 WL 3100840, at 3, citing *Gomez*, 2019 U.S. Dist. LEXIS 155120, at *11 (there will be significant overlap between the *Monell* witnesses and the 404(b) witnesses). The City in fact concedes this fact on page 10 of its Motion; the Individual Defendants concede it on page 4, note 2 of its Supplement (citing to Fed. R. Civ. P. 404(b)[sic]); and judges have so held. *See*, *e.g.*, *Coleman v. Peoria*, 2016 WL 5497363, at *6 (C.D. Ill. Sep. 27, 2016) (denying bifurcation and explaining *Monell* evidence was "relevant to the actions of the defendant officers, who would, assuredly, claim to have acted in conformity with sanctioned department policies and practices" and admissible under Federal Rule of Evidence 404(b)).

Finally, all of the savings Defendants envision are premised on there being *only one trial*. Their false premise is that if Plaintiff *loses* the first trial, the district court proceeding comes to an end AND if Plaintiff *wins* the first trial, the district court proceeding also comes to an end because Plaintiff will have received the maximum monetary compensation to which he is entitled. Motion at 6. If, however, as numerous judges in this District have pointed out, that premise is incorrect, and Plaintiff does not abandon his *Monell* claim, then there will have to be an entire second round of discovery (including several of the same witnesses) and an entire second trial on the City's *Monell* liability. None of the purported time savings being contemplated will be realized. *See Cadle*, 15 C 4725, 2015 WL 6742070, at *3 (refusing to assume that "Plaintiff will abandon his *Monell* claim" and explaining

9

that a discovery stay and bifurcation "requires discovery to be conducted seriatim" and "impose[s] a very real delay on the ultimate adjudication of all of Plaintiff's claims.").

The bottom line is that neither the discovery nor the trial will be rendered substantially more efficient by granting the bifurcation motion, and for that reason, the Court should deny it. Moreover, as developed further below, "even if bifurcation might somehow promote judicial economy, courts should not order separate trials when bifurcation would result in unnecessary delay, additional expense, or some other form of prejudice." *William Reber, LLC v. Samsung Elecs. Am., Inc.*, 220 F.R.D. 533, 536 (N.D. Ill. 2004) (Denlow, M.J.).

**B. The Court Should Reject Defendants' Undue Prejudice Argument.**

The City asserts that if Smith's individual claims and *Monell* claim are tried together, the Individual Defendants, including ASA Brogan, will suffer unfair prejudice. Motion at 1, 11-12, 12 n.4. There are at least three problems with this argument (there were four but realizing that the City did not have standing to assert prejudice for the Individual Defendants, the Individual Defendants have joined the City's Motion).

First, as noted above, the City's (and Individual Defendants') claims of unfair prejudice are premature. The judges who have ruled that trial bifurcation motions early in discovery are premature have saved their choicest words for claims of "undue prejudice." This point was best summarized by Judge St. Eve in *Loury*:

> Several courts in this district have rejected bifurcation arguments based on undue prejudice because it is speculative to determine at the discovery stage what evidence will actually be offered at trial and whether that evidence will unfairly prejudice either the defendant officers or the municipality.

> [These courts] reasoned that [while] the City's argument focused on potential trial prejudice, no prejudice would result from allowing discovery on all claims to proceed simultaneously. Even if all the claims proceeded to a unitary trial, limiting instructions would be sufficient to ensure that none of the defendants were prejudiced by evidence unrelated to them specifically.

Ultimately, the [*Cadiz*, *Giles*, *Cadle*, *Medina*] courts found that at the discovery stage it was simply too early to determine that "the threat of unfair prejudice outweighs the inefficiencies of proceeding in two trials."

*Loury*, 2017 WL 1425594, *4 (full citations to *Cadiz*, *Giles*, *Cadle*, and *Medina* omitted). *See also* *Maysonet*, 2020 WL 3100840, at *4 ("determining potential prejudice to parties at trial is often 'premature and too speculative' at this [early] stage of the litigation"); *Jackson v. City of Chicago*, No. 14 C 6746, 2017 WL 8199322, at *3 (N.D. Ill. Dec. 12, 2017) ("[T]he better time to evaluate [prejudice from trying individual and *Monell* claims together] is shortly before trial, when the court (and the parties) will have a much better understanding of the evidence and its relevance to the individual and *Monell* claims.").

