BEFORE THE POLICE BOARD OF THE CITY OF CHICAGO

| | | |
|---|---|---|
| IN THE MATTER OF CHARGES FILED AGAINST POLICE COMMANDER JON BURGE, STAR NO. 338, CHICAGO POLICE DEPARTMENT | ) ) ) ) | Case No. 1856 |
| IN THE MATTER OF CHARGES FILED AGAINST POLICE DETECTIVE PATRICK O'HARA, STAR NO. 2888, CHICAGO POLICE DEPARTMENT | ) ) ) ) | Case No. 1857 |
| IN THE MATTER OF CHARGES FILED AGAINST POLICE DETECTIVE JOHN YUCAITIS, STAR NO. 7744, CHICAGO POLICE DEPARTMENT | ) ) ) | Case No. 1858 |

**MEMORANDUM IN OPPOSITION TO MOTION
TO BAR TESTIMONY CONCERNING OTHER
ALLEGED VICTIMS OF POLICE MISCONDUCT**

Respondents' attempt to bar the testimony of seven additional victims of torture tactics at Area II headquarters ignores the overwhelming precedent supporting the admission of similar acts under circumstances much less compelling than these. The testimony regarding similar acts sets forth detailed accounts of torturous treatment which are almost identical to the torture suffered by Andrew Wilson. The testimony reveals an astounding pattern or plan on the part of respondents to torture certain suspects, often with substantial criminal records, into confessing to crimes or to condone such activity. The similar acts testimony would clearly be admissible in a federal or state court, and it should be admissible in this proceeding.[1]

_____

[1] Indeed, in a January 16, 1992 hearing in which Judge Shadur dismissed respondents' federal lawsuit, Judge Shadur stated that he knew of nothing that would foreclose the Police Board from considering this evidence. See Exh. A at 13-15.

SP 019631

## I. Admissibility Standard Under Rule 404(b).

Although the Hearing Officer and the Police Board are not bound by the formal or technical rules of evidence, Ill. Rev. Stat. ch. 24, ¶ 10-1-18.1, Fed. R. Evid. 404(b) sets forth the standard for admissibility of other acts evidence that is generally followed in most jurisdictions.[2] Federal Rule of Evidence 404(b) states that while evidence of "other crimes, wrongs, or acts" is not admissible to prove character, it is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The United States Supreme Court has specifically recognized that Rule 404(b) emphasizes the admissibility of evidence of crimes, wrongs, or other acts. Huddleston v. United States, 485 U.S. 681,688 (1988). Indeed, "Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of such evidence." Id. at 688-89.[3] In addition,

---

[2] In fact, as respondents acknowledge, Illinois courts follow the same general rule in civil and criminal cases. See Wernowsky v. Economy Fire & Casualty Co., Inc., 106 Ill. 2d 49, 477 N.E.2d 231, 233 (1985); People v. Bartall, 98 Ill. 2d 294, 456 N.E.2d 59, 66-67 (1983); People v. McKibbins, 96 Ill. 2d 176, 449 N.E.2d 821 (1983).

[3] In another recent Supreme Court case, the Court ruled that a defendant's due process rights were not violated by the admission of evidence of prior injuries to his infant daughter, for whose murder he was on trial. Estelle v.

Footnote continued on next page

**SP 019632**

the Illinois Supreme Court "has held that evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit crime." People v. McKibbins, 96 Ill. 2d 176, 449 N.E.2d 821, 824 (1983). Thus, "Rule 404(b) is one of inclusion rather than exclusion and 'admits evidence of other crimes or acts relevant to any issue in the trial, unless it tends to prove only criminal disposition.'" United States v. DeLuna, 763 F.2d 897, 912 (8th Cir. 1985) (emphasis added) (quoting United States v. Wagoner, 713 F.2d 1371, 1375 (8th Cir. 1983)), cert. denied, 474 U.S. 980 (1985). Applying these guiding principles to the facts before the Board, there is no question that the similar acts testimony is admissible.

In addition, the evidence of other acts is admissible because it easily satisfies the four-part test promulgated by the Seventh Circuit. See Harris v. Davis, 874 F.2d 461, 464 (7th Cir. 1989), cert. denied, 493 U.S. 1027 (1990). First, the evidence clearly establishes the officers' modus operandi, pattern, plan, opportunity, motive, and intent in torturing suspects, as well as the opportunity and identity of the officers, rather than merely their propensity to commit these

---

3/    Footnote continued from previous page

McGuire, No. 90-1074, 50 U.S.L.W. 2012 (Dec. 4, 1991). Proof of the child's prior injuries was ruled admissible under California law even though it was not linked by any evidence to the defendant because it demonstrated that her killing was the result of an intentional act by someone, and was not an accident. Id. at 2014.

SP 019633

acts. Second, the other acts are strikingly similar and close enough in time to be relevant to the pending charges. Third, there is sufficient evidence to support a finding by the Board that these officers committed or condoned these similar acts. Finally, weighing the probative value against the potential for prejudice has no application in this nonjury proceeding. Moreover, even if this were a jury proceeding, the evidence would be admissible because the probative value more than outweighs any potential for unfair prejudice. It is especially important evidence because, as respondent Burge has reminded more than one of his victims, a victim of police torture, particularly one with a significant criminal history, is at a distinct disadvantage when the evidence of the act comes down to "his word against yours."

