**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Robert Smith Jr., | ) | |
| Plaintiff, | ) | No. 21-cv-1159 |
| v. | ) | |
| | ) | Honorable Ronald A. Guzman |
| The City of Chicago, et al. | ) | Honorable David Weisman |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' DNA MOTION

Defendants City of Chicago, former Police Superintendent Phil Cline, and eight former Chicago Police Detectives, all protégés of disgraced Area 2 Violent Crimes Lieutenant Jon Burge, and each with a documented history of framing black men for crimes they did not commit (the "Detective Defendants" and with Cline and the City, "Defendants") have moved for the transfer and testing of seven pieces of evidence. *See* Defendants' December 23, 2021 Motion for Leave to Conduct DNA Testing and Motion for Leave for Defendants to Request The Release of Certain Impounded Evidence, Dkt. 133 ("Motion").

As the Court will see throughout this Opposition, however, this case is not a DNA case and has never been a DNA case, and there are several good reasons for that. To the extent that the Defendants decided during the last week of December to make it a DNA case, their attempt to do so comes way too late on several grounds. In addition, although Defendants' motion seeks both possession of "designated tangible things" and testing of those items under Federal Rule of Civil Procedure 34, Defendants insist that their requests to the Court are "clearly" expert discovery, that such expert discovery is "obviously" relevant to the case, and that the notion that the motion comes too late is "baseless." For reasons explained in detail below, Smith disagrees with all three and requests this Court to deny the motion on the following seven grounds:

1. Defendants do not have statutory standing to bring the motion.

2. This Court does not have statutory jurisdiction to rule on the motion.

3. Defendants have not presented even the *prima facie* continuous chain of custody the statute requires for DNA testing.

4. The motion seeks fact discovery that cannot be completed by the close of fact discovery.

5. The motion does not seek expert discovery, as that term is understood within the Rules.

6. The DNA testing Defendants propose, irrespective of its results, is not relevant to any disputed issue in the case and is being proposed solely for improper purposes.

7. The tangible items Defendants seek to obtain and to test have been contaminated, and Defendants cannot establish the required chain of custody.

## I.      DEFENDANTS HAVE NO STANDING TO REQUEST DNA TESTING.

In their Motion, Defendants do not identify any legal basis at all, not statutory or other, for their request for DNA testing.  This is odd because all DNA testing of evidence from a criminal trial is controlled by 725 ILCS 5/116-3.  Section 116-3, by its plain language, as well as its well-established purpose, grants leave to obtain and test such evidence *only to the criminal defendant him or herself.*  The statute is clear in this regard:

> "*A defendant* may make a motion before the trial court that entered the judgment of conviction *in his or her case* for the performance of … or forensic DNA testing …."

> "*The defendant* must present a prima facie case that … ."

> "The defendant must establish that . . . the result of the testing has the scientific potential to produce new, noncumulative evidence (i) materially relevant *to the defendant's assertion of actual innocence* … .

725 ILCS 5/116-3(a)(b)&(c) (emphasis added).  *See People v. Harper*, 2019 IL App (4th) 180160, ¶ 14 ("[Section 116-3] allows [the] *criminal defendant* to request additional forensic testing of evidence that was secured in relation to the trial that resulted in his or her conviction by filing a written motion in the trial court that entered the judgment of conviction in his or her case")(emphasis added).

Section 116-3 does not give any statutory authority to Defendants, who are defendants in a civil case, and who have no standing whatsoever under Section 116-3 or any of the

statute's other provisions to request DNA testing of the evidence that was gathered from or used against Robert Smith at his criminal trial. Nothing – absolutely nothing – in Section 116-3 states or even remotely suggests that Defendants have standing to request DNA testing or are entitled to such testing. The very fact that the statute limits its provisions to the criminally convicted defendant establishes that this is the outer limit of how the DNA taken from the criminal defendant may be used. *See People v. O'Connell*, 227 Ill. 2d 31, 37 (2007) ("Where a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions.")(internal quotation marks omitted); *People v. Smith*, 2020 IL App (4th) 190120-U, ¶ 12 (not allowing a shoe print comparison under Section 116-3 because, unlike fingerprints, ballistics, and DNA, such comparisons are not specifically listed as within the statutory structure).

Moreover, even if Defendants could show that Section 116-3 applies to their Motion (which they can't), they still have not established the elements of a proper Section 116-3(a) motion. Under its provisions, testing is not permitted unless the movant establishes that:

(1) the evidence was not already subjected to the requested testing at the time of trial; or

(2) the evidence can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial.

725 ILCS 5/116-3(a)(1)-(2). Here, Defendants are completely silent about the tests that were in fact undertaken by the Chicago Crime Lab in the underlying criminal investigation. This is so even though the record clearly shows that the prosecution obtained a Court Order to collect blood, saliva, and hair samples from Smith in July 1988 and that the Chicago Police Department then requested the police crime lab to subject those samples to extensive forensic serological and electrophoresis testing at that time, none of which connected Mr. Smith to the murders in any way. *See* Anderson Dep., Exhibit 1, at 35-36, 95.

The same is true for the second provision, Section 116-3(a)(2), requiring testing utilizing "a method that was not scientifically available at the time of trial." Here, contrary to Defendants' wholly unsupported "of course" assertion, *see* Motion at 4 ("and of course, that was before the availability of DNA technology"), we, in fact, know that well before Smith's 1990 trial, the State was already performing DNA tests in criminal cases. See *The Chicago Tribune*, Exhibit 2 (CPD had been using DNA since April 1988 in criminal cases).

Defendants have not met and cannot meet any of the requirements of Section 116-3(a), and this is the first ground upon which this Court should deny this Motion.

