IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Robert Smith Jr., | ) | |
|    Plaintiff, | ) | No. 21-cv-1159 |
| v. | ) | |
| | ) | Honorable Ronald A. Guzman |
| The City of Chicago, et al. | ) | Honorable David Weisman |
| | ) | |
|    Defendants. | ) | |

**PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE'S
ORDER ON DEFENDANTS' JOINT DNA MOTION**

**INTRODUCTION**

  In the afternoon of December 23, 2021, just hours before the federal court closed for the holiday, Defendants filed a motion for leave to conduct DNA tests (Dkt.133) on eight pieces of evidence still impounded in the Cook County Circuit Court and several pieces of evidence held in CPD's evidence storage (hereafter, the "DNA Motion" or "Motion"). Defendants' DNA Motion also sought this Court's leave to ask the Circuit Court to transfer the impounded evidence to Defendants' retained DNA Lab. Two hours later, Defendants wrote an email to Magistrate Judge Weisman asking that their DNA Motion be briefed and heard on an expedited basis because Defendants were concerned there wasn't enough time left in discovery to complete the DNA testing, which even according to Defendants, would take "up to 4 to 6 weeks upon receipt of the evidence." Over Plaintiff's objections, the Magistrate entered the requested expedited briefing schedule; Plaintiff then timely opposed the Motion (Dkt.140); and on January 14, 2021 the Magistrate, in significant part, granted Defendants' request for leave to seek DNA testing. The Order was docketed on January 18, just two days before the close of discovery. Dkt. 152.

There are four reasons the Magistrate should have denied the DNA Motion and this Court should do so now. First, this is not a DNA case, has never been a DNA case, and the DNA information that Defendants purport to seek is neither relevant nor proportional to any disputed issue of material fact in this case, and therefore fails the test under Rule 26(b)(1).

Second, fact discovery is closed. Defendants waited 241 days into discovery to raise the issue of DNA at all and did so with just 27 days left. As explained below, Defendants' Motion violated (1) Local Rule 16.1, (2) this Court's discovery cut-off, and (3) several additional clear and strong statements that this Court made to Defendants' counsel in granting Defendants' request to extend fact discovery to cover seven specific topics. If the Court allows Defendants to inject DNA evidence into this case – now, after the close of fact discovery – it will severely prejudice Plaintiff and will upend the discovery schedule this Court entered and emphasized repeatedly it would not extend further.

Third, all the DNA testing Defendants wish to conduct falls under Illinois Criminal Code Section 116-3, 725 ILCS 5/116-3 ("Code" & "Section 116-3") (permitting "comparison analysis of genetic marker groupings" between "the evidence collected by criminal justice agencies pursuant to the alleged offense . . . to those of the defendant and . . . other forensic evidence"). Because this statute specifically covers evidence *that is collected by criminal justice agencies*, this Court should apply the statute's post-conviction testing requirements to *any* post-conviction testing of the evidence. In other words, the requirements on testing the evidence travel *with the evidence* because of the manner in which the evidence was obtained. Code Sections 116-3 and 116-4(d-10) require Defendants to establish both the chain of custody and non-contamination of the evidence, neither of which they have done on this Motion.

2

Finally, even if a federal court is not *required* to abide by the testing requirements of Sections 116-3 and 116-4(d-10), as Judge Weisman concluded, Defendants should still be required, as a pre-requisite to DNA testing, to establish some minimal chain of custody sufficient to prove that the evidence has not been tampered with, altered, or contaminated in some material respect. After all, DNA testing inherently requires confidence in the integrity of the actual evidence being tested to yield reliable and admissible results, especially where, as here, there are serious concerns about the way the evidence was collected, stored, and handled over the past 34+ years. A request for DNA testing, therefore, unlike a routine document or inspection request, should not be granted without the movant establishing at least the bare minimum chain of custody, which Defendants cannot do here. Respectfully, Judge Weisman's decision not to impose any chain-of-custody or non-contamination requirement was clearly erroneous.

