IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT SMITH JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21 C 1159 |
| | ) | |
| THE CITY OF CHICAGO, et al., | ) | Judge Ronald A. Guzman |
| | ) | |
| Defendants. | ) | Magistrate Judge M. David Weisman |

**DEFENDANT PHILIP CLINE'S RESPONSE IN OPPOSITION TO PLANTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST HIM AS A SANCTION FOR PERJURY**

Defendant Philip Cline, by his undersigned counsel, submits this response in opposition to Plaintiff Robert Smith's Motion for Default Judgment against Defendant Philip Cline as a Sanction for Perjury, and Plaintiff Robert Smith's Memorandum of Fact and Law in Support of his Motion.[1]

INTRODUCTION

Plaintiff's motion seeks the most extreme sanction possible against a civil defendant – default judgment. He asks the Court to take away defendant Philip Cline's right to defend himself in this litigation on the accusation that Cline has repeatedly committed perjury starting in 1989 at the suppression hearing and then in 1990 at Robert Smith Jr.'s ("Smith") criminal trial, then at a deposition he gave as part of Smith's post-conviction proceedings in 2019, and then again at his deposition in this case in 2021. That accusation is nothing new, his Complaint is rife with allegations that Cline (as well as the other Individual Defendants) perjured themselves in testimony about their interactions with Smith and the evidence collected during the homicide investigation,

---

[1] Despite the uncertainty as who the plaintiff is in this matter (*see* dkt. 269), this response will continue to refer to Robert Smith Jr. as the plaintiff to avoid unnecessary confusion. In addition, reference to the different pleadings herein will be to the docket number and will be collectively referred to as the "motion."

including his confession to the crime. In fact, Smith's counsel has even attempted to refer perjury allegations against Cline and three other Individual Defendants to the U.S. Attorney in 2020. (See Ex. 1, Chanen Emails to AUSA Kocoras and Alexakis.) These allegations, while not the reason his conviction was overturned, permeate this litigation – Smith has made accusations of wrongful conduct, including perjury, and Defendants have denied them. (*See* Dkt. 97, Individual Defendants' Answer to the Second Amended Complaint.) Civil cases in our adversarial system are adjudicated on the merits and require the plaintiff to sustain their burden of proof. Instead, this motion seeks to circumvent Smith's burden of proof in this case as to Cline altogether by seeking entry of a default judgment against him.

The motion cites not a single case in which a court has, under Rule 37 or its inherent power to sanction misconduct, entered default judgment against a defendant on the **allegation** of perjury. Instead, each case Smith cites refers to a plaintiff's **proven** egregious misconduct in the litigation at bar. In *Secrease v. Western and Southern Life Ins. Co.*, an evidentiary hearing conclusively established the plaintiff fabricated a contract and submitted it to the court to benefit him in the litigation. 800 F.3d 397, 401 (7th Cir. 2015). In *Dotson v. Bravo*, the plaintiff filed the lawsuit under a false name and perpetuated that fabrication throughout the litigation and in previous criminal proceedings to his benefit. 321 F.3d 663 (7th Cir. 2003). And in *Ramirez v T&H Lemont, Inc.,* the plaintiff engaged in witness tampering, established following an evidentiary hearing. 845 F.3d 772, 774 (7th Cir. 2016); *see also, Patrick v. City of Chicago*, No. 14 C 3658, 2018 WL 3438942, at *4-8 (N.D. IL 2018) (judgment as a matter of law based on perjury denied, despite the plaintiff's repeated lies that "were entirely unacceptable and wholly inconsistent with any court's ability to dispense justice").

The "evidence" that serves as the basis for this motion seeking judgment against Cline falls far short of the direct evidence of perjury found in those cases. Instead, Smith relies upon conjecture and presumptions drawn from an administrative attendance document called an Assignment and Attendance ("A&A") sheet from September 19, 1987 (the day of the Yeager and Alexander homicides), in which a box next to Cline's name is checked off designating it as his "regular day off." (*See* Pltf Ex. 6, Dkt. 205-6.) Based on that A&A sheet, a document Cline did not prepare or approve, Smith accuses Cline of perjury.

