# REPORT OF THE SPECIAL STATE'S ATTORNEY

APPOINTED AND ORDERED BY THE PRESIDING JUDGE OF THE CRIMINAL DIVISION OF THE CIRCUIT COURT OF COOK COUNTY IN NO. 2001 MISC. 4

Edward J. Egan
Special State's Attorney

Robert D. Boyle
Chief Deputy Special State's Attorney

R.SMITH02591

EXHIBIT A

## Table of Contents

|  |  | Page |
|---|---|---|
| I. | Introduction | 3 |
| II. | Conclusions | 16 |
| III. | Statute of Limitations | 18 |
| IV. | Perjury Trap | 37 |
| V. | Andrew Wilson | 43 |
| VI. | Richard Brzeczek | 67 |
| VII. | Allegations of "Cover-Up" | 112 |
| VIII. | Relationship between OPS and Cook County State's Attorney | 157 |
| IX. | Report of Investigators |  |
|  | 1. Leroy Orange and Leonard Kidd | 169 |
|  | 2. Madison Hobley | 183 |
|  | 3. Stanley Howard | 217 |
|  | 4. Aaron Patterson | 242 |
|  | 5. Phillip Adkins | 266 |
|  | 6. Alfonzo Pinex | 275 |

R.SMITH02592

## INTRODUCTION

When we accepted this Court's request to serve as Special Prosecutors, we examined the pleadings filed in connection with the Petition for Appointment of a Special State's Attorney and particularly the Order of Appointment. The petition asked that a Special State's Attorney be appointed "to investigate allegations of torture, perjury, obstruction of justice, conspiracy to obstruct justice, and other offenses <u>by police officers under the command of Jon Burge at Area 2 and Area 3 Headquarters</u> in the city of Chicago during the period from 1973 to the present." (Emphasis added.) (Petition for Appointment, p.1.) That part of the petition was referred to specifically by this Court in the Memorandum Opinion and Order. (p.1.) In the "conclusion" of the Memorandum Opinion and Order we were appointed "to <u>investigate</u> the facts alleged by the petitioners and to determine if any prosecutions are warranted." (Emphasis added.)

We were aware that we, and no one else, were invested with the same powers and charged with the same duties that the elected State's Attorney was, but in a restricted area. (See <u>Aiken v. Will County</u>, 52 N.E.2d 607.) As the petition for appointment of a Special State's Attorney recognized, Standard 3-3.9 of the American Bar Association Criminal Justice Standards "provides that the institution of criminal charges (at the conclusion of the investigation) is warranted only where the charges are supported by probable cause and <u>where there is sufficient admissible evidence to support a conviction.</u> The purpose of the pre-charging investigation is to develop evidence and to determine at the conclusion of the investigation whether the evidence is sufficient to support charges." (Emphasis added.) (Reply in Support of Petition for Appointment of a Special Prosecutor, pp.9-10) Under the law prosecutors are quasi-judicial officers. That means

3

they are like a judge. That means also that they are to be open-minded and even-handed to those accused as well as to the accusers.

We began to perform our first duty - to investigate - and we were determined to do so independently. We were also determined that that power to investigate would be used with an open-mind and even-handedly; and we would not permit anyone to tell us whom we must hire or how we must proceed or what legal theories we must adopt. Nor would we be influenced by threats, implied or otherwise.

It became obvious to us after a review of the principal cases we were investigating that the results of our investigations, like almost all investigations made by a prosecutor, depended on the credibility of the accuser. We would not be bound by previous conclusions on credibility made by other persons or agencies. To illustrate, we would not be bound by the findings of the Chicago Police Office of Professional Standards, either in favor of or against police officers; and we would not be bound by statements made by a trial judge, Federal or State.

After completing our investigation it would then be our duty to determine whether the admissible evidence available would justify our seeking an indictment against any person. Our next duty would be to determine, assuming the sufficiency of the evidence, whether prosecution would be time-barred. That issue was raised in the petition for appointment of a Special Prosecutor but was not passed on. We concluded that, even if we determined prosecution was time-barred, this case was of such social importance the results of our investigation should be made public.

Our first task was to create a working law office; that required funding, space and personnel. We are heavily indebted to the cooperation we received from the Cook

R.SMITH02594

County Board and this Court in helping us to acquire what we needed. We hired three full-time administrative personnel. They are Keith Liston, the Chief of Staff, Rose Trevino, our secretary, and Daniel Neville, our paralegal. For a time we also had the services of Dorothea Nawara as a secretary. All of them have served us admirably.

We were fortunate to be able to retain the services of eight experienced lawyers, all but one of whom was a prosecutor. They are Donald Hubert, Gordon Nash, Judge Earl Strayhorn, Robert Weber, George Murtaugh, Ronald Neville, Thomas Reed, Terence Mahoney and Patrick Calihan. For a short period of time we also had the services of Thomas Durkin and Tommy Brewer, both former prosecutors. All served on a part-time basis; and all served well. (George Murtaugh is now deceased.)

We express our special thanks to retired Illinois Supreme Court Justice John J. Stamos. Justice Stamos served on the Illinois Supreme Court for three years. For twenty years before that he was a member of the Appellate Court, which he joined after serving as the Cook County State's Attorney. While so serving, he was named the nation's outstanding prosecutor by the National District Attorney's Association. He began his prosecutive career in 1952 and was a trial assistant, Chief of the Criminal Division and First Assistant State's Attorney before being appointed State's Attorney in 1966. Justice Stamos has reviewed material at our request and has expressed his opinions to us. We are deeply appreciative of receiving the benefits of his scholarship and long and distinguished years in the judicial and prosecutive offices.

For our investigative staff we retained Quest Consultants International, Ltd., an agency consisting almost completely of retired agents of the Federal Bureau of Investigation. They also served on a part-time basis. They too have served us well.

5

Because credibility was the primary test, it was our decision that we must, if possible, personally interview all principal witnesses, beginning with the claimants. But before we interviewed those witnesses we wanted to know whether they had said at another time something different from what they were telling us. If they had, this would be the most fundamental form of impeachment. Because many years have passed since the alleged acts complained of occurred, it was also of utmost importance to determine what the witnesses remembered. Under no circumstances would we seek an indictment unless we first had personally interviewed the person making the allegation of police mistreatment and we had been assured that the person was willing to testify.

Needless to say we had to determine the location of the claimants as well as their lawyers. Some of that information was readily available through the lawyers who are presently of record in pending matters; but much of it was not. We subsequently learned that several of the claimants were deceased and several were incarcerated, some on new charges and some in other jurisdictions. Last, we wanted to learn the identity of, and to talk to, any person who could corroborate or contradict the claimants or the officers.

We also had to locate police officers against whom allegations of wrongdoing were made as well as other officers who were listed as witnesses. Several of the officers were deceased and most of them were retired. Several officers were residing out-of-state.

It was necessary to collect as much relevant written material as we could. This would include, but not be limited to medical reports, police reports, State's Attorney files, Public Defender files, the records of the Office of Professional Standards (OPS), and records, including transcripts, in the State and Federal courts, in civil as well as criminal cases and, in one case, the report of proceedings before the Chicago Police Board. We

6

also sought the records of the Chicago Police Pension Board and some records from the Federal Bureau of Investigation, the United States Attorney and the United States Attorney General. Acquiring those reports and court records, which had been in several courts, was a very difficult and time-consuming effort. To this date, we have been unable to locate some of the records. Many important exhibits are still missing. Many police records, OPS records and medical records are no longer available.

We have been assisted by the Clerks of the Circuit Court, the First District Appellate Court, the Illinois Supreme Court, the Federal District Court and the Seventh Circuit Court of Appeals. We have had to seek the assistance of this Court in acquiring some of the Circuit Court records. We have also received records and other information from some of the attorneys representing the claimants.

It has been and is our position that we should use the Grand Jury after we had completed our investigation and had made a judgment in good faith that there was sufficient evidence to present to the Grand Jury and seek an indictment or when we needed Grand Jury process to require the appearance of a witness who refused to co-operate or to require the production of evidence.

It was also our general position that witnesses should be interviewed under oath and their statements be recorded by a court reporter. We knew that some witnesses whose cooperation we were seeking would balk at giving written statements at all, let alone under oath; but we saw no reason why persons who were alleging they were brutalized would take that position. We took many statements following that procedure with several witnesses, including some claimants and former assistant state's attorneys who are presently Illinois appellate court judges. No one made an issue of that procedure

R.SMITH02597

until October 10, 2003, when one of the attorneys for some claimants and later, at his instigation, several other attorneys for claimants expressed objections. We were told that there really was no need to interview the claimants at all, certainly not under oath. After some rancorous exchanges, we agreed to dispense with the necessity of an oath, but we insisted that the interviews would be conducted in the presence of a court reporter. That procedure was agreed upon. We have interviewed hundreds of persons. Near the end of our investigation we had to be involved in proceedings in the Illinois Supreme Court to compel a former assistant state's attorney to testify. We were unable to interview him because his lawyer informed us that his client would invoke his 5th amendment rights. He was the only assistant state's attorney that did not agree to be interviewed by us.

We initiated our investigation with the cases of the men on Death Row, several of whom had post-conviction petitions pending in the Criminal Court. An investigation of those cases involving pending post-conviction petitions was in part delayed because a petition had been filed seeking the appointment of still another Special State's Attorney in those cases and a motion to recuse all Circuit Court judges in Cook County. We had to limit investigating those cases until we learned what lawyer would be appointed to act as Special State's Attorney in those cases, because that lawyer would be the one that we would be dealing with. That petition and motion were decided almost ten months later.

At the beginning of our investigation we received the names of 64 persons who alleged acts of brutality. From various sources we received additional potential "complainants". Although some of the additional complaints came from citizen groups, the majority of complaints came as a result of our efforts. We established a protocol, which allowed us to review complaints, to determine whether the complaints were within

8

R.SMITH02598

our authority as established by Judge Biebel's Order of Appointment and to proceed to an investigation of the facts. We have submitted 148 complaints to such an investigation. The results are set forth in individual reports contained in the Compact Disc which is part of this report. Those reports are identified as <u>Special Prosecutor Investigation Reports</u>.

We have pursued 98 additional complaints which we discovered during our investigation or which were referred to us either through communications with the complainants or by groups. In gathering data concerning these complaints we determined that we could not pursue them in depth, because our preliminary investigation disclosed that, among other reasons, they did not involve Jon Burge or his officers, the alleged complainant would not cooperate with us, the alleged complainant was dead and the facts could not be established without his or her testimony, or the purported complainant stated that he or she was not a victim of physical abuse by Chicago police officers. Further, some of the matters referred to us involved complaints for wrongful convictions having nothing to do with police brutality, the denial of inmate library time at Illinois penitentiaries, medical neglect at Illinois penitentiaries, the quality of food at Illinois penitentiaries and the denial of the use of the telephone at Illinois penitentiaries.

Our initial investigation required our ascertaining the location of the alleged mistreatment of the claimant, that is, whether it occurred at Detective Areas 2 or 3; the date of the mistreatment, that is, whether it occurred while Jon Burge was the commander of the unit involved.

From time to time we received complaints by letter from persons in the penitentiary, alleging that they had been mistreated by the police. Very often, those letters gave us only the name of the person making the complaint. Like the procedure

R.SMITH02599

used for names submitted by the organization referred to above, we had to investigate to determine whether the complaint came within the jurisdiction imposed on us by our appointment order. Even the investigation to determine whether we had jurisdiction took time.

In those new cases over which we determined we did have jurisdiction, our investigation involved the same time-consuming processes as those used in the original 64 cases: requests for State's Attorneys' records, subpoenas for OPS records and police reports, searches for court records, subsequent examination of all transcripts and opinions, contacting lawyers representing claimants, locating claimants and potential witnesses, subpoenaing any medical records, and, in most cases, interviewing the claimants and witnesses willing to be interviewed by us. In some cases we were able to make a determination that an interview of a claimant would not be necessary; but that determination was never made until we had conducted a meaningful investigation.

A relatively recent experience will illustrate some of the problems we faced: we had been assured by the State's Attorney's Office that we had received all material pertinent to our investigation. On January 20, 2006, we received a box full of various documents from the State's Attorney's Office. There was no cover letter explaining the relevance of the information. We were simply informed that the material had just been discovered. The documents contained typed and handwritten matter, including the names of 17 individuals (apparently as potential claimants) who had not previously been included in our list of claimants.

Receipt of the January 20, 2006 material required still another series of investigative steps covering the 17 new names. Subpoenas were served on the

10

Corporation Counsel of the City of Chicago, the Chicago Police Department and the Office of Professional Standards. A review of the records of the United States District Court and the Circuit Court of Cook County were made. Interviews of witnesses and public officials were conducted. Some of the names were traced to old newspaper articles. Information was gathered from reporters, authors and others, leading to the conclusion that at least some of the names had surfaced as a result of random phone calls to publications. It is clear that no subsequent effort had been made to verify the accuracy of what was later published. Rather, some of the names had been repeated from time to time without any substantiation of whether the individuals had been abused. After our complete review of all the information available we concluded there was no evidence to support a claim that those 17 individuals had been abused by the police.

We have interviewed some police officers under proffers. We have subpoenaed 40 police officers most of whom are retired. All but 11 refused to be interviewed by us; 4 of them testified over their objections after grants of immunity. We attach hereto as Introduction Exhibit No. 1 the names of the officers we subpoenaed. We attach as Introduction Exhibit No. 2 the names of the police officers whom we granted immunity.

We assigned virtually all investigations to an Assistant Special State's Attorney (ASSA). We retained some of the investigations ourselves. More than one ASSA were involved in some investigations. On a regular basis we conferred with the ASSAs to ascertain the progress of the investigation; these conferences involved, for example, discussions of admissibility of evidence, availability of witnesses, location of claimants and all other problems that the ASSA's had confronted. The conferences entailed the free exchange of opinions, but the actions to be taken were always subject to our

11

direction. It was understood that we would seek the opinions of each ASSA as to the procedures and merits of each case, but it was also understood that the ultimate decision as to procedure and merits of any claim would be made by the Special State's Attorney and the Chief Deputy.

On some occasions the ASSAs concluded that there was no necessity to proceed further; and, if we disagreed, we assumed that file and the responsibility for making a report. In some instances the ASSA was reluctant to make a recommendation. Some ASSAs were unable to complete their assignments due to the press of other matters and some had to resign for the same reason. One of them died. In each of those instances we either assigned the cases to other ASSAs or to ourselves.

We have made the judgment that the admissible evidence would justify our asking a grand jury to indict in three cases: they are the cases of Andrew Wilson, Phillip Adkins, and Alfonzo Pinex. There are many other cases that raised the belief that the claimant was telling the truth, e.g. Michael Johnson, Melvin Jones and Shadeed Mumin, but their testimony would not be sufficient to establish proof beyond a reasonable doubt. And there are some cases we have concluded that the claimant was not telling the truth, e.g. Leroy Orange and Leonard Kidd.

In our judgment the evidence would support an indictment and conviction of Jon Burge in the case of Andrew Wilson. We believe that he also mistreated Michael Johnson and Melvin Jones. He was the commander of the unit. Common sense compels the conclusion that those who worked for him would not be concerned about their own mistreatment of prisoners, if their commander mistreated them. We have said in another part of this report that if some action had been taken against Jon Burge at the time of the

12

Andrew Wilson case, or even shortly after, our appointment would not have been necessary.

For reasons we explain in another part of this report, we conclude that the statute of limitations bars any prosecution of any officers.

We have attached to this report on a digital compact disc all of the reports for the cases we have investigated, with some exceptions. The exceptions we have made are the cases of Madison Hobley, Aaron Patterson, Stanley Howard and Leroy Orange, which involve civil complaints in the Federal district court. We have been importuned from time-to-time to expedite our investigation of those cases to assist the judges and litigants in resolving discovery questions.

We have even been respondents to motions brought by defendants in those cases to compel us to disclose the time that we anticipated filing our reports in those cases. For those reasons, to facilitate accessibility to the reports in those cases, we have made our reports in those cases part of our general report. We have included the report on Leonard Kidd because we have determined that the report in his case should be considered with the report of Leroy Orange.

13

## INTRODUCTION EXHIBIT NO. 1

### Chicago Police Officers Subpoenaed

| | |
|---|---|
| Leonard Bajenski | Anthony Katalinic |
| George Basile | Michael Kill |
| Thomas Bennett | Thomas Kripple |
| Raymond Binkowski | William Kushner |
| Ronald Boffo | Sammy Lacey |
| Michael Bosco | Francis Lee |
| Kenneth Boudreau | James Lotito |
| Steven Brownfield | Raymond Madigan |
| Jon Burge | William Marley |
| Doris Byrd | Anthony Maslanka |
| John Byrne | Michael McDermott |
| Craig Cegielski | Dennis McGuire |
| Peter Dignan | Raymond McNally |
| Robert Dwyer | Daniel McWeeny |
| Robert Flood | Patrick Mokry |
| Patrick Garrity | Joseph Nolan |
| John Halloran | John Paladino |
| Fredrick Hill | William Pedersen |
| Jack Hines | James Pienta |
| Michael Hoke | Walter Young |

14

## INTRODUCTION EXHIBIT NO. 2

### Officers Who Were Granted Immunity

Patrick Garrity                    William Kushner

Michael Hoke                       Daniel McWeeny

R.SMITH02605

## CONCLUSIONS

After our investigation, that has taken almost four years, we judge that there are cases which we believe would justify our seeking indictments for mistreatment of prisoners by Chicago police officers. These cases are based on the complaints of Andrew Wilson, Alfonzo Pinex and Phillip Adkins. It is our judgment that the evidence in those cases would be sufficient to establish guilt beyond a reasonable doubt. The police officer involved in the Wilson case is Jon Burge. In the Pinex case the officers are Anthony Maslanka and Michael McDermott. In the Adkins case the officers are James Lotito and Ronald Boffo.

There are many other cases which lead us to believe or suspect that the claimants were abused, but proof beyond a reasonable doubt is absent.

While not all the officers named by all the claimants were guilty of prisoner abuse, it is our judgment that the commander of the Violent Crimes section of Detective Areas 2 and 3, Jon Burge, was guilty of such abuse. It necessarily follows that a number of those serving under his command recognized that, if their commander could abuse persons with impunity, so could they.

We have considered every possible legal theory that would permit us to avoid the effect of the statute of limitations on any prosecution; regrettably, we have concluded that the statute of limitations would bar any prosecution of any offenses our investigation has disclosed.

We have also concluded that the use of the immunity statute to compel testimony and possible contempt citations or perjury prosecutions, under the evidence available to us, would constitute an impermissible procedure identified as a "perjury trap."

16

R.SMITH02606

We have found no evidence that would support a charge beyond a reasonable doubt of obstruction of justice (or "cover-up") by any police personnel. There is insufficient evidence of wrongdoing by any member of the State's Attorney's Office, except one person.

The evidence supports the conclusion that Superintendent Brzeczek was guilty of a "dereliction of duty" and did not act in good faith in the investigation of the claim of Andrew Wilson. Despite the fact that Brzeczek believed that officers in the Violent Crimes unit of Detective Area 2 had tortured Andrew Wilson he kept that belief to himself for over twenty years. He also kept Burge in command at Area 2 and issued a letter of commendation to all of the detectives at Area 2.

The inter-office procedures followed by the State's Attorney's Office and the Chicago Police Department during at least the tenure of Jon Burge at Areas 2 and 3 were inadequate in some respects. Since 1999, however, there have been several improvements instituted by the State's Attorney's Office and the Superintendent of the Chicago Police Department.

These conclusions we express are summaries. This report will express in greater detail the bases of our conclusions.

R.SMITH02607

## THE STATUTE OF LIMITATIONS

The issue of the Illinois statute of limitations, which bars initiating prosecution of felonies more than three years after the commission of the crime, was first raised in the original petition filed April 5, 2001, seeking the appointment of a Special State's Attorney. (Page 5.) In response to the petition the State's Attorney argued that there was no offense to prosecute because the statute of limitations had run on all offenses alleged to have been committed by police officers under the command of Lieutenant Jon Burge, whose active service in the Chicago Police Department terminated in November, 1991. The petitioners filed a reply brief on August 10, 2001. In the order appointing a Special State's Attorney this court did not rule on the statute of limitations question. We judge that this court's forbearance was done advisedly; and we respectfully agree that the decision to refrain from passing on the question was a sound one.

After our appointment many persons, including lawyers and journalists, have asked us questions about the applicability of the statute of limitations to any possible indictments. We have declined to answer. As we have previously expressed, it has been our public and private opinion that regardless of whether the statute of limitations was applicable, it was always our intention to make our position known on the question of whether the allegations of wrongdoing by the police officers were true after we had completed our investigation of the facts and research on all pertinent questions of law.

## Illinois Law

We will first address the question of the law governing the statute of limitations in conspiracy cases. We are bound by the decisions of the Illinois Supreme and Appellate

R.SMITH02608

Courts and decisions of the United States Supreme Court, but we are not bound by decisions of the Federal courts of appeal and district courts or of any courts of our sister states; they may be persuasive, but they are not binding.

It is the basic law of Illinois that in conspiracy cases the statute of limitations begins to run with the last overt act committed in furtherance of the conspiracy; and a conspiracy may be proved by circumstantial evidence. (People v. Link, 365 Ill. 266; People v. Konkowski, 378 Ill. 616.) A conspiracy to commit an unlawful act ends with the commission of the unlawful act. People v. Eddington, 129 Ill.App.3d 745.

We began our research by considering the arguments made in support of the petition for appointment of a Special State's Attorney and the argument of the State's Attorney in opposition. The petitioners cited two cases: People v. Perry, 23 Ill.2d 147, and People v. Pascarella, 92 Ill.App.3d 413. The State's Attorney cited four cases: People v. Eddington, 129 Ill.App.3d 745; People v. Columbo, 118 Ill.App.3d 882; People v. McInnis, 88 Ill.App.3d 555; and People v. Meagher, 70 Ill.App.3d 597. None of those six cases cited is applicable; none of them involved the statute of limitations. In Pascarella, the issue was whether an act by one conspirator in Illinois established jurisdiction over a co-conspirator in Colorado to try the co-conspirator in Illinois. In Perry, the Supreme Court held that if any act in furtherance of a conspiracy was committed in Illinois, jurisdiction was in Illinois over the conspirators even if the conspiracy originated in Indiana. All four cases cited by the State's Attorney involved the question of the admissibility of a declaration by one conspirator against a co-conspirator.

19

The petitioners concede that the statute of limitations has run on the prosecution of all substantive offenses, such as armed violence or aggravated battery, committed in furtherance of the conspiracy to extract a confession, and the perjury and obstruction of justice committed when the officers testified at the trials. But they argue that the officers may still be prosecuted for some conspiracy. The petitioners make the following principal contention:

> "The three year statute of limitations for the offense of conspiracy, <u>since it is a continuing offense</u> under Illinois law, begins to run anew with each overt act done by a co-conspirator in furtherance of the conspiracy." (Opening brief, p.5) (Emphasis added.)

In support of that statement the petitioners cited the <u>Perry</u> and <u>Pascarella</u> cases. As noted, those cases do not involve the statute of limitations; and the petitioners cite no authority for their blanket statement that suggests that all conspiracies are continuing offenses. There is no such authority. Some conspiracies are continuing, and some are not, depending on their facts. (See 109 ALR F. 616.) The petitioners' opening brief referred to acts of police officers in 1999 and 2001 as proof that the officers had committed offenses within the three year statute of limitations and concluded "that it is also possible that a full investigation will disclose evidence of <u>another</u> continuing conspiracy, <u>such as the original conspiracy to commit armed violence</u>." (Opening brief, page 6.) (Emphasis added.)

We have received legal arguments from representatives of the claimants. We met twice with one of them, the first time at his request and the second time at ours. He informed us that he had had the principal role in drafting the petition for our appointment. At our request he has done research on the question of the statute of limitations.

20

We summarize what we perceive to be his position:

1) All the police officers at Areas 2 and 3 under command of Lieutenant Burge, who have been accused by any of the claimants, had engaged in a single conspiracy even before the arrest of the claimants to extract confessions from the claimants by force if necessary <u>and at the same time</u>

2) conspired to obstruct justice and to commit perjury by testifying falsely at the trials of the claimants <u>and</u>

3) <u>at any possible future proceedings</u>, such as those involving post-conviction petitions or Federal habeas corpus hearings.

4) A conspiracy to obstruct justice and to commit perjury may be barred by the statute of limitations, but a <u>subsequent</u> overt act will resuscitate it.

5) The original conspiracy to commit armed violence in each case is part of a continuing conspiracy and still exists.

6) It is conceded that the evidence to support a finding of a general conspiracy is all circumstantial.

For the sake of brevity, we will make our position known now on the claim that the original conspiracy to commit armed violence in each case is a continuing conspiracy and still exists. We strongly disagree. Any conspiracy to commit armed violence ended at the time the armed violence occurred. <u>People v. Eddington</u>, 129 Ill.App.3d 745.

Research on the question of when the statute of limitations begins to run in conspiracy cases discloses a large store of material, particularly in the Federal courts.

21

See, e.g., 62 ALR 2d 1369, "When Does Statute of Limitations Begin to Run Against Civil Action or Criminal Prosecution for Conspiracy"; 75 ALR 3d 725, "When Does Statute of Limitations Begin to Run on Charge of Obstruction of Justice or of Conspiracy to Do So"; 109 ALR F. 616, "When is Conspiracy Continuing Offense for Purposes of Statute of Limitations 18 USCA Section 3282."

For purposes of defining the issues we refer to the case of Andrew Wilson. The evidence is sufficient to establish that Lieutenant Jon Burge and at least one other police officer committed armed violence, intimidation, official misconduct and aggravated battery when they brutalized Andrew Wilson at Detective Area 2 on February 14, 1982. The evidence is sufficient to establish that they committed perjury and obstruction of justice when they testified at Wilson's first trial on November 9, 1982. (Burge was called as a witness by the defense at the second trial, but his brief testimony had nothing to do with any treatment of Wilson.) It may be fairly argued that the evidence is sufficient to establish that Burge and at least one other police officer conspired to commit armed violence, intimidation, official misconduct and aggravated battery. Although whether the evidence is sufficient to establish a conspiracy to obstruct justice and to commit perjury may be debatable, for the purposes of illustration, we will accept that it is. It is that conspiracy to obstruct justice by concealment (perjury) that appears to be the linchpin of the argument of the petitioners.

As noted, it was and is the position of the petitioners that the officers entered into one single conspiracy that embraced more than one end. In support of the argument that our investigation involves one conspiracy, People v. Brinn, 32 Ill.2d 232 was cited to us.

R.SMITH02612

In Brinn, the defendant police officers were charged with conspiracy to commit burglary by forcibly breaking and entering into specifically identified buildings. A professional burglar testified to meetings with officers on separate dates where plans for burglarizing the buildings identified in the indictment were discussed. Those buildings were in fact burglarized and property taken; that property was recovered in the homes of the officers. The defendants on appeal argued that the evidence proved separate and distinct burglaries but not a single conspiracy involving all the defendants. The Supreme Court said that the "conclusion was not only permissible but inescapable that all of the defendants entered into a single design *** to conduct a wholesale looting of stores in the district." (32 Ill.2d at 245.) The facts of Brinn, which included irrefutable proof that the burglaries did occur and, most importantly, the direct evidence of a conspiracy provided by a coconspirator are a far cry from the circumstantial evidence available to us. We will refer to Brinn again.

On this question of a general conspiracy to conceal an offense and thereby obstruct justice, we have found no factually applicable Illinois authority, but Grunewald v. United States, 353 U.S.391, is instructive. In that case the defendants were convicted of conspiracy to defraud the United States by operation of a tax-fixing scheme which obtained "no prosecution" rulings by the Bureau of Internal Revenue. The fixing was done in 1948 and 1949. Prosecution was initiated on October 25, 1954. (The statute of limitations at the time of the offenses was three years.) It was the government's position that even if the main object of the conspiracy was to obtain decisions from the Bureau of Internal Revenue not to institute criminal prosecutions - decisions obtained in 1948 and 1949 - the conspiracy also included as a subsidiary element an agreement to conceal the

23

conspiracy to fix the tax cases. The conspiracy to conceal was not charged separately in the indictment; it was charged as part of the conspiracy to fix. Thus, the government argued, there were two conspiracies (entered into at the same time): to fix and to conceal the fix, and that the last act in furtherance of the conspiracy to conceal occurred in 1952. In other words, the acts showing a conspiracy to conceal were also acts in furtherance of the conspiracy to fix and thus restarted the running of the statute.

The Supreme Court rejected the government's arguments with language pertinent here. It said that an agreement to conceal a conspiracy on the evidence before it could not be deemed part of the conspiracy to fix:

> "[A]fter the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from <u>circumstantial</u> evidence showing merely that the conspiracy was kept a secret and the conspirators took care to cover up their crime in order to escape detection and punishment. ***Allowing such a conspiracy to conceal to be inferred or implied from mere overt acts of concealment would result in a great widening of the scope of conspiracy prosecutions <u>since it would extend the life of a conspiracy indefinitely. Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators.</u> For every conspiracy is by its very nature secret; a case can hardly be supposed where men concert together for crime and advertise their purpose to the world. And again, every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces. Sanctioning the government's theory <u>would for practical purposes wipe out the statute of limitations in conspiracy cases</u>, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators." 353 U.S. at 401-402 (Emphasis added.)

The court refused to accept the circumstantial evidence in the record to support a finding that a conspiracy to conceal existed from the beginning of the conspiracy to fix:

24

> "There is not a shred of <u>direct</u> evidence in this record to show anything like an express original agreement among conspirators to continue to act in concert in order to cover up." 353 U.S. at 404. (Emphasis added.)

The court also quoted from the oft-quoted criticism of conspiracy prosecutions by Justice Jackson in <u>Krulewitch v. United States</u>, 336 U.S. 440, of which the following is part:

> "Moreover, <u>the assumption of an indefinitely continuing offense would result in an indeterminate extension of the statute of limitations</u>. If the law implies an agreement to cooperate in defeating prosecution, it must imply that it continues <u>as long as prosecution is a possibility and prosecution is a possibility as long as the conspiracy to defeat it is implied to continue</u>." <u>Grunewald</u>, 353 U.S. at 401. (Emphasis added.)

There are some factual differences between <u>Grunewald</u> and the facts disclosed by our investigation. First, the Supreme Court made a distinction between a conspiracy to conceal, the purpose of which was to protect those engaged in the conspiracy to fix, and a conspiracy to conceal, the purpose of which was to make the fix permanent. (We will discuss this distinction again.) In addition, while the conspiracy to conceal was not a separate part of the indictment in <u>Grunewald</u>, any indictment we might bring would be based entirely on a charge of conspiracy to obstruct justice.

<u>Grunewald</u> has been analyzed in many cases, including some in the Seventh Circuit Court of Appeals and the district court in Chicago. In <u>United States v. Maloney</u>, 71 F.3d 645, a Cook County judge was convicted of violating the RICO statute and of conspiring with two lawyers and a court bailiff who acted as the judge's "bag man." In affirming, a divided court held that the conspiracy (to fix cases) was to continue "as long as Judge Maloney remained on the bench, [one lawyer] continued to practice before him

25

R.SMITH02615

and [the other lawyer] continued his friendship with him." (77 F.3d at 660.) For that reason, the court held, the main objective of the conspiracy had not been attained, and, therefore, Grunewald was inapplicable. It should be noted that the majority opinion still relied on the fact that an overt act had occurred within the statute of limitations. (71 F.3d at 662.) The dissenting judge, citing Grunewald, said that the majority's "view posits a conspiracy that is, for all practical purposes, of unlimited duration." 71 F.3d at 666.

In United States v. Masters, 924 F.2d 1362, a lawyer and a police officer were convicted of violating the RICO statute; and they and a former police officer were convicted of conspiring to do so. The court of appeals rejected the argument of the former police officer that his conviction was barred by the passage of time. The court, citing Grunewald, noted the distinction between inferring a conspiracy to conceal "from circumstantial evidence showing merely that the conspiracy was kept secret and that the conspirators took care to cover up their crime and an express original agreement." (Emphasis added.) (924 F.2d at 1368) The court said that the evidence established that the conspirators "intended from the first to exert strenuous efforts to prevent discovery of the crime." (924 F.2d at 1368) Significantly, the court recognized that the conspiracy ended and remanded the case for the trial judge to make a finding as to the date of termination. 924 F.2d at 1369.

In United States v. Shields, 1991 WL 236495, the issue was whether a tape of a conversation between one of the conspirators and a government witness would be admissible; that issue depended on whether a conspiracy existed at the time the conversation took place. The government relied on Masters. The judge distinguished Masters by the absence of direct proof meeting the requirements of Grunewald.

26

Similarly, in United States v. Fadeyi, 2000 WL 33155618, the judge, citing Grunewald and distinguishing Maloney, rejected the government's argument that the conspiracy was "open ended." The judge concluded that there was "nothing to indicate" that the case was at all "similar to Masters" and cited the Shields case.

We believe that Grunewald stands for the proposition that every conspiracy is subject to the statute of limitations and that regardless of the language or extent of the agreement the statute of limitations begins to run at the time of the last overt act in furtherance of the conspiracy. To illustrate, even under Maloney, which the majority said involved a conspiracy which was entered into with the understanding it was to continue so long as Maloney remained a judge, the majority pointed out and depended on the fact that there was an overt act committed before the statute ran out.

In the Wilson case, the question evolves: What was the central aim of the conspiracy to obstruct justice and to commit perjury? It may be fairly argued that the central aim was twofold: to convict Andrew Wilson and to hide Burge's wrongdoing for the benefit of Burge. But both those aims were accomplished when Wilson was convicted. It is the apparent position of the petitioners that that conspiracy did not end with Wilson's conviction and that it was the aim of the conspiracy not only to convict Wilson but to keep him convicted in possible further proceedings like a post-conviction petition or habeas corpus petition and that the conspiracy continues to this day.

Applying Grunewald to the facts in Wilson, therefore, the State would be required to prove that the officers agreed that they would commit perjury at the trial and that they would commit perjury at any subsequent proceeding in which they might be called as witnesses. The question arises: What is the quantum of proof necessary to establish such

27

a wide-ranging conspiracy? We are aware that a conspiracy may be established by circumstantial evidence, but Grunewald tells us that some circumstantial evidence may be insufficient. It emphasized the lack of direct evidence to support a finding that the purpose of the agreement was to protect the fixers. In contradistinction, it pointed to the direct evidence that would support a finding that the purpose of the conspiracy was to make the fix permanent. It said that there were "many acts of concealment" that could have been motivated by "the safeguard" of the original no-prosecution rulings. Even more important is what the court said in footnote 22 was a "typical example": A report which was sent to a high-ranking member of the Internal Revenue Bureau (and a co-conspirator) who, the court said, attempted to "doctor" the report for the benefit of the taxpayers. Footnote 23 refers to the direct evidence of at least one of the bribing taxpayers that "nothing at all was to be paid unless the prosecution had been eliminated," and that there "would be no fee [a bribe] at all" unless "they were completely successful in eliminating criminal prosecution."

We revert to the Brinn case. The "general" conspiracy was established by direct evidence.

In sum, therefore, it is our judgment that we have no direct evidence to establish any effort on the part of the officers involved in Wilson to conceal their criminal activity from the outset and, more importantly, to so indefinitely. For these reasons, we conclude that the statute of limitations began to run in the Wilson case when the officers testified on the motion to suppress on November 9, 1982.

There can be no conspiracy unless there is an overt act under Illinois law; and whether a conspiracy is considered "open-ended" or "general," the statute begins to run

28

R.SMITH02618

when the overt act is committed. It will begin to run anew with each succeeding overt act performed within three years before the date of the indictment. Consequently, even if we agree that Burge and his fellow officers agreed on November 9, 1982 that they would commit perjury at the trial of Andrew Wilson and at any other proceedings including a post-conviction hearing or a habeas corpus proceeding, that conspiracy would have to end on November 10, 1985 unless Burge or one of his fellow conspiring officers committed an overt act between November 9, 1982 and November 10, 1985. There is no evidence of any such overt act. Burge testified in depositions in the civil suit brought by Andrew Wilson in 1988 and 1989 and subsequently at two trials in the Wilson civil case; and Burge testified at his own hearing before the Chicago Police Board in 1992. In all of that testimony he denied any wrongdoing, contrary to the testimony of Andrew Wilson. All of this testimony occurred after November 10, 1985.

The same impediment to prosecuting Burge exists in all the cases we have investigated; and we have investigated every claim of wrongdoing against every police officer named. Under proffers and under grants of immunity we have sought to discover any evidence that would support a finding that two or more officers agreed to continue to give false testimony at any future proceedings involving any of the claimants. We have not been successful. Therefore, we must concede that the statute of limitations began to run at the time the officer last testified or made the statement. More than three years has expired in each of those cases

We repeat that we are not bound by the findings of any agency, but it is noteworthy that Maloney, Masters, Shields and Fadeyi were Federal prosecutions. And

R.SMITH02619

the issue of the statute of limitations in the cases we have investigated has arisen with the United States Justice Department on a number of occasions.

Shortly after we were appointed, we were informed that persons, including Congressman Bobby Rush, seeking prosecution of police officers, met with Attorney General Janet Reno. We have received a report that the investigation of Jon Burge by the Civil Rights Section of the Justice Department was "closed as of December 2001," because of the statute of limitations. On another occasion a lawyer for one of the claimants met with Andrea Zopp, then an Assistant United States Attorney. She told us that she did not remember everything that was said, but she did know that her office declined prosecution because of the statute of limitations.

On October 3, 1990, Jennifer Modell, a representative of the Task Force to Confront Police Violence, wrote to Fred Foreman, the United State's Attorney, pointing out that her organization had previously submitted information regarding incidents of torture committed by the detectives at Detective Area 2 under the direction of Lieutenant Jon Burge; and that the response from the United States Attorney's Office was that the incidents had occurred more than five years before. She referred him to the Shadeed Mumin complaint, which she alleged occurred within the five year statute of limitations. Prosecution was declined.

On March 15, 1991, Assistant Public Defender Joseph M. Gump wrote to Attorney General Richard Thornburgh, also referring to the case of Shadeed Mumin and the case of Andrew Wilson. Mr. Gump identified over 25 cases involving persons who claimed to have been abused by Lieutenant Burge and some of his subordinates. Mr. Gump was subsequently interviewed by the FBI; and it was determined that prosecution

30

would be declined because of the statute of limitations. The matter was reopened by the Department of Justice, and on May 18, 1993, prosecution was again declined because of the statute of limitations.

The last argument to be addressed is the claim that prosecution of a conspiracy that is barred by the passage of time may be resuscitated by a subsequent overt act. This is an argument that has caused us much concern. It was because of this argument that virtually all police officers refused to talk to us despite being subpoenaed before the grand jury. The lawyers representing them informed us that the officers were concerned that their testimony or statements would be used by us to revive charges of conspiracy that had been barred by the statute of limitations. At one point lawyers for defendant police officers in the civil rights litigation in the Federal district court brought by claimants who had been pardoned by Governor Ryan filed a motion before this court to compel us to make our position known on the applicability of the statute of limitations so that the officers could make a reasoned judgment on whether to testify in those proceedings. As this court knows, we resisted that motion. Our first task was to analyze the evidence; our second task was to analyze the law. Our first task had not been completed at the time of the hearing on the motion and we had not yet begun our second task to analyze the law.

As noted, we invited the assistance of the lawyer who was the principal drafter of the petition for our appointment. After learning of his legal position on the "resuscitation" of the statute of limitations, we asked him to provide us with any authority for his position. At our next meeting, he conceded he could find no authority for his position.

31

It is now our fixed opinion that once the time for prosecuting an offense has passed, and no grounds exist for the tolling of the statute of limitations, e.g. absenting oneself from the state to avoid service, no subsequent act can restart the running of the statute. The law is clear. It must be shown that a conspiracy subsisted within the three years before the return of an indictment and that at least one overt act in furtherance of the conspiratorial agreement was performed "within that period." Grunewald, 353 US at 397 (Emphasis added.)

### Obstruction of Justice and Perjury

We turn now to the additional argument of the petitioners that prosecution for the substantive offenses of obstructing justice or perjury could be maintained against Anthony Maslanka, Peter Dignan, Robert Dwyer and John Byrne. We will take them in order.

### Anthony Maslanka

The petitioners maintain that Anthony Maslanka committed perjury on August 26, 1999 when he testified at the penalty phase of the trial of Cortez Brown, who was later sentenced to death. Maslanka's testimony consisted principally of reading the court-reported statement Brown gave at Detective Area 3 on September 21, 1990. In that statement Brown said that the police had treated him "okay"; that Brown had no complaints about how he had been treated; and that he had been allowed to go to the bathroom and had been given two hamburgers to eat. The petitioners maintain that "[t]here is reason to suspect that Detective Maslanka failed in his testimony to clarify that the detectives at Area 3 repeatedly struck Brown on his chest, hands and legs until he agreed to make a statement and that Brown failed to complain of this treatment because

32

he feared additional police beatings." Our response is that not only has the statute of limitations expired on any possible wrongdoing on the part of Maslanka, it is an understatement to say that there is a complete lack of proof of any wrongdoing by Maslanka when he testified.

### Peter Dignan

The petitioners maintain that Peter Dignan made false statements in an interview he had with a Chicago Sun-Times reporter on or about February 12, 2001. In the interview he said that torture of Darrell Cannon by him, John Byrne and Charles Grunhardt "never happened"; that he had never seen a cattle prod and that the detectives had not used one on the day of Cannon's arrest; that John Byrne did not stand on the bumper of the police car while Dignan and Grunhardt hoisted Cannon by his handcuffs. Cannon had testified to the contrary.

We decline prosecution for a number of reasons that include the fact that the statute of limitations has expired. In addition, we know of no authority, and we think none exists, that would authorize prosecution for false statements to someone other than a law enforcement officer or to a person whose duty it was to receive information in connection with either a court proceeding or some official investigation.

### Robert Dwyer

The petitioners contend that on May 11, 1999, Robert Dwyer lied in a deposition in the Madison Hobley post-conviction proceeding when he said that he had previously denied abusing Hobley in a conversation with Hobley's attorney, Steven Stern, at the police station; and that Hobley's attorney conceded that Hobley had not been abused.

33

R.SMITH02623

They also contend that Dwyer lied when he said that the injury to Hobley's wrists occurred by Hobley's wrenching his own wrists while handcuffed.

We decline prosecution for three reasons:

1.    The bare testimony of Steven Stern would be legally insufficient to prove lying under oath on the part of Dwyer;

2.    The assistant state's attorney corroborated the testimony of Dwyer that the injuries to Hobley's wrists were self inflicted; and

3.    The statute of limitations has expired.

### John Byrne

We will first address the petitioners claim that Byrne obstructed justice when he was interviewed by Carol Marin on Channel 2 on December 7, 1999. In that interview he allegedly falsely said "he never tortured anyone" while working at Area 2; he denied that Aaron Patterson was tortured with a typewriter bag; and he said that Aaron Patterson was guilty "without a doubt." The same observation we made regarding the allegations against Dignan we make here: These are statements made to someone other than a law enforcement officer or a person whose duty it was to receive information in connection with either a court proceeding or some official investigation. In addition, the statute of limitations has expired.

On March 1, 2001, John Byrne gave a deposition in the post-conviction proceedings in <u>People v. Aaron Patterson</u>. The petitioners allege that Byrne testified falsely in nine specific instances. They say he lied about his role in the following cases: Aaron Patterson, Lee Holmes, Stanley Wrice, Alonzo Smith, Darrell Cannon, David Bates, Stanley Howard, Reginald and Jerry Mahaffey and Phillip Adkins. For our

R.SMITH02624

analysis of the weight of the evidence in each of those cases, we refer to the digital video disc attached to this report. In all of the cases the statute of limitations has expired.

In sum, it is our conclusion that, as a matter of law, the statute of limitations would bar prosecution of any officer for any offense that our investigation has disclosed. But there is further authority, besides the statute of limitations, that could be invoked to bar any prosecution. In People v. Hryciuk, 224 N.E.2d 250, a defendant was arrested for rape in 1939. He confessed to the rape and was identified by the victim. Two days later he confessed to a murder which occurred in 1937. He was indicted for the rape but not for the murder. He was convicted of the rape, but the rape conviction was reversed in 1953. Immediately after the reversal, the defendant was indicted for the murder; he was convicted by a jury who fixed his punishment at 199 years in the penitentiary. The Supreme Court reversed the conviction.

The Supreme Court rejected the State's argument that since there was no statute of limitations, an indictment for murder might be brought at any time. The court pointed out that the State had all the evidence in 1939 that it had in 1953. The court also pointed out that the State was unable to produce all the officers who were present at the confession. One had died. The officers who did testify had little personal recollection and had to refer to the confession itself and other records to refresh their recollection.

In our investigation, there has not been a single case that we have investigated that does not involve either deceased or unavailable witnesses who could testify for the defense of the officer accused, or missing records or witnesses who have no independent recollection of events that occurred several years ago or witnesses who have no

35

R.SMITH02625

independent recollection even after examining records. We believe that <u>People v.</u> <u>Hryciuk</u> would be strong authority barring any further prosecution.

R.SMITH02626

# THE PERJURY TRAP

One of the prosecutorial procedures that have been urged on us by the lawyers representing the petitioners for appointment of a special state's attorney and others is the following:

1. We subpoena a witness before the grand jury.

2. The witness refuses to answer on the ground he may incriminate himself.

3. We grant the witness immunity.

4. If the witness still refuses to testify, we ask the court to hold the witness in contempt and to imprison the witness until he does testify.

5. If the witness does testify and denies any knowledge of wrongdoing, we are to have the witness indicted for perjury.

Implicit in this procedure is the assumption that the accuser is telling the truth and the denier of the accusation is lying.

This procedure has been identified in some cases as "The Perjury Trap." (See Bennett L. Gershman, The Perjury Trap, 129 U.Pa.L.REV.624 (1981).)

In <u>United States v. Chen</u>, 933 F.2d 793, 796, the court gave a succinct description of what constitutes a perjury trap:

> "A perjury trap is created when the government calls a witness before the grand jury for the primary purpose of obtaining testimony from him in order to prosecute him later for perjury. <u>United States v. Simone</u>, 627 F.Supp. 1264, 1268 (D.N.J. 1986) (Perjury trap involves 'the deliberate use of a judicial proceeding to secure perjured testimony, a concept in itself abhorrent'). It involves the government's use of its investigatory powers to secure a perjury indictment on matters which are neither material nor germane to a legitimate ongoing investigation of the

37

grand jury. (See <u>United States v. Crisconi</u>, 520 F.Supp. 915, 920.)"

There are a large number of cases, principally Federal, dealing with this question. See e.g., <u>United States v. Regan</u>, 103 F.3d 1072; <u>United States v. Chen</u>, 933 F.2d 793; <u>United States v. Nickels</u>, 502 F.2d 1173; <u>United States v. Devitt</u>, 499 F.2d 135; <u>United States v. Cohn</u>, 452 F.2d 881; and <u>LaRocca v. United States</u>, 337 F.2d 39.

The number of state cases is very small. The New York Court of Appeals decided three of the cases the same day: <u>People v. Tyler</u>, 385 N.E.2d 1224; <u>People v. Pomerantz</u>, 385 N.E.2d 1218; and <u>People v. Schenkman</u>, 385 N.E.2d 1214.

The closest Illinois case, although not precisely in point, is <u>People v. Ricker</u>, 262 N.E.2d 456. In that case, the defendant, a lawyer, gave incriminating evidence against Fisher, another lawyer, before the grand jury. After Fisher was indicted the defendant told the prosecutor that at the forthcoming trial his testimony would be that Fisher had done no wrong. The defendant was called as a court's witness and testified contradictory to his grand jury testimony. He was later convicted of perjury. In the Supreme Court he raised an entrapment defense and argued that the prosecutor called him as a witness knowing that he would testify differently from his grand jury testimony. (The prosecutor had testified that he did not know that the defendant would testify differently from his grand jury testimony.) The Supreme Court said that it was immaterial whether the prosecutor knew that the defendant would testify differently at the trial and denied that entrapment had taken place.

All the Federal cases we cite rejected the defendant's argument that he had been improperly subjected to a perjury trap. They did so on the facts. Four of the cases involve the claim that the defendants were improperly questioned about offenses, the

38

prosecution of which was barred by the statute of limitations: <u>Chen</u>, <u>Nickels</u>, <u>Devitt</u> and <u>Cohn</u>. But our reading of those cases compels the conclusion that the expiration of the statute of limitations for a particular offense does not bar questioning about that offense <u>if</u> that questioning "may afford valuable leads for investigation of suspected criminal activity <u>during the limitations period</u>." (Emphasis added.) (<u>United States v. Cohn</u>, 452 F.2d at 883.)

In <u>Cohn</u>, the defendant testified in April, 1969 under a grant of immunity before a grand jury investigating possible corruption among government and labor officials. The defendant answered questions about possible bribes being paid to a Labor Department official in 1962 and 1963. (That official was still working for the Labor Department in 1968.) The court of appeals said that by concealing information relative to the 1962 and 1963 transactions the defendant might have hindered an investigation into the bribed person's "subsequent activities as a Labor Department official." (452 F.2d at 883.)

Two of the cases, <u>Nickels</u> and <u>Devitt</u>, are from the Seventh Circuit Court of Appeals and involve prosecution of Chicago police officers for perjury. In <u>Devitt</u>, relying on <u>Cohn</u>, the court of appeals pointed out that "truthful answers potentially could have led to a more fruitful investigation." (499 F.2d at 140.) Similarly, in <u>Nickels</u>, relying on <u>Devitt</u> and <u>Cohn</u>, the court of appeals summarily dismissed the defendant's claim that the government was not entitled to propound questions concerning events occurring before the five-year statute of limitations. (502 F.2d at 1176.)

We turn now to the New York cases previously mentioned. In <u>People v. Tyler</u>, 385 N.E.2d 1224, the court of appeals affirmed an order of the appellate division reversing a conviction of perjury. A special grand jury had been charged with, among

39

other things, investigating the relationship of the defendant, a judge, and certain gambling figures. When the defendant testified before the grand jury, he was asked questions about what contacts he had with a specific gambler since he had become a judge. It was his answers to one of those questions, which did not involve criminal activity, that formed the basis of the indictment. The court of appeals concluded: "Dispositive in this case is that the preoccupation with trapping defendant into committing perjury is unmitigated by substantive investigative goals." (385 N.E. 2d at 1231.) In coming to that conclusion, the court of appeals cited <u>United States v. Brown</u>, 245 F.2d 549, which we will discuss below.

In <u>People v. Pomerantz</u>, 385 N.E.2d 1218, the defendant testified under a grant of immunity; he was convicted of perjury; and the appellate division reversed. The court of appeals reversed the appellate division but added this caveat: It would have affirmed the appellate division if "it were demonstrable that what was involved was a sophisticated façade to trap the defendant into a new crime of perjury or contempt, <u>and not to establish evidence of antecedent crime</u>." (Emphasis added.) 385 N.E.2d at 1224.

In <u>People v. Schenkman</u>, 385 N.E.2d 1214, the issue was whether the defendant's testimony before the grand jury was so "evasive or falsely equivocal or contradictory" as to justify a finding of contempt. The court of appeals affirmed the appellate division's affirmance of a conviction but repeated the caveat it had expressed in <u>Pomerantz</u>:

> "A formalistic adherence to any kind of questioning <u>which does not in fact relate to a search for evidence of antecedent crime</u> will not suffice to sustain a conviction for the crime of contempt. There must not only be an appearance in the pursuit of evidence of antecedent crime but it must also be the realty." (Emphasis added.) 385 N.E.2d at 1218.

40

Last, we refer to <u>United States v. Brown</u>, 245 F.2d 549, relied upon in <u>People v. Tyler</u>. In that case the defendant was convicted of perjury for testifying falsely before a Federal grand jury in Nebraska. The questions asked concerned actions taken by the defendant in Missouri. The circuit court of appeals reversed the conviction. It pointed out that the Nebraska court lacked jurisdiction to try the defendant for actions in Missouri. It said that the record established that the purpose of calling the defendant before the Nebraska grand jury was to "extract from the defendant his testimony" about actions in Missouri, "<u>knowing that his recollection differed from that of others present, and to get him indicted for perjury</u>." (Emphasis added.) (245 F.2d at 555.)

From all these cases, we conclude that a perjury trap would occur if we call the witness to answer questions knowing that his answers would never lead us to an offense that we would be able to prosecute. After our complete investigation we have concluded that the statute of limitations would bar all offenses that our investigation may have disclosed or could disclose.

It is recognized by all parties that the prosecution is time-barred of all substantive offenses such as aggravated battery allegedly committed against any of the claimants and perjury and obstruction of justice that allegedly occurred when the officers have testified in the past. As we have discussed on the question of the statute of limitations, however, the petitioners have raised the theory, which we cannot accept, that the statute of limitations may have expired on the charge of a conspiracy to obstruct justice but that some overt act would revive the statute. We have no evidence of any overt act that has occurred within the past three years that would be considered an act in furtherance of a conspiracy. We have interviewed police officers under proffers, and under grants of

41

immunity. None has given us any evidence of a continuing conspiracy to obstruct justice. For us to ask a grand jury to indict someone for denial of the existence of a general conspiracy when we have no evidence to support such a charge would be unacceptable. So would approval of an indictment for denying the commission of an offense which all concede is barred by the statute of limitations.

R.SMITH02632

## ANDREW WILSON

Andrew Wilson's allegation of police brutality, more than any other, set the forces in motion that led ultimately to our appointment. Our final decision in his case, like all the other cases, however, depends on our determination of the credibility of the accuser.

Andrew Wilson was convicted by a jury of the murder of two Chicago police officers, William Fahey and Richard O'Brien, and sentenced to death. His conviction was reversed by the Illinois Supreme Court on the ground that his confession should have been suppressed because the State had failed to explain adequately how Wilson indisputably suffered certain injuries while in police custody. (People v. Wilson, 506 N.E.2d 571) Wilson was retried and convicted, but the jury could not agree on the penalty, and Wilson was sentenced to life imprisonment. That conviction and sentence were affirmed by the appellate court. (People v. Wilson, 626 N.E.2d 1282)

Wilson filed a civil rights action naming Police Superintendent Richard Brzeczek, Lieutenant Jon Burge, the City of Chicago and other police officers. The first trial ended in a hung jury. The second trial resulted in a special verdict; the jury found that Wilson's constitutional rights had been violated but exonerated all the police officers. The jury also found that the City of Chicago had a de facto policy authorizing its police officers physically to abuse persons suspected of having killed or injured a police officer, but the jury also found that the policy had not been a direct and proximate cause of the physical abuse visited on Wilson.

The Seventh Circuit Court of Appeals affirmed the judgment with respect to the City and Superintendent Brzeczek and the judgment in favor of one former police officer and the estate of a former police officer for want of service. It reversed the judgment in

43

favor of the other police defendants, including Jon Burge, on the ground of trial error and remanded the case for a new trial.

While the case was pending in the court of appeals, the City of Chicago instituted disciplinary proceedings against Jon Burge and Officers Patrick O'Hara and John Yucaitis, alleging mistreatment of Andrew Wilson. The Chicago Police Board found the three officers guilty of misconduct, suspended O'Hara and Yucaitis and fired Burge. Burge was found guilty of actively abusing Wilson. The Board held that Wilson's identification of Yucaitis as a person who actively abused him was insufficient. But the Board did find that Yucaitis knew that Wilson was being abused and did not report that abuse. The Board made the same finding as to O'Hara. (Yucaitis and O'Hara are now deceased.) The Board's decision was affirmed in the circuit court on administrative review and the appellate court by a Rule 23 order.

Andrew Wilson's counsel filed a motion for summary judgment in the civil suit which had been remanded by the court of appeals, using the finding of the Chicago Police Board as a basis of collateral estoppel. The district court judge granted summary judgment, which was affirmed, and the City of Chicago and Andrew Wilson settled the case for payment of $100,000 damages and $900,000 in attorney fees.

The facts of the case are set out in the supreme court and appellate court opinions. On February 9, 1982, Chicago police officers William Fahey and Richard O'Brien made a traffic stop at the 8100 block of South Morgan in Chicago. The driver of the car was later identified as Jackie Wilson, and the passenger was identified as Andrew Wilson, Jackie's brother. The passenger shot and killed both officers.

44

R.SMITH02634

A witness, Tyrone Simms, tentatively identified the pictures of Donald White as the shooter and Dwight Anthony as the driver. On February 13, Simms viewed a line-up which included White and Anthony. He did not recognize them as the two men involved in the shooting. Coincidentally, White knew the Wilsons and gave the police information incriminating the Wilsons. Based on that information, warrants were issued for the Wilson brothers; they were arrested the following day and identified, Andrew Wilson as the shooter and Jackie Wilson as the driver. Officers McKenna and O'Hara testified that Wilson made an oral confession to them. Court-reported confessions were then taken from both.

At the joint trial, both brothers made motions to suppress the confessions based on allegations of police brutality. The trial judge denied both motions. As noted, the Supreme Court reversed Andrew Wilson's conviction, holding that the State had failed to submit adequate proof that the injuries of Andrew Wilson were caused by something other than police misconduct. In the second trial, the State proceeded without Andrew Wilson's confession; he was again convicted and his conviction was affirmed.

It is now conceded by Andrew Wilson's lawyers that Andrew Wilson did murder the police officers. We need at this point only to summarize the evidence concerning the allegations of police brutality. The summary will include some evidence adduced at all the proceedings involved - criminal and civil trials, depositions and the Police Board hearing.

Andrew Wilson was arrested at 5:15 a.m. on February 14, 1982 in an apartment at 5301 West Jackson Boulevard. He was on parole for an armed robbery when he was arrested for another armed robbery of a camera store. He was released on bond.

45

R.SMITH02635

When he was arrested, the arresting officers included Lieutenant Jon Burge, the commanding officer of Area 2 Violent Crimes. During the arrest Wilson was thrown to the floor. While Wilson was on the floor, Burge placed one knee in the small of Wilson's back and the other knee on the back of Wilson's head. Wilson was then taken to Detective Area 2 in a room on the second floor.

Wilson testified that he was beaten by several officers who began kicking him, slapping him and hitting him with their fists. They put a plastic bag over his head and burned him on the arm with a cigarette. Yucaitis was the only officer in the room whose name he knew. Burge and O'Hara were not in the room. His right eye was first injured during the course of this beating.

Wilson testified that Burge later came into the room and told the officers that "if it had been him, he would not have messed up [Wilson's] face." Burge ordered the officers to take Wilson out of the room; they took him to a different room on the same floor where his right hand was handcuffed to a ring on the wall. There was a radiator in that room. Burge came in and told him to confess; Wilson refused.

Yucaitis then came into the room with an unnamed officer. He took out a black box from a grocery bag. The box had a crank on the outside and two wires to each of which an alligator clip was attached. Yucaitis attached one of the clamps to Wilson's left ear and one to his left nostril. He received a shock when Yucaitis cranked the box. Wilson kneed Yucaitis, and Yucaitis punched Wilson in the mouth. Yucaitis cranked the box again and Wilson shouted. Yucaitis left when someone knocked at the door.

Wilson testified that O'Hara took him out of the room to see Assistant State's Attorney Lawrence Hyman. Wilson said he told Hyman about being mistreated, and

46

Hyman told the officers "take that jagoff out of here." (In his testimony on a number of occasions, Hyman has denied this testimony of Wilson. We will refer to Hyman in more detail later.) The officers returned Wilson to the room from which they had taken him.

Wilson said Burge came into the room some time later with a detective Wilson later said was Fred Hill. (The evidence concerning Hill is confusing. We will later refer to it in more detail also.) Wilson was not sure what time any of the events happened because the police had broken his watch. Burge took out a device, attached clamps to Wilson's ear and began cranking. This caused Wilson to grind his teeth, scream and rub the clamps off. Burge and Hill stretched him across the radiator in the room so that the radiator was under his chin. Burge placed the clamps on his fingers and began cranking again, causing Wilson to scream.

Burge then took out a device that looked like a curling iron. The device had a cord on it and wires sticking out of it. Burge began rubbing the device between Wilson's legs, and Wilson could feel a tingling sensation. The shock from this device was stronger than from the crank device. When Wilson was being shocked, he was on his knees stretched across the radiator, and Hill was kicking him in the back. Burge took the devices out of the room and Wilson was left alone until he was taken to the line-up at Area 1.

At a room in Area 1 Burge put a gun in Wilson's mouth and clicked it. Burge told Wilson that he would not be mistreated again if he confessed to the murders. Wilson agreed to make the statement to keep from being shocked again. O'Hara and McKenna drove Wilson back to Area 2 after the line-up.

47

O'Hara and McKenna returned Wilson to the same interview room on the second floor of Area 2 that he had been in originally. Hyman came into the room about 6:00 p.m. with O'Hara and a court reporter and his confession was taken. Wilson said that the oral and written confessions he gave to Hyman were the only statements he made; he did not give a statement when he first arrived at Area 2 at about 6:00 in the morning.

Wilson was taken from Area 2 to the lockup at 11th & State by uniform officers Mulvaney and Ferro in a squadrol. The lockup personnel refused to accept Wilson because of his condition. Mulvaney and Ferro then took Wilson to Mercy Hospital where he was examined and treated by Dr. Jeffrey Korn. Dr. Korn testified that he observed numerous red scratches or linear marks along the chest; scratches on the right shoulder; a long wound on Wilson's right thigh which Dr. Korn characterized as a second degree burn; a bruise under Wilson's right eyelid and redness on the surface of the right eye; cuts on the forehead and a cut on the back of the head; and two eight centimeter long linear abrasions on Wilson's right cheek. (The State sought to deprecate the seriousness of the injuries to Wilson by seizing on Dr. Korn's testimony describing Wilson's injuries as "superficial." But Dr. Korn explained what he meant by "superficial": He said it meant that "the patient didn't need to go to the operating room for major surgery or admitted to a hospital but needed further evaluation and treatment at that time.")

Patricia Reynolds Crossen, a Mercy Hospital nurse who assisted Dr. Korn and examined Andrew Wilson herself, observed the same injuries to Wilson that Dr. Korn observed.

Dr. John Raba, the Director of Cermak Hospital, which is the medical facility for the County Jail, testified that he was called to examine Andrew Wilson shortly after

R.SMITH02638

Wilson was brought to the County Jail. Dr. Raba testified to the results of his examination. We attach to this report as Andrew Wilson Exhibit No. 1, a letter of Dr. Raba to Superintendent Brzeczek containing the results of his examination showing the injuries to Andrew Wilson. (Dr. Raba is still available to testify.)

It is now conceded that Mulvaney and Ferro abused Wilson, as he testified, after they arrived at Area 2 to take Wilson to a lock-up. They continued to abuse him after they took him; Mulvaney struck him in the back of the head with a pistol causing a wound that required sutures. Mulvaney refused Dr. Korn's request to put his gun away while the doctor was about to inject Wilson. It was established that one or both of the officers told the doctor that Wilson had better refuse treatment if he knew what was good for him. (No action by the police Office of Professional Standards or the State's Attorney's Office was ever brought against either officer.)

In 1983 Mulvaney committed suicide and Ferro retired. He now lives out-of-state. His deposition was taken in the civil suit in which he had been named as a defendant. He denied any wrongdoing. The estate of Mulvaney was also named as a defendant in Wilson's suit. The claims against Ferro and the estate were dismissed for lack of service.

Burge and all other officers who testified at the motion to suppress or before the jury in any of the cases or in depositions connected with the two civil trials or the Police Board hearings or in statements made to us have denied any knowledge of any mistreatment of Wilson. Burge and many other officers have refused to make any statements to us. We have interviewed some officers under proffers and before the Grand Jury.

49

R. SMITH02639

We begin our analysis of the credibility of Wilson with recognition that his testimony discloses some inconsistencies and other weaknesses.

In Wilson's early testimony either at the motion to suppress or at his first civil trial he said Yucaitis was the first one to tell Wilson he was going to make a statement. At his second civil trial, he testified he was wrong about that - it was Burge who said it. At one time he denied he wore glasses; at another time he said he did wear them. (His glasses were probative evidence at his criminal trial.) He testified that he was never read his rights; the written statement shows that he was. He testified that he was wrong when he said that Burge took out his gun and put it in Wilson's mouth while they were in the same room where the line-up took place.

Dr. Korn testified at his deposition that when he asked Wilson what happened, Wilson said "he fell outside the police station and received all the injuries in that fashion." Wilson denied making that statement to Dr. Korn. (We believe Wilson did make that statement and, under the circumstances, understand why he did.)

Wilson testified at the motion to suppress and at his deposition that he was wearing "long johns" underwear when he was tortured by Burge. He said the same thing at his deposition. But at the first civil trial he said it just occurred to him he was wearing boxer shorts. He said the same thing before the Police Board. (The nurse at Mercy Hospital Patricia Reynolds Crossen, who examined him at the hospital, said that they took his pants off and he was bare-legged.)

On the motion to suppress he testified that one of the officers burned him with a cigarette. He did not mention that when he testified before a jury. He explained that he

50

R.SMITH02640

did not mention the cigarette burn, because he did not want to show the jury where he had been burned; the jury would see his tattoos which he thought might prejudice him.

Wilson has testified at a motion to suppress at his first criminal trial; at a deposition before his civil trial, twice before juries at his civil trials and once at the Police Board hearings. There is no denying that the factfinders in the criminal and civil trials have had a difficult time accepting Wilson's credibility. Even the Police Board findings against Burge were not unanimous.

It is accepted by his own lawyers that Wilson murdered two police officers; and Wilson does not bolster his credibility by insisting on his right to refuse to answer certain questions on constitutional grounds. When we questioned him he informed us that he would continue to invoke his constitutional rights if we call him as a witness.

But recognition of the shortcomings in his testimony does not change our ultimate conclusion that he was telling the truth when he said that he was tortured by Burge and others. The physical evidence is there, and it will not go away. There simply has been no reasonable explanation by the State or the lawyers representing the police officers in the civil action or the Police Board hearing for the burn marks and the marks on his ears, which Wilson said were caused when he was electro-shocked.

In argument in the criminal trial, the prosecutor, William Kunkle, said he did not know what the marks on Wilson's ears were. He did not say anything about the burns. He later theorized that the marks on Wilson's ears could have been caused by the use of clips which are used for holding marijuana cigarettes; they were called "roach clips."

At the first civil trial, Mr. Kunkle, representing Burge, presented an expert witness Dr. Warpeha, who testified that the marks on Wilson's body, which Raba and

51

Korn had identified as burn marks, were not burn marks. He based his opinion on his examination of a picture of Andrew Wilson's body. Another burn expert, Dr. Warren Spitz, was called at the Police Board hearing. In contradiction to the testimony of Dr. Warpeha, Dr. Spitz testified that the mark on Wilson's thigh was a burn mark. He also based his opinion on his examination of a picture. (Dr. Raba and Dr. Korn examined Wilson personally.)

It was also argued at the Police Board hearing by Mr. Kunkle that the burn marks could have been caused by Mulvaney and Ferro by their placing Wilson over a radiator outside the lock-up at 11th & State. (It was disclosed that that radiator was in an open area that was subject to heavy pedestrian traffic.) Last, Burge's attorney introduced the testimony of William Coleman, a British national, who was in the County Jail for possession of cocaine. He had previously done time in England for extortion. (We have been unable to locate Coleman.) He testified in 1989 that Wilson told him in August, 1987 that although the police beat him on the way to Area 2 Wilson had actually draped himself on the radiator to inflict the burns on himself as a means of getting out of the confession. The first time Coleman ever told anyone about his conversation with Wilson was in April or May of 1989 when Coleman told his lawyer, who was a former assistant state's attorney. (Coleman's testimony was also introduced at the second civil trial.)

Thus, according to Coleman, Wilson, after the Supreme Court had already reversed his conviction and held that the confession should not have been introduced told a stranger that he had, in effect, "put one over" on the Illinois Supreme Court and that he was going to claim the police burned him at his upcoming trial where no confession could be introduced. As the Seventh Circuit Court of Appeals noted, this was indeed "an

52

odd suggestion." And thus, those opposing Wilson's testimony have gone from no burns, to burns caused by wagonmen, to self-inflicted burns.

The Chicago Police Board rejected the testimony of William Coleman and the various theories advanced in opposition to Wilson's testimony, and so do we.

### Lawrence Hyman

We consider Lawrence Hyman a crucial witness in our investigation of the Andrew Wilson case. If he was telling the truth when he testified about the sequence of events leading up to the court-reported confession of Andrew Wilson, which Hyman took, then the claim of Andrew Wilson that he had been abused before he gave that confession would be seriously undercut. If, on the other hand, Hyman was not telling the truth, his false testimony would stand as strong corroboration of Andrew Wilson.

Hyman was the Chief of the Felony Review unit. He was an assistant state's attorney from 1976 until he resigned from the office in June 1982, four months after he took the confession from Andrew Wilson. He has testified on the motion to suppress and before the jury that convicted Wilson and sentenced him to death. He was named in the Federal civil rights action brought by Andrew Wilson as an unsued co-conspirator. (We have been informed that he was so named because the lawyers representing Wilson believed that Hyman was protected by prosecutorial immunity.) His deposition was taken, and he testified at both civil trials. He also testified as a witness on behalf of Jon Burge in the Police Board hearing in 1992.

We sought to interview Hyman, as we have interviewed over 25 former assistant state's attorneys. We were informed by his attorney, Michael Ficaro, that Hyman would invoke his constitutional right against self-incrimination if we called him as a witness.

R.SMITH02643

He is the only former assistant state's attorney that has refused to be interviewed by us. After Hyman was subpoenaed, Ficaro moved to quash the subpoena; the motion was denied. Hyman was subsequently held in contempt for failure to appear as ordered by Judge Michael Toomin and ordered arrested by the sheriff. That order was stayed while Ficaro appealed directly to the Supreme Court. The Supreme Court denied leave to appeal. We still have not interviewed Lawrence Hyman. We base our judgment of his credibility on the undisputed facts, his own testimony, our analysis of the testimony of Andrew Wilson and other witnesses and our own experiences as former prosecutors. We do not rely on his refusal to speak to us.

In our judgment Hyman did not tell the truth when he denied that he had been told by Andrew Wilson that he had been tortured by detectives under the command of Jon Burge. His false testimony stands as corroboration of Andrew Wilson.

Hyman testified that he had been called by detectives from Detective Area 2, whom he did not recall, some time around 8:00 a.m. on February 14, 1982. He had already been involved in the investigation of the murders of Officers Fahey and O'Brien since February 9. It was he who approved the warrants for the arrests of both Wilsons on February 13. (We now know that the information leading to the issuance of the warrants had come from Donald White. That information, we can infer, identified Andrew Wilson as the shooter.)

Hyman arrived at Detective Area 2 around 9:00 a.m., and he spoke to detectives there, probably McKenna and O'Hara. He also spoke to Burge. He was informed that the man in custody, Andrew Wilson, had orally confessed to being the person who fired the shots that killed the officers. He read some of the police reports and called his office

54

for a court reporter. The court reporter, Michael Hartnett, arrived around 11:00 a.m. Hyman saw Hartnett about 11:30. Despite the fact that he had been told that Andrew Wilson was the shooter, he did not go in to see, let alone interview, Andrew Wilson. At the first civil trial he testified that he called Michael Angarola, his superior who later prosecuted Andrew Wilson. (Angarola later was the First Assistant State's Attorney and was tragically killed in an automobile accident.)

Hyman learned that Jackie Wilson was in custody, and he waited for Jackie Wilson to be brought to Area 2. He saw Jackie Wilson about 10:30 or 10:45. He took an oral statement which took about a half-hour. Then lunch was brought in about 11:30 or 11:45, and he, Jackie Wilson and some police officers had lunch. The lunch took about a half-hour. After lunch he took a court-reported statement from Jackie Wilson which took about 15 or 20 minutes. According to the statement, it concluded at 12:43 p.m.

Michael Hartnett then transcribed his notes which took about an hour and a half. Hyman received the statement about 2:00 or 2:15 p.m. He had Jackie Wilson review it and sign it. Hyman said he saw Andrew Wilson leaving Area 2 to go to Area 1 for a line-up _after_ Jackie Wilson's statement had been taken.

Then Hyman took an oral and a written statement from Derrick Martin, who said he had been with the Wilsons in a car on the afternoon of February 14 and had been let out shortly before the killing of the police officers. (The appellate court opinion discusses Derrick Martin at length. (See People v. Wilson, 626 N.E.2d 1282.))

After he took the statement from Martin, Hyman left to go to Area 1 for the line-up. He assigned Assistant State's Attorney Catherine Warnick to supervise the signing of Martin's statement. There is confusion in the record over whether Hyman was present at

55

the line-up, which according to the police report, took place at 4:30 p.m. Before the Police Board and at the second civil trial Hyman said he was not present at the line-up. Later at the second civil trial he said he didn't believe he witnessed the line-up. Also, before the Police Board, after his recollection had been refreshed, Hyman said he saw Fred Hill at the line-up. (It is undisputed that Fred Hill conducted the line-up.)

Hyman testified before the jury in the criminal trial that he saw Derrick Martin around 2:00 p.m. and after taking that statement he went to Area 1 for the line-up. The Wilsons were taken there. Tyrone Simms identified the Wilsons, and Hyman went back to Area 2. His testimony was the same on that point at the first civil trial. (We interpreted that testimony to mean that he was present at the line-up.)

He finally saw Andrew Wilson to talk to at around 5:00 p.m. He took an oral statement from him and then a statement which was recorded by Michael Hartnett. He noticed a cut on Wilson's right eyelid which Wilson kept dabbing with a wet paper towel. Hyman never asked Wilson how his eye had been injured. He testified that he had asked some detective about the eye injury and had been told that the injury occurred during Wilson's arrest. He never asked Andrew Wilson or Jackie Wilson how they had been treated by the police or whether their statements were voluntary. He did ask Derrick Martin if his statement was voluntary. Hyman never made out a Felony Review report nor did he make out a report about his conversation with Derrick Martin.

At the Police Board hearing Burge's lawyer introduced testimony of Judge Gregory Ginex and Michael Ficaro. Both Ginex and Ficaro had been the Chief of the Criminal Division in the Cook County State's Attorney's Office. On February 14, Ginex held the position of Chief of the Municipal Division and was Hyman's immediate

56

superior. He testified that he spoke to Hyman by telephone from his home. He was asked what Hyman said to him and what he said to Hyman. He answered:

> A. "Called me at home and basically told me that they have got one of the offenders in custody. I don't believe I had a name at that point. 'He made an oral,' which I took to mean that he made some type of statement. 'They are going after the other guy.' I think we talked for a minute or two about what would happen and I told him, fine, Larry, I will see you at the office later or I will see you guys at the office later, and that was really the sum and substance of the conversation."

He probably talked to Angarola. His direct examination appears to have been directed at proving that Hyman did give Miranda warnings to Wilson "on the record" and did take an oral statement from Wilson before he took a written statement.

Judge Paul Nealis, recently retired from the bench, was subpoenaed as a character witness for Yucaitis and O'Hara at the Police Board hearing. It was by accident that the lawyer for Yucaitis and O'Hara discovered that Nealis had been present at Detective Area 2 on February 14. He was then an assistant state's attorney. He was at Area 2 on his own.

The names of Ginex and Nealis do not appear in any of the testimony or reports that we have read other than the transcript of the Police Board hearing, which occurred ten years after Wilson's criminal trial.

The testimony of Ginex and Ficaro was introduced to bolster the testimony of Hyman. Ficaro testified, in effect, that in his opinion Hyman's decision to refrain over a span of several hours from taking the statement of Andrew Wilson, the shooter, until he had taken the statement of the accomplice, Jackie Wilson, and another witness, Derrick Martin, was sound prosecutorial practice.

R. SMITH02647

The names of Ficaro and Ginex are listed at the front of a manual published by the Illinois Institute for Continuing Legal Education which is entitled "Prosecution of the Criminal Case." Ginex is identified as the general editor and Ficaro as a chapter author. (We note that the hearing officer at the Police Board expressed doubt of the admissibility of the testimony of Ginex and Ficaro, but he would leave it to the Board to determine its relevance. We share his doubt. We note also that the Board made no reference to the testimony of Ginex or Ficaro in arriving at its findings of fact.)

Ginex said he talked to Hyman on the morning of February 14 about "specifically the investigation."

On cross-examination, Ginex agreed that a statement should be taken "probably as soon as feasible," because "the offender might say something else or refuse to talk." Contrary to the manual of which he had been general editor, he disagreed that the statement should necessarily "include recitations that the offender had not been mistreated while in police custody." He said, "If there was an issue of mistreatment, I suppose, yeah, you'd want to know about it. If there was no issue, I don't know that it would even be brought up." He couldn't say it was a general instruction to include a recitation of a lack of mistreatment in a court-reported statement. He was asked if the assistant state's attorney saw a bruise or an eye injury on the alleged offender's face in the course of the interrogation whether he should get it in the record "that that was not the result of police mistreatment." His answer was, "That would probably be a good idea to do so." (Emphasis added.) He did not believe that the fact that a lawyer might show up was a fact to be considered in "homicides, particularly of police officers." When he was asked why, he said, "I can't answer that, sir. I don't know."

58

When he was shown the manual for which he had written several articles he was referred to that part of the manual that said the statement should include the fact that the offender had not been mistreated by police personnel. He was asked if that was the general policy of the State's Attorney's Office while he was there. He answered, "You could say it <u>probably</u> was." (Emphasis added.)

Ficaro was asked what he would do if all the facts and circumstances between the shooter and non-shooter were equal and he was pressed to make a "prioritization" between them. He answered: "If all the facts were equal, I would call somebody else out to help."

One of the last questions asked of Ficaro was whether in the course of his teaching and training there was any training offered about doing as much that would be reasonably possible to assure that the voluntariness of the statement appeared on the court-reported record. Ficaro answered, "Of course." The manual specifically provides that the "statement should include the fact that the offender has not been mistreated by police personnel."

The manual also provides that in cases where a court reporter statement is taken the assistant state's attorney should write a memo immediately following the completion of the statement. Hyman, who was the Chief of the Felony Review unit, never wrote a Felony Review memo. Glaringly, in contravention of the manual, the confessions of Andrew and Jackie Wilson make no mention of how they were treated but, tellingly, Hyman did ask Derrick Martin if his statement was made voluntarily.

59

We observe parenthetically that the confessions of Andrew and Jackie Wilson ignore the admonition of the manual that leading questions should not be used except to set time, place and people or to prevent the offender from going off on a tangent.

We note at this point that Nealis and Warnick were at Area 2 and were available "to help." In fact, Nealis testified that he had conferences with Angarola several times. He agreed to be there with the police. He was there to give any advice that was needed. He rode to the scene of the arrest of Andrew Wilson with Burge. He went back to Area 2 and Angarola arrived there. Angarola was more or less in charge of the investigation. Nealis said "there were other prosecutors that had arrived that day." He saw Lawrence Hyman. We had information that Hyman and Nealis had had an argument at Area 2. When we asked Nealis about that information, he said he did not recall having had an argument with Hyman. He was present when Andrew Wilson left for the line-up. He saw a mark on Wilson's face or something to that effect.

O'Hara testified that he offered Wilson medical attention for his eye, but Wilson refused it. The Commanding Officer of Area 2, Milton Deas, testified that Burge had told him that Wilson had sustained an injury to his eye when he struck his head on a piece of furniture or the floor at the time of the arrest. The Police Board referred to that testimony of O'Hara and Deas as illustrative of the significance of the eye injury to Wilson. The Board then implicitly expressed doubt of Hyman's explanation of his failure to ask Wilson about his eye injury. We share that doubt also.

Hyman said he had been asked to review everything that went on in the case. He basically took over the Felony Review process for the case. He said that there were different stages of confessions: an oral confession to a policeman; a written confession to

R.SMITH02650

a policeman; an oral confession to a state's attorney and a written confession signed by the confessing suspect. A written signed confession is the best thing that a prosecutor could use. He knew that on some occasions a confessing suspect gave an oral statement and then refused to give a court-reported statement.

He did not know if it was the policy of his office, but he presumed it would be up to the individual assistant to determine what the strategy would be that could be used later on, but obviously once the assistant got there, he wanted to get the information as quickly as possible. He knew that it was common knowledge for defendants to change their mind about whether they were willing to make a statement. He agreed that he "took the risk" that Wilson would change his mind about his willingness to confess. Hyman said, "Yes, it was a strategic decision." Even before he took Jackie Wilson's statement, he knew that Jackie Wilson was saying that Andrew Wilson was the shooter.

The whole time that Andrew Wilson was in custody Hyman knew that if a lawyer showed up for Andrew Wilson, it was likely that he would never get his court-reported statement. The first time he ever testified that the reason he didn't take Andrew Wilson's statement until very late was because of a "strategic decision" was at his deposition in 1988.

He said he had opportunities in the afternoon after he had taken Jackie Wilson's statement to take Andrew Wilson's statement. He said the opportunity was there, "but the decision was not to do it at that time." The basis of that decision was that the line-up had been planned and the detectives were going to take Andrew Wilson to Area 1 for Tyrone Simms to view the line-up which would have included Andrew Wilson. (Jackie Wilson's statement was concluded at 12:43 p.m. The line-up was conducted

61

approximately 4 hours later.) He did not withhold Andrew Wilson's statement because of some strategic decision that he needed Derrick Martin's information with which to confront Andrew Wilson.

We have read through all the transcripts of Hyman's testimony. But we do not remember any testimony showing that Hyman displayed any concern for Andrew Wilson from the time Hyman arrived at around 9:00 a.m. until Hyman decided to talk to Wilson around 5:00 p.m. Hyman apparently never asked any policemen about whether Wilson was being fed - unlike the lunch he had provided for and shared with Jackie Wilson. He never asked McKenna, O'Hara, Yucaitis or Burge if Andrew Wilson was still willing to make a statement. He wasn't concerned about the transfer of Andrew Wilson to Area 1, which would involve his intermingling with other prisoners and the possible effect on Wilson's willingness to talk. Instead, Hyman's testimony displays at least eight hours of studied indifference to Andrew Wilson's mental and physical wellbeing. In our judgment, the statements he took from Jackie Wilson and from Derrick Martin were make-work projects that provided him with a reason for failure to question Andrew Wilson. It is ironic that after Andrew Wilson's confession and signing of the confession were completed, he was given a Coke which he drank with Hyman - and Burge - present. In sum, we repeat that we do not believe Hyman's denial of Wilson's testimony; and we strongly disagree with the opinions of Ficaro and Ginex.

At the Police Board hearing the City introduced the testimony of Melvin Jones. Jones testified that he was arrested on February 5, 1982 and was electro-shocked and struck by Burge at Detective Area 2. Also testifying was Shadeed Mu'Min who was arrested on October 30, 1982 and taken to Area 2. Mu'Min said that Burge placed a

R.SMITH02652

typewriter cover over his head until he passed out on two occasions. Mu'Min has informed our office that he will not cooperate with us in any further investigation of the officers of Detective Area 2. We have concluded that the testimony of Melvin Jones would not amount to proof beyond a reasonable doubt, but we believe it would be admissible in any trial of Burge based on the testimony of Andrew Wilson.

In deciding whether to prosecute the prosecutor performs a quasi-judicial function. (Imbler v. Pachtman, 96 S.C. 984, 988. White, J., concurring in the judgment.) In our analysis of the evidence available to us we make judgments with full awareness of the fact that we are quasi-judicial officers who are called upon to express conclusions on credibility which might not be the conclusions on credibility that others, judges or jurors, would share. But it is not the function of prosecutors to refuse to prosecute simply because a case may not be as strong as they would prefer. We believe Andrew Wilson's statements that he had been tortured. Justice Byron White expressed our view more eloquently than we could:

> "A prosecutor faced with a decision whether or not to call a witness whom he believes, but whose credibility he knows will be in doubt and whose testimony may be disbelieved by the jury, should be given every incentive to submit that witness' testimony to the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies." (Imbler, 96 S.C. at 999.)

In our judgment, we could in good faith ask a grand jury to indict and a trial jury to convict Jon Burge of aggravated battery, perjury and obstruction of justice. Both Yucaitis and O'Hara are now deceased. Wilson has made it clear that neither O'Hara or McKenna ever mistreated him nor were they present when he was mistreated. There is

63

no proof beyond a reasonable doubt that they aided, abetted or encouraged Burge or anyone else to mistreat Wilson. Consequently, no criminal charges against McKenna would be justified.

We now turn to the sufficiency of the evidence as to Fred Hill. The record is rife with confusion about the identification of Fred Hill as a participant with Burge in the mistreatment of Andrew Wilson. At one time Wilson said that Burge came into the room with a little bag and another man was with him. He was specifically asked if the other man was "Detective Hill." He did not answer that question directly. He said it was a fat one with a scar who had testified before. (Hill had testified twice in the criminal trial but many other officers had testified also.) Hill had been called as a witness by Dale Coventry, Wilson's lawyer in the criminal trial. He was asked questions about the line-up that Hill had conducted. He said he talked to Wilson at Area 1 about the line-up procedure. He was not asked any questions involving Jon Burge.

Wilson said the man that came in with Burge had a scar on his face; he said he did not know the man's name. But Fred Hill was no stranger to Wilson. Hill was an arresting officer in the camera store robbery that Andrew Wilson had been arrested for a few days before. And more important, Hill had conducted the line-up. Yet Wilson testified at the civil trial that he did not know Hill's name at the motion to suppress. He said that when Hill was testifying at the motion to suppress he "pointed [Hill] out to his lawyer."

However, when that lawyer drafted the pro se complaint, Hill was not named; McKenna was named. So was O'Hara. As noted, Wilson later testified that neither O'Hara nor McKenna every mistreated him or were present when he was mistreated.

R.SMITH02654

Wilson later testified that his lawyer mixed up Hill and McKenna. A new complaint was drafted by new lawyers, and they did not name Hill as a defendant either. At his deposition Wilson testified that there was a third man in the room with Hill and Burge who grabbed his leg and kicked him. He had never mentioned that third man at the motion to suppress.

Hill and several other witnesses including his wife, his partner Katalinic and an employee of a resort in Wisconsin testified to an alibi. On the basis of the record available to us, we conclude that the evidence of identification of Hill does not meet the requirements of proof beyond a reasonable doubt.

Edward J. Egan

R.SMITH02655

## ANDREW WILSON EXHIBIT NO. 1

 Prison Health Services 
2800 South California Avenue  Chicago, Illinois 60608  Telephone 633-5782/5783

February 17, 1982

Richard J. Brzeczek
Superintendent of
Chicago Police Department
1121 S. State Street
Chicago, Illinois

Re: Examination of Andrew Wilson

Dear Mr. Brzeczek:

I examined Mr. Andrew Wilson on February 15 & 16, 1982. He had multiple bruises, swellings, and abrasions on his face and head. His right eye was battered and had a superficial laceration. Andrew Wilson had several linear blisters on his right thigh, right cheek and anterior chest which were consistent with radiator burns. He stated that he had been cuffed to a radiator and pushed into it.

He also stated that electrical shocks had been administered to his gums, lips, and genitals.

All these injures occurred prior to his arrival at the Jail. There must be a thorough investigation of this alleged brutality.

Sincerely,

John M. Raba, M.D.
Medical Director
Cermak (Prison) Health Services

cc: Mr. William M. Doyle
    Mr. Leonard R. Bersky, Director
    Sheriff Richard J. Elrod
    Mr. Phillip T. Hardiman, Executive Director
    Department of Corrections

JMR/fm:

DEPOSITION
EXHIBIT

R.SMITH02656

## RICHARD BRZECZEK

Richard Brzeczek was the Superintendent of the Chicago Police Department from January 11, 1980 until April 29, 1983, when he resigned. He was appointed Superintendent by Mayor Jane Byrne and approved by the City Council. He is a lawyer and now practices law in Illinois; he also teaches "the legal aspects of internal affairs investigations" at the University of Louisville.

He has a wide range of experience on the Chicago police department, including service as the Executive Assistant to the Superintendent. He was the Superintendent at the time Andrew Wilson was arrested on February 14, 1982 for the murder of police officers Fahey and O'Brien; and when Wilson was convicted on February 4, 1983 and sentenced to death.

Wilson's conviction was reversed and remanded for a new trial on April 2, 1987. The Supreme Court ruled that the injuries Wilson indisputably suffered occurred while he was in police custody and that the State had failed to offer adequate explanation for the injuries that would refute Wilson's testimony; consequently, the court held, his confession should have been suppressed. The evidence also included the testimony of personnel at Mercy Hospital. He was tried a second time and convicted by a jury which could not agree on the penalty. He was sentenced to life imprisonment, and his conviction and sentence were affirmed by the appellate court.

While his second appeal was pending in the appellate court, Wilson filed a civil rights action in the Federal district court. Brzeczek was named as a defendant, as were other police officers, including Jon Burge. It was alleged that the City of Chicago and

R.SMITH02657

Brzeczek had a de facto policy, practice and custom to fail to bring an arrested person promptly before a magistrate for the purpose of isolating the arrested person and physically abusing the arrested person if he was "not being cooperative"; and that the policy was "approved of, encouraged and ratified" by Brzeczek. Punitive damages were sought from Brzeczek because he was alleged to have acted maliciously and willfully. During the first civil trial, the attorney for Wilson, while examining a witness, said "the case is all about coverup by both Brzeczek and the City." (First Civil Trial, March 6, 1989, page 1762.)

Brzeczek testified at that trial. The jury was unable to reach a verdict, and the case was retried. Brzeczek again testified; and the jury returned a verdict in favor of the City of Chicago and all defendants. (Copies of the abstracts of Brzeczek's testimony are attached to this report as Brzeczek Group Exhibit 1.) The jury also made a finding that the City of Chicago did have a de facto policy that permitted its police officers to abuse people suspected of killing police officers. On October 4, 1993, the Seventh Circuit Court of Appeals reversed the judgment and remanded the case because of trial errors. It reversed outright the jury's finding that the City had a de facto policy of permitting police officers to abuse prisoners.

While the case was pending in the Seventh Circuit Court of Appeals, Burge was tried by the Chicago Police Board based on the allegations of wrongdoing by Andrew Wilson. Brzeczek did not testify. The Police Board sustained the charges, and Burge was ordered discharged. The circuit court and appellate court affirmed. Based on the finding of the Police Board, Wilson was granted summary judgment in the Federal

R.SMITH02658

district court case on the question of liability, and the City of Chicago and Wilson agreed on a settlement.

It is appropriate to identify some of the persons who figure in the investigation of the treatment of Andrew Wilson while in the hands of the police:

1. Francis Nolan, now deceased, was the Director of OPS.

2. Joseph McCarthy was a Deputy Superintendent.

3. Thomas Lyons was a Deputy Superintendent.

4. William Hanhardt was the Chief of Detectives.

5. Milton Deas was the Commander of Detective Area 2 and Jon Burge's superior.

6. Jon Burge was the Commander of the Violent Crimes Section at Detective Area 2.

7. John Yucaitis was a detective working for Jon Burge.

8. Dr. John M. Raba was the Director of Cermak Hospital.

In our previous discussion analyzing the evidence in the Andrew Wilson case, we have already outlined the facts leading up to his arrest and his subsequent confession. We would add some other facts.

Officers Mulvaney, who died in 1983, and Ferro, who resigned in 1983, were the squadrol officers who took Wilson from Detective Area 2 after his confession to the lock-up at Detective Area 1, where the personnel at the lock-up refused to accept Wilson because of his condition. Mulvaney and Ferro then took Wilson to Mercy Hospital. It is now accepted as fact that Mulvaney and Ferro abused Wilson. It is also now accepted as fact that Mulvaney and Ferro attempted to coerce Wilson at Mercy Hospital to refuse

69

medical treatment, which would have included suturing an open wound. Brzeczek was made aware of the lock-up personnel's rejection of Wilson some time before he received a letter from Dr. John M. Raba, the Director of Cermak Hospital.

On February 24, 1982, Brzeczek received the letter from Dr. Raba, in which he informed Brzeczek of the "multiple bruises, swellings, and abrasions on [Wilson's] face and head" as well as "blisters" on his thigh, cheek and chest, which were "consistent with radiator burns." Dr. Raba said that Wilson had told him that the police had beaten him and that electrical shocks had been administered to parts of his body. The doctor said, "There must be a thorough investigation of this alleged brutality." (A copy of the letter is attached to this report as Brzeczek Exhibit 2.)

Brzeczek sent a copy of Dr. Raba's letter to then State's Attorney Richard M. Daley, informing Daley that Brzeczek had "obtained a C.R. number which initiates its internal investigation of the allegations" in Dr. Raba's letter. (A copy of the Brzeczek letter to Daley is attached to this report as Brzeczek Exhibit 3.)

Brzeczek said in his letter that he was "seeking direction as to how the Department should proceed in the investigation of these allegations." He concluded that he would "forbear from taking any steps other than the one previously mentioned in connection with these allegations until I hear from you or one of your assistants." This letter, which was the only letter ever sent by Brzeczek to Daley, was sent by ordinary mail. Brzeczek never received a response to the letter, and he did nothing to follow up on the letter. Brzeczek never explained either at the Federal trials or to us why the Superintendent of Police needed a State's Attorney to "direct" him how to conduct an internal investigation. It is those two letters that constitute the pivotal evidence in our

70

R.SMITH02660

investigation. The question becomes: What did Superintendent Brzeczek do to perform his non-delegable duty to investigate?

A number of things stand out when analyzing the testimony of Brzeczek. He was aware that the African-American community was aroused by what it perceived to be acts of brutality by the police in the African-American community in connection with the investigation of the murder of Officers Fahey and O'Brien. He called in the twelve or thirteen African-American members of his command personnel and instructed them to contact the leaders of the African-American community to reassure them and to "lay down the law to the police officers" to "reemphasize the Department's policy on the proper treatment of all citizens." He did this before the arrest of Wilson. He did not call in the seventy-five to eighty members of the white command personnel and give them the same mandate.

He was made aware that the lock-up personnel refused to accept Wilson after his confession. That refusal was "a very serious matter" to Brzeczek. He took no steps personally to ascertain why the lock-up personnel refused to accept Wilson. Brzeczek also learned that medical personnel at Mercy Hospital had complained that police officers had coerced Wilson into refusing medical attention, another serious matter to Brzeczek. He did nothing personally to ascertain the basis of that complaint.

He made no attempt to determine the results of any investigation of the officers who had control or custody of Andrew Wilson before he got to the lock-up. The only record of any investigation by OPS shows that the letters of Dr. Raba to Brzeczek and of Brzeczek to Daley, some hospital records and a transcript of a hearing on a motion to

71

suppress filed by Wilson were given to OPS Investigator Keith Griffiths in August, 1983, 18 months after Wilson's arrest and 4 months after Brzeczek's resignation.

Griffiths was an Investigator Grade II, which he described as "somebody past" an entry level position. He testified that he was called in by William Stanley Walsh, who was then the Chief Administrator of OPS and who asked Griffiths if he wanted to write up or do a summary of the investigation of allegations against some police officers. The file Griffiths was given consisted of "mood letters," the letter written by Nolan, the letter from Dr. Raba, some medical reports and several volumes of court transcripts, which covered the motion to suppress. The file did not reflect any work done by any other investigator. His "only command in this case was to write up a summary report." His entire "investigation" consisted of reading the material that had been given to him. His recommendation was that the charge of police brutality made by Wilson be "not sustained." He completed his investigation July 29, 1985, almost two years after he received the assignment. No supervisor ever spoke to him about his investigation. He might have had a conversation around July or August, 1985 with Cathy Cavins, one of his supervisors, who approved his recommendation.

The report of Griffiths, which we attach as Brzeczek Exhibit 4, shows the names of Jon Burge and John Yucaitis as the "accused." Neither Burge, nor Yucaitis, nor any other police officer from Detective Area 2 or anywhere else was questioned about the allegations made by Wilson. The only reasonable inference is that nothing was done by OPS other than Nolan writing a letter to Wilson's lawyer asking for Wilson's cooperation.

R.SMITH02662

In all his testimony while he was a defendant charged with being guilty of a "cover-up" of policy brutality, Brzeczek persistently said that he gave Dr. Raba's letter to Frank Nolan with instructions to investigate. We now know that there was no meaningful investigation. The only step Brzeczek took was to make himself available to Nolan. (Second Civil Trial, June 30, 1989, page 2390.) He did not talk to Deputy Superintendent McCarthy about the letter. When he was asked by his attorney what he did when he received the letter, he said he gave it to Nolan and told him to open an investigation. He never called in Commander Deas to discuss the letter. He had no recollection of discussing the allegations in Dr. Raba's letter other than with Nolan. He did not recall asking Lyons any questions concerning the letter. (Second Civil Trial, Volume 17, July 6, 1989, pages 2776-77.)

When he was asked if he contacted personnel at Area 2 to determine who had custody of Wilson during the time he suffered his injuries, he answered, "No." He was then asked if he talked to any of his command personnel, particularly Lyons or McCarthy, about "these allegations," and he said, "I don't recall."

He told us it was his idea that OPS should be under the direct control of the Superintendent. It was a "component" of his personal staff and worked at his direction. (Second Civil Trial, July 20, 1989, page 4540-41.) In his own words, the OPS would be under the Superintendent "to show the public you mean business. You're going to be right over it." (Interview in Office of Special Prosecutor, March 9, 2005, page 13.) The Superintendent was to "take personal responsibility for it." (Interview, page 16.) Later events disclose that he ignored that "personal responsibility." Any reasonable person reading Brzeczek's testimony would conclude that he was anything but a hands-on

73

administrator overseeing OPS in the Wilson investigation. His testimony presents a picture of someone who was not showing the public he meant "business" and was not "right over" OPS, as he told us he was supposed to be.

Turning now to the question of what he did after he received the letter from Dr. Raba, we observe a sharp difference between his testimony while he was a defendant in the civil suit and the astonishing and contradictory things he says now after the civil suit has been resolved forever.

At his deposition on December 21, 1988, he testified that after he received the Raba letter he did not contact personnel at Area 2 to determine who had custody of Wilson during the period of time when Wilson could have received his injuries. He did not recall talking to any of the command personnel, particularly Lyons or McCarthy, concerning the allegations of Dr. Raba. He was asked if he found it significant that Dr. Raba had corroborated the allegations of police brutality, and he answered: "<u>I'm not - I wasn't of the opinion, at that time, that there was corroboration by the doctor.</u>" (Emphasis added.) He was asked if he had changed his opinion, and he said, "No." He also said that he was looking for "corroboration from the legal standpoint and not necessarily from the medical standpoint." (Pages 128-29) <u>There was nothing brought to his attention that Burge or any other supervisory or command officer was responsible for Wilson's injuries.</u> (Page 134)

He testified on June 30, 1989, that it was his conclusion that injuries suffered by Wilson took place between his leaving Area 2 and his arrival at the lock-up; the Raba allegations about Wilson being handcuffed to a radiator did not cause him to "rethink his conclusion." He said he "wasn't going to prejudge any allegations or the credibility of

74

R.SMITH02664

anyone bringing this to my attention until I have some evidence or that the investigation proceeds and uncovers evidence which supports each specific allegation " (Page 2384.) He gave Raba's letter to Nolan; and he wrote a letter to Daley with a copy of Raba's letter.

On July 6, 1989, he testified that he had no recollection of discussing the Raba letter with anyone other than Nolan. He did not recall asking Lyons any questions about these allegations. As far as he could recall, the only discussion he had about the letter was with Nolan. (Page 2777) There is not a word in his testimony at the deposition or at the trials about calling in command personnel after receiving Raba's letter and demanding answers to questions.

Contrary to those many expressions under oath, he told representatives of the media in April, 2002, after our appointment, that he called the members of his command group to his office and showed them Dr. Raba's letter and asked them, "How could this happen in Detective Area 2?" He said he "could not get an answer." We spoke to him in our office shortly after that, and he told us the same thing he told members of the media. Our meeting with him was not recorded. He did not elaborate on his statement that he could not get an answer. We and the news media personnel were of the opinion that Brzeczek was saying that he had belatedly come to the conclusion that police brutality had existed in Detective Area 2. Our subsequent interview with Brzeczek disabused us of that notion.

At our invitation Brzeczek appeared in our office on March 9, 2005 to be interviewed under oath with a court reporter. The following occurred:

R.SMITH02665

Mr. Egan:

Q:      When was it that you came to that opinion that acts of police brutality occurred at Detective Area 2?

A:      The very first time it came to my mind?  When I got the letter from the doctor at Cermak Memorial Hospital about the burns and the other wounds that I think it was Andrew Wilson suffered.

Q:      So that would be, roughly, February 19th or thereabouts?

A:      1982, right.

Q:      Well, his letter is dated February 17th.  Now as I recall, when Bob and I questioned you the first time we referred you to a TV program that you were on, Phil Ponce.

A:      About three years ago in April, I think.

Q:      And Steve Mills was on the program also, and you were quoted in the Tribune.  And I have to paraphrase what you said, or you were alleged to have said, and what you told us you did say: Is that correct when you got the letter of Dr. Raba, you called a group of command personnel, which included two deputy superintendents and you asked them, "How could something like this happen in Detective Area 2?" Am I quoting you correctly?

A:      That's correct.

Q:      And your answer was, to us -- let me put it this way: you continued on to say, after you asked a question, "I couldn't get an answer to those questions, to that question." Is that accurate?

A:      Yes.  As I'm visualizing that meeting, you know, I'm getting a lot of blank faces, you know.  I'm not saying now.  When I asked a question, I'm getting a lot of blank faces and no responses.

Q:      Where was that question asked?

A:      In my office.

R.SMITH02666

Q:      On the fourth floor of the --

A:      Yes.

Q:      Who were the officers that were present?  You told us two deputy superintendents.

A:      Tom Lyons was there, Joseph McCarthy was there. I'm going to think that I had the commander of Detective Area 2 in there.

Q:      Who's that?  Deas?

A:      It was either Deas or Leroy Martin, I mean they're both African-American, and I just don't remember who was there at the time of the Wilson murder case.

Mr. Boyle:      I think Deas was.

Brezeczek:      My recollection as you ask me that question, I'm saying that from what I can see, you know, I'm trying to put this scene back together, there probably were eight or nine people in that room besides myself.

Mr. Egan:

Q:      Can you elaborate on that for me?  When you say you couldn't get an answer to that can you tell us what was actually said by anybody?

A:      When I -- as you paraphrase what I said, I said "How could this happen?"

* * *

A:      These are some of the things I remember saying to them and just sitting around the room, and they're like poker faces, just looking at me.  And I think -- I don't remember who.  Someone may have said that there was some bud or speculation or some comment about the squadrol personnel, the wagon guys taking him over -- you know, caused the injuries.  And pardon me my record over here, but I says, don't give me that bullshit.  Don't be blaming guys.

Q:      You mean Mulvaney and Ferro?

77

> A:    Whoever they were. I just said, don't give that
> bullshit. And still didn't get any response. It's, like, get
> out of here. <u>I was angry at them because they were there,
> they were all there and this still happened.</u> How can it
> happen? That's what I wanted to know.
>
> Q:    When you're saying how can this happen, I gather, I
> infer from what you're saying is that <u>you believed after
> reading the Raba letter that some police officers had, in
> fact, committed acts of brutality against Andrew Wilson.</u>
>
> A:    <u>Yes, yes. I did at that time.</u> I mean, Ed, I'm telling
> you that I don't see a doctor from Cermak Hospital sending
> me a letter, you know, with these kinds of allegations if he
> doesn't examine the patient and see something consistent,
> you know, wounds or injuries consistent with the
> allegations." (Emphasis added.)

We referred him to what we deemed to be impeaching answers that he had given

at the December 21, 1988 deposition. He said he did not remember the questions and

answers, he was not disputing them. He knew that Lyons and McCarthy were in the

group of command staff that he called in.

He also told us that after Andrew Wilson was taken into custody, he called Mayor

Byrne to let her know. He did not know whether he ever discussed the letter of Dr. Raba

with the Mayor. He did not have any independent recollection of discussing it with her.

He never got an answer to his letter to Daley. The following occurred:

> Q:    Did you ever follow up on it and say, I sent you a
> letter on February 25[th], and I haven't heard anything. I
> would appreciate it if you would contact me.
>
> A:    No, I did not.
>
> Q:    Why not?
>
> A:    I can't answer that question. I don't know what I
> was thinking back at that time, but I did not follow up.

78

R.SMITH02668

> Q:    Did you tell Mayor Byrne about sending Daley this letter?
>
> A:    I do not recall any discussion I may have had with Byrne about either the letter  from Dr. Raba or the letter I sent to Daley, I just do not have any recollection.

He was asked why he thought he would not get a response to the letter he sent to Daley. He said, "I think that the situation was potentially volatile politically over at the State's Attorney's Office." He was asked if he was talking about Byrne/Daley, that kind of politics. He said, "Yeah, that kind -- that type of thing, yeah."

He said upon receiving the letter from the doctor he thought, for the first time, there was physical abuse at Area 2. He was asked if he ever shared that concern with anyone else at the police department. He said he shared his feelings with the command personnel that he thought were out there that day. He knows he shared it with Nolan, who was heading up OPS at the time. He shared his concern with Lyons and McCarthy. While he had no specific recollection of talking to Hanhardt, the Chief of Detectives, he's sure he told him about it.

At this point it is appropriate to observe that we spoke with former Deputy Superintendent McCarthy and former Commander Milton Deas, both of whom are now retired.  Both denied that any such meeting described by Brzeczek ever took place. McCarthy was able to establish with medical records that he was at the Mayo Clinic at the time Brzeczek said the meeting took place. Commander Deas testified in a deposition on February 9, 1989, that he had never seen the contents of the Raba letter, and the contents of the Raba letter were never made known to him. In a recent conversation with us, he repeated that he never had any knowledge of the letter from Dr. Raba.   We

R.SMITH02669

interviewed former Deputy Superintendent Lyons who told us that if such a meeting had ever taken place he would remember it; and he does not remember it.

On October 4, 2005, we called Brzeczek to testify before the Grand Jury. He acknowledged that he had the responsibility to check on subordinate personnel to make sure they were doing what he told them to do. He had some recollection of Andrew Wilson being rejected for acceptance at the lock-up. He didn't remember whether he learned of the rejection at the lock-up before or after he received the letter from Dr. Raba. (On July 5, 1989, at the second civil trial Brzeczek testified that he received notice of Wilson's rejection at the lock-up, then information was given him regarding Wilson's injuries and then the letter from Dr. Raba.)

He gave the Dr. Raba letter to Frank Nolan and told him to investigate. He was sure he would ask Nolan what was going on in the investigation of the letter. He remembers there was an attempt to contact Andrew Wilson's attorney for the purposes of interviewing Andrew Wilson. He recalls that the attorney, Dale Coventry, would not let Andrew Wilson speak to anyone from the police department. "<u>Even though Wilson would not talk to them, it was his policy to pursue the investigation anyway.</u>" He questioned Nolan to insure that that policy was being followed. When he was asked if he told Nolan that he should find out the name of the officers alleged by Andrew Wilson to have injured him, he said, "I don't recall Andrew Wilson providing the names of any officers to us."

He didn't recall if the motion to suppress filed by Andrew Wilson was heard while he was Superintendent. (It was.) He knew that in the civil rights suit brought by Andrew Wilson it was alleged that Brzeczek acted willfully and wantonly and sought five

80

R.SMITH02670

million dollars in punitive damages from Brzeczek. That case was over and there was never a "judgment of liability against [him] or any finding of inappropriate conduct."

When he was talking to the command personnel after he received Dr. Raba's letter, he was convinced that something had happened to Andrew Wilson at Detective Area 2. He was of the opinion that someone at Detective Area 2 had injured Andrew Wilson.

It was pointed out to him that when he was a defendant in the Federal district court or testified in his deposition he never testified that he was convinced that Andrew Wilson had been brutalized at Area 2. The following occurred:

> A: "I am telling you now that going back to 1982, in my mind, when the allegations came regarding the injuries to Wilson and then someone in the police department tried to tell me it was the wagon men I didn't believe the wagon men theory. <u>I was convinced back then that it happened in Area 2</u>. Whether or not I testified to that when I was a defendant, I don't recall that. I most probably, unless I was asked a question, I probably wouldn't volunteer that <u>because I was a defendant in the civil suit and I wasn't about to open myself up to that type of punitive damages, as you read before</u>. If they asked me the question, I gave them the truthful answer. But I am not sure if anyone ever asked me that question."
>
> Q: So, you realize that if you testified and told the jury that you knew that Andrew Wilson had been brutalized, if you had testified to that, that would be very damaging to you as a defendant? That's what you just said, am I right?
>
> A: No. That's not what I said. What I said was when I testified, I answered in Federal court every question truthfully to the best of my ability.
>
> Q: And you said the reason you didn't -- you didn't add this business about getting the people together, that you didn't say that because you felt you were a defendant and they were seeking punitive damages?

R.SMITH02671

> A:     That's not what I said.
>
> Q:     Well, we will get to what you said later."
> (Emphasis added.)

He agreed that it is a fair inference that the Seventh Circuit Court of Appeals was saying that the evidence was sufficient to show that Brzeczek was guilty of "dereliction of duty." He did not recall if he tried to determine who conducted the questioning of Andrew Wilson. The following occurred:

> Q:     "Well, do you know whether or not you said who were the officers that conducted the questioning of Andrew Wilson? Did you ask that?
>
> A:     I don't recall if I tried to determine who conducted the interrogation at that time.
>
> Q:     Well, you're a seasoned investigator. Wouldn't you ask, 'Come on, fellows, who was it that took the confession -- who was it that questioned him'?
>
> A:     Mr. Egan, what I said there in the testimony what I told you already and I'm going to tell you now if somebody did some harm to Andrew Wilson, if was detectives, the way the police department is set up and the way I testified to about ultimate responsibility, you had sergeants, lieutenants, a commander. You had deputy chiefs, chiefs and deputy superintendents all out there. And my question was at that point, how could this happen with all the brass out at the station. That's my concern.
>
> Q:     But you don't think it was -- when you -- you couldn't get an answer, don't you have the right to say, 'Wait a minute, I'm not going to accept that answer, I want you people to get out there and find out everybody that had anything to do with   Andrew   Wilson,   anybody   that questioned him, anybody that handled him, I want the names of everybody'?
>
> A:     The way that that is approached is when I am pointing my finger at the command   staff who was there, I am not going to have them investigate themselves. That's what Nolan was starting to do with OPS, the Office of

82

Professional Standards. It was his job to begin identifying who was there, who had Wilson in custody. I am not going to have the same people investigate themselves who I am pointing a finger at.

Q:   And then you just give it to Nolan and that's the end of your responsibility?

A:   No.

* * *

Q:   Well, don't you have the responsibility to get on him and say, 'Hey, what is going on? And in that case, what have you discovered about this'? Didn't you have a nondelegable duty to do that?

A:   A nondelegable duty to stay on Nolan's back.

Q:   Yes. Yes. That's exactly what I mean.

A.   What I did, as I told you before, Nolan and I for the entire time that I was superintendent and he was the head of OPS, we met sometimes more than once a day on different matters including this matter.

* * *

Q.   So, you believe that you did everything that can reasonably be expected of you in the investigation of Andrew Wilson?

A.   I did not say that.

Q.   Well, I am asking you.

A.   No.

* * *

A:   To answer that question, I am neither proud nor satisfied of the way that investigation came out.

Q:   Really? Well, you were proud enough and satisfied enough with it to give all the members of Detective Area 2 a unit commendation, something like that?

83

A:     I remember --

Q:     I will show it to you.

A:     I remember that commendation.

*  *  *

A:     I had no idea what Jon Burge's involvement --

Q:     You mean to tell me you didn't know that Burge was the one who conducted the investigation on behalf of -- on behalf of Violent Crimes on February the 14th of 1982?

*  *  *

A:     I knew Jon Burge was in charge, yes.

*  *  *

Q:     And we do know that you sent this -- you signed this letter of commendation on        September 1st and you did that knowing that Andrew Wilson had been abused by the police officers in Detective Area 2, right?

A:     Yes.

*  *  *

Q:     Pardon me now. You left [Burge] in charge of the Violent Crimes section of Detective Area 2, right?

A:     Yes.

Q:     Knowing full well that it was under his supervision or control that this man, Andrew Wilson, had been abused?

A:     Yes."

He does not remember testifying that when he got the letter from Dr. Raba and read it, that didn't change his opinion that Andrew Wilson must have been injured by someone other than the people at Detective Area 2. He had no recollection of testifying that there was a difference between medical corroboration and legal corroboration. He didn't know what the difference was. He didn't even know what legal corroboration

84

R.SMITH02674

would be. He thinks he told Mayor Byrne about the letter from Dr. Raba. He doesn't think he gave her the opinion "at that time" that the officers at Detective Area 2 had abused Andrew Wilson. He didn't know why he had not given her that opinion. When his letter to State's Attorney Daley said he was seeking "your direction" he was not asking Daley to tell him how to do his job. He recognized that he did have a nondelegable duty to investigate the allegations of wrongdoing independent of anybody else. He did not call up Daley and tell him, "Hey, I didn't get a response to my letter, what about it."

He agreed that there was for years a direct line of communication available to the Superintendent of Police or any of his subordinates and the Office of the State's Attorney and his subordinates. There were phone calls made in important matters. There was hand-to-hand delivery to prove that the delivery was made so that one could call and say, "What are you doing about it." His only recollection of not following that procedure is this one letter by ordinary mail to Daley.

**Jane Byrne**

On January 16, 2006, this office interviewed former Mayor Jane Byrne. She said that Deputy Superintendent Joseph McCarthy was her direct appointment and she viewed him as "the Superintendent in the field, especially in gang related areas." She received the communications concerning the progress in the investigation of the Fahey and O'Brien homicides from Deputy Superintendent McCarthy. On the date of Andrew Wilson's arrest she was advised by Deputy Superintendent McCarthy of Wilson's arrest and the progress in the case. The reports were given by McCarthy over the phone. She

85

said she did not have any direct communication with Brzeczek prior to or on the date of the arrest of the Wilsons. She said she had no such communication and repeated that her communications during the entire investigation were through Deputy Superintendent McCarthy.

She said she was not aware of the letter from Dr. Raba. The contents of the letter had never been discussed with her by Brzeczek or anyone else. She was not aware of the letter sent by Brzeczek to Daley. She had never had any conversation with Brzeczek concerning violence at Area 2 under the supervision of Jon Burge. She also stated that Brzeczek never informed her that he was convinced that there was physical abuse of detainees at Area 2 under the supervision of Jon Burge. She was not aware of the commendation given by Superintendent Brzeczek to Jon Burge and other detectives at Area 2. She was not aware of any meeting between Brzeczek and command personnel where the members of the command personnel were asked by Brzeczek, "How could this occur at Area 2?"


## Conclusion

Thus, we now have the spectacle of a Superintendent of the Chicago Police Department, a lawyer, who received and believed evidence that a prisoner had been brutalized by the Superintendent's subordinates; that that prisoner had confessed; that those subordinates had testified under oath on a motion to suppress and before a jury and, he had to believe, they testified perjuriously; that the prisoner had been sentenced to death and that that Superintendent still remained silent. For over twenty years. He not only remained silent, but he approved a unit citation for all the Area 2 personnel,

86

R.SMITH02676

including Burge, on September 1, 1982, for their work on the Andrew Wilson case; and, more egregiously, he kept Burge in command of Violent Crimes at Area 2 as long as he remained Superintendent.

Brzeczek resigned on April 29, 1983, over fourteen months after the arrest of Wilson. He was still Superintendent on June 20, 1982, when a complaint was received at OPS of Michael Johnson, who alleged that he had been beaten and electro-shocked by Jon Burge and released. Like the investigation of the Wilson case, not a single police officer was questioned, despite the glaring similarities in the allegations by Wilson and Johnson. And like the Wilson case, OPS held the charge was "not sustained."

We have reread with much interest the reasoning of the Seventh Circuit Court of Appeals in accepting the City's argument that the evidence established as a matter of law that the City of Chicago did not have a de facto policy of allowing police officers to abuse prisoners charged with killing police officers. The court accepted that argument on the ground that the evidence showed a "dereliction of duty" on the part of Brzeczek, but that was not enough. The court said that the plaintiff had to show that Brzeczek had "engaged in conduct fairly describable as personal deliberate wrongdoing." (Wilson v. City of Chicago, 6 F.3d at 1241) Before the court of appeals said that, it also said this:

> "Deliberate or reckless indifference to complaints must be proved in order to establish that an abusive practice has actually been condoned and therefore can be said to have been adopted by those responsible for making municipal policy. [Citations.] If Brzeczek had thrown the complaints into his wastepaper basket or had told the Office of Investigations to pay no attention to them an inference would arise that he wanted the practice of physically abusing cop killers to continue. There is no evidence in this case from which the requisite inference could be drawn by a rational jury."

R.SMITH02677

We wonder what the court of appeals would have said if Brzeczek had testified that he had concluded that Burge or his subordinates had tortured Wilson but Brzeczek said nothing, investigated no further, kept Burge in the same position and approved a commendation for Burge and others under his command. And we wonder what the court of appeals would have said about Brzeczek's self-serving letter to the state's attorney in an obvious attempt to shift responsibility to someone else, while concealing his true views:

> "I have publicly stated that we will scrupulously investigate every allegation of police misconduct brought to our attention." (See Brzeczek Exhibit 3.)

Brzeczek is quoted, accurately he told us, in the May 4, 2005 Chicago Defender about his views of our investigation after we had interviewed him:

> "There's only one outsider - that's me ** I'm not part of [Mayor Richard M. Daley's] political structure. When it's all said and done, you're going to find out that the bottom line is: It's Brzeczek's fault. *** They're going to blame me because I was Superintendent at the time. I'm convinced of it."

We leave to the readers of this report, without further argument, the judgment of Brzeczek's conduct as evidenced by his own words and actions, not ours. We leave it to those readers to decide whether we are attributing "blame" to him just because he was the Superintendent at the time. We do, however, have our own personal judgment: Our judgment is that this investigation we have conducted would never have been necessary if Richard Brzeczek had done his sworn non-delegable duty on reception of Dr. Raba's letter. At the very least he would have removed Jon Burge from any investigative command; and he would have conducted a complete shake-up at Detective Area 2.

88

R.SMITH02678

After our appointment on April 24, 2002, Brzeczek participated in a panel discussion on television concerning our appointment and was quoted, accurately he said, in the Chicago Tribune:

> "The whole situation at Area 2 [was] a disgrace and an embarrassment. It's time something is done about it."

We agree that something should have been done about that "disgrace and embarrassment" - 24 years ago by Richard Brzeczek.

R.SMITH02679

## BRZECZEK GROUP EXHIBIT NO. 1

### Brzeczek Deposition December 21, 1988

Brzeczek learned of several complaints in the African-American community of police misconduct while pursuing the investigation of the murder of Officers Fahey and O'Brien. He specifically remembered calling in all of his black command personnel, discussing the public allegations and asking them to assist him in dealing with those allegations. He also asked them to take a twofold approach: To reemphasize to the police officers what their role was and what their conduct should be and also to deal with the community leaders where the outcries were coming from. (75) He instructed them to reemphasize to the men and women under their command that there should not be any excessive use of force. (76) He was asked if any of the command personnel recounted any incidents of misconduct that had been reported to them. He responded, "Not that I recall." (77) He talked to Frank Nolan every day. If there were complaints with him those complaints would be part of what he talked to Nolan about. (79) His contact with the State's Attorneys Office was directly with the State's Attorney, whoever he might be at the time. Other than that, the State's Attorney's subordinate personnel and his subordinate personnel would always work together and get these things done. (82) He did not recall being briefed about whether there were persons arrested who were thought to be the perpetrators of the crime, who later proved not to be. (84) He was aware of suspects being questioned in police headquarters. He did not know who the persons were. He did not know who was conducting the interrogation or questioning. (85) He would brief the Mayor on the progress of the investigation at least once a day either in

90

person or by phone. If it was in person it would be at her office at City Hall. (97) He didn't have any specific recollection of the conversation he had with the Mayor after he called her about the issuance of the warrants. (104) He never became aware that Superintendent McCarthy actually went on the arrest of Andrew Wilson. He was never informed of that. The first time he heard of it was during the deposition from Corporation Counsel James McCarthy. (107)

Before the receipt of the Dr. Raba letter he had not heard any information concerning allegations that Wilson had been seriously mistreated in police custody. (109) He did not contact personnel at Area 2 to determine who had custody of Wilson during the period of time that he could have obtained the injuries recited by Dr. Raba. He did not recall talking to any of the command personnel, particularly Lyons or McCarthy, concerning these allegations. He made a copy of the letter and sent it to Frank Nolan. He does not recall anyone else. (116) He sent the letter to Daley because he "wanted him to know that there were allegations of such a serious nature that they could possibly be criminal, resulting in a criminal prosecution against the people who caused these alleged injuries, if they were, in fact, caused by criminal means. And I was asking him for some direction as to whether or not he wanted any input, his office wanted any input into our investigation." (118) He wanted to know if the State's Attorneys Office was interested in pursuing a criminal investigation, which is standard routine procedure between the State's Attorneys Office and OPS, when there are allegations of such magnitude, to initiate a criminal investigation. (119) When he referred to "forbear from taking any steps," he meant the "pursuit of the internal investigation." (121) He said that the procedure in existence for many years through the history of OPS and prior to that time

R.SMITH02681

with Internal Affairs was if there was a criminal investigation being conducted against the police officer, the internal investigative agency of the police department would work through the investigation with the State's Attorneys Office. He was not offering to Daley "to not proceed with the OPS investigation if it hindered the criminal prosecution." (122) The police department proceeded with the OPS investigation. <u>There was no direction from him, either verbal or written, to Frank Nolan or anybody else in OPS or anybody else in the police department for that matter to hold off on any internal investigation.</u> He talked to Nolan about this investigation in his daily briefings, but he did not talk to Nolan daily about this investigation. (123) He forbore from any steps other than the ones previously mentioned, because Daley never contacted him. (123) He had no relationship with Daley on a one-on-one basis. He didn't have a relationship with Daley. He had only two contacts with Daley personally. (125) One was in November of 1980 when Daley was elected State's Attorney. Daley contacted him and they had breakfast and he was asking Brzeczek for his perspective on the criminal justice system. The other contact he had with him was in June of 1982. Brzeczek said the police announced some indictments of some police officers dealing narcotics, and Daley showed up at the press conference uninvited. (126) He had no contact with Daley concerning any cases that he and the State's Attorney were working on together. He did not recall ever sending Daley a letter on another case requesting his action or decision concerning prosecution of a police officer. (126) He was telling Daley that the allegations contained in the letter from Dr. Raba were of such magnitude that, if proven, would have warranted criminal prosecution. (127) He was asked if he found it significant that a doctor had corroborated the allegations, at least to some extent, with physical or medical evidence that supported

92

the allegations. He answered "I'm not -- I wasn't of the opinion, at that time, that there was corroboration by the doctor. (Emphasis added.) What I found significant was that the doctor, who sees a lot of people coming into Cermak Memorial Hospital, took the time to write the letter in connection with this case." When he read the letter, what Raba basically disclosed to him was a description of injuries that he observed, apparently, on his examination of Andrew Wilson, and a disclosure to him of what Andrew Wilson told Dr. Raba how he incurred or sustained those injuries. That's the way he looked at the letter. He was asked if he had changed his opinion, and he said "No". (127-128) He was asked if he still didn't feel that there was any corroboration medically for the allegations in that letter. He said "When you're asking me about corroboration from the doctor, I'm looking at corroboration from the legal standpoint and not necessarily from the medical standpoint." He saw a distinction between the two. He thought that the standard medical corroboration is a lot less than is required for legal corroboration. (128-129) On page 131 he said he had no idea how Wilson got those injuries. That was his allegation; he got it from the police. He took Dr. Raba's letter and "implemented the mechanism" that had been established to investigate these allegations and he said, "There was no obligation on [his] part to personally conduct an investigation. That's not what a superintendent does." There was nothing brought to his attention that Burge or any supervisory or command officer was responsible for Wilson's injuries. (134) He did not recall what he might have done in monitoring the OPS investigation after he sent it down there and had a CR number opened. (135) He presumed that he personally gave Nolan a copy of Raba's letter to let Nolan know what "his feelings were about the seriousness of the allegations." (136) He understood why Dale Coventry, acting as Wilson's counsel, would not produce

93

R. SMITH02683

him for questioning. (139) He was told that OPS investigators were present during the testimony of police officers at some point in the criminal proceeding and "somehow capsulized or summarized the officers' testimony as apparently incorporated by reference in this investigation." (144) He did not recall whether he was briefed on the testimony at the motion to suppress. He did not remember having a discussion with Nolan or anyone concerning the testimony on the motion to suppress. He had no recollection of any discussion with Frank Nolan about whether to proceed with the OPS investigation.

### Brzeczek Testimony at the First Civil Trial, February 21, 1989 Volume IV

The only thing he recalls from the meeting with the black commanders is that in a generic sense there were comments made by the black command personnel that they were receiving inquiries and comments about alleged conduct by police officers. He might have, but did not have any recollection, of appearing on Channel 2 on February 11th and telling reporter John Quinones that the charges of police misconduct were baseless. He didn't think that he would have made that statement in relation to these allegations coming from the media or from Nolan at that point because none of those allegations were investigated and brought to a conclusion at that point. (563) On page 579 of Volume IV this occurred. Question: Did you make any effort to find out when you heard about that they were taken to Area 1 whether it was the detectives or it was traffic or the patrolmen that were doing this questioning and the abuse? A: The Office of Professional Standards had the responsibility for investigating these complaints and identifying the alleged officers that were accused of these complaints. I mean, that wasn't my personal responsibility to do at that time. That's why the Office of Professional Standards existed, to do that." It was his responsibility to make sure that the investigation was conducted

94

constitutionally and not in violation of citizens' rights. (580) He did not get on the phone and call Area 1 and talk to that commander and ask whether any of the detectives in Area 1 were responsible for these allegations. (580) He didn't recall any specific conversations with Joseph McCarthy concerning the arrest of Andrew Wilson. (591) McCarthy did not tell him that he was one of the people who first went through the door and threw Andrew Wilson to the ground. (592) He has no recollection whether he was told at the staff meeting on the 15th of February that Andrew Wilson had been rejected from the police lockup and taken to the hospital. He did learn that at some point in time. (593) He would have taken very seriously information that suggested that Wilson had been rejected from the police lockup because of injuries. That's partly because it would have impacted negatively on a prosecution. That was the kind of information that he would expect the command personnel to bring to his attention. He didn't remember whether they did call it to his attention. (595) He didn't recall whether he called in Deputy Superintendent Lyons to discuss the letter with him. Lyons was the person who was ultimately in charge of the investigation. (602) He did not call Commander Deas of Area 2 and ask him about the substance of the charges. He did not call Commander Burge and ask him about the allegations in the letter. He did not ask Deputy Superintendent McCarthy about them. (603)

The OPS file shows that the complaint was received for investigation on August 22, 1983. (621) Nolan would brief him as to what OPS was doing in connection with this investigation. (625) Nolan told him they tried to contact Wilson's attorney in an effort to arrange for a statement to be taken and Wilson's attorney didn't contact or didn't respond to Nolan's request. (626) When he left as Superintendent (in April, 1983) the

R.SMITH02685

investigation had not been completed. (636) He made no attempt to have the investigation "sped up or concluded." (637) He did not make any transfer in this case before he left as Superintendent. (639) He was asked if he made any effort to find out who had caused the injuries while he was Superintendent and he said "I gave the matter to OPS to investigate." (642) He was asked if he followed up to find out whether they identified anyone who had committed this torture: he said "I was getting briefings from Mr. Nolan on a daily basis on OPS investigations and without any specific recollection as to this investigation I don't recall his telling me anything about this investigation that I can specifically recall right now." He did not recall whether OPS had found out through testimony in court the names of the people who were alleged to be involved in the torture. That would be important. Fourteen months later he still didn't know who allegedly did this. (643) He caused the investigation to be initiated and that was it. (644) Plaintiff's Exhibit 26 which he signed is a Unit Meritorious Performance Award that is bestowed upon all the people that were involved in the investigation. (647) The first name mentioned is Jon Burge. It was dated September 1, 1982. (648)

He is almost positive he was never at Area 2 Headquarters between February 9th and February 14th of 1982. (688) He thinks that it was some time during the week of February 15th that he became aware of two allegations. One was the letter from Dr. Raba and he thought there may have been some allegations raised in the media when Wilson appeared in court. (690) He was asked by his attorney, "And when you received that letter from Dr. Raba, what did you do?" He answered, "I personally handed a copy of that letter to Frank Nolan and told him to open up an internal investigation based on the allegations in the letter." (696) He said, in an attempt to clarify his previous testimony of

96

what he intended to say in his letter to Daley, that "we initiated an internal investigation, that we were going to continue that internal investigation, and that we were not going to be looking at any potential criminal violations." He was asked whose responsibility it was within the legal community to conduct a criminal investigation of any allegations against police officers. He said "if the allegation is one that supports or points to a State law violation, it's the State's Attorney of the county. If the allegation is one that supports or points to a Federal law violation, then it's the United States Attorney. (702-703) He was asked "and whenever allegations come to your attention that perhaps may implicate those other criminal concerns that you just enunciated, what actions as Superintendent would you take?" He answered, "basically, we would enlist the assistance of either the State's Attorneys Office or the U.S. Attorneys Office to help us proceed with the criminal investigation." (703) Seventy to seventy-five percent of his time was spent with public relations and ceremonial matters. (706)

It was the policy of the Department that all records of citizens' complaints against police officers would be destroyed after five years if the charge had not been sustained. (708) The police department investigates criminal charges for the State's Attorney. When a crime is committed the police department initiates an investigation into that crime in most instances. When they had allegations of official misconduct or allegations of a nature that would require an extended investigation those investigations by custom and practice have been joint investigations between the police department and the prosecutor's office. It was a custom that he continued as Superintendent that previously existed before he was Superintendent. (712) He ordered the internal investigation because it became more important to him to find out who did it. But he never found out

97

who did it before he left the police department. (713) There is nothing in the letter to Daley that said he would continue the internal investigation. (713) He agreed that one of the reasons he wrote the letter to Daley was so that hopefully he would, if he thought it appropriate, initiate a criminal prosecution. (715)

### Brzeczek Testimony on June 23, 1989 Second Civil Trial

William Hanhardt was the Chief of Detectives at the time of the Wilson arrest. James Reilly was the Deputy Chief. Milton Deas was the Commander of Area 2 and would report to Reilly. Reilly would report to Hanhardt; Hanhardt would report to Lyons, the Deputy Superintendent; and Lyons would report to Brzeczek. (1444) Burge would report to Deas. It was his practice to have a meeting every morning with all of the people who in this organizational structure reported directly to him. That included the deputy superintendents, the first deputy superintendent and the chief administrator of the Office of Professional Standards. (1461) Frank Nolan was to brief him on significant allegations of police misconduct that had been received by the OPS in the period immediately before the meetings. He was in Area 2 on February 5th because of the killing of a police officer named Doyle. He didn't know whether he spoke to Burge on February 5th. (1466) He recalled calling Mayor Byrne to tell her that a police officer had been murdered. He talked to the Mayor every day. (1468) He would brief the Mayor on all major events in the city. He went to the hospital where Fahey and O'Brien had been taken on February 9th. The Mayor was at the hospital. So were numerous of his command personnel. He called the Mayor from his car phone to let her know about the two police officers having been killed. He recalls that there were newspaper articles, radio broadcasts, TV broadcasts regarding allegations of police misconduct. (1486) He

R.SMITH02688

was aware of what he would characterize as an outcry in the black community concerning the misconduct that included acts on the streets. (1487) He was concerned about the outcry in the black community concerning allegations of police misconduct and brutality. (1489) Putting bags over the heads of people the police are interrogating is an extreme example of an unreasonable and unnecessary use of force by a police officer. (1491) He remembers receiving complaints about officers putting bags over heads of prisoners, beatings in the station and breaking into homes. (1505) He tried to ameliorate the relationship between the black community and the police department by calling in the "black command officers or command personnel." They numbered twelve or thirteen. (1506) He told the black members of the command that he was aware of complaints of police misconduct and brutality that were being raised in the Wilson investigation. He asked them for any information they might have concerning allegations of police misconduct that they knew of. (1510) They told him that they were getting complaints from their "constituencies"; there was feeling in the black community that certain police officers were engaging in acts of misconduct which was leaving a bad taste in general in that community on the south side. He asked them to go into the black community to try to ameliorate that situation. Last, he would tell the command personnel to go back to the police station and "in essence lay down the law to the police officers, to restate, refresh, reemphasize the Department policy on the proper treatment of all citizens." (1512) He did not call in the white command personnel and give them the same mandate and ask them the same questions that he did with the black command personnel. (1513)

He was asked if before February, 1982 he had ever had an experience, as a police officer, superintendent and all the other functions in which he had served, of allegations

99

that police officers had put bags over people they were questioning. He answered "I may have. I really don't know specifically but I may have." (1520) When he was asked what he did in the meeting with the black command personnel or anywhere else to identify the persons that were allegedly responsible for the acts of brutality including putting bags over the head, he answered that he gave the complaints and/or instructions to the Office of Professional Standards to investigate those complaints. (1523) Other than that he did nothing to identify the location and the persons that were allegedly involved in that kind of behavior. (1524) He also said this: "The importance of identifying [the police officers who mistreated prisoners] is for the purposes of seeing whether there is sufficient evidence to sustain the complaint and discipline those officers. In my experience I don't think that in a situation like that it would be reasonable or prudent to spend my time trying to identify who these complaints were against. My action, which I thought at that time was prudent and reasonable, was to get the word to the police officers on the street through the meeting with the black command officers and through the daily meetings I had with the Deputy Superintendents, to personally go out there and tell them that this conduct will not be tolerated." (1526) He could have requested that his command personnel find out who the people were and report back to him and take them off the streets. He said that that would take probably a couple of weeks, probably a month or two to identify them. (1528)

On the 13th of February he had a press conference and released the names of the Wilson brothers as the persons who were being sought for the killing of the officers. He had been briefing the Mayor on a daily basis concerning the progress of the investigation. He had had some face-to-face meetings with her about it. (1540) He probably informed

100

R. SMITH02690

Mayor Byrne about the meeting with the black commanders, the kind of complaints they were getting and what was being done about them. Based upon what he could recall of their relationship as to what he would brief her on, those would be the kinds of things that he would tell her. She was briefed on allegations of misconduct from the day he became Superintendent until the day he resigned. (1541) He would have expected to be notified that Wilson had been rejected from the lockup. (1566) Under police department special order dated August 5, 1981 a lockup keeper would immediately notify the office of the First Deputy Superintendent of any extraordinary or unusual occurrence which takes place during the tour of duty in the lockup. The rejection from the lockup of Andrew Wilson should have been the subject of a notification of the First Deputy Superintendent's office. The First Deputy Superintendent at that time was James O'Grady. (1568) The rejection from the lockup was a very serious matter. (1569)

### Brzeczek Testimony at the Second Civil Trial, June 30, 1989

He was notified that photographs taken of Andrew Wilson at Area 2 showed no injuries. That was within a week of the incident. (2302) <u>He concluded that the injuries that caused Wilson's rejection from the lockup must have occurred after he left Area 2 and before he got to the lockup.</u> (2331) He did not have any specific recollection of what he might have done or might not have done in connection with the timeframe from leaving Area 2 to the arrival at the lockup. He did know that there was some investigation done involving police department personnel who may have had access or control or custody of Andrew Wilson from the time he left Area 2 until he got to the lockup. (2333) There is nothing in the OPS file concerning that investigation. He didn't recall who made the inquiry about what happened to Wilson after he left Area 2 and

101

arrived at the lockup. (2339) He didn't have any specific recollection of whether he requested Nolan to initiate an OPS investigation concerning the wagonmen. He would expect that the conduct of the wagonmen, if they had caused the injuries on Wilson's head that he knew about, would require an OPS investigation. It would be the normal way to investigate within his department. (2342) It was his conclusion that the injuries to Wilson, based on the information that was given to him at that time was that the injuries took place some time between his leaving Area 2 and his arrival at the lockup. (2345) The OPS file contained the statement of nurse Patricia Reynolds (at Mercy Hosptal). (2349) The nurse's notes indicate coercion on Wilson to refuse medical treatment. He would expect that that would be investigated by OPS. If the nurse's note had come to his attention in February, 1982 he would have made sure that that allegation was investigated. There is nothing in the file to indicate that there was an OPS investigation concerning the nurse's notes. There is no statement from the wagonmen Ferro or Mulvaney in the file. (2353) He has never seen a statement from Ferro or Mulvaney. He remembers that Wilson and his lawyer Dale Coventry would not cooperate.

He said his reaction to the Raba letter was that there were serious allegations and that he wasn't "going to prejudge any allegation or the credibility of anyone bringing this to my attention until I have some evidence or that the investigation proceeds and uncovers evidence which supports each specific allegation." The fact that the allegations talk about Wilson being handcuffed to a radiator did not cause him to rethink his conclusion that none of the injuries or alleged injuries happened at Area 2. He said that when the letter came in on the 22nd of February his only concern was to "get the letter to

102

the proper component of the police department so that they could take whatever steps are necessary to investigate these allegations." (2384) He gave Raba's letter to OPS Administrator Nolan, who then initiated an OPS investigation. He also wrote a letter to State's Attorney Daley, in which he referred to the allegations in Dr. Raba's letter. (2390) The only personal steps he took was making himself available to Nolan to report to him as to any progress that was being made on the internal investigation. (2390) He wanted to know what was going on initially in the investigation. Nolan told him from time to time what was going on.

There was a hearing in the criminal proceeding in which the testimony of the witnesses was monitored by somebody from OPS or the police department. He thinks that he was briefed on the testimony at the hearing. (2393) It had to be Nolan who briefed him. He did not have any recollection if Nolan specifically named either Jon Burge or John Yucaitis at that time. <u>He did have some recollection that Burge and Yucaitis were the ones accused by Wilson.</u> (2394) He had that information before he left the police department in 1983. He doesn't recall making a suggestion to Nolan to interview Burge and find out what he knew about the situation. (2396) He didn't make a suggestion that Nolan interview the wagonmen. He didn't suggest that Nolan interview the doctors and nurses who treated Wilson at Mercy Hospital and who stated that Wilson was coerced into refusing treatment. (2396) OPS was "a component" of his personal staff and worked at his direction. (4540-41) He would expect that serious allegations of police misconduct which were made in motions to suppress would be called to the attention of the OPS. (4563)

103

R.SMITH02693

### Brzeczek Testimony Second Civil Trial - Volume 16 - July 5, 1989

Brzeczek said the procedure was that when a complaint is assigned to an OPS investigator, the OPS investigator is to investigate that complaint on its own merits. The OPS investigator at that time does not have access either to the officer's complaint history, which means previous complaints filed against the officer, or he does not have access to the officer's disciplinary history, which is actions or penalties taken as a result of sustained complaints. It is simply that one complaint standing alone that the investigator investigates. He recalled that there was a rejection at the lockup; and then there was information given to him regarding Wilson's injuries; and then, subsequently, that letter from Dr. Raba came to him regarding allegations of injuries All of that information, coupled with the fact that he was told where he was taken from the time he was arrested he was focusing in on the locations where Wilson was while he was in police custody regarding those injuries. That led him to the conclusion that supervisors, including deputy superintendents, were at Area 2 when Andrew Wilson was there. He knew that Lieutenant Burge had a fairly predominant responsibility as the Lieutenant in charge of Area 2 Violent Crimes. Burge was one of the supervisory personnel to which he was referring. Deputy Superintendent Lyons was another person and Commander Deas was another. (2658)

### Brzeczek Testimony Second Civil Trial - Volume 17 - July 6, 1989

He said that he indicated to Daley that he would do nothing with regard to any criminal investigation until or unless he heard from him. He did nothing further with regard to any criminal investigation into the allegations of Dr. Raba's complaint. (2711) He was seeking direction from Daley concerning the allegations as far as the criminal

R.SMITH02694

investigation of the allegations was concerned. (2712) By the time he left office he knew that Burge and Yucaitis were among the persons at least who had been alleged to have committed misconduct against Wilson. (2712) Burge changed his testimony from the first trial.) (2716-2719) When he left the department the investigation was not complete. He had done nothing to speed up that investigation. He didn't remember who told him but someone told him that Yucaitis and Burge had been named at the motion to suppress. (2730) He said one of the reasons that concerned him was that he wanted there to be a successful prosecution of the Wilson brothers. Mistreatment or coercion are basically grounds for motions to suppress and "really they create obstacles to a successful prosecution." (2731) After he learned that Burge and Yucaitis had been named as some of the officers who were involved in the alleged torture, he made no effort to take them away from Area 2 and away from their assignments of questioning an investigation. (2735) He never called in Commander Deas to discuss what had happened at Area 2 on February 14. He said, "I have no recollection of discussing the allegations contained in Dr. Raba's letter other than with Mr. Nolan." (Emphasis added.) He does know that Lyons told him he was there at Area 2; and Lyons was the one who informed him about the Assistant State's Attorney being there; and he thinks Lyons is also the one who informed him of the photograph being taken. (2776) He did not recall asking Lyons any questions concerning "those allegations." (2777) He again said that as far as he could recall the only discussion he had about the letters from Dr. Raba was with Mr. Nolan.

### Brzeczek Testimony Second Civil Trial - Volume 26 - July 19, 1989

OPS could defer an investigation of certain criteria or whether certain things happened or didn't happen. There is no evidence here that the Wilson investigation was

105

deferred. He was being briefed by Nolan about this investigation while he was Superintendent. He doesn't recall if Nolan ever told him he was deferring it. He never told Nolan to defer the investigation. (4514) The refusal of a claimant to give a statement, standing by itself, would probably not be a sufficient reason for OPS to stop its investigation. (4516)

R.SMITH02696

## BRZECZEK EXHIBIT NO. 2

Prison Health Services
2000 South California Avenue  Chicago. Illinois 60608  Telephone 633 5782/5783

CHICAGO POLICE
OFFICE OF THE SUPERINTENDENT
22 FEB 1982  09 05

February 17, 1982

Richard J. Brzeczek
Superintendent of
Chicago Police Department
1121 S. State Street
Chicago, Illinois

Re:  Examination of Andrew Wilson

Dear Mr. Brzeczek:

I examined Mr. Andrew Wilson on February 15 & 16, 1982. He had multiple bruises, swellings, and abrasions on his face and head. His right eye was battered and had a superficial laceration. Andrew Wilson had several linear blisters on his right thigh, right cheek and anterior chest which were consistent with radiator burns. He stated that he had been cuffed to a radiator and pushed into it.

He also stated that electrical shocks had been administered to his gums, lips, and genitals.

All these injures occurred prior to his arrival at the Jail. There must a thorough investigation of this alleged brutality.

Sincerely,

John M. Raba, M.D.
Medical Director
Cermak (Prison) Health Services

cc:  Mr. William M. Doyle
     Mr. Leonard R. Bersky, Director
     Sheriff Richard J. Elrod
     Mr. Phillip T. Hardiman, Executive Director
     Department of Corrections

JMR/fm:

DEPOSITION
EXHIBIT
1

CRH 123543
ATT #1

R.SMITH02697

## BRZECZEK EXHIBIT NO. 3



OFFICE OF THE
SUPERINTENDENT OF POLICE
CHICAGO

25 February 1982

Dear Mr. Daley:

I have received the enclosed letter from Dr. John M. Raba, Medical Director of Cermak Health Services.

As you can see from the contents of the letter, Dr. Raba indicates that Mr. Andrew Wilson sustained certain injuries subsequent to his arrest.

I have obtained a C.R. Number which initiates an internal investigation of the allegations. But, because the person in question is one of the defendants in a matter presently pending before the Criminal Division of the Circuit Court of Cook County, I am seeking your direction as to how the Department should proceed in the investigation of these allegations.

I have publicly stated that we will scrupulously investigate every allegation of police misconduct brought to our attention. However, in pursuing this posture I also do not want to jeopardize the prosecution's case in any way. I will forbear from taking any steps other than the one previously mentioned in connection with these allegations until I hear from you or one of your assistants.

Sincerely,

Richard J. Brzeczek
Superintendent of Police

Mr. Richard M. Daley
State's Attorney of Cook County
500 Richard J. Daley Center
Chicago, Illinois 60602

Enc.

108

R.SMITH02698

## BRZECZEK EXHIBIT NO. 4

SUMMARY REPORT DIGEST-
COMPLAINT REGISTER INVESTIGATION NO.: **123543**
CHICAGO POLICE DEPARTMENT

DATE OF REPORT (DAY-MO-YEAR)
25 July 1985
28 August 1985

To be used in all cases that are to be classified as either EXONERATED, UNFOUNDED, NOT SUSTAINED, or
in SUSTAINED cases where the Disciplinary Recommendation does not exceed FIVE (5) DAYS SUSPENSION.

SUBMIT ORIGINAL AND 3 COPIES IF ASSIGNED TO SAME UNIT AS ACCUSED.
SUBMIT ORIGINAL AND 4 COPIES IF NOT ASSIGNED TO SAME UNIT AS ACCUSED.

TO: SUPERINTENDENT OF POLICE
ATTENTION ☒ ADMINISTRATOR IN CHARGE, OFFICE OF PROFESSIONAL STANDARDS
☐ ASSISTANT DEPUTY SUPERINTENDENT, INTERNAL AFFAIRS DIVISION

| FROM-INVESTIGATOR'S NAME | RANK | STAR NO. | SOCIAL SEC. NO. | EMPLOYEE NO. | UNIT ASSIGN. |
|---|---|---|---|---|---|
| Keith W. Griffiths | INV | 16 | 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 | 304798 | 113 |

| ADDRESS OF INCIDENT | DATE OF INCIDENT - TIME | BEAT OF INCIDENT | LOCATION CODE* |
|---|---|---|---|
| Area Two Headquarters | UNK./UNK. | 633 | 94 |

**ACCUSED**

| | NAME | RANK | STAR NO. | SOCIAL SEC. NO. | EMPLOYEE NO. | UNIT ASSIGN. |
|---|---|---|---|---|---|---|
| 1. | Jon Burge | LT. | 338 | 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 | 087577 | 622 |
| 2. | John Yucaitis | DET | 7498 | 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 | 887075 | 622 |

| | SEX/RACE/D.O.B. | DATE OF APPOINTMENT | DUTY STATUS (TIME OF INCIDENT) | | PHYS. COND. CODE† | |
|---|---|---|---|---|---|---|
| 1. | M/W 20 Dec. 1940 | 2 March 1960 | ☒ ON DUTY ☐ OFF DUTY | ☒ SWORN ☐ CIVILIAN | 01 | |
| 2. | M/W 3 June 1942 | 15 June 1964 | ☒ ON DUTY ☐ OFF DUTY | ☒ SWORN ☐ CIVILIAN | 01 | |

| IF APPLICABLE - DATE ARRESTED/INDICTED | CHARGES | COURT BRANCH | DISPOSITION & DATE |
|---|---|---|---|
| 1. | | | |
| 2. | | | |

**COMPLAINANT**

| NAME | ADDRESS** | STATE | TELEPHONE | SEX/RACE | D.O.B./AGE | PHYS. COND. CODE† |
|---|---|---|---|---|---|---|
| Dr. John Raba | Health Service Medical Director Cermak | | 6335782 | | | 01 |

**VICTIMS**

| NAME | ADDRESS** | CITY STATE | TELEPHONE | SEX/RACE | D.O.B./AGE | PHYS. COND. CODE† |
|---|---|---|---|---|---|---|
| Andrew Wilson | 1409 S. May | Chgo, Ill | | M/B | 6OCT52 | 05 |

**WITNESSES**

| NAME | ADDRESS** | CITY STATE | TELEPHONE | SEX/RACE | D.O.B./AGE | PHYS. COND. CODE† |
|---|---|---|---|---|---|---|
| | | | | | | |

☐ SEE ATTACHED SHEET FOR ADDITIONAL ACCUSED, COMPLAINANTS, VICTIMS, WITNESSES.

**ALLEGATIONS**

This complaint was received via letter sent to Superintendent Richard
Brzeczek. This complaint was registered with the Office of Professional
Standards on 25 February 1982 at 1100 hours. It was alleged that the above
accused officers: 1. Physically abused the victim by striking him; kicking
him and 2. administering electric shocks to the victim. It was also al-
leged that unknown officers also 3. physically abused the victim by hitting
kicking and shoving him against a heat radiator.

| I.A.D. LOCATION CODES* | | | | I.A.D. PHYSICAL CONDITION CODES† | |
|---|---|---|---|---|---|
| 01 | Food Sales/Restaurant | 11 | Public Transportation Veh./Facility | 01 | No Visible Injury - Apparently Normal |
| 02 | Tavern/Liquor Store | 12 | Park District Property | 02 | No Visible Injury - Under Influence |
| 03 | Other Business Establishment | 13 | Airport | 03 | Injured, Not Hospitalized |
| 04 | Police Building | 14 | Public Property - Other | 04 | Injured, Not Hospitalized - Under Influence |
| 05 | Lockup Facility | 15 | Other Private Premise | 05 | Injured, Hospitalized |
| 06 | Police Maintenance Facility | 16 | Expressway/Interstate System | 06 | Injured, Hospitalized - Under Influence |
| 07 | CPD Automotive Pound Facility | 17 | Public Way - Other | 07 | Injured, Refused Medical Aid |
| 38 | Other Police Property | 18 | Waterway, Incl. Park District | 08 | Injured, Refused Medical Aid - Under Influence |
| 39 | Police Communications System | 29 | Private Residence | 09 | Deceased |
| 10 | Court Room | | | 10 | Deceased - Under Influence |

* IF CPD MEMBER, LIST RANK, STAR, SOCIAL SECURITY, EMPLOYEE NOS. IN ADDRESS BOX, PAX/BELL IN TELEPHONE BOX.

CPD-44.112A (1/84)

C.R. NO.
123543

**SP 102438**

109

R.SMITH02699

Briefly summarize the investigation describing your efforts to prove or disprove the allegation(s). Indicate whether witnesses or evidence support or do not support the allegation(s).
In sustained cases ONLY, copies of the accused member's Summary of Previous Disciplinary Actions and Record of Previous Complementary History will be included as attachments.

This investigation was initiated on 25 February 1982, after a letter was received by Superintendent Brzeczak from Dr. John Raba, Medical Director of Cermak Health Services. Dr. Raba examined Andrew Wilson on 15 and 16 February 1982. He noted bruises, swellings and abrasions on Mr. Wilson's face and head. Mr. Wilson's right eye was also battered and had a superficial laceration. Mr. Wilson also had several linear blisters on his right thigh, right cheek and anterior chest wall which were consistent with radiator burns. Andrew Wilson told Dr. Raba he had been pushed into a radiator. He also told Dr. Raba the police administered electrical shocks to his gums, lips and genitals.

Francis A. Nolan, Chief Administrator of the Office of Professional Standards, attempted to contact Mr. Dale Coventry of the Public Defender's Office, who was assigned to defend Andrew Wilson. Administrator Nolan sought his cooperation in the investigation of these allegations but received no response from Mr. Coventry.

The trial transcripts, pages 386-1305 were obtained from investigative purposes. These pages covered the direct and cross-examination of witnesses, pertaining to a defense motion to supress the written statements given by the Wilson brothers. The defense attorneys argued that Andrew and Jackie Wilson were coerced into giving statements through physical and mental abuse. This was done after a motion of defense to quash the arrests warrants had been rejected.

| INVESTIGATIVE REPORTS—SUPPORTING ALLEGATION LIST ATTACHMENT NUMBERS: | INVESTIGATIVE REPORTS—SUPPORTING ACCUSED MEMBER(S) LIST ATTACHMENT NUMBERS: | PHYSICAL EVIDENCE LIST ATTACHMENT NUMBERS: | TOTAL NUMBER OF ATTACHME SUBMITTED WITH THIS FILE: |
|---|---|---|---|
| 1, 2, 5 | | | 6 5 |

Summarize the findings and recommendations. Rule violations will be cited by number only. One overall recommendation for Disciplinary Action will be made by the investigator. The recommendation will be for ALL sustained findings; recommendations will NOT be made for each sustained allegation.
Example: 1. Violation noted, no disciplinary action warranted. 2. That the accused member be reprimanded. 3. That the accused membe be suspended for ___ days (not to exceed 5 days).

FINDINGS:

ALLEGATIONS #1 thru 3     NOT SUSTAINED

APPROVED:

*Cathy Caving* *JB.*

O. P. S. Coordinator of Operations Cathy Caving Star #28

em/

SP 102439

| DATED 22 August 1983 | DATE COMPLETED 29 July 1985 | ELAPSED TIME 706 Days |
|---|---|---|

IF NECESSARY, USE AN 8½ x 11 SHEET OF WHITE PAPER TO CONTINUE ANY ITEM

110

R.SMITH02700

Office of Professional Standards
Complaint Register Number 123543
Page #3

SUMMARY OF INVESTIGATION:

Testimony was heard from medical personnel from Mercy Hospital and
Dr. Raba of Cermak Health Services describing the injuries Andrew
Wilson had during his time in the custody of the Chicago Police
Department.  Additional testimony was also head from people of the
Area Two facilities who claimed they heard Andrew Wilson screaming
from being beaten.  Testimony was also heard from Chicago Police
Officers involved in this incident, as well as members of the State's
Attorney Office.  All testimony by the members of thest two agencies
denied any wrong doing or misconduct during the apprehension, handling,
interrogation or processing of the Wilson brothers.

em/

**SP 102440**

111

## ALLEGATIONS OF "COVER-UP"

The accusation has been made for our review that certain individuals have engaged in a "cover-up" of police brutality. The persons named specifically are Thomas Needham and Superintendent Terry Hillard. The charge has also been made generally against several other Superintendents and State's Attorneys. Before we address these charges, it is necessary to identify from a prosecutor's perspective what a "cover-up" means. It means to a prosecutor that an allegation that a public official covered up a crime is an allegation that an individual has committed the crime of obstruction of justice or official misconduct. Our investigation discloses that the evidence is insufficient to support any criminal charges.

### Thomas Needham

Thomas Needham has been a lawyer for twenty-one years; he was an assistant state's attorney for several years; in early 1998 he was appointed General Counsel to Superintendent Terry Hillard. He is now in private practice. The complaint against Thomas Needham centers on a memorandum that he sent to Leonard Benefico on August 11, 1998. Benefico, who was then the Director of Investigations for OPS, came to Needham with nine files that were completed investigations by OPS investigators that had been submitted to Gayle Shines, the then Executive Director of OPS, four and a half years before. Gayle Shines left office without having reviewed six of those files. In the other three she had found the evidence insufficient to support charges against the officers. She testified in her deposition that she never got around to reviewing the six files; she had other things to do. (A copy of the memorandum submitted by Needham to Benefico is attached hereto as Needham Exhibit No. 1.)

112

R.SMITH02702

The individuals whose files were submitted are as follows:

>Michael Johnson, allegedly abused on June 9, 1982;

>Lee Holmes, allegedly abused on September 10, 1982;

>Stanley Howard, allegedly abused on November 3, 1984;

>Phillip Adkins, allegedly abused on November 4, 1984;

>Donald White, allegedly abused on February 13, 1982;

>Gregory Banks, allegedly abused on October 29, 1983;

>Lavert Jones, allegedly abused on January 29, 1984;

>Darrell Cannon, allegedly abused on November 2, 1983; and

>Stanley Wrice (Ware), allegedly abused on September 9, 1982.

Johnson and White were never charged. Insofar as we have been able to determine, motions to suppress evidence were made in all the other cases and evidence was heard.

Michael Johnson filed a complaint on June 9, 1982, which was ultimately closed without any action being taken. Johnson had alleged that he was struck and electro-shocked by Burge and went to Grant Hospital. Grant Hospital found a computer entry which indicated that Michael Johnson had been seen in the Emergency Room, but the hospital was unable to find the medical record of the visit.

Photographs taken of Michael Johnson by the evidence technician of OPS were not available. The investigation was re-opened at the direction of Gayle Shines some time in 1993. In June, 1994, the OPS investigator concluded that the allegations of brutality on the part of Burge were not sustained. Johnson also made a complaint to the

113

FBI. The FBI report, dated December 23, 1982, indicates that "all logical investigations had been conducted" and that the case was being closed.

In the Holmes case, an OPS investigation was initiated on September 10, 1982. After the Burge Police Board hearing, Superintendent of Police Leroy Martin ordered that the Holmes case be re-opened on June 19, 1993. In a report to the Superintendent from Gayle Shines of December 21, 1994, she said that the original investigative file was no longer available so the specific original allegations and findings were unknown.

An extensive investigation was conducted by OPS Investigator Veronica Tillman after which she concluded that the allegations of brutality against Detectives Dignan and Dioguardi be sustained. Dioguardi had already resigned. Gayle Shines concluded, contrary to the recommendation of Tillman, that the evidence was insufficient to establish wrongdoing on the part of Dignan.

In the White case, a complaint was filed with OPS on December 28, 1994, by a private citizen. White was the person who gave the police the incriminating evidence that led to the arrest of Andrew Wilson. He was never charged with an offense. He was to be a State witness, and he and his family were kept at State expense outside Chicago. (He was not called as a witness.) He was in the penitentiary in 1988 and gave his deposition in the Wilson civil suit in which he testified that he had been mistreated. This was contrary to the statement he had given the police in 1982 at the time of the Wilson trial. He has been in and out of the penitentiary several times and has displayed a lack of cooperation with OPS and with us.

The investigation was closed on December 7, 1993 by Investigator Tillman with findings of "not sustained" as to all officers, including Jon Burge, who was no longer a

114

R.SMITH02704

police department member. Investigator Tillman concluded that she was unable to gather sufficient corroborative evidence to substantiate White's allegations. She had interviewed four of the accused officers, all of whom denied any mistreatment of White. White has refused to talk to us.

In the Banks case, a motion to suppress evidence was heard which the trial judge denied. The appellate court reversed Banks' conviction of murder on the ground that the State had failed to establish that Banks' confession was voluntary. On November 1, 1991, Banks filed a civil suit in which he alleged that on October 29, 1983, Sergeant Byrne and other officers had struck and kicked him several times.

A complaint had previously been filed with OPS on November 18, 1983 after Dr. John Raba sent a letter to OPS. Apparently, the allegations were held to be not sustained. Another investigation was opened in 1991 as a result of the civil suit having been filed; it was investigated by OPS Investigator Robert Cosey. After an investigation that took 548 days, the investigator made findings of "sustained" against Sergeant John Byrne, Detectives Charles Grunhard and Peter Dignan. There were "not sustained" findings on allegations against Jon Burge and Robert Dwyer. Although Banks had alleged that Dignan had physically abused him, the investigator held that that allegation was "not sustained." The investigator recommended a finding of sustained against Dignan on the charge of failing to report the use of excessive force and giving false information to OPS.

On March 18, 1995, Leonard Benefico, the Coordinator of Investigations, submitted a report to Gayle Shines in which he expressed "non-concurrence" with the sustained findings of the investigator. Thus, we have an original "not sustained," followed by a "sustained," and followed by a non-concurrence with the "sustained."

115

R. SMITH02705

Gayle Shines approved the non-concurrence recommendation of Benefico. Byrne had resigned and Grunhard was deceased.

A complaint by Lavert Jones was registered in OPS on May 6, 1993. He alleged that on January 28, 1984, he had been abused by Dignan, Byrne and John Yucaitis.

During the course of the investigation additional complaints of excessive force were made on behalf of Thomas Craft, a codefendant of Lavert Jones, against Peter Dignan and John Yucaitis. The investigator concluded that all the allegations should be not sustained except for a charge against Dignan for allegedly stomping on Thomas Craft's feet. In a report to the Superintendent, Gayle Shines filed a non-concurrence with the findings against Peter Dignan.

In July 1993, Stanley Wrice filed an OPS complaint alleging that he had brutalized by Dignan, Byrne and an unknown officer on September 9, 1982. The investigator interviewed Dignan and Byrne and several witnesses whose names were submitted by Wrice. The investigator was unable to locate the doctor who was at Cermak Hospital when Wrice was examined. The medical report for the treatment he received could not be located. The police case report was not available. On January 31, 1994 the investigator concluded that the allegations against Dignan, Byrne and the unknown officer were "not sustained."

Phillip Adkins alleged that he had been struck by Detectives Boffo and Lotito on June 7, 1984. He refused to give a signed statement and refused to sign a medical release. The officers were interviewed and denied the allegations made by Adkins. The OPS investigator recommended that the allegations be "not sustained." In a supplemental investigation in 1993 Adkins alleged that he had been hit in the stomach several times by

116

Boffo and Lotito and that Dignan witnessed the physical abuse and took no action to halt it. A civil rights suit was filed in 1986 and several depositions were taken. Apparently the medical records were made available at the civil trial and were available to the OPS investigator after the case had been reopened.

A new investigator recommended that the allegations of physical abuse by Boffo and Lotito be sustained and that allegations that Dignan made a false report also be sustained. Dignan had said that he had observed injuries to Adkins' chest before Adkins had been placed under arrest.

The stepfather of Stanley Howard made a complaint in early November, 1984. Howard gave a statement to the investigator who subsequently recommended that Howard's complaint be "not sustained." In August 1993, a second investigation was begun by OPS; and at the conclusion of the investigation a second investigator recommended that allegations of abuse on the part of Byrne, Boffo and Lotito be sustained.

In November 1983, an OPS complaint was filed by Darrell Cannon alleging mistreatment by five police officers, including Byrne, Dignan and Grunhard. The investigator changed the original finding of "not sustained" to sustained against Sergeant Byrne on all allegations; the charge that Dignan had put a shotgun in Cannon's mouth was changed from not sustained to sustained; the charge that Grunhard had lifted Cannon off the ground while Byrne held him in the air by handcuffs was sustained.

We have been instructed by Michael Duffy that only complaints that have been completely processed by OPS and determined to be "sustained," are to be forwarded to the Superintendent for review. It thus appears that none of the cases was properly before

R.SMITH02707

the Superintendent; and the Cannon, Howard and Adkins cases require review and concurrence by the Chief Administrator before the Superintendent would be required to review them.

We can understand the position of Benefico in bringing the files to Needham; and we can understand that the action taken by Needham was in a very technical sense not in keeping with established procedures, we hasten to add, in the Cannon, Howard and Adkins cases. But we cannot disagree with Needham's ultimate decision. Every point he raises in his memorandum was valid. Most of the officers were no longer on the department; all the cases were at least fourteen years old; all the cases had been investigated and most reinvestigated and had been languishing in Gayle Shines' office for four and a half years. We cannot say that Needham's conclusion that the remaining officers' defense would be seriously impaired by the passage of time was wrong. Nor can we deny that the lengthy delay between the date of the initial complaint and the date of the memorandum made it "virtually impossible to conduct any kind of meaningful inquiry" in the cases.

Needham was a new General Counsel for a new Superintendent; they were confronted by a very old problem. He exercised his discretion, and his decision was ratified by Superintendent Hillard. Under all these circumstances, we doubt that a case could be made that Needham and Hillard had been guilty of some administrative transgression that called for some type of sanction. We are certain, however, that they were not guilty of an obstruction of justice or official misconduct.

The general charge has been made from the first day of our appointment that some public officials have been guilty of a "cover-up" of the widespread abuse of

118

R.SMITH02708

prisoners at Detective Areas 2 and 3 by police officers serving under Jon Burge. We refer to the attached Exhibit 1, a letter written by the lawyers for the petitioners who sought the appointment of a special state's attorney. In that letter the authors said that prosecutors have denied "for years" that torture took place at Area 2 and that "judges have often turned a blind eye to these charges." They concluded it would take considerable courage on our part to insist on the truth, "[a]ll the more so, if the investigation reveals that people who now hold high office were aware of the Area 2 torture and were part of the cover-up."

Other spokesmen and publications have centered on the State's Attorneys who served from 1980 until the present and questioned their diligence in discovering and prosecuting police officers who allegedly abused prisoners. As we have said in the beginning of this part of our report, to charge a public official of a cover-up of a crime is to charge the public official himself with the crime of obstruction of justice. Needless to say, such a charge should not be made lightly.

In our investigation of this serious charge we have interviewed the following persons:

1. Richard M. Daley, Mayor of Chicago and former State's Attorney of Cook County

2. Richard A. Devine, State's Attorney of Cook County and former First Assistant State's Attorney

3. Justice Jack O'Malley, former State's Attorney of Cook County

4. Jane M. Byrne, former Mayor of Chicago

5. Judge William Kunkle, former First Assistant State's Attorney

119

6.      Judge Gregory Ginex, former Chief of the State's Attorney's Criminal Division

7.      Richard Brzeczek, former Superintendent of Chicago Police Department

8.      Judge Frank DeBoni, former Deputy Chief of the Special Prosecutions unit of the Cook County State's Attorneys Office

9.      Leroy Martin, former Superintendent of Chicago Police Department

We wish to make it clear that the fact that we have interviewed a person is not to be construed as evidence of wrongdoing on that person's part. The interviews were informational.

We have interviewed Mayor Daley, State's Attorney Devine, Judge William Kunkle and Richard Brzeczek under oath in the presence of a court reporter. None of them objected to that procedure. We have also interviewed all of those named persons, except Mayor Byrne and Justice O'Malley, more than once. Our principal focus of inquiry was on the case of Andrew Wilson. State's Attorney Jack O'Malley, now an Appellate Court Justice, had no connection with the Wilson case. Cecil Partee who succeeded Richard M. Daley as State's Attorney is now deceased.

Mayor Daley was the State's Attorney when Andrew Wilson was arrested and tried. Richard Devine was the First Assistant State's Attorney. Judge William Kunkle (elected a Circuit Court Judge in November 2004) was the Chief Deputy State's Attorney; he was subordinate only to Daley and Devine. He prosecuted Andrew Wilson in both trials. In the first criminal trial he was assisted by Michael Angarola. He also represented Jon Burge in two trials in the Federal district court and in the Chicago Police Board hearings at which Burge was ordered discharged.

120

R.SMITH02710

Judge Gregory Ginex was the Chief of the First Municipal Division and was Lawrence Hyman's immediate superior. Lawrence Hyman, of course, took the confession from Andrew Wilson.

Judge Frank DeBoni was the Deputy Chief of Special Prosecutions in the State's Attorneys Office at the time of the arrest and confession of Andrew Wilson. Richard Brzeczek was the Superintendent of Police at the time of the arrest, confession and conviction of Andrew Wilson. Leroy Martin was the Superintendent of Police appointed by Mayor Harold Washington to succeed Fred Rice. It was he who filed the charges against Jon Burge in 1991 that led to the discharge of Jon Burge.

Before we begin our analysis of what occurred in the Andrew Wilson case, it is fitting to acknowledge certain facts:

1. The Andrew Wilson case occurred over twenty-four years ago and memories have naturally dimmed. It would be unfair to expect all the parties involved to remember all that transpired in the Andrew Wilson case with perfect clarity.

2. Both of us were trial assistant state's attorneys for a number of years; and we also served in supervisory positions, one as First Assistant State's Attorney for four years and the other as Chief of the Criminal Division for two years. (In 1970 the Chief of the Criminal Division position was comparable to Chief Deputy State's Attorney, the position held by Judge Kunkle in 1982.) We realize, however, that the State's Attorney's office in 1982 was much larger than it was when we served as supervisors in 1960 to 1964 and in 1968 to 1970. Consequently, it is fair to say that there were more supervisors and the administrative obligations of supervisors in 1982 could have been more extensive than in 1960-64 or 1968-70.

121

R.SMITH02711

3.    Not all administrators think alike.  There are those who believe in delegating responsibility to subordinates and granting them completely unfettered authority.  On the other hand, there are those who deem it necessary to "look over the shoulders" of the persons to whom a task has been assigned and to direct (or perhaps correct) the subordinates in the execution of their tasks in some detail.

In this analysis we intend to express our opinion with full recognition that some reasonable persons may disagree with us.  Our first opinion is that both approaches to administrative delegation of responsibility that we have expressed are wrong: Administrators, wherever they are in the chain of command, must always recognize that responsibility is theirs and that they may not assign a task and forget about it; similarly, administrators should not interfere with the subordinate's decisions over every detail of the task.  But in a case of the importance of the Andrew Wilson case, we believe that the obligation of the supervisors in the State's Attorneys Office to be at least apprised of what was going on at Detective Area 2 was heightened.

### Richard M. Daley

On this question of responsibility and authority, Mayor Daley said that Judge Kunkle was made the Chief Deputy for a reason, to keep "the professionalism within the office, the strong trial lawyer advocacy program in the office."  His philosophy was when a trial lawyer was assigned to the case he or she will try that case without any interference whatsoever in regards to their strategies.  He would never interfere with a trial lawyer who had the primary responsibility in regards to any case.  (We hasten to add that we are not concerned with the decisions of any lawyer in the conduct of a <u>trial</u>.)

122

The primary responsibility of keeping him or his subordinates informed fell within the Felony Review office. The head of Felony Review wasn't just being reported to, he was actually in charge. He was making decisions. Larry Hyman, who was in charge of Felony Review, would have had the ultimate responsibility to make decisions relative to the prosecution of that case and how statements were to be taken. (We disagree that Larry Hyman had ultimate responsibility.) Whether or not Hyman would talk with other people, he didn't need Daley's permission to discharge the obligations and responsibilities that had been entrusted to Hyman. Kunkle and Devine had been given responsibility to effectuate criminal prosecutions in general, and he relied upon them to carry out these responsibilities in a manner they saw fit. (If, by that statement, he meant that Kunkle and Devine had the right to countermand Hyman's decision to wait several hours before taking Wilson's statement, we agree.)

He did not recall that Andrew Wilson was supposed to have made an oral statement and approximately eight hours later the state's attorney decided to take a written statement. He was never advised of the conversation Larry Hyman allegedly had with Andrew Wilson in which Andrew Wilson told Hyman he had been beaten. He didn't recall whether anybody ever brought to his attention the fact that the wagon men had committed a crime. Nobody ever brought to his attention the fact that the lock-up people would not accept custody of Andrew Wilson because of his condition. He did not recall any conversation with any of the supervisory personnel with regards to any statement being made. The trial lawyers have to make the decision to take statements, and they have to decide their procedures.

123

R.SMITH02713

He also said that OPS had the primary responsibility to investigate any allegation of misconduct by a police officer against a citizen. (If he meant that OPS continued to have the primary responsibility to investigate after a case is in court, we disagree.) He did not have an opinion as to whether Larry Hyman's decision was a sound one from a prosecutor's point of view.

Mayor Daley was questioned also on January 23rd, 2006. He described the procedures concerning mail directed to him. It was opened by a secretary and items in the mail were directed to the various departments in the Office of the State's Attorney. He assumes that the letter directed to him by Brzeczek with the enclosed letter from Dr. Raba was directed to his First Assistant, Richard Devine. He assumes that he was advised of the letter and its enclosure was reviewed by the First Assistant. It was probably discussed with him and Devine. He has no current memory of how the letter was processed. He was probably advised as time passed that the Special Prosecutions unit had contacted Wilson's attorney and had been thwarted in efforts to determine the actual basis for the observations of Dr. Raba. He does not recall either before the Wilson arrest or after ever receiving another direct written communication, whether in the mail or otherwise, from Brzeczek.

### Richard A. Devine

We interviewed State's Attorney Devine on June 15, 2006. He was the First Assistant State's Attorney from December, 1980 until October, 1983. He recognized that the Andrew Wilson case was "a case which merited intense attention." He had a number of conversations with Mike Angarola, who was involved very early on. (Mike Angarola later prosecuted Wilson with Judge Kunkle.) His recollection is that he was informed by

124

Angarola when Wilson or one of the Wilsons was picked up. Kunkle did communicate directly with State's Attorney Daley. They did not have a rigid structure then, and they do not have one now. It would be normal that Felony Review would be charged with taking the statement. His general recollection is that a good deal of information came from Mike Angarola; he has specific recollection of Angarola just walking into the office and giving him information about what was going on. His clear impression was that Angarola was at Area 2 on a periodic basis.

He had no specific recollection of the length of time Hyman took before taking a statement coming up either then or later. He has a recollection of Greg Ginex being at Area 2. (Ginex emphatically denies ever being at Area 2.) Hyman worked under Ginex.

It would be a plus to have Kunkle, the most experienced prosecutor on the criminal side in the office, to want to undertake the job of trying the case. Based on his understanding from conversations he had, Kunkle had the letter from Dr. Raba at some point. It was discussed by a number of people in the office, including Kunkle. He remembers that some people might have said, "Why has this letter been sent to us? This is very unusual. What's this all about?" Some of the conversation included a certain level of suspicion as to why the letter was sent. The discussions included the fact that the letter was contrary to the normal procedures in place. That would include the Office of Professional Standards doing an initial investigation to determine if there was any credence or substance to the claim. "There was some thinking it was a cover-your-flanks kind of letter on the part of the police superintendent." At that time there was a certain level of tension between the City administration and the State's Attorneys Office.

R.SMITH02715

Kunkle at some point contacted Frank DeBoni at Special Prosecutions. In the view of Kunkle and Angarola whatever occurred as far as Wilson's injuries were concerned were caused by the wagon men after any statements had been taken from Andrew Wilson. The conclusion given to him (and Daley) by the lawyers running the case, very high-level lawyers in the office, was that there may have been physical abuse, but it was abuse at the hands of the wagon men. That was the kind of conclusion that he and perhaps the state's attorney might have reached as a result of information given to them by Kunkle and Angarola.

He was asked why somebody didn't look at the wagon men. He said he was surprised that as part of an administrative process they were not brought in and talked to because they could not claim their rights to remain silent without forfeiting their rights to be police officers. That was something he would have expected to be done.

DeBoni believed he did not have a basis for doing anything then because the alleged victims were unwilling to participate. During his tenure as First Assistant neither he nor the State's Attorney received a letter directly from Brzeczek other than the one they were talking about.

When he began his tenure as State's Attorney he thought he had to establish credibility as an office that would pursue any legitimate complaints against police officers. He wasn't satisfied that the procedures that were in place, which essentially had remained the same, that OPS would do the investigation and then the state's attorney would take over if there was something there. He wasn't satisfied that that was working appropriately, and part of that was the dissatisfaction with the investigative work that OPS had done. So he created a unit in the office where the attorneys did not work with

R.SMITH02716

police officers on preparing and prosecuting cases one day and then investigating police officers the next day. (We strongly agree with his observations and the steps he instituted with the creation of the Professional Standards Unit.)

He said that "our trial people" were of the view that injuries to Wilson did not occur at Area 2 but occurred with the wagon men later on. He remembers Mike Angarola specifically saying that this was a high profile case; that detectives were determined to do it right so it wouldn't jeopardize the case; so it didn't make any sense for it to have happened at Area 2. They were quite upset that the wagon men had gotten involved later on. That was what was relayed to him. He couldn't say that he received that information after receiving the Brzeczek letter or if it was when the defense filed their motion to suppress. It was certainly during the pre-trial period.

He did not know on February 14 that it took Larry Hyman almost ten hours before he took the statement.

A lot of the issues that the office talked about were looked on as issues to be handled at the trial, at the motion to suppress and during the course of the trial because there were claims that were not shocking in light of the charges that were out there against the defendants. There was not a context at the time of "Gee, there had been fifty charges or fifty claims against this particular officer, so there better be a heads-up." He didn't know Jon Burge from a load of hay at the time, and he's sure the State's Attorney didn't either. The expectation was that there were claims that were going to be presented before the trial judge and there would be a presentation by the prosecutors and the trial judge would decide it. It wasn't a sense of "Gee, let's make these things go away or let's

127

ignore them." They all understood that they would be part of a back and forth between defense attorneys and prosecutors during the course of the trial.

In his first interview with us Mr. Devine said that both he and State's Attorney Daley would, in all cases, rely heavily upon the judgment and advice of each individual prosecutor assigned to specific cases. Their reliance was followed in the Wilson case.

### William Kunkle

William J. Kunkle was the Chief Deputy State's Attorney at the time of the killing of Officers Fahey and O'Brien. He was elected a Circuit Court Judge in 2004. He was the lead prosecutor of the Wilson brothers. They were convicted on February 4, 1983, and Andrew Wilson was sentenced to death. Judge Kunkle left the State's Attorney's Office to join the law firm of Phelan, Pope and John.

The conviction of Andrew Wilson was reversed on April 2, 1987. Harold Washington was the Mayor of Chicago. Fred Rice was the Superintendent of Police. Judge Kunkle was appointed a Special State's Attorney to re-prosecute Andrew Wilson. Richard M. Daley was still the State's Attorney. Because of the Supreme Court's holding, the confession of Andrew Wilson was not used, and he was convicted again.

In 1987 Andrew Wilson filed a civil action in the Federal district court. Jon Burge was named as a defendant. Richard M. Daley was elected Mayor of Chicago in April 1989, and Cecil Partee was appointed the State's Attorney. Judge Kunkle was appointed by the City of Chicago to represent Burge in that lawsuit. The first trial resulted in a hung jury, and the second trial ended in a verdict, in part, in favor of Burge. That verdict was reversed, and the City settled with Andrew Wilson.

R.SMITH02718

In 1991 the then Superintendent of Police Leroy Martin filed charges against Burge with the Chicago Police Board. Judge Kunkle was retained by the City of Chicago to represent Burge. Burge was discharged by the Police Board, and that discharge was affirmed by the circuit court and appellate court. It is our understanding that Judge Kunkle represented Burge before the 7th Circuit Court of Appeals.

We recite this history of Judge Kunkle's participation in the Andrew Wilson cases, because there were questions we felt he would be in the best position to answer. It was our opinion that no person would know or remember as much about the Wilson case as Judge Kunkle. For that reason we interviewed him informally in September, 2002 and formally on May 10, 2006. We wanted to know particularly, as Larry Hyman's superior, what he knew about Larry Hyman's decision to forbear questioning Andrew Wilson. Judging from what he argued at the various hearings and the witnesses he called to buttress Hyman's testimony, Ficaro, for example, we determined that Judge Kunkle believed that Hyman's delay in questioning Wilson represented a sound prosecutorial decision.

### Hyman's Decision

We questioned him about his knowledge on February 14, 1982 of Hyman's actions. He said the following: Ginex's testimony that he conferred with Hyman from time to time made perfect sense. Hyman would have been telling a lot of people what was going on. He would have been telling Ginex. He would have been telling the Chief of Municipal. He would have been telling Angarola. He might have been calling Kunkle. He might have been talking to Devine too, but he didn't do that every ten minutes. Kunkle might have talked to Hyman between February 9 and February 14. He

129

did not have a specific recollection of any particular conversation. He probably spoke to Angarola every day between February 9 and February 14. He assigned Angarola to the case. Angarola's instructions were to help everyone, help the police, help Hyman, help the investigation, do whatever he could to make sure the case got handled properly. He probably talked to Angarola on the 14th but he didn't remember.

It was entirely possible that he talked to Hyman after Wilson had been arrested, but he had no specific recollection. On the 14th he was probably apprised of the fact that Andrew Wilson had been arrested and was at Detective Area 2. He had no independent recollection but would assume that to be the case. He believes that he was told that Andrew Wilson was in Detective Area 2 and that he had made an oral confession to the police, but he didn't have a specific recollection. He might have discussed with Hyman the fact that they had the shooter at Detective Area 2 and that the shooter had made an oral confession to the police, but he didn't recall. He thinks it's correct that Hyman never spoke to Andrew Wilson from the time that Andrew Wilson was brought into Detective Area 2 until around 5:00 that evening. He doesn't recall whether Angarola told him that Hyman had been handling the case, that he was the one who was going to take a confession from the individual, but he hadn't taken a confession from that man, "he's waiting." He had no idea that Hyman took a statement from a witness named Derrick Martin on the 14th but still hadn't taken a statement from the shooter. He was asked the following question and gave the following answer:

> Q. So this is clear, there is nothing in the record that I have seen to show that Hyman ever consulted with any superiors before making the decision about whom he should question first. Do you know whether or not he ever consulted with any superiors about what I consider a rather momentous decision?

R.SMITH02720

A.     No.

Judge Kunkle recalled that in the statement Hyman had taken from the Wilsons, Hyman did not ask them how they had been treated by the police. It was pointed out to him that Daniel Reidy, who represented the City at the Burge Police Board hearing, had brought that fact out. Reidy had also brought out that that failure by Hyman to ask that question of the Wilsons was contrary to the requirements of the manual of IICLE which is put out for prosecutors. Judge Kunkle said, "I have no idea. It could be." (We point out that Judge Kunkle was the lawyer representing Burge at that hearing while Daniel Reidy brought that fact out while questioning Ginex.)

### The Raba Letter

We also asked him, as we asked Daley, Devine, Brzeczek, DeBoni and Coventry, Wilson's trial lawyer, about his knowledge of the Raba letter and what action he took. He has a very vague recollection that Daley received the letter from Raba, read the letter, either showed it to Kunkle or gave him a copy or discussed it with him. His response was to give it to Special Prosecutions. He either told Daley or decided on his own to give it to Special Pros. DeBoni or other people from Special Pros would occasionally talk to him about what was going on with the case. When he was asked if he remembered what they told him, he said he didn't get into what they were doing; that's the whole point of having a separate unit. His answer was that he did not talk to DeBoni and ask him what he had done after he had turned the letter over to DeBoni. Not to his recollection. In the normal course of events DeBoni would report to him, to Devine and to Daley but Kunkle was recusing himself, "taking himself out of the loop" because he's got to play "the role of the trial lawyer." The following occurred:

131

Mr. Egan:

Q.      Let me follow up. Why are you out of the loop?

A.      Because I'm the trial lawyer.

Q.      So what?

A.      Well, that's the luxury I was talking about. If we were in Keokuk, I would have to be doing both, but we're not. We're in Chicago. So I'm going to do the trial. They're going to do their investigation. I'm not going to taint their investigation. I'm not going to say anything to them that someone is later going to claim correctly or incorrectly I tried to manipulate the Special Prosecution's investigation to suit my ends and means as the trial prosecutor.

Q.      Well, yes, but, nonetheless, there's a flip side to that. They might find something out that you should know about at the trial.

A.      Well, then presumably they'll tell me.

Q.      You mean you think it would be improper for you to ask them, hey, what's going on in that particular -- about that letter with Dr. Raba and the letter from Brzeczek? You think that would be improper for you to do that?

A.      No, not just to ask him about it, no, but it might lead to something that I would consider improper.

Q.      Okay. But you indicated that you were going to recuse yourself and it's improper for you to even ask about what's going on in your investigation.

A.      Well, as a practical matter, I think that's the simple answer.

The day after we took a formal statement from Judge Kunkle, he called our office and informed us that he had refreshed his recollection and wished to add some matters to what he had told us. Pursuant to our request, he submitted an affidavit, which is as follows:

132

"I had a conversation with the then chief of Special Prosecutions, Frank DeBoni, in which he told me he had requested that Assistant Public Defender Dale Coventry allow Coventry's client, Andrew Wilson, to speak to or otherwise cooperate with DeBoni in connection with DeBoni's investigation of Wilson's claims of mistreatment by Chicago police as initially raised in a letter from Dr. Raba.

Frank said Coventry had not responded and asked me if I would urge Coventry to respond.

Shortly thereafter I urged Coventry to respond and told him in passing that DeBoni was serous about this matter and would act independently.

I do not recall the dates of these two conversations, but I presume that they would have taken place sometime before, during or shortly after the first criminal trial of Andrew and Jackie Wilson."

After reading that affidavit, we spoke by phone to Dale Coventry, who represented Andrew Wilson and is now retired, and to Judge Frank DeBoni. Mr. Coventry informed us that he _never_ spoke to Judge DeBoni and he _never_ had a conversation with Judge Kunkle in which Judge Kunkle urged him to respond to Frank DeBoni or that DeBoni was serious about the matter and would act independently.

Judge DeBoni told us that he had no recollection of the conversations with Dale Coventry and Judge Kunkle which were described in the affidavit. He said that he was not denying that he had the conversation with Judge Kunkle described in the affidavit.

We have reread Judge DeBoni's deposition taken on February 10, 1989. Judge DeBoni was represented by Judge Kunkle. Judge DeBoni was asked by the attorney for Andrew Wilson if Judge Kunkle or Mr. Angarola ever informed him of the nature of the excessive force used on Andrew Wilson. The following occurred:

133

* * *

"And they were -- and Mr. Kunkle and Mr. Angorola directed the attorney if he had any information such as he was making allegations of or had information or evidence to bring to the proper body in the State's Attorneys Office which was my responsibility to open an investigation and investigate it. And they told me that that's what they referred or told the attorney in court, that was the conversation that was related to me.

* * *

A.     Mr. Kunkle's response to me that an attorney or a victim of an alleged excessive use of force would be contacting me regarding this allegation or these allegations and that never -- it was never forthcoming.

* * *

A.     I did get back to Mr. Kunkle and Mr. Angorola and I asked them if in fact this attorney was going to bring any evidence or bring his clients or any witnesses to me regarding this information that they had given to me earlier, and at that time, I think Mr. -- we were down -- I was on the 11th floor, it was either Mr. Kunkle's or Mr. Angorola's office. He said, "I don't know if he is going to proceed because I don't think he wants to bring his client in to be interviewed and subjected to any questioning at this stage." I told them at that time, "Well, without being able to talk to the victim and having some information, that we wouldn't be able to proceed with an investigation."

* * *

A.     I never heard from anyone, from any other witness or victim or attorney regarding the allegation.

* * *

And Mr. Kunkle and Mr. Angorola told me they gave my name and phone number to the attorney regarding any complaint that he wished to make or any investigation he wanted conducted regarding this, so I would expect to receive the call.

134

* * *

> Q. Did you make any attempt to learn either from Mr. Kunkle or from Mr. Angorola who that lawyer was to contact him rather than to wait for him to contact you to find out what his pleasure was?
>
> A. No. I was told that he was informed who to contact and what my number was and where I was and that I would be hearing from him, so I waited to hear from the attorney."

We have examined a deposition taken of Dale Coventry on February 2, 1989 in the Federal civil case brought by Andrew Wilson. Mr. Coventry was asked by Judge Kunkle if he had any recollection of talking "with anyone from the State's Attorney's Office as to whether Andrew Wilson would submit himself to an interview by an assistant from Special Prosecutions or appear before a Cook County Grand Jury" with respect to his allegations of police misconduct. Mr. Coventry answered, "No." He said he "wouldn't have done that because it was his view that the State's Attorney's Office would certainly not have done him or his client any good whatsoever." He was then asked the following question by Mr. Kunkle and made the following answer:

> Q. You don't recall my asking you in court, in the well of the court in front of Judge Crowley whether Andrew was willing to talk to a grand jury or not? (Emphasis added.)
>
> A. I don't recall that.

Mr. Coventry then said that if such a request had been made, as Andrew Wilson's attorney in the criminal case, he would have refused such a request.

It seems clear to us that there is a sharp difference between the facts as recited by Judge Kunkle's affidavit and the deposition testimony of Judge DeBoni and Dale Coventry.

135

R.SMITH02725

### The Burn Marks

Because we had determined that the burn marks on Andrew Wilson were the most important corroboration of his account of being tortured, we wanted to question Judge Kunkle about what appeared to us to be shifting explanations of the burn marks advanced by Judge Kunkle in the various hearings in which he opposed Andrew Wilson.

At the first criminal trial, Dale Coventry argued at the motion to suppress that the State had failed to rebut the expert testimony of Dr. Raba, who examined Wilson at Cermak Hospital, and Dr. Korn, who examined Wilson at Mercy Hospital, that certain marks on Wilson were burn marks. Judge Kunkle and Mr. Angarola did not present any expert witness at the motion to suppress hearing. In his argument, Judge Kunkle said nothing about the burns; he said he did not know where the "clip marks" on Wilson's ears came from.

In the first civil trial, Judge Kunkle introduced the testimony of Dr. Warpeha, a burn expert, that what Korn and Raba said were burn marks were friction abrasions.

In the second civil trial, Judge Kunkle introduced the testimony of William Coleman, who testified that Andrew Wilson told him at the County Jail before the second criminal trial began that he had intentionally burned himself on a radiator.

In the Police Board hearing, Judge Kunkle introduced the testimony of Dr. Werner Spitz, who testified, contrary to the previous expert testimony of Dr. Warpeha, that the mark on Andrew Wilson's thigh was a second degree burn. Judge Kunkle took the position that the burn had been caused by the wagon men, Ferro and Mulvaney. Judge Kunkle also introduced the previous testimony of William Coleman that Andrew Wilson told him that the burns on Wilson's body were self-inflicted.

136

Thus, in four separate hearings Judge Kunkle took four separate positions - no explanation; no burns; self-inflicted burns; and last, self-inflicted burns or, alternatively, burns caused by the wagon men.

When we questioned Judge Kunkle, we sought some explanation of the seeming inconsistencies in the position he had taken. As we have already pointed out, the burn marks were the most important corroboration of Andrew Wilson's testimony. We wanted to give Judge Kunkle the opportunity to disabuse us of our conclusion that the burn marks were corroboration. When we asked Judge Kunkle about those theories in the civil proceedings, he invoked the attorney-client privilege. He added, "If one simply reads our arguments one can pretty well tell what those theories are, at least what those theories, we wish [ed] to convey to the jury."

He told us that the Coleman self-inflicted theory was "abandoned." (He was in error. That theory was advanced at both the second civil trial and the Police Board hearing. The Police Board expressly rejected it.) He was "not personally that crazy about the self-inflicted theory." He also said he was "never that crazy about Warpeha's friction burn theories." At that point the following occurred:

> Q.  What do you mean when you say you personally weren't crazy?
>
> A.  It's just a matter of trial strategy.
>
> Q.  To me I infer from that you didn't really believe them.
>
> A.  I wasn't there. If there's anything I've learned in this business over all these years, if you are not there, you don't know.

137

R.SMITH02727

Near the end of our interview he sought to convince us that the burns were caused by the wagon men:

> "I mean, these guys take Andrew up in the elevator. He whacks him in the -- he has already got the wound on the forehead. He whacks him on the back of the head. Now he's bleeding front and back. The desk sergeant takes one look at him and he says, "Get him out of here. Take him to a hospital.
>
> Now they're really upset and they go downstairs and here's the radiator. And it is not a big public area the time of night that they were there. It is deserted at that time. And there's no guard on that radiator, and the flute distance from flute to flute on that radiator matches the burn patterns, which the ones at Area 2 do not."

In other words, the wagon men's prisoner, whom they have beaten, is refused acceptance by the lock-up personnel, a fact which must be reported to the First Deputy Superintendent. The wagon men are thus on notice that their actions are going to be the subject of an internal investigation. But the refusal has them "really upset," so they're going to vent their being "upset" by torturing him further, that is, stretching him over a radiator which is at least subject to public scrutiny. This is a theory that is completely unacceptable to us.

After questioning Judge Kunkle, we adhere to our conclusion that Burge had caused the burns on Andrew Wilson.

### Judge Gregory Ginex

Judge Ginex was the Chief of the First Municipal Division of the State's Attorney's Office on February 14, 1982 and was Hyman's immediate superior. His name did not appear in any reports or trial transcripts until we read the transcript of the Police Board hearing where he testified as a witness for Jon Burge.

138

R.SMITH02728

He testified on direct examination that he talked to Larry Hyman about the investigation. He probably talked to Mike Angarola at the time. During the week between February 9 and including February 14, when Andrew Wilson and Jackie Wilson were taken into custody, he had conversations from time to time with either Angarola or Hyman about the case. Specifically, on the 14th, he had a conversation with Larry Hyman in the early morning hours. Right after the conversation he went to the office (at 26th & California). The conversation with Hyman was on the phone. He was at home just getting ready to go to the office that day. Hyman basically told him they have got one of the offenders in custody. He didn't believe that he had a name at that point. "He made an oral," which Ginex took to mean that he had made some type of statement. "They are going after the other guy." He thought that they talked for a minute or two about what happened, and he told him, "Fine, Larry, I will see you at the office later or I will see you guys at the office later" and that was really the sum and substance of the conversation. To the best of his recollection it was between 8:00 and 9:00, 9:30. He later learned the name of the offender that had "in fact given an oral, according to Mr. Hyman." That was Andrew Wilson. He took it from his conversation with Hyman that the oral statement was inculpatory.

In an oral interview we had with Judge Ginex he said he had no recollection of any conversation with Larry Hyman in which Hyman said he was going to delay taking a court reporter statement from the shooter, Andrew Wilson. He also insisted that he never went to Area 2 on February 14.

139

### Jack O'Malley

On February 28, 2006 we interviewed Appellate Court Justice Jack O'Malley at the 2nd District Appellate Court building in Elgin, Illinois. Justice O'Malley stated that when he was first elected State's Attorney he became aware of an unusual amount of allegations of physical violence at Areas 2 and 3 in the Homicide Sex, later known as Violent Crimes units, of the Chicago Police Department. Justice O'Malley stated that the allegations, when embodied in a specific complaint that had been referred to the Office of the State's Attorney, it had been and were assigned to the Special Prosecutions unit of the office and handled by that unit.

He said that some individual allegations of police physical abuse were directed to his attention by members of his staff. He would, with his subordinates, review the facts of the allegations and the steps being taken concerning them by his office.

He appointed Andrea L. Zopp an Assistant State's Attorney; she was a former Assistant United States Attorney with experience in the investigation of abuse of prisoners by law enforcement officers. He assigned Ms. Zopp the development of standards to be followed by the State's Attorney with the review of, investigation of and prosecution of police physical abuse cases. He would from time to time review the progress Ms. Zopp had achieved.

Justice O'Malley has no independent knowledge of any specific case of police abuse, including no independent knowledge of specific action taken by the Office of the State's Attorney while he was the State's Attorney of Cook County.

140

R.SMITH02730

## Jane M. Byrne

This is a repetition of an abstract of the interview we had of Mayor Byrne which we have made part of our report on Richard Brzeczek.

On January 16, 2006, this office interviewed former Mayor Jane Byrne. She related the following relative to her involvement concerning the arrests of Andrew and Jackie Wilson and her relationship with Superintendent Brzeczek:

On three occasions she visited the Area 2 detective division as it was engaged in trying to ascertain the name or names of the Fahey and O'Brien killers.

The first visit to Area 2 was on the night of the Fahey and O'Brien shootings. At that time she met Jon Burge for the first time, whom she described as "appearing to be a businessman rather than a policeman." That description was based on Burge's conduct and his manner of dress. She visited Area 2 on two other occasions before the arrest of Andrew Wilson on February 14. On both occasions she conversed with Jon Burge.

She did not visit 11th & State while Donald White and others were in custody and being questioned at that location.

She said that Deputy Superintendent Joseph McCarthy was her direct appointment and she viewed him as "the superintendent in the field, especially in gang-related areas."

While the manhunt was on for the killers of Officers Fahey and O'Brien, she received her communications concerning the process in the case from Deputy Superintendent McCarthy.

On the date of Andrew Wilson's arrest, February 14, she was advised by Deputy Superintendent McCarthy of Wilson's arrest and the progress in the case. Those reports were given by McCarthy over the phone and Byrne did not visit Area 2 on February 14.

R.SMITH02731

She had Superintendent Brzeczek, Deputy Superintendents Lyons and McCarthy to dinner to voice her gratitude for the police department's work concerning the arrests of Andrew and Jackie Wilson.

She had no further involvement in the case, except that she recalls giving testimony on one previous occasion concerning Jon Burge and the Wilsons.

She stated that she was aware of "community problems" on the south side as a result of the manhunt after the Fahey and O'Brien homicides. She believed that "direct" police work was necessary in trying to ascertain the identity and arrest of the killers. She believed, she said, that direct (i.e. house-to-house) police work was "her way of doing things." She said that the supervising personnel at the police department may well have had different ways of doing things.

When she was asked whether she had any direct communication with Brzeczek prior to or on the date of the arrest of the Wilsons, she said that she had no such communication and further stated that her communications during the entire investigation were through Deputy Superintendent McCarthy.

She said she was not aware of Dr. Raba's letter; the contents of the letter had never been discussed with her by Brzeczek or anyone else.

She said she was not aware of the letter sent by Brzeczek to Daley. She said she never had a conversation with Brzeczek concerning violence at Area 2 under the supervision of Jon Burge. She was asked whether she was aware that Brzeczek now states he concluded there was physical abuse of prisoners at Area 2 under the supervision of Jon Burge when he received the letter from Dr. Raba. She said that Brzeczek had

142

never informed her that he was convinced that such mistreatment of prisoners occurred at Area 2.

She also said she was not aware of the commendation given to Jon Burge and other personnel at Area 2 after the Wilsons' arrest. She was not aware of any meeting Brzeczek had with his "command personnel" after the receipt of Dr. Raba's letter.

### Judge Frank DeBoni

Judge Frank DeBoni, as noted, was the Deputy Chief of the Special Prosecutions Bureau in the State's Attorney's Office in February, 1982.

We have spoken to Judge DeBoni several times. His deposition was taken on February 10, 1989, parts of which we have included in our discussion of Judge Kunkle's actions in response to the Dr. Raba letter. Insofar as we have been able to learn, Judge DeBoni did not see the Dr. Raba letter. (Judge Kunkle said he either told Daley or decided on his own to send it to Special Prosecutions. There is nothing about the letter in the DeBoni deposition that we have read.) Although the record is unclear, it seems more reasonable that someone from the State's Attorney's Office did speak to Dale Coventry and "invited" him to contact Frank DeBoni. It is clear that Dale Coventry did not contact Frank DeBoni and that Frank DeBoni did not contact Dale Coventry. Dale Coventry made it also clear that he would not make Andrew Wilson available for questioning by the State's Attorney under any circumstances.

Judge Deboni never reviewed the transcripts of the motion to suppress in the Wilson case. Kunkle or Angarola told him that they had directed Wilson's attorney to bring any information of excessive force by police officers to Judge DeBoni's unit. He did not recall the details of the allegation. Part of his testimony is this:

143

A.    That's not how we conducted our investigations in Special Prosecutions, Mr. Taylor. We would first like to interview the victims of the alleged excessive use of force and/or their attorney and/or whatever witnesses were there or alleged to have been there before we initiate and bring anything before a grand jury.

\* \* \*

A.    It's been our policy to talk to the victim and witnesses and/or their attorney prior to initiating any official action on the part of the State's Attorney's Office in an investigation of excessive use of force.

\* \* \*

A.    You have to understand, we have to know that we have a willing, cooperative witness before we could initiate any type of investigation. It would be just a futile gesture on our part to start an investigation, not knowing if we were going to get the cooperation of the attorney and/or the victim.

We agree with these observations of Judge DeBoni.

### LeRoy Martin

In 1980 he was the Commander of the narcotics division. He was reassigned in 1983 to be the Commander of Area 2. He was subsequently the Deputy Chief of Patrol for four, years and in 1987 he was appointed the Superintendent of Police by Mayor Harold Washington. He succeeded Fred Rice as the Superintendent. He served until 1992 and then retired.

When he was the Commander of Area 2 Jon Burge was his subordinate. Burge never talked to him about any abuse allegations that may have occurred. During the ten or eleven months he was the Commander of Area 2, nobody else ever brought to his attention allegations that Burge or detectives under his command might have been involved in abuse of people in custody.

144

R.SMITH02734

When he was the Deputy Chief of Patrol all of the districts under his command were in Area 4. None of them was in Area 2 where Burge was working. During the time period from 1987 when he was appointed until he retired there was not any controversy with regard to Jon Burge.

He recalls getting a copy of the Goldston Report. The Goldston Report had received some publicity before it was submitted to him. That was not a normal procedure and would not have been approved by any of his bosses. He read the Goldston Report in which the author made a complaint that all of the command officers at Area 2 during his tenure either took part in wrongdoing involving prisoners or they covered it up. He said that for him to concur in that report would have been saying that he too was a part of wrongdoing or covering up. After he read it, rather than tell Gayle Shines, the Chief Administrator of OPS, to take it back and reword it, he said, "Leave it like it is." But he would have a neutral party, an outside agency, review it. There are times when OPS investigations resulting in recommendations how policemen should be treated are brought before him. One of his functions was to either act or not act upon those recommendations.

Hubert Williams was asked to review the Goldston Report and decide whether it was a good investigation. Martin had further uneasiness about the report. He felt that if command officers had taken part in a cover-up or actual participation, Ms. Shines should have identified those individuals so that he, as Superintendent, could take action against them. That was never done. That was one of the deficiencies that he saw in the Goldston Report.

145

R.SMITH02735

Hubert Williams was the President of the Police Foundation at the time. The Police Foundation was a think tank and research company. It is an independent body. Williams identified in his letter of October 17, 1991, what some of his thoughts were with regard to the Goldston Report. After receiving the letter he wanted Williams to know what his uneasiness was about the Goldston Report. He wanted the officers named that were alleged to have taken part in wrongdoing.

Subsequently Williams wrote back to him on November 22, 1991, identifying some of "his preliminary observations" with regard to what he would like to look into. Williams did conduct or had someone under him conduct an analysis of the Goldston Report. He subsequently received an analysis by Williams of methods employed in the preparation of the Goldston Report. That analysis was dated February 26, 1992. He received a copy of the analysis "pretty close to his exit." He concurred in the analysis made by Williams' organization. His memory was that the sample of the Goldston Report was small. It was not large and inclusive of the people that were there. Martin didn't believe that anybody was ever contacted that commanded that particular area relative to allegations that Goldston put in his report as factual. Williams' report pointed out such questionable independence of observation, missing data, category errors, absence of baseline or comparative data and lack of clear operational definition.

Before he left, Martin recommended that Burge be separated from the department. The (Saunders) Report (should be Sanders) was one of the things he took into account when he recommended that Burge be separated. In the Sanders Report it was stated that Deputy Superintendent Joseph McCarthy apprehended Andrew Wilson. McCarthy said that Andrew Wilson did not have his shirt on and that the only mark he had on him was

146

R.SMITH02736

something like a pin scratch above one of his eyes. That was all the injury he could observe at the time that he turned him over to Area 2 and Lieutenant Burge. Some time later when Wilson was taken down to central lock-up, the lock-up keeper refused to accept him until he was taken to a hospital and given first-aid.

Martin agreed that something had obviously happened to Wilson from the time he was first taken into custody and when he was sent to the hospital. There was conclusive proof to him that something appeared to Wilson when he was in custody under the charge of Burge. That seventy page Sanders Report played a part in his decision to recommend the separation of Burge. He assumed that Gayle Shines generated it. After he left office Superintendent Matt Rodriguez moved forward with the case.

During the almost five years that he was Superintendent there were no other reports or lawsuits that had come to his attention with regard to Jon Burge during that time. He cannot recall any superintendents' meeting where Brzeczek said there's violence going on with prisoners at Area 2, and "how could this ever take place." He never had any conversations with Cecil Partee, the then State's Attorney, concerning violence in the police department, more pointedly, violence by or under Jon Burge. He never had any similar conversation -- about physical violence to prisoners and Jon Burge with States Attorney O'Malley. The United States Attorney's Office never interviewed him concerning Jon Burge.

He had no recollection of being involved in Burge's transfer from Bomb and Arson to Area 3. Burge was one of his lieutenants out in Area 2. Most of the contact he had with Burge and the other lieutenants involved calling them in and have them explain to him whatever it was that he was questioning about. Milton Deas never discussed with

147

him anything that would cause a concern about Jon Burge. Deas was a good commander, hard-working, never anything negative on his record. He was a good boss. Martin did not know anything about the OPS proceedings as to any of the officers whose files were later turned over to Needham.

## Conclusion

From all the interviews we have conducted and all the transcripts we have read, we feel dissatisfaction. There are unanswered many questions. We disagreed that Larry Hyman's version of what transpired represented reasonable prosecutive procedure. We also thought it was unreasonable that he would make the decision he did - to forbear taking the written statement - without clearance from a superior. But our interviews with Hyman's superiors give us scant, if any, help. Our hopes that Judge Kunkle, who said it was obvious to him that the two people who knew the most about the Wilson case were he and Mike Angarola, would shed some light on the question, were dashed. His statement contains few positive recollections. It is studded with, "it is possible," "he was probably," "he assumed," "he believes," "he might have," and "he thinks." He did not know whether Larry Hyman ever consulted with any superiors about whom Hyman should question first. He said he had no idea that Hyman took a statement from Derrick Martin but still hadn't taken a statement from Andrew Wilson. This is very surprising to us. Derrick Martin was a key and controversial witness at both trials.

Judge Kunkle said that Hyman would have been telling a lot of people what was going on. But that is not what Hyman testified to. Hyman never mentioned Ginex or the Chief of Municipal. He did not mention Devine. He said nothing about talking to Kunkle.

148

The only person Hyman named as one with whom he discussed the investigation was Michael Angarola, who is deceased. But Hyman never said he had a conversation with Angarola about waiting to take a statement from Wilson. And if he did tell Angarola, Angarola must have kept that information to himself because all of Angarola's superiors say they had no knowledge of the delay.

State's Attorney Devine told us that he had a number of conversations with Angarola. He also told us he had no specific recollection of the length of time Hyman took before he took Wilson's statement. In fact, in all of Hyman's testimony, there is nothing to show that the question of his delay in taking Wilson's statement was ever discussed with any superior. Hyman said it was a strategic decision and the decision was his. Our final word on this question is that we cannot prove that any of Hyman's superiors knew of his decision, but if all of them did not know of his decision, their failure to know it does not redound to their credit.

We turn now to another aspect of the Wilson case that again, strangely, no one in a supervisory position in the Police Department or the State's Attorney's Office seems to know anything about - the actions of Mulvaney and Ferro.

Andrew Wilson testified to the acts of brutality that were committed against him by the wagon men, Mulvaney and Ferro, at Area 2 when they came to take him to the lock-up at 11th & State and again later, until they surrendered Wilson to the lock-up. Wilson's injuries corroborate his testimony, which was further corroborated by the medical personnel at Mercy Hospital, who testified to the improper behavior of Mulvaney and Ferro.

R.SMITH02739

According to Brzeczek, the idea was circulated very early in the higher echelons of the Police Department that Mulvaney and Ferro had tortured Wilson. State's Attorney Devine told us that he and Daley had been told by the lawyers running the case that there may have been physical abuse, but it came at the hands of the wagon men.

Judge Kunkle in his statement to us said that there was no question that Mulvaney and Ferro had mistreated Wilson; it occurred to him that they had committed a crime. When we asked him whether he ever interviewed Mulvaney and Ferro, he said, "I don't think so. I don't think he would talk to us." He added, that was a "very vague recollection." He was asked if he ever tried to talk to Ferro, and he said he imagined that they did but he didn't recall specifically. After he said he was convinced that Mulvaney and Ferro had in fact mistreated Wilson, he was asked what he did about that. He said that he told Special Prosecutions to handle it. He added that he wasn't sure if he did or if the State's Attorney and the First Assistant did, but somebody did.

He also said that he turned it over to the "Police Department." He was then asked if he knew of anybody in the State's Attorney's Office that apprised the Police Department about his conclusion that Mulvaney and Ferro had committed a crime. He said it would have been a long time "down the road before I concluded what specifically I believed Ferro or Mulvaney did." He added that "it was long before that that Andrew's allegations about them mistreating him were known." He did not define what a "long time" was.

Mr. Devine said that he received information from the lawyers running the case (who were Angarola and Kunkle) that there may have been physical abuse but it was abuse at the hands of the wagon men. Judge Kunkle concluded that the Police

R.SMITH02740

Department knew it, Special Prosecutions knew it; and he asked rhetorically, "Who was I to tell that didn't know?"

State's Attorney Devine was asked why somebody didn't look at the wagon men. He said he was surprised that as part of an administrative process they were never brought in and talked to because they could not claim their rights to remain silent without forfeiting their rights to be police officers. That was something he would have expected to be done.

Insofar as our investigation has been able to discover, no one from the State's Attorney's Office or the Chicago Police Department ever made any attempt even to interrogate Mulvaney and Ferro, let alone file charges against them in the year before Mulvaney killed himself and Ferro retired.

If Ferro committed a crime, and several persons in the State's Attorney's Office and the Police Department were convinced that he did, his moving out-of-state did not place him beyond the reach of Illinois law. And it is not unreasonable to believe that any investigation and prosecution of Mulvaney and Ferro might at least have put to rest the question of whether Mulvaney and Ferro had caused the burns on Wilson's body. By the State's Attorney and police doing nothing, that issue had to remain unresolved; and those opposing Andrew Wilson in litigation were able to argue that it was Mulvaney and Ferro that had caused the burns.

We make the same observation of the Mulvaney - Ferro issue that we made of the supervision of Hyman: The actions of the State's Attorney's Office and the Chicago police department do not redound to their credit.

151

Although the Wilson case was the focus of our investigation, it extended beyond the Wilson case until November, 1991 when Burge was suspended. Although there are numerous complaints of other acts of brutality which we suspect or believe occurred at Detective Areas 2 and 3, we have not been able to uncover any proof that investigation and prosecution of any of those complaints was covered up by any police or prosecutive personnel. To sustain such a charge, the prosecution must show more than police or prosecution lack of diligence. There must be a showing of acts done with the criminal intent to obstruct justice. We can find no evidence to support such a conclusion in any of the cases that we have investigated, including the Andrew Wilson case.

In his statement to us, State's Attorney Devine pointed out that motions to suppress would be involved in most of the cases where abuse was alleged and would provide a vehicle for an airing of the facts. We agree with that observation, with a caveat. Just as we can understand the position of a prosecutor who is faced with a person who claims to have been brutalized by the police but who refuses to speak to the prosecutor, we can also understand the position of a prosecutor who is confronted with a motion to suppress a confession on the ground that it allegedly was not voluntary. It is reasonable for a prosecutor to believe that the motion to suppress will provide a defendant with the opportunity to bring out all probative facts by cross-examination, his own evidence and his access to compulsory process.

But in the Wilson case something crucial happened: The Supreme Court of Illinois held that the truth-seeking process of the motion to suppress had failed; the arguments raised by the State's Attorney and the trial judge's decision were wrong. It is not unreasonable to say that the Supreme Court decision was the watershed of the

152

R.SMITH02742

Andrew Wilson brutality investigation. The question had to arise: What were the obligations of the prosecutor (and the City of Chicago) to investigate further?

At the time of the reversal of Wilson's criminal conviction, April 2, 1987, Harold Washington was the Mayor of Chicago. Upon his death in November, 1987, he was succeeded for only a week by David Orr, who in turn was succeeded for over sixteen months by Eugene Sawyer. Richard M. Daley was the State's Attorney at the time of the reversal and became the Mayor on April 24, 1989. Cecil Partee became the State's Attorney. Mr. Partee is now deceased.

After another OPS investigation was completed, Superintendent Leroy Martin suspended Jon Burge in November, 1991 and Burge was subsequently discharged in 1992. Although Burge was apparently protected from criminal prosecution because of the passage of time, the City of Chicago did take some steps to discharge him. The point of our observations is that motions to suppress may not always be relied upon to provide a thorough exposition of the facts

153

R.SMITH02743

## COVER-UP EXHIBIT No. 1

OFFICE OF THE SUPERINTENDENT                     31 AUGUST 1998

PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION

TO:      LEONARD BENEFICO
         OFFICE OF PROFESSIONAL STANDARDS

FROM:    THOMAS P. NEEDHAM
         GENERAL COUNSEL TO THE SUPERINTENDENT

SUBJECT: **OLD COMPLAINT REGISTER FILES**

       It has come to my attention that the Office of Professional Standards has in its possession a series of complaint register files which date back to the 1980's. Those cases are as follows:

|    | Complaint Register # | Complainant | Date of Alleged Misconduct |
|----|----------------------|-------------|----------------------------|
| 1. | 125071               | Michael Johnson | 09 June 1982           |
| 2. | 126802               | Lee Holmes  | 10 September 1982          |
| 3. | 142017 and 173407    | Stanley Howard | 03 November 1984        |
| 4. | 142201               | Philip Adkins | 13 November 1984         |
| 5. | 169867               | Donald White | 13 February 1982          |
| 6. | 188617               | Gregory Banks | 29 October 1983          |
| 7. | 200390               | Lavert Jones | 29 January 1984           |
| 8. | 134723               | Darrell Cannon | 02 November 1983        |
| 9. | 202019               | Stanley Ware | 09 September 1982         |

       The most recent of these cases is almost 14 years old. while the oldest of them was initiated 16-1/2 years ago. For those files in this group in which a reinvestigation was attempted, proceedings were abandoned at least 3 years ago. Most of the accused officers are no longer Department members. Bringing charges against any of the remaining accused at this time would deprive those officers of an opportunity to present a full defense. More importantly, the lengthy delay between the date of the initial complaint and the present makes it virtually impossible to conduct any kind of meaningful inquiry into the matters in issue.

       Accordingly, you are hereby instructed to classify all of the allegations in the above-referenced complaint register files as "not sustained."

                              *Thomas P. Needham*
                              Thomas P. Needham
                              General Counsel to the Superintendent

TPN/hw

154

R.SMITH02744

## COVER-UP EXHIBIT No. 2

 

Search   Directories   Site Map   Maps   Comments   UChicago   Law School

# Cop Brutality Probe Must Be Thorough, Fair;
# Public Confidence in Our Justice System is at Stake

Locke E. Bowman and Randolph N. Stone
*Chicago Sun-Times*
Thursday, May 16, 2002

On rare, important occasions, in the face of substantial corruption or abuse, the justice system employs the services of an outsider to prosecute police or others whom the elected state's attorney--because of entanglement with the wrongdoers--is unwilling or unable to pursue.

On April 24, such an occasion occurred: Cook County Chief Criminal Judge Paul Biebel Jr appointed former Illinois Appellate Court Justice Edward Egan as special prosecutor and attorney Robert Boyle as assistant special prosecutor to investigate allegations of torture and cover-up against former Chicago Police Cmdr. Jon Burge and detectives who worked under Burge's command at the Area 2 police headquarters in the 1980s. When Biebel made the appointment, he surely recognized that his decision had historic implications and that the investigation would be vital to the integrity of the system.

This is not the first occasion in Chicago in which an outside prosecutor has been called in to challenge an abuse of power and, thereby, to reassert the values of honesty and decency that characterize most of those who work in our criminal justice system. Thirty years ago, Barnabas F. Sears acted as a special prosecutor, having been appointed to investigate former Cook County State's Attorney Edward V. Hanrahan and his role in the 1969 police raid of a West Side home that resulted in the shooting deaths of Black Panthers Fred Hampton and Mark Clark

Other jurisdictions have taken similar extraordinary measures in response to police abuse and corruption. In Los Angeles within the much more recent past, for example, a far-reaching investigation followed in the wake of allegations that a number of police officers had been involved in the drug trade and had planted drugs on suspects. Police officers were prosecuted and criminal cases were thrown out. In Pittsburgh, following a rash of complaints of police abuse of citizens, a federal court imposed a consent decree under which the police are monitored by the U.S. Justice Department.

In making his recent decision, Biebel must have seen that, to restore public confidence, there needed to be an aggressive, outside inquiry into whether Burge and his men applied electric shock, suffocation and other torture techniques to scores of young African-American men in police custody. There is every reason for concern that this in fact happened and that criminal charges should be brought. Richard Brzeczek, the police superintendent under whose watch Burge worked, is recently reported to have said that there is now "no doubt" in his mind that Burge engaged in torture

We represented the coalition of organizations and activists that petitioned Biebel to appoint the special prosecutor. In that role, we feel entitled to offer the special prosecutor our opinions on how he must proceed:

R.SMITH02745

° Be thorough. The Burge torture probe must sort through the accounts of numerous victims over the course of many years. If, indeed, there was a cover-up of torture, getting to the bottom of that will be a painstaking process. Biebel offered the special prosecutor all necessary resources to complete this large task. In light of the significance of the undertaking, he should not hesitate to hire the necessary staff. The special prosecutor must also employ the resources of the prosecutorial function. He should empanel a grand jury, issue subpoenas as necessary, call witnesses and immunize those who are reluctant to testify truthfully

° Be impartial. The African-American community, reasonably enough, sees the allegations that Burge and other white Chicago police officers brutalized dozens of young black men as suggesting the most stark and appalling police racism. Since race figures so prominently in this case, it is imperative that the staff of the special prosecutor's office include several well-qualified and capable black prosecutors.

° Be aggressive. Chicago's criminal justice system is hugely invested in the proposition that the Area 2 torture never happened. Police and prosecutors have denied it for years, while Cook County judges have often turned a blind eye to these charges. In the face of these denials and inertia, it will take considerable courage to insist on the truth. All the more so, if the investigation reveals that people who now hold high office were aware of the Area 2 torture and were part of the cover-up

° Be unsparing. It would be cruelly perverse for the special prosecutor to find that numbers of Chicago citizens were tortured at Area 2, but to decline to prosecute the torturers because of the passage of time and the bar of the statute of limitations. The special prosecutor, if he finds evidence of torture and proof that the truth was covered up for many years, should not hesitate to use the obstruction of justice and perjury statutes to criminally prosecute those involved. He should also consider criminal referrals to the U S attorney's office for prosecution under the federal civil rights statute

°°Be open. The work and the conclusions of the special prosecutor's office should be explained to the public in an official report at the completion of the investigation. There are allegations that Burge and other police officers tortured confessions from people who are now wrongfully on Death Row as a result. This is a matter of grave public concern. Whether or not criminal charges are brought, the special prosecutor must inform the public of the conclusions of his investigation.

Egan and Boyle have been given an opportunity that few in our system ever receive: the chance to be remembered in history for exposing evil and attacking it. We wish them success

Locke E Bowman is legal director of the MacArthur Justice Center at the University of Chicago Law School. Randolph N. Stone is clinical professor of law at the University of Chicago Law School.

Copyright The Chicago Sun-Times. Inc.

uchicago℠ • ©1998-99 The University of Chicago Law School℠ • 1111 E. 60th St  Chicago  IL 60637

R.SMITH02746

## THE RELATIONSHIP BETWEEN THE OFFICE OF PROFESSIONAL STANDARDS AND THE COOK COUNTY STATE'S ATTORNEY

Our personal experience as prosecutors has made us aware of the importance of a good working relationship between the prosecutor and the agency whose primary duty is first, to prevent crime and second, to investigate crime. Our investigation centers principally on the relationship between the Cook County State's Attorney and the Chicago Police Department. That relationship should be based on an understanding by the prosecutor and the police of the problems facing each other and the duties imposed on the other by law. This is particularly true when the possible "crime" being investigated has been allegedly committed by a police officer.

If the police officer is alleged to have committed a crime, that allegation necessarily raises the question of whether the officer should be disciplined - a question exclusively under the control of the police department itself. But the police department at the same time is charged with the responsibility of investigating to determine whether the officer has in fact committed the alleged crime - that is a question that is not exclusively under the control of the police department; it necessarily involves the prosecutor.

We recognize that both agencies have the power to investigate and the duty to investigate. But that duty to investigate by one agency should be done in a spirit of cooperation with the other. Justice is not served when those duties to investigate collide. (People v. Wilson, 626 N.E.2d 1282) On the other hand, exercise of the duty to investigate by one agency does not necessarily absolve the other agency from its duty to investigate.

We wish to make our position clear: We were not appointed to act as an ombudsman over the inner workings of the Chicago Police Department in dealing with

R.SMITH02747

disciplinary problems. The focus of our investigation is on the relationship between the Chicago Police Department and the State's Attorney's Office and the procedures they use concerning allegations of police brutality, a crime.

At this point we wish to express our appreciation for the assistance and cooperation we have received from State's Attorney Devine and Police Superintendents Hillard and Cline. At the direction of State's Attorney Devine we have had valuable help from Assistant State's Attorney Gerald Nora, Executive Assistant to the State's Attorney, and Assistant State's Attorney Thomas Bilyk, the present head of the Professional Standards Unit. Similarly, at the direction of the Superintendents we have had the valuable help of Leonard Bonafico, who was the OPS Coordinator of Investigations, Michael Duffy, the present Coordinator of Investigations, Karen Rowan, who was the General Counsel to the Superintendent, Sheri Mecklenburg, the present General Counsel to the Superintendent and Gary Feffer, an assistant to Sheri Mecklenburg.

The Office of Professional Standards (OPS) is a successor to a division of the Chicago Police Department called the Internal Investigation Division (IID). The IID was created in late 1960 by the newly appointed Superintendent of Police, Orlando Wilson. Its function was to investigate all allegations of wrongdoing by police officers for two purposes: To determine whether, in the opinion of the IID, the officer investigated had violated rules of the Chicago Police Department that would support disciplinary action being taken against the officer, including action seeking separation and to determine whether the officer, again in the opinion of the IID, might have committed a crime. The IID investigators were Chicago policemen. The investigators now assigned to the OPS

R.SMITH02748

are civilian employees. The head administrative officer of OPS, the Executive Director, is appointed by the Superintendent and reports directly to the Superintendent.

Orlando Wilson was appointed as a result of a "police scandal" which involved Chicago police officers acting in concert with a professional burglar. The investigation that led to the issuance of search warrants and subsequent indictment and conviction of the officers was initiated by the State's Attorney and largely conducted by the Chicago police officers assigned to the State's Attorney's Office. The only participation by Chicago police officers, who were not working directly for the State's Attorney, was to assist in the service of the search warrants and the arrest of the defendant officers. (See People v. Beeftink, 171 N.E.2d 632, People v. Brinn, 204 N.E.2d 724.) Neither the Mayor of the City of Chicago nor the head of the Chicago Police Department, then called the Commissioner, was apprised of the investigation before the arrests.

In early 1961 the State's Attorney's investigative staff consisted mainly of Chicago police officers, whose salaries continued to be paid by the City of Chicago. Superintendent Wilson expressed the intention to withdraw all Chicago police officers from assignment to the State's Attorney's Office. Newly elected State's Attorney Daniel P. Ward pointed out that withdrawal of the Chicago police officers from assignment to the State's Attorney's Office would cripple his investigative arm. Superintendent Wilson's principal complaint was with the fact that Chicago police officers under the authority of a county officer would be used to investigate Chicago police officers who served under the authority of the City of Chicago mayor. History has shown that political differences sometimes fostered such investigations.

159

R.SMITH02749

An agreement was reached between State's Attorney Ward and Superintendent Wilson. The Chicago police officers could still be assigned to the State's Attorney's Office, but allegations of wrongdoing against Chicago police officers would be investigated initially by the IID. After the investigation by IID, the results of the investigation were to be brought to the First Assistant State's Attorney, who would decide whether criminal charges would be brought. This procedure was followed for several years; but there were some instances where the State's Attorney's intercession was sought before the internal investigation had been completed by the police. (See e.g., People v. Hansen, 192 N.E.2d 359.) It was always understood, however, that the State's Attorney's Office was not relinquishing its own authority to initiate investigation of police wrongdoing if information of that wrongdoing came first to the State's Attorney. It was also understood that no public notice of such an investigation would be made by the State's Attorney without apprising the Superintendent beforehand.

Now, and for several years, the State's Attorney's Office has its own investigative staff paid for under the Cook County budget. Since 1970 there has existed a division of the State's Attorney's Office called Felony Review. For twenty-four hours each day an assistant state's attorney assigned to that division is available to assist police officers throughout the county. The principal functions of the assistant state's attorneys are to determine whether and what charges are to be made and to take recorded statements in cases of more serious offenses.

Also for several years, there has existed in the State's Attorney's Office a division called the Special Prosecutions Bureau. Among other duties, that Bureau was charged with investigating allegations of police brutality against prisoners. In January 1999 the

160

State's Attorney created the Professional Standards Unit (PSU) to investigate all allegations of excessive use of force for possible criminal charging. The head of PSU is Thomas Bilyk, with whom we have conferred on several occasions.

While we recognize that the focus of our investigation is on the collection of information by OPS and dissemination of that information to the State's Attorney, we believe that we are not required to refrain from expressions of disagreement with all the procedures adopted by either the OPS or the State's Attorney. For example, the command review procedure following a determination by OPS that certain disciplinary steps should be taken requires that four separate commanding officers pass on the OPS recommendation. Their decisions are only advisory. In our judgment, that elaborate review is unnecessary and time-consuming. If that procedure is in place because of an agreement with the bargaining agent for the police officers, the Federation of Police, we would urge the Chicago Police Department to seek to remove it from any agreement.

While Gayle Shines was the Executive Director of OPS, investigation of nine cases of alleged excessive force by police officers had been completed, recommendations were made and the files turned over to her for review. Those files remained in her office for four and a half years unreviewed until she resigned. (We will discuss those nine cases in more detail later.) Since she reported directly to the Superintendent, reporting procedures should have been in place whereby the Superintendent was apprised on a regular basis of what cases had been completed by OPS and had been turned over to the Executive Director for review.

We interviewed Thomas Needham, who had been appointed the General Counsel to Superintendent Terry Hillard in early 1998. He testified at his deposition on March 9,

R.SMITH02751

1999 that his staff reviewed all sustained complaints, and they, in turn, were given to the Superintendent for final review. Needham said that it was his hope or goal that he would complete his review and forward it to the Superintendent within three or four weeks. He did not know the average time it took such cases to get from OPS to the Superintendent's office.

We interviewed Michael Duffy, the Coordinator of Investigations of OPS. We had previously interviewed Leonard Bonafico, who had held the same position before Mr. Duffy. (We also read Mr. Bonafico's deposition which he had given in a civil suit.)

Mr. Duffy testified that presently the Superintendent does not get a report from OPS of the cases that were turned over to the Chief Administrator for review, but that "on occasion" OPS does prepare reports for the Superintendent of "what's pending." He agreed that it would not be a "great hardship, administratively" to notify the Superintendent. We would recommend that the Superintendent personally be apprised of all sustained cases involving allegations of police brutality every month and at the same time the length of time each sustained finding of OPS staff had been pending.

There has been some confusion over the question of whether the OPS should maintain a record of previous claims of coercive behavior having been made against officers. We have been informed by Mr. Duffy that under the procedures now in place at OPS, past allegations of coercive behavior by a police officer, even if not sustained, may be considered in evaluating a new claim of such behavior. In our judgment, this is a salutary measure.

Very early in our investigation, we were given the impression that records were kept showing a breakdown of complaints of excessive force by districts and by Detective

R.SMITH02752

Areas. Thomas Needham testified that it was his belief that Detective Area 2 had the largest number of complaints of excessive force. In response to our questions about such statistics, however, we were informed by Sheri Mecklenburg, General Counsel to Superintendent Cline, that no such statistical breakdowns of complaints by district or Detective Area were maintained. In our judgment, they should be.

Superintendent Cline has also initiated a computer system identified under the acronym "CLEAR." Its purpose, according to Mr. Duffy, is that "it puts in a lot more accountability as to who has a case under their control at any given point during the investigation or the appeal process." Again, this is a salutary measure.

It is appropriate to discuss the cases where allegations of excessive force are made by a person in custody and, usually on advice of counsel, he refuses to be interviewed by either OPS or the State's Attorney's Office. More often than not, this situation arises when criminal charges are pending against a claimant. Again more often than not, the criminal case will involve a motion to suppress a statement made by the person complaining to OPS. In these cases, we see nothing opprobrious or sinister about a prosecutor asking OPS to suspend its investigation until the motion to suppress has been heard. We make our position known on this question, because in the case of Stanley Howard, a charge has been leveled against an assistant state's attorney by persons representing Stanley Howard that the assistant state's attorney had done something wrong by asking OPS to refrain from further investigating Stanley Howard's complaint until the criminal trial had been completed. (Stanley Howard had already made statements to OPS and the FBI while his criminal charges were pending.)

163

We turn now to the procedures in the State's Attorney's Office covering allegations of coercive behavior by police in questioning prisoners. The State's Attorney receives information about allegations of police coercive behavior either from OPS, or a complaint made directly to the State's Attorney's Office or, more often, through motions to suppress evidence filed in criminal proceedings. It is those latter cases that present a problem for the prosecutor. For illustrative purposes we refer to the many cases that have been remanded by the courts of review following the filing of the Goldston Report. The Supreme Court ordered that the defendants should be given the opportunity to present evidence that the officers they named as persons who had tortured them had done the same thing to other persons in custody. (See e.g. People v. Hobley, 696 N.E.2d 313.)

Under Brady v. Maryland, 373 U.S. 83, the State is obliged to provide evidence which may be beneficial to a defendant; if the State fails to do so, the defendant may be granted a new hearing. And concealment of evidence by the police may be imputed to the State. (See Kyles v. Whitley, 514 U.S. 419; People v. Hobley, 696 N.E.2d 313.) Again for illustrative purposes, we refer to the Andrew Wilson case. Wilson alleged that he had been mistreated by Burge. Four months later, Michael Johnson made a complaint to OPS that Burge had mistreated him and released him. We assume that neither the lawyer representing Wilson in the criminal trial nor the prosecutors had any knowledge of Michael Johnson's complaint to OPS. In our judgment, Johnson's testimony would have been admissible in support of Wilson's motion to suppress. The credibility of Johnson and the weight to be given to his testimony would have been for the trier of fact.

It is also our judgment that a reviewing court could impute knowledge of Johnson's complaint to the State and reverse and remand the conviction for a new hearing

164

on the motion to suppress. It is, therefore, our judgment that the State should take every reasonable step to insure that it has all the evidence of prior complaints of coercive action against a given officer against whom allegations of such coercive action are the subject of inquiry in a pending proceeding.

Pursuant to a current agreement between the State's Attorney and the Police Superintendent, there is a monthly meeting between the Office of Professional Standards and the State's Attorney's Professional Standards unit. The Chief of the Professional Standards unit is informed of all new complaints and he reviews progress of previous complaints. He puts all new data in the State's Attorney's system.

We have recommended, and State's Attorney Devine has agreed, that in the future whenever an allegation of coercive behavior by a police officer is made in a motion to suppress, the trial assistant state's attorney shall notify the State's Attorney's Professional Standards unit of the allegations of the motion and the names of the officers against whom allegations of coercive behavior are being made. We assume that the Professional Standards unit will share with the trial assistant any pertinent information that it has. After a motion to suppress has been resolved, the State's Attorney's Office should so advise OPS.

At this point, we will address the responsibility of the claimants and their attorneys. If a claimant has refused to give a statement to OPS on the advice of his lawyer and the trial has been completed, we see no reason why the claimant and his lawyer should persist in refusing to cooperate with OPS. We are not impressed with the arguments of counsel that their clients are justified in refusing to cooperate with OPS until every possible avenue of appeal has been traveled. There are cases we have

165

investigated where statements were made by claimants to OPS (and the FBI) before their criminal cases were completed. Stated very simply, the claimants and their attorneys cannot have it both ways.

Since January 2000, pursuant to an oral agreement between Superintendent Hillard and State's Attorney Devine, OPS is required to notify the State's Attorney's Office by "an immediate referral" of cases involving broken bones; admission to the hospital; stitches/serious lacerations; injury resulting from being struck with a bludgeon or deadly weapon; "emergency occurrence" which involve death or any of the aforementioned factors; police-involved shootings; any case in which an officer's use of force is captured in still photographs or videotapes; and cases of death in custody where there are allegations of excessive use of force. When we pointed out to Mr. Duffy that that list did not include electro-shocking or suffocation by bagging, he assured us that he, as Coordinator of Investigations, had wide discretion in including other unusual allegations of mistreatment to the list of cases for "immediate referral."

An important step toward insuring voluntary interrogations of prisoners has been taken by the Chicago Police Department as a result of legislation that went into effect on July 18, 2005. Section 5/103-2.1 (ILCS 5/103-2.1) requires electronic recording of custodial interrogation of persons suspected of persons suspected of a homicide. The statute sets a burden of proof as to the admissibility of non-electronically recorded statements by an accused in a homicide investigation. Such statements are presumed to be inadmissible as evidence against the accused "unless (1) an electronic recording is made of the custodial interrogation and; (2) the recording is substantially accurate and not intentionally altered."

166

R.SMITH02756

Robert Boyle, the Chief Deputy State's Attorney, has observed and is much impressed by the operation of the state-of-the-art digital recording equipment in operation at what appears to be considerable expense to the City of Chicago. Sheri Mecklenburg, the General Counsel to Superintendent Cline has written "A Lawyer's Guide to the Chicago Police Department's Electronic Recording of Interrogations." That guide explains the law, the electronic recording system and discovery procedures. In the guide the Chicago Police Department recognizes "the Department's obligation to provide the State with a copy of any recording by opening its network to the State's Attorney so that the State will have the same access as the [Chicago Police Department] to the original files of recorded interrogatories." Sheri Mecklenburg's guide should be required reading for anyone in law enforcement and recommended reading for anyone interested in law enforcement.

### Conclusion

For some time, beginning in 1999, State's Attorney Devine and Superintendent Hillard, and continuing with Superintendent Cline, have been working on agreed procedures that would expand and expedite the dissemination of information of police brutality between the State's Attorney's Office and the Chicago Police Department, which Mr. Devine has shared with us. Those procedures, which will embrace all police departments in the county, represent the result of much work and thought. Our ultimate conclusion is that Superintendent Cline and State's Attorney Devine have made a concerted attempt to improve the procedures within their own offices and the working relationship between their offices in cases dealing with allegations of coercive conduct by the police against those in their custody. That being said, however, we caution that the

167

best conceived plans and procedures will be for naught unless the parties recognize the need for supervision and accountability at every stage of the prosecutive process.

R.SMITH02758

## LEROY ORANGE AND LEONARD KIDD

An analysis of the Leroy Orange and Leonard Kidd cases requires consideration of the two cases together. Kidd is either Orange's half-brother or his stepbrother. They were both arrested on January 12, 1984 in connection with the discovery of four bodies, including that of a nine year old boy, in an apartment at 1553 West 91st Street in Chicago. They both confessed. In his court-reported statement to Assistant State's Attorney Dennis Dernbach, Orange said that he and Renee Coleman met Leonard Kidd and discussed using Kidd's combination radio and tape player to exchange for some cocaine. Kidd agreed, and Orange and Coleman returned to her apartment with the appliance. Michelle Jointer, Ricardo Pedro and Coleman's nine year old son were present. After smoking some cocaine, Orange called Kidd at 12:30 or 1:00 that morning and asked him to come to the apartment; when Kidd arrived, Orange explained that he was having some problems with Ricardo Pedro. He said that around 3:30 he got into a fight with Pedro and stabbed him and then tied him up. Later he went to another part of the apartment and consumed more cocaine. He returned to the back bedroom around 5:30 and stabbed Pedro again. He then tied up Jointer, and attempted to tie up Coleman's son. Coleman insisted on doing that herself, and when she was done, Orange tied her up also. He said he gagged Jointer and the Colemans and then stabbed them. He set the bed on fire and started another fire in the front of the apartment. Orange and Kidd left the apartment together.

Kidd's confession was in substance the same: Orange had been the principal malefactor; it was Orange who stabbed the four victims to death and set the fire. Kidd also led police to various garbage cans near Coleman's apartment where the knives used

R.SMITH02759

in the killings were found. He also showed the police where other evidence, including drug paraphernalia, clothing and burnt debris had been left. Kidd was wearing a watch belonging to one of the victims when he was arrested. He first said he had been given the watch by Pedro. Later he said he had taken it from Pedro's body.

While Orange and Kidd were awaiting trial on that charge, they were first represented by the same attorney, Earl Washington. Washington withdrew from representing Kidd in the spring of 1984, and the public defender was appointed to represent Kidd.

Washington testified at a deposition that Orange told him that he believed Kidd had been involved in a fire on October 28, 1980 at 1512 West 65th Place in Chicago, where ten children died. Orange wanted Washington to inform the State's Attorney of Kidd's involvement in that fire to bolster Orange's own position in the 1984 crime for which he was indicted with Kidd. Washington then passed that information on to the State's Attorney's Office that then questioned Kidd, who confessed to setting the fire that killed the ten children.

Orange and Kidd were indicted together for the 1984 fire. On Orange's motion the judge severed their trials. Orange was tried first. On May 21, 1985, Kidd testified at Orange's trial that he, Kidd, had stabbed the four victims and set the fire and that Orange was not present at the time of the stabbing. The State introduced Kidd's confession, which, as noted, corroborated Orange's confession that established Orange as the person who stabbed the victims. The jury convicted Orange and sentenced him to death.

R.SMITH02760

On August 5, Kidd pleaded guilty to the four murders arising from the 1984 fire. On August 8, he made a motion to withdraw his plea of guilty, which was denied. After a sentencing hearing a jury sentenced Kidd to death.

Kidd's conviction was reversed by the supreme court, which held that Kidd should have been permitted to withdraw his plea of guilty. (People v. Kidd, 591 N.E.2d 431) He was tried before a jury which convicted him and sentenced him to death. The State introduced his confession and his testimony at the sentencing hearing after his plea of guilty in which he testified, corroborating his testimony at Orange's trial that he stabbed the victims. That conviction and sentence were affirmed by the supreme court. (People v. Kidd, 591 N.E.2d 431)

His sentence was commuted by Governor Ryan and he is now serving a life sentence without parole. He has a post-conviction petition pending.

He was also convicted and sentenced to death by a jury for the deaths of the ten children in 1980. That conviction was reversed and remanded by the supreme court. (People v. Kidd, 687 N.E.2d 945) He represented himself at the second trial. He was again convicted and sentenced to death by a jury; and that judgment was affirmed by the supreme court. (People v. Kidd, 687 N.E.2d 945) That sentence was also commuted by Governor Ryan to life imprisonment without parole.

**Leroy Orange**

As noted, despite Kidd's testimony, Orange was convicted by a jury and sentenced to death. The supreme court affirmed that conviction and sentence. (People v. Orange, 521 N.E.2d 69) Governor Ryan pardoned him. He has filed a suit for money damages in the Federal district court alleging that police officers, including Jon Burge,

R.SMITH02761

had mistreated him. After his release from prison, he was convicted of a narcotics violation and was sentenced to prison. He was paroled, and we have been informed that he has been returned to prison as a parole violator and has been released again.

At his trial, Orange did not make a motion to suppress his confession. His lawyer, Earl Washington, testified that it was a strategic decision on his part to refrain from making a motion to suppress. He said the prosecutor would be deprived of a "dress rehearsal" prior to Orange's testimony before the jury. The supreme court ruled that that strategic decision was not proof of ineffective assistance of counsel. Orange did not challenge the sufficiency of the evidence of his guilt on appeal. He testified before the jury. His testimony regarding what occurred before Leonard Kidd's arrival at the apartment "corresponded in large part to what [Orange] had told the police concerning that." He also said, however, that he left the apartment around 2:30 a.m. when he went to the home of his friend, where he stayed until 8:00 a.m. He also testified that the police mistreated him while he was in custody, and he attributed his confession to the alleged abuse by unnamed officers.

Officers Dennis McGuire, Raymond Madigan, Robert Flood, Ray McNally, Leonard Bajenski, Daniel McWeeny, John McCabe and David Dioguardi all testified, some of them twice. They are the officers who were involved in the arrest and questioning of Orange. None of them was identified by Orange as having mistreated him. In fact, no one was identified at that time. All denied any mistreatment of Orange.

Orange testified that he was put in an interrogation room and handcuffed behind his back. Two "guys" put a plastic bag over his head. They did it again, and one of the officers hit him in the stomach. A "guy" came in and told him he was from the State's

172

Attorneys Office.  Orange started telling him the police had been beating him and sticking him with an electrical device that they put on his arm that made his fingers move.  Then someone stuck some grease "in his behind."  It caused him great pain.  That person from the State's Attorneys Office said that's enough and walked out.

On cross-examination he said he was slapped once in the car.  It wasn't that big of a deal.  It wasn't a hard slap.  They put a bag over his head at least twice and struck him with "needles, pens (sic), whatever."  They stuck him with needles four times.  There was no reference to an electrical shock or about a bag over his head in the medical report that was made out after he was examined at the jail.

The State published to the jury the statement that Kidd, who had testified before the jury and exonerated Orange, had given to the police.  It was generally consistent with what Orange had said in his confession.

The State also called a Dr. Shirish Parikh, who had examined Orange at the County Jail on January 14, 1984, two days after Orange's arrest.  According to Dr. Parikh, Orange's complaints were that police officers had stuck needles in his back or buttocks and had squeezed his testicles.  Parikh testified that he found no evidence of mistreatment.  Parikh is now deceased.

Orange filed a post-conviction petition which was denied without an evidentiary hearing.  The supreme court affirmed in part, reversed in part, and remanded for a hearing on those portions of the Orange's post-conviction petition that alleged that the defendant was denied effective assistance of counsel because of counsel's failure to investigate and present mitigation evidence at the capital sentencing hearing.  (People v. Orange, 659 N.E.2d 935)

R.SMITH02763

One of the grounds advanced in the post-conviction petition was the contention that his trial counsel had been ineffective because he failed to investigate the factual basis for a motion to suppress Orange's confession. The supreme court rejected that claim and said that the "medical examination reports did not support a claim of physical abuse, and the defendant exhibited no evidence of trauma." There were no witnesses to the alleged brutality. The court also noted "no medical evidence corroborated [Orange's] purported injuries." A photograph taken after Orange's confession showed no evidence of physical trauma, and no witnesses were available to support his allegations of abuse.

Moreover, Orange's wife testified that she saw him at the police station during the evening after his arrest; she said that Orange did not exhibit any signs of pain or torture. The supreme court concluded that "given the lack of corroborating evidence, the record does not indicate that had a motion to suppress been filed, it would have been successful." (People v. Orange, 659 N.E.2d at 942)

In a second-amended post-conviction petition, which was filed by Orange in 1998, Orange for the first time identified Jon Burge as one of the officers who had mistreated him. The supreme court addressed that late identification of Burge:

> "With respect to the defendant's allegation that Burge had been involved eliciting his confession by coercion, we note that the defendant did not name Burge as one of his torturers in his first post-conviction petition filed in 1991, even though he claims that he learned of the identity of Burge when he was shown a group of pictures by an OPS investigator in 1991. Thus, the defendant cannot point to an objective factor that impeded his effort to raise this claim in his first post-conviction petition. Moreover, because Burge was employed by the Chicago Police Department for several years following the date of the defendant's interrogation, the identity of Burge was something that the defendant could have discovered prior to trial through the exercise of due diligence. Furthermore,

174

the record of the trial proceedings involving the defendant's confession contains over six hundred pages. Yet, it does not contain any specific references or descriptions as to the identity of the defendant's torturers. In fact, the various officers responsible for interrogating the defendant testified at trial and denied that any coercion took place. The defendant has not named any of these officers as participating in any acts of torture. Two of the officers testified that Burge was not present at the defendant's interrogation and a third testified that he did not know if Burge was present." (People v. Orange, 749 N.E.2d 932, 940-941)

Orange testified that when he talked to Assistant State's Attorney Dernbach at the time he made his confession he did not mention the police torture because he was fearful of other further torture. This is at odds with his testimony that he told someone from the State's Attorneys Office what the detectives had been doing to him and that he had been "roughed up," to which the representative of the State's Attorneys Office said, "Bullshit, just as I thought," and left the room.

Orange also testified that one of the policemen squeezed his scrotum. He told us that it was the man, whose name he did not recall, who witnessed his statement. It was noted from trial records that this would have been Leonard Bajenski. When he was asked if he could recall Burge's participation in his alleged shock abuse, Orange stated that Burge was there, but he could not state that he actually participated.

Earl Washington's deposition was taken on February 16, 1990, in connection with the first post-conviction petition filed by Orange. He testified that Kidd was prepared from the first time they were before the trial judge to tell the judge that he had committed the crime and that Orange had nothing to do with it. Kidd was trying to take that position and "Orange encouraged it." He also said that Orange and his fiancé told him that Kidd was prepared to make the statement that he did it. Washington also testified that Kidd

175

R.SMITH02765

expressed how much he wanted to testify to clear Orange and "he had a lot of conversations with Orange." Orange would relay them all to Washington. He and Orange met with Kidd in the lockup.

Washington was interviewed by us on December 8, 2004. He told us that Orange and Kidd came up with the plan to have Kidd confess to the crime. He said that he advised them not to do this, but they were adamant and did so anyway, against his advice. (He never said at his deposition in 1990 that he advised them not to do it.) This testimony contradicts Orange's implausible testimony that he knew nothing of the plan and Kidd's testimony that the plan was originally Washington's.

On December 22, 2005, Abdul Karim a former paramedic at Cermak Hospital, was contacted telephonically by one of our investigators in regard to several pages of medical examination forms that are believed to have been completed by him. He denied recalling the names of Leroy Orange or Larry Phillips, another name used by Orange, and denied recalling having worked with Dr. Parikh, who is now deceased. He did make a notation concerning what may have been bruises on Orange's posterior and genitals. He was unable to determine whether those notations were based on what Orange told him. He said that he could not recall the examination and would have to merely confirm that what he noted was an accurate and thorough examination and that the alleged injuries did not require follow up.

While Orange claimed to have filed a complaint with OPS in 1990, he never provided any corroboration. Nor have we found any record of any complaint made by Orange at OPS.

176

On September 13, 2004, Orange was interviewed by our office. In his statement to us, Orange said that he was taken to Detective Area 2 by two officers, one of whom he "believed" was Jon Burge. He was later shown pictures while he was in prison after his conviction by, he believes, "somebody doing an investigation." He forgets who it was. He believes one of the officers in the car when he was driven to Area 2 was Burge. He said that he had the right to a lawyer and asked for one and the "guy he believes was Jon Burge reached around and smacked him in the mouth and told him that he was his rights." (Emphasis added.)

While Orange was in Area 2 some officers came into a room with an electrical device. He could name only Burge. Orange was shocked with the device. He then agreed to go along with "whatever story they wanted him to go along with." They kept coming in and out of the room telling him what Kidd had said.

Contrary to Washington's testimony, Orange said he had no idea why Kidd pleaded guilty. He and Kidd never conferred together and never agreed that Kidd would take the full blame for the incident. He said he attempted to dissuade Kidd from doing so.

Our office interviewed Deirdre Irvin. She told us that she had been called by Orange while he was in the county jail. She visited him about the first day that visitors were allowed. She did not observe any injuries to him that might have occurred as a result of abuse, nor does she recall that he made any statements regarding abuse, only that the Chicago police had forced a confession out of him. She did recall that he asked her to provide him with an alibi by lying and stating that he was with her at the time the murders took place. She refused to do so.

177

R.SMITH02767

We also interviewed Dennis Dernbach, who is currently a judge in the Circuit Court of Cook County. He testified that no complaints of abuse or of threats were made by Kidd or Orange, and no evidence of abuse was present.

What Orange's testimony boils down to is a very shaky identification of Burge made seven years after his arrest allegedly made from a picture shown to him by we know not whom. And despite his claim that he was shown the pictures around 1990 or 1991, he never named Burge until 1998 when he filed a second post-conviction petition. Any question of the credibility of his statement that he saw a picture in 1991 is augmented by the fact that his codefendant Kidd also came up with a very late identification of Burge. We will address the Leonard Kidd case below.

After examining all of the evidence and noting the inconsistencies in Orange's testimony and lack of corroborating evidence of Orange's allegations, it is our conclusion that the evidence based on Leroy Orange's testimony would be insufficient to meet our burden of establishing guilt of Burge or any other police officer beyond a reasonable doubt.

### Leonard Kidd

Kidd's allegations of brutality concern only the fire in 1984 and not the fire in 1980 when ten children died. In the 1980 case, his claim was that the confession he gave was obtained in violation of his 5th amendment right to counsel. A detailed recitation of the facts in the 1980 case is contained in People v. Kidd, 591 N.E.2d 431, in which the supreme court reversed Kidd's conviction and sentence to death on the basis of trial error. Kidd testified that Sergeant Joseph Murphy put a gun in his stomach and told him he was going to make a statement; but, Kidd said, he never made any incriminating statement.

178

R.SMITH02768

He was retried, convicted again and again sentenced to death. The supreme court affirmed. (People v. Kidd, 687 N.E.2d 945) No issue was raised of police brutality. The United States Supreme Court denied certiorari. Kidd has a post-conviction petition pending. His death sentence was commuted by Governor Ryan.

He was interviewed by our office. He was asked why he pleaded guilty to the 1984 murders and testified at Leroy Orange's trial that he, not Orange, had stabbed the victims. He told us that he pleaded guilty and testified for Orange because he was visited at the jail by a man he knew only as Slick Rick, who told him that unless he "took the weight," that is, the blame, for the 1984 killings, Kidd's mother would be killed. Kidd told us that Slick Rick and a man named Ricky Jones were the actual killers and that the killings had been taped on his appliance that was to be exchanged for cocaine. He heard the tape. He later saw the appliance which had been recovered by the police. The taping of the killing had apparently been inadvertently erased.

He told us that it was Earl Washington's idea that he should plead guilty and take the blame but that he resisted. Orange was present when Washington made his proposal that Kidd plead guilty. Kidd said that that conversation had come up before between Kidd, Washington and Orange about Kidd pleading guilty. He said that Orange was there. (This statement is contrary to his testimony at Orange's trial. He said that he never discussed his testimony with Washington and that his testimony was a complete surprise to Washington.) He also told us that he had told his lawyer, Assistant Public Defender Robert Strunck, that he was going to testify at Orange's trial that he had stabbed the four people. Strunck emphatically denies this.

179

Like Orange, after several years, he testified that he was bagged and electroshocked and he named Burge.

Kidd filed a motion to suppress on June 22, 1992 in which he alleged the following:

1. He was handcuffed to a pole in an interview room on January 12, 1984 and slapped by Robert Flood in the face.

2. Flood lowered Kidd's pants and shocked Kidd with a cable from an electrical device.

3. Kidd told Flood and McGuire he would talk with them.

4. Flood placed a phonebook on Kidd's head and struck the phonebook with a piece of wood.

There is not a single reference to Burge and the allegations are contrary to the statement made by Kidd to this office. He never testified on the motion to suppress.

Kidd told us that he was tortured for three days at Detective Area 2. This statement is false. He was arrested on January 12 and was in court on January 13.

We note also that Kidd testified at Orange's trial that in August 1984, after speaking to his mother and grandmother, "he decided to reveal the version of the events that he related at trial, which he insisted, was the truth about the matter." (See People v. Orange, 521 N.E.2d 69, 76)

After his mother moved to California he was no longer afraid of Slick Rick; he felt comfortable in telling his story. He told us that Officer Flood had mistreated him. But he identified a picture of Officer Dennis McGuire as Officer Flood.

180

But the name of "Slick Rick" is not new to the record. When Kidd was first questioned by the police he told them he and Orange were at Coleman's apartment on the night of the murders. However, he left around 4:30 in the morning when Orange began arguing with Ricardo Pedro. Kidd decided to leave when the confrontation turned violent. Before he could do so, however, "two dudes" entered the apartment; both of them had knives. Kidd remained outside the building, and he later saw the two men leave; one was wearing a jacket covered with blood. At that time, Kidd gave inconsistent accounts of the identities of the two men he had seen; at one point, Kidd said that one was named "Slick Rick." After Kidd made that statement, the police brought Orange into the room where Kidd was being questioned. Orange told Kidd that he had already admitted committing the murders and, further, had told authorities that there was no "Slick Rick." (See People v. Kidd, 675 N.E.2d 910, 917)

As noted, the supreme court affirmed Kidd's conviction and sentence. (People v. Kidd, 675 N.E.2d 910) In this appeal, Kidd contended that his confession should not have been introduced because the State failed to establish by clear and convincing evidence that the injuries he disclosed were not the result of police misconduct.

The supreme court rejected that argument. It referred to the denial of the officers and the testimony of Assistant State's Attorney Dernbach, who took Kidd's formal statement, that Kidd made no complaints about his treatment while in custody. More important, the court pointed out that Dernbach asked Kidd about a mark on his forehead and Kidd explained that he had incurred it a week or two earlier when he was a victim of a robbery. Kidd did not testify at the motion to suppress.

181

There is one further observation to be made about Kidd's testimony that he, not Orange, stabbed the four victims in the 1984 fire. It should be noted that when he testified on behalf of Orange, he still wanted to use an escape route from complete inculpation. He testified that his initial attack of Pedro occurred when Pedro threatened him with a knife. Kidd also testified, "I didn't intend to kill nobody. I never did hurt nobody. I didn't know what I was doing. We never had the drugs I had that night. I didn't know what I was doing."

We have concluded that Kidd's testimony is so improbable, if not bizarre, so lacking in any corroboration and contradicted by so many others that any prosecution of any police officers based on his testimony would be futile. In short, we do not believe Leonard Kidd.

_Edward J. Egan_

_Earl E. Strayhorn_

182

R.SMITH02772

## MADISON HOBLEY

Madison Hobley was convicted by a jury in 1990 of the murder by arson of seven people, including his wife Anita and one year old son Phillip. He was sentenced to death. On May 27, 1994 the Illinois Supreme Court affirmed his conviction and sentence. (People v. Hobley, 637 N.E.2d 992) (Hobley I) His petition for writ of certiorari to the United States Supreme Court was denied. (Hobley v. Illinois, 513 U.S. 1015) He subsequently filed a petition for post-conviction relief which was denied after a hearing in the Circuit Court of Cook County. The Supreme Court reversed the order in part and remanded the case for an evidentiary hearing on certain claims including the following: The prosecutor had concealed that Hobley's fingerprints were not on a gasoline can introduced in evidence and the existence of a second gasoline can allegedly found at the scene of the fire. The Supreme Court rejected Hobley's argument that his counsel was ineffective for failure to discover and introduce evidence that other persons had allegedly been tortured by the same officers Hobley alleged had tortured him. (People v. Hobley, 696 N.E.2d 313) (Hobley II)

Pursuant to that Supreme Court order Judge Dennis Porter conducted a hearing and in a lengthy order entered July 8, 2002 denied the post-conviction petition. He found that Hobley's trial lawyers were aware that Hobley's fingerprints were not on the gasoline can and that there was no second gasoline can found at the scene of the fire. An appeal taken from that order of Judge Porter was pending when Governor Ryan pardoned Hobley. Hobley has filed a suit for money damages against several police officers and

183

R.SMITH02773

the City of Chicago in the Federal district court for alleged violations of his civil rights. That case is pending.

The facts of the case are set out in both Supreme Court opinions. On January 6, 1987 a fire broke out in an apartment building located at 1121-23 East 82nd Street in Chicago at approximately 2:00 a.m. Seven persons, including Hobley's wife and one year old son Phillip, were killed. Many others were burned or otherwise severely injured while escaping from the fire.

At the time of the fire Hobley lived in apartment 301 with his wife and son. It was located in the front of the building directly across from the south stairwell. There was conflicting testimony as to whether gasoline was poured on the door of apartment 301. The door and door jamb of apartment 301 were almost completely burned away, but tests of the area revealed no traces of gasoline. The State's expert testified that a peculiar burn pattern on the floor in front of the door showed gasoline had been poured there, but that the water used to extinguish the fire could have washed away all traces of gasoline. (A fire had occurred outside apartment 301 on New Years Eve. That fire also was arson; it was unsolved.) Hobley's expert testified that the burn pattern was caused by a "chimney effect" created when the fire moved up the south stairwell.

Andre Council testified for the State that on the night of the fire he stopped at a gas station located at 83rd & Cottage Grove in Chicago. He saw a man in a dark pea coat approach the station on foot carrying a gasoline container. The man purchased $1 worth of gasoline. Council said that the lighting of the station was excellent, and he was standing within five feet of the man while the man pumped the gas. He paid particular attention to the man because, while the man was filling his gas container, he spilled some

184

gasoline on Council's car. Later, Council saw fire trucks go past the station. The trucks were heading in the direction of his home, so he left the station.

When he got home, Council noticed that the fire trucks had stopped at a building located approximately one block from where he lived. He walked over to the fire scene, and he noticed the man who had purchased the gasoline standing near the building. While watching television the next day, Council saw a picture of Hobley on the news identifying him as a suspect detained by police in connection with the fire investigation. Council recognized Hobley as the man whom he had seen buy gasoline the night before, and telephoned the police to report the incident. He identified Hobley at trial.

Kenneth Stewart, a gas station attendant, also testified for the State. Stewart identified Hobley as "favoring" the man who purchased the gasoline but he could not be 100 percent sure that it was the same man.

Hobley testified first on the motion to suppress alleged confessions; that was denied; and he then testified before the jury. He said that he awoke to the smell of smoke. He shook his wife awake and went to the front door of the apartment and out into the hallway. He saw smoke coming from under the door at apartment 304. He walked 40 to 50 feet down the hallway past the stairwell. He saw nothing unusual at the stairwell. After he had walked up to the door of apartment 304, he heard a popping sound; he turned around to discover the hallway had filled with smoke and flames.

A more detailed recitation of Hobley's testimony is contained in the abstract of some of his trial testimony we have attached to this report as Hobley Exhibit 1. We have also attached an abstract of part of Hobley's testimony at a deposition he gave in connection with his civil case as Hobley Exhibit 2.

185

R.SMITH02775

Hobley used a neighbor's telephone to call his mother; he asked her to bring him some clothes. She and another woman came and took him to his mother's apartment. An ambulance was called so that he might obtain a sedative. Paramedics arrived and took him to the hospital where he underwent tests. Soot was found in his nostrils, and the doctor diagnosed him as suffering from smoke inhalation. The doctor proposed more tests but refused to give Hobley a sedative. At that point Hobley's sister apparently became upset and removed him from the hospital. They returned to his mother's home where he took a bath and changed clothes.

The morning after the fire, Detectives Robert Dwyer and James Lotito went to the Medical Examiner's Forensic Institute to identify the victims of the fire. While there, Dwyer spoke with Hobley's other sister. She had gone to the morgue to identify Anita and Phillip Hobley. She informed Dwyer that Hobley was at his mother's home at 8006 South Rhodes.

At about 9:00 a.m. Dwyer and Lotito went to 8006 South Rhodes to interview Hobley. Approximately fifteen family members had congregated in the apartment. Dwyer suggested to Hobley that it might be easier if they spoke outside in a police vehicle, and Hobley agreed.

While they were seated in the police vehicle, Dwyer told Hobley that the fire had been deliberately set through the use of a liquid accelerant. When Dwyer asked him if he knew who could have started the fire, Hobley said that he suspected a woman named Angelina (also Angela) McDaniels, with whom he had had an affair. The relationship he had with McDaniels had been strained since Hobley returned to his wife. Hobley agreed to come to Area 2 Police Headquarters for further questioning.

186

Hobley testified that once at Area 2 Dwyer placed him in an interview room, handcuffed him to a wall ring and immediately began to physically abuse and racially harass him without asking any questions. Hobley said he requested that he be allowed to contact an attorney, but Dwyer would not allow it. After the interview with Dwyer, during which Hobley continued to insist on his innocence, he was driven to police headquarters at 11th & State by two officers from the Bomb and Arson Unit. Once there, Sergeant Patrick Garrity, a lie detector operator, began asking him a series of questions. Hobley said that when he denied setting the fire, Garrity began to kick him in the shins. After his interview with Garrity, Hobley said he was escorted to another room by Dwyer, Lotito and Officer McWeeny. He said they hit and kicked him and put a plastic typewriter cover over his head. He blacked out and when he awoke, Dwyer told him he had interviewed Angelina McDaniels and that Hobley was in trouble. Hobley was then allowed to see an attorney, Steven Stern, who is Hobley's first cousin and had been called by Hobley's family. Hobley denied he ever confessed to setting the fire. He said he told Stern "they said I confessed." After speaking with Hobley, Stern told Dwyer he would not permit any further questioning. (There are sharp differences between the testimony of Stern and Dwyer as to their conversation.) Hobley had signed a consent form for the lie detector test. The form also contained Miranda warnings, which Hobley said he had read.

Garrity testified that after the test he told Hobley that the test showed that he was lying. After that, Hobley confessed that he had set the fire.

187

R.SMITH02777

Garrity, Dwyer, Lotito and McWeeny denied any mistreatment of Hobley. Dwyer, Lotito and McWeeny testified to an oral statement by Hobley similar in content to that testified to by Garrity.

The motion to suppress contended that the confessions should not be admitted because first, they resulted from an illegal arrest and second, they were procured through physical and verbal abuse. The trial judge held that the arrest was legal and that Hobley had failed to establish that the confessions were involuntary. The Supreme Court affirmed the findings of the trial judge. It necessarily follows that the trial judge by his denial of the motion to suppress and the jury by its verdict rejected Hobley's testimony. The jury had to conclude that Hobley had confessed and that he had not been abused by the police.

The question for us is this: Can we as prosecutors say that the testimony of Hobley is sufficient to establish the guilt of Dwyer, Lotito and Garrity of physically abusing Hobley beyond a reasonable doubt? Needless to say, the answer to that question requires an analysis of Hobley's testimony; a corollary question is how much of his testimony should be considered. That question raises an important point. Hobley has insisted that he did not make a confession. And yet his trial lawyer filed a motion to suppress his confessions to Garrity and later to Dwyer, Lotito and McWeeny. When we questioned her about that seeming inconsistency, she said that she had moved to suppress the confessions as a "precautionary measure."

The Supreme Court in Hobley II noted this inconsistency in Hobley's position in denying his claim that he should be permitted to introduce other alleged acts of brutality by Dwyer, Lotito or Garrity:

188

"We note, however, that at trial, as well as at the suppression hearing, defendant testified that he did not make any confession in this case. He testified that he was physically abused by Dwyer, Lotito and Garrity, but that he did not confess to setting the fire. Thus, it has consistently been defendant's position in this case that he did not make any confessions.

* * *

In order to demonstrate the 'conclusive' effect of the new brutality evidence, defendant argues that this evidence would have convinced the jury that his confessions were the product of police brutality. This argument is, of course, inconsistent with the position defendant took throughout the trial and with his own testimony that he did not make any confessions. Accordingly, in order for the jury to have concluded that defendant's confessions were coerced, the jury would have had to believe defendant's testimony that he was physically abused, but disbelieve his testimony that he did not confess. Thus, the contention that defendant confessed but that the confession was the product of coercion was not a particularly persuasive one for the defense." (Emphasis added.) (Hobley II, 696 N.E.2d at 336)[1]

If a factfinder concluded that Hobley did confess, that would be a serious, if not fatal, blow to Hobley's overall credibility. To show that

---

[1] We note in passing that one of the other acts of mistreatment Hobley sought to introduce was the claim by Stanley Howard that he had been abused by Robert Dwyer. Howard now says that he mistakenly identified Dwyer. He has said in sworn testimony that it was Sergeant John Byrne who abused him and that Dwyer never did. (See our report of the claim of Stanley Howard.)

189

R. SMITH02779

Hobley did confess would be probative evidence the police were telling

the truth about their denial of any brutality.

We cannot be certain what evidence a trial judge might admit in the trial of any

police officers charged with abusing Hobley. Of particular concern would be evidence of

Hobley's conduct at the time of the fire and after, his clothing, and his statements to the

police and other witnesses. We surmise that any lawyer representing the police officers

would attempt to show that Hobley was not telling the truth when he testified on those

matters and, therefore, he was not telling the truth when he accused the officers of abuse.

Our office has personally examined many witnesses, including Hobley, who has,

as noted, testified twice at his trial. We have read the transcripts of all the witnesses at

the trial and have examined many of those witnesses. We have also read Hobley's

deposition taken in his civil suit as well as depositions of other witnesses. We have read

various police reports, including a statement given by Hobley to OPS. We will first

evaluate the evidence without regard to the evidence introduced in support of the State's

case to establish guilt. Any trial of the police officers would be based on the credibility

of Hobley. The first question is whether there is any admissible independent

corroboration of his testimony.

Hobley and Steven Stern testified that Hobley told Stern that he had been beaten

by the police. Julie Harmon was the Assistant Public Defender who represented Hobley

at trial. This office interviewed her, and she said that on January 7, 1987, she was

assigned as Hobley's public defender and that he told her he had been beaten and bagged

by the police. We judge that the evidence that Hobley had complained to Stern and

190

Harmon would be self-serving inadmissible hearsay in any trial of the police officers. Their testimony does not meet the requirements of any exception to the hearsay rule.

Edward Hamilton, Jr., was an emergency medical technician at Cermak Hospital on January 7, 1987, who examined Hobley. He never testified at the trial. The intake form at Cermak Hospital shows, "PT states he was hit in the throat and has bruise on RT wrist and LT wrist and bruise on the chest. C/O hit in the face." The Bruise Sheet made out by Hamilton reflects injuries to both wrists and to the chest. In a memo to his supervisor Hamilton said that Hobley, "states he was beaten by the officer in the lockup." (Emphasis added.) (Hobley testified that he was taken to the lockup after he returned to Area 2 from 11th & State.) Admissibility of much of the testimony of Hamilton is problematical under the Illinois statute. (725 ILCS 5/115-13) (See also People v. West, 823 N.E.2d 82.) But, even if admissible, it is of negligble weight.

The lawyers representing Hobley have given us the name of Phillip Walker who, it was maintained, would testify that he had been abused by Garrity during a polygraph test in December 1987. Walker's deposition was taken by the attorney representing one of the officers in the civil suit. We have read the transcript. When Walker was deposed he was in the Florida penitentiary; he was serving time for sale of narcotics. He has a long criminal record. He had previously given a statement to an investigator for Hobley, which deviated from his deposition testimony. He said he neither wrote nor carefully reviewed the statement before he signed it. He denied several of the allegations in the statement. He had alleged in that statement that Garrity had kicked him while administering a polygraph examination.

191

R.SMITH02781

He explained that when he previously said that Garrity spit on him, he meant the spitting was caused by Garrity being excited and yelling, but it was not purposeful. He agreed that he had been kicked during the polygraph exam but explained that he kept dozing off, and Garrity kicked him to wake him up. He admitted that he had snorted heroin a few hours before being taken into custody. He was down off a "high" and he admitted that the drugs caused him to be "out of it" and "tired" during the examination. (He had been a member of the Gangster Disciples. He quit "pretty much" in 1995.)

The admissibility of Walker's testimony is also questionable under the reasoning of Hobley II that such evidence was not relevant. ("Defendant's primary challenge to the confessions was that they were fabricated by police, and evidence that other suspects were allegedly coerced into confessing would not have directly aided that position.") (Hobley II, 696 N.E.2d at 344) Further, even if admissible, the testimony would be of minimal weight.

Another witness whose name has been given us and has been interviewed by us is Eileen Pryweller, a sister of Detective Robert Dwyer. She has been listed as a witness for some of the plaintiffs, including Hobley, in the civil rights suits pending in the Federal district court. Her deposition has been taken and members of the media have interviewed her. She told us and has testified that she was present in the home of her brother, Robert Dwyer, when her brother and Jon Burge were boasting of mistreatment of prisoners. We have determined that Eileen Pryweller would not be an effective witness in any prosecution of Robert Dwyer.

For all practical purposes, therefore, Hobley's testimony is uncorroborated.

R.SMITH02782

Hobley is contradicted by non-police witnesses, one of whom is former Assistant State's Attorney Jane Lichty Loeb. When he was asked whether he saw a state's attorney who was a woman, he said, "I never saw a female. That's a lie." Loeb testified in rebuttal that she was an assistant state's attorney assigned to the Felony Review unit. She identified herself to Hobley, who by then had talked to Stern. She saw Hobley straining at his handcuffs. Hobley repeated his denial when he gave his deposition on March 19, 2004. He said he was sure he did not speak with a female assistant state's attorney. We find that denial difficult to accept. One thing is clear to us: He never complained of police brutality to the assistant state's attorney. (We also find it difficult to accept that Dwyer would begin to beat Hobley as soon as he came into Detective Area 2 without any attempt to ask him any questions.)

Hobley testified and told us that he was kicked in the shins by Garrity and by Dwyer. Someone kicked him in the groin once. He didn't know how many times he was punched in the stomach. He couldn't tell how many times Dwyer stuck him in the ribs. While in the utility room, Dwyer also hit him in the chest several times. He didn't know how many times he was slapped in the face. Thumbs were pressed in his throat by Dwyer. The Illinois Supreme Court said, in evaluating Hobley's claims of brutality, that "defendant's injuries were not commensurate with his alleged beatings." (Hobley I, 637 N.E.2d at 1002; "No evidence [Hobley] sustained injuries consistent with [his] claims of police brutality." Hobley I, 637 N.E.2d at 1010)

Last, Hobley has pending a lawsuit seeking substantial money damages, a fact that would be used to further attack his credibility.

193

R.SMITH02783

In sum, we conclude that Hobley's testimony against all the named police officers would be insufficient to prove their guilt beyond a reasonable doubt.

Turning now to the evidence concerning the underlying crime, Hobley's credibility is further tested. His testimony covering the time he awoke until the time he left the burning building raises questions. One of the most troubling concerns his testimony covering his actions upon being awakened by the beeping of the smoke alarm. He opened the door and noticed some smoke that looked like it was coming from apartment 304. (The occupants of apartment 304 perished in the fire.) He then walked out of the apartment. He told Anita, "It's a fire. Get Phil." He walked into the hallway toward apartment 304 until he was close to knocking on the door. Thus, he believed that there was a fire but continued to walk away from the apartment that contained his wife and infant son. In our judgment this is a strange reaction for a husband and father. Altruism is commendable and even understandable; but we do not understand it if it is exercised at the risk of the lives of one's wife and child.

Andre Council testified that Hobley was wearing a pea coat at the gas station and at the scene of the fire. Hobley said he did not own a pea coat. Deborah Bedford was a resident of apartment 302, directly across the hall from 301. She was rescued by the firefighters who took her down from her apartment window. She knew Hobley. She testified that she spoke with him at the fire and that he was wearing a pea coat. After her testimony Hobley testified that some woman gave him a pea coat. That woman was never identified.

The coat also figured in Hobley's testimony that he gave the officers the clothes he was wearing. Those clothes did not include the coat he was wearing. The next day his

194

mother turned over a coat to the police; it had allegedly been overlooked the day before.

Hobley testified that he told Louis Casa, the manager of the building, of his suspicions that Angelina had something to do with the fire on New Years Eve. Casa denied that Hobley had told him that.

Bedford also testified that Hobley told her that "he was running out and thought they were behind him." When Hobley was asked before the jury whether he told Bedford that he thought his family was running out behind him, he first said, "No." When he was asked again if he told Bedford he thought his wife was running out behind him, he said he didn't know.

We turn now to the important question of whether Hobley did in fact confess to Garrity. Garrity testified as follows: Detective Falasz of the Bomb and Arson squad brought Hobley to Garrity around 12:30 p.m. Garrity and Hobley were the only two in the room during the examination. Garrity presented Hobley with a preprinted form and read him his rights. Once Hobley stated he understood those rights, both signed the form.

Garrity then asked him background questions such as where he worked and how far he had gone to school. Hobley told him he had gone as far as freshman year in college; his health was fine; he had not been seeing a doctor; and the last time he had consumed alcohol was days before.

Garrity then asked Hobley if he started the fire. Hobley stated that he did not. He also said he did not know who started the fire. When asked if he suspected anyone, Hobley said he suspected Angelina was responsible; she was very upset with him; she had paid some money for the apartment on East 82nd Street and they were battling. She did not make any specific threat to burn down the building, but she had made other

195

threats. She had said that "you will see," or "you know I'm going to get at you" and at one point she tried to scratch his eyes. The last time he saw Angelina was January 2nd and their relationship was very strained.

Hobley told Garrity that he was sleeping with his wife when he heard an alarm. He left his apartment and went out to investigate in the hallway. He observed steam coming up from the carpeting in the hallway; he smelled smoke and began to check doors in the hallway. He observed flames in the hallway and made an attempt to get back to his apartment doorway, but the hallway became engulfed in flames and smoke. Hobley then got from the hallway to the back door when he observed a woman leaving the building. The woman unlocked the door and he was able to escape from the building. (A woman later testified that the door was always unlocked from the inside.)

When he got outside he discovered there was smoke coming from the building, and the building was on fire. He stood with other people who were beginning to gather on the street. He saw a young boy being thrown from a window, and he and another man made an attempt to catch the child but were unsuccessful. (The child survived.)

After more conversation Garrity told Hobley he believed he was not telling the truth. Hobley broke eye contact with Garrity; he looked away and "kind of slumped in his chair." Garrity told Hobley this was a serious investigation; he believed Hobley was responsible for starting the fire and it was important that he tell the truth. At this time Hobley said he did start the fire. He told Garrity that he had taken a gas can and gone to a local gas station on Cottage Grove. (He did not provide the other intersecting street.) He then returned to the building and poured gasoline in the hallway, outside his apartment, and in the stairwell. He took a match and lit the gasoline and threw the gas

196

can somewhere on the second floor hallway. (A gas can was recovered later under a sink in an apartment on the second floor.) Hobley said he was experiencing troubles with both his girlfriend Angelina and his wife.

Garrity testified that at the time Hobley mentioned the gas can Garrity did not know a gas can was involved in the fire. He also testified he did not know a gas station on Cottage Grove had been involved.

Garrity contacted Area 2 and Bomb and Arson, but he does not recall whom he contacted first. He told whomever he talked to that Hobley had admitted to setting the fire. Area 2 Detectives Dwyer, Lotito and McWeeny arrived at his office in about fifteen or twenty minutes. Garrity informed them of Hobley's statements. Hobley left the crime lab with those officers and Garrity later learned that they went to the Bomb and Arson unit.

Garrity did write that Hobley had made an admission, but he did not write the substance of it. He did write that Hobley initially denied starting the fire. He said he did not write the full admission "because [he] felt at the time it was important to notify the investigating detectives and make them aware of the fact an admission had been made and for them to continue the investigation." In response to the last question asked of Garrity on re-cross-examination, he said that he told the Area 2 detectives that Hobley stated he went to the gas station on Cottage Grove and that he ignited the fire by striking a match.

We have said that we would not be bound by previous conclusions on credibility made by other persons or agencies, nor would we be bound by findings for or against the claimants who made motions to suppress evidence even when those findings were

R.SMITH02787

affirmed by reviewing courts. But we did not say or mean that we would ignore the evaluation of evidence made by the highest court in this state. And the highest court of this state has said three times in its opinion affirming Hobley's conviction that the evidence of guilt was "overwhelming." (Hobley I, 637 N.E.2d at 1009, 1011) (We have already referred to the Supreme Court statements that Hobley's injuries were not commensurate with his alleged beatings.)

The court addressed Hobley's argument that the State had failed to prove his guilt beyond a reasonable doubt because the State's evidence that he had confessed was unreliable. The Supreme Court rejected that argument and noted the testimony of Garrity and Dwyer that Hobley had confessed, that the confessions were consistent with one another and were consistent with the physical evidence gathered at the scene of the fire. In addition, the court noted his "confession led the police to the gasoline can, an additional piece of evidence which the police had not found prior to the confession." (Emphasis added.) Hobley I, 637 N.E.2d at 1011.

Our own investigation has established that Detectives Patrick Mokry and Kevin Glynn were conducting a canvass of gasoline stations in the area of the fire. This was a standard police procedure following a suspected fire. At around 11:00 a.m. of January 6, they met Kenneth Stewart who told them of the man who purchased gasoline the night before and gave them a description. (Hobley testified that he had "probably" previously purchased gas for his car at that gas station.) Glynn later talked by phone to Dwyer, who was in charge of the investigation, and told him of Glynn's conversation with Stewart. Dwyer recognized that the description matched that of Hobley, who was then being tested by Garrity. That testing began at around 12:30 p.m.

198

Garrity, who was alone with Hobley, did not talk to Dwyer until he had completed his examination of Hobley and that conversation occurred after Garrity had called Area 2 and the Bomb and Arson section to tell them that Hobley had confessed.

Dwyer was already at the Bomb and Arson section, which is in the building housing police headquarters. Garrity was in an annex next door. Dwyer was at Bomb and Arson because he had taken Angelina McDaniels there preparatory to her also taking a lie test which she subsequently did take.

Dwyer, Lotito and McWeeny went to the lie detector section where Garrity told them in more detail what Hobley had confessed to, including the fact that he had purchased gasoline the night before.

We have read the deposition of John Stout, and we have interviewed him. He is retired and lives in Florida. He conducted the lie detector examination of Angelina McDaniels. In his opinion Angelina was telling the truth when she denied any involvement in the fire. Stout, who did not testify at Hobley's trial, testified in his deposition and told us that he remembers Garrity telling Stout immediately after Garrity had completed the test of Hobley that Hobley had confessed. Garrity also told us that before he spoke to Dwyer he had told Stout that Hobley had confessed.

Garrity filled out a form after the test of Hobley, which we attach to this report as Hobley Exhibit 3. That form is captioned "Polygraph Case Report." The report contains the name "Detective Falasz." Garrity informed us that he received the information in the report concerning the fire from Falasz. There is no reference to a gas can or the purchase of gasoline. The form also contains, in Garrity's handwriting, the notation "subject [Hobley] made post-test admissions." We also attach to this report two pages of notes in

Garrity's handwriting as Hobley Exhibit 4. They contain questions Garrity asked of Hobley and short notations showing answers from Hobley. Nothing in those exhibits has any reference to a gas can or the purchase of gasoline.

Detective Falasz was assigned to the Bomb and Arson section. He also is now retired and lives in Florida. (We interviewed him by telephone.) He and his partner, Henderson Arnold (now deceased), took Hobley from Detective Area 2 to the polygraph section where Falasz met with Garrity. He informed Garrity of what he knew of the fire. Falasz knew nothing about a gas can or the purchase of gasoline. Neither he nor Arnold interrogated Hobley at any time. Consequently, any knowledge of Garrity of the purchase of gasoline by Hobley could not have come from Falasz.

It is the position of Hobley that Garrity, Dwyer, Lotito and McWeeny concocted the story that Hobley had confessed and particularly that Hobley told them he purchased gasoline at 83rd & Cottage Grove. We disagree. In our judgment, the record is clear that Garrity had no knowledge of a purchase of gasoline at 83rd & Cottage Grove before he met Hobley; that the manifest weight of the evidence establishes that Garrity received that information from Hobley; and that that information was part of a confession.

For all these reasons, we conclude that the testimony of Hobley would be legally insufficient to establish the guilt of the officers beyond a reasonable doubt.

Before we conclude this report we think it appropriate to discuss Angelina McDaniels. When Angelina was first questioned by Dwyer and Lotito she was forthright and cooperative. She admitted that she had been having an affair with Hobley knowing that he was married. Hobley told her that he and his wife had been having serious marital problems. Angelina and Hobley shared the apartment at 301. Hobley told her that he

200

was going back to his wife and that Angelina would have to move. She did but they continued to communicate although she was angry with him. She met with him, as he later testified, at the Phaze II lounge. He suggested that perhaps he, Angelina and Anita could live together. Angelina became angry and said she would not agree even if Anita did. She told Hobley this was their final meeting and that he had to make a decision between her and Anita.

Angelina said she knew nothing of the fire on New Years Eve or the fatal fire on January the 5th. She agreed to take a lie detector test and did so successfully. She cooperated with John Stout, the lie detector examiner.

By the time of the trial, however, Angelina had become uncooperative. Trial Assistant State's Attorney Tsukuno located her in another state and acquired an out-of-state subpoena for her appearance at the trial. When they sought to serve her they learned she had moved. The State was unable to use her as a witness.

She is now living in Illinois and gave a deposition in the Federal civil suit brought by Hobley. An examination of her deposition discloses an uncooperative attitude and a litany of "I don't remembers." At one point the attorneys for the defendant police officers had to file a motion to compel her to testify more openly - to no avail. We have attempted to question her on a number of occasions but her lawyer has consistently informed us that she refuses to speak to us. Considering her attitude as displayed at her deposition, we decided that no purpose would be served by subpoenaing her.

It is also appropriate to discuss Haze Skinner, the step-grandfather of Anita Hobley. We have seen a tape of an interview of Skinner by Chuck Goudie of Channel 7 News in which Skinner said that Hobley told him he was innocent. Skinner said he asked

R.SMITH02791

Hobley, if he was innocent, why did he <u>confess</u>? Hobley answered because the police had put a bag over his head. We have attempted to speak to Skinner. Our investigator has been informed by Skinner's wife that he was in a nursing home for psychiatric reasons and is hearing impaired. We determined, under the circumstances, no purpose would be served by seeking to interview Skinner.

In conclusion, we repeat that the evidence would not justify our seeking an indictment and trying Garrity, Dwyer, Lotito and McWeeny on the complaint of Madison Hobley.

Edward J. Egan

202

**MADISON HOBLEY EXHIBIT NO. 1**

2/3/06

Madison Hobley - Testimony before the jury

He heard a beeping noise that woke him up. He realized the sound was coming from the hallway. It was a smoke alarm. He woke Anita. He said, "Anita, Anita, I hear a smoke alarm." He got up and put shorts on. (1866) He got up and walked towards the door that goes to the hallway, the front door. As soon as he opened the door he smelled smoke. He could see it was like "cloudy." Right away, "Anita, it's a fire. Get Phil." (1868) He stepped out "quietly, quickly." It looked like the smoke was coming out from the apartment kitty-corner to his apartment. He "quickly walked over there." The smoke looked like it was coming from up under the door by the rug. It looked like it was coming from under the door. His purpose was to go over there and wake the people up if it was coming out of there. He went to apartment 304.

When he got there he heard a popping noise behind him. He turned around and saw black smoke and flames going straight into his apartment. When he left the apartment he did not shut the door behind him, because he was expecting to come back in. (1870) After he turned around and saw the fire he "hollered fire, fire, you know." (1871) The fire was going right to his door, coming straight across from the stairwell. When he went to apartment 304, he had to walk by that stairwell. He did not see any fire then. (1872) When the fire came across the hallway he hollered "fire, fire, fire."

He tried to get back to his apartment. Smoke was coming at him. He started hollering, "Anita, close the door, close the door, come to the window." The third time he tried to get there he started choking. He couldn't get there. He was blind. (1873) He

203

R.SMITH02793

was telling Anita to close the door because he had left the door open and he saw the fire going in. He told her to come out the window. (1874) He started choking. The smoke got in his eyes. He got down low. He was holding his breath and he started running towards the backdoor. He could feel the heat behind him. He felt like he was going to pass out. He was really desperate to get out.

In the meantime, he was running and he saw a lady tossing with the doorknob and she opened it and ran out the backdoor. (1875) He got to the backdoor. He grabbed the knob, opened it and started gulping for air. He ran down the steps and went around to the side where his bedroom window was. (1876) He looked up at the window and saw smoke coming out the crack of the window and he said, "Anita, come out the window, come out the window." He never saw Anita at the window. He ran to the front and noticed there were a lot of people. They came out, fell out, jumped out the window, whatever. He did not see any flames coming out of his window, just smoke was coming out. He was running around trying to get somebody to help him. To get somebody's attention to help him get his wife and baby out. A guy came to him and asked what was wrong. He said his wife and baby up there. He looked at Hobley and said, "Man, wait a minute I'll get you some pants, and he ran across the street and said, "Here, put these on." He did not have a coat on or shoes. (1878) When he looked up at his window he could see that flames were starting to come out. He ran to the front. He was trying to tell anybody to find the fire department to climb up there. That's when he saw Deborah Bedford. (1882) He asked Deborah if he could make a phone call. He said his wife and baby, he didn't know if they got out. He thought they were still in there. Deborah let him come in and he called his mother. (1883)

204

## MADISON HOBLEY EXHIBIT NO. 2

2/3/06

### Madison Hobley

### Deposition taken March 19, 2004

He believes he first met Angie at a restaurant. It might have been Ronnie's Steakhouse. (53) He doesn't remember how he first met her. He knows she approached him actually. He dropped her off at home. He couldn't remember where. He knew it was by DuSable High School. (54) She obtained his phone number. He was driving a company vehicle and the number was on the vehicle. He didn't talk to her about meeting again. (55) She subsequently contacted him at work. He was surprised. She said she wanted to meet him again. He was living on Michigan Avenue with his wife and son. (56) He began to have sexual relations with Angie the same day he met her. They actually had it inside his car.

That relationship with Angie continued maybe two and a half weeks, three at the most. (57) He continued to have sexual relations with her during that two or three week period off and on at a hotel. He was attempting to hide the affair from Anita. Anita discovered the love note that Angie had written to him. (58) Angie never told him she was in love with him and he didn't tell her that he was in love with her. (59) He probably denied to Anita that he was having an affair. When he was having the affair he told Angie that his relationship with his wife was bad. He lied to her about his relationship with Anita.

At some point he rented the apartment on 82nd Street for Angie. (60) This is the same apartment that he eventually moved into with Anita and his son at 1121 East 82nd

205

Street. He rented the apartment initially with Angie's money. She just didn't have the credit to do it and he did it for her. He paid the rent in his own name. He might have given her a hundred or so (61) Angie lived at the apartment maybe a week, he didn't know. (62) He had sex with her in apartment 301. At some point he admitted the affair to Anita. That was shortly after she found out, he believed. (63) He admitted the affair to Anita's grandparents on Thanksgiving and apologized about it.

At some point he told Angie he wanted to end the affair. That was maybe a week before Thanksgiving. He believes they were in a lounge. It was the Phaze II Lounge. (65) He moved into the apartment on 82nd Street. (66) When he met with Angie at the Phaze II Lounge she wanted to know whether he was living with his wife and child. He told her that he was. She got mad, he thinks. She basically threatened him. She said that he had wasted her time and that he was going pay for it. Angie was mad at him because she felt that he had misled her. (68) After she said that, she just walked out. He recalls meeting with her at the lounge and telling her that the relationship was over. (69) He doesn't remember whether he had another meeting with Angie at the Phaze II Lounge in January of '87. He did meet Angie at the Phaze II Lounge in January of '87 after there had been a fire outside the apartment at 82nd Street on News Years Eve. (70)

He and Anita reconciled a week or so before Thanksgiving. He was continuing to have marital problems with Anita. There was an incident where she called the police on him when they lived at 7401 South Michigan. She called the police because he had taken their son Phillip. He grabbed Phillip away from her. He and Anita were having a disagreement. They were somewhat arguing about. She didn't think that he had actually ended his relationship with Angie. (73) The fight was over Angie. She put him out of

206

the apartment. She told him to leave. He later returned to the apartment. When he returned to the apartment he broke a window. When he went through the window he grabbed Phillip from her and left the apartment. That's why she called the police. He also ripped the phone off the wall. (74) He went to his mother's home and the police came. In response to the police question, he told them that he had Phillip. They advised him to return Phil as soon as possible, otherwise he would be arrested. He thinks he took Phil back to the apartment on Michigan. He left again. (75)

He returned to the apartment the next day. He doesn't remember whether Anita was there. He's sure he went looking for Anita the next day. There was a period at the end of November when he went looking for his wife at Patricia Pfeiffer's apartment. (76) He called the Pfeiffer apartment on several occasions that day. He wanted to talk to Anita. Patricia Pfeiffer told him that Anita didn't want to talk to him. He believes that Anita had his son with her at the time. Anita wasn't speaking to him. (77) He later returned to the Pfeiffer apartment and threw a rock through the window. He then called Pfeiffer. (78) Patricia Pfeiffer signed a complaint against him and he had to go to court. She didn't show up and they "threw it out." Anita came home about twenty minutes after that happened. He never propositioned Patricia Pfeiffer. She propositioned him subliminally. (88)

He went to work on New Years Eve. He didn't remember when he left for work. It was in the morning between 7:00 and 8:00. He doesn't know when he returned from work that evening. He thinks it was early evening. (105) After he observed a hole in the carpet he asked Anita about it. She said that she and someone in the building helped put it out. Anita said they smelled something burning outside their apartment. (107) Anita

207

said maybe it was his girlfriend. He was not still seeing Angie. He doubted that Angie had started the fire. (111) He didn't know if Angie still had a key to apartment 301. She never gave him back the key that she had. (111)

He met with Angie at the Phaze II Lounge after the fire of New Years Eve. He called her. He called her because after listening to his wife he thought it could have been a possibility that Angie may have started the fire. He wanted to talk to her and ask her if she had a problem with him. It was some time shortly after New Years Day or the day after. (112) Angie asked him if he moved his wife and child in there and he told her that he had. That made her mad. That's when she told him he was going to pay for wasting her time. She walked out. (116) She slapped him at the meeting in the Phaze II Lounge just before she walked out. She told him that he had misled her about the state of his relationship with Anita. He didn't remember if she called him a liar. He had lied to her about the state of his relationship with Anita. (117) He suspects that Angie started that fire outside his apartment on New Years Eve. He believes she probably did start it.

He believes that Patricia Pfeiffer had something to do with starting the fire outside his apartment. It could have been Angie or Patricia Pfeiffer. (118) He never saw Angie on another occasion nor had he spoken to her on the telephone after he saw her in the Phaze II Lounge. He testified at the criminal trial that he didn't go to work on January 5th because he was doing housecleaning. (121) He did not see Angie that day (the 5th).

He had probably bought gasoline for his vehicle in the past at the Union 76 station at 8301 South Cottage Grove. (125) He did not go to that station on January 5th or 6th to fill a gasoline can. He did not go to any gas station and put gasoline into a gas can. He

R.SMITH02798

believes that Kenneth Stewart and Andre Council were in it together and made up the story. He believes they possibly could have been the actual culprits. (127)

He and Phillip fell asleep on the couch in the living room and his wife woke them up. He didn't know if it was some time around 11:30 or midnight. She brought him to the bedroom. He believes Anita put Phil in the baby bed. (129) He went to sleep and was awakened by a noise. (132) The noise was a beeping sound. He got up. The noise sounded like it was coming from the hallway, like a smoke alarm. He woke Anita up. He told her that he thought the smoke alarm was going off. Anita was in bed with him when he was awakened. (133) He woke her up. He told her he thought the smoke alarm was going off in the hallway. He put some shorts on. He knew Anita was putting her socks on. He got up and walked to the door that led to their apartment. (134) After he opened the door he noticed some smoke, like a film of smoke that looked like it was coming from the apartment down the hall. He also smelled it. When he first opened the door he did not see any flames. When he opened the door he could hear the smoke alarm. He then walked out of the apartment. He told Anita, "It's a fire. Get Phil." (136) The last time he saw her she was sitting in the bedroom putting her socks on.

After he opened the door he walked into the hallway toward apartment 304. He thinks he had to walk past the stairs to get to apartment 304. (137) As he walked by the stairs toward apartment 304 he did not see any flames coming from the stairs. (138) He doesn't know if the distance between apartment 304 from his apartment was less than 20 feet. (138) It looked like the smoke was coming from up under the door at 304. He didn't know who lived in that apartment. He could not smell gasoline. He was close to knocking on the door at 304. He heard a pop behind him, a pop sound. (139) When he

R.SMITH02799

turned around he saw black smoke going straight into his apartment. He saw flames going into his apartment shortly after. Black smoke and then flames were coming toward him. (140)

He tried to go back and hollered for Anita to close the door and go to the window. (140) A lady gave him a coat, it was a woman's coat. He saw it in evidence. It was a woman's pea coat, a woman's cloth coat, it looked like a pea coat. (156) He never told anybody that he tried to pull Anita out of the apartment, but that she wouldn't go. He had no chance to try to pull Anita out of the apartment. When he first went to the apartment door and opened it and saw smoke he did not try to pull Anita out of the apartment. (160)

He does not recall taking a bath before the police arrived. He did read his criminal trial testimony where he testified that he took a bath after he returned from the hospital. (166) When he was testifying he did not have any memory of how he got from the scene of the fire back to his mother's house or of the paramedics coming to his mother's house or of being at St. Bernard's Hospital that morning. (174) Or of taking a bath at his mother's house after he returned from St. Bernard's Hospital or of changing the clothes he had been wearing at the scene of the fire. Or of making any phone calls while he was at his mother's house that morning. (175)

He remembers Officers Dwyer and Lotito showing up at his mother's house that morning. He doesn't remember talking to Dwyer and Lotito at his mother's house. He remembers that Dwyer and Lotito said, "Let's go out to the car." (177) They said there were too many people in the house or something like that. He did not offer to get the clothes for them that he had been wearing at the scene of the fire. He didn't remember if the officers asked him for the clothes. He didn't remember testifying during the criminal

210

trial that the officers asked him for the clothes. (178) He did not remember seeing his mother hand the officers a bag of clothes. He remembers sitting in the car with the officers. He didn't remember talking to the officers inside the car. He believes they did ask if he had anything to do with starting the fire. (181)

He remembers that they asked if he knew anybody that had reason to set the fire. That's when he told them about Angie. He told them he had an affair; he was seeing this girl and she had threatened him prior. It could be a great possibility that she could have had someone direct, if anyone was mad at him, it would be her. (181) He doesn't know if he first became aware that Anita and Phillip had not made it out of the building from the officers. (185) When they got to Area 2, Dwyer took him to a room. The first thing Dwyer did, he knocked his hat off and hit him in the chest. He slapped some handcuffs on him and handcuffed him to the ring on the wall. (186) He started throwing pictures down in front of him. Dwyer started calling him a bunch of niggers. He threw pictures down and picked them back up and called him a bunch of niggers. He got personal and talked about how he didn't like niggers. Saying that as far as he was concerned, Madison Hobley did it. "I got you. Madison -- as far as I'm concerned, Madison Hobley did it." He pulled a chair in front of Hobley. He didn't know whether Lotito was in the room. (190) Dwyer did not read him Miranda rights. (191) He could have previously testified that when he was in the room that Dwyer put his thumbs onto his throat. He didn't remember. (194) He did previously testify at the criminal trial that Dwyer hit him in the ribs when he was in the room with him.

He doesn't know who transported him from the police station at Area 2 to 11th & State. Garrity told him he was going to give him a polygraph exam. Garrity then asked

R.SMITH02801

him some questions. (199) Garrity asked him if he set the fire and he told him no. He was not handcuffed. (200) Garrity did not read him his Miranda rights. He was shown a form and asked to read it so that he understood his rights. He thought that it pertained to agreeing to take the polygraph test. He believes he read the form when Garrity gave it to him. (201) He was shown the form that he read that had been given to him by Garrity. The form contains the Miranda warnings. (203) He never at any time told Garrity that he didn't want to take the polygraph exam. (206) He believes Garrity asked him about his relationship with Angie. (207) He did not remember telling Garrity that Angie had threatened to scratch his eyes out. He didn't remember telling Garrity that Angie told him that she hated him. After he finished the polygraph exam, Garrity told him that he had failed the exam. (209) Hobley couldn't believe it. He asked Garrity if he could read it to him. Garrity kicked him in the shins. He told Hobley he was a smart ass or something like that. He doesn't know which shin he kicked him in. He couldn't tell how many times he kicked him. He didn't know if it was more than once. Garrity did not do anything to him other than kick him in the shins. He was not bleeding from the shins. After Garrity told him he had failed the polygraph exam he did not admit to Garrity that he had started the fire. He did not admit that he had poured gasoline down the stairs. (211) He did not tell Garrity that he had thrown a gas can to the second floor of the building. (212) He remembers Garrity throwing his hands up after he kept telling him he didn't do it.

He thinks Garrity came back with Dwyer. It was Dwyer or Lotito. It was one of the two or maybe both. They took him to a room that looked like a utility room. He thinks it was Dwyer, Lotito and Officer McWeeny who were in the room. This was the

212

R.SMITH02802

first time he had ever seen McWeeny. Dwyer had put handcuffs on super tight. (214) Dwyer slapped him and punched him. Dwyer was pushing his thumbs in Hobley's throat and telling him he was going to say he did it. (220) Somebody kicked him in the groin from behind. (223) When he got kicked in the groin, Dwyer was standing in front of him. He was kicked from behind. He didn't know if McWeeny was even in the room when this was going on. Dwyer hit him in the stomach some more times. (224) He believes Dwyer punched him in the stomach while they were in the utility room more than ten times. He was hitting him hard with a closed fist. Lotito put a typewriter cover over his head. (225) Dwyer said, "You going to say you did it," and he told Dwyer he didn't do it. He thinks Dwyer threw up his hands and walked out. (227) He asked McWeeny, Why don't they believe him? He didn't do it. McWeeny said that he believed Hobley or something like that.

He remembers talking to Steven Stern, but he didn't know if it was 11th & State or Area 2. (230) He doesn't remember being in a lineup at 11th & State. He may have testified in the criminal trial that he was in a lineup, but he didn't remember. He's sure he told Stern that he had been beaten by Officer Dwyer or Lotito. He did not tell Stern that he had confessed to starting the fire. Stern is his family attorney and he is his cousin. (232) When he left 11th & State he was in handcuffs. He is sure that he did not speak with a female assistant state's attorney at Area 2. (238)

213

## MADISON HOBLEY EXHIBIT NO. 3

| IN 6 JAN 87 1230 HRS | POLYGRAPH CASE REPORT CRIME LABORATORY DIVISION CHICAGO POLICE | OUT 6 JAN 87 15,0 HRS |
|---|---|---|

**OFFENSE** ARSON

**VICTIM** AVITA HOBLEY    **PLACE** 1110 E. 82 ST    T 007699

7 VICTIMS    6 JAN 87 0200 HRS

FIRE DEATHS    3 STORY MULTI-UNIT

**SUBJECT** S#1 MADISON HOBLEY    **ADDRESS** 1110 E. 82 ST    **SEX** X    **RACE** B    **AGE** 25

S#2 ANGELINA McDANIEL    **SEX** X    **RACE** B

**RECORD** IR# UNK

**REPORTING** DET. FALASZ    **UNIT** BOMB & ARSON

**REMARKS**

Fire occurred in multi-flat apt. building. Appears to have started in 3rd Fl. Hallway.

S is resident, wife & child died in fire. S hears alarm, enters hallway, walks around, sees smoke in stairwell, leaves bldg. Possibly gasoline cause.

S & wife previously arguing over marital problems.

Results: S#1 5 Tests — Not Truthful Subject made post-test admissions.

Patrick J. Garrity 058759

S#2 5 Tests — Truthful

007699

**161**

Hobley Exhibit 3

**MADISON HOBLEY EXHIBIT NO. 4**

POLYGRAPH EXAMINER'S QUESTION SHEET

MADISON HOBLEY

1121 E. 82 ST.

*(illegible handwritten polygraph question notes)*

000460

Hobley Exhibit 4

16168     1479

215

2) I did not start   (11) If a fair trial—
that fire.          (12) Going to pass
2a No                  is accurate
3a Maggie, Rosie—   (10) Say the penalty
or her friend,      (13) Would not take it
my girl.               CB —Fire Before?
She paid 3/4 rent      CB —Crime
—I went back w/ wife      Arrests
She excused if wife there
Threaten "Fire—No
Threaten me— "you'll see"  Hated me
Last time— Friday—
    Scratch eyes out —
I'll pay           Bed— No room
                   About 3:30 pm Fire
                        I don't know
Story——> Discovered— Heard Alarm—Told us
       walked into hall      Looking
Smelled smoke, checked hallway,
at doors, stairs revert carpet. Return
apt smoke in hall. Stairs — Flames
Somebody at back door /France unlock.
  outside — Std gas window
popped small boy, het room   Mother's
roller hall — Magg Jai, 13, mother, ...

16169          1480
000461

216

R.SMITH02806

**STANLEY HOWARD**

This is a report on the allegations by Stanley Howard that he had been tortured by Sergeant John Byrne and Officers Ronald Boffo and James Lotito.

Stanley Howard was convicted of the murder of Oliver Ridgell which occurred on May 20, 1984, and he was sentenced to death. His conviction and sentence were affirmed. (588 N.E. 2d 1044)

In the trial Howard was identified by the woman companion of Oliver Ridgell as the man who fired the shot that killed Ridgell in the course of a robbery. Police officers and an assistant state's attorney and court reporter established that on November 3, 1984 Howard confessed to the killing of Oliver Ridgell. The trial judge denied Howard's motion to suppress, and the Supreme Court affirmed that ruling. The Supreme Court opinion recites the facts in cases of victims of crimes who identified Howard and testified at the sentencing hearing after his murder conviction.

On November 1, 1984, Howard was arrested on warrants for a rape and robbery in Blue Island, Illinois and other charges. The arresting officers were from Detective Area 2 in Chicago. Several line-ups were conducted on November 2. In addition to his identification by a woman companion of Oliver Ridgell, he was also identified by a Chicago police lieutenant and a woman patrol officer, who were off-duty, as the man who robbed them while they were sitting in a car on South Western Avenue in Chicago on the night of March 14, 1983. He threatened to rape the woman. According to a civilian witness who also identified him, Howard fled in a 1979 Monte Carlo, after an exchange of gunfire with the police lieutenant. He was subsequently convicted of the armed

R.SMITH02807

robbery of the police officers, whose pistols and stars were taken, and he was sentenced to 28 years. That case was affirmed by the Appellate Court.

Howard was also identified by a woman as the person who, while armed with a gun, stole her 1979 Monte Carlo shortly before the robbery of the two police officers. He also threatened to rape her. She had her small child with her at the time. That woman testified at Howard's sentencing hearing on the murder charge, as did the two police officers.

On May 27, 1983, a woman deputy sheriff was accosted by a man with a gun as she was getting into her car. He drove her car to her home where he robbed and raped her and forced her to perform oral sex on him. He left the home with the woman and her sister-in-law, who escaped from the car. He raped the woman again and released her. Howard was identified as the man who raped, robbed and committed deviate sexual assault on the woman. He was subsequently convicted by a jury and was sentenced to a term of 50 years to run consecutively to the sentence for the armed robbery of the police officers. The woman also testified at the sentencing hearing. That conviction was also affirmed by the Appellate Court.

Also introduced at the sentencing hearing was evidence supporting the inference that Howard broke into a home on June 20, 1983, while masked and armed with a gun, and stole jewelry from a woman. Howard was wearing certain items of the jewelry when he was arrested on June 25, 1983. He was apparently released on bond on that case. Another woman identified him as the man who stole her car by force in October, 1983. He was also released on bond for that offense.

218

R.SMITH02808

A man and a woman identified Howard as the person who went into the woman's home on June 21, 1984, in Blue Island, Illinois and raped and robbed the woman and robbed the man. The woman testified at the sentencing hearing.

Howard did not testify before the jury in any of the cases for which he was tried except the charge of robbing the two police officers. In that case, an investigating officer testified that Howard made an oral confession to the robbery of the officers. In his testimony, Howard denied the armed robbery and denied making an oral confession. He testified on a motion to suppress his confession in the murder trial and said that he had been tortured by Sergeant Byrne and Detectives Boffo and Lotito.

He has been pardoned by Governor Ryan in the murder case; his sentence for the robbery of the two police officers has been served; he is presently serving a sentence for the rape and robbery of the deputy sheriff. There is a post-conviction petition pending in the last case.

Howard has been interviewed by an agent of the Federal Bureau of Investigation and twice by the Chicago Police Office of Professional Standards (OPS). I have read those reports and all of the police reports we have been able to locate in all of the cases in which Howard was identified including the cases in which he was convicted

On February 21, 2003, I interviewed Howard under oath at the Joliet Penitentiary. Present were a court reporter, Jerri Estelle, and our investigator, Lee Flosi, and Howard's attorney, David Blickenstaff. The interview took almost two-and-a-half hours. At the insistence of his attorney, I did not ask him any questions covering the facts of the cases in which he had been identified, including the murder case.

219

R.SMITH02809

Howard is a very fit-appearing person. He again denied committing any of those offenses for which he was identified and denied that he made an oral confession in the case of the robbery of the two police officers. He said the only confession he made was in the murder case and that was a result of the mistreatment he received from the police, especially the "bagging"; he said he was not mistreated in any case except the murder case.

I referred Howard specifically to certain matters that I thought beclouded his testimony and asked for his explanations. One of the matters concerned his identification of Sergeant John Byrne as the person who kicked him in the lower left leg. That testimony is important, because the injury to his lower left leg is alleged to be physical corroboration of his contention he had been abused. There is a medical report that he was taken to the Roseland Community Hospital shortly after he was arrested for injuries he says he suffered while trying to escape from the police. The Roseland Community Hospital report was not introduced at the murder trial. The report does show an injury to Howard's left thigh, which he told the examining physician he suffered when he jumped over a fence as the police were chasing him. He complained of pain in his left thigh. That was the reason he was taken to Roseland Hospital where his left thigh was x-rayed. After his confession, he was taken to the county jail, and records there show that he had some abrasion on his left leg, which Howard argues the Roseland Hospital records do not show.

A paramedic at the county jail testified that Howard told him he had been beaten by the police. The paramedic saw what he said were abrasions on Howard's lower left leg. In his opinion, the abrasions he saw could have been caused by scraping the leg

220

R.SMITH02810

against the ground. (The State argued that the scraping occurred when he was attempting to avoid the arrest.)

In post-conviction proceedings, a doctor, who is now deceased, submitted an affidavit that the paramedic was not qualified to give an opinion that the abrasions on Howard's left leg could have been caused by scraping against the ground. In the doctor's opinion, the abrasions on Howard's leg, which the doctor did not see, could have been caused by kicking. Howard said that he had jumped over fences while fleeing from the police, although he did not know they were police officers. He said that he was injured while fleeing from the police but not injured on his lower left leg. The doctor who examined him at Roseland Hospital and who submitted an affidavit on behalf of Howard was later convicted of Medicare fraud and his license was revoked. We will discuss this doctor in more detail later.

At Howard's direction, his step-father made a telephone complaint to the OPS on November 3 or November 4, 1984. Howard later told the OPS that Officers Dwyer, Lotito, and Boffo struck and kicked him. He subsequently named Dwyer as the man who had kicked him in the lower left leg, causing the abrasions.

Dwyer was present at the taking of the written confession to Assistant State's Attorney Denise O'Malley. Howard said that he gave the OPS Dwyer's name because he saw it in his confession. I told Howard that explanation did not make sense to me. If he saw Dwyer's name on the confession, he knew that the man, Dwyer, who was present at his confession was not the man who kicked him. He also said at one time that Sergeant Byrne was present at the taking of the written confession. It is undisputed now that Byrne was not present.

221

Dwyer, Lotito, Boffo and Byrne all testified at the motion to suppress the confession, and all denied any mistreatment of Howard. Howard said that when he saw the officers testifying he knew that Dwyer was not the kicker; it was Byrne. He did nothing to correct the mistake with the OPS, which was investigating Dwyer. In addition, Howard filed a civil rights action after his conviction, which he said he filed to get off Death Row and to make some money. In that suit, he again named Dwyer as the kicker. He said that that was an honest mistake. He also named Boffo and Lotito, but not Byrne.

I called his attention to a statement to OPS dated November 29, 1984, which recites that he said "both detectives (three) kicked me on the back and legs, and one of them slapped me." (Emphasis added.) He told me that it was not true that more than one officer kicked him. Howard also told another OPS investigator in June or July, 1987, after his murder conviction, that "Boffo, Lotito, Dwyer and Sergeant Byrne choked him repeatedly...Officers Boffo and Lotito kicked him about his legs repeatedly...Sergeant John Byrne and Detective Dwyer kicked him about his legs repeatedly." (Emphasis added.) Howard now says in his statement to me, "Detective Dwyer never abused me in any way," and the only officer who "kicked" him was Sergeant Byrne.

Dwyer testified that he noticed that Howard was arrested within four blocks of where Ridgell was murdered, and it was Dwyer who suggested that Howard be viewed as a suspect in the Ridgell murder, because it fit the facts of the robbery of the police officers and others. After Howard was identified by the woman companion of Ridgell, Dwyer asked Howard if he would re-enact the shooting and Howard said that he would. Dwyer met Howard and the other officers at the scene of the shooting and Howard

222

showed them where he went and described how he committed the crime. Dwyer was present at the confession taken by Assistant State's Attorney O'Malley. He also testified that Howard gave the police the name of Byron Hopkins as the man who gave Howard the gun he used to kill Ridgell. Dwyer denied that he or any other police officer mistreated Howard.

I showed Howard the report made to an investigator named Audrey B. Pate on July 1, 1984, in which she said she showed Howard a "photograph line-up" of detectives. The photograph line-up was of nine officers and included Boffo, Lotito, and Dwyer. (It should be kept in mind that those were the names given to OPS by Howard. Consequently, the photograph line-up did not include Sergeant Byrne.) Investigator Pate's report states that Howard was "unable to identify the accused officers." Howard told me that Pate's statement was false and that he "picked three people off that line-up." He corrected that to "two or three people."

The report of Audrey Pate that Howard was unable to identify any of the officers from the photo line-up is contradicted by the report of FBI agent Sharon Kouba, which states that she and Audrey Pate showed Howard a photo spread of police officers on July 1, 1985. Kouba said that Howard identified Boffo as the "officer who kicked and slapped him numerous times"; he identified Lotito "as the officer who put the plastic bag and typewriter bag over his head"; he was "unable to identify the third officer who was possibly a lieutenant or a sergeant." (Emphasis added.) (As noted, Byrne's picture was not in the photo spread; Dwyer's picture was in it.) The FBI report supports Howard's assertion that he did identify some of the officers, but Howard also identified Boffo as the officer who kicked him numerous times.

223

An important factor in judging Howard's credibility is his testimony concerning the contents of his confession. Howard told me that what is contained in the confession is what he was told to say by the officers. In response to my specific questions, he said they told him to say he was at his girlfriend's house on the morning of the shooting of Oliver Ridgell; that he went over to Byron Hopkins' house; that Byron was a friend, who "stays over at 87th & Loomis"; that Byron gave him the gun; that he needed a gun to try to get some money; that the victim Oliver Ridgell "reached into his pocket like he was going for a gun"; that he "ran and fired 2–3 shots and was facing Ridgell" when he fired; that he ran through the alley and went to his girlfriend's house; and that he had been treated fairly by the police.

Again in response to my specific questions, he also told me that there are some things that he said in the statement that the police did not tell him to say: that he told Byron he needed a gun and Byron went to get it; that he left Byron's house at about 12 p.m.; that he wandered around for a little while trying to find a victim to stick up; that he found a victim around 4:30, 5:00 a.m.; that the person in the car said he didn't have a cigarette when Howard asked for one; that Howard reached in his pocket "as a kind of subterfuge" and instead of pulling out a cigarette, he pulled out a gun. He agreed that he just "invented" some of the things he said in the confession. He made some corrections on the face of the confession when he signed it.

Assistant State's Attorney Denise O'Malley and a court reporter testified that they saw nothing unusual about Howard's appearance. The confession reflects that he was asked by O'Malley whether he had been treated fairly. He admitted to me that that question had been asked by O'Malley. I pointed out to him that when he testified on the

224

motion to suppress the confession, he said that O'Malley never asked him that question. He agreed that his testimony on the motion to suppress on that point was false.

Howard told the OPS investigator that Byron Hopkins was brought into the room and saw the officers strike him in the face with an open hand. When I pressed him on this, he said this was "an assumption" on his part. (Byron Hopkins said he did not see the officers strike Howard.)

A Cook County jail guard named Tonkovich testified at the sentencing hearing. He said that Howard told him that he had not been "beaten or struck" by the police. Howard also told him he was surprised when the two police officers that he had robbed began shooting at him and that he got two police stars as a result of the robbery. Howard filed an affidavit in a post-conviction proceeding, in which he denied that he had had such conversation with Tonkovich. He made the same denial to me. In a telephone conversation with me Tonkovich affirmed his testimony. Howard did not testify before the sentencing jury.

Through Lee Flosi, I scheduled three appointments to interview Byron Hopkins. Hopkins lives in Milwaukee and failed to appear here on all three occasions, despite promises to Lee that he would be here. Hopkins testified by way of stipulation at the murder trial. His stipulated testimony was that he did not provide Howard with a gun; that he saw Howard with guns many times; and that he stopped having anything to do with Howard because he was getting into trouble about guns. His stipulated testimony is consistent with a police report from November, 1984. (The copy I have does not show the date clearly.) The report contains what Hopkins told the officers. Hopkins later submitted an affidavit about the appearance of Howard in Area 2, which is contradicted

225

by pictures taken of Howard. That affidavit was used in support of Howard's application for executive clemency.

Theodore Hawkins gave a statement to OPS and executed an affidavit prepared by Howard's attorneys in support of Howard's application for executive clemency. His statement and affidavit are proffered to buttress Howard's testimony that he had been struck repeatedly in the face and that one of the officers put a plastic bag over his head. The affidavits of both Byron Hopkins and Hawkins were referred to in Governor Ryan's pardon message as corroboration of Howard's statements that he had been abused.

I interviewed Hawkins on September 10, 2004 without a court reporter. Lee Flosi was present. Hawkins, who has a long arrest record and did time in the penitentiary for home burglary, had been arrested on November 3, 1984 for aggravated battery and taken to Detective Area 2. (He was later discharged after a preliminary hearing.) He gave a statement to OPS on September 27, 1993 in which he said he was in an interview room adjoining the interview room that Howard was in. There was a two-way mirror between the rooms. He said that he saw a number of officers standing over Howard in an aggressive manner and that Howard appeared to be "bruised about the side of the head, the jaw, the forehead, the temple area" and "to be in a lot of pain." One of the officers had in his hand a plastic container which Hawkins assumed was a bag, which the officer put away "behind his desk." Hawkins said when he saw Howard closer, "he asked me for my name, I remember that. I gave it to him. That's it." That is the only reference to any conversation between Hawkins and Howard. He never saw anyone strike Howard or put a plastic cover over his head. (Howard had made a statement that Hawkins saw the police put a plastic bag over his head.)

226

R.SMITH02816

Hawkins gave his affidavit to the attorneys representing Howard on March 24, 1994, nine months later. He said he saw three officers standing over Howard. One of the officers walked away from Howard "with a plastic bag in his hands, which he put over a typewriter." He saw that Howard's face "was very battered." He and Howard talked through the glass and Howard told Hawkins his name and Hawkins told Howard his name. Howard told him "that the officers were beating him and were trying to clear their books on him." Hawkins did not say he saw the officers strike Howard.

In his first statement to OPS on November 29, 1984, Howard was asked if there were "any witnesses to this incident at the station in the interview room." Howard answered: "Byron Hopkins saw one of the officers slap me in the interview room. He was brought in for a short moment." When he was asked if Hopkins had been arrested, he said, "No. A guy by the name of Theodore Hawkins 8617 A (sic) Paulina saw my nose bleed but did not see them strike me." That is the only reference to Theodore Hawkins. (Hawkins never said he saw Howard's nose bleed.)

Howard gave a second statement to OPS on August 24, 1993, nine months before Hawkins executed his affidavit, in which his own lawyers were permitted to ask questions. He said he went back to the lockup between 3:00 and 5:00 p.m. after the statement was signed. His lawyer asked him if he was asked by the lockup guards if he had been hurt. He answered, "They didn't." He was then asked when was the first opportunity he had to tell someone that he had been hurt by the police. Howard answered that he called his mother from the lockup and spoke to his stepfather. The OPS statement contains no reference to Hawkins. He was asked if there was anything he wanted to add

227

R.SMITH02817

about the incident that he had not been asked about. He said nothing about Hawkins in response.

Howard testified on the motion to suppress on January 28, 1987. He made no mention of Hawkins. Pursuant to a waiver of lawyer-client privilege executed by Howard, I spoke to Patrick Moriarity, who represented Howard at the murder trial. Howard never told him about Hawkins.

When Howard was questioned by the FBI agent around December 4, 1984, he made no mention of Hawkins. He told the agent "there were no witnesses to his beating." He did not tell the agent that Hopkins saw him being slapped, although he told OPS less than a week before that Hopkins did see him slapped. Howard also told the FBI agent that Hopkins was brought in and said he had not given Howard a gun; that the police took Hopkins away and brought him back and that Hopkins then said that he did give Howard a gun. When I asked Howard whether that statement he made to the FBI was untrue, he said, "That's what I had perceived to be true at that time." He also told the FBI agent that when he was arrested the police told him he was being arrested for murder. He denied to me that the police told him that; he said he did not tell the FBI agent that "in that exact way." He told me that there was no bruise on his head, jaw, forehead or temple, contrary to what Hawkins had told OPS. Howard also said that he was not sure whether he talked to Hawkins through the window or downstairs in the lockup. Later he said that he was not sure that Hawkins was the man that he talked to on the other side of the window. He added this: "I kind of figured that I thought since he was on the other side of that window that he probably saw me being bagged and beaten."

228

At this point it is appropriate to refer to evidence that will show that Hawkins did not see Howard bagged or beaten (as Hawkins admitted) and casts doubt on Hawkins' and Howard's testimony that Hawkins was ever in an interview room while Howard was in an adjoining interview room. In Howard's application for executive clemency, it is alleged that Hawkins was in the interrogation room next to Howard's "during the early morning hours of November 3, 1994." In my judgment that statement is false. According to Howard he was beaten and bagged between 2:00 and 3:00 a.m., November 3. He made an oral confession to the police officers. He went to the scene of the crime with the officers. He was questioned by Assistant State's Attorney O'Malley, and he gave a written statement beginning at 12:55 p.m. Howard was, according to his own statement, taken from the Area 2 interview room to the lockup between 3:00 and 5:00 in the afternoon. (In his second statement to me he said he returned to the lockup at 2:00 or 3:00 p.m.) According to the arrest report, Hawkins was not arrested until 4:00 p.m. on November 3, 1994, more than twelve hours after the alleged mistreatment of Howard and more than two hours after the written statement began and apparently after Howard had been returned to the lockup. (The lockup records were kept for only 3 years and then destroyed.)

Hawkins told me that that he began to speak to Howard after both of them got close to the window. He also told me Howard initiated the conversation, that Howard must have sensed someone was in the other room. He said that both he and Howard were handcuffed to bars that ran perpendicular to the window. (Howard has consistently said that he was handcuffed to a ring in the wall.) When I asked him how he and Howard

229

could have gotten close to the window, he said that he and Howard were able to move along the length of the bars in their rooms toward the window.

Because Howard had testified that he was handcuffed to a ring on the wall and that his movements were impeded, I went to Detective Area 2 on Saturday, September 18, 2004 and was escorted through the interview rooms, seven in number. All of them have one ring attached to the wall which is facing the door. None of them has a bar of any kind attached to any wall. Interview room number 4, which is the number given by Howard as the room where he was mistreated, is separated from another room by a two-way mirror. There was no evidence that a bar might have been in any of the rooms. I have learned from detectives who were familiar with the interrogation rooms at Detective Area 2 in 1984 that there never were any bars in any of the rooms. In a second statement I took from Howard on January 14, 2005 he said there were no bars in the rooms he was in.

Lee Flosi was able to locate Hawkins, whose address is unknown, to set up a second interview. Hawkins agreed to come into our office on January 10, 2005, but he failed to appear or call us. He subsequently called Lee Flosi and arranged to come in for another interview which I conducted on February 14, 2005. He said that he had never seen Howard in the lockup or on the bus going to the county jail. When I pointed out to him that Howard had said that he saw Hawkins on the bus and that Howard had alleged he was beaten 12 hours before Hawkins was arrested, Hawkins told me my "problem" was with Howard, not him.

One fact is certain. Hawkins was not in Detective Area 2 in the early hours of November 3, 1984, when Howard says he was being tortured. It is also certain that he

R.SMITH02820

was not in Detective Area 2 until after Howard had made his confession to Assistant State's Attorney O'Malley. These glaring discrepancies between Hawkins' testimony and the undisputed facts should come as no surprise. In the 1994 report of the OPS investigator of Howard's complaint, the investigator specifically referred to the fact that Hawkins had been arrested at 4:00 p.m. on November 3, 1984.

I have also been provided with an affidavit from Michael West, the informant who led the police to Howard. In that affidavit executed on March 31, 1993, West said that in November of 1984 he was held by the police at Area 2 Headquarters for questioning about Stanley Howard. He was held from 2:00 p.m. until late in the evening. At one time the door to his interrogation room was left partially open. He heard Stanley Howard "screaming in pain." He also saw him being moved between two interrogation rooms across the hall. Howard's face was swollen and bruised.

I interviewed West at the Metropolitan Correction Center in Chicago on February 17, 2005. He was under federal indictment for conspiring to defraud insurance companies through claims of false accidents. At the time he was allegedly in that conspiracy, he was serving time in the Wisconsin penitentiary after having been convicted of the same type of conspiracy. The record shows that he has about a half-a-dozen aliases; he has been convicted and sentenced to the penitentiary on four occasions. He has known Howard for many years. He was in the penitentiary with Howard after Howard had been convicted and sentenced to death. West was a member of the Disciples. He said, confirming what Hobley had said but denying what Howard had said, that Howard also was a member of the Disciples.

231

He was in the county jail when he gave McWeeny the information he had about the whereabouts of Howard with the understanding that McWeeny would assist him in getting out on bond. McWeeny did appear the following day which would be the day after Howard was arrested and assisted West in being released on bond. West was absolutely certain that that occurred on the day after Howard had been arrested. West was taken to Detective Area 2 sometime after 11:00 a.m. While he was in Detective Area 2 show-ups were conducted. He was absolutely certain that what he had said in his affidavit occurred on November 2nd, the day he was released from the county jail and the day after Howard had been arrested. He asked me if I knew Judge Blanche Manning, before whom his federal indictment was pending. I told him that I did know Judge Manning when we both served on the Appellate Court. He asked me if I would intercede with Judge Manning in an attempt to help him get out on bond. I told him that it would do no good and that Judge Manning would resent any attempt on anyone's part to influence her. He repeated that request a number of times during the interview.

After he told me for the second or third time that he was absolutely certain that he observed what he had said in his affidavit the day after Howard was arrested, I told him that Howard said that he had been beaten at 2:00 or 3:00 a.m. on November 3rd. West thought for a while and then told me that upon reflection he concluded that he had been wrong about November 2nd and that he saw and heard what he had stated in his affidavit on November 3rd. I told him that that still didn't fit the facts because he did not arrive until sometime after noon and that Howard had said that he had been abused nine or ten hours before that. It was at that point that West asked me if I was representing Howard. When I told him that I was a State's Attorney who was representing the People of the

232

R.SMITH02822

State of Illinois, West told me that he could tell me "plenty about Howard." I concluded the interview shortly thereafter and left with West making a final plea for my assistance with Judge Manning.

One other part of West's statement to me is pertinent. He said that he was driving his car and Howard was a passenger when he was stopped by the Blue Island police on the evening of June 21, 1984. Because he did not have a driver's license he was taken into custody and his car was impounded. Howard was permitted to leave. That story was pertinent because it puts Howard in Blue Island on the date that the woman was raped and robbed and who later testified at Howard's sentencing hearing.

The testimony of Hopkins, Hawkins and West would be useless as corroboration for the testimony of Howard. In fact, their testimony would militate against any prosecution of the police officers.

Howard also claimed that the police officers caused his nose to bleed. At the motion to suppress, when he was asked if Assistant State's Attorney O'Malley asked anything about the blood, he said this:

> "Well, it was quite obvious that she didn't have to ask me that. I was bleeding at the nose. My wrist was bleeding, and she knew I wasn't like that the night before when I told her I didn't want to sign no statements or to even talk about any cases at all.
>
> Question: Did you have blood on your shirt?
>
> Answer: Yes, I did."

The assistant state's attorney cross-examined Howard extensively about the absence of any of his clothing that would have corroborated his testimony that the police abuse had caused a nosebleed. That cross-examination disclosed confusing and deceptive

233

answers from Howard that included answers that he had thrown a bloody shirt away and that a friend of his gave him a shirt and a jacket on the bus taking him to the county jail. I questioned him about the matter in an attempt to clarify his previous testimony. It would unduly lengthen this memorandum to repeat his testimony on the motion to suppress and to me. Suffice it to say that his testimony at the motion to suppress and to me discloses a deliberate and untruthful attempt to explain away the absence of probative evidence that would corroborate him.

Howard denied to me that he made any statements other than in the murder case and denied that he had been mistreated in any other case. He has maintained that the primary concern of the police was the robbery of the two officers and that because of that robbery and his refusal to cooperate with them in recovering the police stars the police were bent on creating a case against him in the murder case. I felt that, if the police were so concerned about the robbery of the police officers, why would they not do anything to him to get him to confess to that robbery, rather than the murder? One answer is that he did confess to that robbery and that he did so voluntarily.

Officer Daniel McWeeny was one of the first officers to question Howard after he was arrested on November 1. He testified at the trial for the robbery of the police officers that he gave Howard Miranda warnings; Howard told him he had nothing to do with the robbery. McWeeny contacted the informant that had given the police the information that Howard was at a certain location that led to his arrest. McWeeny told Howard that the informant was coming in, and Howard still denied the robbery. McWeeny then spoke to the informant, who was then in the station and who gave McWeeny specific information. (McWeeny later identified the informant as Michael West, the friend of

R.SMITH02824

Howard whom we interviewed.) When McWeeny returned to Howard and confronted him with what the informant told McWeeny, Howard then confessed to the robbery. That statement was not reduced to writing.

The Felony Review records, which are to be filled out by the assistant state's attorneys assigned, covered the robbery of the police officers, the rape and robbery of the deputy sheriff and the robbery of the owner of the 1979 Monte Carlo.

The form covering the rape and robbery shows, "Said he wanted to speak with a lawyer." (Either O'Malley or McWeeny permitted Howard to make a phone call. He called his mother and spoke to her about getting a lawyer for him.) The form covering the robbery of the owner of the Monte Carlo has no entry in the part marked "Statement." The form covering the robbery of the police officers shows that an oral statement was made to "McWeeny and Madigan." The "Summary" is as follows:

> "[Howard] said he was driving down Western and saw victims in car. Put gun on them and got into car. Got purse and (illegible) in purse. He jumped out and ran to stolen car he was driving. He said he couldn't get officers' badges back because they were hot and he threw them out."

There is a police report in November, 1984, which says that the "reporting detectives" confronted Howard "with the facts known at this time, emphasizing the similarities to the incidents to which he had already confessed." (Emphasis added.) Howard then admitted that he was responsible for the killing of Oliver Ridgell. The report lists several reporting officers, but the officer who actually made it out is unknown.

There is another police report, date uncertain, which is listed as the report of Detective Dan McWeeny and three other officers, that recites that Howard first denied the allegations made by the two police officers, but when confronted with the information

R.SMITH02825

supplied by an informant, told the reporting detectives that he would make a statement regarding the police officers but not the rapes. "He was asked why he would not talk about the rapes and he stated that he did not want his family to find out that he raped anyone. He was then asked about the robbery of the police officers and he stated that he was responsible." He admitted exchanging gunshots with the police lieutenant and then driving the stolen vehicle to Robbins. He threw away the police stars because he did not want to get caught with them. At a later date he sold the weapon he used in the robbery to a person in Robbins; he did not know the name of that person.

David Stoioff and Denise O'Malley were the assistant state's attorneys assigned to Felony Review. Their names appear on the reports. Stoioff's name is misspelled "Stoiff" on two of the reports. One of the police reports refers to Assistant State's Attorney Stoider. Neither Stoioff nor O'Malley has any recollection of anything contained in the reports.

All of this raises another question of credibility. A factfinder could conclude that Howard had made an oral confession to McWeeny, but the record is confusing.

A picture was taken of Howard in the line-up when he was identified and another picture when he was received at the county jail. In my opinion, those pictures refute what he told me about what garments he was wearing, and the picture taken at the county jail shows no evidence of injuries to his face. Since the picture taken at the line-up and the picture taken at the county jail do not show evidence of injuries to his face, the only reasonable inference is that the picture taken at the time his confession was taken, which was introduced by the State at his trial and cannot now be found, did not show any injury to his face.

236

Howard was contradicted by many witnesses, including <u>all</u> the victims of crimes for which he was identified and even the arresting officers' testimony about the facts of his arrest. His testimony that he thought the officers who came to arrest him were gang-bangers, thus causing him to flee, is not believable. There is a report of November 1, 1984 from a Lieutenant John Lemmer in which he states that Captain William McCann interviewed Howard, who told Captain McCann that he knew the police were looking for him because he had missed a court date in June. He said he tried to run away from the police. (Captain McCann is deceased. Lieutenant Lemmer is retired. He has no recollection of the case.)

He would be impeached by the statement he made to the FBI; he would be impeached by his statement to OPS. His testimony that he had been slapped in the face repeatedly or that he was "battered" would be refuted by the picture taken at the county jail, as well as by the testimony of Assistant State's Attorney O'Malley and the court reporter. His statement to me that he told O'Malley what the police told him to say to her, apart from the inherent unreasonableness of it, is also contradicted by other evidence. Contrary to what he told me, that is, that the police gave him the name of Byron Hopkins, he told an FBI agent that the police asked him to name someone that could have given him a gun and that he "gave them Byron Hopkins." He also told the FBI agent that the officers took Hopkins out after Hopkins denied giving him a gun and that when Hopkins came back, "he changed his story instead that he had given Howard a gun."

As noted, one of the conditions of my interview with him, imposed by his attorney, was that I was not to question him about the facts of any of the cases in which he had been identified, including the murder. He did tell me that he had denied all the

237

other offenses, which would include the rape and robbery of the deputy sheriff. Howard had filed a post-conviction petition in that case which is still pending.

I had intended to ask Howard further questions about Hawkins and the garments he was wearing when his statement was taken by Assistant State's Attorney O'Malley. I also wanted to ask him about any gang membership he had. Hobley had said in a deposition that Howard had told him that he had been a member of the Disciples gang.

I had read a Chicago Tribune article which reported that the assistant state's attorney handling Howard's pending post-conviction petition had discovered a "rape kit" in the case of the rape of the deputy sheriff and that Howard's DNA matched that contained in the semen recovered from the deputy sheriff victim. The article quoted the attorney for Howard as saying that the match did not surprise him because Howard and the deputy sheriff had a previous "relationship." I called that lawyer, who told me that the quote attributed to him was accurate; he said that that was what Howard had told him. I told the lawyer that I wanted to ask Howard questions about that case, the clothing he was wearing, about Hawkins and the fact that Madison Hobley had said that Howard had told him that he had been a member of a gang. I was notified later by Howard's lawyer that Howard would be willing to talk to me about the matters I mentioned except the case of the rape of the deputy sheriff and that he would invoke his privilege against self-incrimination if I asked him any questions about that case.

I did interview Howard again through an audio-video conference on January 14, 2005. He was under oath and his testimony was recorded by a court reporter. His attorney was present as was one of our investigators. He told me he would invoke his privilege against self-incrimination if asked any questions about the rape of the deputy

238

sheriff. He denied that he told Hobley that he had been a member of a gang. For the first time ever, he said that he remembers talking to Hawkins on the bus going to the county jail. He was not sure whether he talked to Hawkins in the lockup. (As noted, Hawkins denies he ever saw Howard in the lock-up or on the bus.) He was not sure whether he had a conversation with anyone "through the two-way mirror." He said that after he was questioned by Assistant State's Attorney O'Malley he was taken to the lockup at "2:00 or 3:00." He was always handcuffed to the wall except when he was questioned by O'Malley. He now says that his previous testimony that he was wearing only a t-shirt when he was questioned by O'Malley was false. So was his previous testimony that he threw the t-shirt away.

Like his testimony on the motion to suppress and his first statement to me, his latest sworn statement to me is confusing and elusive on the issue of Hawkins and what he was wearing. I conclude that he testified the way he did advisedly because he was aware that Hawkins' affidavit and statement to OPS were false and that he knew if there was blood on his t-shirt when he was questioned by O'Malley, O'Malley would have seen it.

Last and the most damaging to his credibility is his latest ludicrous claim that he had had a prior sexual relationship with the deputy sheriff he raped.

Howard's strongest claim of proof that corroborates his allegation of brutality centers on the report made out by Dr. Ibeabuchi O. Asonye at Roseland Community Hospital after examining Howard, who was taken to the hospital because of an injury to his left thigh, which was x-rayed. Dr. Asonye in 1994 signed an affidavit which had been prepared by Howard's attorneys. It is the position of Howard that the report prepared by

239

Dr. Asonye and his affidavit show conclusively that he did not have any injury to his lower left leg which was later treated by the paramedic at the county jail.

I do not accept the claim that the report and affidavit establish conclusively that Howard did not have abrasions to his lower left leg when he was examined at Roseland Community Hospital. (I have learned that Dr. Asonye has been convicted of fraud in the Federal District Court, that his Illinois license has been revoked.) We were able to locate Dr. Asonye, who no longer practices medicine. We have been unable to conclude arrangements to interview him.

The report shows that the focal point of Howard's complaint was an injury to his left thigh, which caused "slight swelling and pain." An x-ray was taken. There is another injury involving multiple abrasions which were interpreted by Dr. Asonye. In his affidavit, after examining his report, he stated that he observed "multiple abrasions, swelling and pain of the left mid-thigh and leg." (Emphasis added.) He also said that if he had observed abrasions to the lower left leg or shin of Howard "to such an extent that medical treatment requiring cleansing with disinfectant, use of ointment and bandaging was necessary," he would have recorded the injuries and treatment in the medical records.

I read Dr. Asonye's affidavit to mean that he did see abrasions on Howard's left leg, but he made a subjective determination that they did not require any further treatment.

I cannot be certain how much latitude a judge would give a lawyer defending a police officer in cross-examining Howard, but I am confident the judge would give enough to permit the lawyer to show that Howard has lied in many different aspects of

R.SMITH02830

the investigation in which he was involved and continues to lie. In sum, it is my judgment that no jury would ever find beyond a reasonable doubt that the police had tortured Stanley Howard and convict the officers, based on Howard's testimony.

I adhere to that conclusion despite the possible introduction of allegations of abuse by other persons. Banks, Bates, Cannon, Lavert Jones, Reginald Mahaffey and Alonzo Smith might be able to testify against Byrne. Adkins and Tillman might be able to testify to similar acts by Boffo. Adkins, Cleveland, Hobley and Houston might be able to testify to similar acts on the part of Lotito. The testimony of each one of them carries its own infirmities. Introduction of the testimony of those individuals would result in trials within a trial. By no means may it be said that the introduction of the testimony of those individuals would not create some serious credibility problems for the State in any prosecution of the police officers. To illustrate, the only criminal case I am aware of that involves testimony of a third person that he had been abused by the same officers accused in the case on trial is People v. Tillman, in which Darrell Cannon also testified to acts of abuse against him by the same officer that allegedly abused Tillman. The jury apparently rejected that testimony and convicted Tillman again. That conviction has been affirmed by the Appellate Court.

For these reasons, I judge that the investigation of Stanley Howard's claim of police brutality be closed without any further action.

Edward J. Egan

241

R.SMITH02831

*Law Offices*
# Hubert & Fowler

188 West Randolph
Suite 801
Chicago, Illinois 60601

Phone: (312) 368-0213
Fax: (312) 782-4811

Donald Hubert
dh@dhubert.com

July 6, 2004

The Honorable Edward J. Egan and Robert D. Boyle
Special Prosecutors
Office of the Special Prosecutor
221 N. LaSalle Street
Suite 607
Chicago, Illinois 60601

Re:   Recommendation Report No. 1 - **Aaron Patterson**
      Confidential - Privileged
      Attorney Work Product
      Prosecutor's Privilege

Dear Justice Egan and Mr. Boyle:

### Introduction

Set forth is my recommendation and analysis regarding Aaron Patterson's allegation that on the night of April 30, 1986 and into the early morning hours of May 1, while being interrogated at Area Two, he was slapped in the chest, grabbed by the neck, twice pummeled in the dark by seven officers who were suffocating him by forcibly placing a plastic cover over his nose and mouth, when he requested water given bourbon in a cup instead, threatened with a handgun, the target of thrown food, and kicked in the ankle. Patterson made these allegations when he testified at the hearing on his motion to suppress his confession. Patterson's subsequent recounting of the allegations in his Post-Conviction Petition are consistent with his motion to suppress testimony. However, some of Patterson's allegations in the recent civil rights suit he filed are inconsistent with his initial claims.

During his criminal trial, Patterson made these allegations against Detectives James **Pienta**, William **Marley**, William **Pedersen**, Lieutenant Jon Burge, Sergeant Raymond **Madigan**, and former Assistant State's Attorney Peter **Troy**. In the federal civil rights suit Patterson made allegations against each of the above and: former CPD Sergeant John Byrne;

Page 1 of 18

242

R.SMITH02832

Detective Daniel McWeeny; Detective Joseph Danzl; former Assistant State's Attorney William Lacy; Cook County State's Attorney Richard Devine; former Chicago Police Superintendent Terry Hilliard; former Chicago Police Superintendent Leroy Martin; former OPS Director Gayle Shines; former counsel to the Superintendent Thomas Needham; the City of Chicago; Cook County Illinois and it Cook County State's Attorneys' Office.

## Summary Identifying the "Targets," Weight of the Evidence and Recommendation

It is my recommendation that the case be closed but monitored for reopening should Assistant State's Attorney Kip Owen's Grand Jury appearance, our expected interview of James Hill, or further developments produce new evidence. There is insufficient admissible evidence to recommend indictment of any officer or Assistant State's Attorney at this time. It is possible Patterson could be a witness to prove modus operandi should a prosecution of the accused officers occur.

The proof is _weak_ that James **Pienta** slapped Patterson in the chest or grabbed the back of his neck. The proof is _weak_ that **Pienta** or **Pedersen** ever tried to suffocate Patterson with a plastic bag and consequently the proof is weak that **Marley** (or anyone else) witnessed the baggings.[1] The proof is _weak_ that **Burge** threatened Patterson by placing a handgun on the table that they were sitting at. The proof is _weak_ that **Madigan** threw an Egg McMuffin at Patterson. The proof is _weak_ that former Assistant State's Attorney Peter **Troy** grabbed Patterson by the neck or kicked Patterson's ankle. The proof is _weak_ that **Troy** and **Madigan** made Patterson strip and take a shower. Based on the following analysis it is my recommendation the case be closed.

## I. Case Review

### A. Basic Facts

On April 19, 1986, Rafaela and Vincent Sanchez were found stabbed to death in their apartment at 8849 S. Burley. Their badly decomposed bodies were found by 13 year old Wayne Washington, a youth who performed odd jobs for the couple.

Patterson became a suspect two days later when the police received information from Marva Hall informing them that Patterson had admitted to her that he killed the victims. On April 30, Patterson was arrested for an unrelated matter. When homicide detectives learned Patterson was in custody, he was transported from the Fourth District station to Area Two Violent Crime's headquarters for questioning about the murders. According to the police, in the course of the interrogation which lasted about 28 hours, Patterson admitted his role in the murders to the police and the Assistant State's Attorneys on several occassions. Patterson refused to sign the handwritten statement prepared by one of the Assistant State's Attorneys.

---

[1] If admissibility is put aside, the proof is _strong_ that Pienta, Marley, and Pederson participated in beating and bagging Patterson.

Page 2 of 18

R. SMITH02833

Patterson and a co-defendant Eric Caine were indicted for the murders. Before trial Patterson unsuccessfully moved to suppress the statement attributed to him by the police. Judge Arthur J. Cieslik presided over the suppression hearing. Patterson and Caine were thereafter tried by a "double jury" procedure. Judge John E. Morrisey presided over the jury trial.

At trial, the State's evidence focused on Patterson's alleged inculpatory statement and Marva Hall's testimony that Patterson had admitted to her that he committed the murders. Patterson did not testify at the jury stage of the trial. The defense challenged the legitimacy of Patterson's inculpatory statement and attempted to establish an alibi. The jury found Patterson guilty of the murders and the jury determined Patterson should be sentenced to death. The court imposed the death penalty on October 2, 1989.

### B. Procedural History

On direct appeal, the Illinois Supreme Court affirmed Patterson's conviction and death sentence. *People v. Patterson*, 154 Ill. 2d 414, 610 N.E.2d 16, 182 Ill. Dec 592 (1993). cert denied 1993. (Exhibit 1).

After certiorari was denied, Patterson filed a timely post-conviction petition. Eventually, Judge John E. Morrisey granted the State's motion to dismiss the petition. On appeal, the Illinois Supreme Court reversed the dismissal in part. The court remanded the case for further post-conviction proceedings to determine if Patterson's trial counsel had been ineffective for failing to present evidence to establish that the confession was involuntary, and for the post-conviction court to consider the newly developed evidence which reflected the possibility that there had been a systematic pattern of torturing suspects to obtain confessions at Area Two. *People v Patterson*, 192 Ill. 2d 93, 735 N.E.2d 616, 249 Ill. Dec. 12 (2000). (Exhibit 2). The post-conviction process became moot when on January 10, 2003 then Governor Ryan pardoned Patterson on the basis of innocence.

On June 26, 2003, Patterson filed a civil action in the Northern District of Illinois against 17 defendants, including Detectives Burge, Byrne, Pienta, Marley, Madigan, Pederson, McWeeny, Assistant State's Attorney Peter Troy and former Assistant State's Attorney William Lacy. The case is pending. (Exhibit 3).

## II. Patterson's Coercion Claim

### A. Date and Location: April 30 - May 1, 1986 at Area Two and 11th and State

### B. Alleged Abuse

Mr. Patterson has made two statements describing the torture. The first is his sworn testimony at the hearing on the motion to suppress in 1988; the second is the statement he made to the Special Prosecutor on June 17, 2004. In addition, Patterson's Complaint in his federal

Page 3 of 18

244

civil rights law suit which is currently pending in the district court described the torture. The following version of the torture is taken from Patterson's motion to suppress testimony (Exhibit 4):

On April 30, at approximately 6:00 p.m, Patterson and James Hill were being transported in a police vehicle from the Fourth District station to Area Two. Detective **Marley** was driving, **Detective Pedersen** was sitting in the passenger seat, and Detective **Pienta** was sitting in the back seat with the two prisoners. During the ride, **Pienta** reached across Patterson's body and slapped Hill across the face once. Detective **Pienta** then told Patterson that if he had been the one who made the original arrest he would have killed Patterson. (Id., at R.388-89).

After a short stay at Area Two, Patterson was taken to 11th and State to take a polygraph test. No documents to date record or describe the test results and Patterson stated that he was not told. At approximately 9:30 p.m., Patterson was brought back to a second floor interrogation room at Area Two. Patterson testified the police told him they wanted to question him about a double homicide but the police never told him he had a right to remain silent nor the right to a lawyer. He was made to sit on a bench with his right hand fastened to a ring on the wall. Patterson requested a lawyer. Detective **Pienta** told him he was not getting a lawyer; **Pienta** said I am your lawyer; you are going to do what I tell you. Detectives **Marley**, **Pedersen** and **Pienta** questioned Patterson until about midnight. (Id. at R.391-4).

During the questioning, Detective **Pienta** announced: " I don't know about the rest of you, but I am tired of listening to this bullshit, I am about ready to kick ass." **Pienta** left the room. When he returned, **Pienta** was holding a manila folder and a gray plastic item. **Pienta** put the folder and plastic item on the table. Four more officers entered the room and the questioning continued. (Id. at R.395-7).

When Patterson refused to cooperate by implicating himself, **Pienta** reconfigured the handcuffs so that both Patterson's hands were fastened together behind his back and attached to a bar. **Pienta** proceeded to slap Patterson's chest and then to grab the back of his neck. Then someone closed the door and turned off the lights. Detective **Pedersen** grabbed the plastic item while the other detectives grabbed, pushed, and hit Patterson. **Pedersen** pushed the plastic item onto Patterson's face and held it there; at the same time another detective was trying to hold Patterson's nose to stop him from breathing. The assault lasted for about 1 minute. When the lights were turned back on, all the officers returned to their original positions in the room. Detective **Pienta** warned Patterson that if he did not cooperate something worse was going to happen. (Id. at R.395-404).

Following an unspecified period of time, during which Patterson continued his refusal to adopt the detectives' version of his role in the murders, the same group of detectives repeated the bagging assault. This time it lasted about 2 minutes. Patterson promised to cooperate by agreeing to adopt anything the police said. Patterson never said he committed the murders, he just said he would say whatever the police wanted him to say. (Id. at R.472) At that point, four of the

Page 4 of 18

245

detectives left the room leaving Detectives **Marley**, **Pedersen**, and **Pienta** in the room with Patterson. The detectives told Patterson that they were going to get the State's Attorney to come in and talk to him and all he had to do was tell the State's Attorney he killed the people, then he could go. When Patterson asked for something to drink, the police responded by bringing him a paper cup of what turned out to be bourbon. Patterson drank a sip and put it down. He believed Detective **Pedersen** was the officer who brought him the alcohol. Patterson was then left in the room alone for about an hour, unhandcuffed. (Id. at R 405-12).

During the hour he was alone, Patterson took a paper clip off the table and used it to scratch a message onto the bench in the interview room. He scratched a message in one place on the bench. (Id. at R 412-13).

At about 1:00 am, a **detective with red hair**[2] and Assistant State's Attorney Kip **Owen** came into the room. (Id. at R.477). Patterson's request to talk to **Owen** alone was granted, and Patterson told **Owen** he did not want to make a statement and he wanted a lawyer. At the end of their conversation, **Owen** turned to leave the room and when he reached the door he notified the **red hair detective** that Patterson did not want to make a statement and he had requested a lawyer. The detective came into the room. He told Patterson he was "fucking up" and if he didn't cooperate he would get something worse than what had happened earlier. The detective then removed his revolver from its holster and placed it on the table. Soon thereafter, the detective picked-up his revolver and left. Then another officer came in and handcuffed Patterson's right hand to the wall and left him in the room alone. (Id. at R 411-19).

At approximately 3:00 a.m., Patterson identified police photos of "some guys." About an hour or two later, three detectives returned and led Eric Caine past the door of the room Patterson was in. Then the detectives told Patterson that Caine had told them that Patterson had killed the victims. ( Id. at R.420-23).

Next Sergeant **Madigan** and Assistant State's Attorney Peter **Troy** came into the room together.[2] **Troy** denied Patterson's request to consult with his lawyer or his father. **Troy** described the scenario which the police believed implicated Patterson in the murders. **Troy** advised Patterson that all he had to do was admit he killed the victims and after he signed a statement he could leave. **Troy** then said he would go out and prepare the written statement and all Patterson had to do was sign it. Patterson then negotiated a deal where he promised to sign the statement on the condition he would be allowed to call his lawyer and grandmother first. (Id. at R.422-26)

---

[2] In November 1996, Patterson executed an Affidavit which states that sometime after the hearing on his motion to suppress, based on a T.V. news report he saw, he was able to identify the red hair officer as **Jon Burge**. (Exhibit 5).

[2] On cross-examination Patterson said Madigan came into the room about one-half hour before Troy and threw an Egg McMuffin at him (Exhibit 4, P. 491-3)

Page 5 of 18

246

Patterson was taken to another room where he was permitted to use the phone to call lawyer Duke McNeil and his grandmother. He spoke to both parties. After the phone calls, Patterson was returned to the original interview room and left there alone with one hand fastened to the wall. About an hour or two later, Assistant State's Attorney **Troy** came in and presented the written statement he had prepared for Patterson to sign. Patterson read the first two lines of the statement and refused to sign it. When Patterson refused to sign the statement, **Troy** proceeded to grab Patterson's neck and choke Patterson and kick Patterson in the left ankle. Detective Daniel **McWeeny** then came into the room and tried to persuade Patterson to cooperate. Finally, the police made Patterson take all his clothes off and put him in a shower that was in the locker room on the second floor. (Id. at R.431-37). Patterson said the detectives refused to give him a towel after the shower. (Id. at R.508).

## C. Prosecution's Cross-Examination of Patterson

On cross-examination, other than eliciting some factual details that were not consistent with the answers Patterson provided on direct (see Section III B(4), herein), the prosecution did not impeach Patterson's version of events.

## D. The Officers' and Assistant State's Attorneys' Version of the Interrogation

### Detective Pienta's Version of the Interrogation

Detective Pienta testified at the motion to suppress and the trial. Pienta testified that on April 30, 1986, at around 6:30 p.m., he and Detective Marley transported Patterson from the Fourth District to Area Two. During the ride, the officers gave Patterson his Miranda warnings and spoke to him. Patterson denied any knowledge of the murders. Sometime between 7:30 and 9:00 p.m., the officers took Patterson to 11th and State for a polygraph examination. After the examination the officers transported Patterson back to Area Two without speaking to him, except to stop at McDonald's to get Patterson some food. (Exhibit 6, R.202-8).

After returning to Area Two from 11th and State, he again read Patterson his Miranda warnings and, around 10:00 p.m, he talked to him for one-half hour to 45 minutes. Marley was also present. According to Pienta, at around 1 a.m., he again spoke with Patterson after reading him Miranda warning for the third time. Marley and Assistant State's Attorney Owen were also present at this interview. Detective William Pedersen came in and out of the room during the interview. (Id. at 208-9).

According to Pienta, throughout this entire period, Patterson never asked for an attorney or to talk to his father, nor was he threatened, told that he was lying, subjected to physical abuse or made to drink alcohol. Pienta denied the officers placed a plastic bag over Patterson's head or slapped another person in Patterson's presence. (Id. at 209-10).

At the jury stage of the trial, Pienta testified that, soon after Patterson was returned to

Page 6 of 18

R.SMITH02837

Area Two from 11th and State, he confessed under questioning. Pienta further testified that during a later interview, in the early hours of the following morning, with Assistant State's Attorney Kip Owens present, Patterson repeated basically the same inculpatory story. (Exhibit 7).

### Detective Marley's Version of the Interrogation

Detective Marley testified at the motion to suppress hearing and the trial, essentially confirming the testimony of Pienta. (Exhibit 8).

### Detective Pedersen's Version of the Interrogation

Detective Pedersen testified at the motion to suppress hearing. He was present in the car that transported Patterson from the Fourth District to Area Two but he did not remember James Hill being in the car. (Exhibit 9, R.361). In addition he confirmed Pienta's testimony that he was not present for the entire interview at 1:00 a.m., but that he went in and out of the interview room. Pedersen also confirmed the testimony of Pienta and Marley to the effect that Patterson was not abused or threatened at Area Two. (Id. at R.358-66).

### Sergeant Madigan's Version of the Interrogation

Sergeant Madigan testified at the motion to suppress hearing. He related that during the afternoon of May 1, 1986, at approximately 2:45 p.m., he was present with two Assistant State's Attorney's and Patterson in an interview room at Area Two. One of the two attorneys gave Patterson his Miranda rights and Patterson was questioned for 10-15 minutes. Madigan subsequently left the interview room for 15 to 20 minutes. Around 4:00 p.m, Patterson was again interviewed by the same individuals for about 45 minutes. Madigan also testified that Pienta, McWeeny, and Marley were never present during any interview of Patterson in which Madigan was involved. Madigan also confirmed the other officer's testimony that Patterson was not abused. (Exhibit 10, R.254-72).

### Assistant State's Attorney Troy's Version of the Interrogation

Assistant State's Attorney Peter Troy testified at the hearing on the motion to suppress, he testified at the trial, and he gave a Statement to the Special Prosecutor on September 18, 2003. At the hearing, he confirmed the previous testimonies that Patterson had not been threatened, abused, or refused access to his father or a lawyer during the interrogation on May 1. (Exhibit 11, R.278, 282-87).

At the hearing he also testified that he and Assistant State's Attorney Bill Lacy were the two attorneys present with Sergeant Madigan during the two afternoon interviews of Patterson on May 1. Troy gave Patterson his Miranda warnings during the first interview which lasted about 30 to 45 minutes. After Patterson gave his oral version, Troy asked Madigan to leave the room and he and Lacy talked with the Patterson. Patterson told him the police had been treating him

Page 7 of 18

R. SMITH02838

"fine." Upon being asked, Patterson said no promises or threats had been made and what he related was the truth. After asking Patterson if he would give a court reported statement, Troy left the room. (Id. at R. 274-8, 281).

Troy testified that during the second interview, after Patterson refused to give a court reported statement, he asked Patterson if he would be willing to give a handwritten statement. After Patterson agreed, Troy then questioned him and wrote out the statement. After Patterson read the statement aloud, he could not decide if he would sign it. Patterson was then allowed to make telephone calls to his grandmother and his attorney for their advice. (Id. at 2787-82). In his statement to the Special Prosecutor, Troy related that Patterson told him that attorney McNeil said he would not come to Area Two unless Patterson was able to pay him $10,000 cash. (Exhibit 13, P. 14-15).

Troy's testimony at the jury stage of the trial was consistent with his motion to suppress testimony. (Exhibit 12). With one exception, Troy's sworn statement to the Special Prosecutor is consistent with his previous sworn testimony. The exception is at trial Troy testified that when he relieved Assistant State's Attorney Owen at Area Two on the afternoon of May 1, "I can't say" I knew Owen had talked to Aaron Patterson (Exhibit 12, R.1570); in his recent Statement to the Special Prosecutor, however, Troy said Owen had told him that Patterson had already made an oral confession. (Exhibit 13, P.8).

### Former Assistant State's Attorney Lacy's Version of the Interrogation[3]

To date, the only statement now Judge William G. Lacy has given which recounts his role in the interrogation occurred when he gave an unsworn statement to the Special Prosecutor on June 1, 2004. (Exhibit 15). Judge Lacy remembered that on May 1, 1986 he was an Assistant State's Attorney working felony review. On that afternoon, he and his partner Peter Troy arrived at Area Two to review and approve charges for the Sanchez murders. They arrived to relieve Assistant State's Attorney Kip Owen who was getting off duty. Lacy and Troy talked to Owens about the case but Lacy never knew that Owens had already taken a confession from Patterson before they arrived to relieve him. Later, Lacy testified he did not remember if Owens had informed him that Patterson had already confessed. (Id. at P.14)

Throughout the afternoon, anytime Lacy was in the room with Patterson, Troy was also present. Sergeant Madigan was not always present.

Lacy had no independent recollection of what was said during the first interview with Patterson. (Id. at P. 19). The first interview was interrupted to allow Patterson to telephone lawyer Duke McNeil and Patterson's grandmother. Lacy did recall that at some juncture

---

[3] I questioned Judge Lacy on June 1, 2004 and it is my opinion that he made no effort prior to the statement to refresh his recollection. He avoided committing to specific facts by relying on his inability to recollect.

Page 8 of 18

R. SMITH02839

Patterson made an inculpatory statement to him and Troy and that Patterson agreed to sign a handwritten version which Troy prepared.

Lacy said he never saw a typewriter cover in his entire career as a State's Attorney and that Troy never touched Patterson. Lacy acknowledged that the State's Attorneys Office protocol was to list the names of all witnesses on any statement an accused was asked to sign; he could not explain why his name was not listed as a witness to Patterson's statement. (Exhibit 15, P. 26-7). He was unable to explain why he and Troy interviewed Patterson given that Owen had already witnessed a confession.

### E. Persons Present During the Alleged Torture

| Incident | State | Patterson |
|---|---|---|
| Ride from Fourth District to Area 2 | Det. Pienta<br>Det. Marley<br>Det. Pedersen | Det. Pienta<br>Det. Marley<br>Det. Pedersen<br>James Hill |
| At Area 2 from 10:00 p.m. thru 12:00 a.m., time period of questioning/ alleged baggings | Det. Pienta<br>Det. Marley<br>ASA Owens | Det. Pienta<br>Det. Marley<br>Det. Pedersen<br>4 unnamed others |
| Burge threats following alleged baggings, early morning of May, 1, 1986 | None | Lt. Jon Burge<br>ASA Owens<br>unnamed officer |
| Bourbon in cup | None | Det. Pedersen |
| Subsequent interviews May 1, 1986 | Sergeant Madigan<br>ASA Troy<br>ASA Lacy | Sergeant Madigan<br>ASA Troy |

### F. Statement (Confession)

Detective James Pienta testified that, after Patterson was returned to Area Two following the polygraph examination he confessed under questioning. He admitted he was the one who "shanked" both victims and Patterson implicated Eric Caine. (Exhibit 7, P. 1427-32).

Page 9 of 18

250

Pienta further testified that during a later interview during th early hours of the following morning, with Assistant State's Attorney Kip Owen present, Patterson again related basically the same story. Owen testified and corroborated Pienta's testimony regarding Patterson's relation of the events surrounding the Sanchez murders. (Id.at 1432-6).

Former Assistant State's Attorney Peter Troy testified he interviewed Patterson the following afternoon in the presence of Lacy and Madigan. According to Troy, Patterson's description of his role in the murders was consistent with the version he had given to the previous shift. Troy prepared a handwritten version of Patterson's statement. However, after Patterson made phone calls to an attorney and his grandmother, he refused to sign it. (Exhibit 12, P. 1557-69).

## III. Evaluation of Patterson's Torture Claim

### A. Evidence to *Corroborate* Patterson's Allegation

### (1) Outcry on Day of and Day After Alleged Torture.

Patterson made an initial outcry during the interrogation by etching messages on the bench and door frame in the interrogation room noting the torture. That etchings were followed by an outburst at his initial court appearance on May 2, 1986 before Judge Francis A. Gembala and in the presence of Assistant State's Attorney Margaret Stanton and Assistant Public Defender Rita Frye. During that court appearance, Patterson volunteered that he had been physically and emotionally beaten during the interrogation, been bagged, been given alcohol to drink, and physically abused by Assistant State's Attorney Troy. Judge Gembala instructed the court sergeant and Assistant State's Attorney Stanton to conduct an appropriate investigation. (Exhibit 14, P.12-23; Exhibit 23, P. 7-13).

### (2) Patterson has consistently maintained his innocence for the crime he purportedly admitted.

Patterson refused to sign the written inculpatory account prepared by Assistant State's Attorney Troy. Though the following is inadmissible evidence, I note that (1) many years later, he refused to accept a deal that offered an early release in return for an admission of guilt and (2) that subsequently, in 2003, he was pardoned for the crime on the basis of innocence by then Governor George Ryan.

### (3) The Office of Professional Standards Report (OPS) in its Investigation of Area Two Torture Claims From May 1973 through October 1986 described misconduct which is consistent with Patterson's Allegations.

Again, this is inadmissible evidence but I note that the OPS Report identified 13

Page 10 of 18

251

allegations of incidents involving a plastic bag or typewriter cover being placed over the victim's head at Area Two. It should be noted that the OPS Report identified "Players" (persons whose names repeatedly appeared connected to alleged acts of abuse). The only "Player" who is on Patterson's list of alleged abusers is Jon Burge.

**(4) Eric Caine, in his Statement to the Special Prosecutor, Made a Statement Which Supports Patterson's Torture Allegations.**

**(5) ASAs Conduct:** The only irregularity found in the work by the Assistant State's Attorneys was twofold: first, there is no reason in the record why Felony Review Assistants Troy and Lacy took a statement from Patterson <u>after</u> Owen did do; second, Patterson testified that Troy was alone in the room when he chocked and kicked him; yet, Lacey testified that he was always with Troy during all interviews – testimony that is contradicted by the handwritten statement prepared by Troy which does not list Lacey as being present.

In his Statement to the Special Prosecutor, Caine corroborated a portion of Patterson's testimony. Caine stated the detectives at Area Two brought him into Patterson's interrogation room and that Patterson was dirty and looked messed-up. (Exhibit 22, P.49, 55, 56)

### B. Evidence to Rebut Torture Claim

**(1) Detectives Pienta, Marley, Pedersen, Sergeant Madigan, and former Assistant States' Attorneys Troy, Owen and Lacy will testify no physical abuse or coercion occurred.**

If the above named persons were to testify in this case, and remain consistent with their previously sworn testimony, seven (7) detectives and 1 ASA will all deny that any physical abuse or coercion occurred. It is important to note that at trial all the witnesses' testimony was consistent and not impeached in any significant way. Moreover, in sworn testimony to the Special Prosecutor in September of 2003, former Assistant State's Attorney Peter Troy denied that he ever threatened or laid a hand on Patterson (Exhibit 13). Former Assistant State's Attorney, now Judge, William Lacy has also denied that Troy touched Patterson. (Exhibit 15). Assistant State's Attorney Kip Owen has refused to give a statement to the Special Prosecutor. Thus a subpoena will be issued for his appearance before the Grand Jury.

**(2) Patterson did not make an outcry or complaint to the Cook County Jail paramedic Clarence Spivey during the jail intake procedure. Spivey testified Patterson made no complaints about how the police treated him and Patterson appeared to be in good health. (Exhibit 16).**

R. SMITH02842

(3) There were no injuries.

(4) On May 1, 1986, when asked, Patterson told Assistant State's Attorney Troy he was being treated "fine."

At the hearing on the motion to suppress Troy testified that when he and Assistant State's Attorney Lacy were alone with Patterson, Paterson said the police had treated him fine; that there had been no promises or threats made to him; that he had eaten and been given coffee. (Exhibit 11, R.278). In Troy's recent statement to the Special Prosecutor he stated Patterson told him " . . . that I had treated him so well that he hoped when the case came to trial, I could represent him." (Exhibit 13, P. 13). When Justice Egan took Troy's statement he asked Troy if the Assistant States Attorneys at Patterson's trial were aware of this statement, and if so, why didn't they use it at trial. Troy answered he was sure he had advised the trial attorneys and he also thought he had testified about Patterson's compliment during the trial. (Exhibit 13, P 13).[4]

Lacy did not remember if Patterson made either statement but said that he was certain Patterson was asked and replied that he was treated fine because that was the protocol routinely followed whenever a statement was made. (Exhibit 15, P. 18).

(5) Patterson's motion to suppress testimony contains several inconsistent statements.

(i) On direct, Patterson testified while alone in the room after the second bagging, during the hour he scratched the message on the bench, he was not handcuffed. (Exhibit 4, R412). On cross-examination, he testified he was handcuffed to the bench during this same time period. (Id. at R 476-7).

(ii) On direct examination Patterson testified he told Assistant State's Attorney Kip Owen that he didn't have anything to say and he wanted a lawyer. (Id. at R415). On cross-examination he said he told Owen he had been bagged. (Id. at R488).

(iii) On direct examination Patterson testified that when Assistant State's Attorney Troy came into the room Sergeant Madigan was with him. (Id. at R423). On cross-examination he said Detective Madigan came in about ½ hour before the State's Attorney and threw an Egg McMuffin at him. (Id. at. R492).

(6) Information is available to contradict Patterson's Allegations.

---

[4] Troy did not testify about the compliment at the trial or at the motion to suppress hearing. (Exhibits 11, 12).

R.SMITH02843

(i) At the motion to suppress hearing, Patterson testified that during the interrogation he spoke to attorney Duke McNeil on the telephone. (Id. at R501). In a recent interview with the Special Prosecutor, Mr. McNeil denied that he ever spoke to Patterson (Exhibit 17). Both Lacy and Troy, however, said they witnessed and overheard Patterson's end of the telephone conversation and it appeared to them that Patterson was talking to McNeil. (Exhibit 13, P 15; Exhibit 15, P. 21-4) It should be noted that in 1992, in a case where I represented him, the ARDC found Mr. McNeil guilty of neglect in several unrelated matters and he was suspended for a period of six months. (In re McNeil, 91 CH 571, M.R. No. 7914 (Feb. 26, 1992)).

(ii) Patterson testified that Troy was the only Assistant State's Attorney present during the two May 1 interrogation sessions. However, then Assistant State's Attorney Lacy (now Judge Lacy) in a recent interview with the Special Prosecutor corroborated Troy's and Madigan's testimony that he was working as Troy's Felony Review partner on May 1 and he was present with Troy throughout the interrogation of Patterson.[5] Lacy also has stated there was no abuse or threats while he was present. (Exhibit 15). The police reports which document the interrogation confirm that both Lacy and Troy were involved in the May 1, interrogation. (Exhibit 18) .

(iii) According to Patterson, the coercion theme began when Pienta slapped James Hill across the face during the ride from the Fourth District to Area Two. However, Detectives Pedersen, Pienta and Marley testified that James Hill was not in the squad car that transported Patterson from the Fourth District to Area Two. (Exhibit 9, R361; Exhibit 8, R340; Exhibit 6, R 209). Patterson was arrested at James Hill's house but the police reports do not document Hill was arrested or transported by the police. (Exhibit 18).

(iv) On cross examination, Patterson said that when he returned to the interview room after making the phone calls on the afternoon of May 1 (the session during which Patterson was allegedly grabbed and kicked by Troy) one hand was cuffed to the wall. (Exhibit 4, P. 431-34). In his statement to the Special Prosecutor, Lacy said Patterson was uncuffed when they talked to him. (Exhibit 15, P 28).

**(7) Patterson's claim that ASA Troy participated in the physical abuse by choking and kicking him seems implausible.**

As an experienced criminal defense lawyer, I have never heard any another

---

[5] The fact that Troy does not identify Lacy as present on the handwritten statement he drafted is disturbing. Indeed, it corroborates Patterson that only Troy was present when Troy choked and kicked him.

Page 13 of 18

R. SMITH02844

allegation that an Assistant State's Attorney beat a suspect. The allegation seems particularly implausible when, as here, it is made against a lawyer who has been out of law school for only about 4-years and just beginning a career.

**(8) The credibility of Patterson's motion to suppress version of events is undermined by the fact that in his recent civil rights suit Patterson has reformatted some aspects of the arrest and interrogation to conform to the police's account.**

> (i) In his civil rights suit filed June 26, 2003, Patterson added William Lacy as a defendant and designated Lacy as one of the persons who was present and involved in the torture on May 1. (e.g., Exhibit 3, ¶ 12, 38). According to Patterson's motion to suppress testimony and his Statement to the Special Prosecutor, the only persons present were ASA Troy and Sergeant Madigan. (Exhibit 4, R.422-3; Exhibit 21, P. 87-90).

> (ii) In his civil rights suit, Patterson has left out the claim that James Hill was slapped in the face by Detective Pienta during the ride from the fourth district station to Area Two. (Exhibit 3). According to his motion to suppress testimony and his Statement to the Special Prosecutor, Hill was present in the car and Pienta reached across Patterson's body to slap Hill in the face before Pienta told Patterson, if he had been the one who arrested him, he would have killed Patterson. (Exhibit 4, R389; Exhibit 21, P. 20-24).

C.   **Evidentiary Considerations**[6]

**Patterson's Outcries Will not be Admissible as Substantive Evidence at Trial.**

As noted above, the only evidence available to corroborate Patterson's torture allegation is the fact that he made outcries during the course of the interrogation (etchings) and again the first time he appeared in court on May 2, 1986. The Special Prosecutor, however, will not be able to introduce either outcry as substantive evidence. (Exhibit 18.)

The Illinois Supreme Court previously examined the admissibility of the initial outcry Patterson etched on the bench and wall in the interrogation room. The court categorized that outcry as writings that "clearly constituted inadmissible hearsay . . . not within an exception to hearsay." *People v. Patterson*, 154 Ill. 2d 414, 452, 610 N.E.2d 16, 182 Ill. Dec. 592 (1993). (Exhibit 1). The court rejected the argument that the etching qualified for the spontaneous declaration exception. Surely, the same reasoning applies to the oral outcry that occurred during the bond hearing more than one day after the initial outcry. If the Special Prosecutor indicts and the case goes to trial, neither outcry will be admissible as substantive evidence

---

[6]Because of the importance of admissibility trial rulings on outcry evidence, I have prepared a memorandum of law that is the basis of this section. (Exhibit 18.)

Page 14 of 18

255

The Supreme Court also rejected the argument that Patterson's outcries can be admitted for rehabilitative purposes. Consistent statements can be admissible for rehabilitative purposes to rebut an express or implied charge on cross-examination that the witness is motivated to testify falsely, if the statement predates the alleged motive to testify falsely. In Patterson's criminal case, the Supreme Court concluded that neither outcry qualifies for the exception because his outcries did not predate his motivation to testify falsely. *People v. Patterson*, Id. Therefore the rehabilitative exception will not apply in this case.

The only opportunity for the prosecution to get Patterson's outcries before the trier of fact will occur if the defense opens the door. The outcries will be admissible to rehabilitate Patterson if the defense attempts to impeach Patterson's torture testimony by bringing out the fact he remained silent during the jail intake procedure, as paramedic Clarence Spivey's testified at Patterson's trial. If that unlikely scenario develops at trial, the prosecution should be permitted to have Patterson testify in rebuttal about his outcries to explain, disprove, or qualify Patterson's failure to speak at a time when it was natural to do so. Such testimony would be admitted solely for rehabilitative purposes and, if requested by the defense, a limiting instruction will likely be given. (Exhibit 18.)

### D. Evaluation of Aaron Patterson as a Potential Prosecution Witness

Based on my impressions from questioning Patterson on June 17, 2004 and based on my later review of the transcript (Exhibit 21), it is my opinion he will not turn-out to be a good witness for the prosecution if called upon to recount his allegations. Although Patterson's recollection of the facts was generally consistent with the testimony he gave at the motion to suppress hearing in 1988 and he was also able to satisfactorily explain some of the questions I had pertaining to his previous narration of the relevant events, in my opinion his attitude and his demeanor will undermine his credibility.

Mr. Patterson refused to answer any questions that reflected negatively upon him. For instance, even after I had explained to him why his background was relevant to my assessment of whether the officers should be prosecuted for their alleged abuse to him, he refused to answer questions about his prior convictions. He responded his prior convictions were irrelevant and the interview should be limited to what happened at the police station. (Exhibit 21, P. 6). He was, however, willing to give answers to questions that reflected positively on him, despite the fact those question were similarly unrelated to what happened at the police station (*e.g.*, graduated from DeLaSalle, honorable discharge from the Army. (Exhibit 21, P. 21-24). In my opinion, to avoid conceding facts that reflected negatively on him, Patterson was willing to lie. It is common knowledge that Patterson was recently arrested and charged with a minor offense that he allegedly committed during a demonstration. However, when I asked him about it, he answered that he could not remember being arrested nor could he remember if he had any pending cases against him. (Exhibit 21, P. 11)

If this same attitude prevails when Patterson testifies as a prosecution witness, I believe

Page 15 of 18

256

an aggressive cross-examination will undermine the credibility of his direct testimony. It cannot be ignored that, among other things, Patterson has at least three attempt murder convictions which occurred near the time of the alleged torture. If Patterson is unwilling to acknowledge his background, it is unlikely that any fact finder will believe his torture allegations.[7]

## IV.    Related Coercion Claims

(1) Eric Caine (see Caine report)

(2) Attached as an Exhibit to Patterson's Post-Conviction Petition is the affidavit of Michael Arbuckle. The affidavit is dated February 8, 1995. It states Arbuckle was questioned about the Sanchez murders on April 22, 1986. The police told him they wanted to get Patterson and wanted Arbuckle to implicate Patterson. When he refused to do so, Lt. Jon Burge threatened him with the electric chair or lethal injection. Mr. Arbuckle was never charged with playing a role in the Sanchez murders. (Exhibit 20)

## V. Investigation That We Conducted

### A. Materials Reviewed

| | Date | Description |
|---|---|---|
| 1. | 4/30/86 | Supplemental Police Report (Patterson's arrest) |
| 2. | 5/01/86 | Handwritten statement for Patterson's signature |
| 3. | 5/02/86 | Patterson's Bond Hearing transcript |
| 4. | 5/07/86 | Supplemental Police Report (Patterson's arrest and interrogation) |
| 5. | 6/04/86 | Michael Arbuckle Affidavit |
| 6. | 6/06/86 | Marva Hall's recantation |
| 7 | 9/16/87 | Patterson's Motion to Suppress Statements |
| 8 | 2/30 /88 thru 9/08/88 | Transcript Patterson's motion suppress hearing |
| 9. | 4/30/88 | Memorandum re: Marva Hall interview |
| 10. | | Common law record and trial transcript |
| 11. | 12/04/92 | *People v Patterson,* 154 Ill. 2d 414, 610 N.E.2d 16, 182 Ill.Dec 592 |
| 12. | 11/18/96 | Amended Petition for Post-Conviction Relief |

---

[7] It should be noted that at the point in the interview when it became obvious that Patterson would not answer background questions which reflected negatively upon him, one of his attorneys interjected that if I wanted cooperation I should limit my questions to the alleged torture. (Exhibit 21, P. 11-13). A break was requested, and after Patterson and his attorneys consulted in the hallway, I restricted my questions to the alleged torture events and Patterson did make an effort to answer my questions.

Page 16 of 18

R. SMITH02847

| 13. | | Common law record and post-conviction transcripts |
| 14. | 11/22/94 | Affidavit of Dr. Antonio Martinez |
| 15. | 11/18/96 | Aaron Patterson Affidavit |
| 16. | 8/10/00 | *People v. Patterson*, 192 Ill.2d 93, 735 N.E.2d 616, 249 Ill. Dec 12 |
| 17. | 9/04/00 | NPR transcript |
| 18. | 10/02/01 | Chicago Tribune Article "Death Row Deal Rejected" |
| 19. | 3/07/03 | Heartland Journal, untitled article |
| 20. | 6/26/03 | Complaint, Patterson v. Burge et al. , 03 C 4433, United States District Court for the Northern District of Illinois |
| 21. | 9/16/03 | Margaret Stanton McBride's Statement to Special Prosecutor |
| 22. | 9/18/03 | Peter Troy's Statement to Special Prosecutor |
| 23. | 7/10/03 | Memorandum interview with Duke McNeil |
| 24. | 6/01/04 | Judge William Lacy's Statement to Special Prosecutor |
| 25. | 6/24/04 | Memorandum: Overview of Evidentiary Rules Governing Admissibility of Outcry Testimony |
| 26. | 6/17/04 | Aaron Patterson's Statement to Special Prosecutor |

## B. Interviews Conducted by Special Prosecutor

| Party | Date | Exhibit No. |
|---|---|---|
| Duke E. McNeil | July 10, 2003 | 17 |
| Judge Willaim Lacy | June 1, 2004 | 15 |
| Peter Troy | September 18, 2003 | 13 |
| Aaron Patterson | June 17, 2004 | 21 |

## VI. Further Work to be Conducted

*Interviews*

1. Interview Kip Owns (was there an Owens/Burge session; details of turnover to Troy/Lacy?; why Troy/Lacey given he witnessed confession)
2. Interview Michael Arbuckle (abuse and police threats to get him to incriminate AP)
3. Interview James Hill (was he arrested at fourth district? in car to Area Two? Slapped?)
4. Interview Rita Frye (Patterson's conversation off-record; his demeanor; her assessment)
5. Find out who the polygraph examiner was and interview him/her.

*Other Work:*

1. Was there a shower on the 2nd floor of Area 2?
2. Is there a police report that documents the trip from Fourth District to Area Two?
3. Who was the court sergeant that Judge Gembela instructed to investigate torture?

## VII. Our Recommendation

Page 17 of 18

R. SMITH02848

There is no admissible evidence at this time to support Aaron Patterson's claim that on the night of April 30, 1986 and the following day he was physically abused and verbally intimidated by Area Two detectives during the course of their interrogation of him. The proof available to sustain Patterson's claim is limited to his outcries which will not be admissible as substantive evidence at trial. There are no facts or injuries to support his claim. It should be noted, however, that his outcries standing alone are <u>highly credible</u>; moreover they do take on a degree of credibility in light of the fact that an OPS investigation concluded physical abuse and planned torture was systematic at Area Two from 1973 through 1986, and allegations against Jon Burge were sustained.

It would be, however, impossible to prove, by any standard, that Patterson was tortured during his interrogation. Important factors in this assessment are: (1) all the trial testimony, subsequent reports, and witness interviews when analyzed are consistent and they all refute Patterson's claim, (2) the credibility of Patterson's claim is undermined because: (a) his motion to suppress testimony presents three significant inconsistencies, (b) information exists which expressly contradicts some of the relevant facts alleged by Patterson, (c) for purposes of his recent civil rights suit Patterson has reformatted his claim to cause it to conform, in some respects, to what the police witnesses have contended from the outset, (3) Patterson's claim that then Assistant State's Attorney Peter Troy participated in physical abuse by choking and kicking him seems implausible, (4) there is no proof of physical injuries, and (5) in my opinion Patterson will be a poor witness for the prosecution.

After weighing the strengths and weaknesses of this case, I recommend the case should be closed, pending re-opening should new evidence be developed.

Very truly yours,

Donald Hubert

enc.

M:\CLIENTS\1255\030407 L01.wpd

Page 18 of 18

259

R.SMITH02849

*Law Offices*

# Hubert & Fowler

188 West Randolph
Suite 801
Chicago, Illinois 60601

Phone: (312) 368-0213
Fax: (312) 782-4811

Donald Hubert
dh@dhubert.com

October 13, 2004

The Honorable Edward J. Egan and Robert D. Boyle
Special Prosecutors
Office of the Special Prosecutor
221 N. LaSalle Street
Suite 607
Chicago, Illinois 60601

Re:     Supplemental Report - Aaron Patterson
        **Confidential - Privileged**
        **Attorney Work Product**
        **Prosecutor's Privilege**

Dear Justice Egan and Mr. Boyle:

On July 6, 2004 I submitted a letter recommending this case be closed. The purpose of this letter is to update that recommendation based on my further work. I continue to recommend the case be closed.

The current status of the items that were listed as Further Work to be Conducted is as follows:

## 1. Interview Kip Owen

Mr. Owen was an Assistant State's Attorney assigned to felony review in May 1986. Patterson allegedly confessed to his involvement in the murder to Mr. Owen. According to Patterson, Mr. Owen had interaction with a red haired officer while at the police station. Patterson also claims he asked Owen for a lawyer, but was not provided with one. While Mr. Patterson allegedly confessed to Mr. Owen, Owen recommended that further investigation be conducted before homicide charges be brought against Mr. Patterson.

I thought it was important to take Mr. Owen's statement to see whether he would corroborate Mr. Patterson's statement that Owen spoke with a red haired officer (possibly Jon Burge) while he

Page 1

260

R. SMITH02850

was at Area 2. Further, we wanted to have Owen explain why he did not approve charges, but instead recommended that further investigation into the murder be conducted. Finally, we wanted to hear from Owen a confirmation that he saw no evidence of police brutality towards Mr. Patterson while he was at Area 2.

I took a court-reported statement of Mr. Owen on October 5, 2004. I am attaching a copy of that statement as **Exhibit A** to this report. In his statement Mr. Owen indicated that he never saw a red haired officer at Area 2 in May 1986. He has seen pictures of Jon Burge, but never met the man. **Note:** Mr. Patterson made his statement about the red haired officer at his trial in 1988, prior to Jon Burge (often referred to as having red hair) becoming well-known. This seems to cut in favor of the truthfulness of Mr. Patterson's identification of the red haired officer and against Mr. Owen's statement that there was no red haired officer at Area 2 on May 1, 1986.

Mr. Owen indicated that it was not unusual for him to obtain a confession, but not write that confession down or obtain a court reported statement pending further investigation. This is because he has found that arrestee's confessions change over time, so if possible he always wants evidence to corroborate a statement.

Finally, Mr. Owen was adamant that he never saw or heard anyone abusing Mr. Patterson during that night. He said he was always within hearing distance of the room Mr. Patterson was being held in. He admitted he did not know what happened prior to his arrival at Area 2, nor after he left Area 2.

Mr. Owen's statement does not affect my decision to recommend closing this file. Generally Owen seemed very credible. He was adamant that he did not see Burge at the station and that he had never met Burge. The 1988 testimony by Mr. Patterson that Owen entered the room with a red haired officer is troubling. However, that testimony is certainly not enough to change my recommendation on this file.

## 2. Interview Michael Arbuckle

Michael Arbuckle was allegedly one of the people involved in the Sanchez murders. However, he was not charged in connection with those murders. I thought it was important to interview him because he claimed that the police made oral threats to him in order to get him to implicate Patterson in the murders.

Mr. Arbuckle was interviewed by Gerald Theis and James Reilly on December 11, 2003. I am attaching that interview summary as **Exhibit B**. Arbuckle's interview provided us with limited information helpful in our investigation. He did not see Patterson after he was allegedly beaten. He claims that he was taken to Area 2 at one point after Patterson's arrest where he saw Patterson's phone number and a reference to torture etched into a bench in a prisoner holding room. While he was being interrogated by Burge and Kolovitz, Burge attempted to charge at Arbuckle and had to be restrained by Kolovitz. Apparently he was enraged by Arbuckle's

Page 2

R.SMITH02851

response to their questions. Arbuckle allegedly asked for an attorney, but his request was ignored. He was given a polygraph examination and told he failed. He was also shown a statement signed by Patterson that allegedly implicated him in the crime, but it was never close enough for him to read it.

Arbuckle did not confess to involvement in the Sanchez murders, but he did furnish a signed statement admitting complicity in an aggravated assault and an attempted murder. This was a violation of his parole, so he was sent back to Menard Correctional Center to complete an earlier sentence.

A couple of weeks after having been at Area 2, Arbuckle spoke with Patterson at the Cook County Jail and Patterson affirmed that he had scratched the message in the bench and had been tortured.

While Arbuckle's testimony corroborates Patterson's story, much of it is hearsay that would be inadmissible. Therefore, his testimony would not be materially helpful to support an indictment.

## 3. Interview James Hill

Patterson testified that Hill was in the police vehicle with Patterson while Patterson was being transferred from the Fourth District to Area Two. Patterson claims that Hill was slapped during this ride, and Patterson was threatened. I thought it was important to interview Hill to see if his story in relation to this was the same as Patterson's.

To my surprise, at his deposition Patterson testified that only a week earlier he ran into Hill and knew where he lived. He promised at his deposition to send us an address for Hill.

In June of this year, one of Patterson's lawyers, Ms. Joey Mogul, as a followup to Patterson's agreement to give us Hill's address said she would get this information. Oddly, to date, her efforts have not been successful. (See **Exhibit C**)

I also used the investigative resources of your office to locate Hill. To date, your investigators have not located James Hill. (See **Exhibit D** )

## 4. Interview Rita Fry

Ms. Fry was the Public Defender at bond court on May 2, 1986. She observed Patterson and spoke with Patterson in the courtroom and also in the lock-up on that date. In the courtroom, Patterson stated he had been the victim of police abuse (his statements are in the record). I thought it was important to find out what Ms. Fry's recollection of Mr. Patterson's physical condition was. I was also hopeful that she would recall what Mr. Patterson told her about the abuse he allegedly suffered.

Page 3

262

R.SMITH02852

I interviewed Rita Fry on August 23, 2004. I am attaching the summary of that interview as **Exhibit E.** Ms. Fry stated Patterson did not appear to have been beaten or otherwise abused and he never told her he had any specific injury. However, he did make very clear on the record his allegations of police abuse. When Patterson appeared at his arraignment, he was still "screaming" that he had been abused. Fry always felt that Patterson would be represented by the Public Defender's Office, so she told her supervisor they should send an investigator to Area 2 and that investigator should take pictures of the "etchings in a bench" if warranted.

Ms. Fry's testimony is not helpful in pursuing an indictment in the Patterson matter. This is because she said Patterson did not look like he had been beaten, and he did not tell her of any specific injuries he had suffered. However, she admits he did keep complaining about having been beaten. In talking to Ms. Fry one could conclude though she never said it outright that she does not consider Patterson trustworthy.

## 5. Find out name of polygraph examiner and interview him

Upon further consideration, I determined it was unnecessary to interview the polygraph examiner. The polygraph exam occurred at 11th and State before the alleged baggings. Consequently, the polygraph examiner will not be able to furnish any probative information.

## 6. Was there a shower on the 2nd floor of Area 2?

Patterson testified that after he was abused the officers had him take a shower located on the 2nd floor of Area 2. We have not been able to confirm that a shower was located on the 2nd floor of Area 2. However, this is an incidental point, not presently material in light of the existing information known.

## 7. Police report that documents the transportation of Patterson from the Fourth District to Area Two.

I thought it was important to obtain this document to see whether it corroborated Mr. Patterson's story that he was taken to Area 2 with James Hill, or if it corroborates the police story that he was taken alone.

We have obtained a police report related to the Aaron Patterson investigation. I am attaching it as **Exhibit F.** This report references Patterson being transported from the Fourth District to Area 2, but makes no reference to James Hill. Of course, it is possible that the police just neglected to mention that James Hill was present, but that seems somewhat unlikely. Generally because of the fact that it does not mention Hill, this report seems to corroborate the officers' testimony that Patterson was alone when he was taken to Area 2.

Page 4

263

R. SMITH02853

8. Who was the court sergeant Judge Gembela instructed to investigate the alleged torture.

Upon further consideration, I determined it was unnecessary to interview the court sergeant. His recollection of the outcry incident in Judge Gembella's courtroom can only duplicate the information I obtained from Rita Fry.

### Additional Relevant Information

Since my original recommendation, on August 8, 2004, the United States filed a Criminal Complaint in the Northern District of Illinois charging Aaron Patterson with numerous drug and gun crimes. The crimes are alleged to have occurred this year, after Patterson was pardoned. Patterson is currently incarcerated while waiting to be tried on these charges. I note that the United States Attorney furnished your office with a copy of the Complaint and the DEA's Affidavit on August 23, 2004. Tape recordings of Patterson purchasing and selling narcotics and buying and possessing high powered weapons substantially destroys his credibility. Without a smoking gun, allegations that Patterson was abused have no credibility. In this case, there is no smoking gun admissible at a trial.

### Conclusion

I have not learned anything to cause me to change or qualify my original recommendation to close this case.

Very truly yours,

Donald Hubert

Enclosures

1255030410.L06

Page 5

264

R.SMITH02854

MEMO

TO:      ROBERT BOYLE

FROM:    PAT CALIHAN

DATE:    JULY 14, 2006

RE:       AARON PATTERSON CRIMINAL CONVICTION IN FEDERAL
          COURT

Aaron Patterson was convicted before Judge Pallmeyer in the U. S. District Court for
the Northern District of Illinois on July 29, 2005 on weapons and drug charges in Case
No. 04 CR 705-1. As of today's date, the most current sentencing date of Mr. Patterson
is scheduled for October 13, 2006. There may be additional delays in sentencing.

265

R.SMITH02855

## PHILLIP ADKINS

Phillip Adkins was convicted of attempted murder and armed robbery after a bench trial. He was sentenced to 18 years imprisonment. He had filed a pretrial motion to suppress a confession on the ground that it had been coerced by police officers assigned to Detective Area 2. The motion was not heard because the State decided not to use the confession. Adkins appealed only the sentence, alleging that it was excessive. The appellate court affirmed in a Supreme Court Rule 23 order.

The robbery for which he was convicted occurred in the early morning hours of June 7, 1984 at an Arco Gas Station located at 8701 South State Street in Chicago. During the course of the robbery a Chicago police officer, who was a customer at the gas station, was taken hostage and pistol-whipped. The owner of the gas station and his wife identified Adkins as one of four robbers. They said that he had fired shots at them.

On November 7, 1984, Adkins sent a letter to the Office of Professional Standards lodging a formal complaint against Detectives Boffo, Lotito, Binkowski, Kushner, Dignan, Yucaitis and Sergeant Byrne, alleging brutality had been used against him on June 7, 1984. The investigation was closed in 1985 based in part upon a lack of cooperation on the part of Adkins.

The OPS investigation was re-opened on May 4, 1993 and closed on December 16, 1993; it had been conducted by Investigator Leutie Lawrence, who after her investigation entered findings that Boffo and Lotito had mistreated Adkins and that Dignan had made a false report.

266

R. SMITH02856

The complaint filed by Adkins was one of the complaints that were ultimately terminated by Thomas Needham, General Counsel to Superintendent Hillard on August 31, 1998 without any action being brought against Boffo, Lotito and Dignan.

In 1986 Adkins filed a Federal civil rights complaint against Lotito, Boffo, Dignan, Yucaitis, Byrne, Binkowski, Kushner and the City of Chicago. He gave a deposition on December 22, 1987. The case was settled with the City's agreement to pay a judgment entered against it for $25,000. A voluntary dismissal was taken from the complaint against Yucaitis, Byrne, Binkowski and Kushner. It is now conceded that they did not mistreat Adkins.

On December 8, 1992, Adkins was paroled and has not been subsequently convicted of any crimes other than traffic violations. He has been interviewed by this office on more than one occasion.

He was arrested with Willie Cowyin, his brother Willie Adkins and Eugene Phillips. Adkins testified that he was taken from his apartment at Garfield Boulevard and Halsted in a squad car along with three officers, Peter Dignan, who was driving, James Lotito, who was sitting in the front passenger seat, and Ronald Boffo, who was sitting in the rear passenger seat next to Adkins. They first stopped at the McDonald's restaurant across the street from where Adkins lived. All three officers had something to eat but Adkins did not order or eat anything.

He said the officers drove down Garfield east toward the expressway. They made it to the side of the expressway going north and went over the expressway. He told the police that Cowyin, Phillips and his brother were involved with him during the robbery, and he asked the detectives why they wanted to beat him but they didn't say anything.

267

(They had already told him they were going to beat him.) They drove the car into an isolated area near railroad tracks and a viaduct. It was still early in the morning but fairly bright. When they reached 49th Street, Adkins said, "That's when they really started talking about kicking my ass." He believed it was after they turned on Federal Street.

Boffo, sitting in the backseat with him, asked Adkins if he wanted to tell them what he knew about what had happened, and Adkins told him all he knew. As he was telling them that, Boffo hit him in the gut with his fist. The blow pretty well knocked all the wind out of Adkins, and Lotito in the front seat joined in. Boffo hit him again in the stomach. Lotito said, "Well, he's a smartass. Let's get some balls."

Boffo hit Adkins twice before anybody else hit him. After the second blow they started coming more repeatedly. Lotito hit him with a flashlight in the groin area, the testicle area. Lotito never hit Adkins in the head with the flashlight. Lotito was still in the front passenger seat, and Boffo was hitting him at this time with a fist and then after a while with a flashlight.

The driver was trying to stay out of the way. He would only do what they asked him to do. The driver never turned around to beat him. Boffo and Lotito continued hitting him as Adkins was trying to ask them to hold on. They just kept beating him, kept punching him in his groin area. Adkins told them he felt something was coming loose or something. Adkins said that before he could see exactly what was happening, he was losing consciousness. His bowels broke. He defecated on himself. He urinated on himself as well.

Adkins said that after he had the bowel movement on himself, the beating did not continue. He could not estimate how many times he was hit in the stomach area. He said

R.SMITH02858

he periodically lost consciousness and after a while the blows seemed to start getting "numb." He thought they left the viaduct immediately after the beating. They rolled the windows down so that the car could air out.

He became conscious again when they were on 133rd Street at Willie Cowyin's house. He recalled them getting on the expressway. Just before going to 133rd Street, they stopped on 127th Street at the Rosebud Farm restaurant for no more than a minute or two. There they met some more detectives; they were talking outside the car. He could not hear what they were saying. Boffo got out at the Rosebud and then got back in and sat next to him. They asked Adkins if he knew Willie Cowyin and where he lived. Adkins showed them the house where Cowyin lived.

They then also made Adkins change. He said one of them had bought a pair of khaki shorts that they made Adkins put on after taking off his blue jeans that he had soiled pretty bad. He was told to step out of the squad car; his handcuffs were briefly removed and he was given the khaki shorts to change into. His underwear and jeans were somewhere disposed of, and he never saw them again.

He did see the officers go up to Willie Cowyin's house, but he did not see them come out with Willie Cowyin. They took Adkins to Detective Area 2, so he never saw them bring Willie Cowyin out. He had told the police "from the jump" that he was involved and basically confessed to being involved in the robbery before they began beating him.

At the police station Adkins was barely able to move and told one officer that he didn't think he could walk. The officer told him he was going to walk, and if he fell, the

269

officer was going to kick his ass some more. They wanted Adkins to stand up straight and walk, and he was kind of stumbling. He was a little bit wobbly.

Adkins was held in the station at Area 2 for about 12 hours before he received any medical attention. There were officers who thought he should be attended to immediately, but others said they couldn't move him right then. He started out sitting, but the police said he couldn't sit but had to stand for a line-up at the station.

Adkins was photographed in the line-up which included Phillips, Willie Adkins and Willie Cowyin. Adkins was wearing khaki shorts in the line-up photograph; the seven other men in the line-up were wearing long pants. Adkins was in great pain while at Area 2 and sought to lie down but was told he had to stand up for the line-up. He was sick, in a lot of pain and vomiting blood. He made requests for medical attention and complained of his injuries to the officers at the time the line-ups were being conducted, but his requests were turned down.

At approximately 3:00 p.m. he gave a statement to Assistant State's Attorney Lester Joseph in the presence of Dignan and Boffo. Adkins recounted the events of the robbery at the gas station. His statement is inculpatory in that he states that he participated in the robbery; it is exculpatory in that he states that he fired a shot to frighten the victim, not to kill him. We have interviewed Mr. Joseph by telephone. He is now an attorney in the Justice Department in Washington, D.C. He has no recollection of taking the statement from Adkins. He said if there had been any indication of police abuse he would have noted that. There is no such indication in the statement.

At approximately 6:45 p.m. Adkins was not put into a lockup but was taken by uniform police officers in a police car to the emergency room at Roseland Community

270

Hospital, where he was treated and given a urinalysis which showed blood in the urine. Adkins complained at the ER of pain in the back, chest, neck, both legs and both arms. Urinalysis and x-rays were done, and at 1:00 a.m. on June 8, he was transported from the Roseland Community Hospital Emergency Room to Cook County Hospital.

After being examined and treated in the Emergency Room at Cook County Hospital, Adkins was admitted to the hospital at 4:45 a.m. with a medical diagnosis of Multiple Blunt Trauma. He reported to personnel at the hospital that he had been beaten by the police with flashlights and complained of pain in his right shoulder, chest, abdomen and both thighs. He was placed in the Intensive Care/Trauma Ward at Cook County Hospital on June 8th and 9th and was discharged on June 10th with a diagnosis of Multiple Blunt Trauma to the leg, head and chest. For a period of approximately 3 weeks, Adkins received medication and painkillers and physical therapy in the way of bicycle training, weights and other therapy. Subsequently after Adkins had been transferred to the Illinois Department of Corrections facilities in Joliet and Pontiac, medical records reflected Adkins being treated for back pain and pain in his right shoulder.

Virginia Holmes was a registered nurse at Roseland Community Hospital working in the Emergency Room. Her notes indicate that Adkins was complaining that he had pain in his back and both legs. He had possible contusions to the kidney. Another note showed that he was alert, responsive, no acute distress, still unable to give urine at the time. A urinalysis was conducted which was positive for the presence of 20mg of albumin which is an indication that the patient sustained trauma to the kidney. There was

R.SMITH02861

a trace of blood in the urine noted. Those results were consistent with the possible contusion to the kidney.

Dr. Loya worked with Dr. Demetra Soter at Cook County Hospital in examining and treating Phillip Adkins. Attempts have been unsuccessful to reach Dr. Loya.

Dr. Demetra Soter is a trauma specialist at Cook County Hospital. Adkins was admitted with a diagnosis of Multiple Blunt Trauma. The medical records reflect that he reported being beaten by the police with flashlights and complained of pain in his right shoulder, chest, abdomen and both thighs.

Dr. Soter met with representatives of this office on April 26, 2005. She had an independent recollection of examining Adkins. She said that in trauma cases she starts with the negative and some times ends up with the more likely than not conclusion that it is true. She starts out very skeptical. She did not recall Adkins saying that a policeman had inflicted the injuries, but heard it, she thinks, from other nurses or techs. She said he appeared to have been beaten while in police custody. She said Adkins had related that he had been hit among other things with flashlights, and she said in her years of experience usually these patients did not lie about the instrument.

Dr. Soter personally saw the bruising. She saw it within 24 hours. She was of the opinion to a reasonable degree of medical certainty that the injuries were totally consistent with the complaints of abuse that Adkins had related. The injuries were very consistent with the type of instruments used in the complaints of abuse. She characterized Phillip Adkins' trauma as moderate, meaning severely beaten or beaten up pretty badly. It would be very hard for one person to inflict those injuries.

R.SMITH02862

Dignan, Boffo and Lotito have refused to speak to us, but they have given statements to OPS Investigator Leutie Lawrence. All the police witnesses who gave statements to Leutie Lawrence have denied any knowledge of any abuse of Adkins.

Byrne, Lotito, Dignan and Boffo all stated that only Lotito and Boffo were in the car with Adkins. Lotito was driving and Boffo was in the passenger seat. Dignan emphatically denied that he was in the car with Adkins. Boffo's statement was the same as Lotito's except that he said that he did ride in the backseat with Adkins. Lotito had stated that Boffo was never in the backseat.

Dignan also told Lawrence that he had observed bruises on Adkins at the time of the arrest. He also filed a supplemental report on June 15, 1984, in which he said he saw bruises on Adkins' torso at the time of the arrest at Adkins' home. The report stated that Dignan asked Adkins how he had received the bruises and Adkins said it was "no big thing." A number of witnesses, including Adkins and his codefendants told OPS that Adkins was in good health and did not have any bruises before the arrest. The initial arrest report of Adkins (prepared on June 8, 1984 before the supplemental report we referred to above) contains a blank space in box #30 where "marks, scars, deformities, handicaps, etc. are to be noted and makes no reference to any bruises being observed on Adkins' torso at the time of his arrest.

Investigator Lawrence concluded that the evidence was sufficient to establish that Boffo and Lotito had struck Adkins repeatedly about the body with their fists and a flashlight. She further concluded that the evidence was insufficient to establish that Dignan was, in fact, the driver of the car. She further found that the evidence established

273

R.SMITH02863

that Dignan had made a false report in that he said that he observed bruises on Adkins'
body at the time of the arrest.

We have concluded that the medical evidence leaves no other conclusion but that
Adkins suffered injuries while in police custody. The posture of this case is the same as
the posture in the Andrew Wilson case. We believe that the physical evidence is so
strong a corroboration of Phillip Adkins' testimony to us that we could in good faith
present the evidence to a grand jury and seek the indictment of Ronald Boffo and James
Lotito for aggravated battery against Phillip Adkins. The evidence is insufficient to
support an indictment against Peter Dignan. We agree with the OPS investigator that the
evidence is insufficient to establish beyond a reasonable doubt that Dignan was the driver
of the car.

Edward J. Egan

Thomas J. Reed

R.SMITH02864

## ALFONZO PINEX

Eddie McKeever was murdered on August 4, 1982, in a gang-related shooting. On May 29, 1985 Officers Anthony Maslanka and Michael McDermott arrested Samuel Hayes for armed robbery. He offered information about the murder of Eddie McKeever. He said that on the night that McKeever was shot Pinex had told him that he had shot McKeever. Hayes met with the officers at Detective Area 2 the next day and gave another statement in which Hayes described the circumstances under which McKeever had been killed.

Another witness, Roosevelt Strong, gave the police information that Pinex and Hayes were involved in the shooting of McKeever. According to Strong, the motive of the McKeever murder was the fact that McKeever was or had been a witness against Jeffrey Collins. McKeever alleged that Collins had attempted to murder him. At the time the police were interviewing Roosevelt Strong, Collins was serving time in the penitentiary for the previous attempted murder of McKeever.

The police re-interviewed Sammy Hayes, who told them that he, Pinex and others planned the killing of McKeever. They subsequently met Jeff Collins and Mark Pillette, who were riding in Collins' mother's car. Hayes said they saw Eddie McKeever riding a bicycle, and Pinex shot him.

Mark Pillette was arrested and told the police he was present when McKeever was shot. Jeff Collins, Pinex and Sammy Hayes were also present. Pillette said that Pinex and Hayes shot McKeever. Collins was the driver of the car. Pillette subsequently gave a court-reported statement to Assistant State's Attorney James Bigoness, who was assigned to the Felony Review unit.

R.SMITH02865

Bigoness and the officers again interviewed Hayes at Cook County Hospital. He was informed of what Pillette had said. He admitted that he had fired one shot into McKeever's head as he was lying on the ground. Hayes also gave a court-reported statement to Bigoness.

Some of the officers accompanied Assistant State's Attorney Tom Roach to Logan Correctional Center in Lincoln, Illinois where Collins was imprisoned. Collins said he had not shot anyone, but he was the driver of the car when McKeever was killed. He said Hayes and Pinex did the shooting. A tape recording of his statement was reduced to writing; he read it and signed it.

Bigoness approved a murder warrant for Pinex. Pinex was arrested on June 28, 1985, and a statement was taken from him by Bigoness, who testified that he wrote out his summary of what Pinex was telling him. Pinex signed that summary in the presence of Bigoness and Maslanka.

Hayes, Collins and Pinex were indicted for the murder of McKeever. Hayes and Collins were convicted, but their convictions were reversed. They were retried, reconvicted and sentenced to 24 and 23 years respectively in the penitentiary.

Pinex made a motion to suppress his statement, which was allowed by Judge Michael Getty, who made a number of findings of fact which we will refer to in more detail later. One of the findings of fact was that during custodial interrogation Pinex told the officers that he had an attorney and wanted the attorney present during the questioning. But despite his request, Judge Getty found, Maslanka and McDermott "notwithstanding the defendant's assertion of his Miranda rights," questioned the defendant and this questioning was in violation of the defendant's constitutional rights.

276

R.SMITH02866

Based on that finding, Judge Getty suppressed the statement. He advisedly declined to "reach the issue of whether or not the defendant was beaten." He said that it was not necessary for him to make that determination. Pillette recanted his previous statement, and Collins refused to testify for the State. The State then nolle prossed Pinex's indictment.

Shortly after the State dismissed his indictment, Pinex filed a suit against the City of Chicago in the Circuit Court of Cook County, alleging that McDermott and Maslanka had beaten him at Detective Area 2. The suit was settled on November 1, 1991, by payment of $5,000 by the City.

The principal witnesses for Pinex included his lawyer before and at the time of his arrest, Freddrenna Lyle. We have interviewed Pinex and Lyle and we have read their testimony at the motion to suppress. We also interviewed the mother and wife of Pinex.

According to the police reports, tactical officers from the 22nd District located at 111th & Monterey received information from a confidential informant that Alfonzo Pinex, who was wanted on a murder warrant, could be found in the vicinity of 66th & Hoyne Avenue. (The 22nd District is located in Detective Area 2 at 111th & Ellis.) The tactical officers met the informant at 66th & Seeley at approximately 10:20 p.m. on June 28, 1985. The informant told them that Pinex was staying with a girlfriend, Kim West, at 6614 South Hoyne. (6614 South Hoyne is located in the 7th Police District. The 7th Police District station is located at 61st & Racine.) An officer from the tactical unit of the 7th District joined the tactical officers from the 22nd District, and Pinex was arrested at 6614 South Hoyne. The Violent Crimes unit of Detective Area 2 was notified.

R. SMITH02867

According to a report signed by Maslanka and McDermott, Pinex was transported to the 22nd District "for processing." Maslanka and McDermott advised the arresting officers that Pinex should be transported via squadrol to Area 2 for further investigation. Maslanka and McDermott were at the station at the 22nd District when Pinex was brought there. They saw him but did not question him.

Pinex testified at the motion to suppress that he was picked up by the police at the home of his girlfriend, Kimberly West, on June 28, 1985. He was first taken to the police station at 61st & Racine, then to the police station at 85th & Green and finally to the Detective Area at 111th & Michigan where he was taken upstairs to a room. (We believe that he was mistaken when he said he was taken to the station at 85th & Green. We believe that he was taken to the station at 111th & Monterey, District 22.) Maslanka and McDermott came into the room. When he was arrested Pinex had a lawyer, Freddrenna Lyle. Pinex had talked to Lyle before he was arrested on June 28. Lyle had called and talked to him about the case. She told Pinex that they were going to turn him in on Saturday, June 30. He was arrested near midnight on June 28, which was a Thursday.

Pinex said that Maslanka started to question him by saying Pinex knew what he was there for and Maslanka didn't want "no bullshit." He asked Pinex to tell him what he knew about the Eddie McKeever murder. Pinex said he would like to have his lawyer present before he said anything. Maslanka told him that he didn't have a lawyer. Pinex told him that he did have a lawyer, because he was supposed to be turning himself in the next day. Maslanka told him that Pinex was lying, and he was tired of Pinex lying to him. He told Pinex that the police had "papers" of Sammy Hayes and Mark Pillette. (The "papers" were the statements made by Hayes and Pillette to Bigoness.) Maslanka

278

R.SMITH02868

then read them, and Pinex said that he didn't care what the papers said. Maslanka told him to shut up and listen, and he played the tape of Jeffrey Collins which implicated Pinex. After playing the tape, Pinex told the officers that he didn't care what they were saying, they were all lying.

Maslanka struck Pinex in his eye. McDermott jumped over and started helping Maslanka. McDermott started to hit Pinex in his ribs and grabbed his leg so that Pinex could not move. Pinex was just trying to cover up to stop from being hurt too bad in the face. The beating caused him to defecate in his pants. He was wearing underwear which he was able to dispose of. To make them stop the beating, Pinex had hollered, "Okay, I'll do what [you] want me to do."

Pinex testified that the beating occurred immediately after he heard the tape and after he said "he did not care what they were saying, they are all lying." Maslanka started the beating with his first blow to the corner of Pinex's right eye. After Pinex leaned over, Maslanka grabbed his hair, and McDermott was beating Pinex in the ribs. He kneed Pinex at the same time. He was struck maybe three, maybe more times in the right eye. Maslanka first struck him in the eye. At one point he was kneed in the eye.

He was also beaten in his ribs more than once. He was struck on the side of his ribs; the lower part in the ribcage. McDermott beat him in the ribs with his fists. Maslanka also kneed him in the left eye. He was struck in his right eye, left eye and right portion of his head.

About ten minutes after the beating, Pinex saw Assistant State's Attorney James Bigoness. Maslanka was in the room. Pinex said he told Bigoness that he had been beaten by Maslanka. He was crying. Bigoness told him to pull himself together.

R.SMITH02869

Bigoness read the statement to him and asked if he had said that. When he heard the part of the statement about Pinex being treated well by the police, he told Bigoness, "I told you they have bruised me." Bigoness said that he didn't look like he had been bruised. Bigoness never mentioned a court-reported statement, and Pinex never told him he wanted to give a court-reported statement. He never saw Bigoness write down what is contained in the statement that was offered by the State. (A copy of that statement is attached to this report as Pinex Exhibit 1.)

He had seen McDermott and Maslanka earlier at what Pinex said was 84th & Gresham. (The station at 85th & Green is called the Gresham police station.) Even though he was not given Miranda warnings, he knew he had a right to remain silent. On cross-examination, he said that he had never given a statement to any police officers at any time. He saw Bigoness after he told police he would make a statement. Bigoness introduced himself.

Freddrenna Lyle arrived, and Pinex told her that he had been beaten by the police. Some time later, Lyle and Bigoness came in to talk to Pinex. Pinex told Bigoness where and how he had been beaten. The police had come to the room and said to Pinex that he told his lawyer that he had been beaten. Pinex said, "Yeah, I told her that." Pinex pointed out the portions of his body where he had been beaten.

Pinex said that he had worn reading glasses before. There was nothing wrong with his right eye until it became blurred after he had been beaten. His eye injury was the only one serious enough to have treatment for.

Freddrenna Lyle testified that she had met Pinex in maybe '83 or '84 and that she had been called by his mother several days before June 28 and requested to represent

280

Pinex. She made arrangements with the police to turn him in that Saturday at the station at 51st & Wentworth (the 2nd District; also Detective Area 1) at 3:00 p.m. Those arrangements were made on Thursday; she could not get there before Saturday. Mrs. Pinex had given Lyle a card with the number and name of some officers she had been talking to; Lyle took the card and called the officers. (Mrs. Pinex had received the card from policemen who came to her home with a warrant seeking her son.) Lyle was aware that there was a warrant for Pinex's arrest outstanding; this was the reason she had arranged to surrender him. Pinex was aware of the fact that she had been retained to represent him because she had spoken to Pinex and made arrangements as to what time and where they were supposed to go to turn him in. She was unable to find the card with the officer's name and did not remember the name of the officer.

She received a call from Pinex's family about 11:00 or 11:30 p.m. on June 28. She got out of bed and went to 51st & Wentworth; where she had been advised he had been taken. She went to the desk and asked where Pinex was; they checked the records and said he wasn't there. Lyle had been told by an Officer Richardson that Pinex was in custody at 61st & Racine, so she went to that station. She got there about five or ten minutes later. She identified herself on the phone to Richardson, and asked whether Pinex was in custody there, and Richardson said yes, and she went right over. When she had arrived at 61st & Racine Pinex was not in the lock-up. She became rather agitated and asked the desk sergeant to find out where Pinex was. The desk sergeant called the lock-up, and no one knew where Pinex had been taken. After about ten minutes one of the officers who had assisted in making the arrest informed the desk sergeant and Lyle that Pinex had been taken to Detective Area 2.

281

Lyle asked the desk sergeant at 61st & Racine to call Area 2 before she went all the way out there, and the desk sergeant did. She was told that Pinex was not in the lock-up there. The desk sergeant then asked for Violent Crimes detectives and, after speaking to someone there, learned that Pinex was with the detectives. The sergeant told the detectives that Lyle was Pinex's attorney, that she was looking for him and that she was on her way out to Area 2.

Lyle arrived at Area 2 about 12:05 or 12:10 a.m. She immediately went to the desk, showed her identification and told the police at the desk that she wanted to see her client immediately. She was told that he wasn't in the lock-up. She told the officer that Pinex was with the Violent Crime detectives, so the police officer called up to Violent Crimes and indicated that there was an attorney downstairs who wanted to see Pinex. She was then asked to have a seat. She was kept waiting for about ten to fifteen minutes; then she went back to the desk and complained about the delay.

About five minutes later McDermott came downstairs and escorted Lyle up to the second-floor where Pinex was being questioned. On the way up the stairs McDermott asked Lyle whether she knew what the arrest was about. She said that she did know.

When she arrived on the second-floor she saw Assistant State's Attorney Bigoness and Maslanka standing outside a room. There was a court reporter sitting at one of the desks. She knew it was a court reporter because her machine was there. (It was later established that a court reporter was called by Bigoness, and the court reporter arrived at Area 2. Bigoness excused the court reporter because, according to a police report, Pinex had made a statement.) Lyle asked Bigoness whether he was getting ready to have the court reporter take Pinex's statement, and he answered that he was. After she

282

R.SMITH02872

talked to Bigoness about the court reporter, they took her into a room about three or four feet from where they had been standing. Lyle went into the interrogation room and saw Pinex by himself. As soon as she walked in the door, Pinex started crying. She said he was hysterical. Pinex just kept repeating that they had been beating him, and she kept asking him whether he had made a statement. Pinex kept saying that he had asked for his lawyer and that they had been beating him. She kept asking Pinex whether he had made a statement, and he told her that he had.

She left the room and spoke to Bigoness and told him that Pinex said he had beaten. Bigoness told her that that's what they all say after giving a confession. She told him she was not concerned about what they all say; that her client said he had been beaten and that he had told Bigoness that he had been beaten. Maslanka went back into the room where Pinex was and Lyle followed him. Maslanka said to Pinex, "So you told your lawyer we had been beating you." Pinex answered, "Yes, I told her you had been beating me." Maslanka then said to Pinex, "You don't look like you've been beaten to me and we're going to take pictures for our protection."

About fifteen minutes later someone came back with a camera and proceeded to take pictures of Pinex. Lyle told the police not to take the pictures for her satisfaction, because Pinex was too dark skinned and there would be no bruises. If they were to strike somebody as light as she was that person would bruise easily, but someone as dark as Pinex would not show bruises until the next day. Lyle said that the police said they were going to take the pictures for their protection anyway.

Lyle stood in the hallway, and the police asked Pinex where he had been beaten. They proceeded to take pictures of his face and his ribs and then had him pull up his shirt.

R.SMITH02873

Pinex had already told Lyle that he had soiled his pants and that they had allowed him to remove his underclothes. When the police told Pinex to drop his pants, Lyle knew that he didn't have any underclothes on so she turned away. (We have examined the pictures. There are two pictures taken of Pinex without his pants on; he is not wearing any underwear. Some of the pictures also show bloodshot marks in his lower left eye.) In an interview with this office, Lyle said that she had instructed Pinex that he was not to answer any questions by the police after he surrendered.

Celestine West is the mother of Kimberly West, the estranged wife of Pinex. West stated that on the day of Pinex's arrest both her daughter and a neighbor telephoned her and told her that police officers had surrounded her house. By the time West arrived home the police officers were taking Pinex from the house and placing him in a police automobile. Pinex supposedly was to be taken to the station located at 61st & Racine. When West and her daughter went there they were told that Pinex had been taken to the station located at 51st & Wentworth. At that station they were told that Pinex had been taken to the station located on 111th Street (the 22nd District). When they arrived at the 111th Street station they were told that Pinex was not there.

She and her daughter returned home, and some time later received a phone call from Pinex. He told her that he was in custody at Area 2. (Area 2 is on 111th Street but farther east than the 22nd District.) Pinex requested them to bring him clean underclothes because he had soiled himself while in custody. West and her daughter went to Area 2 that evening with the requested clothing which they turned over to the desk officer. They saw and spoke to Pinex in the visiting room area separated from him by a glass partition. West retained an attorney, Walter La Von Pride, for Pinex's defense. (Pride is now

284

deceased.) Pride represented Pinex after he had been indicted. His motion to suppress was granted.

In a statement to our office, Kimberly West Pinex corroborated the statement of her mother. She made numerous visits to Pinex while he was in the county jail. She recalled that on the occasion of the first visit his eyes were still bloodshot. She was sure that at the time of his arrest Pinex had no damage to his eyes and was in excellent physical condition. Following the dismissal of the charges against Pinex in 1986, she and Pinex were married. They are still married, although they do not live with each other.

Frances Pinex is the mother of Alfonzo Pinex. She was not able to go to the Area 2 station because she was sick at the time, but she did notify Freddrenna Lyle of Alfonzo's arrest. She retained Walter La Von Pride to defend her son in connection with the murder charges. She first saw her son after the arrest when he was an inmate at Cook County Jail. His eyes were swollen and red.

Daniel Olsen was a Cermak Hospital physician assistant who did the history and physical examination at the Cook County Jail intake. His signature appears on the Pinex History and Physical Exam Sheet dated June 30, 1985. Olsen is now a physician living in Grand Rapids, Michigan. He says he does not want to be involved and fears being sued, but he did identify a document appearing to be one that was used in 1985. From the bottom part of the form Olsen identified his own handwriting, which indicated that Pinex complained of red eyes and blurred vision secondary to blows. He also determined that there were bilateral subconjunctive hemorrhages. He said that he had probably been requested to examine Pinex because of Pinex's complaint of blurred vision and the redness in his eyes.

285

R.SMITH02875

Dr. Scott Cooper worked at Cermak Hospital. Cooper now practices internal medicine in Johnson City, Tennessee. On January 23, 2006 he was interviewed by a representative from this office.

He examined Pinex on November 14, 1985, relative to a complaint by Pinex that he had a pain in his right eye. Pinex said he had blurring of vision and burning of his eyes for two to three months. He told Cooper he had been hit in the eyes five months before. A vision test revealed that in his left eye Pinex was 20/200 and 20/100 in his right eye. In Dr. Cooper's opinion the finding made by Olsen of a subconjunctive hemorrhaging in both eyes would be consistent with a blow or beating to the head or the area of the eyes endured by the patient.

Maslanka and McDermott both testified at the motion to suppress, but they have refused to give any statement to this office. Bigoness also testified on the motion to suppress and has been interviewed by this office. In the motion to suppress both officers denied any abuse of Pinex. They also denied any knowledge that Pinex had a lawyer. Bigoness also denied that Pinex told him that he had been beaten. It was stipulated by the State and the defense that Bigoness was not present at any time while Pinex was abused.

Judge Getty made findings that Lyle did have an agreement with the police to surrender Pinex on Saturday, the 30th; that Pinex did tell the police that he had an attorney and wanted the attorney present before questioning. He concluded by singling out McDermott and Maslanka as the persons who, by their persistence in questioning Pinex, violated his constitutional rights. The only specific reference he made to Bigoness occurred when he said the following:

> "The court further notes that it's very unusual that thereafter
> the Assistant State's Attorney in a homicide case proceeded to take

286

a summary statement, rather than a court-reported statement, lending itself to make an indication that there was a great deal of hurry, possibly, to get the whole thing done before somebody like Ms. Lyle arrived.

It's curious, also, that Ms. Lyle was held for 15 to 20 minutes at Area 2 in a downstairs office, just enough time to get that statement and the signing of the statement.

It is curious further -- not that there's corroboration -- the defendant's contention that he soiled himself, as he put it, and he had no underpants on when they sought to take his picture."

As noted, we have interviewed Lyle, Pinex and James Bigoness. The police officers have refused to talk to us, but we have come to a conclusion without considering their refusal to speak to us. Our conclusion is first that we agree with all the findings of fact by Judge Getty:

1. Lyle did have an agreement with the police to surrender Pinex.

2. Pinex did tell the police that he had an attorney and wanted her present before any questioning. It defies common sense to say that Pinex did not follow the instructions given to him by Lyle.

3. It was unusual for Bigoness to take a summary statement rather than a court-reported statement. Judge Getty's inference that the police and Bigoness were in a hurry was reasonable.

4. It was also reasonable for Judge Getty to infer that Lyle was stalled.

Although Judge Getty alluded to the fact that Pinex had said that he soiled himself, the judge expressed no inference. But we will: As factfinders we conclude that Pinex did soil himself and that he did so because of physical mistreatment.

In order for Judge Getty to come to the conclusion that he did, he would have had to come to the conclusion that the police, at least, were not telling the truth about whether

287

they knew that Pinex had a lawyer, he wanted his lawyer present and that his lawyer was deliberately given the run-around. We agree; we do not believe they were telling the truth. That being so, the question becomes what effect does that conclusion have on the question of the credibility of the officers in their denial of physical mistreatment. In our judgement, as factfinders we may believe that we may consider the police officers' willfully false testimony that Pinex did not tell them he had a lawyer and wanted his lawyer present in determining the truth of their denial of mistreatment. Moreover, Pinex's testimony is corroborated by the fact that he had to change pants; but the strongest corroboration of all is the medical testimony of Dr. Olsen and Dr Cooper. Pinex did suffer an injury to his eye.

In addition, the testimony of the police and Bigoness contains its own improbabilities.

Consider these facts: According to the police Pinex arrived at Detective Area 2 at 11:45 p.m. and was placed in an interview room. At that time Maslanka and McDermott spoke to Bigoness, "who was already at Area 2 on a separate assignment." They informed Bigoness that Pinex was in custody at Area 2 headquarters. They then began the questioning of Pinex. According to Bigoness' Felony Review Report he was first contacted by McDermott and Maslanka at about 12:30 a.m., but about 15 minutes later (12:45 a.m.) according to the report, the officers were telling Bigoness that Pinex had confessed. That means that all that the officers had testified to - the accusations they made to Pinex, the denial, the reading of the statement of Hayes and Pillette, the playing of the tape of Collins' report and the oral confession Pinex allegedly made to the police all took place in 15 minutes.

288

R.SMITH02878

Consider also these facts: The warrant was issued for Pinex's arrest on June 8, 1985. Twenty days later (June 28) his attorney made arrangements to surrender him on June 30. The very day that his attorney made arrangements to surrender Pinex, a "confidential informant," who apparently had been silent for almost three weeks now told the tactical officers from the 22nd District, not the 7th District where Pinex was allegedly staying, and where Pinex could be found.

Detective Area 2 officers, McDermott and Maslanka, who had been in on the investigation since May 29, when they interviewed Sammy Hayes, were notified of the upcoming arrest. They went first to District 22 and told the tactical officers to take Pinex to Detective Area 2, where they would be waiting to interrogate him. And when the officers got to Detective Area 2, who should be there to assist them in case Pinex wanted to make a statement, but the very assistant who had taken the statements from Hayes and Pillette and approved a warrant for Pinex's arrest on June 8, 1985, an assistant state's attorney who just happened to be at Area 2 on another assignment. Bigoness does not recall what that other assignment was.

It is undisputed that Bigoness was not present when Pinex was mistreated by the police; and there is no direct evidence that he was aware before he began his questioning that an arrangement had been made by Pinex's lawyer to surrender him. (Bigoness testified that Pinex told him, after his oral statement but before his written statement, that he had an arrangement to surrender.)

Pinex testified that he did tell Bigoness that he had been beaten; and Bigoness denied that he had done so. A factfinder could reasonably determine that Pinex was telling the truth.

289

We do not have proof beyond a reasonable doubt that Bigoness aided and abetted any mistreatment of Pinex; but, in our judgment, we have sufficient evidence to present to a grand jury and seek the indictment of Maslanka and McDermott for aggravated battery, perjury and obstruction of justice.


Edward J. Egan

Thomas J. Reed

290

R.SMITH02880

## ALFONZO PINEX EXHIBIT NO. 1

STATEMENT OF

Alphonso Pinex

Taken _June 29, 1995_ At _1:15 a.m._

At _Area 2 Headquarters_

Present _ASA Joan Bromer_

_Det. J. McClenka_

This statement taken regarding the _death_
of _Eddie McKeever_ which occurred on _Aug. 4, 1992_
at _1557 W. 90th St._ at _12:40 a.m._

I understand I have the right to remain silent and that
anything I say can be used against me in a court of law.
I understand that I have the right to talk to a lawyer
and have him present with me during questioning, and if
I cannot afford to hire a lawyer one will be appointed
by the court to represent me before any questioning.
Understanding these rights, I wish to give a statement.

x _Alfonzo Pinex_

After being advised of his rights, Alphonso
Pinex, in summary, stated as follows:
that on August 3, 1992 he was known
as "Chief Zoe" because he was the
head of the Disciples street gang. On
that date he called a meeting of his
gang in the basement. About 15 members
appeared, including Jeffrey Collins, Mark
Pillette, and Sammy Hayes. The purpose
of the meeting was to talk about ways
to raise some more money. The meeting
lasted from around 6:00 p.m. until
about 8:00 or 9:00 p.m. At about 10:00
p.m. Pinex was still home when Collins
and Pillette picked him up in Collins'
ASA _Joan Bromer_                    _Alfonzo Pinex_

291

car. They then picked up Sammy Hayes around 91st and Marshfield. They rode around "looking to get high" for a couple of hours. They then stopped at a liquor store at 91st and Marshfield. Collins went inside to buy some liquor. Sammy then yelled out "There's a rock," meaning that he had seen a Blackstone. The Blackstone and Disciples were feuding. Sammy had his handgun with him and Pinex had a loaded .22 handgun. After Sammy yelled, Pinex, Pillette and Sammy Hayes ran towards a young man who was riding his bike near 90th and Ashland. Sammy Hayes ran up to within 5 feet of the young man, yelled "Disciple," and fired once. Pinex said he then aimed his gun at the victim and fired once. Sammy then fired his gun at the victim several more times. The victim fell back. Pinex and Pillette ran with Hayes right behind. They got back in the car and drove to Brandon Park where Pinex threw the gun in some bushes.

Pinex said that he had been treated well by the police and that no threats or promises had been made in return for this statement. Alfonzo Pinex

P ASA [illegible]

P Det [illegible]

292

R.SMITH02882