*APRIL 24, 2007*

## A REPORT ON

# THE FAILURE OF

# SPECIAL PROSECUTORS

# EDWARD J. EGAN

# AND

# ROBERT D. BOYLE

# TO FAIRLY INVESTIGATE

# POLICE TORTURE IN CHICAGO



EXHIBIT B
SMITH-000707

**REPORT ON THE FAILURE OF SPECIAL PROSECUTORS
EDWARD J. EGAN AND ROBERT D. BOYLE TO FAIRLY INVESTIGATE
SYSTEMIC POLICE TORTURE IN CHICAGO**

*[Burge] put some handcuffs on my ankles, then he took one wire and put it on my ankles, he took the other wire and put it behind my back, on the handcuffs behind my back. Then after that, when he — then he went and got a plastic bag, put it over my head, and he told me, don't bite through it. I thought, man, you ain't fixing to put this on my head, so I bit through it. So he went and got another bag and put it on my head and he twisted it. When he twisted it, it cut my air off and I started shaking, but I'm still breathing because I'm still trying to suck it in where I could bite this one, but I couldn't because the other bag was there and kept me from biting through it. So then he hit me with the voltage. When he hit me with the voltage, that's when I started gritting, crying, hollering . . . It feel like a thousand needles going through my body. And then after that, it just feel like, you know — it feel like something just burning me from the inside, and, um, I shook, I gritted, I hollered, then I passed out.*

*Torture victim Anthony Holmes*
*Statement Provided to Special Prosecutors*

### INTRODUCTION

On April 24, 2002, Paul Biebel, the Presiding Judge of the Criminal Division of the Cook County Circuit Court, ruled that State's Attorney Richard A. Devine had an actual conflict of interest in investigating police torture allegations because he and a law firm with which he had been associated had defended Jon Burge in a civil rights lawsuit brought by torture victim Andrew Wilson. Judge Biebel appointed Edward J. Egan as Special State's Attorney and Robert D. Boyle as Chief Deputy Special State's Attorney (hereinafter Special Prosecutors) to investigate the torture allegations. (*In Re Special Prosecutor,* 2001 Misc. 4, Order and Opinion of Judge Biebel, April 24, 2002). After a four-year investigation that cost Cook County taxpayers $7 million, the Special Prosecutors sought no indictments but rather on July 19, 2006, filed a 292-page Report of the Special State's Attorney (hereinafter Special Prosecutors' Report, or Report).

1

SMITH-000708

After the Report was released, there was a widespread perception, particularly in the African-American community, that the Report was unfair, misleading, and disingenuous, and that the Special Prosecutors should have brought criminal charges against the alleged torturers. As a result of the dissatisfaction, a team of volunteer attorneys, researchers, and community activists was formed to respond to the Report. The team devoted the next nine months to that effort, resulting in this report, which has been endorsed by 212 individuals and organizations active in the fields of human rights, criminal justice, civil rights, and racial justice.[1]

**SUMMARY OF FINDINGS**.

The research team concluded that the Special Prosecutors:

- Did not bring criminal charges against members of the Chicago Police Department despite the apparent existence of numerous provable offenses within the statute of limitations.

- Ignored the failure of former Cook County State's Attorney Richard M. Daley, State's Attorney Richard A. Devine, and various other high-ranking officials to investigate and prosecute police officers who engaged in a documented pattern of torture and wrongful prosecution of torture victims.

- Did not document the systemic and racist nature of the torture and did not brand it as such in accordance with the international definition of torture.[2]

---

[1] The names of endorsing organizations and individuals appear at the end of the report. Those whose names are followed by asterisks participated in researching, writing, editing, and producing this report. The team had access to the entire public record of the torture scandal. Most documents cited herein are posted at http://humanrights.uchicago.edu/chicagotorture/.

[2] The 1984 Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."

SMITH-000709

- Unfairly evaluated the credibility of the alleged torturers and of their victims and unfairly attempted to discredit torture victims who had pending civil or criminal cases.

- Conducted an investigation that was hopelessly flawed and calculated to obfuscate the truth about the torture scandal.

- Ignored a wealth of evidence establishing that there was a widespread and continuing cover-up of the torture scandal — a conspiracy of silence — implicating high officials of the City of Chicago, the Chicago Police Department, and the Cook County State's Attorney's Office.

- Failed to document the role of judges of the Criminal Division of the Cook County Circuit Court in the torture scandal.

- Had appearances of conflict of interest and bias in favor of those whom they had been appointed to investigate.

## B ACKGROUND

To understand what the undersigned believe to be the inadequacies and failures of the Special Prosecutors' investigation and Report, it is essential first to understand the Special Prosecutors' principal findings, which were:

- That the evidence established beyond a reasonable doubt that "Jon Burge and at least one other officer [John Yucaitis] committed armed violence, intimidation, official misconduct, and aggravated battery when they abused Andrew Wilson at Area 2 on February 14, 1982, and committed perjury when they testified at Wilson's first trial on November 9, 1982."[3] (Special Prosecutors' Report, p. 16)

- That the evidence established beyond a reasonable doubt that Area 2 Detectives Anthony Maslanka and Michael McDermott physically abused Alphonso Pinex and committed aggravated battery, perjury, and obstruction of justice. (Id.)

---

[3] The evidence indicated that Wilson was shocked with a black electric shock box on his ears, lips, and genitals, suffocated with a plastic bag, beaten about his head and body, burned on a hot radiator to which he was handcuffed and burned with cigarette butts.

3

- That the evidence established beyond a reasonable doubt that Area 2 Detectives James Lotito and Ronald Boffo abused Philip Adkins and committed aggravated battery against him.[4] (Id.)

- That there were "many other cases" in which the Special Prosecutors "believed" that the persons (including Melvin Jones, Shaded Mumin, and Michael Johnson[5]) were abused but "proof beyond a reasonable doubt [was] absent." (Id.)

- That Burge, the commander of the Violent Crimes Section of Detective Areas 2 and 3, was "guilty [of] abus[ing] persons with impunity," and that it therefore "necessarily follows that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they." (Id.)

- That Police Superintendent Richard J. Brzeczek was guilty of a "dereliction of duty" and "did not act in good faith in the investigation of Andrew Wilson," because Brzeczek "believed at the time that officers at Area 2 had tortured Andrew Wilson," and that Brzeczek "kept Burge in command at Area 2, and issued a letter of commendation to all of the detectives at Area 2." (Id. at 17)

- That Brzeczek "received and believed evidence that a prisoner [Andrew Wilson] had been brutalized by the Superintendent's subordinates, that the prisoner had confessed, that those subordinates had testified under oath on a motion to suppress and before a jury and he [Brzeczek] had to believe, they testified perjuriously, *that the prisoner had been sentenced to death,* and that for 20 years the Superintendent still remained silent." (Id. at 86-87) (*emphasis in original*)

- That the U.S. Court of Appeals for the Seventh Circuit in its 1993 consideration of the City's liability in the Wilson civil case was misled concerning Superintendent Brzeczek's contemporaneous knowledge that Burge and his subordinates tortured Wilson because Brzeczek concealed those views until after the case was concluded. (Id. at 87-88)

- That the Chief of Felony Review of the Cook County States Attorneys' Office, Lawrence Hyman, gave "false testimony" when "he denied that Andrew Wilson told him he had been tortured by detectives under the command of Jon Burge." (Id. at 54)

---

[4] The evidence indicated that Adkins was beaten about his head and body with a flashlight, causing him to defecate on himself, and called racial epithets.

[5] The evidence indicated that Burge electrically shocked Jones on his penis, thigh and foot, struck him in the head with a stapler, threatened him with a revolver, and threatened to "blow [his] black brains out;" that Burge suffocated Mumin with a plastic typewriter cover, threatened him with a revolver, subjected him to Russian Roulette, and repeatedly used racial epithets; and that Burge electrically shocked and beat Johnson.

SMITH-000711

- That no meaningful police investigation was conducted, nor any police witness questioned either in the Wilson case, or in the Michael Johnson electric-shock case, which occurred a few months after Wilson, and had "glaring similarities" to the Wilson allegations. (Id. at 71-73; 88)

- That "something should have been done about the disgrace and embarrassment [at Area 2] 24 years ago" by the Chicago Police Superintendent. (Id. at 89)

- That if action had been taken against Jon Burge at the time of the Andrew Wilson case, or even shortly thereafter, the appointment of the Special Prosecutors would not have been necessary. (Id. at 88)

- That this action should have included, "at the very least," the Superintendent's removal of Burge from any investigative command and a "complete shake-up at detective Area 2." (Id. at 88)

At a press conference after release of the Report, the Special Prosecutors stated that, of the 148 cases they investigated, they believed that abuse occurred in 74, or approximately half of the cases, and that the torture allegations "seemed to center on a crew known as the Midnight Crew." "There are a number of officers who seem to predominate relative to the number of allegations that are made, allegations that we have said that we think happened," said Boyle. "It centers basically around eight to twelve policemen out of a unit of forty-four." (Transcript of the Press Conference of the Special Prosecutors, July 19, 2006)

Despite the findings presented in the Report and the statements at the press conference, the Special Prosecutors sought no indictments, concluding that "the statute of limitations bars any prosecution of any officers." (Special Prosecutors' Report, p. 13)

5

SMITH-000712

## INDICTABLE CASES WHICH THE SPECIAL PROSECUTORS
## COULD HAVE BROUGHT WITHIN THE STATUTE OF LIMITATIONS

*The Special Prosecutors did not bring criminal charges against members of the Chicago Police Department despite the apparent existence of numerous provable offenses within the statute of limitations.*

The Special Prosecutors' Report stated that neither Burge nor any of his subordinates could be indicted because the three-year Illinois statute of limitations had run on all their alleged crimes. This assertion was and is unsupported and unsupportable by the record. In truth, shortly after their appointment, the Special Prosecutors were presented with evidence of indictable offenses within the statute of limitations. Furthermore, during the four-year Special Prosecutors' investigation, numerous additional indictable offenses occurred, including perjury, obstruction of justice, official misconduct, and conspiracy.

Officers who could have been indicted within the statute of limitations, and the offenses for which they could have been indicted, if the Special Prosecutors had proceeded in a timely fashion, include:

**Jon Burge** — The Special Prosecutors found, beyond a reasonable doubt, that Burge tortured Andrew Wilson, and, when he denied doing so at Wilson's 1982 trial, committed perjury and obstructed justice. Furthermore, during the Wilson federal court proceedings, Burge denied under oath, once in 1988 and twice in 1989, that he had tortured Wilson. At a Police Board hearing in 1992, he again denied torturing Wilson. Non-conspiracy charges based on those false denials may have been barred by the three-year statute of limitations. However, in November 2003, during the *Hobley v. Burge* federal court case, Burge once more denied under oath that he had witnessed or participated in any torture or abuse of suspects during his tenure in the Police Department. Therefore, Burge could have been indicted for perjury and obstruction of justice for his 2003 sworn statement, as these denials were in the face of numerous credible cases of torture.

SMITH-000713

**John Byrne** — John Byrne, a disbarred lawyer,[6] was the sergeant in charge of the midnight shift at Area 2 and by his own admission Burge's "right hand man" from 1982 to 1986. On March 1, 2001, in a sworn deposition taken in a state court post-conviction case brought on behalf of torture victim Aaron Patterson, Byrne denied torturing, abusing or witnessing the torture or abuse of any of more than ten individuals. Many of the torture claims in these cases have been validated in court and by administrative bodies, including the cases of Gregory Banks, David Bates, Darrell Cannon, Stanley Howard, Lee Holmes, Philip Adkins, Marcus Wiggins, Aaron Patterson, and Thomas Craft. Byrne's sworn denials occurred well within the three-year statute of limitations, and could have been the basis for a series of perjury[7] and obstruction of justice[8] charges. In early 2004, Egan and Boyle were warned that the statute would soon expire on these alleged offenses. Nonetheless, they neither sought an indictment of Byrne nor sought a statute of limitations waiver from him before the March 2004 deadline. In August 2004, the Special Prosecutors had another opportunity to indict Byrne when he gave them an oral statement that he had not participated in or witnessed any acts of torture, (including the Banks and Cannon cases) took the Fifth Amendment before the Grand Jury the same day, then offered, the next day, to give the Special Prosecutors a formal, unsworn, court reported statement denying all torture at Area 2. (Deposition of John Byrne in *Cannon v. Burge,* December 14, 2006, and exhibits thereto) At his 2006 deposition, Byrne admitted that he refused to give denials under oath because he feared being charged with perjury. Furthermore, he conceded that his unsworn denials could expose him to obstruction of justice charges, but that he felt such an eventuality was highly unlikely. Byrne's legal maneuver supplied the Special Prosecutors with wholesale denials of torture on behalf of Burge and the other 25 detectives who refused to cooperate with the Special Prosecutors' investigation, yet the Special Prosecutors neither took a formal court-reported statement from Byrne nor indicted him for obstruction of justice.

---

[6] On November 26, 1996, Byrne, who had become a lawyer while serving as a detective, was disbarred as an attorney in Illinois. This disbarment was based on eleven separate counts of attorney misconduct. The ARDC found that Byrne had engaged in actions that "defeated the administration of justice and brought the legal system into disrepute" on seven occasions; that he "committed dishonesty, fraud, deceit or misrepresentation" on four occasions; and that he "made statements of material fact or law to a tribunal which he knew or reasonably should have known were false" on one occasion. (Deposition of John Byrne in *People v. Patterson*, March 1, 2001) At his deposition, Byrne admitted to the allegations in each of the 11 Counts brought by the ARDC. (Id.)

[7] In Illinois, "a person commits perjury when, under oath or affirmation, in a proceeding in any other matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true." (720 ILCS 5/32-2(a))

[8] In Illinois, "a person obstructs justice when, with the intent to prevent the apprehension or obstruct the prosecution or defense of any person he knowingly commits any of the following acts: (a) Destroys, alters, conceals or disguises physical evidence, plants false evidence, *furnishes false information,* or (b) Induces a witness having knowledge material to the subject at issue to leave the State or conceal himself; or (c) Possessing knowledge material to the subject at issue, he leaves the State or conceals himself. ." (720 ILCS 5/31-4) *(emphasis added)*

SMITH-000714

**James Lotito** — The Special Prosecutors found that James Lotito, a member of the midnight shift, and Ronald Boffo had severely beaten Philip Adkins. However, in November 2003 in sworn interrogatories in the *Hobley* case, Lotito denied, under oath, that he had participated in or witnessed *any* acts of torture and abuse. As a result, Lotito could have been indicted for perjury and obstruction of justice for his denials in either the Adkins case or for several other cases of torture, including Stanley Howard and Madison Hobley.

**Daniel McWeeny** — Daniel McWeeny was named as a participant — often "the statement taker" — in a number of torture and abuse cases, including those of Melvin Jones, Stanley Howard, Aaron Patterson, Darrell Cannon, Madison Hobley, James Andrews, L.C. Riley, and Leroy Orange. In November 2003, during the Special Prosecutors' investigation of the Hobley case, McWeeny denied under oath that he had participated in or witnessed *any* acts of torture and abuse. Furthermore, torture witness David Bates has subsequently alleged that in September 2004, McWeeny intimidated him at his home after he appeared as a witness at Cannon's parole revocation hearing. In November 2005, McWeeny was granted use immunity by the Special Prosecutors, then appeared before the Special Grand Jury and denied any wrongdoing. In April and June 2006, on four separate occasions in two federal court torture cases, McWeeny denied, twice while under oath, that he saw or participated in *any* acts of torture or abuse. Hence, McWeeny could have been indicted for perjury for all of these acts and for obstruction of justice for all of them except his testimony before the Special Grand Jury.

**John Paladino** — John Paladino, was another Area 2 midnight shift detective who, along with his partner, Anthony Maslanka, was named in numerous cases of torture, including the Hobley, Mumin and Cody cases. Paladino was also named by thirteen-year-old torture victim Marcus Wiggins, who alleged that he was electric-shocked in September 1991. In 1996, in sworn federal court testimony, Paladino denied participating in or witnessing *any* torture at Areas 2 and 3. In November 2003, in the Hobley case, Paladino denied under oath in sworn interrogatories that he had participated in or witnessed *any* acts of torture and abuse. Hence, Paladino could have been indicted for perjury and obstruction of justice for his 2003 sworn denials.

**Fred Hill and Patrick Garrity** — Fred Hill was a long time Area 2 detective who was named as a torturer and witness in the Donald White and Andrew Wilson cases. In sworn federal court testimony given in June 2006 in the *Evans v. City of Chicago* case, Hill denied knowledge of, or participation in, *any* acts of torture or abuse. Hence, he could have been indicted for these sworn denials. In late 2005, after the Special Prosecutors granted him immunity, Patrick Garrity, according to his lawyer, also denied *any* wrongdoing before the grand jury; as a result, he could have been indicted for perjury.[9]

---

[9] There are also at least eight additional Area 2 officers and supervisors who could have been charged with obstruction of justice and perjury within the 3 year statute of limitations for denying any knowledge of torture and abuse.

8

SMITH-000715

**Conspiracy to obstruct justice**

The evidence clearly supports the conclusion that the Area 2 supervisors and detectives named above committed numerous acts of obstruction of justice within the statute of limitations. The Special Prosecutors — by their own admission — believed that these and other Area 2 officers committed more than 70 separate acts of torture as well as numerous testimonial acts of obstruction of justice, perjury, and cover-up which were outside of the three year statute. At the very least, the Special Prosecutors also could have indicted these officers for conspiracy to obstruct justice for committing, with a shared intent and motive, the acts committed within the statute. Moreover, it would also have been reasonable for the Special Prosecutors to have defined the conspiracy more broadly, and used some or all of the earlier evidence of torture and cover-up as part of the proof of the ongoing obstruction of justice conspiracy which continues today.[10]

## FAILURE TO HOLD DALEY, DEVINE, AND OTHER OFFICIALS ACCOUNTABLE FOR THEIR ROLES IN THE TORTURE SCANDAL

*The Special Prosecutors ignored the failure of former Cook County State's Attorney Richard M. Daley, State's Attorney Richard A. Devine, and various other high-ranking officials to investigate and prosecute police officers who engaged in a documented pattern of torture and wrongful prosecution of torture victims.*

The Special Prosecutors largely ignored or obfuscated the roles in the torture scandal of various high-level officials of the City of Chicago, the Chicago Police Department, and the Cook County State's Attorney's Office. Among officials who knew that prisoners were being tortured by Burge and his subordinates, and who had the power and duty to intervene to stop the torture,

---

[10] Since the Special Prosecutors issued their Report, approximately 15 former Area 2 supervisors and detectives, including Byrne, Dignan, McWeeny, and Paladino, have given additional, detailed, sworn federal court testimony denying any involvement or knowledge of torture. These denials are clearly within the five year Federal statute of limitations for the offenses of obstruction of justice, perjury, conspiracy, and racketeering. A comprehensive list of these potential criminal acts, from 1979 to the present, can be found in Appendix A.

9

SMITH-000716

were Richard M. Daley, both in his capacity as State's Attorney until 1989 and as Mayor since then; Richard A. Devine, the First Assistant State's Attorney under Daley and presently the State's Attorney; and Jane M. Byrne, who was Mayor when the torture allegations surfaced.

Within weeks of their appointment, the Special Prosecutors were notified that Richard Brzeczek, the Superintendent of Police in 1982 when Andrew Wilson was tortured at Area 2, had stated that he was certain that there had been torture at Area 2 under Burge. (*Chicago Tonight*, WTTW TV 11, April 30, 2002)

Brzeczek subsequently told the Special Prosecutors that in 1982 — after Dr. John Raba, the director of Cermak Medical Services, notified him by letter that Wilson claimed to have been tortured at Area 2 and that Wilson's allegation was corroborated by photographs and medical evidence — he wrote to State's Attorney Daley, notifying him of the allegation and enclosing a copy of Dr. Raba's letter. Brzeczek's letter to Daley stated that he was deferring investigation of Wilson's allegations until or unless the State's Attorney's Office authorized him to proceed. (Id.) Brzeczek also informed the Special Prosecutors that he believed that he had informed Mayor Byrne of the torture evidence sent to him by Dr. Raba. (Id.)

Instead of capitalizing on a *cooperative* Brzeczek and his knowledge of the evidence supporting Wilson's allegations and investigating the roles that Daley, Devine, Byrne, and other officials played in the ensuing cover-up of the on-going torture, the Special Prosecutors attempted to discredit both Brzeczek and his story. The Special Prosecutors repeatedly questioned Brzeczek under oath, and brought him before the Special Grand Jury, where, despite appearing voluntarily and without immunity, he was aggressively interrogated by both Egan and Boyle. (Statement of Richard Brzeczek, March 9, 2005; Grand Jury Testimony of Richard Brzeczek, October 5, 2005)

SMITH-000717

In contrast, there is not a single written memo, statement, or transcript documenting any formal or informal questioning of Daley, Devine, Byrne, or of any of their high ranking subordinates, until after the Special Prosecutors announced in early 2006 that their investigation was wrapping up and their Report would soon be issued. Then, apparently as an after thought, the Special Prosecutors conducted brief, informal interviews with Daley, Devine, and Byrne. In these interviews, which were not transcribed by the Special Prosecutors, Daley and Devine acknowledged that they had seen the Brzeczek letter. Byrne denied that Brzeczek had ever told her about Dr. Raba's letter. She did admit that she had met with Burge three times while he was leading a manhunt for the men who killed Police Officers William Fahey and Richard O'Brien on February 9, 1982 — the crime in connection with which Andrew Wilson was tortured. The manhunt, she added, was pursuant to her plan for "direct action." (Special Prosecutors' Memoranda dated January 6, January 16, and February 2, 2006)

In April 2006, the Special Prosecutors publicly stated that there would be no indictments and that the Report was essentially complete. The release of the Report, however, was delayed because attorneys for Burge and his subordinates appeared before Judge Biebel and opposed its release. In May, the media began to question why there would be no indictments. Lawyers for the victims responded that the responsibility fell on Daley and Devine because they *should have* indicted Burge for Wilson's torture 24 years earlier. At this point, Brzeczek predicted in widely reported interviews that the Special Prosecutors would scapegoat him in order to absolve Daley and Devine.

Apparently to defend against Brzeczek's charge, Egan and Boyle launched a last minute "investigation" of Daley and Devine's role in the Wilson case. The Special Prosecutors began by taking a sworn statement from former First Deputy State's Attorney William Kunkle, who

11

SMITH-000718

had been next in command to Daley and Devine when Wilson was tortured. In his statement, Kunkle revealed several communications with Daley and Devine concerning the Brzeczek letter and its contents, and acknowledged that they all knew that the facts in the letter established criminal conduct. (Statement of William Kunkle, May 10, 2006) In his statement, Kunkle also removed himself from the chain of responsibility for refusing to investigate and prosecute Burge, instead passing it on to Daley, Devine, and the Special Prosecutions Unit of the State's Attorneys' Office (Id.) Confronted with this apparently unanticipated turn of events, Egan and Boyle attacked and attempted to discredit Kunkle (Special Prosecutors' Report, pp. 126-30)

In June 2006, in response to Kunkle's claims, the Special Prosecutors took sworn statements from Daley and Devine. In his statement, Daley backed off his prior *informal* concession that he most likely received the Brzeczek letter, while Devine conceded the knowledge that Kunkle attributed to him and Daley, thereby corroborating their central role in the failure to investigate and prosecute Burge for torturing Wilson. (Statement of Richard M. Daley, June 12, 1006; Statement of Richard Devine, June 15, 2006)[11]

The Special Prosecutors asked no additional questions of Daley and Devine concerning their subsequently acquired knowledge of torture at Area 2 or about their failure to take action during Daley's tenure as State's Attorney and Mayor and during Devine's tenure as State's Attorney. U.S. Magistrate Judge Geraldine Soat Brown has recently found that "the statement taken by the Special Prosecutor from Mr. Daley contains little useful information. It consists almost entirely of leading questions posed by [Egan and Boyle], often prefaced by long factual

---

[11] According to Devine, after Daley had given his June statement, but before Devine gave his three days later, they discussed the substance of Daley's testimony, particularly that portion where Daley asserted that he delegated responsibility to his subordinates in Wilson and other cases when he was State's Attorney.

