**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ROBERT SMITH, JR.,**      ) | |
| ) | |
| **Plaintiff,**     ) | |
| ) | |
| **v.**     ) | |
| ) | **No. 21 CV 1159** |
| **CITY OF CHICAGO, PHILLIP**     ) | |
| **CLINE, DANIEL McWEENY,**     ) | **Judge Jeffrey I. Cummings** |
| **STEVEN BROWNFIELD, WILLIAM**     ) | |
| **PEDERSEN, JOHN SOLECKI, and**     ) | |
| **the ESTATES of JOHN A. YUCAITIS,**     ) | |
| **WILLIAM HIGGINS and ROBERT**     ) | |
| **RICE,**     ) | |
| ) | |
| **Defendants.**     ) | |

**MEMORANDUM OPINION AND ORDER**

Now pending before the Court is the joint motion by defendants City of Chicago, Philip

Cline, Detective Daniel McWeeny, Detective Steven Brownfield, Detective William Pedersen,

Detective Solecki, Detective Robert Dwyer, Estate of John Yucaitis, Estate of Robert Rice, and

Estate of William Higgins to recuse this Court pursuant to 28 U.S.C. §455(a) and §455(b)(1).

(Dckt. #436). For the reasons stated below, defendants' motion is denied.

**I.     PROCEDURAL BACKGROUND**

Plaintiff Robert Smith, Jr. was convicted of committing a double murder in August 1990

and thereafter imprisoned. Thirty years later, in October 2020, the Circuit Court of Cook County

entered an order vacating plaintiff's conviction and ordering him released. In November 2020,

the Chief Judge of the Cook County Criminal Court issued plaintiff a Certificate of Innocence

declaring that he was innocent of the charges for which he was indicted. Plaintiff filed this

lawsuit on March 1, 2021. In his second amended complaint, plaintiff alleges that the individual

defendants conspired to secure his wrongful conviction by subjecting him to beatings and abuse which caused him to make a false confession, fabricating and destroying evidence, and withholding exculpatory evidence in violation of the Constitution and federal and state law. (Dckt. #82). Plaintiff further alleges that defendants' illegal actions were committed pursuant to one or more de facto policies, practices, and/or customs of the City of Chicago.

I entered service as a United States District Court Judge on October 26, 2023, and this case was reassigned to me as part of my initial docket.[1] In the parties' November 10 initial joint status report, defendants expressed their belief that 28 U.S.C. §455 requires my recusal based upon my endorsement of an April 24, 2007 report titled "Report on the Failure of Special Prosecutors Edward J. Egan and Robert D. Boyle to Fairly Investigate Police Torture in Chicago" (the "2007 Report") and an October 29, 2008 report titled "Torture in Chicago: A Supplementary Report on the On-Going Failure of Government Officials to Adequately Deal with the Scandal" (the "2008 Report").[2] (Dckt. #419 at 5). Defendants also requested a status hearing to discuss the issue prior to my ruling on any substantive matters. (*Id.*). Plaintiff objected to defendants' proposed procedure for resolving this issue and expressed the view that recusal was unnecessary. (*Id.*). Three days later, plaintiff filed a memorandum in opposition to defendants' suggestion that I must be disqualified. (Dckt. #420).

I declined defendants' invitation to address this issue at a status hearing and instead entered an order granting defendants leave to file a joint motion for disqualification by November 27, 2023, and setting a briefing schedule for a response and reply. (Dckt. #422).

---

[1] I previously served as a United States Magistrate Judge between February 1, 2019, and the time when I was sworn in as a district judge on October 26, 2023.

[2] Defendants acknowledge that only the 2007 Report was produced in this case but they assert that the 2008 Report "is relevant to mention as it served as a supplement to the 2007 Report asking for further action in line with the 2007 Report." (Dckt. #436 at 1).

Defendants timely filed their motion, plaintiff filed a response to supplement his initial opposition, and defendants filed a reply. This matter is now ripe for disposition.

## II.    SUMMARY OF THE 2007 AND 2008 REPORTS

Where, as here, a recusal request is based upon writings associated with the judge, the Court's analysis presumes familiarity with the documents at issue as well as the context in which they came into being. *See In re Sherwin-Williams*, 607 F.3d 474, 477-78 (7th Cir. 2010). Accordingly, I will discuss the investigation into allegations of police torture that precipitated the two reports at issue, summarize the reports themselves, and provide additional contextual facts relevant to the reports.

## A.    The 2006 Report of the Special State's Attorney

In April 2002, the Presiding Judge of the Criminal Division of the Cook County Circuit Court ruled that then State's Attorney Richard Devine had an actual conflict of interest in investigating allegations of police torture due to his prior defense of former police commander Jon Burge in a civil rights lawsuit. (Dckt. #436-2 at 2). The Presiding Judge thereafter appointed two special prosecutors to investigate allegations of torture, perjury, obstruction of justice, conspiracy to obstruct justice, and other offenses by police officers under the command of Burge at Detective Area 2 and Area 3 Headquarters in Chicago from 1973 through present (i.e., the date of the court's order). (Dckt. #436-1 at 3). On July 19, 2006, the special prosecutors filed a 292-page Report of the Special State's Attorney (the "2006 Report"). (Dckt. #436-1).

Among other things, the 2006 Report found:

(1) the evidence established beyond a reasonable doubt that Chicago police officers mistreated detainees in three cases and that there are many other cases where the special prosecutors believed that detainees were abused but proof beyond a reasonable doubt was absent;

3

(2) Burge was guilty of prisoner abuse and a number of officers under his command recognized that if he could abuse detainees with impunity, they could too;

(3) Andrew Wilson was telling the truth about being tortured by Burge and others and the evidence would support a conviction of Burge for the aggravated battery of Wilson, perjury, and obstruction of justice;

(4) the Chicago Police Board determined that defendant Yucaitis was guilty of misconduct because he knew that Wilson was being abused but did not report it;[3] and

(5) the Chief of Felony Review of the Cook County States Attorneys' Office, Lawrence Hyman, gave false testimony when he denied that Wilson told him he had been tortured by detectives under the command of Burge.

(Dckt. #436-1 at 16, 17, 51, 54, 63).

The special prosecutors also made findings that were highly critical of Richard Brzeczek, who served as Superintendent of the Chicago Police Department between January 11, 1980 and April 29, 1983 and is also a lawyer. (Dckt. #436-1 at 67). In particular, the special prosecutors found that:

(1) Brzeczek received a February 17, 1982 letter from John Raba, M.D., the Medical Director for Cermak (Prison) Health Services, in which Dr. Raba reported that he had examined Andrew Wilson on February 15 and 16 and observed multiple injuries to Wilson's face and head and blisters on his right thigh, right cheek, and chest that were consistent with radiator burns. (Dckt. #436-1 at 66, 70). Dr. Raba noted that Wilson reported being cuffed to the radiator and pushed into it and being subjected to electrical shocks on his gums, lips, and genitals. (Dckt. #436-1 at 66). Dr. Raba further noted that Wilson's injuries occurred prior to his arrival at the jail and he closed by stating that "[t]here must be a thorough investigation of this alleged brutality." (Dckt. #436-1 at 66). Brzeczek also learned that medical personnel at Mercy Hospital had complained that police officers had coerced Wilson into refusing medical attention. (Dckt. #436-1 at 71);

(2) On February 25, 1982, Brzeczek sent a letter to then Cook County State's Attorney (and later City of Chicago Mayor) Richard M. Daley with a copy of Dr. Raba's letter enclosed. (Dckt. #436-1 at 70, 108). In his letter, Brzeczek reported Dr. Raba's observation that Wilson had sustained certain injuries subsequent to his

---

[3] The 2006 Report suggests that defendant Yucaitis and another officer (O'Hara) would have been subject to indictment in connection with the abuse of Wilson but for the fact that they are deceased. (Dckt. #436-1 at 63).

arrest and indicated that he had obtained a C.R. Number to initiate an internal investigation of Wilson's allegations. (Dckt. #436-1 at 108). However, Brzeczek further stated that he was seeking Daley's direction as to how to proceed with the investigation of Wilson's allegations and that he would forbear from taking any further action regarding Wilson until he heard back from Daley or one of his assistants. (Dckt. #436-1 at 108). Brzeczek never received a response to his letter to Daley and he never explained to the special prosecutors why he, as the Superintendent of Police, needed the State's Attorney to direct him how to conduct an internal investigation. (Dckt. #436-1 at 70, 78-79);

(3) Brzeczek informed the special prosecutors that he told Chicago Mayor Jane Byrne about the fact that Wilson was taken into custody and he believes that he told Mayor Byrne about Dr. Raba's letter. (Dckt. #436-1 at 78, 85);

(4) After he received Dr. Raba's letter, Brzeczek believed that police brutality occurred at Detective Area 2 and that someone there had injured Wilson and he recognized that he had a non-delegable duty to investigate the allegations of wrongdoing independent of anyone else. (Dckt. #436-1 at 76, 81, 85). Nonetheless, the Police Department did not engage in any meaningful investigation of Wilson's allegations under Brzeczek's tenure. (Dckt. #436-1 at 73); and

(5) Despite his belief that Wilson had been abused by officers at Detective Area 2, Brzeczek signed a letter of commendation to all of the detectives at Area 2 in September 1982 for their work on Wilson's case; he left Burge in charge of the Violent Crimes Section of Detective Area 2 despite his knowledge that officers under his supervision and control abused Wilson; and he remained silent for over twenty years. (Dckt. #436-1 at 84, 86-87).

