IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

Robert Smith Jr., )
               Plaintiff, )   No. 21-cv-1159
v. )
                                    )   Honorable Jeffrey I. Cummings
The City of Chicago, et al. )
)
               Defendants. )

**SMITH'S MOTION IN LIMINE NO. 4 TO BAR REFERENCES TO (1) ARGUMENTS SMITH'S CRIMINAL ATTORNEY FAILED TO MAKE OR CHOSE NOT TO MAKE (2) DECISIONS THAT THE SPECIAL PROSECUTOR MADE; AND (3) DECISIONS MADE BY THE JUDGES IN THE POST-CONVICTION PROCEEDINGS**

Pursuant to Federal Rule of Evidence 401, 402, and 403, the fifth amendment to the United States Constitution, and the attorney-client privilege, Plaintiff Robert Smith respectfully requests this Court to bar Defendants from raising or arguing the following three topics during this civil rights trial:

1. Why Smith's criminal defense attorney failed to make or chose not to make certain arguments during Smith's criminal trial ("defense attorney decisions");

2. Why the Special Prosecutor made certain decisions in Smith's post-conviction proceedings ("Special Prosecutor decisions") and

3. Why certain judges made certain decisions in Smith's post-conviction proceedings ("judges' decisions");

In support of this Motion, Smith states as follows.

### 1A. Why Smith and His Criminal Defense Counsel Did Not Present Medical Evidence During His Criminal Case To Prove That He Had Been Beaten

During summary judgment, Defendants argued that during Smith's criminal case, his defense counsel "presented no medical evidence corroborating his injuries." Defendants' Memorandum in Support of Summary Judgment ("DSJM"), Dkt. 494, at 8. The Court should not permit this argument during trial on both relevancy and prejudice grounds.

First, as Judge Guzman best articulated during the trial of *Patrick v. City of Chicago*, there are numerous attorney decisions made during a criminal case, both pretrial and at trial, over which the criminal defendant has no ultimate authority. The decision to pursue or present certain evidence at a suppression hearing or trial is either made solely by the attorney or, if the attorney consults with the criminal defendant, that consultation is protected from disclosure by the attorney-client privilege. Judge Guzman held,

> I have become increasingly disturbed during the course of this trial by the questions that have been asked of [former criminal defendants] as to what happened during their criminal trials or their motions to suppress, et cetera. The problem with asking those questions is that most of the time they're attempts to impeach by omission, essentially. And most of the time the determination to either include or omit the information being asked about, is being made as much by the attorney for the particular defendant in the criminal proceedings as [by] the defendant himself.
>
> And it involves – to be fully explained by the other side would involve conversations between that party and his or her attorney. And I just find that to be unfair impeachment.
>
> So, as I indicated at the sidebar that we had awhile back, I'm not inclined to allow any more questions about what happened during the criminal trial of these [criminal] defendants, [now civil rights plaintiffs].

*Patrick v. City of Chicago,* No. 14-cv-3658, Dkt.263-1, Trial Transcript at 3128-3129 (N.D. Ill. April 3, 2017) (Guzman, J.).

The same rule should apply here. It is simply not relevant to this civil rights case why the defense attorney did or did not pursue such evidence from 1987-1989 or move its admission into evidence. In addition, to challenge Smith or his lawyer as to *why* they failed to assert such evidence would almost certainly invade the attorney-client privilege. The Court should therefore bar such cross-examination or argument based on relevancy and/or privilege grounds.

Second, Your Honor should also bar this argument because the prejudice Mr. Smith will suffer substantially outweighs the argument's probative value. The jury will be asked to decide whether the Detective Defendants coerced Mr. Smith's oral confession. Smith will

present extensive 1987 medical evidence that he was beaten by Defendants (the "1987 Cermak records"), and Defendants will be permitted to rebut such evidence as best they can. But to permit Defendants to try to impeach the 1987 Cermak evidence on the ground that Mr. Smith and his lawyer either (a) did not sufficiently try to obtain that evidence; or (b) did not obtain it; or (c) obtained it and did not use it, at the suppression hearing in '89 or the criminal trial, in '90 would offer virtually zero probative value and would, if admitted, be highly prejudicial to Mr. Smith.

