**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Robert Smith, Jr.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  21 C 1159 |
| v. | ) | |
| | ) | Judge Jeffrey I. Cummings |
| The City of Chicago, et al., | ) | |
| | ) | Magistrate Judge M. David Weisman |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO BAR DR. KARL REICH'S OPINIONS**

Eileen E. Rosen
Stacy A. Benjamin
Andrew J. Grill
Brittany D. Johnson
ROCK, FUSCO & CONNELLY, LLC
333 W. Wacker Drive, 19th Floor
Chicago, IL 60606
T: 312-494-1000

*Attorneys for Defendants Philip Cline,
Daniel McWeeny, Steven Brownfield,
William Pedersen, John Solecki, Robert
Dwyer, Estate of John Yacaitis, Estate of
William Higgins, and Estate of Robert Rice*

Terrence M. Burns
Daniel M. Noland
Paul A. Michalik
Molly E. Thompson
Danil J. Burns
Burns Noland LLP
311 S. Wacker Dr., Suite 5200
Chicago, IL 60606
312-982-0090

*Attorneys for Defendant City of Chicago*

---

[1] Defendants continue to use this caption because, while the Court appointed Diane Yeager Smith to continue this action as Smith's representative on August 11, 2022 (Dkt. 296), the Clerk of the Northern District of Illinois has not yet updated the caption in this case regarding the change.

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................... 1

II.     REICH'S QUALIFICATIONS AND DISCLOSED OPINIONS ...................................... 2

A.      Reich's Qualifications.................................................................................................3

B.      Reich's Opinions........................................................................................................4

III.    LEGAL STANDARD ..................................................................................................... 10

IV.    ARGUMENT .................................................................................................................. 12

A.      Reich's Opinions Must Be Excluded Because He Is Not Qualified to Render Opinions Regarding Police Practices and Criminalistics that Go Well Beyond Forensic DNA.......12

B.      Reich's Opinions Must Be Excluded Because They Are Unreliable and Speculative. .....15

C.      Reich Should Be Barred from Testifying as to Reasoning that a Jury Could Apply on Their Own and as to Ultimate Issues in the Case. ...................................................................18

D.      Reich Should Be Barred from Offering Conclusions That Fail to Rule Out Alternative Theories...............................................................................................................20

E.      Reich Should Be Barred from Testifying as to the Credibility of the Parties and Other Witnesses. ............................................................................................................20

F.      Reich's Opinions Must Be Excluded Because They Are Not Helpful to the Jury and Would Confuse and Mislead Them. ..........................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Cases:**                                                                                        **Page(s):**

*Bourjaily v. United States,*
  483 U.S. 171 (1987) ...................................................................................................12, 13

*Brown v. Burlington N. Santa Fe Ry. Co.,*
  765 F.3d 765 (7th Cir. 2014) ................................................................................................11

*Cage v. City of Chicago,*
  979 F. Supp. 2d 787 (N.D. Ill. 2013) ...................................................................................20

*Carroll v. Otis Elevator Co.,*
  896 F.2d 210 (7th Cir. 1990) ...........................................................................................12, 15

*Chapman v. Maytag Corp.,*
  297 F.3d 682 (7th Cir. 2002) ................................................................................................16

*Claar v. Burlington Northern R. Co.,*
  29 F.3d 499 (9th Cir. 1994) ..................................................................................................20

*Cooper v. City of Chicago Heights,*
  No. 09 C 3452, 2011 WL 2116394 (N.D. Ill. May 27, 2011) ..................................................17

*Daubert. Lewis v. CITGO Petroleum Corp.,*
  561 F.3d 698 (7th Cir. 2009) ................................................................................................11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993) ........................................................................................................10, 11

*Davis v. Duran,*
  277 F.R.D. 362 (N.D. Ill.2011) ..................................................................................18, 19, 21

*Estate of Stuller v. United States,*
  811 F.3d 890 (7th Cir. 2016) ................................................................................................15

*Gayton v. McCoy,*
  593 F.3d 610 (7th Cir. 2010) ...........................................................................................12, 15

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ..............................................................................................................16

*Goodwin v. MTD Prod., Inc.,*
  232 F.3d 600 (7th Cir. 2000) ................................................................................................21

*Hall v. Flannery,*
  840 F.3d 922 (7th Cir. 2016) ................................................................................................14

*Harris v. City of Chicago*,
    No. 14 C 4391, 2017 WL 3142755 (N.D. Ill. July 25, 2017) ....................................................12

*Hill v. City of Chicago*,
    No. 06 C 6772, 2011 WL 2550623 (N.D. Ill. June 27, 2011) ......................................................4

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 5815472 (S.D.N.Y. 2013)..........................................................................................12

*In re Groupon, Inc. Sec. Litig.*,
    2015 WL 1043321 (N.D. Ill. 2015) ...........................................................................................12

*Jones v. Lincoln Elec. Co.*,
    188 F.3d 709 (7th Cir. 1999) .....................................................................................................14

*Jordan v. City of Chicago*,
    2012 WL88158 (N.D. Ill. Jan. 11, 2012) ............................................................................20, 21

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ..................................................................................................................16

*Loury v. City of Chicago*,
    2019 WL 1112260 (N.D. Ill. Mar. 11, 2019).......................................................................20, 21

*Mahone v. United States*,
    No. CIV. 07-148-B-W, 2008 WL 504012 (D. Me. Feb. 20, 2008) ............................................13

*Metavante Corp. v. Emigrant Sav. Bank*,
    619 F.3d 748 (7th Cir. 2010) .....................................................................................................16

*Mid–State Fertilizer Co. v. Exchange Nat'l Bank*,
    877 F.2d 1333 (7th Cir.1989) ....................................................................................................16

*Noffsinger v. The Valspar Corp.*,
    No. 09 C 916, 2011 WL 9795 (N.D. Ill. Jan. 3, 2011) ..............................................................15

