# Exhibit A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| People of the State of Illinois, | ) | |
| | ) | |
| Respondent, | ) | No.    87 CR 15089 |
| v. | ) | |
| | ) | |
| Robert Smith, | ) | Honorable Adrienne E. Davis, |
| | ) | Judge Presiding. |
| | ) | |
| Petitioner. | ) | |

## NOTICE OF MOTION

To:

Kwame Raoul, Illinois Attorney General, 100 West Randolph Street, Chicago, Illinois 60601.

Kimberly M. Foxx, The Office of the Cook County State's Attorney, 2650 South California Avenue, Room 11D38, Chicago, Illinois 60608.

The Office of the Special Prosecutor (for Burge-related torture matters) Michael O'Rourke, O'Rourke LLP, 55 W. Wacker Drive, Suite 1400, Chicago, Illinois 60601.

Please take notice that on October 19, 2020, I filed the attached Petition for Certificate of Innocence pursuant to 735 ILCS 5/2-702 and 775 ILCS 40/50(a), a copy of which is attached hereto and served on you.

Please take notice that this Petition will be heard via Zoom at 11:00 a.m. on October 30, 2020, before the Honorable Adrienne E. Davis, or a judge acting in her stead, in Courtroom 506 of the Cook County Criminal Court Building. The Zoom ID is: 951 7153 3982. The Zoom Password is: 486896.

Respectfully Submitted,
By: /s/ *Stuart J. Chanen*

Stuart J. Chanen
Ariel Olstein
CHANEN & OLSTEIN
7373 Lincoln Avenue, Suite 100
Lincolnwood, IL 60712
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| People of the State of Illinois, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | No.   87 CR 15089 |
| v. | ) | |
| | ) | |
| Robert Smith, | ) | Honorable Adrienne E. Davis, |
| | ) | Judge Presiding. |
| Defendant-Petitioner. | ) | |

## ROBERT SMITH'S PETITION FOR A CERTIFICATE OF INNOCENCE

Petitioner Robert Smith respectfully petitions this Honorable Court to grant him a certificate of innocence pursuant to the Certificate of Innocence Act, 735 ILCS 5/2-702 (the "Innocence Statute" or "Section 702") and the Illinois Torture Inquiry and Relief Commission Act, 775 ILCS 40/50(a) (the "Torture Statute" or "Section 40/50"). In support of this request, Mr. Smith states as follows:

### INTRODUCTION

1.      In the early morning hours of September 19, 1987, now thirty-three years ago, an intruder entered the home of Edith Yeager and Willie Bell Alexander in the Roseland neighborhood of Chicago, slashed their throats with a butcher knife, and set their house on fire.

2.      When Diane and Robert Smith went to check on Diane's mother Edith and grandmother Willie Bell later that morning, as they often did, Area 2 Detectives were present at the scene, but the detectives ordered Robert and Diane out of the house, refusing to tell them what had happened to their own family.

3.     When Mr. Smith persisted in entering the house and demanding answers, including "talking back" to Area 2 Detective Daniel McWeeny, a protege of disgraced Violent Crimes Lieutenant Jon Burge, McWeeny promptly threw Smith to the ground, cuffed and arrested him, and directed that he be carted off to Area 2, which in a 1990 exposé in *The Chicago Reader,* journalist John Conroy referred to as the "House of Screams." After being held in custody for 19 hours, during which Area 2 Violent Crimes Detectives repeatedly beat, threatened, and abused him, Smith *orally* confessed to the murders of his in-laws, although later, when the Detectives and an ASA presented Smith with a confession to sign, he refused to sign it.

4.     Three years later, in August 1990, the State obtained Smith's conviction for those murders, relying primarily on three pieces of evidence:

    a. the oral confession beaten out of Smith;

    b. bloody underwear Detectives Higgins *or* Solecki purportedly found at the crime scene, but which in fact was planted at the murder scene; and

    c. Detective McWeeny's false claim that when Smith arrived at the crime scene with his wife, he "dove headfirst into a pool of blood" in order to contaminate the evidence.

