Exhibit D

1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   JERMAINE WALKER,                    )
                                         )
 4              Plaintiff,               )
                                         )
 5        vs.                            )  No. 16 C 7024
                                         )
 6   MICHAEL WHITE, ERIC REYES,          )
     SEBASTIAN FLATLEY,                  )
 7   and CITY OF CHICAGO,                )  Chicago, Illinois
                                         )  March 2, 2023
 8              Defendants.              )  1:30 o'clock p.m.

 9              TRANSCRIPT OF PROCEEDINGS -
                 Final Pretrial Conference
10        BEFORE THE HONORABLE MANISH S. SHAH

11
     APPEARANCES:
12
     For the Plaintiff:      THE FAKHOURI FIRM, L.L.C.
13                           BY:  MR. ROBERT S. FAKHOURI
                             77 West Wacker Drive, Suite 4500
14                           Chicago, Illinois  60601
                             (312) 471-8873
15
     For the Officer         HALE & MONICO, L.L.C.
16   Defendants:             BY:  MR. BRIAN J. STEFANICH
                                  MS. BARRETT E. BOUDREAUX
17                                MS. JENNIFER BITOY
                             53 West Jackson Boulevard, Suite 334
18                           Chicago, Illinois  60604
                             (312) 870-6908
19
     For Defendant City:     REITER BURNS, L.L.P.
20                           BY:  MR. PAUL A. MICHALIK
                             311 South Wacker Drive, Suite 5200
21                           Chicago, Illinois  60606
                             (312) 982-0090
22

23
              COLLEEN M. CONWAY, CSR, RMR, CRR
24                 Official Court Reporter
            219 South Dearborn Street, Room 1918
25              Chicago, Illinois  60604
         (312) 435-5594  colleen_conway@ilnd.uscourts.gov
```

1    (Proceedings heard in open court:)

2    THE COURT REPORTER:  16 C 7024, Jermaine Walker

3    versus Michael White, et al; final pretrial conference.

4    THE COURT:  Good afternoon, everyone.  Why don't we

5    start with appearances for the record.

6    MR. FAKHOURI:  Good afternoon, Your Honor.  Robert

7    Fakhouri on behalf of the plaintiff, Jermaine Walker.

8    THE COURT:  And Mr. Walker is not attending the

9    conference?

10   MR. FAKHOURI:  He's available by phone, Judge.

11   MR. STEFANICH:  Good afternoon.  Brian Stefanich for

12   Defendants Reyes, Flatley, and White.

13   MS. BOUDREAUX:  Good afternoon, Judge.  Barrett

14   Boudreaux for the same defendants.

15   MS. BITOY:  Good afternoon, Your Honor.  Jennifer

16   Bitoy on behalf of the same defendants.

17   MR. MICHALIK:  And Paul Michalik for the City of

18   Chicago.

19   THE COURT:  Good afternoon.  So a fair amount of

20   material to get through this afternoon.

21   My agenda is to cover jury selection.  I can give you

22   rulings on all of the motions *in limine*.

23   I don't think we're going to be in a position to

24   finalize the jury instructions.  I had some questions and

25   thoughts about the jury instructions, and I think we need to

1    discuss a little bit the claims and the landscape, the legal

2    landscape.  So I don't think we're going to finalize those this

3    afternoon.  I hope we can have a useful discussion that will

4    get us pretty close to -- at least get me pretty close to how I

5    think I am going to want to handle those.

6              What I typically do in this scenario is that I work

7    towards putting together a set of instructions that I will then

8    propose to the parties, and we'll use that as a working set for

9    a jury instruction conference, likely during trial one evening

10   where we have -- we find the time to do that.

11             With respect to exhibits, similarly I am not going to

12   resolve objections over the contested exhibits this afternoon.

13             My rulings on the motions *in limine* will affect some

14   of those disputes.  And then what I think will make the most

15   sense would be having a bit of a procedure where any exhibit

16   anyone wants to use during the trial needs to be identified and

17   disclosed to the other side at least a day before it's going to

18   be used.  And then if there's an objection to that, you can

19   raise that with me either the morning of or the evening before,

20   and I can resolve those objections as we go forward in a way

21   that eliminates a lot of fights in front of the jury.

22             That has worked for me in the past.  And I don't

23   think there are actually a huge number of disputes on this one.

24   So it may be that after the rulings on the motions *in limine*,

25   things will be pretty smooth as far as exhibits.  But I am just

1  telling you right now, I am not in a position to give you

2  rulings on the exhibits.

3         So before we dive in, the motion to supplement the

4  pretrial order to include a defense request for setoff is

5  granted.  Whether the defense will be entitled to a setoff is a

6  different question, but I'll allow the defense to make its

7  desire of record.  And it's not surprising or prejudicial to

8  the plaintiff that the defense is noting that potential issue

9  now.  So that motion is granted.

10        The motion to start the trial on Tuesday is granted

11  in part.  Here's what I would like to do, if it's okay with all

12  of you, is my plan is to bring the venire down to the

13  courthouse on Monday, have them fill out written

14  questionnaires, and then have them come back on Tuesday, and

15  we'll do -- we'll get started with them in person on Tuesday

16  with jury selection.

17        But if someone is available on both sides Monday

18  afternoon, I can make the written questionnaires -- the

19  completed questionnaires available to you and we can start

20  looking at them then.  We might be able to resolve some obvious

21  "for cause" challenges based on the written questionnaire right

22  then and there.  I will discuss with you the kinds of follow-up

23  questions I would ask of those jurors based on the written

24  questionnaires.  And that way, when the jurors do come in on

25  Tuesday morning, we'll have had some bit of a head start on the

1    jury selection process.

2         One of the problems is I cannot bring a venire into

3    the courthouse on Tuesday because of a conflicting venire that

4    is coming into the building.  So in order for us to get started

5    on Tuesday, I need to bring the venire in on Monday.  But I

6    think, and I hope, that this method would be okay with

7    plaintiff.

8         MR. FAKHOURI:  That works perfectly fine, Judge.

9         THE COURT:  Okay.  So -- and, Mr. Fakhouri, will it

10   be you who's here on Monday?

11        MR. FAKHOURI:  I will be here on Monday, Judge.

12        THE COURT:  Okay.  Great.  We'll work out the timing

13   of all of that later.

14        So -- okay.  So let's talk about jury selection,

15   then.  I have prepared a written questionnaire that I would

16   like to use, and we can hand that out.

17        (Document tendered to counsel.)

18        THE COURT:  So first, let me talk about the estimate

19   of trial length.  The latest I think I saw in the pretrial

20   order was that the parties thought five days would be enough.

21        I am tentatively -- or at least I am proposing that I

22   tell the jury seven, just in case.

23        (Counsel nod.)

24        THE COURT:  Anyone have an issue with that?

25        MR. FAKHOURI:  I do not, Judge.  I think that's fair.

1      MR. STEFANICH:  No issue, Judge.

2      THE COURT:  Always better if we can come under-budget

3  than we go over-budget.  So I will tell them seven, starting on

4  Tuesday, March 7th.

5      The way this works is so the venire, the prospective

6  jurors will get this cover letter and a two-page questionnaire

7  and then a list of witnesses or names that may be mentioned

8  during the trial.

9      In the cover letter, I give them a statement of the

10  case.  And so that's the second paragraph of the cover letter.

11  I have considered what the parties had submitted in the

12  pretrial order, and I made some adjustments.  The point of this

13  is to give the prospective jurors some sense of what the case

14  is about and possibly some key bits of information so that the

15  prospective jurors, if there is a "for cause" problem, they

16  will know enough to alert me.

17      So my proposal is to tell them that:  "This is a

18  civil lawsuit.  Plaintiff Jermaine Walker alleges that in 2006,

19  the defendants, Chicago Police Officers Michael White, Eric

20  Reyes, and Sebastian Flatley, fabricated evidence against him

21  to support criminal drug charges.  Mr. Walker was convicted

22  after a trial and sentenced to a term of incarceration.  In

23  2016, the prosecution moved to vacate Mr. Walker's conviction

24  and he was released from custody.  In this lawsuit, Mr. Walker

25  alleges that the defendants violated his civil rights by

1  fabricating evidence, causing his unlawful detention, and

2  maliciously prosecuting him.  The defendants deny all of

3  plaintiff's allegations.  The jury will decide if Mr. Walker

4  has proven his claims and whether to award him an amount of

5  money as compensation."

6          So I am trying to give them a sense of timing of

7  who's involved; that drugs might be coming up in the trial; the

8  nature of the civil rights claims at issue; and that damages is

9  a concept that might come up as well.

