# Exhibit E

1

```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                         EASTERN DIVISION

3    JERMAINE WALKER,                  )
                                       )
4                   Plaintiff,         )
                                       )
5         vs.                          )  No. 16 C 7024
                                       )
6    MICHAEL WHITE, ERIC REYES,        )
     SEBASTIAN FLATLEY,                )
7                                      )  Chicago, Illinois
                                       )  March 7, 2023
8                   Defendants.        )  9:39 o'clock a.m.

9
                            VOLUME 1 AM
10              TRANSCRIPT OF PROCEEDINGS - Trial
            BEFORE THE HONORABLE MANISH S. SHAH
11                      AND A JURY

12   APPEARANCES:

13   For the Plaintiff:      THE FAKHOURI FIRM, L.L.C.
                             BY:  MR. ROBERT S. FAKHOURI
14                           77 West Wacker Drive, Suite 4500
                             Chicago, Illinois  60601
15                           (312) 471-8873

16                           LAW OFFICE OF JARRETT ADAMS, PLLC
                             BY:  MR. JARRETT ADAMS
17                           40 Fulton Street, Floor 17
                             New York, New York  10038
18                           (646) 880-9707

19   For the Defendants:     HALE & MONICO, L.L.C.
                             BY:  MR. BRIAN J. STEFANICH
20                                MS. BARRETT E. BOUDREAUX
                                  MS. JENNIFER BITOY
21                           53 West Jackson Boulevard, Suite 334
                             Chicago, Illinois  60604
22                           (312) 870-6908

23
                  COLLEEN M. CONWAY, CSR, RMR, CRR
24                     Official Court Reporter
                219 South Dearborn Street, Room 1918
25                     Chicago, Illinois  60604
           (312) 435-5594  colleen_conway@ilnd.uscourts.gov
```

1          (Venire out.  Proceedings heard in open court:)

2              THE COURT REPORTER:  16 C 7024, Jermaine Walker

3      versus Michael White, et al; jury trial.

4              THE COURT:  Good morning, everyone.

5              MS. BOUDREAUX:  Good morning.

6              MR. ADAMS:  Good morning, Your Honor.

7              THE COURT:  Why don't we start with appearances for

8      the record.

9              MR. ADAMS:  Good morning, Your Honor.  Jarrett Adams,

10     J-a-r-r-e-t-t, on behalf of the plaintiff, Jermaine Walker, who

11     is present today in court.

12             MR. FAKHOURI:  Good morning, Your Honor.  Robert

13     Fakhouri, F-a-k-h-o-u-r-i, on behalf of the plaintiff, Jermaine

14     Walker.

15             THE COURT:  And Mr. Walker is present.

16             Good morning, Mr. Walker.

17             THE PLAINTIFF:  Good morning, Your Honor.

18             THE COURT:  And for the defense?

19             MS. BOUDREAUX:  Yes.  Barrett Boudreaux on behalf of

20     Defendant Officers Reyes, Flatley, and White.

21             MR. STEFANICH:  Brian Stefanich on behalf of the

22     defendant officers.

23             MS. BITOY:  Good morning, Your Honor.  Jennifer Bitoy

24     on behalf of the defendant officers.

25             THE COURT:  And if counsel could identify the clients

1    for my benefit, please.

2              MS. BOUDREAUX:  Sure, Judge.  This is Michael White.

3         (Defendant stands/sits.)

4              MS. BOUDREAUX:  Sebastian Flatley.

5         (Defendant stands/sits.)

6              DEFENDANT FLATLEY:  Good morning, Your Honor.

7              MS. BOUDREAUX:  And Eric Reyes.

8         (Defendant stands/sits.)

9              DEFENDANT REYES:  Good morning, Your Honor.

10             THE COURT:  Good morning, everyone.

11             I did see the motion to reconsider that plaintiff

12   filed.  Let's talk about that later.  I'd like to go ahead and

13   get started with jury selection.  We've lost a little time this

14   morning.

15             I will -- by the way, I don't think I mentioned this

16   to everyone, but after I make some introductory comments to the

17   prospective jurors, I will ask counsel to introduce themselves

18   by just identifying who you are, who else is seated with you at

19   counsel table.  And I will do that for both sides.

20             So I'll flag for you that I will be calling on you in

21   a few moments to do that.

22             Are there any pressing issues that we need to address

23   before we bring in the venire?

24        (Plaintiff's counsel conferring.)

25             MR. ADAMS:  I don't believe so, Your Honor.  I think

1  that we can address the issues during the 20-minute break after

2  the jury is selected.

3           THE COURT:  That's fine.

4           Anything from the defense?

5           MS. BOUDREAUX:  Judge, just one thing.

6           Officer Reyes was injured on duty, and he needs to

7  stand at times for a back issue, and I just wanted you to know.

8           THE COURT:  That's fine.  About how long can

9  Mr. Reyes sit for a bit?

10          DEFENDANT REYES:  Just when it starts to spasm.  But

11  I just have to stand up just to stretch out.

12          THE COURT:  Okay.  I am only thinking about advising

13  the jury that that might happen from time to time, and I'll

14  find an appropriate time to do that.

15          MS. BOUDREAUX:  That would be great.  Thank you.

16          THE COURT:  Okay.  I think the jurors are probably

17  ready, and so we can ask them to come in as soon as they're

18  ready.

19      (Pause.)

20          THE COURT:  We did hand out to you copies of proposed

21  jury instructions and a verdict form.  I just didn't have time

22  to get it on the docket, so -- but we'll talk about those later

23  as well.

24      (Counsel nod.  Pause.  Venire in.)

25          THE COURT:  Please be seated.

1          Good morning, everyone.  Welcome to federal court.  I

2     am Judge Shah, and I will be presiding over this case.

3          You have met our court clerk, Susan McClintic.  Also

4     in the front here is our court reporter, Colleen Conway.  In

5     the back in the corner here is one of the lawyers on my staff,

6     Austin Hetrick.

7          And today, we will be picking a jury to serve in a

8     civil lawsuit called *Jermaine Walker versus Chicago Police*

9     *Officers Michael White, Eric Reyes, and Sebastian Flatley.*

10         As I mentioned in the letter that you received

11     yesterday, it's hard to predict how long a trial is going to

12     last, but I estimate that this case will take about seven days,

13     including today, so today through Wednesday of next week.

14         Once we are up and running, our days generally run

15     from 9:45 in the morning until 4:30 in the afternoon.

16         We appreciate your willingness to serve on a jury.  I

17     imagine many of you were not pleased to receive a summons to

18     come for jury duty.  Keep an open mind.  Jury duty is one of

19     the most important duties we have as American citizens.

20         Our legal system is the envy of the world, in part

21     because we have a jury system, because we have people from the

22     community who participate in our legal system, using the rule

23     of law to resolve disputes peacefully.  Many other places in

24     the world don't have that kind of system.  And in order for us

25     to have that kind of system, we need you to participate.

1    The other thing I'll say at the outset is you may be

2  surprised at how rewarding jury service can be.  It is very

3  common for jurors to come into the courtroom feeling

4  apprehensive, annoyed, or downright angry at the idea of

5  serving on a jury, but at the end of the process, every juror

6  has reported to me that they have found the experience a

7  net-positive, that it was educational, enlightening, and

8  sometimes very rewarding.

9    So keep an open mind.  This is your duty as an

10  American citizen, but it can be a positive one.

11    We do not require you to wear a mask, but I do

12  encourage you to wear one if you'd like.  Personally, I have

13  the luxury of being up here at a distance from everyone, so I

14  am not wearing a mask.  But we need everyone in a trial to stay

15  healthy and to be comfortable, and so I certainly encourage you

16  to wear a mask if you'd like to do so.

17    A seven-day trial is pretty typical for our

18  courthouse.  Thousands and thousands of jurors have managed to

19  serve on a trial of that length, and it's been quite

20  manageable.  And, in fact, there's another group of jurors

21  coming into this building today to sit on a trial that's

22  scheduled to last up to eight weeks long, so you might consider

23  yourself a bit lucky to be here today.

24    The way we pick a fair and impartial jury is by

25  telling you a little bit about the case and asking you a series

1    of questions, many of which you've already answered in the

2    questionnaires that you filled out yesterday.  But I am going

3    to ask you some more questions this morning, and I expect this

4    process is going to take a couple of hours this morning.

5            In the letter that you received yesterday, I

6    mentioned the rule that you not communicate about this case or

7    do any research about the case.  It's very important that you

8    not look at any outside information.  It can be incomplete,

9    inaccurate, or legally irrelevant.  And it's just not fair to

10   the parties involved in this dispute who have worked hard to

11   get their day in court if that process gets compromised by

12   outside information.

13           So from this point forward until we complete the

14   process, you are not to discuss this case with anyone, even

15   amongst yourselves, and you're not to do any research or

16   investigation about the case.  So no Googling anything having

17   to do with this case.

18           My goal this morning in asking you some questions is

19   to find a fair and impartial group of people to serve on this

20   particular case.  It's not to embarrass anybody or reveal

21   private information to the world.

22           We have a setup here in the courtroom where we can

23   have a conversation in a slightly more private way where you,

24   the prospective juror, would sit in what we ordinarily call the

25   witness stand, which is off to my left.  We'll turn on a white

1    noise machine, so no one else will be able to hear what we're

2    saying, and the lawyers and I and the prospective juror in the

3    witness stand will put on headphones, and we can listen to each

4    other and talk to each other through the microphones without

5    everybody else hearing what we're saying.

6              So there may come a time when I decide that there is

7    something I want to talk to you about that I'd like you to use

8    that method for.

9              And I may interrupt you as you're answering a

10   question, and I certainly don't mean to be rude.  I'm just

11   trying to keep the process fair for everyone and keep things

12   moving along.

13             And if there's a topic that comes up that you would

14   prefer that we talk about in that more private way, just let me

15   know, and we can have a conversation that way.

16             The first thing we're going to do is administer an

17   oath to all of you where you promise to answer the questions

18   truthfully.

19             And so we'll administer that oath now, please.

20             THE CLERK:  Raise your right hands.

21         (Venire duly sworn.)

22             THE COURT:  And my first question for all of you as a

23   group is, do each of you swear or affirm that the answers you

24   gave in the questionnaire were truthful to the best of your

25   ability?

1    (Venire affirm.)

2         THE COURT:  Next, let me just repeat what was in the

3    letter as a very brief preview of what this case is about and

4    then I am going to ask the lawyers who are involved in the case

5    to introduce themselves and the other people that are with them

6    this morning.  And the purpose of this is, at the end, I am

7    going to ask any of you if you think you know anything about

8    this case or the people involved in the case.

9         This is a civil lawsuit.  The plaintiff, Jermaine

10   Walker, alleges that in 2006, the defendants, Chicago Police

11   Officers Michael White, Eric Reyes, and Sebastian Flatley,

12   fabricated evidence against him to support criminal drug

13   charges.  Mr. Walker was convicted after a trial and sentenced

14   to a term of incarceration.  In 2016, the prosecution moved to

15   vacate Mr. Walker's conviction, and he was released from

16   custody.

17        In this lawsuit, Mr. Walker alleges that the

18   defendants violated his civil rights by fabricating evidence,

19   causing his unlawful detention, and maliciously prosecuting

20   him.  The defendants deny all of plaintiff's allegations.  The

21   jury will decide if Mr. Walker has proven his claims and

22   whether to award him an amount of money as compensation.

23        Now I will ask the lawyers involved in the case to

24   introduce themselves, starting with counsel for the plaintiff.

25        MR. FAKHOURI:  Good morning, everyone.  Thank you for

```
 1   your time and consideration.
 2           My name is Attorney Robert Fakhouri on behalf of the
 3   plaintiff, Jermaine Walker.
 4           MR. ADAMS:  Good morning, everyone.  My name is
 5   Attorney Jarrett Maurice Adams, and I am here on behalf of the
 6   plaintiff, Jermaine Walker, who sits here now (indicating).
 7   But I will sit here and he will sit here (indicating) during
 8   the trial, just close, so we can go through the jury selection.
 9           Thank you, all, for being here today.
10           THE COURT:  On behalf of the defense?
11           MS. BOUDREAUX:  Thank you, Judge.
12           My name is Barrett Boudreaux, and I represent the
13   defendant officers, Officer Eric Reyes, Officer Sebastian
14   Flatley --
15       (Defendants stand/sit.)
16           DEFENDANT FLATLEY:  Good morning.
17           DEFENDANT REYES:  Good morning.
18           MS. BOUDREAUX:  -- and Officer Michael White.
19           DEFENDANT WHITE:  Good morning.
20           MR. STEFANICH:  Good morning.  My name is Brian
21   Stefanich, and I represent the same police officers.
22           MS. BITOY:  Good morning.  My name is Jennifer Bitoy,
23   and I also represent the defendant officers.
24           THE COURT:  Do any of you think you know anything
25   about this case or about the people that you've met, either
```

1    with the court or people involved in the trial?

2         (Venire nod.)

3         THE COURT:  We've put you in a random order, and I

4    need you to stay in that order, because that's how I am able to

5    keep track of who you are as we're going through this process.

6              And what we're going to do now is I am going to talk

7    to each of you individually and ask you some questions based on

8    your answers to the questionnaire.

9              And we're going to do that one at a time, and we're

10   going to start with Mr. McIntire.  If we could hand

11   Mr. McIntire a microphone, please.

12        (Microphone tendered to prospective juror.)

13        THE COURT:  And if you don't mind, Mr. McIntire, if

14   you're able, I'd like you to stand.

15        (Prospective juror stands.)

16        THE COURT:  Good morning.

17        PROSPECTIVE JUROR McINTIRE:  Good morning.  Check 1,

18   2.

19        THE COURT:  Could you state your name, please.

20        PROSPECTIVE JUROR McINTIRE:  My name is Jonathan

21   McIntire.

22        THE COURT:  Mr. McIntire, can you tell me a little

23   bit more about what you do day to day for Allstate?

24        PROSPECTIVE JUROR McINTIRE:  Yes.  I'm the manager of

25   testing the authorizations, so I'm part of a larger, kind of

1    web development, web team.  Digital connectivity, we call it.

2    But I manage the testing and authorization team, so testing all

3    of our digital channels, doing AV testing, multi-various

4    testing, if that makes any sense.  Do some --

5              THE COURT:  Not so much.

6              PROSPECTIVE JUROR McINTIRE:  Yeah, sure.

7              THE COURT:  Tell me a little bit more about that.

8              PROSPECTIVE JUROR McINTIRE:  Yeah.  Oh, no.  So it's

9    basically you're setting up -- like, say, we own Direct Auto,

10   Safe Auto, National General, even Allstate.com, so setting up

11   tests to optimize the experience for consumers and things down

12   our customer, you know, finals, customer journeys.

13             THE COURT:  And you've done that for about a year?

14             PROSPECTIVE JUROR McINTIRE:  Uh-huh.

15             THE COURT:  And what did you do before then?

16             PROSPECTIVE JUROR McINTIRE:  I was the manager of

17   digital CX or customer experience at Grant Thornton.  So

18   similar role, but a little bit more broad.

19             THE COURT:  And your fiancee or partner is an

20   environmental lawyer?

21             PROSPECTIVE JUROR McINTIRE:  That's right.

22             THE COURT:  Can you tell me a little bit about what

23   kind of work they do?

24             PROSPECTIVE JUROR McINTIRE:  Well, I don't know the

25   ins and outs because it's -- you know, but they work for the

 1    State of Illinois.  I should probably put that out there.  And,

 2    yeah, they work for the EPA.  So working through, you know,

 3    different lawsuits and things like that.  Dealing with people

 4    who are, you know, not exactly following the rules with

 5    their -- with regulations and things like that that the State

 6    of Illinois has.

 7              THE COURT:  In this trial, and in any trial, people

 8    may have their personal experiences, life experiences that have

 9    given them some insight into the law or legal procedures.  But

10    I am the judge in this case, and the law is what I say it is.

11    It's not what you think it is or what you believe it might be.

12    And it's important for a juror to be able to keep an open mind

13    and follow the instructions of law as I give them, not as you

14    think they might be.

15              Would you be able to follow my legal instructions,

16    even though you might have a lawyer in your personal network?

17              PROSPECTIVE JUROR:  Oh, yes.  Yes.

18              THE COURT:  And any issues with our schedule?  You

19    mentioned in your questionnaire, nothing extreme, but it's an

20    inconvenience.

21              PROSPECTIVE JUROR McINTIRE:  Yeah.  It is what it is.

22    But yeah, no problem.

23              THE COURT:  Okay.  I certainly appreciate that.

24              Why don't -- if you could pass the microphone to Ms.

25    Marquez, please.

1       Good morning.  If you could state your name, please.

2            PROSPECTIVE JUROR MARQUEZ:  Good morning.  My name is

3       Olga Marquez.

4            THE COURT:  Ms. Marquez, you are a second-grade

5       teacher; is that right?

6            PROSPECTIVE JUROR MARQUEZ:  I am.

7            THE COURT:  And have you always taught second grade

8       or have you had other kinds of teaching positions or other

9       positions?

