# Exhibit G

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ROBERT SMITH, JR.,           )

     Plaintiff,              )

  vs.                        ) No. 21 C 1159

THE CITY OF CHICAGO,         )

et al.,                      )

     Defendants.             )


     The videotaped videoconference continued

deposition of MYLES O'ROURKE, taken in the

above-entitled cause, before Paula Ann Erickson,

Certified Shorthand Reporter, Registered

Professional Reporter and Notary Public, on

September 29, 2022, at the approximate hour of

10:03 a.m.


     REPORTED BY:  PAULA A. ERICKSON

     C.S.R. LICENSE NO. 084-003899

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 2

```
 1   REMOTE APPEARANCES:

 2
         MR. STUART J. CHANEN
 3       MR. ARIEL OLSTEIN
         CHANEN & OLSTEIN
 4       7373 Lincoln Avenue
         Suite 100
 5       Lincolnwood, Illinois  60712
         (847) 469-4669
 6       stuart@chanenolstein.com
         ariel@chanenolstein.com
 7
             on behalf of the Plaintiff.
 8
         MR. DANIEL M. NOLAND
 9       REITER BURNS
         311 South Wacker Drive
10       Suite 5200
         Chicago, Illinois  60606
11       (312) 982-0090
         dnoland@reiterburns.com
12
             on behalf of the
13           Defendant City of Chicago.

14       MS. STACY A. BENJAMIN
         ROCK FUSCO & CONNELLY, LLC
15       333 West Wacker Drive
         19th Floor
16       Chicago, Illinois  60606
         (312) 494-1000
17       sbenjamin@rfclaw.com

18           on behalf of the
             Defendants Steven Brownfield, Phillip
19           Cline, Daniel McWeeny, William Pedersen,
             M. Rowan, and John Solecki

20

21

22

23

24
```

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 3

1   REMOTE APPEARANCES CONT'D:

2

    MR. DEAN GRAMLICH
3   O'ROURKE & MOODY, LLP
    55 West Wacker Drive
4   Suite 1400
    Chicago, Illinois  60601
5   (312) 849-2020
    dgramlich@orourkellp.com
6
        on behalf of the
7       witness Myles O'Rourke.

8

9   ALSO PRESENT REMOTELY:

10  Justin Henricksen - Videographer
    Royal Reporting Services
11
    Heather Barhorst - Paralegal
12  Reiter Burns, LLP

13

14                  *    *    *    *

15

16

17

18

19

20

21

22

23

24

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 4

1                    I N D E X

2

3   WITNESS                                PAGE

4

5   MYLES O'ROURKE

6

7        BY MR. NOLAND........................ 7

8        BY MS. BENJAMIN......................96

9        BY MR. CHANEN.......................103

10

11

12                 E X H I B I T S

13

14  DEFENDANT'S EXHIBIT                     REF'D

15  No. 23      Excerpt of Transcript of

16              John Du Shane                  47

17

18

19

20

21

22  Note:  Deposition Exhibit No. 23 was provided

23  electronically to the court reporter and

24  attached to the transcript.

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 5

1    THE VIDEOGRAPHER:  We are now on the
2  record at 10:06 a.m., on September 29, 2022.
3  Please note that microphones are sensitive and
4  may pick up whispering, private conversations,
5  and cellular interference.
6    Please turn off all cell phones or
7  place them away from microphones as they
8  interfere with the deposition's audio.  Audio
9  and video recording will continue to take place
10  unless all parties agree to go off the record.
11    This is Media Unit 1 of the video
12  recorded deposition of Myles O'Rourke, taken by
13  counsel for the defendants in the matter of
14  Robert Smith, Jr. versus the City of Chicago,
15  et al., filed in the United States District
16  Court for the Northern District of Illinois,
17  Eastern Division, case No. 21 C 1159.
18    This deposition is being held via Zoom
19  remote videoconference.  My name is Justin
20  Henricksen, in association with Royal Reporting
21  Services.  I am the videographer.  I am not
22  related to any party in this action nor am I
23  financially interested in the outcome.
24    Will counsel please state their

Page 6

1  appearance and affiliation for the record
2  starting with the taking attorney first?
3    MR. NOLAND:  Good morning.  Daniel
4  Noland, for the City of Chicago.
5    MS. BENJAMIN:  Good morning.  Stacy
6  Benjamin for the individual defendant officers.
7    MR. CHANEN:  Stuart Chanen for the
8  plaintiff Robert Smith, Jr., and his special
9  representative Diane Smith.
10    MR. GRAMLICH:  Dean Gramlich -- Dean
11  Gramlich, on behalf of the deponent Myles
12  O'Rourke.
13    THE VIDEOGRAPHER:  Thank you.
14    MR. OLSTEIN:  Ariel Olstein, also for
15  plaintiff Robert Smith and his special
16  representative.  I may not be on the entire
17  time.  I will note by e-mail when I leave the
18  Zoom call.  Thank you.
19    MS. BARHORST:  I am Heather Barhorst.
20  I am Dan Noland's paralegal, also working for
21  the City of Chicago.
22    THE VIDEOGRAPHER:  Thank you.  The
23  Reporter is Paula Erickson in association with
24  Royal Reporting Services.  Will the reporter

Page 7

1  please swear in the witness?
2    THE REPORTER:  Sir, could you raise
3  your right hand, please?
4    MYLES O'ROURKE,
5  after being first duly sworn, deposeth and saith
6  via videoconference as follows:
7    EXAMINATION
8  BY MR. NOLAND:
9    Q.  Please state your name.
10    A.  Myles O'Rourke.
11    Q.  And you are the Myles O'Rourke who
12  previously sat for a deposition in this case and
13  then a second deposition that was very short,
14  right?
15    A.  That's right.
16    Q.  Nice to see you again, Myles.  I am
17  just going to get right into it.
18    MR. NOLAND:  Heather, can you pull up
19  Exhibit 12, please?
20    MS. BARHORST:  Can you see my screen?
21    MR. NOLAND:  Yes.  It's -- Yeah.  There
22  you go.
23  BY MR. NOLAND:
24    Q.  So, Myles, I am showing you --

Page 8

1    MR. GRAMLICH:  You are going to have to
2  make that bigger, Dan, or somebody.
3  BY MR. NOLAND:
4    Q.  Right now it's just for identification.
5  Myles, I am showing you a memo dated July 6,
6  2018 that was produced by your office from MPO
7  to file.  You are MPO; is that correct?
8    A.  That's me.
9    Q.  And this is a memo that you drafted,
10  correct?
11    A.  Yes.
12    MR. NOLAND:  And, Heather, can you turn
13  to Page 6636?  And can you go down a little bit,
14  and can you highlight the paragraph beginning
15  with, Although motive is unnecessary?
16  BY MR. NOLAND:
17    Q.  So, Myles, this sentence that you wrote
18  states that, Although motive is unnecessary,
19  Robert Smith was high on cocaine with his
20  paramour shortly following these murders.  Seems
21  as though drugs and the need for money caused
22  it.
23    That's what it says, right?
24    A.  Yes.

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 9

1    Q.  And it was -- It was your view that
2  there -- the motive for Smith to have committed
3  these murders, if he did, would have been to get
4  money to purchase drugs, correct?
5          MR. CHANEN:  Objection.  Leading.
6          THE WITNESS:  It was certainly one of
7  the things that was considered, yes.  I mean,
8  the need for money.
9          MR. NOLAND:  And, Heather, if you could
10  pull that down, and go to Exhibit 1.
11  BY MR. NOLAND:
12    Q.  And we looked at this last time, Myles.
13  This is the letter that your office sent to the
14  governor --
15    A.  Right.
16    Q.  -- in opposition to Smith's petition
17  for executive clemency, right?
18    A.  Yes.  I just wanted a point of
19  clarification I wanted to clarify because I
20  think there was some discussion by me at the
21  last that I didn't remember it, and I have
22  reviewed it, you corrected me and it is true
23  that I did review this commutation response or
24  the executive clemency response before it was

Page 10

1  submitted.  So I wanted to clarify that for the
2  record.
3    Q.  I appreciate it.  Thank you.  So --
4          MR. GRAMLICH:  Can you make it a little
5  bigger?
6          MR. NOLAND:  Yeah.  Dean, I am going to
7  be showing things just for identification and
8  then going to specific points and then I will be
9  blowing it up so that we can all see it, okay?
10          MR. GRAMLICH:  Yeah.  That's fine.
11  Just so we can see it.
12          THE WITNESS:  Yeah, because I can see
13  it.
14          MR. GRAMLICH:  Oh, all right.  Okay.
15  Fine.
16          MR. NOLAND:  Heather, please go to
17  Page 7 of the document Bates-stamped Smith 5027.
18  BY MR. NOLAND:
19    Q.  And, Myles -- and if Heather can scroll
20  down, you can just -- if you can just read
21  silently to yourself, Myles, the paragraph
22  beginning with, While defendant questions the
23  absence of motive.
24    A.  Yes.  I see.

Page 11

1    Q.  Okay.  Great.
2          Heather, can you go to the next page?
3          And focusing on the top paragraph and
4  then if you can just read that, Myles.
5    A.  Yes.
6    Q.  Okay.  So the office wrote to the
7  governor in opposition that -- and the last
8  sentence kind of sums it up, his motive in this
9  and his litany of other convictions has always
10  been about -- or has always been money.  That's
11  what that says?
12          MR. CHANEN:  I am going to object to
13  the form of the question.  Leading.
14          THE WITNESS:  That is what that says.
15  BY MR. NOLAND:
16    Q.  And that was the office's position at
17  that time?
18    A.  Yes.
19          MR. NOLAND:  And, Heather, if you can
20  then go to Page 5037 of this document.  Can you
21  scroll down a little bit so Myles can see that
22  this is David Yeager's letter?
23  BY MR. NOLAND:
24    Q.  Myles, do you remember that this was

Page 12

1  the letter that David Yeager provided so that
2  you could attach it to the response to that
3  executive clemency?
4    A.  Yes.
5          MR. NOLAND:  And, Heather, if you can
6  blow up a little bit the paragraph beginning
7  with, At a meeting.
8          THE WITNESS:  Yes.  I see that.
9  BY MR. NOLAND:
10    Q.  So Mr. Yeager -- If you can just take a
11  look at that silently.
12    A.  Yes.  I see that.
13    Q.  And he is talking about a meeting that
14  was a meeting that he came to where Mr. Chanen
15  presented Mr. Smith's side of the case so that
16  you and David could listen to his position.
17    A.  That's correct.
18    Q.  And you see in here that David Yeager
19  is making statements consistent with the motive
20  that your office submitted to the governor in
21  response to the executive clemency; is that
22  right?
23          MR. CHANEN:  Objection to the form.
24  Leading.

6 (Pages 9 to 12)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 13

1     THE WITNESS: About the need for
2  meeting or perhaps getting money, yes. That
3  would be -- I would say that is consistent,
4  although I think that it says -- Okay. Yes.
5  BY MR. NOLAND:
6     Q. And you would agree with me that if
7  Mr. Smith was making an assertion that there was
8  no motive in this case, that you would not agree
9  with that assertion, correct?
10     MR. CHANEN: I am going to object to
11  the form of that question. Leading.
12     THE WITNESS: I would say that there is
13  a potential for that -- for a fact finder to
14  find that.
15  BY MR. NOLAND:
16     Q. Okay. Thank you. And same --
17     MR. NOLAND: Actually, Heather, you can
18  take that down and pull up Exhibit 10.
19  BY MR. NOLAND:
20     Q. So, Myles, I am showing you a mental
21  health evaluation that was received from the
22  Department of Corrections. It's a two-page
23  document.
24     MR. NOLAND: And, Heather, can you go

Page 14

1  to the second page just so Myles can see the
2  psychologist who wrote this? A psychologist by
3  the name of Mohammed Irfan and go back to the
4  top. And, Heather, if you can just blow up a
5  little bit the two paragraphs under Objective
6  Data and History.
7  BY MR. NOLAND:
8     Q. And do you see, Myles, in the paragraph
9  beginning with, Inmate denies a history of
10  psychiatric treatment?
11     A. Yes.
12     Q. If you read on, you'll see that Smith
13  is relaying an incident where he went into a
14  rage and had treatment for that at the Veterans
15  Administration. Do you see that?
16     A. Sure.
17     Q. And do you see that the second
18  paragraph or not -- the second paragraph under
19  Objective Data says, He tells me he is currently
20  serving a sentence for a double homicide, a
21  crime he does not remember committing.
22     A. I see that.
23     Q. Do you recall if you had this document?
24     A. I don't believe we had this document,

Page 15

1  no.
2     Q. From time to time you -- in some cases
3  there is times where you can obtain prison
4  records; is that right?
5     A. Correct.
6     Q. All right. You just don't remember
7  this document as you are sitting here today?
8     A. I don't remember this document or
9  having obtained this document as I sit here
10  today.
11     Q. Okay. Okay.
12     MR. NOLAND: Heather, you can pull that
13  down, and pull up Exhibit 11.
14  BY MR. NOLAND:
15     Q. So, Myles, I am showing you an excerpt
16  of the deposition of Diane Smith in this case,
17  okay?
18     A. Yes.
19     Q. It was taken on October 26, 2021, and I
20  guess I will start with did you have the
21  opportunity to talk to Diane Smith?
22     A. I spoke with Diane, yes. I'm sorry to
23  interrupt you. I will wait for you to complete
24  your question next time.

Page 16

1     Q. Thanks, Myles. No. That's fine. You
2  knew what I was going to say.
3     And I am just going to flag for you
4  some of the things she said in her deposition.
5     MR. NOLAND: Heather, if you can just
6  scroll down to the beginning of the page we
7  highlighted let's just say for the record the
8  page that I am showing. So I am showing
9  Mr. O'Rourke Page 65, and I have highlighted
10  Lines 12 to 19.
11  BY MR. NOLAND:
12     Q. And do you see -- If you can just read
13  that to yourself and essentially she is saying
14  that after the incident where Smith got hit on
15  the head with a hammer in a parking lot.
16     A. Right. Lie 87 in this incident.
17     Q. Right. Right. That he was -- he was
18  more angry after that, and do you see that?
19     A. Yes.
20     Q. All right. Keep on scrolling down.
21  And if you can just read that silently to
22  yourself. I am showing Page -- Page 67 and
23  focusing on beginning of Line 15.
24     A. Okay. I see it.

7 (Pages 13 to 16)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 17

1    MR. NOLAND: Keep on scrolling,
2 Heather, to the next page. Yeah. There you go.
3    THE WITNESS: Okay.
4    MR. NOLAND: Can you keep on scrolling,
5 Heather, to the next highlight?
6    THE WITNESS: All right. I am through
7 Line 24.
8    MR. NOLAND: Next page, Heather.
9    THE WITNESS: Yes.
10 BY MR. NOLAND:
11    **Q. So, Myles, would you agree with me that**
12 **the -- that Mr. Smith's background of first of**
13 **all his criminal background and as Diane is**
14 **describing anger after this hammer incident, and**
15 **as Dr. Irfan described the resumption of the use**
16 **of drugs after the hammer incident and the rage**
17 **that he had previously exhibited, would you**
18 **agree with me that that was the type of**
19 **background that could be consistent with**
20 **Mr. Smith committing these crimes?**
21    MR. CHANEN: I am going to object to
22 the form of the question, foundation, and
23 selective use of showing Mr. O'Rourke just
24 snippets of her deposition without context,

Page 18

1 without the parts of the deposition where she
2 gave different answers. It's just wholly
3 improper.
4    THE WITNESS: I believe it's possible
5 in answer to your question.
6 BY MR. NOLAND:
7    **Q. It would -- Would you agree that it**
8 **would be inaccurate to say that Smith did not**
9 **have a background that would be consistent with**
10 **committing this type of crime?**
11    MR. CHANEN: I am going to object to
12 form and foundation.
13    THE WITNESS: Well --
14    MR. NOLAND: I will rephrase that.
15 BY MR. NOLAND:
16    **Q. Would you agree with me that there is**
17 **evidence that you have seen including his**
18 **criminal background and these documents I have**
19 **shown you that would be consistent with**
20 **Mr. Smith having a violent background?**
21    MR. CHANEN: I am going to object to
22 the form -- the form and foundation.
23    THE WITNESS: When -- With respect to
24 violent background, I believe the violent

Page 19

1 background, we are talking about criminal
2 convictions, I don't believe he had criminal --
3 violent criminal convictions.
4    When it comes to the psychiatric
5 history, the July incident with the use of the
6 cocaine and heroin, I think that -- so it's a
7 little bit of a mixed bag because, yes, I mean,
8 if Diane is saying that she believes he was
9 capable or that he was under certain stresses
10 within weeks of it, then that certainly could
11 conceivably be; but I would say it's a mixed
12 question.
13 BY MR. NOLAND:
14    **Q. Fair enough. Thank you.**
15    MR. NOLAND: Okay. You can take that
16 one down, Heather. Bring up -- Can you bring up
17 Exhibit 13, please?
18 BY MR. NOLAND:
19    **Q. So, Myles, I'm showing you -- And I**
20 **apologize, Myles, is it okay if I call you Myles**
21 **instead of Mr. O'Rourke? It seems just to make**
22 **the record easier and easier to say.**
23    A. Let's do that.
24    **Q. Thank you. So I am showing you**

Page 20

1 **Exhibit 13 which is a stipulation entered into**
2 **this civil case on May 10, 2022.**
3    MR. NOLAND: And, Heather, if you can
4 just blow it up where he can just read the part
5 that is from --
6 BY MR. NOLAND:
7    **Q. If I could ask you to read from**
8 **stipulation to so stipulated, just to yourself.**
9    A. Sure. I see this.
10    **Q. So you'll see that Mr. Smith has**
11 **stipulated that first of all that the blue**
12 **undershorts are his, right?**
13    A. Yes.
14    **Q. And he has also stipulated that the**
15 **human blood found on his skin, his clothing, and**
16 **the cuttings from the clothing belong to one of**
17 **the victims. So that's what it says?**
18    A. Yes.
19    **Q. So the -- You recall the human blood**
20 **found on Smith's skin, you recall that there is**
21 **evidence in the case that there were swabs taken**
22 **from the bottom of his bare feet that had human**
23 **blood?**
24    A. Yes.

8 (Pages 17 to 20)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 21

1    MR. CHANEN: I am going to object to
2  the form and foundation of the question. Both
3  leading and you will recall.
4    THE WITNESS: I mean, I do -- I'm
5  sorry. I do remember certain questions being
6  asked about that from the earlier portion of the
7  deposition.
8  BY MR. NOLAND:
9    Q. Yeah. You recall that there is
10  evidence in this case that that's what happened?
11  That some evidence techs went out to the area
12  and swabbed the bottom of his feet and --
13    A. Yes.
14    Q. -- and the serologist at the CPD looked
15  at that and determined that it was human blood.
16    A. Right. I think it was Roan and -- Yes.
17  I think the serologist, the name escapes me but,
18  yes. Christine Anderson maybe.
19    Q. Correct. Got it.
20    A. Okay.
21    Q. And then clothing I know you are
22  familiar with the issue of the clothing, and we
23  got the underwear, the issue of the underwear
24  and there was human blood found on the

Page 22

1  underwear, right?
2    A. Yes.
3    Q. And these cuttings do you recall that
4  the serologist when she did her work, she takes
5  little cuttings like inch by inch out of certain
6  of the garments and tests those to be able to
7  make her scientific analysis?
8    A. Right. Yes.
9    Q. And then in addition to the underwear,
10  there were also some other articles of clothing,
11  for instance, the police had -- the evidence
12  techs had gathered his black socks and there was
13  human blood found on those?
14    A. Yes. Yeah.
15    MR. CHANEN: Form and foundation.
16  BY MR. NOLAND:
17    Q. And that I think you'll recall that
18  there was a green jacket that he did not wear
19  back into the house when he went back to the
20  scene that had blood on it but the serologist
21  was unable to state that it was human blood?
22    A. Yes. That was in the car.
23    Q. Yeah. Okay.
24    MR. CHANEN: Form and foundation.

Page 23

1  BY MR. NOLAND:
2    Q. So the fact that the victims' blood is
3  on his underwear and his socks and the bottom of
4  his bare feet, would you agree with me that
5  there is evidence, forensic evidence, linking
6  Smith to the murders?
7    MR. CHANEN: Form and foundation. I
8  think a favorite of Dan's and Stacy's is
9  incomplete hypothetical.
10    THE WITNESS: I mean, I think there
11  is -- I think that there is -- the evidence is
12  consistent with the stipulation.
13  BY MR. NOLAND:
14    Q. Okay. And that the -- That is
15  evidence, the fact that there is blood on, for
16  instance, his underwear, that that is forensic
17  evidence linking him to the murders? That is,
18  the victims' blood on his underwear found on the
19  first step by the detectives at the crime scene.
20    MR. CHANEN: Same objection. Form.
21  Foundation. Incomplete hypothetical.
22    THE WITNESS: With -- Well, if it was a
23  completed hypothetical, it would be evidence to
24  tie him to the murders, correct.

Page 24

1  BY MR. NOLAND:
2    Q. So would you agree with me that it
3  would be an incorrect statement -- Strike that.
4    And same thing with the socks. There
5  is blood on the socks, that would be evidence
6  linking him to the murders of the victims?
7    MR. CHANEN: Object to the form.
8  Foundation, and incomplete hypothetical.
9    THE WITNESS: He took off his shoes,
10  right? And he took off his shoes in the
11  interview room; is that right?
12  BY MR. NOLAND:
13    Q. Yeah. I think the evidence is that the
14  evidence techs were called -- were called to
15  gather his clothing.
16    A. Right.
17    Q. That in the process of gathering them,
18  his shoes were removed. They took the swabs
19  from the bottom of the bare feet and they also
20  recovered his socks.
21    A. And he had earlier that day been in
22  blood that had been taken from the bloody
23  hallway.
24    Q. Yeah.

9 (Pages 21 to 24)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

---

Page 25

1    MR. CHANEN: And so at this point, I am
2  going to interject and I am going to say form,
3  foundation, and basically, Dan, you are
4  testifying now. You just keep going back into
5  the record and telling Myles all the different
6  things you remember about the record; and it's
7  highly, highly, highly improper; and please stop
8  doing it.
9    Ask him questions. He is an important
10  witness for your case apparently, so ask him
11  questions. Don't be going deep into the record
12  summarizing the entire history of what you think
13  the evidence shows. It's not a proper way to
14  take a deposition.
15    MR. NOLAND: So, Counsel, you are
16  interfering with my deposition and wasting my
17  time so stop that.
18    MR. CHANEN: Okay. Then call the
19  magistrate. Then you should call the
20  magistrate. I think we should call the
21  magistrate, and you should tell him I am wasting
22  your time. Go ahead. I will wait for you to
23  dial.
24

---

Page 26

1  BY MR. NOLAND:
2    Q.  Myles, so I understand that you are
3  talking about when he went back to the scene and
4  everybody agrees that he went onto the floor in
5  the crime scene, right?
6    A. Yes.
7    Q.  Okay. So but it is arguable that the
8  blood on his socks could be consistent with him
9  having committed the crimes because he may not
10  have got the blood on the socks when he went
11  back to the crime scene. He may have got the
12  blood on the socks earlier when he killed the
13  victims?
14    MR. CHANEN: Form. Form. Foundation.
15  Incomplete hypothetical.
16    THE WITNESS: I can -- I think I
17  understand your question. It is certainly
18  conceivable.
19  BY MR. NOLAND:
20    Q.  And then -- And of course the blood on
21  the bottom of the bare feet is conceivable that
22  he got that blood there in the course of killing
23  the victims, and then doing his laundry after
24  killing the victims?

---

Page 27

1    MR. CHANEN: Form. Foundation.
2  Incomplete hypothetical.
3    THE WITNESS: I would agree with -- I
4  would agree with the statement that it's
5  conceivable.
6  BY MR. NOLAND:
7    Q.  All right. And I know -- Well, I will
8  leave the record as it is from the first
9  deposition.
10    Okay. So would you agree with me that
11  it would be an inaccurate thing to say that
12  there is no forensic evidence linking Smith to
13  the crimes?
14    A. As of now or as of then?
15    Q.  We will say as of now.
16    A. I would say that that would be a
17  disputed fact for certain, whether there is
18  forensic evidence that links him to the crime.
19  I don't think it's safe to say now that there is
20  no evidence that -- potentially linking him to a
21  crime.
22    Q.  So let me just break that down, too.
23  So now after you have seen this stipulation,
24  would you agree with me that it would be

---

Page 28

1  inaccurate to say that there is, quote, "no
2  forensic evidence linking him to the crimes,"
3  end quote?
4    MR. CHANEN: Form. Foundation.
5  Incomplete hypothetical.
6    THE WITNESS: There was -- There would
7  be no forensic evidence today linking him to the
8  crime, yes. I would say that that would be an
9  incorrect statement if that was stating today
10  whether that is -- after seeing the stipulation
11  and the blue undershorts being inventoried.
12  BY MR. NOLAND:
13    Q.  Got it. So as of the time you were
14  working on the case, would you agree -- would
15  you still agree that it would be inaccurate to
16  assert that there is, quote, "no forensic
17  evidence linking him to the crimes," end quote?
18    MR. CHANEN: I am going to object to
19  the form, foundation of that question.
20    THE WITNESS: Well, no, not
21  necessarily, because the -- I believe -- I
22  know -- I think I know -- I don't want to press
23  on ahead of what's going to be shown but at the
24  trial in the 19 -- I believe it was the 1989

10  (Pages 25 to 28)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 29

1    trial, there was no evidence like blood or
2    linking him to -- or the victims that were
3    matching up consistently with them and there
4    were some -- so there was -- there was -- and I
5    think there was also a conclusion by the Torture
6    Inquiry and Relief Commission something along
7    the lines of that to suggest that.
8        So I think that there was -- at least
9    was a belief that there wasn't forensic evidence
10   tying him or linking him that was provided at
11   the original trial.
12   BY MR. NOLAND:
13       Q.  Yeah.  Okay.  So when -- when your
14   office vacated the case, would you agree --
15   however, would you -- would you agree that it
16   would be an inaccurate thing to say that there
17   is no forensic evidence linking him to the
18   crimes as of that time because there was --
19   because of the human blood found on his --
20   bottom of his bare feet, the underwear, the
21   socks?
22       A.  Right.  If you -- If you --
23       THE REPORTER:  Excuse me.  If I could
24   get the objection, please.

