IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Robert Smith Jr., | ) | |
|            Plaintiff, | ) | No. 21-cv-1159 |
| v. | ) | |
| | ) | Honorable Jeffrey I. Cummings |
| The City of Chicago, et al. | ) | |
| | ) | |
|            Defendants. | ) | |

**SMITH OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 26 TO BAR REFERENCE TO THE KITCHEN KNIFE AS THE MURDER WEAPON**

In Defendants MIL #26 ("Motion"), they move to bar Smith from making any reference, argument, or insinuation that the kitchen knife (the "Knife") was the weapon used to murder Robert Smith's in-laws. This is the Knife that the police found buried in the ashes of the crime scene, near the very spot where the victims had their throats slashed, next to where the police recovered the gas can apparently used to set the house on fire, and which Area 2 Detectives bagged and tagged as evidence, sent to the Chicago Crime Lab for serology testing and fingerprint comparisons, and which never had a full serology workup or fingerprint comparisons because the City of Chicago's evidence retention unit (ERPS) destroyed the Knife – outside the dictates of CPD General Order 80.1 – shortly after Robert Smith's defense counsel asked to see and inspect it. This is also the Knife that non-defendant patrol officers Warren Hughes and Patrick Barrins had identified as the murder weapon in their General Offense Case Report.

      Defendants base their motion on the following propositions:

      there is simply no evidence that the kitchen knife was used in the murders of Smith's mother-in-law Edith Yeager and his grandmother-in-law Willie Bell Alexander;

      there is no good faith basis for Plaintiff's counsel to reference, argue, or insinuate that the kitchen knife was the murder weapon;

      [d]uring the original criminal proceedings, Plaintiff did not contend the kitchen knife was the murder weapon, did not argue that it was exculpatory, did not seek to inspect or test the kitchen knife any further;

1

> [t]here is no evidence that the kitchen knife was used in the murders;
>
> [i]t is rank speculation for Plaintiff to suggest . . . that the kitchen knife was the murder weapon;
>
> the kitchen knife was apparently used out of convenience [to cut carpet], but later collected and inventoried by other detectives as possibly relevant;
>
> Simply put, the kitchen knife has no relevance at trial;
>
> depicting the kitchen knife as the murder weapon would also result in unfair prejudice to the Defendants; and
>
> as there is no evidence the kitchen knife was the murder weapon . . ., allowing Plaintiff's counsel to make a contrary argument or insinuation would confuse the issues and would mislead the jury.

Motion on 1-4.

Each of these statements is complete and utter nonsense. As Smith already provided in detail on pages 40-50 of his Summary Judgment Additional Statement of Facts ("PSOF"), this is the actual evidence that supports the inference that the Knife was the murder weapon:

> **In their General Offense Case Report, Patrol Officers Barrins and Hughes specifically identified the murder weapon as "a knife." PX80. See also PX194, at 99:6-101:16 (Hughes Deposition).**
>
> **Hughes testified that he and Barrins identified the murder weapon as a knife in the GOCR because he believes that he observed a knife on the floor of the crime scene between the dining room and living room near where the bodies were found. PX81. *See also* PX194, at 30:12-31:2; 87:14-90:22; 95:18-100:13; 103:4-104:3; 125:20-127:21 (Hughes Dep.).**
>
> **According to Hughes, given the "positioning" and "location" of the Knife on the floor of the crime scene, "all indications showed that it was a knife [that was used to murder the victims]." PX194, at 89:16-19; 126:7-8.**
>
> **CFD Investigator Jack Lumsden took a photo of the Knife on the dining room floor, near the chair on which investigators found the two gallon gas can they believed the perpetrator used to start the fire, and next to where there had been a hide-a-bed sofa, where, according to Lumsden and CPD B&A Lawrence Gates, the fire originated. PX81 (photo of knife, in full view). PX5, at 138:12-2 (Lumsden Dep. Testimony - there was a butcher knife in the dining room floor).**
>
> **Lumsden also wrote in his Initial Case Report that one of the victims had**

2

"horizontal deep slashing *knife* wounds to the throat." PX82 (emphasis added).

