IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Robert Smith Jr., | ) | |
| Plaintiff, | ) | No. 21-cv-1159 |
| v. | ) | |
| | ) | Honorable Jeffrey I. Cummings |
| The City of Chicago, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' DAUBERT MOTION TO BAR THE TESTIMONY OF PLAINTIFF'S FORENSICS EXPERT DR. KARL REICH**

This lawsuit arises out of Robert Smith, Jr.'s October 2020 exoneration for the 1987 murders of his mother-in-law Edith Yeager and grandmother-in-law Willie Bell Alexander. Smith's exoneration includes:

(a) a Special Prosecutor moving to vacate his conviction,

(b) a Cook County Circuit Court Judge vacating his conviction,

(c) the Chief Judge of the Cook County Criminal Court holding that Smith "is innocent of the offenses charged in the indictment" and

(d) four judges of the Illinois Court of Claims holding:

Robert Smith represents yet another victim of the violent and abusive tactics of Chicago Police Lieutenant Jon Burge and his devout crew of similarly violent Chicago Police detectives.

Following hours of torture, Mr. Smith orally confessed. But tellingly, when it was demanded that he sign a written confession by the assigned felony review State's Attorney and detectives, Mr. Smith refused. The oral confession along with other fabricated evidence formed the basis of his double murder conviction. But for the trial judge who raised concerns about the lack of motive by Mr. Smith, he might very well have been sentenced to death.

In this federal lawsuit, Smith has sued nine Detective Defendants, all alumni of the notorious Area 2 Violent Crimes Detectives Division, which came to be known in Chicago as "The House of Screams." See https://chicagoreader.com/news/house-of-screams/ (last checked: May 13, 2025). Smith seeks compensation for the 33 years that he spent incarcerated for a double murder of his own family that he had nothing whatsoever to do with.

On September 19, 1987, Defendant McWeeny seized and shackled Smith for no other reason than that Smith talked back to McWeeny and swatted McWeeny's hands away when McWeeny forcefully grabbed him. Clearly aware that his purported "arrest" of Smith was illegal, McWeeny concocted a fantastical story about Smith diving into a pool blood in order to contaminate the crime scene, and that fantastical story is one of many ways in which Smith will be able to prove that the Detective Defendants fabricated a double murder case against him.

In addition, Smith will call a renowned serology and DNA expert, Dr. Karl Reich, in support of his claims. Dr. Reich (who Defendants simply call, "Reich") is one of the nation's foremost authorities on "DNA forensic analysis" and has testified in more than 140 proceedings, as well as has been qualified as an expert in more than 20 jurisdictions. Defendants have eight basic arguments about Dr. Reich's opinions. They assert:

1. His "opinions extend far beyond DNA and serology."
2. He "offers wild speculation about the events of September 19, 1987."
3. He "offers wild speculation about Defendant detectives' criminal investigation"
4. He "offers wild speculation about Defendant detectives' practices."
5. His "opinions are not valid expert testimony."
6. His opinions "are equally within the knowledge of lay jurors."
7. He "is not qualified to offer [his opinions]."
8. His "opinions are scientifically unreliable."

Motion at 7. Defendants, however, fail to support these eight positions in their Motion, as Smith explains in detail in this Opposition. Rather, Defendants focus on five purportedly more-pointed arguments in sections A-E, each of which we address in turn.

### A. Dr. Reich Is an Expert in "Forensics" and Is Highly Qualified To Give Each of The Opinions Set Out in His Report and Deposition.

Defendants are correct that this Court must satisfy itself that Dr. Reich is qualified as an expert and that he has used proper methodology in reaching his conclusions. *See*, *e.g.*, Motion at 17, *citing in part In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *10 (N.D. Ill. 2015) (court must satisfy itself that the "expert is an expert" and that he or she is testifying about "subjects and theories about which he may testify"). Here, there can be no serious dispute that based on his educational training and background and his more than 46 years of professional experience, he is

2

a qualified expert in the area of forensics. Defendants concede that in *Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 2550623 (N.D. Ill. June 27, 2011), Judge St. Eve concluded that Dr. Reich qualified under *Daubert* and Rule 702 to testify about the field of DNA forensic analysis. Motion at 9, citing *Id*. at *4. Indeed, in setting forth Dr. Reich's qualifications in their Motion, Defendants lift his credentials directly from Judge St. Eve's opinion:

