**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Robert Smith, Jr., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 21 C 1159 |
| v. ) | |
| ) | Judge Jeffrey I. Cummings |
| The City of Chicago, et al., ) | |
| ) | Magistrate Judge M. David Weisman |
| Defendants. ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION *IN LIMINE* NO. 18**

Defendants, by their respective undersigned counsel, for their response in opposition to Plaintiff's Motion *in limine* No. 18, state as follows:

**INTRODUCTION**

Plaintiff seeks to bar Serologist Christine Anderson, Fire Marshall Jack Lumsden, and Bomb and Arson Detective Lawrence Gates from providing testimony at trial that the kitchen knife was not used in the double murder of his mother-in-law Edith Yeager and his grandmother-in-law Willie Bell Alexander. According to Plaintiff, each of these witnesses lack foundation and are otherwise unqualified to provide testimony. But serologist Christine Anderson forensically tested the kitchen knife and determined that no blood was present on the knife despite the assertion it was used in a gruesome double murder where both victims' throats were slit. Fire Marshall Lumsden[1] and Detective Gates investigated the fire and photographed the scene, including when the kitchen knife was used to retrieve a sample of carpeting for forensic testing. Each of these witnesses have personal knowledge of the kitchen knife as set forth below, and they may properly testify regarding their knowledge, including that it was not the murder weapon.

---

[1] Lumsden died after he gave a deposition in this matter.

Contrasting Plaintiff's baseless request that these witnesses be prohibited from testifying that the kitchen knife was not used in the murders, Plaintiff presumably will argue that the knife was the murder weapon (and not the razor blade he routinely carried in his wallet and confessed to using to kill the victims). It is rank speculation to suggest 34 years later that the kitchen knife was the murder weapon, especially when Plaintiff explained that he committed the murders with a razor and Plaintiff's attorney chose not to raise the kitchen knife during the original criminal proceedings. More fundamentally, Plaintiff has presented no evidence that the kitchen knife was used in the murders and, to the contrary, all evidence shows it was *not* the murder weapon. See dkt. 490, at 9-12. In light of this and to the extent this Court grants summary judgment in favor of Defendants on Plaintiff's destruction of evidence claim, there is no reason for any side to reference the kitchen knife at trial as it is simply not relevant. See also dkt. 575, Defendants' motion *in limine* to bar argument that the knife was the murder weapon. This Court should deny Plaintiff's motion.

## ARGUMENT

**I.     Anderson, Lumsden, and Gates Each Have Personal Knowledge of the Kitchen Knife.**

Plaintiff first contends that, because Anderson, Lumsden, and Gates were not "at the scene when the crime occurred" or "saw anyone introduce the [kitchen] Knife into the crime scene," they lack personal or first-hand knowledge as to whether the kitchen knife was used to murder the victims. Beyond a mere reference to Fed. R. Evid. 602, Plaintiff does not provide support or case law for his overly restrictive conditions for a witness's "personal knowledge." As set forth in detail below, each of these witnesses possesses personal knowledge regarding the kitchen knife and may properly testify regarding it. Plaintiff's motion should be denied.

**II.    Anderson Forensically Analyzed the Kitchen Knife and Properly Opined That It Was Unrelated to the Murders**.

Plaintiff asserts (at 3) that Serologist Christine Anderson disclosed "the opinions she

2

intends to give in this case" and "[t]hat the knife was 'unrelated to the crime' was not one of them." It is unclear whether Plaintiff merely takes issue with the quoted phrase "unrelated to the crime" not appearing in Anderson's disclosure or if he generally challenges testimony regarding that opinion. Specifically, Defendants' Amended and Supplemental Rule 26(a)(2)(C) disclosures states that Anderson will testify that "tests on the kitchen type knife did not reveal the presence of any human blood and it is therefore unlikely this knife was used in the murders (see also her deposition testimony)." Exhibit A, at 2. This opinion is properly disclosed, even if it does not contain the redundant phrase "unrelated to the crime."

More fundamentally, Anderson's opinions are properly supported by her expertise and testimony. Anderson personally tested the kitchen knife for the presence of blood after it was received on September 25, 1987 by the serology unit. (SOF ¶24)[2]. Analysis for blood on the kitchen knife yielded negative results. (SOF ¶24). In addition, Anderson observed that the kitchen knife was "rusty" and was "mostly used and worn with white ash type substance." (SOF ¶24). In her deposition in this case, Anderson explained that blood can be detected to a dilution level of 1 in a million. (SOF ¶24). She was asked whether the water from the fire suppression would have removed blood from the knife, and she testified that this knife (which she personally inspected) had a lot of crevices in it where blood could seep into it and would not be washed away. (SOF ¶25). Testifying further, Anderson reiterated that blood would more than likely be present even if the knife had not been used but was lying in a pool of blood and water. (SOF ¶25). Accordingly, given the negative result for blood, Anderson opined the kitchen knife was not the murder weapon. (*Id.*).

