**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DIANE YEAGER SMITH,** | ) | |
| **as special representative for** | ) | |
| **ROBERT SMITH, Jr.,** | ) | **No. 21-cv-1159** |
| | ) | |
| **PLAINTIFF,** | ) | |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **CITY OF CHICAGO,** | ) | |
| **FORMER CPD SUPERINTENDANT** | ) | |
| **PHILIP CLINE,** | ) | |
| **THE ESTATE OF JOHN A. YUCAITIS,** | ) | |
| **THE ESTATE OF WILLIAM HIGGINS,** | ) | |
| **THE ESTATE OF ROBERT RICE,** | ) | |
| **DET. DANIEL McWEENY,** | ) | |
| **DET. ROBERT DWYER,** | ) | |
| **DET. STEVEN BROWNFIELD,** | ) | |
| **DET. WILLIAM PEDERSEN,** | ) | |
| **DET. JOHN SOLECKI,** | ) | |
| | | |
| **DEFENDANTS.** | | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

On September 19, 1987, the Chicago Police Department and Chicago Fire Department responded to a civilian report of a fire at the home of Edith Yeager and Willy Bell Alexander. Upon arrival, Ms. Yeager and Ms. Bell Alexander were found dead in the first-floor hallway with their throats slashed. Robert Smith Jr. and his then-wife Diane Yeager-Smith (who is also the daughter and granddaughter of the two victims) drove past the house and saw the police presence and fire damage to the house, causing them to pull over and run inside to ask what happened to the victims. Robert Smith was arrested at the crime scene based on his interactions with certain Chicago Police Department officers and sent to Area 2 Violent Crimes for questioning, where he asserts that he spent approximately seventeen hours being physically and verbally abused,

without food or medical attention, and fed information about the crime before providing oral statements and an initialed transcribed confession that inculpated him in the murders. Smith was convicted after a jury trial and sentenced to natural life in prison. In 2020, after thirty-three years in prison, Smith's conviction was vacated, and he was granted a Certificate of Innocence.

Plaintiff Diane Yeager Smith ("plaintiff" or "Smith"), Robert Smith's representative under Federal Rule 25(b),[1] asserts that Chicago Police Officers Lieutenant Philip Cline, John Yucaitis, William Higgins, Robert Rice, Daniel McWeeny, Robert Dwyer, Steven Brownfield, William Pedersen, and John Solecki (collectively, the "Officers")[2] along with the City of Chicago (the "City"), (collectively, "defendants") violated Smith's constitutional rights by taking him to Area 2 Violent Crimes and subjecting him to physical and verbal abuse, including choking him until he almost passed out and coercing him to confess to a crime he did not commit.

At the crime scene, a knife was found, inventoried, and identified as the murder weapon on a report prepared by two non-defendant officers. Nonetheless, Pedersen, Rice, and Cline all reported that Smith confessed to using a *razor blade* to slash the throats of the victims. The knife was thereafter destroyed, and no one ever found any evidence of a razor blade at the scene. Smith also asserts that Higgins and Solecki concocted a false story about how he left a pair of his

---

[1] For purposes of simplicity, the Court refers to both Robert Smith, Jr. and Diane Yeager Smith as "Smith" or "plaintiff" in this opinion. This is because after he was diagnosed with dementia, Smith moved under Rule 25(b) to appoint Diane as Smith's representative and to continue this action on his behalf. This Court granted the motion on August 11, 2022. (Dckt. #296). Thus, Diane was substituted as a party and plaintiff "step[ped] into the same position of the original party." *Ransom v. Brennan*, 437 F.2d 513, 516 (5th Cir. 1971). When discussing her involvement in the underlying events of Robert Smith's criminal case and the murder investigation, the Court refers to Diane Yeager Smith as "Diane."

[2] Yucaitis, Higgins, and Rice are deceased, so plaintiff named their estates as defendants. McWeeny died during the pendency of this case, and the Court has appointed Ms. Geri L. Yanow as his Estate's representative. (Dckt. #673).

blood-stained underwear on the stairs between the basement and the first floor after he murdered the victims and before he set fire to the house to cover up the crime.

Smith brings claims against all Officers for: (1) coerced confession; (2) fabrication of evidence; (3) *Brady* violations; (4) conspiracy (under 42 U.S.C. §§1983, 1985(3), and Illinois state law); (5) failure to intervene (under 42 U.S.C. §§1983 and 1986); (6) malicious prosecution under state law; and (7) intentional infliction of emotional distress. Smith brings a claim for the destruction of evidence against all defendants. Finally, Smith brings suit against the City for indemnification, *respondeat superior*, and a *Monell* claim.[3]

The Officers do not move for summary judgment on Smith's claims that certain Officers (Cline, Brownfield, Pedersen, Yucaitis, Higgins, and Rice) coerced his confession, nor do they challenge these Officers' participation under a theory of §1983 liability for conspiracy or failure to intervene. Thus, these claims will proceed to trial regardless of the outcome of defendants' motions. The Officers only move for summary judgment for three officers (Dwyer, McWeeny, and Solecki) on the coerced confession and §1983 conspiracy and failure to intervene claims, arguing that these individuals were not personally involved and therefore cannot be liable for coercing Smith's confession. (Dckt. #494). They move for summary judgment for all of the Officers on the remaining claims (destruction of evidence, fabrication of evidence, *Brady*, §1985(3) conspiracy, §1986 failure to intervene, malicious prosecution, and intentional infliction of emotional distress). (*Id.*). The City separately moved for summary judgment, (Dckt. #489), on Smith's destruction of evidence, *respondeat superior*, and indemnification claims.

---

[3] On September 19, 2024, this Court granted defendants' motion to bifurcate Smith's *Monell* claim for purposes of trial and the claim remains stayed pending resolution of the claims against the Officers. (Dckt. #485).

The Court grants in part and denies in part the Officers' motion for summary judgment, (Dckt. #492), as follows. Summary judgment is denied as to: (1) Smith's fabrication of evidence claim against Pedersen, Rice, Higgins, Solecki, Cline, McWeeny, Brownfield, and Yucaitis based on the transcribed confession; (2) Smith's fabrication of evidence claim against Higgins and Solecki based on the bloody underwear; (3) Smith's coerced confession against all Officers (except for Dwyer); (4) Smith's §1983 and Illinois state law conspiracy claims against all Officers (except for Dwyer); (5) Smith's §1983 failure to intervene claim against all Officers (except for Dwyer); and (6) Smith's intentional infliction of emotional distress claim against all Officers (except for Dwyer). Summary judgment is granted as to: (1) all of Smith's claims against Dwyer; (2) the remaining aspects of Smith's fabrication of evidence claim; (3) Smith's destruction of evidence claim; (4) Smith's *Brady* claim; (5) Smith's §1985(3) conspiracy claim; (6) Smith's §1986 failure to intervene claim; and (7) Smith's malicious prosecution claim. Finally, the Court denies the City's motion for summary judgment, (Dckt. #489), without prejudice to its renewal after the trial against the Officers concludes.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment unless it is a genuine

dispute as to a material fact); *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (issues of material fact are material if they are outcome determinative).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

Courts consider admissible evidence on summary judgment. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014). Moreover, where the parties dispute the admissibility of certain evidence, the court may nonetheless consider such evidence where there exists a theory under which the evidence could be admissible at trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920–21 (7th Cir. 1994) ("The burden on the non-movant is not onerous. [H]e need not tender evidence in a form that would be admissible at trial; he may rely on affidavits or any other materials of the kind identified in Rule 56(c)") (cleaned up); *Desert Ridge Resort LLC v. Occidental Fire & Cas. Co. of N. Cardina*, 141 F.Supp.3d 962, 972 (D.Ariz. 2015) ("if the evidence could conceivably be converted into an admissible form for trial, the Court [may]

consider the evidence for the purposes of summary judgment.") (cleaned up); *Robinson v. Hartzell Propeller Inc.*, 326 F.Supp.2d 631, 635 (E.D.Pa. 2004) ("the Court may consider evidence that is not admissible in the submitted form if the party offering the evidence could satisfy the applicable admissibility requirements at trial.").

In sum: the evidence does not need to be presented in admissible form at summary judgment, "but must be admissible in content, such that, for instance, affidavits may be considered if the substitution of oral testimony for the affidavit statements would make the evidence admissible at trial." *Wheatley v. Factory Card and Party Outlet*, 826 F.3d 412, 421 (7th Cir. 2016) (citing *Widmar*, 772 F.3d at 460); *Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 223 n.2 (3d Cir. 2000) ("hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial."). Thus, notwithstanding whether the contested evidence itself would be admissible at trial, the Court looks to whether the content of the evidence is "of evidentiary quality." *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994) (cleaned up).

## II.    FACTUAL RECORD

The Court draws the factual record from: (1) the Officers' Local Rule 56.1(a)(2) statement of undisputed facts in support of their motion for summary judgment ("DOSOF"), (Dckt. #495), and accompanying exhibits; (2) plaintiff's corrected response to DOSOF ("DOSOF Resp."), (Dckt. #528); (3) the City's Local Rule 56.1(a)(2) statement of undisputed material facts in support of its motion for summary judgment ("DCSOF"), (Dckt. #491), and accompanying exhibits; (4) plaintiff's corrected response to DCSOF ("DCSOF Resp."), (Dckt. #510); (4) plaintiff's Local Rule 56.1(b)(3) statement of additional material facts ("PSAF"),

(Dckt. ##502, 524), and accompanying exhibits; and (5) the Officers' and the City's consolidated response to PSAF ("PSAF Resp."), (Dckt. #536), and accompanying exhibits.

The following facts are presented in the light most favorable to Smith, as required under Rule 56, and the Court acknowledges that defendants dispute many, though not all, of the factual propositions set forth below:[4]

## A. Initial Discovery of the Crime Scene.

At approximately 3:20 a.m. on September 19, 1987 a civilian flagged down a nearby Chicago Police Department ("CPD") officer to report a fire after he drove by the Yeager/Alexander house and observed smoke emanating from it. (PSAF Resp. ¶2). The nearby officer, Sergeant Selk, along with Patrol Officers Hughes and Barrins, were the first officers to arrive at the house, shortly after 3:21 a.m. (*Id.*). Upon arrival, all doors and windows were locked except for the basement, where the door was open (with the dead bolt extended to prevent the door from fully closing) and the lights were on. (DOSOF Resp. ¶8). Both patrol officers went in through the basement door, up the basement stairs to the first floor, and saw two victims on the floor with their throats slashed. (*Id.* ¶9). Due to "heat and smoke conditions," they were forced to retreat. (PSAF Resp. ¶2). The Chicago Fire Department ("CFD") arrived and forced entry through a rear first-floor door, entered the kitchen, and extinguished the fire with a hose line at approximately 3:35 a.m. (*Id.* ¶3). Ms. Alexander and Ms. Yeager's bodies were found

---

[4] The Court acknowledges that defendants include a blanket objection to PSAF and DOSOF Resp. and argue that they are "egregious" violations of Local Rule 56.1 because they include improper argument and immaterial, unsupported facts. (Dckt. #535 at 9–11). However, defendants were able to substantively respond to PSAF and the Court will disregard any asserted fact that is not supported with a proper citation to the evidence in the record, *see* Local Rule 56.1(d)(2).

and thereafter removed from the house. (*Id.*). Throughout the ensuing investigation that morning, at least twenty first responders from CPD and CFD were present. (DOSOF Resp. ¶25).

Fire Marshal Jack Lumsden of CFD's Office of Fire Investigations arrived at the house around 4:00 a.m. and detective Gates of CPD's Bomb and Arson unit arrived around 4:30 a.m. to investigate the fire's origin. (*Id.* ¶11). Also present were CPD Evidence Technicians DeMarco and Batchelder, who arrived around 4:30 a.m. (*Id.* ¶16). Lumsden, Gates, DeMarco, and Batchelder all took photos at the crime scene and Lumsden testified at his deposition that he estimates taking the first photograph in his investigation around 4:15 or 4:20 a.m. (*Id.* ¶¶11, 16). They concluded that the fire was "deliberately set to cover up the murders," (*id.* ¶14), and that a flammable liquid, suspected to originate from a nearby two-gallon gas can that smelled of gasoline, was poured on a hide-a-bed sofa and the surrounding floor to start the fire, (*id.* ¶13; PSAF Resp. ¶72). The sofa was completely burnt and firefighters moved it to the front yard when they extinguished the fire. (DOSOF Resp. ¶13). Gates estimated that the fire started twenty to sixty minutes before it was extinguished. (*Id.* ¶14; PSAF Resp. ¶4). Because the fire was extinguished at 3:35 a.m., the fire was set between approximately 2:35 and 3:15 a.m. (PSAF Resp. ¶4; DOSOF Resp. ¶14).

Area 2 Violent Crimes also responded to the scene and first watch detective Edward Leracz and his partner Ray Binkowski were assigned to investigate the murders at around 4:00 a.m., along with assisting detectives, namely Jerry McGovern, and defendant Officers McWeeny, and Dwyer. (DOSOF Resp. ¶25; PSAF Resp. ¶5).[5]

---

[5] Smith asserts that McWeeny and Dwyer "took the lead in the investigation," (PSAF Resp. ¶5), but does not dispute that they were the "assisting Det[ectives]," (DOSOF Resp. ¶25).

During his investigation, Fire Marshal Lumsden noted a "large volume of blood in the hallway between the kitchen and dining rooms" and a "small trail of blood" leading down the basement stairs. (DOSOF Resp. ¶17. He took a photo around 4:30 a.m. intending to capture the blood stains at the top of the basement stairs, but the photo also captured "what he described as something made of blue cloth on the right side of the first stair leading to the basement." (*Id.*). Another photo depicted a blood stain at the bottom of the stairs which "possibly indicat[ed]" to Lumsden that the perpetrator(s) left through the basement. (*Id.* ¶18).

Evidence Technicians DeMarco and Bachelder used flashlights to search for physical evidence because the crime scene was dark, (*id.* ¶20), and the house lost electricity after the fire was extinguished, (*id.* ¶24). The evidence technicians took two photos that showed a blue bed sheet with white flowers on the basement floor, (*id.* ¶23), although they did not collect the blue bed sheet as evidence. Another photo showed one of the bedrooms with drawers pulled out and items strewn about. (*Id.* ¶24).[6] DeMarco and Bachelder collected:

- the gas can (suspected of containing the flammable liquid which started the fire);

- samples of blood from the first floor of the house, the basement washing machine, the basement stairs, the floor near the hot water heater, and in a bucket;

- a yellow bed sheet and beige towel from the basement floor near the washing machine;

- a glass used for laundry detergent on top of the dryer; and

- fingerprint impressions from the glass and basement door.

(*Id.* ¶21).

---

[6] Smith disputes that only one bedroom had items strewn about but does not support his dispute with any record evidence, so the fact is deemed admitted. *See* Local Rule 56.1(e).

Lumsden also took a photo of a 12-inch kitchen butcher knife on the dining room floor near where the fire was supposedly started. (PSAF Resp. ¶72). In Lumsden's Initial Case Report, (Dckt. #512-2), he wrote that one of the victims had "horizontal deep slashing knife wounds to the throat." (PSAF Resp. ¶73). In his Incident Report, (Dckt. #512-3), Lumsden again stated that "each victim had knife wounds to the throat." (*Id.*). Patrol officers Barrins and Hughes identified the murder weapon as a knife in their General Offense Case Report. (*Id.* ¶70). Specifically, the case report has check boxes for what the potential weapon was, including separate boxes for, *inter alia*, "knife" "razor" "Bottle/Glass," or "UNK [unknown]" and the officers marked the "knife" box. (*Id.*). Hughes testified that he filled out the form to identify the murder weapon as a knife because he believes he observed a knife on the crime scene floor between the dining and living room near where the bodies were found. (*Id.* ¶71). Based on the positioning and location, "all indications showed that it was a knife." (*Id.*). Nonetheless, no officer from the first watch collected the knife, the blue bed sheet, or the "blue cloth" near the blood stain on the basement stairs.

**B. Events Leading Up to the Time of the Murders.**

On September 18 through the early morning of September 19, 1987, Smith was visiting the apartment of his friend Sally Payne Atkins ("Atkins"), drinking and playing billiards at a tavern below Atkin's apartment, visiting his friend and drug dealer Michael Santee ("Santee") to score drugs, and traveling between the two locations. (*Id.* ¶7). Smith told detectives that he was with Atkins all day and night and spoke with Diane around 3:00 a.m. and asked her to pick him up at 4:30 a.m. (DOSOF Resp. ¶56). The call logs establish that Smith called Diane at 3:06 a.m.

and talked with her until 3:23 a.m. (PSAF Resp. ¶9). He called again from Atkins' apartment at 4:56 a.m. and Diane came and picked him up. (*Id.* ¶10).

Diane confirmed that Smith was at Atkins' house, and he called her on September 18 around 4:30 or 5:00 p.m. and again around 3:30 a.m. on September 19 and said "he is counting money and cleaning up" at 65th and Union but would take a cab to Atkins' house and Diane could pick him up there. (DOSOF Resp. ¶49).

Atkins told a detective that Smith arrived at her apartment around noon on the 18th and called Diane to let her know. (*Id.* ¶54). Atkins provided two slightly differing stories about her time with Smith. In one, Smith left Atkins' apartment between 11:30 p.m. and 12:00 a.m. to look for Santee, but Santee thereafter came by Atkins' apartment about five minutes after Smith left. (*Id.*). In a later statement, Atkins reported that Smith left just before 11:00 p.m. and Santee arrived at 11:00 p.m. (*Id.* ¶73). In her earlier statement, Atkins remembers Smith returning to her place at approximately 2:30 a.m. or 3:00 a.m. because her kids had just returned. (*Id.* ¶54). Smith told Atkins that he had just left Santee's and Diane picked Smith up from Atkin's place a little before 4:00 a.m. (*Id.*). In her later statement, Atkins reported that Smith came back to her place at 3:00 a.m. with wet clothes. (*Id.* ¶73). Smith does not dispute that Atkins provided two slightly differing timelines, but states that the 2:30 a.m. estimate is more accurate, (*id.*), and the Court will therefore accept that version as true for the purposes of summary judgment. Diane then picked Smith up from Atkins' place after 4:00 a.m. (*Id.*).

Santee also told a detective about his encounters with Smith on September 18 and 19, 1987. Santee stated that his mother complained about Smith calling multiple times looking for him, so Santee went by Atkins' apartment to look for Smith but was told that Smith had just left. (*Id.* ¶74). Santee returned home and was sleeping in the basement when Smith knocked on the

door, but Smith left when Santee told him that he was sleeping. (*Id.* ¶¶55, 73). Santee said that Smith came by at around 12:00 or 1:00 a.m. to one detective but later said that he was not sure of the time and only knew it was "late." (*Id.*).

## C. CPD Takes Smith from the Scene to Area 2 Violent Crimes.

Diane and Smith drove by the crime scene sometime around 5:30 or 5:35 a.m. (PSAF Resp. ¶11; DOSOF Resp. ¶29).[7] They pulled over after seeing CPD and CFD at the house and ran into the house through the first-floor door. (PSAF Resp. ¶11; DOSOF Resp. ¶30).

Diane told officers that after she picked up Smith, she suggested that they drive by her mother's house. (DOSOF Resp. ¶49). Smith told officers that it was his idea they drive by Diane's mother's house. (*Id.* ¶56).[8] Diane's uncle, Paul Ward, who was also at the house, told officers that Diane told him the police called her and told her about her mother and that was the reason they stopped by the house. (DOSOF Resp. ¶32).

In any event, a plain-clothes officer stopped Diane and Smith upon their arrival to the house, and Diane informed the officer that she was related to the homeowners; the officer then informed them that "there had been a tragedy" and asked them to wait outside the house. (PSAF Resp. ¶12). After waiting approximately thirty minutes, Diane and Smith still had no more information, so Smith re-entered the house through the back door and ran inside toward a group of officers demanding to know what happened. (*Id.* ¶14; DOSOF Resp. ¶31). Smith was

---

[7] Plaintiff disputes this arrival time and states that they arrived at approximately 5:20 a.m., however in support of this, Smith cites to his testimony which does not provide any time estimate, (Dckt. #506-4 at 3–5), and Diane's testimony, which provides a time estimate of "5:30, 25 to 6," (Dckt. 507-4 at 5).

[8] Smith disputes that it was his idea to stop by the house with Diane and states "Smith requested that Diane stop to get something to eat, and it was Diane who responded to that suggestion by stating that she wanted to check on her mother first." (DOSOF Resp. ¶56). However, Smith cites to no evidence in support of his position disputing this fact, whereas the Officers cite to Brownfield's trial testimony and a police report. (*Id.*). Therefore, the fact is deemed admitted. *See* Local Rule 56.1(e).

ultimately detained and brought to Area 2 based on his interaction with the group of officers at the crime scene, but the parties dispute the events leading up to his arrest.

