## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Robert Smith, Jr., | ) | |
| Plaintiff, | ) | Case No.  21 C 1159 |
| v. | ) | |
| | ) | Judge Jeffrey I. Cummings |
| The City of Chicago, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF ROBERT SMITH'S TRIAL BRIEF

Since this case was filed in 2021, Plaintiff Robert Smith has thoroughly detailed his theories, most recently in the materials submitted in opposition to Defendants' Motion for Summary Judgment, Dkt.521.  Therefore, in this Trial Brief, Smith offers a brief summary of the facts and legal theories, and instead, focuses on two key evidentiary issues central to the parties' dispute: (1) the relevance and admissibility of numerous admissions by Defendant City of Chicago about the systemic torture and abuse that the Officer Defendants and other Area 2 Detectives engaged in from approximately 1972 to 1990; and (2) Defendants' attempt to convert this case from a trial about their alleged violations of Smith's civil rights to a "retrial" of Smith for the murders of his in-laws.

Regarding the first issue, Defendants are attempting to deny what the City has acknowledged for years: that Area 2 Detectives, including many of the Defendants in this case, systematically beat and tortured suspects, coerced confessions, fabricated evidence, and suppressed exculpatory evidence. Defendants are asking this Court to disregard the well-documented history of torture involving over 120 African American suspects at Area 2. As detailed in Section I, the factual findings from these official investigations are admissible evidence in this case.

Regarding the second issue, Defendants are attempting to shift the focus of this case from their conduct to a criminal retrial of two murders for which Smith has been fully exonerated and declared innocent.  As detailed in Section II below, Defendants seek to enlist the Court's assistance

in barring all evidence that favors Smith on this matter.  Respectfully, the Court should decline Defendants' request.

## The Material Facts

In the early morning hours of September 19, 1987, Diane Smith picked up her husband, Robert, at the home of his friend, Sally Payne.  Afterwards, as was her habit every time she was in the city, Diane drove past her mother and grandmother's home at 325 West 107th Street in the Roseland neighborhood of Chicago.  As Diane and Robert pulled up this time, however, they immediately knew that something was terribly wrong, as police and fire vehicles surrounded the home. Diane and Robert raced towards the house and Diane identified herself as the homeowner's daughter and granddaughter and Robert as her husband. A police Detective told them only that "a tragedy had occurred," that they would have to wait outside, and that someone would come speak with them shortly.  They were not told that their loved ones had been murdered by having their throats slit.

Thirty minutes later, impatient on his wife's behalf, Smith went back into the house through the back door, headed towards a group of officers, and asked what had happened to his mother-in-law and grandmother-in-law.  He was immediately accosted by Defendant Detective Daniel McWeeny who screamed that he had told Smith to wait outside.  McWeeny grabbed both of Smith's arms to push him out of the house.  Smith resisted McWeeny's pushes and attempted to swat McWeeny's hands off him.  At this point, McWeeny and other detectives and officers grabbed Smith and threw him to the ground, kicking him in the process.  One officer had his knee on Smith's neck, while the other officers handcuffed Smith and pulled him out of the bloody-water that was on the floor from a combination of the victims' blood and the fire department's spraying of

water to put out the fire that the perpetrator had started. McWeeny then arranged for Smith to be carted off to the Chicago's "House of Screams."[1]

At this time, there was not a shred of evidence that Smith had anything to do with the murders. There was (and still is) no motive; there was no murder weapon; there was no eyewitness; there was (and still is) no physical evidence tying Smith to the murders or the fire (such as burn marks on Smith's clothing or body or a smoke smell on his clothes or blood all over his clothes, other than from where they threw him to the ground). The Defendants did not tell Smith why he was being seized and detained, nor did they fill out an arrest report to explain why. Instead, they concocted an easily-debunked lie, after the fact, that upon arriving at the house, Robert ran into the house, sped past McWeeny, "dove into a pool of blood and rolled around in it for 10-15 seconds," while screaming "Mama's dead; grandma's dead." This was the beginning of the series of fabrications, physical torture, and psychological abuse that Defendants set into motion to frame Smith and "clear and close" the case without investigation.

