UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DIANE YEAGER SMITH, | ) | |
| as special representative for | ) | |
| ROBERT SMITH, Jr., | ) | No. 21-cv-1159 |
| | ) | |
| PLAINTIFF, | ) | |
| v. | ) | Judge Jeffrey I. Cummings |
| | ) | |
| CITY OF CHICAGO, | ) | |
| FORMER CPD SUPERINTENDANT | ) | |
| PHILIP CLINE, | ) | |
| THE ESTATE OF JOHN A. YUCAITIS, | ) | |
| THE ESTATE OF WILLIAM HIGGINS, | ) | |
| THE ESTATE OF ROBERT RICE, | ) | |
| DET. DANIEL McWEENY, | ) | |
| DET. STEVEN BROWNFIELD, | ) | |
| DET. WILLIAM PEDERSEN, | ) | |
| DET. JOHN SOLECKI, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## MEMORANDUM OPINION AND ORDER

On September 19, 1987, the Chicago Police Department and Chicago Fire Department responded to a civilian report of a fire at the home of Edith Yeager and Willy Bell Alexander. Upon arrival, Ms. Yeager and Ms. Bell Alexander were found dead in the first-floor hallway with their throats slashed. Robert Smith was arrested at the crime scene based on his interactions with certain Chicago Police Department officers and sent to Area 2 Violent Crimes for questioning, where he asserts that he spent approximately seventeen hours being physically and verbally abused, without food or medical attention, and fed information about the crime before providing oral statements and an initialed transcribed confession that inculpated him in the murders. Smith was convicted after a jury trial and sentenced to natural life in prison. In 2020,

after thirty-three years in prison, Smith's conviction was vacated, and he was granted a Certificate of Innocence.

Plaintiff Diane Yeager Smith ("plaintiff" or "Smith"), Robert Smith's representative under Federal Rule 25(b),[1] asserts that Chicago Police Officers Lieutenant Philip Cline, John Yucaitis, William Higgins, Robert Rice, Daniel McWeeny, Steven Brownfield, William Pedersen, and John Solecki (collectively, the "Officers")[2] along with the City of Chicago (the "City"), (collectively, "defendants") violated Smith's constitutional rights by taking him to Area 2 Violent Crimes and subjecting him to physical and verbal abuse, including choking him until he almost passed out and coercing him to confess to a crime he did not commit.

This matter is set for trial on July 11, 2025, and the parties have filed almost fifty motions in limine. This Opinion will resolve a portion of those motions and the Court will issue a ruling on the additional motions in due course or at the upcoming pretrial conference.

## I.     Standard for Motions in Limine

"The district court has the inherent authority to manage the course of a trial," *Norris v. Bartunek*, No. 15 C 7306, 2017 WL 4556714, at *1 (N.D.Ill. Oct. 12, 2017) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)), including the broad discretion to resolve motions in limine. *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). Prudent motions

---

[1] For purposes of simplicity, the Court refers to both Robert Smith, Jr. and Diane Yeager Smith as "Smith" or "plaintiff" in this opinion. This is because after he was diagnosed with dementia, Smith moved under Rule 25(b) to appoint Diane as Smith's representative and to continue this action on his behalf. This Court granted the motion on August 11, 2022. (Dckt. #296). Thus, Diane was substituted as a party and plaintiff "step[ped] into the same position of the original party." *Ransom v. Brennan*, 437 F.2d 513, 516 (5th Cir. 1971). When discussing her involvement in the underlying events of Robert Smith's criminal case and the murder investigation, the Court refers to Diane Yeager Smith as "Diane."

[2] Yucaitis, Higgins, and Rice are deceased, so plaintiff named their estates as defendants. McWeeny died during the pendency of this case, and the Court has appointed Ms. Geri L. Yanow as his Estate's representative. (Dckt. #673).

in limine serve a gatekeeping function by allowing the judge "to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury." *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). "By defining the evidentiary boundaries, motions in limine both permit the parties to focus their preparation on those matters that will be considered by the jury, and help ensure that trials are not interrupted mid-course for the consideration of lengthy and complex evidentiary issues." *Norris*, 2017 WL 4556714, at *1 (cleaned up).

"A motion in limine should only be granted where the evidence is clearly inadmissible for any purpose." *Thomas v. Sheahan*, 514 F.Supp.2d 1083, 1087 (N.D.Ill. 2007). "Rulings on motions in limine are not necessarily final, and 'the district court may adjust a motion in limine during the course of a trial.'" *One Way Apostolic Church v. Extra Space Storage, Inc.*, No. 16 C 1132, 2018 WL 11219951, at *1 (N.D.Ill. Oct. 23, 2018), *quoting Farfaras v. Citizens Bank & Tr.*, 433 F.3d 558, 565 (7th Cir. 2006).

## II. Plaintiff's Motions in Limine[3]

### a. Plaintiff's motion in limine no. 3 is granted.

Smith's motion in limine no. 3 seeks to bar evidence about him purportedly refusing to take a polygraph examination during his interrogation. (Dckt. #546). Smith argues that any such evidence would be unfairly prejudicial and inadmissible under the Fifth Amendment. (*Id.* at 2–3). The Officers object and argue that Smith hesitating to take a polygraph examination is relevant because Officer McWeeny thought it was a "red flag" because "innocent people are not hesitant," and therefore relevant to the investigative steps taken by the Officers "and their beliefs

---

[3] Two of plaintiff's motions in limine (nos. 11 and 14) are addressed below as they are related to the Officers' motions.

relating to those steps as it concerns probable cause," and that Smith's Fifth Amendment rights are not at issue because his criminal case was vacated. (Dckt. #657 at 2–4).

This Court granted summary judgment to the Officers on Smith's malicious prosecution claim and found that there was probable cause to detain Smith. (Dckt. #678). The Officers do not provide any theory of how Smith's refusal to take the polygraph examination is relevant beyond its support for their probable cause analysis. Since the question of whether probable cause existed has been determined, the evidence regarding Smith's refusal to take a polygraph examination is not relevant to any of the remaining claims. *See* Fed.R.Evid. 401. The Court therefore grants Smith's motion in limine no. 3, (Dckt. #546), and the Officers cannot present evidence of Smith refusing to take a polygraph examination. Because the evidence is irrelevant and thus excluded, the Court declines to address Smith's alternative argument that the evidence is inadmissible under the Fifth Amendment.

### b. Plaintiff's motion in limine no. 6 is granted.

In this motion, Smith seeks to exclude all references to an alleged romantic or sexual relationship with his friend Sally Payne, now deceased. (Dckt. #549). By Smith's own admission, throughout the night of the murders, he went back and forth from Sally's apartment and the tavern below. Smith—who denied any romantic relationship with Sally at his deposition—argues that there is no evidence to support any such relationship and, even if there was, it is not relevant and otherwise prejudicial if admitted.

The Officers respond that there *is* in fact evidence (or at least implications) of a relationship between Smith and Sally and that such evidence is relevant to "what was known or believed by [the] Officers during their investigation and the plausibility of Smith committing the

crimes." (Dckt. #650 at 3). This use, however, is relevant to Smith's malicious prosecution claim and, again, the Court granted summary judgment on that claim in the Officers' favor.

Having failed to offer any purpose of the evidence of a sexual relationship between Smith and Sally (beyond its support for the Officers' probable cause analysis), the Court agrees that such evidence is irrelevant and grants Smith's motion in limine no. 6.

### c. Plaintiff's motion in limine no. 9 is denied in part and the Court reserves ruling in part.

Smith asks the Court to bar the Officers from introducing any evidence of his criminal disciplinary record as irrelevant and prejudicial. According to Smith's motion, (Dckt. #552), over the course of his thirty-three-year incarceration, he had only three alleged violations for: (1) lending personal property to another inmate; (2) possessing a hypodermic needle; and (3) getting into a verbal argument with a guard, none of which are relevant to the claims at issue here.

The Officers respond that the three violations identified by Smith were his only infractions at Cook County Jail but maintain that Smith had over thirty violations while in the custody of the Illinois Department of Corrections. The Officers also explain that they do not intend to introduce *all* of Smith's prison violations, only those that may illustrate Smith's pattern and practice of continued theft, alcohol, and drug use, and his potential motive for the crimes. Unfortunately, the Officers did not provide the who, what, where and when of any such violations, and neither party attached the entirety of Smith's prison disciplinary record.

"Rule 404(b)(1) describes prohibited uses of evidence of other crimes, wrongs, or acts such as to prove a person's character to show that on a particular occasion the person acted in accordance with the character." *McCoy v. Mennerich*, 584 F.Supp.3d 635, 640 (S.D.Ill. 2022); Fed.R.Evid. 404(b)(1). The Rule further establishes, however, that such evidence may be

"admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed.R.Evid. 404(b)(2).

Because the exact nature of Smith's disciplinary violations the Officers may attempt to introduce under Rule 404(b)(2) remains unclear, the Court denies Smith's motion to bar reference to his *entire* disciplinary record and otherwise reserves ruling. If the Officers intend to introduce any of Smith's prison violations, they shall raise this issue at trial outside the presence of the jury. *See McCoy*, 584 F.Supp.3d at 640 (reserving ruling as to potentially admissible prison disciplinary records). And of course, Smith is advised that if he argues or elicits testimony that he was a model inmate with minimal disciplinary violations, he will open the door to the Officers' introduction of his disciplinary records.

As such, plaintiff's motion in limine no. 9, (Dckt. #552), is denied in part and the Court otherwise reserves ruling.

### d. Plaintiff's motion in limine no. 12 is granted.

Smith moves in limine to bar the Officers from introducing evidence of their "good character" including, *inter alia*, work commendations, awards, promotions, or performance reviews as inadmissible character evidence under Rule 404(a). (Dckt. #555). The Officers respond and agree that "specific instances of [their] awards and/or commendations are typically excluded when it is being introduced as character evidence," but argue that Smith's motion to bar *all* evidence of the Officers' work history under the guise that it is inadmissible "good character" evidence "goes too far." (Dckt. #662).

The Court grants Smith's motion and the Officers are barred from offering evidence of commendations and awards, though they can testify as to their work history and background generally. *See Valdez v. Lowry*, No. 18 CV 5434, 2021 WL 5769533, at *10 (N.D.Ill. Dec. 5,

2021) (granting similar motion). Courts routinely bar such evidence and permit only "[r]outine job information" to give the jury a sense of the witness' career path. *Gray v. City of* Chicago, No. 1:18-CV-02624, 2023 WL 7092992, at *11 (N.D.Ill. May 8, 2023). "But no inference may be argued from the promotions." *Id*; *see also Charles v. Cotter*, 867 F.Supp. 648, 659 & n.6 (N.D.Ill. 1994) ("the court strongly suspects that evidence of defendants' commendations, awards or honors could only serve the improper function of providing evidence of defendants' character for the purpose of proving action in conformity therewith on the night in question").

### e. Plaintiff's motion in limine no. 15 is granted in part.

Smith moves in limine to bar any witness from commenting on his or her belief as to Smith's: (1) guilt or innocence; or (2) Smith or any other witness's credibility. (Dckt. #665). In support, Smith argues that any such comments are barred under Federal Rule of Evidence 701 and that the Court is obligated to give Smith's state-court Certificate of Innocence ("COI") "full faith and credit." (*Id.*). The Officers argue that Smith's motion is too broad because: (1) he fails to properly identify the specific evidence at issue; (2) Diane and her two brothers have first-hand knowledge about Smith's behavior that permits them to assess Smith; and (3) the Officers' conclusions and opinions are relevant to the issues of Smith's damages and his malicious prosecution claim. (Dckt. #647). Finally, the Officers argue that the COI statute explicitly states that it is not given *res judicata* effect in other proceedings. (*Id.* at 3–4).

First, because the Court granted summary judgment to the Officers on Smith's malicious prosecution claim, any argument that the Officers' determinations on Smith's guilt, innocence, or credibility are relevant to that claim are now moot. Second, the Officers are correct that the COI statute, 735 ILCS 5/2-702(j), and Seventh Circuit precedent, *Patrick v. City of Chicago*, 974 F.3d 824, 833 (7th Cir. 2020), clearly provide that a COI is binding "only with respect to claims filed

in the Court of Claims" and not given *res judicata* effect in any other proceeding, *id.* at 833. A COI is therefore not given "full faith and credit" even though it may be admissible, (*see infra*, ruling on Officers' motion in limine no. 24).

The Court agrees with Smith that Rule 701 bars witnesses from testifying to topics which are not based on their perception. Lay witnesses may provide opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701. "Lay opinion testimony most often takes the form of a summary of first-hand sensory observations." *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002). As such, a lay witness may therefore testify about his or her own knowledge of Smith's guilt or innocence *only* if the knowledge is based on his or her own observations and perception. Otherwise, any such testimony regarding Smith's guilt or innocence runs afoul of Rule 701. Neither party identifies any witness with first-hand knowledge of Smith's guilt or innocence (apart from Smith, who testified to his innocence).

Despite the Officers' suggestion that Smith's motion is too broad, he points to three specific examples of testimony where individuals were asked to testify about their opinions on Smith's guilt or innocence: Diane testified about her opinion and her brothers' opinions; detective Brownfield testified about his opinion; and David Yeager (Diane's brother and Smith's brother-in-law) wrote a letter to the Office of the Special Prosecutor that lays out his and his brother's opinion as to Smith's guilt or innocence. (Dckt. #665 at 1; Dckt. #665-4).