Second, the City's purported claims of potential prejudice *to itself* are weak. *See Cadle*, 2015 WL 6742070, at *4 ("the City's efficiency, economy and prejudice arguments do not pass muster at this juncture"). The sole prejudice the City asserts that *it* will suffer if *Monell* is not bifurcated is that a jury might "hold the City liable on [Smith's] *Monell* claims [under a *respondeat superior* theory] without giving the *Monell* claims their due consideration." Motion at 14. This purported concern, however, is as fabricated as the detectives' claims that they found Mr. Smith's bloody underwear on the top basement stair. The suggestion that this Court is not capable of instructing the jury on the difference between *respondeat superior* and *Monell* liability and further that the jury is not capable of understanding and following that distinction is an insult both to this Court and the jury to be impaneled. It also flies in the face of the well-established appellate principle that a jury is presumed to follow the Court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 226 (2000).

Third, prejudice alone is not enough. The City must establish that trying the claims together would be *unduly* or *unfairly* prejudicial, and neither the Motion nor the Supplement establish *undue*

11

*prejudice*.  For example, the evidence showing that Defendants McWeeny, Yucaitis, Pedersen, and others repeatedly asserted the Fifth Amendment when questioned about Area 2 torture is admissible in this civil case.  *See Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976); *Rodriguez v. Cervantes*, No. 07 C 2481, 2009 WL 3460100, at *2 (N.D. Ill. Oct. 20, 2009).  At the same time, however, showing that the City was aware of these Fifth Amendment invocations and took no action against the Officers (and continued to pay their lucrative pensions) is also relevant and probative against the City.  That may be prejudicial, but it is not unduly prejudicial, and if confusion ensues (which Defendants in these cases always makes sure it does), any risk of prejudice can be avoided entirely through the instructions the Court gives to the jury.

This then brings us to the Individual Defendants' supplemental arguments.  These Defendants first assert that "Burge was not involved" in Smith's torture and "had been long gone from Area 2 at the time of the murder investigation, having been replaced by defendant Philip Cline."  Dkt. 43 at 2.  First, Burge had not been "long gone."  He left in August 1986, and Smith was tortured in September 1987.  It has been well-documented that the torture and abuse culture ingrained at Area 2 since the early 1970s did not spontaneously disappear with Burge's departure.  In fact, the defendants' own testimony shows that Burge's departure from Area 2 changed nothing.  Defendant Phil Cline, also a former CPD Superintendent, testified under oath (in post-conviction proceedings) that when he took over for Burge he did not instruct the Area 2 detectives to stop using the interrogation "techniques" they had used under Burge's command because, as far as he was concerned, torture never occurred and there was nothing for the Detectives to change.  *See* Cline Dep. Excerpts, attached as Exhibit 3 ("I don't remember there being anything that needed to be cleaned up").

Similarly, Defendants McWeeny, Brownfield, and Pedersen each falsely testified that the torture never happened at Area 2 *at all*, that they never even heard about the torture from sources

other than media, and that the hundreds of torture complaints and numerous judicial and admini-strative findings that torture occurred are all false or wrong. (McWeeny went so far as to describe Burge as "the best supervisor he ever worked for.") McWeeny Dep. Excerpts, attached as Exhibit 4.

Defendants Cline, Solecki, Rowan, and Higgins next attempt to distance themselves from Area 2 torture by claiming "they never worked for or with Burge" and should not have to face "the very real likelihood of guilt by association." Dkt. 43 at 4. This concern is also misplaced. Smith will prove liability not through "guilt by association," but guilt by their own individual conduct, including their own opportunity, intent, preparation, and plan. Each of the detective defendants and ASA Brogan are deeply implicated in Area 2 torture and police misconduct cases – even without any reference to Burge:

- Defendant McWeeny is implicated in the torture and abuse of at least 16 individuals, including Melvin Jones, James Andrews, David Fauntleroy, Lee Nora, Darrell Cannon, Leroy Orange, Leonard Kidd, Alex Moore, Stanley Howard, Aaron Patterson, Madison Hobley, Keith Walker, TyShaun Ross, Kevin Bailee, Arnold Day, and Corey Batchelor.