## II. The Testimony of Andrew Wilson

At the hearing, Andrew Wilson will testify that on February 14, 1982, he was arrested in connection with the murder and armed robbery of police officers Fahey and O'Brien. He was arrested at an apartment by several officers, including respondents Burge and Yucaitis. As Wilson was being taken to the car to be transported to Area II, he heard Burge telling the transporting officers not to "mess with" Wilson and that they would deal with him when they arrived at the station. Wilson was then taken to Area II by Yucaitis and three other officers. Transcript of Testimony of Andrew Wilson, July 7, 10, 11, 1989, at 2914-31 (hereinafter "Tr."), attached as Exh. B.

1185J                               -4-                        **SP 019634**

When they arrived at Area II, Wilson was taken to a room where the four transporting officers, including Yucaitis, and other officers started beating him. They hit him, kicked him, knocked him down and slammed him into a window so hard that it broke. In addition, one of the officers grabbed a plastic garbage bag and put it over Wilson's head, holding it around his neck so that he could not breathe. The officers took the bag off when Wilson bit a hole in it. The officers stopped beating Wilson when Burge entered the room and stated that if it had been him, he would not have left any marks on Wilson. Tr. at 2932-36.

Wilson was taken to a second room and handcuffed to the wall. Yucaitis then took Wilson to a telephone and told him to call his brother. When Wilson replied that he did not want to talk but wanted a lawyer, he was taken back to the second room and again handcuffed to the wall. Tr. at 2937-44. Burge entered the room and told Wilson he was going to make a statement because Burge's reputation was at stake. Burge left the room and Yucaitis came in with a brown paper bag. Yucaitis opened the bag and took out a black box about 12-14 inches long, 8-9 inches wide and 6 1/2-7 inches high. The box had a crank and two wires with clamps. Yucaitis squatted down in front of Wilson with the box between his own legs, and put one clamp in Wilson's nose and one on Wilson's ears, and cranked the box. The shock caused Wilson's teeth to grind and was so painful that he kicked Yucaitis. Yucaitis punched him in the

-5-

SP 019635

1185J

mouth and cranked the box again. Yucaitis left the room and then returned, put the black box in the bag, and left again. Tr. at 2947-55.

Respondent O'Hara then came in and took Wilson to see the Assistant State's Attorney, Lawrence Hyman. According to Wilson's testimony, with O'Hara present, Wilson asked Hyman, "You want me to make a statement after they've been torturing me?" O'Hara took Wilson back to the second room. Tr. at 2956-59.

Burge later returned to the second room with the brown paper bag and said "Fun time." Burge put a pair of handcuffs on Wilson's other arm and another pair on Wilson's ankles. He then placed the bag in the garbage can and left. He returned, took out the black box, put the clamps on Wilson's ears and cranked the box. The shock caused Wilson's to grind his teeth and knocked Wilson out of his chair. Wilson kept rubbing the clips from the electrical device off his ears. Tr. at 2961-63. Wilson was then handcuffed across the radiator, kneeling with his arms outstretched. Burge and another officer put the clamps on Wilson's little fingers and cranked the box repeatedly this time for longer periods. As he was being shocked, Wilson's chest, leg and face were forced against the radiator and he was burned. Tr. at 2963-66.

When Burge stopped cranking and took the clamps off Wilson's little fingers, he took another shocking device out of the bag. It plugged into an electrical outlet and had a cord

SP 019636

1185J

sticking out of it. Burge placed the device very near Wilson's skin so that he could feel it tingling. Burge then jabbed the second device into Wilson's back and Wilson got a full jolt, slamming Wilson into the grill on the window. Wilson began spitting out blood. Burge and the other officer put the devices back in the bag and left. Tr. at 296-68.

A while later, Wilson was taken to Area I headquarters for a lineup. At Area I, Burge stuck his gun in Wilson's mouth and cocked it back and forth. When Wilson arrived back at Area II after the lineup, Burge told him that if he did not make a statement, he would shock him again. Later, Burge told Wilson he was going to "fry his black ass." Tr. at 2969-75.

### III. The Testimony of the Similar Victims.

#### 1. Melvin Jones

Melvin Jones will testify that on February 5, 1982, just nine days prior to Andrew Wilson's arrest, he was taken to an Area II interrogation room where he was handcuffed and questioned by Area II detectives concerning his knowledge and participation in a murder. When he failed to give information implicating himself in the murder, respondent Burge entered the room and told Jones that he was going to talk. Burge then asked Jones if he had ever heard of him, and when Jones replied that he had not, Burge told him that before he left the station Jones would "wish he had never set eyes on him."

Burge left the interrogation room but returned after Jones persisted in his refusal to talk to the interrogating

1185J

-7-

SP 019637

detectives. Burge had Jones cuffed to a second ring and then produced and plugged into the wall socket a wooden box measuring approximately 10" x 6" x 6", with tweezers and a long nail type device. He again asked Jones if he was going to talk. When Jones again refused, Burge pulled down Jones' pants and shorts and, using the electrical device, shocked Jones three times, on the foot, thigh, and penis. While he was shocking Jones, Burge demanded that Jones talk. He told Jones that he had also shocked "Satan" [Anthony Holmes] and "Cochise," forcing them to crawl all over the floor. He also told Jones that nobody would believe his word against a lieutenant's. Burge asked another Area II detective present in the room if he had seen anything, and the detective looked at the ceiling and said no. Burge also tied a sock in Jones' mouth. Burge was interrupted in his interrogation of Jones, apparently by the news that a policeman had been shot and killed on a bus in his area.