Perhaps most significantly, when Defendants filed this Motion before Your Honor, they were already fully aware of the central role that Section 116-3 plays with respect to this Motion, but they chose to omit it from the Motion. We know that to be true because on December 20, 2021, Defendants sought Plaintiff's agreement to the motion and sent Plaintiff's counsel a draft. That draft included a Certificate of Service, attached as Exhibit 3, and that Certificate provides the original working title of the Motion: **"Agreed Motion for Post-Conviction DNA Testing Pursuant to 725 ILCS 5/116-3."** In other words, Defendants clearly knew about Section 116-3 but chose not to share its controlling terms with this Court.

## II.  THIS COURT DOES NOT HAVE JURISDICTION OVER DEFENDANTS' MOTION.

Defendants have also brought their motion to the wrong Court. Section 116-3 unambiguously provides that any motion for DNA testing of the evidence from Plaintiff's criminal trial must be brought "before the trial court that entered the judgment of conviction in [the criminal defendant's] case." 725 ILCS 5/116-3(a). Defendants have not done so. The Court will recall that on November 23, when Smith's counsel first raised with this Court the idea of transferring the impounded evidence from the Circuit Court to this

Court, see Dkt.117 (Court Order), Defendants actually expressed a preference for leaving the impounded evidence there – in the Circuit Court -- *because they might move for additional testing of some of the impounded evidence*. Similarly, on December 20, when the Defendants sought to file the motion as an Agreed Motion, they forwarded it to Plaintiff as a motion to be filed before Judge Reddick. It is clear that Defendants are aware that the Circuit Court is where this motion must be filed, and yet for reasons known only to them, they insisted on filing it here. The reason stated in their email to Plaintiff is flimsy at best. *See* Exhibit 4 ("Since Judge Reddick most likely won't want to rule on a dispute concerning the federal case, we'll be filing a motion first before Judge Weisman").

The Court should also note Defendants' odd double request for relief. The first request is for *this Court* to grant leave to "conduct DNA testing," as if it is some free-floating federal right for this Court to bestow that is distinct from the statutory authority to test a criminal defendant's or criminal victim's DNA. It is not.

Then, Defendants separately request that this Court grant Defendants "leave" to "request" that the Circuit Court direct the Clerk of the Court to release certain impounded evidence to them. But Defendants don't need this Court's "leave" to make that request; they have been free since April 26, and remain free, to make such a request directly to Judge Reddick at any time. What the Defendants really want is for this Court to put its own imprimatur on the release of evidence for testing that the controlling statute does not permit the Circuit Court to order, in the sole hope that an Order from this Court will pave the way to a Circuit Court Order to which Defendants are also not entitled. The Court does not have jurisdiction over this motion, and the motion should also be denied on that basis.

## III. THE TESTING DEFENDANTS SEEK IS NOT SUPPORTED BY ANY CHAIN OF CUSTODY, WHICH IS AN INDEPENDENT REASON TO DENY THE MOTION.

Under Section 116-3(b)(2), any movant who seeks DNA testing on evidence from a prior criminal trial must also present "a prima facie case that . . . the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." 725 ILCS 5/116-3(b)(2).

Section 116-4(d-10) further requires:

> All records documenting the possession, control, storage, and destruction of evidence and all police reports, evidence control or inventory records, and other reports cited in this Section, including computer records, *must be retained for as long as the evidence exists and may not be disposed of without the approval of the Local Records Commission.*

*Id.* (emphasis added).

Here, Defendants do not even attempt to establish a continuous chain of custody, let alone one sufficient to establish that the evidence has not been "substituted, tampered with, replaced, or altered in any material respect." Similarly, Defendants have done nothing to allege, let alone establish, let alone produce during discovery, "[a]ll records documenting the possession, control, storage, and destruction of evidence" and "all police reports, evidence control or inventory records" required by Section 116-4. Illinois courts have held that failure to make the prima facie case required by Section 116-3(b)(2) is a basis to deny the motion on its face. *See, e.g., O'Connell*, 227 Ill. 2d at 37 ("the plain language of subsection (b) further requires a defendant present a *prima facie* case [that] the evidence to be tested has been under a secure chain of custody," affirming denial of the motion in part on that basis).

Further, for reasons explained in detail in later sections, even if Defendants had attempted to make the prima facie case required of them, they are simply not capable of doing so. A chain of custody for the seven items of evidence that Defendants want to test

simply does not exist in the records that have been produced in this case. Nor do several of the key records exist *at all*. Defendants have already conceded, during earlier phases of discovery unrelated to DNA, that several of the "evidence control and inventory records" that Section 116-4(d-10) requires, have already been lost, destroyed, or never filled out in the first instance. *Infra* at 21-22 (summarizing missing inventory sheets). This is evidence that CPD was required to maintain "as long as the evidence exists," which it still does.

Significantly, the stated basis on which Special State's Attorneys Myles O'Rourke and Deborah Cohen moved to vacate Smith's conviction and dismiss his indictment was that the evidence used to convict Smith, including, among other things, that the underpants Defendants now seek to have tested, lacked integrity, both in terms of how Detectives supposedly recovered the evidence and lack of documentation validating its recovery.

> "Upon reviewing and reinvestigating this matter, the State has formed an opinion that there are critical issues with the evidence that was recovered …. The police reports in Mr. Smith's case were absent of key reports regarding the recovery of key evidence that was used to convict Mr. Smith. The previous testimony by officers regarding this key evidence could not be validated by police reports, nor did some of it make sense …. Many items were missing from these police reports regarding key evidence and other findings…."

Transcript of 10/23/20 Hearing Before Circuit Court Judge Adrienne Davis, Exhibit 5, at 4-6.

Where Defendants do not even *allege* a continuous chain of custody over the evidence they wish to test, let alone begin to *establish* such a continuous chain, this Court should not simply presume its existence and grant a motion to test DNA evidence. Defendants' complete failure to address the chain of custody is a third reason to deny the Motion.