## STANDARD OF REVIEW

Where, as here, the losing party files timely objections to a Magistrate's Order on a non-dispositive pretrial matter, "[t]he district judge . . . must . . . modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). This Court is directed to modify or overrule the magistrate's Order if it is "left with the definite and firm conviction that a mistake has been made." *Weeks v. Samsung Heavy Indus. Co.*, 126 F.3d 926, 943 (7th Cir. 1997); *U.S. v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

## I. DEFENDANTS' DNA MOTION DOES NOT MEET THE RULE 26(b)(1) STANDARD FOR DISCOVERABLE EVIDENCE.

Unless otherwise limited by Court Order, Federal Rule of Civil Procedure 26(b)(1) permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Rule 26(b)(1) also sets forth the

3

factors a court should consider in assessing proportionality, which include the importance of the discovery in resolving the issues in the case and whether the burden or expense of the proposed discovery outweighs its likely benefit. *Id.*

Here, this Court has twice specifically directed the parties to focus their discovery on Smith's narrow claims against the Individual Defendants, which are (1) that in the eighteen hours from 6 a.m. to midnight on September 19, 1987, the Individual Defendants beat and coerced a false confession from Smith, a confession the Detective Defendants themselves fabricated, along with other fabricated evidence; and (2) the Detective Defendants intentionally ignored (and in one instance, destroyed, Dkt.82, ¶¶ 224-45) exculpatory evidence because such evidence was not consistent with the fabricated story they had concocted and fed to Smith.

As the Detective Defendants and City of Chicago do in nearly all of these cases, their primary defense at trial will be to attempt to turn the jury's attention away from the Detectives' own misconduct and retry Robert Smith for the double murder, notwithstanding that State prosecutors have already moved to vacate his conviction, a Circuit Judge has already done so; and the Circuit Court's Chief Criminal Judge has found that Smith proved his innocence with respect to the double murder for which he was incarcerated.[1]

DNA has never been an issue in this case. DNA was available and being used by the Chicago Police Department during the two years preceding Smith's trial, *see* Dkts.140-2 and 140, at 9, but they never did any DNA testing in Smith's criminal case. Nor did the police or

---

[1] Four Illinois Court of Claims judges have also held that "Robert Smith represents yet another victim of the violent and abusive tactics of Chicago Police Lieutenant Jon Burge and his devout crew of similarly violent Chicago Police detectives. Following hours of torture, Mr. Smith orally confessed. But tellingly, when it was demanded that he sign a written confession by the assigned felony review State's Attorney and detectives, Mr. Smith refused. The oral confession along with other fabricated evidence formed the basis for his double murder conviction. But for the trial judge who raised concerns about the lack of motive by Mr. Smith, he might very well have been sentenced to death." Dkt.82, at ¶ 115.

special prosecutors or Torture Commission do so during Smith's post-conviction proceedings. The first time DNA was raised in this case at all was December 23, 2021, after eight months of discovery had passed and only 27 days of discovery remained.

Defendants' belated and current request for DNA testing, however, does not and cannot meet the relevancy and proportionality requirements of Rule 26(b)(1) because the test results Defendants seek to obtain will not lead to any relevant evidence in the case. The "fact" of finding the victims' blood on Mr. Smith's clothing or body does not make it any more or less likely that he murdered his in-laws because both sides agree that when Smith and his wife Diane (the victims' daughter and granddaughter) came to the crime scene at approximately 5:30 a.m., several hours *after* the murders occurred, Smith ended up on the floor and got a combination of blood from the victims and water from the fire hoses onto his clothing, socks, and skin. Both sides agree that Robert got the victims' blood on him *during that ½ hour,* rendering irrelevant the fact that he has the victims' blood on him.