Smith deems this A&A sheet as conclusive proof of perjury despite the fact that there is a perfectly reasonable explanation for the discrepancy: Cline testified at his 2021 deposition, that as the Commanding Officer of Area 2 Violent Crimes ("Area 2")—despite his planned day off— he would go to the scene of a horrific double homicide of two women in their home in which a fire was set to coverup the crime and then to the Area to supervise the investigation. (Pltf. Ex. 4 at 33-35.)

In making such a salacious claim, that became front page news minutes *before* the motion was actually filed,[2] Smith buries in a footnote on page 18 of his 35-page brief the most compelling direct evidence that contradicts the fundamental premise of his motion: Smith, himself, has repeatedly identified Cline as being involved in his confession, the earliest of which was *under oath* after having just watched Cline testify against him at the 1989 hearing on Smith's motion to suppress statements.

Smith asks this Court to enter judgment against Cline by relying on repeated pejorative and argumentative interpretation of the facts, often with inaccurate or distorted descriptions of circumstantial evidence, willfully ignoring that his own testimony dooms his motion, as does the

---

[2] *See* https://www.chicagotribune.com/news/criminal-justice/ct-burge-wrongful-conviction-suit-phil-cline-20220316-smbkg5wg3vbgvho7g767ecnlxy-htmlstory.html, published March 16, 2022 at 6:54 a.m.

fact that the direct evidence in this case - testimony by Cline and the other defendants – undermines Smith's interpretation of the facts.

In his motion, Smith also accuses retired Cook County Judge Wilbur Crooks, the lead prosecutor in the criminal proceedings, of being the mastermind behind getting Cline to fabricate his involvement in the case, without citation to any record or evidence. (Plaintiff Robert Smith's Motion for Default Judgment against Defendant Philip Cline as a Sanction for Perjury, Docket 203 at ¶ 2, and Plaintiff Robert Smith's Memorandum of Fact and Law in Support of his Motion, Dkt, 204 at 9 and 20.)

Smith's motion would require this Court to do fact-finding that is appropriate for trial, and the jury. His argument for default judgment is an attempt to end-run summary judgment. Because there is contradicting evidence, his motion would not succeed on summary judgment. Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). There is a question of material fact and a jury could reasonably find that Cline was at the scene and was present in the interrogation. Yet Smith is asking this Court to ignore the inconsistencies and enter the most severe penalty on a party—default judgment. Smith cannot win on a default judgment where his proof fails the summary judgment standard. For these reasons, this Court should deny the motion.

## ARGUMENT

**I. Smith testified in his criminal proceedings that Cline was present for Smith's confession and has never testified, even in this case, that his previous testimony was inaccurate.**

Smith cannot ignore the fact that in his criminal proceeding he testified that Cline was present at the interrogation, and he has never testified, in this case or elsewhere, that he misidentified Cline.

Smith testified at the combined hearing on his motions to quash arrest and to suppress statements and physical evidence on February 6, 1989, continuing onto February 8. (Herein "motion to suppress." *See* Plaintiff's Ex. 2, Dkt. 205-2.) Cline testified prior to Smith on February 6. Despite attaching 54 exhibits to the motion, remarkably, Smith's own testimony about Cline was not included, it is therefore attached hereto as Exhibits 2 and 3. (*See* Smith February 6, 1989 Suppression Hearing Transcript, Ex. 2 and February 8, 1989 transcript, Ex. 3.) At that hearing, Smith gave the following testimony in response to his own attorney's questions:

> Q When he [the Detective Smith called the "evangel-man"] said, "Why don't you make it easier on yourself["], what did you say?
> A I said, "Man, I believe in God." And I said, "I didn't do this here. Do you believe me?" And then he went on. He telling me how he believed in God and this and that. And so we got an interruption, and this lieutenant, I thought his name was Lieutenant Hines all this time, **but I just seen him and his name is Lieutenant something else.**
> Q *The lieutenant who testified here earlier today?*
> A *Yes.*
> Q *Lieutenant Cline?*
> A ***Lieutenant Cline. He come in.*** He came in and the big old fat officer with the threat with the pretty tie come in and tell me, say, "***He's the big boss around here.*** They been giving you a rough time? So then he tell me that, I appealed to him how hurt I am and I need to see a doctor"
> Q What if anything did he say when you told him you needed to see a doctor?
> A Okay. We he seen me how I was trembling and shaking and everything. So he said, "Look here, you give them the statement, and I'll get you to the hospital and see about getting you."[sic] So at that point I said, Okay. I'll give you a statement. And that's when I went to the evangel-man, me and him were talking and I gave him a statement and I can't remember exactly what I said, but he

5

> asked me questions, "How did – how many times did I cut them, or how many – how did I get in the house?" I can't even remember what kind of answer I gave.
>
> …
> Q Who was in the room when they were taking the statement?
> A Both, ***I think lieutenant – lieutenant was there***, and the officer with the pretty tie. He was there also.