SMITH-000719

recitations." (*Hobley v. Burge*, Memorandum Opinion and Order of Magistrate Judge Brown, 2007 U.S. Dist. LEXIS 12159, February 23, 2007) Brown then ordered that Daley sit for what the *Chicago Tribune* described as a "blockbuster" deposition. (Id.; *Chicago Tribune*, February 25, 2007)

The evidence before the Special Prosecutors also revealed that while Daley was State's Attorney, more than 50 additional cases of torture arose in Area 2. Assistant State's Attorneys (hereinafter ASAs) sought — and obtained — death sentences in several such cases. In addition, ASAs under Daley took purported confessions from a number of torture victims. When torture allegations were raised in court by victims, other Daley ASAs defended the veracity of such confessions, claiming that no torture had occurred.

Then, in 1992, three years after Daley became Mayor, he received a report (hereinafter the Goldston Report), based on an internal investigation by Michael Goldston of the Police Office of Professional Standards (hereinafter OPS), stating that Burge and his subordinates had engaged in "systematic" torture and abuse for more than a decade.

Instead of taking the Goldston Report seriously and ordering the Chicago Police Department (hereinafter CPD) to take action, Daley publicly condemned the OPS methodologies and conclusions. (*Chicago Tribune*, February 8, 1992) The evidence before the Special Prosecutors also showed that for eight years Devine and his law firm, acting as specially appointed corporation counsel, earned more than $1 million defending Burge against Wilson's and other victims' charges of torture, then, for the next five years, as the State's Attorney of Cook County, Devine blocked all substantive investigations of Area 2 torture, defended against

13

SMITH-000720

the claims of torture raised by criminal defendants, and continued to rely on these defendants' confessions obtained by torture in arguing that their convictions should be upheld.[12]

None of this evidence was explored with Daley, Devine, or anyone else, nor does it appear that it was seriously scrutinized by the Special Prosecutors. Moreover, neither Daley nor Devine receive *any* blame or criticism in the Special Prosecutors' Report for their failures to investigate and prosecute *anyone* involved in the torture scandal. Instead, the Report criticized Brzeczek and, to a lesser extent, Kunkle, for not taking action that Daley and Devine should have taken but did not.

Without the participation of Daley and Devine as silent accomplices, the torture at Areas 2 and 3 could not have continued. Yet the Special Prosecutors did not expressly blame Daley or Devine, saying only that, "The actions of the State's Attorney's Office and the Chicago police department do not redound to their credit" (Special Prosecutors' Report, p. 151) and reflected "a bit of slippage in the State's Attorney's Office." (Chicago Tribune, July 20, 2006)

### FAILURE TO DOCUMENT THE SYSTEMIC AND RACIST NATURE OF THE TORTURE AND TO BRAND IT AS TORTURE

*The Special Prosecutors did not document the systemic and racist nature of the torture and did not brand it as such in accordance with the international definition of torture.*

In evaluating the individual cases of torture and the credibility of the victims, the Special Prosecutors did not analyze or utilize a vast amount of evidence of common scheme, plan, and motive by Burge and his men to torture suspects. Similarly, the Special Prosecutos refused to

---

[12] The refusal to investigate continued from 1997 until 2002 when Judge Biebel found that Devine and his office had an actual conflict of interest and appointed the Special Prosecutors to investigate Area 2 torture. In April of 2003, Judge Biebel disqualified Devine and the SAO from further involvement in prosecuting cases where the defendant alleged police torture.

SMITH-000721

rely on the numerous official findings, admissions, and decisions of individual and systemic torture. The Report never finds that the "abuse" described above was in reality torture as defined by state, federal or international law. Neither does the Report discuss or condemn the racist nature of the torture or the admitted racist attitudes of the torturers. In fact, those who committed torture, with the exception of Burge, were not named in the Report.

Moreover, there was no mention of the fact the torture techniques alleged were similar in many cases — electric shock, suffocation by baggings, mock executions, and beatings designed to leave no marks — even though the Special Prosecutors professed to find many of the allegations believable. Additionally, there is no mention of the hundreds of times that Area 2 and 3 detectives and supervisors appeared in court and testified that they had not witnessed, participated in, or otherwise become aware of torture, even though the Special Prosecutors professed to believe many of the torture claims that the officers had denied under oath.

In the face of all of this evidence, the Report stated only, without further analysis, that Burge was "guilty" of "abus[ing] persons with impunity," that it therefore "necessarily follows that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they," and that "there are many other cases that lead us to believe or suspect that the claimants were abused." [13]

Not once did the Report use the word "torture," using in its place such terms as "abuse" and "mistreatment." It was only at the press conference following release of the Report that the Special Prosecutors somewhat reluctantly acknowledged that the conduct amounted to torture. Also, it was only at the post-release press conference that they reluctantly stated that they

---

[13] Special Prosecutor Boyle said that they "believed" that abuse had taken place in "about half" of the 148 cases they investigated.

SMITH-000722

believed abuse had occurred in 74 of the cases; that the allegations "seemed to center on a crew known as the midnight crew;" and that "there are a number of officers who seem to predominate relative to the number of allegations that are made, allegations that we have said that we think happened."

### Findings, decisions, and admissions[14]

In 1990, Michael Goldston completed his study of some fifty alleged torture cases that occurred from 1972 through 1985 in Area 2 and made the following findings in a report submitted to Police Superintendent Leroy Martin, who previously had served as Burge's commander at Area 2:

> As to the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse. The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Particular command members were aware of the systematic abuse and participated in it either by actively participating in same or failing to take any action to bring it to an end. This conclusion is also supported by the number of incidents in which Area 2 offices are named as the location of the abuse. (OPS Special Project Conclusion Reports and Findings, November 2, 1990 (Goldston Report))

In supplemental findings, the OPS found that Detectives Jon Burge, John Byrne, Peter Dignan, John Yucaitis, and Charles Grunhard were "players" who were repeatedly named as abusers. (OPS Director Shines' letter to CPD Superintendent Martin and attached supplemental findings, April 30, 1991) Among the fifty cases studied, there were nine cases of electric shock, eleven cases of suffocation by bagging, one hanging, and one threatened hanging. (Id.)

---

[14] A complete listing and summary of all these findings, decisions and admissions can be found in Appendix B.

16

In January 1992, City lawyers, on behalf of CPD Superintendent Leroy Martin and the

City, filed the following judicial admission at Police Board Hearings concerning the testimony of

"seven additional victims of torture tactics at Area II headquarters:"[15]

> The testimony regarding similar acts sets forth detailed accounts of tortuous treatment
> that are almost identical to the torture suffered by Andrew Wilson. The testimony reveals
> an astounding pattern or plan on the part of respondents [Burge, Yucaitis and O'Hara] to
> torture certain suspects, often with substantial criminal records, into confessing to crimes
> or to condone such activity. (Memorandum In Opposition to Motion to Bar Testimony
> Concerning other Alleged Victims of Police Misconduct, filed before the Police Board in
> the *Matter of Charges Filed against Respondents Jon Burge, John Yucaitis and Patrick
> O'Hara,* Case Nos.1856-58, January 22, 1992, p. 1)

In 1993 and 1994, OPS investigators found:

- That Area 2 Sergeant John Byrne struck Darrell Cannon with a cattle prod on his
  testicles and penis and in his mouth, repeatedly called Cannon a "nigger;" and held a
  9 mm handgun to Cannon's head; that Detective Peter Dignan played Russian
  roulette with a shotgun, attempted to lift Cannon by his handcuffs, and put a shotgun
  to Cannon's head; and that detective Charles Grunhard lifted Cannon up while Byrne
  held onto the cuffs; (OPS Investigator Tillman's findings in CR No. 134723)

- That Area 2 Detectives Ronald Boffo and James Lotito repeatedly struck Philip
  Adkins about the body and groin area with a flashlight; and that Lotito and Dignan
  made false reports to OPS concerning Adkins' injuries; (OPS Investigator
  Lawrence's findings in CR No. 142201)

- That Byrne and Grunhard used excessive force against Gregory Banks; that Byrne
  testified falsely in court that Gregory Banks was not physically abused in police
  custody; that Byrne, Dignan, Grunhard, and Robert Dwyer failed to report to a
  supervisor the use of excessive force against Banks; and that Byrne, Dignan, Dwyer
  and Grunhard gave false information while providing a statement to OPS about
  Banks; (OPS Investigator Cosey's findings in CR No. 188617)

- That Byrne and Boffo repeatedly struck and kicked Stanley Howard about the body
  and leg; and that Lotito repeatedly struck Howard about the body and jerked

---

[15] The seven victims relied upon by the City were Leroy Orange, Melvin Jones, Anthony Holmes, George
Powell, Donald White, Shadeed Mumin, and Lawrence Poree. (Memorandum In Opposition to Motion to
Bar Testimony Concerning Other Alleged Victims of Police Misconduct, filed before the Police Board in
the *Matter of Charges Filed against Respondents Jon Burge, John Yucaitis, and Patrick O'Hara,* Case
Nos. 1856-58, January 22, 1992, pp. 7-14)

17

SMITH-000724

Howard's body in the air causing the handcuffs to cut into Howard's wrists; (OPS Investigator Lawrence's Findings in CR No. 142017)

- That Dignan and Area 2 Detective David Dioguardi struck Lee Holmes with a rubber hose and placed a plastic bag over Holmes's head. (OPS Investigator Tillman's Findings in CR No. 126802)

On May 15, 1995, the City of Chicago admitted in a judicial filing in federal court that Jon Burge had in fact tortured Melvin Jones by threatening him with a gun and electrically shocking his genitals while Jones was handcuffed to a wall at Area 2. (*Wilson v. City of Chicago*, 86-C-2360, Local Rule 12 N Statement of the City, ¶ 26.) In *Wilson v. City of Chicago*, 120 F.3d 681, 683-85 (7th Cir. 1997), the City, in its appellate brief, conceded that "a properly instructed jury could have reasonably found that Burge participated in *such savage torture* of Wilson that the outrageousness of his conduct removed him from the scope of his employment," and the Seventh Circuit Court of Appeals held that Burge acted "within the scope of his employment" with the City "when he tortured Wilson," stating:

Burge was not pursuing a frolic of his own. He was enforcing the criminal law of Illinois overzealously by extracting confessions from criminal suspects by improper means. He was, as it were, too loyal an employee. He was acting squarely within the scope of his employment. (*Wilson,* 120 F.3d, at 683-85)

In 1999, U.S. District Court Judge Milton I. Shadur found:

It is now common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis. (*U.S. ex. rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D. Ill. 1999))

In January of 2003, Illinois Governor George H. Ryan granted four death row Burge torture victims, Madison Hobley, Leroy Orange, Stanley Howard, and Aaron Patterson, pardons based on innocence, finding:

18

SMITH-000725

The category of horrors was hard to believe. If I hadn't reviewed the cases myself, I wouldn't believe it. We have evidence from four men, who did not know each other, all getting beaten and tortured and convicted on the basis of the confessions they allegedly provided. They are perfect examples of what is so terribly broken about our system. (Statement of Governor George Ryan, DePaul University School of Law, January 10, 2003)

In her concurring opinion in *Hinton v. Uchtman*, 395 F 3d 810, 822-23 (7th Cir. 2005),

Seventh Circuit Court of Appeals Judge Diane Wood found that "police abuse ran rampant" at

Area 2 under Burge and that:

[A] mountain of evidence indicates that torture was an ordinary occurrence at the Area Two station of the Chicago Police Department during the exact time period pertinent to Hinton's case [November 1983]. Eventually, as this sorry tale came to light, the Office of Professional Standards Investigation of the Police Department looked into the allegations, and it issued a report that concluded that police torture under the command of Lt. Jon Burge — the officer in charge of Hinton's case — had been a regular part of the system for more than ten years. And, in language reminiscent of the news reports of 2004 concerning the notorious Abu Ghraib facility in Iraq, the report said that "[t]he type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture." The report detailed specific cases . . . Behavior like that attributed to Burge imposes a huge cost on society: it creates distrust of the police generally, despite the fact that most police officers would abhor such tactics, and it creates a cloud over even the valid convictions in which the problem officer played a role. Indeed, the alleged conduct is so extreme that, if proven, it would fall within the prohibitions established by the United Nations Convention Against Torture ("CAT"), which defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession . . .," thereby violating the fundamental human rights principles that the United States is committed to uphold.

Only months after the *Hinton* decision, on May 19, 2006, the United Nations Committee

Against Torture (CAT) stated that:

- The Committee is concerned with allegations of impunity of some of the State party's [U.S. Government's] law enforcement personnel in respect to acts of torture or cruel, inhuman or degrading treatment or punishment. The Committee notes the limited investigation and lack of prosecution in respect to the allegations of torture perpetrated in Areas 2 and 3 of the Chicago Police Department (article 12).

- The State party should promptly, thoroughly and impartially investigate all allegations of acts of torture or cruel, inhuman or degrading treatment or punishment

SMITH-000726

by law enforcement personnel and bring perpetrators to justice, in order to fulfill its obligations under article 12 of the Convention. The State party should also provide the Committee with information on the ongoing investigations and prosecution relating to the above-mentioned case. (Conclusions and Recommendations of the UN Committee Against Torture, May 19, 2006, & 25, p. 7)[16]

### Statements and testimony by Area 2 officers

The Special Prosecutors were presented with numerous statements of Area 2 detectives that corroborated the existence of systemic, racist torture at Area 2, but no mention of this evidence can be found in their Report. The first source was a series of letters sent in 1989 to Andrew Wilson's lawyers during his civil trial by an anonymous Area 2 source. This source correctly identified torture victim Melvin Jones, named the core members of Burge's torture crew, including Byrne, Dignan, Yucaitis, Paladino, Hill, and Glynn, and stated:

> I believe that I have learned something that will blow the lid off your case. You should check for other cases where Lt. Burge was accussed (sic) of using this devices (sic). I believe he started many years ago right after he became a detective. . . . I have checked into who was assigned to Area 2 while this was going on and have some comments on the people assigned. You must remember that they all knew as did all of the State's Attorneys and many judges and attorneys in private practice. (First and Second Letters from anonymous police source, postmarked February 2, and March 6, 1989)

The source also asserted that Donald White and his brothers — who were picked up in connection with the murder of Chicago Police Officers Fahey and O'Brien — were beaten at police headquarters with the knowledge of State's Attorney Daley, Mayor Byrne, Superintendent Brzeczek, and Chief of Detectives William Hanhardt:

---

[16] In response to the public furor after the release of the Special Prosecutors' Report, Mayor Daley, while refusing to admit to his role in the scandal, made the following public admissions in a July 21, 2006 press statement: That the City "strongly supported the release of the Special Prosecutors' Report on the practice of abuse and torture of suspects in the 1970's and 1980's at the Calumet Police District [Area 2]" because "the public has the right to know about this shameful episode in our history;" that "no suspect should be subjected to the abuses detailed in [the Special Prosecutors'] Report, and no suspect should ever be coerced into confessing to crimes he did not commit. This fundamentally undermines our system of justice and destroys public confidence. It should never happen;" and that "Burge and his Unit" participated in a "pattern of misconduct." (Press Statement of Richard M. Daley, July 21, 2006, pp. 1-2)

SMITH-000727

Several witnesses including the Whites were severely beaten at 1121 S. State Street in front of the Chief of Detectives, the Superintendent of Police and the State's Attorneys, that Mayor Byrne and State's Attorney Daley were aware of the actions of the detectives, that ASA Angarola told both of them and condoned their actions . . . Mayor Byrne and State's Attorney Daley ordered that numerous complaints filed against the police as a result of this crime not be investigated, and that this order was carried out by an OPS investigator named Buckley who is close to Alderman Burke. (First Letter from anonymous police source, postmarked February 2, 1989)

In subsequent letters, the source further stated that:

Burge hates black people and is an ego maniac. He'd do anything to further himself. . . [T]he common cord is Burge. The machines and plastic bags were his and he is the person who encouraged their use. You will find that the people with him were either weak and easily led or sadists. He probably did this because it was easier than spending the time and the effort talking people into confessing. . . You could check in the taverns at 103rd and at 92 and Western and you will find that Burge youse (sic) to brag about everyone he beat. (Third and Fourth Letters from anonymous police source, postmarked March 15 and June 16, 1989)

During the Special Prosecutors' investigation, five retired African American, former Area 2 detectives broke the code of silence by giving sworn testimony to lawyers representing several *pardoned* torture victims. One of the five, Detective William Parker, testified that while working at Area 2 as a robbery detective in September 1973, he heard a shrill cry coming from an interrogation room. As he opened the door to the interrogation room, he saw an African American man, handcuffed to radiator with his pants pulled down. Next to the man were Jon Burge and two other white detectives. Surprised to see Parker at the door, one of the detectives took something off the desk and put it on the floor. He later concluded that the detectives were attempting to conceal Burge's electric-shock box. Parker described the African American male as looking panicked, scared and in pain. Following the incident, one of the detectives told Parker that their investigation was not any of his business and that he had no right to barge in while they were interrogating the suspect. Not long after the incident Parker was transferred out of Area 2. (Statement of William Parker, October 4, 2004, pp. 5-16)

SMITH-000728

In November 2004, Sergeant Doris Byrd testified that between 1981 and 1984, while she worked at Area 2, detective Frank Laverty came forward (during the George Jones trial) and exposed the existence of secret street files used by Chicago Police detectives. In what Byrd called a message to other officers who considered breaking their code of silence, Burge pointed a gun at the back of Laverty's head as he left a room at Area 2 and said "bang." Furthermore, she testified that while she was assigned to Area 2 she would often remain on duty after 1:00 a.m. and on occasion would hear screaming and other unusual noises coming from interview rooms. She remembered hearing detainees saying "stop hitting me," or "what are you hitting me for?" Byrd further testified that she was told by individuals who were interrogated at Area 2 that detectives had physically abused them with telephone books, plastic bags, and an electric shock box. She said that "the black box was running rampant through the little Unit up there," that she heard about it both from detectives and suspects, that the telephone books, bags, and the electric shock box were an "open secret" at Area 2, and that this kind of abuse was linked to Burge and Byrne and the midnight shift. (Statement of Doris Byrd, November 9, 2004, pp. 8-12, 16)

Moreover, Byrd testified that when she was in the Area 2 stationhouse during the manhunt for the killers of police officers Fahey and O'Brien in 1982, she observed an African American man attached to a hot radiator. She said it was her understanding that Burge was given a mandate by Mayor Byrne to do anything he had to do, including using torture tactics, to solve the murders of Fahey and O'Brien. According to Byrd, following Gregory Banks' arrest, detectives working the midnight shift obtained a statement from him which she understood was obtained by torture. She further stated that it was well known that Burge and his subordinates used torture to obtain confessions and it was an "open secret" at Area 2. She further testified that Burge was a racist, that Byrne, Dignan, Paladino, Hill, George Basile, and Frank Glynn

22

SMITH-000729

were all members of his torture team, and that after an anonymous police source named her as a possible "weak link," she received a call from a Chicago Police Captain who was a friend of Dignan's named Phelan, who said that Dignan was worried about her testifying against him. (Id. at 13, 22-23, 26-29)

Melvin Duncan, a retired homicide detective who worked at Area 2 during the 1970s, gave a sworn affidavit to victims' attorneys in May 2004 in which he stated that during a visit to the Area 2 Robbery Office, he saw a dark wooden box. He thought the box could give electric shocks, like an electrical device with a crank, wires and prongs which his father had demonstrated on him and his brother when he was a child. He further stated that while working at Area 2 he sometimes heard loud and unusual noises coming from the Area 2 Robbery Unit Office and that he heard that certain detectives used an electrical box and cattle prods on people to obtain confessions. He further averred that while working with detective Peter Dignan at Area 2, he formed the opinion, based on Dignan's treatment of an African American crime victim, that Dignan had racist attitudes. (Affidavit of Melvin Duncan, May 20, 2004, pp.1, 4, 5-7, 10)

In a sworn statement dated November 2, 2004, Walter Young testified that in 1980, while he was assigned to Area 2, that he saw a box-like object with what appeared to be a crank in the basement of Area 2, and that after hearing stories and conversations from other Area 2 detectives, he concluded that the box he saw might have been the electrical box that was said to have been used on certain people brought into the Area. He further testified that in the conversations that he overheard at Area 2, there were references to the Vietnamese and Vietnam, that suspects could be made to talk if the same techniques were basically used that were used in Vietnam, that the term "Vietnam special" or "Vietnam treatment" was used, and that based on seeing the box, and overhearing conversations, he later deducted that the

SMITH-000730

"Vietnam treatment" probably referred to the use of electric shock.[17] Young testified that on one

occasion, while walking past an interview room, he heard unusual noises, saw Burge walking

out of the room, and an African American suspect sitting on the floor handcuffed to a ring on

the wall. Young further stated that Burge had a reputation of being forceful in his investigations,

that during the manhunt for the killers of officers Fahey and O'Brien in February 1982, he

overheard conversations from detectives that force was being used on suspects, and that he

heard Area 2 detectives say that a phone book would sometimes help people refresh their

memories, that phone books don't leave marks, and that plastic bags help to cushion the phone

book. Young also concluded from the way he and his fellow African American detectives were

treated by Jon Burge, that Burge was a racist. (Statement of Walter Young, November 2, 2004,

pp. 2-4, 6-8, 10, 12, 18, 27-28, 31)

In his October 17, 2004 sworn statement to victims' attorneys, former Area 2 detective

Sammy Lacey testified that during the 1980s police personnel working at the Fifth District

police station (which was on the first floor of Area 2), asked him "what was going on on

midnights," and "what are they doing to people up there on midnights?" Lacey further averred

that Jon Burge was often present at Area 2 when Lacey left work at the end of his shift at

midnight and "if there was any questioning, he was there." He stated that he was present at

Police Headquarters when Donald White was brought there as a suspect in the Fahey and

---

[17] Burge was a military police interrogator assigned to a prisoner of war compound in Vietnam. In his February 2005 article entitled *The Tools of Torture, Chicago Reader* John Conroy reported on his interviews with officers who served with Burge in Vietnam, and their knowledge of the use of electric-shock torture on POWs by U.S. soldiers and military policemen. This electric shock torture was delivered by a hand cranked generator that also served as a military field telephone. Additionally, a childhood friend of Burge's, radio personality Ed Schwartz, recounted how Burge was an "electrical whiz" who rigged up a communications system for a school play which included "a telephone control box which contained a little crank that generated voltage to ring a bell for a closed circuit phone system." (*Southtown Economist*, "Jon Burge, Grade School Patrol Boy and Electrical Whiz," July, 20, 2006)

24

SMITH-000731

O'Brien murders, and that he was left downstairs with Commander Milton Deas, (who is African American), while Burge and Chief of Detectives William Hanhardt took White to another floor where White alleged that Burge and his men tortured him. (Statement of Sammy Lacey, October 17, 2004, pp. 16-17; Deposition of Donald White in *Wilson v. City v. Chicago*)

In his statement, Lacey said that when Burge left Area 2 to work at Area 3, many of the midnight shift detectives went with him. Lacey went on to say that he heard (off the record) that strange things were going on there and that a lot of confessions were being obtained. Lacey further stated that Burge did not permit African American detectives to work the midnight shift or to investigate homicides, and that when Area 2 Commander Leroy Martin was notified of this scheme, Burge found out and subsequently berated the African American detectives the next day. (Statement of Sammy Lacey, October 17, 2004, pp. 16-20; Statement of Sammy Lacey to the Special Prosecutors, October 12, 2004)

On September 20, 2004, Investigator Mort Smith interviewed Barry Mastin, an African American and former Area 2 general assignments detective who worked on the first floor of Area 2 from 1972 to 1977. He said that it was an "open secret" that certain white detectives tortured and abused suspects on the second floor. He said that suspects were often brought through the back door and held incommunicado for several days. He also heard that a suspect was held out the window by his ankles during an interrogation, accidentally dropped and charged with attempted escape. (Mort Smith Memorandum of interview with Barry Mastin, January 25, 2005) In late 1993, OPS investigator Veronica Tillman interviewed Raymond Peterson, the building engineer at the old Area 2, located at 91st and Cottage Grove. According to Peterson, Area 2 had a "nasty reputation" and that "a lot of abuse went on in that station." (OPS Investigator Tillman Interview with Raymond Peterson in CR No. 202019)

SMITH-000732

Less than a month before he died, white Area 2 homicide detective Frank Laverty gave a sworn statement concerning his knowledge of Burge, Area 2 torture, and the racist attitudes that predominated at Area 2. Laverty testified that one robbery detective told him that he "wasn't going to kiss no nigger's ass if he was transferred into homicide." (Statement of Frank Laverty, November 10, 2006, p. 3) Laverty further stated that "unfortunately" the term "nigger" was commonly used at Area 2. Among those with racist attitudes, Burge "stood out as having more of that attitude." (Id. at 4, 16)

Laverty further testified that when he made the arrest of Donald White (for the murders of Fahey and O'Brien on February 12, 1982), and was preparing to transport him back to Area 2, Burge took the prisoner from him. In response, Laverty testified that he told Burge "I'm turning him over to you and there ain't nothing wrong with him; he hasn't been touched." (Id. at 4-5) Laverty said that he feared that White would be harmed. (Id. at 5) According to Laverty, Burge took White to Police Headquarters, where Laverty heard that despite repeatedly maintaining his innocence in the murder of the police officers, White was extensively beaten by Area 2 detectives while in the presence of Burge and Chief of Detectives Hanhardt. (Id. at 6-7) Laverty further learned that White was subsequently taken to a civilian polygraph examiner who worked for the CPD at Police Headquarters. The polygrapher later confirmed to Laverty that Burge and Hanhardt had been involved in the beating, and said that White was so bloody and beaten when he was brought in for the polygraph that White "should have been in the hospital, not a polygraph office." (Id. at 8) A "big argument" ensued, and the polygraph examiner was later fired for his resistance to polygraphing White. (Id. at 8-10) The Special Prosecutors did not interview Laverty.