The special prosecutors concluded the 2006 Report by noting that "this investigation we have conducted would never have been necessary if Richard Brzeczek had done his sworn non-delegable duty on reception of Dr. Raba's letter. At the very least he would have removed Jon Burge from any investigative command, and would have conducted a complete shake-up at Detective Area-2." (Dckt. #436-1 at 88).

At a press conference following the release of the 2006 Report, the special prosecutors reported that the torture allegations seemed to center on a crew of eight to twelve officers out of a unit of forty-four and they believed that abuse occurred in 74 out of the 148 cases they investigated. (Dckt. #436-2 at 6). Nonetheless, the special prosecutors opined that the statute of

limitations barred the prosecution of any of the officers and they sought no indictments.  (Dckt. #436-1 at 13).

**B.    The 2007 Report**

Following the release of the 2006 Report, there was a widespread perception – particularly in the African-American community – that the report was unfair and misleading and that the special prosecutors should have brought criminal charges against the police officers who allegedly engaged in torture.  (Dckt. #436-2 at 2).  A team of volunteer attorneys, researchers, and community activists (the "research team") thereafter formed to respond to the 2006 Report and, after nine months of effort, they produced the 2007 Report (again, titled "A Report On The Failure of Special Prosecutors Edward J. Egan and Robert D. Boyle To Fairly Investigate Police Torture in Chicago (April 24, 2007)).  The 2007 Report was entirely based on the public record of the torture scandal – including published decisions by the Seventh Circuit Court of Appeals and the Northern District of Illinois – and most of the underlying documentation was posted online.  (Dckt. #436-2 at 3 n.1, 19, 20 (citing to *Hinton v. Uchtman*, 395 F.3d 810, 822-23 (7th Cir. 2005) & *United States ex rel. Maxwell v. Gilmore*, 37 F.Supp.2d 1078, 1094 (N.D.Ill. 1999)).[4]

The research team opined that the special prosecutors "[u]nfairly evaluated the credibility of the alleged torturers and of their victims and unfairly attempted to discredit torture victims who had pending civil or criminal cases" and they "did not bring criminal charges against members of the Chicago Police Department despite the apparent existence of numerous provable offenses within the statute of limitations."  (Dckt. 436-2 at 3-4).  In particular, with respect to certain of the defendants in this case, the research team hypothesized that:

---

[4] This Court refers to the page of the CM/ECF docket entry when making its citations to the record rather than the internal pagination within the document.

(1) Defendant McWeeny "could have been indicted for perjury . . . and for obstruction of justice" based upon his repeated denials under oath that he had participated in or witnessed *any* acts of torture and abuse despite being identified as a participant in such activities by at least nine alleged torture and abuse victims "if the Special Prosecutors had proceeded in a timely fashion" (Dckt. #436-2 at 7, 9, 33-35, 63-65, 67, 68, 72-73); and

(2) Defendant Yucaitis' denial of knowledge of, or participation in, torture and abuse were potential acts of obstruction of justice and potential perjury (Dckt. #436-2 at 17-18, 34-35, 63-64).

The research team further opined that the special prosecutors "[i]gnored the failure of former Cook County State's Attorney Richard M. Daley, State's Attorney Richard A. Devine, and various other high-ranking officials to investigate and prosecute police officers who engaged in a documented pattern of torture and wrongful prosecution of torture victims." (Dckt. #436-2 at 3). The research team's opinion was based in large part on the special prosecutors' lack of follow through once they learned from former Police Superintendent Brzeczek that: (1) Brzeczek failed to perform his non-delegable duty to investigate Andrew Wilson's allegations of torture after he learned (and believed) that Wilson had been abused by officers at Detective Area 2 through his receipt of Dr. Raba's February 1982 letter;[5] (2) Brzeczek wrote to State's Attorney Daley to notify him of Wilson's injuries and allegations and enclosed a copy of Raba's letter; and (3) Brzeczek believed that he told Mayor Jane Bryne about Raba's letter. (Dckt. #436-2 at 10-15).

The research team expressed their belief in the 2007 Report that the special prosecutors "[i]gnored a wealth of evidence establishing that there was a widespread and continuing cover-up of the torture scandal – a conspiracy of silence – implicating high officials of the City of

---

[5] Although the 2007 Report made explicit reference to the experiences of more than ten other men in addition to Wilson whom the research team believes were subject to torture at the hands of Burge and/or those officers under his supervision (*see* Dckt. #436-2 at 7-9), the Report makes no mention at all of plaintiff Robert Smith Jr.

Chicago, the Chicago Police Department, and the Cook County State's Attorney's Office."
(Dckt. #436-2 at 4). In particular, the research team noted that although the special prosecutors found that official action should have been taken in 1982 against Burge and officers under his command for the torture of Andrew Wilson, they instead absolved those who should have taken action (State's Attorneys Daley and Devine) notwithstanding corroborative medical evidence and witness statements because Wilson – who was awaiting trial in a capital case – would not give a statement to the Assistant State's Attorneys. (Dckt. #436-2 at 42-43).

The 2007 Report concluded with a number of requests for action from the United States Justice Department, the Illinois Attorney General, Cook County, and the City of Chicago. (Dckt. #436-2 at 50). Among other things, the 2007 Report requested: (a) an independent investigation into all of the criminal conduct implicated by the evidence discussed therein; (b) the establishment of a fund to provide compensation for the victims of torture who may be barred from obtaining relief by the statute of limitations; (c) new criminal court hearings for incarcerated persons who were convicted based in whole or in part on the basis of confessions obtained by Burge and his subordinates; and (d) an end to the expenditure of public funds for the defense of civil lawsuits brought against torturers.[6] (Dckt. #436-2 at 50).

The 2007 Report lists the names of a diverse group of more than 212 individuals (inclusive of the research team) and over 50 organizations who endorsed it including:

- a sitting United States Congressman;
- a sitting and a former Illinois State Representative;
- the sitting Circuit Clerk of Cook County;
- the former Public Defender of Cook County;
- two former Chicago aldermen;

---

[6] With respect to the latter request, the 2007 Report pointed out that the City of Chicago spent over $10 million to defend Burge and the City in civil torture cases exclusive of the tens of millions more paid to attorneys who worked to fire Burge, the pensions and health benefits paid to twenty-six Area 2 defendants in the torture cases, and to nine torture victims and their lawyers. (Dckt. #436-3 at 19).

- a former Corporation Counsel and Deputy Corporation Counsel for the City of Chicago;
- several former Chicago police officers and a retired Chicago Fire Department Captain;
- the Chief Medical Officer at Rush University Medical Center, the former Medical Director of Cook County, and multiple other physicians;
- professors from multiple law schools and colleges nationwide;
- religious leaders;
- numerous attorneys from private law firms (including myself) and solo practice; and
- a wide variety of human rights, religious, human services, and legal organizations and professional associations.

(Dckt. #436-2 at 3, 51-60).

Members of the research team, who are identified in the 2007 Report by an asterisk next to their names,[7] "participated in researching, writing, editing, and producing" the 2007 Report and they "had access to the entire public record of the torture scandal." (Dckt. #436-2 at 3). After the research team prepared a draft of the 2007 Report, one of the team members contacted me, alerted me to the work that the team was undertaking, shared a copy of the draft report, and asked whether I would join with the numerous other individuals and organizations referenced above by adding his name to the report. I was in private practice at the time and I agreed to add my name to the report because I believed that the police torture scandal in Chicago warranted further investigation.