The prejudice arises because the evidence in fact shows clearly that Mr. Smith was, in fact, not provided with the 1987 Cermak medical records until 2016. Therefore, under FRE 403, the prejudice of permitting such argument substantially outweighs the argument's probative value.

For these reasons, this Court should bar evidence or argument related to any attorney decision to pursue, obtain, present, or move the admission of Smith's Cermak medical records or any other corroborating medical evidence used or not used at the 1989 suppression hearing or 1990 criminal trial.

### 1B. Why Smith and His Criminal Defense Counsel Did Not Argue During Smith's 1990 Criminal Trial That His Confession Had Been Coerced

Smith makes the exact same request to exclude Defendants' additional summary judgment argument that Smith "presented no evidence or argument at [his criminal] trial that coercive conduct led to his confession." DSJM, Dkt.494, at 37. First and second, this argument should first be excluded for both reasons stated above – relevancy and prejudice – but there is also a vital third reason: the only way to present evidence that Smith's confession was the product of the Defendants' coercive conduct was for Robert to have taken the witness stand. Defendants are not permitted – directly or indirectly – to comment on Robert's decision – in conjunction with his criminal defense counsel – to not take the witness

3

stand during his criminal trial. That decision is protected by both the Fifth Amendment Self-Incrimination clause and the Sixth Amendment Right-to-Counsel clause.

The jury in *this case* will be presented with extensive testimony, documentary evidence, medical records, expert testimony, and 404(b) evidence that Defendants coerced Smith's confession. Defendants are free to cross-examine and attempt to discredit that evidence on its own merits, but what they are not permitted to do is harken back to the 1990 criminal trial and assert that because Smith and his counsel did not make that same argument during that trial, the jury should discount or discredit the evidence they are hearing now. Such an argument invades the constitutional right against self-incrimination, invades the attorney-client privilege (because to rebut the inference requested, privileges would need to be disclosed), and most significantly, it masks from the jury that making that argument during the criminal trial would have required Smith to waive his constitutional rights.

There is a fourth major reason the Court should not permit Defendants' "did-not-present-coercion-at-his-criminal-trial" argument. Even if Mr. Smith's counsel was willing to have Smith take the witness stand, there was highly insufficient evidence available to Smith's criminal defense lawyer in 1990 to accuse Chicago Police Detectives of torturing and physically beating suspects in order to gain confessions. Now, 35 years later, we know that such activity was commonplace at Area 2. The City itself has repeatedly admitted as much.[1]

---

[1] As one example only, on May 6, 2015, Alderman Joe Moreno presented to the full City Council a "City Council Resolution" and a "Reparations Ordinance" that admitted to the torture suffered at the hands of Area 2 and Area 3 detectives. The Resolution stated, among other things, that the City Council acknowledged and condemned "any and all acts of torture and abuse inflicted upon the Burge victims" and stating that "words alone cannot adequately convey the deep regret and remorse that we and our fellow citizens feel for any and all harm that was inflicted by Burge and the officers under his command." Dkt. 34, at ¶ 119 (City's Answer in this case). The Ordinance provided reparations to all torture victims who, for whatever reason, no longer had a civil rights claim available to them or who were willing to waive their civil rights claim to obtain the reparations payment. *Id.* ¶ 111. Reparations included a $5.5 million dollar fund meant to ensure that living survivors of Area 2 and 3 torture

Moreover, if this Court were to allow Defendants to argue that Smith and his counsel failed to argue police coercion to Smith's 1990 criminal jury, then unquestionably the Court would also be required to allow Smith's lawyer to explain what evidence of Area 2 coercion was not available to Smith and his defense counsel *at that time* that is available to him *today*.

For all these reasons – relevance, prejudice, the fifth amendment, and the attorney-client privilege – Smith respectfully requests the Court to bar Defendants' "did-not-claim-he-was-coerced-at-trial" argument.