*Paine ex rel. Eilman v. Johnson*,
    No. 06 C 3173, 2010 WL 749863 (N.D. Ill. Feb. 25, 2010).......................................................21

*O'Connor v. Ford Motor Co.*,
    No. 19-CV-5045, 2025 WL 790240 (N.D. Ill. Mar. 12, 2025)...................................................15

*Thompson v. City of Chicago*,
    472 F.3d 444 (7th Cit. 2006)......................................................................................................18

*Timm v. Goodyear Dunlop Tires North America, Ltd.*,
    932 F.3d 986 (7th Cir. 2019) .....................................................................................................11

*United States v. Christian,*
  673 F.3d 702 (7th Cir. 2012) ............................................................................19, 20

*United States v. Hall,*
  9 F.3d 1337 (7th Cir. 1996) ...................................................................................18

*United States v. Scheffer,*
  523 U.S. 303 (1998).................................................................................................21

*United States v. Truitt,*
  938 F.3d 885 (7th Cir. 2019) .................................................................................12

*Varlen Corp. v. Liberty Mutual Ins. Co.,*
  924 F.3d 456 (7th Cir. 2019) .................................................................................11

*Wendler & Ezra, P.C. v. Am. Int'l Group, Inc.,*
  521 F.3d 790 (7th Cir. 2008) .................................................................................16

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.,*
  395 F.3d 416 (7th Cir. 2005) .................................................................................12

**Statutes:**

Fed. R. Civ. P. 26(a)(2)(C)(ii)...................................................................................15

Fed. R. Evid. 403 ...........................................................................................2, 18, 21

Fed. R. Evid. 702 ................................................................................................ passim

Fed. R. Evid. 703 ......................................................................................................10

# I.    INTRODUCTION

This lawsuit arises out of Robert Smith, Jr.'s conviction for the 1987 murders of his then-wife's mother (Edith Yeager) and grandmother (Willie Bell Alexander) in their South Side home. On or about September 19, 1987, both died from having their throats cut, and a fire was set inside the home to cover up the murders. Serological testing was available at the time, but DNA was not, limiting the conclusions that could be reached by the Chicago Police Department ("CPD") Crime Lab scientists then involved in the forensic testing. More specifically, the forensic scientist at the time was only able to determine in this case whether a substance was blood, and if so, whether it was of human origin and, in some cases, what blood type it was; the scientist was not able to determine whose blood it was. Despite the advent of DNA technology, the special prosecutor assigned to handle the post-conviction proceedings in this case never sought DNA testing before agreeing to vacate plaintiff's conviction and dismiss the charges in 2020. Accordingly, Defendants in this action sought to test certain items of evidence from the crime scene for DNA and indications of blood, including but not limited to the swabs of blood taken from the bottom of plaintiff's bare feet the day of the murders, the socks plaintiff was wearing at the time of the murders, and the blue underwear shorts found on the first step of the basement stairs only feet from where the victim's bodies were found. After Defendants retained DNA Labs International to conduct the forensic testing and they began their work, but before their work was completed, the parties entered into a stipulation that the blue underwear belonged to plaintiff and that "the human blood found on Smith's skin, clothing, and the cuttings from the clothing belongs to at least one of the victims." Dkt. 267. As a result of the stipulation, Defendants no longer needed DNA testing (because plaintiff admitted the blood on his feet and clothing belonged to the victims), and the report Defendants disclosed from DNA Labs was limited to the work they had performed up until the

time of the stipulation, which included identifying precisely where on plaintiff's socks and underwear the victims' blood was found.

To purportedly rebut those opinions, Plaintiff then disclosed Dr. Karl Reich, a DNA analyst. *See* Reich's Final Report ("Report") (Exhibit A); Reich's CV (Exhibit A-1). However, Reich's opinions extend far beyond DNA and serology. Instead of offering science-based opinions from his field of expertise, Reich offers wild speculation about the events of September 19, 1987 and the Defendant detectives' criminal investigation and practices. Faced with the devastating impact of the fact that at least one of the victim's blood was on plaintiff's bare feet, on his socks, and on his underwear found next to the victims, all without any reasonable explanation unless he committed the murders, Reich's opinions are an inadmissible facsimile of plaintiff's attorney's anticipated closing argument in a desperate attempt undermine that damning physical evidence. Plaintiff initially chose not to disclose a police practices expert, and Magistrate Judge David Weisman subsequently denied plaintiff's attempt to disclose one belatedly. Dkt. 409. Plaintiff should not be permitted to shoehorn unsupported conjecture about police practices, how the victim's blood got on the bottom of plaintiff's feet, socks, and underwear, and how certain evidence wound up in certain locations, into his DNA analyst's rebuttal report.

Reich's opinions are not valid expert testimony. They are unreliable speculation, improper argument, or unnecessary observations that are equally within the knowledge of lay jurors. The Court should bar Reich's opinions because he is not qualified to offer them and they are scientifically unreliable. In addition, his opinions are independently excludable because any probative value is far outweighed by the danger of confusing and misleading the jury. *See* Fed. R. Evid. 403.

## II.      REICH'S QUALIFICATIONS AND DISCLOSED OPINIONS

Plaintiff's disclosure of Reich was in response to Defendants' expert disclosure of the opinions of Rachel H. Oefelein, a Forensic DNA Analyst, and Dani Stuart, a Forensic Serologist, both from DNA Labs International. Their expert report, dated May 27, 2022, is titled a "Certificate of Analysis" and sets forth the specific crime scene evidence that they tested, whether blood or DNA was indicated or detected on each item, and whether any further analysis was performed. *See* Defendants' Supplemental Rule 26(a)(2)(B) Disclosures, with attached Certificate of Analysis (Exhibit B). Following Defendants' disclosure, plaintiff sought leave to disclose a "rebuttal serology expert witness" (Dkt. 298), and Judge Guzman granted plaintiff leave to do so by October 21, 2022 (Dkt. 300). On that date, plaintiff disclosed the Report from Reich, an expert who provided opinions on, as he described it in his deposition, "forensic DNA." Reich Dep. Trans. (Exhibit C) at 42:8-9. The introduction to his Report states that his opinions are rendered to a reasonable degree of certainty in the fields of "criminalistics, chemistry, and forensics." Ex. A at 1.