5.     Aside from these three pieces of false and fabricated evidence, there is no evidence of any kind whatsoever implicating Mr. Smith in the murders. On the very contrary, there is substantial physical and forensic evidence that contradicts the State's theory of the case and strongly establishes Mr. Smith's innocence. Further, there is evidence in the police record that corroborates Mr. Smith's alibi defense, under which it would have been impossible for him to have committed the murders within the timeframe established by the police, and there is also unimpeached testimony about Mr. Smith's

loving and caring relationship with the victims, demonstrating a complete lack of motive for Smith to have murdered them.

6.      Mr. Smith has maintained his innocence through every step of the criminal justice process – from his first Area 2 interrogation, through and including, his refusal to sign the written confession that an ASA had prepared for him to sign, as well as throughout his suppression hearing, criminal trial, appeals, and imprisonment. He has repeatedly asserted that he was beaten into falsely confessing to a crime he did not commit, for which he had no motive and for which he had no means to commit, as he was several miles from the murder scene at the time it occurred.

7.      In fact, after his conviction, the Court spared Smith the death penalty but sentenced him to natural life, explaining that the State had failed to advance any motive at trial for Smith to commit the murders, there was no evidence that Smith had anything violent in his character, or that he had ever exhibited "violence of any kind," and that "the evidence shows that the man loved his mother-in law and his grandmother-in-law." The Court further reasoned that it could not impose the death penalty in a case where "we have absolutely nothing to indicate what [in fact] happened" and "nothing to indicate why it happened, what the motive was, anything of that kind."

8.      As of Friday, October 23, 2020, Smith has served 33 years, 1 month, and 4 days of that sentence. In 2013, however, both the Illinois Appellate Court and the Illinois Torture Inquiry and Relief Commission (the "Torture Commission") separately concluded that Smith was entitled to an evidentiary hearing on both his Circuit Court post-conviction petition and his TIRC torture Petition. The Torture Commission

3

specifically concluded that "there is sufficient evidence of [Robert Smith's] torture to conclude that his Claim is credible and merits judicial review for appropriate relief." TIRC Case Disposition, *In re Claim of Robert Smith*, TIRC Claim No. 2011-024-S (July 25, 2013). The Appellate Court specifically concluded that the Circuit Court must provide Smith a hearing on his "successive post-conviction . . . with respect to his post-conviction coerced confession claim" because he had met the "cause and prejudice" test sufficient to file a successive petition. *People v. Robert Smith*, No. 1–11–3193, Unpublished Opinion, 2013 IL App (1st) 113193-U, at ¶ 59 (Nov. 7, 2013).

9.   The Office of the Special Prosecutor ("OSP") has told us that on Friday, October 23, 2020, it will move:

(a) to vacate Mr. Smith's conviction;

(b) to dismiss Mr. Smith's indictment in its entirety and with prejudice.

The OSP stated that its decision was based on its belief that Robert Smith is in fact innocent of the crimes for which he had been charged, convicted, and sentenced, and that vacating his conviction and dismissing the indictment are in the interests of justice.

## **JURISDICTION**

10.   This Court has jurisdiction to grant Mr. Smith a certificate of innocence pursuant to both the Innocence Statute and Torture Statute. The Innocence Statute provides that "[a]ny person convicted and subsequently imprisoned for one or more felonies by the State of Illinois which he or she did not commit may . . . file a petition for certificate of innocence in the circuit court of the county in which the person was convicted." 735 ILCS 5/2-702(b). The Torture Statute similarly provides that a court

finding in favor of the petitioner in a post-TIRC judicial proceeding may "enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to re-arraignment, retrial, . . . *or for such relief as may be granted under a petition for a certificate of innocence*, as may be necessary and proper." 775 ILCS 40/50(a) (emphasis added).