10         So let me now ask, having spent enough time to give

11 you a chance to actually read it, whether you have any comments

12 or edits, starting with plaintiff.

13         MR. FAKHOURI:  Your Honor, my only comment would be

14 that, you know, in addition -- and I know this has been

15 discussed before the Court on a prior occasion.  But with

16 respect to the fact that the City of Chicago will indemnify

17 these officers, I do believe it would be important that the

18 jury would be informed that the City of Chicago is a defendant

19 in this matter, and that should be included because they are a

20 defendant.

21         THE COURT:  I thought there was an unopposed in

22 *limine* --

23         MR. MICHALIK:  There was, Your Honor.  It was

24 unopposed.  And that's one of the agreed motions *in limine*.

25         THE COURT:  Yes.  There was an unopposed motion *in*

1      *limine* to effectively treat the City of Chicago as not a party

2      in this case, so that the jury need not be informed that the

3      City is in.

4              So here's -- and I'll just tell you, I would have

5      granted that motion, even if it had not been unopposed, unless

6      there is going to be some issue as to punitive damages and the

7      individual officers' financial wherewithal to pay punitive

8      damages.  And if we're getting into the officers' inability to

9      pay punitive damages, then that may very well lead me to say:

10     Well, the jury ought to then know that the City is indemnifying

11     on compensatory damages.

12             Usually how that plays out is that the officers

13     aren't making a financial poverty issue as to punitives, and so

14     indemnification becomes not an issue.

15             And my view is that indemnification generally is not

16     a fact, a relevant fact for the jury in assessing the amount of

17     damages caused by the conduct.  So --

18             MR. FAKHOURI:  That would be my only criticism,

19     Judge.  So that's fine.

20             THE COURT:  Very good.

21             Any edits or revisions from the defendants?

22             MR. STEFANICH:  Yes, Judge, one small suggested edit.

23     Where you describe the claims, so the sentence that starts, "In

24     this lawsuit," I think we would propose, "In this lawsuit, Mr.

25     Walker alleges that the defendants violated his civil rights by

1    fabricating drug evidence" as opposed to just "fabricating

2    evidence."

3              THE COURT:  So I purposefully didn't do that because

4    I am not exactly sure what we are going to be talking about --

5              MR. STEFANICH:  Okay.

6              THE COURT:  -- in terms of the fabrication of

7    evidence.  And, again, this is just the cover letter before

8    anything has started.  So I appreciate that point, but I will

9    leave it as is.

10             Any other suggestions?

11             MR. STEFANICH:  No, Judge.

12             THE COURT:  Then I, in the cover letter, let the

13   prospective jurors know what our estimate of trial length is,

14   and then I ask them to fill out the questionnaire.  And then I

15   give them a warning not to do any research or talk about the

16   case, because we'll be letting them go and then they'll be

17   coming back.  So I try to enforce that.

18             Then on the questionnaire, you will see that I ask

19   the basic biographical questions that I am sure you're all

20   familiar with, including education, occupation, spouse's

21   occupation, other adults in the household, hobbies, interests,

22   sources of information, organizations, prior jury service,

23   involvement in lawsuits or criminal cases, connections to

24   government agencies.  Then with respect to this case,

25   specifically Chicago Police Department, Cook County State's

1   Attorney's Office, legal training.  And then some catchall

2   questions about the ability to be fair to both sides.

3           I will -- what happens is when jurors answer these

4   questions, if there is an answer -- so, for example, "Have you

5   ever served on a jury," and they just answer "Yes," my plan is

6   to just ask follow-up questions, "Well, what kind of jury was

7   it?  Don't tell me the verdict, but did you reach a verdict?"

8   And if they express any views that require follow-ups, I'll do

9   that in person.

10          I did consider the voir dire questions that both

11  sides had proposed, and to the extent I am not asking them,

12  that's because I am satisfied that the questions I am covering

13  are enough and adequate to identify any "for cause" problems,

14  as well as giving you enough information such that you could

15  exercise peremptories.

16          My main concern is finding any "for cause" problems

17  in the jury.  I am less concerned about giving you fodder for

18  peremptories.  But I'll give you enough to exercise your

19  peremptories.

20          So we will get the written questionnaires.  We'll

21  have an opportunity to look at those before the jurors come

22  back, if everyone's available.

23          You are not allowed -- if you get early access to the

24  questionnaires, you are not allowed to do any research on any

25  of the jurors.  I like to preserve as much the ability or the

1    premise that we're all doing it at the same time, all in the

2    courtroom, and nobody has access to hours and hours of free

3    time to research jurors.  So we're not -- I am forbidding you

4    from conducting any research on the jurors.

5           We'll review the written questionnaires, and once we

6    see them, I'll talk to you about what follow-ups I think are

7    appropriate for any one juror based on their answers.  And I'll

8    solicit from you any follow-ups you think should be asked based

9    on the answers in a questionnaire.  And if someone has written

10   something that suggests a "for cause" challenge right then and

11   there, we can address it based on the questionnaires

12   themselves.

13          I am ordering 32 jurors to come in.  I will seat

14   eight jurors for the trial.  That gives us a fair number of

15   extra jurors.  We need to have 14 jurors after "for cause"

16   challenges for each side to exercise three peremptories and

17   then have eight left over.  So I think 32 is probably going to

18   be more than enough, my hope is.  And you will know who's at

19   the front of the line and who's at the back of the line.

20          So once all the jurors are here, I will do all of the

21   questioning.  I will individually ask each juror to stand and,

22   using a microphone, I'll review with them the answers in their

23   written questionnaire.  I'll ask them follow-up questions.

24          We'll do that for the first 14.  After we have gone

25   over the questionnaires with the first 14, I will ask the group

 1   a few follow-up questions, asking for a show of hands if they

 2   have any issues.  And those questions are usually just to

 3   impress upon them the need to make a decision based on the

 4   evidence in the courtroom, not based on outside sources; find

 5   out whether anyone has any sort of philosophical or religious

 6   or moral reason why they can't sit as a juror, and those kinds

 7   of questions.  And if I get a show of hands, I'll ask

 8   follow-ups of those individual jurors.

 9          After we do all of that for the first 14 jurors,

10   we'll go to sidebar and I'll ask the lawyers:  Based on those

11   first 14, are there follow-up questions you'd like me to ask of

12   anyone of those first 14?  And if I think that's a good

13   question to ask, I'll ask the follow-ups.

14          Once we're done with all follow-ups as to the first

15   14, I'll then ask you at sidebar:  Do you have any "for cause"

16   challenges to that group of 14?  And I'll resolve any "for

17   cause" challenges.  If there are no "for cause" challenges, we

18   will then have questioned enough jurors for you to exercise

19   your peremptories and we'll go to peremptory challenges.

20          If there have been successful "for cause" challenges

21   or agreed disqualifications for hardship and the like, I'll

22   continue, repeat the process with the next batch of jurors.  I

23   might not do another 14, depending on how many jurors I think

24   we need.

25          I won't tell anyone that they have been excused.

 1  I'll just keep going through the process.

 2          And, again, I'll ask -- I'll review the

 3  questionnaires with each individual juror.  I'll ask follow-up

 4  questions.  I'll ask some additional questions, asking for a

 5  show of hands.  I'll ask follow-ups from there.  We'll go to

 6  sidebar and I'll ask you if you have any follow-ups of the next

 7  batch.  We'll repeat.  We'll do "for cause" challenges and so

 8  on until we all know that we have 14 jurors on our list after

 9  "for cause" challenges.

10          Sidebar.  Have you conducted trials in our building

11  now post-pandemic?  And are you familiar with our sidebar

12  mechanisms?

13      (Counsel nod.)

14          THE COURT:  Some of you are; some of you aren't.

15          We don't move anywhere for sidebars.  We put on

16  headsets that are at counsel table.  We turn on a white noise

17  machine so no one can hear; but if you speak into the

18  microphone and are listening on the headsets, you can hear

19  what's being said.  And so we just do the sidebars that way,

20  and that's what I mean by sidebar.

21          Usually, I can have a civil jury before lunch, and

22  hopefully we'll be able to do that this time around as well.

23          Depending on how early it is that we've resolved all

24  the "for cause" challenges, I may give you a 15-minute break or

25  a 20-minute break to do your peremptories.  Or if we're really

1    at the lunch hour, we'll break for lunch and I'll bring

2    everyone back, and we'll resolve the peremptories.