10           PROSPECTIVE JUROR MARQUEZ:  Yes.  I worked for the

11      City for seven years, and I did third through eighth grade in

12      Ravenswood area.  And then I moved to Plainfield.  And I did

13      kindergarten, first bilingual, and then I did first-grade

14      general ed.  And second grade now, general ed.

15           THE COURT:  Your parents live in the same household

16      with you, is that right?

17           PROSPECTIVE JUROR MARQUEZ:  I do, yeah.  I take care

18      of them, yes.

19           THE COURT:  And what did they do before they retired?

20           PROSPECTIVE JUROR MARQUEZ:  Well, my dad worked in a

21      factory.  They did, like, bags or things like that.  He had,

22      like, different jobs.  He worked at the Ritz-Carlton and

23      another manufacturing, like, fabric factory.  And my mom, she's

24      always been like a homemaker, babysitting at home.  But not

25      today.  They don't do anything.  They just relax.

1      THE COURT:  And I understand you have served on a

2  jury before.

3      PROSPECTIVE JUROR MARQUEZ:  I did, in Joliet, yes.

4      THE COURT:  Without -- first, let me just ask you,

5  was that a civil or a criminal case?

6      PROSPECTIVE JUROR MARQUEZ:  Civil.

7      THE COURT:  And without telling me the outcome of the

8  trial, did the jury deliberate and reach a verdict?

9      PROSPECTIVE JUROR MARQUEZ:  No.

10      THE COURT:  You mentioned that you or someone close

11  to you has had some involvement in a lawsuit?

12      PROSPECTIVE JUROR MARQUEZ:  Yes.

13      THE COURT:  Could you tell me a little bit about

14  that?

15      PROSPECTIVE JUROR MARQUEZ:  Sure.  It's -- it was my

16  neighbor, and very close to us, very close to my family.  And

17  he -- he worked in a -- how do you -- a construction company.

18  And he fell and he hurt his shoulder very badly.  And he sued

19  the company, and he had a great outcome.

20      THE COURT:  And did you have to participate in that

21  case in any way?

22      PROSPECTIVE JUROR MARQUEZ:  No.  I only went to --

23  with him because he needed somebody to translate.  So I helped

24  him in the beginning stages until they got a translator for

25  him.

1    THE COURT:  Is there anything about your neighbor's

2    experience with the legal system that would make it difficult

3    for you to keep an open mind in this case?

4    PROSPECTIVE JUROR MARQUEZ:  No.

5    THE COURT:  Jurors -- and you'll all hear me say this

6    a few -- probably many times this morning.  But jurors bring

7    their life experiences to jury duty and their common sense to

8    jury duty, but the facts of the case have to be based on the

9    evidence that is presented in the courtroom, not based on any

10   facts that you may know or believe from outside sources.

11   Would you be able to make a decision based on the

12   evidence that you learn about in the courtroom, not based on

13   any outside information you might have learned about in your

14   life?

15   PROSPECTIVE JUROR MARQUEZ:  Sure.  I believe so.

16   THE COURT:  And I do understand that jury duty is an

17   inconvenience with respect to your occupation, your job and the

18   students who you work with, and I certainly appreciate that.

19   But, as I am sure you also appreciate, this is the kind of

20   civic obligation that every employer is required to understand

21   and accommodate.

22   Thank you, Ms. Marquez.  Can you pass the microphone

23   to Ms. -- is it Glyman?

24   PROSPECTIVE JUROR GLYMAN:  Glyman, yeah.  Michelle

25   Glyman.

1      THE COURT:  Ms. Glyman, could you tell me just a

2   little bit more about what you do for the school district?

3      PROSPECTIVE JUROR GLYMAN:  Well, I just started at

4   the high school this year.  But all three of my kids went

5   there.  And I worked for the past five years with -- well,

6   fourth-graders, and I was a teacher's assistant.  And I was

7   mostly one-to-one with kids.

8      And now I'm a study hall supervisor, and it's a lot

9   more fun, because kids don't need the same amount of care with

10   regard to their personal being.

11      So that's kind of it.  It's great.

12      THE COURT:  And what kind of commercial real estate

13   is your spouse involved in?

14      PROSPECTIVE JUROR GLYMAN:  Buildings, apartments, and

15   some land.

16      THE COURT:  In any particular geographic area?

17      PROSPECTIVE JUROR GLYMAN:  Yeah.  Lake, Kenosha,

18   McHenry County.

19      THE COURT:  You've participated in a Citizens Police

20   Academy.

21      PROSPECTIVE JUROR GLYMAN:  I did.  I just did that.

22      THE COURT:  And you've heard me say this --

23      PROSPECTIVE JUROR GLYMAN:  Uh-huh.

24      THE COURT:  -- in a few different ways, but I'll ask

25   you directly.  Would you be able to follow the law as I

1   describe it --

2           PROSPECTIVE JUROR GLYMAN:  Oh, yeah.

3           THE COURT:  -- and not rely on your understanding of

4   the law and legal procedures that you may have learned --

5           PROSPECTIVE JUROR GLYMAN:  Well, I don't feel like --

6           THE COURT:  -- in the academy?

7           PROSPECTIVE JUROR GLYMAN:  -- that was so much about

8   the law, I mean, in the sense that I went with my girlfriend

9   and, you know, it was neat.  We learned about, like, hiring and

10  training.  We got to go to the range.  We -- I don't know.  It

11  was -- the canine came.  That was -- you know, it was -- it was

12  like an orientation, but I did not feel like it was any

13  specific class on really how to be an officer.  It's more like

14  what they -- it was a little more topical.  It was very, like,

15  user-friendly.

16          THE COURT:  Understood.  Thank you.

17          PROSPECTIVE JUROR GLYMAN:  Uh-huh.

18          THE COURT:  Nevertheless --

19          PROSPECTIVE JUROR GLYMAN:  Yeah.

20          THE COURT:  -- the facts of this case have to be

21  determined by the jury based on the evidence you learn about in

22  a courtroom, not based on any facts you might know or have

23  learned about policing and police officers.

24          PROSPECTIVE JUROR GLYMAN:  Well, I guess my thing

25  would be I don't feel like I learned any facts.  Like, I'm open

1    to the real facts as they pertain to this case in accordance

2    with what you say.

3         THE COURT:  And, ultimately, every juror would be

4    required to keep an open mind throughout the whole case and be

5    fair to both sides and then not make a decision until the end

6    of the trial after you have heard all of the evidence and

7    you've heard my instructions of law.

8         Would you be able to do that?

9         PROSPECTIVE JUROR GLYMAN:  Yes.

10        THE COURT:  Thank you, Ms. Glyman.  You can pass the

11   microphone to Ms. Wadycki.

12        PROSPECTIVE JUROR WADYCKI:  Yes.  Valerie Wadycki.

13        THE COURT:  And another teacher.

14        PROSPECTIVE JUROR WADYCKI:  Yes.

15        THE COURT:  Can you tell me a little bit more about

16   your teaching career and the kind of work you've done?

17        PROSPECTIVE JUROR WADYCKI:  Yes.  I have been

18   teaching for 21 years in the Chicago Public Schools.  I'm a

19   high-school French teacher.  I have taught at two schools.

20   I've been at my current school for seven years.  I also oversee

21   the world language department there.

22        THE COURT:  And in what -- what neighborhoods have

23   you worked in for CPS?

24        PROSPECTIVE JUROR WADYCKI:  I've worked at Schurz

25   High School in Irving Park, and I currently work at Lakeview

1  High School in Lakeview.

2         THE COURT:  And your spouse is a computer engineer?

3         PROSPECTIVE JUROR WADYCKI:  Yes.

4         THE COURT:  And in that company, where does he fall

5  in the sort of management structure of the company?  And what

6  kind of responsibilities does he have there?

7         PROSPECTIVE JUROR WADYCKI:  It's a newer position.  I

8  know he is not managing as many humans in his current position,

9  and that's why he took it.  He was getting sick of managing

10  people.  So he's more on the technical side of what he's doing.

11        I got to meet his boss and his co-worker yesterday

12  because they're down the street.

13        THE COURT:  With respect to the CTU, other than your

14  membership in the CTU, do you have any kind of -- any

15  leadership positions or active role in their --

16        PROSPECTIVE JUROR WADYCKI:  I do not.

17        THE COURT:  In their activities?  You have -- you or

18  someone close to you has been involved in a lawsuit?

19        PROSPECTIVE JUROR WADYCKI:  Yes.  I --

20        THE COURT:  Could you tell me a little bit about

21  that?

22        PROSPECTIVE JUROR WADYCKI:  Yes.  Roughly 20 years

23  ago, I was hit by a car, and there was a lawsuit.  That was

24  settled outside of court.

25        THE COURT:  Is there anything about your experience

1  with the legal system in that case that would make it difficult

2  for you to keep an open mind in this case, follow my

3  instructions of the law, and make a decision based on the

4  evidence in the courtroom?

5          PROSPECTIVE JUROR WADYCKI:  No.

6          THE COURT:  You have a relative who works for the

7  FBI.

8          PROSPECTIVE JUROR WADYCKI:  They're retired.  And I

9  don't know if I indicated that.  But they recently retired.

10          THE COURT:  What -- where in the FBI did they work?

11  Was it in Chicago --

12          PROSPECTIVE JUROR WADYCKI:  Chicago.

13          THE COURT:  -- or somewhere --

14          PROSPECTIVE JUROR WADYCKI:  Yes.

15          THE COURT:  And did you have much interaction with

16  them about their work and what they did as -- with the FBI?

17          PROSPECTIVE JUROR WADYCKI:  No.  But, coincidentally,

18  my husband was called for jury for a case she was on.  But no.

19          THE COURT:  And would you be able to put aside any

20  facts that you may have learned from your cousin about anything

21  at all in order to make a decision about the facts of this case

22  based only on the evidence in the courtroom?  Would you be able

23  to do that?

24          PROSPECTIVE JUROR WADYCKI:  Yes.

25          THE COURT:  And could you keep an open mind and be

1   fair to both sides and not make a decision until you have heard

2   everything, including my instructions of law?

3             PROSPECTIVE JUROR WADYCKI:  Absolutely.

4             THE COURT:  Thank you.  If you could pass the

5   microphone to Mr. Olszta.

6             PROSPECTIVE JUROR OLSZTA:  Yeah.  Ed Olszta.

7             THE COURT:  How long ago did you retire?

8             PROSPECTIVE JUROR OLSZTA:  I retired in 2017.

9             THE COURT:  And what kind of work did you do at

10  Citgo?

11            PROSPECTIVE JUROR OLSZTA:  I was a process supervisor

12  in charge of some of the operating units.

13            THE COURT:  What -- and is your spouse still working?

14            PROSPECTIVE JUROR OLSZTA:  No.  She's retired.

15            THE COURT:  And what kind of nursing was she involved

16  in?

17            PROSPECTIVE JUROR OLSZTA:  Pediatrics.

18            THE COURT:  At a hospital?  At a doctor's office?

19            PROSPECTIVE JUROR OLSZTA:  At a clinic.

20            THE COURT:  Okay.  Mr. Olszta, I'd actually like to

21  ask you some questions from the witness stand.

22            So we're going to try that system right now.  If you

23  can -- you can just leave that microphone on the chair there.

24  And if you could take the witness stand, please.

25       (Prospective juror approaches.)

1          THE COURT:  And over the ledge there, there's a set

2    of headphones to your right, I think.  And then there should

3    also be a handheld microphone.

4          (Court reporter assists prospective juror.)

5          THE COURT:  I'm going to turn on a white noise and

6    machine and then the lawyers and I will put the headsets on,

7    and we will have a little bit of a conversation.

8          PROSPECTIVE JUROR OLSZTA:  Okay.

9          (Proceedings heard at sidebar on the record:)

10          THE COURT:  Okay.  Mr. Olszta, can you hear me?

11          PROSPECTIVE JUROR OLSZTA:  Yes.

12          THE COURT:  You have a -- some friends or retired

13    associates who worked in law enforcement, is that right?

14          PROSPECTIVE JUROR OLSZTA:  That's correct.

15          THE COURT:  A police officer and a judge?

16          PROSPECTIVE JUROR OLSZTA:  Yes.

17          THE COURT:  You can speak up just a little bit

18    louder.

19          PROSPECTIVE JUROR OLSZTA:  Okay.

20          THE COURT:  Is there anything about your friendship

21    with them that would make it difficult for you to keep an open

22    mind in this case?

23          PROSPECTIVE JUROR OLSZTA:  No, I don't think so.

24          THE COURT:  You'd have to make a decision on the

25    facts of this case based on the evidence in the courtroom, not

1   based on something you may have learned from your friends or

2   your associates about policing or anything like that.

3           Would you be able to do that?

4           PROSPECTIVE JUROR OLSZTA:  I believe so.

5           THE COURT:  You mentioned in an answer to a question

6   that knowing that Mr. Walker had been convicted would make it

7   difficult for you to be fair to both sides in this case.

8           Could you tell me a little bit more about why you

9   think that is?

10          PROSPECTIVE JUROR OLSZTA:  Well, as I stated, the

11  reason why was because going through a trial and presenting all

12  the evidence that was there, I'm sure, in my mind, that one of

13  the things that they would've done in the defense of Mr. Walker

14  was to prove that exactly what he has his civil suit for.  And

15  being that they couldn't convince a jury that evidence was

16  fabricated, I had my question about that.  That puts a question

17  in my mind.

18          THE COURT:  And could you now, sitting here today,

19  put that to one side and, in fact, here keep an open mind and

20  be fair to both sides and make a decision based on the evidence

21  in this case?  Because you haven't heard what this case is

22  actually about.

23          Would you be able to keep an open mind?

24          PROSPECTIVE JUROR OLSZTA:  I would -- I would hope I

25  could, yes.

1          THE COURT:  Would you be able to follow the

2   instructions of law as I give them, even if you disagree with

3   the law as I describe it?  Would you be able to follow the law

4   as I will state it to you?

5          PROSPECTIVE JUROR OLSZTA:  Yes.  I could do that.

6          THE COURT:  You have a doctor's appointment coming

7   up.

8          PROSPECTIVE JUROR OLSZTA:  Yes, I do.

9          THE COURT:  Is that something that can be

10  rescheduled?

11         PROSPECTIVE JUROR OLSZTA:  It can.

12         THE COURT:  I appreciate that.  Thank you for letting

13  us know.

14         You can go ahead and take your seat in the jury box.

15         PROSPECTIVE JUROR OLSZTA:  Okay.  All right.

16         THE COURT:  Thank you.

17      (End of proceedings at sidebar.)

18         THE COURT:  And while Mr. Olszta is taking his seat,

19  if, Ms. Dudley-McInnis, you could pick up the microphone,

20  please.

21         Good morning.

22         PROSPECTIVE JUROR DUDLEY-McINNIS:  Good morning.

23         THE COURT:  Could you just state your name, please.

24         PROSPECTIVE JUROR DUDLEY-McINNIS:  Tia

25  Dudley-McInnis.

1    THE COURT:  And can you tell me a little bit about

2  what you do as a managing broker?

3    PROSPECTIVE JUROR DUDLEY-McINNIS:  Yes.  So it's a

4  real estate company where we oversee other agents for sales,

5  leasing, and property management.

6    THE COURT:  In any particular geographic areas?

7    PROSPECTIVE JUROR DUDLEY-McINNIS:  Chicago and the

8  suburbs.

9    THE COURT:  City-wide?

10    PROSPECTIVE JUROR DUDLEY-McINNIS:  Not the whole

11  city, but yes.  You -- we -- I mean, I am actually a licensed

12  broker, so -- for Illinois.  I can do anything in Illinois, but

13  Chicago and the suburbs is the focus.

14    THE COURT:  And your spouse is also involved in real

15  estate.

16    PROSPECTIVE JUROR DUDLEY-McINNIS:  Yes.

17    THE COURT:  And can you tell me a little bit more

18  about their work?

19    PROSPECTIVE JUROR DUDLEY-McINNIS:  Yes.  So he

20  actually is a CPA.  He used to work for PriceWaterhouse.  But

21  once he met me, he got more into real estate, so he was able to

22  leave that.  So he's actually a real estate investor, so he

23  owns buildings in the Chicagoland area.

24    THE COURT:  And in any particular neighborhoods in

25  Chicago?

1       PROSPECTIVE JUROR DUDLEY-McINNIS:  Yes.  So in

2  Englewood, in Grand Crossing, and Auburn Gresham.

3       THE COURT:  You've had -- you or someone close to you

4  has had some involvement in a lawsuit?

5       PROSPECTIVE JUROR DUDLEY-McINNIS:  My husband.

6       THE COURT:  Could you tell me a little bit about

7  that, please?

8       PROSPECTIVE JUROR DUDLEY-McINNIS:  So -- yeah.  One

9  of his tenants sued him.  They asserted that they were hurt by

10  the building door, they said slammed on the back of their

11  ankle, and they had to have medical attention for that.