Page 30

1        MR. CHANEN:  Form and foundation.
2        THE WITNESS:  I think it's a mixed
3    question, but I will try my best to answer it.
4    The -- If you presume that there was -- that the
5    blood was not caused by the diving event or that
6    episode and it was caused by or if it tracks the
7    facts concerning the statement or if it would
8    implicate him and is tied to the confession,
9    then I think the answer is -- now I am confusing
10   myself -- but I think the answer is that if you
11   presume that it came from the murder or murders
12   for that matter, then, yes, there would be
13   forensic evidence linking him to the -- to the
14   crimes.
15       MR. NOLAND:  Okay.  Thank you.  Okay.
16   You can take that down, Heather.
17       THE WITNESS:  And I will back up so I'm
18   not all over your screen.
19   BY MR. NOLAND:
20       Q.  I am going to talk about -- You recall
21   that there was a knife found in inventory at the
22   crime scene?
23       A.  Yes.
24       Q.  And your -- You recall from the last

Page 31

1    deposition -- I am sure you may recall from your
2    work on the case that there was -- the
3    serologist found no indication that there was
4    any blood whatsoever on that knife?
5        MR. CHANEN:  Object to the form and the
6    foundation.
7        THE WITNESS:  That was reported to me,
8    yes.
9    BY MR. NOLAND:
10       Q.  Did your office conduct any
11   investigation to determine whether or not it
12   would have been possible for that blood to have
13   been the murder weapon, yet still not have any
14   blood on it when it was recovered?  (Verbatim.)
15       MR. CHANEN:  I'm sorry.  Can I just
16   have the beginning of that question read back,
17   please?
18       THE REPORTER:  Absolutely.  One moment,
19   please.
20       (Whereupon, the record was read
21        as requested.)
22       THE WITNESS:  I don't -- yeah.  I don't
23   really understand the question.
24   BY MR. NOLAND:

Page 32

1        Q.  Okay.  Yeah.  That's fair, and I didn't
2    say in the beginning, I probably did in the
3    first one, of course, if you don't understand a
4    question, just let me know and I will rephrase
5    it.
6        So did your office do any investigation
7    to determine whether or not it was possible for
8    the knife to be the murder weapon even though
9    there was no blood found on the knife by the
10   serologist?
11       A.  I think that we -- Again, you mean
12   testing or --
13       Q.  Right.  Right.  Consulting with some
14   type of an expert or to determine if that was a
15   scientific possibility.
16       A.  Right.  No.  We did not.  And I think
17   that we did not do the testing at that time, no.
18       Q.  Okay.
19       MR. NOLAND:  Heather, can you pull up
20   Exhibit 14, please?
21   BY MR. NOLAND:
22       Q.  So, Myles, I asked Heather Barhorst, my
23   paralegal, to look through the entirety of the
24   files that you produced in this case; and by the

11  (Pages 29 to 32)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 33

1  way, we appreciate -- we appreciate all the time
2  and effort that your office underwent to do that
3  because this was a lot of material.
4      A.  Yeah.
5      Q.  But Heather put an exhibit together and
6  it will be a Group Exhibit 14 where she has
7  gathered all the photographs in your file, and I
8  am just going to have her scroll through these;
9  so you can take a look at all the photographs
10  that were located in your file, with the
11  exception that you guys downloaded some
12  photographs of some envelopes that were taken
13  during the pendency of this civil case that
14  you -- that would not have been in your file
15  during your work on the case.  So we are not
16  including those in this exhibit, okay?
17      A.  Okay.  Sure.
18      MR. NOLAND:  All right.  Heather, just
19  kind of scroll down.  And, Myles, you can tell
20  Heather if she is going too slow or too fast.
21      THE WITNESS:  Yes.  Okay.  I have seen
22  them or there is more, or?  Oh, there is the
23  statement.  Okay.
24  BY MR. NOLAND:

Page 34

1      Q.  Okay.  You have had a chance to look at
2  those photos.  I think there was 78 of them
3  that --
4      A.  I have.
5      Q.  So the only crime scene photos that
6  were contained in that exhibit are of the
7  victims?
8      A.  Yeah.
9      Q.  And then there is a photo, we are
10  looking at it right now, the first page is an
11  exhibit of Mr. Smith, a Polaroid taken at the
12  police station, right?
13      A.  Yes.
14      Q.  So, Myles, I am representing to you
15  based on Heather's work and our review of the
16  file that you did not have any photographs of
17  the scene of the murders.
18      A.  No.  We -- The assistants -- We had
19  some people go to Pat Brown's office and viewed
20  those, but, no.  There was none that we that we
21  reproduced at our server, but that was years
22  back.
23      But, right.  This is from the impounded
24  evidence -- I believe it was the Impounded

Page 35

1  Evidence Order, these exhibits.
2      Q.  And so, Myles, I will represent to you
3  that Patrick Brown, the impound clerk, doesn't
4  have the photos --
5      A.  Okay.
6      Q.  -- that were impounded anymore from the
7  trials.
8      A.  Okay.
9      Q.  So that your -- To my understanding
10  your office would not have been able to review
11  them because he doesn't have them.
12      A.  Well --
13      MR. CHANEN:  Hold on.  Hold on, Myles.
14  I object to this entire line of questioning.
15  Let Myles do the testifying, please, and if
16  Myles says he got photographs from the clerk,
17  the fact that the clerk doesn't have them today
18  doesn't mean Myles didn't get them from the
19  clerk in January of 2020.
20      THE WITNESS:  Well, no --
21      MR. NOLAND:  Hold on.  Hold on.
22  Stuart, Stuart, Stuart, I am going to say one
23  thing, stop.  Go ahead, Myles.
24      MR. CHANEN:  Yeah.  I object.  Form.

Page 36

1  Foundation.  Assumes facts not in evidence.
2      THE WITNESS:  I need to be a little bit
3  precise.  I think we had a motion to view
4  impounded evidence.  This -- this -- Whatever
5  photos I believe were from a viewing, not from a
6  taking.
7  BY MR. NOLAND:
8      Q.  Right.  I understand.  And there is a
9  motion to view in February of 2020.  Was that
10  the motion to view you are talking about?
11      A.  It may have even been earlier.  I am
12  not sure if an assistant by the name of Rafael
13  Bombino may have had a motion to view, but it
14  may have been earlier.  There may have been a
15  couple motions to view as we were preparing for
16  evidentiary hearings; so of course we are
17  looking for the original statement and things of
18  that nature.
19      Q.  Myles, did you ever see the crime scene
20  photos yourself?
21      A.  Not the photos -- I have seen these
22  photos.  You mean the -- Is that what you are
23  talking about?
24      Q.  Okay.  I will ask it again.  Other than

Royal Reporting Services, Inc.
312.361.8851

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 37

1　these photos in Exhibit 14, have you seen any
2　crime scene photos?
3　　　A.  I am not aware of any -- of seeing any
4　other crime scene photos myself.
5　　　Q.  And so Debbie Cohen would not have been
6　able to see any crime scene photos either
7　because they weren't in your file?
8　　　　MR. CHANEN:  Objection to form.
9　Foundation.  Incomplete hypothetical.
10　　　THE WITNESS:  Whatever is in our file
11　you have.  So that's what she would have been
12　able to see.
13　　　　MR. NOLAND:  Thank you.  Okay.  You can
14　take that down, Heather.
15　BY MR. NOLAND:
16　　　Q.  So, Myles, one of the assertions that I
17　think that was made -- one of the points that
18　was made at the hearing when you vacated the
19　case was that the police did not find the murder
20　weapon, correct?
21　　　A.  I believe that was correct, yes.
22　　　Q.  And the murder weapon as described by
23　Mr. Smith in his court-reported confession was a
24　straight-edge razor, right?

Page 38

1　　　A.  Yes.
2　　　Q.  And you are aware that -- Just describe
3　to me what -- what -- what's your understanding
4　of when the fire department goes into a house to
5　put out a fire -- Strike that.
6　　　　What's your understanding of when the
7　fire department went into this house to put out
8　the fire that the offender started, that what --
9　what -- what happened to the house as a result?
10　　　　MR. CHANEN:  Objection.
11　　　THE WITNESS:  I am sure it was burning,
12　and I am sure that there were portions of it
13　that were incinerated.
14　　　　MR. CHANEN:  Form and foundation.
15　BY MR. NOLAND:
16　　　Q.  And would you also presume that there
17　was a significant amount of debris and other
18　things laying around the house that would have
19　been caused by the fire department's work to put
20　out the fire?
21　　　　MR. CHANEN:  Form and foundation.
22　　　THE WITNESS:  Sure.  Yes.
23　BY MR. NOLAND:
24　　　Q.  And that that type of extreme debris

Page 39

1　from a fire scene could make it very difficult
2　to locate a straight-edge razor in all that
3　mess?
4　　　　MR. CHANEN:  Form and foundation.
5　　　THE WITNESS:  Yes.
6　　　　MR. NOLAND:  Okay.  Heather -- I am
7　going to move on to another topic.  Can you pull
8　up Exhibit 15, please?  So I am showing Myles an
9　exhibit, an e-mail string, and if you can just
10　scroll through the three pages so Myles can see
11　it, Heather, and then I am going to focus on the
12　first page.
13　　　　And, Heather, can you blow up just what
14　you have on the screen a little bit so you can
15　just see the -- Yeah.  There you go.
16　BY MR. NOLAND:
17　　　Q.  So, Myles, I am showing you the first
18　page of this Exhibit 15 and it is an e-mail --
19　It's an e-mail string between you and David
20　Yeager, one of the victims' son?
21　　　A.  Yes.
22　　　Q.  And I am just going to summarize what
23　David said to you as he was talking about it
24　whether there was forced entry and whether his

Page 40

1　mom, you know, would have been unlikely to let
2　somebody in except for somebody she knew and
3　your response is, I understand and I believe you
4　are correct.  It was an inside job.
5　　　　And would -- And so it was your view
6　and you were being forthcoming with David that
7　it was your belief that this crime was an inside
8　job?
9　　　　MR. CHANEN:  I am -- I am going to just
10　object to form and foundation --
11　　　THE WITNESS:  Well, I think that was
12　based upon a review of the transcripts as well,
13　but also based upon what I believe was
14　consistent with what Mr. Yeager told me as well.
15　BY MR. NOLAND:
16　　　Q.  And you thought that what he was
17　telling you was accurate information?
18　　　A.  I believe so, yes.
19　　　Q.  And can you just kind of summarize what
20　you mean by what he told you?
21　　　A.  Well, I think he said something along
22　the lines of -- and again, I am terrible at
23　remembering every single factual detail of
24　discussions that I have had years ago, but I

13  (Pages 37 to 40)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 41

1  believe he said that his parents would not let
2  people into the -- his mother and his
3  grandmother would not allow people into the
4  house; and they had burglar gates, I believe,
5  and they kept it locked.
6      And then there was a question as to
7  whether Robert would have had a set of keys or
8  some set of keys so that he would be able to
9  obtain entry; and he -- then of course the
10 transcripts about him having basically performed
11 odd jobs for the grandma and the mother and that
12 he spent some time there and did work there.
13 **Q.  You have a pretty good memory in my**
14 **opinion, but, okay.  Thank you for that answer.**
15     MR. NOLAND:  Okay.  All right.  You can
16 take that down, Heather.
17 BY MR. NOLAND:
18 **Q.  I want to talk -- move on to the next**
19 **topic which is whether or not this crime had**
20 **anything to do with a gun.  And there is a --**
21 **There were some -- There is a reference in I**
22 **think the Scene Supplementary Report you may**
23 **remember that there were some -- there was some**
24 **ammunition from I think a 22-caliber on the**

Page 42

1  **ground somewhere in the house.  Do you remember**
2  **that vaguely?**
3      A.  There were some weapons evidence that
4  was missing, or, no.  I'm sorry.  There was some
5  evidence, bullets or a gun that was reported
6  missing maybe by Diane.
7  **Q.  The victims, though, were killed**
8  **according to the pathology report or the**
9  **coroner's report by slitting their throats; is**
10 **that correct?**
11     A.  Yes.
12     MR. CHANEN:  Form and foundation and
13 Dan Noland testifying.  Go ahead.
14     THE WITNESS:  Well, so -- That's
15 truly -- There was a coroner that testified at
16 trial and that's true.  That is the -- That is
17 what happened.
18 BY MR. NOLAND:
19 **Q.  And there was no evidence that a bullet**
20 **was found in the bodies or that they had any**
21 **bullet holes in their -- in them, right?**
22     MR. CHANEN:  Form and foundation.
23     THE WITNESS:  No.  There wasn't.
24     MR. NOLAND:  Okay.  All right.

Page 43

1  Heather, can you pull up Exhibit 12 again,
2  please?  So, Myles, I am showing you your
3  July 6, 2018 memo again.  And, Heather, can you
4  go to Page 6621 Bates stamp?
5      THE WITNESS:  Yes.
6      MR. NOLAND:  Okay.  One second.  So,
7  Heather, if you can just scroll down a little
8  bit.  The sentence beginning with Szybist and
9  can you just read that sentence and then what
10 you put in all quotes there, you can read it to
11 yourself.
12     MS. BENJAMIN:  I think you meant all
13 caps.
14     MR. NOLAND:  Not all quotes, all caps.
15 Thanks, Stacy.
16     MS. BENJAMIN:  Uh-huh.
17     THE WITNESS:  Yes.
18     MR. NOLAND:  Okay.  Now, Heather, can
19 you scroll down to Page 6628, please?  If you
20 can scroll down to kind of the second half of
21 the page.
22 BY MR. NOLAND:
23 **Q.  Myles, if you could read these three**
24 **paragraphs silently to yourself that you wrote**

Page 44

1  in this memo.
2      A.  Yes.
3  **Q.  And so you indicated in here that you**
4  **thought that his testimony relative to Brogan**
5  **force-feeding him the details on two or three**
6  **occasions and told him to answer just like that**
7  **is absurd.**
8      A.  Yes.
9  **Q.  And then in the last paragraph you**
10 **characterized it as unbelievable that Smith**
11 **would suggest that he was tortured, yet then**
12 **still have the wherewithal to refuse to sign the**
13 **statement?**
14     MR. CHANEN:  Objection to form and
15 foundation.
16     THE WITNESS:  That's correct.
17 BY MR. NOLAND:
18 **Q.  And that, in fact, the last -- You**
19 **stated that Smith himself recognized that**
20 **signing the document is like paying a bill, and**
21 **you quote his testimony to show that he was in**
22 **control of that situation?**
23     A.  Right.  I likened it to him not being
24 forced to take his wallet out and pay for

14  (Pages 41 to 44)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 45

1  something if he is not signing his name to
2  something.
3      Q.  Okay.  So it was your view that it
4  would have been -- Well, strike that.
5  Withdrawn.
6      MR. NOLAND:  Okay.  You can take that
7  down, Heather.
8  BY MR. NOLAND:
9      Q.  I want to talk about the fingerprints
10  on a gas can, that topic, okay?
11      A.  Okay.
12      Q.  Do you recall that there was testimony
13  at Smith's trial that the fingerprint examiner
14  initially looked at a print that was pulled from
15  the gas can and thought that it was suitable for
16  comparison purposes; but then he took a look at
17  it again a couple weeks later and opined that it
18  was unsuitable for comparison purposes?
19      A.  Correct.
20      Q.  And --
21      MR. NOLAND:  Heather, if you can pull
22  up Exhibit 16, please.
23  BY MR. NOLAND:
24      Q.  So, Myles, I am showing you -- if you

Page 46

1  can just scroll down -- Myles, is that big
2  enough for you to see?
3      A.  I think I can see it, yes.
4      MR. NOLAND:  Go back to that first
5  page, will you, Heather?  So it says -- it says,
6  it's People Exhibit 74.  There is handwriting on
7  an envelope.  Contains negatives.  Will not scan
8  and now you can scroll down -- scroll down,
9  Heather.
10      All right.  Keep on going.  And looking
11  at the last page of this, Page 5 of 5 of
12  exhibit -- this exhibit, and there is some
13  handwriting on a smaller manila envelope that
14  says not suitable.
15      THE WITNESS:  Yes.
16  BY MR. NOLAND:
17      Q.  And so, Myles, from looking at these --
18  And you may have seen these before -- Well,
19  strike that.
20      I'll represent to you that these are in
21  the impounded evidence now.
22      A.  Sure.
23      Q.  And line up with the fingerprint
24  examiners' testimony that he took -- he takes

Page 47

1  photographs of the print lifts and that's what
2  these are, the negatives of those.
3      A.  Okay.
4      MR. CHANEN:  I am going to object to
5  form and foundation.  Dan, are you representing
6  that inside this envelope marked "not suitable"
7  is something -- is some lift of a fingerprint?
8  Is that what you are testifying to?
9      MR. NOLAND:  I am summarizing the
10  fingerprint examiner's testimony at the trial.
11      MR. CHANEN:  And he said that about
12  Exhibit No. 47?
13      MR. NOLAND:  I think it was 74 -- I
14  thought it was 74.  Maybe I got that wrong.  Can
15  you go up -- That might have been transposed.
16  Let's just go to his testimony.
17      Heather, can you pull up the
18  fingerprint examiner's testimony, please?  Let's
19  go to the first page just so, Heather, I can put
20  it -- and we will mark this as exhibit, what are
21  we, 23, Heather?
22      MS. BARHORST:  Yes.  It will be 23.
23  BY MR. NOLAND:
24      Q.  So showing the witness Exhibit 23 which

Page 48

1  is an excerpt of the trial testimony, and it's
2  in People V. Smith on August 30, 1990.
3      Do you see that, Myles?
4      A.  Yes.
5      Q.  Can you go to the next page?  And we
6  have highlighted there on this page it says John
7  Du Shane.  Does that refresh any recollection
8  that Mr. Du Shane was the fingerprint examiner?
9      A.  I believe I have seen this transcript
10  and it does refresh my recollection that
11  Du Shane was the fingerprint examiner.
12      MR. NOLAND:  All right.  Heather, can
13  you scroll kind of slowly because I am going to
14  have to identify where it is he starts talking
15  about this photo -- these photos.  Keep on
16  going.  Keep on going.
17      THE WITNESS:  Right there.  Oh.
18      MR. NOLAND:  All right.  Go ahead.
19  Myles wanted to read a prior page.
20      THE WITNESS:  Yeah.
21      MR. NOLAND:  Okay.  Go ahead.  Take
22  your time, Myles.
23      THE WITNESS:  Sure.
24      MR. NOLAND:  And you are looking at --

15  (Pages 45 to 48)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

---

Page 49

1   Can you just show him just so we can put on the
2   record what page we are reading from?
3       THE WITNESS: This one is D7.
4       MR. NOLAND: D7. Okay. Yeah. Blow it
5   up so we can actually read it.
6       THE WITNESS: Uh-huh. Yes. Yes. Got
7   it.
8       MR. NOLAND: Okay. All right. Go to
9   the next page.
10      THE WITNESS: Thank you. Yes.
11  BY MR. NOLAND:
12      Q.   And then just beginning with Line 11,
13  Du Shane is shown by the prosecutor Exhibit 74.
14      A.   Yes, which I think is back to where we
15  were.
16      Q.   Right.  So just looking at the bottom
17  there, showing him Exhibit 74, please identify
18  them for the ladies and gentlemen of the -- next
19  page -- jury.
20      A.   Yes.
21      Q.   And Du Shane says these are negatives
22  of a gas can showing any possibility of prints
23  or latent prints, rather, that may be on the
24  surfaces at the time these were lifted.

---

Page 50

1       A.   Right.
2       Q.   Are those the negatives from the
3   prints -- Question:  Are those the negatives
4   from the prints you examined back in September
5   and October of 1987?
6       Answer:  Yes, they are, sir.
7       Okay.  Oh, I'm sorry.  And then if you
8   go to Line 11 of this page, we are looking
9   at --
10      MR. NOLAND: And what page are we on,
11  Heather?
12      THE WITNESS: D9.
13      MR. NOLAND: D9, go up to Line 11.
14  Du Shane -- I think we might have lost where I
15  wanted to ask him about.  Can you go up a little
16  bit?
17  BY MR. NOLAND:
18      Q.   All right.  Then Line 11 the prosecutor
19  asks him whether or not People's Exhibit 74, is
20  it your determination that these prints are not
21  suitable?  And he says -- and Du Shane says they
22  are not suitable for comparison.
23      A.   Right.
24      Q.   Okay.  So, Myles, after having

---

Page 51

1   refreshed recollection with reading that
2   transcript, my question for you is:  Did you --
3   Did you hire any type of fingerprint examiner to
4   double-check and look at those negatives in
5   Exhibit 74 in those photographs to double-check
6   Du Shane's work and his opinion that they were
7   unsuitable?
8       A.   No, we did not.
9       Q.   And so you would have no -- You would
10  have no reason to question Du Shane's opinion
11  presented at the trial that in fact the print
12  that was pulled from the gas can was unsuitable
13  for comparison?
14      MR. CHANEN: Object to the form and
15  foundation.
16      THE WITNESS: Well, no.  I do not have
17  any basis to object or question his testimony on
18  that score.
19      MR. NOLAND: Okay.  That's it.  Thanks,
20  Heather.  Heather, can you -- I am going to move
21  on briefly to the Smith going to the scene and
22  winding up in the blood.  So, Heather, can you
23  pull up Exhibit No. 17?
24      So, Myles, I am showing you Exhibit 17.

---

Page 52

1   And, Heather, if you can just blow up the bottom
2   of it so I can identify it.
3   BY MR. NOLAND:
4       Q.   And, Myles, I am showing you the Scene
5   Supplementary Report with Detective LaRaje
6   (phonetic) in Box 1.  You have seen this before,
7   right?
8       A.   Yes.
9       MR. NOLAND: And, Heather, if you can
10  go to the -- I forget which page it was, Page 8.
11  BY MR. NOLAND:
12      Q.   Showing, Myles, Page 8, Detective
13  LaRaje reports that she and her husband were
14  informed of the demise of the victims; and at
15  this time, Robert Smith rushed into the house
16  and removed from -- and into the kitchen and
17  threw himself onto the floor and had to be
18  physically restrained, transported into the area
19  headquarters to be interviewed.
20      That's what the report says?
21      A.   That's what this supp report says, yes.
22      Q.   Thank you.  So would it be -- You know,
23  obviously since this says this, it would be an
24  inaccurate statement to suggest that there was

---

16  (Pages 49 to 52)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 53

1  no report of Smith diving into the blood?
2      MR. CHANEN:  I am going to -- Hold on.
3  Hold on.  I am going to object to the form, the
4  foundation of the question.  It's an incomplete
5  hypothetical, and it's leading.
6      THE WITNESS:  I mean, this is in a
7  supp.  I don't see general progress report; but
8  so, I mean, is this in a supp report?  Yes, it
9  is.  I think the document speaks for itself.
10 BY MR. NOLAND:
11     Q.  Okay.  And you have never been a
12 Chicago police officer, correct?
13     A.  No, I have not.
14     Q.  And there is nothing that you are aware
15 of that would require detectives to record
16 things duplicatively in both a general progress
17 report and in a supplemental report; isn't that
18 true?
19     MR. CHANEN:  Form.  Form and
20 foundation.
21     THE WITNESS:  You mean like an internal
22 guideline or protocol that they had to follow
23 with respect to --
24

Page 54

1  BY MR. NOLAND:
2      Q.  Right.
3      A.  Not that I am aware of any specific
4  internal protocol.
5      Q.  Okay.
6      MR. NOLAND:  You can take that down,
7  Heather.
8  BY MR. NOLAND:
9      Q.  Would you agree with me that there is
10 no evidence that the offender cut himself during
11 the commission of the crime?
12     A.  I don't believe there is any evidence
13 of -- well, that I have seen that the offender
14 cut himself.
15     Q.  And would you also agree -- I'm sorry.
16 Were you done?
17     A.  I am.
18     Q.  Would you also agree with me that there
19 is no evidence that Smith had any cuts on his
20 body when he was brought to the police station?
21     A.  Well, see, that's an interesting --
22 That was contested by them about whether there
23 were bruises or something on ribs when he was
24 brought to the station, but I have not seen

Page 55

1  myself specific evidence on the bruise sheet of
2  a cut or an -- All I saw was -- I think it was
3  either -- It was eight.  It was like a scar or a
4  tattoo on the bruise sheet.
5      Q.  And I am focusing specifically on a
6  cut, on a cut that would have caused him to
7  bleed.  There certainly -- There certainly is no
8  evidence in the record of any cut that caused
9  Smith to bleed?
10     A.  I would agree.
11     Q.  Okay.  Okay.
12     MR. NOLAND:  You can take that down.
13 BY MR. NOLAND:
14     Q.  Am I correct that it was the -- At the
15 time, it was the police and prosecution theory
16 when Smith was tried back in 1990 that after
17 Smith committed the murders, that he did his --
18 did the -- did his laundry in the basement in
19 order to try to get the blood of the victims off
20 of his body?
21     A.  I think that was a theory.
22     Q.  And there was --
23     A.  I think it may have even been mentioned
24 in the statement, if I recall.

Page 56

1      Q.  And I know that you never saw the crime
2  scene photos, but I will represent to you that
3  there is all sorts of evidence that there is
4  blood in the basement at or around the washing
5  machine and some of the things around there.
6  You are aware of that, right?
7      A.  Yes.
8      MR. CHANEN:  I am going to object to
9  the form and foundation of the question.
10     THE WITNESS:  Yeah.  There were sheets
11 in the -- yes.
12 BY MR. NOLAND:
13     Q.  Okay.  That's all I have on that.
14     Did you -- Do you remember -- I am
15 going to move on to the lint filter from the
16 dryer, do you remember that?
17     A.  Yes.
18     Q.  And you recall that the crime labs, CPD
19 Crime Lab, did not have any indication of any
20 blood in the lint filter?
21     A.  That's what I recall.
22     Q.  Did you consult with any expert
23 witnesses to determine whether or not it would
24 have been expected that had the offender done

17  (Pages 53 to 56)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 57

1  his laundry, washed them in the washer and -- to
2  get the blood off and then dried the clothes
3  whether or not it would be expected to find any
4  remnants of blood in the lint filter?
5      A. No. We did not consult with an expert
6  witness on that.
7      Q. Next topic. You never considered Diane
8  Smith as the offender, as a suspect in this
9  case, did you?
10     A. No.
11     Q. And Derek Yeager is the other brother,
12  correct?
13     A. There is two brothers. There is Derek
14  and David.
15     Q. David is the one up in Milwaukee and
16  Derek lives in Chicago; does that refresh your
17  recollection?
18     A. Correct.
19     Q. And you had more contact with David,
20  correct, the accountant?
21     A. Oh, I did, yes, with David.
22     Q. And do you recall that Derek had an
23  alibi that he was at his home on his couch and
24  his wife was in the bedroom that night?

Page 58

1      MR. CHANEN: I am going to object to
2  the form and foundation of the question.
3      THE WITNESS: I believe Derek was the
4  last one to see them when he left, the last
5  member of the family to see them, immediate
6  family; and I do recall about the being in the
7  family home with the wife.
8  BY MR. NOLAND:
9     Q. And would you agree with me that there
10  is no evidence that Derek Yeager committed these
11  homicides?
12      MR. CHANEN: I am going to object to
13  the form, the foundation. Leading. Incomplete
14  hypothetical. If you show him all the evidence
15  regarding Derek.
16      THE WITNESS: Well, I mean none that --
17  none that would specifically lead you to believe
18  that that person is a target or they are
19  somebody who is -- is someone we have to
20  consider and go after. But the -- I believe
21  there was some -- something about a mortgage
22  application or something that some kind of
23  financial, and I just can't remember right now;
24  but I think there was some kind of a financial

Page 59

1  application that involved the mother or the
2  grandmother and Derek.
3      But besides that, I don't know, and
4  maybe being the last one to see them besides the
5  Robert Smith in the statement.
6  BY MR. NOLAND:
7     Q. And so I didn't see any indication of
8  any issue with the mortgage application in their
9  file. Are there any documents that your office
10  withheld?
11     A. No. I think there was a conversation
12  with Diane. It was either Diane or -- because I
13  believe there was a conversation at one point I
14  remember -- I forget when -- but, you know,
15  whether anyone -- they were owed money or
16  somebody -- there was some kind of financial
17  issues, and it may have been about Robert as
18  well. You know, how does he get his income?
19      And at the time, I think he was working
20  at the Safer Foundation, but something came up
21  about an application or a mortgage or something.
22  But to answer the question, no. I didn't -- I
23  did not consider him a suspect.
24     Q. Thank you. Was a statement made -- Do

Page 60

1  you recall that Mr. Smith's lawyers with respect
2  to the underwear were alleging that there was
3  inappropriate paperwork, CPD paperwork, with
4  respect to the recovery of the underwear? Do
5  you recall that issue generally?
6      MR. CHANEN: I'm sorry. I'm sorry. I
7  am just going to call for a clarification.
8  Which -- Are you talking about his criminal
9  defense lawyers or his TIRC lawyer or are you
10  talking about Ariel and me? You just said do
11  you recall --
12      MR. NOLAND: The question stands. If
13  you have an objection, Stuart, go ahead and make
14  it. You don't need to speak.
15      MR. CHANEN: Form. Form. Foundation.
16      THE WITNESS: I recall there being
17  something in the TIRC desposition --
18  disposition, not desposition, disposition about
19  there being no photos and this is in a headnote
20  which led us the wrong way, but there being no
21  photos of the recovery of those shorts; and that
22  was on the -- in the second to last page of the
23  disposition.
24

18 (Pages 57 to 60)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 61

1  BY MR. NOLAND:
2      Q. All right. And we established at your
3  last deposition that you did not have the photo
4  that I showed to you -- Well, strike that.
5          MR. NOLAND: Heather, can you pull up
6  Exhibit 3?
7  BY MR. NOLAND:
8      Q. And by the way you got the TIRC file,
9  right?
10     A. Yeah.
11     Q. Right.
12     A. That's what I am going on.
13         MR. NOLAND: So I am showing
14 Mr. O'Rourke or Myles what we showed him last
15 time, a Group Exhibit 3, which were the Chicago
16 Fire Department photos. Heather, if you can
17 scroll down through these and stop right there.
18         THE WITNESS: Yes.
19         MR. NOLAND: So can you blow that --
20 blow that up, Heather? A little more.
21         THE WITNESS: Yes. I see what you
22 are -- yes. At the top of the stairs, you have
23 blue underwear at the top of the stairs.
24 BY MR. NOLAND:

Page 62

1      Q. Right. Right. So these are -- These
2  are -- And this photo was taken at approximately
3  4:30 a.m. by the Chicago Fire Department?
4      A. And I think that's the disposition in
5  my files and that no photos were taken --
6          MR. CHANEN: Myles, I am going to
7  object to form and foundation.
8          THE REPORTER: And I'm sorry, sir,
9  Mr. O'Rourke, could you repeat your answer,
10 please?
11         THE WITNESS: I said I have a
12 disposition from Torture Inquiry and Relief
13 Commission together with I don't know how many
14 other pages of exhibits, maybe thousands, saying
15 that there were no photos taken of these shorts.
16 BY MR. NOLAND:
17     Q. So obviously --
18     A. Sorry. I am not done.
19     Q. Oh. I'm sorry. Go ahead.
20     A. I wanted to clarify prior testimony,
21 there is a footnote in the disposition that how
22 to came to my office saying there is no photos
23 of this.
24     Q. Thank you, Myles. I appreciate that,

Page 63

1  for explaining that, and that would -- That
2  would explain why you would have had no reason
3  to think to try to get this photo because it was
4  represented to you by TIRC that there was no
5  photo?
6      A. I trust the state agency.
7      Q. Got it. So now seeing this photo taken
8  at 4:30 a.m. of Smith's shorts before any
9  detective would have had the opportunity to
10 plant them, that would have been crucial
11 information for you to have during your
12 prosecution; is that right?
13     A. It certainly would have been relevant.
14     Q. And Ms. Cohen would not have made the
15 statement to judge -- the judge that there was
16 no photo of the underwear on the first step if,
17 in fact, you had this photo because obviously it
18 exists?
19         MR. CHANEN: Object to -- Object to
20 form. Foundation, and Mr. O'Rourke testifying
21 as to what Ms. Cohen would or would not have
22 done.
23         THE WITNESS: And I am going to -- I
24 can't speculate. I hope she wouldn't have if we

Page 64

1  had a photo.
2  BY MR. NOLAND:
3      Q. And, Myles, am I correct that had you
4  had this photo, this would have changed your
5  office's evaluation of whether or not to vacate
6  Smith's conviction?
7          MR. CHANEN: I am going -- Form and
8  foundation.
9          THE WITNESS: Well, I mean, it would --
10 I can't say for certain about what would have --
11 whether it would have been the -- changed it,
12 but I can tell you that it was -- it was not an
13 easy decision to have made, and it certainly is
14 not one that would have not been made, you know,
15 by excluding it if we had it from what we
16 received. It would have been taken into
17 consideration.
18 BY MR. NOLAND:
19     Q. So just to clarify, it may have changed
20 your office's decision to vacate the case had
21 you had this photo?
22         MR. CHANEN: Object to form.
23 Foundation. Incomplete hypothetical.
24         THE WITNESS: I am not certain, but

19 (Pages 61 to 64)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 65

1 it's -- but it is a piece of information we did
2 not have.
3 BY MR. NOLAND:
4    Q. And it's possible? You are not certain
5 because it's two years later and you didn't have
6 it at the time, but it's possible that it might
7 have changed the ultimate decision to vacate the
8 case?
9    A. It's another piece of the puzzle that
10 would have been presented to me so anything is
11 possible. It is possible. It is a piece of
12 evidence we didn't have, for one.
13    MR. NOLAND: Okay. You can pull that
14 down. Heather, can you pull up Exhibit 1,
15 please?
16 BY MR. NOLAND:
17    Q. I am showing you, again, the response
18 to the Executive Clemency Petition.
19    A. Yes.
20    MR. NOLAND: And just quickly, Heather,
21 if you can go to Page 5; and if you can blow up
22 the first full paragraph, and if you can just
23 read that silently to yourself.
24    THE WITNESS: Okay. You mean starting

Page 66

1 with, Defendant also agreed?
2 BY MR. NOLAND:
3    Q. Yes. Just that short paragraph.
4    A. Yes.
5    Q. And in this paragraph, you said that
6 defendant confessed to the killings in detail in
7 the presence of the assistant state's attorney,
8 right?
9    A. Yes. I mean, not great detail but he
10 did confess. There were details and it did
11 survive a challenge in sufficiency of the
12 evidence and appeal because there was some
13 corroboration. It's not the best detail, but
14 there is some detail.
15    Q. And understandably Mr. Smith, I think
16 even by his own admission, was doing drugs all
17 night, right?
18    A. Yes.
19    MR. CHANEN: Well, wait a second.
20 Which night, Dan? Objection to form.
21 Foundation. Mischaracterizes the testimony.
22 You don't mean the night he gave his confession,
23 do you?
24    MR. NOLAND: The night of the murders.