Lumsden twice mentioned a knife in his Incident Report. First, he states that "each victim had *knife* wounds to the throat," and then he states, "Both victims suffered *knife* wounds to the throat." PX83 (emphasis added).

Lumsden testified at his Dep. that he was trained to write his reports with precision, to put in his reports that which he actually observed, as opposed to conjecture or speculation, and that he photographed anything he observed at the scene that he believed was pertinent to the investigation. PX5, at 24:7-10, 41:22-2, 44:11-45:12 (Lumsden Deposition).

In referring to a knife in his reports, Lumsden did not write "apparent knife wounds" or "knife-like wounds." Rather, as stated above, Lumsden referred to a knife conclusively and without any qualification as the murder weapon. PX5, at 140:11-141:23 (Lumsden Deposition).

Although Hughes and Barrins, on the morning of September 19, had already identified the murder weapon as a knife, and although Lumsden, also on the morning of September 19, had photographed a 12" inch butcher knife on the floor of the crime scene and repeatedly referred to a knife in his reports, for some unknown reason, the knife, as depicted in PX81, was initially left back at the crime scene. Why would Lumsden and Gates do that if, as Defendants' lawyers now claim, they had removed the Knife from the kitchen and used it to cut carpet? PX5, at 137:15-138:4, 138:12-18 (Lumsden admitting that his reports do not say that a knife was removed from the scene to cut out a carpet sample); *Id*. at 140:22-141:16 (Lumsden admitting that a sharp instrument like a knife caused the murders). PX194, at 88:19-89:4, 103:4-18, 125:20-23, 126:7-8 (Hughes Dep. Testimony - the knife was probably the murder weapon).

On September 19, Area 2 Detectives Patrick Mokry and Thomas Keough returned to the crime scene where, according to their GPR, "while searching through the debris and ashes in the house a butcher type knife was located in the dining room area." PX85, at CITY-RS-112 (Mokry and Keough GPR).

Mokry and Keough also bagged and tagged the Knife and assigned an inventory number to the Knife. PX85, at CITY-RS-112 (Mokry and Keough GPR).

The Inventory Report to the Knife is missing from the CPD Homicide File and has not been produced in this case.

The Evidence Report for the Knife is missing from the CPD Homicide File and has not been produced in this case.

Area 2 Detective Ronald Gaines prepared a "Request for Analysis Report" in which he requested that the Knife be sent to both the CPD Crime Lab's Serology (blood) and Laser (fingerprint) Units. PX86, at CITY-RS-211 (Gaines Request for Analysis re: Knife).

Notwithstanding Defendants' repeated insistence that the Knife tested

3

> **negative for blood, that is actually not correct. At no time was a full serology work up done on the knife. Rather, as the City's own serologist, Christine Anderson, admitted in both her Lab Report and testimony, she performed only a "*preliminary* chemical test for blood" on the Knife and she did so only on "a single extract" taken from the Knife. While it is true those extracts "yielded negative results," at no time did Anderson conduct any further testing on the Knife.** PX87, at 57:14-58:3 (Anderson Deposition); PX88, at CITY-RS-29 (Anderson/Crime Lab Notes).
>
> **At no time did Anderson send the Knife or any extract taken from the Knife for any chemical testing, as she had done with several other pieces of evidence in the case.** See PX87, at 63:7–66:15.
>
> **The Knife was never sent to the Laser Unit for fingerprint testing and comparison, or if it was, no one issued any reports with respect to such testing and comparison. This is so even though the police had Robert's prints on file.** PX87, at 113:23-115:2, 124:3-14 (Anderson Dep. Testimony - the knife never made it to fingerprint testing because there was no serology evidence). See also Reich Report, at 15-17.
>
> **No Area 2 Detective undertook any step to arrange for ligature comparison testing, which could have determined if the Knife matched the wounds on the victims' throats.** See Reich Report, at 16-17.

Any one of these pieces of evidence would be sufficient for Smith to argue to the jury that the Knife found at the crime scene was the murder weapon, but taken together, this evidence overwhelmingly supports that the Knife was the murder weapon. And this is not even all the evidence that supports that conclusion. There are three, additional, entire categories of evidence that further support that the Knife was the murder weapon.