> Dr. Reich has worked in the field of DNA analysis since he was a graduate student in the Department of Biological Chemistry at the University of California, Los Angeles ("UCLA") in 1979. Specifically, Dr. Reich received his undergraduate degree in chemistry from Cornell University in 1977 and his Ph.D. in molecular biology from UCLA and Harvard Medical School in 1988. After obtaining his Ph.D., Dr. Reich had a two-year fellowship at the Institute Pasteur in Paris, France and then served six years as a research fellow at Stanford University School of Medicine. Dr. Reich has published numerous articles on DNA forensics and has taught DNA evidence courses to legal professionals.
>
> Currently, Dr. Reich is the Chief Scientific Officer for Paternity, DNA Forensics, and Molecular Biology at Independent Forensics of Hillside, Illinois. Prior to his work at Independent Forensics, Dr. Reich worked in pharmaceutical development and genomics-based research.

*See* Motion at 9, *quoting Hill*, 2011 WL 2550623, at *4.

If there is one overriding reason this Court should deny this Motion it is because Defendants read the word "forensics" out of Dr. Reich's expertise. "Forensics" is defined as "the application of scientific principles and techniques to matters of criminal justice especially as relating to the collection, examination, and analysis of physical evidence." Merriam-Webster.com Medical Dictionary, Merriam-Webster, https://www.merriam-webster.com/medical/forensic%20science (Accessed May 5, 2025). It is also defined as "'relating to or denoting the application of scientific methods and techniques *to the investigation of crime*." Oxford English Dictionary (Oxford University Press 1989 Ed.) (emphasis added). Defendants spend their entire brief basically arguing that Dr. Reich is permitted to opine about science, but not permitted to opine about the investigation of crime. A perfect example of Defendants ignoring that *forensic* means crime investigation is this sentence:

> Yet, Reich's Report contains wide-ranging opinions based on police practices, crime investigation, and the assessment of alleged inconsistencies in the evidence, . . . as opposed to *forensic DNA*.

Motion at 18 (emphasis added). This sentence of course makes no sense at all. It's like saying

3

Dr. Reich cannot opine on PB&J because his area of expertise is limited to *sandwiches*. Another example is their assertion that "Reich's background is in science, specifically pharmaceuticals, biotechnology, and DNA analysis," Motion at 13, intentionally omitting the word "forensics" and intentionally ignoring that nine pages earlier they had already conceded that Dr. Reich has been qualified as an expert in "*forensic* DNA," "*forensic* biology," and "*forensic* DNA statistics." Motion at 4 (emphasis added), *quoting* Dkt.579-3, at 42:16-20. Defendants also concede that Dr. Reich has issued his opinions to a reasonable degree of certainty in the fields of "criminalistics, chemistry, and forensics." Motion at 3, 16, quoting Dkt.579-1, at 1.

Defendants then dive into asserting that Dr. Reich is "not qualified" to give any opinions about the investigation of crime because he has never worked for "a police department," "a crime lab," or been a "law enforcement official," and has no experience with "arson investigation" or "evaluating the cause and origin of a fire." Motion at 4. So eager were Defendants to prove that Dr. Reich had no law enforcement experience that they failed to ask him about the actual scope of his expertise or the specific history of his professional practice. As Dr. Reich will testify at the upcoming trial, however, the vast majority of his work over the past 46 years has been about applying science to the investigation of crime. As such, Dr. Reich is perfectly qualified, by education and experience, to opine on each of the issues set forth in his Report and discussed at his Deposition.

Indeed, the issue of "forensics" came to a head at Dr. Reich's deposition when Defendants tried to get Dr. Reich to admit that he was only qualified to testify about forensic DNA and not qualified to testify about "forensics" generally, to which he responded:

> There I think I would disagree. One of the nice things about forensic DNA, it interacts with a whole bunch of other forensic fields. And so I'm quite familiar with a series -- other forensic fields because of that intersection; include[ing] latents, firearms, fibers, particles. I have a back-ground in chemistry because I have an undergraduate degree in that and worked as a professional chemist for a number of years. So I would say I have a [broader] view, by far, of forensics than most.