---

[2] Citations to SOF refer to the City's Rule 56.1(a)(2) Statement of Undisputed Material Facts in Support of Summary Judgment (dkt. 491), and citations to DSOAF refer to Defendants' Rule 56.1(c)(2) Response to Plaintiff's Statement of Additional Material Facts (dkt. 536).

Plaintiff, citing to his statement of additional facts opposing summary judgment, contends that Anderson only performed a "*preliminary* chemical test for blood" on "an *extract* taken from the knife." But Plaintiff's suggestion that "preliminary testing" is somehow insufficient or incomplete finds no support in the record. In fact, Anderson testified in detail about her testing, including what "preliminary" testing refers to. Specifically, preliminary testing involves "adding a chemical to the blood extract to determine a reaction, a color reaction. And that is the indication of whether there's blood apparent or not." (DSOAF ¶79). If blood is detected based on this initial test, serological testing would be performed, which involves the "ABO blood testing or the human blood testing where we're actually adding an antigen to the sample to determine whether it matches with the A, the B, or the AB, or a human blood test." (*Id.*). Anderson confirmed that all chemical testing for the presence of blood is referred to as "preliminary." Here, with respect to the knife, the first test—the "preliminary test"—"indicated there was no blood." (*Id.*). Therefore, no further serological testing, to determine A, B, O, or AB blood type, could be performed since there was no blood present to be tested. In light of this testimony, Plaintiff's assertion that Anderson "did not send the knife for chemical testing at all" is both wrong and disingenuous.

Nor does Anderson say she only performed testing on "*an* extract" of the knife. This quotation of "an extract" does not appear in Anderson's deposition transcript which Plaintiff has cited as support, and it is therefore unclear how plaintiff can attribute this quotation to her. Rather, Anderson's lab report indicates that "[p]reliminary chemical tests for blood conducted on *extracts* of exhibits S-11 [the kitchen knife] and S-12 [a dryer lint filter] yielded negative results." (emphasis added). Contrary to Plaintiff's assertion, Anderson's lab report and testimony does not limit her testing to a singular extract of the knife. In addition, Plaintiff's contention that the knife was not sent for fingerprinting or that it "was never subjected to any ligature comparison testing"

4

is misdirection. Chemical testing on the kitchen knife "yielded negative results," despite Plaintiff's assertion it was used to in a bloody double homicide, so there was no need to undertake fingerprint examination since it was not the murder weapon. And "ligature comparison testing" is unnecessary, as it is undisputed that Edith Yaeger's and Willie Bell Alexander's throats were slit, not that they were strangled.

Plaintiff next asserts (at 4) that Anderson lacked foundation to opine that the kitchen knife was not cleaned or washed prior to being submitted to the crime lab and that she is not expert in "fire hoses," "Knives or wood." But as Plaintiff readily admits, Anderson explained that she reached her conclusion that the kitchen knife was not washed because it contained a white ash substance on it. And Anderson may not be an expert in "fire hoses," "Knives or wood," but she is an expert in serology. It therefore does not matter that, according to Plaintiff, Anderson did not perform tests to determine "wear and tear" or "the type of wood used for the handle." She performed testing to determine the presence of blood to a dilution level of one in a million on an item submitted to her, which yielded negative results. Based on the sensitivity of this chemical testing and her experience as a serologist testing items for the presence of blood, Anderson properly concluded that the kitchen knife was not used in a gruesome double murder where the victims' throats were slit.

Finally, to the extent Plaintiff believes the reference to "preliminary testing" somehow affects the analysis Anderson performed on the kitchen knife and her related testimony, Plaintiff is free to explore that on cross-examination. Any suggestion that the testing was incomplete or could have been performed better would go to the weight of Anderson's testimony, not its admissibility. Plaintiff may not like Anderson's testimony—likely because it completely refutes the unsupported assertion that the kitchen knife was used in the murders—but that is not a basis

for barring her testimony.

**III.     Lumsden and Gates Were Properly Disclosed As Experts and May Testify as to Their Personal Knowledge of the Kitchen Knife.**

Plaintiff first argues (at 5) that Lumsden and Gates "were never identified as expert witnesses." This is simply not true as both were identified in Defendants' Amended and Supplemental Rule 26(a)(2)(C) Disclosures, Ex. A. Specifically, the disclosure states "[t]he subject matter on which Mr. Lumsden may provide evidence under Federal Rule of Evidence 702, 703, or 705, as well as a summary of the facts and opinions to which he is expected to testify, are set forth in Mr. Lumsden's report (CITY-RS-000290, 295-308), his photographs (CITY-RS-000575-598), and deposition testimony in this case," which includes "that the knife in his photograph is unrelated to the murders." Defendants' disclosures also state "[t]he subject matter on which Mr. Gates may provide evidence under Federal Rule of Evidence 702, 703, or 705, as well as a summary of the facts and opinions to which he is expected to testify, are set forth in Mr. Gates's reports (CITY-RS-000149-151 and 171), his photographs (CITY-RS-004235-43), his August 28, 1990 testimony in *People v. Smith,* 87 CR 15089 (SMITH 4048-4066), and deposition testimony in this case," including "that the knife in his photograph is unrelated to the murders." It is unclear why Plaintiff believes Lumsden and Gates were not disclosed as experts, especially where Plaintiff moved to a compel a more definitive statement with respect to these disclosures. See dkt. 225.