According to Smith, one of the Officers, McWeeny, became angry when he saw Smith re-enter the house. (PSAF Resp. ¶15). McWeeny grabbed Smith and with the help of at least one other officer, pinned Smith down on the floor, which was slippery and bloody from CFD spraying water to extinguish the fire. (*Id.*). Smith testified that one of the officers kicked him in the butt and told him, "what are you doing in here for? We told you to wait outside." (*Id.* ¶26(d)). Diane ran upstairs after hearing a commotion and saw Smith pinned on the floor. (*Id.* ¶16). Diane shouted at the officers to not hurt Smith and that he had recently undergone surgery. (*Id.*) McWeeny then handcuffed Smith and arranged for him to go to Area 2. (*Id.* ¶17).

McWeeny tells a different story, although it is undisputed that McWeeny never prepared a report about his interaction with Smith. (*Id.* ¶21). According to McWeeny, Smith "rushed past him" to enter the house and "dove headfirst into a pool of the victims' blood that had formed in the hallway outside one of the bedrooms," and "wiggled" and "rolled around" in the blood for approximately fifteen seconds until McWeeny had to forcibly remove him by the neck, (*id.* ¶¶19–20), while Smith screamed something to the effect of "Mama's dead, Gramma's dead!" (*id.* ¶19; DOSOF Resp. ¶33). McWeeny relied on his version of events to "justif[y Smith's] immediate arrest and detention." (PSAF Resp. ¶20). McWeeny testified at Smith's suppression hearing that he was alone when Smith allegedly dove into the blood but changed his story at his deposition and testified that detective McGovern was also there. (*Id.* ¶25).

No other officer corroborates McWeeny's version of events. Moreover, Smith asserts that he never "dove" into any puddle of blood, nor did he wiggle or roll around in any puddle of blood. (*Id.* ¶21). Smith asserts that McWeeny's version of facts was fabricated to justify his

seizure of Smith. (*Id.*). It is undisputed that no officer prepared a report about Smith diving into a pool of blood. (*Id.*) Furthermore, Smith's clothing was subject to forensic testing and, while blood stains were found, photographs and testing do not show large areas of blood to support McWeeny's story of Smith diving into a pool of blood and "rolling around" and having "a lot of blood" on him.[9] (*Id.* ¶22).

Once Smith was handcuffed, McWeeny requested a prisoner car pick Smith up and take him to Area 2 violent crimes to wait until McWeeny or another detective could arrive. (DOSOF Resp. ¶36). Officers Hervie Wells and Martin Rios responded and took Smith to Area 2. (*Id.*). Diane also went to Area 2, although separately. (PSAF Resp. ¶17).

**D. The Interrogation.**

Before his confession, Smith was placed in an interrogation room and handcuffed to a wall by Rios. (*Id.* ¶27). Rios, described by Smith as "the rough one," (DOSOF Resp. ¶37), told Smith to sit down, and when Smith refused, Rios kicked Smith in the chest, (PSAF Resp. ¶27). When Smith asked Rios to take off his handcuffs, Rios again kicked him. (*Id.*). Rios stayed in an interview room with Smith for around thirty to forty-five minutes until McWeeny entered the interrogation room at approximately 7:00 a.m. on September 19, 1987. (DOSOF Resp. ¶36; PSAF Resp. ¶27).

Smith testified that another officer "busted in the door" to join McWeeny, called Smith a "cold blooded killer," and shoved Smith's wallet and handkerchief into his mouth, causing him

---

[9] The Officers dispute this fact because McWeeny was "never asked to quantify what he meant by 'a lot of blood.'" (PSAF Resp. ¶22). However, Smith's expert states that photographs of Smith's clothing do not support McWeeny's version of events and demonstrate only a line or streak of blood stain which is consistent with Smith's report of falling to the floor instead of diving headfirst into a puddle of blood. (*Id.* (citing Dckt. #507-14 at 12)). Smith's expert also explains that his clothes did not contain enough blood for CPD's serologist to determine the blood type. (*Id.*).

to choke and almost lose consciousness and his eyes to "bug out." (PSAF Resp. ¶¶28–29; DOSOF Resp. ¶41). At this point, McWeeny intervened and told the other officer to stop and brought Smith a cup of coffee and cigarettes. (*Id.* ¶30). McWeeny told Smith, "we know you did this," and "you almost committed the perfect crime," but you "didn't pour gasoline on the body to make it explode." (*Id.*). McWeeny also told Smith that the police knew that the victims' throats had been cut and asked Smith to tell him how he had committed the murders. (*Id.*). Smith denied any involvement in the murders. (*Id.* ¶31).

Smith previously believed the officer accompanying McWeeny was defendant Brownfield, (Dckt. #82 ¶¶29–30), but now states "[t]he evidence obtained over the past 2-1/2 years establishes otherwise," (PSAF Resp. n.4), and he presently believes that the accompanying officer is defendant Dwyer, (*id.* ¶28). The Officers assert that there is no evidence that Dwyer meaningfully participated in the murder investigation, (DOSOF Resp.¶28), and that Smith presents no evidence that Dwyer was the officer who accompanied McWeeny, (PSAF Resp. ¶28). It is undisputed that Dwyer was assigned to investigate the scene and was one of the first officers to arrive. However, he never prepared any police reports, did not sign any of the seventeen progress reports generated during his shift (though his handwriting appears on two of the reports), and was never called as a witness in any of Smith's legal proceedings. (DOSOF Resp. ¶28).

In support of his contention that Dwyer was the officer beating him, Smith cites his own deposition testimony and suppression hearing testimony, but neither testimony supports any identification of this particular officer. (PSAF Resp. ¶28 (citing Dckt. #506-4 at 15–17; Dckt. #506-6 at 41–42, 44)). The Officers cite to the same testimony, noting that Smith described the officer accompanying McWeeny as "blonde," (DOSOF Resp. ¶41), and they provided evidence

that Dwyer had dark brown hair in the late 1980s and has never been blonde. (PSAF Resp. ¶28 (citing Dckt. #536-1 (Ex. A, Dwyer Aff.))). The Officers also cite Dwyer's deposition testimony that his shift ended at 8:00 a.m. on September 19, 1987 and, based on his review of the police reports, he does not believe he participated in the murder investigation in any meaningful way. (DOSOF Resp. ¶¶27–28). Smith claims that Dwyer's "CPD Attendance and Assignment Record" shows that he worked overtime on September 19, 1987 until 1:00 p.m. (PSAF Resp. ¶29 (citing Dckt. #512-17)). However, there is no mention of Dwyer on the CPD Attendance and Assignment Record to which Smith cites. The only other record evidence to which Smith cites is evidence of individuals who were tortured and abused by Dwyer on other dates during the investigation of unrelated crimes. (*Id.* ¶29 (citing PSAF Resp. ¶¶148–151)). In sum: there is no record evidence from which a reasonable factfinder could infer that Dwyer participated in the murder investigation once Smith was taken back to Area 2 or at any time after Dwyer finished his shift at 8:00 a.m. on September 19, 1987.

Only after watching the officer beat and choke Smith did McWeeny eventually tell the officer to stop. (*Id.* ¶30). McWeeny thereafter interrogated Smith for approximately thirty-five to forty-five minutes and told him that he knew Smith committed the murders because of the way Smith jumped into the blood and rolled around. (DOSOF Resp. ¶42). Smith told McWeeny he would consider taking a polygraph but ultimately did not take one, and McWeeny interpreted this as a red flag. [10] (*See id.* ¶39).

---

[10] Smith disputes that hesitating to take a polygraph test was a red flag to McWeeny, but McWeeny's deposition testimony is clear: "if a person is innocent he doesn't have to think about taking a lie box—he wants to take the lie box. And the fact that [Smith] was now thinking about the thing, yeah, that's kind of a red flag to me." (Dckt. #495-28 at 23). Smith's unsupported effort to suggest that McWeeny is not credible on this point is insufficient to create an issue of fact. *See, e.g., Trans-Aire Int'l, Inc. v. N. Adhesive Co., Inc.*, 882 F.2d 1254, 1257 (7th Cir. 1989).

After interrogating Smith, McWeeny spoke with Derrik Yeager (the son of one of the victims) and Diane. (*Id.* ¶44). McWeeny also spoke with the detectives arriving for the second watch who were assigned to the investigation, Brownfield and Yucaitis, about the crime and the two possible suspects (Smith and Diane), before leaving work around 11:00 a.m. (*Id.* ¶¶43, 46).

Brownfield and Yucaitis spoke with Diane, first in an interview room, and then took her to a polygraph exam before returning to the crime scene to see if any property was missing. (*Id.* ¶48). Diane told Brownfield and Yucaitis about her phone calls with Smith and how Smith was at Atkins' apartment and also mentioned that she suspected Smith made unauthorized withdrawals from her mother's bank account the month prior. (*Id.* ¶50). She told the detectives that her mother was careful to always keep the doors locked and, while at the house, Diane told the detectives that the only items that appeared to be missing were a gun her mother kept under her mattress and a set of house keys. (*Id.* ¶¶49–51).

Brownfield and Yucaitis returned to Area 2 and were the next two detectives to interrogate Smith. (PSAF Resp. ¶33; DOSOF Resp. ¶56). One of them asked Smith if he wanted to talk about committing the murders and Smith went into a "rage," cursing at the detective. (PSAF Resp. ¶33). Smith told Brownfield and Yucaitis that he had keys to his mother-in-law's house on and off and that it was his idea to stop by the house that morning.[11] (DOSOF Resp. ¶56). The detective (either Brownfield or Yucaitis) then slapped Smith on the side of his head with an open hand and told him he was the only one who could have committed the murders because the doors to the house were locked. (PSAF Resp. ¶33). The same detective told Smith that he left a thumbprint at the scene, "cleaned up down in the basement," and

---

[11] Again, Smith disputes that it was his idea to stop by the House with Diane, but the Court has deemed this fact admitted. (*See supra*, note 8).

"washed his clothes." (*Id.* ¶34). Smith requested to see a doctor and the detective who slapped him said "you'll get one when we get through with you." (*Id.* ¶35).

When Smith kept denying involvement in the murders, the detective repeatedly slapped him. (*Id.* ¶36). Smith also provided Brownfield and Yucaitis with his alibi: that he was with Atkins and Santee all day and night and spoke with Diane around 3:00 a.m. and asked her to pick him up at 4:30 a.m. (DOSOF Resp. ¶56). A detective said he would check out Smith's story and left the room. (PSAF Resp. ¶38). Brownfield testified that he and Yucaitis "attempted to locate" Smith's alibi witnesses after talking with Smith about his whereabouts on the morning of the murders, (*id.*), however, two other detectives, Gaines and Rowan, ended up speaking with the witnesses, (DOSOF Resp. ¶¶54, 73, 55, 74). Brownfield and Yucaitis' shift ended at 5:00 p.m. and the investigation transitioned to third watch detectives Pedersen, Rice, Higgins, and Rowan. (*Id.* ¶60).

Around 5:00 p.m. detective Higgins entered the room and spoke with Smith. (*Id.* ¶61; PSAF Resp. ¶107). He instructed Smith to disrobe because his clothes needed to be inventoried. (DOSOF Resp. ¶61). Higgins noticed blood stains on Smith's feet as he removed his shoes and socks and requested an evidence technician take samples from Smith's feet. (*Id.* ¶62).[12] Smith told Higgins he would be cold in the paper suit offered to him because he was not wearing underwear, so Higgins let him keep his clothes on. (*Id.* ¶62). Later at his suppression hearing, Smith testified that he was not wearing underwear because he had a genital rash and that boxers

---

[12] Smith admits that Higgins testified to seeing blood stains on Smith's feet but disputes the existence of blood stains, or that any such stains were ever proven to be human blood stains. (DOSOF Resp. ¶62). Smith cites no evidence in support of his position, while the Officers cite to Higgins' trial testimony and the evidence technician's report collecting "blood standards" from Smith's feet, (Dckt. #495-39), so the fact is deemed admitted. *See* Local Rule 56.1(e).

caused him to chafe. (PSAF Resp. ¶108).[13] Smith has provided evidence that he has chronic skin conditions, including chronic groin dermatitis. (PSAF Resp ¶108 (citing Dckt. #505-4)).

Around fifteen to twenty minutes later, Higgins and an African American detective who Smith is unable to identify, entered the room. (DOSOF Resp. ¶64; PSAF Resp. ¶39).[14] The African American detective verbally abused Smith, telling him he was a "low down and nothing n[*****]" and telling him he had a "fine wife," but all she had was a "piece of shit and garbage." (PSAF Resp. ¶39). The African American detective told Smith that Diane was taking a polygraph test and asked Smith to do the same, but Smith refused. (DOSOF Resp. ¶64). Detective Higgins then told Smith that he "couldn't have done this by [him]self" but Smith continued to deny involvement with the murders. (PSAF Resp. ¶40). Two different white detectives then entered the room, one telling Smith "he didn't like n[*****]s" and threatening to "to splatter [Smith's] black butt all against this here doggone wall." (*Id.* ¶41). Diane was brought into the interrogation room at approximately 6:00 p.m. and saw Smith who was still handcuffed to the wall. (*Id.* ¶42). She noticed that he had been crying and looked "real down." (*Id.*).

Sometime later, detectives Pedersen and Rice entered the room, one telling Smith that he was a "man of God" and that he heard Smith also believed in God. (*Id.* ¶43). Smith described the other officer as stocky, wearing a polka dot tie, and lacking a full head of hair. (DOSOF

---

[13] Smith claims that he told Higgins that he had a genital rash and did not want his briefs chafing against the rash but does not cite to any evidence establishing that he told Higgins as such. (PSAF Resp. ¶108). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

[14] Higgins testified that he did not have an African American partner at any time on September 19, 1987, and that there were no African American detectives assigned to Area 2 for the third watch that day. (DOSOF Resp. ¶86). However, he stated that there may have been African American detectives on the first and second watches. (*Id.*).

Resp. ¶71). The tie-wearing officer told Smith that he was on his way to a party and repeatedly threatened Smith, telling him that he would be up against the wall if he refused to cooperate. (PSAF Resp. ¶43). Smith continued to deny his involvement in the murders. The religious detective asked, "why don't you make it easy for yourself?" and Smith said "man, I believe in God, . . . I didn't do this here. Do you believe me?" (*Id.* ¶44).

It is undisputed that these two officers are defendants Pedersen and Rice, although the parties quibble over which officer is which. Smith believes the officer who described himself as a "man of God" to be Pederson and the other officer in the room to be Rice, but the Officers take the opposite position. (*Id.* ¶43). This dispute is immaterial for the purpose of deciding summary judgment given the parties' agreement that both Pedersen and Rice were in the room.

According to Pedersen and Rice, they were the first people to whom Smith orally confessed. (PSAF Resp. ¶49). They told Smith there were discrepancies in his story which allegedly caused Smith to say he wanted to tell the truth and to confess that he did not know what happened but that he used a razor blade to kill the victims. (*Id.* ¶49).

As memorialized in Pedersen's clear and closed report:

This interview was conducted by Det. R. Rice and Det. W. Pedersen. Robert Smith was told that there was some discrepancies in his story. At this time Mr. Smith stated he wanted to tell the truth. Mr. Smith was stopped at [t]his point and advised of his rights by Det. Rice. Mr. Smith stated he understood his rights and wanted to tell what happened. The following is a summary of that interview. Smith states he went over to his Mother-in-laws. He says he does not know what happened. He says he used a razor blade to kill them, that he carries a razor blade in his wallet. After he killed them he went down stairs and washed his clothes because he was full of blood. I went to run out the door and saw the gasoline. I spread the gas all over and lite [sic] it. I then ran out the back and over to Santee's house and bought a bag of dope. I went to Sallys house and we did the dope. We then went up to 78th and Emerald and bought three more bags of dope. We then went back to Sallys house and did the dope. I call my [] to come and pick me up. My wife came and picked me up and I started to think about the house I set on fire. I told my wife to drive by her mothers house. The police were there. They told us to wait around. I tried to see the bodies but the police would not let me. I went off again and started to wrestle with the police. Smith then stated that the razor he used to kill the two

women should still be in the house. He was standing next to the bathroom when he though [sic] it.

(Dckt. #506-9 at 4).

While Smith was being interviewed, Solecki went to the scene. (PSAF Resp. ¶49). According to Higgins and Solecki, Smith orally confessed to them at approximately 8:15 to 8:30 p.m. (*Id.* ¶50). By that time, they had returned to the crime scene along with detective Rowan and purportedly found additional evidence consisting of a pair of bloody underwear and a bloody blue bed sheet, and then came back to Area 2. (*Id.*). They confronted Smith with the underwear, which allegedly caused him to confess that the underwear was his, that he dropped it on the way to the basement to wash the victims' blood off his clothes, and to admit that he stood on the blue bed sheet in the basement while washing his clothes to avoid standing in blood. (*Id.* ¶50).

> As stated in Pedersen's cleared and closed report:

> During the time Mr. Smith was being interviewed Det. Solecki went back to the scene of the murders. Det. Solecki found a pair of boxer short[s] on the first step leading to the basement. They were wet and blood stained. On the basement floor was also found a blood stained sheet. Both these pieces of evidence were brought in to Area Two Violent Crimes and inventoried. Mr. Smith was shown both pieces. Mr. Smith stated that the shorts were his. That he must of dropped them when going to the basement to wash his cloths [sic]. The sheet he used to stand on rather than stand in the blood.

(Dckt. #506-9 at 4). However, Smith denies that he ever told Higgins or Solecki that he stood on the blue bed sheet (or any other item) to avoid standing in blood or that he dropped his underwear on the way to do laundry in the basement. (PSAF Resp. ¶126). According to Smith, any blood on the sheet was from the bloody water mixture present on the floor and present throughout the crime scene, (*id.*), a result of CFD extinguishing the fire.

Smith also gave a transcribed confession after the alleged oral confessions. Rice brought in someone referred to as the "big boss" who told Smith that he heard "they been giving you a rough time." (*Id.* ¶52). Smith told him that he was hurt and needed to see a doctor, but the "big

boss" would not let him see one until Smith gave a statement. (*Id.*). Smith had not slept for at least thirty-nine hours by the time he gave the statement he asserts was coerced, and he felt weak and scared at the time. (*Id.* ¶¶53–54). He also had severe chest pain, along with neck, head, and rib pain, and he believed his rib to be broken. (*Id.* ¶54).

Smith asserts, and the Officers dispute, that Smith was coached on how to answer questions for his transcribed confession. (*Id.* ¶57). Smith identified the religious detective as the first detective who coached him. (*Id.*). The "big boss" then returned and told Smith that "we going to get you a doctor because I see you need one bad." (*Id.*). They relocated Smith to a new room to meet with Assistant State's Attorney Brogan.[15] (*Id.* ¶58). Smith told Brogan that the detectives beat him, that he was under a doctor's care, and that if Brogan sent him back to the detectives, they would continue to beat him. (*Id.*). Brogan replied "they aint doing nothing like that to you" and left the room. (*Id.*) Brogan returned with Higgins and told Smith that the detectives denied mistreating Smith and "if you aint going to cooperate I'm not going to be bothered with you" then walked toward the door. (*Id.* ¶59). Smith said he would cooperate, (*id.* ¶59), and Brogan thereafter went over questions with Smith "two or three times" and told him to answer "just like that" while they were waiting for the stenographer to arrive to take the statement, (*id.* ¶60).

It was only after Smith finished giving his statement that Smith was offered a chance to eat for the first time since he arrived at Area 2. (*Id.* ¶61). Brogan then asked Smith if the police had given him food while he was at Area 2 and Smith replied "yes." (*Id.*). Smith initialed an error in the address of the victims' home but refused to initial any other portion of the confession

---

[15] Smith initially included Brogan as a defendant, but Brogan was dismissed in December 2021 after he reached a settlement with Smith. (Dckt. ##119, 120).

or sign the statement. (*Id.* ¶62). The entirety of the statement was read at Smith's criminal trial. (*Id.* ¶63, DOSOF Resp. ¶99).