The remainder is well-known to the Court. Defendants chained Smith to the wall of an interrogation room for 19 hours, physically and psychologically tortured him, took advantage of his

---

[1] Defendants will object to the use of the moniker, "House of Screams," which is the title of a 1990 John Conroy article about Area 2 from *The Chicago Reader*. But that article was part of an "admission of a party opponent" because when OPS Investigator Michael Goldston (Star #73) issued his September 28, 1990 "Special Project Conclusion Report," which found that Area 2 Detectives had engaged in systemic torture and physical abuse of Black suspects, Goldston relied upon and incorporated "House of Screams" into the first paragraph of his Report:

> I used a variety of sources to obtain and corroborate data [about Area 2 torture]. As usual, some sources were more reliable than others. The article <u>House Of Screams</u> which appeared in the Chicago Reader served as a sound starting point.

OPS's Chief Administrator at that time, Gayle Shines, reviewed and passed on Goldston's Report to Police Superintendent LeRoy Martin, stating that Goldston "had done a masterful job of marshalling the facts in this intensive and extensive project and [his] conclusions are compelling."

poor medical health and need for medication, and repeatedly told him that he would be given

medical attention and some food if he repeated a false confession that they had created. At 12:05

a.m. on September 20, 1987, Smith gave a Q&A statement before a stenographer. Smith's answers

came from the information the Defendants fed to him and rehearsed with him, including many

easily-proven contradictions with the evidence. Smith refused to sign the false statement, but it was

nevertheless read to a jury as an oral confession at his 1990 criminal trial. Smith was convicted and

sentenced to life in prison without the possibility of parole.

On October 23, 2020, after more than 33 years, Smith's conviction was vacated. Shortly

thereafter, he received a Certificate of Innocence ("COI"), and shortly after that, a four-judge panel

of the Illinois Court of Claims wrote:

> Robert Smith represents yet another victim of the violent and abusive tactics of Chicago Police
> Lieutenant Jon Burge and his devout crew of similarly violent Chicago Police detectives.
> Following hours of torture, Mr. Smith orally confessed. But tellingly, when it was demanded
> that he sign a written confession by the assigned felony review State's Attorney and detectives,
> Mr. Smith refused. The oral confession along with other fabricated evidence formed the basis
> of his double murder conviction. But for the trial judge who raised concerns about the lack of
> motive by Mr. Smith, he might very well have been sentenced to death.

On March 1, 2021, Smith brought this lawsuit.

**Legal Claims**

At trial, Smith will prove that some or all of the Officer Defendants (which no longer

includes Detective Dwyer) and the City of Chicago only in #1c:

1. Violated Smith's Fourteenth Amendment Due Process rights by:
   a. Coercion of Smith's false confession (used against him during his criminal case);
   b. Fabrication of evidence (used against him during his criminal case); and
   c. Bad Faith Destruction of potentially exculpatory evidence that was material to his criminal trial. [2]

---

[2] Smith contends that notwithstanding the summary judgment dismissal of the fabrication claim against the
Officer Defendants based on the destruction of the knife, that claim still stands against the City of Chicago
(both directly and as part of a *Monell* claim). Plaintiff further contends that the *Monell* portions should not be
bifurcated because it would be wholly inefficient to do so, given how intertwined the knife's destruction is

2. Engaged in a conspiracy to deprive Smith of his constitutional and state rights.
3. Failed to intervene in other Defendants' violations of Smith's constitutional trial rights.
4. Intentionally inflicted emotional distress in violation of Illinois law.

The City is also liable for indemnifying the Individual Defendants for the constitutional violations and has *respondeat superior* liability for their state law violations.