The Officers concede that Diane and her brothers, Derrick and David, were not first-hand witnesses to the murders. (Dckt. #647 at 3). Nonetheless, the Officers seek to offer their testimony as to Smith's guilt or innocence because they "were first-hand witnesses to other

conduct and behavior of Smith's and have knowledge of the way their mother and grandmother lived that is relevant to the assessment of guilt or innocence and credibility," therefore their testimony is "not based on mere instinct or feelings, but on first-hand observations that are relevant and proper." (Dckt. #647 at 3). The Court disagrees. Witnessing Smith's "other conduct and behavior" does not provide a foundation for the brothers—or anyone else—to testify about whether Smith committed the murders when none of them had first-hand knowledge. *See Fulton v. Bartik*, No. 20 CV 3119, Dckt. #405, at 17 (N.D.Ill. Jan. 31, 2025) ("As for Griffin, her denial that she provided information about Collazo to the plaintiffs is circumstantial evidence of their innocence. Her opinion that they were innocent is not sufficiently based on her own perceptions or other knowledge that would permit her to so testify.").

The Officers further argue, without citation to any caselaw, that their conclusions on Smith's guilt or innocence are "also relevant and admissible to defeat plaintiff's claim his confession was coerced and fabricated." (*Id.*). The Court again disagrees. The focus of these two claims is not on whether the Officers believed Smith to be guilty, but rather on the Officers' actions. The coerced confession claim analyzes interrogation tactics and whether the plaintiff's statement to authorities was voluntary after considering the totality of the circumstances. *Fulton v. Bartik*, Nos. 20 C 3118 & 20 C 3119, 2024 WL 1242637, at *19 (N.D.Ill. Mar. 22, 2024), *quoting United States* v. *Outland*, 993 F.3d 1017, 1021 (7th Cir. 2021) (procedural due process); *Cairel* v. *Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) (substantive due process). The fabrication of evidence claim analyzes whether the Officers knew evidence was fabricated and the subsequent use of such evidence at the plaintiff's trial. *Brown v. City of Chicago*, 633 F.Supp.3d 1122, 1156–57 (N.D.Ill. 2022). The Officers fail to explain how these claims permit them to testify about their opinions on Smith's guilt in contravention to Rule 701.

As to whether witnesses can comment on Smith's (or other witnesses') credibility, Smith argues that credibility determinations are for the jury; that "no witness should be allowed to testify that Smith lied at his deposition when he testified that he had no involvement in the murders;" and that David and Derrick Yeager's letter to Special State's Attorney Myles O'Rourke improperly comments on Smith's credibility.

The Officers respond that David and Derrick Yeager's letter is admissible if Smith is permitted to rely on his COI to support his malicious prosecution claim. (Dckt. #647 at 4). In the letter, David Yeager recounts his feelings towards Smith and his request that Smith be denied clemency and should "not be allowed to see the light of day outside of prison," and provides that his brother Derrick is in agreement. (*Id.* at 3). To begin, the Court has granted summary judgment on Smith's malicious prosecution claim. Moreover, the Officers do not explain how the letter could be admissible due to the variety of hearsay statements (i.e., "My Aunt got word of this and was 'horrified' at the possibility of Robert marrying my sister"), and improper opinions (i.e. "This was clearly an 'inside' job and was clearly committed by Robert Smith") contained therein. (Dckt. #647-1 at 2–3).

However, to the extent Smith is seeking to bar all witnesses from commenting on any other witness' credibility, his request is overbroad. Rule 608(a), for example, allows for a witness to offer an opinion about another witness's reputation for having a character for truthfulness or untruthfulness. Without specificity as to what credibility opinions Smith is seeking to bar (with the exception of the brothers' letter which the Court finds inadmissible), the Court cannot issue a broad ruling barring all credibility statements when such statements could be admissible under the Federal Rules of Evidence.

In sum: the Court grants in part Smith's motion in limine no. 15, (Dckt. #665), and finds that witnesses may not comment on Smith's guilt or innocence and that David Yeager's letter to the Office of the Special Prosecutor is inadmissible.

### f. Plaintiff's motion in limine no. 16 is granted.

In his sixteenth motion in limine, Smith moves to bar David and Derrick Yeager, Diane's brothers and Smith's brothers-in-law, from testifying about three specific topics:

- Their *disapproval* of Robert's marriage to Diane, including their *belief* that Robert only married Diane "to prop himself up in life" and that Robert "was only in the marriage as a front, and a fake to further and enhance his own life."

- Their other negative *opinions* of Robert and their dislike, if not outright hatred, for him, including their claims that Robert has a "rather nefarious past," is a conman who attended church with Diane and only did things for her mother because he wanted to portray a "fake life" and further himself "without having to actually work," and that Robert is a "proven alcoholic" and "prolific abuser of hard-core drugs."

- Their *belief* that Robert must have committed the murders because the murders, in their opinion, were "clearly an inside job" and because they don't believe the murders were part of any robbery or burglary, as such crimes, they speculate, did not occur in the middle of the night in the Roseland Area during the late 80s.

(Dckt. #558 at 1). In support, Smith states that all three topics are irrelevant, unfairly prejudicial, hearsay, and constitute improper character evidence, improper reputation and character testimony, and are improper lay opinions. (*Id.* at 2). The Officers respond and argue that Smith's motion is premature, and that the brothers' testimony is relevant to the issue of probable cause (which, again, is no longer at issue given the Court's grant of summary judgment on Smith's malicious prosecution claim) and damages. (Dckt. #648).

Both parties identified David and Derrick as potential trial witnesses, but neither party sought to depose them. The Officers contend that the brothers have "not yet had the opportunity to offer any further basis for their assessment that the crime was an 'inside job' or for their

11

comments on [Diane and Smith's] relationship," Smith's past, or the "behavior in support of their conclusion that Smith took advantage of their sister." (Dckt. #648 at 2). The Officers state that David and Derrick are expected to have knowledge about the victims' house, their day-to-day habits, their household maintenance (such as whether they locked their doors and whether they kept a gun). (*Id.*). Such information includes David's interview with detective Brownfield during which David told Brownfield that he is an accountant in Milwaukee, he last saw the victims on Labor Day, Smith had keys to the house, David's mother said someone used her bank card twice in the last month and the bank suggested it was a family member, that his mother had a revolver, that he did not like Smith, and that he complained about Smith's marriage to Diane. (Dckt. #648 at 3–4). Finally, the Officers argue that testimony from David and Derrick is relevant to damages because it would undermine any positive testimony that Smith (or others) might offer related to his role and relationship within his family. (*Id.* at 4).

The Officers fail to explain how any of the three categories of testimony from David and Derrick that Smith identifies is admissible. It is irrelevant whether Diane's brothers approved of her marriage or had negative opinions of Smith as that has nothing to do with whether the Officers violated Smith's rights. The brothers also lack the personal knowledge to testify about their belief that Smith must have committed the murders, as discussed in this Court's ruling on Smith's motion in limine no. 15. The Court further finds that testimony from David and Derrick regarding the three topics identified by Smith would be unfairly prejudicial even if it were otherwise admissible. *See Valdez*, 2021 WL 5769533, at *9 ("[E]ven if the above statements and testimony had any marginal probative value, the Court finds that it would be substantially outweighed by the danger of unfair prejudice to plaintiff given its tendency to tarnish plaintiff's

character.").  The Court thus grants Smith's motion in limine no. 16, (Dckt. #558), to bar David and Derrick Yeager from testifying about the three identified topics.

### g.  Plaintiff's motion in limine no. 20 is denied.

Smith's twentieth motion in limine seeks to bar all parties from using any of the crime scene and autopsy photographs that depict the two murder victims and argues that the photographs have "no relationship to any disputed issue of fact" and their use would only serve to inflame the jury.  (Dckt. #560).  Although Smith initially claims the photographs are irrelevant, he nonetheless concedes that there *is* a disputed issue of fact to which the photographs relate but that he would prefer to use alternative evidence, and the Officers should be required to do the same.  (*Id.*).  The Officers respond and argue that since Smith concedes their relevancy, the Officers should not be limited to the non-photographic evidence that Smith would prefer and contend that the photographs are additionally relevant to the Officers' memories of the crime scene and to establishing a timeline of when other photos were taken.[4]  (Dckt. #651).

The photographs in question were used at Smith's criminal trial and depict the victims' cut throats.  Smith's transcribed confession states that Smith cut both victims' necks twice, whereas Smith argues that Ms. Yeager's throat was only cut once.[5]  (Dckt. #560 at 2).  Smith therefore plans to argue that statements in his transcribed confession are false, including the number of times Ms. Yeager's throat was cut.  (*Id.*).  Smith states that there are "alternative admissible documents to prove this point," other than the photographs, which show the neck cuts, and that the Officers should also be barred from using the photos.  (*Id.*).  In particular,

---

[4] The victims' photos are within a larger set of photos taken during the investigation.  If the Officers need to establish a timeline for the photos, they can endeavor to do so with the number of other photos that do not depict dead bodies, as the Officers provide no reason why the victims' photographs would establish a timeline better than other photographs taken within the same photo sequence.  (Dckt. #651 at 4).

[5] The number of cuts on Ms. Alexander is not in dispute.

Smith points to the medical investigator report ("Lillie Bell [Alexander] had what appeared to be 2 cuts to her throat and Edith Yeager had what appeared to be 1 cut to her throat"), medical examiner reports ("[Yeager] [d]ied as a result of an incised wound to the neck" and "[Alexander] [d]ied as a result of incised wounds to the neck"), and cause of death reports for the victims ("1 incised wound to [Yeager's] throat" and "2 incised wounds to [Alexander's] throat").  (Dckt. #560 at 3).  The Officers respond that "just because Plaintiff feels he can prove his point without photos, it does not mean that Defendants must be precluded from introducing the most relevant evidence on the issue of the victims' injuries."  (Dckt. #651 at 3).

The Court finds that the photos of Ms. Yeager, whose injuries are in dispute, have probative value favoring admittance.  If the number of cuts were not in dispute, then perhaps none of the admittedly gruesome pictures would need to be admitted, but where a dispute exists and where the photos have any tendency to make the existence of a fact more or less probable, they are admissible subject to Rule 403.  *See Thompson v. Polaris Indus. Inc.*, No. CV-16-02868-PHX-DJH, 2019 WL 2173965, at *19 (D.Ariz. May 17, 2019) (excluding pictures where injury is not in dispute).  The photos of Ms. Yeager, while gruesome, are probative to the number of cuts on her throat and thus may be used at trial.

However, in consideration of Rule 403 concerns, the parties will only be permitted to use the minimum number of photos necessary to argue their point concerning the throat cuts to Ms. Yeager.  Any additional photos would be cumulative and inflammatory.  *See United States v. Castro*, No. 19-CR-20498, 2022 WL 2328623, at *4 (E.D.Mich. June 28, 2022) (subsequent

gruesome photos excluded as cumulative where they were materially the same as those already admitted).[6]

In sum: the Court denies Smith's motion in limine no. 20, (Dckt. #560), and the parties may not use any photos of Ms. Alexander's injuries and may use only the minimum number of photos required that depict Ms. Yeager's injuries, to be determined at the pretrial conference scheduled for June 25, 2025.

### III. Defendants' Motions in Limine

#### a. The Officers' motion in limine no. 1 is denied.

The Officers move to bar plaintiff from introducing Smith's prior deposition and criminal pretrial hearing testimony at trial because they are inadmissible hearsay. (Dckt. #580). Smith opposes the Officers' motion and argues it is: (1) barred by judicial estoppel; and (2) Smith's prior testimony is admissible under the Federal Rules of Evidence. (Dckt. #608). The Officers' motion to bar Smith's prior testimony is denied.

Smith sat for a deposition in this case on November 17, 2021 that lasted approximately nine hours. (*Id.* at 2). In February 2022, Smith's experts, Dr. Dinwiddie and Dr. Goldstein, both concluded that Smith suffers from dementia. (Dckt. #580 at 1; Dckt. #608 at 2). In particular, Dr. Dinwiddie opined that Smith suffers from Major Neurocognitive Disorder, likely vascular dementia, and that Smith was totally disabled and in need of guardianship. (Dckt. #608 at 2). The Officers retained their own expert, Dr. Argumedo, who opined that Smith had a cognitive

---

[6] The Officers include a final argument which consists of one sentence, stating that if Smith argues that no fingerprints at the scene matched him, the photographs are relevant for the additional reason that they depict the bodies' conditions and show that "neither of the victims could be fingerprinted for comparison purposes." (Dckt. #651 at 4). Without more information, the Court will not admit superfluous gruesome pictures on the off chance that Smith makes this argument. However, if Smith opens the door, the Court might reconsider its ruling on this matter.

disorder in November 2021 which prevented him from giving competent testimony. (Dckt. #580 at 1–2).

On April 8, 2022, the Cook County Probate Court appointed Diane as Smith's temporary guardian. On July 8, 2022, Diane became Smith's permanent guardian under the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act, 755 ILCS 8/203 and 204. The order appointing Diane as Smith's permanent guardian found Smith to be a "person with a disability" under the Illinois Probate act, 755 ILCS 5/11a-2. (Dckt. #608-1).

On August 11, 2022, this Court appointed Diane as Smith's special representative under Federal Rule of Civil Procedure 25(b) and relied on the Probate Court's proceedings. (Dckt. #608 at 1 ("After Plaintiff was adjudicated incompetent, the Cook County Probate Court conducted proceedings regarding the petition of Yeager-Smith.")). In appointing Diane as Smith's special representative, she was substituted as a party and permitted to continue the action on Smith's behalf. *United States ex rel. Valdez v. Aveta, Inc.*, No. CV 15-1140CCC, 2019 WL 13171054, at *2–3 (D.P.R. Mar. 1, 2019) ("When a party is substituted under Rule 25(b), [s]he 'steps into the same position of the original party'"), *quoting Ranson v. Brennan*, 437 F.2d 513, 516 (5th Cir. 1971).

In August 2024, the Officers moved to bar Smith's November 2021 deposition on the basis that he was incompetent at the time of his testimony. (*See* Dckt. #476). This Court denied the Officers' motion after reviewing the deposition and finding Smith was a competent witness under Federal Rule of Evidence 601 at the time of his deposition. This Court reserved ruling on any other issues regarding the admissibility of Smith's deposition because the Officers' motion was based solely on Rule 601. (*See* Dckt. #487, 9/19/24 Tr.).