- Defendant Yucaitis is implicated in the torture of at least 13 victims, including Anthony Holmes, Virgil Robinson, Donald White, Andrew Wilson, Lavert Jones, Thomas Craft, Alex Moore, Phillip Adkins, Robert Billingsley, Jesse Winston, Michael Tillman, Steven Bell, Ronald Wise.

- Detective Robert Dwyer (who headed the murder investigation in this case and who Plaintiff will likely be naming as a defendant shortly) is implicated in the torture of at least nine Burge victims, including Robert Billingsley, Jesse Winston, Madison Hobley, Michael Coleman, Gregory Banks, David Bates, Stephen Cavanero, LC Riley, and Robert Smith (a different Smith, not Plaintiff). Dwyer's sister, Eileen Pryweller, has testified on several occasions that she heard her Burge and Dwyer brag and joke about suffocating and ruthlessly beating and electrocuting suspects.

- Defendant Pedersen is implicated in the torture and abuse of at least three victims, Eric Caine, Clearance Trotter, and Aaron Patterson.

- Defendant Rice is implicated in the torture and abuse of at least two torture victims, Corey Batchelor and Kevin Bailey, who were both exonerated in 2018, and have pending civil rights lawsuits. *See Batchelor v. City of Chicago*, 18-cv-08513 (N.D. Ill.); *Bailey v. City of Chicago*, No. 19-cv-00197 (N.D. Ill.).

- Defendant Brownfield is implicated in the torture of at least two Burge victims, Eric Caine and Clarence Trotter.

- Defendant Cline is implicated in the torture of at least one other victim, Madison Hobley, and has also been implicated in covering up other forms of police misconduct, which in fact led to his resignation in 2007. See https://www.nytimes.com/2007/04/03/us/03chicago.html.

- Defendant Solecki is implicated in the torture of at least two other victims, Franklin Burchette and Michael Nolan. *See also Richardson v. Briley*, 2004 WL 419902, at *12 (N.D. Ill. Feb. 10, 2004) (district court finding Solecki "utterly lacking in credibility based both on his demeanor and the content of his testimony").

- Defendants Michael Rowan and William Higgins are both implicated in at least one police misconduct case, Eddie Bolden, who was exonerated and received a certificate of innocence in 2016, after spending 22 years in prison. Remarkably, Bolden alleges that Rowan and Higgins fabricated evidence and withheld exculpatory evidence, which is precisely the same allegation that Smith makes in this case. Bolden's federal civil case is pending. *Bolden v. City of Chicago*, 17-cv-00417 (N.D. Ill.).

- Lastly, ASA Brogan, participated in covering up Burge torture in at least one other case, Andrew Maxwell, who was severely beaten during his interrogation by Area 2 Detectives on November 12, 1986.

The Individual Defendants' argument that the *Monell* evidence is "unrelated" to the claims against them and will unfairly prejudice them is simply wrong. These are not "*tangential* links" in a chain of 404(b) and *Monell* evidence, *Cf.* Supplement at 3, and this will not be a guilt-by-association case; rather, the defendants will be found liable based on their own individual misconduct in relation to Mr. Smith and their 404(b) conduct in numerous other instances. The Court should reject the Defendants' prejudice claims both as premature and on the merits.

> C. **The Court Should Call Out The Elephant In The Room.**

Defendants assert that "claims of municipal liability require an extensive amount of work on the part of plaintiff's attorneys and experts, and an extraordinary amount of money must be spent in order to prepare and prove [their claims]." Motion at 2. But, by bifurcating the *Monell* claim from the others, they argue, "Plaintiff will be relieved of the burden of having to establish municipal liability in order to obtain entry of judgment against the City on his §1983 claims." Motion at 1. Thank you very much, but no thanks at all.

When Defendants state that they want to "relieve" Smith of his burden of proving municipal liability, it is reminiscent of Tom Sawyer giving Ben Rogers the *chance* to paint Aunt Polly's fence, provided *Ben pay Tom* an apple for the opportunity (followed by "Billy Fisher for a kite, in good repair" and Johnny Miller, who "bought in for a dead rat and a string to swing it with").  While far from a perfect analogy, the way Smith actually wants the City to relieve him of his burdens is by (1) acknowledging the horrific pattern of violence and torture that he and others suffered at Area 2 at the hands of Burge and his henchman, and (2) by paying him for his 33+ years of wrongful incarceration.  It is not by continuing the shameless denial that Burge torture constituted "a pattern," which is what the City does in its Answer, and it is certainly not by trying to convince Mr. Smith and this Court that the best way for Mr. Smith to help himself is by removing his easiest-to-prove claim from the case.  Before turning to Defendants' real goal in removing municipal liability from this case, Smith first addresses three incorrect premises on which the Defendants base their joint Motion.