Later, Burge also struck Jones with a stapler. When Jones continued to deny knowing anything about the murder, Burge again entered the interrogation room. He pointed a gun at Jones' head, cocked it and told Jones he was going to "blow his black head off."

Jones' testimony is set forth in a hearing on a motion to suppress and in a deposition taken by respondents' counsel in connection with Andrew Wilson's civil trial. See Exh. C.

1185J
-8-

SP 019638

### 2.   Anthony Holmes

On May 30, 1973 at approximately 4:00 a.m., Anthony Holmes, whose street name is "Satan," was taken to Area II headquarters where he was held, interrogated and tortured for approximately six hours.  Respondent Burge presided over his interrogation, during which, in an effort to obtain a confession, plastic bags were placed over Holmes' head, causing him to pass out three times.  Burge also applied the end of an electroshock device, housed in a black box, to Holmes' handcuffs, giving Holmes an intense shock which caused him to fall out of his chair and roll on the floor.  The shock was extremely painful and caused Holmes to press his jaws together and grit his teeth.

### 3.   George Powell

On September 20, 1979, George Powell was arrested at his girlfriend's house and taken to Area II where he was handcuffed to a wall.  Burge brought out a long object with a cord, similar to a cattle prod, and said he was going to do to Powell what he had done to "Satan."  Burge shocked Powell on his stomach and chest, such that Powell almost passed out.  Also, while slapping and questioning Powell, Burge put a bag over Powell's head, and Powell had to bite a hole in it in order to breathe.

Powell's mother filed a complaint with the Office of Professional Standards, who ultimately made a finding of "not sustained."

1185J

-9-

SP 019639

### 4. Donald White[4]/

On the evening of February 12, 1982, two days before Andrew Wilson's arrest, Donald White was picked up by police officers and taken to 11th and State. He was taken to a room on the fifth floor by Hill, McKenna, Katalinic and respondent O'Hara, and they began asking him who killed the police officers. They continued asking him and White repeatedly told them that he did not shoot the officers. Hill got mad and said, "I am tired of this fucking shit." He took a black garbage bag and put it over White's head, and then someone began beating him on the head. Although he could not see them with the bag over his head, there had to have been at least four people hitting him. O'Hara was in the room, as was Burge at various times. When White still stated that he did not shoot the officers and did not know anything, they put the bag back over his head two more times and beat him again. White almost lost consciousness. At one point, someone stuck a gun in his mouth. White then said he would tell them anything they wanted to know. Hill then asked him questions and, when White didn't have it right, Hill pretended he was going to hit White.

White testified to these facts in a deposition taken in connection with Andrew Wilson's civil trial. White had not told anyone for five years that he had been abused because he

---

4/  Donald White is not presently subject to subpoena and the Superintendent proposes to admit his deposition taken by respondents' counsel, William J. Kunkle, on July 14, 1989 in relation to Wilson's civil trial. See Exh. D.

SP 019640

feared for his life at the hands of the police officers. When he finally agreed to testify about the abuse he suffered, he did so only on the condition that Wilson's lawyers would move him out of Illinois. In addition, because he was afraid and did not know who he could trust, he did not file an OPS complaint. His mother, however, did file an OPS complaint in connection with his torture at the hands of the police officers. OPS reached a finding of "not sustained."

### 5. Shadeed Mumin

On October 30, 1985, Shadeed Mumin was pulled over and arrested by two police officers in an unmarked car. He was taken to Area II and placed in a small room upstairs. Burge entered the room and told Mumin to get up and turn around to the wall. Mumin was then handcuffed behind him to a ring or hook on the wall such that he could not sit down. Burge told Mumin that he wanted to know about the robbery, and Mumin replied that he had no knowledge of what Burge was talking about. Burge told Mumin he would talk before Mumin left there and tightened Mumin's handcuffs. The handcuffs were painful and cut off Mumin's circulation. Burge then left the room.

Burge returned after a half hour and loosened the handcuffs, asking Mumin if he was ready to talk. When Mumin said he didn't know what Burge was talking about, Burge became angry and pushed him into a wall. He then removed Mumin's handcuffs, took him to an office down the hall and handcuffed him. Burge said, "You're not going to talk, huh?" and Mumin

SP 019641

replied that he didn't know what Burge was talking about. Burge said, "Do you know that we can bury you in the penitentiary?" Mumin replied that he still didn't know what Burge was talking about.

Burge then told Mumin that they really wanted his son, and Mumin repeated that he didn't know what Burge was talking about. Burge became angry and pulled out a fully loaded .44 Magnum. He took out all the bullets except for one, spun it, placed it to Mumin's head and snapped it three times slowly. Burge told Mumin he was "damned lucky" that Burge didn't kill him and that he wanted to know about the "fucking robbery."

Burge became angry, jumped up from the desk and snatched a brownish, plastic typewriter cover. He said, "You'll fucking talk or I'll kill you," and placed the cover over Mumin's head. Burge held the cover over his head and pushed it down in his face so he couldn't breathe. Mumin, who was handcuffed behind his back, passed out. Burge put it on his head three times. The third time, Mumin hollered and Burge took the cover off and laughed. Burge asked him if he was ready to sign a statement and Mumin told him he would do anything. Burge told Mumin that if he told anybody, nobody would believe him because there were no marks on him and that he had better sign the statement.