## IV. DEFENDANTS' PROPOSED TESTS ARE FACT DISCOVERY, AND SUCH TESTS CANNOT BE COMPLETED PRIOR TO THE CLOSE OF FACT DISCOVERY.

As this Court is aware, fact discovery closes on January 20. Contrary to Defendants' stated position, Defendants' Motion raises an issue of fact discovery, not expert discovery.

Federal Rule 34, entitled, "Producing Documents, Electronically Stored Information, and Tangible Things . . . for Inspection and Other Purposes," permits a party to serve a demand on any other party – and also any non-party (*see* Rules 34(c) and 45(a)(1)(D)) – for the opportunity "to inspect, copy, test, or sample . . . any designated tangible things." Fed. R. Civ. P. 34(a)(1)(B). Any right that Defendants have to obtain and test evidence that is the possession of the Circuit Court, if any, is a right that they have under Federal Rules 34 and 45. *See Mickelsen v. Aramark Sports & Ent. Servs.*, No. 2:18-CV-00158, 2020 WL 3037104 (D. Utah June 5, 2020) (Court issues "Memorandum Decision And Order Granting Plaintiffs' Motion <u>To Reopen Fact Discovery</u> To Permit Expert Testing Of Evidence"); *Gomez v. H&M Int'l Transportation, Inc.*, No. 17CV231KSHCLW, 2021 WL 236596, at *12 (D.N.J. Jan. 25, 2021)("fact discovery has included the collection of evidence that ultimately could support an expert report"). Nor does the fact that Defendants are required to use *a motion* in the Circuit Court instead of a *third-party subpoena* (because the evidence from Smith's criminal trial is still subject to Circuit Court supervision) alter the fact that Defendants are still making a Rule 34 request to obtain and test "designated tangible things."

Second, when a Judge in this district sets a fact discovery cutoff, as Judge Guzman has done in this case, it requires the parties to complete *by that date* every Rule 34 and 45 demand to obtain and test designated tangible things. Indeed, this Court's Local Rule 16.1, entitled Standing Order Establishing Pretrial Procedure, goes further and states:

> In cases subject to this Standing Order, the court will, at an appropriate point, set a discovery closing date. Except to the extent specified by the court on motion of either party, discovery must be completed before the discovery closing date. **Discovery requested before the discovery closing date, but not scheduled for completion before the discovery closing date, does not comply with this order.**

L.R. 16.1, § 4 (emphasis added).

For reasons known only to Defendants, but which are otherwise inexplicable, Defendants waited 241 days between April 26 (when discovery opened) and December 23 (when they moved for DNA testing). They also waited 154 days after first viewing the impounded evidence before asking for leave to test it. And, most significantly, Defendants' motion violates, by definition, Section 4 of Local Rule 16.1: "Discovery requested before the discovery closing date, but not scheduled for completion before the discovery closing date, does not comply with this order." There is simply no humanly possible way that the fact discovery outlined in Defendants' Motion, including their proposed 4-6 weeks of testing, *see* Motion at 2 n.1, can be completed by January 20. This is a fourth basis for this Court to deny Defendants' motion.

It actually goes beyond that, however. The Court requires parties to pursue discovery in a timely manner not just for the requesting party's purposes; timely discovery also puts *the opposing party* on notice of evidence that he or she needs to pursue during fact discovery, if any, to counter Defendants' intended discovery. *See Astrazeneca AB v. Mut. Pharm. Co.*, 278 F. Supp. 2d 491, 500 (E.D. Pa. 2003) (precluding Defendants from relying on new testing, theories, and evidence not disclosed during fact discovery). In other words, not only do Defendants have to complete their requested discovery prior to January 20, but, in fairness, Plaintiff would also have to be given the opportunity to:

(1) request and obtain all of Defendants' chain-of-custody evidence not produced to date;

(2) re-take the deposition of crime lab analyst Christine Anderson regarding any lab procedures in place regarding cross-contamination of DNA;

(3) take the deposition of crime lab analyst Dr. Pamela Fish regarding her handling of the evidence Defendants want tested (more on this below);

(4) take the deposition of impound clerk Patrick Brown regarding his handling of the evidence Defendants want tested (more on this below);

(5) take the deposition of Special Prosecutor Bob Williams regarding his January 2020 review of the impounded evidence, his literally taking possession of some of that impounded evidence, and his knowledge of the evidence clerk stating in March 2020 that some of the impounded was "missing"; and

(6) determine what evidence the City is and is not holding in CPD's Evidence & Recovered Property Section ("ERPS") because the City's answer to that question appears to have changed between October 7 to December 23 (more on this below).

These are only examples, not an exclusive list, and because DNA has never been an issue in this case, not ever – not in the criminal trial, not before the Torture Commission, not during post-conviction proceedings, and most importantly, not once in the first eight months of discovery in this case, there was simply never a basis for Plaintiff to take any of this discovery previously.

The bottom line is that neither Defendants' proposed testing, nor the DNA-related discovery that Plaintiff would also be required to take, can be completed in the 13 days between the scheduled January 7 oral argument and the January 20 close of fact discovery.[1]

---

[1]       We are not going to give the argument in this footnote its own section, but the Court should be aware that Defendants have pulled a "bait and switch" on Judge Guzman. On November 22, Defendants filed a document entitled "Defendants' Statement On Additional Fact Discovery," Dkt. 115, but also attached as Exhibit 6. In that document, Defendants requested both: (1) that they be allowed to conduct discovery on seven very specific topics; and (2) that the Court extend by 45 days Defendants' time to complete discovery on seven topics. *Id.* When Judge Guzman heard argument on Defendants' request, Ms. Benjamin emphasized that the request was "not a request for an extension of discovery," but rather was a "a request to complete a limited amount of discovery past the discovery cutoff date." Hearing Transcript, Exhibit 7, at 3; *see also Id.* at 4 ("we're not asking for a wholesale reopening or a continuing open of discovery for another 45 days, we're simply asking for a limited number of matters to be conducted after the close of fact discovery"). Nowhere on that list of seven items was there any mention of obtaining any impounded evidence from the Circuit Court or conducting any DNA testing. *See* Exhibit 6. In light of this, we could certainly argue that fact discovery closed as to the current Motion this past December 6, 2021. Perhaps a better interpretation of what happened is that Judge Guzman unqualified extension of fact discovery was simply more generous than Defendants had even asked for. There can be no dispute, however, that he did so based on the seven items Defendants identified and not to accommodate *this Motion* – hence, the bait and switch.