The parties only disagree as to *how* Smith got the victims' blood on him at that later time. Defendant McWeeny (and Defendant Cline, and Officer Hughes) all asserted at Smith's trial that this occurred when Smith first arrived at the home, when Smith entered the house through the front door, raced past Diane and McWeeny, and "threw himself headfirst into a pool of blood" and then "rolled and wriggled around in it for 15 seconds" and refused to get out of the blood when McWeeny, twice, ordered him to do so. *See* Dkt.140-11. Smith, on the other hand, asserts that he ended up in the bloody water closer to 6:00 a.m. when, after first waiting outside for a half hour – and the police not sharing any information with him or his wife about the whereabouts or circumstances of her mother and grandmother – he went through the back door of the house and demanded to know what

5

had happened. McWeeny did not like that Smith had entered the home, nor the way Smith spoke to him, nor that when he tried to push Smith back out the door, Smith pushed back against McWeeny, including telling McWeeny to get his hands off Smith and slapping McWeeny's hands away. At that point, McWeeny and three other officers violently took Smith into the mixture of blood and water on the ground; handcuffed Smith; and McWeeny ordered Smith carted off to Area 2. (McWeeny claims to have "arrested" Smith at that time, but there is no arrest report covering the incident nor identifying probable cause for arrest.)

Under either scenario, the parties agree that when Smith was forcibly removed from the crime scene, he had the victims' blood on him. Therefore, the entire purpose of DNA testing – the inference that if Mr. Smith had the victims' blood on him, he must have bene present for or committed the murders – is defeated in its entirety. Illinois courts have held that where the evidence a party wants tested will not advance that party's claim, DNA testing is not appropriate. *People v. Savory*, 197 Ill. 2d 203, 214 (2001); *People v. Jeffries*, 2019 IL App (2d) 161095-U, ¶ 1 ("Whether testing would generate evidence that would tend to significantly advance the defendant's claim is not a question that can be answered 'in the abstract.' Instead, answering it 'requires . . . an assessment of the evidence defendant is seeking to test'").

With the exception of the green jacket (which the Chicago Crime Lab has already tested and concluded that there was insufficient blood to test further), none of the items that Defendants want to test for the victims' DNA can be used to prove in any way that Smith murdered the victims. This applies especially to the purported bloody underwear recovered from the scene, which Smith identified as his and explained that he kept, along with other clothes, at his in laws' house because he would do chores there like painting the

6

house, requiring a change of clothes, and also his wife would do laundry there, a fact Diane confirmed in her testimony. No one is disputing that the blood on that underwear, like the blood detected on many other items in the house, is the victim's blood. Therefore, DNA testing of those objects, when compared to the victims' DNA profile is not going to have "any tendency to make the fact [that Smith is the murderer] more or less probable than it would be without the [DNA] evidence." Fed. R. Ev. 401(a).[2]

Perhaps if Smith had never re-entered the house demanding to know what happened to his loved ones, the presence of the victims' blood could lead to the inference that he was present when the victim's necks were slashed. However, given that *he did* re-enter and *he did* get blood on him, scientifically establishing that the blood was the victims' is not a *fact* relevant to *any disputed issue* in this case.[3]

Moreover, given that DNA has never previously been an issue, it lacks any discernable relevance to the case, and is being raised after fact discovery closed, to allow such testing now would open up a Pandora's Box related to this 35-year-old evidence: What documents prove the chain of custody? Has the evidence been contaminated? What

---

[2] In *Harris v. Athol-Royalston Reg'l Sch. Dist. Comm.*, 206 F.R.D. 30 (D. Mass. 2002), the district court denied a motion for DNA testing in part because there was "no direct connection linking any of the Defendants to the alleged 'hair and other biological matter' on the [evidence] such as is the case where DNA testing is used to determine paternity." *Id.* at 35. The analogy is apt. When a paternity test is done, if the child's DNA is a direct match to the putative father's DNA, then the DNA test unequivocally provides *a fact* relevant to the *dispute at issue*. Here, Defendants have not explained how the presence of the victims' blood on Smith leads to any comparable conclusion – or even fair inference – regarding his presence at the scene at the time of the murders.