(Ex. 2 at 144-146, emphasis added.) In this testimony, Smith recognized that he thought Cline's name was Hines previously but that he knew the name was Cline once he saw Cline on the stand. Smith also never wavered from his assertion that the officer present was a lieutenant. It is undisputed that Detective Jack Hines was not the lieutenant.[3] (*See* Pltf. Ex. 5 at CITY-RS-24825.)

Smith then testified about giving a statement to ASA Brogan after that initial statement to police, and that Brogan was also someone he saw testify earlier that day. (Ex. 2 at 146-47, *see also* Pltf. Ex. 1 at 87.) On cross-examination by the State, Smith again referred to Lt. Cline and his involvement in and around the time he made his initial confession to the crime. (Ex. 3 at F98-F100.)

Smith's February 1989 testimony is the one and only time he has given testimony under oath about Cline. But he also described Cline's involvement in his confession again in July 2011 in a sworn affidavit submitted in his post-conviction proceedings. (*See* Robert Smith July 21, 2011 affidavit at ¶¶ 18-27, attached as Ex. 4.) In the July 2011 sworn affidavit Smith refers to Cline, by name, 14 times. (*Id.*) By the time of Smith's deposition in this case in November 2021, (almost 33 years later) he did not remember anything about Lt. Cline's involvement and he certainly never testified that Cline was never present in the interview room with him at Area 2, that the testimony he observed Cline provide in his criminal case was perjury, that he misidentified Cline at his criminal proceedings, or that his prior testimony was inaccurate. (Smith November 17, 2021

---

[3] In fact, the A&A sheet reflects that Detective Hines, who worked the 1st watch (typically 12:00 a.m. to 8:00 a.m.) was not present for duty the day of Smith's arrest.

Deposition at 191-2, attached as Ex. 5.) In fact, Smith testified at his deposition that there were six officers in the room with him when he gave his confession, whom he did not name, making it perfectly plausible that Cline was one of them. (*Id*. at 192.)[4] Thus the only reliable testimony from Smith directly contradicts his Motion's conclusion that Cline perjured himself.

If the proof is sufficient to conclude Cline committed perjury, then is should be sufficient to conclude Smith did as well.

In his footnote, Smith cites reasons that he must have been mistaken, yet Smith did not testify that he was mistaken in his November 2021 deposition.[5] Smith does not cite any statements after the criminal proceedings where he stated that he had misidentified Cline and that he really saw Detective Hines. (Dkt. 204 at 18 n.5.) Smith's *pro se* complaints in federal court alleging physical abuse by officers during his interrogation do not prove that he meant to identify Detective Hines not Lieutenant Cline.

In the first complaint, filed in 1988, he named "Chgo Police Dept Lt. Hines – Officer in Charge Officers of CPD et al." (88 C 3755), but he then refiled in 1992, after his criminal proceedings where he identified Cline, and changed Lt. Hines to "Lt. Kline" (92 C 1118). (*See* Pltf. Ex. 31 and 32.) In the 1992 complaint, Smith alleged that Lt. Kline held the position of lieutenant at all times relevant to the case. (Pltf. Ex. 32 at ¶ 3.) Again, the only violent crimes

---

[4] As this Court is aware, Smith's competency at the time of his deposition has been called into serious question because of guardianship proceedings in state court. Defendants are seeking discovery relating to this issue and anticipate further litigation seeking to bar use of Smith's deposition testimony in any manner in this case. (Dkt. 251.)