Additionally, in a March 2004 sworn videotaped statement, Eileen Pryweller, sister of Area 2 detective Robert Dwyer, stated that she had a conversation with her brother and Jon

SMITH-000733

Burge at Dwyer's house in mid-January, 1987. During that conversation, Burge and Dwyer described how they dealt with "niggers" during interrogations, stating that they'd "give them hell," "beat the shit out of them, throw them against walls, burn them against the radiator, smother them, poke them with objects, [and] do something to some guys' testicles." Pryweller further testified that Dwyer said, "this skinny little nigger, boy I got him [by] just torturing him, smothering him," while Burge laughed. They made an additional reference concerning this torture victim's case that established that they were talking about Madison Hobley. She further testified that Burge seemed proud of his torture tactics, that he and Dwyer were "full of hate," that Burge "described some techniques that he had that no one could even fathom," and that Dwyer said he could "make anyone confess to anything." Pryweller went on to say that in the summer of 2002, while visiting Marin County, California, for her sister's funeral, her brother, Robert Dwyer, approached her and in a private conversation, brought up Burge and the 1987 conversation, and conveyed what she perceived to be a threat. (Statement of Eileen Pryweller, March 11, 2004, pp. 5-6, 9-13, 24-32)

### Admissions by Area 2 officers

The Special Prosecutors were also presented with a series of admissions made in sworn testimony by numerous Area 2 officers, that the use of racial epithets, particularly the racist term "nigger," was commonly used by Burge, Byrne, and numerous of their detectives at Area 2. Specifically, John Byrne, in sworn testimony at his March 1, 2001 deposition in *People v. Patterson*, and Peter Dignan, in his 1996 sworn deposition in *Wiggins v. Burge*, both admitted that they, Burge and other Area 2 officers commonly used the term "nigger." (Deposition of John Byrne in *People v. Patterson*, pp. 67-68, 136, 181; Deposition of Peter Dignan in *Wiggins v. Burge*, pp. 60-63, 64-65) Additionally, in sworn depositions given in the cases of *Evans v.*

27

SMITH-000734

*City of Chicago and Terry v. City of Chicago*, Sergeant Thomas Ferry, and detectives Fred Hill, Tony Katalinic, Joseph DiGiacomo, and John Ryan also admitted to either repeatedly using the term, or of hearing other detectives repeatedly use it. Ferry also admitted that Burge had a reputation for mistreating suspects during the time that Ferry was a sergeant at Area 2 in the late 1970s and early 1980s. The Special Prosecutors' Report makes no mention of these admissions.

### Expert opinions and testimony of assistant public defenders

The Special Prosecutor was also presented with the opinions of several internationally respected experts on torture and police practices. Dr. Robert Kirschner testified in a suppression hearing in an Area 2 case that over a 15-year period he had evaluated approximately two hundred torture victims around the world, and that he had often been called on to evaluate whether there was systematic torture being practiced by the police and other governmental authorities. Kirschner further testified that he had done much of his work on behalf of the United Nations, for whom he had written portions of a protocol that defined the methodologies of torture and how to properly investigate and evaluate cases of alleged torture. (Testimony of Robert Kirschner, *People v. Cannon*, November 11, 1999, pp. 5-6, 10-45, 57-59, 69, 80-81, 90-93, 96) Dr. Kirschner further testified that in his opinion there was a pattern and practice of torture at Area 2 and later at Area 3 Headquarters under the command of Jon Burge, and that this opinion was based, *inter alia*, on his evaluations of several alleged Area 2 and 3 torture victims, including Andrew Wilson, Darrell Cannon, Leroy Orange and Marcus Wiggins; the fact that frequent allegations of electric shock, bagging, and Russian Roulette only arose from Area 2 and later from Area 3 Headquarters while Jon Burge was the commander, and not against other officers in other station houses; and that the patterns and methodologies at Area 2 and 3 under Burge and

28

Byrne closely mirrored those which he observed, investigated, and evaluated in places such as Turkey and Israel. (Id. at 5-6, 10-45, 57-59, 69, 80-81, 90-93, 96)

Kirschner, who also served for many years as Deputy Chief Cook County Medical Examiner, also testified that during his work on homicide cases, he had discussions with detectives who acknowledged that there was torture at Area 2. (Id.) That Area 2 torture was common knowledge in the Criminal Courts of Cook County as early as the late 1970s was also confirmed by several Cook County Assistant Public Defenders who were interviewed by the Special Prosecutors. Specifically, former Assistant Public Defender Janet Boyle, who represented Area 2 victims in the late 1970s, told the Special Prosecutors that she "heard a lot of rumors and innuendos" in those days about "abuses by Area 2 detectives," "particularly Red Burge." (Summary of Special Prosecutors' Interview with Janet Boyle, April 6, 2005) Assistant Public Defender Tom Allen, who represented victims Sylvester Green and Eric Smith in the early 1980s, and is now a Chicago alderman, stated that it was "common knowledge" that abuse took place at Area 2 which he described as a "torture chamber" and that this abuse included electric shock, baggings, and beatings with a telephone book. (Summary of Special Prosecutors' Interview with Tom Allen, July 14, 2005)

Lee Carson, a Unit Supervisor in the Public Defender's Office, represented torture victims Gregory Banks, Thomas Craft and Alex Moore in the mid 1980s. He stated that Area 2 had a "reputation" for its "methods" within the Public Defenders' Office, and when he told a supervisor about Banks' allegations that he had been bagged, the supervisor responded, "Oh, that would be Area 2." (Summary of Special Prosecutors' Interview with Lee Carson, May 12, 2004) Carson said that he started to document "patterns" of abuse, including baggings, arising from Area 2, that Area 2 detectives "knew how to inflict pain without leaving marks in a number of

SMITH-000736

ways," and that Area 2 detectives were "skillful in their ability to have a different funny story" to explain the allegations of torture and abuse in each case. (Id.) He specifically named Byrne, Dignan, and Grunhard as frequently named torturers, said that torture and abuse at Area 2 was "common knowledge" in the 1980s, that "everyone down there [Area 2] knew about it but weren't talking about it," and said that his senior supervisors, including Tom Allen and James Epstein, told him that "there's (sic) a lot of complaints that come out of that place." (Special Prosecutors' Memorandum from Matens to Boyle, July 10, 2005)

Dr. Antonio Martinez, who had treated two hundred victims of torture and supervised treatment in eight hundred other such cases, evaluated several Area 2 victims and found psychological markers consistent with torture. (Testimony of Antonio Martinez in *People v. Cannon,* July 17, 1999, pp. 10-11, 32, 53, 58-59) Dr. Ross Romine, who worked for the Cermak Health Services, told the Special Prosecutors that "ear cupping" injuries were common at the jail and that it was common knowledge among the staff that they were the result of arrestees being slapped on the side of the head by police. (Special Prosecutors' Summary of Interview with Ross Romine, August 30, 2004)

Anthony Bouza, the former Police Superintendent of the City of Minneapolis, and a former New York City Borough Commander, hired by victims' attorneys in the civil cases, proffered the following opinions, which also were supplied to the Special Prosecutors:

- That, from 1972 to 1991, the City of Chicago had a systemic practice of subjecting African-Americans who were interrogated by Area 2 and 3 detectives and supervisors to abusive and coercive interrogations with the intended result of coercing, fabricating or otherwise creating false and/or unreliable inculpatory evidence to be used against the interrogated suspect without regard to his actual guilt or innocence.

- That, from 1972 to the present, the City of Chicago has, as a matter of practice, systemically failed to properly supervise, discipline or control detectives and supervisors at Area 2 and Area 3 who have repeatedly been accused of abuse of

SMITH-000737

African-American suspects during interrogations in order to coerce and fabricate inculpatory statements to be used against them.

- That there has been, from 1972 to the present, a systemic code of silence within the City of Chicago and its police department, particularly with regard to police abuse, and the resultant coercion and fabrication of evidence by Area 2 and Area 3 detectives.

- That at least since February of 1982, the highest ranking officials in City and County Governments, the Police Department, and the City Council, including Jane Byrne, Richard Brzeczek, Richard Daley, Richard Devine, and numerous police command personnel, were aware that there was a serious and systemic problem at Area 2 concerning the abuse of African-American suspects in order to coerce and fabricate confessions, and that they encouraged and condoned this practice.

- That the systemic abuse, interrogations, and the resultant coercion and fabrication of evidence by Area 2 and 3 detectives and supervisors were done with racial animus and discriminatory intent. (Bouza Opinions tendered in *Hobley v. Burge* on October 20, 2005 and in *Orange v. Burge* on August 19, 2006)

**Statistical analysis of documented cases of torture under Burge**

Attorneys for the victims of torture have documented one hundred and seven (107) cases of police torture and abuse at Area 2, and later, at Area 3, from mid 1972 until Burge's suspension from the Police Department in the fall of 1991.[18] A summary of these cases is attached as Appendix C. The Special Prosecutors had the documentation as to each and every one of these cases, and also investigated another forty-one cases that either did not arise under Burge's command, or did not involve allegations of torture or other serious physical abuse. In the vast majority of the 107 cases, the torture was contemporaneously documented by outcry evidence, medical evidence, motions to suppress testimony, OPS complaints, and/or testimony by victims and witnesses. Before the anonymous police source brought the Melvin Jones case to

---

[18] For a complete summary of each of the 107 documented cases, including the name of the victim, the date and nature of the alleged torture, and the names of the alleged torturers, see Appendix C of this Report.

SMITH-000738

light in 1989, Burge, his men, the Cook County State's Attorneys' Office, and the CPD had successfully kept the systemic nature of the torture hidden. Two years later, the OPS studied fifty Area 2 cases that had been discovered, nine of which alleged electric shock, and eleven of which alleged baggings. It was on these fifty cases that the OPS made, in the Goldston Report, its findings of systemic abuse and torture at Area 2. At the time the Special Prosecutors began their investigation in 2002, there were approximately seventy documented Area 2 torture cases, and the remainder of the known documented cases were uncovered by victims' attorneys and by the Special Prosecutors during subsequent investigation.

Of the 107 Area 2 and 3 torture cases that are now known, 80 occurred at Area 2 between 1972 and 1987. A closer analysis of the torture in those years reveals that all but one of the 80 cases arose during the time periods when Burge was a midnight shift robbery detective, (1972-74), midnight shift Robbery Sergeant (1977-80), and commanding Lieutenant of the Violent Crime Unit at Area 2 (1981-86) and while John Byrne was the midnight shift sergeant at Area 2 (1982-86). When Burge and Byrne moved to the Bomb and Arson Unit, torture at Area 2 subsided, except for the 1987 torture of Madison Hobley, and Hobley's interrogation was conducted by Area 2 detectives under the joint supervision of Bomb and Arson Commander Burge and new Area 2 Violent Crimes Lieutenant Phil Cline, who recently retired as CPD Superintendent. In 1988, then Superintendent Leroy Martin, who had been Burge's commander at Area 2 in 1983, reassigned Burge to be Commander of Area 3 Detective Division, and Burge brought Byrne, Paladino, McWeeny, and Maslanka to Area 3 shortly thereafter. Torture cases, some twenty-six in number, were then reported in Area 3 from 1988 to 1991, while the only

SMITH-000739

documented case from Area 2 was the Anderson case, in which several Area 3 detectives, transferred from Area 2, worked together with their former confederates at Area 2.

A further analysis of the 107 torture cases shows that one or more detectives or supervisors were identified by name in 92 of the cases. A total of 67 different officers were identified by victims, testimony, or reports in one or more of the cases. Sixty-four of the 67 officers were white. Forty-six worked at Area 2 under Burge and Byrne, 11 under Burge and Byrne at Area 3, and three worked at both Area 2 and 3 under Burge and Byrne. Burge was named as directly involved in 35 cases, and was the supervising Lieutenant or Commander in virtually all of the remaining cases, while Byrne was named as directly involved in twenty cases, and was a supervising sergeant in numerous additional cases. Dignan was named in 17 cases, Paladino in 13, Yucaitis in 12, McWeeny in 11, Maslanka in 10, Dwyer in 9, and Madigan in eight. Twelve additional detectives were named between five and seven times.[19] All together, 21 Area 2 detectives and supervisors were named in five or more torture cases.

### Electric shock, suffocation, and racist abuse

Further analysis shows that torture by electric shock was alleged in twenty-two cases, and the threat of electric shock in four additional cases. In most of these cases, the electric shock was administered by a generator housed in a dark box, with a cattle prod or curling iron type device used on other occasions. Burge was alleged to be directly involved in 15 of these cases, while Yucaitis, Byrne, Dignan, McWeeny, Hoke, Paladino, and Maslanka were also named as being involved in multiple shockings.

---

[19] Grunhard, Pienta, and Basile were named seven times, Hoke, Dioguardi, Lotito, Kill, and Boffo six times, and McGuire, McNally, McDermott, and Corless, five times.

SMITH-000740

Suffocation by typewriter cover or plastic bags were alleged in 23 cases. Burge was directly involved in 10 of those suffocation cases, Byrne in eight, Grunhard in five, Dignan, McWeeny, Yucaitis, Boffo and Lotito in four, and Dwyer, Paladino, Pienta, Dioguardi, and Bajenski in three. Six additional detectives were involved in two bagging cases, and 14 detectives were involved in one bagging case.[20]

Racial epithets, almost always including the term "nigger," were reported in twenty cases. On at least one occasion the electric shock box was referred to as the "nigger box," and on another occasion the box was introduced with "this is what we've got for niggers like you." One victim was threatened with hanging, "like they had other niggers," while on another occasion, suffocation by bagging was introduced by "we have something for niggers." One victim had a gun put to his head and the detective threatened to "blow his black brains out."

### Mock executions and beatings

Mock executions and gun threats were reported on 15 occasions. Most frequently, this terrifying act took the form of "Russian roulette" — guns to the head or in the mouth — while on one occasion Byrne and Dignan acted out a shotgun mock execution. On five other occasions, the victim was beaten with a pistol or a shotgun. An alleged suicide occurred after one interrogation, suicide was attempted in another, and there were three threatened hangings.

Beatings with a flashlight were reported thirteen times, with a phone book thirteen times, with a nightstick six times, with a rubber hose or lead pipe three times, and with a small baseball bat once. On thirty-six occasions, the victims alleged attacks on their genitals, by

---

[20] Madigan, Hoke, McNally, McGuire, Flood and McCann were involved in two bagging cases, while Hill, Glynn, Mokry, McCabe, O'Hara, McKenna, Joe Gorman, Corless, McDermott, Marley, Basile, Leracz, Krippel, and Hines were named in one case.

SMITH-000741

shocking, kicking, or striking with an object, while on six occasions, the victim was choked or gagged. On four occasions the victim alleged burning, on three occasions, the victim was subjected to ear cupping or thumb pressure to the ears, and on two occasions, the victim was threatened with interrogation by detective Joe Gorman, who was notorious for his role in the Black Panther Police raid. On two occasions, the victim was suspended by his handcuffs, on two occasions either stripped naked or into his underwear, and on one occasion, had his head placed in a toilet bowl. Sleep, food, and bathroom deprivation was also a common complaint.

All of the foregoing information, which was available to the Special Prosecutors, clearly demonstrates the systemic and racist nature of the torture.

### THE SPECIAL PROSECUTORS' INVESTIGATION WAS DEEPLY FLAWED FROM THE START

*The Special Prosecutors conducted an investigation that was hopelessly flawed and calculated to obfuscate the truth about the torture scandal.*

Despite the fact that the majority of the victims had previously testified extensively under oath in prior proceedings as to their torture experiences, the Special Prosecutors, ignoring common prosecutorial practice, spent an inordinate amount of time and money re-questioning each and every torture victim willing to cooperate.[21] While the Special Prosecutors displayed a great deference toward the public officials whom they questioned, they showed an equal amount of insensitivity to those who were the victims and, in some cases, continued to suffer serious mental distress and anguish as a result of having been tortured. Furthermore, as noted

---

[21] Prosecutors, as a practice, do not take formal statements from victims in cases they are prosecuting because such statements must be provided to defense attorneys before trial and are often used by the defense to attack the victims' credibility.

SMITH-000742

previously, the Special Prosecutors attacked the credibility of the one ranking police witness they were handed at the inception of the investigation — Superintendent Brzeczek.

At least ten different grand juries were used, yet only five witnesses provided substantive testimony. No African-American detectives were called, nor were any of the torture victims or their corroborating witnesses. Several leads concerning detectives who had witnessed abuse by Burge and privately complained about it were not pursued, while at least one detective, who was involved in several important torture cases, including Andrew Wilson's, was told that he was not a target of the investigation, and then not pursued.

The Special Prosecutors ignored key Burge operative John Byrne's offer to formalize his denials before a court reporter; other key supervisory and command witnesses were either not interviewed at all, or their interviews were not transcribed or even summarized in memoranda.[22] Of the 44 known ASAs who took statements from 56 of the victims, only 17 were interviewed, and the interviews pertained to only 25 of the cases. None was offered immunity, and only one, Lawrence Hyman, was called before a grand jury.

More than three and a half years after the investigation began, the Special Prosecutors granted immunity to four officers, without obtaining written proffers of their testimony, and without assurances that they would give truthful evidence concerning their actual knowledge of torture. If even one of these officers had been indicted for his denials before the grand jury, and immunity then strategically given to additional officers who were deeply involved in the torture, and to several involved ASAs, the code of silence might well have been pierced.

---

[22] There is no memo of the interview of key witnesses CPD Deputy Superintendent Lyons, CPD Deputy Superintendent McCarthy and Jeffrey Kent, head of the Special Prosecutions Bureau of the SAO, in the 1980s; other key figures were not even interviewed. Devine was interviewed, but there is no written record of what he said.

SMITH-000743

Moreover, the recommendations of several of the African American Assistant Special Prosecutors were overruled and ignored — most significantly when Tommy Brewer urged early in the investigation that police witnesses be aggressively pursued, and when the late Donald Hubert found that there was compelling evidence that Madison Hobley had been tortured by bagging and beating. (Assistant Special Prosecutor Donald Hubert's Memorandum on Madison Hobley's Investigation, July 6, 2004)

## THE CREDIBILITY OF THE ALLEGED TORTURERS — AS OPPOSED TO THAT OF THEIR ALLEGED VICTIMS

*The Special Prosecutors unfairly evaluated the credibility of the alleged torturers and of their victims and unfairly attempted to discredit torture victims who had pending civil or criminal cases.*

While the credibility of the victims — the vast majority of whom cooperated with the Special Prosecutors' investigation — was attacked in the Report, there was no analysis of the credibility of the alleged torturers, or the lack of it. The officers' lack of credibility is demonstrated not only by the prevalence of many similar allegations by torture victims, but also by numerous inconsistencies, omissions, distortions, and falsehoods, which permeate the alleged torturers' prior testimony in the victims' criminal cases, the testimony of Area 2 African American detectives, and the OPS findings that Area 2 officers lied in a significant number of cases. If the victims' allegations were credible, as the Special Prosecutors found many of them to be, it would follow that the officers' denials under oath in the victims' criminal cases were false. Yet the Special Prosecutors made such findings in only three cases. In addition, the Report also ignored repeated admissions of former Superintendent Martin and former OPS Director David Fogel, and the findings of several courts, that there existed within the CPD a code of

37

SMITH-000744

silence which manifested itself in the refusal of officers to testify against their fellow officers, particularly in police abuse cases.

Moreover, the Special Prosecutors chose to evaluate each case individually, using the highest legal standard available — reasonable doubt — rather than the standard applicable to a prosecutor seeking an indictment — probable cause. They made no evidentiary use of the "astounding" pattern of similar acts of torture by Burge, Byrne, Dignan, and their group of officers that occurred both before and after the individual case being evaluated, as well as sometimes to several co-defendants in the same case. This is the kind of proof that prosecutors routinely offer as substantive evidence, particularly in cases, such as rape prosecutions, where the credibility of the victim comes under attack from defense counsel. Moreover, the Special Prosecutors' refusal to utilize this evidence flaunted prior appellate decisions in several of the victims' cases where the court relied on this very evidence. Nor is there any evaluation of this pattern of torture evidence as an ongoing criminal conspiracy, the overt acts of which are these numerous individual cases, scores of which the Special Prosecutors professed to find credible.

Additionally, the Special Prosecutors chose to stand in the shoes of a hypothetical judge and make evidentiary rulings on the wealth of evidence that further corroborated the acts of torture, invariably divining, with little or no basis, that the evidence would not be admissible in a future prosecution. This evidence included the findings of the Goldston Report, outcry evidence to lawyers, doctors, judges, and family members, etchings documenting torture by suffocation in an interrogation room bench, the testimony of doctors and psychologists, including several who are internationally recognized in the field of identifying psychological markers of torture on their victims, the findings of torture and perjury by OPS investigators in several cases, and the expert opinions of an independent former police superintendent. In many

SMITH-000745

instances, the Illinois Appellate and Supreme Courts had relied on this very evidence to reverse the convictions of the victim, or to grant him a new hearing on his torture claims.

In each case, the Special Prosecutors placed primary emphasis on the underlying crimes for which the victims of torture were arrested and imprisoned, rather than on the torture itself. The victim was turned once again into the accused, interrogated by the Special Prosecutors, often without counsel, about inconsistencies in his tortured confession and his defense to the crime. In contrast, Burge and his subordinates all appeared with multiple counsel, supplied free of charge by the City and the Fraternal Order of Police, and either presented denials that stood unchallenged by the Special Prosecutors, or refused to testify. While the Special Prosecutors' Report highlighted alleged victim inconsistencies, and Andrew Wilson's prior invocation of the Fifth Amendment, the Report did not mention inconsistencies in the detectives' statements, their flaunting of immunity, or their refusal to cooperate with the investigation.[23]

More disturbingly, the Special Prosecutors placed particular emphasis on discrediting the four death row inmates — Hobley, Patterson, Orange, and Howard — who were granted pardons based on innocence by Governor Ryan and who had multi-million dollar federal lawsuits pending. In fact, the Special Prosecutors granted several of the defendants in the federal civil cases immunity from prosecution, apparently with an unusual incentive — that they would not pursue perjury charges against them — so they could testify in the pending federal cases.