As defendants acknowledge, (Dckt. #435 at 3; Dckt. #435 at 10), I was not a member of the research team and I had no role in researching, writing, editing, or producing the 2007 Report. Furthermore, contrary to defendants' apparent understanding from the 2007 Report's utilization of the complimentary close "respectfully submitted" prior to the listing of the endorsers' names (Dckt. #436-2 at 50), I did not have any role in the actual submission of the

---

[7] I am listed in the 2007 Report without an asterisk following my name. (Dckt. #436-2 at 52).

Report.  Finally, I had no contact with any of the witnesses, alleged victims, or other persons referenced within the 2007 Report.

## C.    The 2008 Report

On October 29, 2008, the research team that prepared the 2007 Report issued the 2008 Report, which they titled: "Torture in Chicago: A Supplementary Report on the On-Going Failure of Government Officials to Deal with the Scandal." (Dckt. #436-3).

The 2008 Report concluded there had been "some significant action" taken in response to the demands for action stated in the 2007 Report.  (Dckt. #436-3 at 5).  Among other things, the 2008 Report noted that U.S. Attorney for the Northern District of Illinois had since announced a three-count indictment against Jon Burge charging him with perjury and obstruction of justice. (Dckt. #436-3 at 7).  The indictment alleged that Burge was present for, and at times participated in, the torture and physical abuse of a person being questioned on one or more occasions, and that he was likewise aware that detectives he was supervising engaged in torture and physical abuse on one or more occasions.  (Dckt. #436-3 at 7).[8]  The 2008 Report further noted that one of the two imprisoned alleged torture victims who were granted new hearings at the behest of the Illinois Attorney General was released after a Cook County Criminal Court Judge vacated his murder convictions because he presented sufficient evidence to demonstrate that he was coerced into confessing to both crimes by Area 2 detectives.  (Dckt. #436-3 at 9 & n.13).  The 2008 Report also criticized the City of Chicago for paying over $10 million in attorney's fees to private law firms to defend Burge and the City in civil torture cases.  (Dckt. #436-3 at 17 & n.22, 19).

---

[8] After the 2008 Report was issued, Burge was tried, convicted on all counts, and sentenced to 54 months' imprisonment in January 2011.  *United States v. Burge*, 711 F.3d 803, 808 (7th Cir.), *cert. denied*, 571 U.S. 888 (2013).  The Seventh Circuit affirmed Burge's conviction and the district court's sentence.  *Id.*, at 815.

The 2008 Report went on to call for further action from government stakeholders including: (a) obtaining appropriate additional indictments, consistent with the evidence, for perjury, obstruction of justice, false statements, and/or conspiracy against Burge and other implicated officers at Area 2 and Area 3; (b) conducting prompt hearings for all torture victims who remain in prison as a result of confessions allegedly gained through torture at the hands of Burge and his men; and (c) the termination of the funding for the civil defense of Jon Burge and his men and the establishment of a fund for the compensation and treatment of torture victims who otherwise have no legal remedy, among other things. (Dckt. #436-3 at 28-29).

The 2008 Report contains a list of over 260 organizations and individuals who endorsed it, including myself and the vast majority of the diverse individuals and organizations who endorsed the 2007 Report. (Dckt. #436-3 at 29-40). As with the 2007 Report, the 2008 Report makes no mention of plaintiff Robert Smith, Jr., and it was based entirely on publicly available sources of information. (*See* Dckt. 436-3 at 41-14 (listing the appendices referenced within the 2008 Report)). Moreover, as with the 2007 Report: (a) I agreed to add my name to the 2008 Report after I was alerted to its existence by a member of the research team; (b) I had no role in researching, writing, editing, or producing the 2008 Report; (c) I had no role in the submission of the 2008 Report; and (d) I had no contact with any of the witnesses, alleged victims, or other persons referenced within the 2008 Report.

## III.    ANALYSIS

Defendants now move to recuse me pursuant to 28 U.S.C. §455(a) and §455(b)(1) based upon my endorsement of the 2007 and 2008 Reports. In particular, defendants assert that the Reports contain statements that may cause a reasonable person to perceive an appearance of partiality and/or bias or prejudice in favor of plaintiff and against the named defendant officers,

11

and the Reports reflect my personal knowledge of disputed evidentiary facts in this proceeding. (Dckt. #436 at 1-2). In response, plaintiff asserts that defendants have failed to meet their burden of showing that recusal is warranted under either statutory provision. For the reasons stated below, I agree with plaintiff.

A.     **Standard for Recusal Under Section 455(b)(1).**

Section 455(b)(1) provides that a judge "shall disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. §455(b)(1). This Court will begin its analysis with Section 455(b)(1) because, as the Seventh Circuit has observed, "the standard under that subsection is more definite." *Schurz Commc'ns, Inc. v. F.C.C.*, 982 F.2d 1057, 1061 (7th Cir. 1992).

Defendants seek recusal under Section 455(b)(1) based on their assertion that I obtained "personal knowledge of disputed evidentiary facts" concerning this case from an extrajudicial source. Defendants further argue that it would be impossible for me to render a fair judgment in this case because I endorsed the 2007 Report which – according to defendants: stated that defendant McWeeney committed perjury in relation to testimony concerning torture and therefore should be indicted; expressed the opinion that the City of Chicago should stop paying private law firms to defend lawsuits against defendants and others officers who were under Burge's command; and expressed an opinion about the veracity of individuals being subjected to a wrongful conviction at the hands of Area 2 and Area 3 detectives.

1.     **Cognizable bias under Section 455(b)(1) must arise from an extrajudicial source.**

In determining whether a judge must disqualify himself under Section 455(b)(1), "[t]he question is whether a reasonable person would be convinced that the judge was biased." *Hooks*

12

*v. McDade*, 89 F.3d 340, 355 (7th Cir. 1996) (cleaned up).  "Bias *must* be proven by compelling

evidence, and it *must* be grounded in some form of personal animus that the judge harbors

against the litigant" of a kind that a fair-minded person could not entirely set aside when judging

certain persons or causes.  *United States v. Barr*, 960 F.3d 906, 920 (7th Cir. 2020) (emphasis

added); *Grove Fresh Distrib., Inc. v. John Labatt, Ltd.*, 299 F.3d 635, 640 (7th Cir. 2002);

*Hooks*, 89 F.3d at 355.  Nonetheless, "[n]ot *all* unfavorable disposition towards an individual (or

his case) is properly described" as "personal bias or prejudice" within the meaning of Section

455(b)(1).  *Liteky v. United States*, 510 U.S. 540, 550 (1994) (emphasis in original); *United

States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976) ("merely prior knowledge by the judge of

facts concerning a party is not in itself sufficient to require disqualification" under Section

455(b)(1)); *Union Independiente de Empleados de Servicios Legales v. Puerto Rico Legal Servs.,

Inc.*, 550 F.Supp. 1109, 1112 (D.P.R. 1982) ("Prejudicial exposure to a defendant, or defendants,

without more, is not enough to establish bias.").

Instead, to be cognizable under Section 455(b)(1), bias must "arise from an extrajudicial

source."  *Hooks*, 89 F.3d at 355; *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 988 (7th

Cir. 2001); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-

Wisconsin, Inc.*, 991 F.2d 1249, 1255 (7th Cir. 1993) (Personal knowledge of evidentiary facts

means extrajudicial knowledge).  "Extrajudicial" knowledge is "personal knowledge" obtained

by a judge outside of a judicial capacity "which can be neither accurately stated nor fully tested."

*Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996); *see In re Kensington Int'l Ltd.*, 368 F.3d 289,

308 n.18 (3d Cir. 2004), *quoting Edgar*, 93 F.3d at 259 ("personal" or "extrajudicial" knowledge

is information conveyed to the judge that "leaves no trace in the record and cannot 'be

controverted or tested by the tools of the adversary process.'"); *Schumde v. Sheahan*, 312 F.Supp.2d 1047, 1068-69 (N.D.Ill. 2004) (same, citing *Edgar*).