---

received financial compensation. With the exception of a small number who qualified only for partial payment, each torture survivor who applied for reparations received $100,000. In order to obtain such funds, the City either admitted that the individual had a credible claim of having been tortured and for those the City contested, former U.S. District Court Judge David Coar had found, after conducting hearings on each claim, that such claim was credible.

During his presentation, Council Member Moreno read each of the survivors' names who were in attendance, and each torture survivor stood. After several other Aldermen spoke, Mayor Rahm Emanuel addressed the torture survivors and others present and officially apologized on behalf of the City:

> This is another step but an essential step in righting a wrong, removing a stain on the reputation of this great city. Chicago finally will confront its past and come to terms with it and recognize when something wrong was done and be able to be strong enough to say something was wrong.

Addressing the torture survivors (and their families) specifically, Mayor Emanuel continued:

> I want to thank you for your persistence. I want to thank you for never giving in and never giving up and allowing the city to join you on that journey to come face-to-face with the past and be honest enough and strong enough to say when we are wrong and try to make right what we've done wrong. This stain cannot be removed from the history of our city. But it can be used as a lesson of what not to do and the responsibility that all of us have.

***https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2015/april/may or-emanuel--aldermen--and-representatives-of-burge-victims-an.html***.

In the City's Answer to the Complaint in this case, the City admitted that Mayor Emanuel had made such an apology, and admitted that the stain of torture "cannot be removed." Dkt.34, at ¶ 109.

5

### 1C. Why Smith and His Criminal Defense Counsel Did Not Inquire In The Criminal Case About The Kitchen Knife Found At The Scene

On summary judgment, Defendants asserted that Smith's criminal defense counsel failed to use certain evidence at the 1990 criminal trial related to the kitchen knife found at the crime scene. Defendants first argued,

> Smith's defense counsel did not inquire [into] the photographs [or] the Crime Lab sketches [of the kitchen knife] or otherwise attempt to elicit any testimony that suggested the kitchen knife could have been the murder weapon.

CSJM, Dkt.490, at 5-6. Defendants next argued,

> During the original criminal trial proceedings, plaintiff did not contend the kitchen knife was the murder weapon, did not argue that it was exculpatory, did not seek to inspect or test the kitchen knife any further, did not show the jury of the kitchen knife during closing argument, and did not otherwise argue the kitchen knife was relevant to this case in any way.

CSJM, Dkt.490, at 11-12 (collectively, the "failure-to-raise-the-kitchen-knife" argument).

The Court should bar the failure-to-raise-the-kitchen-knife argument for all the reasons already stated above. Arguments that Smith's defense counsel failed to make or chose not make at the criminal trial are simply not relevant to the fact that *during this upcoming trial* Smith will present extensive "kitchen knife" evidence. There could be a million reasons that defense counsel could not have, or chose not to, use such evidence at the trial – everything from:

> even though defense counsel requested it, the Knife was never produced to them, (both facts which are undisputed),

> no photograph of the Knife was ever produced to defense counsel (which we know to be true from the public defender file produced in this case and from Mr. Lemons' imminent testimony),

> Mr. Lemons has no memory of ever having been provided a sketch of the Knife (and, in any event, it is Defendants' burden to prove that it was),

> Even if he was aware of it, it is also possible defense counsel was incompetent in failing to raise it, or

> he lacked the resources to properly investigate it, or

6

>he had a fear of opening the door to the State's experts on the issue, or
>
>he did not have the resources to determine the status of the Knife, or
>
>he made a decision to emphasize different arguments.

Any one or combination of these may be the reason or reasons it was not raised, but the fact that defense counsel did not make the argument 35 years ago in Smith's 1990 criminal trial is not probative of any relevant issue in this 2025 civil rights trial.

In addition to a lack of relevance, permitting inquiry into this issue is too highly prejudicial to Smith for the reasons well-articulated by Judge Guzman in *Patrick*.