## A.     Reich's Qualifications

Reich's CV is introduced with this heading at the top:

FORENSIC DNA / MOLECULAR BIOLOGY / MICROBIOLOGY / PROTEIN
BIOCHEMISTRY / MICROBIAL AND HUMAN FUNCTIONAL GENOMICS / PROTEIN
PURIFICATION

Ex. A-1. Since 2002, Reich has worked at Independent Forensics, as "Chief Scientific Officer/Laboratory Director/Managing Partner for DNA Forensics, Paternity, and Molecular Biology laboratory." *Id.* His prior employment was in pharmaceutical development and genomics-based research. *Id.* Reich has a Bachelor of Arts in Chemistry and a Ph.D. in Molecular Biology. *Id.* After obtaining his Ph.D., Reich had a two-year fellowship at the Institute Pasteur in Paris, France, and then served six years as a research fellow at Stanford University School of Medicine. *Id.*

While Reich's opinions claim to be rendered to a reasonable degree of certainty in the fields of criminalistics, chemistry, and forensics, plaintiff has not shown that Reich has expertise in criminalistics or in any forensic field beyond forensic DNA and serological testing. *See* Ex. A at 1; Ex. A-1. Reich testified at his deposition that he has been qualified as an expert in the following specific fields: forensic DNA, forensic biology, and forensic DNA statistics. Ex. C at 42:16-20; *see also Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 2550623, at *4 (N.D. Ill. June 27, 2011) (St. Eve, J.) (Because "Dr. Reich is the Chief Scientific Officer for Paternity, DNA Forensics, and Molecular Biology at Independent Forensics of Hillside, Illinois" and has an "extensive academic background and practical expertise in DNA forensics, he qualifies as an expert under Daubert and Rule 702 to testify about the field of DNA forensic analysis."). Reich further testified that he is *not* an expert in police practices or in what a police department needs to do to secure a crime scene. *Id.* at 43:4-6; 45:2-9. He also stated he is not an expert in criminalistics. Ex. A-1; Ex. C at 47:13-48:15. He has never been a law enforcement official and has no experience or training in law enforcement. Ex. A-1; Ex. C at 45:7-20. He has never worked for a police department or in a law enforcement crime laboratory. Ex. A-1; Ex. C at 45:18-20. He does not have any expertise in arson investigation or evaluating the cause and origin of a fire. Ex. A-1; Ex. C at 46:22-47:4. He is also not a fingerprint examiner or an expert in footwear impressions. Ex. A-1; Ex. C at 45:21-46:14.

**B.     Reich's Opinions**

Reich's Report lists the following opinions.

1. *CPD failed to secure the crime scene and preserve the integrity of the physical evidence.*

Reich contends that the CPD failed to erect the proper barriers or tape and failed to communicate with additional law enforcement personnel regarding evidence documentation and collection. Ex. A at 1-3. This opinion is based primarily on Reich's review of CPD's record-

keeping and reports. *Id.* Reich notes, for example, that detectives brought Diana Yeager Smith into the house to determine if anything had been removed from the house, but "failed to document what items inside the scene they and/or Diane had touched or moved during their search of the scene." *Id.* at 2-3. Reich also concludes that the detectives must have improperly secured the scene because a General Progress Report states that later in the evening on September 19, 1987, two men came to remove the washing machine from the basement. *Id.* at 3. Reich does not cite any investigatory standards or experience that he is relying upon to reach these opinions. *See id.* at 1-3.

2. *The condition and history of the crime scene compromised the integrity of the physical evidence.*

Reich concludes that the condition of the first and basement floors "were severely affected by the fire, doused water, and multiple individuals who transversed the scene with little or no regard for evidence preservation or integrity." *Id.* at 3. Reich does not identify any basis for this opinion beyond his review of photographs of the scene. *Id.* at 3-5.

3. *The presence of blood on Smith and his clothes, including his socks and shoes, is neither surprising nor unexpected, and does not implicate him in the murders.*

In support of his conclusion that "identifying diluted blood on [Smith's] shoes and socks would be the expected result," Reich states, "[a]s depicted in photos and subsequent lab drawings of evidence, Mr. Smith was wearing a pair of well-worn, low-cut loafers, which were by no means waterproof." *Id.* at 6. Reich continues, "[i]t would therefore make perfect sense that at least some of the bloody water mixture at the scene would have soaked through his shoes, socks, and stained feet." *Id.* In his Report and during his deposition, other than his so-called "common sense" determination, Reich did not identify any scientific principles, research, or testing that supported his "hypothesis." Ex. C at 61:14-62:11, 110:23-111:8; *see also* Ex. A at 5-6. Reich admits there is no research, testing, experiments, or papers as to this theory, but supports his opinion by saying that "[t]here's a degree of common sense in everyday experience for there are no scientific papers

that have been published." Ex. C at 112:2-13. Reich also did not conduct any further investigation related to Smith's particular footwear or conduct any testing of his hypothesis that the diluted blood would have soaked through to Smith's socks and feet. Ex. C at 112:2-22.