## LEGAL STANDARDS

11.     Section 702 provides an avenue for defendants to obtain a finding of innocence in order to obtain relief against the State for wrongful incarceration through the court of claims. *People v. Dumas*, 2013 IL App (2d) 120561, ¶ 16. To obtain a certificate of innocence, a petitioner must prove by a preponderance of the evidence that he or she was neither a principal nor an accomplice in the commission of the charged offenses. *People v. Palmer*, 2019 IL App (4th) 190148, ¶ 150 *appeal allowed*, 144 N.E.3d 1178 (Ill. 2020). To make such determination, the court is required to consider the materials attached to the petition in support of the innocence claim, including any affidavits submitted by the petitioner, as well as testimony from the criminal proceedings related to the conviction which resulted in the wrongful incarceration. *People v. Fields*, 2011 IL App (1st) 100169, ¶ 19. Section 702(g) sets forth the elements that Smith must prove for this Court to grant his Petition:

> (1) the petitioner was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of his sentence;
>
> (2)(A) the judgment of conviction was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either the petitioner was found not guilty at the new trial or the petitioner was not retried and the indictment or information dismissed; or (B) the statute, or application thereof, on which the indictment or information was

5

```
based violated the Constitution of the United States or the
State of Illinois;

   (3) the petitioner is innocent of the offenses charged in the
indictment or information or his or her acts or omissions
charged in the indictment or information did not constitute a
felony or misdemeanor against the State; and

   (4) the petitioner did not by his or her own conduct
voluntarily cause or bring about his or her conviction.
```

All of these elements are met here:

(1) Mr. Smith was convicted of felonies by the State of Illinois, sentenced to a term

of imprisonment, and he has served part of that sentence;

(2) On October 23, 2020, the OPS will move to have Mr. Smith's conviction vacated

and his indictment dismissed;

(3) Mr. Smith is innocent of the offenses charged in the indictment (as discussed

below in the next section); and

(4) Mr. Smith did not by his own conduct voluntarily cause his own conviction (as

discussed in the final section).[1]

## INNOCENCE

12.    Section 702(d) states in pertinent part:

```
The petition shall state facts in sufficient detail to
permit the court to find that the petitioner is likely to
succeed at trial in proving that the petitioner is
innocent of the offenses charged in the indictment . . .
and the petitioner did not by his or her own conduct
voluntarily cause or bring about his or her conviction.
```

---

[1]    Section 702(c)(3) includes a fifth element that Mr. Smith easily meets. His claim is not time-barred. Section 702(i) gives him two years from date his indictment being dismissed to file his Petition. Smith is filing his Petition even before the day of dismissal and will present it formally on the same day as that dismissal.

In evaluating innocence, Section 702(a) directs this Court to consider both evidence suggesting innocence and the absence of evidence that might have been used to prove innocence. Section 702(f) provides that "the court may take judicial notice of prior sworn testimony or evidence admitted in the criminal proceedings related to the convictions." "Whether or not a petitioner is entitled to a certificate of innocence is generally committed to the sound discretion of the court." *People v. McClinton*, 2018 IL App (3d) 160648, ¶ 14 (internal citations and quote marks omitted).

13.     In prior filings with this Court, Mr. Smith has extensively outlined the evidence that fails to prove his guilt, establishes his innocence, and establishes that the evidence used against him was false, fabricated, and planted by the Area 2 Detectives. This evidence further establishes that Smith's purported oral confession was obtained through abuse and coercion and that in any event, the confession is so inconsistent with the actual crime scene evidence, that it cannot possibly be true (even if it was not coerced). Mr. Smith will not repeat in this Petition every piece of evidence to which he has previously pointed, but rather attaches to this Petition as Exhibit 1 and incorporates by reference his April 2, 2020 Memorandum in Support of Summary Judgment ("SJ Memo"), and also attaches as Exhibit 2 all of the Exhibits in Support of the SJ Memo. Therefore, in further support of this Petition, Mr. Smith will summarize the innocence evidence in the following order:

A. After A Suppression Hearing, His Confession Would Be Excluded as Non-Voluntary and Not Believable;

B. In Any Event, The Actual Crime Scene Evidence and Other Evidence Is So Inconsistent with Smith's Confession as to Make the Confession Meaningless;

C. Without the Confession, There Is No Credible Evidence to Convict Smith; and

D. CPD's Complete Failure to Investigate the Murders Is an Additional Basis Supporting Smith's Innocence.


## A. After A Suppression Hearing, Smith's Confession Would Be Excluded as Non-Voluntary

The evidence that Smith gave an involuntary confession is overwhelming:

- The Bond Court Judge ordered Mr. Smith sent to the Hospital;
- A Second Bond Court Judge ordered Mr. Smith to the Hospital;
- Cermak Hospital Records show:
  - "abrasions and bruises to chest, ribs, and left arm;"
  - "right-sided rib fracture;" and
  - no evidence that he had either before going to Area 2.
  - SJ Exhibits 5-9
- Smith's testimony as to "what happened" to him Area 2 has been consistent throughout;
  - "[Smith] has maintained from the beginning in a consistent manner that the confession was coerced." (TIRC Disposition, SJ Exhibit 14, at 4);
- Smith was brought to Area 2 based on a wholly unjustified arrest;
- Smith was in no condition to give a voluntary confession:
  - Trauma of loved-one's deaths;
  - Trauma at house of altercation with police;
  - Cocaine in his system;
  - Alcohol in his system;
  - Prescription drugs in his system;
  - Physical beating at Area 2;
  - Sleep deprivation at Area 2;
  - 18-19 hours of interrogation; and
  - Kept in a dark, locked interrogation room, chained to a wall, during that period.
- Pattern and Practice Evidence that Area 2 engaged in beatings and other forms of torture:
  - 1990 OPS Goldston Report (https://peopleslawoffice.com/wp-content/uploads/2012/02/Goldston-Report-with-11.2.90-Coversheet.pdf);
  - 2006 Special Prosecutor Egan/Boyle Report, (http://www.aele.org/law/2006LROCT/chicagoreport.pdf);
  - 1993 Burge Termination (SJ Memo at 15-16);
  - 2010 Burge Conviction (SJ Memo at 28);

- Det. Yucaitis is alleged to have tortured suspects at least 8 times (SJ Memo at 14-19);
- Detective McWeeny is alleged to have tortured suspects at least 9 times (SJ Memo at 19-24);
- Detective William Pedersen is alleged to have tortured suspects at least 2 times (SJ Memo at 25-27);
- Detective Brownfield is alleged to have tortured suspects at least 2 times (SJ Memo at 19, 33);
- Detective McWeeny took the Fifth Amendment 9 times when asked about torture at Area 2 (SJ Memo at 19-24);
- Detective William Pedersen took the Fifth Amendment 2 times when asked about torture at Area 2 (SJ Memo at 25-27);
- In this case, McWeeny, Cline, Pedersen, and Brownfield all falsely deny that they ever participated in, witnessed, or even heard of suspect torture at Area 2 Violent Crimes (SJ Memo at 27-34);
- Federal Ct. of Appeals Judge Diane Wood held that "a mountain of evidence indicates that torture was an ordinary occurrence at the Area Two station of the Chicago Police Department." *Hinton v. Uchtman*, 395 F .3d 810, 822 (7th Cir. 2005) (Wood, J., concurring).

## B. In Any Event, The Actual Crime Scene and Other Evidence Is So Inconsistent with Smith's Confession as to Make it Meaningless.

Even if the confession were held to be constitutionally "voluntary," it does not constitute credible evidence of Smith's guilt. There are numerous reasons for this, but the two main reasons are: (1) there is too much crime scene evidence that contradicts the confession to make it reliable; and (2) there is too much contradictory evidence about the manner in which the confession was obtained to make it reliable (in addition to the other evidence above that the confession was beaten from Smith).

- The interrogation was 18-19 hours long, and former Chief of Police of Phil Cline admitted at his deposition that the length of an interrogation affects its reliability.