3           Each side will have three peremptory challenges.

4    Defense will share the three, and the plaintiff has three.

5    There are no alternates in a civil trial.  The first eight

6    jurors on the list that survive that process will be the jury.

7           I've done all of that talking to give you some time

8    to look at the questionnaire and let me know if you have any

9    issues with the questionnaire.  I'll start with plaintiff.

10          MR. FAKHOURI:  No objection to anything on the

11   questionnaire, Judge.

12          THE COURT:  Can we take a moment to look at the list

13   of names?

14          MR. MICHALIK:  Judge, if I may?  Is there an extra

15   copy that I could look at?

16          THE COURT:  Do we have an extra copy?

17      (Law clerk nods, tenders document to counsel.)

18          THE COURT:  Where there were entities associated with

19   individuals, I put the entity next to that individual.

20          I understand that some of these individuals are not

21   current employees of some of these entities, but I think that's

22   how they're going to be identified in the case.  I don't feel

23   strongly about it, but I would like to at least confirm that

24   I've got the right names, I've got the right spelling, I've got

25   the right entities.

1        There was one individual, I think it was Officer

2    Nicpan, I wasn't sure in the materials if I even had a first

3    name.  But we gleaned that his first name might be Dennis, and

4    so we put "Dennis" in there.

5        On behalf of plaintiff, are there any names that you

6    think are missing from this list?

7        MR. FAKHOURI:  No, Judge.

8        THE COURT:  And so, defense, any comments or concerns

9    about the questionnaire?  And then any issues with the list of

10   names?

11       MR. STEFANICH:  No objection on the questionnaire,

12   Judge.  And there is no names on the list that you forgot,

13   so --

14       THE COURT:  And do I have the spelling right, as far

15   as everyone knows?

16       MR. FAKHOURI:  You know, I just wanted to check

17   Gamele Folston, Judge.  I thought it was with an E at the end,

18   but I just want to double-check here.

19       (Pause.)

20       MR. FAKHOURI:  That's correct, Judge.

21       THE COURT:  Any spelling or typo issues from the

22   defense?

23       MR. STEFANICH:  No, Judge.

24       THE COURT:  Okay.  So we've then finalized the

25   questionnaire.

1          Any questions about jury selection?  Plaintiff?

2          MR. FAKHOURI:  Nothing from plaintiff, Your Honor.

3          MR. STEFANICH:  No, Judge.

4          THE COURT:  So let's turn to motions *in limine*.

5          I am going to jump around on motions *in limine*.  I

6    have tried to -- at least I just organize my thoughts in a

7    certain way, and so -- but please keep track and make sure I

8    haven't forgotten something.

9          Let me start with the unopposed motions *in limine*.

10         Plaintiff's motion *in limine* No. 2 was -- there was

11   no opposition to 2, so that was granted.  That was about other

12   lawsuits.

13         Plaintiff's motion *in limine* 13, to exclude

14   commendations, is granted without objection; based on

15   defendants' motion *in limine* No. 13, to which there was no

16   objection, so that's granted, about prior acts of the defendant

17   officers.

18         Defendants' 12 about plaintiff's counsel's

19   conviction.  That there was no objection to, so that's granted.

20         Defendants' 14 about the COPA investigation.  There

21   was no objection to that, so that's granted.

22         And defendants' 18 about the sentence, the 22-year

23   sentence, there was no objection to that, and so that's

24   granted.

25         I think that covers all of the unopposed -- now

1    unopposed motions *in limine*.  Have I missed any?

2            MR. STEFANICH:  I don't believe you missed any,

3    Judge.

4            THE COURT:  Mr. Fakhouri, have I missed any?

5            MR. FAKHOURI:  No, Judge.

6            THE COURT:  Okay.  So those are the unopposed ones.

7            So that leads me, then, to plaintiff's No. 1 and

8    defendants' 17 about plaintiff's prior arrests and convictions.

9            In light of the agreement or a lack of opposition to

10   defendants' 18 about the sentence, do I understand correctly

11   that the sentence is not going to be offered by either side?

12           MR. FAKHOURI:  That's right, Judge.  The sentence.

13           THE COURT:  Okay.  So on plaintiff's motion *in limine*

14   No. 1 and defendants' motion *in limine* No. 17, those are

15   granted in part, denied in part.

16           As to the armed robbery conviction, I am excluding

17   the armed robbery conviction.

18           Plaintiff's opinion about the wrongfulness of his

19   conviction, in my view, isn't actually relevant.  And so his

20   opinion about whether it was wrongful that he was convicted in

21   the case at issue here or wrongful that he was convicted in the

22   armed robbery case is not relevant.

23           And while it might be relevant to his concept of

24   damages and his feeling of having been subjected to a wrongful

25   conviction, my view is that the fact of an armed robbery

1  conviction is unfairly prejudicial. It raises a specter of a

2  propensity inference that I don't think could be adequately

3  cured by a limiting instruction.

4  And to the extent that Mr. Walker pled guilty to a

5  crime he says he didn't commit, there may be an impeachment of

6  him for making a false statement under oath. If he, under

7  oath, admitted to a crime that he says he didn't do, there may

8  be impeachment for saying something under oath that isn't true,

9  but that need not elicit the nature of the crime or the

10  sentence that he received for that. And I am not so sure the

11  defendants are going to even try that kind of impeachment.

12  Mr. Walker's prior experience in prison, which might

13  be elicited if I allowed the armed robbery conviction to come

14  in, may be relevant to damages in the sense of evaluating the

15  harm he suffered from his experiences in prison for the

16  sentence at issue, but that point could be made without, again,

17  getting into the conduct that led him into prison on an earlier

18  occasion.

19  So the fact of a prior armed robbery conviction is --

20  I am excluding that under Rule 403.

21  The forgery conviction will be allowed. It goes to

22  honesty.

23  Mr. Walker's credibility is a central issue in this

24  case, so the value of impeachment is high. And it's not

25  substantially outweighed by unfair prejudice. It's not a

1    particularly, in my view, prejudicial or inflammatory crime

2    that would inflame the passions of the jury.  And here, I do

3    think a limiting instruction that the conviction can only be

4    used to evaluate his credibility will eliminate the risk of any

5    improper consideration by the jury.

6           The retail theft conviction will not be allowed.  I

7    am not given any more information other than it was retail

8    theft over $150, and I am not persuaded that that is

9    significant enough of value to make this a crime of dishonesty.

10          And even if there is some sufficient way to think

11   that that was a kind of dishonest crime, when balanced against

12   the prejudicial effect of a felony conviction that is that old,

13   I nevertheless conclude that under Rule 403, it should be kept

14   out.

15          So the retail theft I will not allow.  I have some

16   questions about the Tennessee marijuana conduct and

17   convictions.

18          The information I have, or at least from the briefs,

19   it's these are misdemeanor possession cases.  They're not

20   distribution cases.  So to the extent the defense is saying

21   they impeach Mr. Walker's statement that he's never been

22   involved in a drug deal before, I am not so sure they do if

23   they're just possession cases, unless you're saying:  By saying

24   he was never involved in a drug deal, he's saying he never

25   purchased drugs, and these misdemeanor convictions somehow bear

1     on that.

2         So I guess I am asking, what --

3         MR. FAKHOURI:  They were --

4         THE COURT:  Is there anything more to know about

5     these Tennessee misdemeanors?

6         MR. FAKHOURI:  Judge, they are just possession

7     charges.  They are not a distribution charge.

8         THE COURT:  And the timing of them with respect to

9     the defense argument that at least the 2005 one might be

10    relevant to rebut a claim by Mr. Walker that his life was on

11    the straight-and-narrow at the time of these events, do you

12    have a response on that?

13         MR. FAKHOURI:  Yeah.  Frankly, all of Mr. Walker's

14    convictions, Judge, are well over ten years, ten years,

15    including the distribution of the marijuana.

16         And, again, being in possession of marijuana does not

17    rebut the claim that he was delivering with -- you know, had

18    the intent to deliver within a thousand feet of a school, which

19    is the subject of this case.

20         THE COURT:  Well, what about the argument that --

21    with respect to his damages?  That he was going to be otherwise

22    living a full and productive life that would have generated X

23    amount of income, or the prospects of a life that could be

24    evaluated by X amount of dollars?  And the defense, I think,

25    wants to make the point:  Well, it doesn't look like he was on

1 that track because he had this misdemeanor conviction in 2005,

2 right close in time to the events here.