12       THE COURT:  Did that end up going to court?

13       PROSPECTIVE JUROR DUDLEY-McINNIS:  It did.  It did.

14       THE COURT:  And how long ago was that?

15       PROSPECTIVE JUROR DUDLEY-McINNIS:  I would -- a few

16  years ago.  It wasn't that long ago.

17       THE COURT:  Is there anything about your spouse's

18  experience with the legal system that would make it difficult

19  for you to keep an open mind in this case and follow the law as

20  I will explain it?

21       PROSPECTIVE JUROR DUDLEY-McINNIS:  No, no.

22       THE COURT:  You have had some relatives who have

23  worked for government agencies or law enforcement agencies?

24       PROSPECTIVE JUROR DUDLEY-McINNIS:  Yes, yes.

25       THE COURT:  And so just -- if you could just walk me

1    through who they are and what kind of work they've done.

2              PROSPECTIVE JUROR DUDLEY-McINNIS:  Sure.  So my

3    father, he's a retired sergeant.  He did work for -- in the

4    Internal Affairs Division.

5              And my aunt, she was a Chicago police officer.  She's

6    retired.  And my uncle, who's no longer here, he was also a

7    police officer for Chicago Police.

8              THE COURT:  Your -- you mentioned your father worked

9    in Internal Affairs.  What -- do you know, if you know, what

10   areas did your aunt and uncle work in?  Either geographic or

11   types of duties.

12             PROSPECTIVE JUROR DUDLEY-McINNIS:  They were -- they

13   were -- you know, they worked the police car.  I don't remember

14   which neighborhoods, though.  Honestly, I don't remember that.

15             But my dad, he was at the Homan location and then it

16   moved to 35th.  That's where he retired.

17             THE COURT:  And what -- when did your father retire?

18   What time was -- what time period was he working as a -- with

19   the CPD?

20             PROSPECTIVE JUROR DUDLEY-McINNIS:  Oh, he -- it was a

21   while.  I mean, he's been retired for at least 15-plus years,

22   at least.

23             THE COURT:  Because of the people you know who have

24   worked for the Chicago Police Department, you may have learned

25   things about the police department and policing generally.

1    Would you be able to make a decision in this case

2    based on the evidence that you learn about in the courtroom,

3    not relying on facts that you may have learned or believed from

4    outside sources?  Would you be able to do that?

5        PROSPECTIVE JUROR DUDLEY-McINNIS:  Yes.

6        THE COURT:  Would you be able to keep an open mind

7    and be fair to both sides in this case and not make a decision

8    until you have heard everything?

9        PROSPECTIVE JUROR DUDLEY-McINNIS:  Yes.

10        THE COURT:  Would you be able to follow my

11    instructions of the law?  Even if you might disagree with the

12    law as I have explained it, would you be able to follow my

13    instructions of the law?

14        PROSPECTIVE JUROR DUDLEY-McINNIS:  Yes.

15        THE COURT:  I understand from your questionnaire that

16    you've got other life events happening around now, and that's

17    causing some potential distractions.

18        As you have been sitting here and thinking about this

19    process, is there anything about that that's causing you any

20    additional concerns or anything you'd like to make sure I am

21    aware of?

22        PROSPECTIVE JUROR DUDLEY-McINNIS:  Yeah.  I mean,

23    I -- this isn't the best timing for me personally.  I

24    definitely would love to do this, but I have several things

25    that will be pulling at me, and I feel it will be a big

1    distraction, to be honest.

2    THE COURT:  And I certainly appreciate that, and
3    we'll take that into account.

4    Ultimately, jury service and jury duty does require
5    the participation of people, even those of us who have other
6    things that we'd rather be doing, even important things.  And
7    the question becomes, can you nevertheless, if selected, keep
8    an open mind, listen to the testimony, pay attention, and
9    ultimately make a decision based on the evidence and the law?
10   Would you be able to do all of that?

11   PROSPECTIVE JUROR DUDLEY-McINNIS:  So the paying
12   attention could be an issue for me because I -- again, just my
13   phone is, like, beeping and ringing, and so it's -- so all of
14   those other things except for the attention part, honestly I
15   won't be a hundred percent.

16   THE COURT:  Thank you, Ms. Dudley-McInnis.  You can
17   pass the microphone.

18   PROSPECTIVE JUROR DUDLEY-McINNIS:  Okay.

19   THE COURT:  Good morning.  Ms. Brewster?

20   PROSPECTIVE JUROR BREWSTER:  Good morning.

21   THE COURT:  Could you just state your name, please.

22   PROSPECTIVE JUROR BREWSTER:  Mary Brewster.

23   THE COURT:  Ms. Brewster, could you just tell me a
24   little bit more about what you do in your job as an account
25   manager?

1          PROSPECTIVE JUROR BREWSTER:  Yes.  I work at an

2   insurance brokerage firm and primarily, like, middle market.

3   I'm on the generalist team, but it's probably like 75%

4   manufacturers, the rest contractors.  And we just place their

5   property and casualty business insurance.  We work with various

6   carriers, market their program, place their business on behalf

7   of the clients.

8          THE COURT:  You have served on a jury before.

9          PROSPECTIVE JUROR BREWSTER:  I have.

10          THE COURT:  How long ago was that?

11          PROSPECTIVE JUROR BREWSTER:  It was about three years

12   ago.  It was right, like, February of COVID, yeah.

13          THE COURT:  Do you recall which courthouse you went

14   to?

15          PROSPECTIVE JUROR BREWSTER:  The Cook County Circuit,

16   the Daley Center.

17          THE COURT:  Was that a civil case or a criminal case?

18          PROSPECTIVE JUROR BREWSTER:  Civil, yes.

19          THE COURT:  Without telling me the outcome, did the

20   jury deliberate and reach a verdict?

21          PROSPECTIVE JUROR BREWSTER:  We did.

22          THE COURT:  You or someone close to you has had some

23   involvement in a lawsuit?

24          PROSPECTIVE JUROR BREWSTER:  Yes.

25          THE COURT:  Could you tell me a little bit about

1  that, please?

2  PROSPECTIVE JUROR BREWSTER:  It was a half-sibling

3  and it was, like, 30, 35 years ago.  And I don't believe it

4  went to court.

5  THE COURT:  And so it was your half-sibling who was

6  involved in that lawsuit?

7  PROSPECTIVE JUROR BREWSTER:  Uh-huh.

8  THE COURT:  Did you have any involvement in it --

9  PROSPECTIVE JUROR BREWSTER:  No.

10  THE COURT:  -- or participate?

11  PROSPECTIVE JUROR BREWSTER:  I was -- I think my mom

12  was pregnant with me at the time.  I wasn't even born yet,

13  yeah.

14  THE COURT:  Is there anything about your family's

15  experience with the legal system that would make it difficult

16  for you to keep an open mind in this case, make a decision

17  based on the evidence you learn about in the courtroom, not

18  based on outside sources of information, and ultimately based

19  on the law as I will explain it to you?  Any difficulty with

20  any of that?

21  PROSPECTIVE JUROR BREWSTER:  No.

22  THE COURT:  And is -- you mentioned that you or

23  someone close to you has been involved in a criminal case or

24  the criminal justice system.

25  Is that something different than what we've just

1   talked about?

2           PROSPECTIVE JUROR BREWSTER:  No.

3           THE COURT:  And can you just describe for me, then,

4   what your half-sibling's role in that case was?  Were they the

5   accused?  Were they a victim?

6           PROSPECTIVE JUROR BREWSTER:  They were the accused,

7   uh-huh.

8           THE COURT:  You mentioned -- on a lighter note, you

9   mentioned, in terms of TV and podcasts and radios, a variety of

10  shows.  Anything in particular?

11          PROSPECTIVE JUROR BREWSTER:  It really is a variety.

12  Like, I like comedy, I like action, I like true crime.  I like

13  everything, yeah.

14          THE COURT:  Okay.  Thank you, Ms. Brewster.

15          We're going to pass the microphone to Ms. Pasquesi,

16  who I think is in the front row in the corner there, please.

17          PROSPECTIVE JUROR PASQUESI:  Good morning.

18          THE COURT:  Good morning.  Could you state your name,

19  please.

20          PROSPECTIVE JUROR PASQUESI:  Christina Pasquesi.

21          THE COURT:  Ms. Pasquesi, could you tell me a little

22  bit about your job responsibilities with the American Board of

23  Psychiatry?

24          PROSPECTIVE JUROR PASQUESI:  I'm actually the

25  examination administration manager.  So what I do is make sure

1  that all of our candidates are able to test to get their board

2  certification in either a specialty or subspecialty of

3  psychiatry and neurology.  I also process all the ADA

4  accommodations requests.

5         THE COURT:  So are you -- you're not involved in the

6  practice of psychiatry.

7         PROSPECTIVE JUROR PASQUESI:  No, not at all.

8         THE COURT:  You're administering the exams for this

9  entity.

10        PROSPECTIVE JUROR PASQUESI:  Correct, yes.

11        THE COURT:  And your spouse is retired, but can you

12  just describe a little bit what kind of work they did?

13        PROSPECTIVE JUROR PASQUESI:  He's a registered

14  architect and structural engineer, and he did a lot of the

15  engineering for clean rooms for chip manufacturers.

16        THE COURT:  You've served on a jury before.

17        PROSPECTIVE JUROR PASQUESI:  Yes.

18        THE COURT:  How long ago was that?

19        PROSPECTIVE JUROR PASQUESI:  More than ten years.

20  Ten, twelve years ago.

21        THE COURT:  Do you recall what courthouse you went

22  to?

23        PROSPECTIVE JUROR PASQUESI:  Lake, Lake County.

24        THE COURT:  Was it a civil case or a criminal case?

25        PROSPECTIVE JUROR PASQUESI:  Criminal.

1  THE COURT:  Without telling me the outcome, did the

2  jury deliberate and reach a verdict?

3  PROSPECTIVE JUROR PASQUESI:  Yes.

4  THE COURT:  Thank you, Ms. Pasquesi.  You could pass

5  the microphone to Mr. Newman.

6  PROSPECTIVE JUROR NEWMAN:  Good morning.

7  THE COURT:  Good morning.  If you could state your

8  name, please.

9  PROSPECTIVE JUROR NEWMAN:  My name's Lawrence Newman.

10  THE COURT:  Mr. Newman, can you tell me a little bit

11  about your company?  What does it do and what do you do?

12  PROSPECTIVE JUROR NEWMAN:  We're a manufacturer of

13  paper products, packaging, labels.  We print.  Easiest way to

14  explain it is if you get a Nicor gas bill at your house, I

15  print that, so -- but don't blame me for putting your name on

16  it.

17  (Laughter.)

18  PROSPECTIVE JUROR NEWMAN:  I only do it in big rolls.

19  But the company's 23 years old.  We have 140 employees.  A

20  facility in Alabama, facility in Connecticut.  And a very,

21  very, very fortunate group.

22  THE COURT:  You have served on a jury before.

23  PROSPECTIVE JUROR NEWMAN:  I served on a grand jury.

24  THE COURT:  And how long ago was that?

25  PROSPECTIVE JUROR NEWMAN:  About four years ago.

1      THE COURT:  What courthouse did you go to for that?

2      PROSPECTIVE JUROR NEWMAN:  Wheaton.

3      THE COURT:  How long of a service on a grand jury did

4  you serve?

5      PROSPECTIVE JUROR NEWMAN:  It was just three days.

6      THE COURT:  You or someone close to you has been

7  involved in a lawsuit?

8      PROSPECTIVE JUROR NEWMAN:  I am currently.  It's a

9  small personal suit.  I made a questionable decision.  I lent a

10  friend of mine some money on the promise it'd be paid back in a

11  year, and I would like it back.

12      THE COURT:  Are you the plaintiff in that case?

13      PROSPECTIVE JUROR NEWMAN:  Yes.

14      THE COURT:  And what -- have you filed suit?

15      PROSPECTIVE JUROR NEWMAN:  Yes, I have.

16      THE COURT:  What courthouse is that in?

17      PROSPECTIVE JUROR NEWMAN:  It's going to be in Kane.

18      THE COURT:  Is there anything about your experience

19  with the legal system that would make it difficult for you to

20  keep an open mind in this case?

21      PROSPECTIVE JUROR NEWMAN:  No, not -- none

22  whatsoever.

23      THE COURT:  And you've had experience as a grand

24  juror, hearing testimony.  The role of a grand juror is

25  different than --

1      PROSPECTIVE JUROR NEWMAN:  Most different.

2      THE COURT:  -- than the role of a juror who's hearing

3  a case at trial.

4      Would you be able to follow my legal instructions,

5  notwithstanding anything you might have learned about the law

6  during your grand jury service?

7      PROSPECTIVE JUROR NEWMAN:  Yes.

8      THE COURT:  You or someone close to you has worked

9  for the Department of Education?

10     PROSPECTIVE JUROR NEWMAN:  Yeah.  My second daughter,

11 Sara, works for Department of Education in Washington, D.C.

12     THE COURT:  And what kind of work does she do there?

13     PROSPECTIVE JUROR NEWMAN:  She's mostly in

14 statistics.  She currently is working on a program collecting

15 data that explains attendance pre-COVID to after COVID.

16     And it's actually quite interesting to hear her talk

17 about it.  Way over my head.  She's much smarter than I am.

18 And -- but she's -- she will run that some day.  I'll tell you

19 that.

20     THE COURT:  And your son studied criminal justice or

21 is studying criminal justice?

22     PROSPECTIVE JUROR NEWMAN:  No.  He took three years.

23 It's been five, six years.  He currently works for me.  He's

24 the heir-apparent of my company.  We would never sell.

25     THE COURT:  And did he pursue any particular interest

1   in criminal justice?

2           PROSPECTIVE JUROR NEWMAN:  He really -- his dream was

3   to become a police officer.

4           THE COURT:  Is there anything about that, that your

5   son had that dream at least at some point in time, that would

6   make it difficult for you to keep an open mind in this case and

7   be fair to both sides?

8           PROSPECTIVE JUROR NEWMAN:  No, I don't believe so.  I

9   mean, I understand why he chose to go in a different direction,

10  but it would not sway me in any way.

11          THE COURT:  You've got some travel booked.  How

12  hard-and-fast are those plans?

13          PROSPECTIVE JUROR NEWMAN:  I should let my wife

14  answer that question.

15      (Laughter.)

16          PROSPECTIVE JUROR NEWMAN:  No.  I mean, it could be

17  changed.  I flew in Sunday to be here on Monday.  I'm fortunate

18  enough to have a place in Cape Coral, Florida.  And, you know,

19  you yearn to be able to get away in the wintertime.  So if I

20  gotta change, I gotta change.

21          THE COURT:  Okay.  Thank you, Mr. Newman.  You can

22  pass the microphone to Ms. Warren.

23          PROSPECTIVE JUROR WARREN:  Good morning.  Paris

24  Warren.

25          THE COURT:  Good morning, Ms. Warren.

1      You mentioned that you're not currently working.  Can

2  you just describe for me the kinds of work you've done

3  recently?

4      PROSPECTIVE JUROR WARREN:  Work at temp agencies.

5  I've been working with this one temp agency called Primary

6  Staffing for, like, five years.  So due to the company I was

7  working at called Home Shelf, which is prepare meals.  So they

8  liked my performance, so -- basically, it's like my job was in

9  jeopardy.  If I didn't convert over, they was gonna fire me, so

10 I converted over.

11      So due to the environment, which is a cold

12 environment, I didn't want to work there anymore.

13      THE COURT:  I do have a couple of questions for you,

14 Ms. Warren, but I think I'd like to talk to you about that in

15 the witness stand, if you don't mind.

16      PROSPECTIVE JUROR WARREN:  Uh-huh.

17      (Prospective juror approaches.)

18      THE COURT:  So there is a set of headphones to your

19 right there on the ledge.  And there is a -- should be a

20 handheld microphone over there.  Do you have that?  Okay.

21 Great.  I'll put on my headsets, and we're going to turn on the

22 white noise.

23      (Proceedings heard at sidebar on the record:)

24      THE COURT:  Okay.  Ms. Warren, can you hear me?

25      PROSPECTIVE JUROR WARREN:  Yes, yes.

1    THE COURT:  You can speak up a little bit more.

2    PROSPECTIVE JUROR WARREN:  Yes.

3    THE COURT:  Okay.  You mentioned in your

4  questionnaire that you don't want to judge anything and that

5  you don't believe in this.

6    Could you just tell me a little bit more about those

7  kinds of feelings that you're having?

8    PROSPECTIVE JUROR WARREN:  Due to -- I just lost my

9  brother, and it's like we're dealing with the same thing.  It's

10  been two years, and I feel like it's nothing, it's like y'all

11  haven't -- not doing the work.  So I feel like that I'm here

12  judging someone else, and I haven't find my brother killer.

13  That being said, I don't believe in it.

14    THE COURT:  So --

15    MS. BOUDREAUX:  But, Judge -- I'm sorry.  I cannot

16  hear her.