Page 67

1    THE WITNESS: I think it was -- Well, I
2 mean, it would have been the night if it was
3 September 19, 1987.
4 BY RM. NOLAND:
5    Q. The early morning I guess if we are
6 quibbling over like whether 3:00 in the
7 morning -- If we are quibbling over when he is
8 over at his girlfriend's house doing drugs all
9 night at 3:00 or 2:00 o'clock after, you know --
10 or I guess earlier and then leaves -- I am going
11 to withdraw the question.
12    Would you agree with me that there is
13 evidence that Smith was doing drugs in the early
14 morning hours of September 19, 1987?
15    A. Yes, there is.
16    Q. Okay. That's it.
17    MR. NOLAND: Heather, can you pull up I
18 think it's going to be Exhibit 22? So if you
19 can blow it up so Myles can tell what it is.
20 BY MR. NOLAND:
21    Q. So I am showing you an e-mail string
22 with you and David Yeager dated April 24th of
23 '20.
24    A. Yes.

Page 68

1    Q. And it's a three-page document just
2 because I wanted to -- I tried to get the
3 complete e-mail string. I am not positive if I
4 succeeded.
5    A. Yes.
6    Q. But the focus is on this first page
7 again.
8    A. Sure. I see it.
9    MR. NOLAND: So first of all, can you
10 go down, Heather, to -- Okay. Yeah, that
11 sentence there.
12 BY MR. NOLAND:
13    Q. Myles, do you see it says -- you write
14 to David, We received this clemency petition
15 yesterday. So you are talking about Smith's
16 petition for executive clemency that he sent to
17 the governor?
18    A. I think that's -- You are showing me
19 the response that we filed towards it, so, yes.
20    Q. And then you tell David that a cursory
21 review shows that it contains numerous
22 misrepresentations concerning defendant's
23 claimed innocence and abuse. Do you see that?
24    A. Yes.

20  (Pages 65 to 68)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 69

1    Q.  And that was a truthful statement that
2  you were making to David?
3    A.  Yes.
4    Q.  And then the -- You go on with several
5  sentences, and then I am going to focus on the
6  next paragraph.
7    A.  Sure.
8    Q.  You tell David that in the years since
9  the arrest and prosecution of Smith, his claims
10  have further embellished to the point of
11  absurdity.  He now claims --
12    A.  Yes.
13    Q.  And that's a truthful statement, right?
14    A.  Yes.  More fully focusing on the
15  coercion claims, but, yes.
16    Q.  He now claims an evidence technician
17  named Thomas Bachelder participated in his
18  custodial interrogation.
19    A.  Right.
20    Q.  Forensic technicians do not conduct
21  interviews of murder suspects at Area 2.
22    A.  Right.
23    Q.  Go ahead.
24    A.  Never seen it.

Page 70

1    Q.  Yeah.  Me neither.  So --
2    MR. CHANEN:  Thanks for adding that,
3  Dan.
4  BY MR. NOLAND:
5    Q.  So you are pointing out an example of
6  the absurdity of Smith's coercion claims with
7  that he is now claiming that an ET beat him up?
8    A.  Well, yes.
9    MR. NOLAND:  That's all I have of that.
10  BY MR. NOLAND:
11    Q.  With respect to the -- Strike that.
12    Would you agree, Myles, that Detectives
13  Higgins, Rice, and then Lt. Phil Cline did not
14  have a history of allegations of abuse against
15  them.  Higgins, Rice, and --
16    MR. CHANEN:  I'm sorry.  I'm sorry.
17  Before you answer, Myles, I just -- because I
18  was looking at something, I missed the beginning
19  part of the question.
20    Could I -- Dan, could you either repeat
21  the question or have it read back and then I
22  will --
23    MR. NOLAND:  Yes.  I will just read it
24  again.  I will just state it again.

Page 71

1  BY MR. NOLAND:
2    Q.  Would you agree with me that Detective
3  Higgins, Detective Rice, and Lt. Cline did not
4  have a history of allegations of physical abuse
5  lodged against them?
6    MR. CHANEN:  My only objection is
7  compound, and I think it makes sense to take
8  them one at a time; but other than that, I don't
9  object to the -- your asking him that question.
10    THE WITNESS:  I can answer that.  And I
11  think I understand it even though it may be
12  compound.  The -- As to Higgins, I didn't have
13  anything on Higgins, and I have been doing it
14  for about 13 years.
15    As to Rice, that's not a true
16  statement.  There were allegations against Rice
17  before.  As to Cline, absolutely no allegations
18  of abuse against Cline whatsoever that I am
19  aware of.
20  BY MR. NOLAND:
21    Q.  All right.  Off the top of your head as
22  to Rice, do you remember what cases you are
23  thinking of that he had alleged against him?
24    A.  Corey Batchelor, Kevin Bailey.

Page 72

1    Q.  And any other cases other than
2  Batchelor and Bailey?
3    A.  Not that I can speak to off the top of
4  my head.
5    Q.  All right.  And there has been no
6  finding that Rice committed any misconduct with
7  respect to Batchelor and Bailey.  There was an
8  allegation against them, is what you are
9  remembering?
10    A.  There were allegations, yes.  It wasn't
11  like a -- There was no OPS, no IPRA finding, no
12  judgment in a civil case.  No -- I'm sorry.  I
13  am looking at Justin's note at the bottom of the
14  screen.  But, no.  There was no like judgment,
15  but there were allegations in another case that
16  I am aware of, so I can't really say to you that
17  there were no allegations.
18    Q.  Yes.  And Batchelor and Bailey is the
19  same case, right?  One case?
20    A.  Well, yes.  It was -- It was the same
21  investigation.
22    Q.  Okay.
23    MR. NOLAND:  I think -- Thanks for
24  pointing that out.  The media guy -- the

21  (Pages 69 to 72)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 73

1    videographer has to take a -- change this, so go
2    ahead, Justin.  Should we take a five-minute
3    break?
4           MR. CHANEN:  Sure.  That's a good idea.
5           THE VIDEOGRAPHER:  Okay.  We are going
6    off the record at 11:27 a.m.  This is the end of
7    Media Unit 1.
8           (Whereupon, a short recess was
9           taken.)
10          THE VIDEOGRAPHER:  Okay.  We are back
11   on the record.  The time is 11:41 a.m.  This is
12   the beginning of Media Unit 2.
13          MR. NOLAND:  Heather, could you pull up
14   Exhibit 21, please?  And is this just a
15   one-pager, Heather?
16          MS. BENJAMIN:  It looks like two pages.
17          MR. NOLAND:  Two-pager.  Okay.  Can you
18   blow it up so Myles can see what it is?
19   BY MR. NOLAND:
20      Q.  So, Myles, I am showing you Exhibit 21
21   which is an e-mail exchange July 18, 2018
22   between Shane, I need cheaters, Costello?
23      A.  Costelloe.  Costelloe, yes.  Shane
24   Costelloe.

Page 74

1       Q.  Costelloe?
2       A.  You know, that's always been a
3    question.  I think it's -- we will go with
4    Costelloe for now.
5       Q.  Is he an attorney at your firm?
6       A.  No.  He was at one time.  He was at one
7    time an attorney at our firm.
8       Q.  Okay.  And this e-mail exchange is with
9    your dad, right?
10      A.  Yes.  It's between Mike O'Rourke and
11   Shane.
12      Q.  Okay.  And I want to just direct your
13   attention -- Heather, scroll down to just about
14   an inch -- just the first paragraph and Shane is
15   writing to Mike O'Rourke, As you requested, I
16   have reviewed again the letter Kyle Jacob at
17   Schiff sent you re possible settlement of the
18   Robert Smith case.  Their position is that they
19   seek time served without his convictions being
20   overturned.
21          So who is Kyle Jacob?
22      A.  Kyle Jacob was predecessor counsel for
23   Robert Smith.
24      Q.  All right.  And so in 2018, Smith

Page 75

1    through his lawyers was indicating that he would
2    take time served in exchange for pleading guilty
3    to the crimes?
4           MR. CHANEN:  I am going to object to
5    the form and foundation of that question and
6    misstates the record.
7           THE WITNESS:  I mean, that's what Shane
8    is relating, yes.
9    BY MR. NOLAND:
10      Q.  Do you remember your office -- your
11   office rejected that offer?
12      A.  Yes.  We spoke with Kyle Jacob about
13   the bases for his -- some of the conclusions he
14   gave, yes, and we did not agree to that, no.
15      Q.  Okay.  That's all I have of that.  Oh,
16   then in 2020 of course your office was -- in
17   April of 2020 sent a letter to the governor
18   objecting to Mr. Smith's petition for executive
19   clemency, right?
20      A.  Correct.
21          MR. NOLAND:  Okay.  Heather, could you
22   pull up Exhibit 2, please?  Myles, I am showing
23   you Exhibit 2 from that first deposition.  It's
24   the October 23, 2020 transcript before Judge

Page 76

1    Davis where the case was vacated.
2           And, Heather, if you can go to Page 4;
3    and if you can -- yeah.  Perfect.  Can you go a
4    little bit up where it begins, Upon reviewing so
5    start with Line 5 so if he can review -- read
6    that.
7    BY MR. NOLAND:
8       Q.  So if you can just read that silently
9    to yourself, I am going to have you read to
10   the -- you know, maybe -- Have you recently read
11   this?  Maybe I don't need you to refresh your
12   recollection?
13      A.  I have read this.  I mean, I am reading
14   it right now, but, yes.
15      Q.  So I have just got a few questions.  We
16   talked about some last time.
17      A.  Okay.
18      Q.  So Ms. Cohen states on behalf of the
19   office that the State has formed an opinion that
20   there are critical issues with the evidence that
21   was recovered, and I know we have already talked
22   about the boxer shorts and not recovering the
23   murder weapon.
24      A.  Yep.

22  (Pages 73 to 76)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 77

1      Q.  Are there any other items of evidence
2  that your office was relaying to Judge Cohen in
3  that -- in that sentence?
4      A.  Those were two of them, yes.  That
5  was -- and I think that was -- It had been
6  mentioned to us by defense counsel about a sheet
7  that was missing and -- but those are certainly
8  items that were, you know, no photos of the
9  underwear were -- was part of the issues as
10  well.
11      Q.  Got it.
12      A.  Yeah.
13      MR. NOLAND:  Heather, can you pull up
14  the -- I think it's Exhibit 5?
15  BY MR. NOLAND:
16      Q.  So, Myles, I recognize from prior
17  testimony you haven't seen this photo, right?
18  Well, strike that.
19      Have you seen this photo before, you
20  personally?
21      A.  Me personally, no.  I don't think I
22  have.
23      Q.  You see kind of in the middle right if
24  you can put the hand right where the blue sheet

Page 78

1  is, do you see that, Myles?
2      A.  Yes.  There is a blue -- a blue sheet.
3      Q.  And go ahead.  I'm sorry.  I
4  interrupted you.
5      A.  I think it's -- it appears to be a blue
6  sheet.
7      Q.  And you recall that there is a yellow
8  sheet -- there was a yellow sheet that was
9  recovered, too?
10      A.  Yes.
11      Q.  Do you recall that the crime lab
12  serologist Christine Anderson had the blue
13  sheet, and she conducted testing on it and found
14  that there was human blood on it?
15      A.  Yes.
16      Q.  What is -- As you sit here today, do
17  you recall what -- what, if any -- Strike that.
18      As you sit here today, do you recall
19  what issue that Mr. Smith's counsel was making
20  with respect to the blue sheet?
21      A.  No.  I think there was one sheet that
22  may have been missing from production.  Now I am
23  not certain whether it was blue or yellow, but I
24  think there was some kind of an issue that was

Page 79

1  presented to us about a piece of evidence being
2  missing with respect to a bed sheet.
3      Q.  Yes.  Okay.  And so, like, what's
4  the -- assume hypothetically, Myles, that the --
5  that this is the blue sheet that they are
6  referring to and that this blue sheet existed at
7  the time of the 1990 trial and that the
8  serologist had examined it and reported on her
9  findings of human blood and that the blue sheet
10  was then destroyed by the Chicago Police
11  Department sometime thereafter, after the 1990
12  trial.
13      Is that relevant to your office's
14  evaluation of whether to vacate the case?
15      MR. CHANEN:  Well, I am going to object
16  to the form and foundation; and when you say is
17  that relevant, do you mean the destruction or do
18  you mean all four pieces that you just
19  described?
20  BY MR. NOLAND:
21      Q.  Go ahead and answer, Myles.
22      A.  Well, I think it goes to -- I mean, it
23  does go to what we have.  So is it relevant?  I
24  think -- I think it is part of the facts that

Page 80

1  were provided to us, and so certainly the
2  existence or nonexistence are relevant.
3      Q.  Well --
4      MR. CHANEN:  Relevant or irrelevant?
5  I'm sorry.  I just didn't hear the answer.
6  Relevant or irrelevant?
7      THE WITNESS:  I think the existence or
8  nonexistence of a piece of evidence is relevant
9  to our investigation.
10  BY MR. NOLAND:
11      Q.  So there was human blood found
12  on the blue sheet which Mr. Smith has stipulated
13  was the victims' blood and so in what way can
14  you think of today that the absence of the blue
15  sheet could somehow exonerate Mr. Smith?
16      MR. CHANEN:  Object to the form and
17  foundation.
18      MR. NOLAND:  Let me ask that again.
19  BY MR. NOLAND:
20      Q.  Are you aware of any evidence in the
21  record that would support a conclusion that the
22  absence of the blue sheet today in 2022 even
23  though it existed in 1990 indicates that Smith
24  is innocent?

23  (Pages 77 to 80)

Royal Reporting Services, Inc.
312.361.8851

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 81

1    A.  In the record, no.
2    Q.  Okay.  So --
3        MR. CHANEN:  Same objection.
4        MR. NOLAND:  Going back to that prior
5    transcript, Heather, Exhibit 2, at Line 8.
6    BY MR. NOLAND:
7    Q.  Then Ms. Cohen goes on and says, The
8    evidence that was never tested and the evidence
9    that was never sought to be tested or recovered.
10   So other than these -- the three items
11   you just mentioned the shorts, the underwear,
12   the -- not finding the razor --
13   A.  Right.
14   Q.  -- and the blue sheet, is there
15   anything else that she is referring to on behalf
16   of the office?
17   A.  What's no GPR looking for the bullets,
18   no -- What else would there be?  I mean, those
19   are the types of things, yes.
20   Q.  But the bullets -- There is no evidence
21   in the record that the offender used a gun in
22   this case, though?  We established that,
23   correct?
24   A.  No.  But somebody could plausibly --

Page 82

1    It's not -- Somebody could plausibly believe
2    that this was a robbery and why is somebody not
3    looking for the proceeds of the robbery and
4    bullets were -- I mean, a gun was supposedly or
5    alleged to have been taken; and whether a gun
6    was used in this case, that's not what we are
7    talking about.
8        The question is why wasn't there some
9    kind of information or evidence gathering to
10   find what the proceeds of the robbery were?
11   Q.  And it was consistent with the
12   prosecution and the police department theory of
13   the case -- Strike that.
14   And it is consistent with your
15   understanding of Mr. Smith's motive if he did
16   this crime that robbery was part of it, to get
17   items or money so that he could purchase
18   narcotics?
19       MR. CHANEN:  Form.  Form.  Hold on.
20   Form and foundation.
21       THE WITNESS:  I suspected a financial
22   motive, or some financial reasons that caused
23   him to -- or whomever, because you have got
24   drawers that were open and then there is certain

Page 83

1    things missing that somebody was trying to take
2    valuables from Edith and Willie Mae -- or I'm
3    sorry -- Willie Bell.
4    Q.  And that's consistent with Smith
5    committing the crimes and trying to find
6    valuables that he can then utilize to buy drugs,
7    right?
8        MR. CHANEN:  Object to the form and
9    foundation.  Go ahead.
10       THE WITNESS:  It's certainly possible.
11   BY MR. NOLAND:
12   Q.  Okay.  Other than those things you just
13   mentioned, is there anything else that you can
14   think of that the office was referring to?
15       MR. GRAMLICH:  Object to the form of
16   the question.
17       THE WITNESS:  About critical issues?
18   BY MR. NOLAND:
19   Q.  I am focusing on those Lines 8 and 9.
20   I am going to go through the next several
21   sentences.
22   A.  Oh.  I understand.  Okay.
23       MR. GRAMLICH:  Please.
24       THE WITNESS:  That I can recall, no,

Page 84

1    besides those things.  I think bullets and what
2    we have just spoken about those are what I
3    recall.
4        MR. NOLAND:  Heather, can you scroll
5    down to the last paragraph of this page?
6    BY MR. NOLAND:
7    Q.  And the line I want you to focus on,
8    19, The police reports in Mr. Smith's case were
9    absent of key reports regarding the recovery of
10   key evidence that was used to convict Mr. Smith.
11   A.  Correct.
12   Q.  So what is the office referring to
13   there?
14   A.  Oh, sure.  That would be, you know, the
15   recovery -- There was discrepancies between when
16   and under what circumstances these shorts were
17   recovered because we had some testimony from one
18   officer that it was at 9:30 at night and another
19   person said 6:00 and another one may have said
20   6:30 or 7:00.  That was a question -- That was a
21   question for us.
22       Key reports, the absence of key
23   reports, again, I think that echoes what I was
24   saying previously about, you know, reports of

24  (Pages 81 to 84)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 85

1 efforts to obtain either the razor or the knife,
2 what have you, that were taken and other
3 valuables that were believed to have been taken
4 and those types of things, yes.
5 Q. And you recall that one of the reports
6 that Mr. Smith's lawyers, Mr. Chanen in
7 particular, was asserting was absent was a
8 property inventory form for the blue
9 undershorts?
10 A. Yes. There was some -- There was -- It
11 was brought to my attention there was some - I
12 believe by Mr. Chanen -- about there not being
13 an inventory report for the blue underwear.
14 MR. NOLAND: Can you pull up
15 Exhibit 18, Heather? So I am showing Myles what
16 we have marked as Exhibit 18.
17 BY MR. NOLAND:
18 Q. And, Myles, you'll see that this, in
19 fact, is the Property Inventory Form for one
20 blue boxer undershorts with dark blue bordering
21 and blood stain. Do you see that?
22 A. Yes, I do.
23 Q. And you'll see at the bottom that it
24 indicates it was recovered by a Detective

Page 86

1 Solecki?
2 A. Solecki, yes.
3 Q. So, in fact, Mr. Smith's allegations
4 through Mr. Chanen now that you have seen this
5 report were, in fact, false?
6 MR. CHANEN: Oh, Dan. Oh, you are not
7 seriously going to go there, are you? Tell
8 Mr. O'Rourke when you produced this document.
9 Go ahead tell him.
10 BY MR. NOLAND:
11 Q. Go ahead, Myles. You can answer the
12 question.
13 A. This -- This would seem to indicate a
14 report of a recovery of the blue boxer
15 undershorts we just discussed.
16 Q. Yeah. And this was not in your file,
17 right? You don't remember ever seeing this?
18 A. I don't -- I mean, I can see it's
19 crumpled so it wasn't scanned I don't think.
20 Q. Yeah. So, Myles, for your information,
21 it recently was -- we sent the evidence down to
22 a lab.
23 A. Okay.
24 Q. And the lab a couple days ago was

Page 87

1 allowed to open the envelope. There was an
2 envelope in with the blue undershorts.
3 A. Sure. Yeah.
4 Q. Yeah. And inside that envelope was
5 this inventory that Mr. Chanen said was
6 important because it was allegedly missing, so
7 that's the background that Mr. Chanen wanted me
8 to tell you.
9 A. Okay. So this says 238-D envelope. I
10 think that's what it says and it's underlined.
11 MR. NOLAND: Okay. So you can take
12 that down, Heather.
13 BY MR. NOLAND:
14 Q. So going back to -- And the issues with
15 respect to the timing and the recovery of the
16 underwear, of course they fall by the wayside
17 with this photo that proves that the underwear
18 were, in fact, where the detectives said they
19 found them and that those underwear were there
20 at 4:30 in the morning before the detectives
21 would have had a chance to plant anything,
22 right?
23 MR. CHANEN: Object to the form. The
24 foundation. It's leading, and it misstates the

Page 88

1 evidence.
2 THE WITNESS: I am going to try to take
3 a crack at it. The timing of the recovery, the
4 fact that they were there, that there is a photo
5 of it would definitely contradict a statement
6 saying that there were no photos of it.
7 As to the timing of it, I am not sure
8 if it completely refutes a contrary position
9 given that there was some discrepancy and
10 testimony given regarding the recovery whether
11 it be at 6:00, 5:30, 9:00 o'clock at night,
12 that's just -- but that may not be -- that's
13 probably neither here nor there for your
14 question because your question I think is more
15 so about whether it was there at the time that
16 the fire department was going through, and it
17 was -- the photo shows blue shorts, blue
18 underwear.
19 BY MR. NOLAND:
20 Q. Yeah. I will ask it again. It was a
21 confusing question.
22 I mean, the heart of the question,
23 Myles, is that the fact that the underwear were
24 there at 4:30 makes it irrelevant whether or not

25 (Pages 85 to 88)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

---

Page 89

1  the detectives recovered them at 7:00 p.m.,
2  8:00 p.m. or 9:00 p.m.; isn't that true?
3      MR. CHANEN: I am going to object to
4  the form and foundation of the question. It's
5  leading your own witness, and it's not proper.
6      THE WITNESS: Again, I don't know
7  because I'd have to completely speculate. I am
8  just getting -- I am just telling you, but
9  whether it makes it irrelevant, it depends on
10  whether whoever is making the determination or
11  making a factfinding decision as to whether they
12  wish to believe one set of facts or another.
13      As for my purposes, do we have a photo
14  that shows this? There is one.
15  BY MR. NOLAND:
16      Q. I mean, the whole point of Mr. Smith
17  all these years claiming the photos -- that were
18  issues with respect to the exact time that the
19  detectives found the underwear and recovered it,
20  it supposedly bolstered an allegation that the
21  detectives planted and the photo refutes
22  definitively that the detectives planted the
23  underwear because we can see them right there in
24  the photo, right?

---

Page 90

1      MR. CHANEN: Objection. Form.
2  Foundation. You are basically, Dan, making a
3  closing argument and asking him to agree with
4  it. It's an improper question, and I object.
5      THE WITNESS: I do note that there was
6  a theory that these -- that the underwear --
7  that there are no photos of it, and it could
8  have been planted because of the discrepancy in
9  timing. I know that there was a theory of it,
10  and that was presented by the defense.
11      MR. NOLAND: Okay. I might be done.
12  One second. Actually, if you can pull up,
13  Heather, Exhibit 2 and go again to Page 4 we
14  were looking at.
15  BY MR. NOLAND:
16      Q. And, Myles, I just want to just close
17  this topic out. I am going to read the
18  next three or four lines. It says in Line 22,
19  The previous testimony by officers regarding
20  this key evidence could not be validated by
21  police reports nor did some of it make sense.
22      Many items were missing from these
23  police reports regarding key evidence and other
24  findings.

---

Page 91

1      Other than the items in evidence we
2  have just been talking about over the last
3  several minutes are there any other items in
4  evidence that the office was talking about in
5  those sentences?
6      A. Oh, the absence of a GPR for the blood
7  incident. That was an issue as to the
8  circumstances. There was some contrary
9  testimony given by I believe Paul Ward with
10  respect to placing defendant outside or about
11  how he comes into view of these things, and how
12  he comes to be on the ground; and there was
13  contrary testimony I believe at the suppression
14  hearing by Diane and I think it was his uncle or
15  a next-door neighbor and we didn't have a police
16  report with respect to that specific incident.
17  And that was kind of problematic. That was one
18  of the things.
19      These are some of the -- But what you
20  have said I think is generally speaking, lies at
21  the heart of what we were discussing when it
22  comes to some police reports being absent, and
23  what I said earlier a little bit about what we
24  didn't have.

---

Page 92

1      Q. And there is no other items that you
2  can think about here today?
3      A. About --
4      Q. About those sentences I just read,
5  whether there is any other pieces of evidence
6  that you guys - that your office had in mind
7  when you were explaining that to Judge Davis?
8      MR. CHANEN: Objection to the form and
9  foundation.
10      THE WITNESS: Can we go back to the
11  previous page? I'd like to read the sentence
12  one last time before I --
13  BY MR. NOLAND:
14      Q. Sure.
15      A. Okay. Yes. That and when it was
16  recovered and, too, by whom that was that was a
17  key portion of it.
18      Who took the oral statement? That was
19  another issue. I mean, the GPR for the oral
20  statement because normally there is an oral
21  statement with the progress report before it and
22  then you get either a handwritten or a court
23  reported. That was a question.
24      Q. So hold on. So normally --

26  (Pages 89 to 92)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 93

1    MR. CHANEN: Wait. Wait. Wait. Wait.
2 Let him finish his answer and then you can jump
3 in.
4 BY MR. NOLAND:
5    Q. Were you done?
6    A. Homicide cases is my basis. We have
7 been working on a lot of postconviction cases
8 involving murders, and we -- There is a lot of
9 times we have a GPR that accompanies an oral
10 statement prior to a court reporter or
11 handwritten. That's usually taken by the
12 detectives and then an ASA's call to Area 2 who
13 works about -- well, you know, in 24- or 12-hour
14 shifts maybe 20 --
15    **Q. Again, you didn't -- you didn't check**
16 **with anybody at the police department to**
17 **determine whether or not there was any**
18 **requirement that an oral statement be reduced to**
19 **a GPR?**
20    A. No. No. No. I am not speaking as to
21 a requirement or as protocol. I am just saying
22 as to what we -- what we have observed in some
23 other instances.
24    **Q. I mean, Myles, you are aware that some**

Page 94

1 **detectives choose not to write handwritten notes**
2 **in front of a murderer while he is confessing to**
3 **the murder so as not to chill the murderer from**
4 **saying what happened?**
5    A. Oh, absolutely. Absolutely.
6    **Q. So the absence -- Yeah?**
7    MR. CHANEN: Dan, Dan, I am just going
8 to object to form. Foundation for the last
9 question. Go ahead.
10    THE WITNESS: But they can also take it
11 five minutes later when they leave.
12 BY MR. NOLAND:
13    **Q. But there is no requirement that they**
14 **do so, is there, Myles?**
15    A. I am not staying there is a
16 requirement. I am saying that it helps square
17 time differences. It would have been helpful.
18 No requirement.
19    So some detectives don't take them at
20 all. I mean, we are pretty -- didn't take them.
21 You know, that's not their practice. It doesn't
22 mean -- I am not meaning it to say somebody is,
23 you know, casting, you know, a dark cloud over
24 their testimony.