First, Defendants' theory is that Robert Smith slashed the victims' throats with a razor blade and then threw the razor blade near the entrance to the first floor bathroom. This is not only their theory for trial. It was their theory that very night. It is set forth in several of the Defendants' GPRs, the Cleared and Closed Report, and perhaps most significantly, in Robert Smith's purported typewritten confession (the one Robert refused to sign).

The problem with Defendants' razor blade theory, however, is that:

> **Several Defendants testified that once Robert purportedly confessed to committing the murders with a razor blade that he left at the crime scene, corroborating the confession by searching for and finding the razor became a top priority of the homicide** PX195 at 64:8-12 (Defendant Cline that "corroboration

4

of the murder weapon was among the very most important aspects of the investigation").PX93, at 88:22-89:18 (Defendant Pedersen testifying that it would have been important before submitting the Cleared-and-Closed Report to search for and find the razor blade); PX31, at 129:20-130:9 (Defendant Leracz testifying that he and the other first watch detectives would have been specifically looking for a sharp instrument at the crime scene).PX94, at 41:10-42:8 (Detective McGovern testifying that he and the other first watch detectives would have been looking for a razor blade at the crime scene).

**The razor blade, however, was never found on the floor of the crime scene.** See Dkt. 502, at ¶¶94-102 (citing the evidence).

**There is no report of any kind that indicates that any Area 2 Detective searched for the razor blade.** *Id.* at ¶¶96-99.

**There is no report of any kind that indicates that Area 2 Detectives were sent to search for the razor blade during daylight hours.** *Id.* at ¶102.

**There is no report of any kind that indicates anyone ever did a grid search on the area outside the first floor bathroom.** *Id.*

**There is no report of any kind that anyone ever took a metal detector into the crime scene near the first floor bathroom to locate the razor blade.** *Id.*

**Lieutenant Cline testified that he ordered Higgins and Solecki to search for the razor blade and further testified that a Detective under his command could suffer serious consequences for not following his Orders.** *Id.* at ¶¶95, 101.

**Nevertheless, there is no report from Higgins or Solecki that they ever searched for the razor blade, and Cline testified that he does not believe that Higgins or Solecki ever reported to him on the results of any search for a razor blade.** *Id.*

As with all of the affirmative evidence about the Knife set forth above, any one or two pieces of evidence listed here about the purported razor blade would be sufficient to support Smith's theory that the Knife – and not the razor blade Defendants attempted to put in Smtih's hand – was the murder weapon.

The second major category of evidence that further supports Smith's theory that the Knife was the murder weapon is the fact that less than six months after the Knife was seized at the crime scene as evidence in the Yeager/Alexander murders, and less than three months after Robert Smith's defense counsel asserted his right to inspect every piece of physical

5

evidence that had been seized from the crime scene, including the Knife, the City of Chicago inexplicably destroyed the Knife, and indeed, they did not just destroy the Knife, they did it in direct violation of the procedures for evidence destructions set forth in CPD General Order 80.1. This occurred nearly a year before Robert's February 6-8, 1989 Suppression Hearing and over 2-1/2 years before Robert's August 28, 1990 Criminal Trial. The Knife was never produced to Smith's defense counsel. This evidence includes:

> **On October 15, 1987, before Anderson had finished serology testing and before the Knife had been sent to the Laser Unit for fingerprint testing, Anderson sent the Knife to the CPD's Evidence and Recovered Property Section (ERPS).** PX88, at CITY-RS-195. PX87 at 79:14–80:2 (Anderson 10-5-21 Dep. Testimony).
>
> **Anderson testified that she expected that ERPS would hold and preserve the Knife at least through Robert' Criminal Trial.** PX87 at 79:14–80:2 (Anderson 10-5-21 Dep. Testimony).
>
> **On November 9, 1987, Robert's defense attorney filed a written request for discovery, specifically requesting a "list of all physical property in the possession of law enforcement officials" and "that such property be made available to the defense for inspection before trial."** PX89, at CCSAO1206.
>
> **On February 16, 1988, ERPS destroyed the Knife.** PX117, at CITY-RS-571 (ERPS Ledger); PX90, at 49:2-5 (Blanton Dep. Testimony – ERPS destroyed the knife recovered from the crime scene).
>
> **One year later, on November 14, 1988, the State filed its Response to Robert's written discovery requests. The State omitted any mention of the Knife and the photo of the Knife on the floor of the crime scene.** PX91, at CCSAO1165-69 (State's Discovery Response).
>
> **The State also did not mention in its Response that the CPD had destroyed the Knife, let alone that CPD had sone so on February 16, 1988, *three months after* Robert's defense counsel served his written request to inspect all physical evidence.** PX89, PX91, and PX117.
>
> **Lieutenant Dachae Blanton, Defendant City of Chicago's Rule 30(b)(6) witness regarding the Knife's destruction, testified that in 1987-1988, any officer seeking destruction of property housed at ERPS was required to either obtain a Court Disposal Order or submit a CPD Tracer Form to ERPS in order to obtain the destruction of that property.** PX90, at 33:20-34:9, 34:10–35:22 (Blanton testifying that to destroy evidence ERPS would need the copy of a tracer form or a court order).

6

> **Blanton admitted, however, that she was unable to locate a CPD Tracer Form with respect to the Knife.** PX90, at 36:24—37:8 (there was no tracer form approving the destruction of the knife).
>
> **Blanton also admitted that she was unable to locate a Court Disposal Order with respect to the Knife.** PX90, at 36:24—37:8 (there was no tracer form approving the destruction of the knife).
>
> **Blanton also admitted that contrary to policy, during this time period, ERPS would destroy property in its position on the mere say-so of an Officer or Detective, without a Court Order and without a CPD Tracer Form.** PX90, at 36:24-37:8 (there were no required forms in this instance). *Id.* at 71:1-2 ("they should not [destroy evidence on that basis]. But it is possible [it happened].")
>
> **Former ASA Patricia Woulfe, the prosecutor who handled discovery in Robert's criminal case, during her deposition, was shown a photo of the Knife on the floor of the crime scene. Woulfe testified that she had never seen the Knife depicted in the photo prior to her deposition.** PX92, at 76:14-20 (Woulfe Deposition).
>
> **Woulfe further testified in this case that she wasn't aware when she prosecuted Robert Smith that there had been a knife on the floor of the crime scene.** PX92, at 84:222-85:5 (Woulfe Deposition).
>
> **She also testified that she could not recall ever seeing an Inventory Report for a knife.** PX92, at 187:16-23 (Woulfe Deposition).
>
> **Woulfe eventually admitted during her deposition that she "apparently" did not disclose the Knife and the photo of the Knife to Robert's defense counsel.** PX92, at 154:10 (Woulfe Deposition).
>
> **When asked why she failed to do that, Woulfe, on advice of counsel, refused to answer.** PX92, at 87:14-22, 153:19-154:10, 155:17-157:8 (Woulfe Deposition).

Again, any one or two of the evidence listed here would be sufficient for Plaintiff's lawyers to have a good faith basis to assert that the Knife was the murder weapon. Taken together, this evidence is overwhelming.

The fourth and final full category of evidence that yet further supports the conclusion that the Knife was the murder weapon is that Defendants have concocted a false narrative of how the Knife had come to be among the debris at the crime scene. Indeed, Defendants themselves allude to this theory in their own Motion: "the kitchen knife was apparently used out of convenience [to cut carpet] but later collected and inventoried by other detectives as possibly

7

relevant." Motion at 4. Defendants at one point suggest that "[Detective] Gates, who did not carry a knife, believes he likely used a knife from the kitchen to take the carpet sample." Motion at 2. This statement, however, is patently false. Gates does not believe that he "likely" used a knife from the kitchen to cut carpet. Rather, the evidence establishes that:

> **Gates admitted at this deposition that he was "speculating" that he or Lumsden had retrieved a knife from the crime scene to cut out a carpet sample.** PX8, at 87: 11–88:6 (Gates Dep. Testimony) ("I would agree. I am speculating.").
>
> **Gates has no actual memory of ever retrieving a knife from the kitchen.** PX8, at 84:9-13 (Gates Dep. Testimony).
>
> **Gates never observed anyone else retrieving a knife from the crime scene or using a knife to cut out a carpet sample at the scene.** PX8, at 143:22-24.
>
> **Gates never told anyone at the crime scene that a knife was retrieved from the scene or that a knife was used to cut out a carpet sample at the scene.** PX8, at 151:18-22.
>
> **Gates never heard anyone else say that a knife had been taken from scene or that a knife was used to cut out a carpet sample at the scene.** PX8, at 151:23—152:1.
>
> **Lumsden also conceded that he never mentions in any of his reports that anyone retrieved a knife from the crime scene, nor that a knife was used to cut out a carpet sample at the scene.** PX5, at 137:11-139:10 and 144:13-16.
>
> **Lumsden also testified that while he was at the crime scene he had numerous sharp instruments and tools, including an axe, with a pick on one end and a blade on the other, as well as a pike pole-a tool strong enough to puncture ceilings-and various other types of sharp instruments, including rakes and shovels. Lumsden could not explain why he would have retrieved and used a knife from the actual crime scene to cut out a sample of the carpet instead of using the firefighting and law enforcement tools available at the scene.** PX5, at 13:9-13, 147:7-9, 149:3-150:2 (Lumsden Deposition).
>
> **Gates has no memory of Investigator Lumsden retrieving a knife from the crime scene.** PX8 at 84:9-13.
>
> **Gates has no memory of Investigator Lumsden using a knife to cut out a carpet sample at the scene.** PX8, at 84:14-19.
>
> **Gates was unable to say if the Knife depicted in the photos on the floor of the crime scene was in fact the tool that either he or Lumsden "most likely" and "probably" retrieved from the scene and used to cut the carpet at the scene.** PX8, at 80:18-81:13.

8

> **Gates is not even sure whether he or Lumsden had actually used a knife, as opposed to a different sharp instrument, to cut a sample from the carpet at the scene.** PX8, at 83:14-22.
>
> **Gates also admits that the fire personnel at the scene had cutting instruments with them, which could have been used to cut a carpet sample from the scene, and that using a knife from the crime scene itself to cut out a carpet sample could have compromised the evidence.** PX8, at 87:11-88:6, 85:14-20, 86:11-17 (Gates Deposition – the fire department probably had sharp tools with them and using evidence from the crime scene could compromise the scene or the evidence).
>
> **In fact, using a knife from the scene to collect evidence from the scene would have been a violation of basic investigation and evidence contamination procedures.** PX73, at 18-21 (Jaimee McAllister Expert Report: "The use of a knife from a residence to collect evidence would be in direct conflict with established evidence collection practices and procedures both in current day and at the time of the incident.").

At the risk of starting to sound like a broken record, Smith again submits that once Defendants decided to go with the theory that Gates or Lumsden cut carpet away from the scene with the Knife, then any one of the above pieces of evidence, showing how blatantly false that story is, are sufficient to support Smith's theory that the Knife was the murder weapon.

Defendants' assertion on this Motion that "there is simply no evidence that the kitchen knife was used in the murders of Smith's mother-in-law Edith Yeager and his grandmother-in-law Willie Bell Alexander" and their assertion that there "is no good faith basis for Plaintiff's counsel to reference, argue, or insinuate that the kitchen knife was the murder weapon" is frivolous on its face. If anything, given Gates and Lumsden's completely speculative deposition testimony, it is Defendants that have no good faith basis to assert that the Knife was a tool used to cut the carpet at the scene.

For all these reasons, Plaintiff Robert Smith respectfully requests this Court to deny Defendants' Motion and for any other relief the Court deems appropriate.

Dated: May 14, 2025

                Respectfully submitted,
                *PLAINTIFF ROBERT SMITH JR.*

                By: /s/ *Stuart J. Chanen*

CHANEN & OLSTEIN
8822 Niles Center Road, Suite 100
Skokie, IL 60077
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com

Nicole Nehama Auerbach
ELEVATENEXT LAW, LLP
218 N. Jefferson Street, Suite 300
Chicago, IL 60661
312-676-5460
Nicole.auerbach@elevatenextlaw.com