Dkt.579, at 48:24 - 49:9. Then, to compound Defendants' problem of reading the words "investigation of crime" out of the word "forensics," they then read the words "evidence handling, evidence preservation, and evidence integrity" out of the words "investigation of crime."

Defendants want this Court to believe that Dr. Reich's only value as an expert is to tell the jury what he can observe under a microscope and that he can testify solely about "blood type" or the complicated science of DNA. (Please don't get him started on that subject!)

But Dr. Reich has years and years of experience analyzing how blood, semen, and other substances become evidence, get analyzed, get on other evidence, remain on evidence, can be removed from evidence, become degraded, or how blood, fingerprints, and other biological material may be used or not used as evidence. For example, Dr. Reich explained in both his report and deposition, *but Defendants choose to intentionally ignore*, that the handling of evidence is a central component (and often *the* central component) of what Dr. Reich is retained to analyze. Reich Dep., Dkt.579-3, at 187:16 - 188:6; Reich Report, Dkt.579-1, at 1-2.[1]

As one example only, Defendants asked Dr. Reich if he intended to testify that CPD compromised the integrity of evidence by violating their own evidence collection and documentation procedures, to which he said, "Yes." They then asked what evidence in the record led him to that conclusion, and he identified the evidence upon which he relied. They then asked, "why was that important to your opinions in this case?," and he testified:

---

[1] In his Report, Dr. Reich explained:

> Certainly one of the most basic and important responsibilities of an investigation and collection of physical evidence is the protection, preservation and recording of the crime scene. Limiting access to prevent destruction, alteration, and contamination, ensuring that items of evidence are not moved, altered, or displaced and recording accurate and complete observations of the scene and all items of evidence.

Dkt.579-1, at 1. He further explained:

> [T]he integrity of the prosecution of any suspects is of course wholly dependent on securing the crime scene, preserving the state of the evidence and recording the type, location, circumstance and condition of all items of evidence. The importance of these topics cannot be overstated.

*Id.* at 2. He covered this issue at his deposition as well. *See* Dkt.579-3, at 43, 185-187.

5

> The providence, history, chain of custody of items of evidence is important for being able to draw conclusions -- scientific conclusions from items of evidence that are tested. So I always ask, and it's part of actually a discovery requirement for forensic DNA to provide a chain of custody. So this is not under that rule. It's way before that, but the same concept applies. You want to know about the providence, history, storage, handling of the items of evidence which are tested and then become part of the case. So it's perfectly reasonable to want to know what those [providence, history, storage, handling] are and then figure out whether they're significant or not to being able to draw conclusions from . . . the results of testing. I think that's just normal.

Reich Dep., Dkt.579-3, at 187:16 - 188:6. In sum, Dr. Reich is highly qualified to render all of the opinions that he has rendered and intends to render in this case. Defendants have not actually established a single opinion for which he is not qualified.

Instead of actually comparing his level of expertise to the specific opinions he has given and further intends to give, Defendants wildly assert at the very end of Section A that Dr. Reich is not qualified by training or experience to offer opinions "on the investigative significance of evidence in a murder investigation" and that he is not qualified by education or experience to give opinions on "whether certain [scientific] evidentiary facts . . . implicate or do not implicate Smith in the subject crimes." Motion at 15. These assertions are just flat out wrong. They read out of Dr. Reich's actual qualifications the concepts of "science," "forensics," and "evidence integrity" and completely ignore Dr. Reich's vast 46 years of experience.

Defendants' "not qualified" argument should be resoundingly rejected.[2]

---

[2] On pages 2, 3, 14, and 15 of Defendants' Motion, they also assert that Judge Guzman limited Dr. Reich solely to "rebuttal serology" opinions in response to two of Defendants' experts. This is false. No such limitation was ever placed on Dr. Reich's testimony. Defendants weave this falsehood throughout their motion in an attempt to limit Dr. Reich's permitted testimony, but the argument is based solely on an intentional misreading of Dkt.298, at 2, a copy of which is attached as **Exhibit A** (emphasis added).