Contrary to Plaintiff's assertions, both Lumsden and Gates have personal knowledge of the kitchen knife. Lumsden of the CFD's Office of Fire Investigations and Detective Gates of CPD's Bomb and Arson Unit investigated and photographed the crime scene. (SOF ¶¶8–10). Their investigation revealed that the fire was started in the dining room area and had been deliberately set with the use of gasoline to hide the murders. (SOF ¶11). Lumsden photographed the fire origin area and a nearby gas can. (SOF ¶12). After the fire debris was cleared away to further photograph

the area of origin, Lumsden and Gates each photographed the fire origin area. (SOF ¶¶14, 15). Gates, with Lumsden's aid, removed and inventoried a sample of carpeting from the fire origin area that had an odor of gasoline. (SOF ¶16). Gates, who did not carry a knife, believes he likely used a knife from the kitchen to take the carpet sample. (SOF ¶17). Lumsden and Gates each took photographs of the fire origin area after the carpet sample was cut away and removed. (SOF ¶18). The kitchen knife can be seen depicted in the photographs of the removed carpet taken by both Lumsden and Gates. (SOF ¶¶ 19, 20).

Plaintiff argues (at 6) that Lumsden cannot say that the kitchen knife "was unrelated to the murders" because he testified that he did not retrieve the knife from the kitchen and did not observe anyone retrieve the kitchen knife. Plaintiff further asserts that because Lumsden could not recall—34 years later—Gates physically using the kitchen knife to remove a carpet sample, and that Gates testified he "believes" and "most likely" used the kitchen knife, that both individuals somehow lack personal knowledge. But Lumsden's and Gates's testimonies are consistent with the photographs taken at the scene. Specifically, the initial photographs each taken by Lumsden and Gates do not show the knife (SOF ¶¶ 9, Ex. 4, at CITY-RS-575-598; ¶¶10, 12; ¶14, Ex. 4., at City-RS-591, 593; ¶15, Ex. 5, at CITY-RS-4237 and 4239).




7




It is not until the photographs taken after the carpet sample is obtained does the knife appear. (SOF ¶9, Exhibit 4, at CITY-RS-598; see also SOF ¶¶18; 19; 20, Ex. 5, at CITY-RS-4241).



The sequence of these photographs is consistent with Lumsden's and Gates's testimonies. Ultimately, Lumsden's and Gates's testimonies wherein they state that they "assume" and "most likely" used the kitchen knife to obtain a carpet sample is understandable as they were asked about an investigation that occurred over 34 years prior. Plaintiff is free to explore this on cross-examination, but it is not a basis to bar Lumsden's and Gates's testimonies regarding the kitchen knife because both possess personal knowledge that the kitchen knife was not used in the murders.

Respectfully submitted,

PHILIP CLINE                                   MARY B. RICHARDSON-LOWRY

8

DANIEL MCWEENY[3]
STEVEN BROWNFIELD
WILLIAM PEDERSEN
JOHN SOLECKI
ROBERT DWYER
ESTATE OF JOHN YUCAITIS
ESTATE OF RICE
ESTATE OF WILLIAM HIGGINS

/s/ *Stacy A. Benjamin*
Special Assistant Corporation Counsel

Eileen E. Rosen
Stacy A. Benjamin
Andrew J. Grill
Brittany D. Johnson
ROCK, FUSCO & CONNELLY, LLC
333 W. Wacker, 19th Fl
Chicago, IL 60606
T: 312-494-1000
F: 312-494-1001
sbenjamin@rfclaw.com

Corporation Counsel of the City of Chicago

By: *s/ Daniel M. Noland*
Special Assistant Corporation Counsel

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
Katherine C. Morrison
Daniel J. Burns
Dhaviella N. Harris
Burns Noland LLP
311 S. Wacker Dr., Suite 5200
Chicago, IL 60606
T: 312-982-0090
F: 312-429-0644
dnoland@burnsnoland.com

---

[3] Daniel McWeeny died on March 6, 2025, and his death was suggested on the record on April 2, 2025 (dkt. 540). The parties are in the process of agreeing to substitution of a special representative for him and include his name here as a placeholder.