The parties dispute whether Lieutenant Cline, the Area 2 Violent Crimes commanding officer,[16] was present for any part of Smith's confession or the murder investigation. According to the Officers, Cline was called at home on the morning of September 19, 1987, notified of the double homicide of two senior citizens and "because of the nature of the crime, he went to the scene." (DOSOF Resp. ¶26). Further, the Officers offered Cline's testimony that Cline was in Smith's interrogation room with Pedersen and Rice at around 9:00 p.m. to confront him with inconsistencies in his report of what he was doing prior to the murders. (*Id.* ¶67). Cline testified that Pedersen left the interrogation room and Rice told Smith that he would feel better if he told the truth, which caused Smith to confess. At Smith's criminal trial, Cline testified that it was him (Cline) who told Smith he would feel better if he told the truth, not Rice.[17] (PSAF Resp. ¶51). It is undisputed that Cline never filled out any reports and was not mentioned in any reports concerning Smith's interrogation. (*Id.* ¶103).

_____

[16] Lieutenant Cline replaced the infamous John Burge as Area 2 Violent Crimes Commander in August 1986. (PSAF Resp. ¶166); *see also Cannon v. Burge*, 752 F.3d 1079, 1081 n.1 (7th Cir. 2014) ("In a career spanning more than twenty years, Jon Burge rose to the rank of Commander in the Chicago Police Department before he was fired in 1993 for torturing and abusing suspects in order to obtain confessions. More than one hundred African-American arrestees accused Burge and officers working under him of engaging in sadistic acts. Burge was later prosecuted and convicted on charges of obstruction of justice and perjury related to lies he told during lawsuits for civil damages.").

[17] Inexplicably, Smith argues that Cline's version of his oral confession is made up and that any prior identification he made of Cline was mistaken. He disputes that Cline was present at Area 2 on September 19, 1987 and claims that Cline took a personal day off from work. (PSAF Resp. ¶103). However, taking the evidence in the light most favorable to Smith requires the Court to make the inference that Cline was present and participated in Smith's interrogation which resulted in Smith's coerced and fabricated inculpatory statements. Interpreting the evidence in this manner establishes Cline's personal involvement in the process by which Smith was coerced into making a confession.

### E.  The Evidence at the Crime Scene.

Smith has presented evidence that conflicts with several portions of the confession attributed to him.  Such evidence includes: the failure to locate a razor blade that the Officers allege Smith used to commit the murders; discovery of a knife at the crime scene that was identified as the murder weapon by non-defendant officers, and was later destroyed before Smith's criminal trial; the mismatch between the forensic evidence and Smith's purported description of the manner in which the fire was started to cover up the murders; the status of the washing machine and dryer; and a bloody blue floral bed sheet and bloody pair of underwear that were allegedly recovered from the scene.

#### 1.  The Razor Blade.

The confession stated that Smith used a razor blade to murder the two victims by cutting each of their throats twice.  (PSAF Resp. ¶66(a)).  However, a medical examiner observed one of the victims, Edith Yeager, to only have "1 cut to her throat" and to have "died as a result of an incised wound to the neck," (rather than two incised wounds).[18]  (*Id.* ¶66(a)).  Smith's alleged oral confession also provided that he left the razor at the crime scene because he threw it down near the bathroom.  (*Id.* ¶76).  Despite this, no officer ever found the razor at the crime scene. (*Id.* ¶66(b)).

Moreover, Lieutenant Cline testified that corroboration of the murder weapon was among the very most important aspects of the investigation.  (*Id.* ¶94).  Cline alleges that, after Smith

---

[18]  The Officers dispute this fact because there is a separate medical report noting "an incised wound measuring 2 1/2 inches in length with an adjacent linear abrasion at the left edge measuring 1 1/4 inches in length," which they contend establishes Edith Yeager having two cuts to her neck.  (PSAF Resp. ¶66(a)).  But the Officers are, in essence, requesting the Court to draw an inference in their favor and view the conflicting evidence through a lens which would discredit Smith's version of events.  Because Smith supports his fact with evidence and the Officers do not dispute the cited evidence but instead ask the Court to favor their preferred evidence, this fact is deemed admitted.

purportedly confessed to using a razor blade, he sent Higgins and Solecki back to the crime scene to search for it. (DOSOF Resp. ¶69). Cline testified that there should have been a report discussing the search for the razor blade or murder weapon, but it is undisputed that no report mentions any such search. (PSAF Resp. ¶¶95–96). Construing the evidence in the light most favorable to Smith, Cline sent multiple detectives back to the scene to find the murder weapon and the detectives knew exactly where to look for the razor blade in the 1,200 square foot home because they claim Smith confessed to leaving it near the bathroom. (*See id.* ¶¶76, 136). Yet, the detectives did not find the razor blade, nor did they explain their inability to find it. (*Id.* ¶97).

### 2. The Knife.

The confession does not mention a knife, but multiple officers thought the victims suffered from knife wounds and identified the murder weapon as a knife in a report. Detectives Mokry and Keough found a knife at the scene and its presence was noted by multiple CPD and CFD personnel. The first people on the scene, patrol officers Barrins and Hughes, identified a knife as the murder weapon and CFD Marshal Lumsden photographed the knife and repeatedly described the victims' wounds as "knife wounds." (*Id.* ¶¶70, 71, 73, 75). At his deposition, Lumsden testified that he had "seen these wounds before. Definitely some kind of a sharp instrument like a knife being used." (*Id.* ¶72, *quoting* Dckt. #504-5 at 37). During the second watch (8:30 a.m. to 5:00 p.m.), detectives Mokry and Keough found the knife at the crime scene "while searching through the debris and ashes," and collected it. (PSAF Resp. ¶¶77–78). Detective Gaines submitted the knife and a request for analysis to the CPD crime lab's serology

and laser units.  (*Id.* ¶78).  The request for analysis also had a box checked for the knife to be fingerprinted.  (DCSOF Resp. ¶26).

CPD serologist Christine Anderson performed a "preliminary chemical test for blood" on an extract of the knife which yielded negative results.  (PSAF Resp. ¶79; DCSOF Resp. ¶24).  This was the only test done on the knife.  (*See* DCSOF Resp. ¶26 (no record that fingerprint testing was done)).  On October 15, 1987, Anderson sent the knife to CPD's Evidence and Recovered Property Section and expected that they would keep the knife through the conclusion of Smith's trial.  (PSAF Resp. ¶80).  Instead, it was destroyed prior to the trial and after Smith's defense attorney officially requested a list of all physical evidence in the State's possession and that such evidence be preserved for inspection.

The Officers provide no explanation for why the knife was destroyed.  The City produced a Rule 30(b)(6) witness who testified that in 1987 to 1988, "any officer seeking destruction of property housed at [CPD's Evidence and Recovered Property Section] was required to either [1] obtain a Court Disposal Order or [2] submit a CPD Tracer Form to [the Evidence and Recovered Property Section]."  (PSAF Resp. ¶84).  Sometimes, however, the Evidence and Recovered Property Section would destroy property a third way: namely, an officer could contact it via telephone or in person and simply communicate that the item was no longer needed, and the item would thereafter be destroyed based on that officer's say-so.  (*Id.*)  The City's investigation could not determine what happened that caused the knife to be destroyed.  (*Id.*).  Former ASA Patricia Woulfe, who handled Smith's criminal trial discovery, testified that she was not aware there had been a knife on the crime scene floor and that she had "no idea" whether the knife and photo of the knife should have been turned over to Smith and his counsel.  (*Id.* ¶86).  She also claimed not to know what *Brady* obligations were, despite her role as a state criminal prosecutor.  (*Id.*).

Because it was destroyed, Smith's counsel never inspected the knife and was unable to seek additional testing. (*Id.* ¶87).

Setting aside their inability to account for its whereabouts, the Officers contend that the knife was used to remove a carpet sample from the crime scene where the fire was suspected to have originated. (DCSOF Resp. ¶16). It is undisputed that detective Gates, with Fire Marshal Lumsden's help, removed and inventoried a carpet sample in the dining room of the crime scene, (DCSOF Resp. ¶16), and detective Gates testified that he "may" have used the knife to cut the carpet sample, (PSAF Resp. ¶88). Fire Marshal Lumsden "assume[s]" that the knife was used for cutting the carpet sample but testified that he never retrieved a knife from the scene to cut the carpet and never saw anyone else retrieve a knife from the scene to cut the carpet. (*Id.*). He also never heard anyone say that a knife had been taken from the crime scene. (*Id.*) Gates testified similarly—he stated that he does not remember retrieving a knife to cut carpet from the scene, that using a knife from the scene could compromise the scene and is speculating that the knife was used to cut carpet at the crime scene. (*Id.* ¶90). However, no report mentions that a knife was used to cut a carpet sample at the scene. (*Id.*).

The Officers also argue that the knife could not be related to the murders because it tested negative for blood, but the knife also tested negative for recent damage, hair, and fiber. (DOSOF Resp. ¶23). The Officers offer no explanation for how the knife could have been used to cut a piece of carpet while still testing negative for recent damage, hair, and fiber. Finally, the Officers cite to crime scene pictures to suggest that the knife was moved during the murder investigation because the knife is present in later photos and absent from earlier photos. (DCSOF Resp. ¶15). Smith, however, disputes the temporal order of the photographs. (*Id.* ¶20).

27

Again, Smith's defense attorney filed discovery requests, including a request for a "list of all physical property in the possession of law enforcement officials" and "that such property be made available to the defense for inspection before trial." (PSAF Resp. ¶81). On February 16, 1988, CPD's Evidence and Recovered Property Section destroyed the knife: approximately three months after it was requested by Smith's attorney. (*Id.* ¶82). The State filed its discovery responses on November 14, 1988 and did not mention the knife. (*Id.* ¶83). Indeed, no inventory or evidence report was ever produced for the knife. (*Id.* ¶78).

### 3. The Fire.

Although the confession stated that Smith poured gasoline "around the house" after killing the victims, (PSAF Resp. ¶66(d)), it is undisputed that the fire originated near a hide-a-bed sofa and that flammable liquid was poured on that sofa to start the fire, (DOSOF Resp. ¶13). Fire Marshal Lumsden only noted a gas smell emitting from near the fire's origin and testified that he could not detect an odor similar to gasoline anywhere else other than where the hide-a-bed had been. (PSAF Resp. ¶72 (citing Dckt. #504-5 at 18)).

The fire was estimated to have been set between approximately 2:35 and 3:15 a.m. (*See* PSAF Resp. ¶4; DOSOF Resp. ¶14). Smith was already at Atkins' house during that time frame, (DOSOF Resp. ¶73), and it is undisputed that he called Diane at 3:06 a.m., (PSAF Resp. ¶67). Smith would have needed to set the fire and travel from the Yeager/Bell house all the way to Atkin's house—located four miles away, (PSAF Resp. ¶¶1, 67), and it is undisputed that Smith did not have a car in 1987, nor did he have access to one. (*Id.* ¶67). Further, Atkins did not report that Smith smelled like smoke or gas when she saw him. (*Id.* ¶66(e)). Diane testified that when she picked up Smith from Atkins' house, she only suspected Smith had been drinking. (*Id.*).

### 4. The Washing Machine and Dryer.

The confession stated that after Smith allegedly killed the victims, he was bloody; he needed to wash and dry his clothes and put them back on before going back upstairs to set the house on fire. (PSAF Resp. ¶66(b); Dckt. #505-29 at 5–6).

Detective Brownfield recovered the basement dryer machine's lint filter because it looked like the offender washed his clothes after the murders and the washer and dryer had blood stains on them. (DOSOF Resp. ¶51). There was soapy, bloody water on the floor and a dollar bill stuck to the side of the washer tub and several coins at the bottom. (*Id.* ¶19). The lint filter was tested for blood by CPD serologist Christine Anderson and yielded negative results. (PSAF Resp. ¶66(c) (chemical testing can pick up blood to a dilution of one in a million parts)).

Detectives allowed two unidentified civilian men not associated with CPD or CFD to take the washing machine from the crime scene during the investigation. (DOSOF Resp. ¶75). When they returned to the crime scene, detectives Higgins, Solecki, and Rowan found two men attempting to remove the machine and the men told the detectives that they had keys to the house and had the family's permission to remove the machine before it was stolen. (*Id.*). For reasons unknown, Rowan did not think these men were compromising the crime scene. (*Id.*). No evidence is provided about how or why these men had keys to the house or why they were allowed inside the crime scene to collect the bloody laundry machines without further questioning.

### 5. The Bloody Underwear.

The confession claims that Smith went down to the basement after murdering his mother-in-law and grandmother-in-law to wash his bloody clothes and that he dropped his bloody underwear on his way down the basement steps. Higgins, Solecki, and Rowan claimed that they

found a pair of "crumpled and bloody" blue men's size 34 to 36 underwear in "plain view" on the top stair leading to the basement. (PSAF Resp. ¶¶111, 118). Higgins and Solecki returned to Area 2 with the underwear and he and Solecki confronted Smith with them. (*Id.*). According to Higgins, they must have found the underwear sometime between 5 and 5:30 p.m. [19] (*See* Dckt. #512-16 at 3–6).

When they returned to Area 2, Higgins, Rowan, and Solecki spoke to Pedersen and Rice about what was discovered. (DOSOF Resp. ¶78). They also claim to have spoken to Cline. (*Id.*). When confronting Smith with the underwear, Higgins and Solecki claim that Smith admitted the underwear was his and that he dropped it on the stairs when he was going to wash his clothes. (*Id.*; PSAF Resp. ¶111).

Smith does not dispute that he admitted that the underwear belonged to him but asserts that Higgins and Solecki fabricated everything else about their statements regarding the underwear. (PSAF Resp. ¶112). In support, Smith cites to the many CPD and CFD personnel who were at the crime scene prior to Higgins, Solecki, and Rowan yet did not remember or document that they saw any pair of bloody blue underwear on the basement stair or elsewhere. In particular:

- Evidence technician DeMarco testified to not noticing any blue underwear on the basement stairs. (DOSOF Resp. ¶22).

- No evidence technician took photos of the basement stairs. (*Id.*).

- Officers Barrins and Hughes, the first officers to respond to the scene, did not discuss any pair of bloody underwear, despite Barrins finding the victims' bodies next to the door leading to the basement stairs and Hughes traveling up the basement stairs twice. (PSAF Resp. ¶113(a) and (b)).

---

[19] Although Smith asserts that the detectives went to the crime scene at approximately 6:30 p.m. and then returned to Area 2 around 7:00 p.m., the Court does not credit this assertion because he does not provide any evidentiary support for this time frame. (PSAF Resp. ¶111).

- Evidence Technicians Thomas Bachelder and Frank DeMarco took photos and blood swabs from the basement stairs, but their report does not mention anything about a pair of underwear. (*Id.* ¶113(c) and (d) (citing Dckt. #513-4 ("Scene searched for physical and fingerprint evidence."))).

- Detective Gates took photos of the scene and checked the basement but does not remember seeing any pair of underwear and testified that he would have told CPD if he saw underwear. (PSAF Resp. ¶113(e); *see* Dckt. #504-8).

- Detectives Leracz and Binkowski both reported seeing blood on the stairs, but neither reported seeing any bloody underwear. (PSAF Resp. ¶113(f) and (g), ¶114).

- McWeeny, McGovern, Dwyer (all first responders to the scene) did not report anything about bloody underwear. (*Id.* ¶113(h)–(j)).

- Brownfield and Yucaitis went to the crime scene with Diane to see if anything was missing and neither reported seeing bloody underwear. (*Id.* ¶113(k) and (l). Brownfield testified that even though they spent two and a half hours searching the crime scene for evidence, he did not see any bloody underwear on the top basement stair. (*Id.* ¶116).

- Detective Keough and Mokry found the knife at the crime scene but did not report finding any underwear. (*Id.* ¶113(m) and (n)).

- CFD Marshal Lumsden, who took the photo containing the "blue cloth", stated that he was photographing a bloodstain on the stairs and not a pair of underwear. (*Id.* ¶120). Lumsden testified that if he saw underwear, he would have documented it. (*Id.*).

**6. The Bloody Floral Blue Bed Sheet.**

Around the time that Higgins, Solecki, and Rowan purportedly found the bloody blue underwear, Solecki also collected a floral blue bed sheet from the basement floor that appeared to have blood on it, and which was also in "plain sight." (DOSOF Resp. ¶77; PSAF Resp. ¶129). Higgins and Solecki confronted Smith with the bloody floral blue bed sheet at the same time they confronted him with the bloody underwear and claim that the bed sheet prompted Smith to admit to standing on it to avoid standing in blood while he washed his clothes. (DOSOF Resp. ¶78;

PSAF Resp. ¶¶111, 125). However, the transcribed confession does not mention a bloody floral blue bed sheet. (PSAF Resp ¶132).

Smith points to a photo Lumsden took of a first-floor bed and argues that the photo depicts a floral blue bed sheet and suggests that there was either more than one floral blue bed sheet or that the bed sheet collected by Solecki was not originally on the basement floor. (*Id.* ¶131). The Officers respond that Lumsden's photo depicts a bare mattress that had blue and white flowers rather than a bed sheet. (*Id.*). The photo could be interpreted either way. On one hand, it appears that a pink sheet is on top of the blue floral fabric which suggests that the blue floral fabric is the mattress itself, but on the other hand, the blue floral fabric is wrinkled and could be a fitted sheet or mattress protecter, (*see* Dckt. #495-22 at 18–19). So the Court credits Smith's view for purposes of summary judgment.

Evidence technician DeMarco did not recall seeing the sheet in the basement, nor did Gates or Brownfield. (PSAF Resp. ¶127). Detective Leracz only observed a yellow bed sheet, which was collected earlier in the day by DeMarco and Bachelder. (*Id.* ¶¶127–28). DeMarco testified that if he had seen a blue bed sheet in the same area as the yellow bed sheet, he would have recovered it as well. (*Id.* ¶128). The CPD Homicide File does not contain any Inventory Report for the floral blue bed sheet. (*Id.* ¶130). The floral blue bed sheet was not mentioned in Smith's transcribed confession, (*id.* ¶132), and was not produced to Smith's defense attorney. (*Id.* ¶133). During Smith's criminal trial, the prosecutor asked the CPD serologist about the bed sheet's testing and the court sustained Smith's counsel's objection based on the sheet never being produced. (*Id.*).

The bed sheet was destroyed on September 16, 1997 (while Smith was still trying to seek post-conviction relief). (*Id.* ¶134). The Officers state that it was destroyed because CPD's

Evidence and Recovered Property Section was "quickly running out of storage space." (*Id.* ¶134). However, the City's Rule 30(b)(6) witness did not list "running out of storage space" as a reason why evidence could be destroyed.

## F. The Trial and Post-Conviction Proceedings.

On September 20, 1987, ASA Brogan approved two counts of murder charges against Smith. (DOSOF Resp. ¶84). Smith went to night bond court later that evening and told the judge that the police beat him, causing the judge to enter an order for Smith to be sent to the hospital. (PSAF Resp. ¶46(b)). The next day Smith returned for a second bond hearing and repeated that he was abused by the police, leading to an additional order for Smith to be sent to the hospital. (*Id.* ¶46(c)). Smith told Cermak Hospital staff that the police beat him. (*Id.* ¶46(d)). Smith then filed a complaint with the Office of Professional Standards (OPS) in November 1987 about his abuse and requested an investigation. (*Id.* ¶46(e)).

Smith filed a motion to suppress his confession and a motion to quash his arrest, arguing that he was coerced into making a statement, including being kicked, beaten, and choked. (DOSOF Resp. ¶96). He told his public defender about the abuse he suffered and testified about it during the combined hearing on his motions. (PSAF Resp. ¶46(g),(i)). The motions were denied and Smith's trial lasted from August 28 to August 30, 1990. (DOSOF Resp. ¶¶96, 98). No testimony or evidence was introduced about the floral blue bed sheet and no police reports were put into evidence. (*Id.* ¶¶101–103).

Cline testified at Smith's trial as follows:

Smith stated he went over to his mother-in-law's house. I don't know what went wrong, but I killed them both. Smith said that he used a razor blade that he always carried in his wallet and that he had slit both of their throats. After they were dead, he went into the basement and took off all his clothes and washed them because they were full of blood. He said that as he was walking out, he saw a can of gasoline. He went up and spread the gas around and threw a book of matches into it. He then

went out the back door, and he went over and bought a bag of dope from Santee. He went to Sally's house and used the dope. Then he went out again and bought two more bags of dope on 78th and Emerald and went back to Sally's again to use the dope. He then called his wife and had her pick him up. After she picked him up they drove by the house, saw the fire department and police there and he went into the house and threw himself into a pool of blood. He said he left the razor blade he used at the scene.

(Dckt. #495-13 at 35–36). Smith was found guilty on August 31, 1990, and sentenced to natural life in prison. (DOSOF Resp. ¶105).