I.      **The Admissibility of the Systemic Abuse at Area 2, including By *These Defendants*.**

A crucial issue at trial will be whether the City of Chicago's numerous investigations into Defendants' misconduct at Area 2 (as well as one by a Cook County grand jury and one by the Department of Justice) are admissible in evidence. The answer is a resounding yes, and Defendants' numerous unsupported objections to these documents should be overruled. First, the investigation findings are public records subject to the hearsay exception in Rule 803(8):

> ***Public Records.*** A record or statement of a public office [is not hearsay] if:
> **(A)**    it sets out:
>> **(i)**   the office's activities;
>> **(ii)**  a matter observed while under a legal duty to report . . .; and
>> **(iii)** <u>factual findings from a legally authorized investigation</u>; and
> **(B)**    the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

The CPD's Office of Professional Responsibility ("OPS"), the City of Chicago, a Cook County grand jury, the Chicago's Police Accountability Task Force, and the United States Department of Justice, all "public offices," have investigated these Area 2 Detectives and thoroughly articulated their findings. These findings are set forth in the:

September 28, 1990 Michael Goldston OPS Report (PX312);
November 2, 1990 Francine Sanders OPS Report (PX297);
November 2, 1990 Gayle Shines OPS Letter to Superintendent Leroy Martin (PX296);
October 11, 1991 OPS Recommendation for Separation of Det. Yucaitis and others (PX305);
January 21, 1992 City Mem. Opposing Det. Yucaitis Mot. to Bar Witnesses (PX277);
February 11, 1993 Chicago Police Board Findings & Conclusions re: Det. Yucaitis (PX271);
June 28, 2006 Cook County Grand Jury "Egan-Boyle" Report (PX247);

---

with all of the evidence about the knife (how it was found, the testing that was done, what was not done) that will come into this trial as evidence that Smith's confession that a razor was the murder weapon was fabricated and the confession was coerced. Plaintiff would like to raise this issue with you at the status hearing set for June 10, 2025 at 3 pm.

April 2016 City of Chicago's Police Accountability Task Force ("PATF") Report (PX342); and January 13, 2017 United States Department of Justice Report (PX343).

Many of the findings of these public investigations are vital to Smith's case so the jury is not left to examine Defendants' conduct in a vacuum. In the Goldston Report, the CPD concluded:

> In the matter of alleged physical abuse, the preponderance of the evidence is that abuse did occur and that it was systematic. The time span involved covers more than ten years. The type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture. The evidence presented by some individuals convinced juries and appellate courts that personnel assigned to Area 2 engaged in methodical abuse.

PX297, at 3.

In the Sanders' Report, OPS Investigator Francine Sanders concluded that there was an "overwhelming body of evidence which supports the allegations" that Detective Yucaitis, a Defendant in this case, and others "repeatedly administered electrical stimulation to Mr. [Andrew] Wilson's body in order to create pain" and that Yucaitis also observed another Detective hold "Mr. Wilson, while handcuffed, against a hot radiator causing burns to Mr. Wilson's face, chest and thigh." PX297, at 63-64. Sanders recommended that administrative charges of excessive force should be sustained against Yucaitis. *Id*. at 63-66. Significantly, the Goldston-Sanders Reports identified an additional *50 victims* other than Andrew and Jackie Wilson who were subjected to the same or similar torture and abuse.

Later, when OPS recommended that Yucaitis (and Burge and O'Hara) be separated from the Police Department, the City of Chicago hired a Special Prosecutor, Dan Reidy, a formal federal prosecutor, to prosecute the case. He found:

> As the testimony of the similar victims shows, Respondent Yucaitis counted on the fact that his testimony would be believed over that of a convict when they persisted in their pattern of torture. [Yucaitis and his co-Defendants] should not be permitted now to hide behind their allegations of "prejudicial effect" to secure exclusion of that telling evidence [of police abuse].

PX277, at 32.