The Officers now argue that Smith's deposition, and his criminal pretrial testimony,[7] should be inadmissible at trial. The Officers assert Smith should be forced to testify live because there is a "lack of any additional proof that Smith is unavailable under any evidentiary rule" and that plaintiff "cannot rely upon [Smith's] dementia diagnosis to establish [his] unavailability," (Dckt. #580 at 3). The Officers also argue that they will be prejudiced if Smith is allowed to be present in court and his video deposition is presented in lieu of live testimony. (*Id.*).

The Court first addresses whether Smith's prior testimony is admissible under the evidentiary rules as a hearsay exception. This issue turns on whether Smith is "unavailable" under Rule 804, rather than on whether Smith is "competent," although the Officers seem to use the terms interchangeably. In finding that Smith was competent to testify in November 2021, this Court found that the Officers "[did] not carr[y] their burden of demonstrating that [Smith] was without an ability to observe, remember, communicate or to understand that the oath and affirmation imposes a duty to tell [the] truth and he has met the basic standards under Rule 601." (Dckt. #580-1 at 16). By contrast, the question here is whether Smith has carried his burden of showing that he is unavailable within the meaning of Rule 804 by presenting evidence that he cannot "testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness." Fed.R.Evid. 804(a)(4). The Court finds that Smith has satisfied this burden.

It is well-settled that "[i]llness of an elderly witness can render him unavailable." *United States v. Mallory*, 902 F.3d 584, 590 (6th Cir. 2018) (citing cases). "To establish unavailability on account of illness [a plaintiff] must show that the witness's specific symptoms and the

---

[7] While the Officers seek to bar both Smith's 2021 deposition testimony and his 1989 pretrial hearing testimony, they make no substantive argument as to why the pretrial testimony should be barred beyond the general argument that Smith is not "unavailable." (Dckt. #580 at 1).

duration and the severity of the illness preclude the witness from testifying." *Id.* (cleaned up); *Burns v. Clusen*, 798 F.2d 931, 937 (7th Cir. 1986). In appointing Diane as Smith's permanent guardian, the Probate Court cited Dr. Dinwiddie's opinion and reports from the Guardian ad litem to support its July 8, 2022 finding that Smith suffers from "Major Neurocognitive Disorder, likely vascular type ('vascular dementia')" that caused him to experience "significant deficits in functioning of recent and remote memory" and rendered him "totally incapable of making personal and financial decisions." (Dckt. #608-1 at 2). Thus, Smith's condition evidently worsened between the date of his November 2021 deposition (at which time the Court found him competent to testify) and the Probate Court's July 2022 finding. Major Neurocognitive Disorder is not curable, and Smith now resides at an assisted living facility with around-the-clock care. (*Id.* at 3).

Courts have recognized that dementia is an infirmity that can satisfy the requirements for rendering a witness unavailable under Rule 804. *See, e.g., Mallory*, 902 F.3d at 590 (finding a witness to be unavailable where he was diagnosed with dementia, the dementia worsened after his deposition, and his medical records "gave no indication that his condition would improve."); *Parrott v. Wilson*, 707 F.2d 1262, 1269 (11th Cir. 1983) (noting that a witness's dementia led to his unavailability); *see also United States v. McClellan*, 868 F.2d 210, 214 (7th Cir. 1989) (noting that a witness who had become disabled by a brain tumor and whose memory and reasoning ability was impaired was unavailable under Rule 804). Thus, Smith has presented sufficient evidence that Smith is unavailable within the meaning of Rule 804(a)(4), and his prior

testimony is admissible at trial subject to any particularized objections to his designated testimony.[8]

Finally, Smith's ability to be present in the court room does not unfairly prejudice the Officers as they seemingly suggest. (Dckt. #580 at 3 ("Defendants would be unfairly prejudiced if Smith were sufficiently competent to be available and present in court most of the trial but not required to testify." (footnote omitted))). An individual's ability to physically sit in a courtroom in a wheelchair (as Smith would do) does not mean that that individual is mentally competent and capable of providing reliable and coherent testimony. *See Di Battisto v. State*, 480 So.2d 169, 171 (Fla. Dist. Ct. App. 1985) (witness still unavailable to testify "even if he is capable of being physically transported to the trial" because the ability to testify "means more than mere presence."). Thus, the Court will not bar Smith from being present in the courtroom at trial and this matter, as the Court indicated during the June 10, 2025 status hearing, will be discussed in further detail at the final pretrial conference. (Dckt. #700 at 21–22). In conclusion: the Officers' motion in limine no. 1, (Dckt. #580), is denied.

### b. The Officers' motion in limine no. 2 is granted.

The Officers move in limine to bar Smith from offering testimony, evidence, or argument of a generalized police "code of silence" under Rules 401 and 403. (Dckt. #581). They assert that any "code of silence" is irrelevant and prejudicial because Smith's *Monell* claim was bifurcated, it would confuse the jury, and Smith's claims concern the individual Officers rather than "law enforcement as a whole." (*Id.* at 1–2). The Officers do, however, concede that Smith

---

[8] In light of this finding, the Court need not address Smith's alternative argument that the Officers' motion should be denied on the ground of judicial estoppel.

"would be permitted to argue that there was a conspiracy between the officers in this case to show bias." (*Id.* at 2 n.2).

Smith responds in "partial opposition" and argues that judges are "evenly split" on this issue and that the Officers forfeited any relief because they "disingenuously" cited to case law which supported their position and no case law holding otherwise. (Dckt. #609 at 1–2). Smith also contends that a "code of silence" is particularly relevant to his case because "former Superintendent Phil Cline [gave] perjured testimony about his involvement in this case." (*Id.*). Finally, Smith requests that, in the event this Court bars such references, Smith should be allowed to present evidence that the Officers themselves were biased. (*Id.* at 2–3).

The Court first turns to Smith's theory that the Officers have forfeited the relief sought in their motion in limine. To reach this issue, however, Smith needs to show that judges are indeed split, which he has not done. In support for his argument that judges are "evenly split" about admitting evidence of a generalized "code of silence," Smith cites to cases that reinforce the Officers' position. First, *Cezares v. Frugoli* allowed reference to a generalized "code of silence" and distinguished cases barring such reference because none of them involved a *Monell* claim, "where an alleged code of silence was front and center," like in *Cezares*. No. 13 CV 5626, 2017 WL 4150719, at *3 (N.D.Ill. Sept. 19, 2017). Next, *Spaulding v. City of Chicago* also involved a *Monell* claim. No. 12 CV 877, Dckt. #235 (N.D.Ill. May. 11, 2016) (denying summary judgment on plaintiff's *Monell* claim). The *Monell* claim was specifically premised on the City of Chicago having a widespread code of silence that shields officers from investigation and promotes misconduct. *Id.* at 44. Finally, *Galvan v. Norberg* is the only case Smith cites that did not involve a *Monell* claim. No. 04 CV 4003, 2006 WL 1343680 (N.D.Ill. May 10, 2006). The *Galvan* court was faced with a motion to bar testimony or evidence that "police officers in

general, and in this case, conspire, cover-up, or lie for their colleagues through some form of code of silence" and ruled that the motion should be "denied for now" so that objections in the context of specific evidence could be proffered at trial. *Id.* at *2–3.

For their part, the Officers' cited cases confirm that similar motions in limine are granted when there is no *Monell* claim at issue. The Court agrees that "in *non-Monell* cases like this one, there is no relevancy to an overarching assertion of a generalized code of silence." *Watson v. Fulton*, No. 1:15-CV-11559, 2022 WL 21296130, at *5 (N.D.Ill. Feb. 23, 2022); *see also Brown v. City of Chicago*, No. 19 CV 4082, 2024 WL 5438519, at *10 (N.D.Ill. July 30, 2024) (precluding plaintiff from developing a theory of bias "that extends further than the allegation that Defendants conspired with one another in this case specifically."); *Pryor v. Corrigan*, No. 17-CV-1968, 2023 WL 1100436, at *36 (N.D.Ill. Jan. 30, 2023), *aff'd*, 124 F.4th 475 (7th Cir. 2024) ("Generalized evidence about the police, such as a 'code of silence" is unduly prejudicial."); *Smith v. Garcia*, No. 15-CV-10105, 2018 WL 461230, at *5 (N.D.Ill. Jan. 18, 2018) ("District courts often exclude *generalized* evidence of a code of silence, but permit plaintiffs to develop the theme that a code of silence existed among the particular officers involved in the events underlying the complaint."), *quoting Hillard v. City of Chicago*, No. 09 C 2017, 2010 WL 1664941, at *3 (N.D.Ill. 2010); *Betts v. City of Chicago*, 784 F.Supp.2d 1020, 1028 (N.D.Ill. 2011) ("[G]eneralized allegations—separate and apart from what may be true of the officers named as defendants here—are not helpful and are akin to impermissible propensity evidence."); *Christmas v. City of Chicago*, 691 F.Supp.2d 811, 819 (N.D.Ill. 2010) ("plaintiffs may not introduce generalized evidence of a 'code of silence'").

Smith's single non-*Monell* case denying a similar motion hardly supports his contention that courts are "evenly split." Furthermore, that single case involved a motion in limine that

sought to bar evidence of a generalized code of silence and also evidence concerning the specific defendants. *Galvan*, 2006 WL 1343680, at *2. Here, the parties agree that Smith may present evidence of bias for the individual Officers. Consistent with the majority of the prior rulings on this issue, Smith is barred from referencing a generalized code of silence which extends beyond the Officers. The Officers' motion in limine no. 2, (Dckt. #581), is granted.

### c. The Officers' motion in limine no. 3 is granted in part and denied in part.

The Officers move to bar Smith from making any reference to the City of Chicago as a defendant (including removing the City from the case caption and the verdict form) and to bar reference to indemnification by the City for a damage award against one or more of the Officers. (Dckt #582). In the Officers' view, because the City has already consented to payment of compensatory damages if the jury finds any of the Officers liable to plaintiff, reference to the City and its indemnification is irrelevant, prejudicial, and may result in an inflated award of damages. Citing no case law, Smith responds that because he still has three claims against the City that have not been bifurcated with his *Monell* claim—i.e., destruction of evidence, indemnification, and *respondeat superior*—he should not be barred from pursuing these claims at trial and continuing to reference the City as a defendant. For the following reasons, the Court grants in part and denies in part the Officers' motion in limine no. 3.

To begin, courts generally "bar evidence of indemnification because it may encourage juries to inflate compensatory damages awards." *Jones v. City of Chicago*, No. 14-CV-4023, 2017 WL 413613, at *4 (N.D.Ill. Jan. 31, 2017) (citing *Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998) ("In the general case courts exclude evidence of indemnification out of a fear that it will encourage a jury to inflate its damages award because it knows the government—not the individual defendants—is footing the bill.")); *see also Ferreira v. City of Binghamton*, No.

3:13-CV-107, 2016 WL 4991600, at *4 (N.D.N.Y. Sept. 16, 2016) ("Courts have concluded that evidence of indemnification is generally inadmissible as irrelevant."). If, however, a defendant officer testifies as to an inability to pay a damages award against him, this opens the door to plaintiff introducing indemnification evidence. *See Jones*, 2017 WL 413613, at *4; *Betts*, 784 F.Supp.2d at 1030. Accordingly, the Officers' request to bar any reference to indemnification is granted with the understanding that the Court will revisit this request if any of the Officers testify as to their financial condition and inability to pay.

With respect to the Officers' request to remove the City from the case caption and verdict form, that request is denied. The City is still a defendant in this case under theories of *respondeat superior*, indemnification, as well as under Smith's bifurcated *Monell* claim. (*See* Dckt. #678 at 63 (denying defendants' motion for summary judgment on the destruction of evidence claim without prejudice to its reassertion) and Dckt. #700 at 60 ("The destruction of this knife, in [the Court's] eyes, is still part of that Monell claim.")). "In similar circumstances, courts have declined the relief [d]efendants request." *Jones*, 2017 WL 413613, at *6; *Bruce v. City of Chicago*, No. 09 C 4837, 2011 WL 3471074, at *4 (N.D.Ill. July 29, 2011) ("At this time, the Court will not strike the City of Chicago from the case caption because Plaintiff has asserted a state law claim for respondeat superior against the City. The City is a party to the case and should remain in the case caption."); *see also Wilbon v. Plovanich*, No. 12 C 1132, 2016 WL 890671, at *3 (N.D.Ill. Mar. 9, 2016). Of course, the appropriate content and form of the verdict form will be discussed at a later date.

For these reasons, the Court grants in part and denies in part the Officers' motion in limine no. 3.

23

### d. The Officers' motion in limine no. 4 is denied.

The Officers move to bar Smith from calling Clyde Lemons, one of Smith's former criminal defense attorneys, as a witness at trial or, alternatively, for leave to depose him prior to trial. (Dckt. #563). The Officers argue that Smith failed to properly disclose Lemons' address and anticipated testimony. As explained below, the Officers' motion is denied.

The purpose of Federal Rule of Civil Procedure 26(a) is "to give the opposing party information as to the identification and location of persons with knowledge so that they can be contacted in connection with the litigation" including for the purposes of being deposed. *Biltrite Corp. v. World Rd. Markings, Inc.*, 202 F.R.D. 359, 362 (D. Mass. 2001); *see also* Fed.R.Civ.P. 26 advisory committee's notes to 1993 amendment (mandatory disclosures serve to "accelerate the exchange of basic information about the case" and "the rule should be applied in a manner to achieve those objectives.").