### 1.  Proving *Monell* Liability Is Not A Significant Burden On Smith.

Robert Smith is ready to prove his Monell claim *today*.  The evidence of the City's *Monell* liability for condoning violence against African Americans suspects at Area 2 and failing to stop Detectives from doing so, is overwhelming.  The City Council has admitted it, apologized for it, and set up reparations to atone for it, paying $5.5M to 57 individuals on the specific basis that each made a "credible claim" of torture by Burge and other Area 2 officers.  *See* City's Answer, Dkt. 34, at ¶¶120, 132.  Former Mayor Emanuel apologized for the torture, stating it is "a stain that cannot be removed from the history of our City." *Id*. at ¶109.  In 2016, before running for Mayor, Lori Lightfoot led a panel that concluded Burge and the detectives he supervised "tortured and abused at least 100 African Americans on the South and West sides in attempts to coerce confessions." *See* City's Answer, Dkt. 34, at ¶110.  Later, during her mayoral campaign, Lightfoot blamed Burge for

"so many lives shattered" and the "dark legacy" that left a "horrible stain on the legitimacy of policing that resonates today." https://www.wbez.org/stories/mayor-lori-lightfoot-says-police-tortured-at-least-100-black-chicagoans-the-city-refuses-to-call-it-a-pattern/7b5eca8c-5089-44a4-9648-6e720e8fb521 (last visited: June 20, 2021). Even as Mayor she has stated that Burge's criminal conviction and sentence *for lying about torture* nevertheless had at its core the fact that he and his detectives had in fact "tortured murder suspects for years." *Id.*

Moreover, as far back as January 22, 1992, specially appointed City of Chicago lawyers affirmatively stated and conceded on behalf of *the City* that "[t]he testimony [of other torture victims] reveals an *astounding pattern* or plan on the part of respondents [Burge, Yucaitis and O'Hara] to torture certain suspects . . . into confessing to crimes" and went on to identify "seven additional victims of torture tactics at Area II headquarters." *See* City's Answer at ¶110; *see also* the City's January 22, 1992 Memorandum, attached as Exhibit 5 (emphasis added).[3]

Further, there is overwhelming evidence that the Police Superintendent knew well before September 1987 what was going on at Area 2. *See* Answer ¶127 (City's admissions that on February 17, 1982, Dr. John Raba sent a letter to then-Superintendent Brzeczek about Andrew Wilson's injuries, which Raba indicated called for an investigation of torture); ¶135 (City's admissions concerning OPS investigator Michael Goldston's September 28, 1990 report); ¶144 (City's admissions concerning Mayor Daley's attempt to discredit the Goldston's report); ¶¶154-56 (City's admissions concerning the Egan-Boyle Report and its findings that Area 2 torture was systematic, that

---

[3]       Plaintiff respectfully requests the Court to challenge the City at the June 30 hearing to explain its denial of "a pattern of torture and abuse at Area 2." As this Court knows, the City and its lawyers have a duty to be truthful in signed pleadings, Fed. R. Civ. P. 11, and the City and its leaders should not be allowed to continue to publicly admit and acknowledge the pattern of Area 2 torture, while at the very same time deny that very same pattern in signed pleadings filed in cases brought by exonerated Burge torture survivors like Robert Smith.

Superintendent Brzeczek was guilty of a "dereliction of duty," and that he "did not act in good faith in the investigation of Andrew Wilson").[4]

In sum, leaving Smith's *Monell* claims in place will not make Smith's case substantially more difficult to try, nor to discover. The City's assertions that keeping the claims together will create enumerable discovery problems for the parties and the Court and make this litigation far less efficient is simply not borne out by the facts, the law, the evidence available, or this Court's precedents.