Mumin testified to these facts at an October 5, 1988 hearing on his Motion to Suppress. See Exh. E.

1185J

SP 019642

6.   LeRoy Orange

In January 1984, LeRoy Orange was taken to Area II, where he was interrogated and tortured while Burge was in the room.   Orange was shocked and jolted repeatedly with a black box plugged into the wall.   Orange's pants were pulled down while electroshock was applied to his body, including his buttocks.   He was then asked if he was ready to make a statement, and he replied that he was.

Orange reported this torture to his attorney, Earl Washington, who reported it to the media.

7.   Lawrence Poree

Lawrence Poree will testify that on two occasions in 1973, he was interrogated by respondent Burge and another detective.   The first time, they showed him a wooden box with no top, a generator inside and two wires.   Burge then said, "this is what we got for niggers like you."   Later in 1973, Burge and Hoke put Poree, while handcuffed, on a table and hit him.   They then pulled his pants down and applied electroshock to his arm and armpits, and to his testicles.

On August 7, 1979, Poree was arrested and brought to Area II where he was interrogated by Burge.   Poree was handcuffed in the interrogation room, and the black box was on the table.   Burge came in and said, "Fun time again."   Poree was handcuffed to the wall and hit in the head with a pistol. Apparently referring to Anthony Holmes, Burge said, "You can ask your little fat friend about the box."   Burge shocked Poree

SP 019643

eight or nine times on the arms, chest, forehead and back, causing him to clench his teeth and bite his tongue and his mouth to bleed.

IV. The Evidence Is Not Offered To Show Respondents' Propensity To Torture Suspects.

A. Modus Operandi, Pattern and Plan

Similar acts testimony is admissible as modus operandi evidence under Rule 404(b) because the methods used in relation to the acts bear the requisite "singular strong resemblance to the pattern of the offense[s] charged" in the case. United States v. Shackleford, 738 F.2d 776, 783 (7th Cir. 1984) (quoting United States v. Jones, 438 F.2d 461, 466 (7th Cir. 1971)).[5] That is, the incidents of torture are "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." United States v. Hudson, 884 F.2d 1016, 1021 (7th Cir. 1989) (quoting Shackleford, 738 F.2d at 783), cert. denied, 110 S. Ct. 3221 (1990).

When evidence is offered as proof of modus operandi, the focus is on the common characteristics, rather than on any dissimilarities. United States v. Connelly, 874 F.2d 412, 418 (7th Cir. 1989). In addition, the common characteristics need not be extraordinary. For example, in United States v.

---

[5] Although Rule 404(b) does not specifically enumerate "modus operandi" proof as an exception, courts have approved its admissibility through the identity exception. See United States v. Connelly, 874 F.2d 412, 416-17 n.7 (7th Cir. 1989).

SP 019644

Chaimson, 760 F.2d 798, 808 (7th Cir. 1985), the court ruled that the trial court in a bribery case properly admitted evidence of previous cash bribe payments where the government introduced evidence that defendant had made the bribe payments in plain, white, letter-size envelopes, both previously and in relation to the bribery charged in the case. The court held that that method was not only distinct but was "sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." Id. at 809 (quoting 2 J. Weinstein and M. Berger, Weinstein's Evidence ¶ 404[16], at 404-94 (1982)). In United States v. Anderson, 809 F.2d 1281, 1285 (7th Cir. 1987), the court held that evidence that a defendant participated in one bribery incident may not be admissible to show that defendant had a propensity toward corruption and that he therefore participated in the bribery incident with which he was charged in the case. However, it further held that the evidence was admissible to support the inference that the defendant had a plan and that he acted in conformity with that plan. Also found admissible as probative of a plan was a defendant's prior narcotics arrest. United States v. Wright, 943 F.2d 748, 751 (7th Cir. 1991). In that case, the court found that defendant's possession of many individual packets of crack cocaine in a certain geographic area was probative of a general plan to distribute crack cocaine in that specific area. Id.

The court in Hudson, 884 F.2d at 1021, found that three prior events and the offense charged were "sufficiently

1185J

SP 019645

idiosyncratic" for the prior acts to be admissible as modus operandi evidence. The prior events and the offense charged all involved at least two men coming into a credit union, the taller one asking for change, and both men running behind or leaping over the counter when the teller opened her drawer, grabbing cash, and fleeing. The court in Connelly, 874 F.2d at 417, also found that the similarities between the crime charged in that case and a prior criminal act were "sufficiently distinctive" to support the inference that the defendant committed the crime charged. In that case, both crimes involved walkie-talkies, a lookout, and the use of duct tape to cover the eyes and bind the hands of the victims. Id.

As these and a myriad of other cases both in this Circuit and in others demonstrate, the similar characteristics need not be particularly unusual, nor the modus operandi particularly sophisticated. See also United States v. Montoya, 891 F.2d 1273 (7th Cir. 1989) (evidence of defendant's prior border stop and arrest admissible to establish defendant's modus operandi for transporting contraband and proceeds from the sale thereof; in both stops, defendant was traveling with the same individual who was driving a car defendant claimed to own, and the two were found transporting goods that were purposefully hidden); United States v. Zapata, 871 F.2d 616 (7th Cir. 1989) (evidence of prior drug transaction admissible in trial for cocaine distribution offenses to show modus operandi used in the transactions, namely that defendant flew

1185J

SP 019646

from Miami to acquire distant customers in other cities, used specific code words in conducting drug transactions, and used a car modified with secret compartments for transporting drugs by courier); United States v. Harrod, 856 F.2d 996 (7th Cir. 1988) (prior stolen check scheme and resultant plea agreement admissible to prove modus operandi in bank theft and bank fraud case where in both schemes, defendant submitted stolen and forged checks to third parties, who would then deposit and withdraw the stolen funds).