## V. AWARE THAT THE RULE 34 TESTS THEY WISH TO CONDUCT ARE "FACT DISCOVERY," DEFENDANTS SIMPLY ANNOUNCE THAT THE TESTS ARE "CLEARLY EXPERT DISCOVERY" WITHOUT ANY SUPPORT WHATSOEVER.

On page 5 of their Motion, Defendants write, "Contrary to Smith's contention, this motion is not too late. In fact, . . . *DNA testing is clearly expert discovery*, and defendants' expert reports are not due until April 1, 2022 . . .." *Id.* (emphasis added). Defendants are wrong, for two different reasons. First, the actual testing that Defendants want their expert to undertake is not "expert discovery" within the meaning of Federal Rule of Civil Procedure 26(a)(2). With the exception of complex patent cases not relevant to our discussion here, when a Court sets an expert discovery schedule under Rule 26(a)(2), that schedule does not include time for the experts to conduct tests of "designated tangible things;" rather, such tests are conducted as part of fact discovery. "Expert discovery," as set forth and explained in Rule 26(a)(2), is for setting the following deadlines:

1) setting time for the parties to identify their experts to the other side;
2) providing time for those experts to complete their reports;
3) setting time for the parties to issue those reports to the other side;
4) setting time for the parties to take the depositions of the other sides' experts; and
5) identifying a closing date for expert discovery.

That is what the period of expert discovery has always meant in civil litigation, and that is precisely what it means under the expert discovery order agreed to in this case.

But there is a second reason Defendants cannot use the expert discovery schedule to expand the time to conduct their tests: if Defendants intended to inject DNA as an expert topic and intended to identify an affirmative DNA expert as part of the expert schedule, then the time to have done so was when the expert discovery schedule was negotiated. Defendants never did so. Between November 4 and 19, Plaintiff's and Defendants' counsel negotiated that schedule and submitted it to the Court. Exhibit 8; Dkt.114. On December 2, Judge Guzman entered the parties' agreed expert schedule and further indicated that he

would not extend those deadlines. See 12/02/21 Hearing Transcript, Exhibit 7, at 24-25. At no time in the two weeks that Defendants and Plaintiff negotiated the expert discovery schedule did Defendants' counsel once state that it intended to call any expert other than the rebuttal experts built into the schedule. The Court can see from the schedule itself, Dkt. 114, and the emails between the parties, Exhibit 8, that Defendants did nothing to assert that they were interested in presenting an affirmative expert.

If Defendants intended to identify their own affirmative expert witness, such witnesses would have had to have been identified, to have issued a report, and to have been deposed under the same schedule as the affirmative experts that Plaintiff has identified. Therefore, the time for Defendants to identify an affirmative DNA expert passed on December 21, two days *before* they filed this Motion. Under what appears to be their current theory, Defendants reserved to themselves the right to identify new expert topics on April 1, 2022, but this is simply not possible under the schedule that they themselves negotiated. This Court need not look beyond the schedule's April 1-29 time frame to see that the schedule leaves no time for Plaintiff to identify a rebuttal DNA expert, to produce that expert's report, and for Defendants to depose that rebuttal expert. By intentionally "laying in the weeds" on this point, Defendants either negotiated the expert discovery schedule in bad faith, OR, if Defendants had not yet concocted this DNA idea by that time, then it is in the filing of this current Motion that Defendants' bad faith lies. *See United States v. Murphy*, 768 F.2d 1518, 1542 (7th Cir. 1985) ("In short, the defendant's strategy was to 'lay in the weeds,' a tactic that should have and did backfire"). Under the schedule negotiated, April 1 is not a day for Defendants to name new affirmative experts; it is solely the day they are required to name their rebuttal experts and produce their rebuttal reports.

## VI. THE DNA TESTING DEFENDANTS REQUEST, *IRRESPECTIVE OF ITS RESULTS*, IS NOT RELEVANT TO ANY DISPUTED ISSUE IN THIS CASE.

Defendants assert that the "relevance" of their lab's testing of the impounded evidence "cannot be denied." Motion at 3. In fact, it can be denied; Plaintiff denies it. There is simply no fact relevant to the case that DNA testing of the evidence will establish. *See People v. Jeffries*, 2019 IL App (2d) 161095-U, ¶ 1 ("Whether testing would generate evidence that would tend to significantly advance the defendant's claim is not a question that can be answered 'in the abstract.' Instead, answering it 'requires a consideration of the evidence introduced at trial, as well as an assessment of the evidence defendant is seeking to test'), *quoting People v. Savory*, 197 Ill. 2d 203, 214 (2001).

In this case, neither party disputes that when Smith came to the crime scene at approximately 5:30 a.m., at least several hours *after* the murders occurred, he ended up on the floor and got a combination of blood from the victims and water from the fire hoses onto his clothing, socks, and ankle. In this regard, the Fire Captain emphasized at Smith's criminal trial that there was "a lot of blood" in the hallway between the basement doorway and the bedrooms, where the bodies had been found, as well as in the kitchen and living room. See Capt. Dempsey Criminal Trial Testimony, Exhibit 9, at B95. Captain Dempsey further testified that after completing their work, each of his crew members had to wash blood off their clothing, gear, and boots. *Id.* ("we noticed ourselves slipping around [in] an awful lot [of blood] … we had to wash all of our equipment off; our boots and everything"); *see also* Officer Hughes' OPS Statement, Exhibit 10, at 2 ("the floor in the room was slippery as it was covered with blood and water").