[3] Indeed, the presence of blood on Smith or his clothing does not implicate him in the murders any more than it would implicate the police and fire personnel at the scene, all of whom also had blood on them. *See* Capt. Dempsey Criminal Trial Testimony, Dkt.140-9, at B95 (testifying that after completing their work, each of his crew members had to wash blood off their clothing, gear, and boots). *Id.* ("we noticed ourselves slipping around [in] an awful lot [of blood] … we had to wash all of our equipment off; our boots and everything"); *see also* Officer Hughes' OPS Statement, Dkt.140-10, at 2 ("the floor in the room was slippery as it was covered with blood and water").

additional discovery must be permitted to allow Plaintiff to investigate those questions? Does the evidence have sufficient scientific reliability to permit its testing? Is the Circuit Court going to release the evidence in light of the fact that her Court Order permitting review the evidence – *but prohibiting the breaking of any seals on the evidence* – was violated? With all these issues unresolved, permitting such discovery at this late hour is hardly "proportional" to the needs of the case, all of which is especially true where Your Honor has twice directed the parties to focus on what happened at Area 2 during the 18-hour interrogation and where the testing's end result will not produce a "fact" with any "relevant" bearing on the case. Proportionality is therefore yet another reason to deny the Motion.

Other than stating in his written Order that "the testing Defendants request is relevant," Order ¶ 7, Judge Weisman never provided a reason he was rejecting Smith's relevance or proportionality arguments. Indeed, initially, Magistrate Weisman was open to Plaintiff's relevancy argument, suggesting that if Plaintiff were to stipulate that he had gotten blood on him at the crime scene after the murders occurred that would "dramatically" reduce the relevancy of the DNA testing sought by Defendants and change the "calculus under Rule 26." *See* January 7, 2022 Hearing Tr., Exh. 1, at 36. However, after the hearing was continued and after Plaintiff proposed to Defendants the stipulation Judge Weisman had encouraged, the Judge never revisited the relevancy argument at all, moving on to other points in the interest of time and ultimately rejecting the relevancy argument without explanation. *See Id*. Therefore, the Magistrate's assumption that Defendants' discovery request (1) may produce evidence relevant to Defendants' defense; and (2) is proportional to the needs of the case, are both clearly erroneous and respectfully, should be reversed.

8

## II. DEFENDANTS' DNA MOTION COMES TOO LATE.

Fact discovery opened on April 26, 2021, and during the first 241 days of discovery, Defendants never did anything to obtain or test the evidence impounded by the Clerk of the Circuit Court. Defendants waited until there were only 27 days left in discovery, which was barely enough time to have the Motion ruled upon by Judge Weisman (it ended up taking 25 days), let alone sufficient time for:

(a) Your Honor to rule on the Motion;

(b) the Circuit Court Chief Criminal Judge to rule on the transfer motion (which is required because the evidence is still under her jurisdiction);

(c) the Clerk of the Court transferring the evidence to Defendants' designated Lab;

(d) Defendants' Lab to test the evidence (which Defendants conceded in their original Motion would take at least 4-6 weeks, Dkt.133, at 2 n.1); and

(e) Discovery being re-opened so that Plaintiff could take "chain of custody" and "contamination" discovery, which he of course had no intention and no need to take until after Defendants filed their December 23 DNA Motion.

The time for Defendants to have brought the DNA Motion was in May, June, July, or August, so that Defendants' request to obtain "tangible things" and to "test" those tangible things could have been completed by the original fact discovery cutoff, December 6, 2021. There was no reason to wait until December 23 to do so. In fact, as early as July 22, 2021 – pursuant to an *agreed* motion in Circuit Court – Defendants viewed and photographed the very evidence they now want tested. That was more than six months ago.