[5] Smith's 92 C 1118 case was dismissed less than two months after it was filed because Smith failed to comply with a court order to, *inter alia*, file an affidavit amplifying the allegations of the complaint. (*See* Docket of 92 C 1118 (N.D. Ill.), attached as Exhibit 6). His 2011 affidavit claims it was dismissed because he "spelled Lt. Clines [sic] name with a 'K' instead of a 'C.'" (*See* Ex. 4 at ¶ 32.)

7

lieutenant at Area 2 was Cline. There was no other "officer in charge" or lieutenant named Hines or any other supervisor involved with Smith other than Cline.

As further proof he must not have been correct in his identification of Cline in 1989, Smith cites his 1987 statement to OPS where he states, "I don't know any names." (Dkt. 204 at 18 n.5.) That statement, in context, was that he did not know the names of those who allegedly assaulted him. (Dkt. 205-5 at CITY-RS-024810.) But he has never alleged that the lieutenant was one who assaulted him. Even if he meant he did not know the lieutenant's name, that statement is actually consistent with his 1989 testimony quoted above where he states he was unsure of the lieutenant's name until Cline testified and he was able to identify him.

Smith also argues that his confusion over identifying Cline was attributable to medical issues, including a broken posterior rib under his collar bone, which were the result of a well-documented fall from second story at the jail two days *after* his arrest. Note, however, his testimony identifying Cline was 506 days after his arrest, long after he was allegedly suffering from the medical conditions. Smith has never testified that his medical issues prevented him from reliably identifying Cline or anyone else. If true, after all, then his entire purported account of what occurred and who allegedly was involved in his interrogation is likewise unreliable.

### II. Cline had a scheduled day off, but came into work as the Commanding Officer of Area 2 to oversee the investigation into a grizzly double homicide.

This Court cannot find that Cline committed perjury by a preponderance of evidence when Cline provided an explanation under oath as to the discrepancy with the A&A sheets. It's simple: he had a planned day off but nonetheless went into work. He testified at his 2021 deposition, that as the Commanding Officer of Area 2 Violent Crimes, regardless of his scheduled day off, he would go to the scene of a horrific double homicide of two women in their home in which a fire was set to coverup the crime and then to the Area to supervise the investigation. (Pltf. Ex. 4 at 33-

8

35.) Cline explained at his deposition how it was that the A&A sheet showed him as regular day off, yet he was present at Area 2 and working:

> Q     Now, what if someone is not scheduled to work, but they end up coming in to work that day anyway, how does that get handled by the person -- by the watch commander keeping time and attendance?
> ATTY ROSEN: Objection. Form; foundation; calls for speculation.
> A     I believe they still mark them as being day off, but then he would make out an overtime slip, and then that would explain that they did work that day.

(*Id*. at 57.) Cline further explained that the overtime slip probably got put in some time in the "following couple of days." (*Id*. at 75.) It is reasonable to assume that Cline's focus was on the investigation of the gruesome double homicide, not administrative recording keeping ensuring he got his "overtime." Cline further denied Smith's counsel's assertion that the A&A sheet was "pretty good evidence that you didn't come in that day." (Pltf. Ex. 4, Dkt 206 at 69-70, 75-76.) Plaintiff has not demonstrated that Cline's explanation for the discrepancy is false.

Smith asserts that there is a "central contradiction" that Cline cannot explain that Cline testified at the suppression hearing that Pedersen and Rice made comments to Smith that Cline then testified at the criminal trial he said. There is no contradiction, let alone a "central" one. The fact that a witness provides conflicting testimony does not equal perjury. Moreover, Cline's testimony was not a verbatim accounting of everything said between the investigators and Smith. The fact that Cline recounted different portions of the interrogation at the various proceedings he testified at does not render one perjurious just because it does not mirror previous testimony. Indeed, if it was so crucial, as the motion argues, Smith's criminal defense attorney would have impeached Cline with his prior testimony and did not. (See Pltf. Ex. 1 at C34-48.)