---

[23] Wilson invoked the Fifth Amendment not in the Special Prosecutors' investigation and not regarding torture, while the detectives invoked the Fifth Amendment in the Special Prosecutors' investigation and in reference to torture. The Report lists forty Area 2 and Area 3 officers who were subpoenaed by the Special Prosecutors, but is silent about whether the officers cooperated, whether any were granted immunity and, if so, whether they continued to deny knowledge of torture. However, documents subsequently obtained by victims' attorneys, as well as statements made in open court and to the media, reveal that the vast majority of the officers subpoenaed either took the Fifth Amendment before the Grand Jury or, after grants of immunity, denied any knowledge of torture.

SMITH-000746

Additionally, the Special Prosecutors suppressed a finding by their own assistant, Donald Hubert, that Madison Hobley had been tortured. They also concluded that although Patterson had been beaten and suffocated, his case should nonetheless be closed because the evidence would not, in their opinion, be admissible in court. In the Leroy Orange case, they implied that Orange was untruthful, despite the absence of any corroborating evidence in the Report, and ignored medical and witness corroboration of the torture. The Report also ignored the City's specific admission that Orange was the victim of Burge's "astounding pattern or plan . . . to torture certain suspects . . . into confessing to crimes or to condone such activity." (January 22, 1992 City Memorandum In Opposition To Motion To Bar Testimony Concerning Other Alleged Victims of Police Misconduct, filed before the Police Board in the *Matter of Charges Filed against Respondents Jon Burge, John Yucaitis and Patrick O'Hara,* Cases No.1856-58) Instead they lifted, without attribution, substantial portions of the State's Attorney's memorandum in opposition to the pardon and an Illinois Supreme Court opinion in the case. In a further attempt to discredit Orange, the Special Prosecutors relied on the testimony of his criminal defense attorney, who not only failed to challenge the use of his tortured confession at trial, but who was also found ineffective during Orange's sentencing proceedings and subsequently disciplined by the Attorney Registration and Disciplinary Commission.[24]

---

[24] After the Release of the Special Prosecutors' Report, the City of Chicago, in November 2006, agreed to settle the Hobley, Orange, and Howard cases for a total of $14.8 million. In exchange, they obtained the agreement of those Plaintiffs not to sue Mayor Richard M. Daley for his actions while State's Attorney or to depose him as a witness in those cases. The City has subsequently refused to sign the settlement agreement, and its alleged bad faith in refusing to do so is now the subject of proceedings to enforce the settlement in Federal Court. (See *Chicago Sun Times*, February 25, 2007) The County has yet to make a settlement offer to these Plaintiffs to resolve their claims that Richard Devine and several Assistant Cook County State's Attorneys were also responsible for their wrongful convictions and imprisonment on death row.

SMITH-000747

**THE CONSPIRACY OF SILENCE AT THE HIGHEST LEVELS**

*The Special Prosecutors ignored a wealth of evidence establishing that there was a widespread and continuing cover-up of the torture scandal — a conspiracy of silence — implicating high officials of the City of Chicago, the Chicago Police Department, and the Cook County State's Attorney's Office.*

The Special Prosecutors found that official action should have been taken in 1982 against Burge and his men for the torture of Andrew Wilson, but nonetheless absolved those who should have taken such action — Daley and Devine — of any responsibility. The stated reason for absolving them was that Wilson would not give ASAs a statement at a time when he was awaiting trial in a capital case.

The reasoning, however, was clearly spurious. Prosecutors often bring cases without victim cooperation — in murder cases, for instance. The truth is that in 1982 there was ample independent evidence to establish that Wilson had been tortured by Burge and his men. Wilson's cooperation was hardly necessary in view the evidence, which included:

- Medical documentation of radiator burns on Wilson's chest and face and bruises and lacerations to his face and body, including a battered right eye.

- Photographs of the radiator burns, bruises and lacerations, and alligator-clip markings on his ears.

- A statement from a woman held in the adjoining interrogation room that she heard Wilson repeatedly screaming and sounds of him being thrown to the floor.

- A statement from a CPD deputy commander that Wilson had no marks on his face or upper body when he was arrested.

- Evidence that the police lock-up keeper refused to accept Wilson because of his physical condition.

- Statements by a treating nurse and doctor that police who brought Wilson to the Cook County jail medical facility threatened him in an attempt to get him to refuse treatment.

- A statement from a commander that he saw Wilson at Area 2 with blood on his face.

SMITH-000748

- A statement from Dr. Raba that Wilson told him that he had been electric-shocked, burned, and beaten at Area 2.

- A statement from the lawyer who first visited Wilson that he complained of electric shock and had serious visible injuries.

- Evidence that there had been a number of other allegations of similar torture at Area 2.

With this evidence, responsible prosecutors would have taken appropriate action. Since Daley and Devine had an obvious conflict — they could hardly prosecute Wilson and his torturers at the same time — the proper course of action would have been to have referred the torture allegations either to the Illinois Attorney General or United States Attorney. Rather than sending the case elsewhere for investigation, however, Daley and Devine became the torturers' silent conspirators.

The Special Prosecutors also were presented with clear evidence that nearly 50 felony review ASAs from 1973 through 1993 were present at Area 2 during the interrogations of at least 56 alleged torture victims. Many of the alleged victims either showed signs of severe abuse or complained to the ASA, yet the ASAs nonetheless took their statements and later swore at suppression hearings that there had been no torture.

Daley, Devine, and their ASAs were hardly alone in their dereliction of duty and involvement in the torture cover-up. Among others who were aware of torture allegations but did nothing were CPD Superintendents Terry Hillard and Leroy Martin, OPS Director Gayle Shines, State's Attorneys Cecil A. Partee and Jack O'Malley, and CPD Counsel Thomas Needham, all of whom were absolved of wrongdoing by the Special Prosecutors.[25]

---

[25] For a detailed treatment of the facts demonstrating the complicity of these officials in the continuing cover-up of the torture scandal see Appendix E.

SMITH-000749

**THE COOK COUNTY JUDICIARY'S**
**COMPLICITY IN THE TORTURE SCANDAL**

*The Special Prosecutors failed to document the role of judges of the Criminal*
*Division of the Cook County Circuit Court in the torture scandal.*

Over the last three decades, torture allegations arising from Areas 2 and 3 have been made in hundreds of suppression hearings, trials, and post-conviction proceedings in the Criminal Division of the Cook County Circuit, but no judge has ever found that a single act of torture occurred. Eleven felony review ASAs who took statements from suspects who claimed to have been tortured by Burge and his men have become judges, as have several other ASAs who defended against torture allegations.

Three ASAs involved in the Wilson case — William J. Kunkle, Frank Deboni, and Gregory R. Ginex — are now Cook County judges, and former State's Attorney O'Malley is an Appellate Court Judge. Recent deposition testimony in the *Orange* civil case also reveals that at least one sitting Criminal Division judge, Dennis A. Dernbach, gave money to Burge's defense fund and attended a Burge fundraiser. (Deposition of Dernbach in *Orange v. Burge*) According to the *Chicago Reader,* Judge Nicholas R. Ford, who as an ASA took a confession from an alleged torture victim, denied that same alleged victim's post conviction torture claim without a hearing. (*Chicago Reader*, December 1, 2006)

Had the Special Prosecutors found torture, obstruction of justice, perjury, or cover-up in specific cases, it would have impeached the decisions of the numerous Criminal Division judges in those cases, and, in cases which are still pending, call the convictions into question. Additionally, such findings would implicate the felony review and trial ASAs in those cases, including those who are now sitting judges. Likewise, finding that the SAO's refusal to prosecute

43

SMITH-000750

the torturers in the Wilson case was an obstruction of justice would not only implicate the Mayor and the State's Attorney, but also three sitting judges.

### SPECIAL PROSECUTORS' APPEARANCES
### OF CONFLICT OF INTEREST AND BIAS

*The Special Prosecutors had appearances of conflict of interest and bias in favor of those whom they had been appointed to investigate.*

At the time of the Special Prosecutors' appointment, it was public knowledge that Egan and Boyle had long-standing ties to the Cook County State's Attorney's Office and the Cook County Regular Democratic Organization.

It was not until after the Special Prosecutors' Report was issued, however, that the *Chicago Sun-Times* learned that Egan was the uncle of a violent crimes detective, William Egan, who had worked under Burge at Area 2 from 1982 to 1986. The *Sun-Times* also reported that Egan's grandfather, father, three uncles, two brothers, and a second nephew had all been CPD officers, holding ranks ranging from sergeant to captain and detective. The most troubling familial connection was that with Area 2 Detective Egan, who had participated with Burge and another officer in the 1983 arrest of torture victim Gregory Banks, whose case was investigated by the Special Prosecutors. (*Chicago Sun Times*, August 6, 2006)

Detectives Egan and Burge turned Banks over to the notorious midnight shift headed by Sergeant John Byrne. Banks's co-defendant, David Bates, likewise was turned over to the midnight crew. Both confessed. At their trial in 1985, both testified that they had been beaten repeatedly, suffocated with a plastic bag, and racially taunted by Detectives Byrne and Dignan. (*People v. Banks*, 549 N.E.2d 766 (1989), *People v. Bates*, 642 N.E.2d 774 (1994))

SMITH-000751

Bates and Banks were convicted, but their convictions were reversed by the Illinois Appellate Court based on the evidence that they had been tortured. (Id.) After prosecutors dismissed the charges against both men, the City settled their civil rights claims for substantial sums. The officer who arrested Bates was an African American detective, Doris Byrd, who said in a sworn statement provided to the Special Prosecutors that the torture of suspects by Burge and the midnight crew was an "open secret" at Area 2 in the early 1980s, and that she often heard screams coming from the interrogation rooms. (Statement of Doris Byrd, November 9, 2004, pp. 9-11, 16-17, 21-24) Nonetheless, the Special Prosecutors found the evidence in the Banks case insufficient to support any criminal charges against Byrne or Dignan.

After the evidence of Egan's possible conflict of interest surfaced, he told several different stories to the media. First, he told the *Sun Times* reporter who broke the story that he had disclosed the information concerning his nephew to Judge Biebel and to Locke E. Bowman, the legal director of the MacArthur Justice Center, an attorney who had sought the appointment of the Special Prosecutors. Judge Biebel did not remember the conversation and Bowman said he "could not imagine" that Egan told him his nephew was an Area 2 detective who worked for Burge. (*Chicago Sun Times*, August 6, 2006)

Egan then told the *Chicago Tribune* that his nephew did not work for Burge and that he had disclosed his nephew's involvement in the Banks case shortly after he was appointed. (*Chicago Tribune*, August 6, 2006) Egan also asserted that he was "certain" that his nephew was a tactical officer rather than a detective working for Burge.

After his nephew's personnel records were obtained, however, Egan said that he might have been "mistaken" when he denied that his nephew was an Area 2 detective. (*Chicago*

45

SMITH-000752

*Tribune*, August 8, 2006) Furthermore, he also asserted that he talked to his nephew only "three times in 20 years, always at wakes." (*Chicago Sun Times*, August 7, 2006)

Shortly after Egan made his conflicting statements, an audio tape made by a filmmaker six months after Egan allegedly made his off-the-record disclosures surfaced. During this taped interview, Egan made several additional statements indicative of a pro-Burge bias. When asked what sort of a man Burge was, Egan said a fellow judge had described Burge as "personable" and "hardworking." Egan then volunteered that at the onset of the investigation he had discovered that he had a nephew who had arrested an alleged torture victim.

He said that, if his nephew had anything to do with the alleged torture, he would have to report it to Judge Biebel and "maybe get out of" the investigation. His nephew told him what Egan had been hearing "from everybody" — that Burge was a "great, hard worker" and that his nephew was "only" the officer who arrested Banks. (*Chicago Sun Times*, August 16, 2006)

Hence, from the taped statements and Judge Egan's various statements to the media, it appears that he approved of findings regarding the Banks case, in which his nephew was a possible witness to Burge's involvement in torture. The record also indicates that Judge Egan either did not disclose these facts to Judge Biebel, or, if he did, that his disclosure was incomplete and off the record, and that after the evidence of his conflict of interest and bias was publicly revealed, he repeatedly changed his story to fit the emerging evidence.

Egan and Boyle both also had reputations that apparently made their appointment welcome news at City Hall. According to the *Sun-Times,* Jeffrey Given, a top assistant of Chicago Corporation Counsel Mara Georges, sent Georges this email message:

> By all accounts, Edward Egan and his top assistant, Robert Boyle, are very good choices for special prosecutors. Nick [Trovato, a high level Assistant Corporation Counsel] knows them and John Goggin at Hinshaw [& Culbertson, a law firm representing the

SMITH-000753

City in torture cases] knows both of them very well. They will likely be fair to the City and the CPD and our guess is that they will not be inclined to turn it into the kind of unfocused witch hunt that the PLO [People's Law Office] and their ilk would ideally push for. (*Chicago Sun Times*, July 31, 2006)

Egan had been an ASA under two Democratic State's Attorneys prior to leaving the office under Republican Ben Adamowski. In private practice, Egan defended one of the police officers charged in the Summerdale scandal in 1961. After Democrat Daniel P. Ward recaptured the State's Attorney's office, Egan returned as Ward's first assistant. With the backing of Richard J. Daley, Egan became a Circuit Court judge and then an Appellate Court judge. In 1976, he left the bench when Daley slated him for State's Attorney against Republican Bernard Carey, who had defeated Edward V. Hanrahan for re-election four years earlier. After losing that election,[26] Egan went into private practice before returning to the Appellate Court in 1988.

Boyle had been Chief of the Criminal Division of the State's Attorney's Office under Hanrahan in 1969 when officers under Hanrahan's direction raided a west side apartment and shot Black Panthers Fred Hampton and Mark Clark to death. In an effort to defend the police action in that case, Boyle, Hanrahan, and First Assistant State's Attorney Richard Jalovec provided photographs purporting to show bullet holes indicating that the Panthers had fired shots. In truth, however, the purported bullet holes were nail heads. (Report of the January 1970 Federal Grand Jury, Northern District of Illinois, p. 16) After Boyle left the State's Attorneys' Office, he entered private practice, and subsequently became a law partner of former Democratic Congressman Morgan Murphy Jr., who "was considered a member of Mayor Richard J. Daley's 'inner circle,'" while his father was "a close associate" of the mayor. (*Chicago Tribune*, February 22, 1970)

---

[26] During the campaign, Egan told a reporter, "Everything I ever got I owe to the State's Attorney's Office." (*Chicago Tribune*, October 31, 1976)

SMITH-000754

In May of 2005, during the Special Prosecutors' investigation, Boyle, Murphy, and Murphy's son, Morgan Murphy III, were found civilly liable by a Wisconsin jury for mail fraud, securities fraud, embezzlement, racketeering, and theft, and ordered to pay $242 million in damages. The jury found that they had concealed Murphy's alleged business ties to two purported Chicago mob figures, while brokering a potential Kenosha casino deal for the Menominee Indian tribe. (*Milwaukee Journal Sentinel*, May 25, 2005) This case was subsequently settled for $7.5 million. (*Milwaukee Journal Sentinel*, September 29, 2005)

## CONCLUSION AND CALL FOR ACTION

The record strongly suggests that the Special Prosecutors' investigation and resultant Report, which cost the taxpayers of Cook County $7 million, were driven, at least in part, by pro-law-enforcement bias and conflict of interest, were riddled with omissions, inconsistencies, half truths and misrepresentations, and reflect shoddy investigation and questionable prosecutorial tactics and strategies. The Report also failed to address the systemic and racist nature of the dehumanizing physical and psychological abuse, or to identify it as torture, in accordance with the international definition. Additionally, the record suggests that the investigation was neither designed nor intended to develop evidence in support of indictments for crimes not barred by the statute of limitations but rather was designed to avoid embarrassing City, County, CPD, and SAO officials responsible for the torture scandal and cover-up, and protecting the City from civil liability.

SMITH-000755

Based on the findings set forth above, the undersigned respectfully request that:

- The Cook County Board hold a public hearing to investigate the squandering of public resources by the Special Prosecutors on an investigation that appears to have been flawed by design.

- The U.S. Attorney for the Northern District of Illinois and U.S. Department of Justice conduct an independent investigation into all of the criminal conduct implicated by the evidence outlined above.

- The City of Chicago and the County of Cook establish a fund to provide compensation and treatment for the more than one hundred victims of torture who may be barred from obtaining relief by the statute of limitations.

- The City of Chicago stop spending public funds to defend the torturers in civil cases.²⁷

- The Illinois Attorney General agree to new criminal court hearings for persons behind bars who were convicted in whole or in part on the basis of confessions obtained by Burge and his subordinates.

- The Special Prosecutors make public all transcripts, documents, and other materials gathered during their investigation.

- The U.S. Congress, the United Nations Committee Against Torture (CAT), and the Inter-American Commission on Human Rights continue to monitor the City, County and U.S. Government's responses to the above demands.

*The last time before they brought the statement in and had me to talk to them, I come to, and I thought I was dead then because they was lifting me off the floor trying to pump air into me because I wasn't breathing. I remember that. I thought I was dead because all I could see was blackness and I said, man, this is it. I'm gone. When I looked up, they brought me back. I said, man, I'm on a seesaw, here we go again. I can't take no more of this. They did it again. So they asked me some questions, I answered them. I answered more questions. Then I said, man, I ain't going through this no more. So I said, I ain't saying nothing else. So then they put me back through it again, and the last time, I thought that was it. That was it.*

*Torture victim Anthony Holmes*
*Statement Provided to Special Prosecutors*

---

²⁷ Freedom of Information Act and other public documents establish that, as of March 15, 2007, the City of Chicago has paid $8.5 million to private lawyers to defend Burge, his men, and the City in the Burge torture cases, and another $500,000 to fire him. Over the last six months alone, the City paid out nearly $1 million to defend Burge and itself in the five pending civil torture cases. A summary of these expenditures can be found in Appendix D.

SMITH-000756

RESPECTFULLY SUBMITTED BY:        April 24, 2007
(In Alphabetical Order)

## INDIVIDUALS

Christina Abraham, Civil Rights Coordinator, Council on American-Islamic Relations (CAIR)

Bill Allison, Clinical Professor of Law, University of Texas School of Law, and Director, Texas Center for Actual Innocence

Albert Alschuler, Professor of Law, Northwestern University School of Law

Anthony Amsterdam, University Professor, New York University School of Law

Kimball Anderson, Partner, Winston & Strawn

David A. Ansell, MD, MPH, Chief Medical Officer, Rush University Medical Center

Shawn Armbrust, Executive Director, Mid-Atlantic Innocence Project

Barbara R. Arnwine, Executive Director, Lawyers' Committee for Civil Rights Under Law, Washington, DC

Professor Michael Avery, Professor of Law, Suffolk Law School, co-author, Police Misconduct: Law and Litigation; immediate past president, National Lawyers Guild

Sandra L. Babcock, Associate Clinical Professor and Clinical Director, Center for International Human Rights, Northwestern University School of Law

Cherif Bassiouni, Distinguished Research Professor of Law, DePaul University College of Law, President of the International Human Rights Law Institute; Co-chair, Committee of Experts on the Draft Convention on the Prevention and Suppression of Torture; United Nations Sub-Committee on the Prevention of Discrimination and Protection of Minorities

David Bates, Chicago Police Torture Victim

Rev. Don Benedict, Founder, Protestants for the Common Good

Adele Bernhard, Professor of Law, Pace Law School

Timuel Black, Professor Emeritus, Chicago City Colleges

Karen Blum, Professor of Law, Suffolk Law School and Co-author, Police Misconduct: Law and Litigation

SMITH-000757

Jane Bohman, Executive Director, Illinois Coalition to Abolish the Death Penalty

Nancy Bothne, former Midwest Regional Director, Amnesty International

Locke E. Bowman,* Legal Director, MacArthur Justice Center

David Bradford, Partner, Jenner & Block

Tommy Brewer, former Assistant Special Prosecutor, Burge Investigation

Stephen B. Bright, Founder, Southern Center for Human Rights; Lecturer
in Law, Yale Law School

John C. Brittain, Legal Director, National Lawyers Committee for Civil Rights under Law;
former Dean, Thurgood Marshall School of law, Texas Southern University; Former President,
National Lawyers Guild

Rev. George W. Brooks, Director of Adult Spirituality, Infant Jesus of Prague Parish; Former
Director of Advocacy Kolbe House, the prison ministry of the Archdiocese of Chicago

Justin Brooks, Executive Director, Institute for Criminal Defense Advocacy & California
Innocence Project, California Western School of Law

Dorothy Brown, Circuit Court Clerk and recent candidate for Mayor of the City of Chicago

John Carlos, 1968 Olympian and Bronze Medal Winner

Douglass W. Cassel, Director, Center for Civil and Human Rights, Notre Dame Law School

Leonard Cavise, Professor of Law, DePaul University College of Law

David Cerda, former President of the Hispanic Bar Association and Hispanic Lawyers
Association of Illinois

Coltrane Chimurenga, General Secretary December 12th Movement International Secretariat

Paul J. Ciolino, Past President, National Association of Legal Investigators

Mardge Cohen, MD, Director of Women's HIV Research, CORE Center

Robert L. Cohen, MD, Federal Appointment Monitor, Prison Medical Care

Marjorie Cohn, International Human Rights Professor, Thomas Jefferson School of Law;
President, National Lawyers Guild; U.S. representative to executive committee, American
Association of Jurists

SMITH-000758

Edwin Colfax, Director of State Reform Campaigns, The Justice Project

Ron Crawford, Former Chicago Police Officer and Member, African-Americans for Public Safety

Jerry Crawley, Former Chicago Police Officer

Lisa A. Crooms, Professor of Law, Howard University School of Law

Jeffrey Cummings, partner, Miner, Barnhill & Galland

Danny K. Davis, U.S. Representative, Seventh District of Illinois

Madeline DeLeone, Executive Director, The Innocence Project, Benjamin N. Cardozo School of Law

Leon Despres, former Fifth Ward Alderman; Partner, Despres, Shwartz & Geoghehan; author, *Challenging the Daley Machine: A Chicago Alderman's Memoir*; and recipient, Benton Medal for Distinguished Public Service

Michael E. Deutsch, attorney for Palestinian-American torture victim Muhammad Salah

Bernardine Dohrn,* Director, Children and Family Justice Center, Northwestern University School of Law

Steven Drizin, Legal Director, Center on Wrongful Convictions, Northwestern University School of Law

Mary Fabri, Director, Torture Treatment Services & International Training, Marjorie Kovler Center of Heartland Alliance

James Fennerty, Past President, Chicago Chapter, National Lawyers Guild

Kurt Feuer,* Attorney for Madison Hobley

Keith Findley, Co-founder and Co-director, Wisconsin Innocence Project

Alison Flaum, Clinical Professor of Law, Northwestern University School of Law

Aviva Futorian, Chair, Long-Term Prisoner Policy Project

Craig Futterman, Clinical Professor of Law, Mandel Legal Aid Clinic, University of Chicago Law School

SMITH-000759

Jenni Gainsborough, Director, Washington Office, Penal Reform International

Thomas H. Geoghegan, Partner, Despres Shwartz & Geoghegan.

Thomas Geraghty, Director, Bluhm Legal Clinic, Northwestern University School of Law

Mark Godsey, Professor of Law, University of Cincinnati College of Law; Faculty Director, Ohio Innocence Project

William Goodman, Legal Director, Center for Constitutional Rights (CCR)

Jennifer Greenberg, Executive Director, Florida Innocence Initiative, Inc.

Reverend Larry L. Greenfield, Executive Minister, American Baptist Churches of Metro Chicago

Samuel R. Gross, Thomas and Mabel Long Professor of Law, University of Michigan Law School

Susan Gzesh,* Director, Human Rights Program, University of Chicago

Rick Halperin, Professor of History, Southern Methodist University; Chair, Amnesty International U.S.A.