In *Edgar*, a panel of three court-appointed experts met in private with the judge outside the presence of the parties' attorneys and provided the judge with information regarding the mental health system of Illinois. *Edgar*, 93 F.3d at 257-58. Although the information the experts shared with the judge was neither placed on the record nor described by the judge to the parties, the experts' outline for the meeting listed numerous ways in which they believed that the Illinois health system "falls short." *Id.* at 258. The Seventh Circuit held that disqualification under Section 455(b)(1) was warranted after it found that the information conveyed by the experts was:

> 'personal' knowledge no less than if the judge had decided to take an undercover tour of a mental institution to see how the patients were treated. Instead of going himself, this judge appointed agents, who made a private report of how they investigated and what they had learned.

*Id.* at 259.

Other courts have similarly recognized that extrajudicial personal knowledge of disputed evidentiary facts can be obtained "through prior representation of a party, or by witnessing the events at issue in the proceeding." *In re Grand Jury 95-1*, 118 F.3d 1433, 1438 (10th Cir. 1997) (cleaned up); *Murray v. Scott*, 253 F.3d 1308, 1312-13 (11th Cir. 2001) (disqualification warranted under Section 455(b)(1) where the judge had represented different plaintiffs in a case against the same defendants with similar claims leaving the risk that the judge may have personal knowledge of disputed evidentiary facts in the case before him); *United States v. State of Ala.*, 828 F.2d 1532, 1545-46 (11th Cir. 1987) (holding that district judge's disqualification was mandated under Section 455(b)(1) where the judge had extrajudicial personal knowledge of disputed facts because he actively participated as a state senator and private attorney in the very

14

events and shaped the very facts that were at issue in the suit); *United States v. Page*, 828 F.2d 1476, 1481 (10th Cir. 1987) (Section 455(b)(1) "applies to knowledge which the judge obtained extrajudicially, *e.g.*, through prior representation of a party, or by witnessing the events at issue in the proceeding."); *Wessmann by Wessmann v. Bos. Sch. Comm.*, 979 F.Supp. 915, 918-19 (D.Mass. 1997) (granting motion to disqualify under Section 455(b)(1) where case may involve disputed facts of which the judge may have had personal knowledge by virtue of his prior representation of a client).

Consequently, to secure recusal, a moving party must show – and not merely "assert without any support" – that the judge "had 'personal knowledge of disputed evidentiary facts.'" *Thomas v. Reese*, 787 F.3d 845, 849 (7th Cir. 2015), *quoting* 28 U.S.C. §455(b)(1). Furthermore, a judge's extrajudicial knowledge of disputed evidentiary facts concerning an issue relevant to the case is not sufficient to warrant disqualification under Section 455(b)(1) *unless* the judge's knowledge extends to the connection that the particular parties in the case before the court have to that issue. *See United States v. Boyd*, 208 F.3d 638, 646-47 (7th Cir. 2000), *vacated on other grounds*, 531 U.S. 1135 (2001); *In re Initial Pub. Offering Sec. Litig.*, 174 F.Supp.2d 70, 94 (S.D.N.Y. 2001) (same, citing *Boyd*).

In *Boyd*, the district judge was previously the head of the state police when a joint federal, state, and local task force investigated a business that was created as a part of the drug and incidental murder conspiracy for which the defendants in the case on appeal were tried and convicted. *Boyd*, 208 F.3d at 646-47. The activities of that business were not at issue in the current case except insofar as it connected one of the defendants (Robinson) to the gang. *Id.* at 647. Although the judge had personal, extrajudicial knowledge of the activities of the business, he denied knowledge of how the business connected Robinson to the gang and there was no basis

15

in the record to support Robinson's assertion that the judge had "full knowledge" of the details of the investigation of the business. *Id.* Because the judge lacked personal, extrajudicial knowledge of the connection between Robinson, the business, and the gang, recusal was not warranted under Section 455(b)(1). *Id.*

### 2. Information learned from sources that are in the public record is not extrajudicial knowledge for purposes of Section 455(b)(1).

Information that a judge obtains from the public record that is available to the general public "is simply not the kind of *personal* knowledge of disputed evidentiary facts with which §455(b)(1) is concerned." *Matter of Hatcher*, 150 F.3d 631, 635 (7th Cir. 1998) (emphasis in original); *United States v. Modjewski*, 783 F.3d 645, 651 (7th Cir. 2015) (where "all of the information she knew was available to the general public . . . ., she [the judge] did not need to recuse herself."); *Schurz Commc'ns, Inc. v. F.C.C.*, 982 F.2d 1057, 1061 (7th Cir. 1992) (disqualification under Section 455(b) was not warranted where the judge had "no recollection of having received information from any source other than public documents."); *United States v. Sturgis*, 667 Fed.Appx. 347, 348 (2d Cir. 2016) (recusal unwarranted under Section 455(b)(1) where movant pointed only "to information that exists in the public record or knowledge that Judge Siragusa gained in his professional capacity.").

### 3. Defendants' argument for recusal under Section 455(b)(1) is factually unsupported and contrary to the record.

Again, defendants assert that recusal is required under Section 455(b)(1) because I, by virtue of my endorsement of the 2007 and 2008 Reports, "obtained personal knowledge of disputed evidentiary facts concerning the proceedings which arise from 'an extrajudicial source' under [Section] 455(b)(1)." (Dckt. #436 at 13-14). However, the assertion that I have extrajudicial personal knowledge of disputed evidentiary facts concerning this case is

unsupported by the record and is therefore insufficient to warrant recusal. *See, e.g.*, *Thomas*, 787 F.3d at 849. As stated above in Sections II(B) and II(C), the 2007 and 2008 Reports, which I added my name to, were based entirely on publicly available information.[9] As such, the Reports, by definition, did not provide me with any extrajudicial personal knowledge of disputed evidentiary facts. *See Supra*, at Section III(A)(2) (citing cases to the effect that information obtained from the public record is not extrajudicial personal knowledge).

Furthermore, I had no role in researching, writing, or editing the Reports and had no contact with any of the witnesses, alleged victims, or other persons referenced therein. Thus, I did not acquire any extrajudicial personal knowledge from any of these sources utilized to prepare the Reports. My own personal knowledge regarding my non-involvement in the actual preparation of these Reports trumps defendants' unsupported speculation to the contrary. *See United States v. Balistrieri*, 779 F.2d 1191, 1202 (7th Cir. 1985), *overruled in part on other grounds*, *Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016) (when ruling on a recusal motion under Section 455(b)(1), the court can "contradict the [movant's] evidence with facts drawn from his own personal knowledge."); *Boyd*, 208 F.3d at 647 (same).

Finally, because neither the 2007 Report nor the 2008 Report mention plaintiff Robert Smith Jr. at all, let alone discuss or analyze the circumstances of his arrest, treatment at the police station, prosecution, and wrongful conviction, the Reports do not concern the same "proceeding" that is at issue in this case for purposes of Section 455(b)(1). *See United States v. Lara-Unzueta*, 735 F.3d 954, 959 (7th Cir. 2013) (Under Section 455(b), "*[t]he proceeding*

---

[9] For example, defendants cite to the 2007 Report's finding "that high-ranking officials, including mayors for the City, 'knew that prisoners were being tortured by Burge and his subordinates, and . . . had the power and duty to intervene to stop the torture,'" (Dckt. #436 at 13), even though this finding derives from the special prosecutors' 2006 Report – a publicly available document – regarding the same subject matter. *See supra*, at Section II(A).

means *the current proceeding*" before court.) (emphasis in original). It is not enough that the Reports provided me with some information regarding certain defendants' conduct towards certain alleged victims of torture given that the Reports provide *no* information regarding defendants' conduct toward plaintiff Robert Smith Jr. *Supra*, at Section III(A)(1) (discussing *Boyd*). Thus, even if I had acquired some "personal knowledge of disputed evidentiary facts" by reviewing and adding my name to the Reports, I did not gain any personal knowledge regarding this "proceeding" concerning Robert Smith Jr. Therefore, recusal under Section 455(b)(1) is not warranted for this reason as well.