In sum, as to all three arguments in this Section 1, the Court should not permit Defendants to attack *the choices* (and if not choices, *the failures*) that Smith's criminal defense attorney may or may not have made more than 35 years ago. That is especially for defense assertions regarding evidence that Smith's discovery counsel Clyde Lemons was never given in the first instance, including both the Knife and the Cermak medical records, as well as decisions that were made under the protection of both the fifth amendment and the attorney-client privilege. For all the reasons, stated here, the Court should find these arguments not relevant, and even if the Court believed such argument might have some nominal relevance, the Court should still bar these arguments under FRE 403.

**2. Why The Special Prosecutor Decided To Move To Vacate Smith's Conviction.**

During Smith's post-conviction proceedings, Smith provided extensive evidence to the assigned Special Prosecutor Myles O'Rourke and his colleagues establishing both his innocence and the fact that much of the evidence admitted against him at trial was extremely suspect. At first, the Special Prosecutor disagreed, but he was open to both evidence and argument, and over time, came to agree that some of the evidence used against Smith at trial was either unreliable or at a very minimum, highly suspect. A central element in the Special Prosecutor's

change of thinking was the manner in which the confession was obtained and the fact that there was very little evidence to actually support the story set forth in the confession.

Defendants now wish to attack the decision of the Special Prosecutor and as discussed in a separate Smith MIL, # 21, that the Special Prosecutor was not in possession of all the evidence he should have been. The fact of the matter is that Defendants should not be permitted to attack the decision of the Special Prosecutor *at all*, for all the reasons stated by Judge Guzman above on page 2 and as he fully elaborated, speaking specifically about the post-conviction and Certificate of Innocence proceedings:

> [My concern about improper impeachment and argument applies equally to the post-conviction] proceedings to obtain exoneration and certificates of innocence. I find questions and comments about what went on during those proceedings . . . to be more and more disturbing because of all of the different reasons [defendants have used to attack those proceedings, such as] the length of the [innocence] hearing, whether there was live testimony or not. Most of those things are not in the control of any of the parties, [either] the [defendant] police officers or the plaintiff in this case. And to use those proceedings as impeachment against either side is, I think, not warranted.

*Patrick v. City of Chicago*, April 3, 2017 Trial Transcript, Dkt.263-1, at 3130.

The Seventh Circuit has repeatedly warned against – and given district court judges great discretion to address – arguments that will take the jury far afield of the central arguments that they are to consider. This discretion is of course imbedded into Rule 403, but the Seventh Circuit has emphasized that it is particularly applicable when the evidence sought to be admitted presents a significant risk of "distracting from core issue." *Williams v. DeJoy*, 88 F.4th 695, 704 (7th Cir. 2023), cert. denied, 144 S. Ct. 2660, 219 L. Ed. 2d 1286 (2024).

    **3. Why Circuit Court Judges Made Certain Post-Conviction Rulings and/or Failed to Conduct a Hearing.**

During summary judgment, Defendants asserted that on October 23, 2020, Circuit Judge Adrienne E. Davis vacated Smith's criminal conviction and sentence *without conducting*

8

*an evidentiary hearing*, and that on November 6, 2020, Chief Criminal Circuit Court Judge Leroy K. Martin awarded Smith a Certificate of Innocence, *without conducting a hearing*. DSJM, Dkt.494, at 9, 10. There are several problems with this combined argument. First, Judge Davis had every right to credit both the prosecutors' motion to vacate Smith's conviction and the prosecutors' more specific, articulated concerns about certain evidence used to convict Smith and certain contradictions and failings in the police investigation. Perhaps even more importantly, there was no requirement that the Court conduct an evidentiary hearing under either Illinois statutes or case law, and Defendants' argument to the jury that she failed to conduct one will certainly imply that there is such a requirement, when none in fact exists. Indeed, the jury will not be equipped to weigh the arguments about what is or is not required of a criminal judge to vacate a defendants' conviction, and it will distract from the far more important legal issues on which the Court will be required to instruct the jury. No evidentiary hearing was required as a matter of law, and therefore it is simply not relevant to any disputed issue that one did not occur.