    4.  *The presence of blood on Smith's underwear, given the location where this item was claimed to be recovered from, is also fully expected and does not implicate Smith in the murders.*

As further background as to the issue of Smith's undershorts, while plaintiff had long claimed that the detectives planted them on the first step of the stairs leading to the basement of the crime scene hours after the murders, a CFD photograph depicts the blue undershorts on the first step of the stairs at about 4:30 a.m., shortly after the first responders arrived at the scene to put out the fire. *See* Dkt. 180 at 6-9; Dkt. 148 at 12. Reich supports his opinion regarding alleged inconsistencies between the Defendants' theory and the location of the undershorts by, among other findings unrelated to serology, commenting that "stripping naked while committing a brutal double homicide" is a "rather unusual narrative" and is "inconsistent with Mr. Smith's transcribed statement to police, in which Mr. Smith stated that he removed and washed his clothing in the basement after committing the murders." Ex. A at 7. To further support his conclusion that "claiming that blood on this item has any probative value in determining Mr. Smith's role in the assault is nonsense," Reich also relies on the blue undershorts having been found near where bloody water had pooled and on the non-serological facts that someone had gone through the drawers and cabinets leaving items strewn across the floor, that Mr. Smith kept clothes at his in-laws' house, that Mr. Smith did laundry there, and that the crime scene was unsecured. *Id.* Reich also speculated at his deposition that the undershorts could have "been pushed or scuffed or kicked" into their location on the stairs. Ex. C at 128:1-18. Reich further concluded at his deposition that he does not "find the underwear relevant to the prosecution's theory of the case." Ex. C at 121:3-6. Reich does not cite any scientific basis for these conclusions and does not explain

how such conclusions require the expertise of a DNA analyst as opposed to the lay observations of a jury. Ex. A at 6-7. Instead, Reich states, "I believe I am examining the photograph and having to explain what's – I'm – I'm providing an explanation of how [the underwear] got there." Ex. C at 134:8-20; *see also id.* at 135:4-136:14.

> 5. *CPD compromised the integrity of the evidence by violating several of their own evidence collection and documentation procedures.*

In reaching this opinion, Reich relies on the CPD General Order for collecting, documenting, and inventorying evidence and claims that the CPD's procedures in this case were inconsistent with the applicable General Order. Ex. A at 7-11.

> 6. *The forensic evidence does not support Detective McWeeny's testimony.*

This opinion as to the credibility of Detective McWeeny's testimony relies on Reich's review of photographs, laboratory testing, and laboratory worksheet sketches. *See id.* at 11-13. Specifically, Reich relies on what he believes that evidence showed with respect to the location of blood staining on various items of Smith's clothing and accessories. *Id.* at 12. To remind the Court of the factual background, when Smith and Yeager Smith came to the house shortly before 6:00 am on the morning of September 19, according to Detective McWeeny, Smith ran around the house and threw himself on the floor where there was bloody water in the hallway. According to Smith and Yeager Smith, they were instructed by the officers to exit and wait outside, which they did, but, about 20 minutes later, Smith ran back into the house and approached the detectives. It is not in dispute that Smith struggled with officers and was arrested for obstructing the investigation. In his opinion, Reich concludes that "the pattern of blood staining flatly` contradicts [Detective McWeeny's] contention of 'rolling around' on the bloody floor." *Id.* Reich does not identify any testing or science-based principles that he relies upon to reach that conclusion. *See id.* at 11-13.

> 7. *Review of the 1988 Lab Reports of Ms. Christin Anderson and Dr. Pamela Fish.*

7

Reich concludes that because the testing performed in 1987 and 1988 did not identify Smith's blood type O on any items of the evidence and Ms. Fish's electrophesis results are stated as inconclusive, none of the testing "implicates Mr. Smith in any way to the assault." *Id.* at 13.

8. *The forensic testing performed by DNA Labs International in April 2022 contradicts some of the results of previous testing performed by the CPD Crime Lab in 1987-1988.* [Misnumbered as no. 6 in the Report.]

Reich's opinion that the testing results are inconsistent is supported by, for example, his contention that the Defendants' experts at DNA Labs found blood on the bottom toes area of both socks, while Christine Anderson's findings and drawings show blood staining concentrated on the top area of socks. *Id.* at 14. Reich does not rule out alternative explanations for this alleged "inconsistency" or cite any scientific principles to support his conclusion that the results "need to be considered suspect." *Id.* at 15.

9. *CPD's destruction of the knife found at the crime scene cannot be justified.* [Misnumbered as no. 7 in the Report.]

As a reminder of the role of the kitchen knife in this case, plaintiff alleges that the City violated his due process rights when it destroyed a knife recovered from the house where the double murder took place. (Dkt, 82, Second Amended Complaint ("SAC"), Count XII.) As set forth in the City's motion for summary judgment, contrary to plaintiff's allegations, the evidence shows the kitchen knife was not the murder weapon, not exculpatory and, instead, was likely used by Detective Lawrence Gates of CPD's Bomb and Arson Unit to cut away a piece of the burned carpet in the fire origin area to take it for testing. Subsequently, Area 2 homicide detectives recovered the knife from near the fire origin and it was inventoried and forensically tested.

Reich, after noting that a preliminary chemical test of the knife for blood yielded negative results, opines that there is no "reasonable or justifiable criminalistic reason" to destroy evidence before defense counsel has had the opportunity to inspect it and submit it to his choice of testing

by an independent laboratory. *Id.* at 16. He further concludes, "viewed neutrally, the sole reason for the police's destruction of the knife would be to avoid obtaining evidence that might contradict their assumption of Mr. Smith's guilt or to contradicting [sic.] the prosecution's narrative which included Mr. Smith's purported confession that he committed the murders with a razor blade that he left at the scene." *Id.* at 16-17. Reich does not cite any scientific principles, standards, or law enforcement experience to support this opinion. *Id.* at 15-17.

10. *CPD's destruction of the blue sheet recovered from the crime scene and its failure to produce that sheet to Smith's criminal counsel cannot be justified.* [Misnumbered as no. 8 in the Report.]