- Significant parts of the police reports contradict the oral testimony of how the oral confession came about.

- Significant parts of the oral testimony of how the oral confession came about are not included in the police reports at all.

9

- Cline's trial testimony proffers an unsupportable timeline of when the oral confession purportedly first occurred.
  - "The testimony about the manner in which Robert Smith initially orally confessed [to the murder] is not credible and far from convincing." (TIRC Disposition, SJ Exhibit 14, at 3);

- C&C Report says Rice and Pedersen took Smith's oral confession, but Cline testified three times under oath that Pedersen left room and he, Cline, took the confession. The GPR summarizing the confession makes no mention of Rice whatsoever.

- The Confession conflicts with much of the physical evidence in the case.
  - Lieutenant Cline testified at his deposition in this case that "corroboration of the murder weapon was one of the most important aspects of the investigation."
  - Smith's oral confession states that he reportedly twice slit the throat of each victim with the murder weapon – a razor blade – that he then threw to the floor while next to the first-floor bathroom:
    - But one of the victims' throats was cut *only once*;
    - No razor blade was ever recovered on the floor of the crime scene;
    - This is so notwithstanding that Lieutenant Cline specifically ordered two detectives to search for the razor blade and specifically told those Detectives what "Smith had said about throwing the razor blade;"
    - Cline testified that he would have expected the detectives to report back to him about the murder weapon, but they never did.
    - A butcher knife was inexplicably found on the floor of the dining room, and without any evidence to support why it would possibly be on the floor of the dining room other than being the murder weapon;
    - Although the butcher knife is listed in the police reports, it appears that it was never tested for fingerprints or blood or DNA, nor was it ever produced to defense counsel, and it also appears that it is now destroyed and unavailable to Smith for testing, which would require a jury instruction and inference that any such testing would have been favorable to Smith.
  - The absence of the razor blade, the presence of the butcher knife, the failure to test the butcher knife, the failure to turn over the butcher knife, and the fact that the butcher knife no longer exists, would, standing alone, lead to the both the complete discounting of Smith's confession and to his acquittal.

- Other aspects of transcribed confession are not plausible.

10

- ○ Smith's written but unsigned confession states that he washed and dried his clothes, after the murder, but before starting the fire. This is not plausible.
  - It is implausible that he just killed two people, and then decided to just hang out and wash and dry his clothes.
  - It is implausible that with blood all over the first floor that he would decided to take off all his clothes upstairs, including his underwear, and then go to the basement naked; perhaps he would have taken off his shoes, but there would be no reason to take off his clothes;
  - The suggestion that he dropped the underwear on the top basement stair on his way down to do his laundry, but never realized that he left that underwear behind is wholly implausible – in other words, he went to all that trouble to wash and dry his clothes and get re-dressed but never in the process noticed that he had dropped bloody underwear on the top stair, or he did notice – when he went up and down the stairs to light the fire – but decided to just leave a pair of bloody underwear on the top stair;
  - No one has provided – or can provide – an explanation of how he go blood on his underwear while he was wearing blue jeans during the murder;
  - No one has provided – or can provide – an explanation of how the underwear got "balled up" if he simply dropped the underwear on the way to the basement;
  - No one has provided – or can provide – an explanation of how a total of fifteen different trained CPD officers, detectives, evidence technicians, and a Lieutenant could all have missed the balled-up underwear when they were searching for evidence in the approximately 14-15 hours before Higgins or Solecki claimed finding the balled-up bloody underwear on the top stair;
  - No one has provided – or can provide – an explanation of how Higgins or Solecki could have uncovered the bloody underwear that broke open the case and purportedly got Smith to confess, but neither Higgins or Solecki remembers actually finding the balled-up bloody underwear on the top stair;
    - ○ "I don't remember; it was either me or Solecki" Trial Tr. at CT81-82 (SJ Memo at 55).
  - Higgins and/or Solecki's credibility on the issue of the bloody underwear is further shot on the ground that they purportedly found a blue sheet covered in blood. Although the blue sheet made it into the police reports, including the cleared and closed report, it was never inventoried, never provided to defense counsel, and has been missing since at least Mr. Smith's 1990 trial. In addition, the story of where and how Higgins or Solecki came to find the blue sheet is

implausible to begin with for all the reasons that apply equally to the balled-up bloody underwear.