3 　　　　　MR. FAKHOURI:  Your Honor, the misdemeanor -- the

4 misdemeanor conviction, Judge, has no bearing on, you know, his

5 abilities, when the plaintiff has admitted in his discovery

6 deposition that he was smoking a blunt at the time of his

7 arrest.

8 　　　　　So the, you know, probative value of getting into a

9 misdemeanor conviction is slim, if at all, but the prejudicial

10 effect to the jury of this individual having a conviction in

11 the year before with possession of marijuana is highly

12 prejudicial to the plaintiff.

13 　　　　　THE COURT:  Have I misunderstood the defense point as

14 to what you want to do with these misdemeanor convictions?  Or

15 can you tell me more about why you want to do what you want to

16 do?

17 　　　　　MS. BOUDREAUX:  Sure, Judge.

18 　　　　　First, looking at this, the document by which we

19 gathered the information from, I am not so sure that they are

20 only possession charges.  It says "CS," which I believe means

21 "controlled substance," and then it says "Poss" and then,

22 slash, "Exchange."  So I was not necessarily under the

23 assumption that these were just possession charges.

24 　　　　　I think they're relevant for two reasons; the main

25 one being what Your Honor just said, that his whole argument is

1    going to be that he is on the straight-and-narrow; he's this

2    college student at Fisk University; he has no reason to engage

3    in this type of behavior.  And I think that this impeaches him,

4    that he's not on the straight -- and not only is he using

5    drugs, he's getting caught using drugs by the police.  I think

6    that's relevant to his credibility.

7            And I also think -- you know, I know this is slightly

8    jumping ahead.  But even without the 22-year sentence, ten

9    years seems like a significant amount of time for this crime,

10   and I think that the defense needs to be able to say in, at

11   least, a generalized fashion that his prior criminal history

12   was taken into account by the judge that sentenced him.

13           THE COURT:  All right.  That is jumping ahead, but --

14           MS. BOUDREAUX:  Yeah.

15           THE COURT:  So on the misdemeanor convictions, I am

16   keeping them out under Rule 403 based on a concern that the

17   facts of conviction are more prejudicial than probative,

18   particularly because they are for what apparently are

19   misdemeanors, so minor offenses, which ordinarily don't bear on

20   credibility for convictions.  And I am not convinced that just

21   by the statutory language that might be in the charging

22   document that we know enough to say it is impeaching of any

23   testimony he may offer that he's never been involved in a drug

24   deal.

25           I will be open to reconsidering, in part, based on

1    how Mr. Walker testifies.  And if there is something he says

2    that the defense can put a finer point on why it does make

3    sense to confront him with the fact that he, at a minimum,

4    possessed marijuana in 2005, I'll hear you out on that.

5         But I think the point about the trajectory of his

6    life likely can be made without reference to misdemeanor

7    convictions and his interaction with the criminal legal system

8    in that way, particularly if there will, as I have -- I mean,

9    the forgery conviction is only allowed for credibility.  It

10   can't be used to make that same argument.  But there may very

11   well be other ways to point out that the prediction of his own

12   future may not be all that accurate based on other facts in the

13   case, which then makes this effort less probative on that

14   front.

15        And I continue to have concerns about the use of

16   misdemeanor convictions that could be unfairly prejudicial to

17   the plaintiff.

18        So I am going to keep the Tennessee misdemeanors out,

19   but if something happens during plaintiff's direct testimony,

20   and you want a sidebar on that, I'll hear you out on it.

21             MS. BOUDREAUX:  Okay.

22             THE COURT:  Then there are a group of motions *in*

23   *limine* that I am putting in the bucket of the events that

24   happened during the arrest.

25        So plaintiff's motion *in limine* No. 3 about his own

1    marijuana use, the motion is denied.

2         That evidence of his marijuana use limited to the day

3    of the arrest corroborates his access to marijuana.  It's also

4    relevant to his perception of events at the time.  It's not

5    unfairly prejudicial.  Might not even be a crime under Illinois

6    law now.  So I don't think it's unfairly prejudicial.

7         And the same is true for Russell Walker's use of

8    marijuana on the day of the arrest.

9         So plaintiff's motion *in limine* No. 8 is also denied.

10        The claims on trial are not false arrest or even

11   excessive force during the arrest, but the events that occurred

12   are all relevant to assessing the credibility of the different

13   witnesses who are going to be talking about what happened,

14   especially those witnesses who are going to testify on the

15   question of whether evidence was fabricated or not, and the

16   question of whether there was probable cause to support certain

17   charges.

18        So, as a result, my view is that what happened in

19   that alley and surrounding events is relevant to the claims,

20   and particularly to the credibility of the various witnesses at

21   issue, which leads me to conclude that Mr. Brown 's

22   observations are relevant, as is his mental health history, to

23   the extent it bears on his ability to perceive and relate the

24   events.

25        So plaintiff's motion *in limine* No. 4, defendants'

1    motion *in limine* 6, and plaintiff's 5 are all denied.

2           Plaintiff's 7 about the marijuana in the car is also

3    denied for the same reason.  It's about the events that were

4    going on at the time.  It may tend to show the presence of

5    marijuana in other locations, which is a relevant fact in this

6    case.  So plaintiff's 7 is denied.

7           Plaintiff made a point about whether his guilt for

8    offenses is being attempted to be proven; and if so, then that

9    should be proven beyond a reasonable doubt.

10          I don't agree with that.  Mr. Walker's commission of

11   other offenses need not be shown beyond a reasonable doubt in

12   this civil trial.  They're being offered on the ordinary civil

13   questions of liability and damages.  Whether the evidence

14   proves by a preponderance of the evidence that defendants

15   planted or fabricated the drugs can be evaluated by a

16   preponderance of the evidence on whether Mr. Walker actually

17   possessed the drugs, for example.

18          The BB gun, plaintiff's motion 6.  As I understand

19   it, the BB gun is not alleged to have been fabricated, but its

20   recovery is, in my view, relevant to the circumstances of the

21   arrest, which, in turn, will help the jury understand what

22   happened and whether the defendants' testimony about what

23   happened is credible.

24          So I am denying plaintiff's motion No. 6 about the BB

25   gun.  But it does -- it did lead me to start thinking about a

1    question about the Fourth Amendment claim in the case, and

2    maybe about malicious prosecution as well.

3            Is the plaintiff's legal theory on the Fourth

4    Amendment claim, that the Fourth Amendment claim started upon

5    arrest, upon criminal complaint?  Or is your theory that the

6    Fourth Amendment claim starts after the indictment with the

7    drug charges?

8            MR. FAKHOURI:  No, Judge.  Our position would be that

9    it started at the time of the stop at the -- in the alleyway.

10           THE COURT:  Then that further, I think, supports the

11   relevance of the BB gun and its recovery during the arrest.

12           And this is one of the reasons why I am not exactly

13   sure what the jury instructions are going to look like, because

14   I think we're going to have a conversation about probable cause

15   and probable cause for what at what period of time as a result

16   of what legal process, and what's the causation connection

17   between the defendants' conduct and the different moments when

18   legal process is occurring, causing the plaintiff's detention.

19           I think that's going to be a conversation for another

20   day.  But at least with respect to plaintiff's motion *in limine*

21   No. 6 about the BB gun, the current theory of the case supports

22   the relevance and the admission of the BB gun.

23           The next set of motions I am categorizing is the

24   "camera in the alley" motions.

25           Defendants' No. 7, to bar the Google image, is denied

1    subject to a foundation being laid for an image having some

2    relevance to 2006 and the condition of the scene back then.

3         But that can come from different sources.  It could

4    come from Mr. Walker himself who could look at a picture and

5    say, "That does fairly and accurately depict the scene of the

6    alley as I remember it in 2006."  It perhaps could come from

7    somebody who says they, using Google, did it on a certain time

8    at a certain date, and there's a foundation to think that this

9    is what the image looked like around 2006 or around a

10   particular time.

11        But I am not just going to admit the Google image.  I

12   will need to hear some foundation for it.  But subject to that

13   foundation, it could be admitted.

14        The presence of cameras in the alley is, in my view,

15   only really minimally relevant to the claims on trial.  The

16   only argument from the plaintiff, again, as I understand it, is

17   that the evidence of the cameras' presence undermines the

18   officers' credibility when they say there were no cameras or

19   they didn't notice any cameras.

20        As I said earlier, with respect to Mr. Walker,

21   credibility is important in this case, so I do conclude that

22   either side impeaching their adversary's credibility is

23   important, it's relevant.