17    THE COURT:  Okay.  Let me just ask -- maybe our court

18  reporter can assist with the microphone.  Maybe the volume

19  needs to be turned up.  So just bear with us one moment.

20    (Pause.)

21    THE COURT:  Let me try this.  Ms. Warren, what you

22  were just saying is that you lost your brother about two years

23  ago?

24    PROSPECTIVE JUROR WARREN:  Yes.

25    THE COURT:  Okay.  You can speak up a little bit.

1      PROSPECTIVE JUROR WARREN:  Yes, uh-huh.

2          THE COURT:  Is that a little bit better?

3      (Counsel nod.)

4          THE COURT:  Okay.  And your -- was your brother -- as

5  I understood it, your brother was murdered?

6          PROSPECTIVE JUROR WARREN:  Yes.

7          THE COURT:  And tell me a little bit more about how

8  that experience is affecting your feelings about participating

9  today.

10         PROSPECTIVE JUROR WARREN:  It's affecting my family

11 and everything.  Because, see, like, why's we hearing the same

12 thing since day one?  It's like no progress.  And the issue is

13 like you don't care, so, therefore, it's like why should I care

14 about anybody else?  And I feel like it's not fair.

15         THE COURT:  If you -- well, what we ask of jurors is

16 that they participate in this process to help the parties in

17 this dispute resolve their dispute.  And what we ask jurors to

18 do is listen to evidence that's presented in a courtroom, keep

19 an open mind, and then follow the legal instructions that the

20 judge will give in order to resolve the case.

21         Would you be able to do that?

22         PROSPECTIVE JUROR WARREN:  No.

23         THE COURT:  And are you, frankly, just unwilling to

24 participate in this process?

25         PROSPECTIVE JUROR WARREN:  Not just unwilling.  I've

1    been through a lot with police.  And so I don't believe in them

2    either.

3            THE COURT:  Okay.  Thank you, Ms. Warren.

4            PROSPECTIVE JUROR WARREN:  Thank you.

5            THE COURT:  You can take your seat.

6        (End of proceedings at sidebar.)

7            THE COURT:  Mr. Gozder, if you could grab the

8    microphone, please.

9            PROSPECTIVE JUROR GOZDER:  Good morning.

10           THE COURT:  And if you could state your name.

11           PROSPECTIVE JUROR GOZDER:  Joseph Gozder.

12           THE COURT:  Mr. Gozder, there's another adult in your

13   household who's currently unemployed; is that right?

14           PROSPECTIVE JUROR GOZDER:  Correct.

15           THE COURT:  Can you --

16           PROSPECTIVE JUROR GOZDER:  It's my girlfriend.

17           THE COURT:  And what kind of work has she done in the

18   past?

19           PROSPECTIVE JUROR GOZDER:  She was a server in a

20   restaurant, in a bar.

21           THE COURT:  And you have a sister who's worked for

22   the Federal Reserve Bank?

23           PROSPECTIVE JUROR GOZDER:  Correct.  She was an

24   auditor.

25           THE COURT:  And how long ago did she work there?

1    PROSPECTIVE JUROR GOZDER:  She retired two years ago.

2    She worked in Chicago for many years and then moved out to San

3    Francisco and worked in San Francisco for several years.

4    THE COURT:  And can you just tell me a little bit

5    more about what you do day to day as a manager?

6    PROSPECTIVE JUROR GOZDER:  I'm a restaurant manager.

7    I work for Hooters Restaurant.  I've worked for them for 29

8    years.  Started as a dishwasher and went into management and

9    just have enjoyed the job for a long time.  Worked all over the

10   Chicagoland area.  Day to day is just ordering, scheduling, you

11   know, customer service.

12   THE COURT:  Are you responsible for more than one

13   restaurant or just one?

14   PROSPECTIVE JUROR GOZDER:  Currently, I'm just --

15   just one right now.

16   THE COURT:  Okay.  Thank you, Mr. Gozder.  You could

17   pass the microphone to Ms. Corbett.

18   PROSPECTIVE JUROR CORBETT:  Hello.

19   THE COURT:  Ms. Corbett, I am going to ask you most

20   of my answers over at the witness stand, but while you're still

21   there, can you just talk to me a little bit about the other

22   adult in the household who's involved in -- what I understand

23   to be car dealerships?

24   PROSPECTIVE JUROR CORBETT:  Yeah.  I'm engaged to a

25   person.  Him and his brother own three dealerships -- (clears

1  throat) excuse me -- in Tinley, Orland Park, and Merrillville,
2  Indiana.
3          THE COURT:  And those are car dealerships?
4          PROSPECTIVE JUROR CORBETT:  Yes.
5          THE COURT:  Okay.  What kinds of cars?
6          PROSPECTIVE JUROR CORBETT:  Two are Lexus stores, and
7  one's Toyota.
8          THE COURT:  Okay.  If you don't mind, if you could
9  leave the microphone there and take a spot on the witness
10 stand.
11     (Prospective juror approaches.)
12         THE COURT:  Okay.  You have the headsets there, and
13 there's a handheld microphone.
14         PROSPECTIVE JUROR CORBETT:  Okay.
15     (Proceedings heard at sidebar on the record:)
16         THE COURT:  First, Ms. Corbett, you have had some
17 involvement or someone close to you has been involved in a
18 lawsuit?
19         PROSPECTIVE JUROR CORBETT:  Yes.  I have a nephew --
20         THE COURT:  And you can speak up a little bit.
21         PROSPECTIVE JUROR CORBETT:  Oh.  I have a nephew that
22 was involved in the criminal lawsuit and for murder.
23         THE COURT:  You can speak up a little louder.
24         PROSPECTIVE JUROR CORBETT:  Okay.
25         THE COURT:  That's why we have the system.  So go

1    ahead and speak up, if you can --

2         PROSPECTIVE JUROR CORBETT:  Okay.

3         THE COURT:  -- and give that to me one more time.  I

4    think I heard you, but I'm not so sure everyone else did.

5         PROSPECTIVE JUROR CORBETT:  So he's incarcerated

6    right now for murder.

7         THE COURT:  And that's your nephew?

8         PROSPECTIVE JUROR CORBETT:  So it is my

9    sister-in-law's child, but my brother married her when he was

10   two, so he only knows this family.  Calls us, you know, aunt

11   and uncle, gram and grampa.

12        THE COURT:  And how long ago did that case take

13   place?  And when was he sentenced?

14        PROSPECTIVE JUROR CORBETT:  Okay.  So it's

15   complicated.  So when he was younger -- he was 12 at the time,

16   13 -- is the first time he got in trouble.  And then when he

17   was 21, it happened again.

18        THE COURT:  And how long ago was that?

19        PROSPECTIVE JUROR CORBETT:  Oh, I'm sorry.  So it was

20   12 years ago.

21        THE COURT:  And he's currently serving his sentence?

22        PROSPECTIVE JUROR CORBETT:  Yes.

23        THE COURT:  And you've worked for the Chicago Police

24   Department.

25        PROSPECTIVE JUROR CORBETT:  Yes.

1          THE COURT:  In what kinds of roles with the Chicago

2    Police Department?

3          PROSPECTIVE JUROR CORBETT:  So I was a civilian

4    employee and I was -- I worked in the commander's office,

5    worked for commanders, deputy chiefs, and like administrative

6    work.  So I worked, you know, a --

7          THE COURT:  In what districts or in what areas?

8          PROSPECTIVE JUROR CORBETT:  So I worked in Area 1.  I

9    worked in the 21st District, the 23rd District.  I worked for

10   Motor Maintenance where they -- you know, the cars, they

11   service the cars.  And then I retired from the Area 2 Deputy

12   Chief's Office.

13         THE COURT:  You -- when you were answering the

14   questionnaire --

15         PROSPECTIVE JUROR CORBETT:  Uh-huh.

16         THE COURT:  -- you had some difficulty with

17   articulating --

18         PROSPECTIVE JUROR CORBETT:  Yes.

19         THE COURT:  -- why this case might be difficult for

20   you, and I certainly appreciate that, but if you can try as

21   we're talking --

22         PROSPECTIVE JUROR CORBETT:  Uh-huh.

23         THE COURT:  -- to talk to me a little bit about what

24   you see as the difficulty you may have.

25         PROSPECTIVE JUROR CORBETT:  Well -- and this is two

1    years that I worked for CPD.  In the districts and areas that
2    I've worked in, I have seen numerous people and officers be,
3    like, handcuffed and walked right out of the building.
4             MR. ADAMS:  I'm sorry, Judge.  Could she speak up?
5             THE COURT:  Yeah.  We didn't quite catch that last
6    part, so -- that's all right.  Take your time.
7             PROSPECTIVE JUROR CORBETT:  Yeah.  It's been --
8             THE COURT:  And you can speak a little louder.  It's
9    okay.
10            PROSPECTIVE JUROR CORBETT:  Louder, so -- yeah.  So
11   they've been, you know, literally, like, escorted in handcuffs
12   out of the buildings for various issues.
13            THE COURT:  So you're talking about seeing police
14   employees, officers and unsworn --
15            PROSPECTIVE JUROR CORBETT:  Yes.
16            THE COURT:  -- personnel, being charged with crimes?
17            PROSPECTIVE JUROR CORBETT:  Right.
18            THE COURT:  Taken out of the --
19            PROSPECTIVE JUROR CORBETT:  Right.
20            THE COURT:  -- police facilities in custody, so --
21   and I'm largely repeating for the benefit of the --
22            PROSPECTIVE JUROR CORBETT:  I know.  Sorry.
23            THE COURT:  -- attorneys.  But if I'm understanding
24   you correctly, you're saying that in your experience at CPD,
25   you've seen what looks to have been the results of misconduct

1    by --

2              PROSPECTIVE JUROR CORBETT:  Correct.

3              THE COURT:  -- Chicago Police employees?

4              PROSPECTIVE JUROR CORBETT:  And some were drug

5    related.

6              THE COURT:  I'm sorry.  I didn't catch that.

7              PROSPECTIVE JUROR CORBETT:  Some were drug related.

8              THE COURT:  Some were drug related.  And so the

9    question then becomes, can you make a decision about what the

10   facts of this case are --

11             PROSPECTIVE JUROR CORBETT:  Uh-huh.

12             THE COURT:  -- based on the evidence that you learn

13   about during this trial and not --

14             PROSPECTIVE JUROR CORBETT:  Right.

15             THE COURT:  -- decide the facts based on other facts

16   that you may have learned about in your life?  Would you be

17   able to do that?

18             PROSPECTIVE JUROR CORBETT:  Besides me spending the

19   night not sleeping, I've given it a lot of thought, and I

20   believe I could.

21             THE COURT:  You said you've had a sleepless night and

22   had a hard time sleeping last night and have been giving this

23   some thought.

24             PROSPECTIVE JUROR CORBETT:  Uh-huh, yes.

25             THE COURT:  But having given it thought, you believe

1  you can make a decision based on the evidence that you learn

2  about in the courtroom?

3         PROSPECTIVE JUROR CORBETT:  Right.

4         THE COURT:  Not based on outside facts?

5         PROSPECTIVE JUROR CORBETT:  I believe everybody

6  deserves, you know, their chance.  Right is right.  Wrong is

7  wrong.

8         THE COURT:  So, again, just to repeat, for everyone's

9  benefit, you believe everyone deserves a fair chance; is that

10  right?

11         PROSPECTIVE JUROR CORBETT:  Right.  Yes.

12         THE COURT:  And can you keep an open mind and not

13  make a decision until --

14         PROSPECTIVE JUROR CORBETT:  Uh-huh.

15         THE COURT:  -- you have heard everything?

16         PROSPECTIVE JUROR CORBETT:  I can.

17         THE COURT:  Can you follow my instructions of the

18  law, even if you disagree with the law as I have explained it?

19  Can you follow the law as I will explain it to you?

20         PROSPECTIVE JUROR CORBETT:  Yes, I will.

21         THE COURT:  Okay.  Thank you, Ms. Corbett.  You can

22  take a seat.

23      (End of proceedings at sidebar.)

24         THE COURT:  Okay.  Ms. Wloch?

25         PROSPECTIVE JUROR WLOCH:  Yes.  Good guess.  Yes.

1    Tami Wloch.

2          THE COURT:  Ms. Wloch, tell me a little bit about

3    your company and what kind of work it does.

4          PROSPECTIVE JUROR WLOCH:  Yeah.  I am a marketing

5    consultant.  I do a lot of different things.  I consult right

6    now, for about the past six years, for a friend's marketing

7    company, and I run the social and digital media division.  And

8    then I also enjoy teaching.  I've gotten to teach small

9    business owners all over the world.  So it's been fun.

10         THE COURT:  And what kind of work for Abbott or

11    AbbVie did your spouse do before they retired?

12         PROSPECTIVE JUROR WLOCH:  He was director of

13    parenterals, which is a weird word for injectables.

14         THE COURT:  Can you tell me a little bit about Great

15    Lakes Adaptive Sports and what you do there as a volunteer?

16         PROSPECTIVE JUROR WLOCH:  Yeah.  I'm on their women's

17    auxiliary board.  It's GLASA.  It's an adaptive sports league

18    that's in northern Illinois.  And I help them with their gala.

19    I do their social media for them and then attend the gala.

20         They provide sporting equipment for differently-abled

21    or disabled athletes, and they're also a feeder into the

22    Special Olympics.

23         THE COURT:  Thank you, Ms. Wloch.  You could pass the

24    microphone to Mr. Loverde.

25         PROSPECTIVE JUROR LOVERDE:  Yes.  David Loverde.

1    THE COURT:  Loverde.  Thank you.

2         Can you tell me a little bit about your work at

3    Goldman Sachs there?  Are you working in a particular industry

4    for a business analyst?

5         PROSPECTIVE JUROR LOVERDE:  Yeah.  I'm on the asset

6    management side of the business.  I sit in the performance

7    marketing area.  So most of my day-to-day is marketing

8    analytics, data analytics, data infrastructure, writing

9    queries, thinking critically.  Kind of a professional

10   problem-solver, if you will.

11        THE COURT.  And your fiancee is currently in school.

12        PROSPECTIVE JUROR LOVERDE:  Yes.  She had pursued the

13   finance industry and decided she didn't like it, so we had the

14   opportunity to get her back in school.  So she's pursuing her

15   degree in biology and hopes to become, like, a medical lab

16   technician or scientist.

17        THE COURT:  And what school is that at?

18        PROSPECTIVE JUROR LOVERDE:  She's at CLC, at -- so

19   the community college in Lake County, yeah.

20        THE COURT:  You have -- I guess your fiancee's

21   brother had some involvement in the criminal justice system.

22        PROSPECTIVE JUROR LOVERDE:  Yes.

23        THE COURT:  Can you tell me a little bit about that?

24        PROSPECTIVE JUROR LOVERDE:  Yeah.  He was the accused

25   in a federal criminal trial.  I am not familiar enough with the

 1  details.  And he's very much a -- I see him at holidays and
 2  things like that.  But he's a good kid to my understanding.  He
 3  made a few mistakes.  And it did not go to trial.  It was a
 4  plea.
 5          THE COURT:  How long ago was that?
 6          PROSPECTIVE JUROR LOVERDE:  Quite recently.  Six
 7  months or so.
 8          THE COURT:  Is there anything about that experience
 9  that would make it difficult for you to keep an open mind in
10  this case?
11          PROSPECTIVE JUROR LOVERDE:  I had very little
12  involvement in it.  I just felt it appropriate to mention.
13          My fiancee wrote in a character statement.  That was
14  about the extent of my involvement in it.
15          THE COURT:  And was that case in this courthouse?
16  Where was it?
17          PROSPECTIVE JUROR LOVERDE:  No.  It was in Iowa.  I'm
18  not familiar with where -- anything of this sort.
19          THE COURT:  Okay.  Mr. Loverde, why don't you have a
20  seat.  But don't pass the microphone down to anyone yet.
21          PROSPECTIVE JUROR LOVERDE:  Sure.  Yeah.
22          THE COURT:  But go ahead and have a seat.
23          Let me just ask this group of 14 of you a couple of
24  questions, just to make sure I have covered all of you.  You
25  have heard me ask some of these questions to some of you

1   individually, but I want to make sure I cover the group.

2          Jurors have to make their decision based on the

3   evidence they hear during the trial.  People bring their life

4   experiences and their common sense to jury duty, and to their

5   deliberations, but ultimately the facts of the case have to be

6   based on the evidence that you learn about in the trial, not on

7   facts that you believe or learn from any sources outside the

8   courtroom.

9          Would any of you have any difficulty following that

10  rule?

11         (Prospective jurors nod, say, "No.")

12         THE COURT:  If you are --

13         (Prospective Juror Warren raises hand.)

14         THE COURT:  Okay.  Thank you, Ms. Warren.  I

15  appreciate that.

16         If you are selected as a juror, you will take an oath

17  to follow the legal instructions that I give you and to apply

18  that law to the facts of this case.

19         Sometimes jurors listen to a judge's instructions and

20  they say to themselves, "Well, if that's the law, it ought to

21  be changed."  You may not apply the law the way you think it

22  should be, instead of the way I have stated it to you.