Page 95

1    I am just saying that it's -- sometimes
2 it's helpful; and in this time especially when
3 you have differing testimonies as to when
4 something is retrieved, it may have been
5 helpful. That's all I am saying.
6    MR. NOLAND: Okay. Okay. I think I
7 might be finished, but let me just take like a
8 we'll say a five-minute break.
9    THE VIDEOGRAPHER: Okay. We are going
10 off the record at 12:06 p.m.
11    (Whereupon, a short recess was
12    taken.)
13    THE VIDEOGRAPHER: Okay. We are back
14 on the record. The time is 12:18 p.m.
15    MR. NOLAND: Myles, that's all the
16 questions I have for now. Thank you.
17    THE WITNESS: Thanks, Dan.
18    MS. BENJAMIN: I just have a few, and
19 they are going to skip around so sorry, and
20 Myles, Stacy Benjamin. We met before, so just
21 to remind you.
22
23
24

Page 96

1    EXAMINATION
2 BY MS. BENJAMIN:
3    **Q. You were asked some questions about**
4 **forensic testing earlier today. Did you**
5 **yourself or anyone on your team contemplate**
6 **conducting any type of forensic testing on the**
7 **evidence available to you?**
8    A. We did not perform forensics testing,
9 Stacy.
10    **Q. Okay. And were you allowed to do that?**
11 **Was that even an option for you in your role as**
12 **the special prosecutor for these postconviction**
13 **proceedings?**
14    A. We are -- It normally doesn't take
15 place within the context of the postconviction.
16 It normally takes place if there is an order of
17 a new trial or if there is an order on something
18 that would continue it because the
19 postconviction is really, well, it's limited to
20 the issues that are either of constitutional
21 dimension that were not -- that there is newly
22 discovered evidence of or that were not
23 otherwise waived or forfeited in the trial
24 courts.

27 (Pages 93 to 96)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 97

1    Q.  Okay.
2    A.  But in order to do that, I think there
3  is a 116-3 motion that we would do which
4  primarily in this kind of a case we would have
5  done a motion for DNA testing.
6    Q.  And was that ever discussed by you
7  about possibly filing a motion to do DNA
8  testing?
9    A.  Not in this case because there was a
10  statement and there is -- there is some -- Kind
11  of ironically, but there is a case called People
12  versus Savery and People versus Bailey which is
13  Kevin Bailey where there is -- the issue in
14  order to solicit or seek testing is that
15  identity was at issue; and if you have that
16  statement sometimes that puts identity as not
17  being an issue.
18    Q.  Okay.  So you --
19    A.  -- DNA testing under 116-3.
20    Q.  So am I correct in saying that you,
21  from your perspective of the case and because
22  there was a confession in this case, did not
23  feel that DNA testing would be ordered by the
24  Court if you had thought it?

Page 98

1    A.  I think there could have been arguments
2  against it.  I am not sure what the Court would
3  have done.
4    Q.  Okay.  You had some questions earlier
5  about whether Diane Yeager, Smith, or David were
6  ever considered a suspect; and I think that one
7  person left off that list was the other brother
8  David.
9        Was he ever considered a suspect by you
10  or your office?
11    A.  No.  David?  No.  David was in
12  Milwaukee.
13    Q.  Okay.  So were there any other suspects
14  identified through your investigation and
15  ultimate decision to dismiss the charges?
16    A.  None except Robert Smith.
17    Q.  Now, you yourself -- your office -- You
18  yourself through your office sent a letter
19  opposing the clemency petition as well as
20  included a letter from David Yeager, correct?
21    A.  Yes.
22    Q.  Okay.  And that letter also referred to
23  David's brother Derek joining him in that -- the
24  premise behind his letter, correct?

Page 99

1    A.  Yes.  I'm sorry, Stuart.
2        MR. CHANEN:  Form and foundation.
3  Sorry to interrupt.
4  BY MS. BENJAMIN:
5    Q.  Did you ever talk to Diane about the
6  clemency petition?
7    A.  Bob Williams was working primarily on
8  it.  I may have spoken to Diane.  I am not sure
9  if I have.
10    Q.  Okay.  Do you recall if she had a
11  petition on the clemency, petition that he
12  communicated to either you or Bob?
13    A.  I always thought with Diane she was
14  very uncertain about -- She just seemed very
15  uncertain, so I am not -- I am not -- I am not
16  sure.  My recollection is not great on that, but
17  I am not sure whether she believes even -- I
18  mean, I am not even sure whether she believes he
19  is guilty or not.
20        I mean, my conversations with her have
21  always been, you know, I have been asking her
22  about -- I had asked her about the circumstances
23  leading up to when she is outside the door
24  telling him to go talk to them.  You know,

Page 100

1  what's going on?  What is she seeing in the
2  room?  She said she (sic) looked sad -- or he
3  looked haphazard or something and just looked
4  bad.
5        But Diane never gave me any -- Like
6  some victims would say, you know, he is the one
7  who did it.  You got to go.  Or he is not the
8  one.  You know, you got to go look for somebody
9  else.  She never gave me the impression either
10  way strongly or not strongly as to what she
11  truly believes that I -- that I know.
12    Q.  Were you involved in any way in the
13  Batchelor, Bailey postconviction proceedings?
14    A.  I had a peripheral.  Not really
15  involved heavily.  That was not -- That was --
16  The people who were on that case were Brian
17  Stefanich, Andy Levine, and I think Bob Mylan.
18    Q.  Okay.  And those are different special
19  prosecutors from your office, correct?
20    A.  Not all from my office.  I mean, let me
21  clarify this.  The special state's attorney's
22  office has judges, former law clerks, former
23  post PDs, former state's attorneys who worked on
24  it before and they are not all from my office.

28  (Pages 97 to 100)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 101

1    **Q. Okay. Now if you had known that there**
2  **were, in fact, photos taken of the underwear on**
3  **the stairs by the Chicago Fire Department around**
4  **5:00 a.m. the morning of the crime and also that**
5  **blood taken from Robert Smith's bare feet and**
6  **recovered from his socks and underwear were all**
7  **conclusively linked to one or both of the**
8  **victims in this case, would that have changed**
9  **your evaluation of the evidence and decision to**
10 **eventually drop the charges?**
11      MR. CHANEN: And I'd like that
12 question -- It was a long question. I'd like it
13 read back, please.
14      THE REPORTER: Absolutely. One moment,
15 please.
16      (Whereupon, the record was read
17      as requested.)
18      MR. CHANEN: Form. Foundation. I'm
19 sorry. Whenever you are ready. Form.
20 Foundation. Incomplete hypothetical. Misstates
21 the evidence. You can answer.
22      THE WITNESS: Stacy, as to the first
23 portion, would it have changed the evaluation?
24 It certainly would have.

Page 102

1      As would it have forced me to decide
2  differently? That, I don't know, but it would
3  have changed the analysis and the evaluation for
4  certain because clearly we were discussing and
5  we were in discussions with -- based upon
6  evidence that we thought was -- or facts that we
7  thought were true; and so I was -- I was very --
8  When Dan showed the underwear to me, the photo
9  of the underwear, I was -- the first -- I think
10 my first day of deposition, it was a very
11 strange moment for me because it was listed in a
12 disposition saying there are no such photos that
13 we received and that's part of the reason why we
14 were on this case is pursuant to a TIRC statute
15 in which we received discovery from the TIRC
16 directly. So I don't know -- Go ahead.
17 BY MS. BENJAMIN:
18      **Q. No. If I interrupted, you can finish.**
19      A. So I don't know -- I mean, we have
20 issued subpoenas to Chicago Police Department,
21 and I will state here that we did not issue a
22 subpoena to the fire department for that that
23 would have led to the discovery of the photo of
24 the underwear.

Page 103

1      But that was -- that was in memos and
2  notes. The recovery of that we did think was a
3  very material piece of evidence, and so that was
4  very important to us. That was one of the items
5  of evidence that was important.
6      MS. BENJAMIN: All right. That's all I
7  have. Thank you.
8      MR. CHANEN: Mr. O'Rourke, I am Stuart
9  Chanen. I represent the plaintiff Robert Smith.
10 We have met many times.
11      EXAMINATION
12 BY MR. CHANEN:
13      **Q. And is it correct that in your capacity**
14 **as a special assistant state's attorney, you**
15 **moved in October of 2020 to vacate the criminal**
16 **conviction of Robert Smith?**
17      A. I did.
18      **Q. And you did that in a written motion,**
19 **correct?**
20      A. That's correct.
21      **Q. And you also did so in an oral hearing**
22 **before Judge Adrienne Davis, correct?**
23      A. That's correct.
24      **Q. And is it correct that in your capacity**

Page 104

1  **as a special assistant state's attorney, that it**
2  **is -- that a decision to move to vacate the**
3  **murder conviction of a convicted criminal, a**
4  **convicted murderer, is never a decision that you**
5  **make lightly, correct?**
6      A. Correct.
7      **Q. And would you agree that you would**
8  **especially not take it lightly in a case like**
9  **Robert Smith's where in the first several years**
10 **of your work on the case, you were of the**
11 **disposition to deny and block his petitions to**
12 **have his conviction vacated?**
13      A. Well, I do take some umbrage with
14 block. I didn't block anything. But when it
15 came to negotiations, yes. It was -- I was of
16 the mindset prior to that time and I thought
17 differently prior to that time, that's correct.
18      **Q. Okay. And thank you. I think my**
19 **question -- I appreciate your clarifying all**
20 **that and my question was badly phrased.**
21      A. Yeah.
22      **Q. In a situation where for meant for a**
23 **significant amount of time you do not think a**
24 **petition should be granted, in order to change**

29 (Pages 101 to 104)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 105

1  your mind to get to the point where you do think
2  a petition is -- should be granted, that's
3  something you don't take lightly; is that
4  correct?
5       MR. NOLAND: Object to the form.
6       THE WITNESS: That is correct, and I
7  thank you for the objection because there are
8  more than one petition. So just to back up
9  here, there was a postconviction petition and
10 there was a Torture Inquiry and Relief
11 Commission and petition.
12      The postconviction petition that was
13 pending was a coercion petition based upon newly
14 discovered evidence -- I'm sorry -- Madam Court
15 Reporter, I am going fast. A newly discovered
16 evidence of pattern and practice of police
17 coercion at Area 2 Violent Crimes at or around
18 the time of Commander John Burge's role as being
19 head of Violent Crimes.
20      It turns out in this case, he wasn't
21 head of Violent Crimes at that time; but there
22 was a postconviction petition and then there was
23 a Torture Inquiry and Relief Commission
24 petition.

Page 106

1       The Torture Inquiry and Relief
2  Commission petition injected the issues
3  regarding actual innocence with respect to -- at
4  least with respect to certain items of evidence
5  or testing that was not done or was not part of
6  the original trial record.
7       I wanted to clarify that because when
8  we were talking about -- We are really talking
9  about two petitions here. We are not talking
10 about one.
11 BY MR. CHANEN:
12      Q. Okay. But in addition to questions
13 that the TIRC panel raised about evidence --
14 numerous questions about the evidence --
15      A. Yes.
16      Q. -- they concluded that Mr. Smith had
17 proven by preponderance of the evidence that
18 there was a likelihood that he was beaten into a
19 confession, correct?
20      MR. NOLAND: Objection. Form.
21 Foundation.
22      THE WITNESS: I mean, they made a
23 recommendation that I think it was kind of like
24 a probable cause, a recommendation, or what we

Page 107

1  know of as a 615 that there was enough here to
2  get it to court so that a judge could consider
3  it; and certainly Mr. Smith had made a showing
4  of such.
5  BY MR. CHANEN:
6       Q. Yes. And for purposes of the Illinois
7  statute for TIRC, that is considered an
8  administrative ruling within the Administrative
9  Procedures Act, correct?
10      A. I am unaware of whether it is or not.
11 I know it's not an adjudication because there is
12 a case on People versus Darryl Christian which
13 will tell you it's not an adjudication.
14      As to whether that suffices as to a
15 decision, I don't think it can even be appealed
16 by the state. I am not sure, but I don't know
17 the answer to that question, sir, and I really
18 honestly don't. We will probably -- We may get
19 clarity of it within the next couple years. We
20 will see.
21      Q. All right. Are you okay if during my
22 questioning during this deposition I refer to
23 your decision to move to vacate Mr. Smith's
24 conviction as Decision No. 1? That was your --

Page 108

1  that was a decision you made, and I am going
2  to -- You consulted with Debbie Cohen, you
3  looked at the evidence, and at some point you
4  made a decision to move to vacate, correct?
5       A. Yes.
6       Q. And are you okay if I refer to that
7  during this deposition for ease of reference as
8  Decision No. 1?
9       A. Perfect. Sure.
10      Q. All right. Is it correct that after
11 Mr. Smith was released, he sought a Certificate
12 of Innocence before the chief judge of Cook
13 County criminal court LeRoy Martin?
14      A. Yes.
15      Q. And the Certificate of Innocence a
16 petition for -- is a declaration -- Sorry.
17 Let's start again.
18      A petition -- Let's start a third time.
19      A Certificate of Innocence is a
20 declaration by the chief judge of the Criminal
21 Division that a former defendant has proven by a
22 preponderance of the evidence that he or she is
23 innocent of the crime for which he or she has
24 spent time in prison, correct?

30 (Pages 105 to 108)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 109

1    A.  I think it's -- Well, it's right in the
2  statute the Certificate of Innocence so he
3  checks the box that he is innocent of all of the
4  offenses because sometimes they would have been
5  guilty of another offense, like a lesser or
6  maybe -- or they are on a parole and that would
7  negate any showing of actual innocence.
8        But it really is statutory, so, I mean,
9  whatever -- The statute is one of the threshold
10 showing is innocent of all of the offenses for
11 which he was convicted or serving time I believe
12 it is.
13   Q.  And he did that in this case to the
14 satisfaction of Judge Martin, correct?
15   A.  Judge Martin granted that I believe in
16 November, I believe.
17   Q.  Correct.
18   A.  Okay.
19   Q.  And at the time that after he filed the
20 petition, you had to make -- you, Myles
21 O'Rourke, as the lead special assistant state's
22 attorney had to make a decision whether to
23 oppose that petition or not oppose that
24 petition, correct?

Page 110

1    A.  Correct.
2    Q.  And sometimes in your role as special
3  state's attorney, you have opposed petitions for
4  Certificates of Innocence; is that correct?
5    A.  Yes.  Yes.
6    Q.  And then other times you have chosen
7  not to oppose such certificates, correct?
8    A.  Yes.
9    Q.  All right.  And in the Smith case, you
10 made a decision not to oppose his petition for a
11 Certificate of Innocence, correct?
12   A.  No.  We did not file a written response
13 or -- to oppose the petition that was filed.
14   Q.  All right.  But on October -- The first
15 hearing before Judge Martin, I will represent to
16 you was October 30th.
17   A.  Okay.
18   Q.  And Mr. Rosen covered that hearing for
19 your office; is that correct?
20   A.  That is correct.
21   Q.  And the reason Mr. Rosen covered it is
22 you and Ms. Cohen had conflicts with other
23 matters and you had informed us in advance that
24 you would be sending Mr. Rosen, correct?

Page 111

1    A.  I'm sure I did.
2    Q.  All right.  And one of the things that
3  Mr. Rosen said at the hearing, and I am reading
4  from Page 3, Lines 13 and 14, is he told Judge
5  Martin, we are not going to oppose the petition.
6        Did you make a decision prior to
7  sending Mr. Rosen to that hearing that you were
8  not going to oppose the petition?
9    A.  Yes.
10   Q.  Okay.  Are you okay if I refer to that
11 decision as Decision No. 2?
12   A.  Fine.
13   Q.  Okay.  And you had authorized -- Prior
14 to Mr. Rosen going to that October 30th hearing,
15 you had authorized him to say to Judge Martin
16 that you weren't going to oppose the petition,
17 correct?
18   A.  That's correct.
19   Q.  And it was your decision, it wasn't
20 Mr. Rosen's, correct?
21   A.  That was my decision.
22   Q.  All right.  Now, later during the same
23 hearing where Mr. Rosen appeared, and I am
24 reading from Page 6, Lines 14 and 16, Judge

Page 112

1  Martin said he had not read the materials yet
2  that Mr. Smith had submitted with his petition.
3    A.  Okay.
4    Q.  And he went on to say, Inasmuch as this
5  is an extremely important issue, I would like to
6  read Mr. Smith's motion for summary judgment
7  before I, meaning Judge Martin, would be
8  prepared to rule on his Innocence Petition.
9        Are you aware that Mr. -- that Judge
10 Martin said that at that hearing?
11      MS. BENJAMIN:  Object to form.  I think
12 you have interpreted the transcript more than is
13 written in the transcript.  If you want to put
14 it up as an exhibit so he can review it that
15 would be --
16      MR. CHANEN:  Yeah.  I have it -- I have
17 it marked as an exhibit, and I am happy to show
18 it but I'm trying to read through it so let
19 me -- I am going to rephrase the question.  I am
20 going to rephrase the question.
21 BY MR. CHANEN:
22   Q.  Are you aware that Judge Martin
23 referred to his decision on whether to grant the
24 petition as a very important issue?

31  (Pages 109 to 112)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

---

Page 113

1    A.  Yes.
2    **Q.  Are you aware that Judge Martin said he**
3  **would not be prepared to rule on such an**
4  **important issue without taking some time to**
5  **review the material?**
6    A.  I believe -- I believe you have jogged
7  my memory.  I think that that's correct.
8    **Q.  All right.  And he set a second hearing**
9  **for November 6th, correct?**
10    A.  That's -- That -- I think it was a week
11  or so or something, yeah.
12    **Q.  All right.  And both you and your**
13  **colleague Debbie Cohen appeared by Zoom at that**
14  **second hearing, correct?**
15    A.  I believe -- Do you have a copy of it?
16  I probably --
17    **Q.  I do.  I am happy to show it to you.**
18  **Hold on.**
19    A.  I believe you.  I believe you.  I am
20  just, November 6th -- If I am listed, I was
21  there.  I am not denying it.
22    **Q.  All right.  All right.  Hold on one**
23  **second.  Oh, boy.  Hold on.  All right.  Well,**
24  **let me --**

---

Page 114

1    MR. OLSTEIN:  Hey, Stuart, this is
2  Ariel.  I was listening with a half an ear.
3  What are you looking for?
4    MR. CHANEN:  Yeah.  I am looking for --
5  I have all of my exhibits lined up, but I am not
6  connected so I can't share my screen, but I will
7  send it to you right now.  It's Exhibit 6 for
8  this deposition and if you bear with me, I am
9  just going to shoot it over to you and you can
10  share screen it.
11    I may -- You know, originally I didn't
12  need you to share screen because I had every
13  single exhibit up, but when my computer kicked
14  me out of Zoom, I can't both be on the phone and
15  show the picture.  So I may ask you to do it but
16  hold on one second.  I am going to send you two
17  pictures.
18    MR. OLSTEIN:  Sure.  No problem.
19    MR. CHANEN:  Thanks for jumping in.
20  So, Ariel, if you have them, I am looking for I
21  believe it's 6.
22    MR. OLSTEIN:  I'm sorry.  Have we lost
23  the witness?  Can we go off the record?
24    THE WITNESS:  I am right here.

---

Page 115

1  BY MR. CHANEN:
2    **Q.  Okay.**
3    A.  Yes.  I see where you have that.
4    MR. CHANEN:  All right.  Thank you.  So
5  let's go back to the outline.  Thank you, Ariel.
6  I may need you to --
7  BY MR. CHANEN:
8    **Q.  So you see that you did attend this**
9  **hearing, correct, Myles?**
10    A.  Yes.
11    **Q.  And Judge Martin I will represent to**
12  **you, and Ariel can try and find it on the**
13  **transcript to show you and you're welcome to**
14  **wait until he finds that position, but in**
15  **summary Judge Martin stated that he put off a**
16  **decision on the petition for Certificate of**
17  **Innocence in order to review the material**
18  **Mr. Smith had filed; is that correct?**
19    A.  Correct.
20    **Q.  And at the hearing before Judge Martin**
21  **and in your capacity as special prosecutor, you**
22  **informed Judge Martin that the State does not**
23  **object to the issuance of a Certificate of**
24  **Innocence in this case.  And I am reading from**

---

Page 116

1  **Page 3, Lines 23 and 24.**
2    A.  Yes.  I see that.  I think I said the
3  State does not object, correct.
4    **Q.  And when you -- And you were committed**
5  **to that position at the time you said it to**
6  **Judge Martin, correct?**
7    A.  That we -- No.  We were not -- Yes.
8  That there was factually pleaded the requisite
9  elements that were required under statute.
10    **Q.  All right.  And you also told Judge**
11  **Martin and -- that Mr. Smith had met the legal**
12  **standard of the Innocence Statute for proving**
13  **factual innocence, correct?**
14    A.  For proving, yes.  It requires an
15  affidavit and, yes, for proving of innocent of
16  offenses.
17    **Q.  Factual -- And the term you used was**
18  **factual innocence?**
19    A.  Right.  That's why they have the
20  affidavit requirement.
21    **Q.  Okay.  And you said we do not -- The**
22  **precise words, and I did find it now, it's at**
23  **Page 3, Lines 13 to 15 --**
24    A.  Yes.

---

32  (Pages 113 to 116)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 117

1  Q. -- We do not contest that defendant has
2  cleared the elements under the statute for
3  showing factual innocence.
4  A. That's the showing, right.
5  Q. All right. And I believe that
6  Mr. Smith met that legal standard in the
7  materials he provided to Judge Martin?
8  A. Yes. I believe he had an affidavit and
9  there was -- Yes. There was no contest to the
10  issuance of the Certificate of Innocence.
11  Q. And then Judge Martin ruled on Page 5,
12  Lines 1 to 3 that Mr. Smith had sustained his
13  burden of showing that he is entitled to the
14  Certificate, Lines 1 to 3 on Page 5.
15  A. Yes. That was his ruling.
16  Q. All right. And then he also issued a
17  written order.
18  MR. CHANEN: And, Ariel, I didn't
19  forward it to you but it's an -- it's the
20  Certificate of Innocence itself. I will give
21  you -- I will give Ariel a chance to catch up.
22  BY MR. CHANEN:
23  Q. But basically he said the petitioner is
24  innocent of the offenses charged in the

Page 118

1  indictment or information. That's a box that
2  Judge Martin checked on the Certificate of
3  Innocence, correct?
4  MR. NOLAND: Object to the form.
5  MS. BENJAMIN: Object -- Yeah.
6  MR. CHANEN: You can wait, Myles, if
7  you want to wait to see the document.
8  THE WITNESS: This is on his -- Okay.
9  Yes. I see the order.
10  BY MR. CHANEN:
11  Q. And Ariel is going to blow it up a
12  little bit for you, and then he is going to go
13  to the part where it says, The
14  defendant/petitioner is innocent of the offense
15  charged in the indictment or information.
16  A. Paragraph 4, yes.
17  Q. And you did not object to Judge Martin
18  signing such an order, correct?
19  A. No, I did not.
20  Q. And did you believe Mr. Smith at that time
21  you believed him to be innocent of the charges
22  for which he had been convicted?
23  A. Absolutely not. That's not what I am
24  saying. We did not contest it. My personal

Page 119

1  beliefs, what the evidence showed and what was
2  going on in this hearing, we did not have a
3  contrary position to the summary judgment that
4  was presented to him and he may --
5  Q. And the petition -- and the petition --
6  MR. NOLAND: Hold on. Hold on. Let
7  him finish.
8  MR. CHANEN: Okay.
9  THE WITNESS: He made the decision that
10  the innocent -- that he is innocent of the
11  offenses. I myself personally never arrived at
12  a decision that Robert Smith was actually
13  innocent of anything. I did not contest his
14  innocence petition.
15  BY MR. CHANEN:
16  Q. Okay. And your office -- And whether
17  you personally had made a judgment that he was
18  innocent or not, you felt enough information had
19  been presented to your office that you had no
20  objection to a judicial order that he was
21  innocent of the crimes for which he was
22  convicted, correct?
23  A. Right. We did not file an objection,
24  and we did not contest within the Certificate of

Page 120

1  Innocence the pleading in the file.
2  Q. Because you believed -- because you
3  believed he met the innocence standard?
4  MR. NOLAND: Objection. Form.
5  Foundation. Mischaracterizes.
6  THE WITNESS: No. I believe that the
7  Court found that.
8  BY MR. CHANEN:
9  Q. Okay.
10  A. I mean, I don't make that particular
11  finding. That's for the Court to make the
12  finding.
13  Q. Got it. All right. I think Judge
14  Guzman would agree with you on that.
15  During the years you were a special
16  prosecutor, you'd come to know Chief Judge
17  Martin pretty well, correct?
18  A. I know Judge Martin.
19  Q. And you had appeared before him many
20  times in a series of cases, correct?
21  A. I have appeared before Judge.
22  Q. Just as you had his predecessor Chief
23  Judge Biebel, correct?
24  A. Oh, yes.

33 (Pages 117 to 120)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 121

1  Q. And Judge Martin also got to know you
2  pretty well in your capacity as a special
3  state's attorney for these Burge and other
4  torture cases, correct?
5  A. I think he did.
6  MS. BENJAMIN: Object to form.
7  BY MR. CHANEN:
8  Q. All right. What was Judge Martin's
9  reputation in the community for reviewing
10  materials thoroughly before he made important
11  decisions?
12  MS. BENJAMIN: Object to foundation.
13  MR. GRAMLICH: I am going to object to
14  that question. Can you rephrase it?
15  BY MR. CHANEN:
16  Q. What was Judge Martin's reputation in
17  the community for being thorough in his work and
18  looking at pleadings carefully before making a
19  decision? Did he have a good reputation in that
20  regard or a bad reputation in that regard?
21  MS. BENJAMIN: Object.
22  THE WITNESS: Judge Martin is very
23  well -- I'm sorry. Go ahead.
24  MS. BENJAMIN: Yeah. Just object to

Page 122

1  the foundation. Object to form.
2  THE WITNESS: Judge Martin is very well
3  respected. He is an Appellate court juris.
4  BY MR. CHANEN:
5  Q. I understand, but for many years he was
6  a chief judge of the Cook County criminal court,
7  correct?
8  A. Right. And I found him to be very hard
9  working, and I found him to be a very good
10  judge.
11  Q. And intelligent?
12  A. Of course.
13  Q. Did you find him to be intelligent?
14  A. Very much so.
15  Q. Did you find him to be thorough?
16  A. Yes.
17  Q. Did you find him to be fair?
18  A. I found him to be fair.
19  Q. And was his reputation in the community
20  that he was a very fair judge?
21  MS. BENJAMIN: Objection. Foundation.
22  Form.
23  THE WITNESS: See, I don't know that.
24  I would imagine. He is now in the Appellate

Page 123

1  court so he has got a great reputation in the
2  community -- in the legal community; but -- I
3  mean, if that's what you mean.
4  BY MR. CHANEN:
5  Q. And he has a reputation for being very
6  thoughtful in his decisions before making them;
7  is that correct?
8  MS. BENJAMIN: Object to form.
9  Foundation. Asked and answered.
10  MR. GRAMLICH: Objection.
11  THE WITNESS: In my -- In my litigation
12  before, I found that he was thoughtful and
13  careful.
14  BY MR. CHANEN:
15  Q. Okay. Did you have an opinion about
16  whether Judge Martin generally got his rulings
17  correct?
18  A. Oh, I don't know. I mean, that I don't
19  know. About whether he generally got them
20  correct? I have no idea whether he --
21  Q. Do you think Judge Martin would take a
22  decision to declare that a defendant who had
23  been convicted by a jury factually innocent of
24  the of crimes for which he had been convicted,

Page 124

1  do you think that is a weighty -- a decision
2  that Judge Martin would treat as a weighty
3  decision that required a lot of care before
4  making it?
5  A. Right --
6  MS. BENJAMIN: Objection to form.
7  Foundation.
8  THE WITNESS: I think he gave it
9  consideration, and I think it shows that he set
10  it over to another court date.
11  BY MR. CHANEN:
12  Q. Didn't he tell you during the
13  hearing -- I'm sorry, Ariel. I don't have the
14  page number so you may have to search for it --
15  but Judge Martin said, Mr. O'Rourke, you can be
16  rest assured that in deciding these kinds of
17  matters, I consider only those issues with
18  which -- which are relevant or germane to
19  whether or not the petitioning party has
20  sustained their burden of showing that they are
21  entitled to a Certificate of Innocence?
22  A. Right.
23  Q. Do you see -- And that's something that
24  he said to you during the hearing, correct?