On August 17, 2022, while expert discovery was stayed, Smith filed a Status Report with Judge Guzman to propose a schedule to complete expert discovery. In that Report, Smith mentioned retaining a "rebuttal serology expert witness," but he also mentioned discovery related to (a) "chain of custody;" (b) "evidence contamination;" and most significantly, Smith expressly stated, "If [Smith's] rebuttal expert also *offers any affirmative opinions beyond rebutting the opinions set forth in the June 1* [DNA Labs Int.] *reports*, [the schedule should be as follows: proposing schedule]." Dkt. 298.

The next day, Judge Guzman set a schedule, and **he did not limit Dr. Reich's opinions in any way, Exhibit B,** but Defendants want Your Honor to think otherwise. They assert that "Smith

**B and C.**   **Defendants Assert and This Court Should Reject That Dr. Reich's Opinions (i) Are Not Reliable; (ii) Improperly Adress Ultimate Issues; and (iii) Are No More Than "Common Sense."**

In Sections B and C, Defendants assert that Dr. Reich's opinions should be barred because they:

(1) are not "reliable;"
(2) go to the "ultimate issues in the case;" or
(3) are simply statements of "common sense" that the jury can reach on its own.

Motion at 15-19. Because many of the arguments in Sections B and C overlap, Smith combines his responses to those two sections here. With the exception of one or two "common sense" statements, all three of Defendants' arguments should be rejected.

    **1.**   **Dr. Reich's Opinions Are Reliable.** Defendants assert that Defendants' opinions must be excluded "because they are not sufficiently reliable to be presented to a jury." Motion at 15. As an initial matter, Smith agrees with Defendants that in order "[t]o satisfy *Daubert*, the proffered testimony must have a reliable basis in the knowledge and experience of the relevant discipline, consisting of more than subjective belief or unsupported speculation." Motion at 15-16 (citations omitted). Smith also agrees that a court should ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" and that the expert must offer "more than a 'bottom line.'" Motion at 16 (citations omitted).

Defendants begin this section by criticizing the phrasing of Dr. Reich's report, and most specifically, his statement that the "the opinions I provide in this Report are based upon my education, experience, knowledge, and training and rendered to a reasonable degree of certainty in the fields of criminalistics, chemistry, and forensics." Motion at 16, citing 579-1, at 1.

---

sought leave to disclose a 'rebuttal serology expert witness' (Dkt. 298), and Judge Guzman granted plaintiff leave to do so . . . (Dkt. 300)," and they then assert on pages 2, 14, and 15 that Reich was only permitted to provide "rebuttal serology" opinions. Defendants intentionally assert that Dr. Reich has gone far beyond "rebuttal serology" opinions when Dkts. 298 and 300, in fact, overwhelming establish that he was never limited to "rebuttal serology" opinions. Respectfully, this Court should strike all of Defendants' references to a "serology rebuttal" expert and to "serology rebuttal" opinions, Motion at 2, 3, 14, 15 and issue any other Order Your Honor deems appropriate.

Defendants assert that this "basis" for his opinions (their quote marks) is insufficient under *Daubert* because he relies solely on his education, experience, knowledge, and training, but fails to identify the "professional experiences" he has had and the "specific industry standards" on which he relies. Motion at 16, *citing Kumho Tire Co.*, 526 U.S. at 157. Smith disagrees and explains here why the Court should not bar Dr. Reich's opinions on this ground.

The sole example of an "unreliable" opinion that Defendants actually discuss in this Section is their argument that because Smith had blood on his feet, he must be the murderer. Dr. Reich scientifically disagrees and notes in his Report (Dkt.579-1) and Deposition (Dkt.579-3) that Smith also could have gotten blood on his feet when he walked "through diluted bloody water" (that the firefighters created when they put out the fire) and that "the diluted bloody water got on his shoes, seeped through the shoes, got onto his socks." See Motion at 17, citing Reich Dep., Dkt.579-3, at 110:23-111:8 and Reich Report, Dkt.579-1, at 5-6. Defendants assert that this opinion is not reliable because there is "no research, testing, experiments, or papers" to support his hypothesis, and it is therefore "mere speculation." *See* Motion at 17.

Smith and Reich simply disagree and assert that Dr. Reich's training and experience in biology, biochemistry, serology, and his long involvement with the transfer of blood and its effects on clothing and other surfaces qualifies him to give an opinion on whether there were alternative ways for Smith to get blood on his feet other than during his in-laws' murder.