While in prison, Smith filed two *pro se* federal civil rights lawsuit describing the police violence he experienced. (PSAF Resp. ¶46(h),(j); *see also Smith v. City of Chicago, et al.*, No. 88 CV 3755, Dckt. #1 (N.D.Ill. Apr. 29, 1988) and *Smith v. City of Chicago, et al.*, No. 92 CV 1118, Dckt. #1 (N.D.Ill. Feb. 13, 1992)). Smith also gave a victim statement in the prosecution of *United States v. Burge*, No. 8 CR 846 and in two statements to the Illinois Torture Inquiry and Relief Commission. (PSAF Resp. ¶46(k),(l),(n)).

While Smith remained in prison, allegations of misconduct and abuse at Area 2 Violent Crimes surfaced more frequently and became more publicized. The Officers consistently dispute Smith's factual assertions concerning such historical abuse, but the Court may consider such evidence to the extent that it bears on the actions of any of the Officers and that could potentially be admissible at trial under Rule 404(b) even if not currently in admissible form.[20] (*See supra* at Section I). That evidence is as follows.

---

[20] Smith cites to voluminous exhibits purporting to support historical abuse by the Officers, but upon the Court's review, many of the cited exhibits do not support his factual assertions that each defendant was involved in the abuse. (*See* PSAF Resp. ¶¶140(b),(c),(d),(f),(g),(i), 143(b)(d)(g)(h); ¶151(a)). Plaintiff additionally cites to a reversed and vacated opinion, (PSAF Resp. ¶164 (citing *Richardson v. Briley*, 2004 WL 419902, at *12 (N.D.Ill. Feb. 10, 2004), *rev'd*, 401 F.3d 794 (7th Cir. 2005)). Plaintiff also relies on a case denying summary judgment but mischaracterizes the case's ruling. (PSAF Resp. ¶165 (citing *Collier v. Baker*, No. 96 CV 23, 1999 WL 543206, at *9 (N.D.Ill. July 23, 1999)). Although Smith asserts that the *Collier* court found "sufficient evidence that Solecki violated Collier's Fourth Amendment rights during a warrantless search and also stood by while officers beat Willy Lewis, rejecting Solecki's testimony," the court actually held that there was an open question about how much force was used

**Defendant Yucaitis**

Shortly after Smith's criminal trial, an October 1990 OPS report came out regarding an investigation of the torture of Andrew Wilson.[21] (PSAF Resp. ¶144 (citing Dckt. #515-6)). Yucaitis was specifically mentioned for his abusive actions towards Wilson, including "repeatedly administer[ing] electrical stimulation to Mr. Wilson's body in order to create pain" while "Mr. Wilson was handcuffed and incapable of providing any resistance."[22] (PSAF Resp. ¶146; *see also id.* ¶143(c)). Mr. Wilson described the shock as one that "goes to your brain, and you feel your teeth shattering." *(Id.* ¶143(c) (citing Dckt. #515-2)). Yucaitis (along with Jon Burge) is also claimed to have tortured and threatened Anthony Holmes into signing a confession. (PSAF Resp. ¶143(a) (citing Dckt. ##514-16, 514-17)). He also is claimed to have participated in the abuse of Lavert Jones, (PSAF Resp. ¶143(e) (citing Dckt. #515-5)), Thomas Craft, (PSAF Resp. ¶143(f) (citing Dckt. #515-6 (Yucaitis hit Craft in the head with a flashlight, causing a skull fracture, before choking and placing the barrel of his gun to Craft's forehead and then up his nose))), Michael Tillman, (PSAF Resp. ¶143(i) (citing Dckt. #515-13 (Yucaitis stuck his thumbs between Tillman's ears and pressed inwards, poured soda up Tillman's nose, and

---

against the plaintiff, and it neither "reject[ed] Solecki's testimony" nor otherwise found that Solecki violated the plaintiff's Fourth Amendment rights. *Collier*, 1999 WL 543206 at *7–9.

[21] Defendants do not challenge the admissibility of the 1990 OPS report but rather argue that it is immaterial, and that no officer knew about it prior to Smith's criminal trial. Regardless of whether the Officers knew about the report, it mentions Yucaitis and discusses the torture Wilson experienced during his interrogations involving Yucaitis.

[22] Defendants object to this fact (and every other fact discussing allegations of abuse by the Officers) as inadmissible hearsay and impermissible propensity evidence under Federal Rule of Evidence 404(b). (PSAF Resp. ¶140(a)). Absent defendants establishing that Wilson's deposition could never be in admissible form, the court may consider it at the summary judgment stage. *See Widmar*, 772 F.3d at 460 (affidavits, depositions, or other forms of testimony can be sufficient at summary judgment to substitute for live testimony). As to whether the fact constitutes impermissible propensity evidence, defendants filed a separate Motion in *Limine* concerning this issue and the Court will address propensity evidence in ruling on that motion. (*See* Dckt. #586). In sum: because this evidence could be admissible at trial, it will be considered on summary judgment.

repeatedly placed a bag over Tillman's head to cut off his air supply))), and Steven Bell, (PSAF Resp. ¶143(j) (citing Dckt. #515-14 (Yucaitis beat Bell in the head with a telephone book))).

**Defendant McWeeny**

McWeeny was accused of torturing Melvin Jones and was present when Jon Burge physically hit Jones and pointed a gun at him. (PSAF Resp. ¶140(a) (citing Dckt. #513-25)). McWeeny is also accused of using a cattle prod to torture Darrell Cannon when he refused to answer interrogation questions. (PSAF Resp. ¶140(e) (citing Dckt. #514-1)). Alex Moore told special prosecutors that officers, including McWeeny, called him racial epithets and used electric shock torture on his genitals, causing him to defecate on himself. (PSAF Resp. ¶140(h) (citing Dckt. #514-7)). McWeeny is additionally accused of failing to stop officers from torturing Madison Hobley during an interrogation, including failing to stop an officer pushing his fingers into Mr. Hobley's throat while other officers beat and kicked him. (PSAF Resp. ¶140(k) (citing Dckt. #514-14)). Finally, McWeeny, along with Pedersen and other officers, is accused of participating in the torture of Aaron Patterson, during which McWeeny threatened Patterson that something bad would happen if he did not cooperate. (PSAF Resp. ¶140(j) (citing Dckt. #514-11)).

**Defendant Pedersen**

Pedersen, along with McWeeny and other officers, is accused of being involved in the torture of Aaron Patterson and suffocating Patterson with a plastic bag while other officers physically abused him. (PSAF Resp. ¶140(j) (citing Dckt. #514-11)). Pedersen also has multiple sustained OPS findings against him, ultimately leading to Pedersen spending fifteen months in federal prison. (PSAF Resp. ¶154).

**Defendant Rice**

Defendant Rice was involved in the interrogation of a (different) Robert Smith and allegedly prevented him from accessing a lawyer and planned to keep him "incommunicado" until he made a statement. (PSAF Resp. ¶158 (citing Dckt. #515-90)).

**Defendant Brownfield**

Brownfield has previously been found liable for malicious prosecution by a federal jury. (PSAF Resp. ¶161 (citing Dckt. #513-3)).

**G. Smith's Conviction Is Vacated.**

On October 23, 2020, after thirty-three years of incarceration, Smith's conviction and sentence were vacated. (PSAF Resp. ¶136). At the hearing to vacate his criminal conviction, the Special Cook County Assistant State's Attorneys acknowledged that there were "critical issues with the evidence that was recovered, the evidence that was never tested and the evidence that was never sought to be tested or recovered." (*Id.*). Furthermore, "[p]olice reports state that Mr. Smith used a razor blade to murder both of the victims" but there "was no recovery of this murder weapon" despite the "house [being] an approximately 1200 square foot home." (*Id.*) Smith thereafter received a Certificate of Innocence in November 2020 and Judge Leroy K. Martin, Chief Judge of the Cook County Circuit Court Criminal Division held Smith to be "innocent of the offenses." (*Id.* ¶138). Four Illinois Court of Claims judges reaffirmed Smith's innocence in 2021 and stated:

> Following hours of torture, Mr. Smith orally confessed. But tellingly, when it was demanded that he sign a written confession by the assigned felony review State's Attorney and detectives, Mr. Smith refused. The oral confession along with other fabricated evidence formed the basis of his double murder conviction. But for the trial judge who raised concerns about the lack of motive by Mr. Smith, he might very well have been sentenced to death.

(*Id.* ¶139).

### III.     ANALYSIS

### A.     Smith's Claims Under 42 U.S.C. §1983

The Court begins with Smith's claims brought pursuant to 42 U.S.C. §1983, which authorizes private suits to redress deprivations of constitutional rights by state actors. *King*, 954 F.3d at 984.  In particular, Smith alleges that one or more of the Officers (1) coerced him to confess to a crime for which he is innocent; (2) conspired to violate his rights; (3) failed to intervene to stop others from violating his rights; (4) destroyed potentially exculpatory evidence; (5) fabricated evidence; and (6) withheld evidence in violation of *Brady*.

Before turning to the specifics, the Court will first address Smith's overarching argument that if he succeeds on defeating defendants' summary judgment motion for any §1983 claim against a single Officer, summary judgment must be denied for all §1983 claims against that same Officer.[23]  (Dckt. #521 at 17) ("once Defendants conceded that Smith's Section 1983 unfair trial claim goes to the jury against Brownfield, Cline, Higgins, Pedersen, Rice, and Yucaitis, their summary judgment motions may be denied in their entirety.").  Put another way, because the Officers do not seek summary judgment on plaintiff's substantive due process claim against Brownfield, Cline, Higgins, Pedersen, Rice, and Yucaitis, Smith asserts that all §1983 claims against these Officers must proceed to trial, regardless of whether there is evidence of their personal involvement.  Plaintiff cites two cases in support of this "all or nothing" contention:

---

[23]  In the same vein, Smith argues that his case should bypass the summary judgment stage altogether, relying on *Kennedy v. Silas Mason Co.*, 334 U.S. 249 (1948).  (*See* Dckt. #521 at 13–15).  A court has "discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'"  *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012), *quoting Anderson*, 477 U.S. at 255.  However, *Kennedy* is intended to be invoked only in the rare situation where "the law is evolving rapidly," *Dearth v. Lynch*, 791 F.3d 32, 34 (7th Cir. 2015) (cleaned up).  This case is not one of those rare situations.  To the contrary, the Officers' summary judgment motion will promote judicial efficiency because it is capable of narrowing the issues for trial.

namely, *Goudy v. Cummings*, 922 F.3d 834 (7th Cir. 2019) and *Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019). However, neither case supports plaintiff's sweeping contention.[24]

Simply put, because "[i]ndividual liability pursuant to § 1983 'requires personal involvement in the alleged constitutional deprivation,'" Smith must show that each Officer is personally involved to hold that Officer liable for each of his claims. *Estate of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017), *quoting Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017); *Hill v. City of Chicago*, No. 6 CV 6772, 2009 WL 174994, at *5 (N.D.Ill. Jan. 26, 2009) ("As the Seventh Circuit instructs, Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation") (cleaned up); *Johnson v. Guevara*, No. 20 CV 4156, 2025 WL 903813, at *17 (N.D.Ill. Mar. 24, 2025) ("[c]ourts routinely and appropriately assess sub-theories of fabrication and suppression claims to determine which sub-theories are adequately factually supported to advance to trial.") (cleaned up). In sum: Smith's ability to "establish[] that one defendant may have violated his right to a fair trial based on one theory of liability," does not mean "that his claims as to all defendants on any theory of fair trial liability can advance to trial." *Id.*

## 1.      Smith's Coerced Confession under the Fifth and Fourteenth Amendments.

Smith alleges that the Officers violated his procedural and substantive due process rights related to his coerced confession. Three of the Officers—Dwyer, Solecki, and McWeeny—seek

---

[24] In *Goudy*, the Seventh Circuit explained that it would be premature at the summary judgment stage to dismiss a *Brady* claim against a defendant who was only personally responsible for the suppression of some (but not all) of the material evidence at issue because the plaintiff brought a single claim asserting that he was deprived of his due process rights and he alleged that the individual defendants contributed to that injury in different ways. 922 F.3d at 843–44. Similarly, in *Camm*, the plaintiff presented a single *Brady* claim alleging the suppression of three baskets of evidence and the Seventh Circuit found that the plaintiff presented evidence to proceed against some defendants on one type of evidence and against other defendants based on a second type of evidence. 937 F.3d at 1108–09, 1111.

summary judgment on plaintiff's coerced confession claims on the ground that they were not personally involved and therefore cannot be held liable under §1983. *See Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005); *Carmody v. Bd of Trs. Of Univ. of Ill.*, 893 F.3d 397, 401–02 (7th Cir. 2018).

The Fifth Amendment's self-incrimination clause applies when an individual is coerced into making an incriminating statement that is used against him in a criminal proceeding. *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1023–27 (7th Cir. 2006). For a procedural due process claim, a court considers whether the "statements to authorities were voluntary" in consideration of "the totality of the circumstances." *Fulton v. Bartik*, No. 20 C 3118, 2024 WL 1242637, at *19 (N.D.Ill. Mar. 22, 2024), *quoting United States* v. *Outland*, 993 F.3d 1017, 1021 (7th Cir. 2021).

> A confession will be deemed involuntary if authorities obtained the statement through coercive means that overcame the defendant's free will. Put another way, a confession is voluntary if, in the totality of circumstances, it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.

*Fulton*, 2024 WL 1242637, at *19 (cleaned up). The Court "analyze[s] coercion from the perspective of a reasonable person in the position of the suspect," *United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015), *quoting United States* v. *Huerta*, 239 F.3d 865, 871 (7th Cir. 2001), and relevant factors include "age, education, intelligence level, and mental state; the length of the . . . detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Huerta*, 239 F.3d at 871.

A Fourteenth Amendment substantive due process claim concerns an individual's right to be free from coercive questioning. *Chavez v. Martinez*, 538 U.S. 760 (2003). For a substantive

due process claim, the Court examines whether the alleged interrogation tactics "shock[] the conscience." *Cairel* v. *Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) ("substantive due process guarantees of the Fourteenth Amendment" protect against "conscience-shocking interrogation tactics") (cleaned up). Conduct meant to injure in some way unjustifiable by any governmental interest is most likely to shock the conscience. *Chavez*, 538 U.S. at 775. But a finding of coercion "need not depend upon actual violence by a government agent; a credible threat is sufficient." *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). "[C]oercion can be mental as well as physical, and [] the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960).

### i.    Defendant Dwyer.

The Court grants summary judgment for Dwyer because Smith has failed to provide evidence that would allow a reasonable jury to infer that Dwyer was personally involved in Smith's arrest, interrogation, or confession. To reiterate, plaintiff alleges that the officer accompanying McWeeny in the interrogation room when he first arrived at Area 2 was Dwyer, but plaintiff fails to provide any admissible evidence to support this argument. The Officers, on the other hand, provide admissible evidence to support that the officer was not defendant Dwyer, including citations to Smith's testimony where he described the officer as "blonde" and an affidavit from Dwyer attesting to the fact that he has never been blonde. Further, although Smith cites to evidence that he claims establishes Dwyer worked overtime on September 19, 1989, the exhibit Smith cites, Exhibit 97, (Dckt. #512-17), does not mention Dwyer at all. Smith has therefore failed to present evidence that would allow a reasonable jury to infer that Dwyer was

personally involved in the actions which Smith asserts coerced him to confess and summary judgment is warranted.

### ii.    Defendant McWeeny.

The factual record shows that McWeeny played a substantial role in bringing Smith to Area 2 and in his initial interrogation, including watching another officer physically and verbally abuse Smith. Drawing all reasonable inferences in Smith's favor, the facts are as follows. McWeeny fabricated a story that Smith "dove" into a pool of blood, "wiggled" around in the blood, and refused to get up, which McWeeny used as an excuse to detain and arrest Smith. McWeeny then called officers to come pick Smith up and drive him to Area 2 and wait with him until McWeeny could return. Rios (the officer that picked Smith up from McWeeny) physically abused Smith and handcuffed him to a wall. Once McWeeny and another officer came in, Smith was beaten and choked with his own wallet and handkerchief until he almost passed out. The other officer called Smith a "cold blooded killer." (PSAF Resp. ¶28). McWeeny watched Smith suffer and then told Smith he knew Smith was guilty because of the fake story about Smith diving into blood and interrogated Smith for thirty-five to forty-five minutes. McWeeny told Smith, "we know you did this," and "you almost committed the perfect crime," but you "didn't pour gasoline on the body to make it explode." (*Id.* ¶30). McWeeny also told Smith that the police knew that the victims' throats had been cut and asked Smith to tell him how he had committed the murders. (*Id.*). Smith denied any involvement in the murders. (*Id.* ¶31). Before leaving at the end of his shift, McWeeny talked to detectives Brownfield and Yucaitis about Smith.

The Officers argue that because Smith's confession occurred approximately fourteen hours after his interactions with McWeeny that McWeeny cannot be personally involved in

coercing his confession. (Dckt. #494 at 34). The Officers further argue that McWeeny merely arrested Smith and thereafter had positive interactions with Smith (i.e. did not physically abuse him). (*Id.*). However, "[a]n official satisfies the personal responsibility required of §1983 if [he] acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge or consent." *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1012 (7th Cir. 2000), *quoting Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985). Here, Smith offers sufficient evidence for a reasonable jury to infer that McWeeny was personally involved in violating Smith's constitutional rights insofar as McWeeny and the officer accompanying him used coercive tactics to verbally and physically abuse and falsely accuse Smith of murder.

The parties agree that McWeeny never physically abused Smith, but Smith testified that McWeeny witnessed, stood and watched, and waited while another officer physically abused him. (PSAF Resp. ¶¶28–30). It is enough for McWeeny to have watched his fellow officer violate Smith's rights while doing nothing to stop him. *Phillips v. City of Chicago*, No. 14 CV 9372, 2018 WL 1309881, at *29 (N.D.Ill. Mar. 13, 2018) ("Defendants overreach, however, when they suggest that Heyrman himself must have engaged in coercion, fabrication, or withholding of exculpatory evidence in order to be liable."). The Officers rely upon *Jakes v. Boudreau*, which actually supports Smith's position. No. 19 CV 2204, 2023 WL 3585629, at *13 (N.D.Ill. May 22, 2023). In *Jakes*, the court found that a certain defendant involved in the plaintiff's arrest was not personally involved in the subsequent coerced confession because he never questioned the plaintiff about his role in the murders.[25] *Id.* Here, McWeeny not only

---

[25] Defendants' reliance on *Burks v. Raemish*, 555 F.3d 592, 595 (7th Cir. 2009) is similarly misplaced. There, a complaint examiner was found to have no personal involvement in denying the plaintiff's medical needs where she dismissed the plaintiff's untimely prisoner grievance without investigating the

played a role in Smith's arrest, but also questioned and coached Smith and witnessed another officer's physical abuse, easily establishing his personal involvement.

The Officers also appear to argue that because McWeeny was not present for the confession, he cannot be liable. (Dckt. #494 at 29). In reliance, defendants point to *Hill v. City of Chicago*, No. 6 CV 6772, 2009 WL 174994, at *5–6 (N.D.Ill. Jan. 26, 2009), which held that certain defendants were not personally involved in a Fifth Amendment violation where they had *no* contact or interaction with the plaintiff during his arrest and interrogation. *Id.* Here, the evidence shows that McWeeny *did* have contact with Smith during both his arrest and his interrogation. Further, even though he was not present for the eventual confession, a reasonable jury could view McWeeny's actions as threatening and demonstrating that he was acting in concert with the other officers to falsely accuse Smith of the murders.

In sum: the Court cannot grant summary judgment in McWeeny's favor when Smith presents evidence of McWeeny watching another officer's physical abuse against Smith and McWeeny himself "coach[ed Smith] as to the details of the confession" by insisting to Smith that he committed the murders while participating in the interrogation with the other officer. *See Hill*, 2009 WL 174999, at *8; *Hyung Seok Huh v. Graf*, 307 F.Supp.3d 827, 855 (N.D.Ill. 2018) (finding that "lying to" a suspect and "coaching him on the details of the confession" in conjunction with verbal and physical intimidation was conduct that violates the Fifth Amendment).

---

merits. *Id.*; *see also Odogba v. Wisc. Dept. of Justice*, 22 F.Supp.3d 895, 911–12 (E.D.Wis. 2014) (knowledge of plaintiff's EEOC charges without more does not establish personal involvement).

### iii.     Defendant Solecki.

Likewise, Solecki is not entitled to summary judgment.  The Officers assert that Solecki was not personally involved in Smith's coerced confession because Smith did not testify that Solecki used any coercive conduct during the encounter where Higgins and Solecki confronted Smith with the bloody underwear and bed sheet.  (Dckt. #494 at 36–37).  Plaintiff disagrees and argues that Solecki's role extends beyond this interaction.