On April 24, 2002, Cook County Criminal Division Chief Judge Paul Biebel appointed Special Prosecutor Edward Egan and Deputy Special Prosecutor Robert Boyle to conduct a criminal grand jury investigation into allegations of police torture and abuse at Area 2. On July 19, 2006, they released a report of their findings (the "Egan-Boyle Report"). Most notably, portions of the Egan-Boyle Report specifically implicate named Defendants in this case – Detectives McWeeny, Pedersen, and Yucaitis for physically abusing suspects. *See, e.g.*, PX247, at 44, 46, 192, 197, 242, 245. That Report also found systematic torture and abuse at Area 2 during the time frame relevant to Smith's case, including "many cases" in which it was reasonable to believe that African American men were abused by Area 2 detectives. *Id.* at 16. Importantly, the Egan-Boyle Report also found that because the then-Area 2 Commander (Burge) abused persons in Area 2 custody "with impunity," it therefore "necessarily follows ***that a number of those serving under his command recognized that if their commander could abuse persons with impunity, so could they***." *Id.* (emphasis added). Finally, the Report identified several torture cases in which there was "proof beyond a reasonable doubt" of such abuse by Area 2 detectives, *Id.* at 12-13, 16, 63, 274, although no criminal charges were brought because the statutes of limitation had run. *Id.* at 18-34.

In December 2015, in response to public outcry from the shooting of 17-year-old Laquan McDonald, Mayor Emanuel created the Chicago Police Accountability Task Force ("PATF"), which published an April 2016 Report emphasizing that the "linkage between racism and CPD did not just bubble up in the aftermath of the release of the McDonald video. Racism and maltreatment at the hands of the police have been consistent complaints from communities of color for decades." PX342, at 6. The PATF Report describes abuse at Area 2 as one of the prime examples of historical police misconduct and racism in Chicago: "From 1972 to 1991, CPD detective and

commander Jon Burge and others supervised torture and abuse of at least 100 African-Americans on the South and West sides in attempts to coerce confessions." *Id*. at 34.

All of the City of Chicago findings are admissible because: (1) they are relevant statements of a party opponent and thus not hearsay under Rule 801(d)(2); and (2) they are public-record "factual findings" under Rule 803(8). The factual findings from the Egan-Boyle and DOJ Reports are also admissible under Rule 803(8).

These factual conclusions are also relevant because they ***expressly*** relate to many of the named Defendants in this case and provide relevant evidence to central and hotly-disputed issues, including the Defendants' plan, opportunity, modus operandi, motive, intent, preparation, and knowledge under Rule 404(b)(2). But these findings are also relevant to prove Defendants' habit under Rule 406 and to give the necessary context for Defendants' violence against Smith (*i.e.*, that these detectives had a motive (to coerce confessions to "clear and close" cases), and that their m.o. was to habitually treat black suspects in this manner – rather than uniquely and selectively choosing Smith as an isolated victim of their torture). Equally important, these factual findings should be admitted because they go directly to Defendants' denials that any such abuse ever occurred at Area 2 or that they were part of it or aware of it. Such findings go directly to Defendants' character for untruthfulness, which this Court may admit under Federal Rule of Evidence 608(b)(2): "[T]he court may, on cross-examination [of a witness], allow [specific instances of past conduct] to be inquired into if [those prior acts] are probative of the character for truthfulness or untruthfulness of [the witness]."

Instead of providing an actual explanation of why the City of Chicago's own findings (and Cook County and DOJ) factual findings are inadmissible, Defendants instead revert to repeated boilerplate objections to these reports:

Foundation; Relevance (FRE 401, 402); unfair prejudice, confusing the issues, misleading the jury, waste of time, presenting cumulative evidence (FRE 403); improper character evidence (FRE 404, 608(b)); hearsay (FRE 802); *See* MIL 11, 16, 17; *See also* Dkt. 75, 485 (bifurcating Monell).

Defs' Objections to Pl's Exhibits, Pretrial Order Exh. F, at ¶¶ 247, 271 277, 296, 297, 305, 312, 342, 343.

Defendants' relevance, hearsay, and character objections do not hold up.

In addition:

- Defendants' Rule 403 assertions of unfair prejudice, confusing the issues, misleading the jury, waste of time, and presenting cumulative evidence are simply underdeveloped conclusions and are therefore forfeited. Even if not forfeited, Defendants have not provided any support for how the jury would be confused, or why this evidence "wastes their time." Each of the Defendants worked for the City of Chicago, and Defendants have not explained, nor can they, how the City's own detailed investigation into and findings regarding their conduct constitutes *unfair* prejudice. "Because all probative evidence is to some extent prejudicial, we have consistently emphasized that Rule 403 balancing turns on whether the prejudice is unfair." *United States v. Eads*, 729 F.3d 769, 777 (7th Cir. 2013).