All parties identified Lemons in their respective disclosures. In particular, on June 6, 2021, the Officers disclosed Lemons as an individual likely to have discoverable information. (Dckt. #611 at 1). Smith disclosed Lemons on July 28, 2021, and provided the following description:

> Mr. Clyde Lemons was one of Smith's defense counsel from his arrest through shortly before his criminal trial. We don't have an address for Mr. Lemons, but we know that he resides in Guam, works for the U.S. Attorneys' Office in Guam, and that his office phone number is [omitted].

(Dckt. #611 at 1).

The Court can quickly resolve the Officers' first issue—namely, that Smith failed to provide Lemons' address in his disclosure. This is not a basis to bar Lemons as a witness. The Officers likewise failed to provide Lemons' address in their disclosure. More importantly, even without the address, the Officers were able to contact Lemon and they attached proof of their

24

communications as an exhibit to their motion. (*See* Dckt. #563-1). The Officers were thus not prejudiced by Smith's failure to include Lemons' address in his disclosure.

The Officers additionally claim that Lemons should be barred from testifying because Smith failed to provide a more fulsome description of Lemons' anticipated testimony and because of the Officers' failure to secure his deposition. The Court is not persuaded.

The Officers claim that they "initially did not attempt to contact or seek to depose Lemons due to his limited role in the criminal proceedings and the limited information that Smith provided regarding his knowledge." (Dckt. #563 at 2). However, the Officers were aware that Lemons was one of Smith's former criminal defense attorneys, and Lemons was included in many documents exchanged throughout discovery, placing them on notice that he played an active role in Smith's underlying criminal proceedings. For example, Lemons represented Smith at both of his bond hearings where the judges ordered Smith be sent to the hospital after Smith described officers physically abusing him. Lemons also drafted Smith's criminal discovery requests, which included a request for a list of all physical evidence within the State's possession and that such evidence be made available for inspection before trial. Additionally, Lemons represented Smith at his combined hearing on his motion to suppress his statements and his motion to quash his arrest.

Nonetheless, the Officers changed course in December 2021 and decided to contact Lemons to schedule a deposition and indeed succeeded in contacting him that same month. (Dckt. #563-1). After some back and forth, the Officers ultimately gave up trying to schedule the deposition, determining "that proceeding with service would be futile." (Dckt. #563 at 2). To explain their abandonment in trying to schedule with Lemons, the Officers cite to: (1) Smith's "limited disclosure" of Lemons; (2) the impending close of discovery on January 20, 2022; (3)

Lemons' email communications stating that he requires personal service (a process server represented that personal service typically takes six to ten days in Guam) and that he will not be testifying about any privileged material absent a waiver from Smith; and (4) Smith's counsel "not indicat[ing] any willingness to sign a privilege waiver." (Dckt. #563 at 2–3).

The Officers do not explain why they waited until one month before the close of discovery to contact Lemons, nor do they explain why they failed to raise any discovery issues related to Lemons in between the close of discovery in 2022 and now. In addition, it appears that the Officers never contacted Smith to discuss deposing Lemons or concerning a privilege waiver. (Dckt. #611 at 4). The Officers cannot now point to Smith's Rule 26(a) disclosure to justify their inaction. *See Abernathy v. Vill. of Park Forest*, No. 16 CV 2128, 2018 WL 5499788, at *1 (N.D.Ill. Oct. 29, 2018) (Rule 26(a) "is not intended to be a substitute for more particularized discovery; it is just a first step toward identifying people from whom discoverable information profitably might be obtained.").

Finally, the Officers point out that Smith elaborated on Lemons' role in one of his motions in limine, stating that Lemons would testify "that he did not receive a photograph or sketch of the knife at issue in this case during his representation of plaintiff." (Dckt. #563 at 1–2). The Officers do not argue that this is improper, nor could they, as Smith has maintained this position throughout the parties' briefing on summary judgment. (*See* Dckt. #510 ¶31 (Smith disputing that the State ever disclosed the knife to his criminal defense attorneys)).

Because Smith timely disclosed Lemons as an individual with relevant knowledge, and the Officers were able to contact Lemons prior to the close of discovery with the information provided by Smith, the Officers' motion to bar Lemons is denied. The Officers' failure to depose Lemons during the pendency of this litigation does not justify excluding him as a trial

witness or otherwise granting leave to depose him now, over three years after the close of discovery. The Officers' motion in limine no. 4, (Dckt. #563), is denied.

### e. The Officers' motion in limine no. 6 is denied in part and the Court reserves ruling in part.

In this motion, the Officers ask the Court to bar Smith from making any argument or even mentioning that the Officers failed to call a witness or present evidence at trial. Citing no case law, the Officers argue that it "would be improper for Plaintiff to argue that Defendants failed to call any particular witnesses or present any evidence during trial as it would unfairly prejudice the Defendants and mislead the jury as to the burden of proof." (Dckt. #584 at 1). In response, Smith takes issue with the Officers' "wildly overbroad" request and essentially argues that he should be permitted to poke holes in the Officers' case, as appropriate. For the most part, the Court agrees.

To resolve this motion, the Court draws upon the holding in *Watson*, 2022 WL 21296130, at *8, regarding a similar motion in limine. As the *Watson* court explained,

> The defense's argument is a mutated—but inapposite—version of the principle that a *criminal* defendant has no obligation whatsoever to offer evidence, and can do so without suffering an adverse inference of any kind. That is a protection arising out of the Fifth Amendment right against self-incrimination and the right to due process, which places the burden of proof on the government beyond a reasonable doubt. That protection simply does *not* apply in civil cases. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (explaining that "the Fifth Amendment does not forbid inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a civil case.'") . . . So Watson is indeed permitted to argue about the absence of witnesses or evidence that would otherwise be presumably favorable to the defense (and the defense may do the same as to Watson's failure to introduce evidence or witnesses).

*Id*. at *8. So too may Smith point to what he views as deficient evidence in the Officers' case, and vice versa.

27

Of course, to the extent any party intends to seek an adverse inference due to the opposing party's failure to call a particular "missing" witness, it will be first required to make the requisite showing under *Oxman v. WLS-TV*, 12 F.3d 652, 661 (7th Cir. 1993) ("Before a party can argue to the trier of fact that an adverse inference should be drawn from another party's failure to call a witness, the complaining party must establish that the missing witness was peculiarly in the power of the other party to produce").  The Court reserves ruling on any such request, which should be raised with the Court at the appropriate time outside the presence of the jury.  *See Torres v. City of Chicago*, No. 12 C 7844, 2015 WL 12843889, at *7 (N.D.Ill. Oct. 28, 2015) (denying motion in limine without prejudice to renewing with the Court at the appropriate time); *see also Farnik v. Horan*, No. 14 C 3899, 2018 WL 11195947, at *2 (N.D.Ill. Nov. 1, 2018) ("While defendants may point out holes and deficient evidence in plaintiffs' case, they may not point out plaintiffs' failure to call a particular witness to raise an adverse inference or imply that the jury should make such an inference without the requisite showing").

Finally, the Officers' concerns will be further alleviated given the likelihood that the Court will include Pattern Jury Instruction 1.08 Pattern Instruction (Absence of Evidence), "which takes much of the bite out of arguing about missing witnesses."  *Watson*, 2022 WL 21296130, at *8.

For all of these reasons, the Officers' motion in limine no. 6, (Dckt. #584), is denied in part and reserved in part.

### f.   The Officers' motion in limine no. 7 is granted.

The Officers move to bar Smith from introducing the prior testimony of Paul Ward, the late uncle of Smith.  (Dckt. #585).  In so moving, the Officers argue that Ward's testimony is inadmissible hearsay and not subject to any exception under: (1) Federal Rule of Evidence

804(b)(1) because the Cook County State's Attorney's Office ("CCSAO") was not the Officers' predecessor in interest and did not have an opportunity or similar motive to develop Ward's testimony by direct, cross, or redirect examination; or (2) the residual exception to the hearsay rule. Smith disagrees and argues that the CCSAO was the Officers' predecessor in interest and had an opportunity and motive to develop Ward's testimony and is alternatively admissible under the residual hearsay exception. (Dckt. #614). For the following reasons, the Officers' motion to bar Ward's prior testimony is granted.

Under Rule 804(b)(1), an unavailable declarant's prior testimony is not excluded by the rule against hearsay if the testimony: was given as a witness at a trial, hearing, or deposition and "is now offered against a party who had—or, in a civil case, whose predecessor in interest had— an opportunity and similar motive to develop it by direct, cross-, or redirect examination." Here, the parties agree that Ward is unavailable because he is deceased and that his prior testimony was given at a hearing. Because Smith seeks to offer Ward's testimony against the Officers, the remaining issue is whether the CCSAO prosecutors had an opportunity and similar motive to develop Ward's testimony.

When considering whether a party had a "motive to develop testimony," courts look to "the similarity of issues and the purpose for which testimony was given." *United States v. Reed*, 227 F.3d 763, 768 (7th Cir. 2000). Circumstances which influence the "motive to develop testimony" include "(1) the type of proceeding in which the testimony [was] given, (2) trial strategy, (3) the potential penalties or financial stakes, and (4) the number of issues and parties." *United States v. Feldman*, 761 F.3d 380, 385 (7th Cir. 1985).

Ward testified at Smith's criminal pretrial proceedings and was offered to "corroborate the defendant's testimony that Robert entered by the back door" on the morning of the murders.

(Dckt. #585-1 at 127). The Officers argue that Ward was a surprise witness at Smith's criminal hearing and that the prosecutors did not have the chance to talk to Ward or prepare for his testimony until immediately before he took the stand.[9] The judge presiding over the hearing allowed the State "an opportunity to interview [Ward] before he continues with his testimony" for a "few moments" so that "there is no longer any surprise." (*Id.* at 127–28). Ward proceeded to testify that he saw Smith and Diane in front of the crime scene and talked with them before they went to the back of the house. (*Id.* at 129–30). Ward then saw Smith three to five minutes later and he appeared calm, but was in handcuffs and placed in a squad car. (*Id.* at 130–31). During cross-examination, the prosecutor only asked Ward nine questions and Ward testified that he did not know what Smith and Diane were doing after he lost sight of them when they went to the back of the house. (*Id.* at 131–33).

The Seventh Circuit has not addressed the issue and courts within this Circuit are split as to whether a criminal prosecutor can be a predecessor in interest for civil municipal defendants. The Officers rely primarily on *Butler v. Ind. Metro Pol. Dept.*, No. 7 CV 1103, 2009 WL 2092416, at *1–2 (S.D.Ind. July 13, 2009) and *Hill v. City of Chicago*, 2011 WL 3876915, at 2–4 (N.D.Ill. Sept. 1, 2011), to argue that a criminal prosecutor and civil defendant have inherently divergent motives in developing testimony. The *Butler* court reasoned that prosecutors are focused on protecting the public and do not have the time nor resources to "act as surrogate defense counsel for future civil rights lawsuits against officers who are not their clients," and that

---

[9] Smith notes that his defense counsel reserved the right to call any individual who appeared on a police report to testify, and that Ward fit that description, thereby placing the prosecutors on notice that he could be called as a witness. (Dckt. #614 at 1 n.1). While true, this does not negate the fact that prosecutors did not know Ward was going to testify until he showed up in court on the day of the hearing. According to the hearing transcript, the defense did not list Ward as a witness in their motion to suppress or motion to quash and when asked why, Smith's criminal attorney stated that he received the "last bit of discovery we were entitled to from the State" only two weeks prior. (Dckt. #585-1 at 126–27).

police officers facing a civil suit arising from the same incident as an underlying criminal case face reputational harm and the prospect of personal liability in the form of punitive damages if found liable in a civil suit. *Id.* at *3.

Smith, for his part, argues that two cases decided after *Butler* and *Hill* concluded that prior criminal testimony was admissible under Rule 804(b). *See Fields v. City of Chicago*, No. 10 CV 1168, 2014 WL 477394 (N.D.Ill. Feb. 6, 2014); *Volland-Golden v. City of Chicago*, 89 F.Supp.3d 983 (N.D.Ill. 2015). In *Fields*, the court explained that Rule 804(b)'s "predecessor-in-interest proviso does not require privity or some other form of legal relationship; a like motive to develop testimony about the same material facts is sufficient." 2014 WL 477394, at *8. Where the testimony concerns facts that are "seriously disputed," at both the time of the original testimony and at the trial where the testimony is sought to be introduced, "it will normally be the case that the side opposing the version of a witness at the first trial had a motive to develop that witness's testimony similar to the motive at the second trial." *Volland-Golden*, 89 F.Supp.3d at 988 (cleaned up).

Here, even assuming that the CCSAO is the Officers' predecessor in interest, Ward's testimony is inadmissible because the Court finds that the CCSAO did not have a like motive to develop Ward's testimony. Ward was offered at the pretrial hearing for only a handful of narrow questions and the CCSAO did not have the opportunity to cross-examine him for the same purpose that Smith now seeks to use the testimony: to discredit McWeeny's version of Smith's arrest.

Smith's criminal attorney told the judge that Ward's testimony was being offered to "corroborate the defendant's testimony that Robert entered by the back door" on the morning of the murders. (Dckt. #585-1 at 127). Smith argues that the Officers mischaracterize the purpose

of Ward's testimony at the hearing (even though they directly quote Smith's defense attorney) and that, instead, the "main reason" for Ward's testimony was to "corroborate Smith's version of what occurred at the scene and to discredit Detective McWeeny and other defense witnesses' contention that Smith was 'obstructing' officers and the crime scene, wasn't calm, and that immediately upon arriving at the scene, Smith 'dove into a pool of blood.'" (Dckt. #614 at 5). Smith contends that the CCSAO had "an acute interest in undermining and rigorously cross examining all witnesses offered by Smith" and the "potential stakes in the criminal proceeding were also much higher since Smith's liberty and his life (the State was seeking the death penalty) were at stake. Here, only money damages, the majority of which, aside from punitive, will be paid by the City, are at stake." (Dckt. #614 at 3 n.2).