### 2. A Plaintiff Is The Master of His Complaint And The City's Offer To Consent to Judgment Does Not Change That.

The City's second false premise is that the Court, not the Plaintiff, is the master of Plaintiff's complaint, and that in these particular circumstances, the Court should take away Smith's *Monell* claim. The City asserts that if the Court does so, it is even willing to sweeten the deal, asserting:

> [I]f bifurcation is granted, the City would agree to an entry of judgment against it for any compensatory damages awarded to plaintiff should he prevail on an underlying constitutional claim against any named Defendant Officer who was acting within the scope of his City employment during the relevant time.

Motion at 3. In those cases that grant bifurcation and stay discovery, much is made of the City's consent to judgment offer. The problem, however, as the City concedes, is that it is already obligated, "both statutorily and contractually," to indemnify the Detective Defendants for any judgment entered against them. *See* Motion at 14. And, because its offer of judgment still denies that it did anything

---

[4]    The City also complains that the "age of the case only increases the difficulties and expenses that will be associated with *Monell* discovery," Motion at 10 n.3, apparently suggesting that if the City can cover up police misconduct long enough, then its ability to defend civil rights suits arising out of that misconduct becomes *too difficult*, and any such *Monell* claim should be stricken. This is of course ridiculous since the age of the case harms only Plaintiff, not the City. First, Plaintiff carries the burden of proof. Second, unlike Mr. Smith, the City and its lawyers have not been wrongfully incarcerated the past 31 years; they have been out and about, free to collect, process, and analyze the evidence of the City's *Monell* violation; Mr. Smith, who spent those 31 years quite differently, has not until now had that chance. Moreover, as numerous judges have noted, the City has *already produced Monell evidence* in other cases. Therefore, *if* Smith ends up issuing any *Monell* discovery, all the City will need to do is to go back to those cases and produce the *Monell* discovery previously produced.

wrong with respect to stopping, supervising, or disciplining the outrageous conduct that occurred, it actually offers Plaintiff *nothing* in exchange for dropping his *Monell* claim. *Maysonet*, 2020 WL 3100840, at *4 ("courts in this district have particularly taken issue with similar consents to judgment as offering little, if any, deterrent effect where, as here, the proposal expressly denies any wrongdoing on the part of the City"); *Rodriguez*, 2018 WL 3474538, at *3 ("A proposed consent judgment is particularly ill-designed to have any deterrent effect where, as here, it expressly denies any wrong-doing on the City's part."); *Giles*, 2013 WL 6512683, at *2 (finding that the proposed consent "attempts to circumvent the public policy goals of *Monell* claims by insulating the City from litigating and accepting responsibility if their practices and polices result in constitutional injuries.").

These judges have therefore repeatedly rejected that bifurcation should be used to force or put pressure on the Plaintiff to give up his municipal liability claim. In 2019, in *Cadle*, the court held,

> [T]he City essentially is trying to take away [Plaintiff's] choice of theories and how to proceed with his claims. Courts do not routinely bifurcate claims in other civil cases on the assumption that certain of the Plaintiffs claims are less valuable or important than others. For example, it is difficult to imagine a scenario in which a court takes away a corporate litigant's claim or theory, at an early stage in the proceedings, because the judge thinks the plaintiff can obtain sufficient relief with its other theories or claims and it is possible that all claims will not be tried at the same time. Why should a court do so when a civil rights plaintiff sues police officers and the City, particularly when the City's efficiency, economy and prejudice arguments do not pass muster at this juncture?

2015 WL 6742070, at *3 (citations omitted). In 2020, Judge Rowland repeated this theme:

> The Court notes that bifurcation is essentially a means "to achieve a *de facto* dismissal of the *Monell* claim. . . . This Court will not deprive a plaintiff, particularly one who has spent 27 years in prison on a conviction that has been vacated by the state courts, a merits determination on a *Monell* claim. *Monell* claims are difficult to prove and consent to judgment agreements like that proposed here may pose a benefit to someone in Maysonet's position. But the Court will not *force* Maysonet to accept such an agreement and forfeit a merits determination on his *Monell* claim through the vehicle of bifurcation.