The similar acts testimony is highly probative of the modus operandi used or condoned in the torturing of suspects to elicit statements. Respondents' methods of torture through electroshock, bagging, and holding a gun to a suspect's head, are more than sufficiently unique to establish a modus operandi for Rule 404(b) purposes. In addition, the testimony establishes a pattern of and plan to torture suspects in these similar ways to elicit confessions to violent crimes.

B.    Motive, Intent and Absence of Mistake or Accident

The similar acts evidence is also admissible to show respondents' motive and intent in torturing or condoning the torture of Andrew Wilson and to refute their claims that Wilson either was mistakenly injured during the arrest or was injured by accident. Many cases permitting the use of similar act evidence involve situations strikingly similar to the present case. The Seventh Circuit has held that the intent exception may be used not only to establish a specific intent crime, but

1185J

SP 019647

"may also be used, in a broader sense, to admit prior crimes 'because the repetition of the crime is itself circumstantial proof of intent, not direct proof of a propensity to commit crime.'" Young v. Rabideau, 821 F.2d 373, 379 (7th Cir. 1987) (quoting United States v. Fountain, 768 F.2d 790, 805 (7th Cir. 1985)(Swygert, J., concurring in part and dissenting in part), cert. denied, Gometz v. United States, 475 U.S. 1124 (1986)), cert. denied, 484 U.S. 915 (1987). In Young, a civil rights case brought by an inmate against two corrections officers for excessive force, the trial court admitted evidence of plaintiff's past disciplinary history. The Seventh Circuit affirmed, finding that the evidence was probative of plaintiff's intent, as well as of the lack of mistake or accident, where plaintiff contended that he did not intend to poke a guard in the face or snatch a chain out of his hand. Young, 821 F.2d at 379-80. Additionally, the court in Young cited with approval the holding in Carson v. Polley, 689 F.2d 562 (5th Cir. 1982). The court in Carson held that a deputy sheriff's performance evaluation report which showed a record of loss of temper and of hostility toward inmates on prior occasions was admissible in a civil rights action against the deputy for use of excessive force. Id. at 571-72. The court found that the report tended to show the deputy's similar intent to do harm in his conduct toward the defendant. Id.

Similarly, the Second Circuit has held that "[a] plaintiff in an excessive force case is entitled to prove by

-18-

**SP 019648**

1185J

extrinsic evidence of other instances that the police officer defendant acted 'maliciously and sadistically for the very purpose of causing harm,' . . . ." Ismail v. Cohen, 706 F. Supp. 243, 253 (S.D.N.Y. 1989) (quoting O'Neill v. Krzeminski, 839 F.2d 9 (2d Cir. 1988)). In Ismail, a civil rights action, the court held that evidence of the defendant police officer's involvement in a subsequent similar incident of excessive force was admissible in the form of the victim's testimony and the Civilian Complaint Review Board complaint. 706 F. Supp. at 252-53. Following Huddleston, 485 U.S. at 688, the court stated that no criminal conviction, civil judgment, administrative finding or preliminary judicial finding by the court was necessary before the similar act evidence could be admitted. Ismail, 706 F. Supp. at 252-53. The evidence was admissible to show the officer's pattern of lashing out when he felt that a citizen was challenging his authority, as well as his intent to abuse his public office and to lie about it afterward. Id. at 253; see also Borenstein v. City of Philadelphia, No. 84-2132, slip op. at 3 (E.D. Pa. July 18, 1985)(in ruling on a motion to compel discovery in a civil rights action against police officer for unlawful arrest, court held that officer's personnel file and records of violent incidents or complaints involving the defendant officer had the potential for shedding light on the officer's intent or motive when the incident which was the subject of the suit took place); Hurley v. Keenan, No. 79 Civ. 4772, slip op. at 9

-19-

1185J

SP 019649

(S.D.N.Y. May 8, 1984)(in ruling on a motion to compel discovery in a civil rights action brought by an inmate against correctional officers, the court held that reports of any administrative, criminal or civil proceeding in which one of defendants was charged with or investigated for possible abuses of the type alleged by plaintiff could be directly admissible to demonstrate intent).

Rule 404(b) has been applied similarly in other civil rights cases. In Conklin v. Lovely, 834 F.2d 543 (7th Cir. 1987), plaintiff alleged she was improperly discharged from her position as a county employee because of her political activities and in violation of her First Amendment rights. The court held that the testimony of another former county employee who was discharged for her patronage of the former County Prosecutor was admissible because defendants' motive in discharging the witness would be relevant to their motive and intent in discharging plaintiff. Id. at 550. Accord Phillips v. Smalley Maintenance Services, Inc., 711 F.2d 1524, 1532 (7th Cir. 1983)(in sexual harassment action brought against employer, testimony of another female former employee that she was subjected to similar treatment admissible to show motive, intent or plan of defendant).