Defendant McWeeny asserts that when Smith first arrived at the crime scene, at approximately 5:30 a.m., Smith "threw himself headfirst into a pool of blood" and then "rolled and wriggled around in it for 15 seconds," refusing to get out of the blood when McWeeny

ordered him to do so. *See* 1/13/20 McWeeny Dep. at 49-56 and 69 (Exhibit 11). Indeed, Defendant McWeeny has been adamant that Smith, as a result of supposedly diving into and rolling in the blood, "had *a lot* of blood on him." *Id.* at 55 (emphasis added).

Smith, on the other hand, has repeatedly testified that he was thrown into the blood and water closer to 6:00 a.m. As he and his wife Diane were instructed when they first arrived, they waited outside her mother's home, during which time the police provided them with no information whatsoever about whether Edith and Willie Bell were dead and if not, what had become of them. After 30 minutes, with no police officer coming to speak with them at all, Robert lost patience and re-entered the home through the back porch door, demanding to know what had happened to "my people." Detective McWeeny, the first officer Smith encountered, did not like that Smith had entered the crime scene or the way Smith spoke to him, and McWeeny grabbed Smith to push him back outside. When Smith resisted, McWeeny and three other officers grabbed Smith, and after a brief scuffle, forcibly threw Smith onto the floor of the kitchen. The officers then handcuffed Smith, whisked him outside, and McWeeny ordered Smith to be carted off to Area 2. *See* Smith Dep., Exhibit 12, at 249 ("I was thrown down by the police in the kitchen and that's how I got blood on me.")

Under either version of Smith ending up on the ground, however, the parties are in absolute agreement that when Smith was forcibly removed from the crime scene, he had the victims' blood on him. Therefore, the entire purpose of DNA testing is defeated. With the exception of the green jacket (which the Chicago Crime Lab has already tested and concluded that there was insufficient blood to test further), none of the items that Defendants want to test for the victims' DNA – socks, swab from Smith's ankles, or the black plastic card case he carried on his person, which fell onto the floor of the crime

scene when Smith scuffled with the police – can be used to prove in any way that Smith murdered the victims. The same is true with the purported bloody underwear. No one is disputing that the blood on the underwear is the victims' blood.

The sole dispute is how and when the blood got on the underwear – was it when Detectives Higgins and Solecki went back to the house searching for "additional evidence," found men's underwear in the home and decided to frame Smith with it, as Smith argues, or did it get on the underwear when Smith murdered the victims, as Defendants argue. Either way, under Federal Rule of Evidence 401(a), testing the underwear to determine if it has the victims' blood on it will not have "any tendency to make [that] fact [whose blood it was] more or less probable than it would be without the evidence." Fed. R. Ev. 401(a). This is yet another reason to deny the motion.[2]

---

[2]  Defendants assert that Smith recently testified that the underpants with which he was confronted may have belonged to one of the victim's sons who also kept clothes at the house, that such testimony is inconsistent with Smith's testimony at his criminal suppression hearing, and that Smith is now trying "to suggest the existence of an alternative suspect." Motion at 3-4. This is all plainly wrong. First, the entire inquiry as to who owned the underwear is a complete red herring, as even if Smith were to confirm the underwear were his (or the brother-in-law were to confirm that they were his), that does not prove that either one committed the murders; it merely shows that that person kept underwear in the house, and this is so with or without DNA testing. Second, there was nothing inconsistent about Smith's deposition testimony. He testified in the criminal proceedings that the police showed him the underpants "from a distance" and that at that time he recognized blue stripes on the underwear, and that he told the police they were his. He has never denied that *this is what he told the police.* At his deposition, 34 years later, Ms. Benjamin very purposefully did not show Smith either the underpants themselves or even a photo of the underpants, and then, in the context of Smith's testifying that one of the victim's son's also kept clothes at the house, she asked, "were that underwear yours or David's [one of the victim's sons]?," to which Smith responded that "it could have been his." Smith never suggested that David was involved in the murders, but only that David, like him, also kept clothes in the house. His actual answer, in the context of the questions being asked, do not contradict his prior testimony in any way, nor suggest that he has done anything to try to make David into "an alternative suspect," and, in any event, nothing about his deposition answer justifies DNA testing.

## VII. EVEN IF GIVEN THE OPPORTUNITY TO DO SO, DEFENDANTS CANNOT ESTABLISH THE INTEGRITY OF THE EVIDENCE THEY WISH TO TEST.

If, notwithstanding all the Motion's failings outlined above, the Court still believes it should nevertheless rule on the merits of the motion, the motion should still be denied.

### A. The Impounded Evidence Has Repeatedly Been Exposed To Contamination.

Defendants mention in passing that the evidence they now want tested was impounded with the Clerk of the Circuit Court after Smith's 1990 criminal trial. Defendants are completely silent, however, about how that impounded evidence was stored, maintained, and handled over the past 34+ years. Plaintiff submits that Defendants cannot meet their burden of establishing that the evidence "has not been substituted, tampered with, replaced, or altered in any material aspect" and further submits that it was stored in a manner that prevents it from being subjected to any form of reliable DNA testing. Most significantly, there are numerous photographs that support Plaintiff's position.

On January 16, 2020, pursuant to Circuit Court Judge Adriene Davis's January 6, 2020 post-conviction Order, Exhibit 13, Special State's Attorney Bob Williams and Smith's counsel Ariel Olstein viewed the impounded evidence. In the attached photos from January 16, Group Exhibit 15, the Court can see for itself that the evidence, most of which was not bagged at all, much of which the seals were already broken, and all of which was thrown collectively in a single box, contains a mixture of evidence taken from Smith, the crime scene, and the victims. Storing the evidence in this manner completely precludes DNA testing. Specifically, the Court can see the following:

- Smith's black socks inside a plastic bag that is completely torn open. SMITH-1212. This is and one of the pieces of evidence that Defendants now seek to test for DNA (Inventory# 435436).