Defendants' Motion was not only untimely under this Court's original December 6 discovery cutoff, it was also untimely under this Court's extended January 20 cutoff. The Court will recall that on November 22 Defendants filed a "Statement On Additional Fact Discovery," Dkt.115, identifying seven specific items of discovery they wanted to pursue after the December 6 discovery cutoff. Then, at the December 2 hearing before Your Honor, the

9

Defendants represented that they were not seeking "a wholesale reopening . . . of discovery for another 45 days," but rather "simply asking for a limited number of matters to be conducted after the December 6 close of fact discovery." Dkt.140-7, at 3-4.

Significantly, neither obtaining the impounded evidence from the Circuit Court nor testing it for DNA were identified in their Statement On Additional Discovery, nor did they mention either item on December 2 as items they wished to add to the "limited number of matters" they represented to this Court they would pursue during the 45 days. While it is true that this Court was even more generous than Defendants had asked for – extending *all discovery* for 45 days, Defendants still waited an additional three weeks before filing their DNA Motion, and this is so notwithstanding that the Court specifically warned Defendants to pursue *immediately* any additional discovery they would seek:

| | |
|---|---|
| THE COURT: | You are not going to get more than 45 days. [N]othing else [other than actual obstructive actions by plaintiff] is going is to be considered by me for purposes of extending the discovery any further. Understood? |
| Ms. BENJAMIN: | Understood for the individual defendants, your Honor. |
| THE COURT: | Okay. Let me make it even plainer. I don't care if a tsunami hits the east coast of the United States and floods the entire country, that will not be a reason for extending it past 45 days. . . . So the first thing you should do when you get back to your office after this, or if you're there now[,] when you hang up, *is to start working on this discovery immediately.*" |

*Id.* at 21 (emphasis added).

Defendants' DNA Motion also violates Northern District Local Rule 16.1 § 4, which provides that discovery "requested before the discovery closing date, but not scheduled for completion before the discovery closing date, does not comply with this order." There can be no reasonable dispute that Defendants' DNA Motion is a Federal Rule 34 motion to obtain tangible things and for leave to test those tangible things. Rule 34 is entitled, "Producing

10

Documents, Electronically Stored Information, and Tangible Things . . . for Inspection and Other Purposes." It permits a party to serve a demand on any party and also any non-party (*see* Rules 34(c) and 45(a)(1)(D)) for the opportunity "to inspect, copy, test, or sample . . . any designated tangible things." Fed. R. Civ. P. 34(a)(1)(B). Any right that Defendants had during fact discovery to obtain and test evidence was a right under Federal Rules 34 and 45, and therefore they needed to have filed such motion not only before the discovery cutoff but far enough in advance of the cutoff to have the testing *completed* by the discovery cutoff. Defendants did not do so, expressly choosing to ignore this Court's warning at their peril.

When Defendants appeared before Judge Weisman, however, they simply dubbed the "tangible things" they wished to "obtain" and "test" – "expert discovery." Defendants asserted, and Judge Weisman agreed, that Defendants' requests were not governed by Rule 34 at all, nor, for that matter, by this Court's fact discovery cutoff. Rather, Judge Weisman adopted Defendants' argument that these requests constituted "expert discovery" because the underlying facts being discovered were going to be used by an expert. Respectfully, this conclusion is contrary to law and clearly erroneous. The term "expert discovery," as applied under Rule 26(a)(2), is not the period in which parties obtain discovery or run tests to support the opinions of their experts. That discovery occurs during the fact discovery period. *See Mickelsen v. Aramark Sports & Ent. Servs.*, No. 2:18-CV-00158, 2020 WL 3037104 (D. Utah June 5, 2020) (Court grants Plaintiffs' motion "to reopen *fact discovery* to permit *expert testing of evidence*") (emphasis added); *Gomez v. H&M Int'l Transportation, Inc.*, No. 17CV231KSHCLW, 2021 WL 236596, at *12 (D.N.J. Jan. 25, 2021) ("fact discovery has included the collection of evidence that ultimately could support an expert report"). In contrast, the time referred in Rule 26(a)(2) as "expert discovery" specifically covers:

11

1) the date by which the parties will identify their experts to the other side;
2) the date by which the experts will complete their reports;
3) the date by which the parties will produce their experts' reports to the other side;
4) date ranges in which the experts will be deposed; and
5) the specific date identifying the close of expert discovery.