There was no conspiracy, led by the prosecutor, retired Cook County Judge, Wilbur Crooks, to fabricate Cline's involvement in the case at the "twelfth-hour," immediately prior to

9

the suppression hearing. (Dkt, 204 at 20.)[6] Smith has no evidence, only pure speculation, of such a conspiracy. Indeed, Crooks would have had to lay the groundwork a year earlier, on January 12, 1988, when Detective William Pederson told OPS Investigator Calvin Bouma that Lt. Cline was present for Smith's interview. (Dkt. 205-5, CITY-RS-024841.) Cline did not testify at the suppression hearing until February 1989. That is also why Smith's contention that the CR file refutes Cline's involvement fails—because Pedersen's statement in that file records that Cline was present. The CR file does contain the A&A sheet and a note from the Investigator Bouma that the A&A sheet indicates that "Cline was not present for duty." (Dkt. 205-5, CITY-RS-024866.) Smith argues that because Cline signed off on the discipline recommendations, he must have seen the memo and agreed with its conclusion. However, no one signed that memo as "approved," and there is no record how Bouma used that information if at all. (*Id.*)

Likewise, Smith's arguments based on timelines and investigative steps taken are equally problematic in a 30+ year-old case, where testimony and reports prepared around the time of the event fail to account for all investigative tasks with the type of precision Smith's arguments presume. For instance, Smith argues that the time of his arrest for murder occurred at the same time he was giving his confession. (Dkt. 204 at 15-16.) But Smith was arrested that morning for tampering with the crime scene and was a suspect in the murders. Once he gave his confession, there was then probable cause for the murder charges reflected in the arrest report. Smith uses this point and the fact that Cline is not mentioned in the arrest report to make the convoluted and nearly nonsensical argument that "how could [Sgt.] Wilson [(who Smith says "approved the arrest report"

---

[6] Smith implies the supplemental witness list including Cline was not disclosed until February 6, 1989, the day of the hearing. While the criminal disclosure Smith relied upon to support his argument is file stamped February 6, 1989 (*see* Pltf. Ex. 38, dkt. 205-38), he produced a copy of that document from his criminal defense attorney's file which has handwritten at the bottom "Rec'd. Clyde Lemons Jr. 2-3-89." (*See* Arrest Report, SMITH 2840, attached as Exhibit 7.) Lemons raised no objection to Cline's testimony. (*See* Pltf. Ex. 2, Dkt. 205-2).

and filled out the A&A sheet)] have approved a 9:15 arrest report but missed Cline's presence at 9:15." (Dkt. 204 at 15.) But the "evidence" referred to – Smith's arrest report – makes absolutely no reference to Sgt. Wilson and the "Approval of Charges" box on Plaintiff's Exhibit 27 is redacted. In fact, an unredacted version of the report establishes that "Lt. M.J. Briegel, star 375" at 0125 (1:25 a.m. the following day), is the supervisor who approved the murder charges against Smith. (Arrest Report, box no. 44, Attached as Ex.7.)

Cline admits he prepared no reports, and the fact that Detectives or the Felony Review ASA did not mention his involvement in their reports. But this absence of reference to him in reports prepared by others does not overcome the affirmative evidence of Smith himself identifying Cline as there and Pedersen reporting to OPS that Cline was there. Defendant Detective Brownfield also testified that he saw Cline at Area 2 on September 19, 1987, which plaintiff also relegates to a footnote in his brief. (Dkt. 205-19 at 149, 194.) The fact that others, who can barely recall their own involvement in this 30+ year old case, do not recall seeing Lt. Cline or interacting with him is hardly grounds to prove perjury. That is in contrast to the fact that no one, not even Smith, has affirmatively testified that Cline was not at Area 2 on September 19, 1987.

**III.     Smith's supposition and speculation does not disprove sworn testimony**

Smith has many other theories in his motion about why Cline's testimony is perjury, but these are all pure conjecture. None of it is evidence, and the theories themselves are not well-reasoned.

Smith alleges that the City issued subpoenas in discovery to media outlets to "prove" Cline was present at the scene of the crime and because those subpoenas did not result in such evidence, Cline must not have been at the scene. Smith is creating a nefarious scheme out of a routine discovery request. The subpoenas were for any footage and do not mention Cline. (Pltf. Ex. 39.)

11

It is true that Cline does not appear to be in what little footage was produced in response to the various media outlet subpoenas. And, more importantly, the footage does not show many of the officers that Smith concedes were at the crime scene, such as Detectives McWeeny, Dwyer, Leracz, Binkowski, McGovern and Gates.