Ron Hampton, Executive Director, National Black Police Association

Pat Hill, Executive Director, African American Police League

Madison Hobley, Chicago Police Torture Victim

Charles Hoffman,* Board Member, Illinois Coalition to Abolish the Death Penalty

Anthony Holmes, Chicago Police Torture Victim

Constance A. Howard, Illinois State Representative

Stanley Howard, Chicago Police Torture Victim

Margaret Huang, Director, U.S. Program, Global Rights

Reverend Jesse L. Jackson Sr., Founder and President, Rainbow PUSH Coalition

Reverend Paul Jakes Jr., Pastor, Old St. Paul Missionary Baptist Church

Mary Johnson, Named Petitioner, Motion for Appointment of a Special Prosecutor, and mother of torture victim Michael Johnson

SMITH-000760

Scott Kamin, Attorney at Law

Lawrence Kennon,* Named Petitioner, Motion for Appointment of a Special Prosecutor; Past President, Cook County Bar Association

Rashid Khalidi, Edward Said Professor of Arab Studies, Middle East Institute, Columbia University

Nancy Kurshan, MSW, Chicago Public Schools Social Worker

Richard A. Leo, Associate Professor of Law, University of San Francisco School of Law.

James S. Liebman, Simon H. Rifkind Professor of Law, Columbia Law School.

Bert B. Lockwood Jr., Distinguished Service Professor, University of Cincinnati School of Law and Director, Urban Morgan Institute for Human Rights,

Jon Loevy, attorney for Stanley Howard and Madison Hobley

Professor Jose E. Lopez, Executive Director, Puerto Rican Cultural Center.

Andrea Lyon, Dean, Clinical Studies, DePaul College of Law

Joseph Margulies, MacArthur Justice Center, Northwestern University School of Law; author, *Guantanamo, and the Abuse of Presidential Power*

Lawrence C. Marshall, Associate Dean for Public Service and Clinical Education and Director of Clinical Education, Stanford Law School

Robert J. Marx, Rabbi Emeritus, Congregation Hakafa

Ezra McCann, Retired Captain, Chicago Fire Department

Calvin S. Morris, Ph.D., Executive Director, Community Renewal Society; co-President, Justice Coalition of Greater Chicago

Imam Malik Mujahid, Chairman, Council of Islamic Organizations of Greater Chicago

Michael McConnell, Regional Director, American Friends Service Committee (AFSC)

Judson H. Miner, partner, Miner, Barnhill & Galland and former Corporation Counsel, City of Chicago

Jeanne Mirer, Secretary General, International Association of Defense Lawyers

SMITH-000761

Joey L. Mogul,* attorney for Darrell Cannon and Leroy Orange

Nike Mourikes, M.D., County Bureau of Health Services

Clyde Murphy, Director, Chicago Lawyers Committee for Civil Rights Under Law

Prexy Nesbitt, Adjunct Professor, Columbia College

Peter Neufeld, Co-founder, Innocence Project, Benjamin N. Cardozo School of Law

Charles Ogletree, Harvard Law School Jesse Climenko Professor of Law, and Founding and Executive Director of the Charles Hamilton Houston Institute for Race and Justice

Leroy Orange, Chicago Police Torture Victim

Matthew Piers, partner, Hughes, Socol, Piers, Resnick & Dym, Ltd, and former Deputy Corporation Counsel for Litigation, City of Chicago

Mary Powers,* Named Petitioner, Motion for Appointment of a Special Prosecutor

David Protess, Director, The Medill Innocence Project, Northwestern University

Coy Pugh, former Illinois State Representative

Michael L. Radelet, Chairman, Department of Sociology, University of Colorado

Frank Ralph, attorney for Petitioners who Secured the Appointment of the Special Prosecutors

Vanessa Ramos, Secretary General of the American Association of Jurists

Jane Ramsey, Executive Director, Jewish Committee on Urban Affairs; co-President, Justice Coalition of Greater Chicago

Kathleen Ridolfi, Executive Director, Northern California Innocence Project

Andrea J. Ritchie, Attorney at Law, New York City

Don Rose, Political Consultant

Jon Rosenblatt, attorney for Stanley Howard and Madison Hobley

David A. Rothstein, M.D. and researcher and author, medical ethics and torture

Len Rubenstein, Executive Director, Physicians for Human Rights

SMITH-000762

Leonard S. Rubinowitz, Professor of Law, Northwestern School of Law

Kristi Rudelius-Palmer, Human Rights Center, University of Minnesota

David Rudovsky, Senior Fellow, University of Pennsylvania Law School; Co-author, Police Misconduct: Law and Litigation

Bill Ryan, Publisher, Stateville Speaks newspaper and Citizens for Earned Release

Howard Saffold, founder, Positive Anti-Crime Thrust

Carl Safford, President of Blacks In Government, South East Wisconsin Chapter

Stephen Saloom, Policy Director, The Innocence Project, Benjamin N. Cardozo School of Law

Steven Saltzman,* Editor, Civil Rights Litigation and Attorney Fees Annual Handbook

Reverend Al Sampson, Pastor, Fernwood United Methodist Church; President, Chicago Metropolitan Council of Black Churches.

Jorge Sanchez, Attorney at Law

Austin D. Sarat, William Nelson Cromwell Professor of Jurisprudence and. Political Science. Amherst College

Barry Scheck, Co-founder, The Innocence Project, Benjamin N. Cardozo School of Law; Past President, National Association of Criminal Defense Lawyers

Gordon Schiff, MD, Cook County Hospital, Professor of Medicine Rush University

Ron Shansky, M.D. and former Medical Director, Illinois Department of Corrections

Brenda Shead, former Chicago Police Sergeant; President, The Guardians Police Organization

Dick Simpson, Chair, Department of Political Science, University of Illinois at Chicago; Former Alderman, Forty-fourth Ward

Virginia E. Sloan, President, The Constitution Project

Jean Maclean Snyder, Attorney at Law

Cynthia Soohoo, Director, Bringing Human Rights Home, Human Rights Institute, Columbia Law School

SMITH-000763

Brian Spears, Civil Rights and Police Brutality Attorney, Atlanta

Colin Starger, Staff Attorney, Innocence Project, Benjamin N. Cardozo School of Law

Robert Starks, Professor, Education and Development, Northeastern Illinois University

Randolph N. Stone, Clinical Professor of Law, University of Chicago Mandel Legal Aid Clinic; former Public Defender of Cook County

G. Flint Taylor Jr., * Attorney for Andrew Wilson, Darrell Cannon, Leroy Orange, and Several Other Chicago Police Torture Victims

J. Samuel Tenenbaum,* Assistant Clinical Professor of Law, Bluhm Legal Clinic, Northwestern University School of Law

Studs Terkel, Author/Interviewer

John Terzano, President, The Justice Project, Washington, D.C.

Doug Tjapkes, Founder, Innocent!

Jeffrey Urdangen, Clinical Professor of Law, Northwestern University School of Law

Mario F. Venegas, Ph.D. and Chilean Torture Survivor

Bill "Doc" Walls III, Director, Committee for a Better Chicago; recent candidate for Mayor of the City of Chicago

Rob Warden,* Executive Director, Center on Wrongful Convictions, Northwestern University School of Law

Roger S. Wareham, Esq., International Secretary-General of the International Association Against Torture

Steven Weinberg, Author of Center for Public Integrity Report on Prosecutorial Misconduct; Former Executive Director, Investigative Reporters & Editors

Burns H. Weston, Bessie Dutton Murray Distinguished Professor of Law Emeritus and Senior Scholar, Center for Human Rights, The University of Iowa

Steve Whitman, PhD., Health Researcher

Standish Willis, National Conference of Black Lawyers

Audra Wilson, Director of Diversity Education & Outreach, Northwestern University School of Law

SMITH-000764

Wilbourne Woods, Former Chicago Police Officer

Quentin Young, M.D., former Medical Director, Cook County Hospital

Marvin Zalman, Professor, Department of Criminal Justice, Wayne State University

Cliff Zimmerman, Dean of Students, Northwestern University Law School

Howard Zinn, Professor Emeritus, Department of Political Science, Boston University; Historian and author, *A People's History of the United States*

## ORGANIZATIONS

African American Police League
American Association of Jurists
American Friends Service Committee, Chicago Chapter
American Friends Service Committee, National Committee on Criminal Justice
Amnesty International U.S.A., Midwest Regional Office
Amnesty International, Group 50, Evanston, Illinois
The Association in Defense of the Wrongly Convicted
Blacks In Government, Southeast Wisconsin Chapter
Black People Against Police Torture
Bluhm Legal Clinic, Northwestern University School of Law
California Innocence Project
Campaign to End the Death Penalty
Center on Wrongful Convictions
Centro Sin Fronteras
Center for Constitutional Rights (CCR)
Chicago Committee Against Police Torture
Chicago Committee to Defend the Bill of Rights
Children and Family Justice Center, Northwestern University Law School
Christian Council on Urban Affairs
Citizens Alert
The Committee For A Better Chicago
Community Renewal Society
Cook County Bar Association
Council on American-Islamic Relations (CAIR)-Chicago
The Council of Islamic Organizations of Greater Chicago (CIOGC)
Crossroads Fund
December 12th Movement International Secretariat
Eighth Day Center for Justice
Florida Innocence Initiative
Global Rights
Greensboro Justice Fund

SMITH-000765

The Guardians Police Organization
Illinois Coalition to Abolish the Death Penalty
Illinois Association of Criminal Defense Lawyers (IACDL)
The Innocence Project, Benjamin N. Cardozo School of Law
International Association Against Torture
International Association of Defense Lawyers
Jewish Council on Urban Affairs
MacArthur Justice Center
Midwest Committee for Human Rights
National Alliance Against Racist and Political Repression
National Association of Black Law Enforcement Officers, Inc.
National Black Police Association
National Boricua Human Rights Network
National Conference of Black Lawyers
National Lawyers Guild
National Lawyers Guild, Chicago Chapter
National Coalition on Police Accountability (NCOPA)
National Police Accountability Project of the National Lawyers Guild
Northern California Innocence Project
People's Law Office
Positive Anti-Crime Thrust (PACT)
Protestants for the Common Good
Rainbow PUSH Coalition

SMITH-000766

APPENDICIES TO THE REPORT ON

THE FAILURE OF

SPECIAL PROSECUTORS

EDWARD J. EGAN

AND

ROBERT D. BOYLE

TO FAIRLY INVESTIGATE POLICE

TORTURE IN CHICAGO

SMITH-000767

# **Appendix A**

**POTENTIAL ACTS OF OBSTRUCTION OF FEDERAL AND STATE COURT
PROCEEDINGS AND POTENTIAL PERJURY IN VIOLATION OF FEDERAL
AND STATE LAW FROM 1979 TO THE PRESENT IN THE BURGE TORTURE
CASES**

SMITH-000768

**POTENTIAL ACTS OF OBSTRUCTION OF FEDERAL AND STATE COURT
PROCEEDINGS AND POTENTIAL PERJURY IN VIOLATION OF FEDERAL
AND STATE LAW FROM 1979 TO THE PRESENT IN THE BURGE TORTURE
CASES**

**1. 1979-1994**: **State Criminal Court and Federal Civil proceedings:**

a. The 1982 and 1983 sworn testimony of Jon Burge, and numerous other law

enforcement officials, including Area 2 detectives John Yucaitis, Thomas McKenna, Fred

Hill, Dennis McGuire, Leonard Bajenski, and Joseph Dioguardi, Deputy Superintendent

Joseph McCarthy, and Assistant State's Attorney (ASA) Larry Hyman, at Andrew

Wilson's state Court criminal proceedings, denying torture and abuse;

b. The sworn testimony of Jon Burge, Sergeant John Byrne, Detectives Peter

Dignan, Charles Grunhard, Ray Binkowski, Dan McWeeny and Raymond Madigan,

denying torture and abuse at numerous state Court criminal proceedings from 1980 to

1994, including, but not limited to, Willie Porch (1980); Derrick King (1980); Melvin

Jones (1982); Alonzo Smith (1983); Stanley Wrice and Rodney Benson (1983); James

Andrews (1984); Gregory Banks and David Bates (1985); Leonard Hinton (1985); Philip

Adkins (1985); Lonza Holmes (1986);Thomas Craft (1986); Stanley Howard (1987);

Shaded Mumin (1987); LC Riley (1987); Aaron Patterson and Eric Caine (1988),

Michael Tillman and Stephen Bell (1988); and Tyshaun Ross and Keith Walker (1994).

c. The sworn testimony of John Byrne, Area 2 Detectives Peter Dignan,

McWeeny and Grunhard at their 1987 Federal Court depositions in *Cannon v. Burge*

denying the torture of Darrell Cannon;

d. The 1988 and 1989 sworn testimony of Burge and his law enforcement

confederates, including John Yucaitis, Larry Hyman, Thomas McKenna, Fred Hill,

1

SMITH-000769

Joseph McCarthy, and Richard Brzeczek, at Federal depositions and trials in the *Wilson v. Burge* civil case, denying knowledge of or participation in torture and abuse;

e. The 1984 and 1994 sworn testimony of John Byrne, and Detectives Dignan, Grunhard, Michael Bosco, Ray Binkowski, McWeeny and their Area 2 confederates at Darrell Cannon's criminal proceedings denying knowledge of, or participation in, the torture and abuse of Darrell Cannon, and the re-submission of said testimony at Cannon's 1999 motion to suppress hearing;

f. The sworn testimony of other Area 2 confederates denying torture and abuse at numerous additional state Court criminal proceedings.

**2. 1984-1993: The Police Board Hearings and Official OPS Statements**

a. The sworn testimony of Jon Burge at the 1992 Police Board Proceedings denying torture and abuse;

b. The sworn testimony of Daniel McWeeny and numerous other law enforcement confederates,, including, but not limited to Area 2 detectives Robert Flood, Dennis McGuire, Thomas McKenna, Fred Hill, and John Yucaitis, Deputy Superintendent McCarthy, and Assistant State's Attorneys Hyman, Ginex, and Nealis, at the 1992 Burge Police Board Proceedings, denying knowledge of, or participation in, torture and abuse;

c. The OPS statements given as official police reports in 1984 and in 1993 by Area 2 detectives and supervisors, including John Byrne, Peter Dignan, Ray Binkowski, Charles Grunhard, Michael Bosco and Dan McWeeny in Darrell Cannon's original and re-opened OPS investigations;

2

SMITH-000770

d.  The OPS statements given as official police reports by Area 2 detectives and supervisors, including John Byrne, Peter Dignan, James Lotito, Robert Dwyer, Daniel McWeeny, and Ronald Boffo, in numerous other OPS investigations, including Lee Holmes (1982); Gregory Banks (1984 and 1992); Stanley Howard (1987 and 1993); Thomas Craft (1993);  Philip Adkins (1984 and 1993); and Madison Hobley (1992).

**3.  1992-2005: Federal Court Depositions, Pleadings and Investigations**

a.  The answers to complaints denying torture and abuse filed by Burge John Byrne, and Dignan and their co-conspirators, including detectives Anthony Maslanka, John Paladino, Michael Kill and Kenneth Boudreau, from 1992 to 1996 in the *Banks v. Burge*, *Wiggins v. Burge* and *Bates v. Burge* Federal civil rights cases;

b.  The 1996 testimony of Peter Dignan and Area 2 and 3 co-conspirators Anthony Maslanka, John Paladino, Michael Kill, Kenneth Boudreau and Michael Hoke denying torture and abuse in Federal Court depositions taken in the Federal torture case of *Wiggins v. Burge*;

c.  The 1999 testimony concerning their knowledge and involvement in the cover-up of torture and abuse given by Superintendent Terry Hillard, Administrative Assistant Thomas Needham and OPS Director Gayle Shines in Federal Court depositions taken in *Santiago v. Marquez*;

d.  The withholding evidence of a pattern and practice of torture at Area 2 and 3 and its cover-up, including but not limited to in the cases set forth above and below by all the law enforcement officials named herein from several Federal investigations initiated by the U.S. Attorney's Office and the U.S. Justice Department from 1989 to the present.

3

SMITH-000771

**4. 1999-Present: Post-Conviction and Habeas Proceedings and Statements to the Media**:

a. The 1999 testimony of Area 2 Violent Crimes Commander Philip Cline and Area 2 detective Robert Dwyer denying knowledge of and/or participation in, torture, abuse and fabrication of evidence in depositions taken in the Madison Hobley State court post conviction proceedings;

b. The March 1, 2001 testimony of Area 2 Defendant John Byrne at a deposition taken in the Aaron Patterson State Court post conviction proceedings denying knowledge of, or participation in, the torture of Darrell Cannon, Gregory Banks, and numerous other victims;

c. public statements to the media denying torture made by Byrne and Dignan, respectively, in 1999 and 2001;

d. The destruction of relevant and potentially exculpatory torture evidence, during the year 2000, by a high ranking Chicago Police official who previously worked with Burge at Area 2;

e. The failure by any Area 2 detective, supervisor, or other law enforcement official to come forward in any of the cases which are pending in State or Federal court on post-conviction or habeas petitions brought by victims of the pattern and practice of Area 2 or Area 3 torture and abuse, or in cases where such victims of said abuse still stand wrongfully convicted on the basis of statements coerced from them, and admit that they committed perjury in those cases and that the victim was in fact tortured and abused as a part of the pattern and practice of torture. These victims include Ronald Kitchen, Anthony Holmes, George Powell, Shaded Mumin, James Andrews, Lee Holmes, Thomas

4

SMITH-000772

Craft, Derrick King, Leonard Hinton, Virgil Robinson, Michael Tillman, Stanley Wrice, Mearon Diggins ,Tony Anderson, and Rodney Benson.

**5. 2003-Present: Federal Court Proceedings:**

    a.  The sworn interrogatory answers given on November 25, 2003 by Jon Burge and on November 26, 2003, by Daniel McWeeny in the Federal Court case of *Hobley v. Burg* denying torture and abuse;

    b.  The responses to requests to admit made on November 25, 2003, by Jon Burge and on November 26, 2003, by Daniel McWeeny in the Federal Court case of *Hobley v. Burge* denying torture and abuse;

    c.  The November 2003 sworn interrogatory answers of Area 2 detectives Paladino, Lotito, Dwyer, and Garrity denying torture and abuse given in the Federal Court case of *Hobley v. Burge*;

    d.  The November 2003 responses to requests to admit of Area 2 detectives Paladino, Lotito, Dwyer, and Garrity made in the Federal Court case of *Hobley v. Burge* denying torture and abuse;

    e.  The answer denying torture and abuse filed in the Federal Court case of *Orange v. Burge* by Daniel McWeeny in June of 2006;

    f  The answer denying torture and abuse filed in Federal Court in *Cannon v. Burge* by Daniel McWeeny in June of 2006;

    g.  The June 22, 2006 sworn interrogatory answers given by Daniel McWeeny in *Cannon v. Burge* denying any and all torture and abuse;

    h.  The June 22, 2006 sworn interrogatory answers given by Daniel McWeeny in the Federal Court case of *Orange v. Burge* denying any and all torture and abuse;

5

SMITH-000773

i. The answer denying torture and abuse filed in Federal Court in the case of *Patterson v. Burge* by McWeeny on April 25, 2006;

j. The answer denying torture and abuse filed in Federal Court in the case of *Hobley v. Burge* by McWeeny on August 21, 2006;

k. The February 17, 2005 sworn interrogatory answers given by Defendant Leroy Martin in the Federal Court case of *Patterson v. Burge*;

l. The November 21, 2006 sworn deposition answers given in *Cannon v. Burge* by Daniel McWeeny denying knowledge of, or participation in, any acts of torture;

m. The November 17, 2006 sworn interrogatory answers given in *Cannon v. Burge* by Detective Michael Bosco denying knowledge of, or participation in, any acts of torture;

n. The June 5, 2006 sworn interrogatory answers given by Defendant Leroy Martin in *Cannon v. Burge* denying any knowledge of torture and abuse at Area 2;

o. The sworn answers denying knowledge of torture and abuse given in his August 17, 2006 and October 18, 2006 depositions by co-conspirator ASA Dennis Dernbach in the Federal Court case of *Orange v. Burge*;

p. The sworn answers given in his September 25, 2006 deposition by Superintendent Leroy Martin in the Federal Court case of *Orange v. Burge* denying knowledge of torture at Area 2;

q. The sworn answers, given in his September 27, 2006 and November 14, 2006 depositions by State's Attorney Richard Devine in the Federal Court case of *Orange v. Burge*, *inter alia*, concerning his and Defendant Daley's knowledge of the Brzeczek evidence and their knowledge of torture and abuse by Jon Burge and others at Area 2;

6

SMITH-000774

r.  The sworn answers given at his July 27, 2006 deposition by Area 2 Sergeant Alvin Palmer in the Federal Court case of *Orange v. Burge* denying knowledge of Area 2 torture;

s.  The sworn answers given at his October 27, 2005  deposition by Area 2 Commander Hubert Holton in the Federal Court case of *Orange v. Burge*, denying knowledge of Area 2 torture;

t.  The deposition testimony given in June and July of 2006 in the Federal court case of *Evans v. City of Chicago* by Area 2 detectives Hill, Anthony Katalinic, Joseph DiGiacomo, John Ryan, McKenna and Daniel Zwick denying knowledge of, or participation in, torture at Area 2;

u.  The sworn testimony given by Area 2 detective David Dioguardi at his Federal Court deposition of October 25, 2006 in the case of *Orange v. Burge,* denying, *inter alia*,  witnessing, participating in, or having knowledge of, the torture and abuse of suspects at Area 2, including, Andrew Wilson, Leroy Orange, Leonard Kidd, Stanley Howard, Lee Holmes, Stanley Wrice, and Rodney Benson by Burge, Byrne, Dignan, and other Area 2 detectives and supervisors;

v.  The sworn testimony given by Area 2 detective Leonard Bajenski at his Federal Court deposition of November 7, 2006 in the case of *Orange v. Burge*, denying, *inter alia*, witnessing, participating in, or having knowledge of, the torture and abuse of suspects at Area 2, including, Andrew Wilson, Leroy Orange, Leonard Kidd, Gregory Banks, David Bates, and Leonard Hinton by Defendants Burge, Byrne, Dignan, and other Area 2 conspirators .

SMITH-000775

w.  The sworn testimony given by Area 2 detective Dennis McGuire at his Federal Court deposition on November 16, 2006 in the case of *Orange v. Burge*, denying, *inter alia*, witnessing, participating in, or having knowledge of, the torture and abuse of suspects at Area 2, including, Andrew Wilson, Leroy Orange, Leonard Kidd, and Melvin Jones;

x.  The answers denying knowledge of, or participation in, the torture and abuse of Leroy Orange and Leonard Kidd, filed in Federal Court in the case of *Orange v. Burge* by co-conspirators Flood, McGuire, Bajenski, and Dioguardi on November 9, 2006;

y.  The answer denying, *inter alia*, knowledge of, or participation in, the torture and abuse of Madison Hobley, filed in Federal Court in the case of *Hobley v. Burge* by Patrick Garrity on August 21, 2006;

z.  The answers denying knowledge of, or participation in, *inter alia*, the torture and abuse of Madison Hobley, filed in Federal Court in the case *Hobley v. Burge* by Area 2 detectives Paladino, Robert Dwyer, and Lotito on September 13, 2006;

aa.  The December 7, 2006 sworn interrogatory answers given by Raymond Binkowski in *Cannon v. Burge* denying any and all torture and abuse;

bb. The November 27, 2006 sworn interrogatory answers given by Raymond Madigan in *Cannon v. Burge* denying any and all torture and abuse;

cc.  The December 8, 2006 sworn interrogatory answers given by John Byrne in *Cannon v. Burge* denying any and all torture and abuse;

dd.  The December 18, 2006 sworn interrogatory answers given by Peter Dignan in *Cannon v. Burge* denying any and all torture and abuse;

8

SMITH-000776

ee.  The December 1, 2006 sworn deposition answers given in *Cannon v. Burge* by Michael Bosco denying knowledge of, or participation in, any acts of torture;

ff.  The December 4, 2006 sworn deposition answers given in *Cannon v. Burge* by Raymond Madigan denying knowledge of, or participation in, any acts of torture;

gg.  The December 14, 2006 sworn deposition answers given in *Cannon v. Burge* by Raymond Binkowski denying knowledge of, or participation in, any acts of torture;

hh.  The December 15, 2006 sworn deposition answers given in *Cannon v. Burge* by John Byrne denying knowledge of, or participation in, any acts of torture including, but not limited to, Darrell Cannon and Gregory Banks;

ii.  The December 29, 2006 sworn deposition answers given in *Cannon v. Burge* by Peter Dignan denying knowledge of, or participation in, any acts of torture including, but not limited to, Darrell Cannon and Gregory Banks;

jj  The April 13, 2007 sworn deposition answers given by John Paladino in *Hobley v. Burge* denying knowledge of, or participation in, any acts of torture.

kk.  The wholesale invocation of the Fifth Amendment in 2004, 2005, and 2006 in Federal Court depositions and interrogatory answers by Burge, John Byrne, Peter Dignan and more than 25 other Area 2 co-conspirators.