Defendants next argue that because I endorsed the 2007 Report, which – in defendants' view – posits "that Defendant McWeeny committed perjury in relation to testimony concerning torture and therefore should be indicted," a reasonable person would be convinced that it would be impossible for this Court to render a fair judgment. (Dckt. #436 at 13). This argument is unavailing. To begin, the 2007 Report does not state that McWeeny *committed* perjury. Instead, the 2007 Report (as defendants acknowledge elsewhere in their brief)[10] opines that he "*could have been indicted* for perjury . . . and for obstruction of justice" based upon his repeated denials under oath that he had participated in or witnessed any acts of torture and abuse despite being identified as a participant in such activities by at least nine alleged torture and abuse victims. (Dckt. #436-2 at 9 (emphasis added)). Such an opinion does not reflect "personal bias or prejudice concerning a party" within the meaning of Section 455(b)(1) unless it is based on an extrajudicial source. *See Liteky*, 510 U.S. at 550, 554-55; *Hook*, 89 F.3d at 355. As the 2007 Report makes clear, the opinion regarding McWeeney is not based on an extrajudicial source but is instead based on the juxtaposition between McWeeney's publicly available testimony and the

---

[10] (*See* Dckt. #436 at 9).

publicly available contrary allegations regarding his conduct from at least nine torture victims. (Dckt. #436-2 at 9); *supra*, at Section III(A)(2) (information based on the public record is not extrajudicial knowledge under Section 455(b)(1)).[11]

Next, defendants suggest that I have a personal bias or prejudice that will render it impossible for me to render a fair judgment in this case because the 2007 and 2008 Reports express the opinion that the City of Chicago should stop paying private law firms to defend lawsuits against defendants and other officers who were under Burge's command. (Dckt. #436 at 13, 14). However, to the extent that defendants believe that I am biased against their attorneys because they are being paid with public funds, that is insufficient. A judge's bias must be against a party – and not against a party's attorney – under Section 455(b)(1) unless the judge has "such a virulent personal bias or prejudice against the attorney as to amount to a bias against the party." *United States v. Sykes*, 7 F.3d 1331, 1339-40 (7th Cir. 1993) (cleaned up); *United States v. Barr*, No. 14-CR-287, 2019 WL 1594888, at *8 (N.D.Ill. Apr. 12, 2019); *Givens v. O'Quinn*, No. 1:04CV00125, 2005 WL 3359115, at *3 (W.D.Va. Dec. 7, 2005). Defendants here do not allege that I have any such "virulent personal bias" against their attorneys, nor do I for that matter.

Finally, defendants seek recusal under Section 455(b)(1) because the 2007 Report expressed an opinion "about the veracity of individuals being subject to a wrongful conviction at the hands of Area 2 and 3 detectives." (Dckt. #436 at 14). However, opinions about credibility

---

[11] In their reply, defendants make the same argument with respect to the 2007 Report's opinion that defendant Yucaitis likewise could have been indicted for potential acts of obstruction and justice and perjury. (Dckt. #439 at 14). This argument fails for the same reasons stated above. Moreover, the special prosecutors stated in their 2006 Report that Yucaitis *would* have been subject to indictment in connection with the abuse of Wilson but for the fact that he was deceased. (Dckt. #436-1 at 63).

are not "disputed evidentiary facts" within the meaning of Section 455(b)(1). As the Third

Circuit has held:

> The disqualification provision [Section 455(b)(1)] is directed toward knowledge of
> disputed evidentiary facts, that is, matters underlying the cause of action. We do
> not understand the statutory language to be directed toward routine judgments of
> credibility. Such an interpretation would require all the judges of many districts to
> be disqualified in the most pedestrian of cases if they had some previous contact
> with a witness. Congress did not intend to disrupt the court's business on such
> inadequate grounds.

*Plechner v. Widener Coll., Inc.*, 569 F.2d 1250, 1263 (3d Cir. 1977); *Parrish v. Bd. of Comm'rs*

*of Alabama State Bar*, 524 F.2d 98, 104 (5th Cir. 1975) (en banc) ("Credibility choices are not

disputed facts."); *United States v. Salemme*, 164 F.Supp.2d 49, 77 (D.Mass. 1998) (same).

    In sum: for these reasons, defendants have failed to meet their burden of showing that

this Court must recuse itself under Section 455(b)(1).

## B.    Standard for Recusal under Section 455(a).

    Section 455(a), which provides that a judge "shall disqualify himself in any proceeding in

which his impartiality might reasonably be questioned," encompasses the specific circumstances

outlined in §455(b) "but also a broader range of situations in which impartiality exists, but its

appearance is compromised." *United States v. Herrera-Valdez*, 826 F.3d 912, 918 (7th Cir.

2016). "Section 455(a) asks whether a reasonable person perceives a significant risk that the

judge will resolve the case on a basis other than the merits. This is an objective inquiry." *Hooks*,

89 F.3d at 354 (citations omitted); *see also Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S.

847, 865 (1988). "The objective analysis does not focus on the reality of a judge's actual state of

mind, purity of heart, incorruptibility, or impartiality. . . . Rather, the focus is on perception (i.e.,

appearance): whether sufficient factual grounds exist to cause an objective observer reasonably

to question the judge's impartiality." *United States v. Black*, 490 F.Supp.2d 630, 656 (E.D.N.C.

2007) (citing *Liteky*, 510 U.S. at 548-51; *Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847,

858-60 (1988)).

> As the Seventh Circuit has explained,

> An objective standard is essential when the question is how things appear to the well-informed, thoughtful observer rather than to a hypersensitive or unduly suspicious person . . . . Trivial risks are endemic, and if they were enough to require disqualification we would have a system of preemptory strikes and judge-shopping , which would itself imperil the perceived ability of the judicial system to decide cases without regard to persons.  A thoughtful observer understands that putting disqualification in the hands of a party, whose real fear may be that the judge will apply rather than disregard the law, could introduce bias into adjudication. *Thus the search is for a risk substantially out of the ordinary.*

 *Hooks*, 89 F.3d at 354, *quoting In re Mason*, 916 F.2d 384, 385-86 (7th Cir. 1990) (emphasis

added).  As such, defendants have the burden under Section 455(a) of showing that "an

objective, disinterested observer fully informed of the reasons for seeking recusal would

entertain a significant doubt that justice would be done in th[is] case." *United States v. Barr*, 960

F.3d 906, 919 (7th Cir. 2020) (cleaned up); *Herrera-Valdez*, 826 F.3d at 917 (same).  "There is a

general presumption that judges rise above any potential biasing influence, as judges are not

obliged to recuse themselves without reason." *Hardy v. City of Milwaukee*, 99 F.Supp.3d 883,

892 (E.D.Wis. 2015) (cleaned up); *Tezak v. United States*, 256 F.3d 702, 718 (7th Cir. 2001).

In evaluating whether my impartiality might reasonably be questioned, the "inquiry is

from the perspective of a *reasonable* observer who is *informed of all the surrounding facts and

circumstances*," including the content of the 2007 and 2008 Reports as well as the context in

which the Reports came into being.  *In re Sherwin-Williams Co.*, 607 F.3d 474, 477-78 (7th Cir.

2010) (emphasis in original) (cleaned up).  "That an unreasonable person, focusing on only one

aspect of the story, might perceive a risk of bias is irrelevant." *Id.*, at 477.  Finally, "a reasonable

person is able to appreciate the significance of the facts in light of relevant legal standards and

21

judicial practice and can discern whether any appearance of impropriety is merely an illusion."

*Id.*, at 478; *Cooper v. Shulkin*, No. 17 C 6913 & 18 C 2064, 2018 WL 6171785, at *2 (N.D.Ill.

Nov. 26, 2018) (same).

In applying these standards, I am mindful that "[r]uling on a motion for recusal is

difficult business" and that "[j]udges have an obligation to litigants and their colleagues not to

remove themselves needlessly." *Matter of Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 839 F.2d

1226, 1229 (7th Cir. 1988). As one judge has explained:

> Recusing when it is not necessary under the law is the easy choice. It allows a
> judge to avoid cases he or she does not want to decide. It allows a judge to avoid
> cases with hard calls, cases that are high-profile, cases where there will be public
> controversy no matter how the issue is decided, cases that are a lot of work, and so
> on. It foists those cases onto colleagues who already have large dockets and hard
> cases of their own. This sort of duck-and-cover maneuver is an abdication of the
> judicial role and an insult to one's colleagues in the district.

*Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 578 F.Supp.3d 1011, 1024

(E.D.Ark. 2022); *United States v. Snyder*, 235 F.3d 42, 45 (1st Cir. 2000) ("judges are not to

recuse themselves lightly under §455(a).").