Second, although Chief Judge Martin did not conduct a hearing, he specifically stated on the record that he was not prepared to rule on the date the petition was first heard and that he wanted to take time to review all of the *written evidence* that had been submitted with the petition before he ruled. That evidence included a 69-page Summary Judgment memorandum and 139 pages of exhibits. Approximately two weeks later Judge Martin stated on the record that he had reviewed all material presented, believed the Petition was well-supported, and issued the Certificate of Innocence ("COI"). Again, the suggestion that a hearing did not occur implies that one was required, when it was not. The Judge made his ruling based on the evidence presented, and to allow Defendants to start attacking the precise procedure he used to do so is going to open up an entire case-within-a-case sideshow that is both not relevant and highly prejudicial.

Finally, permitting Defendants to attack what two judges did or did not do is at the height of the concern expressed by Judge Guzman, when he barred defense counsel in *Patrick* from inquiring into why participants in the criminal process did what they did, given that every decision made by a judge is completely out of the control of both Smith and the Defendant Detectives *in this case*. *See supra* ¶ 1 ("I just find that to be unfair impeachment"). Indeed, Judge Guzman spoke specifically to the various ways in which Defendants had attacked both Patrick's vacated conviction and Patrick's COI:

> And I have to tell you, the same thing goes, frankly, for the [post-conviction] proceedings to obtain exoneration and certificates of innocence.
>
> I find questions and comments about what went on during those proceedings – I did not foresee this at the final pretrial conference – to be more and more disturbing because of all of the different reasons [defendants have used to attack those proceedings, such as] the length of the [innocence] hearing, whether there was live testimony or not. Most of those things are not in the control of any of the parties, [either] the [defendant] police officers or the plaintiff in this [civil rights] case. And to use those proceedings as impeachment against either side is, I think, not warranted.

*Patrick v. City of Chicago*, April 3, 2017 Trial Transcript, Dkt.263-1, at 3130. On appeal, the defendants in *Patrick* did not challenge Judge Guzman's holding in this regard. In other contexts, however, the Sevent Circuit has not been at all reluctant to give district judges wide leeway in this regard. See *Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993) ("[g]iven the substantial risk of prejudice and confusion of the issues, the district court did not abuse its discretion" when (1) it repeatedly barred counsel from attempting to impeach the other party with conduct related to other litigation; and (2) barred counsel from calling rebuttal witnesses in order to do more of the same); *Lindh v. Murphy*, 124 F.3d 899, 903 (7th Cir. 1997) (emphasizing the wide leeway a district court has to limit impeachment, a wholly "discretionary decision in the hands of a trial judge"),

10

For all these reasons, Smith requests the Court to bar Defendants from arguing or presenting evidence that Circuit Judge Davis vacated Smith's conviction *without an evidentiary hearing* and that Chief Judge Martin issued a COI *without conducting a hearing*. Neither fact is relevant to this case under FREs 401 and 402, is prejudicial to Smith for the several reasons stated by Judge Guzman, and such prejudice substantially outweighs the probative value of the argument under FRE 403.

## Local Rule 37.2 Certification

Pursuant to this Court's Standing Order, Plaintiffs' counsel met and conferred telephonically with Defendants' counsel on April 16, 2025, and notified them of Plaintiffs' intention to seek to bar the evidence identified in this Motion. Defendants confirmed that they intend to put on such evidence and that they object to this Motion. Therefore, there remains a dispute about this evidence.

Dated: April 23, 2025

                                        Respectfully submitted,

                                        *PLAINTIFF ROBERT SMITH JR.*
                                        By:  */s/ Stuart J. Chanen*

Stuart J. Chanen
Ariel Olstein
CHANEN & OLSTEIN
8822 Niles Center Rd., Suite 100
Lincolnwood, IL 60712
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com


Nicole Auerbach
ELEVATENEXT LAW LLP
218 N. Jefferson St., Suite 300
Chicago, IL 60661
312-676-5460
Nicole.auerbach@elevate.law