When the third-watch detectives subsequently returned to the crime scene, in addition to collecting the blue underwear, they collected a blue bed sheet from the basement floor that appeared to have blood on it. The bed sheet was inventoried and then subsequently "confiscated and destroyed" on September 16, 1997." Property Inventory Ledger (Exhibit D). Reich opines that "the police's destruction of the Blue Bed Sheet, cannot be justified on any grounds: criminalistic, scientific, procedural." *Id.* at 18. Reich further states:

> Because there is no good explanation for the police's destruction of the Blue Bed Sheet, and because the destruction of the Blue Bed Sheet appears to have served no legitimate purpose, we are left with a 'bad' explanation, The police withheld the Blue Bed Sheet and later destroyed it in an effort to suppress evidence that could potentially contradict or undermine the prosecution's narrative, including contradicting the supposed confession by Mr. Smith.

*Id.* Again, Reich does not cite any scientific principles, standards, or law enforcement experience to support this opinion. *Id.* at 17-18.

11. *Certain theories propounded by the policy and Defendants are not supported by the forensic evidence.* [Misnumbered as no. 9 in the Report.]

Reich points to evidence that supposedly discredits certain defense theories. For example, he states that Smith's confession that he cut both victims twice is inconsistent with the Medical Examiner's report because it states one victim was cut once and the other was cut twice. *Id.* at 18.

Reich also states, without reliance on any scientific principles, that the lack of any detected blood in the lint filter is inconsistent with Smith's confession that he washed and dried his clothes after committing the murders. *Id.* Finally, Reich notes, without citing any experience in arson investigation or a comparable field, that there was no evidence that Smith or his clothes smelled of gasoline, fire, or smoke. *Id.* at 18-19.

> 12. *CPD failed to investigate key pieces of evidence.* [Misnumbered as no. 10 in the Report.]

Reich contends the CPD should have taken additional investigative steps, such as comparing the footwear impressions on the bed sheets with Smith's shoes. Reich explains, "comparing footwear impressions is not a scientific field that permits one *to obtain an 'exact match,'* footwear analysis may still be used *to exclude brands of footwear*." *Id.* at 19 (emphasis in original). Reich offers no basis in law enforcement experience or training to support this opinion and seemingly admits that it does not stem from his scientific training.

Reich also contends that the CPD did not attempt to perform comparisons of collected latent fingerprints. *Id.* at 19. Again, Reich offers no training or experience in this area to demonstrate that he has the expertise to determine when it is or is not reasonable and proper for law enforcement to perform a latent fingerprint comparison. *Id.* Nevertheless, Reich concludes that these failures by the police are "at best, confusing and at worst, and indication of cognitive bias writ large." *Id.* at 20.

### III.        LEGAL STANDARD

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Federal Rule of Evidence 702 imposes a special obligation upon a trial judge, acting as a gatekeeper, to "ensure

that any and all scientific testimony ... is not only relevant, but reliable." *Daubert v*, 509 U.S. 579

at 589. Rule 702 provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. To be relevant, expert testimony must "help the trier of fact to understand the

evidence or to determine a fact in issue." *Id.* When determining reliability, the Court's role is to

assess if the expert is qualified in the relevant field and to examine the methodology that he used

in reaching his conclusions. *Timm v. Goodyear Dunlop Tires North America, Ltd*., 932 F.3d 986,

993 (7th Cir. 2019). The party offering expert testimony bears the burden of demonstrating by a

preponderance of the evidence that the evidence satisfies Rule 702 and *Daubert*. *Lewis v. CITGO

Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *Brown v. Burlington N. Santa Fe Ry. Co.*,

765 F.3d 765, 772 (7th Cir. 2014); *Varlen Corp. v. Liberty Mutual Ins. Co*., 924 F.3d 456, 459 (7th

Cir. 2019); *see* Fed. R. Evid. 702, Committee Notes, 2023 Amendments ("the rule has been

amended to clarify and emphasize that expert testimony may not be admitted unless the proponent

demonstrates to the court that it is more likely than not that the proffered testimony meets the

admissibility requirements set forth in the rule."). "Critical questions of the sufficiency of an

expert's basis, and the application of the expert's methodology," are not questions of weight, but

admissibility. Fed. R. Evid. 702, Committee Notes, 2023 Amendments.

# IV.     ARGUMENT

**A.     Reich's Opinions Must Be Excluded Because He Is Not Qualified to Render Opinions Regarding Police Practices and Criminalistics that Go Well Beyond Forensic DNA.**

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). The question is not whether the expert is qualified in general, but "whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010); *see also United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019). The court must look at each of the expert's conclusions individually "to see if he has the adequate education, skill, and training to reach them." *Id.* at 617. "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). A "court should not simply accept a proffered expert—even if he has been accepted as such before; the law requires an inquiry into whether an expert is an expert, and some degree of 'regulation of the subjects and theories about which an expert may testify.'" *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, *10 (N.D. Ill. 2015) *quoting IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, *1 (S.D.N.Y. 2013). *See also, e.g., Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3142755, at *4 (N.D. Ill. July 25, 2017) ("no indication in the record that [the proffered expert] has researched the specialized area of coercive interrogations and false confessions drawing on the principles of rational decision making, perception, and interpersonal influence, or that he has systematically analyzed documented factors that correlate with false confessions"). The witness must meet the Rule 702 threshold of knowledge, skill, experience, training, or education. *See* 2023 Committee Notes to Fed. R. Evid. 702, *citing Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("The

12

preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration.").