- It is not plausible that the Officers and ASA would have taken a confession from a murder suspect that completely lacked any detailed inquiry into what actually happened.
  - ○ "The confession is cursory in nature as far as the substance of the confession is concerned. There are very few details, and most of the answers are very simple and would have been known to RS simply by virtue of his relationship with the victims." (TIRC Disposition, SJ Exhibit 14, at 3).
- Smith refused to sign Confession when it is presented to him for his signature, and since that time has repeatedly disavowed its contents. Put another way, if he wasn't coerced into making the court-reported statement – that is, he made that statement "voluntarily," then why did he refuse to sign the court-reported statement once completed?

With respect to these failures of evidence supporting Smith's confession, the TIRC described each of the above-outlined failures as "the standard characteristics of coerced, false confessions." (TIRC Disposition, SJ Exhibit 14, at 4). "At trial the prosecution's case against [Smith], apart from the confession, was 'almost wholly circumstantial,' 'very weak,' and 'almost nil,' suggesting that the confession was a quick, easy 'solution' to the case." (*Id.*).

## C. Without the Confession, There Is No Credible Evidence to Convict Smith

There is no other admissible, probative evidence to convict Smith.

- The State did not present and does not have motive evidence.
  - ○ "There is 'absolutely no evidence of a motive' for [Smith] to murder his in-laws." (TIRC Disposition, SJ Exhibit 14, at 4.)
  - ○ "The State had failed to advance any motive at trial for Smith to commit the murders." (Judge Savage, September 28, 1990 Smith Sentencing Hearing at G88).
  - ○ "The evidence shows that the man loved his mother-in law and his grandmother-in-law." (*Id.* at G88-89.)
  - ○ "Robert did things for my mother and grandmother like painting the house, mowing the lawn, fixing things around the house." (Diane Yeager's trial testimony at D25-26.)

12

- The State did not present and has no evidence that Smith had anything violent in his history or his character.
  - The State had failed to show that defendant has ever exhibited "violence of any kind." (Judge Savage, Sentencing Hearing at G88.)
- The State did not present and cannot present a murder weapon.
- The State did not present and cannot present any eyewitness to the murders, or even to having seen Smith in that area that night, let alone entering or departing the home.
- The State did not present and cannot present any physical evidence tying Smith to the murders or the break-in into the home.
  - "There was no reliable physical evidence implicating [Smith] in the offense." (TIRC Disposition, SJ Exhibit 14, at 3.)
- The State did not present and cannot present any forensic evidence tying Smith to the murders or the break-in. Indeed, to the contrary, the complete lack of forensic evidence tied to Smith supports his innocence.
  - Although fingerprints lifts were taken (from the gas can, for example), none were tied to Smith.
  - Although there was purportedly hair found in the lint filter taken from the dryer, none of the forensic evidence from that lint filter tied to Smith.
  - Although the dryer lint should have detected microscopic remainder of blood, the State produced no evidence of blood in the lint.
  - Although Mr. Smith purportedly set the house on fire with gasoline, which, according to the "Confession" purportedly "blew up" when ignited, the State did not present and cannot present any evidence that Smith:
    - smelled of gasoline;
    - smelled of smoke;
    - had gasoline, gasoline residue on his body or clothing when he was arrested within 2-3 hours of him purportedly starting the fire that exploded; or
    - had burn patterns, injuries, or any other fire residue on his body or clothing.

- Area 2 Detectives corroborated Smith's alibi defense when they interviewed two witnesses who had been with Smith during the early morning hours when his in-laws were murdered.