24        But under Rule 403, I am concerned that the cameras

25   become a bit of a mini trial or a sideshow and not a good use

1  of time.  It may be a fairly-simply-done exercise of

2  establishing through proper witnesses that there were cameras,

3  such that when the officers say there weren't, the jury has

4  something to say:  Well, that's not true.  The officers are

5  wrong or mistaken or lying about that.

6       So I will allow evidence of the cameras in the alley

7  to be introduced, but I will just caution plaintiff from

8  belaboring that point because it's -- this is no longer the

9  case against Mr. Finnelly, and that theory of the wrongfulness

10  of the conviction here is not what this jury is going to

11  decide.

12       So with respect to defendants' motion 20, which was

13  to bar the evidence entirely, that's denied.  But I'll keep an

14  eye on how it's coming in and whether it's a good use of time.

15       With respect to defendants' motion 11 as to Ms.

16  Johnson's testimony that officers were asking about cameras,

17  that is granted in part.

18       Ms. Johnson, as I understand it, doesn't identify

19  which officer was asking the question, so her testimony doesn't

20  directly contradict the testifying officers about their

21  perception of events.  Testifying that, at some point in the

22  past, out of court, she told someone that there were cameras

23  offered to prove the truth that there were cameras there would

24  be hearsay.  Even though it's her own statement, that's

25  hearsay.  It's an out-of-court statement by Ms. Johnson, so

1  that's not admissible.

2          The fact that officers were asking questions about

3  cameras, again, that's not hearsay.  Those are questions.  But,

4  as I just said, we don't know who the -- what that officer --

5  who that officer was, so I find that not probative of the

6  officers at issue, their credibility.

7          She could testify, however, that there were, in fact,

8  cameras in the alley in 2006.  She was a percipient witness at

9  the time.  She has knowledge.  She could testify that there

10  were cameras there.  But she can't testify about what she told

11  unknown officers.  And absent some stronger tie that the

12  officers asking her the question were, in fact, Reyes and

13  Flatley, the fact that officers ask questions is too weakly

14  probative of their credibility to be relevant and a good use of

15  everybody's time.  And so in that sense, it's a 403 issue I am

16  having with testimony about officers asking questions about

17  cameras.

18          I see, Mr. Fakhouri, you want to be heard on this, so

19  go ahead.

20          MR. FAKHOURI:  I do, Judge.

21          With respect to the timing, which Ms. Johnson states

22  that officers came and asked about the cameras, it was during

23  the 2006 period.  Why are officers going into that alleyway to

24  ask about the existence of the cameras but for them being the

25  officers involved in this litigation?

1          It is circumstantial proof that the officers involved

2     in this case were aware that cameras existed, and that is

3     something that the plaintiff should have the right to show.

4          Now, I understand Defendant Reyes and Flatley were

5     not specifically identified, but, Judge, we're dealing with

6     three officers in a circumstance, in a situation where since

7     the arrest that my client underwent on February 21st, 2006,

8     stated that there was a camera.

9          You know, the -- while I understand that this

10    litigation is not with respect to the camera, and the

11    fabrication is as it relates to drug evidence, but that calls

12    into question these officers' credibility, if they were, in

13    fact, ones that went out there and asked the employee of Joann

14    Johnson what the -- you know, the existence of this camera and,

15    you know, potentially if this camera was capable of recording

16    at that time.

17         THE COURT:  The problem being if it were those

18    officers, and I am not satisfied that there's enough there to

19    make that tie.  There were other officers involved in the

20    arrest and in the investigation.  It could have been them.

21    There's no showing that what they learned was communicated back

22    to Reyes and Flatley.

23         So I am just not satisfied that there's enough there

24    to warrant the inquiry.  So that's my ruling on defendants'

25    motion *in limine* 11.

1      The next set of motions *in limine* that I'll talk

2  about are the statements to defense attorneys by Russell

3  Walker.  So this is plaintiff's 9, plaintiff's 10, and

4  plaintiff's 11.

5      Those -- all three are denied.  Those motions are

6  denied based on defendants' explanation that they're only

7  offering evidence of Russell Walker's prior inconsistent

8  statements to the attorneys as impeachment of Russell Walker.

9      And if Russell Walker is confronted with the

10  inconsistent statement and denies making the inconsistent

11  statement, proving it up by extrinsic evidence would be allowed

12  under Rule 613.  But it's not allowed substantively and only

13  for impeachment of Russell Walker.  So the defense would not be

14  able to argue that those statements were true; just that

15  Russell Walker is not telling the truth today based on that

16  inconsistency.

17      So you have to be careful about how you argue it.

18  But these are just prior inconsistent statements of Russell

19  Walker.  And as long as the defense tracks the proper method of

20  impeachment with a prior inconsistent statement, this evidence

21  could be admitted.

22      Next is the recorded telephone call between Russell

23  Walker and Plaintiff Walker, which is plaintiff's motion *in*

24  *limine* 12 and defendants' motion *in limine* 5.

25      Russell Walker's statements are hearsay.  Adopting

1    Russell Walker's admission that, "I have done my time," is -- I

2    guess my view is Mr. Russell Walker's statement, "I have done

3    my time," and Plaintiff Walker's failure to say anything in

4    response contradicting that is not an admission by Jermaine

5    Walker that Jermaine Walker did anything.

6         This is a different kind of statement than the ones

7    at issue in the *Ward* and *Woods* cases cited by the defense,

8    where the statements were more directly incriminating of the

9    silent party to the conversation.

10        Here, it's quite a stretch, I think, to read, "I did

11   my time, and I threw everything out the window," as -- from

12   Russell Walker as meaning that Plaintiff Walker was complicit

13   in the events.  To the extent that is an inference, my view is

14   that's so weakly probative of that point that the risk of

15   confusion and blurring the lines between Russell Walker and

16   Plaintiff Walker's conduct would substantially outweigh the

17   probative value.  And so I exclude it under both hearsay and

18   Rule 403.

19        As part of my Rule 403 concerns, my concern is

20   admitting part of a recording here would likely invite other

21   parts of the recording to come in for completeness or added

22   context, and that would spin this relatively minor point, in my

23   view, into a collateral and tangential issue that's not a good

24   use of time.

25        So plaintiff's motion *in limine* 12 is granted and

1    defendants' motion *in limine* 5 is denied.

2            Again, Russell Walker could be impeached by a prior

3    inconsistent statement if he denies committing the offense;

4    but on a prior occasion has admitted to committing the offense,

5    he might be confronted with an inconsistent statement.  As a

6    result, again, only for his credibility, not for the truth of

7    the matter asserted.  But that could be -- that would be a

8    separate issue.

9            Defendants' motion *in limine* No. 8 as to Ms. Stack's

10   employment at Hale & Monico, that's denied.

11           Her employment could be relevant to bias.  Bias is

12   always a relevant consideration.  So that's denied.

13           There's a separate issue about favorable termination,

14   and the defense offered to stipulate to that.  We'll talk about

15   that in a moment.

16           Defendants' motion *in limine* No. 9, to bar testimony

17   about Mr. Walker's witnessing of a prison killing, is denied.

18   My view is it's not unfairly prejudicial to these defendants,

19   and it is relevant to damages.

20           The jury will easily understand, I think, that these

21   defendants were not present or involved in that activity.  And

22   I don't -- I just don't agree that there's a risk of unfair

23   propensity or 404(b) inferences drawn against the officers.

24   And it does go to Mr. Walker's experience while incarcerated,

25   which is a relevant consideration for damages.

34

1      So defendants' 9 is denied.

2      Defendants' 10 with respect to Krista Walker, that's

3  granted in part, without objection, as to her opinion about Mr.

4  Walker being a victim of sexual assault.

5      And as to Mr. Walker telling Ms. Walker that the

6  drugs were planted, that motion is also granted.  That's

7  hearsay.  It's not a present-sense impression in June or later

8  for Mr. Walker to be narrating what he says happened to him.

9  So that would be hearsay.

10      Ms. Walker could testify by describing his demeanor

11  at the time without getting into the content of his statements.

12      So, again, his emotional state is a relevant

13  consideration, especially as it bears on damages, but without

14  eliciting the content of the statements, she can talk about how

15  she talked to him in June of 2006, and he was very upset, very

16  worked-up about what he was experiencing, those kinds of

17  things.  But a statement about what he says happened offered

18  for the truth would be hearsay.