23         Would any of you have any difficulty accepting the

24  instructions, the legal instructions as I give them and in

25  applying that law as I will state it to the facts of this case?

1    Would any of you have any difficulty with that proposition?

2         (Prospective jurors nod, say, "No.")

3              THE COURT:  Thank you.

4              Is there anything on any of your minds that we

5    haven't talked about, but would make it difficult for you to

6    keep an open mind in this case, be fair to both sides, and

7    serve on a jury?

8              Is there anything on your mind that you haven't

9    mentioned?

10        (Prospective jurors nod.)

11             THE COURT:  Okay.  Thank you.

12             Bear with me for a moment.  I am going to talk to the

13   lawyers over the headsets for a bit.

14        (Proceedings heard at sidebar on the record:)

15             THE COURT:  Are there any follow-up questions that

16   the lawyers would like me to ask of this group of 14 jurors,

17   starting with the plaintiff?

18             MR. ADAMS:  Judge, for 1 -- no, not 1.  Let me see

19   this.  I have a question about city employment.  I'm sorry.

20             For 1, Judge, was the city employment just a teacher

21   at CPS?

22             THE COURT:  I'm sorry.  Which juror are you talking

23   about?

24             MR. FAKHOURI:  No. 2.

25             MR. ADAMS:  Juror No. 2.  I apologize.  Juror No. 2.

1    THE COURT:  That was my understanding of her answer;

2    that she used to work for CPS, but now she works in Plainfield.

3    MR. ADAMS:  Okay.

4    THE COURT:  Any other follow-up questions you'd like

5    me to ask of any of these jurors?

6    MR. ADAMS:  I just want a clarification, Judge, on

7    juror No. 2 and her city job employment.

8    THE COURT:  And what clarification is that?

9    MR. ADAMS:  Just to make sure that it was just

10    employment as a CPS teacher.  Because I thought I -- I'm having

11    trouble when I was hearing, so I apologize.

12    THE COURT:  Other than that, any follow-up questions

13    you'd like me to ask of this group of 14?

14    MR. ADAMS:  I don't think we have anything, Judge.

15    MR. FAKHOURI:  No, Your Honor.

16    THE COURT:  Any follow-up questions from the defense?

17    MS. BOUDREAUX:  No.

18    THE COURT:  I'll ask Ms. Marquez that one question

19    and then we'll go back on the headsets for "for cause"

20    challenges.  So --

21    MR. ADAMS:  Thank you.

22    THE COURT:  -- let's get off the headsets.

23    (End of proceedings at sidebar.)

24    THE COURT:  Ms. Marquez?  If we can get the

25    microphone to Ms. Marquez in the back row there.

1     I may have misheard you, so just let me -- for my
2   benefit.  Did you used to work for the Chicago Public School
3   system?
4           PROSPECTIVE JUROR MARQUEZ:  Yes.
5           THE COURT:  Okay.  And how long ago was that?
6           PROSPECTIVE JUROR MARQUEZ:  I've been teaching for 26
7   years, and it was my first seven years in 1997.
8           THE COURT:  And what kinds of schools did you teach
9   at with CPS?
10           PROSPECTIVE JUROR MARQUEZ:  Oh, it was elementary
11   school.  I did third grade through eighth.
12           THE COURT:  Okay.  Thank you.  You may have a seat.
13           And let's go back on the headsets, please.
14       (Proceedings heard at sidebar on the record:)
15           THE COURT:  Are there any "for cause" challenges to
16   this group of 14 from the plaintiff?
17           MR. FAKHOURI:  Yes, Judge.  With respect to -- would
18   you like me to list them, Your Honor, all at once or take them
19   in turn?
20           THE COURT:  One at a time, please.
21           MR. FAKHOURI:  Sure.  With respect to No. 3, Your
22   Honor, the witness -- or the juror's bias with respect to being
23   at a Citizens Police Academy we believe is a "for cause"
24   challenge and would cause her not to be impartial.
25           THE COURT:  What's the defense response?

1     MS. BOUDREAUX:  We object.  I don't think anything

2   she said rose to the level of that.  She said it was a very

3   informal, topical, almost fun thing she did with her

4   girlfriend.

5     THE COURT:  The motion to excuse No. 3 for cause is

6   denied.  I am satisfied that Ms. Glyman did express confidence

7   in her ability to keep an open mind and be fair and impartial

8   in this case, so that request is denied.

9     Any others from plaintiff?

10    MR. FAKHOURI:  Yes, Judge.

11    No. 5 is obvious prejudice, Your Honor.  That is a

12  "for cause" challenge.

13    Despite his answers to Your Honor at the end of the

14  questioning on the stand, he made it clear that the underlying

15  case would make it difficult for him to be impartial in judging

16  the evidence in this matter, and for those reasons, that

17  obvious prejudice would be a "for cause" challenge.

18    THE COURT:  What's the defense response?

19    MS. BOUDREAUX:  Your Honor, he was answering that way

20  on the questionnaire because he was not oriented to what was

21  going to be in -- at issue in this lawsuit.  And you explained

22  it to him.  He said he could be fair.  And he understood that

23  he'd have to apply the facts to the law given in this room.

24    THE COURT:  His response was, ultimately, that he

25  believed he could be fair and that he would try.  Sometimes

1  that is satisfactory on my end.  But I believe that that person

2  is effectively unequivocal in their ability.

3       But sometimes saying, "I believe I can be fair," or,

4  "I could try to be fair," is equivocal.  And given his answers

5  and the way he expressed his concerns about how the underlying

6  criminal case happened and his coming in to this with some sort

7  of perceived hurdle that would make it, I think, difficult for

8  him to keep an open mind, I take his answer that he believed he

9  could follow the law as actually equivocal and not unequivocal.

10      And so for that reason, I am sustaining the

11  plaintiff's objection to Mr. Olszta and excusing No. 5 for

12  cause.

13      Any others from the plaintiff?

14      MR. FAKHOURI:  Just a moment, Your Honor.

15      We're fine, Judge.

16      THE COURT:  Any motions for cause from the defense?

17      MS. BOUDREAUX:  Yes.  No. 10, Ms. Paris Warren.

18      THE COURT:  Any objection from the plaintiff?

19      MR. FAKHOURI:  No, Your Honor.

20      THE COURT:  I'll excuse Ms. Warren for cause, No. 10.

21      MS. BOUDREAUX:  Okay.

22      THE COURT:  Any others?

23      MS. BOUDREAUX:  Yes.  No. 12, Nancy Corbett.

24      THE COURT:  Why don't you flesh that one out a little

25  bit more, please.

1    MS. BOUDREAUX:  Sure.  You know, it was interesting

2 because she said she worked for CPD for 32 years, but then sort

3 of the opposite inference came to be that she saw police

4 officers get in trouble and get led out of the building in

5 handcuffs.  And some of those were related to drug incidents.

6    And, you know, she said she's had a sleepless night

7 over this, and I think it was clear that she was feeling some

8 emotional distress about this type of fact pattern.

9    So I don't think she's the right juror for this case

10 and I think she should go for cause.

11    THE COURT:  What's the plaintiff's response?

12    MR. FAKHOURI:  Your Honor, I think she made it clear

13 on the stand that she can be fair, that she can be impartial.

14    Her work experience -- I believe Your Honor had

15 specifically requested if she's going to be able to separate

16 that and follow the instructions that Your Honor gives, and she

17 stated affirmatively that she could.

18    As opposed to the other witnesses that we have

19 discussed with respect to being "for cause" challenges, there

20 was no dispute or unequivocality as it relates to her ability

21 to be impartial.

22    And for those reasons, Your Honor, we object to her

23 being removed for cause.

24    THE COURT:  The motion to excuse No. 12, Ms. Corbett,

25 for cause is granted.

1    Based on her demeanor and the way she struggled,

2    similar to the earlier juror, she said she believed she could

3    do it, and she could do it, but she was, in my view, in my

4    assessment of her demeanor, equivocal about it.

5    And so I agree that she should be excused for cause,

6    and she will be so excused.

7    Any other "for cause" challenges from the defense?

8    MS. BOUDREAUX:  Yes.  No. 6, Tia Dudley-McInnis, just

9    based on her answers regarding being distracted and seemingly

10   not wanting to be here.

11   THE COURT:  What's the plaintiff's response?

12   MR. FAKHOURI:  Yeah, Your Honor, jury duty may be an

13   inconvenience, but there is no extreme circumstance that would

14   allow for Ms. Tia to be removed on a "for cause" basis.

15   THE COURT:  As she answered in her questionnaire, she

16   has concerns about her father's kidney cancer.  And she

17   expressed that her phone is buzzing, and that's causing her

18   distraction.

19   She was, in my view, fairly emotional about the

20   prospect of being on this jury.  And I asked her if she could

21   pay attention, and I thought she was fairly forthright in

22   saying she would have a hard time paying attention.

23   And I think it's important for every juror to bring

24   100% attention and focus to a case of any kind, and this one,

25   of course, no different.

1    So I think she cannot participate with the kind of
2  focus and attention that is necessary, and so I am going to
3  excuse No. 6 for cause.

4    Any others from the defense?

5    MS. BOUDREAUX:  No.

6    THE COURT:  So we've lost four, so I will keep going
7  and question the next batch of about -- we'll see how the next
8  five or six go and then we'll see how the pool looks at that
9  point.  So we'll just keep going.

10   We can go off the headsets.

11   (End of proceedings at sidebar.)

12   THE COURT:  Okay.  Thank you for your patience,
13  everyone.

14   If we can pass the microphone to Mr. Therens.
15  Someone have -- Ms. Marquez, if you could get the microphone to
16  Mr. Therens, please.

17   PROSPECTIVE JUROR THERENS:  Good morning, Your Honor.

18   THE COURT:  Good morning.  Could you state your name,
19  please.

20   PROSPECTIVE JUROR THERENS:  I'm sorry.  Brian
21  Therens.

22   THE COURT:  Mr. Therens, can you tell me a little bit
23  about what you do at Zillow?

24   PROSPECTIVE JUROR THERENS:  Sure.  I am a software
25  developer.  I mostly work on the back end, statistics

1    frameworks.  So I design and implement new statistics and

2    design the data warehouses that we use to store them and run

3    things.

4            THE COURT:  And your spouse is at --

5            PROSPECTIVE JUROR THERENS:  Empowered Therapy,

6    primarily.

7            THE COURT:  And what is Empowered Therapy?

8            PROSPECTIVE JUROR THERENS:  It is a -- she's a --

9    it's a therapists' office, providing psychoanalytic therapy to

10   people in the Chicago area.

11           THE COURT:  Is there any particular client base that

12   that practice serves?

13           PROSPECTIVE JUROR THERENS:  Before the pandemic, the

14   office was located in the loop, so they kind of have that

15   legacy, clientele of mostly, like, office workers, I would say,

16   who's kind of the main group of people in the loop.

17           THE COURT:  And what are her responsibilities as the

18   chief of clinical staff?

19           PROSPECTIVE JUROR THERENS:  Yeah.  So she's kind

20   of -- she's the second-in-charge of the practice.  It's a

21   medium-size practice with 30 or 40 working therapists, and she

22   basically helps run the company.

23           THE COURT:  Thank you, Mr. Therens.  You can pass the

24   microphone to Ms. Keller.

25           PROSPECTIVE JUROR KELLER:  Good morning.

1     THE COURT:  Good morning.  Could you state your name,

2     please.

3             PROSPECTIVE JUROR KELLER:  Julia Keller.

4             THE COURT:  Ms. Keller, can you just talk to me a

5     little bit about your teaching career?  What kinds of teaching

6     positions have you had?  And for which school districts?

7             PROSPECTIVE JUROR KELLER:  So I've only taught for

8     four years in School District 246, so Elgin.  And currently,

9     I'm a second-language teacher, so I have sixteen students, but

10    nine different languages in the class.  I don't speak any other

11    language, but I help them learn English.

12            THE COURT:  And your spouse is in nursing, is that

13    right?

14            PROSPECTIVE JUROR KELLER:  Yes.  So he administers

15    chemotherapy at Little Company of Mary OSF.

16            THE COURT:  And where is that based out of?

17            PROSPECTIVE JUROR KELLER:  Evergreen Park.

18            THE COURT:  And you are a member of the Teachers

19    Union.

20            PROSPECTIVE JUROR KELLER:  Yes.

21            THE COURT:  Any involvement in any of the activities

22    of the union?  Leadership activities or anything like that?

23            PROSPECTIVE JUROR KELLER:  No.

24            THE COURT:  And I do appreciate that if you were

25    serving on this jury, it would take you away from your work and

1  your students, and that is an inconvenience, but I expect, as a

2  teacher, you also understand the importance of civic duty as

3  well.

4          PROSPECTIVE JUROR KELLER:  Uh-huh.

5          THE COURT:  Thank you, Ms. Keller.  You can pass the

6  microphone to Mr. Knapczyk.

7          PROSPECTIVE JUROR KNAPCZYK:  Yes.  My name is Stanley

8  Knapczyk.  Good morning.

9          THE COURT:  Good morning.  Can you tell me a little

10  bit about what you do as a software engineer?

11          PROSPECTIVE JUROR KNAPCZYK:  Yes.  The team I work

12  on, we develop applications and libraries for Android phones,

13  primarily, and we do security, like encryption for securing

14  voice calls, data, virtual private networks, things like that,

15  and make it available.

16          Our customer base is primarily, like, federal

17  agencies, law enforcement, you know, people who would want to

18  keep their communications private.

19          THE COURT:  And your spouse works as a florist.

20          PROSPECTIVE JUROR KNAPCZYK:  Yeah.  She -- she's now

21  semi-retired.  But she started a business with her mom probably

22  25 years ago, and did that for quite a while.  And just this

23  past year, sold her shop and is sort of semi-retired.  She's

24  still working part time with the new owner.

25          THE COURT:  You've served on a jury before.

1     PROSPECTIVE JUROR KNAPCZYK:  I have.  Yeah.  I was --

2          THE COURT:  How long ago was that?

3     PROSPECTIVE JUROR KNAPCZYK:  Probably five or six

4  years ago.

5          THE COURT:  What courthouse was it?

6     PROSPECTIVE JUROR KNAPCZYK:  I believe it was here.

7          THE COURT:  Was it a civil or a criminal case?

8     PROSPECTIVE JUROR KNAPCZYK:  Criminal.

9          THE COURT:  Without telling me the outcome, did the

10  jury deliberate and did it reach a verdict?

11     PROSPECTIVE JUROR KNAPCZYK:  I was an alternate.  So

12  I sat through the trial, but then I was excused.

13          THE COURT:  You have a friend who was a CPD officer?

14     PROSPECTIVE JUROR KNAPCZYK:  That's right.  My wife's

15  best friend, her husband was a CPD officer for quite some time.

16  He's now retired.  But he was fairly high-ranking.

17          THE COURT:  Do you recall what his position was?

18     PROSPECTIVE JUROR KNAPCZYK:  He was a captain.

19          THE COURT:  And do you recall what either part of the

20  city or what part of the department he was in?

21     PROSPECTIVE JUROR KNAPCZYK:  I couldn't say.  Yeah, I

22  don't know.

23          THE COURT:  Is there anything about your friendship

24  with him that would make it difficult for you to keep an open

25  mind in this case and be fair and impartial to both sides?

1      PROSPECTIVE JUROR KNAPCZYK:  I don't believe -- I
2  don't believe so.
3      THE COURT:  You've heard me say this to everyone as a
4  group, but let me ask you directly.
5      A juror has to make a decision about the facts of the
6  case based on the evidence that you learn about in the
7  courtroom, not based on facts that you might know or believe
8  from outside sources.
9      Would you be able to do that?
10      PROSPECTIVE JUROR KNAPCZYK:  I believe so.
11      THE COURT:  A juror has to follow the legal
12  instructions as I give them and the law as I state it.  Even if
13  you disagree with how I've explained or described the law, you
14  have to follow the law as I explain it.
15      Would you be able to do that?
16      PROSPECTIVE JUROR KNAPCZYK:  Yes.
17      THE COURT:  You mentioned that in your work with
18  Motorola, some of the clients you have -- or that Motorola has
19  are government agencies or law enforcement agencies.
20      Do you have much interaction with those direct --
21  those clients directly?
22      PROSPECTIVE JUROR KNAPCZYK:  Not a lot.  From time to
23  time, we're doing, like, field testing or things of that
24  nature.  So we have some interaction with some of the
25  customers, if you will, customer base.  Have in the past.

1       THE COURT:  And have you worked with the Chicago

2   Police Department as a client for Motorola?

3           PROSPECTIVE JUROR KNAPCZYK:  No.

4       THE COURT:  Okay.  Mr. Knapczyk, if you could pass

5   the microphone to Mr. Doehrer.

6           PROSPECTIVE JUROR DOEHRER:  Hello.

7       THE COURT:  Good morning, Mr. Doehrer.

8           You are a musician.

9           PROSPECTIVE JUROR DOEHRER:  I am.

10      THE COURT:  First, let me ask you if you could just

11  state your name, please.