34 (Pages 121 to 124)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 125

1   A.  Right.  Because --
2      **Q.  And do you have confidence that Judge**
3  **Martin was being truthful in that regard?**
4      A.  I mean, I believe -- With respect to
5  this particular issue, yes.  Because there was
6  an object -- There was something that came up
7  that we were objecting to some portions, but
8  that's why he had the, Separate the wheat from
9  the chaff, the line that follows underneath, and
10  I think that is what speaks to it.
11      **Q.  All right.  Did you --**
12      A.  I am not going to speculate, but --
13      **Q.  Did you --**
14      A.  I mean --
15      MS. BENJAMIN:  Stuart, can you let him
16  answer?  You keep interrupting him.  You need to
17  stop.
18      THE WITNESS:  Right.  I generally
19  believe that, yes, he does look at matters
20  before him.  I think what he had before him was
21  your motion for summary judgment.  We didn't
22  file a responsive brief.
23      We did have issues with certain
24  positional statements regarding coercion and

Page 126

1  police brutality that were contained therein,
2  and that's what I think he was talking about
3  when he is separating the wheat from the chaff;
4  but the issues that -- what he wrote is what he
5  wrote.
6      And I think he generally is a very
7  good judge who takes -- and takes decisions very
8  carefully and looks at other side's position
9  papers and tries to come to the right decision?
10  The answer is yes.
11  BY MR. CHANEN:
12      **Q.  Why did you -- I'm sorry.  Were you**
13  **done after the answer is yes?**
14      A.  Go ahead.
15      **Q.  Why did you move to vacate Robert**
16  **Smith's conviction what we are going to refer to**
17  **as Decision 1?**
18      A.  Why did I move to vacate?  I think it's
19  already within the transcript why I did.
20      **Q.  Well, tell me then in your own words.**
21  **I think it's in the transcript in Mr. Noland's**
22  **words.  I'd like it in your words.**
23      A.  Well, sure.  There was issues --
24      MS. BENJAMIN:  Object to the form of

Page 127

1  the question.
2      THE WITNESS:  Again, we had issues with
3  the evidence.  We had issues with -- There is a
4  host of different reasons, but there is
5  issues -- availability of witnesses, some alive,
6  some -- some dead.  There is many different
7  issues that came into a potential for a retrial,
8  but those are some of the things.
9      Some of the -- There were obstacles
10  obviously because the absence of some police
11  reports that we mentioned.  Certain items were
12  missing that we didn't have access to, but I
13  believe I have testified to a lot of this.
14  BY MR. CHANEN:
15      **Q.  And why did you not oppose Mr. Smith's**
16  **petition for a Certificate of Innocent, Decision**
17  **No. 2?**
18      A.  I believe that at the time there was --
19  I moved -- There was a dismissal motion on it
20  and there was -- there was an affidavit that was
21  backed by Robert, and I didn't have any other
22  evidence besides that I thought that I had truly
23  connecting him to it besides a confession that
24  was unsigned.

Page 128

1      **Q.  And as you sit here today, is there any**
2  **evidence that you didn't have on November --**
3  **October 30th or November 6th that's any**
4  **different than your decision back then to not**
5  **oppose it?**
6      A.  There is a photo --
7      MS. BENJAMIN:  Objection to form.
8      THE WITNESS:  -- blue underwear that
9  were apparently recovered from the scene which
10  was recovered at around 4:00 o'clock in the
11  morning.
12  BY MR. CHANEN:
13      **Q.  Okay.  Anything else?**
14      A.  There is obviously blood testing, DNA
15  testing, that was done that seems to -- that was
16  a -- that led to a stipulation.  There is a
17  whole different -- a whole lot of facts that I
18  think were developed in your litigation right
19  now.
20      **Q.  Okay.  Anything else other than the**
21  **photo of the blue underwear at 4:00 in the**
22  **morning and blood -- and the blood stipulation?**
23      MS. BENJAMIN:  Objection.
24  Mischaracterizes his answer.

35  (Pages 125 to 128)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 129

1    THE WITNESS: There is the -- I mean,
2  the sum total of the evidence is a little bit
3  different than what I was considering, but, yes.
4  What you had on the Certificate of Innocence
5  petition was it was an affidavit-backed motion
6  for summary judgment that met the requirements
7  of the Certificate of Innocence statute, and we
8  did not file an objection.
9  BY MR. CHANEN:
10    Q. Okay. But other than the photo of the
11  blue underwear and other than the blood
12  stipulation, is there any evidence in the case
13  as you believe it sits today that is different
14  than the way you believe it sat on October 30th
15  and November 6th when you decided not to oppose
16  the petition for a Certificate of Innocence?
17    MR. NOLAND: Just objection.
18    THE WITNESS: Yes. I believe I have
19  answered that, but, I mean, do I think that
20  there was differences between what I received
21  and what is -- what's been shown to me? There
22  are some differences, and I think I have
23  testified to it; but I do -- do -- do understand
24  your positional point and that we did not

Page 130

1  respond to the Certificate of Innocence. We did
2  not oppose it. We did state that it met the
3  statutory requirements.
4    MR. CHANEN: All right. Ariel, could
5  you please put up what I sent to you, and I'm
6  sorry to reengage you after telling you I would
7  take all of this myself, Exhibit 7A, and blow it
8  up, please?
9  BY MR. CHANEN:
10    Q. Mr. O'Rourke, this is a memo from
11  Debbie Cohen to you; Is that correct?
12    A. Yes.
13    Q. All right. And did you discuss this
14  memo with Ms. Cohen at or shortly after the time
15  she presented it to you?
16    A. Extensively.
17    Q. Okay. And did you ask her to prepare a
18  memo in this general format, or is that
19  something she did on her own initiative?
20    A. That, I do not recall, but it was I had
21  numerous memos detailing my prior positional
22  statements. I did want to know what her points
23  were and we had discussions about it that were
24  ongoing, and she created this as well.

Page 131

1    Q. All right. And why did you bring Debra
2  Cohen -- Well, let me back up.
3    Is it fair to say that at a certain
4  point in serving as the special state's attorney
5  on Robert Smith's case you hired -- you hired
6  Ms. Smith to work on -- Let's start that all
7  over again. It was a mess.
8    A. No. No. Go ahead.
9    Q. When you hired -- When you hired
10  Ms. Cohen to do some work for O'Rourke & Moody,
11  was it specifically as to this case or did you
12  hire her generally?
13    A. Let me back up. She was -- At a point
14  in time, she did work -- I believe she worked
15  for us, O'Rourke & Moody being us. She was
16  originally appointed to represent the State or
17  to represent the state assistant by Judge
18  Nudelman way back when, probably 2010 I want to
19  say, 2011, and so she did have prior experience.
20  She was a former assistant state's attorney.
21    What led her directly to being put on
22  this case was Robert Williams had a serious
23  health issue that struck him and that was in I
24  believe the spring of this year -- of that year.

Page 132

1    Q. Spring of -- spring of 2020?
2    A. Yes.
3    Q. All right. And so when Mr. Williams
4  had his serious health issue you made a -- and I
5  assume he indicated I really can't work
6  regularly on the Smith case anymore in light of
7  the health issue, you made the decision to ask
8  Ms. Cohen to come in and work on the Smith case;
9  is that fair?
10    A. Yes. Well, it was more -- Yes. She
11  did have prior experience working as a special
12  state's attorney with us, but I did reach out to
13  her.
14    Q. Okay. And did you reach out to her to
15  work on all of Mr. Williams's open cases or most
16  specifically this case, the Smith case?
17    A. I know that throughout this period of
18  time, it was really the Robert Smith case that
19  she was working on.
20    Q. All right. Thank you. And is she a
21  good lawyer?
22    A. I find her to be a very good lawyer.
23    Q. Do you believe she is an excellent
24  lawyer?

36  (Pages 129 to 132)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 133

1    A. I would say she is an excellent lawyer.
2    Q. Do you have respect for her judgment?
3    A. I do.
4    Q. Is she hard working?
5    A. She is.
6    Q. Is she thorough in her work?
7    A. Yes.
8    Q. Is she thorough in her judgment?
9    A. Yes.
10   Q. And you would agree that as a former
11   state's attorney and a former special
12   prosecutor, she would not likely recommend that
13   you make Decision No. 1, move to vacate
14   Mr. Smith's conviction, unless she had a strong
15   belief that it was the right thing to do,
16   correct?
17       MR. NOLAND: Objection. Speculation.
18       THE WITNESS: I mean, I don't believe
19   she would recommend it if she didn't think it
20   was -- Exactly. I don't think she would
21   recommend it unless she thought it was the
22   correct thing to do.
23   BY MR. CHANEN:
24   Q. All right. So you -- At some point

Page 134

1    you -- whether she did it of her own initiative
2    or you asked her to do it, arising out of
3    conversations that you were having with
4    Ms. Cohen, she went ahead and put down in
5    writing the various aspects of the Robert Smith
6    case that she found troubling; is that a fair
7    summary of this memo?
8    A. I think so, yes.
9        MS. BENJAMIN: Object to form.
10       THE WITNESS: But it's a summary, so
11   she is probably -- I don't know how much stuff
12   that she worked up but this is a summary.
13   BY MR. CHANEN:
14   Q. Right. All right. And because it's a
15   summary, it sort of forces me to now go category
16   by category and ask you a little bit about the
17   discussions you had and whether they affected
18   your Decision No. 1 or your Decision No. 2.
19   A. Sure.
20   Q. So the first thing that Ms. Cohen wrote
21   to you was no violent background.
22       Did you agree with Ms. Cohen that
23   Mr. Smith had no violent background?
24   A. And this is why I think this kind of

Page 135

1    dovetails what Dan was talking about earlier.
2    Does he -- Did I agree with her wholly about no
3    violent background? Not really, but no violent
4    criminal convictions, I think we can agree that
5    burglary wouldn't be something that would be
6    like a physical force conviction; but when it
7    comes to violent background from what we were
8    looking at, rap sheet, it didn't seem like he
9    had any, you know, batteries, aggravated
10   batteries or something that was, you know, a
11   lead up to this.
12   Q. In addition to having no violent
13   convictions, he also had no arrests for violent
14   activity; is that correct?
15   A. Offhand, I don't -- I don't -- I don't
16   believe that I found any violent arrests that
17   led up to the convictions for burglary, the '70s
18   burglary convictions. I am not really sure
19   about convictions.
20   Q. All right. And you were aware that at
21   the time Mr. Smith was arrested for this murder,
22   he had not had a burglary conviction for seven
23   years, correct?
24   A. Yes. I was aware that there was a

Page 136

1    period of time in which he was not incarcerated.
2    Q. Okay. And in terms of the July -- what
3    you refer to as the July 2020 incident, that was
4    where he had gotten hit in the head by a bunch
5    of hoodlums, right?
6    A. No. July 1987. It was --
7    Q. I'm sorry. I completely misstated and
8    thank you for correcting that.
9    A. Correct.
10   Q. In July of 1987, he was attacked in a
11   Walgreens parking lot and hit very severely in
12   his head, correct?
13   A. Right. He was provided three separate
14   medications, correct.
15   Q. All right. And he -- One of the things
16   that Mr. Noland showed you was that he was very
17   angry about being hit in the head and attacked
18   by that group of men, correct?
19       MR. NOLAND: Objection.
20   Mischaracterizes the testimony. Go ahead.
21       THE WITNESS: I don't remember Dan
22   telling me it like that. I think Dan was saying
23   he was actually recounting what Diane Smith
24   testified to if I recall correctly.

37 (Pages 133 to 136)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 137

1 BY MR. CHANEN:
2 **Q. Okay. And Diane Smith testified, among**
3 **other things, that he was angry during the**
4 **period after which he was attacked in the**
5 **Walgreens parking lot and hit in the head and**
6 **had surgery?**
7 A. Right. I think it happened after --
8 The July 1987 incident is what she was
9 testifying to, if I am correct. Now again, you
10 have shown it to me. I wasn't there when she
11 testified, but that's what I thought it said.
12 **Q. Okay. But you are not aware, as you**
13 **sit here today, and as -- Well, let's back up.**
14 **When Ms. Cohen told you that he had no**
15 **violent background, you were not aware at that**
16 **time of any violent act that Mr. Smith had ever**
17 **engaged in, correct?**
18 A. No. I was told -- I was told -- I
19 think Diane said the opposite. That he was
20 not -- that prior to that time he was not --
21 Like, he got along with the mother and the
22 grandmother; so I wasn't aware of any, like,
23 violent arrest or arrest for some kind of a
24 violent act or any felony conviction.

Page 138

1 **Q. Okay. So did the fact that he had no**
2 **violent background factor into your decision to**
3 **vacate Mr. Smith's conviction?**
4 MR. NOLAND: Object. Misstates his
5 prior testimony.
6 THE WITNESS: That -- That -- Even
7 though it does misstate prior testimony, that
8 factor was a part of the evaluation.
9 BY MR. CHANEN:
10 **Q. Okay. And did it influence your**
11 **decision-making?**
12 A. Yes.
13 **Q. And did it influence -- Did it**
14 **influence your decision-making regarding**
15 **Decision No. 2, to not oppose the Certificate of**
16 **Innocence?**
17 A. I don't know. I don't believe so.
18 **Q. Okay. Did -- Did the complete absence**
19 **of any violent background make you question**
20 **whether Mr. Smith was involved in this double**
21 **murder, whether he had gone -- Let me rephrase**
22 **the question.**
23 **In your experience as a special**
24 **prosecutor, is it unusual for people to go from**

Page 139

1 a zero violent background, all the way up, you
2 know, immediately in one step to double murder?
3 MR. GRAMLICH: Object to the form of
4 the question.
5 THE WITNESS: I can answer that,
6 though. That is -- that is unusual.
7 BY MR. CHANEN:
8 **Q. Okay. And, therefore, did the complete**
9 **absence of any violent background make you**
10 **question whether Smith -- Mr. Smith was, in**
11 **fact, involved in this double murder?**
12 MR. NOLAND: Hold on. Objection that
13 mischaracterizes his testimony. Complete
14 absence?
15 THE WITNESS: I mean, it does. So I am
16 going to ask you if you don't mind rephrasing
17 the question because it really doesn't respond
18 to any of the testimony that I have given
19 about --
20 BY MR. CHANEN:
21 **Q. Well, as -- at the time that you were**
22 **having this discussion with Ms. Cohen shortly**
23 **after her presenting this memo to you --**
24 A. Sure.

Page 140

1 **Q. -- you were not aware of any violent**
2 **act in which Mr. Smith had ever engaged,**
3 **correct?**
4 A. True.
5 **Q. No such arrest, correct?**
6 A. True.
7 **Q. No such conviction, correct?**
8 A. That's correct.
9 **Q. Neither David nor Derek nor Diane**
10 **telling you that he was a violent person,**
11 **correct?**
12 A. Right. None of them explained to me a
13 single incident that there was some violent
14 activity by Robert Smith.
15 **Q. Okay. So however you want to**
16 **characterize that, those four things. No family**
17 **member telling you he was violent, no violent**
18 **convictions, no violent arrests, and not aware**
19 **of any other violent act in which he had**
20 **engaged --**
21 A. True.
22 **Q. -- did those four things taken together**
23 **make you question whether he was involved in the**
24 **double murder of his mother-in-law and**

38 (Pages 137 to 140)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

---

Page 141

1  grandmother?
2       A.  Certainly.
3       Q.  Okay.  The next thing says no
4  disciplinary history.  Did Ms. Cohen explain or
5  articulate to you that during his time in
6  prison, he had had no disciplinary history while
7  a prisoner for 30-plus years?
8       A.  I believe that was --
9       MS. BENJAMIN:  Objection.
10      MR. NOLAND:  Hold on.  Objection.
11 Foundation.
12      THE WITNESS:  Sorry about that.  I
13 was -- I believe that our -- we learned that
14 there was not much of a disciplinary history for
15 him in custody.
16 BY MR. CHANEN:
17      Q.  And is it fair to say that Ms. Cohen
18 articulated that to you?
19      A.  She did.
20      Q.  And did you agree with Ms. Cohen when
21 she said it?  Did you basically believe her
22 representation?
23      A.  I believed her representation.  I think
24 you may have also made the representation.  We

---

Page 142

1  may have asked you or sought IDOC, but I think,
2  yes.  I don't think his disciplinary history was
3  substantial in the IDOC.
4       Q.  Okay.  Did that factor into your
5  decision to vacate Mr. Smith's conviction?
6       A.  Not as much.  It's not as much.  It's
7  not as much.
8       Q.  Did it factor into your decision to not
9  oppose the Certificate of Innocence?
10      A.  Slight if -- I mean slightly, I mean,
11 but not as much.
12      Q.  All right.  To the extent that you just
13 testified, though, that it was highly unusual
14 for someone to go straight from no -- no violent
15 history whatsoever, straight to double murder,
16 did the fact that he had never been violent in
17 the prison system or at least his disciplinary
18 history suggested he had never been violent in
19 the prison system further your prior answer that
20 the absence of a violent background made you
21 question that Mr. Smith was involved in this
22 double murder?
23      Did the next 33 years or 30-plus years
24 of not having violence in the prisons magnify,

---

Page 143

1  increase, or affect the prior statement you made
2  about having it cause a little bit of a doubt?
3       MR. NOLAND:  Objection.  Form.
4  Foundation.
5       MS. BENJAMIN:  Object to form.
6       THE WITNESS:  I mean, I think it's the
7  no disciplinary history is consistent with no
8  violent background to the extent that, you know,
9  when you are looking whether somebody goes from
10 A to Z and how they get there and there is not a
11 lot of violent either arrests for violent
12 felonies or infractions or what have you or any
13 convictions and then there is no disciplinary
14 history where, you know, it's more -- I think
15 it's more kind of taken together with no violent
16 background.  It may support it.
17 BY MR. CHANEN:
18      Q.  Okay.  What about no motive?  Is that
19 something that you discussed with Ms. Cohen?
20      A.  Yeah.  We discussed that.  We discussed
21 that.
22      Q.  All right.  Could you tell me the
23 nature of those discussions, please?
24      A.  Well, the discussions had to do with,

---

Page 144

1  you know, whether there was any prior incidents
2  between the grandmother, mother, and Robert.  I
3  spoke with -- I believe I spoke with Diane who
4  informed me that he was oftentimes over at the
5  house and he was a good -- like a caregiver
6  towards them at times and would take care of
7  things for them.
8       And so we were very interested in,
9  well, did he have -- Was this a proceeds?  Did
10 he have something -- Was there some basis for
11 him to kill them?  And now there was also the
12 aspect of, well, he is on drugs, and he doesn't
13 have a job.
14      So we kind of debated a little bit
15 about whether there is an absence or -- this is
16 in her memo of a motive whether it would suggest
17 that somebody was going to go commit two
18 murders.  There was some argument on this.  But,
19 yeah.  It's not like a clear that they had just
20 gotten in a fight that day and they came back
21 three hours later.
22      But there was -- from -- This doesn't
23 completely explain or flush out what we thought
24 about motive as a group so to speak.

---

39  (Pages 141 to 144)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 145

1    Q.  Okay.  But is it fair to say then that
2  you at least agreed with Ms. Cohen -- Her
3  position was there was no clear motive, correct?
4    A.  I would agree that that was her
5  position.
6    Q.  Okay.  And did you -- Okay.  Good.  We
7  have established that she thought there was no
8  clear motive.
9    A.  She did not.
10    Q.  Was she able to convince you that there
11  was no clear motive for him going ahead and
12  murdering these two people?
13    A.  Well, I mean, totally convince me?  No.
14  I mean, there is -- there is -- If he is on
15  drugs what's -- you know, how does he get his
16  money?  You know, for me there is other aspects.
17  He doesn't have to have, you know, have had a
18  physical confrontation with these individuals
19  before he does so.
20    But clear motive, I think that really
21  turns on the word clear so whether there is a
22  clear motive or not or whether there was some
23  hostility which I did not -- I did not get that
24  from any of the people I have spoken with about

Page 146

1  it, about whether there was hostility between
2  the grandma and the mother and Robert.
3    Q.  And, in fact, what you are really
4  learned from Derek, David, and Diane was the
5  exact opposite, that he had a very generally
6  good and generally close relationship with his
7  mother-in-law, correct?
8    A.  Well, no --
9    MR. NOLAND:  Objection.  Objection.
10  Foundation.  Inconsistent with the record.
11    MS. BENJAMIN:  Objection.
12    THE WITNESS:  And here, that's what I
13  would say Diane.  I don't think David would
14  vouch for that at all.  But so that's -- And
15  Derek I think I spoke to maybe once or twice.
16  So I can't speak for -- I am just saying there
17  was no one who said did -- was there any -- did
18  these guys have issues with each other?  Was
19  there some -- something that happened between
20  them?  Is there some money that was owed?  Was
21  something going on?
22    BY MR. CHANEN:
23    Q.  And the answer to those questions was
24  no repeated -- was repeatedly no, correct?

Page 147

1    MR. NOLAND:  Objection.  Form.
2  Foundation.
3    THE WITNESS:  From Diane it was we do
4  not believe that there was.  Believe.
5    BY MR. CHANEN:
6    Q.  Okay.  And but when you asked Derek or
7  David they never -- they never -- whether they
8  liked Robert or not, they never identified any
9  issue between Robert and his mother-in-law or
10  Robert and his grandmother, correct?
11    MR. NOLAND:  Objection.  Form.
12    THE WITNESS:  I'm sorry.  I interrupted
13  you.
14    MR. NOLAND:  Go ahead.
15    THE WITNESS:  Derek we can put to the
16  side because I don't think I had any
17  conversations with Derek about whether a motive
18  existed.  David -- David nothing sticks out as
19  to what -- you know, whether something was going
20  on that preexisted this, so I would have to say
21  he didn't give me any information that I didn't
22  know that would lead me to believe there was a
23  reason for Robert Smith to do what he did or
24  what he was alleged to have done or convicted

Page 148

1  with.
2    BY MR. CHANEN:
3    Q.  Did -- Did Ms. Cohen's position that
4  there was no clear motive for this crime -- I'm
5  sorry.
6    Were you aware that at the sentencing
7  hearing that the judge -- the judge who sat
8  through the trial and sentenced Mr. Smith stated
9  that from all apparent -- words to the effect
10  of, From all appearances, Mr. Smith loved his
11  grandmother -- loved his mother-in-law, and
12  loved his grandmother-in-law?  Words to that
13  effect.
14    MS. BENJAMIN:  Object to form.  Object
15  to form.  Misstates.
16    THE WITNESS:  Yes, he --
17    BY MR. CHANEN:
18    Q.  Go ahead, Myles.
19    A.  I believe he said something along the
20  lines of -- something along those lines.
21    Q.  Okay.  Do you agree that Mrs. --
22  Ms. Cohen's belief that there was no clear
23  motive for this crime as well as the degree to
24  which she did or did not convince you of that

Royal Reporting Services, Inc.
312.361.8851

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 149

1  fact was a factor in your decision to move to
2  vacate his criminal conviction?
3       MR. GRAMLICH: Object to that question
4  because it's been asked and answered maybe four
5  or five times at this point.
6       THE WITNESS: But I will -- I mean, I
7  will go ahead and answer it again. It was one
8  of the factors upon which we -- there was
9  consideration.
10 BY MR. CHANEN:
11      Q.  Okay. And that would be true for both
12 Decision No. 1 and Decision No. 2, both moving
13 to vacate and not opposing the Certificate of
14 Innocence?
15      MR. GRAMLICH: It's not same objection.
16 Go ahead.
17      THE WITNESS: I think so with respect
18 to Decision 1 and 2.
19 BY MR. CHANEN:
20      Q.  Okay. Ms. Cohen concluded that there
21 was no forensic evidence leaking -- linking him
22 to the crimes and then she identifies with
23 specificity four examples.
24      Did the fact that -- Well, first, you

Page 150

1  agree that Ms. Cohen believed there was no
2  specific forensic evidence linking him to the
3  crime?
4       A.  I think I am looking at a memo that
5  says it so you have to believe that, right?
6       Q.  All right. So every time I don't to --
7  I don't need to -- You would say that everything
8  that's asserted in the memo is something that
9  Ms. Cohen believed; is that fair?
10      A.  I think so, too, yes.
11      MR. NOLAND: Objection. Foundation.
12 BY MR. CHANEN:
13      Q.  And that she communicated it to you
14 both through the memo and even beyond the memo,
15 correct?
16      MR. NOLAND: Same objection.
17      THE WITNESS: Yeah. I mean, she
18 definitely communicated this to me, and we
19 definitely had numerous conversations, yeah, and
20 sessions where we spoke about this.
21 BY MR. CHANEN:
22      Q.  So did you agree with her -- Well,
23 let's take it in baby steps.
24      Did you agree with Ms. Cohen that there

Page 151

1  was no forensic evidence linking Mr. Smith to
2  the crimes?
3       A.  Do I agree with that there is no
4  forensic evidence?
5       Q.  No. Hold on. Hold on. Let's break it
6  down because we are going to talk about today
7  and we are going to talk about then.
8       A.  Sure.
9       Q.  When you had a discussion with
10 Ms. Cohen at the time or shortly after receiving
11 this memo --
12      A.  Right.
13      Q.  -- did you believe there was no
14 forensic evidence linking Mr. Smith to the
15 crimes?
16      A.  I always thought the green jacket was a
17 problem for the defense and the reason being is
18 the green jacket never went inside the house.
19 Everything else, if you are creating a
20 reasonable doubt about whether the persons could
21 have gotten blood fragments by taking off their
22 shoes in custody on the bottom of his feet, the
23 thing that always posed a problem for me is why
24 is there a -- something that has blood on a

Page 152

1  jacket that was never inside the house?
2       So do I agree with her that there is no
3  forensic evidence whatsoever in this world that
4  could have ever connected him at the time there?
5  The answer is, no. I did not agree with her
6  one-on-one on that.
7       Q.  Okay. Anything --
8       A.  I think that there was -- Do I think
9  that there was great forensic evidence linking
10 him to especially from the earlier I think was
11 it 1990 trial, I don't think there was great
12 forensic evidence linking him to the -- I am
13 going to try to do this -- the crimes back then,
14 no.
15      Q.  Got it. Did you share -- And when you
16 say that the fact that you didn't think there
17 was strong forensic evidence used against him at
18 the 1990 trial --
19      A.  Right.
20      Q.  -- did that have -- did that influence
21 you in making a decision to move to vacate his
22 conviction?
23      A.  Yes.
24      Q.  And did it influence you to choose not

Royal Reporting Services, Inc.
312.361.8851

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 153

1    to oppose the Certificate of Innocence?
2        A.  No.  I believe that the choice to not
3    oppose the Certificate of Innocence was made
4    with the dismissal or along the lines of.  It
5    was not -- It was not something that we were
6    going to do.  It was something that was
7    considered separate and apart from the decision
8    in the criminal case.
9        Q.  Okay.  But that's why I am asking it as
10   Decision 1 and Decision 2.  So I am asking so
11   you just said the fact that the forensic
12   evidence at the 1990 trial was weak, was a
13   factor in influencing your decision to move to
14   vacate his conviction.
15       I'm asking you if it was also a factor
16   in making your decision to not move to vacate?
17       A.  Oh, yes.
18       MR. NOLAND:  Hold on.  Hold on.
19   Objection.  Form.  Foundation.  Go ahead.
20       THE WITNESS:  Absence -- The absence of
21   the evidence, so I couldn't put on, like, a
22   report or -- Yes.  So the absence of evidence to
23   rebut a Certificate of Innocence.
24   BY MR. CHANEN:

Page 154

1        Q.  Okay.  Did you agree with Debbie on the
2    several specific items that she identifies in
3    this memo?  We will just go through them one at
4    a time and all I am really asking you, Myles, is
5    if at the time you made your decision to vacate
6    the criminal conviction, whether you agreed with
7    Debbie Cohen as to a specific fact that she
8    stated in the memo, and I am going to read the
9    fact to you, okay?
10       A.  Got it.
11       Q.  All right.  The fact that the knife was
12   taken -- that was taken into the evidence went
13   missing, was that something that influenced you?
14       A.  Sure.
15       Q.  Are you aware that the knife got
16   destroyed before Mr. Smith even filed his motion
17   to suppress evidence?
18       A.  I believe I was at the time.
19       Q.  And were you troubled by the fact that
20   the police had caused the knife to be destroyed?
21       MR. NOLAND:  Objection.  Form.
22   Foundation.
23       THE WITNESS:  I don't know who
24   caused -- I don't know who caused anything, so I

Page 155

1    can't speak to that.  I am just talking about
2    what I had.
3    BY MR. CHANEN:
4        Q.  Okay.  So putting aside who caused it,
5    did it trouble you that the knife had, in fact,
6    been destroyed within just a few months of being
7    recovered?
8        MR. NOLAND:  Objection to form.
9        MR. GRAMLICH:  Objection.  Asked and
10   answered.
11       THE WITNESS:  And just so you know, it
12   doesn't -- it didn't trouble me.  It's part of
13   the calculus that I am looking at what we have.
14   And I did take note that there was -- that a
15   knife was taken into evidence and we don't have
16   it anymore.
17   BY MR. CHANEN:
18       Q.  Okay.  Okay.  So then -- All right.
19   Sorry.  I deviated from my own plan.
20       In any event, you did agree with Debbie
21   that a knife that was taken into the evidence
22   was no longer available, correct?
23       MR. GRAMLICH:  Object.  Asked and
24   answered.