In this section, Defendants also throw out an additional list of opinions that they assert are unreliable, including "Reich's opinion regarding":

- "the bloody underwear;"
- "blood stains from rolling on the ground,"
- "the alleged failure to do a latent fingerprint comparison"
- "the lack of bloody lint from the dryer"
- "CPD's motivations behind destroying the knife"
- "CPD's motivations behind destroying the blue bed sheet."
- "the lack of a smell from the fire on Smith's clothes"; and
- the 'suspect' inconsistencies in the 1987/1988 and 2022 testing.

Motion at 17. But these arguments are wholly undeveloped and therefore forfeited. Nowhere

8

in Defendants' 22-page *Daubert* Motion do Defendants actually address why these opinions are purportedly unreliable. They do cross-reference these arguments to an earlier section of their brief where they summarize his opinions, but the purported "unreliability" of these opinions is also not discussed in those cross-referenced sections.

As judges in this Circuit have held 677 times since 1991, "Judges are not like pigs hunting for truffles buried in briefs." *See, e.g., United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991): *Belcastro v. United Airlines, Inc.,* No. 17 C 1682, 2019 WL 1651709, at *3 n.2 (N.D. Ill. Apr. 17, 2019) (Cummings, M.J.). And in June 2024, the U.S. Supreme Court joined in the chorus that litigants may not treat judges as "pigs hunting for buried truffles." *See Murthy v. Missouri*, 603 U.S. 43, 67 (2024). Put another way, the Seventh Circuit has repeatedly held that a skeletal argument – which the Court has referred to as "really nothing more than an assertion" – does not preserve a claim. *Dunkel*, 927 F.2d at 956; *Fields v. City of Chicago*, 981 F.3d 534, 547 (7th Cir. 2020); *Button v. Kibby-Brown*, 54 F.3d 779 (7th Cir. 1995). *See also Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("even arguments that have been raised may still be waived . . . if they are under-developed, conclusory, or unsupported by law").

In addition to being forfeited or waived, this argument should also be rejected on the merits (if the Court decides to reach the merits) for two reasons. First, as to some of the opinions that Defendants have declared "unreliable" it is simply not correct that Dr. Reich has not provided his methodology or principles in reaching his conclusions. *See*, *e.g.*, Reich Report, Dkt.579-1, at 5-6 (identifying the methodology and materials he relied on to reach the conclusion that the presence of blood on Smith and his clothes does not implicate him in the murders and explaining "there are simply 'no controls' for the biological evidence taken from Mr. Smith and there is absolutely no dispute that without proper controls, no scientific conclusions are possible."); *Id.* at 7-11 (same for his conclusion that the CPD compromised the integrity of the evidence by violating several of their own evidence collection and documentation procedures).

9

Second, when a deposing attorney makes a conscious decision at an expert's deposition not to ask pointed questions about the "methodology," "principles," or "experience" that support the expert's opinion, that attorney cannot later come back on a *Daubert* motion and complain that the expert failed to identify what specific methodology, principles, and experience "underpin[] his conclusions." See Motion at 18. During Defendants' 211-page deposition of Dr. Reich, they did not ask a single question that included any of these words: "methodology," "principles," or "experience" (although they did use the word "methods" one time, and then dropped that line of questioning). In sum, Defendants have not established that any of Dr. Reich's opinions are "unreliable," and for all the reasons stated in this Section B&C1, Defendants' "unreliability" arguments should be rejected.

### 2. Dr. Reich's Opinions Do Not Resolve or Attempt to Resolve Ultimate Issues.

Defendants next assert that the Court should bar Dr. Reich's opinions because:

> Rather than aid the jury with expert knowledge, Reich's opinions synthesize the facts for the jury, suggest inconsistencies, and reach conclusions (without ruling out the alternative explanations) *on ultimate issues in this matter*. Those [ultimate] issues properly remain for the jury to decide.

Motion at 19 (emphasis added). Defendants then list a number of issues that they view as "ultimate issues," and argue that all such testimony must be barred as invading the province of the jury. *Id.*

This argument is both forfeited and frivolous because this issue is controlled by Federal Rule of Evidence 704(a), which Defendants do not cite anywhere in their Motion. Rule 704(a) provides that an expert's opinion "is not objectionable just because it embraces an ultimate issue." FRE 704(a). In other words, the actual Rule of Evidence that addresses this issue is 100% opposite of what Defendants have requested.