As noted above, Solecki was involved with allegedly recovering Smith's bloody underwear at the crime scene, along with the bloody blue floral bed sheet.  Plaintiff presented evidence that numerous CPD and CFD employees did not see either piece of evidence when they investigated the scene *prior* to Higgins and Solecki discovering them, which contradicts Solecki's testimony that both items of eye-catching evidence were in "plain sight" or "plain view."  (PSAF Resp. ¶¶111, 118, 129).  Solecki then went back to Area 2 with Higgins and confronted Smith with the evidence and this confrontation formed the basis for creating a false story (by Smith's account) that Smith went to do laundry in the basement after murdering the victims and dropped his underwear on the stairs on the way to do so.  Drawing the reasonable inferences in Smith's favor, as the Court is required to do, Solecki knew that this story was false because Smith never told him or Higgins that he went to do laundry after murdering the victims or that he dropped his underwear on the way to the basement.  Solecki's acts in falsifying evidence, confronting Smith with the evidence, and fabricating reports memorializing the false confession based on Higgins and Solecki's fabrication establishes his personal involvement.  The Court can therefore not grant summary judgment to Solecki.

In sum: the coerced confession claim may proceed against all Officers except Dwyer.

2.      **Smith's Failure to Intervene Claim.**

Plaintiff bases his failure to intervene claim under §1983 on the same factual evidence as

his coerced confession claim.  Failure to intervene "is a theory of liability under section 1983,

specifically, a way to prove the liability of a state actor who was not a direct participant in the

challenged wrongdoing."  *Fields v. City of Chicago*, No. 10 CV 1168, 2014 WL 477394, at *10

(N.D.Ill. Feb. 6, 2014).  As the Seventh Circuit has explained:

> [a]n officer who is present and fails to intervene to prevent other law enforcement
> officers from infringing the constitutional rights of citizens is liable under §1983 if
> that officer had reason to know: (1) that excessive force was being used, (2) that a
> citizen has been unjustifiably arrested, or (3) that any constitutional violation has
> been committed by a law enforcement official; *and* the officer had a realistic
> opportunity to intervene to prevent the harm from occurring.

*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).  A "realistic opportunity to intervene" can exist

if the officer(s) could have "called for a backup, called for help, or at least cautioned [the officer]

to stop."  *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005), *quoting Yang*, 37 F.3d

at 285.  Notably, the Seventh Circuit "has made clear that the prongs of this analysis almost

always implicate questions of fact for the jury."  *Id.*

Turning to Smith's failure to intervene theory, he argues that the Officers have, in

essence, conceded that "if any federal claim survives against any one Detective Defendant, then

the federal conspiracy, federal failure-to-intervene, and IIED claims also survive, against all

Detective Defendants."  (Dckt. #521 at 10 ("Because Defendants concede there are viable

coercion and IIED claims against six Defendants, then any of the nine Defendants could have

conspired with them to do so and/or were aware of the violations and failed to intervene.")).  Put

another way, Smith claims that because the Officers only seek summary judgment for three

Officers on his coerced confession claim, then all nine Officers can be liable under a failure to

intervene theory.  Smith cites no case law in support of this position, which would require the

46

Court to disregard the precedent that requires an officer be personally involved and have a "reasonable opportunity to intervene" in the underlying violation" to be liable for the failure to intervene.  *Abdullahi*, 423 F.3d at 774.

For their part, the Officers argue that they are entitled to summary judgment on the failure to intervene claim for three reasons: (1) there is no underlying constitutional violation, (Dckt. #494 at 54, *quoting Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019) ("conspiracy and failure to intervene, and municipal liability claims each depend on proof of an underlying constitutional violation.")); (2) failure to intervene is an improper form of vicarious liability and should not be cognizable under §1983, (Dckt. #494 at 55); and (3) plaintiff cannot show that defendants Dwyer, McWeeny, and Solecki had any personal involvement and "an officer not present when the constitutional violation occurred cannot be held liable for failing to intervene."  (Dckt. #494 at 30 (citing *Powell v. City of Berwyn*, 68 F.Supp.3d 929, 942 (N.D.Ill. 2014)).

The first two of the Officers' arguments are without merit.  The Officers will proceed to trial on multiple underlying constitutional violations and the Seventh Circuit "has permitted §1983 failure to intervene claims for decades."  *Brown v. City of Chicago*, 709 F.Supp.3d 558, 576 (N.D.Ill. 2023).  Indeed, the Officers admit that "current precedent allows" for such a claim. (Dckt. #494 at 55); *see Fulton*, 2024 WL 1242637, at *27 n.32 ("Unless and until the Seventh Circuit alters course, failure to intervene remains a viable theory of liability under Section 1983.").

Turning to the final argument, the Court agrees with the Officers' position that Smith has not produced evidence that Dwyer had personal involvement in his arrest, interrogation, or

confessions. *See supra*, Section III(A)(1)(i). Thus, Dwyer cannot be liable for failing to intervene.

For defendants McWeeny and Solecki, plaintiff's claim for coerced confession and failure to intervene are premised on the same evidence. Because plaintiff alleges that they "were either directly involved in those violations, or failed to take action to prevent them," *Phillips*, No. 14 CV 9372, 2015 WL 5675529, at *6 (N.D.Ill. Sept. 24, 2015), the derivative claim can survive. According to the Officers, McWeeny did intervene and stopped the officer (who plaintiff mistakenly believes to be Dwyer) from physically abusing Smith and then left prior to Smith's confession. (Dckt. #494 at 35) But McWeeny only intervened "after watching [the officer] hit, punch, and choke Smith for a while" and it was only "until Smith was close to unconscious" that McWeeny told the officer that he should probably stop. (Dckt. #521 at 63–64). It is of no moment that Smith does not point to evidence identifying who the abusive officer is because "it is possible to hold a named defendant liable for his failure to intervene vis-à-vis the excessive force employed by another officer, even if the plaintiff cannot identify the officer(s) who used excessive force on him." *Sanchez v. City of* Chicago, 700 F.3d 919, 926 (7th Cir. 2012) (citing cases). McWeeny also coached Smith and fed him false information while the other officer repeatedly hit, punched, and then choked Smith until he almost passed out and these actions contributed to the tactics employed by the Area 2 officers which led to Smith's confession. Finally, McWeeny had an opportunity to intervene to stop the officer's physical abuse before he eventually intervened when Smith was choked nearly to the point of unconsciousness. Thus, even though this conduct occurred during the early hours of Smith's protracted interrogation, it nonetheless could be viewed as a contributing factor leading up to and causing his confession. *Hill*, 2009 WL 174994, at *10 (denying summary judgment on failure to intervene claim where

defendant officers were present while another officer was in the process of coercing plaintiff's confession). A reasonable jury could view these facts and find direct involvement or failure to intervene and therefore the Court will not grant summary judgment to McWeeny.

The Officers also contend that Solecki is entitled to summary judgment even though Smith "point[s] to Solecki's allegedly fabricated progress report that reflects inculpatory statements relating to the underwear and blue bed sheet," because Solecki "was not present for any of the alleged coercive conduct leading up to Smith's confession." (Dckt. #494 at 38). Smith, however, asserts that Solecki (along with Higgins) concocted the story that Smith dropped his underwear on the way to wash his clothes and stood on a bed sheet while doing laundry so he would not get his feet bloody. Solecki then returned to Area 2 and memorialized this story in a police report. Accepting Smith's version of events, Solecki not only had personal involvement in fabricating the bloody blue underwear but also could be viewed as failing to intervene to stop the misconduct of other Officers (such as Higgins). *Brown*, 709 F.Supp.3d at 578 (denying summary judgment where the plaintiff sought a theory of direct or derivative liability). Furthermore, the moment to intervene reaches far beyond Solecki's interrogation with Smith. "[A]ny officer who was aware that a confession, statement, or report was false or the product of fabrication or coercion (or both) could have intervened at least until plaintiffs' criminal proceedings concluded." *Fulton*, 2024 WL 1242637, at *28 (citing *Heidelberg v. Manias*, 18 CV 1161, 2019 WL 4862069, at *19 (C.D.Ill. Mar. 26, 2019)). Solecki never intervened prior to Smith's criminal trial and conviction despite knowing that evidence was fabricated, and Smith was thereafter convicted and sentenced to natural life in prison.

Summary judgment is therefore not warranted for Solecki and the §1983 failure to intervene claim may proceed against all defendants except Dwyer.

### 3.     Smith's Conspiracy Claims.

Smith brings conspiracy theories under §1983 and Illinois state law[26] and alleges that "the Conspirators all worked together on the Yeager/Alexander homicide investigation, deciding that Smith was a suspect even though there was no evidence against him when they threw him to the ground, handcuffed him, seized him, and brought him to Area 2 to begin beating him.  The Conspirators concocted the storyline that became Smith's purported confession and then fabricated evidence in an effort to support that storyline."  (Dckt. #521 at 78).  The Officers assert that there is no evidence to support plaintiff's §1983 or state law conspiracy claims. (Dckt. #535 at 75).

To establish liability for a conspiracy under §1983, a plaintiff must allege that "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015).  A conspiracy under §1983 also requires an underlying substantive constitutional violation.  *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) ("conclusion that the Cefalus suffered no constitutional injury thus forecloses relief on the conspiracy claim").  Illinois state conspiracy jurisprudence largely tracks the federal requirements.  *See Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004); *Brown v. City of Chicago*, 633 F.Supp.3d 1122, 1174 (N.D.Ill. Sept. 30, 2022) ("standard for conspiracy under state law is similar.").

The Officers claim that Smith provides no evidence that Dwyer, McWeeny, or Solecki engaged in a conspiracy and that he fails to point to any agreement or overt acts in support of any Officer engaging in a conspiracy because he has only alleged conspiracy in boilerplate terms. (Dckt. #535 at 75–76).  However, as Smith points out, he need not prove direct evidence of an

---

[26]  The parties address these claims together.  (Dckt. #494 at 52; Dckt. #521 at 71).

agreement. (Dckt. #521 at 77); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir. 1984) ("Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire."). Each alleged conspirator does not need to agree on the details of the conspiracy or know who the other actors are; "[i]t is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). And under Illinois law, "a plaintiff can succeed on a conspiracy claim using circumstantial evidence only if that evidence is clear and convincing." *Brown*, 633 F.Supp.3d at 1174. Smith asserts that the Officers and ASA Brogan agreed to "work[] together on the Yeager/Alexander homicide investigation, deciding that Smith was a suspect even though there was no evidence against him." (Dckt. #521 at 78). The Officers' conspiracy "concocted the storyline that became Smith's purported confession and then fabricated evidence in an effort to support that storyline." (*Id.*).

The Court therefore turns to the same evidence as those for the underlying constitutional violations in order to analyze each Officer's role. Because the Officers agree that the conspiracy claims are derivative of the coerced confession claim, they may survive as to the same Officers. (Dckt. #535 at 71–72; *see also* Dckt. #494 at 52 ("The §1983 and Illinois conspiracy claims are derivative.")). The Officers again argue that Dwyer, McWeeny, and Solecki had no personal involvement, but the Court again disagrees as to McWeeny and Solecki. As noted above, *supra* Section III(A)(1)(ii) & (iii), McWeeny and Solecki have sufficient involvement to establish personal liability for Smith's coerced confession claim. However, the Court agrees with the Officers that Smith fails to establish Dwyer's personal involvement. As explained, *see supra* Section III(A)(1)(i), Smith fails to provide evidence that Dwyer played any role at Area 2.

Summary judgment is thus proper for Dwyer on Smith's §1983 and Illinois state law conspiracy claims.

i.    **The Intracorporate Conspiracy Doctrine.**

The Officers additionally argue that summary judgment is appropriate because Smith's conspiracy claim is "barred as a matter of law under the intracorporate conspiracy doctrine, which precludes claims under §1983 and §1985 when the alleged conspirators were part of the same organization," and in the alternative, they are protected by qualified immunity. (Dckt. #494 at 53).[27]

The intracorporate conspiracy doctrine, derived from corporate and antitrust settings, *Jordan v. Bonano*, 636 F.Supp.3d 924, 931 (N.D.Ill. 2022), provides that "employees of the same corporate entity cannot be liable under a conspiracy theory if the employees act within the scope of their employment." *Haliw v. City of S. Elgin*, No. 19 CV 1515, 2020 WL 1304697, at *4 (N.D.Ill. Mar. 18, 2020) (citing *Travis v. Gary Cmty. Mental Health Ctr.*, 921 F.2d 108, 110 (7th Cir. 1990)). "The intracorporate conspiracy doctrine was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory." *Piercy v. Warkins*, No. 14 CV 7398, 2017 WL 1477959, at *19–20 (N.D.Ill. Apr. 25, 2017).

The Seventh Circuit has extended the intracorporate conspiracy doctrine to apply to conspiracy claims under §1985(3) but has not yet determined whether it applies to those arising under §1983. *See Wright v. Ill. Dep't of Child. & Fam. Servs.*, 40 F.3d 1492, 1508 (7th Cir.

---

[27] Plaintiff's §1985(3) conspiracy claim is addressed *infra* Section III(B).

1994); *Travis*, 921 F.2d at 110.[28]  Courts within this District go both ways.  *Compare Haliw*, 2020 WL 1304697 ("There is reason to doubt, however, that this corporate-based and antitrust-based doctrine should apply to civil-rights conspiracy claims under § 1983."); *Piercy v. Warkins*, No. 14 CV 7398, 2017 WL 1477959, at *19–20 (N.D.Ill. Apr. 25, 2017) (collecting cases declining to extend doctrine to §1983 claims), *with Liggins v. City of Chicago*, No. 1:20-cv-04085, 2021 WL 2894167, at *5 n.3 (N.D.Ill. Jul. 9, 2021) (collecting cases applying intracorporate conspiracy doctrine to §1983 claims).

Even presuming that the intracorporate conspiracy doctrine is, in concept, applicable to §1983 conspiracy claims, it does not apply under the circumstances here.  *See Bonano*, 636 F.Supp.3d at 932 (the Court "need not consider whether the [Doctrine] can ever apply in a §1983 action because it does not apply here on the facts alleged.").  The intracorporate conspiracy doctrine "applies only when the agents of a corporation or government entity act within the scope of their employment in joint pursuit of the entity's *lawful* business."  *Gray v. City of Chicago*, No. 18 CV 2624, 2022 WL 910601, at *14 (N.D.Ill. Mar. 29, 2022).  Here, Smith's evidence includes the Officers' action to frame him for the Yeager/Alexander murders by violating his civil rights.  The intracorporate conspiracy doctrine thus does not apply because Smith alleges conduct that is "not the product of routine decision-making by police departments," *Ochoa v. Lopez*, No. 20 CV 2977, 2021 WL 4439426, at *9 (N.D.Ill. Sept. 28, 2021), including that defendants deprived him of his civil rights, which can never constitute a "corporation's 'lawful business.'"  *Sassak v. City of Park Ridge*, 431 F.Supp.2d 810, 821 (N.D.Ill. 2006), *quoting Wright*, 40 F.3d at 1508; *see also Wilson v. Est. of Burge*, 667 F.Supp.3d

---

[28]  By contrast, the Sixth and Eleventh Circuits have recognized that the intracorporate conspiracy doctrine applies in §1983 suits.  *Jackson v. Cleaveland*, 925 F.3d 793, 817 (6th Cir. 2019); *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1262 (11th Cir. 2010).

785, 876 (N.D.Ill. 2023) (intracorporate conspiracy doctrine inapplicable where plaintiff alleged police deprived him of his civil rights, which cannot be the product of a police department's routine decision making).

Smith's allegations concerning the Officers' conduct clearly fall outside of "routine police-department decision making," that is associated with the intracorporate conspiracy doctrine. *See Piercy*, 2017 WL 1477959, at *20 (conspiracy between police to frame plaintiff for murder not barred by the doctrine) (collecting cases); *Ochoa*, 2021 WL 4439426, at *9 (violating civil rights "cannot be the goal of the City or its police department."); *Sassak*, 431 F.Supp.2d at 821 (conspiracy claim not barred by doctrine because "[t]he deprivation of civil rights is unlawful."). Therefore Smith's §1983 conspiracy claim is not barred by the intracorporate conspiracy doctrine.

### ii. Qualified Immunity Does Not Bar Smith's Conspiracy Claims.

Defendants argue that "[i]f the lack of Seventh Circuit precedent precludes this court from applying the intracorporate conspiracy [doctrine] to the §1983 claims, [the] Officers are still entitled to summary judgment based on qualified immunity" because "'it cannot be said that the law [was] clearly established on this point. . . [t]hat is, reasonable officers would not necessarily know that a conspiracy amongst employees of a single municipality can violate the Constitution (no matter what the underlying substantive right is at stake).'" (Dckt. #494 at 53, *quoting Haliw*, 2020 WL 1304697, at *4). The Court disagrees.

Government officials like the Officers are protected by qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223 (2009) (cleaned up). "First, we ask whether the plaintiff's allegations make out a deprivation of a constitutional right.

Second, we ask whether that right was clearly established at the time of the defendant's alleged misconduct." *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 598 (7th Cir. 2011) (citing *Ault v. Speicher,* 634 F.3d 942, 945 (7th Cir. 2011)); *see also Tousis v. Billiot*, 84 F.4th 692, 698 (7th Cir. 2023) (cleaned up). The rights allegedly violated must be defined at the appropriate level of specificity. *Reed v. Palmer*, 906 F.3d 540, 547-48 (7th Cir. 2018). Put another way, at the time of the officers' conduct, the law was sufficiently clear that every reasonable officer would understand that what he is doing is unlawful. *Tousis*, 84 F.4th at 698.

A majority of courts within this District have declined to apply qualified immunity based on the intracorporate conspiracy doctrine. In *Harris v. City of Chicago*, the court reasoned that because a conspiracy holds the individual defendants liable for the underlying constitutional violation, "[r]ecent uncertainty over the intra-corporate conspiracy doctrine's application to §1983 cases does not create an opening for qualified immunity." No. 20 CV 4521, 2020 WL 7059445, at *5 (N.D.Ill. Dec. 2, 2020). *Pena v. Ortiz* held that allegations concerning the fabrication of police reports "remove[d] the conspiracy claims from the reach of the intracorporate conspiracy doctrine, making the Defendant Officers' arguments regarding qualified immunity inapplicable." 521 F.Supp.3d 747, 752 (N.D.Ill. 2021). In *Liggins v. City of Chicago*, the court determined that the underlying constitutional violation that the defendants conspired to violate is what needs to be clearly established—*not* the availability of the intracorporate conspiracy doctrine. 2021 WL 2894167, at *6; *Walker v. City of Chicago*, 559 F.Supp.3d 747, 753 (N.D.Ill. 2021) (same). Most recently, in *Johnson v. Guevara*, the court declined to find qualified immunity where the defendant officers were alleged to have violated the plaintiff's civil rights because it was clearly established that police officers in the same municipality could be held liable for conspiracy. 2025 WL 903813, at *33 ("The Individual

Defendants' argument misses the mark.").  In contrast, a single court has found qualified immunity applicable based on the intracorporate conspiracy doctrine and the uncertainty around whether it applied to §1983, reasoning that "reasonable officers would not necessarily know that a conspiracy amongst employees of a single municipality can violate the Constitution (no matter what the underlying substantive right is at stake)."  *Haliw*, 2020 WL 1304697, at \*4.

Here, the Court is persuaded by the decisions holding that the intracorporate conspiracy doctrine does not create an opening for qualified immunity.  The Court is convinced that it is the underlying constitutional violation which must be clearly established for the purposes of qualified immunity, not the application of the intracorporate conspiracy doctrine.  *See Morales v. Carrillo*, 625 F.Supp.3d 587 (W.D.Tex. 2022) ("[W]hen a defendant faces conspiracy claims under §1983, the qualified immunity analysis that applies to the underlying §1983 claims resolves the qualified immunity analysis for the conspiracy.").  If it is clearly established that the underlying actions were unconstitutional, the Court believes that every reasonable officer would understand that entering an agreement/conspiracy to perform that unconstitutional action is likewise unlawful.  Thus, where defendants would not be protected by qualified immunity for committing the underlying constitutional violation, it goes without saying that they are not protected for conspiring to commit the same violation.  *See Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001) ("if the unlawfulness is apparent in light of preexisting law, then the standard is met.  In addition, even if there is no closely analogous case law, a right can be clearly established on the basis of common sense.") (cleaned up).

The underlying violations here relate to the Officers coercing and fabricating Smith's confession and the evidence related to his confession, and "there is no disputing that such conduct [fabricating evidence] violates clearly established constitutional rights."  *Whitlock v.*

*Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (concerning conduct that occurred in 1987), *quoting Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008). Thus, defendants are not entitled to qualified immunity on Smith's §1983 conspiracy claim.