- Nothing in Defendants' MIL 11, 16, 17 is to the contrary. *See* Plaintiff's Responses, at Dkts. 554, 558, 559.

- Defendants also assert without support that the Court's *Monell* bifurcation is a basis to bar this evidence. While some of this evidence might be used against the City of Chicago in a future *Monell* trial, Defendants cannot argue that this evidence is not ***equally relevant*** against the individual Defendants. Indeed, the City, Grand Jury, and DOJ findings illuminate the glaring omission of this impeachment evidence from Smith's trial 38 years ago and underscore why Defendants acted with impunity for so long — namely, because, in a vacuum, they knew a jury would uncritically accept the testimony of allegedly "reputable" detectives over that of a Black criminal defendant who had allegedly confessed. Smith's 1990 jury, wholly unaware of the now well-documented pattern of systemic abuse and torture perpetrated by these same Defendants, lacked the context to fairly assess the credibility of the Defendants. These findings thus make the central factual question— whether the Defendants physically and psychologically abused Smith—more or less likely, which is the very definition of relevant evidence.

## II.    Smith Must Be Permitted To Properly Defend Himself From Defendants' Efforts to Retry Him.

Smith has had his criminal conviction vacated and has been awarded a COI.  Defendants insist that the COI finding is inadmissible, in part because they claim they were not permitted to participate in the COI proceeding.  Even accepting that Defendants are permitted to make such an

argument, Defendants cannot get to where they need to without the Court's assistance. To that end, Defendants repeatedly ask this Court to exclude ***all otherwise admissible evidence that even suggests that Smith is innocent of his in-laws' murders.*** Defendants request the Court to:

- Bar reference to the butcher knife as the "murder weapon," even though it was found on the floor of the dining room where the murders occurred (next to a bloody chair), was identified as the murder weapon by officers first on the scene, was seized as evidence by Area 2 Detectives, was submitted to the Chicago Crime Lab as evidence, and then, before being fully tested, was mysteriously destroyed before Smith's trial.

- Bar the City's 30(b)(6) representative's admission that in 1988 an individual detective could direct the destruction of evidence without obtaining court or prosecutor approval and that under the City's policies, all paperwork showing who had ordered the destruction would also be destroyed.

- Bar evidence that fingerprints were recovered at the murder scene but never compared to known prints.

- Bar Smith's forensics expert from testifying on numerous scientific points about several pieces of key evidence; and

- Bar a Court Order (the COI) that proves that Smith's criminal case was resolved in a manner indicative of Smith's innocence.

As to evidence that undermines Smith's coerced, false confession, Defendants ask this Court to:

- Bar Smith's testimony that Defendants beat him into confessing!

- Bar the testimony of Smith's attorney, who was the first to see Smith after he was beaten and who filed and argued Smith's motions to quash his arrest and suppress his confession.

- Bar questioning, evidence, or argument that the complete absence of blood in the dryer's lint filter establishes that the murderer did not wash and dry his clothes; and

- Bar all 404(b) evidence against the Defendants.

The trial in this case will cover all of these issues and in the end, the jury's decision will turn on whether they believe Robert or Defendants. For that to occur *fairly*, all relevant evidence should be admitted.

10

Dated: June 4, 2025

Respectfully submitted,
*PLAINTIFF ROBERT SMITH JR.*

By:   /s/ *Stuart J. Chanen*

Stuart J. Chanen | Ariel Olstein
CHANEN & OLSTEIN, LLP
8822 Niles Center Road, Suite 100
Skokie, IL 60077
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com

Nicole Nehama Auerbach
ELEVATENEXT LAW, LLP
218 N. Jefferson Street, Suite 300
Chicago, IL 60661
312-676-5460
Nicole.auerbach@elevatenextlaw.com