The Officers disagree and argue that, had they been able to question Ward to "defend their interests," they would have questioned him about: bias (he was Smith's uncle); his ability to recall events that he testified to and events to which he did not testify; the state of Smith's clothing (i.e. whether it was bloody); whether Smith appeared to be high on drugs or alcohol or if Smith was acting strangely; how Ward came to be at the crime scene and who notified him of the murders; the information discussing Ward contained within the police reports; and any inconsistencies between Ward and Smith and/or Diane's accounts. (Dckt. #585 at 6). Because Ward was only presented as a witness at the hearing on Smith's motion to suppress and quash, they could not explore any of these topics. (*Id.*).

Despite Smith's argument to the contrary, Ward's testimony only covered a very narrow series of events. He testified to seeing and talking with Smith and Diane, seeing them head to the back of the house, and then seeing Smith around five minutes later in handcuffs. Neither party questioned Ward about his interaction with Smith on the morning of the murders and how

32

it is supposedly inconsistent with McWeeny's version of events. Prosecutors were not able to prepare for his testimony except for a "few moments" immediately before he took the stand. Further, even if offered for the purpose Smith claims, Ward's testimony does not discredit McWeeny and other defense witnesses' accounts of what occurred beyond the fact that it contradicts McWeeny's story that McWeeny "escorted Smith and Diane into the house." (Dckt. #614 at 5). The remaining events which Smith cites—Smith immediately diving into a pool of blood, obstructing officers, and Smith immediately being arrested and transported to Area 2—are not addressed by Ward's testimony. (*Id.*). Thus, the circumstances here are distinct from those in *Fields*, where the prosecution "vigorously [tried] to cast doubt" on the witness's prior testimony that an officer induced him to fabricate testimony, and the civil case sought to introduce the prior testimony for "essentially the same" purpose. *Fields*, 2014 WL 477394, at *8.

In sum: the prosecutor did not have a motive to develop Ward's testimony on the issues for which Smith now seeks to introduce it. Ward's hearing testimony was offered for a limited purpose, and Smith cannot use Ward's testimony to proceed beyond that limited purpose to address additional topics in his civil trial given that the prosecutor lacked a motive (or a realistic opportunity for that matter) to develop his testimony regarding those topics in the criminal hearing. Simply put, Ward's testimony at the criminal hearing concerned topics which were not "seriously disputed" whereas his proposed testimony in the forthcoming trial is disputed. *Volland-Golden*, 89 F.Supp.3d at 988. Thus, Ward's prior testimony does not meet the requirements of Rule 804(b) because there is not sufficient similarity of issues and purpose for which the testimony was given. *Reed*, 227 F.3d at 768.

Ward's testimony is likewise not admissible under the residual exception to the hearsay rule. Rule 807 permits a statement that is otherwise hearsay to be admitted if two conditions are met: (1) the statement is supported by sufficient guarantees of trustworthiness and (2) the statement is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed.R.Evid. 807(a)(1), (2). The court "construe[s] the Rule 807 requirements narrowly." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 233 (7th Cir. 2021) (citing *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 583 (7th Cir. 2019)).

Here, the Officers correctly point out that additional evidence exists which also establishes that Smith entered the house through the rear door, rather than through the front door (as McWeeny testified). (Dckt. #585 at 8 (citing Hughes' deposition testimony)). Smith also implicitly admits that Rule 807(2) is not met here because he concedes that there is "corroborating evidence that supports Ward's testimony," including four witnesses who "contradict[] or [are] inconsistent with McWeeny's version of the events at the scene, including Robert Smith and Diane Yeager-Smith, and two non-defendant CPD officers, Detective Lawrence Gates and Officer Warren Hughes." (Dckt. #614 at 7). The Court thus concludes that other evidence exists which Smith can present through reasonable efforts that discredits McWeeny's version of events. Because Ward's prior testimony is inadmissible hearsay and does not fall under the residual exception, the Officers' motion in limine no. 7, (Dckt. #585), is granted.

### g. The Officers' motion in limine no. 8 is granted and Plaintiff's motion in limine no. 11 is granted in part and denied in part.

In the Officers' motion in limine no. 8, (Dckt. #564), they seek to bar reference, evidence, or argument regarding Smith's settlement with former defendant Raymond Brogan, the

Assistant State's Attorney who was present when Smith gave his court-reported statement. The Officers argue that this evidence should be excluded as irrelevant and inadmissible, particularly under Rule 408. Smith responds that he intends to introduce the settlement with Brogan for another permissible purpose under Rule 408, i.e., to establish bias and prejudice on Brogan's part. In Smith's view, the "fact that Plaintiff has alleged that Brogan participated in the wrongdoing alleged, named him in the lawsuit and required him to go through the process of responding to the claims, give a deposition and engage in the process prior to settlement can demonstrate bias or prejudice towards the Plaintiff." (Dckt. #615 at 2).

Paradoxically, in light of Smith's objections to the Officers' motion in limine no. 8, Smith filed his own motion in limine (no. 11), (Dckt. #554), to bar the Officers "from mentioning any collateral source payments, specifically the payment of $239,306.00 that Robert Smith received from the Illinois Court of Claims as a result of obtaining a certificate of innocence ("COI") and the payment of $425,000.00 he received as a result of the settlement of his claims in this case" against former defendant Brogan. Smith has since clarified that he misworded his motion and only seeks to bar the *amount* of these payments, and not necessarily their existence. In any event, both motions require the Court to consider whether evidence of Smith's settlement with former defendant Brogan is admissible and so the Court begins there.

Rule 408(a) prohibits the use of evidence about settlement negotiations "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed.R.Evid. 408(a). However, as Smith correctly notes, the "court may admit this evidence for another purpose, such as proving a witness's bias or prejudice." Fed.R.Evid. 408(b). Nonetheless, Smith's reliance on this exception is misplaced here because Brogan's *settlement* of this case does not show his bias or prejudice toward Smith.

Rather, Brogan's bias and prejudice toward Smith—if any—would have been created when
Smith accused him of wrongdoing and named him as a defendant in this case. The subsequent
settlement agreement did not change the landscape and thus the Brogan settlement is neither
relevant nor admissible under Rule 408(b). *See Smith v. Sheahan*, No. 95 C 7203, 2000 WL
765089, at *6 (N.D.Ill. June 12, 2000) (granting motion to bar reference to settlement as "not
relevant to the jury's determination of damages"). Of course, Smith is not barred from informing
the jury that Brogan was a former defendant in this case. Moreover, at the appropriate time, the
Court will discuss with the parties the propriety of a jury instruction advising the jurors that the
disposition of Smith's claims against Brogan is not relevant to their consideration of Smith's
claims against the remaining defendants.

For these reasons, the Court grants the Officers' motion in limine no. 8 and denies
Smith's motion in limine no. 11 in part as to the Brogan settlement.

With respect to the remainder of Smith's (re-worded) motion in limine no. 11, he asks the
Court to bar any reference to the *amount* of his Court of Claims Award following receipt of the
COI under the collateral source doctrine. Again, and as explained in more detail below, (*see
infra*, ruling on Officers' motion in limine no. 24), a COI entails a finding by a state-court judge
that a criminal defendant has shown by a preponderance of the evidence that he is "innocent of
the offenses charged in the indictment or information" of a state felony conviction that has been
reversed or vacated, 735 ILCS 5/2-702(g). Under Illinois law, a person who receives a COI also
receives a monetary award, the amount of which is set by statute. *See* 705 ILCS 505/8(c). It is
the amount of this award Smith seeks to exclude.

Smith's motion to exclude the amount of his Court of Claims payment is granted under
the collateral source document. *See Hillmann v. City of Chicago*, 66 F.Supp.3d 1109, 1119

(N.D.Ill. 2014) ("Under the collateral source rule, the amount of damages a plaintiff is entitled to in a civil action will not be decreased by the amount of benefits the plaintiff received from a source wholly independent and collateral to the wrongdoer.") (cleaned up). However, because "it is reasonable for the jury to know that compensation is one result of receiving a Certificate of Innocence under Illinois law, *Brown v. City of Chicago*, No. 18 C 7064, 2023 WL 2640317, at *3 (N.D.Ill. Mar. 22, 2023)—and with no apparent dispute from Smith upon the re-wording of his motion—the Officers are not barred from introducing evidence that Smith received a monetary award after obtaining his COI.

### h.  The Officers' motion in limine no. 16 is granted.

The Officers' sixteenth motion in limine seeks to bar any evidence and argument related to a so-called "pattern or practice" of alleged abuse.[10]  (Dckt. #589).  This motion almost entirely relates to Smith's claim that the Officers violated *Brady* by failing to disclose evidence of systemic abuse.  However, the Court granted summary judgment to the Officers on this claim. (Dckt. #677).  To the extent that any "pattern or practice" evidence could relate to Smith's other claims, those claims have been bifurcated.  In particular, this Court bifurcated Smith's *Monell* claim in September 2024, (Dckt. #485), and Smith intends to try his destruction of evidence claim against the City also under a theory of *Monell*.  (*See* Dckt. #521 at 52 (Smith opposing summary judgment and arguing that "the City (under *Monell*) [is] liable for the destruction of the Knife.")).  To the extent Smith proceeds on his *Monell* theories after trial against the Officers and discovery on the *Monell* claim is opened, Smith may seek "pattern and practice" discovery.  For

---

[10]  The City joins the Officer's motion.  (Dckt. #589 at 1 n.1).

the current trial, any evidence of a "pattern or practice" of systemic abuse at Area 2 is not relevant to the remaining claims.[11]

The Officers also seek to bar reference to the Sanders-Goldston Report, the Goldston Report, and the Special State's Attorney Report, three reports that constitute part of Smith's "pattern or practice" evidence, because they are irrelevant to the claims against the Officers. (Dckt. #589 at 9). Smith responds that the reports also relate to his coerced confession claim, although Smith does not explain how, and to his now-defunct *Brady* claim. (Dckt. #629 at 4). Finally, Smith unpersuasively argues that the "two Chicago reports [the Sanders-Goldston Report and the Goldston Report] are admissions of a party opponent that may be used for any purpose." (*Id.* at 4.). Smith, however, does not account for Rule 801(d)(2) proviso that "a party's statement is admissible as non-hearsay only if it is offered against that party." *Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000). Here, Smith does not mention any "pattern or practice" evidence that constitutes an admission by one of the individual Officers. Smith purportedly wants to use the reports, which he characterizes as statements by the City, against the individual Officers who are sued in their individual capacity and are separate parties distinct from the City itself. This he cannot do under Rule 801(d)(2). *See, e.g., Fitzpatrick v. City of Fort Wayne*, 259 F.R.D. 357, 366–67 (N.D.Ind. 2009) ("[u]nder Rule 801(d)(2)(A), a party's statement is admissible as non-hearsay only if it is offered against that party.") (cleaned up).

The Officers' motion in limine no. 16, (Dckt. #589), is therefore granted.

---

[11] The Court addresses any Rule 404(b) evidence in its order concerning the Officers' separate motion in limine related to specific Rule 404(b) evidence. (Dckt. #586).

### i. The Officers' motion in limine no. 18 is denied.

The Officers ask the Court to exclude Smith's ex-wife, Diane—the daughter and granddaughter of the victims—from the courtroom and to bar any reference, evidence, or argument as to Diane's undisputed role as guardian or special representative of Smith.  (Dckt. #570).  According to the Officers, Diane is a crucial witness and her presence in the courtroom (apart from when she is testifying) would be prejudicial.  The Court disagrees.

Pursuant to Federal Rule of Evidence 615, at a party's request, "the court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony."  However, Rule 615 does not authorize excluding, *inter alia*, "a party who is a natural person," "any person whose presence a party shows to be essential to presenting the party's claim or defense."  As explained above, and in this Court's Opinion on summary judgment, after he was diagnosed with dementia, Smith moved under Rule 25(b) to appoint Diane as Smith's representative and to continue this action on his behalf.  This Court granted the motion on August 11, 2022.  (Dckt. #296).  Thus, Diane was substituted as a party and plaintiff "step[ped] into the same position of the original party."  *Ransom*, 437 F.2d at 516.  As such, notwithstanding the unique situation Diane is in, she has stepped into the same position as Smith and will not be excluded from the courtroom.

Moreover, the Court will not bar Smith (or the Officers for that matter) from referencing or presenting evidence regarding Diane's role as guardian and special representative of Smith due to his dementia because doing so would undoubtedly cause unnecessary confusion for the jury and potential prejudice to all parties.  The parties are encouraged to meet and confer to discuss a stipulation to present to the jury regarding Diane's legal status vis-à-vis Smith and her role in this case.

The Officers' motion in limine no. 18, (Dckt. #570), is denied.

### j. The Officers' motion in limine no. 19 is granted and plaintiff's motion in limine no. 14 is denied as moot.

In motion in limine no. 19, (Dckt. #591), the Officers seek to bar reference, evidence, or argument that defendants McWeeny, Pedersen, and/or Brownfield: (1) made prior invocations of the Fifth Amendment regarding unrelated incidents in other cases;[12] and (2) were granted immunity prior to testifying at their depositions in Smith's postconviction proceedings. With respect to prior invocations of the Fifth Amendment, the Officers explain that:

> [B]etween 2002 and 2006, during the Egan-Boyle Special Prosecutor investigation into the possibility of prosecuting Jon Burge and officers under his command for abuse allegations, and in civil litigation pending around that same time, many detectives who, at times, worked under Burge, including certain Defendants in this case, were advised by counsel to assert their Fifth Amendment rights in response to questioning about abuse they allegedly inflicted or observed. In the past, defendant McWeeny asserted his rights in nine instances, Dwyer three, Pedersen four and Brownfield twice.