*Maysonet*, 2020 WL 3100840, at *5 (citations omitted). And this past April, Judge Ellis cited and relied upon both of these statements in denying bifurcation. *Gibson*, 2021 WL 2127182, at *2, *citing*

18

*Cadle* and *Maysonet* ("the City's argument discounts that Gibson is the master of his complaint and has chosen to pursue both individual and municipal liability claims"). *See also Cadiz v. Kruger*, No. 06 C 5463, 2007 WL 4293976, at *10 (N.D. Ill. Nov. 29, 2007) ("If accepted, the City's bifurcation strategy would allow [the City] to avoid the merits of virtually any *Monell* claim alleging police misconduct.").

Quite simply, the doctrine that "a plaintiff is the master of his/her complaint" bars Defendants' suggestion that the Court should simply *require Smith* – on either efficiency or prejudice grounds – to accept the City's consent and abandon his *Monell* claim.

### 3. The City's Liability Is Not Dependent On The Officers' Liability.

Defendants' third false premise is that the City's liability "is entirely dependent on the liability of Defendant Officers." Motion at 3. While it is true that generally *Monell* liability requires an initial finding against the officer defendants, it is not always the case, which is why two sentences later, the City concedes, "a municipality could be liable under *Monell* even when its agents are not," so long as such finding does not create an inconsistent verdict. Motion at 3 (citations omitted).

The City goes on to assert that because Plaintiff's *Monell* claim is based exclusively on theories involving the City condoning and failing to discipline the individual officers' intentional misconduct, a finding in favor of the officers would render any verdict on the *Monell* claim against the City inconsistent. This is incorrect. There are a number of ways in which the City could be liable in this case even if the individual officers are not. As just one example, the jury could determine that Area 2 detectives worked together to extract a false confession from Plaintiff but be unable to determine *which named defendant* took which action ("they were not wearing nametags"). In that instance, the jury could find that the City was the "moving force" behind Plaintiff's wrongful conviction without a corresponding determination of individual liability. Judge St. Eve made this point in Alonso Smith's Area 2 torture case, *Smith v. Burge*, 16-cv-3404 (N.D. Ill. August 9, 2018):

Plaintiff's Fourteenth Amendment due process claim based on his allegedly coerced and fabricated confession involved not only certain named Defendants' alleged misconduct, but also other detectives and under Defendant Burge's command and municipal policymakers – many of whom helped create the pattern and practice of using torture to coerce confessions. Under this theory of liability, Plaintiff not only alleges that Defendant Officers coerced his false confession and fabricated evidence via torture, but that Defendant Officers' and other municipal employees' misconduct was the natural consequence of the City's widespread custom and policy aided by the alleged code of silence. Under the circumstances, a jury's verdict against the City would not be inconsistent with a jury finding in favor of the named Defendant Officers. Accordingly, the City's argument fails under *Thomas* and *Swanigan*.

*Id*. at Dkt. 205, attached as Exhibit 6.

The City has not met its burden of demonstrating that municipal liability in this case is entirely dependent on first establishing individual liability. This is yet another ground on which this Court should deny the City's Motion.

### 4. The City Does Not Want The Elephant In The Room In The Room.

With the three false premises removed, we turn to the real reason that the City has filed this Motion and the Individual Defendants have joined it. The purpose of the City's Motion is *not* to offer Smith relief from his burdens, nor is it to advance judicial economy or efficiency. Rather, the purpose of the City's Motion is to avoid having to face a jury as to *its own* failures to investigate and stop Area 2 torture after it learned through numerous credible sources, at least by February 1982, that Area 2 Detectives were routinely torturing suspects and engaging in other forms of severe police misconduct. The City does not want to sit at a defense table before a jury that learns it took no substantive action whatsoever when it learned what was going on at Area 2. The City does not want the jury to hear that only after a state judge interceded and empowered special prosecutors; only after those special prosecutors issued a detailed report of the widespread torture; and only after that report left the City no choice, did it take any action – and even then, action that was woefully inadequate. The City simply does not want to face the *Monell* claim, and that is not a basis to bifurcate it from the case.

Robert Smith respectfully requests this Court to deny the City's Motion.

Dated:  June 24, 2021                          Respectfully submitted,

                                               Plaintiff Robert Smith

                                   By:    /s/ Stuart J. Chanen
                                          /s/ Ariel Olstein

CHANEN & OLSTEIN
7373 N. Lincoln Ave.
Lincolnwood, IL 60712
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com