Courts have been equally liberal in admitting evidence of similar bad acts to show intent or motive in criminal cases. In United States v. Taggatz, 831 F.2d 1355, 1359-60 (7th Cir. 1987), in which defendant was charged with knowingly

SP 019650

and unlawfully executing a scheme to defraud a federally insured savings and loan in connection with a check-kiting scheme, the court held that evidence of a prior check-kiting scheme was admissible to show intent, as well as a plan, knowledge, and absence of mistake or accident. In United States v. Khorrami, 895 F.2d 1186 (7th Cir.) cert. denied, 111 S. Ct. 522 (1990), defendant was charged with mailing threatening communications and making threatening phone calls to the Jewish National Fund. The court upheld the admission of tape recordings of other threatening telephone calls made by defendant to the Jewish National Fund which were not charged in the indictment, because they demonstrated a pattern of threatening phone calls and were relevant to defendant's identity and intent. Id. at 1194-95. See also United States v. Mills, 895 F.2d 897 (2d Cir. 1990)(in challenge to convictions for conspiracy and counterfeiting offenses, court upheld admission of evidence that defendant intentionally engaged in prior counterfeiting activity to show defendant intended to do so in the instance for which he was convicted), cert. denied, 110 S. Ct. 2216 (1990); United States v. Ross, 886 F.2d 264 (9th Cir. 1989)(in upholding defendant's convictions of conspiring with his wife to defraud, making false statements, and improperly using his wife's social security number, court held that evidence that defendant improperly used his wife's social security number 13 years earlier was admissible to show intent and to negate a claim of mistake), cert. denied, 110 S. Ct. 1818 (1990).

1185J

SP 019651

The similar acts testimony in this case clearly establishes respondents' motive and intent in torturing or condoning the torture of Wilson. Respondents generally engaged in these similar practices in order to coerce a confession to a serious crime. In addition, the testimony refutes respondents' claims that Wilson was mistakenly injured during his arrest or that he was accidentally injured when he fell down the steps or in the squadrol on his way to the lockup. There is no question that the evidence is admissible for these purposes.

### C. Opportunity and Knowledge

Evidence is also admissible under Rule 404(b) when it demonstrates a defendant's opportunity to commit an act, or his knowledge of particular practices. In United States v. Covelli, 738 F.2d 847 (7th Cir.), cert. denied, 469 U.S. 867 (1984), the court upheld the trial court's admission of testimony regarding defendant's prior possession of a small caliber pistol in defendant's prosecution for committing robbery by means of force and violence and for transporting stolen goods. The trial court ruled that under Rule 404(b) the evidence was probative of defendant's possession of the murder weapon, his opportunity to commit the crime, and the ultimate identification of him as the robber. Id. at 855. The court emphasized that "evidence of prior possession of a weapon can be used to prove opportunity and identification even where it cannot be directly identified as the weapon used in the crime." Id.

-22-

SP 019652

1185J

In <u>United States v. Cooper</u>, 942 F.2d 1200 (7th Cir. 1991), an appeal from a drug conspiracy conviction, the court ruled that evidence of a prior drug transaction was admissible under Rule 404(b) to show a defendant's opportunity to acquire and distribute cocaine, his knowledge of the distribution network, and his intent to take part in the conspiracy. Similarly, the court has permitted the admission of evidence of a prior uncharged drug transaction to show defendant's access to large quantities of cocaine and his ability to attract customers, and to rebut defendant's assertion that he had never had anything to do with cocaine transactions. <u>Zapata</u>, 871 F.2d at 621. <u>Accord</u> <u>United States v. Shukitis</u>, 877 F.2d 1322, 1329 (7th Cir. 1989); <u>Montoya</u>, 891 F.2d at 1284.

In a trial in which defendant was charged with knowingly disposing of property pledged to Farmers Home Administration (FHA), evidence of prior grain sales was relevant to show defendant's familiarity with the practice of selling property through third parties to avoid FHA requirements. <u>United States v. Studley</u>, 892 F.2d 518, 527 (7th Cir. 1989). The evidence was also relevant to show defendant's knowledge of how to dispose of pledged property while avoiding detection. <u>Id.</u>; <u>see</u> <u>also</u> <u>United States v. Falco</u>, 727 F.2d 659, 664 (7th Cir. 1984) (evidence of defendant's repeated contact with and knowledge of stolen goods is admissible to show defendant's knowledge that the goods involved in the present case were stolen).

-23-

1185J

SP 019653

The similar acts testimony is admissible because it shows the physical existence of one or more electroshock devices at Area II, prior and subsequent to Wilson's arrest, and Burge's possession of and familiarity with the use of the devices. It is also admissible to show knowledge of that technique and of the bagging technique, about which respondents deny knowing, and of the technique of putting a gun to the head of a victim.

D.    Identity

Finally, the testimony regarding similar acts is admissible to establish the identity of the perpetrator of the acts. In Covelli, 738 F.2d at 855, the court ruled that evidence regarding defendant's past possession of a pistol was admissible as probative of the ultimate identification of him as the perpetrator of an armed robbery in which a victim was killed. Similarly, in Khorrami, 895 F.2d at 1194, the court held that tapes of prior harassing phone calls were relevant to establishing defendant's identity with respect to the phone calls underlying the charges in the instant case. In this case, the "prior and charged offenses are so strikingly similar that the same person or persons probably had a hand in both." Connelly, 874 F.2d at 416; see also discussion of modus operandi supra at 16-17.