- A glass detergent jar collected by the police from the crime scene, inside a paper bag that is completely ripped open. SMITH-1224.

- The blue underpants inside a plastic bag that was ripped open, and which at Mr. Olstein's insistence the Clerk taped closed and marked "sealed 1/16/2020." SMITH-1206. This is one of the pieces of evidence Defendants now seek to test for DNA (Inventory# 428528). See also SMITH-16256 (better photo taken 7/22/21).

- Smith's shoes – the ones he wore when he was thrown to the floor of the crime scene – were left completely unbagged. SMITH-1215.

- Smith's blue jeans, which Smith wore when he entered the crime scene and was thrown to its floor, left completely unbagged. SMITH-1217. (Interestingly, Defendants have not included the blue jeans as something they want tested.)

- Crime lab standards and extracts apparently taken from the victims, left in a completely open paper envelope. SMITH-1219 and 1220. This is another piece of evidence Defendants now seek to test for DNA (Inventory# 448106).

- Crime lab standards apparently taken from Smith inside a paper bag that is completely ripped open. SMITH-1221 and 1223. This is another piece of evidence Defendants now seek to test for DNA (Inventory #520272) and which Defendants say in their Motion is now in the possession of ERPS, but Defendants do not explain when, how, and under what authority or circumstances these standards were transferred to ERPS. Perhaps even worse than that, when Plaintiff specifically asked the City what physical evidence related to this case was stored at ERPS, the City responded that Inventory #438315 was the only physical evidence the City possessed at ERPS and completely omitted any reference whatsoever to Inventory #520272. Before testing was permitted, we would need to get to the bottom of that issue.

- Smith's black plastic card case (which Defendants want to test (Inventory # 428527)), handkerchief, and belt inside a paper bag that is completely ripped open. SMITH-1227-28. Smith had the card case and handkerchief with him at the crime scene and reported losing them during the scuffle with the police. Smith had the belt on him at that time and that was taken from him later at Area 2.

- Smith's green jacket left completely unbagged and mixed in with all the other evidence. SMITH-12235. This is another piece of evidence Defendants now seek to test for DNA (Inventory # 428530).

- Smith's gray sweatshirt left completely unbagged, which again Smith wore while inside the crime scene and when he was thrown to the floor of the crime scene. SMITH-1241 and 1246. (Again, interesting that they don't ask this to be tested.)

- A blood-stained towel apparently collected by crime lab technicians from the basement of the crime scene inside a paper bag completely ripped open. SMITH-1248.

- Crime lab samples – apparently taken from the victims – inside a paper bag completely ripped open. SMITH-1251 and 1254.

- A blood-stained *yellow bed sheet* collected by crime lab evidence technicians from the basement of the crime scene, in front of the washer-dryer, inside a paper bag, completely ripped open.  SMITH-1257.  (This piece of evidence is important because Higgins and Solecki claim that they found a *blue bed sheet* in the exact same spot, which leads to the obvious question, how come the crime lab evidence technicians saw the yellow sheet and not the blue sheet?)

That is just the state of the evidence as of January 16, 2020.  It gets much worse at a later July 22, 2021 evidence viewing. To understand why, it is important to understand the run-up to that viewing.

On May 10, 2021, as part of discovery in this case, the City's counsel emailed Smith's counsel stating, "we'd like to view the impounded evidence at 26th Street and hope to present that request as agreed."  Smith's counsel promptly responded, "we have no objection to an agreed order for reviewing . . . the evidence."  One month later, on June 14, the City's counsel emailed a draft of a proposed agreed order, and Smith's counsel promptly responded, "We have no objection to the motion, and you can represent to [Judge Reddick] that we have no objection."  One week later, on June 22, the City's counsel emailed Smith's counsel an update,

> At the presentment of the motion to view yesterday, Judge Reddick continued the case . . . *because she was concerned about the handling of the evidence* and wanted the parties to present an agreed order regarding same. [Mr. Noland's colleague] Dhaviella [Harris] is in the process of reaching out for Patrick Brown at the clerk's office to discuss his handling procedures to include in the order … . We will circulate a revised agreed order before June 28 for y our review and comment.

Six days later, on June 28, 2021, Ms. Harris, accompanied by Assistant State's Attorney Andrew Horvat, appeared before Judge Reddick. ASA Horvat then stated,

> Judge, by way of background, I was notified that you might have some questions regarding *how the evidence was handled, the integrity of the evidence*. I'm familiar with these motions, and I also deal with Supervisor Brown -- Patrick Brown, in the Clerk's Office. I suspect I might be able to answer any questions your Honor has.

Transcript of 6/28/21 Hearing at 3 (Exhibit 16). Judge Reddick then explained that she was concerned with preserving the integrity of the evidence and its chain of custody, and Horvat responded by reassuring Judge Reddick – in the presence of the City's counsel Ms. Harris – that the process the Clerk uses does not jeopardize the integrity of the evidence, emphasizing specifically that the Clerk "***does not break evidentiary seals***." *Id.* at 4 (emphasis added) ("[Clerk Brown] won't actually open the bag and he certainly won't open the vials but he'll let the parties view and photograph the evidence.") Still, Judge Reddick was not satisfied, instructing that the parties prepare an agreed order stating expressly that ***no seal will be broken during the viewing of the evidence***, that the evidence will only be photographed, and that the chain of custody will be preserved at all times. Exhibit 16, at 5-6 (emphasis added). Two days later, Judge Reddick entered the Agreed Order, which expressly directed, **"*During this viewing, no evidentiary seals will be broken.*"** Exhibit 17 (emphasis added).