In other words, the "expert discovery cutoff" does not mean the time by which a parties' counsel gets to discover evidence to feed to its expert; it means the time the parties have to discover the identity, qualifications, evidence relied upon, fee, and opinions of the opposing party's experts. That is what "expert discovery" has always meant in civil litigation under Rule 26(a)(2), and that is precisely what it means under the expert discovery order the parties agreed to on November 22 and this Court entered December 2. Defendants did not cite below, and still cannot cite, any case that supports their theory that obtaining tangible things from the Circuit Court, transferring those tangible things to Defendants' selected lab, and obtaining leave to run tests on those tangible things are anything other than classic Rule 34 discovery.

There is one final reason Defendants' DNA Motion comes too late: the motion's untimeliness severely prejudices Smith. Smith never had any reason to believe DNA was going to be an issue in this case. It was not an issue in the criminal trial, before the Torture Commission, during post-conviction proceedings (where additional discovery was permitted), nor in the eight months of fact discovery in this case. If the Court now affirms DNA testing at this late stage, fact discovery would have to be re-opened to permit Plaintiff to discover Defendants' chain of custody, documentation, and contamination of the tested items, discovery Smith will need to move *in limine* to exclude any purported DNA evidence that is not reliable. In his Opposition below, Plaintiff identified several examples of such chain of custody and contamination discovery that he would've pursued had Defendants timely filed their Motion.

Dkt. 140 at 9-10. Magistrate Weisman acknowledged prejudice to Plaintiff, stating, "I understand the potential prejudice of timing to the plaintiff," but he then concluded that because Defendants shoulder the burden of proving chain of custody, the prejudice to Plaintiff will be "minimal." *See* January 12, 2022 Hearing Tr., Exh. 2, at 14. Respectfully, the fact that Defendants shoulder the burden of proving chain of custody does not negate Plaintiff's right and need under the Federal Rules to fully investigate – during fact discovery – the absence of chain of custody for and contamination of the evidence Defendants want tested, nor is there any basis to assume, as the Magistrate did, that the prejudice resulting from denying Plaintiff that right will be "minimal."

In sum, in disregard of this Court's specific directives and repeated warnings that it would not further extend discovery and in violation of LR 16.1 § 4, Defendants untimely moved to take Rule 34 fact discovery, which, if allowed, will severely prejudice Plaintiff. Re-opening discovery in this way is simply not consistent with the goals of Federal Rule 1, Federal Rule 26, L.R. 16.1, the Court's two discovery cutoff Orders, nor the clear signal the Court gave on December 2 that all of Defendants' discovery be wrapped up by January 20.

### III. BECAUSE THE DNA EVIDENCE DEFENDANTS WANT TESTED WAS OBTAINED BY THE POLICE AND PROSECUTORS DURING ROBERT SMITH'S CRIMINAL CASE, THE COURT SHOULD REQUIRE DEFENDANTS TO MEET THE DNA TESTING REQUIREMENTS OF THE CRIMINAL STATUTE.

All nine pieces of evidence that Defendants desire to test arose from the criminal investigation into the Yeager and Alexander murders. Indeed, with respect to the taking of Smith's hair, pubic hair, saliva, and blood, CPD and Cook County prosecutors obtained a coercive Court Order, and Defendants now want to use those samples as part of their requested testing. As noted in the introduction, Illinois has set specific limits on the use of DNA testing related to evidence "collected by criminal justice agencies pursuant to the

alleged offense." Under 725 ILCS 5/116-3(b)(2), a party moving to test or compare such DNA must present "a prima facie case that . . . the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect." *Id.* Section 116-4(d-10) further requires CPD to retain "as long as the [underlying evidence exists] . . . all records documenting the possession, control, storage, and destruction of evidence and all police reports, evidence control or inventory records, and other reports cited in this Section . . . ." *Id.*