Smith also bizarrely criticizes Cline's testimony at the trial detailing Smith's confession because it tracks too closely to what Rice reported that Smith said in his confession. (Dkt. 204 at 22-23). Smith, without citation to any literature on memory, any caselaw, or any other support for his conjecture, supposes that the similarity must be a sign that Cline made up his testimony about the confession. In other words, Smith contends Cline's accuracy is proof of a perjury. But if Cline was present for the same confession, as he has testified that he was, he should have a memory consistent with Rice's report. The examples Smith's cites are not "verbatim" regurgitations of the report either. While the gist of the statements were the same in the report and Cline's testimony, the wording was hardly an exact match. (*Id.* comparing "…I washed the clothes." to "…he went into the basement and took off all his clothes and washed them because they were full of blood."). That is consistent not with perjury but with a person testifying truthfully as to an event he observed.

Smith also surmises that Cline lied when he "determined" that Smith dove into blood at the crime scene. (Dkt. 204 at 24.) Reading Smith's motion, though, he states only that Cline stated that he had learned about that event when the detectives he supervised informed him of it and when Smith himself told Cline that fact. (Dkt. 204 at 24.) Cline did not deduce that Smith dove in blood, he was told that was the reason Smith was arrested at the scene. (Dkt. 205-1 at C43 (Q. "Did you, as the supervising officer determine why Mr. Smith was in your police station…? **** A. "…he had been arrested earlier in the day for coming into a crime scene and throwing himself on a pool of blood.").) While Smith has a different account as to how he came to be rolling around

12

in the bloody water at the crime scene – there is no dispute he did and that he had blood all along the right side of pants and shirt. (*See* Photo of Smith take approximately 1 a.m. on September 20, 1987 CITY RS 526, attached as Ex. 8 and Crime Lab serology analysist drawing of "reddish brown" substance on Smith's clothing, CITY 186-187, attached as Ex. 9.)

Smith further argues that he has proven McWeeny committed perjury about what happened, which in turn proves Cline's testimony is perjury. (*See* Dkt 204 at 24.) Smith does not make this motion against McWeeny and he does not have proof that McWeeny lied about the incident that would warrant summary judgment on the issue. What's more, Cline does not claim he saw the incident, he only states he was told what happened. Smith has no proof that Cline was not told by officers that Smith dove into blood. To support his conjecture, Smith actually imagines a conversation that *would have* occurred between McWeeny and Cline. This cannot qualify as proof of perjury warranting default judgment. Moreover, the account of what happened at the crime scene is very much in dispute between the parties. Smith's conjecture is not sufficient basis for summary judgment against McWeeny on this issue. He cannot do an end-run around summary judgment and ask this Court to come to the more severe conclusion that anyone committed perjury and enter default judgment in his favor.

Another example of distortions of evidence combined with baseless accusations is seen in Smith's argument relating to motives for Cline to commit perjury relating to the razor blade. (Dkt. 204 at 30-31.) First, Smith rejects Solecki's deposition testimony that he was sent back to the scene of the crime to search for a razor blade as "unbelievable" because he had not previously given testimony in this matter. Then he offers yet another convoluted theory – this time of a knife recovered from the scene causing Cline's concern that it might undermine Smith's confession that he used a razor blade in committing the murders (which, incidentally, was never recovered). Smith

13

argues that this prompted Cline to commit perjury by testifying he sent detectives back to the crime scene to search for a razor blade to bolster the confession, that he was supposedly not even present for. The starting point in untangling this mess is to dispel Smith's faulty premise that the knife is somehow the murder weapon, not a razor blade. While it is true that the knife recovered later in the day at the crime scene was inadvertently destroyed before Smith's criminal trial, we know from discovery in this case that the knife most certainly was not the murder weapon. Detective Gates, of the Bomb and Arson Unit, testified that he used a knife from the kitchen to remove carpeting at the origin of the fire as part of his investigation and must have inadvertently left it behind. (Gates Deposition at 80-83, attached as Ex. 10.) Photos of the fire origin location taken by Jack Lumsden, the Fire Marshal from the Chicago Fire Department, shortly after the fire was suppressed show no knife in the area, while a later photo with the carpet and nearby debris removed shows the knife off to the side. (CFD Crime scene photos, CITY 593 (no knife) and 598 (knife), attached as Ex.11) And finally, Crime Lab Analysist Christine Anderson who tested the knife found no blood on the knife, leading her to conclude it was not the murder weapon. (Anderson Deposition at 78, attached as Ex. 12) The knife had no relevance at the criminal trial and was not addressed by either side. Yet Smith, who admitted at the suppression hearing that he carried a razor in his wallet prior to the night of the murders and told the police that fact (*see* Ex. 12 at 112-115), argues now in his motion that the knife is "evidence" of a motive for Cline to commit perjury. This is yet another example of the motion's faulty logic premised on a distorted presentation of facts.