**6. 2004-2006: State Court Special Prosecutor Proceedings**

a.  The answers concerning the 2/25/82 Brzeczek letter reporting Andrew Wilson's torture to State's Attorney Richard M. Daley and related evidence given by Daley in his June 12, 2006 sworn statement to the Special Prosecutor, including those that were at variance with answers that he previously gave in an unsworn February 2, 2006 statement to the Special Prosecutor, particularly one answer given on the subject of

9

SMITH-000777

his knowledge of the Brzeczek letter. This answer was given after his lawyer interrupted the answer Daley was originally giving, and suggested a different answer which he then parroted;

      b. The answers concerning the Brzeczek evidence given by Daley in his February 2, 2006 statement to the Special Prosecutor;

      c. The answers given by State's Attorney Richard Devine to the Special Prosecutor in his June 15, 2006 sworn statement and in his previous unsworn statement, *inter alia*, concerning his and State's Attorney Daley's knowledge of the Brzeczek evidence;

      d   The answers given in his April 19, 2006 sworn statement by Leroy Martin to the Special Prosecutor concerning his knowledge of torture and abuse;

      e. The answers given in his June 2, 2004 sworn statement by co-conspirator Dennis Dernbach to the Special Prosecutor concerning his knowledge of torture and abuse;

      f. The answers given in her January 16, 2006 statement by Mayor Jane Byrne to the Special Prosecutor;

      g. The testimony of Daniel McWeeny, Patrick Garrity, and two other Area 2 detectives denying torture and abuse given before the Special Prosecutor's Special Grand Jury in October and November of 2005;

      h. Two statements denying torture and abuse which were given to the Special Prosecutor by Defendant John Byrne in August of 2004, and his contemporaneous attempt to further manipulate the Special Prosecutors by offering to give an unsworn,

SMITH-000778

court-reported statement denying torture and abuse the day after he appeared before the Special Grand Jury and took the Fifth Amendment;

  i. The wholesale invocation of the Fifth Amendment before the Special Prosecutor's Grand Jury in 2004 by Burge, John Byrne, and more than 25 other Area 2 co-conspirators.

**7. 1982 -2004: Intimidation of and interference with Witnesses and Lawyers**

  a. Defendant Jon Burge's 1982 physical threat - - - pointing a gun at the back of his head in front of other Area 2 detectives - - - of Area 2 detective and whistleblower Frank Laverty who was a State and Federal Court witness exposing the illegal Area 2 police practice of suppressing exculpatory evidence;

  b. Burge's 1983 attempt to intimidate African-American detectives who reported to then Area 2 Commander Leroy Martin his discriminatory exclusion of African-American detectives from homicide investigations;

  c. Burge's and several of his co-conspirators' 1989 attempt to identify and to intimidate a potential whistleblower witness who had anonymously revealed the existence and members of Burge's torture ring to Wilson's lawyers in the pending Federal Wilson civil rights case;

  d. Burge's 1990 threat against lawyers from the Peoples Law Office who were then representing Andrew Wilson in his Federal civil rights litigation, that he would "blow them away with a shotgun" if he was fired by the Chicago Police Department;

  e. McWeeny's September 2004 intimidation of torture victim and witness David Bates at his home;

11

SMITH-000779

f. Robert Dwyer's post April 2002 intimidation of his sister, Eileen Pryweller, who was a witness to admissions of torture made by Burge and Dwyer;

g.. The attempted intimidation of African-American Area 2 detective Doris Byrd by co-conspirator Peter Dignan through a Captain of police.

**8. 1982-Present: Refusal to Investigate or Prosecute for Torture and Related Crimes**

a. State's Attorney Daley, First Assistant Devine, First Deputy William Kunkle and their ASA subordinates' refusal to investigate or prosecute Burge and his men in 1982 after beng informed by Superintendent Brzeczek of evidence that Andrew Wilson was tortured and abused;

b. Superintendent Brzeczek and his subordinates' refusal to investigate or discipline Burge and his men for torturing Wilson;

c. Mayor Richard M. Daley, Superintendent Leroy Martin, the Cook County State's Attorney's Office and their subordinates' refusal to investigate or seek indictments against Burge and his men in 1991 and 1992 after the OPS findings of systematic Area 2 abuse and torture were submitted to them;

d. Superintendent Terry Hillard's refusal to investigate or seek charges in 1998 and 1999 after he was informed that OPS Director Gayle Shines had suppressed findings of torture and abuse and that there were scores of additional torture cases that had never been investigated;

e. State's Attorney Devine's refusal to investigate, prosecute, or recuse himself for conflict of interest, from 1996 to 2002, despite the overwhelming evidence that there was a pattern of torture and abuse at Area 2 and Area 3 that was presented to him and his SAO subordinates.

12

SMITH-000780

# Appendix B

**SUMMARY OF JUDICIAL, EXECUTIVE, AND ADMINISTRATIVE FINDINGS
AND ADMISSIONS CONCERNING SYSTEMIC CHICAGO POLICE TORTURE
AT AREA 2 AND AREA 3**

SMITH-000781

**SUMMARY OF JUDICIAL, EXECUTIVE, AND ADMINISTRATIVE FINDINGS AND ADMISSIONS CONCERNING SYSTEMIC CHICAGO POLICE TORTURE AT AREA 2 AND AREA 3**

1. In *Wilson v. City of Chicago*, 86-C-2360, the City of Chicago, who was a Defendant in that case, admitted in its Amended Answer, dated July 13, 1995, that Andrew Wilson was tortured by Jon Burge on February 14, 1982.

2. On May 15, 1995, the City of Chicago admitted that Melvin Jones had been electrically shocked by Jon Burge on his genitals and thigh with a device in a wooden box and threatened with a gun, while he was handcuffed to a ring in the wall in an Area 2 interview room in an attempt to coerce a confession from him. Local Rule 12 N Statement of the City, ¶ 26.

3. On January 28, 1991, Amnesty International issued a Report calling for "a full inquiry into allegations that Chicago police systematically tortured criminal suspects from 1972 to 1984," *Chicago Sun Times*, 1/28/91, "Police Torture Probe Sought Here."

4. On November 2, 1990 OPS Director Gayle Shines approved as "compelling" and forwarded to Superintendent Martin the 25 page Report and findings made by OPS investigator Michael Goldston concerning allegations of torture and abuse at Area 2. This Report included the following findings:

> As to the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse.
> The number of incidents in which an Area 2 command member is identified as an accused can lead to only one conclusion. Particular command members were aware of the systematic abuse and participated in it either by actively participating in same or failing to take any action to bring it to an end. This conclusion is also supported by the number of incidents in which Area 2 offices are named as the location of the abuse.

1

SMITH-000782

OPS Special Project Conclusion Reports and Findings, and Cover Letter, Shines to Martin, dated

November 2, 1990 (Goldston Report).

5. On or about November 2, 1990, OPS Director Gayle Shines also approved "as

compelling" and forwarded to Superintendent Martin the 66 page report and conclusions of OPS

investigator Francine Sanders which found that based on "the overwhelming body of evidence

which supports the allegations" that administrative charges of excessive force should be

sustained against Jon Burge and John Yucaitis including that they "repeatedly administered

electrical stimulation to Mr [Andrew] Wilson's body in order to create pain" and that Burge

"held Mr. Wilson, while handcuffed, against a hot radiator causing burns to Mr. Wilson's face,

chest and thigh." Chicago Police Office of Professional Standards (OPS) Special Investigative

Report and Findings, October 26, 1990 (Sanders Report), pp.62-66.

6. In their Memorandum In Opposition To Motion To Bar Testimony Concerning Other

Alleged Victims of Police Misconduct, filed on January 22, 1992 before the Police Board in the

*Matter of Charges Filed against Respondents Jon Burge, John Yucaitis and Patrick O'Hara,*

Cases # 1856-58, specially appointed City of Chicago lawyers, on behalf of Chicago Police

Superintendent Leroy Martin and the City of Chicago, made the following judicial admission

concerning the testimony of "seven additional victims of torture tactics at Area II headquarters:"

> The testimony regarding similar acts sets forth detailed accounts of tortuous treatment
> that are almost identical to the torture suffered by Andrew Wilson. The testimony reveals
> an astounding pattern or plan on the part of respondents [Burge, Yucaitis and O'Hara] to
> torture certain suspects, often with substantial criminal records, into confessing to crimes
> or to condone such activity.

Memorandum In Opposition To Motion To Bar Testimony Concerning Other Alleged Victims

of Police Misconduct, p. 1.

SMITH-000783

7. In *Wilson v. City of Chicago*, 120 F.3d 681, 683-85 (7th Cir. 1997), the Seventh

Circuit Court of Appeals held that Defendant Burge acted within the scope of his employment

with the City "when he tortured Wilson," stating:

> Burge was not pursuing a frolic of his own. He was enforcing the criminal law of Illinois overzealously by extracting confessions from criminal suspects by improper means. He was, as it were, too loyal an employee. He was acting squarely within the scope of his employment.

8. In January of 1994, OPS Investigator [Tillman] Messenger entered sustained findings,

which were subsequently approved by her supervisor, on the following allegations made by

Darrell Cannon in CR #134723:

a)  Area 2 Sergeant John Byrne struck Cannon with a cattle prod on his testicles and penis and in his mouth;
b)  Sergeant Byrne repeatedly called Cannon a "nigger;"
c)  Sergeant Byrne held a 9 mm handgun to Cannon's head;
e)  Sergeant Byrne attempted to lift Cannon by the handcuffs;
d)  Area 2 Detective Peter Dignan played Russian roulette with a shotgun with Cannon;
e)  Detective Dignan attempted to lift Cannon by his handcuffs;
f)  Detective Dignan put a shotgun to Cannon's head;
h)  Area 2 Detective Charles Grunhard lifted Cannon up while Byrne held onto the cuffs.

9. On December 16, 1993 Office of Professional Standards investigator Leutie

Lawrence made the following sustained findings against Area 2 Detectives Boffo, Lotito and

Dignan on allegations made by Philip Adkins in CR # 142201:

a)  Detective Boffo violated Rule 8, maltreatment of any person, by repeatedly striking Adkins about the body and groin area with a flashlight on June 7, 1984;
b)  Detective Lotito violated Rule 8, by striking Adkins repeatedly about the body with a flashlight on June 7, 1984;
c)  Detective Lotito violated Rule 14, making a false report, by stating to OPS that he had seen injuries to Adkins prior to arresting Adkins while Adkins was in his house the morning of June 7, 1984 and for falsely stating that Det. Boffo had not been in the car while he was transporting Adkins;

3

SMITH-000784

d)      Sergeant Dignan violated Rule 14, making a false report, for writing in a police report dated June 15, 1984, and for stating to OPS on November 18, 1993, that he had observed injuries to Adkins' chest and torso while inside Adkins' house prior to his arrest on June 7, 1984.

.

10.    In June of 1993 OPS investigator Robert Cosey made the following sustained findings against four accused Area 2 officers on allegations made by Gregory Banks in CR # 188617:

a.     Sergeant Byrne violated Rule 6 by failing to report to OPS the use of excessive force against Gregory Banks;

b.     Sergeant Byrne violated Rule 14 by making a false report by testifying falsely before Judge Robert Sklodowski on June 3, 1985, that Gregory Banks was not physically abused in police custody;

c.     Sergeant Byrne violated Rule 8 by kicking Gregory Banks on October 29, 1983;

d     Sergeant Byrne violated Rule 6 by failing to report to a supervisor the use of excessive force against Banks;

e)     Sergeant Byrne violated Rule 14 by making a false report by giving a false statement to OPS that Banks was not injured while in police custody;

f)     Detective Peter Dignan violated Rule 6 by failed to report to a supervisor the use of excessive force against Banks;

g)     Detective Peter Dignan violated Rule 14 by giving false information while providing a statement to OPS about Banks;

h.     Detective Robert Dwyer violated Rule 6 by failing to report to a supervisor the use of excessive force against Banks;

i)     Detective Robert Dwyer violated Rule 14 by giving false information while providing a statement to OPS about Banks.

j)     Detective Charles Grunhard violated Rule 8 by kicking Gregory Banks about the body while he lay handcuffed on the floor during his interrogation;

k)     Detective Charles Grunhard violated Rule 6 by failing to report to a supervisor the use of excessive force against Banks;

l)     Detective Charles Grunhard violated Rule 14 by giving false information while providing a statement to OPS about Banks

CR 188617, Cosey Summary Report.

11.   On January 11, 1994, OPS investigator Leutie Lawence entered the following sustained findings against Area 2 detectives and supervisors on allegations made by Stanley

4

SMITH-000785

Howard in CR # 142017:

a.   Sergeant Byrne violated Rule 8, maltreatment of any person, by repeatedly striking
     Howard about the body with his fists inside interview room # 4 at Area on
     November 3, 1984;

b)   Sergeant Byrne violated Rule 8, maltreatment of any person, by repeatedly
     kickingHoward's left leg inside interview room 4 at Area 2 on November 3, 1984;

c)   Detective Boffo violated Rule 8, maltreatment of any person, by repeatedly
     kicking Howard about the body inside interview room # 4 at Area on November
     3, 1984;

d)   Detective Boffo violated Rule 8, maltreatment of any person, by repeatedly
     striking Howard about the body inside interview room # 4 at Area on November
     3, 1984;

e)   Detective Lotito, violated Rule 8, maltreatment of any person, by repeatedly
     striking Howard about the body with his fists inside interview room # 4 at Area
     on November 3, 1984;

f)   Detective Lotito, violated Rule 8, maltreatment of any person, by jerking
     Howard's body in the air causing the handcuffs to cut into Howard's wrists inside
     interview room # 4 at Area on November 3, 1984.

Summary Report, CR 142017.

12.   OPS investigator [Tillman] Messenger testified in *People v. Cannon* that she

recommended that OPS allegations be sustained against Peter Dignan for using excessive force

during interrogation against Lee Holmes.  An OPS memorandum indicates that she also found

violations of Rule 8 against Dignan and Area 2 detective Dioguardi for hitting Holmes with a

rubber hose and placing a plastic bag over Holmes' head.  *People v. Cannon,* 11/2/99, p. 46;

Shines Memo, 12/21/94).

13.   In September of 1992 Judge Earl Strayhorn granted a motion to suppress an alleged

Area 3 torture victim's confession which was extracted under the supervision of then Area 3

Commander John Burge and Area 3 Sergeant John Byrne, finding that:

> Given the atmosphere that existed in that District with eleven people under suspicion in
> custody in the same location the atmosphere must have been horrendously oppressive and
> I am going to suppress the statements

5

SMITH-000786

*People v. Clemon*, 259 Ill. App.3d 5, 8 (1994). The Illinois Appellate Court subsequently affirmed Judge Strayhorn's granting of the motion to suppress. *People v. Clemon*, 259 Ill. App.3d 5, (1994).

14. On February 11, 1993., the Chicago Police Board ordered that Jon Burge be separated from the Chicago Police Department and John Yucaitis be suspended for 15 months for torturing and physically abusing Andrew Wilson. *In The Matter of the Charges Filed Against Jon Burge*, No. 91-1856 (Chicago Police Board, February 11, 1993).

15. On February 10, 1994, Cook County Circuit Court Judge Thomas O'Brien affirmed the Police Board's order separating Burge and suspending Yucaitis, and on December 15, 1995, the Illinois Appellate Court affirmed Judge O'Brien's ruling. *Burge v. Police Board of the City of Chicago*, No. 93 CH 2265, (Circuit Court of Cook County, February 10, 1994); *Burge, O'Hara and Yucaitis v. Police Board of the City of Chicago,* No. 1-94-999, 1-94-2462, 1-94-2475 (consolidated) (Ill. App. Ct., December 15, 1995, unpublished)

16. On May 9, 1997, Federal Judge Ruben Castillo, while ordering the public release of numerous police disciplinary files which contained allegations and findings of Area 2 torture and abuse, found:

> As Martin Luther King, Jr. stated in his now famous letter from the Birmingham County Jail in April of 1963: Like a boil that can never be cured as long as it is covered up but must be opened with all its pus-flowing ugliness to the natural medicines of air and light, injustice must likewise be exposed, with all of the tension its exposing creates, to the light of human conscience and the air of national opinion before it can be cured. Similarly, this Court concludes that the allegations of police misconduct contained in the disputed files must be exposed to the light of human conscience and the air of natural opinion.

*Wiggins v. Burge*, 173 F.R.D. 226, 230 (N.D.Ill 1997).

SMITH-000787

17.  On January 10, 2003, Illinois Governor George Ryan granted four Burge death row torture victims, Plaintiffs Aaron Patterson, Madison Hobley, Leroy Orange and Stanley Howard, pardons on the basis of innocence, finding:

> The category of horrors was hard to believe.  If I hadn't reviewed the cases myself, I wouldn't believe it. We have evidence from four men, who did not know each other, all getting beaten and tortured and convicted on the basis of the confessions they allegedly provided. They are perfect examples of what is so terribly broken about our system.

Statement of Governor George Ryan, Depaul University School of Law, January 10, 2003.

18.  In *U.S. ex. rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1094 (N.D.Ill. 1999),

Judge Shadur found the following in his decision:

> It is now common knowledge that in the early to mid-1980s Chicago Police Commander Jon Burge and many officers working under him regularly engaged in the physical abuse and torture of prisoners to extract confessions. Both internal police accounts and numerous lawsuits and appeals brought by suspects alleging such abuse substantiate that those beatings and other means of torture occurred as an established practice, not just on an isolated basis.

19.  In her concurring opinion in *Hinton v. Uchtman*, 395 F 3d 810, 822-23 (7th Cir 2005), Seventh Circuit Court of Appeals Judge Diane Wood found:

> [T]he claim Hinton has made regarding his confession illustrates dramatically the high price our system of criminal justice pays when police abuse runs rampant: a cloud hangs over everything that the bad actors touched  . . . [A] mountain of evidence indicates that torture was an ordinary occurrence at the Area Two station of the Chicago Police Department during the exact time period pertinent to Hinton's case. Eventually, as this sorry tale came to light, the Office of Professional Standards Investigation of the Police Department looked into the allegations, and it issued a report that concluded that police torture under the command of Lt. Jon Burge — the officer in charge of Hinton's case — had been a regular part of the system for more than ten years. And, in language reminiscent of the news reports of 2004 concerning the notorious Abu Ghraib facility in Iraq, the report said that "[t]he type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture." The report detailed specific cases, such as the case of Andrew Wilson, who was taken to Area Two on February 14, 1982. There a group led by Burge beat Wilson, stuffed a bag over his head, handcuffed him to a radiator, and repeatedly administered electric shocks to his ears, nose, and genitals. See People v. Wilson, 506 N.E.2d 571 (Ill.

7

SMITH-000788

1987). Burge eventually lost his job with the police, though not until 1992. See In the Matter of the Charges Filed Against Jon Burge, No. 91-1856 (Chicago Police Board, February 11, 1993). To this day, Burge has not been prosecuted for any of these actions, though it appears that he at least thinks that he may still be at some risk of prosecution. See, for example, "Cop brutality probe must be thorough, fair," Chi. Sun-Times, May 16, 2002 (editorial); Hal Dardick, "Burge repeatedly takes 5[th]; Former police commander stays mum on torture questions," Chi. Tribune, Sept. 2, 2004 (noting allegations that Burge or people reporting to him had tortured 108 Black and Latino suspects between August 1972 and September 1991). . . .Behavior like that attributed to Burge imposes a huge cost on society: it creates distrust of the police generally, despite the fact that most police officers would abhor such tactics, and it creates a cloud over even the valid convictions in which the problem officer played a role. Indeed, the alleged conduct is so extreme that, if proven, it would fall within the prohibitions established by the United Nations Convention Against Torture ("CAT"), which defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession . . .," thereby violating the fundamental human rights principles that the United States is committed to uphold. . . .

20. The following criminal defendants who have alleged torture and abuse by Area 2 or

3 detectives have received new hearings or trial, or had their confessions suppressed, on the

basis of evidence of Area 2 or 3 torture and abuse in the following cases:

a.  Andrew Wilson : *People v. Wilson*, 116 Ill.2d 29 (1987);
b.  Darrell Cannon:  *People v. Cannon*, 293 Ill. App. 3d 634 (1997);
c.  Aaron Patterson: *People v. Patterson*, 192 Ill. 2d 93, (2000);
d.  Gregory Banks:  *People v. Banks*, 192 Ill. App. 3d 986 (1989);
e.  David Bates:  *People v. Bates*, 267 Ill. App. 3d 503, 505 (1994);
f.  Derrick King:  *People v. King*, 192 Il. 2d 189 (2000);
g.  Stanley Howard: *People v. Howard,* 84 C 13134. (Ill. Sup. Ct. Order of 6/18/99);
h.  Jesse Clemon:  *People v. Clemon*, 259 Ill. App.3d 5, (1994).

21.  On April 24, 2002, Judge Paul Biebel, Chief Judge of the Cook County Criminal

Division, finding the State's Attorney Richard Devine had a conflict of interest, appointed

Special Prosecutors Edward Egan and Robert Boyle to investigate allegations of police torture

and abuse at Area 2 and Area 3.

8

SMITH-000789

22.  In an affidavit executed in August of 2004, Richard Brzeczek averred that he was

the Chicago Police Superintendent  from January 11, 1980 until April 29,1983, and  that he

made the following true and accurate statements to *Chicago Tribune* reporter Steve Mills which

appeared in an April 29 2002 *Chicago Tribune* article:

> Twenty years later, Brzeczek, now a defense attorney, said that there is 'no doubt in my
> mind' that Burge and his detectives tortured some suspects. The whole situation at Area
> 2  [was] a disgrace and an embarrassment. It's time something is done about it,"
> Brzeczek said, referring to the former Burnside station on the southside where most of
> the torture allegedly occurred.

Id., ¶¶ 4-5.

23.   On October 19, 2005, the Inter-American Commission for Human Rights of the

Organization of American States held a hearing on the question of Area 2 torture and is presently

considering whether to hold a highly unusual on-site visit to question, *inter alia*,  Mayor Richard

Daley, Cook County State's Attorney Richard Devine, and victims of torture concerning the

police torture scandal.

24.   On May 19, 2006, the ten person United Nations Committee Against Torture made

the following findings:

> The Committee is concerned with allegations of impunity of some of the State
> party's [U.S. Government's] law  enforcement personnel in respect to acts of
> torture or cruel, inhuman or degrading treatment or punishment. The Committee
> notes the limited investigation and lack of prosecution in respect of the allegations
> of torture perpetrated in Areas 2 and 3 of the Chicago Police Department (article 12).
>
> **The State party should promptly, throughly and impartially investigate all
> allegations of acts of torture or cruel, inhuman or degrading treatment or
> punishment by law enforcement personnel and bring perpetrators to justice,  in
> order to fulfill its obligations under article 12 of the Convention. The State party
> should also provide the Committee with information on the ongoing investigations
> and prosecution relating to the above-mentioned case**.