### 1. My endorsement of the 2007 Report would not lead a reasonable person to question my impartiality in this case.

Defendants seek recusal under Section 455(a) based on their assertion that a reasonable

person would question my impartiality in the case because I adopted the following opinions by

endorsing the 2007 Report: (1) defendant McWeeney could have been indicted for perjury and

obstruction of justice because he denied he saw or participated in torture or abuse; (2) high-

ranking officials, including Chicago mayors, knew of torture by Burge and his subordinates yet

failed to exercise their power and duty to intervene to stop it, which is problematic because

plaintiff's *Monell* claim tracks the 2007 Report and I will have to rule on the City's renewed

motion to bifurcate plaintiff's *Monell* claim for trial; (3) the City should stop spending public

funds to pay private law firms to defend lawsuits against defendants and other officers under Burge's command; and (4) the testimony of the other alleged torture victims is credible, which is problematic because I will be called upon to rule on the admissibility of their testimony under Rule 404(b).  (Dckt. #436 at 8-12).

Defendants close by noting that "[e]ven if a reasonable person would not question [my] impartiality based on the above examples when considered individually, a thoughtful observer could come to the conclusion when those examples are considered together."  (Dckt. #436 at 12 (citing *Fairly v. Andrews*, 423 F.Supp.2d 800 (N.D.Ill. 2006)).  As shown below, however, defendants' examples – whether considered individually or as a whole – would not lead an objective, disinterested observer to entertain a significant doubt that justice would be done in this case.  Moreover, the facts and circumstances which caused the district judge to decide to recuse himself in *Fairly v. Andrews* are simply not present in this case.

To begin, my endorsement of the 2007 Report seventeen years ago while I was in private practice does not warrant disqualification under Section 455(a) based on the Report's inclusion of the opinion on the legal question of whether defendant McWeeney *could* have been indicted for perjury.  Judges are permitted to come to the bench with preconceived views on legal issues. *Republican Party of Minnesota v. White*, 536 U.S. 765, 766 (2002) (citing *Laird v. Tatum*, 409 U.S. 824, 835 (1972)) ("it is virtually impossible, and hardly desirable, to find a judge who does not have preconceptions about the law"); *Siefert v. Alexander*, 608 F.3d 974, 982 (7th Cir. 2010) ("We not only allow, but expect, judges to have preconceived views on legal issues.").

This is true even if the judge has views on issues present in the case before them.  In *Laird v. Tatum*, for example,

> Justice Rehnquist rejected a suggestion that he should have recused himself from the case because before he became an Associate Justice of the Supreme Court he

23

had appeared before a Senate Subcommittee as an expert witness for the Justice Department . . . (which was a party in the case), and had stated the Department's position on the law relating to the subject matter of the case, and because he had made other public statements about his understanding on the issues raised by the case.[12]  Noting that he had no active or formal connection with the litigation of the case while he was in the Justice Department, Justice Rehnquist concluded that his testimony on behalf of the Department was not sufficient reason for disqualifying himself from the case.

*Lead Indus. Ass'n, Inc. v. Env't Prot. Agency*, 657 F.2d 1130, 1175 n.136 (D.C.Cir. 1980) (citing *Laird*, 409 U.S. at 825) (cleaned up); *Schurz Commc'ns*, 982 F.2d at 1062 ("noting that "the movants do not and could not argue that a judge should disqualify himself because he has views on a case."); *Phillip v. ANR Freight Sys., Inc.*, 945 F.2d 1054, 1056 (8th Cir. 1991) ("recusal is not required where the judge has definite views as to the law of a particular case.") (cleaned up); *Wessmann*, 979 F.Supp. at 918 (disqualification not warranted by the fact that the judge "advocated a legal position in another case that is implicated in this litigation."); *McBride v. Galaxy Carpet Mills, Inc.*, 920 F.Supp. 1278, 1282 (N.D.Ga. 1995) ("The court does not believe that section 455(a) requires a court to be perceived by the public as being 'opinion-less' about the merits of a plaintiff's case or of the defenses asserted by defendant.  The court does not believe that the general public would question a judge's impartiality simply because the judge might have an opinion with respect to the arguments advanced by the parties.").

The conclusion that a judge's prior expression of a legal opinion does not call for disqualification is particularly warranted where – as here (*see supra*, at Section III(A)(3)) – the legal opinion in question is based on publicly available information and not on an extrajudicial

---

[12] Although defendants acknowledge that "a judge's views on legal issues may not serve as a basis for motions to disqualify," they mistakenly suggest that Justice Rehnquist's comments in *Laird* concerned "general legal issues" that were unrelated to the case before the Court.  (Dckt. #439 at 7).  This is wrong. As the above quotation makes clear, Justice Rehnquist's comments concerned the law and issues that directly related to the subject matter of the *Laird* case.

source.  *See Liteky*, 510 U.S. at 554-55 (holding that the extrajudicial source doctrine applies to Section 455(a)).

Defendants' assertion that a reasonable observer would question my impartiality because plaintiff's Monell claim parallels the 2007 Report's opinion that the high-ranking City officials knew of torture by Burge and his subordinates yet failed to intervene to stop it is similarly unpersuasive.  As stated above, a judge is entitled to have views on issues that pertain to the case in front of them.  *See also United States v. Corbin*, 827 F.Supp.2d 26, 31-33 (D.Me. 2011).[13] Moreover, the 2007 Report's opinion on this issue derives from publicly available information – most prominently, the special prosecutors' 2006 Report (*see, supra*, at Section II(A) – and is therefore not based on an extrajudicial source.  Finally, the fact that I will be called upon to rule on defendants' renewed motion to bifurcate plaintiff's *Monell* claim is of no moment because that will be a procedural decision under Rule 42(b) that will be made without regard to the merits of the *Monell* claim.  *See Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999) (discretionary decision to bifurcate liability claims under Rule 42(b) is made with consideration of judicial economy, potential prejudice to the parties, and the parties' Seventh Amendment rights to a jury trial).

Next, my endorsement of the 2007 Report does not warrant disqualification under Section 455(a) based on the Report's expression of the opinion that the City of Chicago should stop spending public funds to pay private law firms to defend defendants and other officers under Burge's command in lawsuits where plaintiffs allege that they were subject to torture and abuse.

---

[13] In *Corbin*, the judge held that his 2011 comments to the media regarding drug trafficking from Canada is dangerous and that methamphetamine will be difficult to eradicate if it takes hold in Maine did not provide a reasonable basis for doubting his impartiality in a case involving the subsequent 2011 indictment of a defendant for charges including possession with intent to deliver methamphetamine. *Corbin*, 827 F.Supp.2d at 31-33.

Whether the City chooses to either rely on its own lawyers from the Corporation Counsel's Office to defend its police officers or, alternatively, to pay additional public funds to hire lawyers from private firms to do so is a question of public policy that is *not* at issue in this case. A judge's commentary on a public policy question that is *not* at issue in the case prior to when he or she became a judge is not grounds for recusal under Section 455(a).

Indeed, a judge's pre-bench commentary on a public policy issue does not warrant recusal even when that public policy *is* at issue in the case before the judge. *See, e.g.*, *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 471 F.3d 1355, 1358 (D.C.Cir. 2006) ("judges who previously participated in policy matters . . . do not ordinarily recuse in litigation involving those policy issues."); *Southern Pac. Commc'ns Co. v. American Tel. and Tel. Co.*, 740 F.2d 980, 990 (D.C.Cir. 1984) ("It is well established that the mere fact that a judge holds views on law or policy relevant to the decision of a case does not disqualify him from hearing the case."); *Ass'n of Nat'l Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1171 n.51 (D.C.Cir. 1976) ("[J]udges are free to decide cases involving policy questions on which they previously have expressed a view."); *Common Cause Fla. V. Lee*, No. 4:22-CV-109-AW-MAF, 2022 WL 2343366, at *3 (N.D.Fla. Apr. 6, 2022) ("[c]ourts have uniformly rejected the notion that a judge's previous advocacy for a legal, constitutional, or policy position is a bar to adjudicating a case even when that position is directly implicated in the case before the court.") (cleaned up) (citing cases); *Wessman*, 979 F.Supp. at 916-17 (same).