Reich's background is in science, specifically pharmaceuticals, biotechnology, and DNA analysis. Yet, Reich's Report contains wide-ranging opinions based on police practices, crime investigation, and the assessment of alleged inconsistencies in the evidence (as a jury should do), as opposed to forensic DNA. In addition to his more general conclusions about deficiencies in the investigation, Reich also attempts to draw conclusions in the fields of, for example, footwear impression analysis, whether footwear is waterproof, and whether latent fingerprint comparison may be viable or reasonable to conduct. *See* Ex. A at 5-6, 19-20. While footwear impressions and latent fingerprint comparison are certainly areas suitable for expert testimony, Reich admits he does not have the requisite expertise in those areas (*see* Part I, *supra*). *Cf. Mahone v. United States*, No. CIV. 07-148-B-W, 2008 WL 504012, at *2 (D. Me. Feb. 20, 2008), aff'd, No. CIV.97-148-B-W, 2008 WL 907665 (D. Me. Apr. 2, 2008) (finding an expert was sufficiently qualified to opine on footwear impressions because she is a trained forensic professional with a specialty in impressions, has a masters degree in forensic science, had made more than 11,000 footwear comparisons, had worked as a 'latent impressions' specialist for more than two years, had twice testified in court as an expert in footwear impressions, had also taken a 40–hour FBI course in footwear and tire impression evidence analysis, and is subject to annual proficiency testing by an outside agency).

Despite Reich's admission that he has never worked in law enforcement and is not an expert in police practices or in what a police department needs to do to secure a crime scene (Ex. C at 43:4-6; 45:2-9), Reich's first opinion in his Report is that the "CPD failed to secure the crime

13

scene" (Ex. A at 1-2; Part II.B., *supra*, at No. 1). Other examples of opinions that are wholly

outside of his field of expertise include:

- Reich opines, solely based on photographs, that the fire, water, and people transversing the scene affected the integrity of the evidence and, thus, "very little, if any, probative information can be deduced from evidence collected from or exposed to the crime scene." Ex. A at 3-5; Part II.B., *supra*, at No. 2.
- Reich opines that bloody water may have soaked through Smith's shoes. Ex A at 5-6; Part II.B., *supra*, at No. 3.
- Reich opines that the underwear likely got in their location (feet from where the victims were found) as a result of CFD or CPD activity, rather than by Smith leaving the underwear at the crime scene after committing the murders, as he told law enforcement. Ex. A at 6-7; Ex. C at 119:23-135:3; Part II.B., *supra*, at No. 4.
- Reich opines that the CPD violated its own procedures. Ex. A at 7-8; Part II.B., *supra*, at No. 5.
- Reich opines as to how blood stains should have appeared on Smith's clothing if he had been rolling around on the floor (Ex. A at 11-13; Part II.B., *supra*, at No. 6), about inconsistencies between Smith's confession and how many cuts each victim had (Ex. A at 11; Part II.B., *supra*, at No. 6), about footwear impressions (Ex. A at 19; Part II.B., *supra*, at No. 12), about the lack of smells from the fire on Smith's clothes (Ex. A. at 18-19; Part II.B., *supra*, at No. 11), and about whether or not the detectives should have done a latent fingerprint comparison (Ex. A at 19-20; Part II.B., *supra*, at No. 12).
- Reich opines, without any scientific basis, that certain testing results from 1987 and 1988 are inconsistent with Defendants' theory or with more recent testing results in this case, and "none of the forensic work implicates Mr. Smith in any way to the assault." Ex. A at 13-15; Part II.B., *supra*, at Nos. 7 and 8.
- Reich opines that "the police withheld the Blue Sheet and later destroyed it in an effort to suppress evidence that could potentially contradict or undermine the prosecution's narrative, including contradicting the supposed confession by Mr. Smith." Ex. A at 17; Part II.B., *supra*, at No. 10. Reich offers similar conclusions regarding the knife. Ex. A at 9; Part II. B., *supra*, at No. 9.

These and other opinions in the Report fall outside the realm of a DNA analyst or "rebuttal

serology expert witness." *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016) (noting that the

court "must look at each of the conclusions [an expert] draws to see if has the adequate education,

skill, and training to reach them"). An expert may only testify to matters within his area of

expertise. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 724 (7th Cir. 1999). A witness with

extensive experience in one field may lack the knowledge and experience necessary to testify in

another. *See Estate of Stuller v. United States,* 811 F.3d 890, 895, 896 (7th Cir. 2016); *see also Gayton*, 593 F.3d at 616 ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."), *quoting Carroll*, 896 F.2d at 212. Reich's role extends well beyond the contemplated "rebuttal serology expert witness" that plaintiff was granted leave to disclose. *See O'Connor v. Ford Motor Co.*, No. 19-CV-5045, 2025 WL 790240, at *14 (N.D. Ill. Mar. 12, 2025) (Cummings, J.) (barring rebuttal opinion that fell outside the proper function of rebuttal, which is "solely to contradict or rebut evidence on the same subject matter identified by another party"), *citing* Fed.R.Civ.P. 26(a)(2)(C)(ii); *see also id.* at *15, *citing Noffsinger v. The Valspar Corp.*, No. 09 C 916, 2011 WL 9795, at *6 (N.D. Ill. Jan. 3, 2011) (other internal citation omitted) ("A party may not offer testimony under the guise of 'rebuttal' only to provide additional support for his case.").

Reich is not qualified by training or experience to offer opinions regarding the quality and sufficiency of a criminal investigation, let alone opinions on the investigative significance of evidence in a murder investigation and whether certain evidentiary facts (extending well beyond the science of serological testing) implicate or do not implicate Smith in the subject crimes. Reich's opinions should be barred because he is not qualified to offer them.

**B.**     **Reich's Opinions Must Be Excluded Because They Are Unreliable and Speculative.**

Even if Reich were qualified to testify as an expert on topics such as, for example, the CPD's adherence to its policies, police practices, the investigative significance of certain evidence, Smith's footwear, and the Defendants' alleged motivation for not testing certain evidence, which he is not, his opinions must nevertheless be excluded because they are not sufficiently reliable to be presented to a jury. To satisfy *Daubert*, the proffered testimony must have a reliable basis in the knowledge and experience of the relevant discipline, consisting of more than subjective belief

15

or unsupported speculation. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). By assessing reliability, the court ensures the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). An expert's opinion must offer more than a "bottom line." *Wendler & Ezra, P.C. v. Am. Int'l Group, Inc.,* 521 F.3d 790, 791 (7th Cir. 2008) (per curiam).