- Smith could not have been both where he and two other witnesses said he was during the early morning hours of September 19, 1987, and still have made it to his in-laws' home and back in time for his wife Diane Smith to have picked him up at that location.

13

In short, there is no credible evidence to convict Mr. Smith, and he has to this point, proven his innocence by a preponderance of the evidence.

**D. CPD's Complete Failure to Investigate the Murder is an Additional Basis Supporting Smith's Innocence.**

There is additional overwhelming evidence that CPD failed to pursue numerous exculpatory leads that would have further exonerated Mr. Smith:

- Even though detectives had found a butcher knife at the crime scene (after they had already coerced Mr. Smith into confessing that he killed the victims with a razor blade), the detectives never had the knife tested for fingerprints, blood, or DNA, and the State never presented the knife, or for that matter any murder weapon at all, let alone one linked to Mr. Smith, at the trial.

- Even though the Lieutenant in charge purportedly ordered two Detectives to search for the purported murder weapon – a razor blade – no Detective made any effort to locate a razor blade at the crime scene, there is no discussion of searching for the razor blade in any police report, and no such razor blade was ever located at the crime scene.

- Diane Smith told CPD Detectives that a gun was missing from her mother's home (which was consistent with unspent shells found on the floor of the home), but the Detectives never investigated any aspect of the missing gun or the unspent shells.

- CPD Detectives appear to have never tagged and bagged the bullets found on the floor of the crime scene, or if they did, no inventory sheet was ever prepared, and the evidence was not shared with the defense.

- Diane Smith told CPD Detectives that there was a missing set of keys (why steal keys when Mr. Smith could knock on the door to be let in or borrow his wife's key), but the CPD Detectives never asked a single question of any person about the missing keys, and this remained true after two men mysteriously appeared in the home late in the afternoon on the day of the murders, claiming to have keys to the house.

- Diane Smith told CPD Detectives that approximately one month before the murder, there had been a mysterious ATM Withdrawal from her mother's checking account, but CPD did no investigation whatsoever of the person who made that unauthorized withdrawal. This is especially astounding if the bank had video surveillance timed to that transaction that could have identified someone who had the unauthorized use of Edith Yeager's card.

For all these reasons, Petitioner Robert Smith has met the 702(g)(3) standard of establishing his innocence by a preponderance of the evidence.

## SMITH DID NOT BRING ABOUT HIS OWN CONVICTION

There remains only one further element. Section 702(g)(4), which requires Mr. Smith to establish that he "did not by his or her own conduct voluntarily cause or bring about his or her conviction." This provision was added simply to exclude situations where a petitioner seeks a certificate of innocence despite being responsible for his or her own prosecution. *People v. Dumas*, 2013 IL App (2d) 120561, ¶ 18 (petitioner who voluntarily caused or brought about his own conviction by taking multiple steps to arrange a drug sale was not entitled to certificate of innocence even if acquitted due to insufficient evidence). The Illinois General Assembly decided that such individuals who are later exonerated should not have the same access to a Certificate of Innocence and compensation from the State for "wrongful incarceration." *Id.* at 19 (citing legislative history).

Mr. Smith has easily met this test. Indeed, every step he has taken since the CPD asserted that he had confessed to these murders supports the conclusion that he did not bring about his own conviction: (1) he refused to sign the confession; (2) he pled "not guilty;" (3) he moved to suppress his purported confession; (4) he stood trial; (5) he appealed; and (6) he vigorously pursued his post-conviction rights, including under the Post-Conviction Statute, the Torture Statute, and the Innocence Statute. Smith has not done anything to bring about his own conviction, within the meaning of Section 702(d).

Finally, Mr. Smith's Verification under Section 207(d) is attached.

## CONCLUSION

Pursuant to 735 ILCS 5/2-702(g) and 775 ILCS 40/50(a), Petitioner Robert Smith

respectfully petitions this Court to:

(1) grant him the Certificate of Innocence attached to this Motion as a proposed Order; and

(2) order the Clerk of the Court to send the certificate to the Court of Claims in accordance with Section 2-702(h), consistent with the proposed Order attached to this motion.