19      So defendants' 10 is granted.

20      Defendants' --

21      MR. FAKHOURI:  Your Honor, may I be heard on defense

22  No. 10?

23      THE COURT:  Sure.

24      MR. FAKHOURI:  Just for clarification purposes?

25      THE COURT:  Go ahead.

1    MR. FAKHOURI:  If there is an explanation by Krista

2  Walker as it relates to her conduct following that

3  conversation, any effect on the listener is not going to be

4  prevented from the plaintiffs getting into that subject matter.

5    THE COURT:  He wouldn't necessarily need to elicit

6  the content of the statement either.  "I had a conversation

7  with Mr. Walker, and then I did X," doesn't elicit the content

8  of the conversation with Mr. Walker.

9    MR. FAKHOURI:  Well, with -- I understand, Judge.

10  But the fact that she took steps to investigate the scene -- it

11  was -- you know, we're not offering it for the truth, but it

12  would be the effect on the listener; that she went out there,

13  she took photographs, she did certain things and got involved

14  with certain individuals in order to, you know, assist her

15  brother while he was incarcerated.

16    And I think that's an important point, although we're

17  not offering it for its truth.

18    THE COURT:  I am not sure why that's relevant.

19    Why is Ms. Walker taking steps relevant to whether

20  these defendants fabricated evidence or lacked probable cause

21  for his detention?

22    MR. FAKHOURI:  Well, as it relates to the fabrication

23  of evidence, of the drugs, Judge.  She went out to see, you

24  know, the scene of the alleyway.  She took certain steps to,

25  you know, make sure any allegations that were brought against

 1   her brother were, in fact, true.

 2          THE COURT:  She could also do that without saying, "I

 3   did that at the prompting of my brother."

 4          Again, there's ways -- if that is relevant, there's

 5   ways to elicit that testimony without eliciting the content of

 6   a communication for the truth from Mr. Walker.  So my ruling

 7   remains the same.

 8          Defendants' 15 about the "code of silence" is

 9   granted.

10          As briefed, it was fairly perfunctory.  So I can see

11   how things play out at trial and I might revisit this.  But,

12   ultimately, I am not seeing a connection between a code of

13   silence -- which itself, I don't think, has a settled,

14   agreed-upon definition as to what that even means.  But I am

15   not seeing a connection between a code of silence and these

16   officers' fabrication of evidence.

17          That doesn't mean that loyalty among officers isn't a

18   potential source of bias that bears on officer credibility, but

19   that can be inquired of without invoking the term "code of

20   silence."

21          So, as currently briefed, I am not seeing really any

22   relevance to the "code of silence," and I will not permit

23   argument that it's because of a code of silence that these

24   officers fabricated evidence.  So defendants' 15 is granted.

25          Defendants' 16 as to racial motivation.  Again,

1    similarly, it's a little perfunctory as briefed.  It seems -- I
2    am not seeing evidence of racial motivation being offered by
3    the plaintiff.

4         If racial motivation were the subject of some
5    evidence, which perhaps could be relevant to a claim for
6    punitive damages, then there may be appropriate argument to be
7    had.  But, as I am seeing it, I am not seeing an evidentiary
8    foundation to make an argument that there was racial motivation
9    to the conduct.  So defendants' 16 is granted.

10        That then leaves the almost final set, which is the
11   certificate of innocence and the issues around the certificate
12   of innocence.

13        Starting with defendants' motion *in limine* No. 1 as
14   to Judge Haberkorn's comments.

15        The judge's comments seem to be about the camera and
16   the camera issue, which isn't, as we've talked about already,
17   all that relevant to the claimed fabrication of evidence
18   against these defendants.

19        As I've already said, the presence of the cameras is
20   relevant to the credibility of the officers, Reyes and Flatley,
21   but the judge's comments offered for the -- if offered for the
22   truth that some unidentified people did not tell the truth, and
23   if offered for the truth of the judge's statements that this
24   was outrageous, that would be hearsay.  And the judge's
25   sickening feeling about this case is, in my view, irrelevant

1    for this jury.

2           Evidence that the case was terminated in a manner

3    indicative of innocence is relevant to the claims, at a

4    *minimum*, to the state-law claim of malicious prosecution, and

5    that would be a non-hearsay use.  But with the defendants'

6    concession that the case was so terminated, the probative value

7    of Judge Haberkorn's comments drops to near zero.  Not all the

8    way to zero, because a stipulation doesn't necessarily mean

9    additional evidence can't add to the preponderance of the

10   evidence on a question, but it's near zero if there is a

11   concession on that element.

12          And meanwhile, there is then a strong weight

13   substantially outweighing the probative value of unfair

14   prejudice from the broad-strokes judicial comments that are not

15   clearly directed at these defendants and outweighs the value of

16   any of those comments on the manner-indicative-of-innocence

17   issue.

18          Plaintiff also refers to the relevance of innocence

19   to his damages.

20          I agree that guilt or innocence is relevant to

21   damages, but I don't agree that Judge Haberkorn's statements

22   can be admitted to demonstrate actual innocence without them

23   being admitted for the truth of the matters asserted.  So the

24   prohibition on hearsay precludes their use to prove innocence

25   for purposes of damages.

1         So defendants' No. 1 is granted.

2         Defendants' No. 3 with respect to the judicial

3    statements of Judge Martin on the certificate of innocence I

4    resolve similarly.

5         I agree with the defense that Judge Martin's comments

6    are inadmissible as hearsay.  And under Rule 403, in light of

7    the defense stipulation that the proceedings had been favorably

8    terminated, the probative value is near zero, but then

9    substantially outweighed by unfair prejudice.

10        A limiting instruction about the certificate of

11   innocence procedures can be effective in some cases, but in

12   this one, I nevertheless worry that the judge's actual comments

13   take on an added force that a jury would have too difficult a

14   time parsing, even with a limiting instruction.

15        And, again, as to damages, the judge's statement that

16   he is finding Mr. Walker innocent by a preponderance would be

17   offered for the truth of factual innocence, and my view is that

18   that would be prohibited hearsay.

19        So defendants' 3 is granted.  Again, all subject to

20   the defendants stipulating to:  The proceedings had been

21   terminated favorably in a manner indicative of innocence.

22        The certificate of innocence itself, defendants' 2,

23   carries with it less prejudice than the judge's comments and

24   less risk of inadmissible hearsay.  It has, as we've already

25   discussed, the probative non-hearsay value of demonstrating on

1    the manner in which the proceedings had been terminated.  True,

2    it occurred after the conviction was vacated, but I think it

3    still can shed some light on the manner of termination.

4         The balance, again, though, I conclude, is that the

5    probative value on that issue is very low to -- near zero in

6    light of the defense stipulation.

7         In *Kluppelberg v. Burge*, the court there did say that

8    judicial findings in a certificate of innocence could be

9    non-hearsay public records.  And the court there cited the

10   Seventh Circuit's opinion in *Greycas*, G-r-e-y-c-a-s, 826 F.2d

11   1560, 1567 (7th Circuit 1987).

12        But I don't read *Greycas* as opening the door the same

13   way that the court in *Kluppelberg* thought.  There is no *res*

14   *judicata* or preclusive effect of a certificate of innocence.

15   And it was the preclusive effect of civil judgments that led

16   the Seventh Circuit to muse that evidentiary use could be

17   allowed in a bench trial.

18        That's not our situation here.  And my view is it

19   would be hearsay to offer the certificate of innocence as

20   evidence of actual innocence and the truth of innocence.

21        So defendants' 2 is granted.  I am excluding the

22   certificate of innocence, again, based on the defense

23   stipulation that the proceedings had been terminated in a

24   manner indicative of innocence.

25        And defendants' 4 as to Russell Walker's certificate

1    of innocence is granted.

2          Russell Walker's certificate of innocence is really

3    of no probative value to the manner of termination of

4    plaintiff's case, and my same analysis of hearsay and unfair

5    prejudice applies to that as well.

6          That then leaves defendants' motion *in limine* 19, to

7    dismiss the failure-to-intervene claim.  That's denied.

8          The defense had made the argument.  It's procedurally

9    unusual to raise the argument in a motion *in limine*.  The

10   argument is more likely one that should be raised at summary

11   judgment, which time has passed.

12         It could be raised, I suspect, as a motion for a

13   directed verdict, and there's still time to do that.  So the

14   issue, in my view, can be preserved for appeal that way.

15         For present purposes, the motion *in limine* to dismiss

16   the failure-to-intervene claim is denied.