12          PROSPECTIVE JUROR DOEHRER:  Terran Doehrer.

13      THE COURT:  Mr. Doehrer, can you tell me a little bit

14  about what kind of musician you are and what your company does?

15          PROSPECTIVE JUROR DOEHRER:  Well, the styles of music

16  that we play are everything from French Canadian to Israeli.

17  It's world music.  A lot of Greek, a lot of Klezmer, all sorts

18  of things like that.

19          We also teach dance, the dances that go with the

20  styles of music that we play.  And we tour, my wife and I tour

21  internationally, so --

22      THE COURT:  And in -- I gather you've been doing that

23  for 35 years.

24          PROSPECTIVE JUROR DOEHRER:  Actually, the company

25  that I've -- that I own has been doing that, but I've been

1   performing since 1978, so --

2           THE COURT:  But you've had other jobs in your

3   lifetime.

4           PROSPECTIVE JUROR DOEHRER:  Yeah.  I'm also a graphic

5   designer, and I own my own little design agency.

6           THE COURT:  And is that the kind of work you did for

7   The Reader?  Was that graphic design work?

8           PROSPECTIVE JUROR DOEHRER:  I was doing design work

9   for them when I worked there, yes.

10          THE COURT:  And your spouse is also a musician and

11  works with you at your company?

12          PROSPECTIVE JUROR DOEHRER:  Correct.

13          THE COURT:  You didn't have much to say in response

14  to questions about newspapers or websites or TV shows or

15  hobbies.  Can you tell me a little bit about yourself, about

16  what kinds of activities you're engaged in?

17          PROSPECTIVE JUROR DOEHRER:  Music and dance.  That's

18  my life.

19          THE COURT:  You or someone close to you has been

20  involved in a lawsuit?

21          PROSPECTIVE JUROR DOEHRER:  I have been.  A musician

22  had felt that I didn't pay them properly, and the decision was

23  that I did, so --

24          THE COURT:  So you were sued?

25          PROSPECTIVE JUROR DOEHRER:  I was sued.

1      THE COURT:  And did that go to court?

2      PROSPECTIVE JUROR DOEHRER:  It did.

3      THE COURT:  How long ago was that?

4      PROSPECTIVE JUROR DOEHRER:  Over 30 years ago.

5      THE COURT:  Is there anything about your experience

6   with the legal system that would make it difficult for you to

7   keep an open mind in this case?

8      PROSPECTIVE JUROR DOEHRER:  Yeah.  I can't see

9   anything that would have any bearing on this, no.

10     THE COURT:  You or someone close to you has been

11  involved or had some involvement in a criminal case or the

12  criminal justice system?

13     PROSPECTIVE JUROR DOEHRER:  I had been attacked

14  when -- as a teenager.  And that's basically it, yeah.

15     THE COURT:  Where did that take place?

16     PROSPECTIVE JUROR DOEHRER:  In Hyde Park.

17     THE COURT:  Is there anything about that experience

18  that would make it difficult for you to keep an open mind in

19  this case?

20     PROSPECTIVE JUROR DOEHRER:  No, I don't think so.

21     THE COURT:  Okay.  And anything about your

22  interaction -- possible interaction with the Chicago Police

23  Department in connection with that experience that would --

24  anything about that that would make it difficult for you to

25  keep an open mind here?

1    PROSPECTIVE JUROR DOEHRER:  I can't see any -- yeah,
2  no.  I'd be fine.
3    THE COURT:  And one of your clients was the Chicago
4  Transit Authority.
5    PROSPECTIVE JUROR DOEHRER:  Correct.
6    THE COURT:  Was that in your music business or your
7  graphic design business?
8    PROSPECTIVE JUROR DOEHRER:  Graphic design.  I
9  designed the CTA map.
10    THE COURT:  In response to a couple of the questions
11  about whether there's anything that would make it difficult for
12  you, it looks like in your questionnaire, you started writing
13  something down and then you scratched it out.
14    Now that you've been sitting here and you've heard me
15  talk about the kinds of questions that I've asked jurors about,
16  whether jurors can keep an open mind, make a decision based on
17  the evidence in the courtroom, not based on facts from outside
18  sources, and follow the law as I explain it, even if you
19  disagree with it, is there anything on your mind that would
20  make it difficult for you in this case?
21    PROSPECTIVE JUROR DOEHRER:  No, I don't think so.
22    THE COURT:  Okay.  Let's -- if we could pass the
23  microphone to Mr. Kosteck.  Good morning.
24    PROSPECTIVE JUROR KOSTECK:  Good morning.
25    THE COURT:  If you could hold the microphone up a

1    little bit more.  And state your name, please.

2              PROSPECTIVE JUROR KOSTECK:  Gerald Kosteck.

3              THE COURT:  Mr. Kosteck, talk to me a little bit

4    about the kind of work you do as a project manager at Hy-Power

5    Electric.

6              PROSPECTIVE JUROR KOSTECK:  I -- (clears throat)

7    excuse me.

8              I started off as an electrician.  And I've been with

9    the company for a long time, so now my position is a project

10   manager.

11             We do primarily commercial educational work.  So I'm

12   in charge of making sure that the electricians have what they

13   need, interact with the customer, make sure we're hitting

14   things on schedule, getting the projects done on the electric

15   side of it.

16             THE COURT:  And your spouse is retired, but used to

17   work in human resources.

18             PROSPECTIVE JUROR KOSTECK:  Yeah.  She was a

19   compensation analyst.

20             THE COURT:  For what kind of company?

21             PROSPECTIVE JUROR KOSTECK:  The last company she

22   worked for was Veolia, which I think they're an environmental

23   company, and she's been retired from there probably eight to

24   ten years.

25             THE COURT:  Okay.  Thank you, Mr. Kosteck.  Why don't

1    you have a seat.

2            But everyone just bear with me.  I'm going to talk to

3    the lawyers on the headsets for a moment.

4        (Proceedings heard at sidebar on the record:)

5            THE COURT:  Are there any follow-up questions anyone

6    would like me to ask of this group of five?

7            MR. FAKHOURI:  Yeah, Judge.

8            The only one I think would be important to know is

9    what his direct affiliation would be with respect to juror No.

10   17.  He mentioned the CPD officer/captain.

11           I know that he said that it was his wife's best

12   friend's husband, but what his relationship was with that

13   individual specifically I don't think was addressed.

14           THE COURT:  Any other follow-up questions of this

15   group?

16           MR. ADAMS:  There is one more, Your Honor.

17           Juror No. 18 is sleeping.  I just want to ask if he's

18   under any medication or anything that would keep him from being

19   alert during trial.

20           THE COURT:  Any follow-up questions of this group

21   that the defense would like me to ask?

22           MS. BOUDREAUX:  No.

23           THE COURT:  Let's go off the headsets, then, please.

24       (End of proceedings at sidebar.)

25           THE COURT:  If we could pass the microphone to

1    Mr. Knapczyk.

2             You had mentioned that your -- I think it was your

3    wife's best friend's husband had worked for the Chicago Police

4    Department.

5             PROSPECTIVE JUROR KNAPCZYK:  That's right, yes.

6             THE COURT:  Can you tell me a little bit about your

7    friendship with that person?  How close of a friend are you to

8    that person?

9             PROSPECTIVE JUROR KNAPCZYK:  No, I would say like I

10   wouldn't get together with him, hang out, say, one on one, but

11   just as two couples.  You know, they've come sailing with us

12   and go-out-for-dinner type of thing.

13            THE COURT:  Okay.  Thank you.  And if we could pass

14   the microphone to Mr. Doehrer, please.

15            Mr. Doehrer, this may seem a little odd, but any

16   difficulties that you may have in order to -- in paying

17   attention throughout the trial, being focused on the case, and

18   any possible distractions or any difficulty you might have if

19   you were called upon to sit as a juror?

20            PROSPECTIVE JUROR DOEHRER:  I can't see anything that

21   would be a problem.  Why?

22            THE COURT:  Okay.  Thank you.  Let me just -- you can

23   have a seat, Mr. Doehrer.  And just to make sure I've covered

24   this group of five jurors that I have just talked to.

25            As you've heard me say to the others, jurors have to

1   make a decision based on the evidence they hear during the

2   trial.  People bring their life experiences and their common

3   sense to jury duty, but ultimately the facts have to be based

4   on the evidence in the courtroom, not based on facts that you

5   may know or learn from outside sources.

6          Would any of the five of you have any difficulty

7   following that principle?

8          (Prospective jurors nod.)

9          THE COURT:  If you're selected as a juror, you'd take

10  an oath to follow the law as I explain it and to apply that law

11  to the facts of this case.

12         Sometimes jurors listen to a judge's instructions and

13  they say, "Well, if that's the law, it ought to be changed."

14  You may not apply the law the way you think it should be

15  instead of the way I will explain it to you.

16         Would any of the five of you have any difficulty

17  accepting that proposition?

18         (Prospective jurors nod.)

19         THE COURT:  Thank you.

20         Let me talk to the lawyers on the headsets, please.

21         (Proceedings heard at sidebar on the record:)

22         THE COURT:  Are there any "for cause" challenges to

23  this group of five?

24         MR. FAKHOURI:  Yes, Judge.

25         With respect to No. 18.  This Court noted that paying

1 │ attention is critical during this trial, and my co-counsel and

2 │ I have marked now on -- I think on five different occasions on

3 │ our notes here that he was sleeping.

4 │ So with all due respect to his answer, there has been

5 │ a lack of paying attention that is important for the Court to

6 │ know.

7 │ THE COURT:  What's the defense response?

8 │ MS. BOUDREAUX:  No objection.

9 │ THE COURT:  I'll -- any other "for cause" challenges

10 │ from the plaintiff?

11 │ MR. FAKHOURI:  No, Judge.

12 │ THE COURT:  Any "for cause" challenges from the

13 │ defense?

14 │ MS. BOUDREAUX:  We are going to move for cause on No.

15 │ 16, Julia Keller, based on the autistic children in her

16 │ classroom that she discussed on the questionnaire.

17 │ THE COURT:  What's the plaintiff's response?

18 │ MR. FAKHOURI:  Your Honor, there are substitute

19 │ teachers that can fill in for No. 16, Judge.  There's no reason

20 │ that there's a "for cause" challenge basis with respect to her

21 │ employment.

22 │ (Prospective Juror Newman exits.)

23 │ THE COURT:  I agree with the plaintiff.  It's not a

24 │ "for cause" basis.  I am denying the defense request as to No.

25 │ 16.

1            Any other "for cause" challenges?

2            MS. BOUDREAUX:  No, Judge.

3            THE COURT:  Okay.  I will excuse No. 18 for cause.

4    I'll grant the plaintiff's motion as to No. 18.

5            But that does mean we have 14 jurors in our pool now,

6    and we can stop the questioning and you can exercise your

7    peremptories.

8            So I'll let the prospective jurors know what's going

9    to happen next.  And so we can get off the headsets.

10           (End of proceedings at sidebar.)

11           THE COURT:  We are missing one of our prospective

12   jurors, but we'll convey this message to him as soon as he gets

13   back.

14           We're going to take a break right now.  The lawyers

15   and I need to talk about a few things, and now's a good time,

16   in terms of how many people we've talked to, for the lawyers

17   and I to take a few minutes, but I don't want you to just sit

18   here listening to white noise while we do that.  So the lawyers

19   and I are going to spend a few minutes working on some things

20   that we don't need you here for, so I am going to ask you to

21   go, and the courtroom deputy will take you back to the other

22   courtroom where you've been waiting.

23           Do not discuss this case, even amongst yourselves.

24   Don't do any research about this case or anything involved in

25   this case, or the law or anything like that.

1           We're just going to take about -- probably about a
2    20-minute break or so.  So just take a moment.
3           But, again, don't talk about the case.  Don't form
4    any opinions about the case.  And don't do any research about
5    the case.  Let's just take a break for 20 minutes.
6           All rise.
7       (Venire out.  Prospective Juror Newman reenters.)
8           THE COURT:  Everyone can have a seat.
9           MR. FAKHOURI:  Your Honor, may I approach and tender
10   to the Court the microphone?
11          THE COURT:  Yes.  Mr. Newman, before you step out,
12   let me just say to you what I have told the other jurors.
13          We're taking a break right now.
14          PROSPECTIVE JUROR NEWMAN:  Yes.
15          THE COURT:  Please do not discuss this case with
16   anyone, even anyone amongst the other jurors.  Don't do any
17   research about the case.
18          We're just going to take a break for about 20
19   minutes.  Okay?
20          PROSPECTIVE JUROR NEWMAN:  Okay.
21          THE COURT:  Thank you.
22      (Prospective juror exits.)
23          THE COURT:  Okay.  So I will give the parties some
24   time to write down your strikes on a piece of paper.  Each side
25   has three strikes.

1    If you strike the same person, that counts against

2  both of you.

3    And the first eight that are left over on our list

4  will be our jury.

5    Are there any issues anyone would like to raise

6  before I give you some time to exercise your peremptory

7  strikes?

8    MR. FAKHOURI:  No, Your Honor.  Thank you.

9    MS. BOUDREAUX:  No.

10    THE COURT:  I'll give you a few minutes, and we'll

11  resume after that.

12    MS. BOUDREAUX:  Thank you, Judge.

13    THE COURT:  We're in recess.

14    (Recess.  Strikes tendered to Court.)

15    THE CLERK:  16 CV 7024, Walker versus White.

16    THE COURT:  Good afternoon, everyone.

17    The parties have tendered their strikes to the Court.

18    The defense struck juror No. 1, Mr. McIntire.

19    The defense struck juror No. 2, Ms. Marquez.

20    The plaintiff struck juror No. 3, Ms. Glyman.

21    The plaintiff struck juror No. 9, Mr. Newman.

22    The plaintiff struck juror No. 14, Mr. Loverde.

23    And the defense struck juror No. 16, Ms. Keller.

24    Which means that our jury will be:  No. 4, Ms.

25  Wadycki; No. 7, Ms. Brewster; No. 8, Ms. Pasquesi; No. 11,

1   Mr. Gozder; No. 13, Ms. Wloch; No. 15, Mr. Therens; No. 17,

2   Mr. Knapczyk; and No. 19, Mr. Kosteck.

3            Does that first comport with both -- each side's

4   understanding of the strikes that you exercised?

5            MR. FAKHOURI:  That's correct, Judge.

6            THE COURT:  Defense?

7            MS. BOUDREAUX:  Yes.

8            THE COURT:  And does either side have any issue or

9   motion to raise with respect to their opponent's use of

10  peremptories?  On behalf of plaintiff?

11           MR. FAKHOURI:  No, Your Honor.

12           THE COURT:  Defense?

13           MS. BOUDREAUX:  No.

14           THE COURT:  And does what I have just announced as

15  the jurors, does that track with your respective understanding

16  of how this process works?

17           MR. FAKHOURI:  That's correct, Judge.

18           MS. BOUDREAUX:  Yes, it does.

19           THE COURT:  Okay.  So that means we are done with

20  jury selection.

21           What we'll do is we'll bring the venire back in.

22  I'll announce who has been selected.  I'll excuse the rest.

23  The jurors that have been selected will then be taken into the

24  jury room, given a little bit of an orientation about now what

25  happens.  But I think we are close enough to just break for

1  lunch at this point.  We can talk about some issues and then
2  I'll give you a break for lunch, and then we'll pick it up,
3  let's say -- I think 1:30, I think, will give us enough time to
4  do what we need to do.  And if we can reconvene at 1:30, that
5  should be enough time to get started with opening statements at
6  1:30.
7          Any issues anyone wants to raise now before we bring
8  in the venire?
9          MR. FAKHOURI:  Nothing, Your Honor.
10         MS. BOUDREAUX:  No, Judge.  That sounds good.
11         THE COURT:  Okay.  We'll bring in the venire.
12      (Venire in.)
13         THE COURT:  Please be seated.
14         Okay.  Good morning again, everyone.  And thank you
15  for your patience as we've been going through this process.
16         The lawyers and I have finished our end and have
17  completed selecting the jurors.
18         I want to thank everyone for participating in the
19  process, even those of you who I didn't get to and didn't get
20  to talk to.  You being here and participating in the process
21  was an important component of your civic duty, and I very much
22  appreciate it.
23         I am going to now announce the names of the people
24  who have been selected on the jury.  So if I don't call your
25  name, that means you have not been selected.