Page 156

1        THE WITNESS:  I mean, she represented
2    that; and I believe, you know, three,
3    four years, five years, six years ago, I believe
4    my -- my work on it suggested that was probably
5    true as well; so I did take her on that, yeah.
6    BY MR. CHANEN:
7        Q.  All right.  Now she also says bullets
8    never tested for prints.  There were bullets
9    found on the floor of the residence, correct?
10       A.  I believe so, yes.
11       Q.  And those bullets were never tested for
12   prints.  You agreed with Deb at the time that
13   you were having discussions with about vacating
14   the conviction, correct?
15       A.  Yeah.  I agree with her on that.
16       Q.  Did you agree with her that the back
17   door was not dusted for prints?
18       A.  Not that I could see.
19       Q.  Okay.  And were you also aware that
20   some prints that had been taken from one of the
21   doors they had never done a fingerprint
22   comparison, were you aware of that?
23       A.  I may have been.  I am not certain as
24   to that specific fact.

42  (Pages 153 to 156)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 157

1    Q. All right. They had never -- They
2  weren't able to identify a print on the gas can;
3  or if they did identify a print, they weren't
4  able to match it to Mr. Smith, correct?
5        MR. NOLAND: Object to the form of the
6  question. Mischaracterizes --
7        MR. CHANEN: I agree. I'll break it
8  down into two questions.
9  BY MR. CHANEN:
10   Q. Did you agree with Debbie that there
11  was no print on the gas can?
12       A. I agreed that she wrote that. I don't
13  have an -- I don't have any -- I didn't have a
14  report or testimony from somebody connecting
15  him -- a print of his to the gas can, no.
16   Q. Right. Right. And, in fact,
17  throughout the entire 1990 trial there wasn't
18  any fingerprint that anyone said matched his,
19  correct?
20       A. I don't believe there was any
21  fingerprint evidence introduced at the trial.
22   Q. Well, a fingerprint guy took the
23  witness stand but mainly to say that a print
24  that he thought -- he thought was suitable was

Page 158

1  not suitable. You went through that with
2  Mr. Noland, do you recall that?
3        A. Right. But we were talking about to
4  take his print from a gas can, is that what you
5  are saying?
6    Q. Yes. There was -- There was no such
7  evidence at his trial?
8        A. Yeah. There was no such evidence that
9  there was his prints on the gas can.
10   Q. And you -- and you and Debbie Cohen
11  realized that you had no such evidence matching
12  him to the crime scene through fingerprints at
13  all, correct?
14       A. Not that I was aware of, no.
15   Q. Okay. Ms. Cohen states that no blood.
16  Now by this, what do you understand her to mean?
17       A. She is talking about testing whether
18  there is -- one of the victim's bloods I think
19  it's about whether he has got their blood on
20  him, I think that's what it's talking about.
21   Q. All right. Did you and Ms. Cohen
22  discuss the fact that if he did have their blood
23  on him, it could have gotten on there when he
24  was thrown into the bloody water when he came

Page 159

1  into the house the second time? Is that
2  something you and Ms. Cohen discussed?
3        A. It was certainly something we discussed
4  about the incident about him getting on the
5  floor. Whether he contaminated the evidence or
6  whether there is testimony to say that he
7  contaminated the evidence, what impact that has
8  on, if anything, if there is blood on him.
9    Q. Okay. But that -- So my question is:
10  Did you and -- Did Ms. Cohen say words to the
11  effect to you of, If there is blood on his
12  person, it still wouldn't prove he is the
13  murderer. If the victim's blood was on him or
14  his clothing, it wouldn't prove that he was the
15  murderer because he could have gotten that blood
16  on him when he came back to the house later that
17  morning -- when he came to the house later that
18  morning with his wife?
19       MR. GRAMLICH: I am going to object.
20  You have to ask the question to where it's
21  comprehensible.
22       MR. CHANEN: Okay. I am going to ask
23  it again then. Sorry to -- to not --
24

Page 160

1  BY MR. CHANEN:
2    Q. Did you and Debbie talk about ways in
3  which Mr. Smith could get blood on him during
4  September 19, 1987?
5        A. Yes. We did discuss about this --
6  the -- the incident, the event where he is on
7  the floor and what, if any, impact that has to
8  do with connecting him through blood evidence or
9  DNA evidence.
10   Q. And was that a factor, the fact that --
11  that blood on his clothing or skin could not
12  establish that he was the murderer, did that
13  affect your opinion in deciding whether to move
14  to vacate his conviction?
15       A. Yes. It was amongst the -- it was
16  among the considerations with the evidence that
17  I had.
18   Q. Okay. Now what about no -- no razor
19  found? You agreed with Debbie that no razor had
20  been found, correct?
21       A. Right.
22   Q. Were you aware whether anyone had gone
23  back after Mr. -- Sorry. That was badly
24  phrased. Let me try again.

43 (Pages 157 to 160)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

---

Page 161

1      **When Mr. Smith confessed that evening,**
2 **the evening of the 19th, somewhere between**
3 **approximately 9 -- 9:00 and 10:00 o'clock or**
4 **later when his recorded statement -- Let me back**
5 **up.**
6      **In his recorded statement, Mr. Smith**
7 **said he threw the razor blade on the floor; is**
8 **that correct?**
9   A. Yes.
10   **Q. From your experience of dealing with**
11 **police procedures as a special prosecutor, would**
12 **the next normal step be to go search for such a**
13 **razor blade?**
14     MR. NOLAND: Objection. Foundation.
15     THE WITNESS: Normal procedure there is
16 no normal procedure really. I mean, but would
17 somebody try to go ahead -- Do I think that
18 somebody could have gone ahead and looked for
19 the weapon, would that have -- If they obtained
20 it, would that have been helpful? Of course it
21 would have.
22 BY MR. CHANEN:
23   **Q. And a murder --**
24   A. But procedure, I am not a police

---

Page 162

1 officer, and I certainly can't speak to what the
2 normal procedures or protocols are if they think
3 they have sufficient evidence or not.
4   **Q. So but you do agree generally that**
5 **searching for the murder weapon can be an**
6 **important element in a murder investigation?**
7     MR. NOLAND: Objection.
8     THE WITNESS: Yes. I mean, yes. You
9 wish to have obtained the murder weapon, yeah.
10 BY MR. CHANEN:
11   **Q. And if you -- What would you have done**
12 **in that regard to search for the razor blade**
13 **that night or the next morning when the light**
14 **came on?**
15     MR. GRAMLICH: Object. Calls for --
16     MS. BENJAMIN: Object to form.
17 Foundation.
18     THE WITNESS: Write a brief about it,
19 Stuart? You are asking me what I would have
20 done about it?
21 BY MR. CHANEN:
22   **Q. Yeah, I am.**
23   A. Come on. What would I have done? I
24 would have -- I mean, I am an attorney.

---

Page 163

1   **Q. Yeah. Okay. But, Myles, what I am**
2 **asking is you do agree that had they done a**
3 **search, they could have gone and collected the**
4 **debris off of the floor of the house, correct?**
5     MR. NOLAND: Objection. Foundation.
6     MR. CHANEN: Correct?
7     MR. NOLAND: Objection.
8     THE WITNESS: I could speculate and
9 suggest that, yes, they could have gone
10 conceivably to go get a murder weapon and the
11 case would have been great if they had a murder
12 weapon with his prints on it.
13 BY MR. CHANEN:
14   **Q. Did it trouble you when you were having**
15 **these discussions with Ms. Cohen at or about the**
16 **time this memo was prepared that no -- that you**
17 **could not see any evidence of anyone going back**
18 **to search for the murder weapon?**
19     MR. NOLAND: Objection. Form.
20 "Trouble."
21     THE WITNESS: It was a part of the
22 items in consideration. Did it trouble me?
23 This is what we have. I mean, it is not
24 troubling to me. It's just what we have, so...

---

Page 164

1 BY MR. CHANEN:
2   **Q. All right. Okay. Did it -- So for**
3 **purposes of your analysis in deciding to vacate**
4 **this conviction, is it fair to say you relied in**
5 **part on the fact that no murder weapon was ever**
6 **found?**
7   A. That was one of the considerations,
8 correct.
9   **Q. And was it also one of the**
10 **considerations that no murder weapon was ever**
11 **searched for?**
12     MR. NOLAND: Objection.
13 Mischaracterizes the record.
14     THE WITNESS: That we didn't have
15 any -- that we didn't have -- we didn't have any
16 kind of report or anything to go search for it
17 was one of the considerations she raised to me.
18 Did that -- Did that trouble me? No. I mean,
19 not necessarily. Some people do make them or
20 not.
21     I think that the absence of GPRs
22 regarding statements are a little bit -- for me
23 was a little bit different but not with -- but
24 not with this. We just didn't have a murder

Royal Reporting Services, Inc.
312.361.8851

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 165

1  weapon that was included.
2  **Q. Did -- Did --**
3       MS. BENJAMIN: Stuart, I don't know --
4  Stuart, hold on. I don't know if you can see it
5  from your phone, but the videographer said about
6  like five or six minutes ago that he needs to
7  break to switch tapes. So I don't know if you
8  are aware of that.
9       MR. CHANEN: Thank you. In fact, I was
10  not able to see that from the phone or if it did
11  pop up, I missed it.
12      MS. BENJAMIN: I didn't think so.
13      MR. CHANEN: And I appreciate your
14  pointing it out, and we will have to take a
15  break for purposes --
16      THE WITNESS: My attorney has a
17  question. Dean is here. He has a question.
18      MR. GRAMLICH: How much longer is this
19  going to be?
20      MR. CHANEN: I don't know, Dean. Hold
21  on. I will tell you in a second. How long --
22  How long have we gone for?
23      MR. GRAMLICH: We are going through
24  every factor of this memo when the memo speaks

Page 166

1  for itself and says what it says.
2       MR. CHANEN: Well, wait a second, sir,
3  your client at the beginning of my pointing out
4  the memo said that these were Debbie's lists;
5  but since it's a summary, it doesn't explore all
6  the discussions that he and Debbie had about
7  these issues and your suggestion that I have to
8  rely standing alone on this document without
9  asking him how much of it influenced his
10  decision-making and how much of it he discussed
11  with Ms. Cohen is completely improper.
12      THE WITNESS: Okay. That's fair, but,
13  Stuart, Stuart, do we know how much time they
14  have? Can you give us an idea because right now
15  we are going on six hours.
16      MR. CHANEN: Yeah. I will try to
17  finish it within an hour.
18      THE WITNESS: Okay. Thank you, because
19  I have a hard stop -- Just so you know, I have a
20  hard stop at 3:30.
21      MR. CHANEN: All right. Very good.
22      THE WITNESS: Thanks.
23      THE VIDEOGRAPHER: Okay. We are going
24  off the record at 1:35 p.m. This is the end of

Page 167

1  Media Unit 2.
2       (Whereupon, a short recess was
3       taken.)
4       THE VIDEOGRAPHER: Okay. We are back
5  on the record. The time is 1:44 p.m. This is
6  the beginning of Media Unit 3.
7  BY MR. CHANEN:
8       **Q. All right. Thank you. Debbie Cohen's**
9  **next bullet point is that no murder weapon,**
10  **alleged razor, was found or even searched for.**
11      **Now this is something -- I am not going**
12  **to go through it all again. This is something**
13  **we just covered in the prior section, correct?**
14      A. Yes.
15      **Q. And it's something you -- was a factor**
16  **that not only did Debbie articulate it but also**
17  **a factor that you relied upon in coming to the**
18  **decision to move to vacate Mr. Smith's**
19  **conviction, correct?**
20      A. Correct.
21      **Q. All right. Next bullet point says, do**
22  **not need keys to get in the house because**
23  **basement door was open. House was found open**
24  **with lights on in the basement. Anybody could**

Page 168

1  have entered that house.
2       **Now, is this something that you agreed**
3  **with or disagreed with Ms. Cohen?**
4       A. Agreed, and it contradicts an earlier
5  statement or conclusion I had arrived at. She
6  went back and looked at the testimony; and it
7  was -- She was correct. I think that there was
8  a cellar door that was ajar.
9       **Q. And did that -- and that cellar door**
10  **unlike the two upstairs doors did not have**
11  **burglar bars, correct?**
12      A. I believe so.
13      **Q. All right. And was this a factor in**
14  **making your decision when Debbie Cohen went and**
15  **found that indeed the basement door was in a**
16  **different posture than the two upstairs doors,**
17  **did that also have an influence on you, Myles**
18  **O'Rourke, in deciding to vacate Mr. Smith's**
19  **conviction?**
20      A. Yes.
21      **Q. Now, this one was also touched upon**
22  **above, but I am just going to read it quickly.**
23  **A knife was taken from the house and put into**
24  **evidence but not fingerprinted or -- hold on, my**

45 (Pages 165 to 168)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 169

1　screen went out -- not fingerprinted and
2　preserved.
3　　　I think we have covered that and my
4　only question is:  Did this influence you in
5　deciding to vacate Mr. Smith's conviction?
6　　A.  Yes.
7　　Q.  Did you and Ms. Cohen discuss the fact
8　that someone -- a pathologist could have
9　compared the knife to the wounds of Ms. -- of
10　the two victims and perhaps made a determination
11　of whether that knife had been used as the
12　murder weapon?
13　　　MR. NOLAND:  Object to form.
14　　　THE WITNESS:  I do not recall that
15　specific -- specific -- that specificity with
16　respect to the conversation, but that's
17　certainly an understanding.
18　BY MR. CHANEN:
19　　Q.  Okay.  And did Ms. Cohen express that
20　she was troubled by the fact that a piece of
21　evidence like a knife that was put into evidence
22　by the police department was neither
23　fingerprinted nor preserved?
24　　A.  I think that was an issue that she had,

Page 170

1　yes.
2　　Q.  All right.  And -- Okay.  And but
3　beyond just repeating those words, she felt
4　strongly about it and was -- and was critical of
5　the fact that that knife had been made to
6　disappear, correct?
7　　　MR. NOLAND:  Objection.  Form.
8　Foundation.
9　　　MS. BENJAMIN:  Object to form.
10　　　MR. GRAMLICH:  Speculation.
11　　　THE WITNESS:  I mean, I don't know
12　about being made to do anything.  I mean, was
13　that something that she was -- she considered?
14　Yes.  This is something that she related to me.
15　BY MR. CHANEN:
16　　Q.  Okay.  And something you considered in
17　deciding to vacate the conviction?
18　　A.  Yes.
19　　Q.  All right.  And something you
20　considered in deciding not to move -- not to
21　oppose Mr. Smith's motion petition for a
22　Certificate of Innocence?
23　　A.  Yes.
24　　Q.  All right.  The next bullet point says,

Page 171

1　gun ammunition was found, never tested,
2　fingerprinted, questioned.
3　　　This refers to -- And we touched on
4　this briefly, and I won't spend much time on it.
5　You are aware that bullets were found on the
6　floor of the crime scene?
7　　A.  That's my understanding.
8　　Q.  And there was -- And is it a fair
9　inference -- and given what Diane had said to
10　Detective Dekatus (phonetic) and others is the
11　belief that there was a gun and ammunition in
12　the drawer of that bedroom prior, prior to the
13　robbery, prior to the burglary?
14　　A.  Diane might have said something along
15　the lines of it was kept somewhere.  It may have
16　been in their bedroom.
17　　Q.  Okay.  And she did tell one of the
18　detectives that a gun was missing from the home,
19　correct?
20　　A.  Yes.  That, I remember.
21　　Q.  And there were bullets on the floor,
22　correct?
23　　A.  Yes.
24　　Q.  And the point that Ms. Cohen was

Page 172

1　making, as stated in this bullet point, was that
2　those bullets were never tested or
3　fingerprinted, correct?
4　　A.  Yes.  I believe that is a point she was
5　making.
6　　Q.  And that the absence of the gun and the
7　bullets on the floor were never questioned,
8　meaning that no part of the investigation that
9　was done into the murder raised any significant
10　issue about the missing gun or the bullets on
11　the floor, correct?
12　　　MS. BENJAMIN:  Object to form.
13　　　THE WITNESS:  I think that that has to
14　do with -- I would say that's correct.
15　BY MR. CHANEN:
16　　Q.  All right.  And did that influence your
17　decision to move to vacate Mr. Smith's
18　conviction?
19　　A.  Correct.
20　　Q.  And also influence your decision in
21　Decision No. 2, correct?
22　　A.  Correct.
23　　Q.  All right.  What about the next point?
24　Drawers were open in the bedroom and things were

46  (Pages 169 to 172)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 173

1  strewn about indicating a possible burglary.
2  Did that influence your decision to move to
3  vacate Mr. Smith's conviction?
4      A.  Yes.  I considered it with, again, with
5  the gun ammunition being found, that there is a
6  taking -- perhaps taking of a weapon, perhaps
7  taking of other items and where -- were these
8  items on Robert Smith's person when he was going
9  back to the -- I think the apartment that he was
10  hanging out with Sally Payne or the apartment,
11  did anybody it see him with a gun, that type
12  of --
13      Q.  Yeah.
14      A.  Right.
15      Q.  Yeah.  So do you know if the police
16  ever took -- undertook any investigation
17  whatsoever to look for the gun?  Did they go
18  back -- Did they go back to Sally Payne's house
19  to look for the gun?  Did they look for the gun
20  in Diane Smith's car?  Did they look for the gun
21  anywhere?
22      A.  I can just tell you that I didn't
23  see -- I am not certain, but I didn't see
24  reports on it of whether they did or did not.

Page 174

1      Q.  Okay.  All right.  Now, let's go to the
2  next bullet point.  Defendant did not sign the
3  admission but signed the photograph and
4  initialized the address.  So let's talk about
5  this for a second.
6      Earlier in your thinking about the
7  case, you had written in one of your own memos
8  or e-mails words to the effect of if his will
9  was broken and he -- such that he went ahead and
10  gave a confession, how could he then have the
11  presence of mind to insist not to sign the
12  confession or words to that effect; is that
13  fair?
14      A.  If his will was overborne, it would
15  be -- it kind of cuts against his will being
16  overborne if he is allowed not to sign a
17  statement which is kind of -- and I think we
18  referenced it as People versus Kinkaid which is
19  an Illinois Supreme Court case from the early
20  '80s.
21      Q.  Okay.  And yet -- and yet Debbie Cohen
22  wrote in her memo that his refusal to sign the
23  admissions made in the written transcript still
24  influence -- was an influence to her as a factor

Page 175

1  of -- Well, I don't want to put words in your
2  mouth.
3      What did Debbie Cohen have to say about
4  the fact that he did not sign the transcript of
5  his court-reported admission?
6      A.  Well, I think on that one we were kind
7  of contrary in that she believed that that could
8  be evidence that this was not -- that this is
9  not something that he wished to sign.  To me,
10  him not -- being able not to sign it cut against
11  any question about voluntariness, so I think we
12  had a difference of opinion on that fact.
13      Q.  So it's fair to say that unlike the
14  earlier bullet points where you indicated it did
15  affect your decision to move to vacate, you
16  would state that with respect to this bullet
17  point, it did not affect your -- it did not move
18  you towards a decision to move to vacate Robert
19  Smith's conviction?
20      MR. NOLAND:  Hold on.  Objection.
21  Mischaracterizes the testimony.
22      THE WITNESS:  I did not say that.  I
23  did not say that.  What I am speaking of is with
24  respect to the coercion claim.

Page 176

1  BY MR. CHANEN:
2      Q.  Okay.
3      A.  And I would think when it comes to
4  whether there is an issue of reasonable doubt
5  whether somebody had made to another person,
6  casts some -- casts some questions over whether
7  that individual was freely and voluntarily -- or
8  whether that was a good piece of evidence in the
9  actual trial.
10      But when it comes to the coercion case,
11  I didn't have a problem with this specific fact
12  because I said, okay.  Well, if he is not being
13  forced to sign a statement, then I think it cuts
14  against his will being overborne at the time
15  that he gave a statement as long as --
16      Q.  Okay.
17      A.  Right?  As long as we believe -- I am
18  speaking to myself.  I'm sorry, but the -- So it
19  really -- It's a little bit different what I
20  look at it as.
21      In a coercion case, a coercion case
22  standing aside, I would use this as a fact -- I
23  could conceivably use this as a fact that would
24  suggest that the statements were not -- were not

47 (Pages 173 to 176)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 177

1  coerced.
2  **Q. Okay. But -- but do you agree with**
3  **Debbie that if the case were to be retried, not**
4  **having his signature on the purported confession**
5  **could be problematic and, therefore, even though**
6  **you had some disagreement with Debbie on this**
7  **issue, nevertheless, it did support moving to**
8  **vacate Mr. Smith's conviction but didn't support**
9  **Mr. Smith's allegations of coercion?**
10     MR. NOLAND: Vague and to form.
11     MS. BENJAMIN: Form.
12     THE WITNESS: You delineated the
13  nuance. There is the nuance.
14  BY MR. CHANEN:
15     **Q. Okay. And so you would agree with the**
16  **statement I just made, it captures the nuance**
17  **you intended?**
18     A. To an extent, yes.
19     **Q. All right. Okay. The next bullet says**
20  **gas can originally had suitable prints and then**
21  **a month later did not.**
22     A. Yes.
23     **Q. And then so let's just take that first**
24  **and then we will get to the subpoint which is a**

Page 178

1  **slightly different point.**
2     **Ms. Cohen expressed to you the fact**
3  **that it was, you know, I keep using the word**
4  **troubling. She felt it was a negative that**
5  **someone concluded that there were suitable**
6  **prints, and then simply decided a month later**
7  **that they were unsuitable. She -- She found**
8  **that troubling, is that fair to say as the first**
9  **step?**
10     MR. NOLAND: Objection to the form.
11     THE WITNESS: I can't -- I believe that
12  this was something that concerned her. Whether
13  it found her troubling -- whether she found it
14  troubling, I am not certain; but I am certain
15  that it did -- was something that she considered
16  because it's in -- it's here.
17  BY MR. CHANEN:
18     **Q. Okay. And is it something she**
19  **communicated to you that she was concerned**
20  **about?**
21     A. She communicated the absence of this
22  evidence.
23     **Q. All right. And was it a factor that**
24  **factored into your decision regarding Decision**

Page 179

1  **No. 1?**
2     A. Yes.
3     **Q. And was it a factor in your decision**
4  **regarding Decision No. 2?**
5     A. Yes.
6     **Q. The subpoint underneath the gas can is**
7  **did not make any comparison of the prints when**
8  **he originally thought they were suitable.**
9     **In other words, she is basically saying**
10  **how come in the months after taking a print you**
11  **found suitable, you did not -- the police did**
12  **nothing to compare it to the gas can?**
13     **Is it fair to say that Debbie Cohen was**
14  **concerned that no one had bothered to do that**
15  **comparison at a time they thought the print was**
16  **suitable?**
17     MR. NOLAND: Objection. Form.
18  Foundation.
19     MS. BENJAMIN: Objection.
20     THE WITNESS: I think the form is a
21  problem, Stuart, but I have answered the
22  question and I think it was a consideration that
23  we looked at.
24  BY MR. CHANEN:

Page 180

1     **Q. Okay.**
2     A. I don't know whether she was -- what
3  she is thinking in her mind, I am not certain.
4     **Q. Well, what did she articulate to you?**
5     A. What you are reading.
6     **Q. Did she go beyond what I am reading?**
7     A. She stated that there was no evidence
8  of a print on the gas can and there was no
9  evidence regarding that the gas can -- She found
10  that there was an issue with respect to a gas
11  can being suitable for comparison and that and
12  then found not to be suitable for comparison.
13     **Q. All right. And also a concern that**
14  **nothing was done about a suitable print for the**
15  **first month that they held the evidence,**
16  **correct?**
17     MR. NOLAND: Objection.
18  Mischaracterizes.
19     THE WITNESS: I don't know if she told
20  me that.
21  BY MR. CHANEN:
22     **Q. All right. All right. Okay. Did the**
23  **fact that there was no comparison taken from the**
24  **print to the gas can influence your decision as**

48 (Pages 177 to 180)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 181

1  to Decision 1?
2       A.  Yes, it did.
3            MR. NOLAND:  Objection.  Form.
4  Foundation.
5  BY MR. CHANEN:
6       Q.  And as to Decision 2?
7            MR. NOLAND:  Same objection.
8            THE WITNESS:  Yes.  This is -- This is
9  part of what was evaluated.
10 BY MR. CHANEN:
11      Q.  Okay.  The next one says, no
12 circumstantial evidence linking him to the
13 crimes besides Smith's dive into the blood at
14 the house according to McWeeny and his
15 confession.
16          Tell me in your own words, you know,
17 what did Ms. Cohen say to you about this
18 subject?
19      A.  I think she was trying to explain or
20 convey that it didn't make a lot of sense to her
21 that if he -- why he would dive into blood or
22 why he -- about the testimony that there was
23 some testimony at the motion to suppress that I
24 don't think made a lot of sense, but what this

Page 182

1  specific section means or what it meant to her,
2  I'd have to say I don't really recall what she
3  said with respect to this specific section.
4       Q.  Okay.
5       A.  I do believe she was concerned about
6  some of the testimony offered by the defendant
7  regarding the whereabouts of Robert Smith,
8  whether he is in the house, whether he is in the
9  back porch.  How does he get back in the house?
10 Is he with Diane?  Is he not with Diane?  Those
11 type of things.
12      Q.  Did you and -- Did either she or you
13 look at the evidence regarding the issue of,
14 quote, "diving into the blood" before making a
15 decision to move to vacate Robert Smith's
16 conviction?
17      A.  Yes.  We compared testimonies but --
18      Q.  Okay.  And did -- Did Ms. Cohen express
19 the view that she believed McWeeny was lying?
20      A.  I believe she -- I don't recall that.
21      Q.  Okay.
22      A.  I am not sure.  I believe -- That
23 specific statement, I don't -- I don't know if
24 she did or did not.  I don't recall that.

Page 183

1       Q.  Did she tell you that regard -- Putting
2  aside whether he was lying or not, did Ms. Cohen
3  say to you that she did not find Mr. McWeeny's,
4  Detective McWeeny's, version of the events to be
5  credible given the other evidence about people
6  saying they went outside immediately and waited
7  a half hour before reentering the house or words
8  to that effect?
9            MS. BENJAMIN:  Object to -- Object to
10 form.  Mischaracterizes the evidence.
11           THE WITNESS:  I think that there was a
12 difficulty squaring the testimony that she
13 alerted me to, that it was very, very -- that
14 you had testimony that was there blood in the
15 hallway or was there not.  I don't know if she
16 used the specific words, I think he is lying or
17 this person is lying; but as to -- as to having
18 a definite understanding of what occurred in the
19 house upon them coming to the house around
20 5:00 a.m., that was what I thought she was --
21 was speaking of here.
22 BY MR. CHANEN:
23      Q.  Okay.  But do you agree with her --
24 Well, I am going to ask the same question two

Page 184

1  different ways.
2           Did you agree with her that the dive to
3  hide incriminating evidence made zero sense?
4       A.  Not necessarily.  I mean, that wasn't
5  something that I took with any great gravitas
6  whether somebody would or not, especially
7  somebody who may or may not be very high on
8  drugs at the time that they are doing so.
9       Q.  Okay.  What was your understanding
10 about what happened to him -- I'm sorry.
11          Okay.  All right.  Was this a factor --
12 Was the statement that Debbie Cohen made that
13 there was no circumstantial evidence linking him
14 to the crimes other than the confession and the
15 dive into the blood, that there was no other
16 evidence other than those two things, did that
17 influence your Decision No. 1?
18      A.  To the extent that it related to
19 certain inconsistencies in the testimony on a
20 retrial, that would have been -- we would have
21 to prove up, yes.  It did contribute to a
22 decision to make a dismissal.
23      Q.  And also Decision No. 2, not to oppose
24 the Certificate of Innocence?