By failing to bring the controlling legal rule to this Court's attention, Defendants have forfeited their "ultimate issues" argument, *see supra* at 11, but even if they had not forfeited it, they are arguing for a result that is directly rejected by Rule 704(a) and the case law

10

explaining it. As the United States Supreme Court explained last year in *Diaz v. United States*, 602 U.S. 526 (2024), by the late 1800s several states had prohibited experts from touching upon any "ultimate issue" that was left to a jury. *Id.* at 532. Concluding that such a limitation, however, was "impracticable and misconceived" and that it often deprived juries of help where "the jury should have help if it is needed," Id. at 533, in 1975, Congress adopted Federal Rule of Evidence 704(a), which now wholly permits experts to touch upon ultimate issues. *Id.* at 533.

In other words, Rule 704(a) wholly permits Dr. Reich to touch on "ultimate issues" in his opinions. The sole exception to Rule 704(a) is set forth in Rule 704(b), but that exception applies solely to criminal cases and is therefore not applicable to this civil rights case at all. Nor have Defendants cited a single case that applies any other exception to Rule 704(a). Therefore, Dr. Reich is permitted to touch upon and even "embrace" ultimate issues, as long as he does not tell the jury "how to rule."

Defendants' ultimate issue argument should be rejected in its entirety.

**3.     While Some of Dr. Reich's "Common Sense" Statements Are Inadmissible, Most Are Admissible.** The parties are in agreement that **"**expert testimony does not help the jury when it 'can be derived from common sense, common experience, the jury's own perceptions, or simple logic," and that it is also not needed where a "layperson could reach a particular conclusion without the expert's help." Motion at 19 (citations omitted). Where the parties disagree is which of Dr. Reich's opinions fall within this category and which do not.

Although Dr. Reich concedes in this section that some of the statements he made during his deposition are primarily based on common sense (*e.g.*, wet socks transfer liquid to one's feet), he absolutely disagrees – strongly disagrees – that his opinions:

> inform the jury about how he believes testimony should be weighed and how credibility should be assessed in relation to Smith's guilt or innocence, the veracity of his confession, and the sufficiency of the criminal investigation.

Motion at 18. As already established above on pages 2-6, Dr. Reich is permitted to give

11

"forensic" opinions, "relating to or denoting the application of scientific methods and techniques to the investigation of crime." Smith agrees (and Dr. Reich also agrees) that he may not tell the jury:

(1) to reject Smith's confession,

(2) to conclude that Defendants' criminal investigation was improper; or

(3) how the jury should assess witness credibility.

One of the best examples of where Defendants overplay their hand as to "common sense" is latent fingerprints. Defendants attempt to block Dr. Reich's fingerprint testimony on this ground, but their request fails in its entirety. Defendants took three sets of latent fingerprints from the crime scene and sent them to the Chicago Police Department Crime Lab. Dkt. 572, at 1-2. Defendants don't dispute that fact. *Id.* The Lab, however, never engaged in any fingerprint comparisons based on those latent fingerprints. Id. at 2. Defendants don't dispute that fact. *Id.* Dr. Reich addressed this evidence in both his Report and his Deposition. For example, at his deposition, he explained that the term "latent fingerprint" refers to "oil and skin ridge impressions which become fingerprints when revealed," Dkt.579-3, at 49:10-14, and in his report, he notes that one of CPD's Evidence Technicians significantly changed his view as to whether a "latent fingerprint" was or was not "suitable" for comparison to known fingerprint samples, and that that witness, during Smith's trial, never explained why the latent was no longer suitable for comparison. Reich Report, Dkt.579-1, at 19-20.

The average juror does not have knowledge of how to evaluate "latent fingerprints" taken into evidence or to determine whether such latent fingerprints were or were not suitable for comparison. Dr. Reich can explain to them how the comparisons work or fail to work and what evidence suggests that the latents recovered were suitable or not suitable. By doing so, he is not telling the jury to believe or disbelieve Officer DuShane's trial testimony from 38 years ago. Dr. Reich is telling the jury scientific information about available evidence and how it is scientifically evaluated. He is not telling them to conclude that the Defendants' conducted a "sufficient" or "insufficient" investigation, but he absolutely is permitted to opine that at least two (and perhaps all three) of the latent fingerprints recovered should have been compared to known fingerprints (fingerprints taken from Smith that very same day and others).