**4.      Smith's Due Process Claims.**

Smith asserts multiple theories of Due Process violations related to the Officers' actions to destroy evidence of the murder weapon, fabricate various forms of evidence, and withhold evidence of the same from him.

**i.      Smith's Claims Related to the Destruction of Evidence.**

Smith argues that defendants destroyed evidence of a 12-inch butcher knife recovered from the crime scene in violation of *Arizona v. Youngblood*, 488 U.S. 51 (1988). To prove that defendants violated his due process rights by destroying evidence, Smith must prove "(1) bad faith by [the defendant], (2) that the exculpatory nature of the evidence was apparent before its destruction, and (3) that he could not obtain the same evidence anywhere else." *United States v. Cherry*, 920 F.3d 1126, 1140 (7th Cir. 2019). Bad faith requires "proof of an official animus or a conscious effort to suppress exculpatory evidence, and necessarily turns on an official's subjective knowledge that the evidence in question had exculpatory value at the time it was lost or destroyed." *Id.* (cleaned up). The Officers argue that they are entitled to summary judgment because the knife was not exculpatory and was not destroyed in bad faith.

To reiterate, patrol officers Barrins and Hughes, the first officers on the scene, identified a knife as the murder weapon on their case report. (PSAF Resp. ¶70). Hughes testified that he believed he saw a knife on the floor near where the bodies were found and that "all indications showed that it was a knife." (*Id.* ¶71). Lumsden photographed the knife and repeatedly described the victims' wounds as "knife wounds." (*Id.* ¶¶73, 75). He testified that the wounds

looked like they were done by "[d]efinitely some kind of a sharp instrument like a knife." (*Id.* ¶72, *quoting* Dckt. #504-5 at 37). Detectives Mokry and Keough found and collected the knife while searching "through the debris and ashes" and detective Gaines submitted the knife for testing at the serology and laser units. (*Id.* ¶¶77–78). The CPD Serologist, Christine Anderson, performed preliminary chemical testing and did not find blood on an extract of the knife. (*Id.* ¶79; DCSOF Resp. ¶24). The knife also did not show any recent damage, hair, or fiber. (DOSOF Resp. ¶23). No other testing was done even though detective Gaines' analysis form also requested fingerprinting. (DCSOF Resp. ¶26). Anderson sent the knife to CPD's Evidence and Recovered Property Section and expected that it would be preserved through the conclusion of Smith's trial, but instead, the knife was destroyed. (PSAF Resp. ¶80).

Smith's defense attorney filed discovery requests and requested a list of all physical property in law enforcement's possession, which would have included the knife. (*Id.* ¶81). The State's response did not mention the knife. (*Id.* ¶83).

Again, the City is not able to explain why or how the knife was destroyed. (*Id.* ¶84). According to the Officers, the knife was not used in the murders and was instead used by detective Gates and Fire Marshal Lumsden to cut a carpet sample from the area where the fire originated, although neither Gates nor Lumsden recalls ever retrieving or using a knife from the crime scene. To the contrary, Gates testified that using a knife from the crime scene could compromise the crime scene's evidence. (*Id.* ¶90). There are no reports to support the Officers' theory that the knife was used to cut a carpet sample. (*Id.*).

### a. Smith Has Presented Evidence That the Knife Was Potentially Exculpatory.

A *Youngblood* destruction of evidence claim requires that the destroyed evidence have "apparent potential exculpatory value,"—compared to evidence that is obviously exculpatory,

which is governed by *Brady v. Maryland*, 373 U.S. 83 (1963), and which does not require bad faith. In essence, if evidence is obviously exculpatory, it must be disclosed pursuant to *Brady*, whereas if evidence is potentially exculpatory, the government has a duty to preserve the evidence. *Bolden v. City of Chicago*, No. 17 CV 417, 2019 WL 3766104, at *8 (N.D.Ill. Aug. 2019).

The Officers argue that the knife had no exculpatory value. In so arguing, they point to the knife's preliminary testing which yielded negative results for blood and the fact that CFD and CPD investigators believe they might have used the knife to cut a piece of carpet from the crime scene near where the fire originated. (Dckt. #494 at 26–27; Dckt. #490 at 10–13). However, the Officers ignore the report of Barrins and Hughes indicating that a knife *was* the murder weapon and Lumsden's testimony that the cuts on the victim's necks were made by a knife. Moreover, Smith argues that the knife was inventoried and sent for testing. Thus, the knife was relevant to the crime investigation and its designation as the murder weapon by two officers contradicts Smith's assertedly coerced confession that a razor blade was used to commit the murders.

As such, the Court agrees with Smith that the knife was potentially exculpatory.

**b. A Reasonable Jury Could Find that Whoever Ordered the Destruction of the Knife Did So in Bad Faith.**

To demonstrate bad faith, Smith must show that the person or persons who caused the destruction of the knife "acted with intent sufficient to demonstrate that they are personally responsible for the failure to preserve the [evidence], and without intent, there can be no bad faith." *Bolden*, 2019 WL 3766104, at *10. A reasonable jury could infer that whoever destroyed

the knife did so to deprive Smith's defense attorney's request for all physical evidence and deny Smith the opportunity to present the knife as evidence at trial.

To reiterate, the City produced a Rule 30(b)(6) witness to testify about how the Evidence and Recovered Property Section destroyed evidence in the late 1980s. She testified that there were two official methods the Property Section was supposed to follow to destroy evidence: first, an officer would deliver a "tracer" signed by CPD to authorize destruction; or second, an officer would deliver a court order instructing for the evidence to be destroyed. (Dckt. #512-10 at 11). However, she also testified that evidence could be destroyed a third way: namely, when an officer contacts the Evidence and Recovered Property Section "via telephone or walk in to inform them that an item is no longer needed"—without a tracer or court order—and the evidence "could be destroyed." (*Id.* at 17; PSAF Resp. ¶84). She testified that it was "possible" for a police officer to order the destruction of evidence even though an officer "should not" order evidence to be destroyed on his or her own. (Dckt. #512-10 at 14, 20).

It is undisputed that there was no tracer or court order that authorized the destruction of the knife recovered at the crime scene, nor is there any other documentation authorizing the destruction of or stating the purported reason for destroying the knife. (PSAF Resp. ¶85). Indeed, the City's Rule 30(b)(6) witness was unable to provide any explanation for why or how the knife was destroyed. She testified that she was unable to find anything related to the knife or its destruction, and that any paperwork relating to the knife would have been destroyed at the same time as the knife. (Dckt. #512-10 at 11, 18). Given this, a reasonable jury could infer that the knife was destroyed by the say-so of an officer and not by CPD's official methods.

Assuming that the knife was destroyed at the direction of an officer, the destruction necessarily required a "conscious effort to suppress exculpatory evidence," *United States v.*

*Fletcher*, 634 F.3d 395, 408 (7th Cir. 2011), because an officer would have needed to know of the knife's existence; affirmatively talk with the Evidence and Recovered Property Section; and request the knife's destruction. Furthermore, the destruction of the knife occurred after Smith's attorney requested an inventory of all physical property, and before Smith's attorney could gain access to the knife for additional testing. A reasonable jury could therefore infer that whichever officer ordered the destruction of the knife in this manner and under these circumstances acted in bad faith.

### c. Smith Could Not Obtain Evidence Regarding the Destroyed Knife from Any Other Sources.

Smith also presents sufficient evidence that he could not obtain physical evidence regarding the knife from any other source. *See Tabb v. Christianson*, 855 F.3d 757, 767 (7th Cir. 2017) (petitioner must show that evidence could not be obtained from a comparable source, in addition to bad faith). Smith argues that his defense attorney, who had requested a list of the physical evidence in defendants' possession, had no information about the kitchen knife at any point. Moreover, the Cook County State's Attorney's Office never mentioned a knife in their discovery response. (PSAF Resp. ¶83). ASA Woulfe, who handled Smith's criminal discovery, testified that she was not aware of any knife at the crime scene and admitted that she "apparently" did not disclose the knife or the photo of the knife to Smith's defense counsel. (*Id.* ¶86).

In sum: a reasonable jury could find that Smith was unable to obtain physical evidence regarding the knife from any other source where the prosecution failed to even disclose the existence of the knife to Smith's counsel.

### d. Smith Fails to Present Sufficient Evidence to Create a Genuine Factual Dispute as to Whether One or More Individual Officers Was Responsible for the Knife's Destruction.

Notwithstanding the knife's potential exculpatory value and evidence of bad faith, Smith's claim must still fail because he lacks evidence that any of the Officers was personally responsible for the knife's destruction.

Again, defendants presented a Rule 30(b)(6) witness, and during her deposition, she testified that her investigation did not produce any explanation for why the knife was destroyed. Plaintiff offers no evidence beyond conclusory statements that the Officers consciously destroyed the knife.

Instead, Smith presents evidence that only non-defendant officers handled the knife and sent it for testing. He does not present evidence that any of the Officers interacted with the knife or knew of its existence. Smith cannot rely on speculation to attribute the knife's destruction to one of the Officers given the number of non-defendant officers (known and unknown) who were involved with this case and who could have taken it upon themselves to order the destruction of the knife. The Court therefore grants summary judgment for the destruction of evidence claim against the Officers because "[t]here is no evidence that defendants were the ones who failed to preserve the notes or destroyed them, which is reason enough to grant summary judgment on the theory." *Bolden*, 2019 WL 3766104, at *11.[29]

---

[29] In instances where a *Youngblood* claim has been permitted, such as *Yarris v. County of Delaware*, 465 F.3d 129, 142–43 (3d Cir. 2006), allegations established that detectives "consciously acted to frustrate [plaintiff's] request for DNA testing" which was sufficient at the motion to dismiss stage to establish bad faith. In *People v. Hobley*, 696 N.E.2d 313, 331–32 (Ill. 1998), the Illinois Supreme Court permitted an evidentiary hearing where the defendant presented evidence that the State destroyed one of the two gasoline cans found at a crime scene after the criminal defendant issued a subpoena requesting exculpatory evidence related to his case. The State refused to produce evidence regarding the can's destruction without a Court order, so it was unknown who exactly destroyed it, but on a petition for post-conviction relief, this was sufficient to sustain a claim. *Id.* ("It was not up to the police to decide that only one of these cans was relevant to the case and to deny defendant access to the other one.").

e. **The Court Denies the City's Motion for Summary Judgment on Smith's Destruction of Evidence Claim Without Prejudice to its Reassertion.**

The City also moves for summary judgment on plaintiff's *Youngblood* claim, arguing the same as the Officers: that the knife was not exculpatory and was not destroyed in bad faith. (Dckt. #490). In addition, the City argues that summary judgment is appropriate because Smith is pursuing his destruction of evidence claim pursuant to *Monell*. (Dckt. #535 at 60). Smith argues that, because the knife was destroyed without a court order or police tracer, "it becomes clear that both Defendants and the City (under *Monell*) are liable for the destruction of the Knife." (Dckt. #521 at 52). Smith asserts that the City's "de facto policy" allowing evidence destruction based on the say-so of a single officer is flawed and opens the City to liability. (*Id.*). As pointed out above, the knife had potential exculpatory value, and a reasonable jury could find that it was destroyed in bad faith. Nonetheless, Smith need not prove that the City has a "de facto policy" for allowing the destruction of evidence pursuant to a single officer's instruction to establish his claims against the Officers. (*See* Dckt. #485 (bifurcating *Monell*)). To the extent that Smith is pursuing a *Monell* claim for the destruction of the knife, the Court denies the City's motion for summary judgment without prejudice subject to its reassertion after the conclusion of Smith's trial against the Officers.

ii. **Smith's Fabrication of Evidence Claims.**

Smith also claims that multiple pieces of evidence were fabricated and used against him, leading to his conviction.

Because Smith's claims arise under the Fourteenth Amendment, he must demonstrate that he "was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process. A conviction premised on fabricated evidence will be set aside if the evidence was material—that is, if there is a reasonable

likelihood the evidence affected the judgment of the jury." *Patrick v. City of Chiago*, 974 F.3d 824, 835 (7th Cir. 2020) (citing *United States v. Agurs*, 427 U.S. 97, 103 (1976)). "An evidence-fabrication claim has four elements: (1) the defendant knowingly fabricated evidence against the plaintiff, (2) the evidence was used at his criminal trial, (3) the evidence was material, and (4) the plaintiff was damaged as a result." *Brown*, 633 F.Supp.3d at 1156–57 (cleaned up).

Specifically, Smith asserts that there are five categories of fabricated evidence:

- Statements fabricated by Higgins, Solecki, Pedersen, and Rice, and that Smith then repeated in his transcribed, but unsigned, confession;

- Actions fabricated by McWeeny that Smith purportedly took when entering the crime scene;

- Evidence fabricated by Higgins and Solecki that they found a pair of underwear on the top basement stair that had the victims' blood on it and which Smith later told them that he must have dropped at the murder scene; []

- Evidence fabricated by Higgins and Solecki that they found a blue bed sheet in the basement and that Smith stood on the sheet to avoid getting blood [on] him[; and]

- Evidence fabricated by Cline that he was present at Area 2 on the day that Smith was seized and interrogated, that Cline participated in the interrogation that led to Smith's oral confession, and that Cline directed Solecki and Higgins to return to the crime scene to locate the murder weapon, a razor blade.

(Dckt. #521 at 21).

Here, plaintiff has provided evidence to raise a question of material fact and thereby survive summary judgment on two of his five theories: namely, the transcribed confession and the bloody underwear, but he lacks sufficient evidence regarding his other theories.

### a. Smith's Fabrication Theory Related to the Transcribed Confession.

It is undisputed that the entire transcribed confession was read into evidence at Smith's criminal trial. (DOSOF Resp. ¶99). The Officers argue that the confession could only be considered coerced (and not fabricated), whereas plaintiff argues that it is fabricated. The

Seventh Circuit has recognized a distinction between a coerced confession and fabricated confession. Testimony can be coerced without being fabricated insofar that coerced statements, while "deplorable" and still possible of "contribut[ing] to wrongful convictions," do not necessarily add up to a constitutional violation because "evidence collected with these kinds of suspect techniques, unlike falsified evidence and perjured testimony, may turn out to be true." *Whitlock*, 682 F.3d at 584. A fabricated or falsified confession, on the other hand, "will *never* help a jury perform its essential truth-seeking function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right to due process." *Avery v. City of Milwaukee*, 847 F.3d 433, 440 (7th Cir. 2017). In sum: whether Smith's confession was fabricated (and not simply coerced) turns on whether he has evidence to show that defendants knew his confession was *not* true.

The facts taken in the light most favorable to Smith are as follows. Pedersen and Rice entered Smith's interrogation room where he was handcuffed to the wall and repeatedly threatened him if he refused to cooperate. Smith denied all involvement in the murders, but Pedersen and Rice created a police report stating that Smith confessed to the murders by using a razor blade and then went down to wash his bloody clothes in the basement. Separately, Higgins knew that Smith was not wearing underwear because he asked Smith to disrobe to inventory his clothing. After Higgins and Solecki returned to the crime scene and came back with a pair of bloody underwear, they confronted Smith with it. They did the same with the bloody bed sheet. Even though Smith only admitted the underwear belonged to him, Higgins and Solecki used the underwear in his confession. In particular, the confession now detailed Smith dropping his bloody underwear on his way to wash his clothes and standing on the bed sheet while doing

laundry so that he would not get blood on his feet. Then Smith redressed (but without his underwear) and went up the stairs (past his underwear) and set the house on fire.

According to Cline, he was present when Smith confessed to using a razor blade to murder the victims. (PSAF Resp. ¶51; DOSOF Resp. ¶67; Dckt. #495-13 at 35–36). Also according to Cline, he sent Higgins and Solecki back to the crime scene to look for the razor blade after Smith confessed to using it. (DOSOF Resp. ¶69). Even though Cline allegedly sent officers back for the razor, two non-defendant officers had identified a knife as the murder weapon by this point. If this evidence is taken as true, which it must be at the summary judgment stage, it materially contradicts the transcribed confession and would allow a reasonable jury to find that the confession was false.

Moreover, in preparation for his transcribed confession, a purportedly religious officer (either Pedersen or Rice) coached Smith on how to answer questions. (PSAF Resp. ¶57). Officers denied Smith access to a doctor until he agreed to give a sworn statement to ASA Brogan. (*Id.*) Brogan and Smith rehearsed questions while waiting for the court reporter to arrive and Brogan told Smith, "I want you to answer just like that." (*Id.* ¶60). Smith thereafter gave the rehearsed statement in the presence of the court reporter. (*Id.* ¶61).

Drawing all inferences in his favor, Smith's version of events rises to a level sufficient to survive summary judgment against all Officers except Dwyer. Smith's argument is analogous to that presented in *Phillips v. City of Chicago*, 2018 WL 1309881, at *26. There, the plaintiffs testified that police provided them with pre-written stories and coached them to memorize the stories' details, promising leniency if they did. *Id.* Here, just as in *Phillips*, "[t]his suggests something beyond mere coercion. It suggests a calculated effort to weave a complex narrative out of whole cloth." *Id.*

Accepting Smith's version of facts, Pedersen, Rice, Higgins, Solecki, and Cline must have known the falsity of the stories contained within Smith's confession because the stories originated with the Officers, rather than with Smith. This is not a case of just coercion, where improper questioning or abuse leads to the confession of the incriminating truth. Rather, this is a situation where defendants provided Smith with the facts used to ultimately find him guilty. In this regard, the decision in *Gray v. City of Chicago* also supports plaintiff's claim. 2022 WL 910601, at *10. There, the plaintiff brought a fabrication claim relating to his confession that he committed arson by pouring gasoline from a milk jug on the scene, but defendants knew there was no evidence of gasoline on the milk jug, establishing that the plaintiff's confession had to be false. *Id.* ("If a jury were to credit Gray's testimony over the Individual Defendants', they could reasonably find that the Individual Defendants must have known by the time of trial that the confession was false."). Here, a reasonable jury could find that the Officers involved must have known the confession was false, because it was created by them. Accepting Smith's testimony and drawing inferences in his favor, the Officers concocted a story, coached Smith to repeat it, and then used it to convict him.

The Officers argue that McWeeny, Dwyer, Brownfield, and Yucaitis are entitled to summary judgment because they were not personally involved in eliciting Smith's confession and therefore not personally involved with fabricating it. (Dckt. #535 at 33). However, Smith has offered sufficient evidence to raise a material dispute about the personal involvement of McWeeny, Brownfield, and Yucaitis (but not Dwyer) in fabricating the transcribed confession such that summary judgment for these three Officers is not appropriate.[30]

---

[30] Dwyer is granted summary judgment for the reasons stated in Section III(A)(1)(i), *supra*.

### i.     Brownfield and Yucaitis

The record evidence shows that Brownfield and Yucaitis interacted with Diane before they interrogated Smith.  They took her to the crime scene to look for missing property and spent over two hours there.  When they returned to Area 2, Brownfield and Yucaitis jointly interrogated Smith after McWeeny and the unidentified officer finished physically abusing and interrogating Smith.  One of the officers (Brownfield or Yucaitis) asked Smith if he wanted to talk about committing the murders, slapped Smith on the side of his head, and told him he left a thumbprint at the scene and was the only one who could have committed the murders because the house doors were locked, he "washed his clothes," and "cleaned up down in the basement." (PSAF Resp. ¶34).  Smith denied involvement in the murders and asked to see a doctor, but the same officer refused and continued to slap him.  Smith told the officers his alibi and how he spent all day and night with Atkins, but Brownfield and Yucaitis failed to locate his alibi witnesses.

A reasonable jury could find that defendants fabricated the transcribed confession attributed to Smith and that Brownfield and Yucaitis, who spent over two hours at the crime scene and did not report seeing any bloody underwear and knew that Smith repeatedly denied involvement with the murders while being physically abused, acted with "a deliberate or reckless disregard" to Smith's constitutional rights and that the fabrication occurred with their knowledge. *See Crowder v. Lash*, 687 F.3d 996, 1005 (7th Cir. 1982).  At summary judgment, when the record is viewed as a whole, and the facts are viewed in the light most favorable to Smith, a reasonable jury could find that Brownfield and Yucaitis were personally involved in the sequence of events leading up to, and including, the fabrication of the transcribed confession attributed to Smith.