(Dckt. #591 at 1-2). The Officers argue that Smith should not be able to introduce these prior invocations of the Fifth Amendment—and any resulting adverse inference—particularly where none of these Officers invoked their Fifth Amendment at any time during *this* case. They argue further that the grant of use immunity to certain Officers during Smith's postconviction proceedings does not amount to an invocation of their Fifth Amendment rights for purposes sufficient to warrant an adverse inference.

Smith responds that the Officers' prior invocation of the Fifth Amendment can support an adverse inference against the Officers in this case and, in turn, filed his own motion in limine (no. 14), (Dckt. #556), to bar defendants from asserting that they previously invoked the Fifth

---

[12] The Officers also moved with respect to Dwyer's prior invocation of the Fifth, but the Court has since granted summary judgment in Dwyer's favor. (Dckt. #678 at 41–42).

Amendment on advice of counsel or, in the alternative, waiver of the attorney-client privilege. For the following reasons, the Court grants defendants' motion in limine no. 19 and, as such, denies Smith's motion in limine no. 14 as moot.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment may be "asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972). Although constitutionally protected, "in a civil case, the jury is permitted to hear evidence of a witness's invocation of the privilege and may draw an adverse inference from it." *Hillmann v. City of Chicago*, 834 F.3d 787, 793 (7th Cir. 2016); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify . . ."); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 835 (7th Cir. 2016) ("The Fifth Amendment allows adverse inference instructions against parties in civil actions."); *Evans v. City of Chicago*, 513 F.3d 735, 745 (7th Cir. 2008).

Smith's steadfast attempt to invoke the adverse inference permitted in civil cases is misplaced here, however, where the Officers invoked the privilege in proceedings that did *not* concern Smith and where it is undisputed that none of the Officers invoked the privilege at any time during *this* case. Contrary to Smith's contention, the Seventh Circuit cases he cites do not dictate otherwise. *See, e.g., Hillman*, 834 F.3d at 792 ("During *discovery*, Sullivan and Drumgould invoked their Fifth Amendment privilege and refused to testify in deposition") (emphasis added); *Harris v. City of Chicago*, 266 F.3d 750, 752 (7th Cir. 2001) ("Invoking his

Fifth Amendment privilege against self-incrimination, Ramos refused to answer any of plaintiff's interrogatories, document requests, or requests to admit" or testify at his deposition); *see also Empress Casino Joliet Corp.*, 831 F.3d at 835 (district court did not abuse discretion in giving the adverse inference instruction that a horse racetrack owner initially invoked his Fifth Amendment rights before receiving immunity from prosecution in exchange for information on corruption of former Governor).  Furthermore, Smith has cited no authority in support of his contention that the jury can draw an adverse inference from the Officers' receipt of use immunity during his post-conviction proceedings.

Finally, even if the Officers' twenty-year-old invocations of the Fifth Amendment in different proceedings were relevant, the Court finds that the admission of such evidence would result in unfair prejudice to the Officers and could potentially confuse the issues before the jury. Fed.R.Evid. 403.

For all of these reasons, the Court grants the Officers' motion in limine no. 19, (Dckt. #591), and denies Smith's motion in limine no. 14, (Dckt. #556), as moot.

### k.  The Officers' motion in limine no. 20 is granted.

The Officers' twentieth motion in limine seeks to: (1) bar evidence and argument regarding damages sustained by Smith's family members; (2) bar testimony from Smith's family about Smith's prison experiences; and (3) exclude any argument that each alleged violation of Smith's constitutional rights is a distinct category of damages.  (Dckt. #571 at 1).  Smith states that he does not oppose the lion's share of the Officers' motion but nonetheless wants the Court to deny it.  (Dckt. #628).  The Court notes that neither Diane nor Joshua (Smith's son) have asserted claims against the Officers on their own behalf.

42

To start, Smith contends that he has no intention of asking for any damages "for any person other than for himself," but argues that Diane and Joshua can testify about the "experiences they both lived through and observed as a result of having [Smith] in prison." (Dckt. #628 at 1). Not only can Smith not ask for damages "for any person other than for himself," but he also cannot elicit testimony about damage suffered by others. Smith's case concerns the Officers' alleged violation of *his* constitutional rights, and the relevant damages relate to what Smith *himself* experienced, not what his family experienced. Diane and Joshua may testify about what they observed and what they have first-hand knowledge of regarding Smith's prison experience. "They may not, however, opine that Individual Defendants caused [Smith's] mental and physical health problems." *Fulton*, No. 20 CV 3119, Dckt. #405 at 7–8 (cleaned up).

Next, Smith also states that he agreed to not elicit testimony from anyone discussing Smith's experiences in prison if they lacked first-hand knowledge and no hearsay exception applied. (Dckt. #628 at 2). Nonetheless, Smith asks the Court to deny the Officers' request until trial so that the Court can rule on a case-by-case basis. (*Id.*). But where the parties agree no witness can discuss Smith's prison experiences without first-hand knowledge (as the evidentiary rules require) and where no hearsay exception applies, there is no reason to delay the ruling. Further, Smith does not provide any example of evidence which he intends to proffer.

Finally, Smith states that he has no objection to the Officers' third argument—that individual alleged violations do not provide for a distinct category of damages. (Dckt. #628 at 2–3). Smith, however, states that he should not be barred from "telling the jury things to the effect of: 'police officers should not violate citizen's constitutional rights,' that 'constitutional rights are important and should be upheld,' or that 'victims of violations of constitutional rights

should be compensated,' etc." (*Id.* at 3). Nor should he be kept from talking about the specific alleged violations, Smith contends. (*Id.*). The Court is unsure why Smith makes these requests because the Officers are not seeking to bar such statements. The Officers merely seek to bar any argument that a monetary value be placed on constitutional violations, in alignment with *Memphis Community School District v. Stachura*, 477 U.S. 299, 305–08 (1986) (rejecting jury instructions in §1983 lawsuit where jury was told to place monetary value on the "rights" at issue). Here, Smith claims that he intends to rely on the Seventh Circuit's pattern jury instructions, including the one upon which the Officers rely in their motion.[13] Smith is permitted to seek compensatory and punitive damages based upon his injuries and the Officers' violation of his rights but he is precluded from seeking damages based upon the intrinsic value of any constitutional rights that he proves that one or more of the Officers have violated.

The Officers' motion in limine no. 20, (Dckt. #571), is thus granted, largely by agreement of the parties. In sum: Smith's family cannot testify about their own damages they suffered based upon Smith's ordeal because they have not asserted their own claims against the Officers; (2) Smith's family can testify about Smith's prison experiences only to the extent that their testimony is based on their observation and first-hand knowledge; and (3) Smith cannot argue he is entitled to damages based upon the intrinsic value of any constitutional right that the Officers have violated.

### l. The Officers' motion in limine no. 22 is granted.

The Officers seek to bar Smith from arguing that the jury should "send a message to the City of Chicago or the Chicago Police Department with its verdict." (Dckt. #593 at 1). The

---

[13] The Court assumes the Officers intended to cite to Federal Civil Jury Instructions of the Seventh Circuit 7.26, Cmte. Cmmt. (and not 7.25), because *Stachura* is not cited in instruction 7.25.

Officers argue that any such argument would be akin to arguing for punitive damages, which cannot be imposed against a municipality. (*Id.*). Smith agrees. (Dckt. #630). However, Smith requests that he still be permitted to argue that the jury should "send a message" to "both the five living Defendants in the case, as well as other supervisors, police officers and Detectives in the Department." (*Id.* at 2).

By agreement of the parties, the Court grants the Officers' motion in limine no. 22, (Dckt. #593), to bar Smith from arguing the jury should send a message to the *City or CPD*. Arguments that a jury should "send a message" is an argument for a punitive damages, *Bruce*, 2011 WL 3471074, at *6, which are intended to "punish the defendant for reprehensible conduct and to deter him and others from engaging in similar conduct," *Cezares*, 2017 WL 4150719, at *5, *quoting Kemezy v. Peters*, 79 F.3d 33, 34 (7th Cir. 1996). Smith however cannot recover punitive damages from the City, *Patterson v. City of Chicago*, No. 15 CV 4139, 2017 WL 770991, at *5 (N.D.Ill. Feb. 28, 2017), and "sending a message" to CPD "is tantamount to invoking the City itself," *Martinez v. City of* Chicago, No. 14 CV 369, 2016 WL 3538823, at *14 (N.D.Ill. June 29, 2016); *see also City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. §1983.").

Furthermore, the jury will not be resolving any claims against the City, who is named as a defendant solely for indemnification and *respondeat superior* purposes in this non-*Monell* phase of the proceedings. Similar to the reasoning in *Betts*, 784 F.Supp.2d at 1033, "any argument that [plaintiff] would like to 'send a message' to the City implies that the city has a policy or practice of condoning such misconduct, which is precisely the question at issue in [plaintiff's] *Monell* claim that is not being addressed in this trial."

However, Smith is permitted to ask the jury to send a message in the form of punitive damages (not compensatory) to the Officers or to other police officers generally. *Id.* at *15; *Smith*, 2018 WL 461230, at *6 (plaintiff "is barred from making any argument that the jury should 'send a message' to the City, but may argue that the jury should send a message to the Defendant officers and others like them."); *Patterson*, 2017 WL 770991, at *6 ("Patterson may ask the jury to send a message to the defendant officers or other police officers generally to deter the type of misconduct Patterson alleges here."); *Gonzalez v. Olson*, No. 11 CV 8356, 2015 WL 3671641, at *13 (N.D.Ill. June 12, 2015) ("Plaintiff may ask for a message, in the form of punitive damages, as to the individual Defendants, but he cannot ask for or imply he is entitled to punitive damages from the City."). The Officers' motion in limine no. 22, (Dckt. #593), is thus granted insofar that Smith may not ask the jury to "send a message" to the City or CPD.

### m. The Officers' motion in limine no. 23 is granted.

The Officers move in limine to bar Smith from arguing that the jurors are "guardians of the community" or otherwise tasked with protecting the public. (Dckt. #573). The Officers contend that any argument to that effect would be improper because it suggests the jury should "decide the case based on their self-interest or the interest of the community at large." (*Id.* at 1). Smith, in response, argues that the Officers fail to point to caselaw in support of their motion and the motion must therefore be denied. (Dckt. #631). The Court finds that any argument that the jurors are "guardians of the community" and tasked with protecting the public, without more information, would be inflammatory and therefore grants the Officers' motion.

The Officers cite two cases that discuss the impropriety of asking jurors to protect the community. *See United States v. DeSilva*, 505 F.3d 711, 719 (7th Cir. 2007); *United States v. Weatherspoon*, 410 F.3d 1142, 1149–50 (9th Cir. 2005). *DeSilva* concerned remarks during the

prosecutor's closing argument which "could be construed as inviting [the jurors to determine] guilt based on community-wide deterrence." *DeSilva*, 505 F.3d at 719. The Seventh Circuit found that it is prejudicial to imply that a determination of guilt should be based on a desire to send a message although it ultimately determined that the prosecutor's statement did not rise to the level of plain error sufficient to warrant reversal. *Id.* The Ninth Circuit in *Weatherspoon* likewise cautioned against statements "designed to appeal to the passions, fears and vulnerabilities of the jury." *Weatherspoon*, 410 F.3d at 1149; *see also United States v. Koon*, 34 F.3d 1416, 1444 (9th Cir. 1994), *aff'd in part, rev'd in part*, 518 U.S. 81 (1996) (cleaned up) ("[a]n appeal to the jury to be the conscience of the community is not impermissible unless it is specifically designed to inflame the jury."). Here, Smith has not presented—and the Court cannot imagine—any situation where it would not be inflammatory to argue to the jurors that they are acting as "guardians of the community" or are otherwise tasked with protecting the community. The Court therefore grants the Officers' motion in limine no. 23, (Dckt. #573).

### n. The Officers' motion in limine no. 24 is denied.

The Officers move to bar Smith from introducing evidence of his COI and any reference thereof. (Dckt. #594). In support, the Officers argue that Smith's COI is: (1) not probative of the "favorable termination" element of Smith's malicious prosecution claim; (2) inadmissible hearsay; and (3) unfairly prejudicial. Because this Court recently granted summary judgment to the Officers on Smith's malicious prosecution claim, the Officer's argument that Smith's COI is not probative to the favorable termination element of a malicious prosecution claim is moot. (*See* Dckt. #678). The Court rejects the Officers' remaining arguments.

Again, a COI entails a finding by a state-court judge that a criminal defendant has shown by a preponderance of the evidence that he is "innocent of the offenses charged in the indictment

or information" of a state felony conviction that has been reversed or vacated, 735 ILCS 5/2-702(g). The primary purpose of a COI "is to remove legal obstacles that prevent a wrongly convicted person from receiving relief in the Illinois Court of Claims." *Patrick*, 974 F.3d at 833 (citing 735 ILCS 5/2-702(a)).

The Officers argue that the COI and "any declarations (or 'findings') therein" are inadmissible hearsay. (Dckt. #594 at 3). However, there is authority to support the proposition that COIs fall within the public record exception of Federal Rule of Evidence 803(8). *See Kluppelberg v. Burge*, 84 F.Supp.3d 741, 746–47 (N.D.Ill. 2015) (citing cases). The *Kluppelberg* court reasoned that a COI is necessary evidence of plaintiff's injury, which "included the need to apply for and obtain the COI." *Id.* at 746. "[T]he application for the COI is part of the narrative of this case[;]" it is admissible "under Rule 803(8) as evidence of the extent of injury to the plaintiff." *Id.* Other courts within this District are in agreement. *See Brown*, 2023 WL 2640317, at *2 ("This court, consistent with others in this Circuit, finds that the Certificate of Innocence is a public record within the meaning of Rule 803(8)."); *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 11887787, at *3 (N.D.Ill. Mar. 29, 2017) ("the Court can take judicial notice of the fact that the [COI] issued" and "other courts in this district have concluded that the existence of a Certificate of Innocence falls under the public record exception of [Rule] 803(8)."). The Officers' argument that Smith's COI must be barred because it is inadmissible hearsay is thus without merit.