Respondents cannot seriously dispute that Wilson's injuries were sustained while he was in police custody. However, they have consistently maintained that Wilson's

1185J

-24-

SP 019654

injuries were inflicted by persons other than themselves. Thus, identity of the officers engaging in the torture is a crucial issue, and the Superintendent is entitled to offer similar acts evidence to support the identification of these officers as the perpetrators.

V.     **The Prior Bad Acts Are Strikingly Similar And Occurred Close Enough In Time To Be Relevant To Wilson's Torture.**

   A.     **The Similarity Between The Acts Alleged By Wilson And The Acts Alleged By The Similar Victims Is Striking.**

There is no question that the similarities between Wilson's testimony and the similar victims' testimony is more than sufficient to meet the Rule 404(b) standard. Burge was the main perpetrator of the torture in almost all of the cases and, when he was not the principal, he was still involved. In the case of all but one of the victims, the victim was picked up and taken to Area II where he was then interrogated regarding his knowledge of or involvement in a serious offense. Although Donald While was taken instead to Area I, he was taken there and interrogated by Area II detectives. All of the victims were black and generally had significant criminal histories.

Also similar was the way in which several victims were threatened with consequences if they refused to make a statement. After an initial refusal, the punishment would begin and then would become stronger and more painful as the refusals to speak persisted. The most striking similarities,

1185J

-25-

SP 019655

however, are found in the methods of torture used on the suspects. Wilson was electroshocked by Yucaitis using the black box and by Burge who used the black box and a curling-iron looking device, was "bagged" and beaten, and was threatened with a gun placed in his mouth. Jones, Holmes, Poree, Powell and Orange were similarly electroshocked by Burge. Holmes, Powell, White, and Mumin were all "bagged" to the point where they lost or almost lost consciousness. Burge pointed a cocked gun at Jones' head, hit Poree in the head with a pistol, and placed a revolver containing one bullet to Mumin's head and snapped it three times slowly. White had a gun placed in his mouth. Additionally, each of the victims was slapped around and punched.

Burge's statements to the victims were also very similar. Burge told both Jones and Mumin that nobody would ever believe their word against his. As he did in relation to Wilson, he referred to the absence of marks on Mumin's body. He said "Fun time" as he approached Wilson and Poree with the black box, and laughed when he "bagged" Mumin. He told Wilson he would "fry his black ass" and Jones he would "blow his black head off."

As the case law cited above aptly demonstrates, these actions or the condoning of these actions by respondents are overwhelming in their similarity. Clearly they are more than similar enough to be relevant to the pending charges.

1185J

-26-

SP 019656

B.    The Similar Acts Occurred Close Enough In
      Time To Be Relevant To Wilson's Torture.

The similar acts occurred close enough in time to be relevant to to this proceeding, especially given the close similarities between Wilson's testimony and the testimony of the similar victims. Andrew Wilson was tortured at Area II on February 14, 1982, and all other acts to which the similar victims will testify occurred within the period from 1973 to 1985. "Questions about 'how long is too long' do not have uniform answers; the answers depend on the theory that makes the evidence admissible." United States v. Beasley, 809 F.2d 1273, 1277 (7th Cir. 1987). Thus, in Falco, the court held that two thirty-year-old convictions, a twenty-year-old conviction, and a five-year-old conviction, all relating to stolen merchandise, were admissible to establish defendant's knowledge that the goods underlying the current charges were stolen. 727 F.2d at 665. The court stated:

> It is the pattern of conduct represented by
> the prior convictions, and not the age of
> each separately considered, that is critical
> to their relevance here. Despite the gaps
> between the convictions, a pattern emerges
> that tends to establish defendant's
> familiarity with transactions or shipments
> of stolen goods that makes it more probable
> that defendant knew the goods in this case
> were stolen.

Id.

In Ross, the court upheld the admission of evidence that defendant improperly used his wife's social security number thirteen years before the acts in the case. 886 F.2d at

1185J

-27-

SP 019657

267. Like the court in Falco, the Ross court held that "[g]iven the similarity of the offenses, the prior act was not so remote as to require exclusion." Id.; see also Harrod, 856 F.2d at 1002 (prior acts evidence of five-year-old stolen check scheme and two-year-old stolen bond scheme were so similar in character to the acts charged in the indictment that they could not be said to be too remote in time); United States v. DeCastris, 798 F.2d 261, 265 (7th Cir. 1986)(determining that use of prior acts occurring ten years before the crime charged is permissible); Chaimson, 760 F.2d at 807 (government's evidence of delivery of a bribe payment five years before the bribe payments charged are close enough in time to be admissible under Rule 404(b)).

Given the similarities between the serious offenses charged and the offenses to which the similar victims will testify, there is no question that the offenses are close enough in time to be relevant to this case. Taken the offenses in sequence, they reveal a pattern of almost identical acts of torture directed toward persons suspected of violent crimes. While the sequence spans twelve years, each offense is close enough to the next to connect it to the relevant pattern of behavior. Moreover, Melvin Jones' and Donald White's testimony will demonstrate that they were tortured just days before Andrew Wilson was tortured. The similar acts evidence is relevant, and therefore is admissible.