On July 22, 2021, several of Defendants' counsel, ASA Joe Hodal, and Mr. Olstein viewed the impounded evidence at the Circuit Court Clerk's Office. The impounded evidence was presented, and at one point, shockingly, the Deputy Clerk*, Patrick Brown, began to break certain evidentiary seals, including some of the same evidence Defendants now seek this Court's permission to test.* Mr. Olstein immediately objected and requested that Mr. Brown make a clear record of every evidence envelope being opened during the viewing and mark each such envelope with the date it was opened and re-sealed (which was the very same manner that Mr. Brown, at Mr. Olstein's insistence, had marked the bag containing the underpants at the prior viewing in January 2020. *See* Exhibit 18, IIE-71) (Photo).

Defendants' counsel, however, disagreed with Mr. Olstein, telling him "it doesn't work that way" and words to the effect of "that's not what sealed means." In light of Defendants'

position, Mr. Brown, in this instance (unlike his prior agreement to do so), refused to mark the envelopes and other packages in which the seal was broken. The parties, however, including *both* Mr. Olstein and Monica Burkoth (an attorney for dismissed Defendant ASA Brogan) were able to make an informal record of what occurred during the viewing of the evidence by photographing both the envelopes the Clerk unsealed and the contents of those envelopes he emptied onto the table. The Court can see for itself in Group Exhibit 18:

- Swabs, standards, and small cardboard boxes containing specimens that CPD and/or the M.E. (that itself remains unclear) took from the victims, being removed by the Clerk from a paper evidence envelope and then emptied onto a black plastic tray, and then from the tray onto the table. Exhibit 18, at IIE-216 (the envelope containing the swabs, standards, and specimens) and IIE-217-223 (photos showing these pieces of evidence being placed by the Clerk on the black tray). These are some of the pieces of evidence that Defendants now want tested for DNA (Inventory# 448106).

- Several of the same specimens from the victims having their evidentiary seals broken by the Clerk, in the process of which the micro slides contained inside the specimens – containing blood from the victims – fell out of the containers. IIE-240-252 and SMITH-016335-016347.

- A white envelope marked "two blood samples drawn from Robert Smith, 7 July 88" being unsealed by the Clerk, then placed on the same black tray (the one the Clerk had used for the swabs, standards, and specimens taken from the victims). SMITH-016286-016292.

- The Clerk using the same black tray for the black plastic card case and the papers inside it, which Defendants now want tested for DNA. SMITH-016274-016281.

As the Court can see with its own eyes, the Deputy Clerk of the Court – in direct violation of Judge Reddick's Order – broke the seals on evidence and then emptied their contents onto the viewing table, at times side-by-side with evidence recovered from Smith, thereby contaminating and compromising the very same pieces of evidence for which Defendants now seek permission to test for DNA. In addition, as the Court can also see in the photos, the Clerk contaminated and compromised the integrity of the evidence by using the same gloves

to handle all the evidence throughout the entire viewing, including the yellow blood-stained bed sheet and towel recovered from the crime scene and Smith's clothing and shoes.

The gross violation of Judge Reddick's Order, despite her unequivocal instructions and repeated emphasis on not opening any of the sealed evidence, and the wildly uncontrolled manner in which the Clerk managed the evidence during its viewing, standing alone, are grounds for this Court to deny Defendants' motion.

### B. Defendants Have Lost or Destroyed Several Inventory Sheets and Other Evidence Pertinent to the Chain of Custody.

The Court will recall (from page 6 above) Section 116-4(d-10)'s requirement that "[a]ll records documenting the possession, control, storage, and destruction of evidence and all police reports, evidence control or inventory records, and other reports . . . must be retained for as long as the evidence exists and may not be disposed of without the approval of the Local Records Commission." 725 ILCS 5/116-4(d-10).

Defendants' request must also be denied because this rule has been repeatedly broken by the City. Indeed, Defendants have already repeatedly conceded – earlier in the discovery process – that many of the necessary documents to establish chain of custody have already been lost and destroyed. By way of example only, CPD Inventory Sheets (the ones that in 1987 were made with a 5-page, 5-color carbon set, one copy of which was to be retained in the police's "*Permanent Retention* File") do not exist for the following critical pieces of evidence:

- The bloody underpants that Defendants now ask to have tested, which Detectives Higgins and Solecki claimed to have found on the top basement stair at the crime scene and then brought back to Area 2 and showed to Smith, purportedly prompting him to immediately confess. (The explanation of how the underpants were used to frame Smith is set forth in Plaintiff's Complaint, Dkt. 1, at ¶¶ 99-109.) There is no Inventory Sheet for this purported piece of evidence.

- The bloody blue bedsheet, which Detectives Higgins and Solecki also claimed to have found in the basement of the crime scene (in the same location that the evidence technicians found the separate yellow sheet), which also, at least according to Higgins and Solecki prompted Smith's confession. There is no Inventory Sheet for this purported piece of evidence.

- A 12" butcher knife that two other detectives found buried in the ashes at the crime scene, which the City's admits, and the police's own records show, was destroyed by the police on February 16, 1988, less than five months after the murders occurred, without court approval, in violation of the police's own rules in existence at the time, and despite Smith's counsel's November 1987 written request to inspect all the physical evidence recovered by the police. A photograph of the butcher knife is included as Exhibit 19. *See also* Exhibit 20 (police ledger showing knife destroyed). There is no Inventory Sheet for this purported piece of evidence.

- In addition, together with the knife, the police destroyed all the documentation showing why the knife was destroyed and who purportedly authorized its destruction, including the so-called "tracer" document that one or more of the detectives sent to ERPS, requesting the knife's destruction. Therefore, there is no evidence anywhere identifying who purportedly ordered the knife's destruction.