Smith argued before Judge Weisman that this Court should adopt the chain of custody, lack of contamination, and documentation requirements set forth in Sections 116-3 and 116-4. Judge Weisman rejected that argument, concluding that under *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938), the Court was to apply federal procedural rules, not state procedural rules, and he was therefore not bound by Illinois' DNA testing requirements. We respectfully disagree with Judge Weisman; our position remains that the right to test the evidence travels with the circumstances in which this evidence was gathered. When a party in subsequent civil proceedings tries to use evidence that was collected solely based on the statutory authority (including coercive authority) of the State, the State in turn can place reasonable rules on the DNA testing *of that* evidence, as Illinois has done. This Court should deny Defendants' Motion because Defendants cannot meet the chain-of-custody, documentation, and non-contamination requirements of Code §§ 116-3 & 116-4.

### IV. DEFENDANTS CAN ESTABLISH NEITHER A CONTINUOUS CHAIN OF CUSTODY, NOR THAT THE EVIDENCE HAS NOT BEEN CONTAMINATED.

Even if this Court agrees with Judge Weisman that a federal court can never be *required* to apply Code Sections 116-3 and 116-4 to DNA testing in a federal case, it was still clearly erroneous to not require Defendants to make at least some minimum showing that the

evidence to be tested is supported by a continuous chain of custody and has not been contaminated. Unlike a run-of-the-mill testing request, because DNA testing is entirely premised on the evidentiary integrity of the pieces of evidence subjected to the testing, both legislatures and courts have repeatedly held that DNA testing must be held to a higher standard.[4] In this case, no chain of custody exists at all for the nine items of evidence that Defendants have requested to test. *See* Dkt.140 at 16-25. Moreover, virtually all the records CPD was required to maintain until the evidence at issue had been destroyed has either never existed at all or has since disappeared (notwithstanding that the City's copy is supposed to be kept in CPD's "permanent retention file"). Where, as here, Defendants do not even *allege* a continuous chain of custody over the evidence they wish to test, let alone begin to *establish* such a continuous chain and where Plaintiff has raised serious concerns about contamination, it was error for Judge Weisman to simply presume the integrity of the evidence for testing.

## CONCLUSION

Robert Smith respectfully requests this Court to sustain the objections and overrule Magistrate Weisman's Order permitting DNA testing and permitting Defendants to seek a Circuit Court Order to transfer impounded evidence to Defendants' selected DNA Lab.

---

[4] *See*, e.g., 18 U.S.C. § 3600(a)(4) (federal criminal defendant requesting DNA testing must show "[t]he specific evidence to be tested … has been subject to a chain of custody and retained under conditions sufficient to ensure that such evidence has not been substituted, contaminated, tampered with, replaced, or altered in any respect."); *Jenkins v. Scully*, 91-CV-298E, 1992 WL 205685, at *2 (W.D.N.Y. July 16, 1992) (requiring in a habeas case, as "a prerequisite to testing" that a criminal defendant show "by medical or scientific evidence" that the evidence he wants tested will yield relevant and reliable results); *Young v. State*, 746 N.E.2d 920, 924 (Ind. 2001) (upholding denial of criminal defendant's motion to compel DNA testing where crime laboratory technician submitted affidavit stating tests would not produce reliable evidence); *Ashby v. Mortimer*, 329 F.R.D. 650, 655 (D. Idaho 2019) (ordering DNA testing because other available evidence was not supported by "documented chain of custody"). *See also* 90 Ill. B.J. 472 (referring to DNA testing as an "evidentiary Goliath").

Dated: January 28, 2022

                                             Respectfully Submitted,
                                             *ROBERT SMITH JR.*

                               By:     /s/ Stuart J. Chanen

Stuart J. Chanen
Ariel Olstein
Chanen & Olstein
7373 Lincoln Avenue, Suite 100
Lincolnwood, IL 60712
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com