      These factual disputes, distortions and faulty arguments are just some of many more that permeate Smith's motion, which when combined with his own testimony that Cline was present for his confession, preclude any judicial finding of perjury in this case.

**IV.     There is no legal authority for default judgment in this case.**

Dismissal is the "ultimate" sanction "reserved for cases in which the offending party has demonstrated willfulness, bad faith, or fault." *Long v. Steepro*, 213 F.3d 983, 986 (7th Cir. 2000). If plaintiffs were allowed to file motions seeking default judgment on the basis of perjury every time there was a dispute over evidence the jury system would be effectively eliminated. Smith's motion is replete with conflicting facts as to what occurred. These factual issues are being litigated in this case. He would not meet the summary judgment standard on the evidence he puts forth. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A reasonable jury could conclude that his allegations are wrong. Smith should not be able to win a default judgment on allegations in his complaint, where there is a question of fact that would preclude summary judgment. As set forth in the Introduction above, Smith has not identified a single case supporting default judgment being an appropriate remedy for unproven allegations of perjury. Administrative documents and selective interpretation of evidence is not a proper basis for this Court to even entertain such a motion.

Smith also argues that Cline should be bound to arguments made in the *Patrick* litigation by the individual defendants and City in that matter on the applicable law. Smith does not explain what legal principle binds Cline to pleadings in a case in which he was not a party. Cline of course is not bound to any pleadings or arguments advanced in the *Patrick* post-trial motions. Regardless, Smith's contention here, that the appropriate remedy for perjury is default judgment is an overly simplistic view of the law and the facts at issue in this case. In *Patrick* it was undisputed that the plaintiff committed multiple acts of perjury – the plaintiff admitted it. 2018 WL 3438942 *4-7. Here there is nothing more than the allegations built on supposition and conjecture that is contradicted by Smith's sworn testimony that he will never be able to further explain or contradict.

15

If the proven perjury of the plaintiff in *Patrick* was insufficient to warrant judgment as a matter of law to the defendants, surely Smith's lack of any actual proof of perjury here warrants swift dismissal of this motion.

"Perjury is a circumstance to be weighed by the jury in determining a witness's credibility rather than a ground for removing the issue of credibility from the jury by treating the witness's entire testimony as unworthy of belief." *Allen v. Chi. Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003); *see also Kemp v. Pfizer, Inc.,* 152 F.R.D. 556, 561 (E.D. Mich. 1993) (On its own initiative, the court found a violation of Rule 11 and imposed sanctions on plaintiffs' counsel in similar circumstances where "Plaintiffs' counsel has attempted to turn reasonable legal disputes into an occasion to use the ugly accusation of 'perjury.'").

Moreover, absent here is any advantage to Cline to putting himself in the interrogation room with Smith or at the scene. Cline would not be a party to this lawsuit if he was not involved in the investigation. He is being sued for his involvement. As Smith rightly points out, Cline is absolutely immune for his testimony.

Smith's attempt take this case out of the jury's hands should be rejected by the Court. As set forth above, in the only sworn testimony from Smith, Smith testified that Cline came into the interview room at Area 2 and spoke with him. If Cline was lying, so was Smith.

## CONCLUSION

WHEREFORE, Defendant Cline seeks an order from this Court denying Plaintiff's motion for default against him and for any other relief this Court deems just and proper.

Date May 13, 2022

Respectfully submitted,

Phillip Cline

/s/ *Stacy A. Benjamin*
  Special Assistant Corporation Counsel

Eileen E. Rosen
Stacy A. Benjamin
Brittany D. Johnson
Philip J. Andrews
ROCK, FUSCO, & CONNELLY, LLC
333 W. Wacker Suite 1900
Chicago, IL 60606
Tel: (312) 494-1000
sbenjamin@rfclaw.com