9

SMITH-000790

5/19/06 Conclusions and Recommendations of the U. N. Committee Against Torture, paragraph 25, p. 7 (bold in original).

25. On May 19, 2006, Chief Cook County Criminal Court Judge Paul Biebel, after

finding that "over the past 30 years, the public has demanded to know why no complete

investigation was ever conducted into the [torture] allegations," and that there have been

"allegations of a cover-up by high ranking police and government officials," ordered that the

Report of the Special Prosecutor in the Burge torture investigation be made public, finding that:

[T]he [Special Prosecutor's investigation] was ordered because of an "open sore" on the civic body of the City of Chicago which has festered for many years. The Court finds the interests of justice require full publishing of the Special Prosecutor's Report, including certain materials relating to the Grand Jury.

Memorandum Opinion and order of 5/19/06, pp. 9, 17-18.

26. On July 19, 2006, the Special Prosecutors issued their Report and elaborated on

them at a press conference. Among their findings were the following:

That the evidence established beyond a reasonable doubt that "Jon Burge and at least one other officer [John Yucaitis] committed armed violence, intimidation, official misconduct, and aggravated battery when they abused Andrew Wilson at Area 2 on February 14, 1982, and committed perjury when they testified at Wilson's first trial on November 9, 1982." (Report, p. 16)

That the evidence established beyond a reasonable doubt that Area 2 Detectives Anthony Maslanka and Michael McDermott physically abused Alphonso Pinex and committed aggravated battery, perjury, and obstruction of justice. (Id.)

That the evidence established beyond a reasonable doubt that Area 2 Detectives James Lotito and Ronald Boffo abused Philip Adkins and committed aggravated battery against him. (Id.)

That there were "many other cases" in which the Special Prosecutors "believed" that the persons (including Melvin Jones, Shaded Mumin, and Michael Johnson) were abused but "proof beyond a reasonable doubt [was] absent." (Id.)

That Jon Burge, the commander of the Violent Crimes Section of Detective Areas 2

10

SMITH-000791

and 3, was "guilty [of] abus[ing] persons with impunity," and that it therefore "necessarily follows that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they." (Id.)

That Police Superintendent Richard J. Brzeczek was guilty of a "dereliction of duty" and "did not act in good faith in the investigation of Andrew Wilson," that he "believed at the time that officers at Area 2 had tortured Andrew Wilson," and that he "kept Burge in command at Area 2, and issued a letter of commendation to all of the detectives at Area 2." (Id., p. 17)

That Brzeczek "received and believed evidence that a prisoner [Andrew Wilson] had been brutalized by the Superintendent's subordinates, that the prisoner had confessed, that those subordinates had testified under oath on a motion to suppress and before a jury and he had to believe, they testified perjuriously, *that the prisoner had been sentenced to death,* and that for 20 years the Superintendent still remained silent." (*emphasis in original*) (Id., pp. 86-87)

That the U.S. Court of Appeals for the Seventh Circuit in its 1993 consideration of the City's liability in the Wilson civil case was misled concerning the Superintendent's contemporaneous knowledge that Burge and his subordinates tortured Wilson because Brzeczek concealed those views until after the case was concluded. (Id., pp. 87-88)

That the Chief of Felony Review of the States Attorneys' Office, Lawrence Hyman, gave "false testimony" when "he denied that Andrew Wilson told him he had been tortured by detectives under the command of Jon Burge." (Id., p. 54)

That no meaningful police investigation was conducted, nor any police witness questioned in either the Wilson case, or in the Michael Johnson electric-shock case, which occurred a few months after Wilson, and had "glaring similarities" to the Wilson allegations. (Id. pp. 71-73; 88)

That "something should have been done about the disgrace and embarrassment [at Area 2] 24 years ago" by the Chicago Police Superintendent. (Id. p. 89)

That if action had been taken against Jon Burge at the time of the Andrew Wilson case, or even shortly thereafter, the appointment of the Special Prosecutors would not have been necessary. (Id. p. 88)

That this action, should have included, "at the very least," the Superintendent's removal of Burge from any investigative command and a "complete shake-up at detective Area 2." (Id., p. 88)

27.   In a press statement made by the Mayor of the City of Chicago on July 21,

2006, he made the following admissions binding on himself, his office, the City of Chicago, its

11

City Council and its police department:

    a. That the City "strongly supported the release" of the "Special Prosecutor's Report on the practice of abuse and torture of suspects in the 1970's and 1980's at the Calumet Police District" [Area 2] because "the public has the right to know about this shameful episode in our history." (Daley Statement, p. 1);

    b. "no suspect should be subjected to the abuses detailed in [the Special Prosecutor's] Report, and no suspect should ever be coerced into confessing to crimes he did not commit." This "fundamentally undermines our system of justice and destroys public confidence. It should never happen." (Daley Statement, p. 1);

    c. That Burge and his Unit participated in a "pattern of misconduct" (Statement, p. 2)

SMITH-000793

# Appendix C

**107  KNOWN BURGE AREA 2 AND 3 TORTURE VICTIMS 1972-1991**

SMITH-000794

## 107  KNOWN BURGE AREA 2 AND 3 TORTURE VICTIMS 1972-1991

| DATE | VICTIM | TORTURE METHODS | OFFICERS | DOCUMENTATION |
|------|--------|-----------------|----------|---------------|
| 8/5/72 | Rodney Mastin Lindsey Smith Clarence Hill | vicious beatings, beating with ashtray, kicked in groin** | Burge,* Listkowski, Houtsma (Area 2)*** | 7/24/04 Sworn Statement of Rodney Mastin |
| 9/72 | Unknown victim | screaming, pants down, hiding implements, handcuffed to hot radiator** | Burge* and two unidentified dets. | 10/4/04 Sworn statement of Detective Bill Parker |
| 5/30/73 | Anthony Holmes | repeatedly bagged, beaten, electric shocked with black box, called "nigger"** | Burge,* Pienta* Yucaitis,**** Wagner* Hoke* Listkowski Gaffney | 4/19/04 Court Reported statement of Anthony Holmes; Judicial Admissions by City in Memo filed 1/22/92 |
| 1973 | Lawrence Poree | shown black shock box, "this is what we got for niggers like you"** | Burge,* Hoke,* Wagner* Corless**** | 4/19/04 Court reported statement of Lawrence Poree |
| 1973 | Lawrence Poree | electric shock to testicles, armpits, arm, beaten** | Burge,* Hoke* | 4/19/04 Statement of Lawrence Poree |
| 1975 | unknown victim | electric shock | Burge | Witness statement on WLS TV 7 |
| 12/73 | Howard Collins | beaten, Russian Roulette, noose around neck ** | Burge,* Hoke* | 4/89 Attorney Interview |
| 9/25/77 | Virgil Robinson | beaten with flashlight and police helmet, gun in mouth at railroad tracks** | Dignan,* McGuire* Yucaitis**** | Testimony in *People v. Robinson* |
| 8/7/79 | Lawrence Poree, Leroy Sanford | Electric shocked, beaten, hit with gun** beaten** | Burge* Wagner* Corless**** Basile* Gallagher | 3/10/80 Testimony in *People v. Sanford* et.al; 4/19/04 Poree Statement |

SMITH-000795

| 11/13/79 | James Lewis Edward James | kidnapped from Memphis, beaten, threatened with horror chamber and Fred Hampton Black Panther murder, ear cupped, "nuts" threatened, called "nigger"** | Burge* Wagner* Corless,**** Basile* Gallagher | 3/10/80 Testimony, *People v. James and Lewis*; 4/19/04 Court Reported statement of Edward James |
| --- | --- | --- | --- | --- |
| 9/20-22/79 | George Powell | repeatedly electric-shocked on chest, groin, bagged, beaten** | Burge* Corless**** Basile* Hoke* | 6/14/04 Court Reported Statement of George Powell; 1/22/92 Judicial Admissions by City |
| 9/20-22/79 | Ollie Hammonds | repeatedly beaten, threatened with electric shock on penis, held incommunicado without food or bathroom for several days** | Burge* Basile* | 8/25/04 Court Reported Statement of Ollie Hammonds |
| 9/28/-29/79 | Tony Thompson | beaten with gun and fists until face totally swollen, 8-10 stitches, repeatedly electric shocked with dark box referred to as "nigger box" on genitals and chest, repeated racial epithets, Hampton murder referenced | Burge* Gorman Unidentified detective | 3/5/05 Sworn Statement Court Reported Statement of Tony Thompson; 5/22/81 Testimony in *People v. Porch, Thompson, and Golden* |
| 9/28-29/79 | Willie Porch | beaten, threatened with a gun (Russian Roulette), pistol whipped, hung by handcuffs, threatened with Fred Hampton murderer, stepped on groin** | Burge* Gorman | 5/22/81 Testimony in *People v. Porch, Thompson*, 6/27/89 Testimony in *Wilson v. City of Chicago* |

SMITH-000796

| 9/28-9/79 | Raymond Golden | threatened with gun (Russian roulette); smashed in the head with shotgun butt** | Burge* Gorman | 5/22/81 Testimony in *People v. Porch, Thompson, and Golden;* 6/27/89 Testimony in *Wilson v. Chicago* |
|---|---|---|---|---|
| 9/29/79 | Timothy Thompson | threatened to look like "Tony Puff face", beaten** | Burge* Gorman | 5/22/81 Testimony in *People v. Porch et. al* |
| 2/23/80 | Michael Coleman<br><br>Derrick King | beaten to the body, kicked in groin, stitches pulled out with tweezers**<br><br>beaten with a baseball bat to the body and with a phonebook** | Burge* Pienta* Dwyer* Basile* Corless**** | 11/20/80 Testimony in *People v. Coleman and King* |
| 2/20/81 | William Bracey | beaten, stomped on hand-cuffs, kicked on groin** | Hoke* O'Callahan | Post trial filings, *People v. Bracey* |
| 11/13/81 | Sylvester Green | bagged, beaten to body and head, repeatedly threatened and called "nigger," threatened his "balls"** | Burge* Grunhard**** McCabe**** McNally* | 3/4/83 Testimony in *People v. Green* |
| 2/5-6/82 | Melvin Jones | electric shocked on penis, thigh, foot, threatened to blow "black brains out" with gun to head, beaten** | Burge* Flood* McGuire* McWeeny* | 8/5/82 Testimony in *People v. Jones* and 2/92 at Police Board; 1/22/92 & 7/95 City judicial admissions |
| 2/9-2/12/82 | Larry Milan<br><br>Paul Mike | bagged and beaten**<br><br>beaten on bottoms of feet and testicles** | Unidentified officers under Burge's direct command during manhunt for | 1989 Testimony of Julia Davis, Mike, Johnson. Brown and Pinexes in |

SMITH-000797

| | Alphonso Pinex | beaten, threatened** | Andrew Wilson | *Wilson v. Chicago* |
|---|---|---|---|---|
| | Roy Brown | bagged, beaten** | Area 2 Lt. (Burge) | |
| | Walter Johnson | bagged, beaten** | | |
| 2/12/82 | Donald White | beaten to the body and head while bagged, threatened with a gun** | Burge* Yucaitis**** O'Hara**** Hill* McKenna* | 7/14/89 White Deposition in *Wilson v. Chicago* |
| | Dwight Anthony | beaten** | | |
| 2/13/82 | Donnell Traylor | bagged, threats, beaten** | Burge* | 1989 Attorney Interview |
| 2/14/82 | Andrew Wilson | bagged, threatened with a gun, beaten to body and head, electric shock to ears, genitals, burned on radiator, racial epithets** | Burge* Yucaitis**** Pienta* McKenna* Hill* O'Hara**** | Testimony of Andrew Wilson: *People. v. Wilson*, 11/12/82, 1989 *Wilson I and II* trials, and 2/92 Police Board; 2/11/93 Police Board Findings. |
| 2/14/82 | Jackie Wilson | threatened with electric shock and a gun** | O'Hara**** McKenna* | 11/8/82 Testimony of Jackie Wilson, *People v. Wilson* |
| 2/14/82 | Doris Miller | Held incommunicado for 20 hours, threatened, verbally abused, over heard screaming and torture of Andrew Wilson, forced to urinate in ashtray** | Burge* and company | 11/12/82 Testimony of D. Miller in *People v. Wilson*; deposition in *Wilson v. Chicago*. |
| 6/9/82 | Michael Johnson | beaten, electric shocked, threatened with a gun, called lawyer "nigger bitch" ** | Burge* | 6/9/82 OPS Statement, 7/6/82 FBI Statement, 6/14/89 Deposition in |

SMITH-000798

| | | | | *Wilson v. Chicago* |
|---|---|---|---|---|
| 9/10/82 | Lee Holmes | bagged, beaten to the body, beaten with a flashlight and rubber hose on penis** | Byrne* Dignan* Dioguardi* | 6/24/93 Holmes OPS Statement |
| 9/10/82 | Stanley Wrice | beaten to body, repeatedly hit with flashlight and black jack including on groin** | Byrne* Dignan* Dioguardi* | 1983 Testimony in *People v. Wrice, Benson*; 9/23/83 Wrice OPS Statement |
| 9/10/82 | Rodney Benson | beaten with piece of rubber with tape on both ends and with flashlight on groin, back, knee, chest and stomach, threatened with hanging, like they had other "niggers"** | Byrne* Dignan* Dioguardi* | 12/23/82 Benson verified motion to suppress in *People v. Benson, Wrice* |
| 9/10/82 | Bobby Williams | beaten on thighs and groin with long black flex object with ball on end** | Byrne* Dignan* Dioguardi* | 1983 Williams Testimony in *People v. Wrice, Benson et. al.*; 1/29/94 Williams OPS Statement |
| 1/1-1/2/83 | Eric Smith | repeatedly beaten on side, back and groin with lead pipe encased in rubber hose, repeatedly electric shocked on side and groin, while naked and handcuffed, forced to give false confession** | Dignan* Kushner Binkowski* Burge | 8/87 Testimony and Exhibits in *People v. Smith*; 1/2/84 OPS statement; 3/21/05 sworn court reported statement |
| 1/21/83 | Alonzo Smith | beaten to the body with stick, blackjack, kicked in groin, while bagged** | Byrne* Dignan* | 8/3/83 testimony in *People v. Smith*; 4/00 testimony in *People v. Cannon* |
| 4/26-8/83 | James Andrews | beaten with fists and flashlight** | McWeeny* Madigan* | 10/1/84 testimony in *People v.* |

SMITH-000799

|  |  |  |  | *Anderson* |
|---|---|---|---|---|
|  | David Faultneroy | beaten on head, back, ribs** |  |  |
| 9/2/83 | Jerry Mahaffey | beaten to the body while bagged, threatened with a gun, kicked in the groin** | Byrne* James Lotito* Grunhard,**** Boffo* Leracz* | 2/9/84, 2/16/84 Testimony in *People v. Mahaffey* |
| 9/2/83 | Reginald Mahaffey | Kicked in head, ribs, hit with flashlight, kicked in groin, beaten, bagged** | Byrne* James Lotito* Grunhard **** Boffo* | 2/10/,84, 2/13/84 Testimony in *People v. Mahaffey* |
| 10/28-29/83 | Gregory Banks | beaten to the body while bagged, threatened with a gun in mouth, beaten with a flashlight, said "we have something for niggers" while bagging him** | Byrne* Dignan* Grunhard**** Dwyer* | 5/17/85 testimony in *People v. Banks*; 1993 OPS sustained findings; 4/00 testimony in *People v. Cannon* |
| 10/28-29/83 | David Bates | beaten to the body while bagged, kicked in the groin, threatened** | Byrne* Grunhard**** Dwyer* | 5/17/85 testimony in *People v. Banks*; 4/00 testimony in *People v. Cannon* |
| 11/2/83 | Darrell Cannon | threatened with a gun, Russian roulette, mock execution, repeatedly electric shocked on testicles and penis, hung by his cuffs, repeatedly called "nigger"** | Byrne* Dignan* McWeeny* Grunhard**** | 3/27/84 Testimony in *People v. Cannon*; 1993 OPS Sustained findings; 8/27/04 Parole Board testimony |
| 11/18/83 | James Cody | beaten to the body with a flashlight, electric shocked on buttocks and testicles, threatened with castration, beating** | Paladino* Basile* McNally* | 4/23/84 Testimony in *People v. Cody* |
| 11/25/83 | Leonard Hinton | beaten to the body while bagged, hit with gun, repeatedly beaten, kicked in groin, repeatedly | Burge* Krippel Bajenski* Mokry* | 7/1/85 testimony in *People v. Hinton*. |

SMITH-000800

|  |  | electric shocked on genitals and in rectum** |  |  |
|---|---|---|---|---|
| 1/12-13/84 | Leroy Orange | beaten to the body while bagged, electric shocked on arm and buttocks and in rectum, testicles squeezed** | Burge* Flood* Bajenski* McGuire* McWeeny* Madigan* McCabe**** McNally* | 5/22/81 Testimony, *People v. Orange*; Orange Affidavit; 1/84 *Sun Times* Article; City Judicial Admissions of ½2/92; 1/03 innocence pardon |
| 1/12-13/84 | Leonard Kidd | bagged, beaten on head with phone book and stick, electric shocked on buttocks and genitals, and in rectum** | Burge* Flood* Bajenski* McGuire* McWeeny* Madigan* McCabe**** McNally* | 2/14/00 Kidd Affidavit; 1/84 *Sun Times* Article. |
| 1/28/84 | Lavert Jones | repeatedly beaten to body and head; beaten with a telephone book, club; kicked in genitals, called "nigger"** | Byrne* Dignan* Yucaitis**** | 3/5/87 Testimony, *People v. Jones* |
| 1/28/84 | Thomas Craft | beaten with a flashlight, choked, foot crushed, threatened with weapon to face and nose, strapped naked to cell bunk** | Dignan* Yucaitis**** Ryan | 8/20/ and 9/23/93 OPS statements; OPS sustained findings |
| 1/28/84 | Alex Moore | electric-shocked, beaten, repeatedly called "nigger" | Burge, Byrne, Dignan, McWeeny, Yucaitis | Special Prosecutor statement |
| 4/84 | Stephen Cavanero | phone book placed on head, hit on phone book with mag flashlight** | Burge* Dwyer* | Phone Interview, Statement |

Page 7 of 14

SMITH-000801

| 5/24/84 | Franklin Burchette | threatened with electric shock on testicles, sleep deprivation** | Burge* McDermott* DiGiacomo* Solecki | 10/21/85 Affidavit and Testimony in *People v. Burchette.* |
|---|---|---|---|---|
| 6/7/84 | Phillip Adkins | beaten to the body, beaten with a flashlight on body and groin, repeatedly called "nigger"** | Byrne* Yucaitis**** Boffo* Dignan* James Lotito* | Testimony in *People v. Cannon;* 1993 OPS sustained findings |
| 6/24-25/84 | Robert Billingsley | repeatedly beaten, kicked, gagged with paper in throat, whipped with phone books, bribed to drop OPS complaint** | Dwyer* Dignan* James Lotito* Yucaitis **** | OPS complaint; 4/2/04 Affidavit; 3/28/05 Court Reported Statement, Deposition |
| 10/28-29/84 | Terry Harris | choked, arm twisted, held in underwear overnight, repeatedly threatened, sexually derogatory comments** | Burge* Sgt. Wilson Marley* Maslanka* McGuire* Mokry* | 5/29/86 OPS Statement |
| 11/2-4/84 | Stanley Howard | beaten to the body while bagged, slapped and kicked until unconscious, called "nigger" ** | Byrne* McWeeny* Boffo,* Lotito* Paladino* Glynn* | 1/28/87 Testimony, *People v. Howard;* 1993 OPS sustained findings; 3/30/93 Affidavit; 1/03 innocence pardon |
| 3/21/85 | Jesse Winston | hanging after interrogation | Byrne* Dwyer* Yucaitis**** Grunhard | 1986, 1990 Winston OPS files |
| 5/31/85 | Lonza Holmes | beaten and kicked to the body, repeatedly hit on the head with a phone book, judo chops under neck** | Burge* Madigan* Dignan* | 12/12/86 Testimony, *People v. Holmes* |

SMITH-000802

| 6/28/85 | Alphonso Pinex | Severe beating | Maslanka, McDermott, Byrne | Testimony, *People v. Pinex,* OSP statement |
|---|---|---|---|---|
| 8/28/85 | LC Riley | repeatedly punched, slapped, kicked in ribs, stomach, face, hit in the groin with a rolled up newspaper** | Madigan* Dwyer* | 3/13/87 Testimony, *People v. Riley* |
| 10/9-11/85 | Mearon Diggins | repeatedly beaten on back and legs with flashlight during 2 ½ days of questioning, no food, water, or bathroom** | Paladino* Pienta* Burge* | OPS statement and pictures (destroyed); 7/5/04 Diggins Court Reported Statement |
| 10/10/85 | Terry Williams | beaten, screaming** | unidentified Area 2 detectives. | 7/5/04 Diggins Court Reported Statement |
| 10/30/85 | Shaded Mumin | pushed into wall, threatened with .44 magnum silver revolver to head, Russian Roulette, suffocated with typewriter cover until unconscious, threatened with worse treatment, repeatedly called "nigger" ** | Burge* Paladino* McDermott* Lacey | 5/13/87 Testimony, *People v. Mumin*; 2/92 Police Board Testimony on behalf of City; 1993 OPS file |
| 4/22-23/86 | Michael Arbuckle | threatened with electrocution, death, assaulted, threatened with beating, framing, told they wanted to get Aaron Patterson ** | Burge* Kolowitz | 6/4/86 Motion to Suppress in *People v. Arbuckle*, Arbuckle 2/8/95 Affidavit and 11/19/04 Deposition |
| 4/29-30/86 | Aaron Patterson | beaten to the chest and upper body while repeatedly bagged with typewriter cover nose held while bagged, | Burge* Byrne* Pienta* McWeeny* Marley* Madigan* | 3/30/88 Testimony in *People v. Patterson*; Patterson |

SMITH-000803

|  |  | threatened with a gun and with worse treatment, kicked, choked** | Pederson* ASA Troy other unidentified Area 2 Detectives. | Affidavit; etchings in bench; 8/11/00 decision in *People v. Patterson;* 1994 Affidavit of Dr. Martinez; 1/03 innocence pardon |
|---|---|---|---|---|
| 4/29-30/86 | Eric Caine | ear cupping, beating in chest, threats, sleep deprivation** | Pienta* Marley* Madigan* Brownfield* | 8/88 Motion to Suppress and 9/25/89 trial testimony, *People v. Caine* |
| 7/21-22/86 | Stephen Bell | repeatedly beaten to the head and body, head smashed into wall, kicked in groin, head and ribs, beaten with a phone book** | Byrne* Dignan* Boffo* Yucaitis**** | 11/20/86 Testimony in *People v. Tillman and Bell* |
| 7/21-23/86 | Michael Tillman | repeatedly bagged, beaten to body and head, threatened with a gun to head, thumb pressure to ears, beaten with flashlight and phone book** | Byrne* Dignan* Boffo* Yucaitis**** Hines | 11/21/86 Testimony in *People v. Tillman and Bell* |
| 8/10/-12/86 | Clarence Trotter | slammed against the wall, physical and mental brutality and held incommunicado for 36 hours | Madigan* Brownfield* Nitsche | post conviction Petition and testimony in *People v. Trotter* |
| 10/13/ 86 | Terrence Houston<br><br>Darrell Cleveland | beaten to the body,** electric shock, beaten with a flashlight<br><br>head slammed on table** | Pienta,* Marblocki, Hayes, John Lotito | 10/4/88 Terrence Houston Deposition in *Houston v. Marblocki;* Houston and Cleveland 1986 OPS Statements |
|  |  |  |  |  |