Next, my endorsement of the 2007 Report does not warrant disqualification under Section 455(a) based on the Report's expression of belief that the allegations of the persons who assert that they were abused and tortured by Burge and the officers under his command were credible. As an initial matter, the 2007 Report is at least in part consistent on this point with the

26

2006 Report, in which the special prosecutors expressed the belief that abuse occurred in 74 out of the 148 cases they investigated. (Dckt. #436-1 at 13). Moreover, I have had no contact with any of these prospective witnesses. Even if I had, courts have "consistently held that a judge need not recuse himself on the basis of prior contact with a party or a witness, as long as the judge does not have a familial, financial, or similarly close relationship with the party or witness and as long as the judge has not received out-of-court information about the case at hand." *Johnson v. Mitchell*, 585 F.3d 923, 946 (6th Cir. 2009) (citing cases); *see also Delgado-O'Neil v. City of Minneapolis*, 745 F.Supp.2d 894, 915 (D.Minn. 2010), *aff'd*, 435 Fed.Appx. 582 (8th Cir. 2011) ("Plaintiff's motion is based on the fact that this Court is a former colleague of potential, non-party witnesses in Plaintiff's case. That fact alone would not cause a reasonable person to question this Court's impartiality in this case.").

Furthermore, I will not be called upon to evaluate the credibility of these prospective witnesses when determining whether their testimony is admissible under Rule 404(b), which requires a showing, *inter alia*, that "the evidence is sufficient to support a jury finding that the defendant committed the similar act." *United States v. Long*, 86 F.3d 81, 83 (7th Cir. 1996). Under Rule 404(b), the proffered "evidence must be sufficient so that 'the jury can reasonably conclude that the act occurred and that the defendant was the actor.'" *Id.*, *quoting Huddleston v. United States*, 485 U.S. 681, 689 (1988). Eyewitness testimony (here, the testimony of the alleged torture victim) can suffice, and "the trial court neither weighs credibility nor makes a finding that the [party] has proved the conditional fact by a preponderance of the evidence" when determining the admissibility of evidence under Rule 404(b). *Huddleston*, 485 U.S. at 690; *United States v. Toro*, 359 F.3d 879, 884 (7th Cir. 2004); *Long*, 86 F.3d at 85. Furthermore, it

will be for the jury (and not for me) to assess the credibility of these witnesses should they ultimately testify at trial. *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993).[14]

Finally, defendants' reliance on the decision in *Fairly v. Andrews* is misplaced. The recusal motion in that case did not concern anything that the district judge said or did before he ascended to the bench. Instead, the district judge in that hard-fought case acknowledged his own "negative interactions" with defense counsel while ruling on 146 contested motions, and that he made "unfortunate" and "unusually harsh" comments that touched on his perception of the merits of the case and implied that the manner in which defendants defended the case was a misuse of their office akin to public corruption. *Fairley*, 423 F.Supp.2d at 817-21. It was under those circumstances that the district judge, with utmost caution, recused himself after concluding that the reasonable person standard of Section 455(a) was satisfied. *Id.* at 821. Nothing like this has occurred between me and defense counsel in this case. Defendants' failure to cite a recusal case with circumstances even remotely like those here is telling. *See Schurz Commc'ns*, 982 F.2d at 1062 (denying motion for recusal where, *inter alia*, "[t]he movant[] cite[d] no case similar to the present one.").

---

[14] Defendants also assert that I will have to rule on the admissibility of the 2007 and 2008 Reports should plaintiffs seek to rely on them, noting that plaintiff cited the 2007 Report to support a background fact for his since denied motion for partial summary judgment. (Dckt. #436 at 12; Dckt. #63-3 at 66). In his response, plaintiff does not state that he intends to attempt to introduce these Reports into evidence or even address this point at all. Thus, whether plaintiff might seek to introduce these Reports into evidence is unknown. It is also unclear how the Reports could be admissible evidence since, as mentioned above in Sections III(B) and III(C), they are essentially summaries of publicly available information from other sources. In any event, my recusal is not warranted based on the speculative possibility that I might have to rule on the admissibility of the Reports. *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986) (a judge "should not recuse himself [based] on unsupported, irrational, or highly tenuous speculation.").

In sum: none of the examples cited by defendants – whether taken individually or cobbled together – would cause a reasonable, objective person to entertain a significant doubt that justice would be done in this case.

**2.      Other surrounding facts and circumstances weigh against a finding that a reasonable person would question my impartiality in this case.**

As stated above, the Court is required to consider all of the surrounding facts and circumstances, including the context within which the 2007 and 2008 Reports came into being, in determining whether to recuse itself under Section 455(a). *In re Sherwin-Williams Co.*, 607 F.3d at 477-78.

To recap, the 2007 Report, as its title ("A Report On The Failure of Special Prosecutors Edward J. Egan and Robert D. Boyle To Fairly Investigate Police Torture in Chicago") indicates, was produced by the research team based upon the widespread perception that the special prosecutors had failed to fairly and thoroughly investigate allegations of police torture in Chicago. (Dckt. #436-2 at 2). While the 2007 Report contained opinions regarding legal and factual issues related to police torture, the principal purpose of the Report was to point out the shortcomings of the special prosecutors' 2006 Report (Dckt. #436-2 at 3), and to request further action from the federal, state, county, and city governments to fully investigate the torture scandal, hold those responsible for torture and abuse accountable under the criminal and civil laws, and to provide relief to the victims of the torture and abuse. (Dckt. #436-2 at 49-50; Dckt. #420 at 9). The 2008 Report focused on urging further action by governmental authorities with respect to the torture scandal. (Dckt. #436-3 at 28-29). On the other hand, neither Report mentioned plaintiff Robert Smith, Jr. at all and they therefore expressed no opinion or commentary regarding the actual events in dispute here related to plaintiff's arrest, treatment at the police station, prosecution, and wrongful conviction. I do not believe that an objective,

disinterested person fully aware of the purpose and content of the Reports would entertain a significant doubt that justice would be done in *this* case concerning *this* plaintiff.

Defendants' inconsistent position regarding recusal issues in this case is also relevant under Section 455(a) because it could suggest "strategic motivations" and "judge-shopping." *See United States v. Sampson*, 148 F.Supp.3d 75, 83-84 (D.Mass. 2015), *adhered to on reconsideration sub nom.*, No. CR 01-10384-MLW, 2015 WL 13333677 (D.Mass. Nov. 13, 2015); *see also Hooks*, 89 F.3d at 354 ("Trivial risks are endemic, and if they were enough to require disqualification we would have a system of preemptory strikes and judge-shopping, which itself would imperil the perceived ability of the judicial system to decide cases without regard to persons.") (cleaned up). The facts regarding this issue are as follows.

This case was referred to Magistrate Judge Weisman for discovery supervision and to resolve discovery disputes on May 5, 2021. (Dckt. #23). On June 8, 2021, Magistrate Judge Weisman held a status hearing and informed the parties about his involvement as a federal prosecutor in the criminal case against Burge. (Dckt. #37). As the parties are aware, Magistrate Judge Weisman was a member of the Government's trial team in the Burge criminal case and he delivered the Government's closing argument. *United States v. Jon Burge*, No. 08 CR 846 (N.D.Ill.) ("*Burge* criminal case") (Dckt. #403 – transcript of proceedings – June 24, 2010). In his closing argument, then Assistant United States Attorney Weisman expressly argued that Burge and Yucaitis physically abused and tortured a suspect, that Burge was responsible for the torture of an additional four men, and that a "code of silence" existed in Area 2 during Burge's tenure to conceal the torture and abuse of suspects. (*Burge* criminal case, Dckt. #403 at 11, 25-26, 28-29, 38, 42). Burge was convicted of perjury and obstruction of justice and sentenced to 54 months' imprisonment in January 2011. *See supra*, at n.8.

30

In his June 8, 2021 order in this case, Magistrate Judge Weisman stated that he did not believe that recusal was required under Section 455(b) though he acknowledged that Section 455(a) may be applicable and he ordered the parties to file a joint status report by July 7, 2021 to state whether any party had concerns about his disclosure and would like for the case to be assigned to a different magistrate judge. (Dckt. #37). Magistrate Judge Weisman intended for the forthcoming joint status report to serve as a waiver under 28 U.S.C. §455(e) in the event that none of the parties sought his recusal. (Dckt. #37). On July 7, 2021, the parties filed a joint status report in which they indicated that no party was requesting the recusal of Magistrate Judge Weisman. (Dckt. #49).