Rule 702 requires that the expert explain the methodology and principles supporting his opinion. *See* Fed. R. Evid. 702. In contravention of these rules, however, Reich states only that the "opinions I provide in this Report are based upon my education, experience, knowledge, and training and rendered to a reasonable degree of certainty in the fields of criminalistics, chemistry, and forensics." Ex. A at 1. Not only does Reich not have sufficient education, experience, knowledge, or training in the relevant areas to support his opinions, but also, simply stating this is the "basis" for his opinions is insufficient under *Daubert*, which requires citations to specific industry standards and professional experiences. *See Kumho Tire Co.*, 526 U.S. at 157. Absent such an analysis, this Court is left with a "bottom line" opinion that lacks a sufficient foundation. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (Experts "cannot simply assert a "bottom line.'"); *Wendler*, 521 F.3d at 791 ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."), *quoting Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir.1989).

As one example, Reich's hypothesis about the blood on the bottom of Smith's foot is the following:

> . . . he's walking through diluted bloody water and that the diluted bloody water got on his shoes, seeped through the shoes, got onto his socks. If you're walking around with wet socks, you're going to transfer that liquid onto the skin. And there could have been enough water to splash. We don't know. I didn't see any pictures one way or the other for that. But that's not an unreasonable hypothesis.

Ex. C at 110:23-111:8; *see* Ex. A at 5-6. Reich admits there is no research, testing, experiments, or papers as to this theory, but supports his opinion by saying that "[t]here's a degree of common sense in everyday experience for there are no scientific papers that have been published." Ex. C at 112:2-13. Reich's opinion is based on mere speculation about the realm of possibilities that could have resulted in Smith having the victims' blood on the bottom of his foot and is, therefore, unreliable under *Daubert*. *See Cooper v. City of Chicago Heights*, No. 09 C 3452, 2011 WL 2116394, at *7 (N.D. Ill. May 27, 2011) (Kendall, J.) ("An expert witness cannot simply speculate because speculation is not based on a reliable methodology."). Other examples of opinions stated only as *ipse dixit* include, but are not limited to, Reich's opinion regarding the bloody underwear (Part II.B., *supra*, at No. 4), the blood stains from rolling on the ground (Part II.B., *supra*, at No. 6), the alleged failure to do a latent fingerprint comparison (Part II.B., *supra*, at No. 12), the lack of bloody lint from the dryer (Part II.B., *supra*, at No. 11), the CPD's motivations behind destroying the knife and blue bed sheet (Part II.B., *supra*, at Nos. 9 and 10), the lack of a smell from the fire on Smith's clothes (Part II.B., *supra*, at No. 11), and the "suspect" inconsistencies between the testing in 1987 and 1988 and in this case ((Part II.B., *supra*, at Nos. 7 and 8).

The opinions offered by Reich, including his assertions throughout his Report that certain evidence does not implicate Smith or that the CPD should have taken additional or different steps in its criminal investigation, are nothing more than *ipse dixit* masquerading as science or they are

based on lay logic that supplants the fact-finding role of the jury. *See* Part II.B., *supra*, at Nos. 1-11. Reich does not explain the methodology and principles that support his opinions, nor does he identify what experience underpins his conclusions. For this reason, and as further described with respect to additional specific deficiencies below, Reich's opinions should be barred.

## C.     Reich Should Be Barred from Testifying as to Reasoning that a Jury Could Apply on Their Own and as to Ultimate Issues in the Case.

Reich's opinions inform the jury about how he believes testimony should be weighed and how credibility should be assessed in relation to Smith's guilt or innocence, the veracity of his confession, and the sufficiency of the criminal investigation. Reich's Report operates under the premise that Smith's confession was coerced. He then informs the jury, through his opinions, what he believes the detectives' motivations were for taking or not taking certain steps in their investigation to conform the evidence to the confession. *See e.g.*, Ex. A at 15-20 (explaining why the detectives destroyed the knife and blue bed sheet and did not conduct certain fingerprint comparisons). Reich's views as to the detectives' purported motivations are not based on any scientific reasoning and certainly not on any that fall within his realm of expertise.

The ultimate consideration in assessing the admissibility of expert testimony is whether it would assist the jury in understanding the evidence. *United States v. Hall*, 9 F.3d 1337, 1342 (7th Cir. 1996). Expert testimony is inadmissible when it usurps the jury's function by replacing its fact-finding position with improper and unreliable expert testimony. *See Thompson v. City of Chicago*, 472 F.3d 444, 458 (7th Cir. 2006). Although an expert witness may provide opinions regarding factual issues, the opinion must "add[ ] something" and not merely be a gratuitous interpretation of the factual record. *Hall*, 93 F.3d at 1343 ("Unless the expertise adds something, the expert is at best offering a gratuitous opinions, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403."); *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D.

Ill.2011) ("[E]xpert witnesses are not allowed to sort out possible conflicting testimony or to argue the implications of those inconsistencies. That is the role of the lawyer, and it [is] for the jury to draw its own conclusions from the testimony it hears."). Rather than aid the jury with expert knowledge, Reich's opinions synthesize the facts for the jury, suggest inconsistencies, and reach conclusions (without ruling out the alternative explanations) on ultimate issues in this matter. Those issues properly remain for the jury to decide.