Dated: October 23, 2020

Respectfully submitted,

ROBERT SMITH

By:   /s/ Stuart J. Chanen
One of Robert Smith's Counsel

16

Stuart J. Chanen
Ariel Olstein
Chanen & Olstein
7373 Lincoln Avenue, Suite 100
Lincolnwood, IL 60712
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| People of the State of Illinois, | ) | |
| | ) | |
|       Respondent, | ) | No.   87 CR 15089 |
| v. | ) | |
| | ) | |
| Robert Smith, | ) | Honorable Adrienne E. Davis, |
| | ) | Judge Presiding. |
| | ) | |
|       Petitioner. | ) | |

## CERTIFICATE OF SERVICE

I, Stuart Chanen, caused the foregoing *Robert Smith's Petition for a Certificate of Innocence* to be served on the following:

Kwame Raoul, Illinois Attorney General, 100 West Randolph Street, Chicago, Illinois 60601.

Kimberly M. Foxx, The Office of the Cook County State's Attorney, 2650 South California Avenue, Room 11D38, Chicago, Illinois 60608.

The Office of the Special Prosecutor (for Burge-related torture matters) Michael O'Rourke, O'Rourke LLP, 55 W. Wacker Drive, Suite 1400, Chicago, Illinois 60601.

Date: October 19, 2020 ~~19~~ 23

/s/ *Stuart J. Chanen*

Stuart J. Chanen
Ariel Olstein
CHANEN & OLSTEIN
7373 Lincoln Avenue, Suite 100
Lincolnwood, IL 60712
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

People of the State of Illinois,  )
                                   )
      Respondent,          )   No.   87 CR 15089
v.                                 )
                                   )
Robert Smith,                      )   Honorable Adrienne E. Davis,
                                   )   Judge Presiding.
                                   )
      Petitioner.          )

## VERIFICATION IN SUPPORT OF PETITION FOR
## CERTIFICATE OF INNOCENCE

I declare under penalty of perjury that all the assertions made in this Petition are to the best of my knowledge and information complete, truthful, and accurate.

Respectfully submitted this October _____, 2020:


_____
Petitioner Robert Smith

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**PEOPLE OF THE STATE OF ILLINOIS**

v.

No.:  87 CR 15089

Robert Smith
_____ ,
**Defendant/Petitioner**

## ORDER GRANTING CERTIFICATE OF INNOCENCE

This cause comes before the Court on the Defendant/Petitioner's Petition for Certificate of Innocence pursuant to 735 ILCS 5/2-702.  The Court being fully advised finds by a preponderance of evidence that:

1. ☑ The Defendant/Petitioner was convicted of one or more than one felony by the State of Illinois in the County of Cook and was subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

2. ☑ The Defendant/Petitioner's judgment or conviction was reversed or vacated and the indictment or information dismissed or, ☐ a new trial was ordered and either s/he was found not guilty at the new trial or s/he was not retried and the indictment or information is dismissed; or ☐ the statute, or application thereof, on which the indictment or information was based violated the Constitution of the United States or the State of Illinois;

3. ☑ The Defendant/Petitioner's indictment or information was dismissed or s/he was acquitted and a Petition was filed within 2 years of the dismissal of the indictment or information or acquittal;

4. ☑ The Defendant/Petitioner is innocent of the offenses charged in the indictment or information or ☐ Defendant/Petitioner's acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State;

5. ☑ The Defendant/Petitioner did not by his/her own conduct voluntarily cause or bring about his/her conviction.

**IT IS THERFORE ORDERED as follows:**

1. That the Petition for a Certificate of Innocence is GRANTED.

2. That the Clerk of the Circuit Court shall transmit a copy of the Certificate of Innocence to the Clerk of the Court of Claims, together with the Defendant/Petitioner's current address as indicated on the Petition.

**ENTERED:**

Dated:  October 28 ,  2020

_____
**Judge**

_____
**Judge's No.**

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**