17         As I read the state of the law, failure to intervene

18   is a recognized method of proving liability under Section 1983,

19   at least as far back as *Byrd v. Brishke*, *B-y-r-d v. Brishke*,

20   B-r-i-s-h-k-e, 466 F.2d, 6 at page 10 (7th Circuit decision of

21   1972), which relied on the Supreme Court's decision of *Monroe*

22   *v. Pape*, 365 U.S. 167, 187.

23         That traces back to where I think, as I understand

24   it, failure to intervene as a theory of liability has come to

25   be accepted.  There may be some tension with more recent

1   Supreme Court precedent.  And I have to follow the Supreme
2   Court precedent as well as the Seventh Circuit precedent.  My
3   view is that I can resolve that tension by understanding
4   failure to intervene as not mere vicarious liability, but it is
5   a method of proving conduct that rises to the level of personal
6   involvement.

7           I might be alone in this view -- I am not sure -- but
8   I see failure to intervene as very similar to conspiracy in
9   Section 1983 cases where all the defendants are state actors.
10  It's just really an evidentiary and accepted theory of proving
11  someone's liability for the substantive violation.

12          I see and understand the argument that absent an
13  affirmative constitutional duty to intervene, then there should
14  be no personal involvement under Section 1983.  At least as
15  where the case law is today that I am bound to follow, I take
16  failure to intervene as a gloss on how tort liability works,
17  which, in turn, informs Section 1983.  And there, the
18  reasonable opportunity to do something while acting under color
19  of law to stop a constitutional violation would be the kind of
20  evidence of complicity and participation in the underlying
21  violation.

22          So that's why I view failure to intervene similarly
23  to conspiracy in cases involving all state actors.  It's just a
24  method of demonstrating responsibility for the substantive
25  violation.

1    Other authorities will likely have the last word on

2  that, but that's my take on the issue for now.  So defendants'

3  motion 19 is denied.

4    Have I forgotten any motions *in limine*?

5    MR. STEFANICH:  Judge, I think in the Russell --

6  defendants' motion about Russell Walker's COI, there were

7  arguments about his lawsuit and his settlement with the

8  defendants in this case, as well as Defendant Finnelly's

9  settlement in this lawsuit.

10    THE COURT:  Right.  Thank you for reminding me about

11  that one.

12    Let me ask the plaintiff, are we getting into Mr.

13  Walker's lawsuit or settlement?  Mr. Russell Walker's lawsuit

14  or plaintiff's settlement with Finnelly?

15    MR. FAKHOURI:  We don't intend to, Judge.

16    THE COURT:  With that, I guess I am not sure what I

17  would be excluding.

18    MR. STEFANICH:  Sure, Judge.  Understood.

19    THE COURT:  Are there any other issues in motions *in*

20  *limine* that I've --

21    MR. FAKHOURI:  Judge, I just want to make sure, as it

22  relates to 9, 10, and -- 9 and 10, plaintiff's 9 and 10, they

23  can only be used as it relates to inconsistent statements made

24  by Russell Walker.  Am I correct?

25    THE COURT:  Correct.

1       MR. FAKHOURI:  Okay.  So they can only be used

2    against Mr. Russell Walker?

3       THE COURT:  They can be used to impeach Mr. Russell

4    Walker's credibility.

5       MR. FAKHOURI:  Thank you, Your Honor.

6       THE COURT:  Okay.  So --

7       MS. BOUDREAUX:  Judge, could I just -- one more point

8    of clarification about that?

9       So are we saying that the phone call can only be

10   played during Russell Walker's examination and not during

11   Jermaine Walker's examination?

12      MR. FAKHOURI:  The phone call's out.

13      THE COURT:  I have excluded the phone call entirely.

14      I alluded to the idea that he might be impeached with

15   an inconsistent statement, but the way to do that would be to

16   first confront him with:  "Isn't it true in a conversation with

17   your brother that had been recorded, you admitted that you did

18   your time for the crime you committed?"  And if he denies it,

19   then I would let you prove that up by extrinsic evidence of the

20   recorded statement.

21      But I am not -- again, I don't know if he's going to

22   deny that --

23      MS. BOUDREAUX:  Right.

24      THE COURT:  -- or will need to prove it up.  And then

25   I may be worried about whether it's really worth the time to do

1    that.

2            MS. BOUDREAUX:  Yes.  I guess I am just wondering if

3    there's any ability to play it for Jermaine's statements in the

4    phone -- I think what you said was you did not consider his

5    statements to be an admission and, therefore, it's excluded.

6            So you're saying that in order to be played, it would

7    have to be an admission, not just a statement of a party

8    opponent?

9            THE COURT:  Correct.

10           MS. BOUDREAUX:  Okay.

11           THE COURT:  Because, as briefed, the only parts of

12   the call that the defense was saying you wanted to use were for

13   the purpose of suggesting that Jermaine Walker was adopting

14   Russell Walker's statement, "I did my time for the crime I

15   committed, and I threw everything out the window."  That was

16   how it was briefed.

17           I did not see anywhere in the motion *in limine* the

18   defendant saying:  Here's just a statement of Jermaine Walker

19   that he made in this recording that we want to offer as a

20   statement of a party opponent.  And having read the transcript,

21   I am not surprised that there isn't a statement that you want

22   to offer from Mr. Jermaine Walker in the recording.

23           So, as briefed, it was really just about, is there an

24   adopted admission?  My conclusion is no, there isn't.  And

25   that's my ruling on it.

1        MS. BOUDREAUX:  Okay.  Thanks for the clarification.

2        MR. FAKHOURI:  Your Honor, may I also have a

3    clarification on the certificate of innocence?

4        Now, with respect to defendants' stipulation, how are

5    we going to be handling that?  Because it's been made clear,

6    especially in Your Honor's order as it relates to the motion

7    for summary judgment, that our use of that is in order to prove

8    that element.

9        Now, are we going to be reading the stipulation to

10    the members of the jury that the defendants are admitting that

11    the underlying charge was terminated in a manner consistent

12    with his innocence?

13        THE COURT:  Well, if -- so what happens often is that

14    there are stipulations that elements have been met and the jury

15    doesn't need to consider the element at all.  So then the jury

16    doesn't even need to be told that there is an element of the

17    claim that the plaintiff has to prove.  And so it's only these

18    two elements that the plaintiff has to prove, or only these

19    three elements.

20        So, for example, the most common one is under color

21    of law.  It is an element of the 1983 cause of action that the

22    plaintiff prove that the defendant officers were acting under

23    color of law.  But it's almost routine for there to be an

24    agreement in a stipulation that the officers were, in fact,

25    acting under color of law, so the jury is never even instructed

1    that there is this element under color of law, and it's on the

2    elements instruction, and they need to be told about it.

3         So that was how I was thinking of this approach;

4    that, effectively, the defendants, just as I think they have

5    said they stipulate to under color of law, they also stipulate

6    to that other element, which means I find that that element has

7    been established.  The jury need not find it in order to find

8    liability in this case.  The jury need only find the other

9    elements that are contested in order for there to be a judgment

10   against the defendants.

11        MR. FAKHOURI:  Thank you for the clarification,

12   Judge.

13        THE COURT:  The other things on my agenda are to talk

14   a little bit about jury instructions and about the schedule.

15        Does anyone need a break?

16        MR. FAKHOURI:  No, Judge.

17        MR. STEFANICH:  No, Judge.

18        THE COURT:  Okay.  So before opening statements, I

19   have a set of stock jury instructions that I read to the

20   jurors, and we can hand out a set of those.

21        (Document tendered to counsel.)

22        THE COURT:  I don't think you will see anything

23   surprising in these, so I'll let you look at that on your own

24   time.  And if you do want to change something or suggest a

25   change, we could do that on Tuesday or Monday.

1    Ordinarily, at this point in the preliminary

2    instructions, I do give the jurors the elements of the various

3    claims that they'll be considering.  I am not proposing to do

4    that in this case because I still don't know what the elements

5    will be as I want to instruct the jury.

6    So what I am planning on doing is just, again,

7    basically repeating what was in the cover letter, which is the

8    claims are fabricated evidence, unlawful detention, malicious

9    prosecution.  And if the jury finds for the plaintiff, they'll

10   have to decide damages.  But you will see that in what we've

11   handed out.

12   Let's talk about the schedule.  So Monday, the jurors

13   will come in and fill out the questionnaires.  They should be

14   done by the morning, and we'll let them go home.  And so we

15   usually have the -- we have copies made and ready for you to

16   inspect usually by late morning, early afternoon.

17   If there is a time that you think you'd all be

18   available and want to come down to look at the questionnaires,

19   we can set that time now.