1          And then once I do that, I'll give everyone some
2    further instructions.
3          So our jury will be:  Ms. Wadycki, Ms. Brewster, Ms.
4    Pasquesi, Mr. Gozder, Ms. Wloch, Mr. Therens, Mr. Knapczyk, and
5    Mr. Kosteck.
6          So if I did not call your name, that means you have
7    not been selected.  You have -- although, hold on one moment.
8    Let me ask.
9          (Court conferring with his clerk.)
10          THE COURT:  So if I did not call your name, that
11    means you have not been selected and you have completed your
12    jury service.  You don't need to call in on the number again,
13    and you're free to go.
14          And I want to thank you for your attendance this
15    morning and your attendance yesterday.  I very much appreciate
16    it.
17          But for those of you who have not been selected, if I
18    may ask you to please step outside the courtroom, and you are
19    free to go.  All rise.
20          (Venire excused.)
21          THE COURT:  And Mr. Therens, Mr. Knapczyk, and
22    Mr. Kosteck, why don't you grab a seat in the jury box, please.
23          (Jurors reassemble in box.)
24          THE COURT:  So a few things.  You have been selected
25    to be our jury.  There are -- and everyone may have a seat.

1      There are no assigned seats now in the jury box.  As

2    the trial gets going, you'll just need to find a spot that

3    you're comfortable in where you can see and hear everything

4    that's happening.  If you're ever having any challenge, just

5    let me know, and we'll do what we can.  But there are any

6    number of vantage spots in the jury box, and just find those

7    that work for you.  And that's fine.  No assigned seats.

8      We're going to take a break now, and I'll give you an

9    opportunity to step into the jury room, which is on this side

10   of the floor.  And the jury room will now be your base of

11   operations from here on out.  And that will be where you go in

12   the mornings.  And when we take a break, you'll go into the

13   jury room.

14     From here on out, I'd like you to use the elevators

15   that are on the north side of the building, the ones that are

16   closer to this courtroom and the jury room.  And we'll make

17   sure we point that out to you.  But I want you to use those

18   elevators.

19     And I am directing everyone else involved in this

20   case to use the south elevators, the ones that are farther

21   away.

22     We do that just so that people don't have these

23   awkward interactions on the elevator.  And it's important that

24   you not have any contact or communication with anyone who's

25   involved in the case.

1           And if you do see people in the hallways or in the

2    lobby who are involved, and they're ignoring you, they're not

3    being rude.  They're just following my instruction that people

4    not have any contact or communication.

5           You are not to discuss this case with anyone, even

6    amongst yourselves.  You are allowed to tell people, if they

7    need to know, that you have been selected on a jury and what

8    your schedule is going to be; but other than that, don't talk

9    about this case, don't discuss it with anyone, even amongst

10   yourselves.

11          I'm going to be giving you more instructions about

12   your conduct as jurors after we take a break.  And given the

13   hour, I think what we'll do is we'll break effectively for our

14   usual lunch break.  And I'd like you to be back in the jury

15   room, ready to go at 1:30, and we'll pick up the case then.

16          The lawyers and I have some things that we need to

17   work on, but we'll be ready for you at 1:30 and we'll start the

18   trial.  And the trial's going to start with me giving you some

19   instructions, the lawyers will be giving opening statements,

20   and then we'll start hearing testimony.

21          So we'll be off and running this afternoon.  And for

22   your planning purposes, the day will end at 4:30.  And I'll

23   give you more information about our schedule as we move along.

24          But for now, let's just take a break.  And you're

25   going to go through that door, and the courtroom deputy will

1    escort you.

2         All rise.

3       (Prospective jury out.)

4         THE COURT:  Other than the motion to reconsider, are

5    there other issues anyone would like to raise before we break

6    for lunch?

7         MR. ADAMS:  I would, Your Honor.

8         So there's an issue with the use of the demonstrative

9    evidence in the opening.

10        The defendants would like to display a picture of Mr.

11   Walker's mug shot in the opening, Judge, and we object to that

12   for many reasons, and part of which will be discussed in the

13   motion.

14        But it's clear that the use of this picture is

15   intended to prejudice the jury in to believing that that is it,

16   that's all the case is decided.  There's a mug shot.

17        Although it was admitted into evidence, the report

18   was, these pictures and its use is starting the case off in a

19   prejudicial manner for the plaintiff.

20        THE COURT:  And when you say for the reasons in the

21   motion, which motion *in limine* are you saying addresses this

22   subject?

23        MR. ADAMS:  Well, I guess our argument -- and Mr.

24   Fakhouri will argue the motion that was recently filed to the

25   Court.  But our argument is basically this.

1    We're facing a trial where the defendants are going

2    to argue that he did it, they know how he did it, because he

3    was found guilty.  But we can't argue the end result, which was

4    the reversal in the granting of the certificate of innocence.

5    And that is our point on that, Your Honor.  And it

6    ties our hands behind our back.

7    THE COURT:  Well, let's focus first on the arrest

8    photo, the booking photo.

9    As I understand the exhibit, it is part of the arrest

10   report that is an admitted exhibit that has been admitted by

11   agreement.

12   Am I at least understanding what exhibit we're

13   talking about?

14   MR. ADAMS:  That is correct, Your Honor.

15   THE COURT:  What's the defendants' response?

16   MS. BOUDREAUX:  Yeah.  These are exhibits that were

17   both on the plaintiff's exhibit list and the defendants'

18   exhibit list.  I believe it's Plaintiff's 38 through 40.  That

19   includes the arrest reports of Dewey Brown, Russell Walker, and

20   Jermaine Walker.

21   Both sides wanted them in, to the point we literally

22   wrote on the pretrial order, the parties stipulate to its

23   admissibility.

24   I don't think there's anything prejudicial about it.

25   You know, this is going to be -- I mean, my position would be

1   that no foundation even has to be laid for this.  And there's

2   nothing wrong with it being used in opening statement.

3            THE COURT:  It is a portion of an exhibit that's

4   admitted.  And there's no prohibition, in my view, to using

5   exhibits in opening statements.

6            And I suppose I'll just ask the defense, are you

7   making the argument that because there is an arrest photo, Mr.

8   Walker is necessarily guilty of what he was charged with?

9            MS. BOUDREAUX:  No.

10           MR. ADAMS:  Okay.  Well, Judge, may I?

11           What's the point of Dewey Brown and Russell Walker's

12  photo?

13           And if you're not introducing it for that, elaborate.

14  Because last night, through communications, counsel told me she

15  was setting the stage with the booking photo.  The only stage

16  that can be set with that is the implications that he was

17  arrested, he was found guilty, he's guilty.

18           THE COURT:  Might there be a point in orienting this

19  jury as to the identity of people they will be meeting during

20  the course of the trial?

21           And showing them photos that are part of admitted

22  exhibits that both sides wanted in the case would be a way to,

23  by way of opening statement, identify for the jurors different

24  individuals that they may be encountering during the trial.

25           Why wouldn't that be a fairly ordinary and routine

1    use of an exhibit?

2             MR. ADAMS:  Judge, it's -- the plaintiff is here.

3    The defendants are here.  Dewey Brown, Russell Walker are not

4    here.

5             And it is argument.  We have no argument with it

6    coming in, being used in closing, but to start off a trial with

7    the picture of our client in a mug shot I think is prejudicial,

8    Your Honor.

9             THE COURT:  The plaintiff's objection to using an

10   admitted exhibit, even a portion of an admitted exhibit in

11   opening statement, is overruled.

12            I don't agree that there is an improper or unfair

13   prejudice from using an admitted exhibit, so long as there is

14   no improper argument that's being tied to the exhibit's use.

15            And, of course, if there is an improper argument

16   that's made, an objection can be made, and I'll rule on it.

17            Before we get to the motion to reconsider, are there

18   any other issues anyone would like to raise?

19            MR. FAKHOURI:  Your Honor, we're not addressing the

20   jury instructions at this time, correct?

21            THE COURT:  Not at this time.  I'll talk to you about

22   what I have handed out, just to orient you, but we're not going

23   to run through them right now.

24            MR. FAKHOURI:  Then the only thing for plaintiff

25   would be the motion, Judge.

1        THE COURT:  And any other issues from the defense?

2        MS. BOUDREAUX:  No.  We just had this e-mail exchange

3    last night where I said what exhibits I would be using in

4    opening.  I asked them what they were using.  They didn't

5    respond to the e-mail.  So I would just like to know that.

6        MR. ADAMS:  We did respond there.  We responded and

7    said we'll be using a Google exhibit.

8        MS. BOUDREAUX:  No.  That was for Jermaine's cross --

9    direct examination.  You did not respond to the opening.

10       THE COURT:  Why don't we do this.

11       MR. FAKHOURI:  Yeah.

12       THE COURT:  Address the Court, not each other.

13       MR. ADAMS:  Okay, Your Honor.  We played --

14       THE COURT:  That tends to keep people in a mode of

15   decorum; that if you were talking to each other, you might

16   easily slip into less decorum than you would engage in when

17   you're talking to me.  So why don't we direct comments to me.

18       So the question, Mr. Adams, is just, are you using

19   any exhibits in your opening?  And can you disclose them to the

20   defense?

21       MR. ADAMS:  Well, Your Honor, we're going to use the

22   mug shot.  And we're also -- we wanted to use the Google Map

23   exhibit that we introduced into evidence as well.

24       THE COURT:  Any issue?

25       MS. BOUDREAUX:  Well, that was the one that you

1    stated needed -- the foundation needed to be laid for that at

2    trial because there's a dispute as to the year those

3    photographs were taken.

4            THE COURT:  Well, here's the thing.  My view as to

5    opening statements is if somebody uses an exhibit in opening

6    statement, and that exhibit ends up not being admitted into

7    evidence, you have made a promise to the jury that you did not

8    keep, and that's on you.

9            But other than that, I am not going to police it in

10   that way, unless it's a clear exhibit that is definitely not

11   coming in, and we all know it's not coming in, and you're

12   violating some sort of motion *in limine* by using it in opening,

13   which is not what the plaintiff is doing.  So I'll allow it.

14           MR. FAKHOURI:  Well, Your Honor, if I may?

15           With respect to the trial exhibits that have been

16   exchanged and just received by this Court early this morning,

17   there are going to be certain exhibits that, now that we have

18   them in color as opposed to what has been exchanged to by the

19   parties in black and white, those will be used by plaintiff

20   during their opening statement.

21           And, of course, the defense is aware of it.  They're

22   the ones that brought it into court this morning.

23           THE COURT:  Any issue with that?

24           MS. BOUDREAUX:  No.

25           THE COURT:  Okay.  Are there -- do we want to, just

1   for the record now, announce -- do you have a list of exhibits
2   that are agreed and we can admit right now?
3           MS. BOUDREAUX:  I am not sure we have it as organized
4   as all that.
5           THE COURT:  Well, why don't -- can we do that when
6   you come back?
7           MR. FAKHOURI:  Certainly.
8           THE COURT:  Before openings?
9           MR. FAKHOURI:  Certainly, Judge.
10          MS. BOUDREAUX:  Yes.
11          THE COURT:  Okay.  I think that would be a good use
12  of people's time, if we get that process going; where if you
13  have agreed exhibits, let's get a list of them and, outside the
14  presence of the jury, I will admit them.  And then no one needs
15  to lay any foundation.  And you can use them with any witness
16  you want at any time.
17          Okay.  So then why don't we address the motion to
18  reconsider.
19          Has the defense received the motion?  Had an
20  opportunity to read it?
21          MR. STEFANICH:  Yes, Judge.
22          THE COURT:  What is your response?
23          MR. STEFANICH:  The first response is it's --
24  procedurally, there are some problems with it.  I don't think
25  it's a real motion to reconsider.

1     I don't think there was any argument on any sort of
2  newly-discovered evidence that was discovered since the
3  original motion was filed. And there wasn't any argument as to
4  any merit -- manifest errors of law or fact when you originally
5  ruled on the motion and then when you clarified the ruling
6  yesterday.
7     Going to the merits of the motion. Again, Judge, I
8  don't think a lot of your ruling -- original ruling was
9  addressed. You ruled that it was hearsay. Plaintiff responded
10 and cited the *Kluppelberg* case, which you addressed in your
11 original ruling. And you distinguished *Kluppelberg* and the
12 *Greycas* case, which *Kluppelberg* relied upon. I didn't see any
13 sort of attempt to distinguish how you distinguish those cases.
14    So I think the hearsay ruling is still sound, that
15 the COI is hearsay, and it is being attempted to be offered to
16 prove the truth of the matter asserted.
17    And then, Judge, when you get to the 403 argument, as
18 you said last week and yesterday, with our waiver and our
19 concession of the second element of the state-law malicious
20 prosecution claim, the probative value of the COI is close to
21 nothing. I think that still stands.
22    And I think the distinction the Court is making is
23 the right one. No one's barring plaintiff from presenting
24 evidence of innocence. It's just that the mode or the method
25 of how plaintiff intends to prove it cannot be proven through

1  the COI.  And I think that's -- that was a sound decision,
2  Judge.
3            So that would be our response.
4            THE COURT:  Anything in reply from the plaintiff?
5            MR. FAKHOURI:  Yes, Your Honor.
6            First of all, with respect to the 403 objection.
7  There is nothing prejudicial to -- about this COI because
8  plaintiffs are not offering it for its truth.  This is setting
9  the stage for the jurors to understand the nature and the
10 history of what has occurred over the last 15 years, Judge.
11           If we are going to be getting into the grand jury
12 indictment, and we're going to be getting into the criminal
13 trial, and there is going to be a statement that my client was
14 found guilty at a criminal trial, there has to be information
15 before this jury to put it within their frame of reference the
16 same exact way, Your Honor, that we want the jury to know who
17 Dewey Brown is, the same way that we want the jury to know who
18 Russell Walker is.
19           Your Honor, this is the procedural history.  And just
20 because it is not advantageous to the defendants does not mean
21 plaintiff should be barred from allowing the jury to know his
22 damages.
23           Again, Your Honor, this certificate of innocence is
24 being offered for the purpose of the procedural history, which
25 the jury must know, and the damages that the plaintiff

1    suffered.  Barring him from getting into that information, Your

2    Honor, simply tells half of the story in this case.

3              Additionally, Judge --

4              THE COURT:  Can -- let me just ask you, can you put a

5    finer point on how it's being used not for the truth of the

6    matter asserted and relevant to damages?

7              MR. FAKHOURI:  Absolutely, Your Honor.

8              Our client has suffered in prison for nearly 11 years

9    as a result of a conviction that he stood before another judge

10   in another courtroom and was told that at that proceeding, that

11   conviction was overturned.

12             That mental turmoil that our client suffered, and

13   knowing the 11-and-a-half years that he was incarcerated was

14   for a conviction that has been vacated in a certificate of

15   innocence that was now before him, after 12 years, Judge, this

16   goes directly to his damages.

17             He is an individual with a college scholarship before

18   going into prison, before his arrest on February 21st, 2006.

19   All of that was lost.

20             And now we get to tell a story that only allows this

21   jury to hear the criminal case and nothing that follows after.

22   If that's not prejudice to the plaintiff, Judge, I am not sure

23   what is.

24             THE COURT:  Okay.  The motion to reconsider is

25   denied.

1    I am not persuaded that the motion is raising issues

2    or articulating a theory of admissibility or use that wasn't

3    adequately briefed and addressed the first time around, but

4    plaintiff has made a record of plaintiff's position.

5    I am not persuaded that the use of the judicial

6    comments and the actual certificate itself is not being offered

7    or there's not a great risk that it would be construed for the

8    truth of the matters asserted, that is, factual innocence,

9    which, in my view, as I've said, would be hearsay coming from

10   out-of-court sources, including from, in part, declarants who

11   have zero personal knowledge of the underlying events.  So they

12   are not really competent witnesses with direct personal

13   knowledge of what did and didn't happen with respect to the

14   crimes.

15   As I said, as to damages, I do agree that proof of

16   innocence is relevant to damages.

17   I also agree, as I believe I alluded to yesterday,

18   that plaintiff's testimony and experience in going through the

19   process is relevant to his claim of damages.

20   What I haven't heard is a precise-enough expression

21   of why the actual certificate of innocence is itself probative

22   of damages, or why the judicial comments in the motion to

23   vacate or the hearing in granting the certificate of innocence,

24   why those comments are probative of damages.  But I should say,

25   as with any motion *in limine*, it may depend on how the

1    plaintiff articulates it and testifies to it.

2          And, as we talked about yesterday, it may be that

3    there is some expression or role that the process and the

4    procedural history played in plaintiff's experience that bears

5    on his damages.  I have not heard yet a way that that then

6    means that the actual certificate comes in as a piece of

7    evidence, or that the actual comments of the court, of the

8    judges come in, especially given the risk that these jurors,

9    our jurors will necessarily take from that that there is actual

10   proof or admissible proof of the fact of innocence.  And that's

11   the line that I think needs to be drawn here, is the risk that

12   the jurors, our jurors will use this testimony or evidence for

13   an improper purpose balanced against its probative value

14   towards the point of damages.  And I continue to be persuaded

15   that the balance is that exclusion is the way to solve the risk

16   of unfair prejudice or, primarily, even confusion as to what

17   these pieces of evidence are and what they're for.

18          I, of course, have considered the use of limiting

19   instructions, and I still believe that the limiting instruction

20   is not the most effective way to eliminate this risk of

21   prejudice when the probative value is, so far as I have

22   understood it, so minimal.