49 (Pages 181 to 184)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 185

1    A.  Well, the topical headline, No
2  circumstantial evidence certainly would; but I
3  am not certain as to -- Again, the paragraph
4  here I think is a little bit -- for me it's
5  hard -- it's hard to kind of deduce what Debbie
6  meant word for word on this one.
7    Q.  Okay.  And you don't have any memory of
8  how -- of what she said to you to expand upon
9  what's written here?
10    A.  Respecting this other than what I just
11  testified, not -- not that I can recall.
12    Q.  All right.  One of the things -- and we
13  have covered now the diving into the blood but
14  she adds here a separate bullet point that
15  McWeeny never wrote a report -- or I'm sorry.
16  Let me rephrase that.
17    That no one had written a report of him
18  diving into any blood and being arrested for
19  obstruction.  She goes on to say McWeeny wrote
20  five reports but no mention of blood or
21  obstruction even though he claims he had never
22  seen anything like that before and McWeeny
23  testified in motion to dismiss -- Look, I'm
24  sorry.  Let's stop at anything like that before,

Page 186

1  and then we'll deal with the last phrase as
2  well.
3    Does the fact that McWeeny wrote five
4  reports and nowhere in any of those GPRs did he
5  ever mention that he saw Robert Smith dive into
6  a pool of blood even though he had never seen
7  anything like that before, did that fact concern
8  you or trouble you in any way?
9    MR. GRAMLICH:  Object.  Lack of
10  foundation.
11    THE WITNESS:  Again, was it a
12  consideration of mine, the absence of reports
13  that ties to a fact?  Yes.  It goes into my
14  consideration.  Did it trouble me --
15  BY MR. CHANEN:
16    Q.  And one of -- And one of --
17    MS. BENJAMIN:  Hold on.  He wasn't done
18  answering.
19    MR. CHANEN:  Oh, sorry.
20    THE WITNESS:  Did it trouble me?  The
21  answer is no.  It didn't trouble me.  It's a
22  part of the calculus, but it doesn't trouble me.
23  BY MR. CHANEN:
24    Q.  Okay.  McWeeny testified in the motion

Page 187

1  to suppress that no one else saw him dive into
2  the blood.  What did Ms. Cohen say to you about
3  that fact?
4    MR. GRAMLICH:  Object.  Lack of
5  foundation.
6    THE WITNESS:  That no one else saw it?
7  I don't know what she told me about that
8  specific fact.  Again, recalling specific
9  details, I think there was an issue regarding
10  the competing testimonies regard -- with respect
11  to the blood and the presence of blood and him
12  being in the blood.
13    I do believe that there were -- another
14  officer testified to it, but there was a
15  question I think that was raised regarding him
16  coming and going back into the house that was
17  just not squared away.  It was inconsistent with
18  some of the other testimony.
19    Q.  Was this a factor that factored into
20  your decision to -- and by "this" I mean
21  everything she says about McWeeny and there not
22  being a written report about the blood, diving
23  into the blood incident, did that influence your
24  decision regarding Decision No. 1?

Page 188

1    MR. NOLAND:  Objection.  Form.
2  Mischaracterizes the evidence.
3  BY MR. CHANEN:
4    Q.  You can answer.
5    A.  What I am -- What I am recalling, yes.
6  It does -- it does -- it did factor into my
7  consideration.
8    Q.  Okay.  And also with respect to
9  Decision No. 2?
10    A.  Correct.
11    Q.  All right.  Now, you mentioned that
12  another officer testified that he had seen it
13  happen and that would be Officer Hughes,
14  correct?
15    A.  Yes.  Warren Hughes.
16    Q.  Yeah.  Were you aware at the time you
17  and Deb Cohen were having this discussion that
18  Warren Hughes had given a statement to the OPS
19  that had never been turned over to your office?
20    A.  I think you just answered it.
21    Q.  Well --
22    A.  No.
23    Q.  Wait.  Wait.  Hold on.  As you sit here
24  today, are you aware that Mr. Hughes gave a

50  (Pages 185 to 188)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 189

1   statement to the Office of Professional
2   Standards?
3        A.  With respect to this case or with
4   respect to --
5        Q.  Yes.  No.  No.  Very specifically with
6   respect to this case including testimony about
7   the dive in the blood incident.
8        A.  Not that specific OPS report, no.  I am
9   not certain about that, Stuart.
10       Q.  All right.  Did you -- When you
11  subpoenaed the Chicago Police Department for
12  their records, did you expect the Chicago Police
13  Department to provide you with all statements
14  that had been made by detectives and officers
15  with respect to the investigation if it fell
16  within your subpoena request?
17       MR. GRAMLICH:  Object to the form of
18  the question.
19       THE WITNESS:  We normally request a
20  complete investigative file, so whatever is in
21  there.
22  BY MR. CHANEN:
23       Q.  Okay.  And would you have expected the
24  OPS file as well?

Page 190

1        MR. NOLAND:  Objection.  Form.
2   Foundation, and best evidence rule.
3        THE WITNESS:  I think we served a
4   subpoena on the Office of Professional
5   Standards, and I would expect it to be complete.
6   BY MR. CHANEN:
7        Q.  All right.  One of the things that
8   McWeeny testified to was that Diane and
9   Robert -- when Diane arrived at the door and
10  Robert was with him, he then led Diane into the
11  house during the investigation of the double
12  homicide and Debbie is criticizing that
13  testimony that he had walked them into the crime
14  scene as being illogical, and that Robert's
15  story and Diane's story is more credible.
16       Did you agree with Debbie Cohen that it
17  was not credible that McWeeny would walk people
18  into a crime scene and that Robert and Diane's
19  story about waiting outside was more credible?
20       A.  I did not -- I did not agree or
21  disagree with -- with -- with this statement
22  that it is illogical that he would walk Diane in
23  a house during an investigation of a double
24  homicide, but I am not saying it's never

Page 191

1   happened before where I have seen it happen in
2   some other incidents if I recall correctly.
3        But I do -- did note that Diane and
4   Robert Smith gave, I believe, testimony that was
5   corroborative with respect to the timing of him
6   going into the blood and whether he went there
7   one time or whether he went there twice, I
8   believe there was a five-minute conversation
9   that took place between the rear of the house
10  with Paul Ward or 5 to 15 minutes, and where did
11  he come from?  Did he come from the back?  Did
12  he go up to the house?  Did he arrive, come in
13  from the back door?  Or did he come back around
14  to the front door himself at which time he
15  wouldn't have been with Diane.
16       So these are certain parts -- certain
17  parts that were with, you know, taken into
18  consideration in the calculus.
19       Q.  Well, but when push came to shove and
20  after everything that Debbie Cohen wrote in this
21  memo and everything additional she shared with
22  you about the subject of the story of Mr. Smith
23  diving into the blood, did you weigh a factor --
24  as a factor any -- either the credibility that

Page 192

1   Robert and Diane had on how that day -- how that
2   event unfolded or McWeeny and other officers and
3   how the event unfolded?  Did that influence your
4   decision as to Decision 1?
5        A.  Whether I have competing testimony in
6   the facts, yes, that would have -- that led to
7   the arrest, yes, that's a factor that we took
8   into consideration.
9        Q.  And did you -- And is your position
10  that you agreed with Debbie Cohen or disagreed
11  with Debbie Cohen or took no position on her
12  position that Robert and Diane were more
13  credible than McWeeny about the blood incident?
14       A.  I take any such position --
15       Q.  You had no -- You were totally
16  neutral --
17       MS. BENJAMIN:  Can you let him answer
18  the question?  You keep interrupting him.
19       THE WITNESS:  No.  I am not -- I am not
20  trying to be saying that I am not totally
21  neutral on it.  I am saying that these
22  investigating -- There is an investigation of a
23  crime scene and there is a house that was just
24  recently charred that they are going through.

51  (Pages 189 to 192)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 193

1  Whether their memory recollection in
2  hundreds of homicides match the -- like match
3  the other witnesses is what I am concerned with.
4  What does it look like?  Whether we have a story
5  as to how this person is arrested, and I am not
6  suggesting that one is more -- I didn't look at
7  it so much as a credibility determination so far
8  as do we have facts that match up?  Or is this
9  in dispute or is it not in dispute?
10  And certainly she believed that there
11  was corroborating evidence, and I can't say that
12  she was wrong that there is corroborating
13  evidence that details an entrance or arrival
14  that's somewhat different than what Detective
15  McWeeny recalled, but Detective McWeeny's was
16  corroborated to some extent, or lesser maybe, by
17  Warren Hughes and defendant's story was
18  corroborated by Diane to some extent and Paul
19  Ward.
20  MR. OLSTEIN:  Stuart, I'm story to
21  interrupt.  Did you want me to put up the Hughes
22  OPS statement?
23  MR. CHANEN:  Yeah.  Go -- Yeah.  No,
24  Ariel.  We are going to do that at the end.  At

Page 194

1  the very tail end we will just go through all
2  the exhibits that were not shared with
3  Mr. O'Rourke.
4  MR. OLSTEIN:  No problem.
5  BY MR. CHANEN:
6  **Q.  All right.  No blood match to defendant**
7  **of any of the blood in the house.  So they are**
8  **now this was Ms. -- This was Ms. Cohen's**
9  **position after looking at all the evidence as of**
10  **this snapshot in time that you and she were**
11  **discussing what the blood evidence showed; is**
12  **that correct?**
13  A.  Yes.  She was presenting this to me.
14  **Q.  And she basically in oversimplified**
15  **terms she said there was no testimony at the**
16  **trial that Mr. Smith had the victims' blood on**
17  **him; is that correct?**
18  A.  Right.
19  **Q.  And that -- And then she gives some**
20  **different examples about the way the blood was**
21  **treated -- or what inferences could be drawn**
22  **from the blood from the evidence that had been**
23  **presented, correct?**
24  A.  I think so, yes.

Page 195

1  **Q.  All right.  And did this influence you,**
2  **the fact that no blood matched to defendant of**
3  **any of the blood in the house, did it influence**
4  **your decision in deciding to move to vacate the**
5  **murder conviction?**
6  A.  Yes.
7  **Q.  And did -- And also as to Decision**
8  **No. 2?**
9  A.  Yes.
10  **Q.  And have you learned anything since**
11  **making a decision to do so that would alter your**
12  **decision to vacate the conviction, anything very**
13  **specifically about the blood?**
14  MR. NOLAND:  Objection.  Asked and
15  answered.
16  THE WITNESS:  I believe I have answered
17  that.
18  BY MR. CHANEN:
19  **Q.  So tell me -- So I'm sorry if I am**
20  **asking you to repeat but go ahead and repeat.**
21  A.  I'm sorry.  There was a stipulation
22  that was presented to me.
23  **Q.  All right.  And that's -- And so what**
24  **do you understand the stipulation to provide?**

Page 196

1  A.  I believe that there was a stipulation
2  to -- I would have to look at it again.  I don't
3  want to paraphrase, but there was a stipulation
4  that suggested that there were some blood that
5  matched that was found on his person.
6  **Q.  Do you agree that if blood was found on**
7  **his person, it's possible that -- if blood was**
8  **found on his person, it could have gotten on him**
9  **when he and his wife returned to the house**
10  **between 5:30 and 6:00 a.m. on September 19th,**
11  **correct?**
12  MR. NOLAND:  Objection to form.
13  Foundation.
14  THE WITNESS:  I think it's possible.
15  MR. NOLAND:  Mischaracterizes the
16  record.
17  THE WITNESS:  It's possible.
18  BY MR. CHANEN:
19  **Q.  Yep.  Let's go down to no smell of**
20  **gasoline on Smith from cops or Diane.  What did**
21  **Diane -- What did Debbie Cohen say to you about**
22  **this subject?**
23  A.  I think it was just mentioned that
24  there was no testimony that he smelled or reeked

52  (Pages 193 to 196)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 197

1  of gasoline.
2      Q.  And did you -- And was she -- Did she
3  say words to the effect that if he took gasoline
4  in a gas can and splashed it around the living
5  room and/or the dining room, that if he had done
6  that, there would be a likelihood that he would
7  smell of gasoline or that basically Debbie
8  was -- said that to you or drawing that
9  inference, correct?
10      MR. NOLAND:  Objection.  Form.
11  Foundation.
12      THE WITNESS:  I think she believed
13  that, yes.
14  BY MR. CHANEN:
15      Q.  And did you agree with her?
16      A.  Not necessarily -- Not entirely.  I
17  mean, it's certainly possible that you can do
18  that without getting gasoline on yourself but --
19      Q.  Okay.
20      A.  -- but in the absence of evidence, did
21  it come into my consideration, so I will answer
22  your next question, the answer is yes.
23      Q.  Okay.  And in addition to the cops not
24  saying they smelled gasoline on Smith and Diane

Page 198

1  saying that they hadn't smelled gasoline on
2  Smith, it's also correct that the police did not
3  do anything to investigate whether Robert Smith
4  had thrown gasoline around his in-laws' living
5  room or dining room; is that correct?
6      MR. NOLAND:  Object to the form.
7      THE WITNESS:  No.  That's not correct.
8  I mean, they took -- There was a statement that
9  he gave.  I mean, to say that they didn't do
10  anything to investigate the circumstances of the
11  murder I don't -- which is what -- this is part
12  of circumstances of murders --
13  BY MR. CHANEN:
14      Q.  Yeah.  Okay.  So I guess my question
15  was badly phrased?
16      THE REPORTER:  I'm sorry.  Excuse me.
17  I'm -- I lost the end of the witness's answer.
18      MR. CHANEN:  Yeah.  I apologize.
19      MS. BENJAMIN:  I don't think he was
20  finished.
21      THE WITNESS:  Can you read back my
22  answer so I can at least hear what it is and
23  then I can try to resurrect it?
24      THE REPORTER:  Absolutely.  One moment,

Page 199

1  please.
2      (Whereupon, the record was read
3      as requested.)
4      THE WITNESS:  Okay.  -- would be
5  incorrect to say that they didn't do anything to
6  investigate gasoline on Smith.  They did take a
7  statement or -- and they did -- I mean, they put
8  out a -- their investigators put out a fire, so
9  I do think that they -- it would be incorrect to
10  say that they did nothing to investigate it.
11      Did they -- Were there any written
12  reports from the police officers or testimony to
13  say, hey, he reeked of gasoline in the morning
14  in question?  The answer is no.
15  BY MR. CHANEN:
16      Q.  And they didn't do any forensic testing
17  of either his clothes or skin to determine if
18  any gasoline had spilled on his clothing or skin
19  at the time that they asserted he was in the
20  house?
21      A.  Right.
22      Q.  And did that factor into your decision
23  to -- as to Decision No. 1?
24      A.  It did.

Page 200

1      Q.  And did that factor into your decision
2  as to Decision No. 2?
3      A.  It did.
4      Q.  All right.  Then the next one is, no
5  blood from dryer lint filter discrediting theory
6  that killer washed and dried the -- hold on --
7  dried their clothes.
8      A.  Right.
9      Q.  Is this something that she articulated
10  to you?
11      A.  Yes.
12      Q.  Did she say anything further than what
13  she says right here in this bullet point?
14      A.  I thought -- I believe -- The belief
15  was it was -- it didn't make a whole heck of a
16  lot of sense that they are -- you know, if they
17  are describing blood everywhere and they have
18  obviously gaping holes in their neck with tons
19  of blood everywhere, the loss of blood, that
20  there is -- and then somebody would wash and dry
21  such articles and not to find any was unusual.
22  I think that's what was conveyed to me something
23  along those lines.
24      Q.  And did you agree with her?

53  (Pages 197 to 200)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 201

1       MR. NOLAND: Objection. Foundation.
2       THE WITNESS: It was a factor in
3 consideration --
4       MR. CHANEN: I'm sorry, Myles. What's
5 the objection, Dan?
6       MR. NOLAND: Foundation. That he would
7 have any scientific basis to agree or disagree
8 with Ms. Cohen's wild speculation.
9       MR. CHANEN: Got it. Okay. Go ahead.
10 Go ahead, Myles.
11       THE WITNESS: The fact that there was
12 at least no testimony regarding any blood being
13 found in the dryer or lint filler was part of
14 the consideration.
15 BY MR. CHANEN:
16    **Q. And was it -- Was it -- Did you agree**
17 **that it discredited the theory that the killer**
18 **washed and dried their clothes?**
19       MR. NOLAND: Objection. Form.
20 Foundation.
21       THE WITNESS: I - It was not evidence
22 we had. So does it discredit the theory? I
23 wouldn't go so far to say does it discredit a
24 theory, but it's not evidence we have.

Page 202

1
2 BY MR. COHEN:
3    **Q. Okay. To back up the theory?**
4    A. Sure.
5    **Q. All right. And that influenced your**
6 **decision on Decision No. 1 and Decision No. 2,**
7 **correct?**
8    A. Well, correct.
9    **Q. All right. Diane was inconclusive on**
10 **her lie detector test and an alleged suspect,**
11 **but they let her leave after inconclusive tests.**
12    **Now, did she tell you that one of the**
13 **detectives had testified that at the beginning**
14 **Diane was a suspect?**
15    A. Did she say she was a suspect?
16    **Q. I'm sorry. Let me rephrase the**
17 **question.**
18    **Did Debbie Cohen tell you that she had**
19 **read a detective's testimony that Diane at the**
20 **beginning was a suspect with Robert?**
21    A. I don't believe she said that
22 specifically. I am not certain if she did or
23 not.
24    **Q. Okay. Okay.**

Page 203

1    A. I was aware that there was no lie
2 detector results coming back conclusive or
3 inconclusive with Diane. I believe I did know
4 about that. I didn't give it great
5 consideration to be honest.
6    **Q. You did or did not?**
7    A. No. I did not pay -- I did not give
8 that too much great weight, I suppose, whether
9 she is -- she fails or passes a lie detector or
10 doesn't or neither. There is an inconclusive
11 result. The inconclusive result, that's just
12 no -- didn't really lead me anywhere.
13    Clearly she was -- You know, it also
14 coincides with someone being traumatized after
15 seeing their mother and their grandmother in
16 that kind of a circumstance.
17    **Q. And, in fact, isn't there a rule that a**
18 **lie detector -- I'm sorry. Isn't there a CPD**
19 **rule that a lie -- that if someone is in a**
20 **traumatized state, they should not give a lie**
21 **detector?**
22       MS. BENJAMIN: Objection. Foundation.
23       THE WITNESS: I mean, is there a CPD
24 rule? I am not aware of a specific rule if

Page 204

1 that's what you are asking. I would think --
2 BY MR. CHANEN:
3    **Q. All right. Let me rephrase.**
4       THE REPORTER: I'm sorry. I'm sorry.
5 The witness wasn't finished. Could you finish
6 your answer, please?
7       THE WITNESS: Yeah. I am sure you
8 would want somebody calm and within their -- you
9 know, within their right mindset and a good --
10 you know, good feeling to be taking one of
11 those, being taking a lie detector of somebody
12 calm, not somebody who, you know... But am I
13 aware of a specific rule? The answer is no.
14 BY MR. CHANEN:
15    **Q. Okay. But did it influence your -- Did**
16 **Debbie Cohen's concern about them letting Diane**
17 **go even in the face of an inconclusive lie**
18 **detector test, did that influence your decision**
19 **on Decision No. 1 or Decision No. 2?**
20       MR. GRAMLICH: Object. Asked and
21 answered.
22       THE WITNESS: And this is to say again
23 not really, no.
24 BY MR. CHANEN:

54 (Pages 201 to 204)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 205

1    Q.  Okay.
2    A.  I never gave too much -- I didn't --
3  Yeah.  This didn't lead me one way or the other
4  too much because of what we just discussed.
5    Q.  All right.  Very good what about the
6  next bullet, the son Derek Yeager was not given
7  a lie detector test?  Did that influence your
8  decision on Decision No. 1?
9    A.  More of what she says about the last
10  person to see them alive.  And there wasn't -- I
11  mean, not -- not saying, you know, but -- but
12  not given a lie detector test, did this factor
13  greatly into the consideration to dismiss
14  charges?  No.
15    Q.  All right.  Let me ask it -- Let me ask
16  it a different way.  Let's put the lie detector
17  issue to one side.
18      Did the fact that he was the last
19  person to see the victims alive and that his
20  alibi to police was that he went -- he was
21  sleeping on his couch, not in the same bedroom
22  with his wife, did the fact that the police did
23  not further investigate Derek or ask Derek
24  additional follow-up questions influence your

Page 206

1  decision regarding Decision No. 1?
2    A.  Well, I mean, that would be greatly
3  guessing about what specific questions of all
4  the questions they asked Derek when they saw
5  him, so this specific section did not greatly
6  influence me one way or the other.
7      The fact that he was the last person or
8  identified as the last person besides Robert
9  with a statement is certainly something that is
10  a fact in an investigation, is who is the last
11  person to have seen them, but did this specific
12  section, did this sway one way or the other?
13  No, it did not.
14    Q.  Okay.  The next bullet point says,
15  bloody underwear suddenly appear but not
16  originally found in evidence, and then she puts
17  in parentheses, (typical for him to keep his
18  laundry in the house.)
19      The point that was made at the time was
20  that about 15 investigators and/or police
21  officers and/or detectives and/or supervisors
22  had gone up and down the stairs and no one had
23  grabbed the underwear from the top stair.
24      That was at that time, and we are going

Page 207

1  to get to the change in evidence in a second,
2  but at that time, that was the primary
3  discussion, correct?
4    MS. BENJAMIN:  Object to form.
5    THE WITNESS:  That and the fact that we
6  had no photos.
7  BY MR. CHANEN:
8    Q.  Okay.  And -- and -- and tell me
9  then -- putting aside -- and we will get to it
10  in a second the issue about a photo being
11  produced to you, but for now at the time you had
12  the discussion then about no one seeing the
13  underwear among the 15 and there being no photo
14  of it, tell me how that affected your
15  decision-making.
16    A.  Well, it struck as odd because, you
17  know, people going up and down the stairs and
18  not locating evidence that's, you know, in plain
19  sight struck as odd and how would they look to a
20  third party who has to find facts in this or
21  have to make determinations of guilt or
22  innocence on it, how would that weigh on a fact
23  finder's role.  That was certainly something we
24  considered.

Page 208

1      It also struck as odd, however, that he
2  was not wearing underwear at the station, but
3  Diane gave some -- gave some information to us
4  that seemed to lead us to believe that maybe
5  that wasn't something that was -- that was not
6  unusual for Robert or something.  Like it wasn't
7  unusual for him not to wear underwear I guess is
8  what she was trying to say.
9    Q.  Did she explain to you words to the
10  effect that he had something called groin
11  dermatitis and that it was a chaffing in his
12  groin area and that when he wore underwear, it
13  exacerbated or caused problems for his groin
14  dermatitis or words to that effect?
15      Is that the gist of what Diane told you
16  when she shared information about it not being
17  unusual for him not to wear underwear?
18    MR. NOLAND:  Hold on.  Objection.
19  Form.  Foundation.  Mischaracterizes the medical
20  records.
21    THE WITNESS:  Stuart, she didn't say it
22  that way.
23  BY MR. CHANEN:
24    Q.  Okay.  Do you remember as you sit here

55  (Pages 205 to 208)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 209

1  today how she said it?
2      A.  Yeah.  She said it wasn't unusual for
3  him not to wear underwear.
4      Q.  Okay.  I want to show you -- I want
5  Ariel -- We are going to leave this exhibit for
6  a second and then come back to it.
7          MR. NOLAND:  Hold on.  Hold on.  You
8  just said you were going to ask him about the
9  fact that he seen the photos, and you said he
10  was about to answer and you interrupted him and
11  now you are going to leave it, so I object to
12  that procedure.
13         MR. CHANEN:  Okay.  Very good, Dan.
14  Thanks for that.  Ariel, can you pull up
15  Exhibit 8A?
16         MR. NOLAND:  But you misrepresented to
17  the witness and, therefore, he wasn't
18  answering -- he wasn't providing the full sum
19  answer, so you are creating a misleading record,
20  Mr. Chanen.
21         MR. CHANEN:  Oh, thanks for that, Dan.
22  Ariel, could you pull up Exhibit 8A?
23  BY MR. CHANEN:
24      Q.  All right.  Can you see this exhibit,

Page 210

1  Mr. O'Rourke?
2      A.  I see this.  Yes.
3      Q.  And it's a subpoena to the Chicago
4  Police Department, correct?
5      A.  Yes.
6      Q.  And if you scroll down or if,
7  Mr. O'Rourke scrolls down, it's from Clyde
8  Lemons, an assistant public defender, do you see
9  that?
10     A.  Sure.
11     Q.  And in this subpoena he asks the
12  Chicago Police Department to produce any and all
13  police reports, arrest reports, supplemental
14  reports, general reports, and other documents
15  related to the incident described in Report
16  RDJ43385, and I will represent to you that
17  RDJ43385 is the Chicago Police Department's
18  investigation of Robert Smith committing murder.
19  Okay?
20     A.  Yes.
21     Q.  All right.  To your knowledge, if you
22  know, and you may or may not know, was the
23  picture, the photograph of the blue underwear on
24  the top stair produced by the Chicago Police

Page 211

1  Department to the -- to the public defender's
2  office in response to this subpoena?
3      A.  I don't know.  I am not sure.  I think
4  we received -- I mean, I am not certain because
5  I do know that we subpoenaed -- We issued many
6  subpoenas and maybe we got some from the public
7  defender's office, and I am certain they would
8  have provided me this.  I don't know.  I mean,
9  the answer is I don't know.
10  BY MR. CHANEN:
11     Q.  Okay.  All right.  So I understand your
12  answer to be you don't know if the City produced
13  it to the assistant public defender.  But it's
14  your belief that your office, the special
15  state's attorney's office, subpoenaed the
16  assistant public defender for all documents in
17  its possession and that the assistant public
18  defender responded to that subpoena; is that
19  correct so far?
20         MR. NOLAND:  Objection.  Form.
21  Foundation.  Best evidence rule.
22         THE WITNESS:  I mean, I am saying -- I
23  am saying that in the general, I am not
24  certain -- I mean, the subpoenas in this case --

Page 212

1  I know that we subpoenaed the Chicago Police
2  Department and the Records Division.
3          You are asking me whether the public
4  defender received the lab report.  The only
5  reason why I am coming at it from the other way
6  is because the only way that I know that they
7  received it is if I get it from them, so I can't
8  answer that question.
9  BY MR. CHANEN:
10     Q.  All right.  Well, then let's look at 8D
11  for a second, and it's hard because this is a
12  little bit harder to see because it's a little
13  fainter.
14     A.  I can see it.  Don't worry.
15     Q.  Okay.  And then so this is now -- now
16  you are in the case --
17     A.  That's my --
18     Q.  -- as of May 31, 2019 and you now are a
19  lawyer in Mr. Smith's postconviction proceeding,
20  correct?
21     A.  Correct.  That's not my signature, but
22  that's my subpoena.
23     Q.  All right.  And it was issued out of
24  your -- you would agree that it was issued out

56  (Pages 209 to 212)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 213

1  of your office?
2      A.  Absolutely right.
3      Q.  And whoever's signature that is, they
4  had your authority to sign the subpoena?
5      A.  That is correct.
6      Q.  All right.  And you are -- It's a
7  subpoena for records only and you direct them to
8  the subpoena rider tied to the investigation of
9  the deaths of Willie Bell Alexander and Edith
10  Yeager, correct?
11      A.  Absolutely.
12      Q.  All right.  And then we scroll down to
13  the subpoena rider and you are asking for
14  basically their entire file, correct?
15      A.  The investigative file, yes.
16      Q.  All right.  And no one from the Chicago
17  Police Department ever produced to you a
18  photograph of the blue underwear on the top
19  stair; is that correct?
20      A.  I didn't receive it under the subpoena,
21  no.
22      Q.  Did they respond -- Did the City -- Did
23  the Chicago Police Department respond to your
24  subpoena with some documents?