12

Such testimony should not be barred simply because Defendants label it as "common sense."

This analysis of appropriate v. inappropriate testimony applies to other complaints that Defendants make about "common sense." For example, Defendants try to bar Dr. Reich from testifying about the dryer's lint filter that two Defendants removed from the crime scene, sent to the lab, and the lab tested for the presence of blood. (Defendants apparently assert that their expert, Anderson, is permitted to testify about this evidence, but not Smith's expert.)

One of the scientific statements that Defendants' own expert, Christine Anderson, provided about her tests on the lint filter is that her equipment could measure the presence of blood to "one part in a million." The jurors are not going to know how to evaluate the phrase "one part in a million" or what effect that has – scientifically – in evaluating the complete absence of blood from the lint filter. Dr. Reich is a world-renowned serologist. The notion that he cannot explain or opine on this evidence to the jury because it is all "common sense" to them must be rejected.

This is not to say that there aren't a statement or two that the jury can't figure out on its own, such as wet socks transfer the wet to a person's feet, and Dr. Reich agrees not to make such "common sense" statements to the jury – unless Defendants open the door or the Court permits such statements in the context of the parties' direct or cross examinations.

**D.      The Court Should Reject Defendants' "Alternative Theories" Argument.**

On pages 13-15 of his Report, Dr. Reich opines that the certain conclusions made by Defendants' Serology/DNA are suspect, and that the reason they are suspect is because (1) they found blood on a piece of evidence in 2022 that was not found on that evidence when tested in 1987 and 1988; and (2) they found that a swab containing DNA over 30 years ago, no longer has detectable DNA on it. Dkt.579-1, at 13-15. Defendants have now moved to bar Reich's "suspect" opinion on the ground that Dr. Reich did not sufficiently consider "alternative explanations" for why certain evidence had disappeared or why certain other evidence had magically appeared. Motion at 13-15. In making their "alternative theory" argument, Defendants rely on two cases, *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 831–32 (N.D. Ill. 2013), and *Claar v. Burlington*

13

*Northern R. Co.,* 29 F.3d 499 (9th Cir.1994). But significantly *Cage* did not just cite *Claar*; it also cited a Third Circuit case called *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717 (3d Cir. 1994). In *Cage*, Judge Kendall held:

> The Court cannot conclude that Keel employed a reliable methodology in reaching is [expert] conclusion. *See **Paoli**,* 35 F.3d at 746 (judge should exclude evidence if flaws in the expert's investigative process are "large enough that the expert lacks 'good grounds' for his or her conclusion"); ***Claar,*** 29 F.3d at 502 (failure to adequately take into account alternative explanations fatal to the admissibility of expert testimony under *Daubert* ).

*Id.* at 831-32. Why did Defendants include *Claar*, but intentionally omit the court's reliance on *Paoli*? In *Paoli*, the Third Circuit held,

> [A] judge should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusion incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her [expert] conclusion."

*Id.* at 746. In other words, Defendants withheld *Paoli* because it holds the exact opposite of what Defendants assert in their Motion.

The second case, *Claar,* is also unhelpful to Defendants. In *Claar*, twenty-seven Burlington Northern ("BN") employees brought suit against BN alleging that they suffered from a variety of ailments stemming from their exposure to chemicals at BN's plant. *Claar,* 29 F.3d at 500. Plaintiffs filed "affidavits from physicians listing each plaintiff's specific injuries, the particular chemicals the physician's opined caused each injury, and the scientific basis for the physician's conclusions." *Id.* As to two of the experts, the Court concluded that they failed to make "any effort to rule out *other possible causes for the injuries plaintiffs complain of*, even though they admitted that this step would be standard procedure before arriving at a [medical] diagnosis." *Id.* at 502 (emphasis added). As one example, an expert concluded that a plaintiff had an arithmetic disability ("dyscalculia") and a spelling disability ("dyspraxia") but the expert failed to account for the fact that plaintiff in fact had had those very same disabilities *since childhood. Id.* (plaintiff "offered no scientific basis for concluding that chemical exposure played any part at all in [his] condition"). Therefore, while the district court struck this affidavit as unreliable because the doctor