### ii. McWeeny

As described above in Section III(A)(1)(ii), McWeeny played a substantial role in Smith's arrest and interrogation. He is accused of inventing the story that resulted in Smith being sent to Area 2 violent crimes—that Smith "dove headfirst" into a puddle of blood and "wiggled" around while screaming something akin to "Mama's dead, Granma's dead!" (PSAF Resp. ¶19). He thereafter interrogated (and coached) Smith with an unidentified officer and watched the officer physically abuse Smith, only stopping him when Smith was about to lose consciousness. McWeeny then testified at Smith's criminal trial about the same sequence of events, which the Court assumes is false testimony when viewing the facts in the light most favorable to plaintiff.

Based on his false testimony and his personal involvement in Smith's physical abuse, McWeeny acted with a deliberate or reckless disregard for Smith's constitutional right to not have evidence fabricated against him. But for McWeeny's false story about Smith "wiggling" around in a puddle of blood to justify his arrest, Smith would not have been sent to Area 2. A reasonable jury could view McWeeny's actions as an "affirmative link" or "causal connection" to the fabrication of which Smith complains. *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983).

In sum: Smith provides sufficient evidence to allow a reasonable jury to infer that Pedersen, Rice, Higgins, Solecki, Cline, McWeeny, Brownfield, and Yucaitis were personally involved in the fabrication of the transcribed confession, and they are therefore not entitled to summary judgment.

**b. Smith's Fabrication Claim Related to McWeeny's Testimony Reflecting Smith's Actions at the Crime Scene.**

Smith argues that McWeeny fabricated the story of Smith "diving" into a pool of blood at the crime scene, "wiggling" around in the pool of blood, and causing Smith to be arrested and taken to Area 2.

Defendants argue that Smith cannot base a fabrication claim based on McWeeny's criminal trial testimony even if that testimony is presumed false for purposes of summary judgment. This is so because it is well-settled that there can be no fabrication claim premised solely on witness testimony. This principal dates back to *Briscoe v. LaHue* which held that a plaintiff may not pursue a §1983 damages claim against a police officer giving perjured testimony. 460 U.S. 325 (1983). Relying on legislative history, the Supreme Court held that when the Civil Rights Act was adopted, common law recognized absolute immunity for all trial witnesses and §1983 "did not abrogate the absolute immunity existing at common law," or otherwise intend to make a distinction for police officers. *Id.* at 1115–16. In *Walker v. City of Chicago*, the court granted summary judgment to the defendant officers' where the fabrication claim was premised solely on the officers' testimony. No. 21 CV 2648, 2025 WL 343471, at *3–4 (N.D.Ill. Jan. 30, 2025). In sum: "a due process claim based *solely* on trial-testimony perjury *itself* must fail as a matter of law." *Id.* (citing *Briscoe*, 460 U.S. at 335–36).

Smith describes this category of allegedly fabricated evidence as "[a]ctions fabricated by Defendant McWeeny that Smith purportedly took when entering the crime scene[.]" (Dckt. #521 at 21). But, it is undisputed that McWeeny never prepared any reports about his interaction with Smith. (PSAF Resp. ¶21). Absent any underlying tangible fabricated evidence, Smith is basing his fabrication claim on McWeeny's testimony, which fails. Plaintiff points to the Seventh Circuit's decision in *Avery v. City of Milwaukee*, but *Avery* is distinguishable because there *was*

underlying tangible evidence alleged to be fabricated in that case, unlike here. 847 F.3d 433. Moreover, *Avery* establishes that absolute immunity does not apply to trial testimony which authenticates previously fabricated police reports or other fabricated tangible evidence. *See Avery*, 847 F.3d at 441–42. Because plaintiff advances this fabrication theory without any fabricated tangible evidence, his claim is based on McWeeny's testimony alone and cannot survive summary judgment. *Walker*, 2025 WL 343471, at *3 ("the distinction between fabricated evidence versus trial testimony makes all the difference.").

### c. Smith's Fabrication Claim Related to the Bloody Underwear.

Smith alleges that defendants Higgins and Solecki fabricated their reports about him dropping his bloody underwear on the way down to the basement to wash his clothes after murdering the victims. Plaintiff argues that "[f]rom the moment they noticed [he] was not wearing underwear and then found a pair of his underwear at the scene, the entire scenario after that is false and fabricated," and more specifically, that defendants Higgins or Solecki: (1) placed the blood on the underwear they found at the crime scene (or, if blood was already present, fabricated that the blood was associated with Smith committing the murders); (2) placed the bloody underwear on the stair; and (3) inserted into the fabricated confession the false fact of Smith dropping the underwear on the way down to the basement. (Dckt. #521 at 28). Defendants argue that they are entitled to summary judgment because (1) the underwear was found at least fourteen hours prior to Higgins and Solecki going to the crime scene and was captured in a photograph taken by Fire Marshal Lumsden at around 4:30 a.m.;[31] (2) there is no

---

[31] The photo alleged to have captured the boxers fourteen hours before Higgins and Solecki went to the scene was not produced until "well after the [Torture Inquiry and Relief Commission]'s ruling and this is so notwithstanding an earlier Court Order during Smith's post-conviction proceeding requiring the State to turn over any such photographs, if they existed." (DSOF Resp. ¶108).

evidence that Smtih's underwear was planted; and (3) even if the claim survives, only Higgins and Solecki were involved so all other individual defendants should be granted summary judgment.  (Dckt. #494 at 22–24).

The only element of Smith's fabrication claim regarding the underwear that is in dispute is whether one or more of the Officers knowingly fabricated the evidence.  The remaining factors are not in dispute: in particular, the underwear was introduced at trial; the evidence was material to Smith's conviction; and Smith was damaged by the use of the evidence because he was, in fact, convicted.  But whether a defendant knowingly fabricated evidence is a "high bar to clear." *See Coleman*, 925 F.3d at 344.  The relevant inquiry is whether "the officers created evidence that they knew to be false," *Avery*, 847 F.3d at 439, and "[t]here must be persuasive evidence supporting a conclusion that the proponents of the evidence are aware that evidence is incorrect or that the evidence is offered in bad faith."  *Black v. Montgomery Cnty*, 835 F.3d 358, 372 (3d Cir. 2016).

Here, despite the Officers' contention that it is "undisputed," Smith *does* dispute that Fire Marshal Lumsden photographed the underwear.  (DOSOF Resp. ¶17).  Indeed, although it is undisputed that Lumsden took a picture of the top stair to the basement to capture an area of blood and within the picture is a piece of blue cloth, it is disputed whether the blue cloth is the recovered underwear used to inculpate Smith.  (*See* DOSOF Resp. ¶17).  When shown the photograph he took containing the blue cloth and the corresponding report, Lumsden testified that he was photographing the "bloodstain that was on the top stair" and could not identify what the blue cloth was but agreed that it appeared to be something fabric though it did *not* appear to have bloodstains on it.  (Dckt. #504-5 at 26).  He further testified that if he had observed a bloodstained pair of men's underwear, he "would have definitely put it in [his] report and I

definitely would have photographed them if I had observed them." (Dckt. #504-5 at 26). A reasonable jury could find from this testimony that Lumsden was not photographing a "bloody pair" of underwear.

The Officers next argue that it is "undisputed" that Higgins and Solecki recovered bloody underwear from the same location in Lumsden's photograph over fifteen hours after the photo was taken, but this too is disputed. (DOSOF Resp. ¶76). Smith offers evidence of numerous CPD and CFD personnel who went up and down the basement steps at the crime scene without noticing or recovering any bloody underwear. To reiterate, evidence technicians DeMarco and Bachelder, patrol officers Barrins and Hughes, detectives Gates, Leracz, Binkowski, McWeeny, McGovern, Dwyer, Brownfield, Yucaitis, Keough, and Mokry, and CFD Marshal Lumsden all were at the crime scene *before* Higgins and Solecki yet none of them noticed any bloody underwear on the basement steps. A reasonable jury could infer from this evidence that the underwear was *not* located at the top of the steps as the Officers contend. Indeed, it strains credulity to believe that all of these CPD and CFD officials failed to notice the bloody underwear as they repeatedly stepped over and around the top of the basement stairs, where the underwear was supposedly located. This establishes a genuine dispute of material fact as to whether the underwear Higgins and Solecki collected was on the basement stairs and was the same item as contained within Lumsden's photo.

The Officers next argue that only Higgins and Solecki can be liable for this theory of fabrication. On this point the Court agrees. Smith fails to point to any involvement by the other Officers with the bloody underwear and he does not argue that the other Officers knew that Higgins and Solecki were fabricating evidence. Without any personal involvement linking them to the bloody underwear, the remaining Officers cannot be held liable for its fabrication. *See*

*Estate of Perry*, 872 F.3d at 459 ("Individual liability pursuant to § 1983 'requires personal involvement in the alleged constitutional deprivation.'") (cleaned up). Summary judgment is therefore granted on this portion of Smith's fabrication claim to all Officers except Higgins and Solecki.

### d. Smith's Fabrication Claim Related to the Bloody Blue Bed sheet.

Smith also alleges that Higgins and Solecki fabricated evidence surrounding their recovery of the bloody blue bed sheet at the crime scene along with the story that Smith stood on the bed sheet while doing laundry to avoid getting blood on him in the basement after murdering the victims. The Officers argue that they are entitled to summary judgment on this theory of fabrication because there is photographic evidence depicting the blue bed sheet a few feet away from the laundry machines in the crime scene basement taken between 4:30 a.m. and 7:00 a.m. (DOSOF Resp. ¶¶23, 70; Dckt. #494 at 494).[32] The Officers further assert that Higgins and Solecki collected the blue sheet when they returned to the scene later that day and inventoried it. (DOSOF Resp. ¶77).

The Officers are entitled to summary judgment on this claim because Smith has seemingly abandoned it by failing to offer evidence to satisfy any of the required elements to support it. Most importantly, the bed sheet was not used at trial against Smith and therefore cannot support a fabrication claim. *See Brown*, 633 F.Supp.3d at 1156–57 (fabrication claim requires evidence to be used against criminal defendant at trial); (*see also* PSAF Resp. ¶133 (bed sheet not discussed at criminal trial due to defense counsel's objection)); *Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (failure to delineate claim in opposition brief to motion

---

[32] Plaintiff disputes DOSOF ¶70 to the extent it describes the bed sheet as being within a few feet from the laundry machine but does not cite any evidence in support of this dispute, so the fact is deemed admitted.

for summary judgment leads to abandonment); *Laborers' Int'l Union of N. Am. V. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (arguments not developed in opposition to summary judgment are waived); *Jones v. LaPorte Cnty. Sheriff's Dept.*, No. 13 CV 1330, 2016 WL 1254367, at *22 (N.D.Ind. Mar. 29, 2016) (same).

**e. Smith's Fabrication Claim Related to Cline's Trial Testimony.**

Finally, Smith advances a fabrication claim relating to "evidence fabricated by Defendant Cline that he was present at Area 2 on the day that Smith was seized and interrogated," including that Cline participated in Smith's interrogation and directed Higgins and Solecki to return to the crime scene to locate the murder weapon. (Dckt. #521 at 21). The Officers argue that Cline is absolutely immune for his trial testimony. For the same reasons outlined above regarding McWeeny's testimony, the Court agrees.

Smith argues that Cline's trial testimony was entirely perjurious because he was not in Area 2 and he took the day off work. Cline prepared no reports and there is no mention of Cline in any of the reports with Smith's confessions. (Dckt. #521 at 26–27) ("In fact, there is not any mention of Cline in any police report from that entire day, by any person."). The Officers dispute Cline's presence (or rather the lack thereof), asserting Cline testified at his deposition that, as the Area 2 Violent Crimes Commander, "he was called into work despite it being his day off because the crime involved the murder of two senior citizens in their home and a fire was set to cover it up, he went to the scene [and] he stayed involved throughout the day." (Dckt. #535 at 27 (citing DOSOF ¶¶26, 67–70)).

Smith does not point to any piece of fabricated evidence beyond Cline's trial testimony, and it is undisputed that Cline did not create any reports and is not mentioned on any reports. (PSAF Resp. ¶103). While Cline's presence is a disputed fact, Smith's fabrication claim related

to Cline's testimony cannot survive under either party's version of facts. If Cline was not present at Area 2, as alleged by Smith, then the fabrication theory relies solely on Cline's testimony. If Cline was present and participated in Smith's interrogation and confession, it is undisputed that Cline did not make any police reports, and the fabrication theory must still rely solely on Cline's testimony. For the same reasons identified above regarding McWeeny's testimony, *see supra Section* III(A)(4)(ii)(b), Cline is also immune. *Briscoe*, 460 U.S. at 335–36 (due process claim based solely on perjured trial testimony fails as a matter of law). Summary judgment is thus appropriate for Cline on this claim.

### iii. Smith's Brady Claims.

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), suppressing evidence violates a defendant's due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87; *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 600 (7th Cir. 2019). Police officers have an affirmative duty to disclose all potentially exculpatory evidence, including impeachment evidence. *Ruiz-Cortez*, 931 F.3d at 600–01; *Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir. 2019). Smith must prove that (1) the evidence in question was favorable to him; (2) the police suppressed the evidence; and (3) that prejudice ensued because the suppressed evidence was material. *Anderson*, 932 F.3d at 504. For evidence to be "material" there must have been a "reasonable probability" that the "result would have been different had the suppressed evidence been put before the jury." *Id.* at 505, *quoting Goudy*, 922 F.3d at 842 (cleaned up); *Ruiz-Cortez*, 931 F.3d at 602.

Smith asserts three *Brady* claims: one violation relates to the suppression of evidence related to the "systematic torture of persons in custody at Area 2;" and the second and third violations relate to suppressing the "fabrication of, tampering with, and/or planting of" the

bloody underwear and bloody blue bed sheet recovered at the crime scene. (Dckt. #521 at 37–38).

### a. Smith's *Brady* Claim Related to Historical Abuse at Area 2.

The Court begins with Smith's *Brady* violation based on the Officers' failure to disclose evidence of systemic physical and psychological abuse in Area 2. (Dckt. #521 at 38–45). Smith argues that systemic abuse and torture of other individuals was "(1) known to Defendants, (2) not known to Smith, (3) could have been used to impeach Defendants, and (4) was unavailable for impeachment because Defendants suppressed it." (Dckt. #521 at 42). The Officers argue that plaintiff fails to identify evidence that defendants were required to disclose pursuant to *Brady* and, in the alternative, they are protected by qualified immunity. (Dckt. #494 at 40–45).

In an attempt to pin down what evidence was withheld, the Officers argue that Smith provided them with a "156-item exhibit list that included, a 'List of 118 Individuals Tortured at Area 2 or 3' (which lacks an author and is of unknown origin); testimony in various criminal proceedings; City Council hearing transcripts, depositions, the July 19, 2006 Egan-Boyle Special Prosecutor's Grand Jury Report and the April 24, 2007 Shadow Report." (Dckt. #494 at 40 (citing Dckt. ##65-2, 65-3). The exhibit list was provided when plaintiff moved for leave to file a motion for partial summary judgment on his *Monell* claim (which has since been bifurcated).

The Officers correctly point out that many of the events identified on the list *post-date* Smith's 1990 criminal trial and therefore are not relevant to a *Brady* analysis. *See Steidle v. Fermon*, 494 F.3d 623, 625 (7th Cir. 2007) (*Brady* establishes a criminal defendant's right to know about exculpatory evidence "when that exculpatory evidence was known to the state at the time of the original trial."). Thus, Smith cannot pursue a *Brady* claim for the Officers' failure to

disclose documents and compilations of evidence that did not exist at the time of Smith's August 1990 criminal trial. (*See* Dckt. #65-2 (list of 144 documents dated after Smith's criminal trial)).

In response, Smith does not dispute that many of the listed items occurred after his trial. Instead, he asserts that some of the documents are dated prior to 1990 and "[a]s long as Smith can point this Court to a single document that Defendants should have given to the prosecutor, but which they did not, Smith's *Brady* claim survives." (Dckt. #521 at 43). In particular, Smith provides the following list of documents which pre-date his 1990 criminal trial and which should have been provided to him:

- Dr. John Raba's February 17, 1982 Letter to CPD Superintendent Richard Breczek that Andrew Wilson had been brutalized at Area 2 and had burn injuries consistent with his reports of being pressed against a radiator;

- Dr. John Raba's November 14, 1983 Letter to OPS requesting they investigate Gregory Banks's allegations of torture and noting that Banks had injuries consistent with his torture claim;

- Andrew Wilson's December 15, 1988 Deposition in *Wilson v. City of Chicago*;

- Andrew Wilson's February 27, 1989 Deposition in *Wilson v. City of Chicago*;

- Donald White's July 14, 1989 Deposition in *Wilson v. City of Chicago* (regarding his torture at Area 2);

- The numerous complaints OPS received throughout the 1980s that Area 2 detectives were abusing and torturing suspects at Area 2, *see Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir. 1993) (OPS 'received many complaints from members of the black community [during the manhunt] that officers in "Area 2 violent crimes" . . . were abusing suspects; such abuse was in fact common at Area 2 . . . but [OPS] had done nothing *except lose a lot of the complaints*')[];

- The July 1989 jury verdict finding a torture pattern at Area 2 in *Wilson v. City of Chicago*;

- The August-September 1989 Police Board Proceedings regarding Wilson's torture by Burge and Yucaitis; and

- The September 1989 City Council hearings about police torture.

(Dckt. #521 at 43–44).

However, it is well-settled that "to be liable on a *Brady* claim, [the defendant] first had to have known of and had access to information that was not readily available to [the plaintiff] through the exercise of reasonable diligence." *Orange v. Burge*, No. 04 CV 168, 2008 WL 4425427, at *9 (N.D.Ill. Sept. 25, 2008); *Johnson v. Guevara*, No. 20 cv 4156, 2023 WL 4864313, at *5 (N.D.Ill. July 31, 2023), *quoting Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008) ("Suppression of evidence results when 'the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.'"); *see also Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001) (*Brady* claim requires law enforcement to be aware of the evidence prior to the alleged suppression).

Smith does not assert that any Officer knew about any of the listed documents. Smith also fails to provide the documents to the Court. Nonetheless, the Court can make a reasonable inference that Yucaitis knew or should have known about the 1989 *Wilson v. City of Chicago* verdict (because he was a named defendant) and the August-September 1989 Police Board Proceedings regarding Wilson's torture because he was personally named as having tortured Wilson. It is possible that additional Officers knew of certain events, but Smith fails to provide evidence establishing such knowledge.

Even so, Smith's *Brady* violation fails because he offers no evidence that Yucaitis (or any other Officer) suppressed the evidence. The *Wilson v. City of Chicago* jury verdict was widely publicized and available to Smith through the exercise of reasonable diligence. Therefore, it was not "suppressed." *See e.g.*, *Orange*, 2008 WL 4425427, at *9 (no *Brady* claim where criminal defendant had access to Goldstein Report); *Tillman v. Burge*, 813 F.Supp.2d 946, 968 (N.D.Ill. 2011) ("Plaintiff fail[ed] to allege with any specificity what that information might have been

79

[or] whether it differed from information that had already trickled out into the public,").  The Police Board Proceedings were also publicly available and so Yucaitis did not (and, indeed, would not have been able to) "suppress" them.

Smith argues that there is "overwhelming legal precedent" requiring disclosure of evidence related to Area 2's pattern and practice of torture and abuse, (Dckt. #521 at 38), but nothing in his cited cases negates the requirement that he must show that one or more of the Officers knew of the suppressed evidence.  Only one of the cases cited by Smith was decided at the summary judgment stage, and it did not involve a *Brady* claim related to the pattern and practice of torture and abuse in Area 2, but instead concerned a defendant's known relationship with a criminal informant.  *See Ruiz-Cortez v. City of Chicago*, No. 11 CV 1420, 2016 WL 6270768, at *16 (N.D.Ill. Oct. 26, 2016), *aff'd*, 931 F.3d 592 (7th Cir. 2019).  The remainder of the cases upon which plaintiff relies occurred at the motion to dismiss stage and thus did not require the production of evidence sufficient to raise an issue of fact as to the defendants' knowledge.

For example, *Patterson* found that "evidence of widespread torture and malfeasance by the Area 2 defendants qualifies as exculpatory under *Brady*," and that allegations regarding Devine's knowing suppression of this evidence from prosecutors, judges, and defense counsel while Patterson's judicial proceedings were ongoing amounts to a violation of Patterson's due process rights.  *Patterson v. Burge*, 328 F.Supp.2d 878, 894 (N.D.Ill. 2004).  Similarly, *Cannon v. Burge* included allegations that a particular OPS report was secretly provided to the defendants before it was made publicly available, supporting the fact that the defendants did have knowledge of the suppressed evidence.  2006 WL 273544, at *4, *13; *see also Wilson*, 667 F.Supp.3d at 863 (*Brady* claim permitted where defendant learned of OPS findings in 1990

80

despite the findings not becoming public until 1992). By contrast, in *Tillman v. Burge*, the Court dismissed a *Brady* claim where the plaintiff failed to allege specific information that was suppressed or whether a defendant had knowledge of any such information. 813 F.Supp.2d at 967–68. *Tillman* also recognized that public hearings and reports cannot be "suppressed" by virtue of their publicity. *Id.* at 968.