The Officers also contend that the COI is "not probative of any of Plaintiff's federal claims," and should be barred under Rule 403. (Dckt. #594 at 9). The Court disagrees and first finds that the COI is relevant evidence. Where—as here—the Officers will be arguing that Smith is guilty of the underlying crimes and Smith, in turn, intends to argue his innocence, Smith

"is entitled to offer evidence to support his claims of innocence, including the COI." *Chatman v.
City of Chicago*, No. 14 CV 2945, 2018 WL 11426432, at *3 (N.D.Ill. Oct. 11, 2018).[14]
Moreover, as the court suggested in *Kluppelberg*, the COI might help focus a jury on the
materiality of the plaintiff's due process claim, rather than on his actual guilt or innocence.
*Kluppelberg*, 84 F.Supp.3d at 747. Finally, the COI "could be very significant" at the damages
phase of the trial "if as anticipated the defense plans to minimize damages by showing evidence
that [plaintiff] committed the crime." *Id.*

The Court further finds that the COI is admissible notwithstanding the concerns
embodied by Rule 403, which permits a court to exclude relevant evidence if its probative value
is substantially outweighed by the risk of unfair prejudice, confusing the issues, or misleading
the jury. The Seventh Circuit has held that COIs are not "categorically inadmissible," and
indeed affirmed the admittance of a COI into evidence notwithstanding that a COI "carries a risk
of unfair prejudice if misunderstood," including the possibility of confusing the issues or
misleading the jury. *Patrick*, 974 F.3d at 833. As another court has noted, the possibilities of
unfair prejudice are mitigated by the fact that the Officers will have an opportunity to inform the
jury about the "infirmities surrounding the COI" including that they "were not a party to the COI
proceedings, were not made aware of such proceedings, and were not given an opportunity to
participate in or object to the Certificate." *Brown*, 2023 WL 2640317, at *2. The Officers will

---

[14] In one case cited by the Officers where the court granted the defendant officers' motion to
exclude a COI, the court included the following caveat: "since the Court will exclude the COI, it
will also bar Defendants from implying that the prosecution could have secured another
conviction but declined for a reason other than Plaintiff's guilt or innocence. Doing so will open
the door to the COI. Either both sides may address the substance of posttrial proceedings or
neither side can." *Brown*, 2024 WL 5438519, at *15. Unlike in *Brown*, there is no reason to
wait to determine the admissibility of the COI because both sides fully intend to litigate the issue
of whether Smith was, in fact, guilty of the murders.

also be free to point out that the Special Prosecutor was unaware of certain evidence (namely, the picture of Smith's bloody underwear at the scene) that likely impacted his position regarding whether to oppose the COI. *Id.* In sum: because the Officers "will be able to challenge the probative value of [Smith's] Certificate of Innocence to the jury, the court does not believe that the risk of prejudice is so great as to call for its exclusion at trial." *Id.*

Finally, woven throughout the Officers' motion is the argument that Smith's COI is inadmissible because the jury will not be able to properly weigh it against other evidence presented in the case. (Dckt. #594 at 9 ("No matter what instruction the Court could craft, the jury will ignore any reasoned analysis regarding the evidence that relates to the actual claims in this case.")). However, the Officers incorrectly conflate admissibility with *res judicata*, which is prohibited by statute and precedent. The COI statute provides that the certificate will not have *res judicata* effect in any other court not mentioned in the statute, and courts have repeatedly acknowledged this principle. *See* 735 ILCS 5/1-702(j); *Chatman*, 2018 WL 11426432, at *4 ("the COI does not have any preclusive effect on any of the issues in this case—the jury will have the prerogative to weigh it along with all other evidence to render its verdict as to [plaintiff's] claims."); *Harris*, 2017 WL 11887787, at *2 (same).

Additionally, the state court was not asked to decide the issues that will be presented to the jury, including whether Smith's constitutional rights were violated and whether the Officers fabricated evidence or coerced his confession. *See also Gray*, 2023 WL 7092992, at *12 ("on balance, the certificate is admissible against Rule 403 concerns."). The Court thus denies the Officers' motion in limine no. 24, (Dckt. #594). The Court's ruling in this regard does not preclude the Officers from requesting an appropriate limiting instruction regarding the COI. *See*

*Patrick*, 974 F.3d at 833 (citing with approval the limiting instruction in *Harris*, 2018 WL 2183992, at *4–6)).

### o. The Officers' motion in limine no. 25 is denied in part and the Court reserves ruling in part.

The Officers move to bar Smith from asking leading questions and treating non-defendant officers Ronald Gaines, Frank DeMarco, Warren Hughes, and Lawrence Gates, crime lab employees Christine Anderson and Pamela Fish, and Assistant State's Attorney ("ASA") Patricia Woulfe as adverse witnesses. (Dckt. #574). The Officers argue that these witnesses had minimal involvement in the investigation and prosecution of Smith's case and should not be treated as adverse unless their testimony at trial turns hostile and proves otherwise. Smith responds that each of these witnesses had a hand in the incident leading to this case and qualify as adverse witnesses. The Court agrees in part.

Under Federal Rule of Evidence 611(c), while leading questions typically should not be used on direct examination, they may be employed "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed.R.Evid. 611(c). "The normal sense of a person identified with an adverse party has come to mean, in general, an employee, agent, friend, or relative of an adverse party." *Ratliff v. City of Chicago*, No. 10-CV-739, 2013 WL 3388745, at *6 (N.D.Ill. July 8, 2013) (cleaned up). "When the city is a defendant to a §1983 claim, police officers employed by the city and who were present during portions of the incident at issue are 'clearly qualified as a witness identified with an adverse party" for purposes of Rule 611(c). *Ratliff*, 2013 WL 3388745, at *6, *quoting Ellis v. City of Chicago,* 667 F.2d 606, 613 (7th Cir. 1981). Applying this standard here, the Court orders as follows.

First, the Officers' motion is denied as moot with respect to former ASA Woulfe because she will not be testifying live at the trial.  (*See* Dckt. #683 at 7 (identifying Woulfe as a witness who is outside the Court's jurisdiction and will not offer live testimony)).

Second, the Court denies the Officers' motion with respect to non-defendant Officers Gaines, DeMarco, Hughes, and Gates.  Although these Officers may not have been directly involved in obtaining Smith's *confession*, they "each had a hand in the ordeal which gave rise to the lawsuit." *Ratliff*, 2013 WL 3388745, at *7.  Indeed, as the Officers concede, Officer Hughes was a first responder to the scene and later helped Smith from the crime scene; Officer Gates was a bomb and arson investigator who investigated the cause and origin of the fire; Officer DeMarco was a technician who photographed the crime scene and plaintiff himself; and Officer Gaines interviewed Smith's alibi witnesses and submitted the kitchen knife to the crime lab. (*See* Dckt. #574 at 3 (describing the involvement)).  Accordingly, these officers, "by virtue of their employment with Defendant City of Chicago, by their involvement (even if tangential or limited) with the case, and by their relationship with the Defendant Officers as their co-workers, clearly qualif[y] as 'witness(es) identified with an adverse party' for purposes of Rule 611(c)." *Ratliff*, 2013 WL 3388745 at*7; *see also Pryor*, 2023 WL 1100436, at *21 ("Plaintiff can call adversely any police officers from the City of Aurora who worked on Plaintiff's case in any capacity.").

Finally, the Court reserves ruling on whether Smith may treat crime lab employees Anderson and Fish as adverse witnesses.  On the instant record, the Court agrees that their involvement in the incident at issue appears to be more attenuated than that of the non-defendant officers.  If, however, during the course of Anderson and/or Fish's testimony it becomes apparent that either one of them is hostile to Smith, the Court will consider allowing plaintiff's

counsel to treat them as adverse and ask leading questions. *See Washington v. Illinois Dep't of Revenue*, No. 01-3300, 2006 WL 2873437, at *1 (C.D.Ill. Oct. 5, 2006) (noting that an adverse witness "classification usually involves a showing by the examining party that the witness is biased against the direct examiner, his/her client or both and often is demonstrated by examples of that witness's demeanor.") (cleaned up).

For these reasons, the Officers' motion in limine no. 25, (Dckt. #574), is denied in part (as to Woulfe and the non-defendant Officers) and the Court reserves ruling in part (as to the crime lab employees).

### p. The Officers' motion in limine no. 26 is denied.

The Officers' motion in limine no. 26 seeks to bar "reference, argument, or insinuation to the kitchen knife as the murder weapon." (Dckt. #575 at 1). The Officers argue that there is no evidence that the knife was the murder weapon and Smith argues the opposite.

It is the Officers' position that the knife was used by CFD or CPD to cut the carpet at the crime scene near where the fire originated and that the knife yielded negative results for blood at the CPD crime lab, thus excluding it as the potential weapon. Smith responds by arguing that the Officers are only speculating that the knife was used to cut a carpet sample and lists evidence suggesting that the knife could have been the murder weapon, including:

- Two CPD patrol officers filled out a general offense case report and identified the murder weapon as "a knife."

- One of the patrol officers testified at his deposition that he believed he saw a knife on the crime scene floor near where the bodies were found and the knife's positioning and location indicated that it was used as the murder weapon.

- CPD Fire Marshal Lumsden photographed the knife near the gas can used to start the fire and near the fire's origin.

- Lumsden repeatedly used the phrase "knife wounds" in his initial case report to describe the wounds on the victims, and testified that he was trained to write his reports with precision.

- Two detectives found the knife "while searching through the debris and ashes in the house" and collected it, after which detective Gaines sent it to the CPD crime lab for blood and fingerprint testing.

- The CPD serologist only performed a "preliminary chemical test for blood" and never sent it for additional testing.

- The knife's inventory and evidence reports are missing.

- Smith's criminal defense attorney filed a discovery request for a list of all physical property in law enforcement's possession and that such evidence be made available for inspection, but the knife was not mentioned in the State's discovery responses.

- The ASA in charge of discovery for Smith's criminal case testified that she was not aware there was a knife on the crime scene floor, had never seen an inventory report related to the knife, and "apparently" did not disclose the knife or photo of the knife to Smith's defense attorney.

- CPD destroyed the knife three months after Smith's defense counsel sent the discovery request.

- CPD destroyed the knife in a way not consistent with CPD's official methods which required either a court disposal order or CPD tracer form, but the knife was destroyed without either.

(Dckt. #633 at 2–4, 6–7). Furthermore, Smith contends that the knife is relevant to his transcribed confession which states that a razor was used to murder the victims, but that no razor was ever located. (*Id.* at 4–5).

The parties are clearly at odds about the significance of the knife, but Smith presents evidence that the knife was at the crime scene; multiple CPD and CFD officials believed the victims were killed with a knife; the knife was considered relevant to the investigation insofar that CPD had it tested and thought it should be inventoried, and Smith will be able to present and argue this evidence to the jury. If the jury believes that the knife was the murder weapon, it will

necessarily conflict with Smith's transcribed confession, which states that a razor blade was used. The Court is thus not persuaded by the Officers' contention that there is "no evidence" that the knife was the murder weapon.

The Officers argue that they would be unfairly prejudiced by an argument that the knife was the murder weapon because "it had never been even insinuated that the kitchen knife was used in the murders," and for Smith to suggest as such now would mislead the jury. (Dckt. #575 at 5). The Officers' argument misses the mark because Smith contends that he was unable to argue that the knife was the murder weapon because he did not know about its existence. Moreover, non-defendant CPD officers identified a knife as the murder weapon and the CFD Fire Marshal indicated that the victims had knife wounds.

Of course, without evidence tying the Officers to the knife's destruction, the Officers may not be "held directly liable or be assessed damages based on the conduct of other non-defendant [CPD and CFD] officers." *Gomez v. City of Chicago*, No. 13 CV 5303, 2015 WL 13651138, at *8 (N.D.Ill. June 29, 2015). But, because the knife is directly relevant to rebutting the veracity of Smith's transcribed confession, which is relevant to his coerced confession and fabrication claims, the evidence is admissible. The Officers' motion in limine no. 26, (Dckt. #575), denied.

### q. The Officers' motion in limine no. 28 is granted in part and denied in part.

The Officers ask the Court to bar the showing of video deposition clips in opening statements, closing arguments, and for other purposes beyond impeachment and to present the testimony that the parties and Court pre-determine will be presented by video in lieu of a live witness. The Officers argue that permitting video testimony during opening statement and closing argument would be "unfairly prejudicial because it emphasizes testimony that is

presented by video through repetition, and that opportunity does not exist for a live witness."
(Dckt. #576 at 1). In response, Smith attacks the Officers' case law and argues against a per se
ban on video deposition testimony in opening and closing arguments. Within its discretion, the
Court grants the Officers' motion in part.

As the Officers note, case law regarding the propriety of presenting video deposition
testimony during opening and closing statements is not particularly abundant. However, in
*Hynix Semiconductor Inc. v. Rambus Inc.*, No. C-05-00334 RMW, 2008 WL 190990, at *1
(N.D.Cal. Jan. 21, 2008), the court granted defendant's motion to bar plaintiff from presenting
video deposition testimony during opening statements. In doing so, the court explained that:

> Videotaped testimony may seem more believable or important to the lay jury
> because it can both see and hear the witness. During argument, [defendant]
> submitted that it cannot "preview" what its live witnesses will look like and testify
> to; it can only generally describe what it hopes to elicit. On the other hand, if
> unrestricted, a video deposition can be shown once in opening, again during trial
> (at least once), and in closing in the exact same form. Repeatedly showing the same
> few deposition segments seems to exalt the relevance of those videotaped shreds of
> evidence over live testimony.