1185J

-28-

SP 019658

VI. The Similar Acts Evidence Should Be Admitted Because There Is Sufficient Evidence To Support A Finding By The Court That The Similar Acts Were Committed By One Or More Respondents.

In Huddleston, the Supreme Court held that the district court need not make a preliminary finding that the Government has proved the other acts by clear and convincing, or even by a preponderance of the evidence. 485 U.S. at 687-89. Rather, evidence of similar acts should be admitted "if the jury can reasonably conclude that the act occurred and that the defendant was the actor." Id. In fact, to grant respondents' request for a preliminary evidentiary hearing as to each offered witness would be directly contrary to the Supreme Court's holding that no preliminary showing by the proponent is necessary before the evidence may be admitted for a proper purpose. Id. The court or, in this case, the Police Board simply engages in a relevance analysis under Fed. R. Evid 104(b). Id. Moreover, similar acts are admissible even if the perpetrator was never indicted or convicted (or presumably disciplined) in connection with those offenses. See Wright, 943 F.2d at 750-52; United States v. Rivera-Medina, 845 F.2d 12, 15-16 (1st Cir.), cert. denied, 488 U.S. 862 (1988). In this nonjury case, the Board could certainly reasonably conclude that respondents also tortured the similar victims by means of electroshock, bagging, and/or placing a gun to a suspect's head, as the proffers of testimony show. Respondents' request for preliminary hearings should be denied and the similar acts evidence should be admitted.

1185J

SP 019659

VII.    Balancing The Probative Value Of The Other Acts
        Evidence Against Its Prejudicial Effect Is
        Inapplicable In A Nonjury Proceeding.

"Excluding relevant evidence in a bench trial . . . on
the basis of 'unfair prejudice' is a useless procedure." Gulf
States Utilities Co. v. Ecodyne Corp., 635 F.2d 517, 519
(1981). Under Federal Rule of Evidence 403, the trial judge
determines and weighs the improper inferences a jury might draw
from similar acts evidence and balances them against the
probative value and necessity of the evidence. Id. However,
it is assumed that a court in a bench trial is able to exclude
improper inferences from his own decision-making process. Id.

The Hearing Officer and the Police Board are fully
capable of ascertaining the relevance of the similar victims'
testimony while simultaneously avoiding any prejudicial effect
on their decisions. Respondents' requested evidentiary
hearings as to each offered witness would be an unnecessary
waste of time. The Board should follow the general rule for
bench trials and allow the similar acts to testify. See also
United States of America v. Bilugan, No. 90-5852, 1991 U.S.
App. LEXIS 14270, at *6 (4th Cir. July 9, 1991)(the fact that
the trial was held without a jury diminishes the role of Rules
403 and 404(b)); Carter v. Hewitt, 617 F.2d 961, 972 n. 13 (3d
Cir. 1980)(nonjury trials present a much smaller danger of
prejudice than jury trials); Van Alen v. Dominick & Dominick,
Inc., 560 F.2d 547, 552 (2d Cir. 1977)(the prudent course in a
bench trial is to admit records and testimony based on them

1185J

-30-

SP 019660

into evidence, even if they are doubtfully admissible);
Anderson v. Whittaker Corp., 692 F. Supp. 734, 737 n. 3 (W.D.
Mich. 1987)(the Rule 403 balance requires a different result in
a bench trial); People v. Reed, 209 Ill. App. 3d 575, 568
N.E.2d 334, 339 (1st Dist. 1991)(in a bench trial, the court is
presumed to have considered only competent evidence),
app. denied, 139 Ill. 2d 602, 575 N.E.2d 920 (1991).

Even if the Board decides that it must balance the
probative value of the similar acts evidence against any
potentially prejudicial effects, the balance clearly tips in
favor of admission. Because all relevant evidence is
inherently prejudicial, it should not be excluded unless its
probative value is substantially outweighed by the danger of
unfair prejudice. Montoya, 891 F.2d 1273. As the
Superintendent has shown, the similar acts testimony is
probative of respondents' modus operandi, pattern and plan, of
respondents' motive and intent, of the absence of mistake or
accident, of respondents' opportunity and knowledge, and of the
identity of respondents. Moreover, necessity is a
consideration in balancing probity and prejudice. United
States v. Cardenas, 895 F.2d 1338, 1343 (11th Cir. 1990);
United States v. Dolliole, 597 F.2d 102, 106 (7th Cir.),
cert. denied, 442 U.S. 946 (1979). Although the Superintendent
will offer the credible and compelling testimony of Andrew
Wilson himself, as well as medical and expert testimony, the
similar victims' testimony is important for countering the

-31-

1185J

SP 019661

testimony of the parade of police officers who will testify that they saw and heard nothing. Indeed, as the testimony of the similar victims shows, respondents counted on the fact that their testimony would be believed over that of a convict when they persisted in their pattern of torture. They should not be permitted now to hide behind their allegations of prejudicial effect to secure exclusion of that telling evidence.

## Conclusion

For the alternative and independent reasons stated above, respondents' motion to bar testimony concerning other alleged victims of police misconduct should be denied.

Dated: January 22, 1992            Respectfully submitted,


Daniel E. Reidy
June K. Ghezzi
JONES, DAY, REAVIS & POGUE
225 West Washington Street
Chicago, Illinois 60606
(312) 782-3939

Special Corporation Counsel to
LeRoy Martin, Superintendent of
Police

1185J

-32-

SP 019662