- A *second* gas can that police apparently discovered at the crime scene, which at some point was assigned inventory number 386799, and which was never turned over to prosecutors or defense counsel at Smith's criminal trial, and the existence of which is never mentioned in any of the Detectives' reports in this case, and which the police also destroyed on October 17, 1994, again together with any documentation showing why this gas can was destroyed. *See* Exhibit 20. There is no Inventory Sheet for this purported piece of evidence and no "tracer" identifying the basis for the evidence's destruction.

The fact that these inventory sheets simply "went missing" is of major significance, because, in addition to Section 116-4 regarding DNA testing, the police's own 1987 rules and regulations required that these sheets be completed "immediately" upon recovery of evidence, identify with specificity who recovered the evidence, the time of the recovery, the place of the recovery, the manner of the recovery, and the initial destination of the evidence. *See* Exhibit 21, at 1-2 (1982 CPD General Order). Numerous Defendants have testified as to the centrality of the Inventory Sheet in the collection, control, and chain of custody of evidence,

and yet no Inventory Sheet exists for these central pieces of evidence, and all the information essential to establishing the initial chain custody for these four pieces of evidence, including the underpants and the knife, is now unavailable.

Lastly, Smith asked Detective Solecki at his deposition (the transcript of which is not yet available) why neither he nor Higgins completed an inventory sheet for the bloody underpants and the blue bed sheet they claim they found at the crime scene and used to prompt Smith to confess to the murders, and Solecki had no explanation whatsoever, nor was he or any of the other deposed Defendants able to provide any explanation whatsoever as to how the inventory sheets, if they ever existed, were lost or destroyed, including the copy of each inventory sheet that was to be kept in the CPD's "permanent Retention File."

### C. The Problem of Crime Lab Analyst Pamela Fish.

While no further basis is needed to deny Defendants' motion, unfortunately, there is more. We will try to keep it brief. Illinois Crime Lab Analyst Pamela Fish was a one-woman wrecking crew of criminal defendants' lives. By way of example only, at John Willis's criminal trial for two 1990 rapes, Fish testified that DNA findings from the vaginal swabs were "inconclusive," even though her actual test results specifically excluded Willis as the source of the semen from the sexual assault victims. Willis, who spent more than eight years in prison, was later exonerated and paid $2.5 million for his wrongful conviction.

Fish used the same tactic in the trials of three men convicted of the 1986 rape and murder of Rush University medical student Lori Roscetti. This time, Fish testified not that her DNA tests were inconclusive, but rather that they established that all three men could have been the source of the semen in the vaginal swab – even though her testing, in fact, showed that *none of the three could have been the source of the semen*. All three men

received life in prison without parole, served approximately 14 years, and were later exonerated and collectively awarded $10 million in settlements. There are many, many others. *See*, *e.g.*, https://www.chicagotribune.com/news/ct-pamela-fish-murder-case-appeal-met-20170129-story.html and Group Exhibit 22, printouts from the University of Michigan Law School's National Registry of Exonerations (describing in detail Fish's false testimony and fabrication of evidence in the wrongful convictions of Marcellius Bradford, Larry Ollins, Calvin Ollins, Omar Saunders, Marvin Penelton, Dana Holland, Donald Reynolds, Lafonso Rollins, and Billy Wardell).

Fish worked at the Chicago Police Lab from 1979 through 1996, when it was merged into the Illinois State Police Crime Lab, where she continued to work until 2004. In 2001, she was promoted to head of the biochemistry section, the same year that renowned DNA expert Dr. Edward Blake reviewed nine cases in which Fish testified that her tests had produced inconclusive results. Dr. Blake concluded that in every one of the nine, Fish's actual test results fully exonerated the criminal defendant and that she had given false testimony at each of those trials.

In Robert Smith's criminal case, Fish not only handled much of the evidence Defendants want tested, including the extracts and standards taken from Smith and the victims, *see* 10/11/88 Fish Lab Report at 1-2 (Exhibit 23) and Evidence Chart (Exhibit 24), but she was also assigned to undertake both biochemical and electrophoresis examination of that evidence. Anderson Dep., Exhibit 1, at 63, 83-84. Without further discovery of Fish, this is as far as we can take the argument that Fish may have contaminated the evidence, but Fish's active involvement with the very evidence Defendants request leave to test is yet another reason the Motion cannot be resolved in the 13 days remaining in fact discovery.

There are numerous additional failings in the chain of custody that there is simply not enough space and time to insert here, such as the two strangers who were wandering through the crime scene at the very same time that Detectives Higgins and Solecki re-entered the home searching for "additional evidence," and who Detective Rowan (a third officer present at that time and former defendant in this case), admitted could have easily handled evidence inside the crime scene. Rowan Dep., Exhibit 25, at 107-108.

All of this leads to the same simple conclusion: 13 days is simply not enough time to complete the DNA discovery that Defendants are inserting into this case, and therefore, under Section 4 of Local Rule 16.1, Defendants' request for DNA discovery must be denied.

## VIII. SANCTIONS.

Pursuant to Federal Rule of Civil Procedure 11(c)(1) & (3), the Court's inherent authority, and 28 U.S.C. § 1927, Plaintiff Robert Smith requests sanctions against Defendants and their counsel for having to respond to this motion, which is frivolous as to both fact and law, intentionally omits the controlling law, was filed way too late in violation of this Court's Standing Order and two of Judge Guzman's "No Extensions" Orders, and was filed for an improper purpose.

**WHEREFORE,** Plaintiff respectfully requests this Court to deny Defendants' Motion and grant sanctions.

Dated: December 30, 2021

*PLAINTIFF ROBERT SMITH JR.*

/s/ Stuart J. Chanen

Stuart J. Chanen
Ariel Olstein
CHANEN & OLSTEIN
7373 N. Lincoln Ave.
Lincolnwood, IL 60712
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com