Page 10 of 14

SMITH-000804

| 11/12/86 | Andrew Maxwell | beaten to the body and face, kicked during interrogation | Paladino* Glynn,* Basile* McDermott* | 7/23/87 Testimony in *People v. Maxwell, Thompson, and Howard* |
|---|---|---|---|---|
| | Jerry Thompson | kicked, beaten with flashlight to body, slapped in face during interrogation | | |
| | Jeffrey Howard | kicked, slapped during interrogation | | |
| 1/6/87 | Madison Hobley | hit in chest, thumbs to neck, racial epithets, including "nigger," kicked in groin, beaten to the body while bagged, held nose while bagged, passed out, threatened to kill him during interrogation | James Lotito* Dwyer* Burge* McWeeny* Paladino* Garrity* Cline | 8/87 Hobley OPS Statement; 9/29/87 Testimony in *People v. Hobley;* Hobley Deposition; 1/03 innocence pardon |
| 11/6/87 | Robert Smith | beaten during questioning | Dwyer* | *People v. Smith* decision |
| 12/87-1/88 | Philip Walker | kicked, beaten, cuffed to steaming radiator, called "nigger;" ** | Kill* (Area 3) Garrity* (Polygraph) | 10/5/04 Sworn Philip Walker Statement |
| | Johnny Walker | beaten, kicked in groin, screaming;** | Kill* (Area 3) | Philip Walker statement |
| | Andre Wilk | 13 year old, beaten with flashlight, slapped into falsely naming Walker. ** | Kill* (Area 3) | 4/3/89 Testimony in *People v. Walker* |
| 4/17/88 | Grayland Johnson | beaten with flashlight, phone book, hung out window, head pushed into toilet, bagged ** | Eldridge Byrne* (Area 3) | Testimony in *People v Johnson*, OPS file, civil complaint in Johnson |
| 6/24/88 | Donald Torrence | beaten | Paladino* Maslanka* | *Torrence* Civil complaint |

SMITH-000805

| | | | (Area 3) | |
|---|---|---|---|---|
| 8/25-26/88 | Ronald Kitchen | beaten to the groin and body, beaten with a phonebook, with a black jack to groin, and with phone receiver during interrogation | Burge* Kill* Smith Byron (Area 3) | 2/2/90, 9/17/90 Testimony, *People v. Kitchen*; 12/12/96 Kitchen Affidavit; 12/18/96 Journey Affidavit |
| 12/29-12/31/89 | Keith Eric Johnson | Repeatedly slapped, beaten, kicked from chair, kicked, called "lying nigger" during 48 hours of interrogation | Sgt. Byrne, Paladino, Maslanka, Collins, Moser, McCann, Cesar | Testimony in People v. Johnson, Affidavit in Post conviction |
| 4/19-20/90 | Tony Anderson | beaten on ribs, thighs with nightstick, gun to head, threatened to "blow brains out," no food, water, or washroom during 2 day interrogation | at Area 2 by Paladino* Maslanka* (from Area 3), and McDermott* Gallagher (from Area 2) | 5/1/91 Testimony in *People v. Anderson* |
| 6/9/90 | Demond Weston | 17 years old, slapped, beaten, choked, hit with phonebook, threatened with hanging | Kill, Maslanka, Mosher | Factual Statement |
| 9/21/90 | Cortez Brown | beaten on chest and arms, and beaten on hands and legs with steel flashlight** | Paladino* Maslanka* (Area 3) | 11/8/91 Testimony in *People v. Brown* |
| 4/91 | Unknown 14 year old | electric shocked | unknown Area 3 detectives | *Chicago Sun Times* article by Deborah Nelson |
| 6/3-/4/91 | Keith Walker | repeatedly kicked, beaten, repeatedly electric shocked | McWeeny, blond detective, reddish-brown haired detective, McCann, Halloran, Caesar | Motion to Suppress and motion to suppress testimony in *People v. Walker* |

Page 12 of 14

SMITH-000806

| 6/5/91 | TyShaun Ross | beaten with nightstick on side, kicked on foot, pulled down pants, repeatedly electric shocked on groin and upper thighs, repeatedly called "nigger" during interrogation | McCann, Caesar McWeeny* (Area 3) | Ross OPS Statement of 7/16/91; 8/5/91 OPS Interview with Ross' Grandmother; Dr. Raba Letter |
|---|---|---|---|---|
| 8/8/91 | Jevon Delony<br><br>Maurice Delony | repeatedly punched in chest, slapped in face, back of head, threatened during interrogation<br><br>Punched to the floor | Area 3 Detectives | Testimony in *People v. Brooks and Delony*, Jevon Delony Affidavit of 10/2/97 |
| 9/25-26/91 | Marcus Wiggins | 13 year old, hit on head with flashlight; repeatedly hit in chest; electric shocked on hands with box like device, screamed, passed out ** | Paladino* Maslanka,* Kill* O'Brien Boudreau (Area 3) | 6/4/96 Wiggins Dep.; OPS file; Testimony of Myron James in *People v. Clemon*; Dr. Martinez report |
| 9/25-26/91 | Jesse Clemon<br><br>Imari Clemon<br><br>Damoni Clemon<br>Clinton Welton<br><br>Diyez Owen | beaten on hand, face, and stomach**<br><br>16 year old, beaten **<br><br>electric shocked **<br><br>16 year old, beaten with flashlight and fists **<br>16 year old, beaten to chest and stomach ** | | Testimony of James, Damoni Clemon, Clinton Welton, and Dyez Owen  in *People v. Clemon*; decisions in *People v. Clemons*, 259 Ill App. 3d 5 (1994) |
| 9/28/91 | Michael Peterson<br><br>Travis Richardson | choked, beaten, kicked, attempted burning with cigarette **<br>head slammed on table** | Paladino* Maslanka* O'Brien (Area 3) | 8/11/04 Richardson Affidavit; OPS Statements |

SMITH-000807

| 11/22/91 | Ivan Smith | slapped in face, back of head, punched in chest, thrown to floor, open phone book placed on chest, repeatedly hit with stick on phone book, at Tennessee jail** | O'Brien Stehlik (Area 3) | 4/15/94 Testimony in *People v. Brooks* |
|---|---|---|---|---|

\* **Took Fifth Amendment when asked about this torture.**
\*\* **Torture and abuse occurred during interrogation.**
\*\*\***All cases from 8/5/72 through 11/6/87 are Area 2 cases, except for the unknown victim in 1975 which took place at Area 2**
\*\*\*\* **Deceased**

SMITH-000808

# **Appendix D**

**SUMMARY OF AREA 2 ATTORNEYS FEES PAID BY THE CITY AND COUNTY TO PRIVATE ATTORNEYS AS OF MARCH 15, 2007 FROM FOIA AND OTHER PUBLIC DOCUMENTS**

SMITH-000809

## SUMMARY OF AREA 2 ATTORNEYS FEES PAID BY THE CITY AND COUNTY TO PRIVATE ATTORNEYS AS OF MARCH 15, 2007 FROM FOIA AND OTHER PUBLIC DOCUMENTS

Attorneys for the torture victims have obtained, through FOIA requests to the City and County, records which reflect monies paid by the City and County to private lawyers to defend, fire, or investigate Jon Burge and his men, and to represent the City in Area 2 torture and frame-up cases, from 1988 to the present. These records are not complete, as they do not reflect the payouts in at least one additional torture case (David Bates), do not include the hundreds of thousands of dollars spent for court costs from May 2005 to the present, and do not reflect the monies paid by the County to private lawyers Patti Bobb and James Figulio to represent Richard Devine and several other Assistant States Attorneys. Therefore, the total numbers are even higher than those reflected here:

 - - - In the last six months, from September 15, 2006 to March 15, 2007, a period almost exclusively contemporaneous with the period after there was an agreement with the City to settle 3 of the 5 pending civil torture cases, **$1,000,000** was paid to the four law firms defending Burge and the City in those cases, with **$685,000** being paid out in the three cases where the settlement had been agreed to by the City;

- - - In the 3 1/2 years these five civil torture cases have been pending,**nearly $7 million** has been paid to private lawyers by the City to defend Burge and itself, despite the fact that none of them is near trial;

- - - **More than $2 million** in additional public funds has been paid to private lawyers to defend Burge, his associates and the City in prior civil torture cases, to fire him, to defend the City's interests in criminal cases where torture evidence was sought, and to deal with the Cook County Special Prosecutors, for a total of **more than $9 million** spent by the City on the torture cases;

- - - **Nearly $4 million** more has been paid to private attorneys to defend Burge associates and the City in the still pending Evans (appeal) and Terry (early pre-trial) Area two frame-up cases for a total of **nearly $13 million** paid by the City in these Area 2 torture and frame-up cases;

- - - **More than $7 million** spent by the County for the Special Prosecutors' 4 year "investigation" wherein they refused to indict Burge and issued a completely inadequate Report.

- - - The total spent to date by the City and County is **$20,000,000,** an amount that is presently increasing, before a single trial has begun, by **$2,000,000 per year** in City taxpayer funds**.** This amount does not include the $1-2 million in pensions paid yearly to Burge and the more than thirty other Area 2 detectives and supervisors who are named in multiple torture cases and refused to cooperate with the Special Prosecutors' investigation.

SMITH-000810

# Appendix E

**Additional Evidence of Cover-up by CPD, SAO and CCSAO Officials
That Was Ignored by The Special Prosecutors**

SMITH-000811

# Additional Evidence of Cover-up by CPD, SAO and CCSAO Officials that was Ignored by the Special Prosecutors

## MAYORS, POLICE SUPERINTENDENTS, AND THE OPS

The Special Prosecutors also absolved Mayor Byrne, Mayor Daley, Superintendent Martin, Superintendent Hillard, and OPS Director Shines, as well as the CPD and the OPS, from any blame for the continuing cover-up. The Special Prosecutors had before it the uncontroverted fact that in only one of the more than 100 documented cases of police torture did the CPD and its OPS take any disciplinary action in an Area 2 or 3 torture case, and in that case, the action was taken almost ten years after the torture took place. Yet despite the fact that the Special Prosecutors found that Burge and his men abused "with impunity," they neither condemned, nor even mentioned, this almost absolute failure to discipline. The Report is similarly derelict in its treatment of the various City and police officials under whose leadership and with whose participation, this cover-up flourished.

### Superintendent Richard Brzeczek and Mayor Jane Byrne

In one section of the Report, the Special Prosecutors found that Superintendent Brzeczek knew that Burge and his subordinates had brutalized Andrew Wilson, and quashed any police investigation for a year and a half. It further found that the OPS and its Director then conducted a sham investigation which did not even bother to interview Burge or his men, and, three and a half years after Wilson's torture, closed the investigation with a "not sustained" finding. It additionally found that the OPS did not

1

meaningfully investigate another contemporaneous allegation of electric shock against Burge. The uncontroverted evidence before the Special Prosecutors further showed that Superintendent Brzeczek and the OPS also did no investigation into the numerous complaints of police abuse which arose from the black community during the February 1982 manhunt which led to the arrest of Andrew Wilson, a manhunt which was directed by Burge and encouraged and approved by Mayor Jane Byrne. This five day manhunt was one of the biggest in Chicago history, and lead to hundreds of complaints of illegal searches, brutality, and torture. (*Wilson v. City of Chicago*, 6 F.3d 1230 (7th Cir. 1993) One involved Area 2 detective anonymously called it a "reign of terror" and likened it to Kristallnacht, while the Reverend Jesse L. Jackson called it a "military occupation." (*Chicago Reader,* August 2003)

The Special Prosecutors further raised serious questions about whether the Superintendent's concealment of his contemporaneous knowledge that Burge had tortured Wilson in his testimony at Wilson's 1989 civil rights trial influenced the subsequent decision of the United States Court of Appeals to absolve the City and the Superintendent of civil liability for their role in Wilson's torture. Additional evidence before the Special Prosecutors also demonstrated that Mayor Byrne never before revealed her involvement in encouraging Burge during the manhunt, and that the high ranking police officials who were present at Area 2 during the torture and were castigated at a meeting by Superintendent Brzeczek for permitting the torture to happen, concealed their knowledge of both the torture and this meeting during testimony at the Wilson trials. The Special Prosecutors also specifically found that:

> the Superintendent of Police Department received and believed evidence that a prisoner [Andrew Wilson] had been brutalized by the Superintendent's

SMITH-000813

subordinates, that the prisoner had confessed, that those subordinates had testified under oath on a motion to suppress and before a jury and he had to believe, they testified perjuriously, that the prisoner had been sentenced to death, and that for 20 years the Superintendent still remained silent . . . approved a Unit citation for all Area 2 personnel, including Burge, and, more egregiously, he kept Burge in command of violent crimes at Area 2 as long as he remained superintendent. (Special Prosecutors' Report, pp. 86-87) (emphasis in original)

These findings and supporting evidence, by itself, powerfully demonstrate what the Special Prosecutors refused to find - - - that Brzeczek, Byrne, OPS Director Nolan, CPD Deputy Superintendents Joseph McCarthy and Thomas Lyons, as well as several of their direct successors, also covered up Area 2 torture and their knowledge of it.

### Superintendent Leroy Martin and Mayor Richard M. Daley

In the Report, the Special Prosecutors accept, at face value, Leroy Martin's denial that he knew about Burge or his record for torture, abuse and racism while he was Burge's Commander at Area 2. In fact the evidence available to the Special Prosecutors shows that Martin was fully aware that Burge was charged with torturing Wilson when Martin became Burge's direct supervisor in January of 1983, and that he received contemporaneous OPS summaries of several other complaints of police torture by Burge's men, including in the *Banks* and *Cannon* cases, yet he did nothing to monitor Burge or to prevent further torture and abuse at Area 2. (Deposition of Leroy Martin in *Orange v. Burge*, Dec. 11, 2006.) Additionally, the evidence shows that when the African American detectives complained to Martin about Burge's racist practices, he reported it to Burge, who took action against the complaining detectives. (Statement of Sammy Lacey, Oct. 2004.)

The evidence available to the Special Prosecutors further shows that after Martin became Superintendent in 1987, he installed Burge as the Commander of Area 3 and

SMITH-000814

was instrumental in getting Kunkle and Devine appointed as counsel for Burge and his men in the *Wilson* civil case. It further shows that Martin was present in 1989 at numerous City Council and Police Board Hearings when evidence of systemic police torture was presented by both aldermen and victims, and that Martin rejected repeated demands to have Burge suspended while the emerging pattern of Area 2 torture was fully investigated.

Most significantly, the uncontroverted evidence also shows that in November of 1990, OPS Director Gayle Shines presented Martin with a confidential OPS Report, now known as the Goldston Report, which found, after studying fifty known cases of Area 2 torture and abuse, that the abuse was "systematic," included "planned torture," and that "particular command members were aware of the systematic abuse and participated in it either by actively participating in same or failing to take any action to bring it to an end." The Goldston Report identified the victims and the alleged torturers by name, described the nature and the location of the abuse alleged in each case, and, in a supplement, specifically identified Burge, Byrne, Dignan, Yucaitis, and Grunhard as centrally involved abusers. Martin admitted to the Special Prosecutors that he thought that the Report condemned him as one of the involved command personnel, and has further admitted that he took the Report personally, and considered it to "blacken the entire command structure" at Area 2. (Statement of Leroy Martin to the Special Prosecutors, April 19, 2006; Deposition of Leroy Martin and Exhibits in *Orange v. Burge,* December 11, 2006.)

After reviewing the Goldston Report, Martin first sent it back to Shines for further justification, and when she refused to alter its findings, he retained the Police

4

Foundation, a pro-police organization headed by former Newark Police Superintendent Hubert Williams, allegedly for "review" of the Report's "methodology." Former Minneapolis Police Superintendent Anthony Bouza described in an expert opinion tendered to the Special Prosecutors this highly unusual action as a "sophisticated attempt to entomb the report and its findings by referring it to his [Martin's] cronies at the Police Foundation." (Opinion of Expert Anthony Bouza in *Hobley v. Burge* and *Orange v. Burge*)

Martin further admitted to the Special Prosecutors that he intentionally chose not to send the findings of the Goldston Report to an independent law enforcement agency such as the FBI. Instead he kept the findings of the Report secret for almost a year and a half while seeking no administrative, disciplinary, or prosecutorial action for any of the fifty cases analyzed in the Report, with the single exception of the *Wilson* case, where, after a year's delay, he sought administrative, rather than criminal, charges against Burge.[1]

In February of 1992, Federal Court Judge Milton Shadur ordered the Goldston Report publicly released, and Martin and Mayor Daley, in a joint public attack, condemned the Report as "unsubstantiated" "rumors," and again took no action. (*Chicago Tribune*, February 8, 1992) Martin resigned two months later, still having

---

[1] Martin and the City lawyers, like the Special Prosecutors many years later, asserted that the statute of limitations, which was six years at that time, precluded him from seeking criminal charges. However, when Martin received the Goldston Report in 1990, Burge and his men had denied torturing Andrew Wilson only a year and half before at the *Wilson* civil trial, there were many cases of alleged torture, including *Mumin*, *Patterson*, *Hobley*, and *Caine*, which were well within the six year statute, there were recent testimonial denials of torture and abuse in numerous torture cases, and the Goldston Report itself revealed a continuing conspiracy to torture, cover-up, and obstruct justice, which ran from 1972 to the present. Hence, for Martin and the City, like the Special Prosecutors, the statute of limitations was a pretext, rather than a bar.

SMITH-000816

taken no action against Burge or any of the other Area 2 Officers named in the Goldston Report beyond the aforementioned Police Board Proceedings.

### OPS Director Gayle Shines

The Report makes almost no mention of OPS Director Gayle Shines' role in the continuing cover-up, and the Special Prosecutors did not even bother to interview her. Shines, a long-time ASA under Richard M. Daley, was appointed by him to head the OPS. In November of 1990, she approved the Goldston Report, finding it "compelling" and a "masterful job." Martin challenged her approval of the Report, and turned to his cronies at the Police Foundation who returned their findings to Shines and the Police Department in July of 1992. While the bought and paid for conclusions of the Police Foundation were critical of the methodology of Goldston's Report, the Foundation also recommended further investigation.

In response to the Police Foundation, Shines ordered a limited reinvestigation, reopening ten individual cases, and assigning them to her most proficient investigators. After exhaustive re-investigations, which turned up much additional evidence, the investigators recommended sustained findings in six cases against some of the most notorious of Burge's men for a wide range of torture and abuse. The findings included findings of electric-shock and mock execution against Byrne, Dignan, and Grunhard in the Cannon case, bagging and beating with a rubber hose by Dignan and Dioguardi in the Lee Holmes case, and beating, kicking, stomping and other abuse in the Howard, Adkins, Craft and Banks cases. (see, pp. 17-18 of the Report above) These findings were reviewed by supervisors, and the files were tendered to Shines in early 1994. Contrary to Chicago Police Department policies, she kept these files in her office, in a box, for four

SMITH-000817

and a half years, never finalizing her review of the investigations or the findings because she assertedly "had other things to do." (Deposition of Gayle Shines in *Santiago v. Marquez*) In 1994, while these files languished in Shines' office, Darrell Cannon was on trial and subpoenaed his OPS file in order to challenge his tortured confession, but neither Shines nor the OPS produced it. (Id.) At the same time, Stanley Howard was on death row for a crime he did not commit, and this suppressed evidence would have assisted him in his post-conviction challenge to his tortured confession.

### Superintendent Terry Hillard and his Counsel, Thomas Needham

. The evidence shows that Terry Hillard became Police Superintendent in 1998 and appointed Thomas Needham as his chief legal and administrative assistant. Needham, the son of a Deputy Police Superintendent who once guarded the Daley house in Bridgeport, was formerly an Assistant State's Attorney who had been involved in the prosecution and review of several cases where torture was alleged, and later served first as a campaign volunteer for, then as an administrative assistant to, Mayor Richard M. Daley. After OPS director Shines left, her assistant, Leonard Benefico, discovered the suppressed torture files in her office, alerted Needham to the files, and asked what to do with them. Without substantively reviewing them, Needham summarily closed all the cases by entering "not sustained" findings in each. (Special Prosecutors' Report, pp. 112, 118, 154.) As the ostensible reason, Needham cited the age of the investigations. Hillard approved Needham's actions, later stating that he wanted to put an end to Area 2 torture investigations. (Hillard Dep., *Santiago v. Marquez*, Mar. 1999.)

The age of the investigations was due to the continuous course of delay by the OPS, which originally did shoddy investigations and closed the cases; by Martin, who

SMITH-000818

suppressed the Goldston Report; and by Shines, who suppressed the files in her office for 4 ½ years. Moreover, neither Hillard nor Needham made any effort to produce those files to Cannon, Howard, or any other defendant who had pending criminal cases. In 1999, Hillard rejected a formal community request to open OPS investigations into numerous uninvestigated torture cases or to investigate Shine's misconduct. Nonetheless the Special Prosecutors, without even interviewing them, absolved Needham and Hillard, finding their conduct to be "in a very technical sense not in keeping with established procedures," and that they "doubt[ed] that a case could be made that Needham and Hillard had been guilty of some administrative transgression." (Special Prosecutors' Report, p. 118).

## STATE'S ATTORNEYS PARTEE, O'MALLEY AND DEVINE

The evidence before the Special Prosecutors showed that Cecil Partee succeeded Richard Daley as State's Attorney of Cook County in 1989, at a time when the evidence of police torture at Area 2 was receiving public attention through the *Wilson* civil trials and City Council Hearings. O'Malley replaced Partee in 1990, and became aware of "an unusual amount of allegations of physical violence at Areas 2 and 3." (Report, p. 140). The Goldston Report also became public during O'Malley's term in office. Although the statute of limitations had clearly not run on at least some of the acts of torture and cover-up, neither O'Malley nor Partee investigated or indicted Burge or his men.

Richard Devine became State's Attorney in 1997. As First Assistant, he had previously been centrally involved with Daley and Kunkle in the 1982 refusal to investigate or prosecute Burge for Wilson's torture. In 1983 he had left for the private practice of law, and was reunited with Kunkle at Phelan, Pope and John in 1987.

8

SMITH-000819

Kunkle, as a private lawyer, prosecuted Andrew Wilson at his 1987 re-trial, then, as a specially appointed City lawyer, represented Burge, Yucaitis and other Area 2 defendants in the *Wilson* civil rights trials, the Police Board Proceedings, and in several other civil torture cases from 1988 to 1996. Devine was Kunkle's partner during this entire time, did legal work for Burge in the *Wilson* case, and shared in the more than $1 million in fees which his law firm was paid by the City and the Fraternal Order of Police for defending Burge. According to the Special Prosecutors, Kunkle offered four different defenses at four separate proceedings while defending Burge's torture of Wilson. (Report, pp. 136-37.) While Kunkle and Devine were Burge's lawyers, evidence of a pattern and practice of torture and abuse at Area 2 was presented in the *Wilson* civil proceedings, the Goldston Report became public, Burge, through Kunkle, offered four contrary defenses, and Burge was convicted by the Police Board.

The evidence before the Special Prosecutors also shows that after Devine became State's Attorney, he was involved in making numerous decisions with regard to the criminal cases where torture was alleged. In 1999, he was presented with a request from public officials, including state Representative Connie Howard and Congressman Jesse L. Jackson, Jr., to agree to death row inmate Aaron Patterson's post-conviction request for a hearing on his claim that Burge and his men had tortured a confession from him. He was presented with similar requests and petitions in several other torture cases. In each and every case, he rejected these requests and continued the prosecutions of the Burge torture victims. In 2001 he resisted the request of numerous community organizations to have a special prosecutor appointed to investigate Burge and Area 2 torture, a request that was granted in 2002 by the Chief Judge of the Criminal Court on

9

SMITH-000820

the grounds that Devine had an actual conflict of interest due to his prior representation of Burge. In 2003, he and the CCSAO were removed from further involvement in the prosecutions of Burge torture victims. At no time from 1996 to his removal in 2002, did he initiate any investigation into the longstanding allegations of systematic torture and abuse at Area 2 and 3 by Burge and his men. This continuing refusal to investigate or prosecute was also completely ignored by the Special Prosecutors in their Report.

SMITH-000821