Plaintiff asserts that there is no reasonable explanation as to why defendants are seeking my disqualification but did not seek Magistrate Judge Weisman's disqualification under Section 455 given that his role as a Burge prosecutor was far more adverse to the Area 2 detectives and the constitutional violations that occurred there than my action in endorsing the 2007 Report. Plaintiff also notes that Magistrate Judge Weisman had access to the factual record of what occurred at Area 2 and actually interviewed numerous torture victims and presented their sworn testimony in federal court, whereas I had no contact at all with the victims. (Dckt. #438 at 8).

In their reply, defendants assert that they are not judge-shopping and they provide two reasons to explain their decision to seek my recusal and not the recusal of Magistrate Judge Weisman. First, they assert that plaintiff has "ignore[d] the important distinction between a magistrate judge and an Article III district judge" and they proceed to outline the manner in which duties and powers are allocated between the respective positions. (Dckt. #439 at 12). However, defendants overlook the fact that 28 U.S.C. §455(a) applies to "*[a]ny* justice, judge, or magistrate judge of the United States" without differentiation. 28 U.S.C. §455(a) (emphasis

added); *see also Shell Oil Co. v. United States*, 672 F.3d 1283, 1289 (Fed.Cir. 2012) ("Section 455 governs the disqualification or recusal of federal judges."). Both Magistrate Judge Weisman and I are federal judges, and defendants' attempt to draw a distinction between us based on our titles for purposes of the application of Section 455(a) is contrary to the plain text of the statute.

Second, defendants assert that the circumstances surrounding Magistrate Weisman's prior prosecution of Burge are "materially different" from my endorsement of the 2007 and 2008 Reports because his "involvement as a prosecutor for the government in a criminal prosecution that resulted in a conviction is not the equivalent of taking a stance on issues directly related to civil liability of Defendants, including the City." (Dckt. #439 at 13). This too is wrong. The criminal prosecution of Burge raised issues that are directly related to defendants' civil liability here (in particular, whether Burge, Yucaitis, and others under Burge's command at Area 2 engaged in physical abuse and torture of suspects and whether there was a "code of silence" at Area 2 that covered up their actions). As pointed out above, then-AUSA Weisman forcefully (and persuasively) addressed these issues in his closing argument at the Burge trial.

Defendants also ignore the fact that Magistrate Judge Weisman interviewed numerous men who alleged that they suffered physical abuse and torture while at Area 2, prepared them for trial, and implicitly expressed his belief in their credibility by presenting their testimony to the jury in the Burge case and referencing them in his closing argument. Yet, defendants question my impartiality even though I never met these men and have no non-public information regarding them simply because their accounts of physical abuse and torture are referenced within the 2007 Report and taken seriously. *Supra*, at Section III(B)(1). Finally, defendants point to the fact that Magistrate Judge Weisman did not publicly endorse further prosecution against Burge *after* he secured a conviction that sent Burge to the federal penitentiary for 54 months or make

any public comments related to possible civil liability. (Dckt. #439 at 13). However, it was not within then-AUSA Weisman's purview – as a federal prosecutor – to make *any* public statements regarding additional criminal or civil liability for Burge.

In sum: I find that defendants' explanations for their inconsistent position regarding recusal of myself and Magistrate Judge Weisman to be unpersuasive.[15] As I have stated above in Section III(B)(1), I do not find that Section 455(a) requires my recusal. I also decline "to disqualify myself in part because recusal could encourage the reasonable perception that §455(a) can abused to have an impartial judge replaced for strategic reasons." *Sampson*, 148 F.Supp.3d at 84. "This conclusion also serves the interest of assuring that §455(a) is not abused, and does not reasonably appear to have been abused, by a party to manipulate the system to replace an impartial judge with one it prefers." *Id.*, at 122; *In re Bulger*, 710 F.3d 42, 46-47 (1st Cir. 2013) (same).

### 3. The passage of time defeats any appearance of partiality that might otherwise have existed at the time when I endorsed the Reports.

It has been more than 17 years since I agreed to add my name to the 2007 Report and 16 years since I added my name to the 2008 Report. Defendants assert that "the passage of time does not affect recusal," (Dckt. #439 at 9, 11), but they cite no supporting authority, and the Seventh Circuit has held to the contrary when construing Section 455(a). *See, e.g.*, *In re Taylor*,

---

[15] A reasonable observer evaluating the question of my impartiality would also consider that I served as the assigned Magistrate Judge between February 1, 2019 and October 27, 2023 in a wrongful conviction case captioned *Maxson v Dwyer*, No. 16-CV-9417 (N.D.Ill.). The plaintiff in *Maxson* (like plaintiff Smith here) alleges that detectives under Burge's command at Area 2 tortured him into giving a false confession. The individual defendants and the City of Chicago are represented in that case by one of the law firms of defense counsel in this case (Hale & Monico LLC). Nonetheless, the *Maxson* defendants did not seek my recusal under Section 455 despite the fact that I endorsed the 2007 and 2008 Reports and had an active role in overseeing discovery and resolving multiple pretrial motions in that case. *See, e.g.*, *Maxson v. Dwyer*, No. 16-CV-9417, 2023 WL 4352146 (N.D.Ill. July 5, 2023) (denying plaintiff's motion to strike the defendant officers' supplemental disclosures and to bar all witnesses mentioned therein).

417 F.3d 649, 653-54 (7th Cir. 2005) ("Lastly, eight years have passed since the conclusion of

Taylor's cases against Judge Reinhard.  Even if Judge Reinhard was personally biased against

Taylor in 1997, it is unlikely that a reasonable observer would think that his judgment was still

clouded today."); *Schurz Commc'ns*, 982 F.2d at 1061-62 (holding that "[t]he lapse of time is of

course one factor" in determining whether an expert witness affidavit submitted by the judge 15

years ago would cause his impartiality to be reasonably questioned in the case at hand which

concerned at least one common question and holding that it did not).

Numerous other courts have similarly recognized that the passage of an extended period

of time is relevant to the inquiry of whether a reasonable person would question a judge's

impartiality.  *See, e.g.*, *Draper v. Reynolds*, 369 F.3d 1270, 1281 (11th Cir. 2004) (judge's

impartiality could not be reasonably questioned on the basis of his previous affiliation 15 years

earlier with a law firm in which defendant's counsel worked); *United States v. Walton*, 56 F.3d

551, 556 (4th Cir. 1995) (finding that a judge who had worked at a law firm representing the

defendant in four marijuana-related cases approximately 20 years prior to defendant's current

indictment for marijuana use could preside without violating Section 455(a) because the judge's

connection to the defendant was too "attenuated"); *Cipollone v. Liggett Group, Inc.*, 802 F.2d

658, 659 (3d Cir. 1986) (no reasonable person could question a judge's impartiality due to "the

long passage of time" from when he represented a cigarette manufacturer in a similar product

liability case 15 years earlier, and the same conclusion would be reached even if that

manufacturer were a party in the present case); *Chitimacha Tribe of Louisiana v. Harry L.L. Co.*,

690 F.2d 1157, 1166 (5th Cir. 1982) ("The relationship between Judge Davis and Texaco,

terminated at least six years ago, is too remote and too innocuous to warrant disqualification

under §455(a)."); *RRCI Constructors, LLC v. Charlie's/Diamond Ready Mix, Inc.*, No. CIV.

2007-147, 2008 WL 2048355, at *4 (D.V.I. May 12, 2008) ("Finally, the long passage of time since Tutein's prosecution – approximately nine years – lends further support to the conclusion that no reasonable person could question the Court's impartiality in this matter."); *Est. of Londono v. Honeywell Int'l Inc.*, No. 05CV92 WDS/RHS, 2006 WL 6334215, at *12 (D.N.M. May 1, 2006) (denying recusal after stating that "[t]he Court has found no case in which recusal was ordered based on an employment relationship dating back approximately 17 years.").

The above cases are instructive. Given my lack of involvement with the preparation of the 2007 and 2008 Reports, I do not believe that my endorsement of the Reports 16 to 17 years ago would cause a reasonable, objective person to entertain a significant doubt that justice would be done in this case and find that my recusal was warranted under Section 455(a) even if a reasonable person might have had a significant doubt proximate to the time the Reports were issued.

## CONCLUSION

For the reasons stated above, defendants' motion to recuse (Dckt. #436), is denied.

**Date: May 28, 2024**

**Jeffrey I. Cummings**
**United States District Court Judge**

35