The following are a few examples, among many, of Reich deciding an issue that should be left to the jury: Reich opines that it does not make logical sense that Smith would have stripped out of his clothes after committing the murders (Ex. A at 7); he opines that photos of Smith's clothes are inconsistent with Detective McWeeny's testimony (*id.* at 12); he opines that there is no reasonable explanation for CPD's destruction of the knife and bedsheet (*id.* at 15-18); he opines that Smith's confession that he cut both victims twice is inconsistent with the Medical Examiner's report because it states one victim was cut once and the other was cut twice (*id.* at 18); and he opines that Smith's confession that he poured gasoline "around the house" is inconsistent with the crime photos showing the fire burned in the dining (*id.* at 19). These and other opinions explicitly controvert Rule 702, which mandates that a proposed expert's testimony address a matter "beyond the understanding of the average person." *Davis*, 277 F.R.D. at 266. Expert testimony does not help the jury when it "can be derived from common sense, common experience, the jury's own perceptions, or simple logic." *United States v. Christian*, 673 F.3d 702, 710-11 (7th Cir. 2012) (quoting 29 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure § 6264 (1997)). In fact, there is no more certain test for determining when experts may be used than the "common-sense inquiry" of whether a layperson could reach a particular conclusion without the expert's help. Fed. R. Evid. 702, Advisory Committee Notes. Because "a witness should not be

allowed to put an 'expert gloss' on a conclusion that the jurors should draw themselves," which is precisely what Reich attempts here, he should be barred from offering his opinions. *See Christian*, 673 F.3d at 710.

**D.      Reich Should Be Barred from Offering Conclusions That Fail to Rule Out Alternative Theories.**

Reich also improperly reaches *ipse dixit* conclusions without assessing the alternative explanations. For example, Reich concludes that it is "suspect" that certain results of the Defendants' experts' testing found blood that was not found through testing in 1987 and 1988 and that a swab was shown to contain DNA over 30 years ago, but it no longer does. Ex. A at 13-15. Reich ignores the fact that it is not uncommon to obtain results now that may not have been obtained in 1988 due to the additional testing and forensic advances of the past several decades. *See id.*; *see also* Oefelein Rebuttal Rep. (Exhibit E) at ¶ 13. Similarly, Reich also fails to acknowledge that swabs that may have tested positive for blood when Christine Anderson tested them decades ago could be subject to degradation and thus later test negative. *See* Ex. A at 13-15; *see also* Ex. D at ¶ 13. Rather than properly examine or rule out other scientific explanations for this purported inconsistency, Reich's opinion improperly jumps to the results being "suspect." Ex. A at 15; *see also Cage v. City of Chicago*, 979 F. Supp. 2d 787, 831–32 (N.D. Ill. 2013), *citing Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (failure to adequately take into account alternative explanations fatal to the admissibility of expert testimony under *Daubert*).

**E.      Reich Should Be Barred from Testifying as to the Credibility of the Parties and Other Witnesses.**

Reich would like to tell the jury not to believe Detective McWeeny (who has died since he gave his deposition in this case). *See* Ex. A at 11-13. Experts' opinions regarding whether they believe or disbelieve certain witness testimony "are clearly inadmissible." *Jordan v. City of Chicago*, 2012 WL88158, at *4 (N.D. Ill. Jan. 11, 2012); *see also Loury v. City of Chicago*, 2019 WL 1112260,

at *4 (N.D. Ill. Mar. 11, 2019) (stating that it is not the role of an expert witness to sort out possible conflicting testimony or to argue the implication of those inconsistencies). "It is the fundamental premise of our trial system that determining the weight and credibility of witness testimony . . . belongs to the jury who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." *Davis*, 277 F.R.D. at 370 (internal quotations omitted), *citing United States v. Scheffer*, 523 U.S. 303, 313 (1998). *See also Jordan*, 2012 WL 88158, at *4 ("It is well-settled that ... experts are not permitted to offer opinions as to the believability or truthfulness of [witness] testimony."); *Paine ex rel. Eilman v. Johnson*, No. 06 C 3173, 2010 WL 749863, at *3 (N.D. Ill. Feb. 25, 2010) ("[E]xperts may not offer opinions as to whether they believe, or disbelieve, the testimony of particular lay witnesses, 'because an expert cannot testify as to credibility issues.'"), *quoting Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000). On this additional basis, Reich's opinion no. 6 (Ex. A at 11-12) and any other opinion as to the credibility of a witness should be barred.

**F.      Reich's Opinions Must Be Excluded Because They Are Not Helpful to the Jury and Would Confuse and Mislead Them.**

Under Rule 403, the Court may exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. For many of the same reasons that Reich's opinions fail to meet the standard under Rule 702 to be deemed admissible, Reich's opinions should be barred under Rule 403. His opinions will unfairly prejudice the Defendants by misleading the jury and supplanting its fact-finding role while operating under the guise of scientific expertise.

WHEREFORE, Defendants request that this Court enter an order barring Dr. Karl Reich as a witness and barring all of his opinions or, in the alternative, barring each opinion that the Court deems inadmissible, and for whatever other relief the Court deems just.

Date: April 23, 2025                                   Respectfully submitted,


/s/ *Stacy A. Benjamin*                                /s/ *Daniel M. Noland*
Special Assistant Corporation Counsel                  Special Assistant Corporation Counsel

Eileen E. Rosen                                        Terrence M. Burns
Stacy A. Benjamin                                      Daniel M. Noland
Andrew J. Grill                                        Paul A. Michalik
Brittany D. Johnson                                    Elizabeth A. Ekl
ROCK, FUSCO & CONNELLY, LLC                            Katherine C. Morrison
333 W. Wacker Drive, 19th Floor                        Molly E. Thompson
Chicago, IL 60606                                      Dhaviella N. Harris
T: 312-494-1000                                        Burns Noland LLP
F: 312-494-1001                                        311 S. Wacker Dr., Suite 5200
                                                       Chicago, IL 60606
                                                       312-982-0090

*Attorneys for Defendants Philip Cline,*
*Daniel McWeeny[2], Steven Brownfield,*                *Attorneys for Defendant City of Chicago*
*William Pedersen, John Solecki, Robert*
*Dwyer, Estate of John Yacaitis, Estate of*
*William Higgins, and Estate of Robert Rice*

---

[2] Daniel McWeeny died on March 6, 2025, and his death was suggested on the record on April 2, 2025 (dkt. 540). No further action having been taken, counsel for the remaining individual defendants include his name here as a placeholder.