20   MR. FAKHOURI:  Yeah.  Judge, my schedule's already

21   cleared for the next two weeks, so --

22   MR. STEFANICH:  Same, Judge.

23   THE COURT:  Okay.  So why don't we plan to convene in

24   the courtroom to review the completed questionnaires at 1:00

25   p.m.

1         We will send you an e-mail or let you know if they're

2 available earlier, and you can come down and start looking at

3 them even earlier. You won't be allowed to take them out of

4 the courtroom. You'll have to leave them in the courtroom.

5         Then on Tuesday, be here at 9:15. I will want to

6 bring in the venire at 9:30 to start the questioning and then I

7 hope we'll have the jury by lunchtime. So plan on opening

8 statements and your first witness or witnesses on Tuesday.

9     (Counsel nod.)

10         THE COURT: Do you have a sense now how long your

11 opening statements are?

12         MR. FAKHOURI: I think ours is about 30 minutes,

13 Judge.

14         MS. BOUDREAUX: 30 to 40.

15         THE COURT: So I think we'll have time to get started

16 with witnesses. At least that's my hope. Unless jury

17 selection takes a lot longer than I'm currently thinking.

18         Do try to have your witnesses close by and get a

19 sense for how long it takes for someone who's sitting in an

20 attorney/witness room to walk down the hallway. And do what

21 you can to get a feel for when one witness is about to wrap up

22 so you can get the next one lined up.

23         I don't take a break in the mornings until it's time

24 to break for lunch. We take an hour for lunch. And that's

25 usually 12:15 or so, 12:15, 12:30. Do an hour for lunch. In

1  the afternoons, I will break for about 15 minutes, around 3:15
2  or so.  And then we'll end the day at 4:30.  And every day
3  we'll end at 4:30.

4          That should give us plenty of time, outside the
5  presence of the jury, to handle any issues that come up, so --
6  because then I'll tell the jurors, after Tuesday, to be here at
7  9:45, and I'd like to start with them by 10:00 o'clock.

8          So if you're here by 9:45, you can tell me if you've
9  got any issues before we bring in the jury at 10:00.  If there
10  are issues, we can talk about those over the lunch hour.  And
11  then at 4:30, we can talk about whatever issues that are coming
12  up the next day.

13          Do use the courtroom technology for publishing
14  exhibits.

15          On Tuesday, be extra careful in the hallways.
16  Because when you're coming up on the public side of the
17  courtroom, the venire is also going to be coming up at the same
18  time.  So extra caution about anything you're saying, anything
19  you're doing.  There might be a prospective juror right around.

20          After jury selection, we can be more successful at
21  keeping everybody apart, but the way we're doing this,
22  especially that Tuesday morning, there could be a real risk
23  that you're going to be on an elevator or in a hallway or in
24  one of the restrooms with a prospective juror.  So please use
25  extra caution Tuesday morning.  So --

1    MR. STEFANICH:  Judge, one of the issues we're having

2    is trying to get a sense of where plaintiffs are going to be, I

3    guess, on Tuesday and Wednesday to line up some of our

4    witnesses.  So I don't know if you have a rule or a practice

5    that you do where plaintiff tells the Court and the parties,

6    you know, what the lineup's going to be.  But we would

7    appreciate that.

8    THE COURT:  I do.  I do expect that everybody -- this

9    is related to my comment earlier about telling each other what

10   exhibits you're using at least a day in advance.  So that the

11   day before someone is going to use an exhibit, there's an

12   opportunity for me to weigh in on any exhibit issues.

13   Similarly, the lineup of witnesses should be

14   disclosed on a rolling basis.

15   Do you know now who your first witness is?

16   MR. FAKHOURI:  The plaintiff, Judge.

17   THE COURT:  And do you know now who your second

18   witness is?

19   MR. FAKHOURI:  No, Judge.

20   THE COURT:  Okay.  Well, as we get closer, you should

21   have a sense of who your second witness is.

22   MR. FAKHOURI:  Yes.

23   THE COURT:  I think that would likely get us through

24   day one.

25   And then -- so on Monday when we convene for the

 1  questionnaires, I'll ask you, are there any exhibit issues for
 2  Tuesday?  Who are your witnesses for Tuesday?  Do you know now
 3  who your witnesses are going to be for Wednesday?  And we'll
 4  start that process.
 5          MR. STEFANICH:  Thanks, Judge.
 6          MR. MICHALIK:  Judge, one other question on
 7  witnesses.
 8          I presume that, for example, that the plaintiff's
 9  going to call some of the defendant officers in his
10  case-in-chief.  Then the defense would just put in the rest of
11  the case at that point.
12          THE COURT:  Yes.  Thank you for that reminder.
13          No scope objections to the first round of questions
14  and then there can be scope objections.  But let's extract
15  everything we're going to extract out of a witness the first
16  time the witness is on the stand.
17          I need to take a break for a moment.  So let's
18  reconvene in about five minutes.
19          MR. FAKHOURI:  Yes, Judge.
20          MS. BOUDREAUX:  Thank you, Judge.
21       (Recess.)
22          THE COURT:  I have to interrupt what we're doing for
23  another matter, so let's just run through a couple of things.
24          Let's -- we'll talk more about jury instructions
25  Monday when we convene for the questionnaires.

1    Primarily, what I think I need to talk to you most

2  about is the Fourth Amendment claim.  My tentative view or

3  current view is that there is a difference between unlawful

4  detention and malicious prosecution, even under Section 1983.

5  I think those are two different things; and that this is an

6  unlawful detention claim, but probable cause is still required,

7  because it's a Fourth Amendment claim, and the Fourth Amendment

8  is primarily concerned with seizures without probable cause.

9    I want to think through the chronology and the

10  timeline as to when the constitutional violations occurred and

11  then ended, and whether that matters with respect to damages.

12    So, for example, if the Fourth Amendment drops out

13  upon conviction and sentence, do the damages from a Fourth

14  Amendment violation stop at that point?  And should the jury be

15  advised of that?

16    We talked a little bit at the very beginning about

17  when does the Fourth Amendment claim -- when did it start?  Did

18  it start at the arrest?  Did it start with the indictment?  And

19  I ask those questions because then probable cause for what

20  offenses to support the seizure becomes a relevant thing to

21  discuss.  And maybe the jury needs to know what the different

22  offenses are and what the elements of them may be.

23    So those are some of the thoughts I had about the

24  Fourth Amendment claim.  But we'll need to talk about that

25  further.

1          Masks during the trial will be not required.  It's

2    now a voluntary proposition.  I'll tell the jurors that they

3    are welcome to and free to wear a mask, but they're not

4    required to.  And so the same goes for you and your witnesses.

5          Any exhibits, you need to make sure that you have

6    them formatted in an electronic format that can be used with

7    our court system with the jurors, when they deliberate, and

8    you'll be giving the exhibits on a flash drive to the courtroom

9    deputy at the end of the trial.  So be sure to pay attention to

10   that.

11        (Court conferring with staff.)

12        THE COURT:  Speaking of exhibits, if there are

13   exhibits that you have no objection to and you're in agreement

14   on, then I'll just admit them outside the presence of the jury

15   and you don't need to lay foundation.  You'd just say, "Showing

16   you what's previously been admitted as Exhibit X," and then go

17   ahead and show and publish.

18        So that's the other thing that we can do during

19   breaks, is, are there any exhibits you want to admit right now?

20   And we can do that.

21        I think I have likely given you enough direction to

22   be able to get started on Monday and Tuesday.  Are there any

23   pressing issues that you'd like to raise with me?  On behalf of

24   plaintiff?

25        MR. FAKHOURI:  Not at this time, Your Honor.

1          MS. BOUDREAUX:  No, Judge.

2          MR. STEFANICH:  No.

3          THE COURT:  Okay.  Thank you.  I'll see you on Monday

4    at 1:00 o'clock.

5          MS. BOUDREAUX:  Thank you.

6          MR. MICHALIK:  Thank you.

7          MR. FAKHOURI:  Thank you, Judge.

8       (Proceedings concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3

4

5          I, Colleen M. Conway, do hereby certify that the

6     foregoing is a complete, true, and accurate transcript of the

7     Final Pretrial Conference proceedings had in the above-entitled

8     case before the HONORABLE MANISH S. SHAH, one of the Judges of

9     said Court, at Chicago, Illinois, on March 2, 2023.

10

11

12     _/s/ Colleen M. Conway, CSR, RMR, CRR_      _03/03/23_

13          Official Court Reporter              Date
          United States District Court
14        Northern District of Illinois
              Eastern Division
15

16

17

18

19

20

21

22

23

24

25