23          And I also think it's worth this jury's time to not

24   have to get taken down a side route of a lot of further

25   discussion or evidence about the certificate-of-innocence

1   process, who played a role in it, what that had to do with the

2   underlying conduct that these defendants are alleged to have

3   committed.

4           I certainly agree with the plaintiff that the

5   liability aspect of this trial is about what the defendants did

6   and whether they violated plaintiff's civil rights, and that's

7   the focus of liability.

8           But, as we've been discussing, whether Mr. Walker

9   engaged in some conduct is a relevant consideration both for

10  liability and for damages.  So it's necessarily going to be a

11  subject of this trial, what the conduct was and whether that

12  happened, either as committed by Mr. Walker or as by the

13  defendant officers.

14          And so I don't agree with plaintiff that my ruling is

15  somehow shifting or improperly putting the focus on facts that

16  are not important or not as important as other facts.

17          MR. ADAMS:  Judge --

18          THE COURT:  So you have my ruling.

19          MR. ADAMS:  I do.

20          THE COURT:  The motion to reconsider is denied.

21          MR. ADAMS:  I -- just clarification, Judge.  If I

22  may?  So I wasn't present yesterday.

23          So we're not allowed to introduce the certificate of

24  innocence.  And we're not also allowed to let the jury know

25  that the defendants had, you know, stipulated to the case

1  resolving in a manner of innocence as well?  We can't tell the

2  jury that as well?

3       THE COURT:  That's correct, because that's not an

4  issue we are asking the jury to weigh in on, because the

5  defendants have conceded that issue.

6       And on that topic, I should also note that the

7  articulation of the second element of malicious prosecution

8  doesn't necessarily have to read in a manner indicative of

9  innocence.  The second element of malicious prosecution

10  traditionally is favorable termination.

11       And the issue of indicative of innocence often comes

12  up when the way a case has been terminated is somehow

13  ambiguous.  And so the Illinois Supreme Court has said:  Well,

14  if you have this ambiguous situation, the plaintiff will need

15  to prove that it was terminated in a manner indicative of

16  innocence.  In cases where a conviction is just outright

17  vacated, that in and of itself may be sufficient to demonstrate

18  favorable termination without any further proof on the part of

19  a plaintiff.

20       So, frankly, it's not actually the case that an

21  element given to this jury would necessarily even require the

22  plaintiff prove termination in a manner indicative of

23  innocence.  The plaintiff need only prove favorable

24  termination.  And that -- even on that front, then, there's a

25  risk that -- well, I'll just leave it at that, only to say that

1    we've been spending a lot of time and the plaintiffs have been

2    spending a lot of time articulating the importance of the

3    element that the case had been terminated in a manner

4    indicative of innocence, and I am just pointing out that that's

5    not necessarily the only articulation of that element.

6              As I have said -- well, I think I have said

7    everything I am going to say about this.  I am happy to address

8    questions and give you further direction in terms of how you're

9    planning to proceed, but I should take it one question at a

10   time as things come up.

11             So I am happy to continue the discussion.  But what's

12   your next question?

13             MR. FAKHOURI:  Your Honor, just for clarification

14   purposes, and just so that we are following this Court's

15   guidelines.

16             With respect to stages of what occurred, our client

17   is free to testify as to those stages while he may not be --

18   while we may not be permitted to admit a certain document.

19             The stages of what transpired is an important, you

20   know, piece of information for the jury to know, and Your Honor

21   is not preventing us from doing that, correct?

22             THE COURT:  I am not preventing you from doing that,

23   except I haven't heard from you exactly how what you want to

24   say about the procedural history is bearing on what I would say

25   is admissible evidence of damages.

1    And so that's where it seems pretty clear to me that

2  there is going to be some effort to bring this up, and I'll

3  have to address it when it happens.  And it may be that I'll

4  end up having to give some kind of limiting instruction or the

5  like.

6    But until that happens -- frankly, I'm loathe to tell

7  you here's the kind of damages testimony I will say is

8  admissible and here's the kind of damages testimony I'll say is

9  not admissible because it's not my -- I don't know what the

10  facts are and what the testimony is, and I ought not to -- I

11  am, frankly, really trying not to insert myself into the

12  evidentiary presentation more than I need to.

13    MR. FAKHOURI:  And lastly, Your Honor.  And this is

14  out of respect for the Court in advance.

15    Plaintiffs have been made aware early this morning

16  and late last night, after our motion was filed, that there is

17  a ruling directly opposite of what is being ruled on in this

18  court by Judge Pallmeyer as it relates to the stipulation

19  versus what we are now saying is a waiver.

20    And if I may, Your Honor, briefly?  I do not want to

21  waste the Court's time.  But I think we're conflating the words

22  "waiver" and "concession."  And the effect of those two things

23  are far different as it relates to this case.

24    And while the jury need not consider an issue, there

25  is still a statute, and that statute requires certain prongs be

1   met, such that if an issue is not at issue, the jury is advised

2   that that issue is not at issue because there is a concession.

3          The fact that the defendants have waived the second

4   element -- and, again, Your Honor, and the only reason I'm

5   bringing this up is because I am waiting on the transcript from

6   Judge Pallmeyer's courtroom to present to Your Honor, once I am

7   in receipt of it, where this exact same issue -- and Your

8   Honor's exact words as of the pretrial hearing that occurred

9   last week -- were used as a sword in that matter.  And Judge

10  Pallmeyer, to my understanding -- waiting on the transcript,

11  Judge -- has said they can't have it both ways.  Either the

12  stipulation is read to the jury so they're aware of the statute

13  and what the law requires or the COI is coming in.

14         And while I understand Your Honor's ruling as it

15  relates to that, there's a difference between a waiver and a

16  concession, and I just want to make that point for the record,

17  Judge.

18         THE COURT:  Your point is made.  I don't agree with

19  it.

20         And the reason I don't agree with the point you just

21  made is that I don't agree that if there is a concession of an

22  element, such that the defense is agreeing that judgment can be

23  entered against them if other elements are proven, I don't

24  agree that this jury, then, needs to be advised of the

25  existence of that element and the fact that the plaintiff has

1   proven it.

2          I understand the rhetorical value of a plaintiff

3   being able to say, "There are four elements to this claim, and

4   here's one that we've proven by agreement.  The defense has

5   even conceded that we've proven this element."  I understand

6   the rhetorical value to that, but I am not aware of, and it has

7   not been brought to my attention, any legal authority that a

8   jury must evaluate an element of a civil claim when the

9   defendants agree and have conceded that that element has, in

10  fact, been established, and that the defendants agree that

11  judgment can be entered against them if the other elements are

12  proven.

13         So whether I have used the term "waiver" or

14  "concession," I don't agree that there is a distinction there

15  with a difference as to the outcome of my ruling.

16         And I'll say, I don't disagree that this is debatable

17  and that other judges might reach a different conclusion.  And

18  other judges might balance the actual arguments that were

19  raised to them in a way that might be different than the way I

20  have evaluated the actual arguments that have been presented to

21  me.  And sometimes that's a reason why decisions are different

22  in different courtrooms, is that the arguments were different

23  and the way they were presented were different, and their

24  persuasive value was different.  Ultimately, this is a

25  discretionary judgment on my part as to the admissibility of

1    certain evidence.

2              So I am not convinced that this is a good use of our

3    time to constantly --

4              MR. FAKHOURI:  I'm sorry, Judge.

5              THE COURT:  -- go back to this well.  And you're just

6    eating into your time in terms of your presentation of the

7    case.  And so let's try to move forward as best we can in light

8    of the rulings.

9              Is there anything else we should address before we

10   break for lunch?

11             MR. FAKHOURI:  No, Your Honor.

12             THE COURT:  From the defense?

13             Okay.  So please be ready to go.  If you could be

14   back just maybe a couple of minutes before 1:30 so we can be

15   sure to get ready right at 1:30.

16             And if you need any help with the courtroom

17   technology and getting set up for opening statements, we'll be

18   sure to help you out with that.

19             MR. FAKHOURI:  Thank you, Judge.

20        (Recess.)

21

22

23

24

25

1          C E R T I F I C A T E
2
3
4
5              I, Colleen M. Conway, do hereby certify that the
6      foregoing is a complete, true, and accurate transcript of the
7      Trial proceedings, Vol. 1 AM, Pages 1-102, had in the
8      above-entitled case before the HONORABLE MANISH S. SHAH, one of
9      the Judges of said Court, at Chicago, Illinois, on
10     March 7, 2023.
11
12
13         _/s/ Colleen M. Conway, CSR, RMR, CRR_      _03/08/23_
14             Official Court Reporter                  Date
               United States District Court
15             Northern District of Illinois
               Eastern Division
16
17
18
19
20
21
22
23
24
25

                   Colleen M. Conway, Official Court Reporter

# EXHIBIT 7



# Transcript of the Deposition of
# **Robert L. Weaver**
**Case:** James Gibson v. City of Chicago; et al.
**Taken On:** August 17, 2022

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Page 1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3
   JAMES GIBSON,                          )
4                                         )
                   Plaintiff,             )
5                                         )
                   -vs-                   )  No. 19 CV 4152
6                                         )
   CITY OF CHICAGO and former             )  Judge Ellis
7  Chicago Police Officers ANTHONY        )
   MASLANKA, WILLIAM MOSER, JOHN E.       )  Magistrate
8  BYRNE, LOUIS CAESAR, JOHN              )  Judge Weisman
   PALADINO, HENRY J. LEJA, JEROME        )
9  RUSNAK, VICTOR BRESKA, ESTATE OF       )
   JOHN McCANN, ESTATE OF PHILLIP         )
10 COLLINS, ESTATE OF JOHN O'MARA,        )
   and ESTATE OF JON BURGE,               )
11                                        )
                   Defendants.            )
12

13

14           The deposition of ROBERT L. WEAVER, taken

15  pursuant to the Federal Rules of Civil Procedure of

16  the United States District Courts pertaining to the

17  taking of depositions, taken before KRISTA R.

18  DOLGNER, Registered Professional Reporter and

19  Certified Shorthand Reporter of the State of

20  Illinois, at 53 West Jackson Boulevard, Suite 337,

21  Chicago, Illinois, on Wednesday, August 17, 2022, at

22  10:00 a.m.

23

24

James Gibson v. City of Chicago; et al.
Deposition of Robert L. Weaver - Taken 8/17/2022

Page 2

1   APPEARANCES:

2        ODIM LAW OFFICES
         MR. CARLTON E. ODIM
3        225 West Washington Street
         Suite 2200
4        Chicago, Illinois 60606
         Phone:  312.775.1009
5        E-mail: carlton@odimlawoffices.com

6             on behalf of Plaintiff;

7

         REITER BURNS
8        MS. DHAVIELLA N. HARRIS
         311 South Wacker Drive
9        Suite 5200
         Chicago, Illinois 60606
10       Phone:  312.982.0090
         E-mail: dharris@reiterburns.com
11

              on behalf of Defendant City of
12            Chicago;

13       HALE & MONICO, LLC
         MS. KELLY M. OLIVIER
14       MS. JENNIFER BITOY
         53 West Jackson Boulevard
15       Suite 337
         Chicago, Illinois 60604
16       Phone: 312.341.9646
         E-mail: kolivier@halemonico.com
17       E-mail: jbitoy@halemonico.com

18            on behalf of Defendants Breska,
              Caesar, Leja, Moser, Rusnak,
19            Paladino, Maslanka, Estate of
              Collins, Estate of McCann, and
20            Estate of O'Mara.

21

22

23

24

Royal Reporting Services, Inc.
312.361.8851

Page 3

1                      I N D E X

2     WITNESS                                      PAGE

3     ROBERT L. WEAVER

4           Examination By Ms. Olivier ..................5

5           Examination By Mr. Odim ....................88

6           Further Examination By Ms. Olivier .........103

7           Further Examination By Mr. Odim ...........110

8

9                    E X H I B I T S
                                                  MARKED
10    NUMBER                                      FOR ID

11    Weaver Deposition Exhibit

12          No. 1  ...................................113

13

14

15

16

17

18

19

20

21

22

23

24

James Gibson v. City of Chicago; et al.
Deposition of Robert L. Weaver - Taken 8/17/2022

Page 4

1      MS. OLIVIER:  I'm going to put on the record

2   Dhaviella Harris from Reiter Burns is here too.  She

3   just walked in.

4                    (Witness sworn.)

5      MS. OLIVIER:  Let the record reflect that this

6   is the deposition of Robert Weaver, being taken

7   pursuant to subpoena, which has been scheduled,

8   rescheduled, and canceled a number of times up until

9   today's date.  It is being taken today in accordance

10   with the Federal Rules of Evidence and Civil

11   Procedure and all applicable local rules in the

12   matter of James Gibson versus the City of Chicago,

13   et al., pending in the United States District Court

14   for the Northern District of Illinois before

15   Judge Ellis.

16           This deposition is being taken via Zoom

17   and is not being video recorded.  Mr. Weaver is

18   present at my office, the office of Hale & Monico,

19   at 53 West Jackson in Chicago, Illinois, along with

20   myself, Kelly Olivier, representing the individual

21   defendant officers in this matter; the court

22   reporter; my colleague, Jennifer Bitoy; and

23   Dhaviella Harris on behalf of the City of Chicago.

24   Mr. Odim is appearing remote via Zoom.

Page 5

1    WHEREUPON:

2                    ROBERT L. WEAVER,

3    having been first duly sworn, was examined and

4    testified via videoconference as follows:

5                    EXAMINATION

6    BY MS. OLIVIER:

7         Q.    Mr. Weaver, have you ever been deposed

8    before?

9         A.    Have I ever been where?

10        Q.    Have you ever given a deposition before?

11        A.    No, ma'am.

12        Q.    So you came to my office at approximately

13   9:15 today, correct?

14        A.    Yes.

15        Q.    All right.  And I know I went over a few

16   ground rules with you this morning, but I'm going to

17   go over them again for the record.  Okay?

18        A.    Okay.

19        Q.    As you can see, there's a court reporter

20   present in the room who is taking down every word

21   that is said.  Because of that, she can't take it

22   down when both of us are speaking over each other.

23   So if you can do your best to allow me to fully

24   finish asking my question before you begin your

Page 6

1   answer, I'll do my best to extend the same courtesy

2   to you of allowing you to fully answer before I

3   start another question.  Okay?

4        A.   Yes.

5        Q.   You're already doing a good job, but make

6   sure all of your answers are out loud and verbal.

7   She can't take down a nod or a shake of the head,

8   and uh-huh and uh-uh look the exact same on the

9   record.  Okay?

10       A.   All right.

11       Q.   And keep your voice up a little bit just

12  so Mr. Carlton -- or Mr. Odim can hear you.

13       A.   All right.  I will try to.

14       Q.   Lastly, if you need to take a break at any

15  time, that's fine.  I just ask that if I've asked

16  you a question, you answer it before we take that

17  break.

18       A.   Okay.

19       Q.   All right.  And then, actually, this is

20  the last thing:  If you answer a question that I ask

21  or any of the other attorneys ask, we're going to

22  assume that you understood it.  So if you don't

23  understand a question, please let us know, and we

24  will try to rephrase it.  Okay?

James Gibson v. City of Chicago; et al.
Deposition of Robert L. Weaver - Taken 8/17/2022

Page 7

1      A.    Okay.

2      Q.    All right.  Mr. Weaver, you and I have

3    spoken prior to today on a number of occasions,

4    correct?

5      A.    Correct.

6      Q.    All right.  And I explained to you, and

7    you understand, that I'm not your attorney, correct?

8      A.    Correct.

9      Q.    All right.  I have also explained to you

10   and do you understand that I'm one of the attorneys

11   representing a group of former City of Chicago

12   Police Department detectives in a lawsuit that was

13   filed by James Gibson, also known as Peter Gunn,

14   against my clients, the officers; and the City of

15   Chicago?

16     A.    Correct.

17     Q.    Okay.  I explained to you in those

18   conversations that you are here today simply to tell

19   the truth, correct?

20     A.    Correct.

21     Q.    And you understand that you are under oath

22   here today?

23     A.    Yes.

24     Q.    All right.  Is it true, Mr. Weaver, that

Page 8

```
 1    you are currently residing in Chicago?
 2         A.   Yes.
 3         Q.   Were you living in Springfield, Illinois,
 4    before residing where you are at today?
 5         A.   Yes, I was.
 6         Q.   When you and I first spoke, you were still
 7    living in Springfield; is that true?
 8         A.   That's correct.
 9         Q.   All right.  Do you remember roughly when
10    that was, when you and I first spoke?
11         A.   My grandmother passed in November.  So it
12    had to be around December or January, I believe.
13         Q.   All right.  If I represent to you that it
14    was in early 2022, does that sound about right to
15    you?
16         A.   Okay.  Yeah, that could be.  I had a lot
17    going on during that time, you know, dealing with my
18    household and my grandmother passing and stuff,
19    so...
20         Q.   Okay.  Do you recall being served with a
21    subpoena and with that subpoena a $40 check ordering
22    you to appear for a deposition?
23         A.   Yeah.
24         Q.   Other than receiving that $40 check, which
```