Page 214

1      A.  I believe it did.
2      Q.  But it did not include the photograph
3  of the blue underwear, correct?
4      A.  I don't believe -- I don't believe it
5  did.  I don't believe it did --
6      Q.  All right.
7      A.  -- with the photo of -- on the top of
8  the stair the blue underwear.  I think that was
9  not included in the production to me from the
10  subpoena.
11      Q.  All right.  And then just to circle
12  back to what we said about the public defender's
13  office, in addition to serving a subpoena on the
14  Chicago Police Department, you also would have
15  served -- is it your belief that you served a
16  subpoena on the public defender's office as
17  well?
18      MR. NOLAND:  Objection.  Form.
19  Foundation.
20      THE WITNESS:  I don't recall.  I really
21  don't.
22  BY MR. CHANEN:
23      Q.  All right.  Was it your normal practice
24  to serve a records subpoena on the public

Page 215

1  defender and the Cook County state's attorney's
2  office of any case for which you were assigned
3  as a special prosecutor regarding claims of --
4  under the Burge or torture cases that were
5  assigned to your office?
6      A.  Certainly if it's a postconviction
7  petition, ordinarily we would go to the -- to
8  both the public defender and state's attorney
9  office.  Sometimes we get the trial file from
10  the state's attorney.  Public defenders a lot of
11  times they will -- the production is made to --
12  in Torture Inquiry and Relief Commission, we
13  will get a lot of their documents, some short
14  documents.  They are very helpful.
15      Q.  And isn't it a correct statement that
16  when you made a document production in this case
17  in response to Mr. Noland's subpoena, so I am
18  talking about the work that you and Mr. Gramlich
19  and others did in your office over the last
20  several months --
21      A.  Yes.
22      Q.  -- trying to pull together a complete
23  production of everything that you have with
24  respect to the case, is it correct that that

Page 216

1  included documents that you received from the
2  state's attorney's office?
3      MR. NOLAND:  Objection.  Form.
4  Foundation and that, as you know, is
5  inconsistent with the record.
6      THE WITNESS:  Right.  I think, Stuart,
7  we found this out that the state's attorney
8  reported to us that certain documents they
9  didn't have.
10  BY MR. CHANEN:
11      Q.  Okay.  Did they produce any documents
12  to you?
13      A.  I'd have to go back and look.  I don't
14  know -- I mean --
15      Q.  All right.  What about the public
16  defender's file?  Did the production you
17  recently made include documents that your office
18  had received from the public defender?
19      A.  It may have been from the public
20  defender.  It may have been from Torture Inquiry
21  and Relief Commission which may have been turned
22  -- it may have subpoenaed or gotten the
23  documents from the PD's office.  I just can't
24  recall when I am thinking off the top of my -- A

Royal Reporting Services, Inc.
312.361.8851

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

---

Page 217

1  lot of times the public defender will give their
2  file or give certain file documents to the
3  Torture Inquiry and Relief Commission. And it
4  will be -- and it will pop back up in their --
5  in the exhibits and the indices that are
6  attached to the written dispositions.
7       MR. CHANEN: Ariel, let's look at 8C
8  for a second.
9       MR. GRAMLICH: Before we move on to 8C,
10  it's now 2:30 and I think we are well past the
11  seven-hour limit in connection with this
12  deposition.
13       MR. CHANEN: Mr. Gramlich, I am going
14  to try to speed it up, but I do need at least a
15  half an hour, and I will try to speed it up to
16  get it all in within that half hour.
17       MR. GRAMLICH: Okay. But we are not
18  waiving anything with respect to this --
19       MR. CHANEN: That's fine.
20       THE WITNESS: Stuart, Stuart, you have
21  until 3:00, okay? Because this has been -- This
22  is now my third appearance here, and I
23  understand the reason why we are here three
24  times and part of it is my fault and I get it;

---

Page 218

1  but this
2  is -- this is now we are going on -- we are
3  going on seventh, eighth hour here and we need
4  to wrap this up, so let's get it going.
5  BY MR. CHANEN:
6       Q. All right. So forget 8C then. Let's
7  just cut to the chase. At the time that you
8  subpoenaed the TIRC records, when the TIRC
9  records were produced to your office and you
10  forwarded them in response to Mr. Noland's
11  subpoena, there was no photograph of blue
12  underwear on the top stair, correct?
13       A. None. No. Not to me.
14       Q. And then the same would apply with
15  respect to the public defender, whatever public
16  defender documents were tendered to you in
17  response to subpoena that you in turn tendered
18  to Mr. Noland, none of those included the
19  blue -- the photograph of blue underwear on the
20  top stair, correct?
21       MR. NOLAND: Just objection. Form.
22  Foundation.
23       THE WITNESS: Well, correct. I mean, I
24  think I know where you are going with the

---

Page 219

1  foundation; but, you know, you also have to see
2  that I was -- there is a recommendation saying
3  that there was no photos of the underwear from
4  the Torture Inquiry and Relief Commission.
5  BY MR. CHANEN:
6       Q. That's because none was produced to
7  them, correct?
8       A. I have no idea. It led me to believe
9  there was no photos of it.
10       Q. I understand, but numerous -- Do you
11  agree with me that of the TIRC subpoenaed the
12  police department for their records?
13       MR. NOLAND: Objection. That calls for
14  speculation.
15       MS. BENJAMIN: Objection. Form.
16  Objection. Foundation.
17       THE WITNESS: I mean, I know they get
18  documents. I know they have -- literally have
19  seen thousands of documents and productions that
20  they have made. In these -- In this specific
21  case, I never saw -- all I can speak to is what
22  I know and this is I never received the photo
23  from either the Torture Inquiry and Relief
24  Commission or any other subpoena that was sent

---

Page 220

1  out on this case, never seen a photo of the blue
2  underwear on the top of the stair.
3  BY MR. CHANEN:
4       Q. Including the subpoena that your office
5  sent to the Chicago Police Department on May 31,
6  2019, correct?
7       A. Including any subpoenas ever issued in
8  recorded time.
9       Q. Okay. Great. All right. I think we
10  have covered that issue.
11       MR. CHANEN: Let's go back, Ariel, if
12  we go to 7A. Let's jump to the bullet that says
13  generic answers in his statement and no
14  description given.
15  BY MR. CHANEN:
16       Q. You had discussed this briefly with
17  Mr. Noland. Do you -- Did Debbie Cohen tell you
18  words to the effect of, If you look at the
19  actual transcript that they call his confession,
20  it's a series of yes, no questions that the ASA
21  is asking Mr. Smith as opposed to asking
22  Mr. Smith what happened and having him give
23  verbal answers that describe in his own words
24  what had occurred. Did she say words to that

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 221

1  effect to you?
2      A.  Yeah.  She was -- She was -- did say
3  words to the effect of the statement itself does
4  not have -- is not very specific whatsoever.
5  It's almost nonspecific.
6      Q.  And did you agree with her?
7      A.  I thought it was not a lot of specific
8  information.  I have seen many more detailed
9  statements.  I would, though -- not to discredit
10 myself -- would say that the Appellate court has
11 already found against what I would think because
12 they have said there was sufficient evidence and
13 that statement was corroborated by objective
14 facts which include the fire, but I thought that
15 the statement itself was short on details.
16     Q.  And did that influence your decision as
17 to Decision No. 1?
18     A.  Yes.
19     Q.  Did it influence your decision as to
20 Decision No. 2?
21     A.  Yes.
22     Q.  And is it fair -- I think you touched
23 on it, but would you agree that the good
24 confessions that you have seen in your

Page 222

1  experience as a special prosecutor allow the
2  person confessing to put in their own words what
3  had happened and what they did to commit the
4  crime and that -- Well, let's start with that.
5  That you have seen many confessions that use
6  that approach instead and they are more
7  effective confessions, correct?
8      A.  Well --
9      MR. NOLAND:  Objection to form.
10     MS. BENJAMIN:  Object to form.
11     MR. NOLAND:  Yeah, and foundation.
12     THE WITNESS:  You mean like open-ended
13 questions, right?
14 BY MR. CHANEN:
15     Q.  Yes, I do.  I mean, like tell us what
16 happened and then the person proceeds to state
17 the way in which they committed the crime.
18     A.  Right.  Give us the why and go, right?
19 And I don't care what -- And the state's
20 attorney doesn't care what they say, take down
21 whatever they say whether they say they are trying --
22 Yes.  I think giving open-ended questions I have
23 seen is good practice that I think is -- was
24 employed by a number of assistant state's

Page 223

1  attorneys.
2      Q.  And the fact that that practice was not
3  used in this case influenced your decision on 1
4  and 2; is that correct?
5      MR. NOLAND:  Objection.  Form.
6  Foundation.
7      THE WITNESS:  I am not saying that it
8  wasn't.  I am just saying in this specific case
9  what you have is a statement that's kind of
10 sparse and details.  And, you know, that's all I
11 am saying.  I am not saying that ASA Brogan was
12 doing anything wrong.  I am just saying that
13 this specific statement doesn't give me a whole
14 heck of a lot.
15 BY MR. CHANEN:
16     Q.  All right.  We are going to skip the
17 next one for purposes of time because I think we
18 have touched on it.  The next bullet says, Smith
19 repeated same and consistent story of abuse to
20 judges and attorneys; and I think what Ms. Cohen
21 is referring to here is that when he first
22 appeared for a bond hearing, he indicated to the
23 judge that he needed to get to the hospital, and
24 then he did the same thing at his arraignment

Page 224

1  and he did the same thing with -- to his defense
2  attorneys; is that -- Did Ms. Cohen say words to
3  the effect of that?
4      A.  Well, she --
5      MR. NOLAND:  Objection.  Objection.
6  Form.  Foundation.  Mischaracterizes the
7  document.
8      THE WITNESS:  She -- She wrote this.
9  She and I greatly disagree on the consistency
10 and or that hospital visit on September 21st
11 when he fell from the tier -- second tier to the
12 first floor and what his -- in the bruise sheet.
13 So this was not something that I gave great
14 credence to because although he did -- I will
15 say he did -- did state so, which is a factor,
16 whether there is a contemporaneous outcry, you
17 don't always see in the bruise sheet and here I
18 think it was a bruise sheet outcry, but there is
19 no items on the -- the person -- the outline of
20 the person, the skeleton so to speak that match
21 up with bruises, scars, injuries of whatsoever
22 on the bruise sheet.  This is just a bruise
23 sheet.
24     And then I looked at a contemporaneous

59 (Pages 221 to 224)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 225

1    Cook County record regarding his falling from
2    the tier, and this is to me that's like Babe
3    Ruth calling your shot.  You know, if he is
4    claiming he is abused and then lo and behold
5    that day he is falling off of a second floor to
6    first floor, maybe he is -- maybe he picked it.
7        Q.  So your -- So it's your belief that he
8    threw himself from the second floor down to the
9    first floor at the prison on the 21st, is that
10   your testimony?
11       A.  My belief is that a police officer --
12   Chicago police officer didn't throw him from the
13   tier -- the second floor to the -- to the first
14   floor.  That's my belief.
15       Q.  Okay.  How did he -- What caused his
16   fall from the second floor to the first floor?
17       A.  You'd have to ask him, okay?  I don't
18   know, but what we do know is that he is not in
19   -- he is not in care with anyone at the time he
20   is in a -- he is on a tier which means he has
21   not received medical -- or not receiving medical
22   treatment.  He is not with the doc, okay?
23       He is on a tier after his reporting of
24   it and then he receives injuries after he is on

Page 226

1    the tier, okay?  There was no reports of
2    injuries consistent before that period of time.
3        Q.  All right.  But is your
4    testimony that the fact that he had told a judge
5    prior to that time at his bond hearing that he
6    had been beaten by the police that did not serve
7    as a factor in your decision as to Decision
8    No. 1; is that correct?
9        A.  I'm sorry.  I didn't catch the
10   question.
11       Q.  Sure.  Do I understand your testimony
12   to be, Mr. -- Myles, that Debbie -- Let's back
13   up.
14       Debbie writes here, Smith repeated same
15   and consistent story of abuse to judges and
16   attorney.
17       A.  Okay.
18       Q.  So for a second, put aside, if you can,
19   what happened on the tier and what happened at
20   the hospital.  I am not talking about the tier,
21   and I am not talking about the hospital.  I am
22   focusing only on Debbie Cohen's words.
23       A.  Yes.  Yes.
24       Q.  Are you saying that it did not

Page 227

1    influence you in any way that Mr. Smith had told
2    judges and his attorney prior to the fall from
3    tier to tier that he had been beaten by the
4    police?
5        A.  I mean, here's the thing, I would say
6    that that's -- if you are talking about
7    coercion, if there is a contemporaneous or a
8    prompt outcry it goes in the column of the of
9    the defendant's credibility.  It would help
10   bolster a defendant's credibility if you see a
11   contemporaneous outcry, or lack of outcry on the
12   other hand may be a factor to detract.
13       It's not the be-all end-all, so whether
14   a third party would look at it that way so
15   certainly this is a consideration because we are
16   considering third party -- what a third party
17   would do.  An attorney, we got to consider what
18   a fact finder would think.
19       So it is a consideration whether
20   somebody makes prompt or contemporaneous
21   outcries, so I would agree with you on that.
22       Q.  So it was -- So the contemporaneous
23   outcry that Mr. Smith made and that Ms. Cohen
24   identified in this bullet point beginning with

Page 228

1    Smith repeated, that you -- that it was a factor
2    because -- not necessarily a deciding factor on
3    the issue of being beaten or being bruised,
4    because there are other factors you got to
5    consider, but it nevertheless was -- the outcry
6    was nevertheless a factor you considered in
7    making Decision No. 1?
8        MS. BENJAMIN:  Object to form.
9        THE WITNESS:  No.  Not for me.
10   BY MR. CHANEN:
11       Q.  Okay.  That's fine.
12       A.  I did not believe -- I did not believe
13   it tended it towards Decision No. 1.
14       Q.  Okay.  The next she says, The motion to
15   suppress was solely based on credibility of
16   officers.  Police officers that were deposed
17   have no credibility, were deposed lying.  What
18   did Ms. Cohen mean by this bullet point?
19       A.  I think that she had trouble with the
20   some of the certain police officers who were --
21   she believed gave -- Well, that's a good
22   question.
23       I think as to the motion to suppress
24   based on credibility of the officers, yeah, I

60  (Pages 225 to 228)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 229

1 believe it was based on the credibility
2 determination. I don't know, and you will
3 correct me if I am wrong, I don't know if, like,
4 the medical records from Cermak, where it is. I
5 am not sure whether photos of -- I think a photo
6 of Robert Smith was introduced.
7 But with respect to the credibility of
8 the officers or having them deposed that they
9 lied, I mean, that statement in itself, I mean,
10 I did not share the same mindset so to speak.
11 Q. All right. But did Ms. Cohen tell you
12 words to the effect of having now read all
13 deposition testimony on top of any motion to
14 suppress testimony that they gave back in 1989,
15 I no longer believe these -- one or more of
16 these officers is credible, words to that
17 effect? Was that her basic position?
18 A. There was certainly one with Peterson,
19 and I think you deposed William Peterson. I
20 remember that factor but the -- and some of the
21 testimony that he gave, I mean, there is fraud
22 conviction or there is -- you know, he has
23 subsequent felony convictions. He is also
24 testifying under a grant of immunity.

Page 230

1 And, you know, whether -- I think this
2 definitely led to her -- to this kind of
3 position that she had.
4 Q. Okay. And but did it -- Did her
5 position regarding either Peterson or any other
6 officers' credibility did you factor that into
7 your decision to move to vacate the Robert
8 Smith's conviction?
9 A. Yes.
10 Q. And did you factor it into Decision
11 No. 2 to not oppose the Certificate of
12 Innocence?
13 A. Yes.
14 Q. Did the fact that William Higgins and
15 Rice were now dead factor into your decision to
16 move to vacate his conviction?
17 A. Yes.
18 Q. And No. 2, Not oppose his petition for
19 Certificate of Innocence?
20 A. Yes.
21 Q. The fact that the felony review ASA did
22 not review all police reports before taking
23 Robert's statement, did that influence your
24 decision to move to vacate his conviction?

Page 231

1 A. No. I think that dovetails more so
2 with -- Let me correct myself.
3 I think it more dovetails with the
4 statement about how sparsely detailed the
5 statement because I think it had some -- if this
6 is the case there was not a review of all of the
7 police reports or any general progress reports
8 that were taken, you know, or sometimes you'll
9 see like an hour, they get called to the
10 station, they go to the station, they speak with
11 the officers and they sit and they review the
12 reports for a half hour or an hour and then they
13 sit down and take the statement, maybe that
14 would -- is somehow explanatory of why the
15 statement itself was -- not was sparsely
16 detailed.
17 Q. But my question is: Did that influence
18 your decision to move to vacate his conviction?
19 A. Right. Yes. Because it dovetails with
20 the statement.
21 Q. Okay. And the same would be, too, your
22 decision to not oppose Certificate of Innocence?
23 A. Correct.
24 Q. All right. Now let's -- I am going to

Page 232

1 only ask one or two questions about the pages
2 that follow, Ariel, if you are still with us and
3 if you are, you are a better man than I am but
4 if you can just scroll down.
5 This is basically a separate memo that
6 Ms. Cohen wrote to you where she walked through
7 inconsistencies either between one detective and
8 another detective or in something someone said
9 at the motion to suppress versus what they might
10 have testified to at their deposition.
11 But she basically is -- It's a memo
12 regarding lack of credibility regarding some key
13 issues. Is that a fair summary of what she is
14 trying to communicate on pages -- Hold on. The
15 last page is 6735 and the first page is 634.
16 Sorry, Ariel.
17 A. I think she is just finding -- she was
18 finding notable inconsistencies that are -- that
19 were in the record.
20 Q. And did the -- did the inconsistencies
21 she identified to you influence your decision to
22 move to vacate Mr. Smith's conviction?
23 A. One, yes. The first -- The first one,
24 we have gone over this ad nauseam, but, yes.

61 (Pages 229 to 232)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

---

Page 233

1    The underwear was pretty -- was -- was a factor.
2        Q.  Okay.  And the other fact -- and also
3    some of the other ones she identified were also
4    factors?
5        A.  Well, right.  With fire personnel and
6    McWeeny and issues, this goes back to whether
7    there is -- we have testimonies that are
8    conflicting and that's what Point 2 does --
9    means is that we do have conflicting evidence
10   with respect to -- or testimonies with respect
11   to what we were looking at in the hallway there.
12       Q.  All right.  And those were two pages
13   that she shared with you prior to your making
14   the decision, correct?
15       A.  Right.
16       Q.  And then the last pages of this
17   document starting with 6736 and, Ariel will walk
18   you through it slowly, going down to 6738, this
19   is a summary -- This is where she puts together
20   some testimony from various detectives that
21   would not be helpful to the State's case.
22   Basically admissions made by one or more of the
23   officers or detectives that she felt hurt the
24   State's case as opposed to helping; is that a

---

Page 234

1    fair summary of what this document is?
2        A.  I think that this is -- This is a fair
3    summary of what she said or what she provided
4    us.
5        Q.  And did she share this three-page memo
6    with you prior to your making your decision?
7        A.  She did.
8        Q.  And did it influence you in making
9    Decision No. 1?
10       A.  Yes.
11       Q.  And did it influence you in terms of
12   making Decision No. 2?
13       A.  Yes.
14       Q.  All right.  Now, I only have one last
15   area, and I am going to go through it very
16   quickly because I am basically out of time.
17           Now you were never -- I just want to
18   talk about some evidence in the case that you
19   were never given, so I am going to identify the
20   evidence and I am going to ask you to the best
21   of your memory did the Chicago Police Department
22   ever give you the following piece of evidence as
23   part -- when you subpoenaed it, okay?
24       A.  Sure.  Sure.

---

Page 235

1        Q.  Okay.  The CR file that Robert Smith
2    filed against some -- McWeeny and other
3    detectives?
4        A.  That would be OPS?
5        Q.  Yes.
6        A.  Did I have an OPS FPR for Robert Smith?
7    I don't believe I did.
8        Q.  What about a photo of the knife?  Did
9    you have a photo of the knife at the time that
10   you made the decision?
11       A.  No.
12       Q.  Let me rephrase the question.  Not
13   whether you had a photo of the knife.  I mean,
14   whether you had been provided a photo of the
15   knife by the Chicago Police Department?
16       A.  I don't believe I was provided a
17   photo -- photograph of the knife.
18       Q.  Were you provided by Chicago Police
19   Department any records which showed that the
20   knife had been destroyed?
21       A.  Not that I recall or am aware of.
22       Q.  Were you ever provided an OPS report
23   that concluded that Lt. Phil Cline was not
24   present for duty on September 19, 1987?

---

Page 236

1        A.  An OPS report stating that?
2        Q.  Yes.
3        A.  No.
4        Q.  You were never provided such a report?
5        A.  No.  I don't believe I was.
6        Q.  All right.  Were you ever provided a
7    statement that was made by Officer Hughes
8    that -- about Robert Smith being taken to the
9    floor by officers which he had given to OPS
10   prior to testifying at Mr. Smith's trial?
11       MS. BENJAMIN:  Object to the form.
12       THE WITNESS:  I mean, with specifically
13   with respect to that, I don't recall.  I do not
14   know.  I don't think I have it.
15   BY MR. CHANEN:
16       Q.  You have no memory of seeing a
17   statement of Mr. Hughes other than the statement
18   he made at the trial?
19       A.  Yes.
20       Q.  All right.  Hold on.  Just bear with me
21   one second.
22       A.  Stuart, I will give you five more
23   minutes.  Go ahead.
24       Q.  Okay.  Good.  I think that's all it's

---

62  (Pages 233 to 236)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 237

1  going to take. I just have to find the list of
2  other things that you were not given.
3      MR. CHANEN: Oh, boy. Hold on.
4  BY MR. CHANEN:
5      Q. All right. You never had a copy of
6  Robert's letter to OPS where he describes in
7  some detail the manner in which he was beaten by
8  detectives? That was never provided to you,
9  correct?
10     A. Now that, I am not certain. I thought
11 that you may have tendered -- I don't -- I'm not
12 certain because I had separate -- I had
13 affidavits from Robert and I had -- so I can't
14 be -- I am not certain --
15     Q. All right.
16     A. -- whether that was given to me by you
17 or your predecessor, but I am not certain as to
18 that. I do know that I have seen more than one
19 testimony of Robert Smith regarding his
20 custodial statement.
21     Q. Have you ever seen a report by the
22 defendant's expert -- by the City of Chicago's
23 expert called Data Labs International in which
24 they concluded that they could not detect any

Page 238

1  blood on the green jacket? Has that ever been
2  provided to you?
3      MR. GRAMLICH: Stuart, DNA, not data.
4  BY MR. CHANEN:
5      Q. I'm sorry. They could not detect DNA
6  on the green jacket?
7      MS. BENJAMIN: Object to form.
8      THE WITNESS: No --
9      MR. GRAMLICH: I'm sorry to interrupt.
10 Not -- DNA on the green jacket but not Data
11 International. DNA Labs International.
12     MR. CHANEN: Oh. Sorry. Sorry. Got
13 it. Let me start the whole question again,
14 Myles.
15 BY MR. CHANEN:
16     Q. Have you ever seen a report by the City
17 of Chicago's expert DNA Labs International in
18 which they concluded that they could not detect
19 blood on the green jacket? Has that ever been
20 provided to you?
21     A. No.
22     Q. All right. Were you ever aware at the
23 time you were undertaking your analysis that
24 Martin Rios was a convicted felon for sexually

Page 239

1  assaulting a child?
2      A. You know -- You know, that is one of
3  the things that kind of came up and I talked to
4  him and I contacted him and it always struck me
5  as odd that I said we have this hearing and
6  prepping a witness or talking to a witness and I
7  wanted to know what -- his availability; and he
8  said something along the lines of, you know, do
9  you really need me? Or, you know, are we sure?
10 And I learned later that there was a conviction;
11 and so now it made sense.
12     But the allegations against him at the
13 time I thought, you know, he said that Rios
14 kicked him with combat boots. They seemed so
15 extraordinary, and I just was -- wanted to run
16 to put him on the witness stand to discuss it
17 but, yeah, he seemed reluctant in conversations
18 with me.
19     Q. And did that influence your decision
20 to -- into Decision No. 1?
21     A. Yes.
22     Q. And to Decision No. 2?
23     MR. NOLAND: Hold on. Objection.
24 Form. Foundation.

Page 240

1      THE WITNESS: Did his hesitancy or wish
2  not to -- or expressed desire not to testify,
3  did that impact my decision as to, 1? Would it
4  weight a little bit more towards 1? Yes.
5  BY MR. CHANEN:
6      Q. Okay. And what about the effect that
7  the conviction would have on his credibility?
8  Did you believe that the conviction might have
9  some effect on what a jury or how they would
10 view his credibility about his denial of kicking
11 Mr. Smith in the chest?
12     A. Well. I don't know about what the jury
13 is going to say. I think that the conviction
14 itself is problematic, and I also -- I thought
15 it was -- it was problematic. Hesitancy,
16 reluctance. Is he going to testify? These are
17 problematic for me.
18     Q. Okay.
19     A. You got one more question, Stuart.
20 It's 3:04. I have been very nice.
21     Q. All right. I got one more -- I got one
22 more question but it's in two parts.
23     A. Do it.
24     Q. Is it correct that Judge Cannon ordered

63 (Pages 237 to 240)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 241

1  that the CR file that Mr. Smith had filed
2  ordered -- in the special state's attorney's
3  postconviction proceeding and Robert's
4  postconviction proceeding Judge Cannon ordered
5  that the CR file be produced, correct?
6       MR. NOLAND:  Hold on.  Hold on.
7  Objection.  Form.  Foundation.  Best evidence
8  rule.
9       THE WITNESS:  Here, I will do it this
10  way and I think I can answer, there is a motion
11  for leave to take discovery.  That was a joint
12  motion between -- that we had agreed to and that
13  was a motion for leave to take discovery that
14  was I think to issue subpoenas that we had
15  agreed to all of the issues in these subpoenas.
16       I think amongst the items in which we
17  agreed to, specifically agreed to so that we
18  could properly investigate, was OPS files were
19  at large, okay, and any detected -- and I think
20  it's in a motion for leave to discovery that was
21  filed years ago in an order, and we went before
22  Judge Cannon and she agreed.
23       Q.  Fabulous.  And my very last question
24  then is after she agreed and issued an order

Page 242

1  that was agreed between you and Smith's counsel
2  to include all CR files carte blanche related to
3  Mr. Smith, is it correct that the Chicago Police
4  Department and its OPS division never produced
5  to you the file that began with Robert Smith's
6  OPS complaint?
7       A.  I am not certain if they did or did
8  not.
9       Q.  But if you didn't produce it in your
10  recent production, that's because you don't have
11  it?
12       A.  That's absolutely right.
13       Q.  All right.
14       A.  Or in your production because it was a
15  joint -- it was your subpoena, not you but the
16  other one.  Your predecessors.
17       Q.  Yeah.  We didn't get it at that time
18  either, Myles, if it makes you feel any better.
19       A.  Okay.
20       MR. CHANEN:  All right.  Thank you very
21  much.  I appreciate the courtesy of you and your
22  office, Mr. Gramlich, and your whole team
23  throughout.  None of this is pleasant for
24  anyone, and you have been a gentleman throughout

Page 243

1  and I appreciate your courtesy.
2       THE WITNESS:  Thank you, all.
3       MR. GRAMLICH:  Thank you, Myles.
4       MS. BENJAMIN:  Thank you.
5       MR. NOLAND:  Signature?
6       MS. BENJAMIN:  He is gone.  What did he
7  say after the last dep?  Hold on.  Let's see.
8  Did we end that first one?  I can't remember.
9  Hold on.
10       MR. NOLAND:  Yeah.  I am looking at his
11  transcript, and I don't see a statement of
12  whether he was -- so I don't know.  You may have
13  to reach out to him, Miss Court Reporter.  We
14  will take a copy of the transcript, regular
15  delivery, Paula.
16       MR. CHANEN:  Paula, at this point
17  unless Mr. Olstein who is my boss tells me
18  otherwise in the next day or two, I don't think
19  we need a copy of this transcript at this time.
20       MR. OLSTEIN:  Given I am the boss, I
21  think we will wait.
22       THE REPORTER:  Ms. Benjamin, would you
23  like to order a copy?
24       MS. BENJAMIN:  No.  I won't need one.

Page 244

1  Thank you.
2       THE VIDEOGRAPHER:  We are off the
3  record at 3:06 p.m.
4       (FURTHER DEPONENT SAITH NOT.)
5  (Deposition concluded at 3:06 p.m.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

64  (Pages 241 to 244)

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 245

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4    ROBERT SMITH, JR.,            )

5            Plaintiff,            )

6      vs.                         ) No. 21 C 1159

7    THE CITY OF CHICAGO,          )

8    et al.,                       )

9            Defendants.           )

10

11           I, MYLES O'ROURKE, hereby certify that I

12    have read the foregoing transcript of my

13    deposition taken on September 29, 2022,

14    consisting of Pages 1 to 245 and that to the

15    best of my knowledge it is a true and correct

16    transcript of said deposition, except as I have

17    changed it on the attached sheets in accordance

18    with the rules provided by said court.

19                    _____
                               MYLES O'ROURKE
20    No errata sheets submitted (Please initial) ___.

21    Number of errata sheets submitted _____(pgs.)

22    Subscribed and sworn to
      before me this        day
23    of                    , 2022

24

Royal Reporting Services, Inc.
312.361.8851

Robert Smith, Jr. v. The City of Chicago; et al.
Continued Deposition of Myles O'Rourke - Taken 9/29/2022

Page 246

1                    C E R T I F I C A T E

2

3

4

5        I, Paula Ann Erickson, Certified
   Professional Reporter, Registered Professional
   Reporter and Notary Public, do hereby certify:

6

7        That the witness in the foregoing
   deposition named was present on the date and
   time therein specified;

8

9        That the said proceeding was taken remotely
   before me as a Notary Public at the same date and
   time and was taken down in shorthand writing by me;

10

11       That this transcript is a true and
   accurate transcript of my shorthand notes so
   taken, to the best of my ability.

12

13       I further certify that I am neither
   counsel for nor related to or employed by any of
   the parties to this action and that I am not a

14 relative or employee of any counsel employed by
   the parties hereto or financially interested in

15 the action.

16

17

18       Paula Ann Erickson
         Certified Shorthand Reporter
19       Registered Professional Reporter
         License No. 084-003899
20       Notary Public

21

   Dated this 4th day
22
   of November, 2022.
23

24

Royal Reporting Services, Inc.
312.361.8851