14

had failed to consider "alternatives" for plaintiff's disability, neither the district court nor the Ninth Circuit concluded that in every instance, a court should strike an expert's opinion if that expert failed to properly consider every counter-argument. In fact, the Ninth Circuit stated the opposite in a footnote that Defendants also omit:

> The district court did not insist that the [expert] affidavits rule out all other possible causes of plaintiffs' injuries. It merely took account of the fact that the experts not only failed to explain how they arrived at their conclusions, but that they evidently failed to follow generally accepted scientific procedures by neglecting to investigate any other possible causes of plaintiffs' injuries.

Id. at 502 n.4.

Defendants have significantly overplayed their argument that Dr. Reich's opinions should be barred because he "failed to rule out alternative theories." Both the Third and Ninth Circuits reject the very argument that Defendants make here. The actual rule that emanates from all three cases (including Judge Kendall's opinion) is

> [A Court] should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusion incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusion."

*Paoli*, 35 F.3d at 746. For all these reasons, this argument should be rejected in its entirety.[3]

### E. Dr. Reich Has No Intention of Testifying About Defendants' Credibility or That of Any Other Witness

While it is a cute trick to assert that "Reich would like to tell the jury not to believe Detective McWeeny," *see* Motion at 20, citing Dkt. 579-1, at 11-13, that is not at all what Dr. Reich said on pages 11-13 of his report. Dr. Reich has no intention of telling the jury in this case "to believe or disbelieve" Defendant McWeeny or any other witness in the case. Rather, he

---

[3] Defendants' argument is also factually unsupported. This is because Defendants' own experts remain free to explain or to justify their conclusions about the blood that they now claim is absent (which was present before) or the DNA that is now present (which was absent before). Dr. Reich remains free, in turn, to opine that such justifications are "suspect." Indeed, as Defendants themselves concede, these experts have been given every opportunity to assert their own positions. *See* Dkt.579-6 (Oefelein Rebuttal Report). See also Motion at 25, citing Dkt.579-6, at ¶ 13.

15

is going to talk about DNA science, blood science, and about the various ways blood evidence provides scientific information. Such testimony will certainly include an opinion that certain facts about blood that are asserted by Detective McWeeny are inconsistent with certain scientific facts related to blood, but that does not mean he will be telling the jury who to believe or disbelieve. McWeeny will testify (through transcripts/video) about what he observed; Dr. Reich will testify about what he observed in the evidence. The jury will decide who to believe. That is not telling the jury *who to believe.*

If this Court looks carefully at what Dr. Reich actually intends to say on this topic, on pages 11-13 of his Report, the Court will see that Dr. Reich has no intention of crossing the impermissible line of telling the jury who to believe.[4]

For all these reasons, Defendants respectfully request this Court to deny Defendants' *Daubert* Motion in its entirety.

Dated: May 14, 2025

                                            Respectfully submitted,
                                            *PLAINTIFF ROBERT SMITH JR.*

                           By:    /s/ *Stuart J. Chanen*

---

[4] Defendants also appear to request this Court to bar Dr. Reich's testimony under Rule 403, but Defendants have waived this argument, and even if not waived, Defendants' 403 argument should be rejected. First, in order to support a party's Rule 403 argument, the party must establish that the danger of unfair prejudice or misleading the jury (the two 403 components raised by Defendants) substantially outweighs the evidence's probative value. Here, Defendants have not undertaken that comparison *at all*. They simply declare – without explanation or citation – that the risk of the jury being misled is just too great. This is not sufficient to preserve a Rule 403 argument. *See System Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 887 (N.D. Ill. 2012) (internal citations omitted). Even if the Court were to consider the merits of Defendants' 403 arguments, the probative value of Dr. Reich's opinions are not substantially outweighed by the purely speculative risk that Defendants purport to identify. *Id*.

16

Stuart J. Chanen
Ariel Olstein
CHANEN & OLSTEIN
8822 Niles Center Road, Suite 100
Skokie, IL 60077
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com

Nicole Nehama Auerbach
ELEVATENEXT LAW, LLP
218 N. Jefferson Street, Suite 300
Chicago, IL 60661
312-676-5460
Nicole.auerbach@elevate.law