In sum: with respect to the evidence where the Court can infer knowledge on behalf of one or more of the Officers, Smith fails to provide evidence that the Officers suppressed that evidence because it was all publicly available. Moreover, Smith does not connect any Officer to any of the allegedly suppressed evidence that was not publicly available. *See Orange*, 2008 WL 4425427, at *9 (no *Brady* claim where defendant did not know about allegedly suppressed evidence until it was publicized through the media). Because Smith has failed to present sufficient evidence to raise a disputed question of fact, the Court need not address the Officers' alternative argument that they are protected by qualified immunity.

**b. Smith's *Brady* Claim Related to the Bloody Underwear.**

Smith also asserts a *Brady* violation related to the "fabrication of, tampering with, and/or planting of the purportedly bloody underwear." (Dckt. #521 at 37). As described above in relation to Smith's claim that the Officers fabricated the underwear, Smith argues that Higgins and Solecki did not find the bloody underwear on the top basement step and falsely claimed that the blood on the underwear, if any, was associated with Smith killing the victims. The Officers dispute the fabrication of the underwear claim and therefore assert that no *Brady* materials could exist which relate to its fabrication. (Dckt. #494 at 45–46). Further, the Officers argue that, even if a claim survives, *Brady* does not require officers to create exculpatory evidence nor disclose the circumstances of their investigations. (*Id.*). Once more, to succeed on his *Brady* claim,

Smith must establish that (1) the evidence in question was favorable to him; (2) the police suppressed the evidence; and (3) that prejudice ensued because the suppressed evidence was material. *Anderson*, 932 F.3d at 504.

Plaintiff does not address any of the *Brady* factors for this claim. He has therefore waived any opposition to the Officers' arguments for summary judgment. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (failure to respond to argument results in waiver); *Hodges v. Archer Daniels Midland Co.*, 474 F.Supp.3d 956, 967 (C.D.Ill. 2020) ("Plaintiff does not respond at all to Defendants' arguments . . . and, therefore, has waived any opposition to them and concedes the arguments."). Furthermore, Smith does not allege that the underwear, and the evidence related to the underwear, were suppressed. To the extent plaintiff is arguing that defendants had a duty to create evidence consistent with plaintiff's theory of fabrication, such a claim must fail. *See Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015) (failure to disclose alleged fabrication of evidence did not amount to *Brady* violation); *Johnson*, 2025 WL 903813, at *27 (same); *Ruiz-Cortez*, 2016 WL 6270768, at *12 (fabrication of false evidence cannot sustain *Brady* claim). Summary judgment is therefore appropriate on Smith's *Brady* claim related to the bloody underwear.

### c. Smith's *Brady* Claim Related to the Bloody Blue Bed Sheet.

Smith's final theory of a *Brady* violation likewise lacks evidentiary support. Smith argues that defendants suppressed "the fabrication of, tampering with, and/or planting of, and later concealment of, the purportedly bloody blue bed sheet recovered at the scene." (Dckt. #521 at 37). The Officers argue that this theory must fail for the same reason as Smith's allegations related to the bloody underwear: they claim the bloody bed sheet was not fabricated so there is no evidence related to its fabrication which could be disclosed. (Dckt. #494 at 45–46). In the

82

alternative, they argue that officers do not have an obligation to disclose the circumstances of their investigations. (*Id.*).

Similar to the bloody underwear, Smith does not present any evidence to satisfy the *Brady* requirements: that the evidence was favorable to Smith, the evidence was suppressed, and that prejudice ensued. *Anderson*, 932 F.3d at 504. Smith's failure to address this theory results in waiver. *Bonte*, 624 F.3d at 466; *Palmer*, 327 F.3d at 597. Furthermore, the Court is unsure how evidence related to the bloody sheet—which was *not* used at trial—could be favorable to Smith. The Court's lack of clarity on this claim is compounded by Smith's failure to flesh out his fabrication claim related to the bloody bed sheet. Without knowing what the Officers failed to disclose, how the suppressed evidence was favorable to Smith, and how it impacted his criminal trial, Smith's *Brady* theory related to the bloody sheet cannot survive summary judgment.

**B.      Smith's Conspiracy Claim Under 42 U.S.C. §1985(3).**

Turning to Smith's remaining claims, those not arising from §1983, the Court begins with his final conspiracy claim. A §1985(3) conspiracy provides a cause of action where the alleged conspiracy deprives the plaintiff of "equal protection of the laws" or "equal privileges and immunities under the laws." *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 827 (7th Cir. 2022). To succeed on a §1985(3) clam, Smith must prove:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Id.*, quoting *Un. Bhd. Of Carpenters v. Scott*, 463 U.S. 825, 828–29 (1983). Also required is "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Bowman v. City of Franklin*, 980 F.2d 1104–1109 (7th Cir. 1992).

The Officers argue that Smith's §1985(3) claim cannot survive because he "has pled no equal protection claim, making the §1985[(3) conspiracy] claim inapplicable." (Dckt. #494 at 52). Smith responds that the only difference between the two federal conspiracy claims is that the §1985 claim has a racial animus and equal protection component and that he pled a §1985 racial animus claim in his operative complaint. (Dckt. #521 at 75). Plaintiff points to paragraphs 185 through 188 of his second amended complaint:

> 185. The conspiracy was racially motivated.

> 186. The Individual Defendants willfully conspired with racial animus toward Smith and the many other African American Area 2 torture victims identified above.

> 187. The Individual Defendants willfully conspired with malice and/or reckless indifference to the rights of Smith.

> 188. Through their conspiracy, the Individual Defendants deprived Robert Smith of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

(Dckt. #82 ¶¶185–88). Smith particularly relies on paragraph 188 to argue that he "clearly pleads the equal protection component [] in his Complaint." (Dckt. #521 at 75).

In order to state a claim under §1985(3) (even at the motion to dismiss stage), a plaintiff must set forth facts "suggesting a racial or other invidiously discriminatory animus." *Brisco*, 663 F.2d at 723. Here, Smith does not bring forth any evidence in support of his racial animus claim and "[m]ere conjecture that there has been a conspiracy is not enough." *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1208 (7th Cir. 1980). In addition, Smith cannot rely on his complaint at this stage of the proceedings. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)

("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.").  Regardless of whether the allegations are true, Smith cannot rely on them to survive summary judgment. The Court thus grants summary judgment to the Officers on Smith's §1985(3) conspiracy claim.

## C.     Smith's Failure to Intervene Claim Under 42 U.S.C. §1986.

The Court grants summary judgment on Smith's §1986 claim because he fails to plead a successful §1985(3) claim as required.

Importantly, "[l]iability under Section 1986 is derivative of Section 1985(3) liability; without a violation of Section 1985(3), there can be no violation of Section 1986." *Kurr v. Vill of Buffalo Grove*, 912 F.2d 467 (7th Cir. 1990) (citing *Grimes v. Smith*, 776 F.2d 1359, 1363 (7th Cir. 1985) (same)); *see also Mian v. Donaldson, Lufkin & Jenrett Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) ("[A] §1986 claim must be predicated upon a valid §1985 claim."); *Ulmer v. Avila*, No. 15 CV 3659, 2016 WL 3671449, at *13 (N.D.Ill. July 11, 2016) ("a finding of § 1985 conspiracy is a necessary prerequisite to a finding of liability under §1986").  The Court therefore grants summary judgment on this claim.

## D.     Smith's Malicious Prosecution Claim.

Smith brings an Illinois state law malicious prosecution claim against all Officers, alleging they "initiated a malicious prosecution without probable cause against Robert Smith, and continued that prosecution without probable cause."  (Dckt. #82 ¶209).  The Officers argue that they are entitled to summary judgment on this claim because there was "sufficient probable cause to charge Smith with murder based on evidence developed unrelated to his confession," and because certain Officers were not personally involved in commencing or continuing Smith's criminal proceedings.  (Dckt. #494 at 47–52).  To succeed on an Illinois malicious prosecution

claim, Smith must establish five elements, "(1) commencement or continuation of an original proceeding; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Cairel*, 821 F.3d at 834 (citing *Sang Ken Kim v. City of Chicago*, 858 N.E.2d 569, 574 (Ill.App.Ct. 2006)).

The Court begins with probable cause because "[l]ack of probable cause for instituting the original proceedings is an indispensable element of an action for malicious prosecution," *Beaman*, 183 N.E.3d at 789, and "the existence of probable cause is a complete defense to a malicious prosecution claim," *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001). Probable cause is defined as "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 265 (Ill.App.Ct. 2016). Probable cause is not a high bar, *Barnett v. City of Chicago*, No. 18 CV 7946, 2025 WL 1122049, at *3 (7th Cir. April 16, 2025), and is an objective inquiry based on the time the criminal complaint was filed, *Brown*, 709 F.Supp.3d at 569.

Although the Officers may not rely on fabricated or tainted evidence to support probable cause, probable cause may still be found if the *untainted* evidence is sufficient to support probable cause when looking at the totality of the circumstances. *Id.* at 570 ("Police cannot rely on fabricated evidence or evidence knowingly tricked out of a witness to support probable cause."); *see also Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011). So long as the facts sufficient to create probable cause are undisputed, probable cause is a question of law. *Kies v. City of Aurora*, 156 F.Supp.2d 970, 981 (N.D.Ill. 2001) (citing *Potts v. City of Lafayette*, 121 F.3d 1106, 1112 (7th Cir. 1997)).

Here, the Officers point to a long list of facts to support their argument regarding the existence of probable cause. The Court finds that the list falls into three different pools of evidence: disputed evidence, undisputed evidence, and evidence that is deemed admitted for purposes of summary judgment because Smith disputes the evidence without any citation to any countervailing evidence in the record to support his dispute. Because probable cause at the summary judgment stage cannot rest on disputed evidence, the Court only looks to the latter two groupings of facts, which include the following:

- It appeared, based upon the open doors of the washer and dryer (which was not typical of the victims), blood on the washer and detergent box, paper money and a coin in the wash tub, bloody towels and sheets along with soapy bloody water on the floor surrounding the laundry area, that the offender used the washing machine;

- Smith's clothes were wet when Sally saw him around 3:00 a.m.;

- Smith regularly carried a razor blade in his wallet in 1987 when the murders were committed, and the victims' throats were slashed by a sharp object.

(Dckt. #494 at 49).

Smith has no comment on the above three undisputed facts. Smith does, however, quibble with the following undisputed facts. Smith acknowledges that it is undisputed that he was not wearing underwear while at Area 2 and that a pair of his underwear was at the crime scene. But Smith asserts that: not wearing underwear "hardly makes [him] a murderer," (Dckt. #521 at 69), and that his "explanation at the time was that he had [a] rash in his groin, which Defendants could easily have confirmed with his wife, had Defendants bothered," (*id.*). It is also undisputed that Diane told detectives that she suspected Smith made unauthorized withdrawals from her mother's (one of the victim's) bank account, that Smith was unemployed and using heroin and alcohol at the time, and that the only thing of value that appeared missing from the house was a gun kept under one of the victims' mattresses. (Dckt. #521 at 68–69). Smith asserts

that his undisputed unemployment and heroin/alcohol use and possible unauthorized withdrawals "standing alone, do not translate to probable cause for murder," and the additional fact that only a gun was missing would suggest that the perpetrator did not have a financial motive because more items were not missing. (Dckt. #521 at 69–70). Smith also does not dispute that the crime scene was bloody, but states that would be a fact regardless of who committed the murders. (Dckt. #521 at 69). Smith takes issue with how these undisputed facts are viewed insofar they establish he had a financial motive to commit the murders.

Smith's attack takes too narrow of a view at the probable cause inquiry. While each particular fact in isolation might not point to Smith's guilt, probable cause is a "holistic, commonsense inquiry," *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010), and Smith's arguments to undermine probable cause "would be proper arguments to pursue on cross-examination and in closing arguments at trial, but [ ] do not preclude reliance by the officers in establishing probable cause," *Moorer v. City of Chicago*, 92 F.4th 715, 722 (7th Cir. 2024). In addition, police need not "draw inferences in favor of the suspects," *Bridewell v. Eberle*, 730 F.3d 672, 676 (7th Cir. 2013), and the Seventh Circuit has "often cautioned that the mere existence of innocent explanations does not necessarily negate probable cause." *Greenpoint Tactical Income Fund LLC v. Pettigrew*, 38 F.4th 555, 569 (7th Cir. 2022) (cleaned up).

While the above undisputed facts would likely be sufficient for probable cause, the addition of the second group of facts (those which have been deemed admitted because Smith has disputed them without any supporting evidence) further supports defendants' argument that they had probable cause.

- The crime did not appear to be the act of a random stranger.[33]  There was no sign of a forced entry and the victims were careful to keep the doors locked. These facts suggested the victims knew their assailant and let him in or he had his own keys.  Smith was someone the victims would have opened the door to and he admitted having his own key at times.

- Smith and Diane gave differing accounts for why they claimed to have just shown up to the murder scene well before dawn: Diane said it was she who wanted to drive by; Smith told Yucaitis and Brownfield that it was his idea; and yet Paul Ward, on scene before Smith and Diane, told police at the scene his niece (Diane) told him that police called her and told her about her mother.

- Smith refused to give a polygraph, a red-flag to investigators, while Diane gave a polygraph and her brother offered to give one.

- Smith had blood on the soles of his feet.

- Smith told Diane at around 3:30 a.m. when he called her and told her to pick him up later at Sally's home (just ten minutes after the fire was reported) that he was "counting money and cleaning up."

- Smith's alibi witnesses—Sally Payne and Mike Santee—who were interviewed twice, could not account for Smith's whereabouts between around midnight and 3:00 a.m., suggesting at a minimum, Smith was lying to police.

The Court finds as a matter of law that the above evidence shows that the Officers had probable cause even in the absence of Smith's confession and the allegedly fabricated evidence. While Smith may assert disagreements about the relevant facts, disagreements do not "preclude a finding of probable cause 'so long as the finding survives after adopting the plaintiff's version of the disputed facts for which there is some support in the record.'"  *Logan*, 246 F.3d at 926, *quoting Cervantes v. Jones*, 188 F.3d 805, 810–11 (7th Cir. 1999).  The cumulative effect of these facts would suffice, even if some are insufficient on their own.  *Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006) (when encountering inconsistent stories, police often "lack the tools to determine immediately where the truth lies.").  Because probable cause existed at the

---

[33]  Smith agreed as such during his deposition but disputes that this should be considered at summary judgment because there was no foundation for the question.

time charges were filed against Smith, the Officers are entitled to summary judgment on Smith's

Illinois malicious prosecution claim.

### E. Smith's Intentional Infliction of Emotional Distress Claim.

Finally, Smith brings an intentional infliction of emotional distress ("IIED") claim under

Illinois law.  To succeed in holding defendants liable for IIED, Smith is required to show "[f]irst,

the conduct involved must be truly extreme and outrageous[; s]econd, the actor must either

intend that his conduct inflict severe emotional distress, or know that there is at least a high

probability that his conduct will cause severe emotional distress[; and t]hird, the conduct must in

fact cause severe emotional distress." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003).

"Extreme and outrageous" conduct does not include "mere insults, indignities, threats,

annoyances, petty oppressions, or other trivialities.  Instead, the conduct must go beyond all

bounds of decency and be considered intolerable in a civilized community." *Honaker v. Smith*,

256 F.3d 477, 490 (7th Cir. 2001).  The plaintiff must also prove causation. *McDade v. Stacker*,

106 Fed.Appx. 471, 476 (7th Cir. 2004).

The Officers argue that Smith's IIED claim is derivative and can only proceed if the

underlying constitutional or state law claim proceeds.  (Dckt. #494 at 55–56).  Smith argues that

the Officers fail to address the merits of his IIED claim, resulting in waiver.  (Dckt. #521 at 71).

Here, drawing inferences in Smith's favor, summary judgment is not appropriate because the

claims for coerced confession and certain theories of fabrication may proceed.  Relying on the

same factual allegations, a jury could view the conduct and conclude that it caused Smith severe

emotional distress. *Brown*, 633 F.Supp.3d at 1172 (allowing IIED claim to proceed where facts

could lead fact finders to reasonably conclude that defendant acted in extreme and outrageous

manner by fabricating statements).  Where Smith's substantive due process claim relating to his

90

coerced confession looks to whether interrogation tactics are considered "conscious-shocking," the same analysis will be key for Smith's IIED claim in determining whether the Officers' conduct was "extreme and outrageous." *See Cairel*, 821 F.3d at 833. Summary judgment is therefore not proper on this claim, and it may proceed against all the same Officers who will proceed to trial on the coerced confession claim (i.e., all Officers except Dwyer).

**F.    Summary Judgment on Smith's Respondeat Superior and Indemnification Claims Against the City of Chicago Is Unwarranted.**

The City additionally seeks summary judgment on Smith's *respondeat superior* and indemnification claims where the Officers are not liable. (Dckt. #490 at 15). The City argues that any claim where the individual Officers are not liable can likewise not serve as the basis for municipal liability under *Monell*. (*Id.* (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). "To the extent plaintiff does not prove that the Defendant Officers caused him to suffer a particular constitutional injury, he cannot succeed against the City on any *Monell* claim arising out of that alleged violation. Similarly, for any state law claims that are dismissed, plaintiff cannot succeed on his corresponding vicarious liability claims." (Dckt. #490 at 16). Not necessarily.

First, several of Smith's claims survive the Officers' summary judgment motion so the City may still be on the hook for *respondeat superior* and indemnification. 745 ILCS 10/9-102 ("A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable . . . ."). If a jury could reasonably find the Officers culpable, vicarious liability may follow. *Cole v. Meeks*, No. 15 CV 1292, 2018 WL 4682297, at *9 (C.D.Ill. Sept. 28, 2018) (Because claims against officers "will proceed toward trial, Plaintiff's indemnification and *respondeat superior* claims against the City

of Peoria will move forward as well.") (cleaned up); *see also Anderson*, 932 F.3d at 513 (grant of summary judgment on all claims was premature where there was potential liability on claims against individual officers).

Second, the Court finds it premature at this point to dictate how Smith must try his *Monell* case when the time comes. In *Swanigan v. City of Chicago*, the Seventh Circuit reversed a district court's decision to dismiss plaintiff's *Monell* theories where the plaintiff could still amend the theories to seek equitable relief. 775 F.3d 953, 963 (7th Cir. 2015). Currently, Smith is not pursuing equitable relief. (Dckt. #82). But in the event that Smith wishes to pursue equitable relief on his *Monell* theories, "district courts cannot prevent plaintiffs from pursuing potentially viable *Monell* claims that seek additional equitable relief or are distinct from the claims against individual defendants." *Swanigan*, 775 F.3d at 963.

The Court therefore denies the City's motion for summary judgment without prejudice. If the parties are able to stipulate to an agreement concerning the City's indemnification of Smith's claims, then the Court can revisit the issue. *See Valdez v. Lowry*, No. 18 CV 5434, 2021 WL 5769533, at *14–15 (N.D.Ill. Dec. 5, 2021) (striking Village of Brookfield from case caption where the remaining substantive claims against it were dismissed).

## CONCLUSION

The Court grants in part and denies in part the Officers' motion for summary judgment, (Dckt. #492), as follows. Summary judgment is denied as to: (1) Smith's fabrication of evidence claim against Pedersen, Rice, Higgins, Solecki, Cline, McWeeny, Brownfield, and Yucaitis based on the transcribed confession; (2) Smith's fabrication of evidence claim against Higgins and Solecki based on the bloody underwear; (3) Smith's coerced confession against all Officers (except for Dwyer); (4) Smith's §1983 and Illinois state law conspiracy claims against all

Officers (except for Dwyer); (5) Smith's §1983 failure to intervene claim against all Officers (except for Dwyer); and (6) Smith's intentional infliction of emotional distress claim against all Officers (except for Dwyer). Summary judgment is granted as to: (1) all of Smith's claims against Dwyer; (2) the remaining aspects of Smith's fabrication of evidence claim; (3) Smith's destruction of evidence claim; (4) Smith's *Brady* claim; (5) Smith's §1985(3) conspiracy claim; (6) Smith's §1986 failure to intervene claim; and (7) Smith's malicious prosecution claim. Finally, the Court denies the City's motion for summary judgment, (Dckt. #489), without prejudice to its renewal after the trial against the Officers concludes.

**Date: June 5, 2025**

**Jeffrey I. Cummings**
**United States District Court Judge**