*Id*. at *1. The Court thus barred either party from presenting video deposition testimony in
opening statements and a number of other courts have followed suit. *See, e.g.*, *Doe v. City of San
Diego*, No. 12CV689-MMA (DHB), 2014 WL 11997809, at *6 (S.D.Cal. July 25, 2014);
("In accord with the majority of courts, the Court is strongly against [permitting video deposition
testimony during opening argument]"); *Farris v. Int'l Paper Inc.*, No. 2:13-CV-02079-CAS,
2014 WL 6473273, at *24 (C.D.Cal. Nov. 17, 2014) ("The Court's general practice is that,
absent an agreement between the parties, videotaped testimony may not be offered during
opening argument"); *Beem v. Providence Health & Servs.*, No. 10-CV-0037-TOR, 2012 WL
13018728, at *2 (E.D.Wash. Apr. 19, 2012) ("What Plaintiff proposes to do, is to introduce
evidence during opening statement. The Court will not allow the showing of video deposition

excerpts during opening statement."); *Wyatt Tech. Corp. v. Malvern Instruments*, Inc., No. CV078298ABCMANX, 2010 WL 11505684, at *22 (C.D.Cal. Jan. 25, 2010) ("The Court agrees that opening arguments is not the time to play excerpts of video-taped depositions."); *but see Sadler v. Advanced Bionics, LLC*, No. 3:11-CV-00450-TBR, 2013 WL 1340350, at *3 (W.D.Ky. Apr. 1, 2013) (providing that the court "may" consider allowing the parties to utilize videotaped deposition testimony during opening statements); and *Smith v. I-Flow Corp.*, No. 09 C 3908, 2011 WL 12627557, at *4 (N.D.Ill. June 15, 2011) (denying motion to bar video testimony in opening statements without elaboration, but requiring the parties to disclose the portions they intended to use in advance of trial).

In sum: the Court finds the reasoning of *Hyinx* and its progeny sound and it bars the use of video deposition testimony during opening statements.

The Court, in its discretion, reaches the opposite conclusion with respect to the use of video deposition testimony during closing arguments. *See Empress Casino*, 831 F.3d at 836 (holding that courts have "broad discretion" to control closing arguments.). As one court has noted, "there is no per se ban on the use of video excerpts of depositions in closing arguments," *K.C. ex rel. Calaway v. Schucker*, No. 02-2715-STA-CGC, 2013 WL 5972192, at *7 (W.D.Tenn. Nov. 8, 2013), and—unlike with opening statements—any video testimony used during closing arguments will have already been admitted into evidence. Accordingly, the Court will deny the Officers' request to bar plaintiff presenting video deposition testimony during his closing argument.

For these reasons, the Officers' motion in limine no. 28, (Dckt. #576), is granted in part and denied in part.

### r. The Officers' motion in limine no. 29 is granted.

The Officers seek to bar any evidence, argument, or reference relating to the substance of Judge Kennelly's subsequently reversed opinion in *Richardson v. Briley* regarding defendant Solecki's credibility. In *Richardson*, Judge Kennelly granted the plaintiff's habeas petition after a hearing, finding, *inter alia*, that Solecki was "utterly lacking in credibility based both on his demeanor and the content of his testimony" when he testified to whether witnesses tentatively or positively identified Richardson in a lineup. *Richardson v. Briley*, No. 00 C 6425, 2004 WL 419902, at *12 (N.D.Ill. Feb. 10, 2004), *rev'd*, 401 F.3d 794 (7th Cir. 2005), *as modified* (Aug. 8, 2006). The Officers anticipate that Smith will seek to impeach Solecki's credibility or introduce prior act evidence at trial by introducing evidence of the *Richardson* opinion and asks the Court to exclude such evidence. The Court grants this request over Smith's objection.

First, as the Officers point out, the Seventh Circuit reversed Judge Kennelly's decision and vacated the writ of habeas corpus rendering both his ruling and the factual underpinnings— including the related credibility findings—a legal nullity. *See Brisco v. Stinar*, 2020 WL 7027719, *4, *8 (N.D.Ill. Nov. 30, 2020) ("[A] vacated judgment is vacated for every purpose" and "when a judgment is vacated, the factual findings underlying that judgment are vacated, too"); *see also United States v. Williams*, 904 F.2d 7, 8 (7th Cir. 1990) (holding that when a judgment is vacated "the effect is to nullify the judgment entirely and place the parties in the position of no trial having taken place at all"). It is of no moment—as Smith contends, without support—that the Seventh Circuit vacated a writ of habeas corpus, as opposed to a more routine civil or criminal judgment, because the practical effect of reversing Judge Kennelly's opinion remains the same.

Accordingly, the Officers' motion in limine no. 29, (Dckt. #597), is granted.

### s.   The Officers' motion in limine no. 30 is granted in part and denied in part.

The Officers seek to bar any evidence, argument, or reference to defendant Pedersen's:

(1) federal prosecution and 1992 conviction for, among other things, fraud by wire,[15] in

connection with unlawfully accessing the National Crime Information Center ("NCIC") database

maintained by the FBI and disclosing records from that database; (2) his related resignation from

CPD;[16] (3) his sustained complaint register ("CR") file related to his criminal conviction, and (4)

his sustained CR file for violating the terms of his medical leave.

The Court first turns to Pedersen's federal prosecution and 1992 conviction related to the

NCIC database.  Federal Rule of Evidence 609 permits evidence of a criminal conviction for

purposes of "attacking a witness's character for truthfulness."  Fed.R.Evid. 609.  Under Rule

609(a)(2), Pedersen's crimes may be admitted if "a dishonest act or false statement" was an

element of the crime.  Fed.R.Evid. 609(a)(2).  Pedersen's prior conviction for wire fraud

undoubtedly falls into that category.  *See United States v. Johnson*, No. 19 CR 405, 2024 WL

1486760, at *2 (N.D.Ill. Apr. 5, 2024) (finding the defendant's prior conviction for wire fraud

was a crime which involved proving "a dishonest or false statement" under Rule 609(a)(2)).

Even so, where, as here, more than ten years have passed since the date of conviction, the

conviction is admissible under Rule 609(b) only if its probative value substantially outweighs its

prejudicial effect.  Fed.R.Evid. 609(b).  Smith argues that this is an appropriate case to apply

---

[15] (*See* Dckt. #505-20 at 8 (Pedersen Deposition Transcript)).

[16] Although the Officers seek to exclude evidence and reference to Pedersen's resignation from CPD, they do not develop this argument in their motion, therefore it is waived.  *Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019) (underdeveloped and unsupported arguments are waived) (citing *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.")).  Smith may offer evidence or argument regarding Pedersen's resignation from the CPD related to his federal conviction.

Rule 609(b) because the probative value of Pedersen's conviction substantially outweighs any prejudicial effect it may have. The Court agrees.

The Court finds that Pedersen's conviction is relevant to his character for truthfulness, and that his credibility is a critical factor in this case given the contradictions between his testimony and Smith's testimony regarding Smith's interrogation and confession. Thus, the probative value of Pedersen's conviction is high, and it substantially outweighs its prejudicial effect. *See United States v. Redditt*, 381 F.3d 597, 601 (7th Cir. 2004) (holding the district court did not abuse its discretion where it determined that the probative value of a 1992 conviction outweighed any prejudicial effect where credibility was a critical issue in the case.)

The Officers nonetheless argue that there is no probative value of Pedersen's conviction because the charges and conviction took place after Smith's criminal trial; there is no evidence that Pedersen tried to enrich himself through the investigation or that he attempted to steal sensitive information as part of the investigation into Smith; and the allegations in this case are otherwise unrelated to the crime that Pedersen pled guilty to. But Rule 609(b) does not require Smith to establish that Pedersen's conviction preceded his trial, or that Pedersen's crime was related to Smith, or that he committed the crime to enrich himself. Nor do the Officers cite any authority in support of their position. Accordingly, the Court rejects these arguments, particularly in light of its finding that Pedersen's truthfulness is a critical factor in this case.

The Officers also seek to bar evidence related to Pedersen's two sustained CRs. The Officers argue that the CRs would be impermissible propensity evidence under Federal Rule of Evidence 404(b) or more prejudicial than probative under Federal Rule of Evidence 403. Smith responds that he does not intend to introduce Pedersen's sustained CR complaints as propensity evidence under Rule 404(b), but rather, Rule 608, which permits any questions on cross-

examination that relate to specific instances of misconduct in the witness's past so long as they are probative of the witness's character for truthfulness and untruthfulness. Fed.R.Evid. 608(b). The admission of such evidence is tempered by Rule 403, under which the Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice. Fed.R.Evid. 403.

The Court agrees with Smith that Pedersen's sustained CR related to his 1992 conviction is probative of his truthfulness, and that its probative value outweighs the potential that the jury will use this information to infer he is a "bad person," as the Officers suggest. *See Casares v. Bernal*, 790 F.Supp.2d 769, 778–79 (N.D.Ill. 2011) (allowing in sustained CR against an officer where the fact that officer had been untruthful in the past regarding the reasons for their use of force was probative of their truthfulness); *Battle v. O'Shaughnessy*, No. 11 C 1138, 2012 WL 4754747, at *4 (N.D.Ill. Oct. 4, 2012) (permitting cross-examination as to a sustained CR which involved a claim of putting false information on a police report, which was probative of the defendant's character for truthfulness).

The Court however grants the Officers' motion with respect to Pedersen's sustained CR for violating the terms of his medical leave. The fact that Pedersen left his house for a medical appointment, but did not alert the police department, is not probative of his character for truthfulness. The Court's ruling is limited to the two sustained CRs raised by the Officers. To the extent the parties raise any additional CRs, they will be addressed at the pre-trial conference or when they are sought to be introduced at trial.

The Officers' motion in limine no. 30, (Dckt. #598), is therefore granted in part and denied in part.

### t. The Officers' motion in limine no. 31 is denied.

The Officers' motion in limine no. 31, (Dckt. #577), seeks to bar Smith from using the City's Rule 30(b)(6) witness's video deposition at trial. The City offered Dachae Blanton as its Rule 30(b)(6) witness to testify about the destruction of the kitchen knife found at the crime scene and the applicable General Order G.O. 81-1 (which was in effect at the time of Smith's arrest and the knife's destruction).

The Officers argue that Blanton's deposition should be barred if the Court grants summary judgment on Smith's destruction of evidence claim, but in the alternative, Blanton's deposition should be barred because Blanton is not "unavailable" under Federal Rule of Evidence 804(a) and plaintiff should instead be required to call Blanton as a live witness to testify at trial in lieu of presenting her deposition testimony. The Officers also request the opportunity to supplement their briefing, if necessary, based on this Court's summary judgment ruling. Smith responds that Blanton's testimony is admissible regardless of this Court's ruling on the Officers' motion for summary judgment pursuant to Federal Rule of Civil Procedure 32(a)(3) or Federal Rule of Evidence 801(d)(2)(A), (C), and (D). (Dckt. #638). For the following reasons, the Officers' motion to bar Blanton's deposition testimony is denied and the Court does not require supplemental briefing.

Federal Rule of Civil Procedure 32(a)(3) provides that "[a]n adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)." Fed.R.Evid. 32(a)(3); *Merchants Motor Freight v.* Downing, 227 F.2d 247, 249–50 (8th Cir. 1955) (the Rule is broad and "has been liberally interpreted" (citing previous iteration of Rule 32(a)(3)); *Fey v. Walston & Co.*, 493 F.2d 1036, 1046 (7th Cir. 1974) (the "pre-trial deposition of a party is in a position

different from that of an ordinary witness, and may be introduced as a part of the adversary's substantive proof irrespective of the fact that the party is available to testify or has testified at the trial."); *Pingatore v. Montgomery Ward & Co.*, 419 F.2d 1138, 1142 (6th Cir. 1969) (holding that the deposition of a party to a suit may be used by an adverse party for any purpose at the trial "even though the party was present at the trial and testified orally."); *Zimmerman v. Safeway Stores, Inc.*, 410 F.2d 1041, 1044 n.5 (D.C. Cir. 1969) (holding that "the deposition of an adverse party may be introduced as original evidence"); *Luxco, Inc. v. Jim Beam Brands Co.*, No. 14 C 0349, 2016 WL 6193794, at *6 (N.D.Ill. Oct. 24, 2016) (same, citing *Fey*). Furthermore, "the decision to admit deposition testimony is within the sound discretion of the district court." *Boston Scientific Corp. v. Cook Med. LLC*, No.17 CV 3448, 2023 WL 3604030, at *5 (S.D.Ind. May 22, 2023), *quoting Oostendorp v. Khanna*, 937 F.2d 1177, 1179 (7th Cir. 1991).

Here, Smith has claims against the City for indemnification and *respondeat superior* (in addition to Smith's *Monell* claim, which remains bifurcated). The City is therefore an adverse party and Blanton's deposition falls squarely within Rule 32(a)(3). Thus, Smith does not need to establish Blanton's unavailability in order to present her deposition at trial. *See, e.g., Pingatore*, 419 F.2d at 1142; *Luxco*, 2016 WL 6193794, at *6–7. Because Blanton's testimony is admissible under Rule 32(a)(3), the Court need not address Smith's alternative argument that it is admissible under Federal Rule of Evidence 801(d)(2). The Officers' motion in limine no. 31 to bar the City's Rule 30(b)(6) witness's video deposition at trial, (Dckt. #577), is denied.

## CONCLUSION

For the foregoing reasons, the parties' motions in limine discussed herein are granted in part, denied in part, and reserved for ruling in part. The Court will not recite its rulings on the parties' numerous motions in limine in this conclusion. Instead, the Court trusts that the parties

will carefully review this opinion and fully comply with the rulings stated herein during trial. If there are any questions about the parameters of the Court's rulings, the counsel for the parties are directed to raise them at the final pretrial conference or prior to the start of the testimony on each trial day.

**Dated: June 24, 2025**

**Jeffrey I. Cummings**
**United States District Judge**